**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| YATRAM INDERGIT, on behalf of himself and others similarly situated,<br><br>    Plaintiff,<br><br>    vs.<br><br>RITE AID CORPORATION, RITE AID OF NEW YORK, INC. and FRANK OFFOR as Aider & Abettor,<br><br>    Defendants. | **08 Civ. 9361 (JPO) (HBP)**<br>**ECF Case** |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Daniel E. Turner
Tracey T. Barbaree
Beth A. Moeller
**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
One Ninety One Peachtree Tower
191 Peachtree Street, N.E.
Suite 4800
Atlanta, Georgia  30303
Telephone:  (404) 881-1300
daniel.turner@ogletreedeakins.com
tracey.barbaree@ogletreedeakins.com
beth.moeller@ogletreedeakins.com

Patrick G. Brady
Suzanne K. Brown
**EPSTEIN BECKER & GREEN, P.C.**
250 Park Avenue
New York, NY 10177-1211
Telephone:  (212) 351-4500
Facsimile:  (212) 878-8600
One Gateway Center
Newark, New Jersey 07102-5311
Telephone:  (973) 642-1900
Facsimile:  (973) 639-8556
pbrady@ebglaw.com
skbrown@ebglaw.com

*Counsel for Defendants Rite Aid Corporation*
*and Rite Aid of New York, Inc.*

**TABLE OF CONTENTS**

I.   INTRODUCTION ......................................................................................................... 1

II.  ARGUMENT AND CITATION TO THE RECORD AND AUTHORITIES ......................... 3

   A.  Plaintiff's NYLL Claims Cannot Satisfy Rule 23's Requirements .................................... 3

      1.  *Hertz* confirms Plaintiff's NYLL claims cannot be certified. ....................................... 4

      2.  Other Courts Rely on *Hertz* and *Dukes* to Deny Certification of
          Misclassification Claims. ............................................................................................. 7

      3.  The Court's Prior Summary Judgment Order Similarly Requires Denial of
          Plaintiff's Motion. ...................................................................................................... 11

   B.  Commonality, Typicality, and Predominance Are Not Satisfied on This Record. .......... 13

      1.  Store Managers Are In Charge of Multi-Million Dollar Operations With Wide
          Variations in the Job Duties They Perform. ............................................................... 16

          a.  Store Managers Have Responsibility for the Overall Success of Their Stores. ..... 16

          b.  SMs' Own Descriptions of Their Job Duties Differ. ........................................... 21

      2.  Plaintiff's Purported "Corporate Control" Theory Is Belied By The
          Record Evidence. ....................................................................................................... 25

          a.  Rite Aid's Policies and Procedures Do Not (And Could Not) Run the Store. ....... 25

          b.  SMs Testified They Run Their Stores, Not DMs .................................................. 27

          c.  The Use of Labor Budgets Does Not Support Class Certification. ....................... 29

          d.  SMs Do Not Receive Uniform Training, Nor Would It Change the Need to
             Consider Their Actual Duties. ............................................................................ 31

          e.  Business Decisions to Classify SMs as Exempt, and Later as Both Exempt
             and Non-exempt, Do Not Support Class Certification. ....................................... 32

          f.  Indergit's RFA responses confirm that mini-trials would be inevitable. .............. 34

III. CONCLUSION ............................................................................................................. 35

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Dolgencorp of NY, Inc.,*
  Nos. 1:09-cv-360, 1:09-cv-363, 2011 WL 1770301 (N.D.N.Y. May 9, 2011) ...................... 12

*Aquilino v. Home Depot, U.S.A., Inc.,*
  04-4100-PGS, 2011 WL 564039 (D.N.J. Feb. 15, 2011) ...................................................... 16

*Aramony v. United Way,*
  254 F.3d 403 (2d Cir. 2001) ................................................................................................ 11

*Basco v. Wal-Mart Stores,*
  No. 00-3184, 2004 WL 1497709 (E.D. La. July 2, 2004) .................................................... 31

*Beauperthuy v. 24 Hour Fitness USA, Inc.,*
  772 F. Supp.2d 1111 (N.D. Cal. 2011) ............................................................................. 9, 15

*Bernard v. Household Int'l, Inc.,*
  231 F. Supp. 2d 433 (E.D. Va. 2002) ................................................................................... 31

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ............................................................................................................... 4

*Chowdhury v. Duane Reade, Inc.,*
  2007 WL 2873929 (S.D.N.Y. Oct. 2, 2007) ........................................................................ 10

*Clarke v. JP Morgan Chase Bank,*
  No. 08-Civ-2400, 2010 WL 1379778 (S.D.N.Y. Mar. 26, 2010) ......................................... 34

*Clougher v. The Home Depot,*
  696 F. Supp. 2d 285 (D.N.J. 2010) ...................................................................................... 11

*Cruz v. Dollar Tree Stores, Inc.,*
  Nos. 07-2050SC, 07-4012SC, 2011 WL 2682967 (N.D. Cal. July 8, 2011) ............... 8, 15, 27

*Cuevas v. Citizens Fin. Grp., Inc.,*
  283 F.R.D. 95 (E.D.N.Y. 2012) ........................................................................................... 10

*Damassia v. Duane Reade, Inc.,*
  250 F.R.D. 152 (S.D.N.Y. 2008) .................................................................................. 5, 8, 10

*Deane v. Fastenal Co.,*
  Case. No. 11-CV-0042 (N.D. Cal. Sept. 26, 2012) ................................................................ 9

*Devilla v. Schriver,*
  245 F.3d 192 (2d Cir. 2001) ................................................................................................ 11

*Diaz v. Elec. Boutique of Am., Inc.*,
   04-CV-0840E(SR), 2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005)......................................... 13

*Donovan v. Burger King Corp.*,
   675 F.2d 516 (2d Cir. 1982) ................................................................................................. 12, 16

*Gardner v. Western Beef Properties, Inc.*,
   No. 07-CV-2345, 2011 WL 6140518 (E.D.N.Y. Sept. 26, 2011)................................ 7, 14, 27

*Gen. Tel. Co. v. Falcon*,
   457 U.S. 147 (1982) ...................................................................................................................... 4

*Gordon v. Rite Aid Corp*,
   1:09-cv-07665-PGG (S.D.N.Y. Mar. 12, 2012)................................................................. 11, 16

*Grace v. Family Dollar Stores, Inc.*,
   637 F.3d 508 (4th Cir. 2011) ....................................................................................................... 9

*Guillen v. Marshalls*,
   750 F. Supp. 2d 469 (S.D.N.Y. 2010) .................................................................................. 8, 27

*Hearn v. Rite Aid Corp.*,
   Docket No. A-2009-10T1 (N.J. Super. Ct. App. Div. Mar. 27, 2012)...................................... 9

*Hearn v. Rite Aid Corp.*,
   No. SSX-L-429-06, 2010 WL 4552975 (N.J. Super. L. Nov. 1, 2010), *aff'd* in part, *rev'd*
   in part by 2012 WL 996603 (N.J.Super.A.D. Mar. 27, 2012) ................................................... 9

*Hernandez v. United Auto Credit Corp.*,
   2010 WL 1337702, at *4-5 (N.D. Cal. Apr. 2, 2010) ........................................................... 27

*In re Crysen/Montenay Energy Co.*,
   226 F.3d 160 (2d Cir. 2000)...................................................................................................... 11

*In re Nassau County Strip Search Cases*,
   461 F.3d 219 (2d Cir. 2006)...................................................................................................... 32

*In re Wells Fargo Home Mort. Overtime Pay Litig. (Wells Fargo II)*,
   268 F.R.D. 604 (N.D. Cal. 2010) ............................................................................................. 15

*In re Wells Fargo Mortgage Overtime Pay Litig.*,
   571 F.3d 953 (9th Cir. 2009.).......................................................................................... 5, 9, 32

*Johnson v. Big Lots Stores, Inc.*,
   604 F.Supp. 2d 903 (E.D. La. 2009) ....................................................................................... 11

*Knott v. Dollar Tree Stores*,
   No. 06-cv-1553-LSC, 2012 WL 4341816 (N.D. Ala. Sept. 19, 2012) .................................... 24

*Kopera v. Home Depot, U.S.A., Inc.*,
  09-Civ-8337(WHP), 2011 WL 135016 at **4, 6 (S.D.N.Y. Jan. 11, 2011) ...................... 8, 10

*Moore v. Painewebber,*
  306 F.3d 1247 (2d Cir. 2002) ............................................................ 14

*Myers v. Hertz,*
  624 F.3d 537 (2d Cir. 2010), *cert. denied,* 132 S.Ct. 368 (U.S. 2011) ........................... passim

*Myers v. Hertz Corp.,*
  No. 02-CV-4325 (DRH)(MLO), slip op. (E.D.N.Y. May 18, 2006) ..................................... 14

*Novak v. Home Depot, U.S.A., Inc.,*
  259 F.R.D. 106 (D.N.J. 2009) ...................................................... 15, 16

*Ruggles v. Wellpoint, Inc.,*
  272 F.R.D. 320 (N.D.N.Y. 2011) .................................................... 14, 27

*Scott v. SSP Am., Inc.,*
  No. 09-CV-4399, 2011 WL 1204406 (E.D.N.Y. Mar. 29, 2011) ......................................... 10

*Smith v. Heartland Auto. Serv., Inc.,*
  404 F. Supp. 2d 1144 (D. Minn. 2005) .............................................. 16

*Tahir v. Avis Budget Grp., Inc.,*
  09-3495-SRC, 2011 WL 1327861 (D.N.J. Apr. 6, 2011) .................................... 5, 11

*Tierno v. Rite Aid Corp.,*
  2006 WL 2535056 (N.D. Cal. Aug. 31, 2006) ..................................................... 8, 9

*Vasquez v. Vitamin Shoppe Ind., Inc.,*
  No. 10-cv-8820, 2011 WL 2693712 (S.D.N.Y. July 11, 2011) .............................. 32

*Vinole v. Countrywide Home Loans, Inc.,*
  571 F.3d 935 (9th Cir. 2009) .......................................................... 9

*Wal-Mart Stores, Inc. v. Dukes,*
  131 S. Ct. 2541 (U.S. 2011) ...................................................... passim

*Wang v. Chinese Daily News, Inc.,*
  231 F.R.D. 602 (C.D. Cal. 2005) ......................................................... 9

*Weigele v. FedEx Ground Package Sys., Inc.,*
  267 F.R.D. 614 (S.D. Cal. 2010) ......................................................... 26

*Zivali v. AT&T Mobility, LLC,*
  784 F. Supp. 2d 456 (S.D.N.Y. 2011) ................................................. 15

iv

**STATUTES**

California Labor Code § 515(a),(e) ................................................................................................. 8

Fair Labor Standards Act ("FLSA") ...................................................................................... passim

New York Labor Law ("NYLL") ..................................................................................................... 1

**OTHER AUTHORITIES**

29 C.F.R. §§ 541 ......................................................................................................................... passim

12 NYCRR § 142-2.2 ........................................................................................................................ 14

18 Wright, Miller & Cooper, *Federal Practice and Procedure* § 4478 at 788 ............................ 19

Fed. R. Civ. P. 23 ......................................................................................................... 1, 3, 4, 14

## I.      INTRODUCTION

Plaintiff Yatram Indergit contends that he was misclassified as a Store Manager ("SM") and denied overtime under the New York Labor Law ("NYLL") and asks the Court to certify a class of persons who worked as exempt SMs at Rite Aid[1] brand stores in New York State for a period of more than ten years.[2]  Despite Plaintiff's hyperbolic and unsupported allegations, the record establishes that a New York SM's primary duty is overall responsibility for the success of his or her store, although how each SM accomplishes that goal and the job duties he or she actually performs vary dramatically.[3]  The striking conflict between Plaintiff's allegations and the deposition testimony in the record can only be resolved through SM-by-SM determinations.  As the Second Circuit found in *Myers v. Hertz,* 624 F.3d 537, 545 (2d Cir. 2010), *cert. denied,* 132 S.Ct. 368 (U.S. 2011)*,* Rule 23(b)(3) certification of NYLL misclassification claims must be denied where, as here, "the main issue to be decided …, whether each potential plaintiff was properly classified as 'exempt'," requires "a fact-intensive inquiry into each potential plaintiff's employment."  *See also* Dkt. No. 92 ("SJ Order") at 10 (finding whether Plaintiff Indergit is exempt is a "highly fact intensive inquiry" to be made on a "case-by-case basis"). On this record, Plaintiff cannot meet his burden of proof and certification of a statewide class action of all New York SMs must be denied.

