<u>Exhibit O</u>

<u>Confidential</u>

This exhibit will be filed under seal

# Exhibit P

# Confidential

This exhibit will be filed under seal

Exhibit Q

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/19/12

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

YATRAM INDERGIT, on behalf of himself and
others similarly situated,

              Plaintiff,

      vs.

RITE AID CORPORATION, ET AL.,

              Defendants.

Index No: 08 Civ. 9361 (JPO)

---

## STIPULATION *ORDER*

Plaintiff Yatram Indergit ("Plaintiff") and Defendants Rite Aid Corporation and Rite Aid of New York, Inc. ("Defendants" or "Rite Aid"), by and through their respective undersigned counsel, hereby stipulate and agree as follows:

1.     Based upon data available to Rite Aid, at the time Rite Aid first implemented the job position of hourly Store Manager (job code L6) in June 2009, the breakdown of exempt and non-exempt Store Managers at Rite Aid brand stores was as follows:

| | |
|---|---|
| Exempt Store Managers (job code 40) | 2,944 |
| Non-Exempt Store Managers (job code L6) | 1,847 |

2.     The current breakdown of exempt and non-exempt Store Managers at Rite Aid brand stores is approximately as follows:

| | |
|---|---|
| Exempt Store Managers (job code 40) | 1,660 |
| Non-Exempt Store Managers (job code L6) | 2,253 |

Dated: September 1, 2012.

VALLI KANE & VAGNINI LLP

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

James Vagnini
*Attorney for Plaintiff*
600 Old Country Road, Suite 519
Garden City, NY 11530
(t): (516) 203-7180
(f): (516) 706-0248

Daniel E. Turner
*Attorney for Defendants*
One Ninety One Peachtree Tower
191 Peachtree Street, NE, Suite 4800
Atlanta, GA 30303
(t): (404) 881-1300
(f): (404) 870-1732

SO ORDERED and ENTERED
this _19_ day of ___SEPT___ 2012.

UNITED STATES DISTRICT JUDGE

Exhibit R

Page 1

1          IN THE COURT OF COMMON PLEAS OF
          PHILADELPHIA COUNTY, PENNSYLVANIA
2                  CIVIL DIVISION

3

4    LARRY EATON, KARRIEM    : APRIL TERM 2009
     PERKINS, and RICKEY     :
5    HAWKINS,                : NO. 00455
                             :
6        Plaintiffs          :
                             :
7        vs.                 :
                             : JURY TRIAL DEMANDED
8    RITE AID OF             :
     PENNSYLVANIA, INC.      :
9    d/b/a RITE AID, and     :
     RITE AID CORPORATION,   :
10                           :
         Defendants          :
11

12

13       DEPOSITION OF THOMAS P. ASTLEFORD, SR.

14

15          Taken in the law offices of The
16   Perry Law Firm, 305 Linden Street, Scranton,
17   Pennsylvania  18503, on Wednesday, December 1,
18   2010, commencing at 10:20 a.m., before Trisha
19   Sims, Certified Shorthand Reporter and Notary
20   Public.

21

22                  * * *

23

24

25      Job No. CS300726

THOMAS ASTLEFORD, SR.

Page 149

1    termination?

2    A.        She was using somebody else's charge

3    card.

4    Q.        Somebody's credit card?

5    A.        Yes.

6    Q.        And she did that at the store?

7    A.        Yes.

8    Q.        How did you go figure that out?

9    A.        How did I figure that out?  I can't

10   remember if it was a bag check, and I checked

11   the receipt, and it had somebody else's charge

12   card.  I can't remember how I found that out.

13            She was a cashier up front, and she

14   used somebody else's charge card to -- she

15   actually had the card, charge card -- to

16   purchase something in cosmetics.  I found out.

17   I forget how I found out, though.

18   Q.        What was the process for terminating

19   this employee?

20   A.        I had to get the approval of the

21   district manager first.  He got security or

22   whatever involved.  Okay.  And when I called

23   him and stuff, he said -- oh, God, what did he

24   say?  Just don't schedule her until they find

25   out definitely what we could do.

THOMAS ASTLEFORD, SR.

Page 150

1    Q.        They had to make sure that she had,

2    in fact, been using somebody else's credit

3    card?

4    A.        Yeah.  You can't just fire somebody.

5    You have to get the approval of your district

6    manager or your loss prevention supervisor.

7    Q.        So once you discovered she had the

8    charge card, you called the district manager

9    and recommended that that be investigated?

10   A.        Yes.

11   Q.        And that was investigated?

12   A.        Yes.

13   Q.        She was ultimately terminated?

14   A.        Yes.  I had to let her go.

15   Q.        Did you inform her that she was being

16   terminated?

17   A.        I didn't do that.

18   Q.        Who did that?

19   A.        I can't remember if it was the

20   district manager or loss prevention.

21   Q.        Do you recall any other occasion upon

22   which you had to terminate an employee?

23   A.        With Rite Aid or Eckerd?

24   Q.        Let's start with Rite Aid.

25   A.        Rite Aid, no, I don't remember.

THOMAS ASTLEFORD, SR.

Page 151

1    Q.       Do you recall having to --
2    A.       Yes.  I'm trying to think because
3    they closed the Peckville store, and I had to
4    let people go there, but it wasn't as formal.
5    It was just that I don't have more hours.  I
6    don't have any hours for you.  Because they
7    closed one store and brought their employees,
8    whoever wanted to come up to my store,
9    including that other manager that I said was a
10   co-manager, but she was the manager at the
11   Peckville store.
12   Q.       So when they closed the Peckville
13   store, in addition to another manager, you
14   actually had other hourly employees come to
15   your store?
16   A.       Yes.
17   Q.       You weren't able to offer all of them
18   employment?
19   A.       Right.  Well, for a certain period of
20   time, I was told -- I told the district manager
21   that -- again, I don't know if it was Marty or
22   Maryann at the time when they closed the store.
23   They said don't worry about payroll because we
24   know you have extra employees.
25          I had Gale there, which was extra

THOMAS ASTLEFORD, SR.

Page 191

1  could was filled.  My assistants did the same

2  thing.

3  Q.        With regard to ordering, how did you

4  ensure you would have the merchandise in stock

5  with regard to the order?

6  A.        A regular store order or ad order?

7  Q.        What's the difference?

8  A.        We used to get an ad book.  You used

9  to do the ad book.  It would -- the ad book

10  would, actually, tell me the last time that

11  item was on sale, okay?  We'll say

12  Christmastime.  Naturally, paper towels aren't

13  going to sell as much at Christmastime as they

14  would in the summertime because you have

15  picnics.  You'd sell some, but you won't sell

16  as much.

