# Exhibit U

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

YATRAM INDERGIT, on behalf      )
of himself and all others       )
similarly situated,             )
                                )
          Plaintiff,            ) CIVIL ACTION NO.
                                ) 1:08-cv-09361-
                                ) PGG-HBP
v.                              )
                                )
RITE AID CORPORATION, RITE      )
AID OF NEW YORK, INC.,          )
and FRANCIS OFFOR as            )
Aider & Abettor,                )
                                )
          Defendants.           )
                      - - -

The deposition of PHILIP P. BOURGEOIS III, taken on behalf of the Defendants, pursuant to the stipulations agreed to herein, before JoRita B. Meyer, Registered Merit Reporter, Certified Realtime Reporter, Certified Court Reporter, at Ogletree, Deakins, One Ninety One Peachtree Tower, 191 Peachtree Street, N.E., Suite 4800, Atlanta, Georgia, commencing at 9:46 a.m., August 3, 2011.

Page 26

1  Guard?

2      A.   Every day.  Every day.  We had an armed

3  guard at the door every day.  Two, actually.

4      Q.   And did the armed guard give you any

5  instructions in terms of things you had to do?

6      A.   No.  They -- well, they made us close at

7  6 o'clock.  I had to tell corporate that, that we

8  could only open during daylight hours.

9      Q.   And was your pharmacist there when you

10  first opened up the store?

11     A.   Are you kidding me?  The pharmacist?

12  He's the last one to show up.

13     Q.   So how did you deal with that?  Was the

14  pharmacy open?

15     A.   We couldn't open the pharmacy until a

16  pharmacist was there.

17     Q.   Because there has to be a licensed

18  pharmacist in order to dispense drugs, right?

19     A.   Exactly.

20     Q.   So were there a lot of people trying to

21  come in and get drugs?

22     A.   Not too many.  Well, at the time, not

23  too many.  They were mainly looking for batteries,

24  ice, water, the basic necessities.

25     Q.   And did you run out of those things?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Philip P. Bourgeois III                                      August 3, 2011

Page 27

1         A.    Oh, gosh.   I ran out before, yeah,

2    before the storm.

3         Q.    Was there anything that -- did you try

4    to order more, or did you try to get some after

5    the storm?

6              MS. REHMAN:   Objection to form.

7              You can answer.

8              THE WITNESS:   Actually, we had no way of

9         ordering other than through, you know,

10        communications through a phone, because

11        everything was basically down.   Corporate did

12        all the ordering for us and sent it down.

13   BY MS. PUCKETT:

14        Q.    So how did you -- did you -- who did you

15   call at corporate?

16        A.    I'm trying to think who it was I

17   contacted.   I can't recall who it was.   But it was

18   a certain line that we would call, and then they

19   would instruct them what trucks are coming and

20   what they're sending from the warehouse.

21        Q.    Did you -- was it a live person that you

22   talked to on the line?

23        A.    Yes.

24        Q.    And you don't remember what that

25   person's title was or anything?

Page 28

1          A.    No, I sure don't.

2          Q.    Did you have to order like that for the

3     entire month period when you were on a generator?

4          A.    Basically -- yeah.  Basically, we didn't

5     do a lot of the ordering.  Corporate did it,

6     because they were just assuming what you needed

7     and didn't realize -- you know, we kept saying

8     hey, we need, this, this, this, but they would

9     already have the trucks packed and already

10    shipping.

11               And we know what we need and we know

12    what the community needs, but they would not

13    adhere to that.  They were shipping what they had

14    in their relief trailers to us.

15         Q.    So they had prepared a certain list of

16    things for relief trailers, and they just sent

17    that no matter what?

18         A.    Exactly.

19               MS. REHMAN:  Objection to form.

20               You can answer.

21               THE WITNESS:  Yes.

22    BY MS. PUCKETT:

23         Q.    And did you tell them, hey, we need

24    this, this, this?

25         A.    Basically, I was telling them, yeah, we

Page 29

```
 1   need, this, this, this, we need flashlights, we

 2   need more of this, we need ice arranged, those

 3   type of things, you know.  And they would say

 4   okay, but we would never see it, basically.  I

 5   mean, we'd see a little bit of some things.

 6         Q.   Did you ask them why you didn't get

 7   everything that you asked for?

 8         A.   Not really.  Because it was kind of a

 9   thing of if you asked them why, you're just going

10   to hear, oh, well, it wasn't available or, oh,

11   this -- we can only ship this or that.

12              It was told to us many times that, hey,

13   we're shipping this; this is what you're getting,

14   basically.  You can put it on a wish list but...

15         Q.   So if I'm understanding you correctly,

16   you would assess the needs of the community, and

17   you would relay them to corporate, and only

18   sometimes you would see some of it; is that right?

19              MS. REHMAN:  Objection to form.

20              You can answer.

21              THE WITNESS:  Yeah, in other words, I

22         would tell them, hey, look, just for

23         instance, we need lamp oil, okay?  That was

24         something you sold a little bottles of it,

25         okay?  We didn't have the big bottles or
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP**
**Philip P. Bourgeois III**                                        **August 3, 2011**

Page 30

```
 1        anything, but we had the little ones.  But
 2        they were buying anything, you know, if you
 3        could get it in.
 4             So I said, look, I need -- I could use
 5        50 cases of this lamp oil here right now.  We
 6        can sell it.  I said people need lamp oil.
 7        And at this time it was through the district
 8        manager.  You know, we -- the district
 9        manager had set up his own hotline now, and
10        we could call within -- I think it was within
11        three or four days.  And we were on
12        conference calls with him every day,
13        basically in the morning.
14             And, you know, I would tell him, look,
15        we can -- we need this, this.  And basically,
16        he would just say, look, you're not going to
17        get this.  You're going to get whatever we
18        can send as far as from the warehouse.
19        They're going to send it to you.
20   BY MS. PUCKETT:
21        Q.   So was the warehouse near your store?
22        A.   No.
23        Q.   How far away was it?
24        A.   I think it was in Alabama.
25        Q.   Was Alabama affected by Katrina too?
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Philip P. Bourgeois III                                August 3, 2011**

Page 31

 1              MS. REHMAN:  Objection to form.

 2              You can answer.

 3              THE WITNESS:  Yeah, but not as -- not as

 4       critical.

 5   BY MS. PUCKETT:

 6         Q.    Was the warehouse affected by Katrina?

 7         A.    No.  They were in full capacity.

 8         Q.    How long were you taking in cash out of

 9   a shoebox?

10         A.    Until we got the generator.  So it was

11   about two weeks.

12         Q.    How did you secure the shoebox?

13         A.    We had a safe, not an electronic safe, a

14   regular.

15         Q.    At that time were cashiers allowed to

16   handle the shoebox, or did you require it to be a

17   manager?

18         A.    Well, we didn't have any cashiers until

19   about two weeks.  So it was basically me and one

20   other guy there for almost a week and a half,

21   running the store.

22         Q.    Who was the other guy?

23         A.    He was my clerk.  He was a young

24   gung-ho-type guy, so it was like -- I knew he

25   would make it of all people.