---

[1] Rite Aid Corporation was not, and never has been during the relevant time frame, any Plaintiff's employer.  Plaintiff Indergit's employer at all relevant times was Rite Aid of New York, Inc.  Rite Aid Corporation appears specially and without waiver of any jurisdictional defenses.

[2] Defendants submit that although not limited to SMs in the State of New York, the arguments set forth in Defendants' Motion to Decertify further warrant the denial of Plaintiff's motion for class certification under Fed. R. Civ. P. 23. Defendants incorporate by reference the arguments made in their Motion to Decertify.

[3] Due to limitations on discovery to date, *see* Order, Dkt. No. 131, the record for purposes of Plaintiff's New York claims consists only of the depositions of 11 New York SMs (four taken by Plaintiff prior to conditional certification of the FLSA case, six taken by Defendants of FLSA opt-ins and Plaintiff Indergit).  Defendants noticed the depositions of five additional New York SM opt-ins who failed to appear for their depositions.  Defendants maintain their objections to the use of purportedly representative discovery in this action.  The SM opt-ins Defendants were allowed to depose pursuant to the Court's Order come from an already self-selected group of persons who affirmatively opted in to this case.  Despite this very limited and self-selected record – ordered over Defendants' objections – the evidence establishes wide disparities in the experience of SMs.  It follows that were further discovery allowed, the record of difference would increase exponentially.

Plaintiff's central premise that Rite Aid utilizes corporate policies and up-line management to dictate SMs' job duties such that SMs have no independent discretion is simply false.[4]  As detailed in the comparison charts attached as Exhibits 1-4, many of Plaintiff's factual allegations either include no citation to the record, misrepresent the testimony cited, or rely on the testimony of a single SM to assert that such testimony is consistent with the record as a whole.[5]  Instead, the record evidence, including the testimony of Plaintiff Indergit, other New York SMs, and other Rite Aid witnesses, establishes that SMs are responsible for the overall operations of their stores, including the store's financial success, and that how each SM runs a store to achieve such success is highly individualized.  *See* Sadler 30(b)(6) 33:8-12 ("We don't standardize things in our organization. We look for best practices and we provide best practices to our stores on different activities.  But we don't dictate how they do any particular activity.").[6]  Similarly, the policies and procedures upon which Plaintiff relies (a) require interpretation, implementation and enforcement by store-level management; (b) do not provide evidence of actual duties performed by each SM; and (c) were applied by some SMs and never even reviewed by others.[7]  Further, to the extent Plaintiff relies on the existence of a job description, the Second Circuit rejects such reliance, the SM job description describes an exempt position, and SMs' testimony demonstrates that whether and to what extent it describes the duties actually performed varies person by person.

Moreover, as detailed below, Plaintiff's allegations do not and cannot eliminate the need for individual inquiries into whether each SM was properly classified under the executive, administrative, and/or combination exemptions.  As demonstrated by the comparison chart of SM

---

[4] (Pl.'s Br. at 8.)
[5] It is noteworthy that Plaintiff cites to testimony of only 6 N.Y. SMs, wholly ignoring the testimony of the other 5 N.Y. SMs deposed in this matter.  Drawing from their exceptionally limited record, Plaintiff then broadly proclaims that all SMs run all stores the same way, despite knowing full well that the record does not support such assertions.
[6] All deposition transcript citations, affidavits and other documentary references are attached to the Declaration of Daniel E. Turner, Esq. ("Turner Decl."), filed concurrently.
[7] *See e.g.*, Blake dep. 45:12-18.

testimony attached as Exhibit 5, discovery confirms direct contradictions between the SMs'

testimony cited by Plaintiffs and other SMs' testimony about their performance of such managerial

duties as hiring, scheduling, and disciplining store associates.  Some definitively regularly

performed such tasks, while others claim they did not.[8]  Similarly, as demonstrated by the

comparison chart of District Manager ("DM") testimony attached as Exhibit 6, the discretion

afforded to SMs by DMs varied.  In fact, the evidence establishes that an SM's duties and

responsibilities can and do vary from store-to-store – and even from manager-to-manager within the

same store.  (*See* Rand dep. 256:19-25, admitting that many of the challenges he faced as a SM

were store specific and only occurred in one particular store, out of several he worked in.)  As

Plaintiff's witness SM Rand testified, the job duties and responsibilities of each SM vary so much

that one would have to ask each SM what duties s/he performs and how s/he ran the store.  (*Id*.

75:4-76:2, 102:10-103:11 ("…There are so many factors that go into the daily, day-to-day operation

of a store.").)  Under these circumstances, no liability determination can be made without engaging

in mini-trials regarding each SM's claim.

     In short, the factual record in this case and binding caselaw confirm that Plaintiff cannot

satisfy his burden of demonstrating that Rule 23's commonality, typicality, and predominance

requirements are met.

## II.    <u>ARGUMENT AND CITATION TO THE RECORD AND AUTHORITIES</u>

### A.    <u>Plaintiff's NYLL Claims Cannot Satisfy Rule 23's Requirements.</u>[9]

     Class treatment is "'an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only.'"  *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541,

---

[8] *See* section II.B.1, *infra*.

[9] Defendants do not challenge the numerosity requirement of Rule 23(a)(1), but note that more than 1,040 putative class members already received notice of the FLSA claims in this lawsuit.  Of those receiving notice, only 204 opted in.  In excess of 80% of the absent class members elected *not* to participate – presumably because they believe they were properly classified.

2550 (U.S. 2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)).  To justify departing from this rule, Plaintiffs must "affirmatively demonstrate" their proposed class "*in fact*" meets all the requirements of Rule 23(a) and one of the requirements of Rule 23(b).  *Id.* at 2551. Certification is proper only if the Court "'is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) [and (b)] have been satisfied.'"  *Id.* (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982)).  "Frequently [this] 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped."  *Id.* at 2551-52.  The "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."  *Id.*  On this factual record and in light of the multi-factored exemption analyses required for each SM, Plaintiff cannot satisfy his burden.

### 1.   *Hertz* confirms Plaintiff's NYLL claims cannot be certified.

The Second Circuit's decision in *Hertz* – never mentioned in Plaintiff's brief – requires denial of certification here.  The plaintiff in *Hertz* was a station manager who alleged she was misclassified under the NYLL and the FLSA.  The district court denied the plaintiffs' motion for certification of a class of managers,

> conclud[ing] that the plaintiffs failed to satisfy Rule 23's commonality, typicality, and predominance requirements because the main issue to be decided in the case, whether each potential plaintiff was properly classified as "exempt" from FLSA's overtime guarantees, *required ... a "fact-intensive inquiry into each potential plaintiff's employment status* under the FLSA."[10]

In affirming the district court's denial of class certification of NYLL claims, the Second Circuit specifically rejected the notion that an "across-the-board" classification of a position standing alone, is itself determinative of "'the main concern in the predominance inquiry:  the balance between

---

[10] *Hertz,* 624 F.3d at 545 (emphasis added).

individual and common issues.'"[11]  The Second Circuit held:  "Again, the question of entitlement to

overtime pay is answered by examining the employee's actual duties,"[12] and explained,

> [t]he "questions of law or fact" that this case will ultimately require resolving, therefore, include 1) whether plaintiffs were denied overtime and 2) whether plaintiffs were *entitled* to overtime under FLSA.  While the first is a simple factual matter and is not in dispute, the second is a complex, disputed issue, and its resolution turns on exemption, which in turn will require the district court to decide a number of subsidiary questions involving whether plaintiffs fall within the Labor Department's criteria for [exempt executives].

The Court further explained that for liability purposes, the

> exemption question, therefore, is a mixed question of law and fact, … involving a number of subsidiary questions, each of which may or may not be able to be proven in common with respect to all Hertz New York station managers.  Significantly, the regulations make clear that these questions should be resolved by examining the employees' actual job characteristics and duties.[13]

Although the Second Circuit noted that "district courts in this Circuit have certified classes on state

law claims that turn on the question of FLSA exemption for a particular group of employees,"[14] it

held: "But these cases confirm that the exemption inquiry requires examination of the 'duties that

the employee' actually 'performs,' … and they involve evidence tending to show that the plaintiffs'

jobs were similar in ways material to the establishment of the exemption criteria."[15]  No such

evidence of similarity exists in the record here.  The Second Circuit also concluded that the *Hertz*

plaintiffs' reliance on testimony of Hertz representatives who purportedly stated "generally that

station managers at various locations have 'similar responsibilities' and that their jobs are 'more or

---

[11] *Id.* at 549 (quoting *In re Wells Fargo*, 571 F.3d 953, 957, 959 (9th Cir. 2009.); *Tahir v. Avis Budget Grp., Inc.,* 09-3495-SRC, 2011 WL 1327861, at *3 (D.N.J. Apr. 6, 2011), likewise confirms superficial reliance on a common job description and policies is insufficient.  In *Tahir*, the court rejected certification under the lenient FLSA standard, despite the plaintiff's reliance on an "identical" job description, use of the same training materials, and a uniform classification decision.  *Id.*  The court confirmed the plaintiff's day-to-day responsibilities were critical, rejecting reliance on corporate materials: "Plaintiff's reliance on the common documents misses the point of the claim, which turns on the alleged discrepancy between the job on paper and the job in practice. … It sheds no light on how Tahir and the others were similarly subjected to an improper compensation practice by Avis based on the true nature of their work, which is the crux of the claim."  *Id.*
[12] *Id.* at 550 (citing 29 C.F.R. §§ 541.2; 541.700).
[13] *Id.*
[14] *Id.* at 549 (citing *Damassia*, 250 F.R.D. 152 (S.D.N.Y. 2008)).
[15] *Id.*

5

less the same,'" was not sufficient to establish commonality.  *Id.* at 550.  In any event, here Plaintiff's "facts" rely on bare citation to documents and/or misrepresentations regarding the testimony of Rite Aid witnesses.  But those witnesses testified unequivocally that the actual duties varied person to person and store to store.  *See* Charts attached as Exs. 1-6; Crandall 30(b)(6) dep. 55:11-56:16 ("There's no way that we could capture every responsibility [in the job description].  Or depending, again, like we said, on the person's experience or background that their experiences are going to be different."); DM Smykla dep. 182:4-15 (SM job duties "really depends on the store and it varies.  Every store is different.  And some managers will have to focus more on certain activities, like training and hiring, than other activities, and it's really how the manager chooses to run the store which kind of decides what their main responsibilities are.").[16]  Similarly, the testimony reflects – for example – that some SMs had the authority to terminate employees, others recommended that their DMs terminate employees, and still others never terminated employees at all.  *See e.g*., Indergit dep. 130:23-132:9; Hazara dep. 62:7-15; Gerber dep. 145:19-146:2, 161:2-166:9; Simons dep. 61:20-62:6; *see also* Exs. 5-6.  Even Plaintiff Indergit's own responses to Defendants' Requests for Admission establish that some SMs performed certain tasks, while others did not.[17]  Just as the record in *Hertz* reflected variations across locations and differences in managers' duties, the testimony of Rite Aid SMs and Rite Aid witnesses who worked in stores in New York confirms wide variations in the actual job duties performed such that liability can only be determined on an individual basis.

---

[16] *See also* DM Barrett dep. 304:25-305:7 ("Q.  You said that the job of the store manager is to run a profitable store. A. Yes, sir. Q.  Does each store manager run a profitable store in the same way? MS. REHMAN:  Objection to form. A. No.  Every store's run different."), DM Dilallo dep. 312:16-21 ("Q. How would you determine if the store managers in your district were performing the job duties and responsibilities as Rite Aid expects? A. I can't unless I'm in the store, in every store, every day, um, it varies by store."); DM Augustine dep. 140:2-12 ("Q. How does it vary? A. Based on size of the store, product mix, volume of the store, location of the store."); DM Carpenter dep. 60:3-4 ("All stores are different.  Managers choose the way they do their job.").