17        So if I sold, let's say, two cases at

18  Christmastime, but I might have sold six cases

19  in the summer.  So that would tell me the

20  difference.  So I would order accordingly to

21  when that ad -- that paper towel goes on sale

22  again.

23        So if I sold, we'll say, two cases at

24  Christmastime and it's going on sale again at

25  Christmas time, I would order maybe like three

THOMAS ASTLEFORD, SR.

Page 192

1   cases to make sure I had it, to make sure I'm

2   in stock.

3   Q.       Okay.  So you had the discretion to

4   order more or less?

5   A.       At the one given time for the ad.

6   Q.       For the ad order?

7   A.       For Eckerd now, for ad ordering.

8   Q.       Was that different for Rite Aid?

9   A.       Rite Aid, I believe, it came in

10  automatically.  They had the computer, and they

11  used to -- the computer figured out how much it

12  sold at what time of the year and how much

13  you're going to sell again.  So they ordered

14  it.

15  Q.       Were you able to adjust that order?

16  A.       The only way -- the district manager

17  had authorization to adjust all orders.  So if

18  I -- if our ad order was sent in and I caught

19  it and I said that's not enough, I'd have to

20  call my district manager and let him know

21  that's not enough.  Then it's his decision to

22  up it or not.  The same thing with seasonal.

23  We had no authorization to do anything like

24  that.

25           The only other way I could get around

THOMAS ASTLEFORD, SR.

Page 193

1    it, which, again, you're getting into

2    paperwork, which gets into shrink, is -- if I

3    notice that I'm not getting enough paper towels

4    for the ad, so rather than going through the

5    system, calling my district manager, I would

6    order another case of paper towels on my store

7    order.

8              Naturally, my cost is going to be

9    higher because on your ad order, you get a

10   special cost on ad orders because you're

11   ordering by quantity.

12             If I order in the store, I'm ordering

13   by case, which is my normal cost.  Maybe my

14   normal cost for that paper towel is 80 cents,

15   one roll of paper towels.  On my ad order, it

16   might only be 50 cents.  So now if I have to

17   order that through my regular store order,

18   believe it or not, that adds up to shrink.

19             The difference between 50 cents and

20   80 cents adds up to shrink.  That's another

21   paper trail where shrink comes in.  A lot of

22   managers do that.  They order extra, or they

23   order through the store orders.

24   Q.        Do you know whether other managers

25   had the discretion to change the ad order?

THOMAS ASTLEFORD, SR.

Page 194

```
 1   A.        I believe it's all the same for
 2   everybody.
 3   Q.        Do you know?
 4   A.        Yes, I do know.
 5   Q.        How do you know?
 6   A.        It's the same for everything.  We
 7   talk amongst managers.  It's also brought up at
 8   meetings.  If you have to change your ad order,
 9   call me first.
10   Q.        That was meetings within your
11   district?
12   A.        Yes.
13   Q.        Do you know if other district
14   managers allowed --
15   A.        That was Marty.  I don't know about
16   other districts.  Marty and Tony, I remember
17   that if you ordered something on an ad order
18   and you need something else -- say, like I
19   ordered 30 case of something and said, oh, no,
20   I need more, I'd have to call them.
21             Or it was also their discretion -- if
22   they look at my ad order and I only ordered 10
23   cases, he could go ahead and order 20 cases
24   without me even knowing.  That's happened,
25   because he looks at the ad order and looks at
```

THOMAS ASTLEFORD, SR.

Page 195

```
 1   your sales growth and everything.
 2                   MS. SHARMA:  Can we take a
 3   bathroom break soon?
 4                   MS. MOELLER:  Sure.
 5                   (A brief recess was taken.)
 6   BY MS. MOELLER:
 7   Q.       You understand you're still under
 8   oath?
 9   A.       Yes.
10   Q.       Does your store have a cash
11   register -- a vault which held cash at the
12   Eynon store location?
13   A.       Yes.
14   Q.       And who had the combination to the
15   vault?
16   A.       Myself.
17   Q.       Anyone else?
18   A.       Christine.
19   Q.       That's your assistant store manager?
20   A.       And Tracie.
21   Q.       And the shift supervisor?
22   A.       Yes.
23   Q.       And were all of -- you, the assistant
24   store manager and the shift supervisor, did you
25   all handle money from the safe?
```

THOMAS ASTLEFORD, SR.

Page 196

```
 1    A.        Yes.
 2    Q.        I believe you previously testified
 3    that bank deposits were made daily; is that
 4    correct?
 5    A.        Yes.
 6    Q.        Are you familiar with the concept of
 7    partnering?
 8    A.        No.
 9    Q.        Did you ever have to work with the
10    human resources manager regarding employee
11    issues?
12    A.        I would have to say yes, but I can't
13    remember which one.
14    Q.        You can't recall what the issue was?
15    A.        Right.
16    Q.        Do you recall who the human resources
17    manager was for the Eynon store location?
18    A.        It used to be Rob Beck.  He was the
19    district one.  There was a corporate one.  I
20    can't remember her name.
21    Q.        Okay.  Did you ever have to work with
22    the corporate human resources manager on an
23    employee issue?
24    A.        Yes.
25    Q.        You don't recall the occasion?
```

THOMAS ASTLEFORD, SR.

Page 197

1    A.        I can't recall the occasion.  I

2    remember doing it, but I can't remember.

3    Q.        Did you keep any records of the hours

4    that you worked during the time that you were a

5    store manager for Rite Aid?

6    A.        No.

7    Q.        Did you keep any record of hours that

8    you worked during the time you were store

9    manager for Eckerd?

10   A.        No.

11   Q.        During the time that you were store

12   manager for Rite Aid, approximately how many

13   hours a week did you work?

14   A.        Approximately 50.

15   Q.        How many hours a week did you

16   schedule yourself?

17   A.        I think it was 45.

18   Q.        And did the hours that you worked in

19   a given week vary?

20   A.        Yes.

21   Q.        For what reason would they vary?

22   A.        Well, depending on certain tasks that

23   had to be completed -- if we're getting store

24   visits, if the truck wasn't finished -- I'd

25   always normally stay.

THOMAS ASTLEFORD, SR.

Page 198

1    Q.        Anything else that would vary the

2    hours that you worked?

3    A.        Yes.  I'd go in every morning at

4    seven o'clock when I worked days.