Page 51

```
 1   open from 9 to 3 instead of opening from daylight
 2   till dawn -- I mean till dusk.  That's what they
 3   wanted.  They wanted until dusk, until it got
 4   dark.  That was the hours the National Guard said.
 5            But, you know, listening to the radio
 6   and the news and that, we were hearing about, you
 7   know, people are getting looted, the pharmacies,
 8   they're hitting pharmacies a lot and stuff.  And,
 9   you know, National Guard -- this was towards more
10   New Orleans, but, you know, it wasn't meaning
11   that's going to be National Guard.  They were
12   hitting stores.
13            So I told them, I said, you know, my
14   suggestion is we open from 9 to 3.  I said, take
15   care of the community, they'll know we're open
16   from that time.  Then the employees can get home
17   safely and everything and that.  And he said,
18   well, let me get it through.  Let me call, let me
19   run it through corporate, see what they think.
20       Q.   Do you know whether he did that?
21       A.   No, I don't know.  I mean, he came back,
22   told me, no, we're going to stay the same hours.
23       Q.   So sounds like during this time and in
24   general there was red tape that you had to go
25   through; is that fair?
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Philip P. Bourgeois III                                     August 3, 2011

Page 52

1              MS. REHMAN:  Objection to form.

2              You can answer.

3              THE WITNESS:  Yeah.  In other words, you

4         know, as a store manager, you was more of a

5         puppet saying, okay, I'm here at the store,

6         this is what happened, this is what it is.

7         Now, what do you want me to do?  Here's what

8         I think.

9              And then, bam, well, no, here's what

10        we're going to do.

11   BY MS. PUCKETT:

12        Q.   What percentage of the time when you

13   were offered suggestions did they go against your

14   judgment, would you say?  Did they generally agree

15   with your judgment or not so much?

16        A.   Well, I mean, the store manager would

17   say, yeah, I understand, but, you know, I'm going

18   to have to run it through corporate or the

19   regional, whoever he was talking to.

20        Q.   Sorry.  I think I might have not been

21   clear.

22             How often when you asked to run

23   something through was your decision reversed, is

24   what I wanted to know.  Like, if you had, like, an

25   80 percent success rate or like a 50 percent, that

Page 53

 1   kind of thing.

 2           MS. REHMAN:  Objection to form.

 3           You can answer.

 4           THE WITNESS:  Oh.  I would say I had a

 5      30 percent success.

 6   BY MS. PUCKETT:

 7      Q.   So they didn't agree with your judgment?

 8      A.   They weren't taking any -- no.  They

 9   wanted basically -- their main concern was to keep

10   that store open and make that money while the

11   opportunity was there.

12      Q.   You're talking about during Katrina; is

13   that right?

14      A.   Yes.

15      Q.   In general, during non-Katrina times,

16   was it also 30 percent success rate or higher?

17      A.   Hmm.  That's -- that's basically.  I

18   mean, it's -- it was basically about 30 percent,

19   you know.  Any type of things you can come up

20   with, like, hey, I believe we need these type

21   shirts or this type of souvenirs for this area,

22   this, that, well, let me run it through corporate.

23           Next thing you know, well, no, they said

24   no, we can't do that.

25      Q.   So you're talking about primarily

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Philip P. Bourgeois III                                      August 3, 2011

Page 54

1    ordering when you say that, right?

2          A.   That and running the store, asking for

3    payroll according to sales and percentages, you

4    know, needs for the store, due to the fact that

5    either you're in a high -- a higher -- a bigger

6    store, so to speak, where you need more people to

7    watch the store and help customers deter any type

8    of theft they might try.  That type of thing.

9          Q.   So it sounds like as a store manager,

10   you were constantly observing what the needs of

11   the store were and relaying them to corporate.  Is

12   that fair?

13         A.   Yes, that's fair.  That's fair.

14         Q.   And then it was frustrating because you

15   only had a 30 percent success rate in terms of

16   suggestions that you made; is that also fair?

17         A.   Yeah, it was -- because coming from --

18   you know, I just came from WalMart, and I was

19   out -- I stayed out for about a year, enjoyed kind

20   of my freedom.

21              But, you know, coming back into -- into

22   it, I always said I wanted to come into something

23   smaller so that it was more -- not as hectic.  So

24   coming from them, you know, where you had all the

25   freedom to run your store, and do -- do

**Page 55**

 1   everything, getting into Rite Aid, it was like you

 2   was just a puppet there to turn that key and open

 3   that door and start taking that money.  You had

 4   no -- no basic say-so over the store, to run your

 5   store.

 6        Q.   When you say "puppet," you mean you had

 7   to implement company policy; is that fair?

 8             MS. REHMAN:  Objection to form.

 9             You can answer.

10             THE WITNESS:  Yeah.  In other words,

11        whatever the company said, you know, hey,

12        you're going to do this, you're going to do

13        that, you're going to do this.  And of course

14        I understood.  You know, you always have some

15        rules that corporate followed, that you had

16        to follow.

17             But also, if corporate is going to

18        involve you as a store manager, then they

19        should give you the freelance to run your

20        store accordingly to the community, to the

21        customers and what they want.  And you go and

22        you run your store accordingly.

23             And that's how -- that's how it was run

24        as far as -- you know, I was adjusted to as

25        far as WalMart.  And then coming here, it was

Page 56

 1       like your hands were tied.  You couldn't.
 2  BY MS. PUCKETT:
 3       Q.   So -- but it was your primary
 4  responsibility to enforce company policy; would
 5  you agree with that?
 6            MS. REHMAN:  Objection to form.
 7            You can answer.
 8            THE WITNESS:  Well, yeah, of course.  I
 9       mean, if the company said you got to do this,
10       you better do it or you won't have a job.
11  BY MS. PUCKETT:
12       Q.   And that includes telling -- telling the
13  employees to do things in accordance with company
14  policy, right?
15       A.   Yeah, when you had employees to work.
16       Q.   And when you say when you had employees,
17  are you talking about the Katrina period or just
18  in general?
19       A.   In general.
20       Q.   So meaning you -- did you have a lot of
21  call-outs or that kind of thing that you had to
22  deal with?
23       A.   Not as much call-outs as just basic
24  hours given and scheduling of where you -- you
25  were told basically how you had to set your

Page 57

1    schedule up.

2        Q.   You mean -- you're talking about labor

3    budgets?

4        A.   Yes.

5        Q.   So if I understand labor budgets

6    correctly, based on sales volume, maybe, from the

7    year before, the same week, it generates a certain

8    number of payroll hours, and then the district

9    manager can make changes to it; is that right?

10           MS. REHMAN:   Objection to form.

11           You can answer.

12           THE WITNESS:   Yeah.   It was a weird --

13       it was weird how it was set up, but the

14       district manager would set your budget with

15       it.   And then Kronos would come in, and you

16       would have to be a percent to payroll on a

17       schedule.

18           Well, Kronos would look at it and say,

19           okay, well, this day you did, just for

20           instance, $6,000.

21   BY MS. PUCKETT:

22       Q.   Last year?

23       A.   Yeah.  And then the next day you did

24   10,000.  Okay, well, you don't need as much

25   payroll on this day because you only did 6, but

Page 58

```
 1    then this day it shows it more.

 2              Well, one thing wrong here.  How do you

 3    know this day wasn't raining?  Or how do you know

 4    this day wasn't a Katrina day?  Or how does the

 5    computer know blah, blah, blah.  So in turn, you

 6    had to set it accordingly, but once again, you had

 7    no deviation from that to run it.

 8         Q.   Did you ever go over your payroll

 9    budget?

10         A.   I've tried, but it was -- you know, we

11    would have to send it in to the district manager,

12    and he would approve it.

13         Q.   Your schedule?

14         A.   Yes.

15         Q.   Every week?

16         A.   Yes.

17         Q.   And do you know whether it was the same

18    way in other districts?

19         A.   Oh, yeah.  Every -- on the two different

20    districts that I worked in, on those stores it was

21    all the same.

22         Q.   Outside of those -- were those districts

23    in the same region?