[17] *See, e.g*., Plaintiff's Responses to RFA Nos. 26, 65, 110, and 145, admitting that some – but not all – SMs assigned work, reviewed shrink reports and wrote their store schedules by hand.  Attached as Exhibit 40.

### 2. Other Courts Rely on *Hertz* and *Dukes* to Deny Certification of Misclassification Claims.

Also absent from Plaintiff's brief is any reference to *Gardner v. Western Beef Properties, Inc.*,[18] in which the court relied on the binding *Hertz* and *Dukes* decisions to refuse to certify the NYLL misclassification claims of a putative class of grocery manager and assistant managers. The *Gardner* court explained:

> [W]hether defendant failed to pay overtime and minimum wage in violation of NYLL is the central consideration here, but it is not a common one. Because defendants claim the management exemption, a dispositive question for each plaintiff is whether defendants misclassified that particular plaintiff as management. The resolution of this question is not conducive to collective proof … because it will require individualized examinations of each plaintiff's daily responsibilities and duties while on the job.[19]

The court further found that typicality was also not satisfied where "the basis for defendants' liability to each plaintiff – whether that plaintiff was misclassified – is unique to each plaintiff and requires an individualized examination."[20] Similarly, the court explained, "a review of the deposition testimony shows variation between the quality and quantity of the different potential plaintiff's levels of managerial responsibility. …. These differing accounts are precisely the reason why individualized proof is necessary to determine if any particular employee was misclassified."[21] Finally, the *Gardner* court found that "individual inquiries necessary to determine the propriety of the classifications do not relate merely to damages, but rather to the heart of defendants' liability."[22] Like the deposition testimony considered by the *Gardner* court, Rite Aid SMs in New York testimony provide vastly differing accounts of their actual job duties and responsibilities that varied over time and depending on their store, and that direct conflict with each other and with Plaintiff's theory of centralized control. *See, e.g.,* Exhibit 5. Under these circumstances, nothing but

---

[18] No. 07-CV-2345, 2011 WL 6140518 (E.D.N.Y. Sept. 26, 2011).
[19] *Id.* at *3.
[20] *Id.* at *4.
[21] *Id.* at *5.
[22] *Id.* at *6.

individualized proof will suffice, and any attempt to proceed on a class basis will dissolve into more than a thousand mini trials. *See also Kopera v. Home Depot, U.S.A., Inc.*, 09-Civ-8337(WHP), 2011 WL 135016 at **4, 6 (S.D.N.Y. Jan. 11, 2011) (denying certification of a NYLL class of manager trainees alleging they were misclassified as exempt, relying on *Hertz's* holding that the "'exemption inquiry requires examination of the duties that the employee actually performs,'" and concluding "the question – whether ASM Trainees were properly classified under the executive exemption based on their actual duties – is likely to be overwhelmed by a case-by-case inquiry."); *Guillen v. Marshalls,* 750 F. Supp. 2d 469, 478 (S.D.N.Y. 2010) (denying conditional certification of assistant managers' FLSA claims where liability was individualized, rejecting the plaintiff's reliance on *Damassia*, and finding, "essentially, plaintiff's argument on this point boils down to the proposition that where there is a corporate management structure that applies to all regions of the country – as is likely true for many, if not most, companies that operate nationally – any single employee may plausibly assert that employees throughout the country are similarly situated with respect to that employee's day-to-day job activities even if those job activities contravene the company's stated requirements.").[23]

Despite the binding *Dukes* and *Hertz* precedent, Plaintiff surprisingly continues to rely on dated caselaw that has since been rejected. For example, Plaintiff cites *Tierno v. Rite Aid Corp.*, C05-2520TEH, 2006 WL 2535056 (N.D. Cal. Aug. 31, 2006),[24] a case alleging misclassification of SMs under California state law, but *Tierno* relies on logic and caselaw the Ninth Circuit – like the

---

[23] *See also Cruz v. Dollar Tree Stores, Inc.,* Nos. 07-2050SC, 07-4012SC, 2011 WL 2682967, at *4-5 (N.D. Cal. July 8, 2011) decertifying SM state law misclassification claims, holding, "[the] recent decision in *Dukes* provides a forceful affirmation of a class action plaintiff's obligation to produce common proof of class-wide liability in order to justify class certification. In *Dukes,* … the evidence of commonality the plaintiffs offered …failed to provide the 'glue' necessary to render all class members' claims subject to common resolution. … Similarly here, … Plaintiffs have failed to provide common proof to serve as the 'glue' that would allow a class-wide determination of how class members spent their time on a weekly basis. In the absence of such proof, the commonality threshold … has not been met.").
[24] *Tierno* applied California regulations which are materially different from the NYLL's reliance on FLSA regulations. California Labor Code § 515(a),(e) (utilizing a strict percent of time performing managerial duties).

Second Circuit in *Hertz* – has since expressly rejected.[25]  In determining whether common issues predominated over individual issues, the 2006 *Tierno* decision reasoned that Rite Aid's uniform classification of all SMs as exempt employees essentially estopped it from arguing that the exemption inquiry was an individualized one.  *Id.* at *9.  Aside from this and other critical factual and legal distinctions, the *Tierno* court relied on *Wang v. Chinese Daily News, Inc.*, 231 F.R.D. 602, 609 (C.D. Cal. 2005), which was later rejected in *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 945-46 (9th Cir. 2009) ("a district court abuses its discretion in relying on an internal uniform exemption policy to the near exclusion of other factors relevant to the predominance inquiry").[26]  Since *Wells Fargo* and *Dukes*, district courts in California have routinely rejected certification of manager misclassification claims.  *See Deane v. Fastenal Co.*, Case. No. 11-CV-0042 (N.D. Cal. Sept. 26, 2012); *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp.2d 1111, 1130-31 (N.D. Cal. 2011) (rejecting any possibility of using "representative" testimony for purposes of misclassification claims where record shows "that for every manager who says one thing about his or her job duties and responsibilities, another says the opposite").[27]

---

[25] In a recent decision denying class certification, Judge Gonzalez Rogers of the Northern District of California chastised plaintiffs' counsel for relying on the *Tierno* decision stating that "[i]t was improper for Plaintiffs to cite to it, much less make it a centerpiece of their argument."  *See* Order dated September 26, 2012 at p. 10, *Deane v. Fastenal Co.*, Case. No. 11-CV-0042 (N.D. Cal.).

[26] On the same day, the Ninth Circuit issued its decision in the matter of *In re Wells Fargo Mortgage Overtime Pay Litig.*, 571 F.3d 953, 955-58 (9th Cir. 2009), reversing a district court's certification of a class of employees alleging misclassification and further rejecting *Wang*.

[27] Although Plaintiff's brief did not address the lower court's decision in *Hearn v. Rite Aid Corp*, No. SSX-L-429-06, 2010 WL 4552975 (N.J. Super. L. Nov. 1, 2010), *aff'd in part*, *rev'd in part* by 2012 WL 996603 (N.J.Super.A.D. Mar. 27, 2012), refusing to certify a class of Rite Aid assistant store managers pursuing misclassification claims under the New Jersey Wage and Hour Law, Plaintiff does cite the reversal of certification by a New Jersey appellate court (which is presently the subject of an appeal) in *Hearn v. Rite Aid Corp.*, Docket No. A-2009-10T1 (N.J. Super. Ct. App. Div. Mar. 27, 2012).  The New Jersey appellate court, however, relied in part on a percentage of time requirement under the New Jersey law, where the executive exemption required proof that the employee "devotes … less than forty percent" of work time to "non-exempt work" if "employed by a retail … establishment."  *Id.* at *7.  The New Jersey Appellate Court ultimately concluded that, "To be sure, the factual record suggests that the experiences of the putative class members varied.  But all asserted that a significant percentage of their time was spent on non-managerial tasks."  *Id.* at *12.  The NJWHL's "less than forty percent" of time requirement relied upon in *Hearn* is without parallel in the NYLL or the current FLSA regulations.  29 C.F.R. § 541.700.  Thus, even if this Court believed SMs were uniformly spending a significant percentage of their time performing non-exempt work as the *Hearn* plaintiffs alleged, that factor would not be sufficient to make a common liability finding, particularly in light of the concurrent duties regulation applicable here.  *See Grace v. Family Dollar Stores, Inc.*, 637 F.3d 508, 517 (4th Cir. 2011) ("We conclude that [plaintiff] was

Similarly, Plaintiff also relies on *Damassia v. Duane Reade, Inc.,* 250 F.R.D. 152 (S.D.N.Y. 2008), in which Judge Lynch granted certification of NYLL claims of *assistant store managers* on a very different record.[28]  Judge Lynch found "whether the class member is exempt from NYLL" was a common issue of law, because Duane Reade did not "contest that the first question of law is common to all plaintiffs, even if some questions of fact it raises are not."[29]  Rite Aid makes no such concession, and, as detailed below, the Court has already found that whether any particular Rite Aid SM is exempt under the executive, administrative, or combination exemptions is a mixed question of law and fact that must be determined individually.  Moreover, the differences between the evidence relied upon in *Damassia* and the evidence here include that, unlike Rite Aid, Duane Reade 'conceded that the business practices at issue in this case are uniform among its stores,' and that the duties and responsibilities of assistant managers are 'centrally derived.'"[30]  *Id.* at 159 (quoting *Chowdhury v. Duane Reade, Inc.,* 2007 WL 2873929 at *4 (S.D.N.Y. Oct. 2, 2007)).

---

performing management duties whenever she was in the store, even though she also devoted most of her time to doing the mundane physical activities necessary …."); *Scott v. SSP Am., Inc.,* No. 09-CV-4399, 2011 WL 1204406, at *8 (E.D.N.Y. Mar. 29, 2011)(crediting plaintiff's testimony that she spent 90% of her time on non-exempt work but finding her "management duties were more important," and she "continued to supervise her subordinates by 'multi-task[ing]'")).

[28] Indeed, when carefully reviewed, the vast majority of the cases Plaintiff cites concern assistant or second tier managers as opposed to store managers.

[29]*Id*. at 156.

[30]*See Kopera,* 2011 WL 135016, at *4 (rejecting the plaintiffs' reliance on *Damassia,* explaining "general corporate policies bear on a predominance analysis only '[w]here … there is evidence that the duties of the job are largely defined by comprehensive corporate procedures and policies.' … Here, Home Depot has introduced compelling evidence showing significant variations …." *Id.* at *4 (quoting *Damassia,* 250 F.R.D. at 160.) Similarly, Plaintiff cites *Cuevas v. Citizens Fin. Grp., Inc*., 283 F.R.D. 95 (E.D.N.Y. 2012), a decision on appeal to the Second Circuit.  *See Cuevas*, Case No. 10–CV–5582 (E.D.N.Y.) at Dkt. No. 53.  The proposition for which *Cuevas* cites *Hertz* is directly contrary to the Second Circuit's ruling in *Hertz*. 283 F.R.D. at 98 (citing *Hertz* at 624 F. 3d 537, 549.)  Moreover, the record evidence in the *Cuevas* case differs from the record of differences here.  In *Cuevas,* in finding that commonality was satisfied, the Court found that "defendants fail to submit any evidence showing that the company-wide policy documents upon which plaintiff relies are not an accurate representation of the general ABM responsibilities."  *Id*. at 98. Here, as detailed in section II.B.1 and Exhibits 1-4, there are stark differences in Plaintiff's allegations and the actual discovery record.