5    Q.        I'm sorry.  Was there any other

6    reason that the hours that you worked in a week

7    would change, other than the truck or store

8    visits?

9    A.        No, I don't remember.

10   Q.        I believe you testified that the

11   store opened at eight o'clock; is that correct?

12   A.        It opened at 9:00.

13   Q.        The Eynon store?

14   A.        Yes.

15   Q.        You went in at seven o'clock a.m --

16   A.        Yes.

17   Q.        -- on the days that you worked the

18   day shift?

19   A.        Yes.

20   Q.        What did you do between seven o'clock

21   and nine o'clock when the store opened?

22   A.        Made deposits, count drawers, read

23   e-mails and SYSMs, solved anything that had to

24   be solved before the store opened.

25   Q.        What do you mean you solved --

THOMAS ASTLEFORD, SR.

Page 199

1   A.        Any displays that had to be done,

2   back stock I used to work a lot, when the truck

3   came in.

4   Q.        What do you mean by back stock?

5   A.        Well, if you get too many items that

6   come in on an order -- a lot of items you had

7   to order by the case instead of by the piece.

8            So if you got a case of an item that

9   holds, say, 24 cans of cat food and the shelf

10  only allows 12 and you have two on there, you

11  can only put 10 on there.  Now you have the

12  rest as back stock.  So that used to go in the

13  back room.  I'm just using that as an example.

14  And then every day, I'd go in and work the back

15  stock.

16  Q.        Okay.  Did the hours that you worked,

17  on average, during the week change at any point

18  during your employment with Rite Aid?

19  A.        Yes.

20  Q.        When?

21  A.        I don't know exactly.  A lot of

22  times, especially around the holidays and

23  everything, you're working extra.  The summer

24  months, you're working extra.

25  Q.        Any other reason that the average

THOMAS ASTLEFORD, SR.

Page 200

```
 1    hours that you worked in a week would change?
 2    A.        Well, if I'm going to get supplies
 3    for my store that I needed from another store,
 4    then I ran over, yeah.
 5    Q.        How many hours a week on average
 6    would you estimate that you worked during the
 7    time you were a store manager for Eckerd?
 8    A.        Between 50 and 60 hours.
 9    Q.        Did you work more during the week for
10    Eckerd than you did for Rite Aid?
11    A.        No, about the same.
12    Q.        Did you ever make any complaints to
13    anyone at Rite Aid during your employment about
14    the number of hours that you worked?
15    A.        I can't remember if I did.
16    Q.        You don't recall sitting here today?
17    A.        Pardon me?
18    Q.        You don't recall any complaints about
19    that, sitting here today?
20    A.        Not about the hours I worked.
21    Q.        Did you make any complaints to anyone
22    at Rite Aid about the tasks that you were
23    performing?
24    A.        Yes.
25    Q.        What did you complain about?
```

THOMAS ASTLEFORD, SR.

Page 227

1    Q.        Who created the plan-o-gram?

2    A.        Corporate.

3    Q.        And did you have any discretion to

4    change the plan-o-gram?

5    A.        I couldn't.

6    Q.        So you had to -- you had to make sure

7    that the store you were at, I guess, followed

8    the plan-o-gram for that particular store?

9                   MS. MOELLER:  Object to form.

10                   THE WITNESS:  Yes.

11   BY MS. SHARMA:

12   Q.        Now, did you have any authority to

13   change the store layout?

14   A.        No.

15   Q.        That was dictated by corporate?

16                   MS. MOELLER:  Object to the

17   form.

18                   THE WITNESS:  Yes.

19   BY MS. SHARMA:

20   Q.        Did you have any authority to change

21   the products that your store sold?

22   A.        No.

23   Q.        That was dictated by corporate?

24                   MS. MOELLER:  Object to form.

25                   THE WITNESS:  Correct.

THOMAS ASTLEFORD, SR.

Page 228

1   BY MS. SHARMA:

2   Q.        And did you have any authority to set

3   or change the price of products that were sold

4   at the store?

5   A.        No.

6   Q.        Did you have any authority to change

7   the labor budget for the store?

8   A.        No.

9   Q.        Did you have any authority to change

10  the truck day for the store?

11  A.        No.

12  Q.        Can you describe for the record what

13  the truck day is?

14  A.        Truck day is when you get your

15  initial -- when you do your order for the

16  store, your truck comes in on a certain day

17  from the warehouse, because it's picked and

18  pulled and put on a truck, and they deliver it

19  to your store.

20          That day was delegated by corporate

21  or by the warehouse, and that was your day and

22  time.  Mine was seven o'clock in the morning.

23  I would unload, on average, between, I would

24  say, six to 10 pallets on a truck; more on the

25  holidays.

THOMAS ASTLEFORD, SR.

Page 229

```
 1          You have to put it in your back room,
 2    set it down so the truck driver could go,
 3    because he's on a time schedule.
 4          And then once he's gone, you open the
 5    store, and do what you have to do and unload
 6    the trucks.  You have to break down the
 7    pallets, cut the shrinkwrap, cut them down,
 8    break it down, put the items in the perspective
 9    departments, like cosmetics.
10          They come in totes.  A lot of stuff
11    comes in totes.  It says on top what
12    department.  So you take that and make a stack.
13    We have what we call wheels.  We make a stack.
14    You wheel that out to cosmetics and go back and
15    get another stack; back and forth, back and
16    forth.
17    Q.       Who did that unloading?
18    A.       I did.
19    Q.       And was that part of your job as
20    store manager, or is that typically a job for
21    an hourly worker?
22                MS. MOELLER:  Object.
23                THE WITNESS:  No.  I always said
24    it was for an hourly worker; but, again, I was
25    told no payroll.  So I had to do it.
```

THOMAS ASTLEFORD, SR.

Page 249

```
 1                  SIGNATURE PAGE

 2                       OF

 3               THOMAS ASTLEFORD, SR.

 4

 5

 6

 7          I hereby acknowledge that I have

 8   read the foregoing deposition, dated

 9   December 1, 2010, and that the same is a true

10   and correct transcription  of the answers

11   given by me to the questions propounded,

12   except for the changes, if any, noted on the

13   attached errata sheet.

14

15

16

17        SIGNATURE: _____

18

19        DATE: _____

20

21

22        WITNESSED BY: _____

23

24        DATE: _____

25
```

# Exhibit S

Page 1

IN  THE  UNITED  STATES  DISTRICT  COURT

FOR  THE  SOUTHERN  DISTRICT  OF  NEW  YORK


YATRAM INDERGIT, on Behalf

of Himself and Others

Similarly Situated

        Plaintiff        Civil Action No.:

vs.        1:2008cv09361

RITE AID CORPORATION, RITE

AID OF NEW YORK, INC. and

FRANCIS OFFOR as Aider &

Abettor

        Defendants

_____/


        The deposition of BRIAN BOGASH was held on

Wednesday, July 20, 2011, commencing at 10:00 a.m., at

the Offices of Gore Brothers Reporting &

Videoconferencing, 20 South Charles Street, Suite 901,

Baltimore, Maryland 21201, before Susan M. Wootton,

Notary Public.