24         A.   Yes.

25         Q.   So outside of that region, do you know
```

Page 59

```
 1   if that's how they did it everywhere?
 2         A.    Only by talking to other store managers
 3   when we'd go to a conference and that, they would
 4   say, oh, yeah, we do the same thing.
 5         Q.    In terms of getting a schedule approved
 6   by the district manager?
 7         A.    Yeah.  Because we -- that was always a
 8   hot thing, because we never had control over the
 9   schedule.  We never could say, okay, Monday we're
10   not going to do that much, but this guy -- but
11   Kronos is saying you are.  So, you know, you can't
12   say, okay, no, I want this for truck day.
13         Q.    You're saying Kronos.  Is that -- that's
14   different from the Staffworks?
15         A.    Well, same thing.  Staffworks.
16         Q.    So same thing, Kronos and Staffworks?
17         A.    Yeah, that's how it was, we were calling
18   it.
19         Q.    Okay.  So it's your testimony that you
20   believe that every store manager in the company
21   had to get their schedule approved by the district
22   manager in advance?
23         MS. REHMAN:  Objection to form.
24         You can answer.
25         THE WITNESS:  I mean, to my knowledge,
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Philip P. Bourgeois III                                      August 3, 2011

Page 60

1        yeah, that's what I believe.
2   BY MS. PUCKETT:
3        Q.   That's what you believe, but you don't
4   know for sure.  You only for sure about your
5   district, right?
6        A.   Yeah.
7             MS. REHMAN:  Objection to form.
8             You can answer.  Sorry.
9             THE WITNESS:  Yeah.
10  BY MS. PUCKETT:
11       Q.   Go ahead.
12       A.   Yes.
13       Q.   And when you say you had to get approval
14  from the DM for your schedule, that was to make
15  sure -- that was the number of hours, not
16  necessarily, hey, I don't think Joe should be
17  working the night shift so many days a week; is
18  that right?
19            MS. REHMAN:  Objection to form.
20            You can answer.
21            THE WITNESS:  No.  In other words, you
22       had so many hours that day, you know, to
23       spend.  So, you know, you had to look at
24       Joe's availability and you had to look at
25       Sally or whoever, and accordingly adjust it

Page 71

1              MS. REHMAN:  He hadn't finished his

2         answer.

3              MS. PUCKETT:  Oh, I'm sorry.

4              THE WITNESS:  But as you go through on

5         the end caps, on the plan-o-grams, they do

6         them different.  Basically, a large format

7         store, a medium store, and, like, a small

8         store.

9              So it was kind of, you know, the end

10        caps, what they show there, you kind of look

11        at it, say, okay, they want this, they want

12        this, they want this on the front end caps,

13        on it.

14   BY MS. PUCKETT:

15        Q.   But the plan-o-grams you got from

16   Bogolusa weren't -- were in sort a larger format,

17   but they weren't tailored towards the Bogolusa

18   store, right?

19             MS. REHMAN:  Objection to form.

20             You can answer.

21             THE WITNESS:  Not in particular, no.

22   BY MS. PUCKETT:

23        Q.   And how did you handle that difference?

24        A.   Well, what would happen is, I would have

25   to -- I have a layout of the whole store for all

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Philip P. Bourgeois III                                                          August 3, 2011

Page 72

1    the end caps, and when the plan-o-gram came in for
2    that month or the following month, I would put
3    what's got to go at each end cap and then fax it
4    over to the district manager and say, look, here's
5    my layout, here's what we're doing.
6              And then he'll -- he'll either call me
7    and say, yeah, that's fine, go ahead, or he'll fax
8    back with an X saying, no, you need to put this,
9    this is where they want this.
10        Q.    And what was your success rate with
11   that?
12             MS. REHMAN:  Objection to form.
13             You can answer.
14             THE WITNESS:  It varied.  I mean, it --
15        you know, sometimes there was nothing else
16        they could do.  You know, the Tide had to go
17        here, or the Gatorade had to go here because
18        that's all that we have left open according
19        to the end caps, and they want it on a front
20        aisle end cap, a main aisle going like
21        towards pharmacy or something.
22   BY MS. PUCKETT:
23        Q.    But in terms of the Bogolusa store, you
24   had a lot of extra end caps, right?
25        A.    Back end caps.

Page 73

```
 1        Q.   Back end caps.  And in terms of your
 2   success rate in terms of what you put on the back
 3   end caps, whether the district manager approved
 4   it, what do you think that was?
 5             MS. REHMAN:  Objection to form.
 6             You can answer.
 7             THE WITNESS:  I would put some things
 8        that I believed -- like clearance stuff and
 9        things that getting out of the back room, to
10        try to sell and things.
11             But again, once he came in, he would
12        say, look, corporate doesn't want this.  They
13        don't want to see this clearance stuff like
14        this.  And I would say, well, where does
15        corporate want it?  Well, just keep it in the
16        back room for now.  We'll make a decision on
17        it later.
18             Then I would say, well, give me -- can I
19        get some markdown dollars to get rid of this
20        or something?
21             Well, we'll see what we can do, but as
22        of right now, I can't give you nothing.
23   BY MS. PUCKETT:
24        Q.   How frequently would that happen?  Would
25   it happen pretty often that he would come in and
```

Page 109

 1    coming from a different place starting at Rite

 2    Aid; is that right?

 3              MS. REHMAN:  Objection to form.

 4              You can answer.

 5              THE WITNESS:  Yeah.  In other words,

 6         he's coming from a different culture, so to

 7         speak.

 8    BY MS. PUCKETT:

 9         Q.   Do you consider yourself a good trainer?

10         A.   You have to ask the train -- the ones I

11    trained -- the one I trained there.  But I would

12    think, because I mean at WalMart, I had to train

13    different people in different jobs, you know.  And

14    I've got a lot of patience and that, and I don't

15    blow up at people that make mistakes.  I just make

16    them understand that it's a learning experience;

17    everybody is going to make mistakes.

18         Q.   So when you say you got to learn from

19    your own mistakes, that applies not just to

20    assistant managers, but all employees?

21         A.   Yeah, basically, as long as it's within

22    the guidelines and it's not a gross conduct

23    mistake type thing.  But I mean, you know, if you

24    make a mistake that you are short $10 or something

25    that day, well, you got to learn from that, that,

Page 110

```
 1    you know, you possibly gave this $10 away or

 2    something, you know.

 3         Q.   So you try to turn mistakes into

 4    learning experiences?

 5         A.   As a positive, yes.

 6         Q.   That was your personal philosophy?

 7         A.   Yeah.  You never -- in retail, you

 8    never, you never learn everything as a negative,

 9    because then you got low moral standards in the

10    store.  The people are always down.

11              The other way, if everybody is happy,

12    you get more work productivity out of people, and

13    they understand you better.

14         Q.   And is that how you ran your stores at

15    Rite Aid?

16         A.   Yes, basically.  And I had a few issues

17    that -- that -- you know, that I had to address in

18    a more -- more, you know, harsh way.  But again,

19    with Rite Aid, compared to just, say, WalMart,

20    again, you know, I had a person that -- that I

21    knew was stealing.  It was a key guy.  It was a

22    key person.

23         Q.   At Rite Aid?

24         A.   At Rite Aid.  Okay.  Well, you know, I

25    can't tell him to go home.  I can't send him home.
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Philip P. Bourgeois III                                    August 3, 2011

Page 111

1    I can't suspend him or anything.  I got to call

2    loss prevention.  I got to call the district

3    manager.  And I got -- and the district manager

4    has got to call HR.

5              And, you know, before I know it, I mean,

6    three days has been passed, and here's this guy

7    who's still coming to work, and I'm trying to

8    watch this or that, you know, and we can't do

9    anything till we get all these approvals.

10         Q.   Was this person eventually terminated?

11         A.   Oh, yes.  And arrested.

12         Q.   And when you suspected this person was

13   stealing, you immediately called loss prevention,

14   right?

15         A.   Oh, yes, we called loss prevention and

16   the district manager also.

17         Q.   And did they set up any kind of

18   investigation, like cameras or anything?

19         A.   There was no really basically need.

20         Q.   You already had proof?

21         A.   We basically had the proof.  And it also

22   involved a night deposit bag that came up missing.

23         Q.   So between the time that you reported it

24   and the actual termination, how many days went by?

25         A.   The actual termination -- actually, when

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Philip P. Bourgeois III                                        August 3, 2011

Page 112

1    we suspended him or whatever, he quit.

2          Q.    How many days went by before he was

3    suspended?

4          A.    I want to say two days.

5          Q.    So --

6          A.    But it might have been one.

7          Q.    You asked loss prevention, can I suspend

8    this guy, and maybe two -- one or two days later

9    they said okay?

10         A.    Well, basically what I did -- what I

11   done was I called loss prevention, told them what

12   was going on and everything.  Okay.  Then once

13   he -- he was aware of it, you know, I waited for

14   direction from him to say, okay, go ahead, suspend

15   him, whatever, at that time.  Well, he didn't give

16   me no answer.

17               So I said okay.  I got -- he said, okay,

18   give me -- I need a statement, I need blah, blah,

19   blah.  Okay.

20               So then I called the district manager

21   and I said, look, loss prevention didn't tell me

22   to suspend this guy, fire this guy, or anything.

23   I said, I need to know what we need to do with

24   this to get -- I don't want him back in here and

25   that.  He said, let me call HR, we're going to

Page 115

1    ultimately able to prove the case against him,

2    right?

3             MS. REHMAN:  Objection to form.

4             You can answer.

5             THE WITNESS:  I guess, yeah.  I mean,

6        loss prevention was handling everything at

7        that.  From that point on, he was coming in

8        the store and doing -- you know, looking at

9        the cameras, store cameras and everything,

10       and trying to determine it.

11            And, you know, they watched him leave

12       the store with the bag, with the deposit, so

13       we know he left with the deposit but --

14   BY MS. PUCKETT:

15       Q.   On the security camera?

16       A.   Yeah, in the store.

17       Q.   Did you watch that too?

18       A.   I think I might have.

19       Q.   Did you think to check that?

20       A.   Well, I didn't, because I -- once I

21   reported it to loss prevention, it's in their

22   hands, let them come in and do the investigation

23   and that.  I didn't know that they were going to

24   start saying, well, maybe, you know, it could be

25   something in the morning.

Page 116