### 3.    The Court's Prior Summary Judgment Order Similarly Requires Denial of Plaintiff's Motion.

The Court's Order denying summary judgment on Indergit's individual NYLL claims also confirms that class treatment is not possible.[31]  *See* SJ Order, Dkt. No. 92.  The Court has already recognized in this case that Plaintiff's alleged common issue – whether salaried SMs are exempt – requires an analysis of each SM's daily job duties, the time spent performing those duties, and whether the job duties were performed under the administrative, executive and/or combination exemption tests.[32]  In denying Defendants' motion for summary judgment on Plaintiff Indergit's FLSA and NYLL claims, the Court found "material issues of fact remain as to whether Plaintiff was properly classified as an exempt executive employee,"[33] (*id.* at 5), and found a fact question existed as to whether Indergit's "'primary duty' was 'management of the enterprise.'"[34]  (*Id.* at 9.)  The Court made the following findings, which are now law of the case:[35]

- "Determining whether an employee is exempt from the overtime requirements is a highly fact-intensive inquiry that is 'to be made on a case-by-case basis in light of the totality of the circumstances.'"  (SJ Order at 10).[36]

---

[31] The Second Circuit similarly relied on the district court's denial of summary judgment in *Hertz* in affirming the district court's refusal to certify NYLL claims.  624 F.3d at 543-44; *see also Tahir*, 2011 WL 1327861, at *3 ("As the Court's analysis in its opinion denying Defendant's motion for summary judgment demonstrates, establishing an FLSA violation in this case requires an examination of the individual employee's duties and tasks vis-à-vis the exempt category …"); *Clougher v. The Home Depot,* 696 F. Supp. 2d 285, 290 (D.N.J. 2010)(denying summary judgment on manager misclassification claim, finding consideration of the exemption factors "is a highly fact-intensive inquiry, 'to be made on a case-by-case basis in light of the totality of the circumstances'")(quoting *Johnson v. Big Lots Stores, Inc.,* 604 F. Supp. 2d 903, 908 (E.D. La. 2009)).

[32] *See* 29 C.F.R. § 541.700(a).

[33] Defendants did not move for summary judgment on the administrative or combination exemptions.

[34] Similarly, in a two plaintiff manager misclassification case, the Court held "[d]etermining whether the executive exemption is applicable to employees such as Plaintiff – who worked in a single Rite Aid store – is a highly fact-intensive exercise.  … Here the record is replete with factual disputes about the nature of Plaintiff's duties and responsibilities while working for Rite Aid," and "[i]ssues of material fact also exist as to whether Davis exercised discretionary authority and whether he enjoyed relative freedom from supervision." *Gordon v. Rite Aid Corp,* 1:09-cv-07665-PGG, Dkt. 78 (S.D.N.Y. Mar. 12, 2012) at 2, 29.

[35] The law-of-the-case doctrine "'posits that if a court decided a rule of law, that decision should continue to govern in subsequent stages of the same case.'" *Aramony v. United Way,* 254 F.3d 403, 410 (2d Cir. 2001) (citing *In re Crysen/Montenay Energy Co.,* 226 F.3d 160, 165 n. 5 (2d Cir. 2000).  The purpose of the law of the case is "to 'maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit.'" *Devilla v. Schriver,* 245 F.3d 192, 197 (2d Cir. 2001) (quoting 18 Wright, Miller & Cooper, *Federal Practice and Procedure* § 4478 at 788).

[36] Internal citations have been omitted.

11

- The primary duty analysis requires review of the factors set forth in 29 C.F.R. § 541.100(a)(2), and "[d]etermination of an employee's primary duty <u>must be based on all the facts in a particular case</u> …."  (SJ Order at 9, emph. in orig.)
- With respect to the time spent performing exempt vs. non-exempt duties, "Rite Aid elicited testimony that can be used to undermine Plaintiff's 90% estimate and attack Plaintiff's credibility on this point," but "there remains a genuine issue of material fact as to how much time Plaintiff spent performing exempt versus non-exempt duties.  To resolve this critical factual dispute will require a more fully developed factual record, including, *inter alia*, testimony from Plaintiff's co-workers and supervisor."  (*Id.* at 15-16.)
- "Whether Plaintiff's performance of non-exempt duties was mandatory or discretionary is of critical importance in deciding whether Plaintiff was correctly classified as an exempt employee. … Once again, Plaintiff's deposition does not represent the sum total of evidence material to this determination.  Testimony from Plaintiff's supervisor and co-workers is likely to be highly relevant, along with corporate records and documentation from Rite Aid."  (*Id.* at 18-19.)[37]

In addition to making each of the above-listed determinations for <u>each</u> SM in the putative class,   the

Court must determine:

- the time spent, reason for, and importance of performing each job duty actually performed by each person on a daily basis in each store s/he worked (29 C.F.R. § 541.700(a)-(b));
- whether each SM was concurrently performing managerial duties while performing non-managerial duties (29 C.F.R. § 541.106 (a)-(b));
- which of each SM's duties were more important to Rite Aid;[38]
- whether the job duties involved the performance of work directly related to the management or general business operations of Rite Aid or Rite Aid's customers (29 C.F.R. § 541.201);
- each SM's authority to hire or fire, or whether their suggestions as to hiring, firing, advancement, promotion or any other change of status recommendations were given particular weight (29 C.F.R. § 541.105);
- whether and to what extent each SM exercised discretion and independent judgment with respect to "matters of significance" (29 C.F.R. § 541.202(a));
- to what extent each SM performed a combination of different types of exempt duties to qualify for the combination exemption (29 C.F.R. § 541.708); and
- the total number of hours worked by each SM during each workweek of the relevant period – whether over or under forty.

---

[37] The charts attached as Exhibit 6 and 7 containing testimony from New York Assistant Store Managers ("ASMs") and DMs illustrate the numerous individualized fact questions created by the testimony of ASMs and DMs about the job duties performed by the SMs with whom they worked.

[38] *Anderson v. Dolgencorp of NY, Inc.,* Nos. 1:09-cv-360, 1:09-cv-363, 2011 WL 1770301, at *10 (N.D.N.Y. May 9, 2011) (citing *Donovan v. Burger King Corp.,* 675 F.2d 516, 521 (2d Cir. 1982)(court must "evaluate[] which of plaintiff's duties – managerial or non-managerial – were more important to the employer")).

In conjunction with all of these factors, the Court must also determine each SM's "primary duty" based on all the facts in a particular case, with the major emphasis on the character of each SM's job as a whole.[39]

As set forth below, the depositions of SMs who worked in stores in New York during the relevant time period confirm wide variations with respect to the factors the Court must consider to determine whether each SM was properly classified.  For example, the record is replete with SMs' admissions that they concurrently performed managerial and non-managerial duties.[40]  Record testimony differs about whether an SM performed a particular duty at all, why or why not, and if so, how frequently.  *See infra*, section II.B.1.  As recognized by the Court, misclassification claims in this case are inherently "highly fact-intensive," "difficult," "complicated," "require[] weighing a variety of factors," and "require a fully developed factual record."  SJ Order, Dkt. No. 92 at 10, 12, 16.  As such, they must be determined individually.

## B. Commonality, Typicality, and Predominance Are Not Satisfied on This Record.

When the Court applies Rule 23's requirements to the factual record here, Plaintiff cannot meet his burden.  For purposes of the Rule 23(a) criteria, the *Dukes* decision expressly requires much more than a "minimal" showing of common <u>questions</u>:

> What matters to class certification … is not the raising of common 'questions – even in droves – but, rather the capacity of the class wide proceeding to generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.[41]

---

[39] Factors to consider when determining the primary duty of each SM include, but are not limited to, the relative importance of the exempt duties as compared with other duties; the amount of time spent performing exempt work; each SM's relative freedom from direct supervision; and the relationship between the SM's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.  29 C.F.R. §541.700(a).

[40] *See, e.g.*, Indergit dep. 257:22-258:6, 367:2-373:18; Simons dep. 178:15-21,178:22-179:20, Spencer dep. 117:4-16; Gerber dep. 324:2-5.  *See Diaz v. Elec. Boutique of Am., Inc.*, 04-CV-0840E(SR), 2005 WL 2654270 at *7 (W.D.N.Y. Oct. 17, 2005)(denying certification, finding "individualized nature" of the exemption inquiry required considering daily activities, citing 29 C.F.R. §541.106(b)("For example, an assistant manager in a retail establishment may perform work such as serving customers, cooking food, stocking shelves and cleaning … but performance of such nonexempt work does not preclude the exemption if the assistant managers' primary duty is management.")).

[41] 131 S. Ct. at 2551.

13

The record here confirms that Plaintiff's alleged common questions cannot generate common answers for liability purposes, and that Plaintiff's claims are not typical. Rather, there are significant dissimilarities in the actual job duties performed by SMs who worked in New York stores such that determinations as to whether each of the elements of the exemptions are satisfied requires a person-by-person analysis.[42]

Moreover, as the Second Circuit explained in *Hertz,* Rule 23(b)(3)'s predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hertz*, 624 F.3d at 547 (citation and internal quotations omitted). Just as in *Hertz,* liability with respect to Plaintiff's misclassification claims here simply cannot be determined through generalized proof. For purposes of liability, "any determination as to [plaintiff's] right to overtime would require a highly individualized analysis as to whether the duties they performed fell within that exemption,'"[43] and "'conceded' issues in this case, such as whether … managers worked overtime, whether they were paid overtime, and whether [Rite Aid] classified them as exempt pursuant to a common policy, are clearly less substantial in the overall mix of issues this case presents when compared to the ultimate (contested) question the district court would have to decide … – whether plaintiffs were *legally entitled* to the overtime they were not paid."[44]

---

[42] Plaintiff concedes that the exemptions to NYLL overtime requirements are interpreted using the same standards as the Fair Labor Standards Act. (*See* Pl.'s Br. at 23); 12 NYCRR § 142-2.2.

[43] *Id.* at 544 (quoting *Myers v. Hertz Corp.,* No. 02-CV-4325 (DRH)(MLO), slip op. at 9 (E.D.N.Y. May 18, 2006).) The Second Circuit has also made clear that Plaintiff's burden of proof for certification of Plaintiff's Rule 23 class is "distinct" from the standard for conditional certification of FLSA claims and is a "much higher threshold of demonstrating that common questions of law and fact will 'predominate' for Rule 23 purposes …." *Hertz,* 624 F.3d at 556.

[44] *Id.* at 550-51 (quoting *Moore v. Painewebber,* 306 F.3d 1247, 1252 (2d Cir. 2002) (noting further "it does not matter that exemption in this case may technically be termed an 'affirmative defense.' … courts must consider potential defenses in assessing the predominance requirement.*"). See also Gardner,* 2011 WL 6140518, at *5 (Rule 23(b)'s requirements were not satisfied with respect to the grocery managers' misclassification claims, specifically rejecting the plaintiffs' reliance on uniform classification and explaining the "plaintiffs in [*Hertz*] made the same argument," and the Second Circuit rejected it because "the real question is 'answered by examining the employee's actual duties.'" (quoting *Hertz,* 624 F.3d at 549-50).); *Ruggles v. Wellpoint, Inc.,* 272 F.R.D. 320, 339 (N.D.N.Y. 2011) (Although the court found that the single named plaintiff representing the NYLL class lacked standing, it further found that the plaintiffs' misclassification claims could not satisfy Rule 23(b)'s predominance and superiority requirements, rejected the plaintiffs' reliance on "the overlap in the job descriptions," and rejected reliance on corporate guidelines because "even

Finally, the highly individualized nature of the factual and legal issues for each SM's claim will result in overwhelming management difficulties and any attempt at common proof will violate Defendants' due process rights.  Should the claims at issue be permitted to proceed on a class basis, they will inevitably dissolve into thousands of mini-trials.[45]  *Novak v. Home Depot, U.S.A., Inc.,* 259 F.R.D. 106, 110 (D.N.J. 2009) (denying certification based on the "substantial differences among" managers, holding "[b]y moving for class certification, Plaintiff asks this Court to decide in one trial whether every [manager] in New Jersey is either exempt or non-exempt.  Such an all-or nothing determination would mean that either every [manager] could recover for being misclassified or none could recover.  This is untenable.  The superior avenue for [a manager] is to bring an individual action.").[46]  Under similar circumstances courts have found such individualized

---

if all nurses in the proposed class used the … Guidelines, this would not dispense with the need for individualized inquiries.  The Regulations specifically note that reliance upon manuals does not, in itself, preclude exemption."  *Id.* at 339-340 (citing 29 C.F.R. §541.704).)

[45] Not only would liability have to be assessed by the finder of fact asking highly individualized questions of each SM class member, but damages are also highly individualized as well.  Putative class member Rand's testimony is illustrative of the individualized inquiry that would need to be made for each and every class member in order to assess damages:

> Q:     And for any particular week or time period we would have to sit down and figure out what was going on in the store, whether or not you had an assistant manage, to determine approximately how many hours you worked in any particular week, correct?
>
> A:     I would say that's fair to say.  We would have to go through a very lengthy discussion to figure out what was going on during that period of time or that particular week. There would have to be certain factors to refresh my memory, maybe certain documents, and certain company time records and other, you know, things would need to be produced to refresh my memory.