REPORTED BY: Susan Wootton, RPR, CLR

Page 70

```
 1                 THE WITNESS:  Not really.
 2                 MS. BARBAREE:  Did you ever fail one?
 3                 THE WITNESS:  No.
 4        Q      Were you ever disciplined in any way for
 5   SMTs in any of your stores?
 6        A      No, ma'am.
 7        Q      Those were just things that, as a good
 8   store manager, you knew that you needed to do?
 9        A      Yes, ma'am.
10        Q      Did you hold your assistant store managers
11   responsible for cashier analysis?
12                 MS. SCOTT:  Objection to form.
13                 THE WITNESS:  Yes.
14                 MS. BARBAREE:  And did they write up
15   cashiers for overs and shorts?
16                 THE WITNESS:  Sometimes yes, sometimes no.
17   If it was sometimes no, it would result in me doing a
18   coaching and counseling, which was a written form
19   explaining to them why it was important that, that they
20   document what goes on in their shift.
21        Q      So you would actually coach and counsel
22   your ASMs if they had not properly coached and
23   counseled the store associates?
24        A      That's correct.
25        Q      And I assume your assistant managers also
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.          1:2008cv09361
Brian Bogash                                                      July 20, 2011

Page 71

 1    handled deposits?

 2          A     Yes.

 3                And just going back to the SMTs, once you

 4    had two SMTs that were bad, the third, the third one

 5    you failed, it was just, it was just termination.

 6                There was no, there was no salvation at

 7    that point.

 8          Q     While you were a store manager at Rite Aid,

 9    were you the highest ranking employee in the store?

10                MS. SCOTT:  Objection to form.

11                THE WITNESS:  When, when there was no

12    corporate visit, yes, I was.

13                MS. BARBAREE:  As the store manager at

14    Rite Aid, did you understand that you were in charge of

15    the store?

16                MS. SCOTT:  Objection to form.

17                THE WITNESS:  That's a, that's a weird

18    question.  We were -- one of the biggest conversations

19    that we had, that I had with other managers is the way

20    the company runs the business, you're really not

21    managing the business.

22                You're basically a store operator because

23    of corporate compliance.

24                MS. BARBAREE:  In your opinion, could your

25    stores be run without you as store manager?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.          1:2008cv09361
Brian Bogash                                          July 20, 2011

Page 72

1            MS. SCOTT:  Objection to form.

2            THE WITNESS:  The stores that I was in?  I

3    would have to say no because they were -- pardon me --

4    they were in the crapper before I took them over.

5            Several stores, several stores, Smith

6    Avenue store, I ran, I cleaned it up.  We had a good

7    shrink.  We had great sales.

8            I left.  I was gone for almost a year, and

9    then I was asked to go back and clean the store up

10   again.  So, in that case, the store did not run as well

11   without me.

12           The store right around the corner from

13   here, which was Store 2211, that I was moved out of the

14   store and then asked to come back and take the store

15   over.

16           Mark Farling's exact words, when he

17   re-recruited me the last time, we haven't had a good

18   shrink, a good store visit or good sales, come to think

19   of it, there's been nothing good about that store since

20   you left.

21           When I took over, it was a store that

22   looked like it was when I took it over the first time,

23   just basement full, dirty floors, dirty condition, poor

24   inventory, just, just in general poor store conditions,

25   unsanitary store conditions.

Page 158

```
 1        A      No.

 2        Q      -- while you were at 390?

 3        A      No.

 4        Q      So she said she wanted to but she didn't?

 5        A      Right.

 6        Q      And you said that you hired at least two

 7   people there, right?

 8        A      Uh-huh.

 9        Q      Yes?

10        A      Yes, ma'am.

11        Q      Did you ever allow your assistant store

12   managers to interview candidates?

13        A      Yes.

14        Q      Certain assistant store managers or all of

15   them?

16        A      Most of my assistant managers.  It's part

17   of, part of trying to build their, build their

18   knowledge and people skills is having them do things.

19              And sometimes I would interview somebody.

20   I like the person, I would like for you to interview

21   them to see what you think.  You know, I would even sit

22   in on some of the interviews, and after the interview,

23   I would sit and ask about open questions and ways they

24   can actually interview people a little bit better.

25              You know, my goal was to try to get people
```

Page 159

1    promoted.

2         Q    Did they actually, your assistant store

3    managers actually pull applications sometimes?

4         A    No.

5         Q    No?

6         A    No.

7         Q    You were the only person who did that?

8         A    Yes, ma'am.

9         Q    And can you think of a loss prevention

10   manager who actually interviewed a candidate that you

11   were considering for one of your stores?

12        A    Jim Carnes, Bob Raybold, they would

13   interview anybody that was going for a promotion from

14   cashier to shift or shift to assistant.

15             Those people would be interviewed by

16   district manager or loss prevention manager.

17        Q    So promotions.  Yes?

18        A    Yes.

19        Q    But not initial hires.

20        A    No.

21        Q    How many employees do you think you hired

22   while you were a store manager for Rite Aid?

23        A    Oh, boy, 17 years?  Hundreds.

24        Q    How many employees did you fire while you

25   were store manager for Rite Aid?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.                    1:2008cv09361
Brian Bogash                                                               July 20, 2011

Page 160

 1        A      Well, we weren't -- we were allowed to
 2   make, make decisions that we ran through the district
 3   manager, where they would let us know if we could fire
 4   the person or not.
 5               Unless it was a loss prevention issue, and
 6   then loss prevention would not let us fire the person
 7   until they came in and interviewed them on an exit
 8   interview.
 9        Q      Is it your testimony that you did not ever
10   terminate an employee without running it by your
11   district manager or loss prevention?
12               MS. SCOTT:  Objection to form.
13               THE WITNESS:  No, it was against company
14   policy.
15               MS. BARBAREE:  You did not do that.
16               THE WITNESS:  No.
17        Q      And was there ever a time that you
18   recommended to a district manager that someone be
19   terminated and that person was not terminated?
20        A      Yes.
21        Q      How many times did that happen?
22        A      Multiple times.
23        Q      How many?
24               MS. SCOTT:  Objection to form.
25               MS. BARBAREE:  How many, objection to form?

Page 161