```
 1               But then when they seen -- and he told

 2      me, he said, when I seen him leave with it and

 3      there's nothing on camera that he showed up at the

 4      bank with it, to the bank deposit box to deposit

 5      it, that tells me right there.

 6          Q.   So that's one example of having to call

 7      loss prevention before you terminated someone,

 8      right?

 9          A.   Correct.

10          Q.   And you believed you weren't authorized

11      to suspend him before you called loss prevention;

12      is that correct?

13          A.   Yeah.  You could not -- you could not

14      fire or suspend anybody without going through your

15      district manager or loss prevention or both and

16      them going through HR and then getting

17      confirmation.

18          Q.   Do you know whether that was true of

19      other regions and districts?

20          A.   I don't know about other districts.

21          Q.   You only know about the two districts

22      you worked in, right?

23          A.   Yeah, just that.

24          Q.   So you never fired anybody without first

25      telling the district manager; is that your
```

Page 117

1    testimony?

2         A.   Oh, yes, yes.  You never could -- we

3    never had to say, look, I got to let you go, blah,

4    blah, blah.  You always had to go through HR --

5    through the district manager to go through HR or

6    go through both loss prevention and district.

7         Q.   Did you ever -- did you ever ask for

8    approval to fire someone and have it be denied?

9         A.   Yes.

10        Q.   Who?

11        A.   Oh, gosh.  It was one of the girls in

12   pharmacy.  She kept calling in every -- every

13   week, constantly, constantly.  And I wrote her up

14   twice for it.  And, you know, and then the

15   pharmacist is there saying, look, you got to get

16   rid of this girl, I don't want her anymore, she's

17   not dependable, blah, blah, blah.

18             Well, so she ends up at the front end.

19   I move her out and I move somebody else.  Well,

20   she continues at the front end, the same thing,

21   every weekend calling in.  So I wrote her up

22   again.  So I had three write-ups.

23             So I called the district manager and

24   said, look, I'm going to fire this girl.  I got

25   her written up three times.  She calls in every

Page 118

 1    weekend.  It's just every time.

 2           Well, how many write-ups?  I said, I got

 3    three.  Well, we need to get a couple more.  And I

 4    said, well, three is not enough?  I said and also,

 5    she's been doing it in the pharmacy I don't know

 6    for how long.  And he proceeded to say, well, I

 7    don't care.  He said, we don't have nothing else.

 8    I want some more documentation.

 9           Q.   Was that Jim?

10           A.   That was actually -- that was Birch.

11           Q.   Do you -- did you think that that girl

12    was possibly somebody who might sue the company?

13                MS. REHMAN:  Objection to form.

14                You can answer.

15                THE WITNESS:  I don't -- the character

16           of her, possibly.

17    BY MS. PUCKETT:

18           Q.   Did Birch know that too?

19                MS. REHMAN:  Objection to form.

20                You can answer.

21                THE WITNESS:  I wouldn't think so.  I

22           don't think he kind of, you know, could

23           relate.  He had so many people, I don't know

24           if he could actually even know who I was

25           talking about personally-wise.

Page 119

```
 1    BY MS. PUCKETT:

 2         Q.    Did the process of getting approvals for

 3    firing people increase over the course of your

 4    time at Rite Aid?

 5         A.    I mean, the process stayed the same.

 6    You just had to -- you had to -- there was no way

 7    you could fire somebody on your own.  You had to

 8    have that approval from upper management.

 9         Q.    Was that person the only one that --

10    strike that.

11              Did she ultimately get fired?

12    A.    Yes.

13         Q.    Because you got the additional

14    write-ups?

15         A.    Yes.

16         Q.    So how long between the time that you

17    first asked to fire her and she was actually

18    fired?

19         A.    Two weeks, because I had five by then.

20    Because each other weekend she did the same.

21         Q.    So in the end, even though your request

22    was first rejected, it eventually was approved,

23    right?

24         A.    Correct.

25         Q.    Any other example of you asking to fire
```

Page 120

1    someone and it not being approved?

2         A.   Well, taking a long time, you know, and

3    then finally they went ahead and did it.

4              When I first got to the Bogolusa store,

5    I monitored a girl coming -- a pharmacy tech came

6    out of pharmacy and went into the photo lab part,

7    got her film, brought it to pharmacy, and was

8    looking at the pictures.  And I watched her on the

9    camera with it.  And then I watched her go up to

10   the -- to the pickup window and give them out to

11   whoever came through the pickup window.

12             So I called loss prevention, told them

13   what I seen and that.  And he said, well, hold up,

14   I'll have to come in and look at the film on that.

15   I said okay.

16             So then I called the district manager

17   and I told him, look, I witnessed everything, I

18   seen everything.  He said, well, let loss

19   prevention handle it.

20        Q.   And she was ultimately terminated,

21   right?

22        A.   Yes, she was.

23        Q.   Anybody that you recommended termination

24   for that was never terminated, that you remember?

25        A.   No, not really.  Most of -- the majority

Page 132

```
 1        observed you doing this, you know, and I had
 2        to get approval to terminate.  So in turn,
 3        I'm telling them, well, I was going to fire
 4        you, but I had to get approval beforehand.
 5   BY MS. PUCKETT:
 6        Q.   So they understood that you weren't the
 7   only one making the decision?
 8        A.   Correct.  That's what I wanted them to
 9   understand, is that if you want to decide to call
10   the district manager, whatever, you can go ahead,
11   but it came through him also to do this.
12        Q.   So if you want to slash somebody's
13   tires --
14        A.   Yeah, go to his house.
15        Q.   So that was actually kind of a benefit
16   that you had that buffer, right?
17             MS. REHMAN:  Objection to form.
18             You can answer.
19             THE WITNESS:  Benefit?  I wouldn't -- I
20        wouldn't think of it, because I -- I would
21        want to feel as though it's my store, I'm
22        running this store, and I'm making the
23        decisions, and if I feel as though I need to
24        fire you -- because I'm not going to just
25        fire you because I don't like you.  Okay?
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Philip P. Bourgeois III                                    August 3, 2011