(Rand dep. 113:23-114:12.)

[46] *See also Zivali v. AT&T Mobility, LLC,* 784 F. Supp. 2d 456, 459 (S.D.N.Y. 2011)("considerations of procedure and fairness weigh heavily in favor of granting decertification, as the Court harbors considerable doubt that any fair determination could be achieved on the basis of representative evidence.").  Courts have repeatedly recognized the impossibility of relying on "representative" proof for liability purposes in misclassification cases.  *Cruz v. Dollar Tree Stores, Inc.,* Nos. 07-2050SC, 07-4012SC, 2011 WL 2682967, at *4-5 (N.D. Cal. July 8, 2011)(decertifying managers' misclassification claims, holding "[i]t has become clear to the Court that "the crux" of Plaintiffs' proof at trial will be representative testimony from a handful of class members. … The appropriateness of such a trial plan was a questionable proposition under this circuit's case law at the time of the Court's Partial Decertification Order.  It is now untenable in light of the Ninth Circuit's decision in *Marlo II* and the Supreme Court's decision in *Dukes*"); *In re Wells Fargo Home Mort. Overtime Pay Litig. (Wells Fargo II),* 268 F.R.D. 604, 612 (N.D. Cal. 2010)("[T]he court has been unable to locate any case in which a court permitted a plaintiff to establish the non-exempt status of class members, especially with respect to the outside sales exemption, through statistical evidence or representative testimony."); *Beauperthuy v. 24 Hour Fitness USA, Inc.,* 772 F. Supp. 2d 1111, 1130 (N.D.Cal. 2011) (rejecting the use of representative testimony where deposition testimony "show[ed] that for every manager who says one thing about his or her job duties and responsibilities, another says just the opposite").

15

defenses make class treatment unmanageable,[47] and, a manager misclassification claim is not of

such small value that it could not be pursued individually, particularly where the statute provides for

recovery of attorneys' fees.[48]  In short, the record of differences detailed in Exhibits 1-7 and below

confirm class certification must be denied.

> **1.   Store Managers Are In Charge of Multi-Million Dollar Operations With Wide Variations in the Job Duties They Perform.**

Plaintiff claims – without support – that SMs spend the majority of their days engaging in

non-managerial tasks and "have no input, let alone power to make independent decisions, for many

'managerial' duties."  (Pl.'s Br. at 19.)  Plaintiff's allegations are again flatly contradicted by the

SM testimony and that of the ASMs they supervised (*see* Exs. 5 and 7).

> a.   <u>Store Managers Have Responsibility for the Overall Success of Their Stores.</u>

Plaintiff attempts to distort the record testimony and diminish the managerial nature of the

tasks SMs perform by claiming that "managerial" duties are so regulated by the company as to

allow no room for managerial discretion.[49]  (*See* Pl.'s Br. at 19-22.)  The record, including the stark

contrast between Plaintiff's allegations and the actual testimony detailed in Exhibits 1-6, establishes

that SMs exercise discretion and determine which managerial duties to perform and how to perform

them to ensure the commercial success of their individual stores.  In fact, contrary to his own

---

[47] *Aquilino v. Home Depot, U.S.A., Inc.*, 04-4100-PGS, 2011 WL 564039, at *9 (D.N.J. Feb. 15, 2011) ("Defendant is entitled to question each individual [manager] about his or her managerial responsibilities to illustrate that [managers qualify as exempt.]  In addition, Defendant is entitled to impeach the credibility of individual [managers] by bringing to light misrepresentations about duties that they may have made on their resumes.  … Such individual questioning would likely make it difficult and confusing for the fact finder to make both credibility determinations and to discern whether each individual [manager] is exempt …."); *Smith v. Heartland Auto. Serv., Inc.,* 404 F. Supp. 2d 1144, 1154 (D. Minn. 2005).

[48] *See Novak v. Home Depot U.S.A., Inc.,* 259 F.R.D. 106, 117 (D.N.J. 2009) (noting that in a manager misclassification case "individual recovery is potentially substantial, giving each [assistant manager] ample incentive to bring an action on his own").

[49] These are exactly the types of job duties the Second Circuit has previously held to be important managerial job functions.  *See Donovan v. Burger King*, 675 F.2d 516, 521-22 (2d Cir. 1982) ("*Burger King II*").  As the *Burger King II* court recognized, "the wrong number of employees, too much or too few supplies on hand, delays in service ... or an underdirected or undersupervised work force all can make the difference between commercial success and failure."  *Id.* at 522.

assertions, Plaintiff Indergit readily admits that he was in charge of his store at all times.[50]   (Indergit

dep. 57:22-58:9, 111:21-112:7, 368:25-373:18.)  Plaintiff admits that the SM position is intended to

assume plenary responsibility for the management of a particular store, including its overall

profitability.  (*Id*. 58:24-59:12, 63:24-64:10, 92:2-20.)  The record is replete with testimony from

SMs who admit that their most important, or primary job duties, relate to the overall success of their

stores:[51]

> Q.    And as a store manager, your objective is to increase sales and reduce losses,
>       correct?
> A.    Correct.
> Q.    And as a store manager, you're always ultimately responsibility for the overall store's
>       success, right?
> A.    As the store manager, yeah, I would agree with that.

(Gerber dep. 86:23-87:6.)

> Q.    As a store manager, regardless of the task you're performing, you are in charge of the
>       overall operations of the store, correct?
> MS. REHMAN:  Objection to form.
> THE WITNESS:  Correct.

(Simons dep. 165:18-24.)

> Q.    As a store manager, your most important job duty was to ensure the overall success
>       and profitability of the store, right?
> MS. REHMAN:  Objection to form.
> THE WITNESS:  Yes.

(*Id*. 172:9-15.)

Despite Plaintiff's allegation that "SMs are stripped of independent authority to hire hourly

associates" (Pl.'s Br. at 11), the record also reflects SMs' varied degrees of authority in hiring.

---

[50] Plaintiff also admits that his job duties and responsibilities as a Store Manager included maintaining and operating the store, supervising employees, hiring, training and disciplining employees, scheduling, ensuring that employees follow and obey all Rite Aid rules and policies, and managing the operations of the store.  (Indergit dep. 58:24-61:10, 91:2-93:20, 102:14-103;22, 111:21-112:7, 124:22-127:4, 133:17-138:3, 200:16-19, 253:13-258:6, 367:2-373:18, 403:12-16.) Plaintiff further admits that irrespective of the task he was performing, as the SM, he was at all times in charge of the store and monitored and supervised associates.  (*Id*. 112:4-7.)  In contrast, Rand testified that when he was not physically in his store, he did not feel responsible for what was happening in the store.  (*See* Rand dep. 203:8-205:4.)

[51] An employee's "primary duty" is "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).

*Compare* testimony of SM Hazara, dep. 61:19-21 ("Q.  Does your DM have any involvement in you

hiring employees? A.  No.") and SM Blake, dep. 49:5-8 ("Q. If someone passes the drug test and

you want to hire them do you have to get approval from a DM?  A. No.") *with* testimony of SM

Saab, dep. 79:9-16 ("Q.  If you wanted to hire associates part-time and have employees in the store

just during the times when you had the highest sales volume, could you do that? A. Not on my own.

Q. Say that again? A. Not on my own.  I have to call the district manager.")  Indeed, the bulk of

record evidence demonstrates that many SMs have routine and significant input in hiring and the

power to make independent hiring decisions.[52]  *See* Indergit dep. 342:7-346:21; S. Khan dep. 38:2-

40:13; Gerber dep. 108:20-110:18; Saab dep. 79:9-24, Simons dep. 52:4-53:24; Santos dep. 172:1-

25, 255:2-16.; Spencer dep. 85:16- 87:11; Otuaney dep. 59:20-63:14.

Although Plaintiff alleges "personnel decisions are largely controlled by RA" (Pl.'s Br. at

10), the record further establishes that an SM's authority to set or adjust rates of pay depends on the

SM and factors such as whether the store is a unionized store governed by a collective bargaining

agreement.[53]  For example, SM Hazara testified that she determines the hourly rate of new hires

based upon the prior work experience.  (Hazara dep. 57:3-58:12).  However, SMs Spencer and

Simons testified that due to union contracts, they had no authority to set rates of pay.  (Spencer dep.

151:22-152:18; Simons dep. 179:22-180:12.)

Significant variations exist in SMs' testimony about their responsibility for and involvement

in training – for example, SMs are responsible for training store associates, but the amount of time

SMs spend training store employees varies.  SM Simons only hired one new employee during his

short tenure as an SM, and thus spent minimal time training (Simons dep. 100:15-101:4), but

admitted that had he hired more employees, he would have spent much more of his time training

---

[52] Interviewing and selecting employees is defined as "management" by the regulations.  29 C.F.R. § 541.102.
[53] Setting and adjusting rates of pay is defined as "management" by the regulations.  29 C.F.R. § 541.102.

18

them.  (*Id.* 103:2-14).  In contrast, Plaintiff Indergit testified that training of store employees was

"ongoing and constant."  Indergit dep. 404; *see also* Otuaney dep. 65-66 ("Q.  What if someone's

not doing such a great job, what do you do?  A. Don't doing great job?  Q.  Yes.  A. Talk to the

person.  See how you can improve.  I re-coach and retrain the person."); Gerber dep. 203:15-23 ("Q.

What was the turnover like at 3883?  A. There was a lot of people who came and left but there were

also a lot of long-term employees also, a mixed bag I guess is the best way to put it. Q. And with the

higher degree of turnover comes more interviewing and more hiring and more training, right? A.

Sure.").

   Further, despite Plaintiff's claim that "[u]nequivocally, SMs do not have the authority to

terminate an employee" (Pl.'s Br. at 11), SMs had incredibly varying degrees of authority regarding

employee terminations.[54]  For example, SM Gerber had complete authority to terminate employees

without approval from higher management if the employees were within their 90-day probationary

period.  (Gerber dep. 145:19-146:2, 161:2-166:10.)  For employees who were past the 90-day

probationary period, Gerber would recommend their termination to either his DM, or the company's

human resources or loss prevention departments.  (*Id*. 164:20-166:9.)  Gerber could not recall an

instance where his termination recommendation was not followed.  (*Id.*)  SM Simons only worked

as an SM for two and a half months, and in that time had no occasion to terminate an employee, or

recommend an employee for termination.  (Simons dep. 61:20-62:6.)  Plaintiff Indergit describes his

authority changed over time, testifying that prior to 2005 or 2006, he had complete authority to

terminate employees without any approval from his DM, but that after 2005 or 2006, DM approval

was required.  (Indergit dep. 130:23-132:9.)  Prior to 2005 or 2006 when approval became

necessary, Indergit testified that he alone terminated and/or disciplined employees for attendance

---

[54] Recommending changes in status and disciplining employees is defined as "management" by the regulations. 29
C.F.R. § 541.102.

issues, failure to show up to work, stealing, cash register violations, vandalizing property, and insubordination.  (Indergit dep. 133:17-137:20.)  Indergit was unaware after 2005 or 2006 whether his termination recommendations were all approved, but admitted that all such persons left his store.  (*Id.* 126:11-127:4, 132:10-133:25.)  SM Hazara testified that although she consults with HR and her DM, she has the authority to terminate employees on her own.  (Hazara dep. 62:7-15.)

The testimony of SMs also demonstrates that they perform work "directly related to the management or general business operations"[55] of a Rite Aid store for purposes of the administrative exemption.  There are, however, wide disparities even in this testimony.  For example, some SMs performed duties affecting the store's sales or profitability, while others disclaimed such work.  SM Brad Gerber testified that he "built up the sales" in his store "[b]y doing a lot of things that we already discussed, fostering better feelings in the community, making sure that our in stock was in good shape, doing good ad ordering and recognizing what merchandise we were going to sell, creating a good environment in the store to make it a better shopping experience for the customers."  (Gerber dep. 275:15-24.)  In contrast, SM Santos testified that "people from corporate" were responsible for the profitability of the store.  (Santos dep. 249:17-22.)  As another example, the testimony of other SMs also establishes that, contrary to Plaintiff's claim that SMs have no input into "what products to sell," "sale items," or "the hours of a store" (Pl.'s Br. at 19-20), SMs have authority to request changes in the store hours of operation due to unique characteristics in his store's customer base (Gerber dep. 62:19-63:22), to suggest using a local neighborhood bank for money deposits (*id.* 195:19-196:14), to carry specific products (*id.*), and to place particular items on sale (Hazara dep. 75:25-76:13.)[56]

---

[55] 29 C.F.R. §541.200(a)(2).
[56] *Compare* Pl.'s Br. at 19-20, claiming – without supporting citations – that SMs have no such authority.