```
 1   What's the objection?
 2            MS. SCOTT:  You're asking him to speculate.
 3   He said he didn't remember.
 4            MS. BARBAREE:  No, he didn't.  He said
 5   multiple times.
 6            THE WITNESS:  Yes, I mean, it was multiple
 7   times but, you know, again, you're asking me for a
 8   quantity over 17 years.
 9            You know, a lot of times, like I had one of
10   the people that I worked with downtown, she was
11   insubordinate, she was rude to customers, she came in
12   out of dress code.
13            She was written up for all of those.  She
14   was talked to by me.  I sent my write-ups to the
15   district manager.  The district manager moved her to
16   the store down the street.
17       Q    So she moved out of your store?
18       A    She was transferred out.
19       Q    Can you think --
20       A    I had a stock --
21       Q    I'm sorry, go ahead.
22       A    I had a stock guy who wasn't performing his
23   job function.  We thought that he might be stealing.
24            I brought it to loss prevention.  They
25   needed a stock guy at the store down, down the other
```

Page 265

1    during the day.

2              A lot of that list -- some of it was for

3    team members, but it's impossible for you to give,

4    like, cycle counts to a team member who's on a register

5    and expect for them to finish up 266 cycle counts that

6    are at the other side of the store and expect for them

7    to still do register functions.

8              So there were things that you would have

9    people sometimes help you with, but a lot of it, you

10   know, "tag, you're it," is the expression we always

11   used.  You know, you would run out of time with your

12   other people, or you would be short staffed, or you

13   would end up doing most of this stuff pretty much

14   yourself.

15       Q    Which of those duties would you consider to

16   be nonmanagerial duties?

17             MS. BARBAREE:  Objection to form.

18             THE WITNESS:  Do I answer that?

19             MS. BARBAREE:  Yes.

20             THE WITNESS:  Okay.  Cleaning the

21   bathrooms, washing the windows, sweeping the floor,

22   stocking the shelves, unloading a truck, ringing a

23   register.

24             Like I said, there were times, you know,

25   and there's always going to be times that a manager, I

Page 266

```
 1   mean, even -- and I hate to go off a little bit -- but

 2   the manager at Safeway, every now and then I see Paul

 3   on a register ringing people up because all the

 4   cashiers are busy and because the needs of the business

 5   require it.

 6           But on a regular basis, when we looked at

 7   the schedule, there were a lot of times when we

 8   actually scheduled ourselves to be a cashier because we

 9   didn't have the budget.

10           MS. SCOTT:  How many hours a week did you

11   work, typically, on average?

12           MS. BARBAREE:  Objection to form.

13           THE WITNESS:  Probably 70-plus.

14           MS. SCOTT:  And out of those 70-plus hours,

15   how many did you devote to nonmanagerial tasks?

16           MS. BARBAREE:  Objection to form.

17           THE WITNESS:  Probably, probably at least

18   40 percent of the hours.

19           MS. SCOTT:  How many hours a week did you

20   spend at the cash register, working the cash register?

21           MS. BARBAREE:  Objection to form.

22           THE WITNESS:  Probably as many as 15 to 20.

23           MS. SCOTT:  How many hours a week did you

24   spend unloading a truck?

25           MS. BARBAREE:  Objection to form.
```

Page 267

 1              THE WITNESS:  Two trucks a week at 374, two

 2    and a half hours unloading and sorting, so that would

 3    be five hours a week at that store.

 4              Downtown we had street delivery.  Sometimes

 5    it took us four hours to get a truck in, but we only

 6    got one a week.

 7              Again, downtown, nonmanagerial tasks would

 8    be, we would also go with carrying merchandise up and

 9    down two flights of stairs because our stockroom was in

10    the basement.

11              MS. SCOTT:  And how frequently would you do

12    these nonmanagerial tasks?

13              MS. BARBAREE:  Objection to form.

14              THE WITNESS:  Daily.

15              MS. SCOTT:  To your knowledge, were these

16    tasks that we've been talking about as nonmanagerial

17    tasks, were they part of the job description of a store

18    manager?

19              MS. BARBAREE:  Objection to form.

20              MS. SCOTT:  Already?

21              THE WITNESS:  No, ma'am.

22              MS. SCOTT:  Did doing these nonmanagerial

23    duties affect how you were able to run your store?

24              MS. BARBAREE:  Objection to form.

25              THE WITNESS:  Yes.

Page 268

1              MS. SCOTT:  In what way?

2              MS. BARBAREE:  Same objection.

3              THE WITNESS:  Because you can't manage

4     people, and there are a lot of times when you don't

5     have people to manage.

6              Again, the work list that we would come up

7     with during the day on a day that, that there weren't

8     ample or there weren't sufficient crew, you would be --

9     it was you and one person.

10             Therefore, you're really not managing a

11    business, you're working the business.

12             MS. SCOTT:  Were you able to fully

13    supervise your employees when you were doing these

14    nonmanagerial tasks?

15             MS. BARBAREE:  Objection, leading.

16             THE WITNESS:  Not really.

17             MS. SCOTT:  In what ways did it impede you

18    from supervising?

19             MS. BARBAREE:  The same objection.

20             THE WITNESS:  Oh, okay.  Lunch coverage is

21    a good example.  You're by yourself covering for, for

22    somebody who is ringing a register, who was ringing a

23    register, now you're ringing the register.

24             You have a security guard on the floor who

25    is, who is a nonstore member.  He is a member of the

Page 269