Page 133

```
 1        I'm going to fire you because there's a
 2        reason.  Okay?  So I should be able to do
 3        that.
 4   BY MS. PUCKETT:
 5        Q.   But everybody you felt as though needed
 6   to be fired was ultimately fired, right?
 7             MS. REHMAN:  Objection to form.
 8             You can answer.
 9             THE WITNESS:  That, or they quit before
10        the time.
11   BY MS. PUCKETT:
12        Q.   So more administrative red tape, that
13   was annoying to you, right?
14             MS. REHMAN:  Objection to form.
15             You can answer.
16             THE WITNESS:  Red tape?  I would say,
17        you know, just your hands are tied.  In other
18        words, upper management, you know -- well,
19        Rite Aid is saying, hey, you got to go
20        through this, you can't run your store as a
21        store manager like we said you're going to
22        be.  Okay?  That's what they're basically --
23        I was feeling they were telling me.
24   BY MS. PUCKETT:
25        Q.   Right.  But, see, you said your hands
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Philip P. Bourgeois III                                              August 3, 2011

Page 134

```
 1   were tied, but ultimately the result was the same.
 2   It just took longer because you asked for approval
 3   to terminate.  And every single time the person
 4   was ultimately terminated.  Is that fair?
 5              MS. REHMAN:  Objection to form.
 6              You can answer.
 7              THE WITNESS:  Yeah, that's fair to say,
 8         that because of my prior experience with
 9         firing people, that I know I have to have the
10         ducks in a row to get fired.
11   BY MS. PUCKETT:
12         Q.   And you had the ducks in a row?
13         A.   Exactly.  And --
14         Q.   So when you asked for the approvals,
15   except in that one case where you had to get a few
16   more write-ups, your approval was granted?
17              MS. REHMAN:  Objection to form.
18              THE WITNESS:  Yes, yes.  That's --
19   BY MS. PUCKETT:
20         Q.   So that was four people that had to be
21   fired.  How many people did you have to hire
22   through your course at Rite Aid?
23         A.   Oh, gosh.  I had a lot of turnover in
24   the Bogolusa store.
25         Q.   Would you describe that as a
```

Page 135

1    high-turnover store?

2         A.   Yes.

3         Q.   What made it a high-turnover store?

4         A.   Basically, and I hate to -- it was more

5    of a younger clientele crowd at that store.

6    There's no set seasoned associates at that store,

7    so the turnover was constantly.

8              So when you hire the younger kids, they

9    don't want to work nowadays.  They just want a

10   paycheck, okay, basically.  And when they got to

11   work on a Friday night when the ballgame is at the

12   high school or whatever, you know, they wanted

13   off.  They don't understand that the store doesn't

14   just close the door, we still have to have

15   somebody.

16             Well, that type of mentality of these

17   folks, and it was just -- it was almost every

18   other week we were hiring somebody.

19        Q.   So you had to do a lot more hiring in

20   that store than Picayune?

21        A.   Oh, yes, most definitely.

22        Q.   Picayune had some seasoned employees?

23        A.   Yes.

24        Q.   And did you have to also get approval

25   before you hired someone from your district

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Philip P. Bourgeois III                                    August 3, 2011

Page 136

1   manager?

2        A.    Well, the process is they got to take

3   this card and go call the number and take this

4   survey.

5        Q.    A screening?

6        A.    Yeah, a survey.   That's what Rite Aid

7   wants it understood, it's a survey.

8        Q.    So they don't want it to be called a

9   screening?

10       A.    Yeah.

11       Q.    But that's what it is, right?

12       A.    Yeah, exactly.   And after they take

13  that, you get sent with a SYSM from HR saying

14  whether it's okay to call them in for an interview

15  or whether no, you can't, because they didn't pass

16  the screening.

17       Q.    I see.  So the screening took place

18  before you interviewed them; is that right?

19       A.    Correct.  In other words, they came in,

20  filled out an application, you know, and that.

21  And, you know, if they didn't come in with shorts

22  on or flip-flops and, you know, muscle shirts and

23  stuff, then I would give them the card and say,

24  okay, well, look, go ahead and call this.

25            So I would have a bunch of people

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Philip P. Bourgeois III**                                    **August 3, 2011**

Page 137

1    already preapproved from the survey that I could

2    call in to interview when I needed.

3         Q.   I see.  Do you know whether the

4    screening was done before an interview in other

5    districts?

6         A.   The way I understood it, that was Rite

7    Aid policy, that you could not interview anybody

8    until they have taken the survey.

9         Q.   But you don't know for sure, right?

10        A.   I can't -- yeah, I can't speak for other

11   people.  I can speak for some of the store

12   managers that called me and say, I got to wait for

13   this stupid survey thing before I can even talk to

14   the person.

15        Q.   So those people were from your general

16   districts and regions, right?

17        A.   Yes.

18        Q.   Would you have preferred it the other

19   way around?  Like, for example, you invited

20   whoever you wanted in and then they got screened,

21   and then you might have wanted to hire somebody,

22   but then the screening came back negative and you

23   had to not hire them?

24             MS. REHMAN:  Objection to form.

25             THE WITNESS:  You can look at it both

Page 167

1              You can answer.

2              THE WITNESS:  Yes.

3    BY MS. PUCKETT:

4        Q.    Did you have special Mardi Gras

5    merchandise?

6        A.    Here again is where managing your store

7    comes into play compared to, like, you know, when

8    I managed WalMarts, we could go locally to the

9    vendors and order the Mardi Gras merchandise from

10   these.

11       Q.    But not at Rite Aid?

12       A.    Not at Rite Aid.  We could not get it.

13   And then when I would say, okay, we need to order

14   a stack base of Bacardi rum because this is what

15   they buy, you know, and I'd have to send it in to

16   Birch or John and say, this is why I want this,

17   because the parade passes right in front of the

18   store, you know, this is what I need.

19            Well, then they'd come back and say, no,

20   corporate doesn't want you ordering that because

21   the inventory is going to go up and blah, blah,

22   blah.  And I'd say, well, it's going to sell.

23   That was my argument:  I'm buying things that's

24   going to sell that I know that caters to this

25   store, to this community.  But I would always get

Page 168

 1    overshot.

 2         Q.   You're talking about liquor

 3    specifically, right?

 4         A.   In a certain aspect of it.  But I mean,

 5    the Mardi Gras supplies, that type stuff, you

 6    know, I'd call, say, look, we need flags and these

 7    type of things sell because they buy the stuff for

 8    Mardi Gras and that.  And, you know, well, that

 9    has to be approved through corporate.

10         Q.   Did any Mardi Gras merchandise get

11    approved?

12         A.   I never seen any Mardi Gras merchandise

13    show up during Mardi Gras.  And I always said I

14    can't believe they're missing the boat.

15         Q.   That could have been a gold mine?

16         A.   It very well could have.  Extra sales,

17    put it that way.

18         Q.   But Rite Aid didn't order any because it

19    wasn't part of what they usually ordered?

20         A.   Either that or the buyer or whoever is

21    handling that felt as though that it wasn't that

22    important.  You know, I don't know the whole

23    aspect.  I can tell you, you know, from their

24    point, because they -- it was always handled by

25    corporate.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Philip P. Bourgeois III**                                    **August 3, 2011**

Page 169

 1              I can tell you from WalMart standards,

 2      when I bought it, it was guaranteed sales.  So

 3      when I bought it from the vendor, he guaranteed

 4      whatever didn't sell, I sent back and get full

 5      credit.

 6          Q.    So Rite Aid may not have had that kind

 7      of arrangement with their vendors?

 8          A.    They may not have.

 9              MS. REHMAN:  Objection to form.

10              You can answer.

11              THE WITNESS:  They may not have or, you

12          know, I don't know if they checked into it or

13          what, but I never could understand that.

14      BY MS. PUCKETT:

15          Q.    Did Rite Aid sell any beads?

16          A.    No.

17          Q.    Beads, Mardi Gras.

18          A.    Right.

19          Q.    And you would have wanted them to sell

20      that, right?

21          A.    Yes.

22          Q.    So we talked about -- strike that.

23              Which store was it that Ron Tardo worked

24      for you in?

25          A.    Bogolusa.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Philip P. Bourgeois III                                    August 3, 2011

Page 210

1    weren't sure about it, right?

2        A.   Yeah.

3        Q.   You weren't -- and you didn't want to

4    accuse her, right?

5        A.   Yeah.

6        Q.   But once it was told, hey, these are all

7    coming from the same number, you told her not to

8    do it anymore, right?

9        A.   Correct.

10       Q.   Any other examples, even though we have

11   only seven hours, of ambiguous policies?  How

12   about just one more?

13       A.   One more.  Well, the policy again with

14   the hours and telling us that, oh, you're going to

15   be off every other weekend and you're going to

16   only work 48 hours, which in turn turned out to be

17   then 50 hours, saying, no, it's 50 hours you guys

18   need to work.

19       Q.   When did that change?

20       A.   Right after I started.  When I went to

21   the Picayune store, they started the 50 hours, or

22   supposedly that was supposed to be it all the

23   time.  And, you know, that policy was out the

24   window, because, I mean, you worked 50 hours,

25   yeah, plus the added time that you put in your own

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Philip P. Bourgeois III                                              August 3, 2011

Page 211

1    time.

2              And, you know, and I reported -- I

3    told -- I told the district manager that, you

4    know, I'm working 60 hours a week.  You know, I

5    said, I need help in here, I cannot operate the

6    store with what I'm getting.

7              You know, he says, well -- again, gives

8    that thing.  Well, we got to do what we got to do

9    to get things done.

10        Q.   So you just interpreted that to the best

11   of your ability, right?

12        A.   Correct, in a sense.  And he knew the

13   hours.  Birch and John, they knew the hours that I

14   was battling.

15        Q.   You said you worked more at the Bogolusa

16   store.  How many hours a week, on average, on an

17   average week, not like a seasonal week, at

18   Bogolusa?

19        A.   Average, average, 60 hours.

20        Q.   What about Picayune?

21        A.   Picayune, probably 55, average.

22        Q.   And what about seasonal for Bogolusa?

23        A.   Oh, gosh.  Seventy-five.

24        Q.   And what about Picayune, for seasonal?

25        A.   About 60, about an extra five.

Page 212