Thus, even the limited record concerning New York SMs establishes that, contrary to Plaintiff's unsupported arguments, SMs exercise a great deal of managerial authority for their stores, but the job duties they perform in running their stores vary SM-by-SM.

          b.      <u>SMs' Own Descriptions of Their Job Duties Differ.</u>

Rather than demonstrating a uniformity in job duties performed and that proof of the exemption defenses can be established on a classwide basis, the deposition testimony of SMs conclusively establishes the absence of uniformity in duties performed by each SM during the relevant period.  The SMs deposed offered divergent accounts as to whether, and to what extent, they performed managerial duties enumerated in the relevant interpretative regulations.  For example, Plaintiff's and SM Rand's testimony confirm that the day-to-day experience of and job duties performed by SMs vary depending on a number of different factors.  (Indergit dep. 46:13-48:14, 77:5-17, 248:15-249:10, 298:2-99:4, 334:12-336:7 (whether the store is a 24 hour location, employs night crews, is a training stores, has a loading dock, GNC department, or photo lab, the number of ASMs, the amount of the labor budget, the number of employees on the payroll); Rand dep. 51:11-19, 92:15-98:3, 101:17-103:11, 111:2-112:14, 155:4-156:16 (the personalities of the DMs, personality of the pharmacy manager, volume of pharmacy business, performance of ASMs, loss prevention issues in the store)); *see also* Gerber dep. 106:25-107:9 (store remodeling accounted for increase in responsibilities for SM); Spencer dep. 161:1-23 (certain managerial tasks, such as scheduling and closing the store, took less time as he gained experience in SM position).

Plaintiff's claim that "SMs spend the majority of their day engaging in non-managerial tasks," (Pl.'s Br. at 19) is not supported by the record, as numerous SMs testified that they do <u>not</u> perform many of these purportedly "non-managerial" tasks, or, if they do, they do not consume "the majority of their day" (*id*.).  For example, SM Blake does not clean the restrooms at his store (Blake dep. 30:2-8), does not work in the photo lab (*id*. 30:18-19), and does not decorate his store (*id*.

21

32:18-19).  When asked what he does, SM Blake succinctly responded, "I run the store."  (*Id.*

35:16-19).  The full record (as opposed to the few depositions repeatedly cited by Plaintiff)

demonstrates that whether an SM performs the tasks identified by Plaintiff varies person-by-person

and store-by-store:

| Examples of Differences in SM Testimony About Plan-O-Grams | | |
|---|---|---|
| Q.  Would you set that [plan-o-gram] up yourself?<br>A.  **No, you assign to an employee**.<br>(S. Khan dep. 47:3-4.) | Q.  What about the plan-o-grams, who would generally do those?<br>A.  **We have a cashier or the store clerks.**<br>(Outaney dep. 26:11-14.) | Q.  And were there times as a store manager at Rite Aid that you delegated planograms?<br>A.  **Yes.**<br>Q.  And then there were times that you made the decision and did them yourself?<br>A.  **Yes.**<br>(Spencer dep. 120:9-15.) |

| Examples of Differences in SM Testimony About Running the Cash Register | | |
|---|---|---|
| Q.  Okay.  Would you ever be on the register yourself, as the manager of that store?<br>A.  **No.**<br>(Otuaney dep. 38:16-19.) | Q.  If they're fully staffed, would there ever be a time that you would get on the cash register?<br>MS. LIGHT: Objection to form.<br>A.  **No.**<br>(S. Khan dep. 55:3-7.) | Q.  Would you agree with me that as a store manager you had to multitask pretty much whenever you were in the store?<br>A.  **Yes, I do.**<br>Q.  And so while you were doing things like teaching employees, you were also putting up stock?<br>A.  **Sometimes.**<br>Q.  And while you were doing -- while you were supervising employees sometimes you would also be running a cash register?<br>A.  **Sometimes.**<br>(Gerber dep. 227:16-228:2.) |

| Examples of Differences in SM Testimony About Stocking Shelves | | | | |
|---|---|---|---|---|
| Q.  You don't take merchandise out of boxes and put it onto the shelf?<br>A.  **No.**<br>(Blake dep. 23:23-25.) | Q.  So the stock clerks would stock the stockroom?<br>A.  **Yeah.**<br>Q.  Would you ever help them?<br>MS. LIGHT: Objection.<br>A.  **Help them** | Q.  If you are fully staffed, would there ever be a time that you would be helping stock shelves?<br>MS. LIGHT: Objection to form.<br>A.  **No.** | Q.  And so while you were doing things like teaching employees, you were also putting up stock?<br>A.  **Sometimes**. | Q.  And you also stock shelves, right?<br>A.  **Correct.**<br>Q.  And while you were stocking shelves, were you still in charge of the overall operations of the store, right? |

|  | **cleaning?  Yeah, I'll go there and give ideas, supervise them to clean.** (Otuaney dep. 28:21-29:4.) | (S. Khan dep. 54:22-55:2.) | (Gerber dep. 227:20-23.) | MS. REHMAN: Objection to form. A. **To a point, yes.** (Simons 162:24-163:9) |
|---|---|---|---|---|

| **Examples of Differences in SM Testimony About Cleaning Store** | | | |
|---|---|---|---|
| Q.  What about sweeping and cleaning, making sure that was done? A. **The store clerks.** Q.  Who? A. **The store guy, the store clerk.** Q.  Would you ever do that? A. **No.** (Otuaney dep. 26:15-21.) | Q.  Do you ever sweep the store aisles? A. **No.** Q.  Do you ever help clean them? A. **No.  Please stop asking me the same question differently.** (Blake dep. 26:6-10.) | Q.  Do the co-managers spend some time cleaning and organizing the stockroom? A. **Yes.** Q.  Do you do that, as well? A. **Not in this store, but I have done it.** Q.  In the last store you were in? A. **Yeah.** Q.  You would clean and organize the stockroom? A. **No.** MS. LIGHT:  Objection. A. **No, not on a regular basis, but let's say we had inventory or, you know, something that was getting out of hand, I would help out.** (S. Khan dep. 81:23-82:14) | Q.  Were you required to clean? A. **Yes.** Q.  Sweep? A. **Yes.** Q.  Mop? A. **Yes.** (Simons dep. 190:6-11.) |

| **Examples of Differences in SM Testimony About Truck Day** | | |
|---|---|---|
| Q.  Were you helping during this process to unpack and put things on the shelves also? A. **I assign it to employees.** Q.  So what are you doing while the employees are doing that? A. **I'm just supervise them, make sure everything goes in the right places.** (Otuaney dep. 76:13-20.) | Q.  What do you do when the truck is being unloaded, you personally? A. **Right now?** Q.  Yes. A. **At this store?** Q.  Yes. A. **My store is a high volume store, so I'm not there for the truck.** (S. Khan dep. 51:16-23.) | Q.  Were you required to stock shelves? A. **Yes.** Q.  Unload trucks? A. **Yes.** (Simons dep. 190:12-16.) |

*Compare* Pl.'s Br. at 19.

Not only do the job duties performed by SMs differ, but the amount of time SMs spent

performing what Plaintiff characterizes as "exempt" and "non-exempt work" (an issue that would

have to be determined individually, based on all the facts) is incredibly varied.  SM Spencer

testified:

> Q.   Do you think that it would be fair to say that to know how much time a store
> manager spent on specific duties we'd have to ask each store manager?
> MR. SABA:  Objection.  Form.
> A.   I think you would get different answers from different managers.  Different stores.
> Different sales volumes.  Different amounts of staff working.  So it would be hard to
> compare that, in my opinion.

(Spencer dep. 188:19-189:3.)  The regulations also recognize that "[c]oncurrent performance of

exempt and nonexempt work does not disqualify an employee from the executive exemption if the

requires of [executive employee status] are otherwise met."  29 C.F.R. § 541.106(a).  In this case,

many SMs admit to simultaneously performing exempt and nonexempt work:[57]

> Q.   And that's -- as a store manager you constantly have to perform different duties at the
> same time, right?
> MS. REHMAN:  Objection to form.
> THE WITNESS:  Yes.
> Q.   You constantly have to do more than one thing at once, right?
> MS. REHMAN:  Objection to form.
> THE WITNESS:  Yes.

Simons dep. 179:15-20; *see also* id. 178:22-179:20.

> Q.   Would you say that, to be an effective store manager at a Rite Aid store, you have to
> be able to multitask?
> A.   Yes.
> Q.   You're often doing many things at the same time?
> A.   Yes.
> Q.   And one of the things that you're supposed to be doing is supervising the employees
> at all times that you're in the store. Correct?
> A.   Yes.

Spencer dep. 117:4-16.

> Q.   So you had to complete the nonmanagerial tasks and the managerial tasks at the
> same time, right?
> A.   Sometimes.

---

[57] *Knott v. Dollar Tree Stores*, No. 06-cv-1553-LSC, 2012 WL 4341816, at *6 (N.D. Ala. Sept. 19, 2012) ("[w]hile the differences in the amount of time spent on any individual act of 'management,' such as training associates, might not seem material, these differences as a whole could ultimately lead to differing conclusions as to each employee's 'primary duty.'").

Gerber dep. 324:2-5.

| | |
|---|---|
| Q. | And all at times regardless of what you were doing you were supervising them, right? |
| A. | Supervising and manually working. |
| Q. | At the same time? |
| A. | Yes. |
| Q. | Continuously? |
| A. | Yes. |

Indergit dep. 257:22-258:6; *see also id*. 367:2-373:18.  In short, the significant differences in

Plaintiff's allegations, Plaintiff's and other SMs' testimony, and the testimony of Rite Aid witnesses

confirms that liability can only be determined on an individualized basis, and Rule 23's

requirements are not satisfied here.

## 2. Plaintiff's Purported "Corporate Control" Theory Is Belied By The Record Evidence.

Plaintiff attempts to circumvent the mandated individualized inquiry by asserting that Rite

Aid's alleged "policies, procedures and guidelines" created a uniformity of job duties susceptible to

class treatment.  In reality, this theory is again directly contradicted by the testimony in the record,

which demonstrates the absence of uniformity as to each SM's most basic managerial duties and

confirms the necessarily individualized nature of the inquiry.  *See* Exhibits 1-4.

### a. Rite Aid's Policies and Procedures Do Not (And Could Not) Run the Store.

Plaintiff's assertion that SMs are divested of discretion by the mere existence of Rite Aid's

policies is completely undercut by the record.  Like any responsible corporate citizen, Rite Aid has

established policies to ensure that all applicable laws and regulations are followed, and to ensure the

fair treatment of its customers and employees.  *See, e.g*., Simons dep. 122:5-10 ("Q:  Bringing in

HR is a way of making sure everyone is treated fairly, right?  A: Correct.")  SM testimony

establishes that it is within the discretion of the SMs to interpret policies and to discipline associates

for violations of the policies.  *See* Simons dep. 120:11-121:1 ("Q. You will agree, I think, that you

are responsible for enforcing company policy --… right? A. Agree.  Q. If an employee steps out of

line, violates company policy, you have a responsibility to stop that behavior, right? … A. Right.");

Gerber dep. 163:6-17 ("Q. And this company policy like you said you would have to interpret and

enforce that company policy on the employees in your store, right?  A. Well, some things you can

interpret, some things you couldn't.  Overages and shortages was light.  Attendance I believe also

was light.  Three days missed without calling or something like that, if that's what it was, I don't

remember, just giving an example, there's no gray area.  Performance is more interpretation.")