```
 1   loss prevention team, so his job is only to keep an eye
 2   on the floor.
 3             And then, of course, you have nobody there
 4   other than yourself to manage at times.
 5             MS. SCOTT:  And did Rite Aid expect you to
 6   supervise the store while you were still doing these
 7   nonmanagerial tasks?
 8             MS. BARBAREE:  Objection to form.
 9             THE WITNESS:  Yes.
10             MS. SCOTT:  Do you feel like these
11   nonmanagerial duties prevented you from truly being
12   able to manage the store?
13             MS. BARBAREE:  Objection to form.
14             THE WITNESS:  Yes.
15             MS. SCOTT:  Did you feel like you had the
16   autonomy to run your store at any time?
17             MS. BARBAREE:  Objection to form.
18             THE WITNESS:  No, we were a store -- we
19   were store operators, not store managers.
20             The closest thing I ever came to being able
21   to manage a store was Store 2211 here on Baltimore
22   Street, where I was allowed to make marketing and
23   merchandising decisions.
24             But I wasn't able, again, to make staffing
25   decisions to have the proper amount of employees in the
```

Page 270

1    store to run the store how I saw fit in the hours that

2    I was supposed to be working.

3                MS. SCOTT:  Did you ever have the power to

4    alter the budget?

5                THE WITNESS:  No.

6                MS. SCOTT:  Did you ever have the power to

7    alter the number of hours that the store was given?

8                MS. BARBAREE:  Objection to form.

9                THE WITNESS:  No.

10               MS. SCOTT:  Do you believe that Rite Aid

11   created a budget policy that left most, if not all, of

12   the Rite Aid stores inadequately staffed?

13               MS. BARBAREE:  Objection to form.

14               THE WITNESS:  Yes.

15               MS. SCOTT:  And do you believe that store

16   managers were working in a nonmanagement capacity

17   because they were, because the store was inadequately

18   staffed?

19               MS. BARBAREE:  Objection to form.

20               THE WITNESS:  Yes.  Right to the point

21   where, if you look at the job description at least, and

22   again, the job descriptions have changed throughout the

23   years, just like the handbooks and everything else.

24               One of the lines in the job description is

25   any other tasks handed down by the district manager or

Page 271

```
 1   through corporate.  I don't know exactly what the
 2   phrase is, but it's easy enough to go on the Internet
 3   and pull it up and see.
 4           So, again, we're back to the WIT method,
 5   which is whatever it takes to run it under the
 6   company's parameters.  And, you know, we weren't
 7   allowed to just make decisions on our own without,
 8   without -- you could call it partnering.
 9           But partnering is when you have a good
10   objection, and you're talking to somebody and they
11   understand your point of view, and they could make a
12   difference.
13           But to do the same thing and they agree
14   with you, and they say, but you don't have the hours,
15   you know, maybe if you work by yourself a couple days a
16   week in the morning, you'll have the six extra hours to
17   have that extra person on truck.
18           MS. SCOTT:  Were the assistant store
19   managers also performing nonmanagerial duties?
20           MS. BARBAREE:  Objection to form.
21           THE WITNESS:  Yes, ma'am.
22           MS. SCOTT:  And they were salaried, is that
23   correct?
24           THE WITNESS:  Yes, ma'am.
25       Q    Earlier on, you said that there were
```

Page 272

1    several ways for a store manager to increase

2    profitability, and I would like to talk about

3    profitability.

4             What are some of the ways that you would

5    increase profitability as a store manager?

6        A    In Store 2211, the way we increased

7    profitability was, we're selling single sodas that were

8    brought into the store as, as 12-packs.

9             What it did was, it took an item you were

10   selling for $2.49 to $3.89 and selling them

11   individually through the cooler at 99-cents a can would

12   mean that you were ringing $12 instead of the less than

13   $4.

14            That was a way we were allowed to -- not

15   really allowed to -- but they didn't really care if we

16   did or not.  We brought in cases of beer and did the

17   same thing with where we sold a lot of single serve.

18            We increased sales by giving free T-shirts

19   to anybody that bought $25 of vodka or tequila.

20            We used the vendor-free goods to help drive

21   sales until the liquor laws changed in Maryland.

22       Q    Was one of the ways that you would increase

23   profitability to have the manager work more hours?

24            MS. BARBAREE:  Objection to form.

25            THE WITNESS:  Actually, yes.

Page 273