```
 1        Q.    So the seasonal affected Bogolusa even
 2   more than Picayune?
 3        A.    Yeah, because you had much more space on
 4   the shelves that you had to get things done.  Plus
 5   not -- you know, you didn't have seasonal
 6   associates, so it was more work for you to do that
 7   a season associate possibly could have done.
 8        Q.    You had to spend more time training
 9   people to do things at Bogolusa too, right?
10        A.    Correct.
11        Q.    Because they weren't -- it was a
12   high-turnover store?
13        A.    Correct.
14        Q.    Do you remember about how much time you
15   would spend training in Bogolusa, on average?
16        A.    Well, I mean, as far as -- they got to
17   go through, I think, eight hours of training of
18   the CBTs that they're just in a room taking those
19   CBTs.  I think it's eight hours it takes.
20        Q.    So you would train them sort of more in
21   a shadowing sense, right?
22             MS. REHMAN:  Objection to form.
23             You can answer.
24             THE WITNESS:  Shadowing, yeah.  In other
25        words, like price changes, I would try to
```

Page 215

```
 1   look better, right?
 2            MS. REHMAN:  Objection to form.
 3            THE WITNESS:  Well, not that I wanted it
 4       to look better.  I just -- just my personal
 5       preference on the -- on what, you know, on
 6       the job they were doing.
 7   BY MS. PUCKETT:
 8       Q.   Would you agree that if the floor was
 9   better waxed, then customers would find it more
10   pleasant?
11       A.   That, and the appearance.
12       Q.   Just general appearance?
13       A.   General appearance.
14       Q.   Do you -- have you in your many years of
15   retail observed a correlation between cleanliness
16   and sales?
17       A.   Yes.
18       Q.   Tell me about that.
19       A.   Well, I mean, when you walk into a
20   store -- I'll give you an instance that happened.
21   It's just like -- well, today it's even worse now
22   at WalMart.  But you walk into a WalMart store and
23   you got freight all over the floor in the morning,
24   you know, and you're trying to shop.  How can you
25   shop when you got freight, you got the carts and
```

Page 216

```
 1    everything there?  You don't want to go through

 2    all that mess.

 3         Q.   Doesn't make you want to buy things?

 4         A.   Right.  You get disgusted and you just

 5    say, I'm leaving.  Okay?  Or long lines at

 6    WalMart.  You got to wait and 15 people ahead, you

 7    know, and you got a customer service manager and

 8    assistant manager is over there, they're just

 9    walking around with walkie-talkies.  They can jump

10    on the register and help.  So those type of

11    things --

12         Q.   They affect sales?

13         A.   That affects it.

14         Q.   And that was also true at Rite Aid,

15    right?

16         A.   As far as?

17         Q.   In terms of a correlation between

18    cleanliness and sales.

19         A.   Well, it depends who is running the

20    store and how you do it.  I mean, Rite Aid

21    expected you to clean the bathrooms and expected

22    you to get the -- to vacuum the carpets and sweep

23    the floors.

24         Q.   And would you agree that that would

25    affect sales?
```

Page 217

1        A.    Oh, yeah.   I mean, it would make

2   definitely an appearance on your store and how

3   people feel in your store.

4        Q.    And like you just mentioned about

5   WalMart, the customer would come in and see just

6   gross, not vacuumed floor, and they would be,

7   like, ooh, I'm getting out of here, I don't want

8   to buy stuff, right?

9             MS. REHMAN:   Objection to form.

10            You can answer.

11            THE WITNESS:   Yeah.   In other words, you

12        go to a pharmacy where you had to vacuum in

13        the waiting area, I mean, if you go in there

14        and you see spider webs and everything else

15        in there, you go, wait a minute, I don't want

16        these guys filling my prescription.

17   BY MS. PUCKETT:

18        Q.    And similarly with bathrooms and all

19   that other stuff, that could make your store less

20   pleasant to be in?

21        A.    Well, back rooms, customers don't shop

22   in back rooms.

23        Q.    Bathrooms, I said.

24        A.    Oh, bathrooms.   Yes.

25        Q.    But in terms of back rooms, where the

Page 261

1    one, and then come back and do the front end on

2    the other.

3           Q.    So it didn't matter which two, you just

4    had to do at least two a day; is that right?

5           A.    Correct.  You can do two in pharmacy.

6    You can do it in the morning or evening or however

7    you want to do it.

8           Q.    So how would you decide which two to do?

9           A.    You just think about it, say, oh, I got

10   to do my audit today, so you make a choice right

11   then.  I'll go and I'll ask:  Did you do any cash

12   audits today, cashier audits today?

13          Q.    Ask who?

14          A.    I'll ask -- let's say if Ron was there,

15   I would say, hey, Ron did you do any cash?  No, I

16   didn't.  I said, okay, we got to do one.  So then

17   I'd choose where, and either I'll do it or --

18          Q.    Would Ron know that you had to do at

19   least two a day?

20          A.    Yes.  Yes.  Ron --

21          Q.    So sometimes when you asked him, he

22   would say, yeah, I already did one?

23          A.    Very few times, but it did happen before

24   that.  Yeah, I did one this morning.  You know, I

25   might come in at 2 o'clock, and I'd say, hey, Ron

Page 262

```
 1   you did any audits, any cashier audits yet?  And

 2   he'd say, oh, yeah, I did one this morning or, oh,

 3   no, I forgot about it.