Further, although Rite Aid utilizes policies and guidelines, these materials do not evidence

the actual daily duties and responsibilities of SMs.  For example, Rite Aid's Vice President of Store

Operations, Tony Sadler, testified that because of the differences amongst stores, not all policies

apply to all stores, and that it is up to the individual SMs to apply appropriate policies.  Sadler

30(b)(6) dep. 25:16-26:6.  Sadler further explained that with respect to policies, "we look for best

practices and we provide best practices to our stores on different activities.  But we don't dictate

how they do any particular activity."  Sadler dep. 33:10-12.  For example, Plaintiff cites to a

document setting forth the layout of a store manager's office, but as Sadler explains, with regard to

the suggested office standards, "I probably visited half the stores in the chain and I have never seen

an office that looks like this."  (*Id*. 87:4-6.)  Sadler further testified that Rite Aid does not expect the

standards to be followed (*id*. 87:7-11), but rather that it provides the stores with guidelines.[58]  (*Id*.

86:20-24); *see also* DM Barrett dep. 113:17-114:7 (Q.  Do you expect your store managers to

---

[58] Even if Plaintiff had presented evidence of policies dictating the job duties of SMs, the mere existence of
corporate policies simply cannot eliminate the individual liability determinations required.  In *Weigele v.
FedEx Ground Package Sys., Inc*., 267 F.R.D. 614, 622 (S.D. Cal. 2010), the court recently decertified a class
of over 500 managers and explicitly rejected such an argument.  The plaintiffs in *Weigele* alleged that FedEx
created standardized policies and procedures, such as manuals, task lists, and work flow processes, for many
elements of their operation, which showed that the managers "perform a finite set of uniform duties."  *Id.* at
621.  The court found:  "Defendant's common processes and training are not overwhelmingly supportive of a
finding that common issues predominate. For example, the training materials provide instruction regarding the
tasks a Dock Service Manager would perform... This guidance, however, does not appear to instruct Plaintiffs
to perform non-exempt tasks and would provide no help to the Court in determining the actual work mix
performed by the Plaintiffs." *Id.* at 622.

follow that guideline [regarding SM's office]? A. No…. I just made sure that my office was clean and organized.  That's -- and that's what I expect my store managers to do.").  In any event, regardless of the number of "policies" in place, in a misclassification case it is each SM's actual job duties that matter, and where SMs testify as to numerous material differences in those actual job duties, no class can be certified.[59]

### b.   SMs Testified They Run Their Stores, Not DMs

Plaintiff's contention that Rite Aid "runs the stores via DMs while SMs serve as pawns carrying out specific and detailed instructions, possessing no authority" (Pl.'s Br. at 9), is also directly refuted by the record testimony.[60]  As set forth *infra*, SMs manage their stores, with little to no input from their DMs.  *See* section II.B.I.a, *infra*; *see also* Blake dep. 58:7-9 ("Q.  Are you in charge of your store, the store that you are the store manager of?  A. Yes.").  The SM testimony further demonstrates significant store-by-store variation in DM contact and oversight.  *See* Gerber dep. 43:7-45:4 (testifying that different DMs visited his store as few times as twice a month to as many as 10 times a month); Simons dep. 41:7-16 (testifying that his DM visited his store monthly for "[a]bout an hour."); S. Khan dep. 87:13-88:18 (testifying his DM is new and so visits his store

---

[59] *See also Cruz v. Dollar Tree Stores,* No. 07-2050, 2011 WL 2682967, at *8 (N.D. Cal. Jul. 8, 2011) (finding plaintiffs' reliance on "evidence that all store managers are given uniform training and training-related materials, use the same on-the-job tools, receive 'daily planners' that require them to perform certain tasks, and are subject to other [the employer's] policies intended to standardize the experiences of all store managers" was insufficient to prevent decertification of state-law misclassification claims). *Gardner v. Western Beef Props.*, No. 07-2345, 2011 WL 6140518, at *5 (E.D.N.Y. Sep. 26, 2011) (refusing to certify grocery managers' misclassification claims, specifically rejecting the plaintiffs' reliance on uniform classification and explaining the "plaintiffs in [*Hertz*] made the same argument," and the Second Circuit rejected it because "the real question is 'answered by examining the employee's actual duties.'" (quoting *Hertz,* 624 F.3d at 549-50)); *Ruggles v. Wellpoint, Inc.*, 272 F.R.D. 320, 339 (N.D.N.Y. 2011) (Although the court found that the single named plaintiff representing the NYLL class lacked standing, it further rejected the plaintiffs' reliance on "the overlap in the job descriptions," and rejected reliance on corporate guidelines because "even if all nurses in the proposed class used the … Guidelines, this would not dispense with the need for individualized inquiries."); *Guillen v. Marshalls,* 750 F. Supp. 2d 469, 476-77 (S.D.N.Y. 2010) (denying conditional certification of assistant managers' FLSA claims and rejecting plaintiff's reliance on common policies, a nationwide corporate management structure, and a uniform job description); *Hernandez v. United Auto Credit Corp.*, 2010 WL 1337702, at *4-5 (N.D. Cal. Apr. 2, 2010) (decertifying collective action where plaintiffs relied on employer's uniformly treating all supervisors nationwide as exempt and on a single job description since court still had to examine actual duties that supervisors performed because "actual work performed … varies significantly from branch to branch").

[60] Despite Plaintiff's contention that the day to day activities are dictated by corporate and DMs, the record testimony of SMs establishes variations in such alleged oversight.  *See e.g.,* Blake dep. 46:14-16 ("Q. Do SYSMs tell you what needs to be done in your store? A. No.")

every other day); Rand dep. 95:19-96:3 ("Q. So the amount of time that a DM may come and visit

your store could depend on what's going on in the store, correct?  A. It could depend on a lot of

factors.  Q. What other factors?  A. What the reports are of the store's condition.  What the reports

are of the customer service within the store.  If there are any maybe loss prevention factors that are

reported to him.")  Indeed, SM Gerber testified as follows:

> Q.   Most of the time, though, you weren't directly talking to the district manager, right?
> A.   The majority of the time that I was at work?  Correct.
> Q.   And so for most of the time that district manager was not directly supervising you?
> A.   Correct.

(Gerber dep. 233:19-234:2.)

DM testimony also reflects wide variation in the extent to which they supervised their SMs.

For example, New York DM Kim Smykla testified that there are some stores in her district she

visits only once every six to ten weeks.  (Smykla dep. 42:25-44:18.)  Smykla stated that the

difference in the length between store visits depends on a number of things, including whether the

Store Manager is new or if the store is a seasonal store where the store volume increases during

certain seasons.  *See id.*  New York DM Michael Dilallo testified that how often he visits stores

depends on the SM, and "[t]he leadership dimensions that the store manager encompasses.  Their

overall skill set" and further explained:

> If a store manager is strong and effective and, um, running the store the way that
> we just explained, I would see him probably once every two to three weeks.  If a
> store manager struggles in any area of running their daily business or if they have
> any questions for me or if they are brand new with the company, they would
> probably see me once a week, maybe even twice a week, especially when they
> are brand new.  That would be it.

(Dilallo dep. 76:20 - 77:18.)  There are thus material differences in each SM's and "freedom from

supervision," a factor in the executive exemption analysis under 29 C.F.R. § 541.203 (2004).

c.      The Use of Labor Budgets Does Not Support Class Certification.

Like other retailers, Rite Aid brand stores have annual budgets and track performance against budget.  Markley Decl. ¶ 4.  Many factors affect a store's actual weekly labor costs, including, but not limited to, the wage rate for each hourly employee, the total number of employees, tardiness/absences, turnover, and hours of operation.  *Id.*  During the relevant time period, store labor budgets (for hourly employees) in Rite Aid brand stores in New York varied widely, ranging from $988 to $18,954 per week, and even individual store budgets were subject to fluctuations, increasing or decreasing over time.  *Id.* ¶ 5.

Field-level management has discretion to make adjustments to each store's labor budgets. *Id.*  In addition, each SM has discretion to use his/her weekly labor budget as he or she deems necessary to adequately staff the store.  *Id.*; s*ee also* Hazara dep. 42:2-43:2 (SM Hazara testified that her store's labor requirements "sometimes" goes over the projected labor budget and, when they do, she speaks with her DM about it and she schedules more hours); *see also* DM Virga dep. 188:13-190:13 (stating that SMs in her district have the discretion to exceed their payroll budgets); DM Barrett dep. 197:15-198:15 (stating that SMs in his district have power to adjust store labor budgets without approval).  For example, SMs, including Plaintiff, testified that although a corporate program assists with creating a schedule, SMs are responsible for crafting a schedule that works depending on the needs of each store's employees.  *See* Hazara dep. 35:16-36:25 ("It depends on my team, my team member, how their hours are."); Blake dep. 39:8 ("I edit, create it and post [the schedule]"); S. Khan dep. 47:24-48:8 ("we are given hours and then dollar amount and we put it into that software and it creates a schedule for the store and we edit it to fit the needs of the store and then we post it.").  Plaintiff Indergit testified that he utilized his managerial discretion in creating the weekly schedules for his store.  Indergit testified that he would first look at the labor

budget and calculate the total number of hours he had available.  (Indergit dep. 200:24-201:10.)
How Indergit created his schedule varied during his employment, whether by hand or with the
assistance of software.  (*Id*. 185:18-186:12.)  No matter how he created his schedule, Indergit had to
make many adjustments to the schedule throughout the week.  (*Id*. 186:18-187:7.)

   Plaintiff's claim that SMs are not permitted to allow employees to work overtime (Pl.'s Br.
at 23) is directly contradicted by the record, which again reflects variations in discretion to use
overtime. *Compare* Indergit dep. 159:5-10 ("Q.  So it's not the amount of money that you had for
labor decreased, it's just that you couldn't use overtime?  A. Yes.  Q. That's your allegation?  A.
Yes."); *with* Hazara dep. 47:20-23 ("Q. Do employees in your store 4790 receive overtime?  A.
Sometimes, yes."); Otuaney dep. 45:20-23 ("Q. When you were the store manager of 4790, were
you permitted to give overtime to hourly employees, if necessary?  A. Yeah.").

   Plaintiff also falsely claims that "fewer labor hours were allocated to stores causing SMs to
spend more time performing non-managerial tasks"[61]  (Pl.'s Br. at 22.)  The record establishes that
whether SMs perform purportedly non-managerial tasks, and more importantly *why*, is subject to
wide variation.  For example, SM Khan testified that he has not seen the need to use overtime at his
store.  S. Khan dep. 63:4-9 ("Q. Do you ever request overtime for your employees? A. No, not
really.  Q.  Why?  A.  Well, I haven't seen the need for it.")  Despite this, SM Khan does not spend
time stocking, cleaning or running the cash register in his store.  (S. Khan dep. 54:22-55:7, 80:9-19,
82:7-9.).  SM Blake also testified that he has never been asked to use less overtime (Blake dep.
42:19-43:2), and that there has never been a time when things needed to get done in the store and he
did not have an associate to do it.  (*Id*. 43:17-22.)  Thus, contrary to Plaintiff's claim, the use of

---

[61] Plaintiff cites testimony that some store's labor budgets decreased over time.  *See* Pl.'s Br. at 22.  Thus, to correctly
determine whether a store's labor budget affected each class members' exempt status, the finder-of-fact would also have
to analyze any changes in each SM's job duties over time.  Such changes would not be limited to alleged changes in
labor budgets, but would also involve the addition of new policies or procedures throughout the class period (October
2002 to the present), that have allegedly affected SMs' job duties.

labor budgets provide no basis for common issues, because the record reflects they neither limit the discretion of SMs, nor are all SMs required to perform non-managerial tasks due to budget restrictions.[62]

        d.       <u>SMs Do Not Receive Uniform Training, Nor Would It Change the Need to Consider Their Actual Duties.</u>

Plaintiff claims, without any supporting citation, that Rite Aid "expects consistent training throughout the chain." (Pl.'s Br. at 18.) Plaintiff's claim is once again not supported by record. Vice President of Field Human Resources Kristin Crandall testified that with respect to Rite Aid's training of SMs, "there are different things that might apply, different types of training that might apply to different store managers." (Crandall 30(b)(6) dep. 123:15-17.) Ms. Crandall further stated that, "there is that basic suite of information that a trainer starts with, and then they have to vary the training. And that's a perfect example of why they would need to vary the training. Because the experience of the store managers are going to be different." (*Id*. 126:19-23.) Additionally, there are many SMs who have not gone through the Management Development Program ("MDP"), either because they have been employed with the company since before the program was created, or because they came in as SMs upon an acquisition of another company. (*Id*. 151:23-152:10.) Further, the testimony of SMs reveals the training they did receive is anything but "uniform." For example, SM Spencer did not go through the MDP, but rather received on the job training from a training SM for a period of three months. (Spencer dep. 39:2-17, 46:11-47:13.) In contrast, SM

---

[62] As the court in *Basco v. Wal-Mart Stores*, No. 00-3184, 2004 WL 1497709, at *7 (E.D. La. July 2, 2004), recognized:
> [p]laintiffs seek to make a corporate policy to keep employee wage costs low sufficient proof to justify the creation of a class of all Wal-Mart employees that have not been properly paid overtime in the last three years. It is obvious from the discovery presented that this "policy" and its effects are neither homogeneous nor lend themselves to collective inquiry. The effects of the policy as alleged are anecdotal, that is to say particularized. Plaintiffs' own witnesses demonstrate that the "policy" was not even uniformly or systematically implemented at any given store.