```
 1            It would have been directly related to that
 2  because that's what we -- as payroll became tighter,
 3  they were using salaried management to make up the
 4  extra hours and the workload for doing those tasks.
 5            MS. SCOTT:  And in regards to overtime,
 6  would overtime be a way -- or not allowing employees to
 7  participate in overtime be a way, to make the store
 8  more profitable?
 9            MS. BARBAREE:  Objection to form.
10            THE WITNESS:  It definitely would.
11            MS. SCOTT:  Did your nonmanagerial tasks
12  cut into the time that you spent trying to increase
13  profitability in the store?
14            MS. BARBAREE:  Objection to form.
15            THE WITNESS:  Yes.
16            MS. SCOTT:  And would you agree that
17  creating the budget affects profitability?
18            MS. BARBAREE:  Objection to form.
19            THE WITNESS:  Yeah.
20            MS. SCOTT:  And creating the payroll, would
21  that also affect profitability --
22            MS. BARBAREE:  Objection to form.
23            MS. SCOTT:  -- of the store?
24            THE WITNESS:  Yes.
25            MS. SCOTT:  Okay.  And who set the payroll
```

Page 274

1    and who set the budget?

2              MS. BARBAREE:  Objection to form.

3              THE WITNESS:  It was based -- I don't know

4    who in corporate or where it came from.

5              I did have the pleasure at one point of

6    helping start getting numbers together.  And, again,

7    the numbers, how they were put to me by Mark was, you

8    know, was, you know, this is what I have to work with,

9    and I have to figure out who to cut and who not to cut.

10             So it became -- so you would have one store

11   running at 12, 14 percent payroll, while you had

12   another store, like Lexington Market, that ran at under

13   6 percent payroll, which makes no sense because percent

14   to sales budget should be equal to a certain point.

15             So stores were up to a certain volume, but

16   once they're down below a certain volume, there's still

17   a minimum necessity of running a store.

18             MS. SCOTT:  But was it ever the store

19   manager's duty to create the budget or payroll?

20             MS. BARBAREE:  Objection to form.

21             MS. SCOTT:  So would you say --

22             THE REPORTER:  I didn't get an answer.

23             THE WITNESS:  No.

24             MS. SCOTT:  Would you say that you were

25   ultimately in charge of the profitability of the store,

Page 275

1   or would you say that the district or corporate was

2   ultimately in charge of profitability?

3                   MS. BARBAREE:  Objection to form.

4                   THE WITNESS:  District manager was really

5   the one that would watch the profitability of the

6   store.

7                   We didn't have a whole lot of control over,

8   over any of that, honestly.

9                   MS. SCOTT:  Okay.  You've talked a little

10  bit about cleaning up other Rite Aids and also cleaning

11  up the 390 store.

12                  What tasks were involved in cleaning up a

13  store?

14                  MS. BARBAREE:  Objection to form.

15                  THE WITNESS:  Cleaning up a store was

16  everything from washing windows, taking merchandise off

17  shelves, scrubbing shelves, cleaning mouse crap off of

18  products, washing bags of candy down that, that showed

19  fluorescent.  When mouse pee is on bags of merchandise,

20  it glows.

21                  Some of that we were issued to turn back;

22  some of it we were issued to clean and put back on the

23  shelf.

24                  Cleaning the backroom out, scanning

25  damages, resetting planograms, changing prices,

Yatram Indergit, et al. v. Rite Aid Corporation, et al.        1:2008cv09361
Brian Bogash        July 20, 2011

Page 276

1   changing merchandising, pulling product withdrawals
2   that were health concerns, product withdrawals, just a
3   vast array of getting equipment fixed, fixing
4   bathrooms, fixing doors, having tiles replaced, having
5   doors fixed.
6              Sometimes as much as restaffing the store
7   or moving people around to get old blood out and get
8   new blood in to see if it made a difference.
9              MS. SCOTT:  What percentage of your tasks
10  that you completed when you were quote, unquote,
11  cleaning up a store, would you consider to have been
12  nonmanagerial?
13             MS. BARBAREE:  Objection to form.
14             THE WITNESS:  Probably at least 90,
15  95 percent on the cleanup.
16             MS. SCOTT:  Okay.  You said earlier, or you
17  mentioned earlier that, or you were -- excuse me,
18  strike that.
19             You were asked earlier if the store could
20  be run without you and you said no.
21             Why is that?
22             MS. BARBAREE:  Objection to form.
23             THE WITNESS:  Because the stores that I --
24  and maybe it's ego, so I apologize for that -- and
25  we'll just, we'll just hit the last couple of stores.

Page 277

 1              Store 2211 was a shit-hole, excuse me,
 2    totally, from the basement being overrun with mice to
 3    asbestos falling out of the ceiling, to old outdated
 4    and nasty merchandise on the shelves.
 5              I cleaned the store up.  They would, you
 6    know, have me go in and work on an acquisition and go
 7    help another store.  When I came back, the store was
 8    deteriorating back.
 9              When I left, when they pulled me out of the
10    store and moved me up to Store 369 in Parkville, where,
11    which is where I actually resigned out of the second to
12    the last time, their purpose for re-recruiting me,
13    which was back to Mark Farling, his words exactly were,
14    since they pulled me out of the store, the store hadn't
15    had a good visit, hadn't had a good shrink, hadn't had
16    good sales.
17              The only thing it's done is it's fallen
18    apart, and they had gone through several managers
19    there.
20              When they closed that store, they moved me
21    to, they moved me to Ingleside.  And, again, it was a
22    store that was being run very poorly.  Again, so it
23    might be ego; some of it might be just how I perceive
24    it.  And I would clean the store up and was again back
25    to just a good situation with the sales.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.                    1:2008cv09361
Brian Bogash                                                             July 20, 2011

Page 278

1           The sales in the store, 374, from what I

2    understand from, from one of the employees there, have

3    gone down since I left.

4           But across the street, where I work at the

5    CVS, my sales have gone up double digits two years now,

6    going on two years in a row, which is just, it just

7    goes to show that there are good managers out there,

8    and there are very poor choices in managers.

9           And poor choice of managers for somebody

10   like a district manager to have working in a store is a

11   bad business decision just for any company.

12          MS. SCOTT:  Could, could all the

13   nonmanagerial tasks have been completed in your store

14   if you weren't there to help complete them?

15          MS. BARBAREE:  Objection to form.

16          THE WITNESS:  No.  I'm sorry, no.

17          MS. SCOTT:  Now, you said that one of the

18   biggest challenges to running a Rite Aid store or to

19   being a store manager at a Rite Aid store was payroll.

20   Why is that?

21          MS. BARBAREE:  Objection to form.

22          THE WITNESS:  Because payroll is your

23   biggest resource.  It's also the largest expense on a

24   P and L.

25          So I don't mean to elaborate a little bit,

Page 287

1            THE WITNESS:  CVS's policy is just like

2    Rite Aid's in the fact that employees are paid for

3    every hour that they work.

4            CVS's policy is that they don't want you to

5    use overtime, but overtime that's approved by a

6    district manager is perfectly acceptable.

7            MS. SCOTT:  How many hours a week do you

8    work at CVS?

9            THE WITNESS:  I'm working about 45 to maybe

10   55.

11           MS. SCOTT:  How many of those hours are

12   spent on nonmanagerial tasks?

13           MS. BARBAREE:  Objection to form.

14           THE WITNESS:  By choice or by necessity?

15           MS. SCOTT:  Let's start with by necessity.

16           MS. BARBAREE:  The same objection.

17           THE WITNESS:  By necessity, probably maybe

18   four or five hours a week at the most.

19           MS. SCOTT:  And then what about by choice?

20           MS. BARBAREE:  The same objection.

21           THE WITNESS:  I think some of the things

22   that I do that by choice, that I don't have a choice, I

23   could, I could actually have that done a different way.

24           There are certain things that I do enjoy

25   doing that are nonmanagerial and, you know, like

Page 288

1   setting a season for an example.

2            I love merchandising and I don't really

3   necessarily have to do all the merchandising.  But once

4   I get started, it's just something that I just tear up

5   and I enjoy it.

6            It's a passion, you know, so, so I don't

7   have a problem with doing some of the things that are

8   nonmanagerial.

9            MS. SCOTT:  But you could have CVS

10  employees, nonmanagerial employees do those tasks?

11           MS. BARBAREE:  Objection to form.

12           THE WITNESS:  Right.

13           MS. SCOTT:  Who made the final decision

14  regarding hiring staff?

15           MS. BARBAREE:  Objection to form.

16           THE WITNESS:  Are you referring to, at CVS

17  or at Rite Aid?

18           MS. SCOTT:  Oh, I'm sorry, getting back to

19  Rite Aid.

20           MS. BARBAREE:  The same objection.

21           THE WITNESS:  We were able to -- we were

22  able to interview people, review applications,

23  interview people, have people do, it was called -- and

24  I don't know if it was called that at the end or not

25  because I don't remember what it was called -- a London

Page 289

1    House survey.

2              It was a series of 100-some questions, I

3    think it was, and at the end of it you would get

4    something that was a pass or a fail.

5              If you got back a pass, you could let the

6    district manager know that you were interested in

7    hiring that person and bring them in for an interview.

8              Once you brought them in for an interview,

9    you were, you would do the background.  And then once

10   the background came up, you would discuss it with the

11   district manager and they would either pull out or they

12   would say no, we want to put a hiring freeze on right

13   now, we're trying to reduce payroll.

14             MS. SCOTT:  So would you say the district

15   manager had the final say in hiring?

16             MS. BARBAREE:  Objection to form.

17             THE WITNESS:  The loss prevention

18   manager -- actually, the district manager and the loss

19   prevention manager had final say at who we hired.

20             MS. SCOTT:  And what about firing staff?

21   Who had the final say in that?

22             MS. BARBAREE:  Objection to form.

23             THE WITNESS:  District manager, loss

24   prevention manager or human resource manager.

25             MS. SCOTT:  And who made the final decision

Page 290

1   in disciplining staff?

2            MS. BARBAREE:  Objection to form.

3            THE WITNESS:  I don't quite understand.  In

4   disciplining staff, if you're talking about like a

5   write-up?

6            MS. SCOTT:  Yes.

7            THE WITNESS:  As a manager I was allowed to

8   write people up, okay?

9            If the employee objected to it and called

10  human resources, the district manager might call me up

11  and say, you know, you wrote so-and-so up for being a

12  half hour late, but you didn't write so-and-so up for

13  being five minutes late.  Tear up the written warning

14  and -- you know.

15           MS. SCOTT:  What about promoting staff?

16  Who had the final decision-making ability?

17           MS. BARBAREE:  Objection to form.

18           THE WITNESS:  District manager.

19           MS. SCOTT:  And did you evaluate staff, or

20  was that a district manager task?

21           MS. BARBAREE:  Objection to form.

22           THE WITNESS:  I evaluated most of my staff.

23           The only thing I can't remember, when

24  Tracey was asking me, I can't remember because -- and

25  some of this is because it all kind of blurs together.

 1          Because CVS's policy is that I do reviews

 2   on all hourly people, and the district manager does the

 3   reviews on all salary people.

 4          And for the life of me, I cannot remember

 5   if I did reviews on my salaried people at Rite Aid or

 6   not.

 7          MS. SCOTT:  Okay.  That's okay.

 8          Did the same systems, policies and

 9   procedures for training Rite Aid managers apply to all

10   the stores?

11          MS. BARBAREE:  Objection to form.

12          THE WITNESS:  I don't know.

13          I do know they had for, for the training

14   for the trainees, they had what was called Chinese

15   overtime.

16          They were given, they were given a salary

17   or an hourly salary, and if they worked over that, the

18   trainees would get -- not the trainers but the

19   trainees, would get a -- it was broken down real weird

20   where it didn't make any sense in the amount.  I mean,

21   we used to call it Chinese overtime.

22          No disrespect to anybody that has got

23   Chinese family members.

24          MS. SCOTT:  Other Rite Aid store managers

25   that you know of, do you know if they worked more than

Page 292