 4           I said, okay, well, we need to do one

 5   now.  So then later on tonight or something, I'll

 6   do one or I'll go to pharmacy and do one right

 7   now.

 8       Q.   So you didn't specifically have to tell

 9   Ron every day to do one?

10       A.   No.  He -- that was basically part of

11   everyday-type routine thing that we needed to do.

12       Q.   You talked about ordering merchandise

13   for the store.  Did you ever do the ad order?

14       A.   I would do the ad order, but again, you

15   don't have the last say on the ad order.  The

16   district manager has to look at it.  You do the ad

17   order and you hit a button, it tells the district

18   manager you looked at it.  Then he looks at it.

19   If he feels you didn't order enough or he wants to

20   order this because he wants this or that --

21       Q.   He'll tell you?

22       A.   He don't tell you.  He orders it.

23       Q.   He doesn't tell you?  How often did that

24   happen?

25       A.   That happens every ad order.
```

Page 263

1         Q.    So does the district manager always

2     change that?

3         A.    He would -- sometimes he would call you

4     and say, look, I ordered -- get ready, I ordered

5     you two pallets of toilet paper, whatever, you

6     know, get ready, you know.

7              And I'd say, well, we're not going to

8     sell it.  It's going to end up in the back room

9     all this time, because we don't sell that kind, we

10    sell the other kind.  You know, well, I'm ordering

11    district-wide, and this is what we're going to do.

12        Q.    So sometimes he would order the same

13    things for every store in the district?

14        A.    Correct.

15        Q.    Did -- how often did he change it

16    without calling you and telling you?

17              MS. REHMAN:  Objection to form.

18              You can answer.

19              THE WITNESS:  It depends.  I mean, you

20        know, in a percentage again way, 60 percent

21        of the time he changed it --

22    BY MS. PUCKETT:

23        Q.    60 percent?

24        A.    -- some kind of way.

25        Q.    Are we talking about John or Birch?

Page 264

1        A.    Talking about both.

2        Q.    They both changed it the same?

3        A.    Same percentage, about.  Category?

4        Q.    Yes.

5        A.    And when I say change, I don't mean, you

6    know, like I just said, two pallets.  I might have

7    ordered six, and they turned around and said, no,

8    you need ten.  You know, I might have not ordered

9    any, and they said, no, you need to order some.

10   That type of thing.

11             But once again, they're ordering the

12   stuff.  They don't know -- I'm here in the store.

13   I know what sells at this store.  I know what --

14   how many we got on the shelf right now of this

15   item, and I know that we're not going to sell more

16   than what we got on the shelf, so I don't need

17   them for the ad order, so I zero it.

18        Q.    You mentioned before that it was -- that

19   Rite Aid is the one who enters contracts with the

20   vendors, not the store manager; is that right?

21        A.    To buy?

22        Q.    Yes.

23        A.    I would think that's how they do it.  I

24   mean, the contracts.

25        Q.    So you don't know whether Rite Aid

Page 340

1    there and tell him I'm not going to try to make

2    this, this is way too big.

3         Q.   Would you agree with me that, therefore,

4    you were responsible for meeting the store retail

5    budgeted sales?

6         A.   In all senses, yeah, because they're

7    saying this is what you got to be on, we're going

8    to hold you accountable, yes.

9              I don't know if that's what you was

10   trying to get the whole time.

11        Q.   Okay.  So going back to Number 1,

12   "Responsible for opening and closing the store and

13   maintaining proper accountability for cash

14   handling and company banking."  Just for the

15   record, we're looking at Exhibit 3, "Essential

16   Duties and Responsibilities," which is about

17   halfway down the page.

18             So you didn't change anything to that

19   one.  Would you agree with it?

20        A.   Yeah.  I mean, that's basics, yeah.

21        Q.   Okay.  Number 3, "Utilize and follow

22   Staffworks to ensure that labor is scheduled to

23   meet customer service needs and completing

24   operating activities and ensure the same standards

25   of operation are enforced in the pharmacy

Page 341

```
 1   department."
 2            And you wrote "Had no leadway in
 3   schedules.  Had to follow what Staffworks said."
 4            That's what we talked about before
 5   today, right?
 6       A.   I think so.  We talked about a bunch.
 7       Q.   So your previous testimony to me about
 8   Staffworks is accurate, right?
 9            MS. REHMAN:  Objection to form.
10            THE WITNESS:  "Previous" meaning?
11   BY MS. PUCKETT:
12       Q.   Today.
13       A.   Yeah, I mean, to what I can remember,
14   yeah.  I mean, yes.
15       Q.   So when you say "Had no leadway in
16   schedules, had to follow what Staffworks said,"
17   you're not saying anything different from what you
18   said earlier, right?
19       A.   Like I said, we've talked about so much,
20   but I would -- I think so.  I think we might have
21   discussed it that way.
22       Q.   Okay.  Well, you testified earlier in an
23   accurate manner, right?
24       A.   Yeah, yeah, to whatever I said, yes.
25       Q.   So is there anything that you feel you
```

Page 342

```
 1    need to add in terms of this comment that we

 2    didn't already discuss?

 3         A.   I can't remember exactly what we

 4    discussed.

 5         Q.   Okay.  So is there anything you feel

 6    that you need to add to this comment "Had no

 7    leadway in schedules, had to follow what

 8    Staffworks said"?

 9              I think earlier -- and tell me if I'm

10    mischaracterizing.  Earlier we talked about how

11    you had to take longer to use Staffworks than it

12    did to write the schedule by hand, because you had

13    to not only work with the availability of your

14    employees, but you had to deal with what

15    Staffworks told you and do a certain percentage in

16    terms of payroll.

17              Do you remember that testimony?

18         A.   Correct.

19         Q.   And that's what you meant by this,

20    right?

21         A.   Yeah.  And in other words, I had no --

22    in Staffworks I had no leadway to change people to

23    here or there other than if I had to change them

24    due to their availability, but I still had to plug

25    that same time frame of those hours.
```

Page 343

 1           I couldn't take those hours and say, you

 2    know what, I don't need those eight hours on a

 3    Monday.  I would do better getting those hours on

 4    a Friday when, I don't know, maybe truck day or

 5    something, I could use an extra person.

 6         Q.   Okay.  Hold on.  So it's your testimony

 7    that even within a workweek you could not change

 8    your hours from Monday to Friday?

 9         A.   My hours?

10         Q.   Yes, or the hours you're scheduled.  You

11    couldn't say -- I mean, I understand that the

12    bottom line, you could not go over payroll.  But

13    you couldn't within a week switch hours from

14    Monday to Friday and vice versa?  You had to go

15    with what Staffworks said?

16           MS. REHMAN:  Objection to form.

17           THE WITNESS:  They -- okay.  The company

18           wanted you to go with exactly what the

19           Staffworks said and no deviation from

20           Staffworks.  Okay?  But in turn, in order to

21           run my store, and even though I was -- I

22           would get chewed out for it, I would deviate

23           from that on it.

24           But the company did not want you -- if

25           you had 16 hours on to work a cashier that

Page 344

1        Staffworks gave you Monday, they expected

2        you -- that's what they wanted.

3    BY MS. PUCKETT:

4        Q.   I see.  So you deviated from it when you

5    found it necessary to do so, but you weren't

6    supposed to; is that fair?

7             MS. REHMAN:  Objection to form.

8             THE WITNESS:  Yeah, that's fair enough,

9        to where I knew that I would need that person

10       better.  Might have been that day it was

11       scheduled to rain that whole day, you know,

12       and I said, man, we're going to be dead, I

13       don't need an extra person there.  So I'm

14       going to -- and granted, I'm not the

15       weatherman.  I didn't know for sure ahead of

16       time, but, you know, they said that.

17   BY MS. PUCKETT:

18       Q.   Right.

19       A.   And I said, well, I can still survive.

20       Q.   It would be nice if Staffworks scheduled

21   the rain, right?

22       A.   Yeah, with that and Mardi Gras and the

23   whole nine yards of it.

24       Q.   Do you know whether Staffworks was

25   implemented in that way all over the company?

Page 357