*See also Bernard v. Household Int'l, Inc.*, 231 F. Supp. 2d 433, 435 (E.D. Va. 2002) (management incentive plan rewarding managers for minimizing overtime hours and increasing unit productivity does not on its face encourage FLSA violations and therefore could not be a policy upon which conditional certification was based).

Saab received training in the store from a Rite Aid trainer after Rite Aid's acquisition of Eckerd. (Saab dep. 257:23-258:18.)

                e.      <u>Business Decisions to Classify SMs as Exempt, and Later as Both Exempt and Non-exempt, Do Not Support Class Certification.</u>

Plaintiff simultaneously claims that Rite Aid's previous uniform classification of SMs as exempt, and its restructuring rendering some SMs non-exempt, supports class certification. Notwithstanding this inconsistency, neither allegation supports certification.  With regard to the alleged uniform classification, the Second Circuit rejects such reliance: "the existence of a blanket exemption policy, standing alone, is not itself determinative of 'the main concern in the predominance inquiry:  the balance between individual and common issues."[63]  Moreover, in addition to the other variations, some SMs testified that they would have to make changes to the exempt SM job description for their position in order to make it accurately reflect their duties.  *See e.g.,* Santos dep. 208:17-226:16, Ex. 2; Gerber dep. 276:5-282:10, 284:24-291:9, Ex. 8.  Plaintiff Indergit admits that the job description *accurately* and *completely* states the job duties he performed and his responsibilities.  (Indergit dep. 147, Ex. 6.)  In contrast, opt-in Rand testified:

> Q.     But the job duties that a store manager performed every day may vary from the job description?
> A.     I can tell you personally that my experiences as a store manager varied quite a bit to this [job description].

(Rand dep. 75:4-9, Ex. 6.)

> Q.     The only way to know what job duties you actually performed as a store manager would be to sit down and have a discussion like we're having today, correct?
> A.     Yes.

---

[63] *Myers v. Hertz Corp.*, 624 F.3d at 549 (quoting *Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d at 957, 959 (9th Cir. 2009).)  The Second Circuit held:  "[a]gain, the question of entitlement to overtime pay is answered by examining the employee's *actual duties*."  *Id.* at 550 (emphasis added) (citing 29 C.F.R. §§ 541.2; 541.700); *Vasquez v. Vitamin Shoppe Ind., Inc.,* No. 10-cv-8820, 2011 WL 2693712, at *3 (S.D.N.Y. July 11, 2011) (uniform classification of store manager position as exempt was not a common policy or plan in violation of the FLSA). Plaintiff's citation to *In re Nassau County Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006), as support for his allegation that a blanket classification supports certification is mystifying, as the decision has no relationship to this issue.

(*Id*. 75:22:-76:2, Ex. 6.)  SM Simons testified as follows:

> Q.     Is the first page of this exhibit an accurate reflection of your job duties as store
>         manager?
> MS. REHMAN:  Objection to form.
> THE WITNESS:  Yes.
> Q.     Are there any other job duties that you feel should be added to make it more
> complete or accurate?
> A.     No.

(Simons dep. 171:22-172:8, Ex. 4.)

The 2009 restructuring of Rite Aid store leadership which lead to the creation of a non-exempt SM position also does not establish class treatment is appropriate.  The record establishes that Rite Aid adjusted the business model of some of its lower volume stores, which necessitated changes to the SM classification in certain stores where there was a need for flexibility in supervisory hours for SMs so as to ensure those stores could remain profitable.  Crandall 30(b)(6) 52:24-53:7, 53:23-54:12 ("whether the store manager is exempt or non-exempt, they are in charge of the store … in most cases a million plus dollar business."), *id*. 115:7-117:23 ("We chose to create a level of flexibility in our operations.  We chose for reasons of our operations to make this non-exempt job description.")  Moreover, Ms. Crandall testified that the store structure changes implemented in 2009 are not one size fits all.  *Id*.  74:18-76:15 (depending upon a Rite Aid store's front-end volume, "it gets a certain complement of management or leadership positions," the type of management is "part of the discussion as we reconfigure, open or move a store," and sometimes exempt status is determined by "go[ing] in and tak[ing] a look at the store's situation, the store manager, and mak[ing] our decision from there".).  In other words, changes to the classification

varied as a result of changes to the business model, again confirming the individualized nature of whether each SM was properly classified during the decade Plaintiff challenges.[64]

        f.    <u>Indergit's RFA responses confirm that mini-trials would be inevitable.</u>

Plaintiff Indergit's own responses to Defendants' Requests for Admission directly contradicting his prior sworn deposition testimony illustrate yet another example of the numerous factual and credibility determinations a factfinder would have to make for each opt-in SM based on his prior sworn testimony and/or the testimony of individuals he worked with:

| Plaintiff Indergit's Responses to Defendants' Requests for Admission | Plaintiff Indergit's Testimony Directly Contradicting His RFA Response |
|---|---|
| 23.  If you deny Request No. 22, admit that some Store Managers had supervisory authority over all employees in their store.<br><br><u>Response:</u>  [As incorporated from Response to Request No. 22] Plaintiff Indergit objects to this Request on the grounds that, as framed, it is overly broad, vague, and contains undefined terms.  For the definition of "authority" Plaintiff refers to the definition of the word as defined in Merriam-Webster Dictionary: "power to influence or command thought, opinion, or behavior."  Subject to and without waiving any of the foregoing objections: deny. | Q.  And the same was true when you were present as the store manager, you were responsible for all of the employees in your store, correct?<br>A.  **Yes.**<br>Q.  And you had supervisory authority over all of those employees, correct?<br>MS. KANE:  Objection to form.<br>A.  **Yes.**<br>(Indergit dep. 60:25-61:10.) |
| 53.  If you deny Request No. 52, admit that, whenever they were in the store, some Store Managers were supervising employees regardless of the task they were performing.<br><br><u>Response:</u>  Plaintiff Indergit objects to this Request on the grounds that, as framed, it is overly broad, vague, ambiguous, and contains undefined terms.  Subject to and without | Q.  And all at times regardless of what you were doing you were supervising them, right?<br>A.  **Supervising and manually working.**<br>Q.  At the same time?<br>A.  **Yes.**<br>Q.  Continuously?<br>A.  **Yes.**<br>(Indergit dep. 257:22-258:6.) |

---

[64] Despite Plaintiff's argument, courts have rejected any reliance on an employer's reclassification of a position as materially relevant to whether an employee is properly classified.  As Judge McMahon explained in *Clarke v. JP Morgan Chase Bank,* No. 08-Civ-2400, 2010 WL 1379778, at *22 (S.D.N.Y. Mar. 26, 2010), "the mere fact that an employee was reclassified cannot establish an employer's liability for the period prior to the reclassification.  [Plaintiff] does not cite a single case suggesting otherwise.  Instead, the exempt status of a given employee depends upon an analysis of the employee's *job duties.*"  (emph. in orig.).

| Plaintiff Indergit's Responses to Defendants' Requests for Admission | Plaintiff Indergit's Testimony Directly Contradicting His RFA Response |
|---|---|
| waiving any of the foregoing objections: deny. | Q. We've established that no matter what you were doing you were always concurrently monitoring and supervising your employees, correct? A. **Yes.** (Indergit dep. 403:12-16.) |
| 71. If you deny Request No. 70, admit that some Store Managers could issue written discipline to employees without approval. Response: Plaintiff Indergit objects to this Request on the grounds that, as framed, it is overly broad, vague, ambiguous, and contains undefined terms. Subject to and without waiving any of the foregoing objections: deny. | Q. And as a store manager, you had the authority to verbally counsel them, correct? A. **Yes.** Q. You had the authority to provide written discipline, correct? A. **Yes.** Q. You had the authority to suspend for up to three days without anybody's approval, correct? A. **Yes.** (Indergit dep. 126:4-14.) |
| 166. If you deny Request No. 165, admit that the most important job duty for some Store Managers was to ensure the overall success and profitability of their store. Response: Plaintiff Indergit objects to this Request on the grounds that, as framed, it is overly broad, vague, ambiguous, and contains undefined terms. Subject to and without waiving any of the foregoing objections: deny. | Q. The first a page, which is Bates labeled 1815 -- you're on it -- that states that your primary duties and responsibilities -- the primary duties and responsibilities of the store manager position were total responsibilities of the overall store management. That's a true statement, correct? A. Yes. (Indergit dep. 92:2-10.) |

## III.    CONCLUSION

Defendants respectfully request that Plaintiff's Motion for Class Certification be denied.

Respectfully submitted, this the 30th day of November, 2012.

*s/ Daniel E. Turner*
Daniel E. Turner
(admitted *Pro Hac Vice*)
daniel.turner@ogletreedeakins.com
Tracey T. Barbaree
(admitted *Pro Hac Vice*)
tracey.barbaree@ogletreedeakins.com
Beth A. Moeller
(admitted *Pro Hac Vice*)
beth.moeller@ogletreedeakins.com

Patrick G. Brady, Esq.
Bar No. PB1114
PBrady@ebglaw.com
**EPSTEIN, BECKER & GREEN P.C.**
One Gateway Center, 12th Floor
Newark, New Jersey 07102
Telephone: (973) 642-1900
Facsimile: (973) 639-8556

**OGLETREE, DEAKINS, NASH, SMOAK &**
**STEWART, P.C.**
One Ninety One Peachtree Tower
191 Peachtree Street, NE, Suite 4800
Atlanta, Georgia 30303
Telephone: (404) 881-1300
Facsimile: (404) 870-1732

*Attorneys for Defendants Rite Aid Corporation*
*and Rite Aid of New York, Inc.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| YATRAM INDERGIT, on behalf of himself and others similarly situated,<br><br>    Plaintiff,<br><br>    vs.<br><br>RITE AID CORPORATION, RITE AID OF NEW YORK, INC. and FRANK OFFOR as Aider & Abettor,<br><br>    Defendants. | **08 Civ. 9361 (JPO) (HBP)**<br>**ECF Case**<br><br><br>**CERTIFICATE OF SERVICE** |

**CERTIFICATE OF SERVICE**

I hereby certify that on November 30, 2012, I delivered a true and correct copy of **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** by First-class and electronic mail to all parties of record as follows:

| | |
|---|---|
| Robert John Valli, Jr.<br>Sara Wyn Kane<br>James Vagnini<br>Aneeba Rehman<br>Valli Kane & Vagnini, LLP<br>600 Old Country Road, Suite 519<br>Garden City, NY  11530 | Jay D. Ellwanger<br>Deven Hahn<br>DiNovo Price Ellwanger & Hardy LLP<br>7000 North MoPac Expressway<br>Suite 350<br>Austin, TX  78731 |

Keith A. Raven
Raven & Kolbe, LLP
126 East 56th Street, Suite 202
New York, NY  10022

Dated: November 30, 2012
Atlanta, Georgia

*s/ Daniel E. Turner*
Attorney for Defendants Rite Aid of
New York, Inc. and Rite Aid
Corporation

14045744.1 (OGLETREE)