```
 1   50 hours a week?
 2               MS. BARBAREE:  Objection to form.
 3               THE WITNESS:  The ones that I knew, yes.
 4               MS. SCOTT:  Do you know if they had the
 5   same payroll issues --
 6               MS. BARBAREE:  Objection to form.
 7               MS. SCOTT:  -- as your store did?
 8               MS. BARBAREE:  The same objection.
 9               THE WITNESS:  Yes.
10               MS. SCOTT:  Do you know if they didn't have
11   enough employees to work or hours allocated in the
12   budget?
13               MS. BARBAREE:  Objection to form.
14               THE WITNESS:  That was, that was the main
15   talk between us managers was that none of us had ample
16   staff to get the jobs done.
17               We all worked -- we didn't have the ample
18   staff, okay, that some of the insinuations have been
19   put today, like, we had all these people to pull out of
20   the air to put here and here to do tasks.
21               So we all ended up having to work longer
22   hours to do the projects that needed to be done to keep
23   the store successful or to keep yourself out of harm's
24   way.
25               MS. SCOTT:  So did other store managers
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**  1:2008cv09361
**Brian Bogash**  July 20, 2011

Page 293

1    have to complete nonmanagerial tasks?

2                MS. BARBAREE:  Objection to form.

3                THE WITNESS:  Yes, ma'am.

4                MS. SCOTT:  How many of the store managers

5    that you know -- or percentage-wise, how many of the

6    store managers that you know of had to complete

7    nonmanagerial tasks?

8                MS. BARBAREE:  Objection to form.

9                THE WITNESS:  Joe Gillespie, a very good

10   friend of mine, he had the store right up the street

11   from me.  John Brown, he had the other store down the

12   street from me.

13               There were, there were a group of managers,

14   Larry Bowes, who, we were friends, we stayed friends,

15   Zahed Durrani, you know.

16               And I don't know what percentage, but the

17   managers that I talked to, Patty Merson, who had the

18   Store 3239, she didn't have the payroll to run her

19   store so she did a lot of nonmanagerial functions as

20   well.

21               It was an in-general conversation with all

22   of us.

23               MS. SCOTT:  You mentioned earlier when you

24   were speaking with Tracey that the, that there's a

25   minimum amount of people needed to run a store.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.                     1:2008cv09361
Brian Bogash                                                               July 20, 2011

Page 294

1                    What, what is that amount?

2                    MS. BARBAREE:  Objection to form.

3                    MS. SCOTT:  In your eyes?

4                    THE WITNESS:  Well, just for the safety of

5     the store, you know, low-volume store, you should

6     always have a minimum of two people in the store.  And

7     that's a minimum because, if you have one person on

8     register and one person on the floor that can also be

9     used as a loss prevention person or be used as stock

10    person or whatever they are, there's a minimum

11    necessity.

12                   It's not like a High's or 7-Eleven, where

13    you have a room not much bigger than this room, and one

14    person at a register, and everything valuable is behind

15    the counter and everything else is either food or

16    beverages or candy, and you know, there's nothing

17    really that could go that wrong.

18                   You know, because there are so many tasks

19    that were, that were given down that, when you, when

20    you started taking a look at what needed to be done,

21    there's just -- you know, a store that does $50,000 a

22    week still has to do the same compliances with

23    planograms, price changes, setting up -- setting up the

24    sale.

25                   Setting up the sale was an example.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**                    **1:2008cv09361**
**Brian Bogash**                                                              **July 20, 2011**

**Page 311**

1                        CERTIFICATE OF DEPONENT

2

3            I hereby certify that I have read and

4     examined the foregoing transcript, and the same is a

5     true and accurate record of the testimony given by me.

6

7            Any additions or corrections that I feel

8     are necessary, I will attach on a separate sheet of

9     paper to the original transcript.

10

11

12                      _____

13                              BRIAN BOGASH

14

15

16

17

18

19

20

21

22

23

24

25