```
 1    customers, though, to make sure?
 2         A.   Not really, because it was a lot of more
 3    involved, and it was not directly in the
 4    customers' way.  I mean, it was a lot of outside
 5    repainting and stuff.  And in the inside, it was a
 6    lot of repainting around the outskirts.  So it
 7    really wasn't too -- too much involved.
 8         Q.   So it didn't affect your store
 9    operations that much?
10         A.   No, I didn't see where it did that much,
11    no.
12         Q.   Did you ever help open a new Rite Aid
13    store?
14         A.   No.
15         Q.   Did you ever help close, liquidate a
16    Rite Aid store?
17         A.   No.
18         Q.   Number 9 says "Responsible for hiring
19    and training from the leadership" -- strike that.
20              Number 9 says "Responsible for hiring
21    and training," and then you handwrote "from the
22    leadership DM and HR."
23         A.   Yes.
24         Q.   And what that meant was that you had
25    to -- you had to do the screening before you were
```

Page 358

```
 1    able to hire, right?
 2              MS. REHMAN:  Objection to form.
 3              You can answer.
 4              THE WITNESS:  Yeah.  In other words, you
 5       know, I was responsible for that, but I
 6       wasn't able to do anything without the
 7       leadership, without the leadership of the DM
 8       or the HR to hire.
 9    BY MS. PUCKETT:
10       Q.   Correct me if I'm wrong, but you said
11    that once the screening took place, then you
12    interviewed them.  And then what you did was you
13    told the district manager who you were going to
14    hire and he signed off on it.  Is that right?
15              MS. REHMAN:  Objection to form.
16              You can answer.
17              THE WITNESS:  That's somewhat right.
18       What happens is most of the time they will
19       take your word in that.
20              I don't know when it was, this happens
21       in spurts, but it was to the point where it
22       got where after you interviewed them and
23       that, and you thought that they were hirable
24       material, you had to set up an interview with
25       the DM, and the DM had to come down and
```

Page 359

1          interview them.

2      BY MS. PUCKETT:

3          Q.    We looked at Exhibit 1, which was the

4      hiring guidelines, the Region 70 memo.

5          A.    Uh-huh.

6          Q.    Yes?

7          A.    Yes.

8          Q.    And I asked you if the DM ever came and

9      hired at your store, and you said no.  Is that not

10     accurate?

11         A.    No, that's accurate.  He never came to

12     my store and did it, but there was, you know --

13     what was it?  There was a policy stating out there

14     that the DM would do it.

15         Q.    Is that this policy?

16         A.    I don't know if it was this one or not.

17     I don't remember, because it happened -- you know,

18     they put in an implement, then maybe two weeks

19     later it's noneffective anymore, you know, that

20     they didn't -- they didn't think it was feasible,

21     I guess, or something.

22              But no, Birch never had to come.  I

23     would call Birch and I would say, hey, I got this

24     person, and pretty much he would just say, go

25     ahead, send the paperwork, make sure you do

Page 360

1    everything.

2         Q.   And I believe your testimony today is

3    that he never told you you could not hire someone?

4         A.   Yeah, he's never -- he's never declined.

5         Q.   And neither did John?

6         A.   No, neither did John.  I didn't have too

7    much intervening with John as I did with Birch,

8    mostly Birch.

9         Q.   In terms of hiring?

10        A.   Yeah, because it wasn't too bad.  Wasn't

11   with him as much.

12        Q.   And training, why was training from the

13   leadership to the DM?  I thought you testified

14   that you were always training people.  That wasn't

15   always something the DM told you to do, was it?

16             MS. REHMAN:  Objection to form.

17             THE WITNESS:  No.  Training came in CBTs

18        from HR.

19   BY MS. PUCKETT:

20        Q.   But you also mentored Ron, for example,

21   right?

22             MS. REHMAN:  Objection to form.

23             You can answer.

24             THE WITNESS:  Well, yeah.  I mean, if he

25        had -- you know, if he did something, I would

Page 363

1    that I didn't about your claims.

2              MS. REHMAN:  Objection to form.

3              THE WITNESS:  No.  I mean, like I said,

4         the only thing, in thinking about things, you

5         know, these people are sitting at corporate,

6         saying do this, do this, do that, have never

7         actually stepped in a real environment and

8         witnessed this, but yet they can turn around

9         and say this is what it should take.

10             And in turn, it wasn't like this.  It

11        was totally different.  And, you know, we're

12        out there on the lines, front lines, doing

13        this and not being paid for it, basically,

14        while they're sitting at a desk, writing all

15        this up and getting paid and going home at

16        5 o'clock.

17   BY MS. PUCKETT:

18        Q.   Anything else about your claims that I

19   didn't ask that I should have?

20        A.   Claims?

21             MS. REHMAN:  Objection to form.

22   BY MS. PUCKETT:

23        Q.   About the facts that relate to this

24   lawsuit that I should have asked but didn't.

25        A.   No, not that I can think of.

Page 364

1      Q.   And would you describe your primary

2  responsibility for Rite Aid as a store manager to

3  operate a profitable store?

4      A.   Looking back at it now and looking at

5  it, I would think Rite Aid did -- that was their

6  intention, for us to manage that store in a

7  profitable, you know, environment.

8           But now looking at it, it was -- you

9  know, you had no control to operate that

10  environment to make it even more profitable or

11  even make it profitable when it became not

12  profitable according to Rite Aid.

13      Q.   So you didn't feel you had enough

14  control, but your primary responsibility was to

15  run it as best you could, within company policy

16  and to be profitable, right?

17      A.   Yeah, within the company policy of it,

18  yes.

19      Q.   So if I'm understanding you correctly,

20  your primary duty as a store manager was to

21  operate and manage the operation of a profitable

22  store and enforce company policy as best as you

23  could; is that accurate?

24           MS. REHMAN:  Objection to form.

25           THE WITNESS:  To manage it to the best

Page 365

```
 1        of my knowledge from their direction, yes.

 2   BY MS. PUCKETT:

 3        Q.   To enforce their policies, right?

 4        A.   To enforce their policies from their

 5   direction.

 6        Q.   So your primary duty as a store manager

 7   for Rite Aid was to manage the operation of a

 8   store to make it as profitable as possible, while

 9   enforcing their policies; is that fair?

10             MS. REHMAN:  Objection to form.

11             THE WITNESS:  Yeah, that's fair.

12   BY MS. PUCKETT:

13        Q.   Has your testimony today been complete

14   and accurate?

15        A.   As best as I can recollect.

16        Q.   Anything that you can think of that

17   would help you refresh your memory?

18        A.   I mean, just like you did about asking

19   me about Lanier, I totally forgot working for

20   Lanier, you know, that type of stuff.

21        Q.   So you can't think of any particular

22   document that you might have that would help you

23   refresh your recollection?

24             MS. REHMAN:  Objection to form.

25             THE WITNESS:  No, no, no.
```

Page 394

1   Page_____Line_____should read:_____

2   Reason for change:_____

3

4   Page_____Line_____should read:_____

5   Reason for change:_____

6

7   Page_____Line_____should read:_____

8   Reason for change:_____

9

10  Page_____Line_____should read:_____

11  Reason for change:_____

12

13  Page_____Line_____should read:_____

14  Reason for change:_____

15

16  Page_____Line_____should read:_____

17  Reason for change:_____

18

19

20  _____

21  PHILIP P. BOURGEOIS III

22  Sworn to and Subscribed before me

23  _____, Notary Public.

24  This_____day of_____2011.

25  My commission Expires:_____              JBM