# Exhibit V

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


YATRAM INDERGIT, on behalf of    * CIVIL ACTION No.
himself and others similary      * 1:08-cv-09361
situated,                        * PGG-HBP
                                 *
        Plaintiff,               *
                                 *
vs.                              *
                                 *
RITE AID CORPORATION, RITE       *
AID OF NEW YORK, INC., and       *
FRANCIS OFFOR as Aider           *
& Abettor,                       *
                                 *
        Defendants.              *
                                 *
*    *    *    *    *    *    *    *    *



DEPOSITION OF RICHARD ALLEN BROWN
taken on Tuesday, October 4, 2011,
before Diana C. Nadas,
Registered Professional Reporter
and Certified Court Reporter
in and for the State of Louisiana,
at Law Offices of
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.,
639 Loyola Avenue, Suite 2550,
New Orleans, Louisiana 70113,
commencing at 10:30 o'clock a.m.



REPORTED BY:

    Diana Nadas Roloff, CCR, RPR
    License No. 90012

Page 191

1      Q.    And what steps did you take to try to

2    increase the sales of your store?

3      A.    You make sure that -- you look at your

4    ad planner and make sure that you feel that you

5    have enough product to last during the sale and,

6    hopefully, you can hit it -- the right number so

7    that you don't have too much after the sale, which

8    is not always the case.  You have your product

9    fronted, clean.  The floors are tidy.  The cooler

10   is presentable.  The product is available to them.

11   Just because it's in the back, that doesn't mean

12   it's available to them; so that was the manager's

13   responsibility.

14     Q.    And when you say, "in the back," you

15   mean in the warehouse?

16     A.    (Indicating.)  No.  That it's in the

17   back of the cooler.

18     Q.    Oh, I see.

19     A.    Right.

20     Q.    So you had to make sure that the product

21   that was in the cooler was accessible to the

22   customers?

23     A.    That's correct.

24     Q.    Okay.  If a cashier, either in the

25   front-end or the pharmacy, was found to be a

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Richard Allen Brown**                                    **October 4, 2011**

Page 192

1   certain amount over or short on his or her

2   register, that person was subjected to discipline;

3   correct?

4        A.   That's correct.

5        Q.   And that's discipline that you would

6   administer; right?

7        A.   That's correct.

8        Q.   Who had the safe combination in your

9   store?

10       A.   Just the three of us.

11       MS. SCOTT:

12            Objection form.

13   BY MR. SCOTT:

14       Q.   You, the assistant store manager, and

15   the relief manager?

16       A.   That's correct.

17       Q.   Who had the alarm codes?

18       A.   The same three.

19       Q.   All right.  How many hours a week did

20   you work in 2007?

21       A.   I have no clue.

22       Q.   I'm assuming that it was more than 40?

23       A.   Absolutely.  We were required to, at

24   least, have 50 hours.

25       Q.   What was --

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Richard Allen Brown                                      October 4, 2011

Page 193

```
 1        A.    That was the minimum requirement.
 2        Q.    Did you ever work less than 50?
 3        A.    Oh, no.
 4        Q.    Obviously, you went on vacation some
 5   weeks?
 6        A.    Well, yeah.  That's not --
 7        Q.    But the weeks you were working, you
 8   worked, at least, 50?
 9        A.    At least, 50.
10        Q.    And what -- give me a range.  What's the
11   most?
12        A.    The most?
13        Q.    Yes.
14        A.    Eighty.
15        Q.    And what time of year was that?  Would
16   that be inventory time?
17        MS. SCOTT:
18             Objection form.
19        THE WITNESS:
20             Inventory time.  Seasonal time.
21        Business time.
22   BY MR. SCOTT:
23        Q.    Would your hours increase when your
24   assistant store manager went on vacation?
25        A.    Yes.
```

Page 194

```
 1        Q.    And when you had a fully-staffed
 2   management team, your hours are not as high;
 3   right?
 4        A.    Not, necessarily.
 5        Q.    Depending on the time of season?
 6        A.    Right.
 7        Q.    All right.  But that's a factor; right?
 8        A.    Yes.
 9        Q.    What are the other factors, besides the
10   ones we've already discussed, which is seasonal,
11   inventory, staffing, that might cause your hours
12   to go up or down?
13        A.    Planograms.  If you had to stay over to
14   monitor the mopping crew.
15        Q.    The store had a cleaning crew that came
16   through overnight?
17        A.    Yes.  Not every night, but yes.
18        Q.    Some nights?
19        A.    Yes.
20        Q.    And so when the cleaning crew came
21   through, you had to stay there and make sure that
22   they weren't stealing things, among --
23        A.    Make sure --
24        Q.    -- other reasons --
25        A.    -- the store had representation by the
```

Page 218

```
 1   with milk, beer, soft drinks, the customer has no

 2   access to you; so, therefore, you weren't doing

 3   managerial responsibilities.

 4       Q.    And would you be able to, for instance,

 5   supervise your employees in the front-end of the

 6   store -- strike that.  Would you be able to

 7   supervise an employee who was working the cash

 8   register if you, yourself, were cleaning the

 9   bathroom?

10       A.    No.

11       MR. SCOTT:

12            Objection to form.

13   BY MS. SCOTT:

14       Q.    And did Rite Aid expect you to still

15   supervise the store while completing

16   non-managerial tasks?

17       A.    Absolutely.

18       Q.    Did Rite Aid expect you to provide

19   customer service, even though you were doing

20   non-managerial tasks?

21       A.    Absolutely, yes.

22       Q.    Who made the final decision regarding

23   setting the budget while you were a store manager

24   at Rite Aid?

25       MR. SCOTT:
```

Page 219

```
 1              Object to form.

 2         THE WITNESS:

 3              Say that one more time.

 4    BY MS. SCOTT:

 5         Q.   Who made the final decision regarding

 6    setting a budget while you were a store manager at

 7    Rite Aid?

 8         MR. SCOTT:

 9              Same objection.

10         THE WITNESS:

11              Well, Staffworks set the -- the

12         objective.  No, we weren't -- we had to go

13         with what it said.

14    BY MS. SCOTT:

15         Q.   And was Staffworks -- strike that.  Were

16    you able to alter the budget, at all?

17         MR. SCOTT:

18              Object to form.

19         THE WITNESS:

20              No.  Couldn't go over the budget.

21    BY MS. SCOTT:

22         Q.   And who controlled Staffworks?

23         A.   A couple of college kids in Camp Hill,

24    Pennsylvania.

25         Q.   Were they controlled by the Corporate
```

Page 220

1    Office at Rite Aid?

2         A.    That's correct.

3         Q.    So you had no control over the actual

4    budget in your store?

5         MR. SCOTT:

6              Object to form.

7         THE WITNESS:

8              No.

9    BY MS. SCOTT:

10        Q.    And do you believe that the budget

11   policy that Rite Aid had, while you were a store

12   manager at Rite Aid, left you understaffed in your

13   stores?

14        MR. SCOTT:

15             Object to form.

16        THE WITNESS:

17             Absolutely.

18   BY MR. SCOTT:

19        Q.    And because you were understaffed,

20   inadequately staffed, do you believe that that's

21   the reason that you were having to complete

22   non-managerial tasks, as a store manager at Rite

23   Aid?

24        MR. SCOTT:

25             Object to form.

**Page 231**

```
 1                  WITNESS' CERTIFICATE

 2

 3

 4        I, RICHARD ALLEN BROWN, do hereby certify

 5    that I have read or have had read to me the

 6    foregoing transcript of my testimony, given on

 7    Tuesday, October 4, 2011, and hereby certify that

 8    it is a true and correct transcription of my

 9    testimony, with the exception of any corrections

10    or changes attached hereto.

11

12

13    (CHECK ONE)

14

15    (   )   WITHOUT CORRECTIONS.

16

17    (   )   WITH CORRECTIONS, AND/OR

18       ADDITIONS ATTACHED HERETO.

19

20

21

22    SIGNATURE:  _____

23

24

25
```

# Exhibit W

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

YATRAM INDERGIT, on behalf of      :

Himself and all others similarly:

Situated,                          :

          Plaintiff,               :

v.                                 : NO. 08 CV 9361 (PGG)

RITE AID CORPORATION, RITE AID     :

Of NEW YORK, INC., and FRANCIS     :

OFFOR as aider and abettor,        :

          Defendants.              :

- - - - - - - - - - - - - - - - - - x

Deposition of VINCENT BROWN

Washington, D.C.

Thursday, October 17, 2011

10:00 a.m.

©COPY

Job No.:  79485

Pages 1 through 373

Reported by:  Cassandra E. Ellis, RPR

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**
**Vincent Brown**

08 CV 9361 (PGG)
October 17, 2011

10 (Pages 34 to 37)

Page 34

1    Q  Do you remember how old the previous
2  assistant was?
3    A  It was a she.
4    Q  Oh, a she, finally a girl?
5    A  She probably was 25.
6    Q  Oh, okay.
7    A  We got stuck up a couple of times and her
8  husband didn't want her to be there any longer.  You
9  know what I mean by stuck up?
10    Q  Someone Robbed?
11    A  Robbed, yes, ma'am.
12    Q  So she was the manager in charge of the
13  store during the robberies?
14    A  Yes, ma'am.  Well, not robberies, she was
15  there only one time.
16    Q  Oh, one time?
17    A  Yes, ma'am, the other robbery happened
18  before, even before I got there.
19    Q  Do you remember about what year that
20  robbery was?
21    A  Two -- 2006.
22    Q  2006?  And how long was she the overnight
23  assistant?
24    A  Not even a year.
25    Q  And who was before her?

Page 35

1    A  We weren't overnight.
2    Q  Oh.
3    A  Remember?
4    Q  Did you ever have an assistant named
5  Tobias?
6    A  Tobias?  Where did that come from, Tobias?
7    Q  Tobias Johnson?
8    A  Yes, that sounds familiar, that,
9  definitely, Tobias, yeah, that does sound familiar,
10  Tobias.  He was an elderly, older black gentleman,
11  yes, Tobias, yes.
12    Q  Was he also an overnight assistant?
13    A  Tobias, they transferred him in, and he did
14  work overnight, yes, he did.
15    Q  But that was before Peru?
16    A  No.  Peru has -- was there all the time
17  that I was there.
18    Q  Oh, okay.  Was it before Peru went to
19  overnights?
20    A  Yes.
21    Q  Okay.  And it was before the young lady, as
22  well?
23    A  Mm-hmm.  Mm-hmm.
24    Q  Yes?
25    A  Yes.  Yes.

Page 36

1    Q  So any other assistant managers, who worked
2  the overnight shift, other than those three?
3    A  Tobias wasn't a person that I hired, it was
4  a person that Rite Aid transferred from another store
5  to there.  So I really -- he was a salaried, I think
6  he was waiting for another store to open so he can
7  move into a store, but he wasn't with me that long,
8  not even three months was he there.
9    Q  During -- during those three months he was
10  on the overnight, though; right?
11    A  Well, I was, too, because we had to unload
12  trucks at 3:00 in the morning.  So every time he was
13  there I was there unloading trucks with him.
14    Q  You had to unload trucks every day?
15    A  Every Friday night.
16    Q  Okay.
17    A  Or Thursday night, Friday mornings, 3:00
18  a.m., in the morning.
19    Q  Okay.  So every Friday night you were there
20  with him?
21    A  Every Friday morning, yes, ma'am, I was.
22    Q  Oh, yeah, Friday morning?
23    A  Mm-hmm.
24    Q  But during the other shifts you weren't on
25  the overnight, he was, though; right?

Page 37

1    A  When everybody left, yes, ma'am, I was the
2  only one that was on the overnight shift, me and one
3  other person.
4    Q  Okay.  Did you always do the truck, on the
5  overnight shifts, no matter who was the assistant
6  manager during that shift?
7    A  No, ma'am.
8    Q  Okay.  So sometimes the assistant manager
9  took in the truck?
10    A  When it was Peru and Tobias, yes.  Those
11  two did it, there was no need for me to be there.
12    Q  Okay.  Because they handled it?
13    A  Yes, ma'am.
14    Q  And other than Peru having his hand in the,
15  what did you say, in the till?
16    A  The till, mm-hmm.
17    Q  Other than that he performed his job?
18    A  Mm-hmm.
19    Q  Yes?
20    A  Yes, ma'am.  Yes, ma'am.
21    Q  And Tobias did, too?
22    A  Yes.
23    Q  What about -- do you remember the young
24  lady's name?  You don't?
25    A  I can't recall her name.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.
Vincent Brown

08 CV 9361 (PGG)
October 17, 2011

11 (Pages 38 to 41)

**Page 38**

1    Q. Okay. And what about her, did she perform
2  her job?
3    A. Yes.
4    Q. So you trusted them to handle the overnight
5  shift?
6    A. Yes.
7    Q. So the times you were talking about being
8  there for the truck that was after all of those people
9  left; correct?
10    A. Yes, ma'am.
11    Q. Do you know why they didn't hire -- why you
12  didn't hire another assistant manager to work the
13  overnight shift?
14       MS. REHMAN: Objection to form. You can
15  answer.
16    A. Because I didn't do the hiring once Rite
17  Aid took over. When it came to salaried managers Rite
18  Aid did all the hiring.
19    Q. So Rite Aid hired salaried managers?
20    A. Yes, ma'am.
21    Q. But why didn't they replace Peru?
22    A. Good question.
23       MS. REHMAN: Objection to form. You can
24  answer.
25    A. To me, that's a good question.

**Page 39**

1    Q. Did you ask about it?
2    A. Oh, of course. Do you think I would enjoy
3  working from 3:00 in the morning to 12:00 in the
4  evening, going home, and coming back at 10:00 p.m.
5  that same day? How many people do you think would
6  enjoy doing that? And I did that for at least four --
7  four or five months.
8    Q. So -- so I'm correct that you did ask about
9  another assistant?
10    A. I did ask. I inquired. I called. I
11  called the personnel to find out what was going on.
12    Q. And what was the response?
13    A. They were -- they were working on it.
14    Q. And by "personnel" do you mean human
15  resources or...
16    A. Yes. Yes. Yes, mm-hmm.
17    Q. And you also called your district manager;
18  right?
19    A. He was well aware of what was going on, I
20  didn't need to call him, he would stop in every now
21  and then and he would just make a comment and saying
22  that we got to get you some help. I'm like, I'm
23  waiting, I'm looking for it, whenever you ready give
24  it to me.
25    Q. So the district manager also wanted you to

**Page 40**

1  have an assistant overnight; is that correct?
2    A. Mm-hmm.
3       MS. REHMAN: Objection to the form. You
4  can answer.
5    A. Yes.
6    Q. But your understanding was that there was
7  some sort of administrative hold up?
8    A. I don't know, miss. I, 'til this day, I
9  don't know what -- why they didn't hire anybody.
10    Q. Have you been back in that store?
11    A. Don't have to, nothing what I need to go
12  back in there for.
13    Q. Okay. So you don't know whether they hired
14  someone?
15    A. Oh, I know the morning when I was leaving
16  out the front door they already had a manager from
17  Rite Aid right around the corner. She was sitting in
18  the parking lot waiting for me. Once I left she just
19  went in and she became the store manager for about
20  four months. And then she was -- she was gone.
21    Q. Do you know why she left?
22    A. Nope. Didn't care.
23    Q. But I guess I should be clear about what I
24  was asking. I didn't -- I actually didn't mean the
25  store manager that replaced you I meant whether they

**Page 41**

1  hired an assistant for her?
2    A. Oh, yes, they did.
3    Q. They did?
4    A. This lady, she had to be in her probably
5  early 60s, and there was no way that she could run
6  that store by herself, like I did, so they had to get
7  her some help. I mean, it would be ridiculous not to
8  get her any help. It was ridiculous for them not to
9  give me help but they did.
10    Q. And you don't understand why they did not
11  get you help; is that correct?
12    A. Yes, ma'am, I did not understand.
13    Q. And you said it was about four or five
14  months --
15    A. Yes, ma'am.
16    Q. -- that you were short one assistant?
17    A. Yes, ma'am. The overnight assistant, not
18  just one assistant, I can deal with the day, with one
19  assistant, because I can get the other one to work
20  some extra hours, but nobody wanted to work the
21  overnight.
22    Q. So the overnight assistant was a critical
23  position in your store?
24    A. Oh, yes. Yes, ma'am. I mean, it would
25  have been on automatic pilot if there was no assistant

Yatram Indergit, et al. v. Rite Aid Corporation, et al.
Vincent Brown

08 CV 9361 (PGG)
October 17, 2011

15 (Pages 54 to 57)

Page 54

1  observation in the store, and they observed somebody
2  doing something that they shouldn't have done.
3      Q  Like theft?
4      A  Yes, or cheating on the time clock or
5  something to that effect, they would fire that person.
6  And then when I get there they would tell me that they
7  fired this gentleman for this or we got rid of this
8  gentleman for that, so that's how they worked.
9      Q  But that wasn't the DM, that's loss
10 prevention; right?
11     A  Well, they worked side by side.  Most of
12 the time when you saw him the DM was right with him.
13     Q  And we're talking about Peru and about the
14 two people, Sheiffel's brother and that assistant
15 manager; right?
16     A  Sheiffel's brother wasn't -- I don't think
17 Sheiffel brother was during the -- the Rite Aid era.
18     Q  Oh, okay.
19     A  I think Peru was.
20     Q  Okay.  So we're talking about Peru, then,
21 in this, this context of how firing occurs?
22     A  No.
23        MS. REHMAN:  Objection to form.  You can
24 answer.
25     A  No.  There was other people that was fired,

Page 55

1  by the Rite Aid people, that I had nothing -- they --
2  they told me that they had did it, they told me that
3  they were going to do it, but I had no say so in it,
4  it wasn't like I had to go and look at the tapes to
5  see it for myself, which I did anyway.
6      Q  Why did you do it anyway?
7      A  Because I'm so used to do it, I mean, if
8  you're going to tell me my person is stealing money I
9  want to see it for myself.  Even though they had
10 already made the decision to fire the person but I
11 still want to see it, you know.
12     Q  Did they ever make a decision to fire
13 someone that you did not agree with?
14     A  No, because I saw it for myself.
15     Q  So you would have come to the same
16 decision?
17        MS. REHMAN:  Objection to form.
18     A  I don't understand your question.  What do
19 you mean I would have --
20     Q  So you say that the loss prevention
21 department did the firing?
22     A  Mm-hmm.
23     Q  Is that -- is that right?
24     A  Mm-hmm.
25     Q  Yes?

Page 56

1      A  Yes.
2      Q  And then you said you agreed with that
3  decision; is that right?
4      A  Yes.
5      Q  So I guess my only question is, so if -- if
6  you had been making that decision you would have made
7  the same decision; right?
8      A  Under the circumstances, yes, I would have,
9  yes.
10     Q  Did K-Mart have a loss prevention
11 department?
12     A  Oh, yeah.
13     Q  Do you think most major companies do?
14     A  Oh, yes.
15     Q  Why?
16     A  You have to.
17        MS. REHMAN:  Objection to form.
18 BY MS. PUCKETT:
19     Q  Why?
20     A  You have to.
21     Q  Why do you have to?
22     A  Because there's certain things that
23 security have to do that the customer service people
24 aren't qualified to do, customer service people can't
25 watch one another.  Security can sit back in his

Page 57

1  office and observe the coming and going of everyone,
2  customers and employees.
3      Q  But what about the manager, can't the
4  manager do that?
5      A  No, that wasn't part of my job.
6      Q  But I mean you said that you have to have a
7  loss prevention department?
8      A  Yes, ma'am, you have to, that's just --
9  well, not to cut you off.
10     Q  That's okay, go ahead.
11     A  That's just like having a president that
12 don't have a vice president.
13     Q  And you mentioned that one of your
14 assistant managers was actually stealing, Peru was;
15 right?
16     A  Mm-hmm.
17     Q  Yes?
18     A  Yes.
19     Q  So one of the reasons that loss prevention
20 has to be involved is because maybe the store manager
21 might be stealing?
22     A  Yeah, exactly.
23     Q  That's happened before; right?
24     A  Yes.  Yeah, exactly, they could be in
25 cahoots.  And if you're stealing and I'm stealing and

Yatram Indergit, et al. v. Rite Aid Corporation, et al.          08 CV 9361 (PGG)
Vincent Brown                                                                October 17, 2011

17 (Pages 62 to 65)

Page 62

1    meant Rite Aid?
2        A   I never signed anything with Rite Aid.
3        Q   Okay.
4        A   They just took over, and whatever was
5    there, it was Rite Aid's now.  So anything I signed
6    with Eckerd became the property of Rite Aid.  They
7    didn't renegotiate out contracts or anything, which
8    really basically wasn't a contract, it was just an
9    acknowledgment.
10       Q   So the contract -- the -- what you were
11   referring to as a contract --
12       A   Was a --
13       Q   -- was an acknowledgment?
14       A   Yes, ma'am, it was an acknowledgment.
15       Q   An acknowledgment of what?
16       A   That we understood the reason why we were
17   store managers and what we were expected to do.
18       Q   And that, that part of it, didn't change
19   when Rite Aid took over?
20       A   Oh, yes, it did.
21       Q   But they had -- I'm sorry, I -- okay.  I --
22   I'm just getting the paperwork part.  So
23   paperwork-wise they didn't have you sign anything
24   different?
25       A   Rite Aid did not.

Page 63

1        Q   Is that your testimony?
2        A   Rite Aid did not.
3        Q   And did they give you a new manual?
4        A   They gave us a new company policy, yes,
5    they did.
6        Q   And did you sign anything, an
7    acknowledgment of that?
8        A   Nope, no, ma'am, sure didn't.
9        Q   Okay.  So when you say that everything you
10   signed with Eckerd became the property of Rite Aid --
11       A   Mm-hmm.
12       Q   -- you mean that the contract or the
13   acknowledgment, that you signed with Eckerd, Rite Aid
14   didn't have you sign a new one; right?
15       A   No, they did not.
16       MS. REHMAN:  Objection to form.  Please let
17   me make my objection before you respond.
18       THE WITNESS:  Oh, sorry, sorry.
19   BY MS. PUCKETT:
20       Q   But they did give you a new handbook to
21   read; is that correct?
22       MS. REHMAN:  You can answer.
23       A   Yes.
24       Q   And you did read it; correct?
25       A   Yes, mm-hmm.

Page 64

1        Q   And you were referring earlier to the
2    changes that Rite Aid made.  Can you tell me about
3    those, generally?
4        A   You know, it's almost like you don't want
5    to relive a horrible situation.  So you know, I -- I
6    -- I can't tell you everything.  I won't tell you
7    everything, because the things that -- that I had to
8    go through no one else should ever have to go through
9    them.  I'll just leave it at that.
10       Q   You understand you're under oath; right?
11       A   I'm telling you the truth.
12       Q   Yeah, you understand that you have to
13   answer my questions?
14       A   Yes, ma'am, I do.
15       Q   So you understand that even if you don't
16   want to relive it you sort of have to, for purposes of
17   today?
18       A   Okay.
19       Q   And I'm sorry for making you.
20       A   I'll relive as much as I can remember.
21       Q   Okay, perfect, as long as we understand
22   that?
23       A   Mm-hmm.
24       Q   So what things that you had to go to, that
25   you were referring to, that no one should have to go

Page 65

1    through?
2        A   The one I spoke to you earlier, about me
3    being the overnight manager and the store manager, and
4    they never got me anybody to replace me.
5        Q   What else?
6        A   What else?
7        Q   I'm not -- I'm not -- I'm not trivializing
8    that experience but I want to make sure that we talk
9    about everything?
10       A   Them not being able to -- well, everything
11   -- it sounds like we just keep talking about the same,
12   I mean, it's coming out different but we keep saying
13   the same thing over and over and over.
14       Q   Okay?
15       A   The -- the -- I told you about not having
16   any merchandise, empty pegs, that's one of the things.
17       Q   Okay.
18       A   The -- the not being involved in -- in
19   ordering merchandise.  When it came, when it did
20   eventually come in, you set up the plan-o-gram and you
21   put it out, regardless if it's -- if it's something
22   that -- that has already been a proven fact that it
23   won't sell in my store, if it was on the plan-o-gram
24   you were to put it out, and it went out and it sat
25   there and it sat there.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.      08 CV 9361 (PGG)
Vincent Brown      October 17, 2011

18 (Pages 66 to 69)

**Page 66**

1    And -- and just feeling like a robot all
2    the time, you know, just coming in and just -- just
3    being a robot.  All we did was just push freight out
4    the door, bring freight in the door, clean bathrooms.
5    I mean, there's a lot of -- lot of stuff
6    that, as a manager, that I didn't feel like I was the
7    manager.  I felt like a robot.
8        Q   And that changed when Rite Aid took over?
9        MS. REHMAN:  Objection to form.
10   BY MS. PUCKETT:
11       Q   I'm sorry.  The -- withdrawn.  The question
12   that I was asking, I think I asked it backwards, this,
13   this feeling like a robot, that was only under Rite
14   Aid and not under Eckerd?
15       A   Yes.  Yes, it was.
16       Q   Do you remember the name of your last
17   district manager with Rite Aid?
18       A   Mm-mm.
19       Q   No?
20       A   Mm-mm.
21       Q   I'm sorry, can you just say no?
22       A   No.  I'm sorry.  I'm sorry.
23       Q   And do you remember the name of any of your
24   district managers?
25       A   No.

**Page 67**

1        Q   Was it the same district manager the whole
2    time or did you have several?
3        A   Which one are you talking about, Rite Aid
4    or Eckerd?
5        Q   During the entire five-year period?
6        A   Rite Aid and Eckerd.
7        Q   And Eckerd, both.
8        A   Eckerd was the same.  Rite Aid, there was
9    two.
10       Q   And they were both men but you don't
11   remember their names?
12       A   No, I do not.
13       Q   Did you like one of them more than the
14   other?
15       A   I can't like men.  I work for them.  I do
16   the job.  I don't -- I'm not there to be their friend.
17   I treated both of them equally.  They were my bosses.
18       Q   Did they both treat you equally?
19       A   No.
20       Q   Which one treated you better?
21       A   It wasn't a matter of better.  It's -- it's
22   a matter of respect.
23       Q   Okay, which one respected you more?
24       A   The Eckerd person.
25       Q   Did the Eckerd person continue with Rite

**Page 68**

1    Aid?
2        A   Yeah, they shipped him away on the Maryland
3    side.  I don't -- I don't know what happened to him.
4    Chances are he didn't -- he didn't make it, either.
5        Q   Why do you think he didn't make it?
6        A   Because he warned me before he left.  He
7    said, these guys are after you, just do what they ask
8    and you'll be fine.
9        Q   "These guys" meaning your new DM?
10       A   Yeah.
11       Q   Anybody other than the new DM?
12       A   No, no, that's not -- don't be specific, it
13   wasn't just my DM, it was Rite Aid.
14       Q   The entire --
15       A   It wasn't --
16       Q   -- company?
17       A   He said, these guys don't want you around.
18   They don't want Eckerd people around.  You do what you
19   -- what they ask you to do then you'll stay around a
20   little bit longer than other people.
21       Q   So you think that Rite Aid treated the
22   Eckerd managers differently?
23       A   Oh, yes, ma'am, it was very obvious, it was
24   very obvious.
25       Q   So they treated Eckerd managers differently

**Page 69**

1    from Rite Aid managers, people who came from core Rite
2    Aid stores -- is that -- is that what you're saying?
3        MS. REHMAN:  Objection to form.  You can
4    answer.
5        A   I can only speak for myself, miss.  I know
6    they definitely treated me differently.
7        Q   And you believe it was because you were an
8    Eckerd manager?
9        A   Mm-hmm, I know it was because of that, plus
10   I was a high -- a high salary manager, also.
11       Q   Do you remember what your salary was at
12   Rite Aid?
13       A   It depend on the bonus.  The last year I
14   was there my salary was 82,693 and some change.
15       Q   And did that include the bonus?
16       A   Yes.
17       Q   Were you salaried the entire time you
18   worked for Rite Aid and Eckerd?
19       A   Yes.
20       Q   And you understood that you would be paid
21   the same salary no matter how many hours you worked?
22       A   I'm trying to understand your question.
23       Q   Did you --
24       A   As a salaried manager you don't -- you
25   don't -- I want to answer your question, it's hard to

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**          08 CV 9361 (PGG)
**Vincent Brown**                                    October 17, 2011

35 (Pages 134 to 137)

Page 134

1    A  And I think I said, no, I don't know.
2    Q  Okay.  That's all I was asking.
3    A  Okay, that's what you --
4    Q  That's what I was asking.
5    A  Okay, all right.
6    Q  And now I'm asking -- now I'm asking, you
7  never worked in a Rite Aid after the transition was
8  complete; is that correct?
9    A  Correct.
10      MS. REHMAN:  Objection to form.
11      THE WITNESS:  I'm sorry.
12      MS. REHMAN:  You can answer.  That's okay.
13    A  Yes.
14    Q  So you don't know what it's like to run a
15  Rite Aid store after the transition was complete;
16  correct?
17      MS. REHMAN:  Objection to form.  You can
18  answer.
19    A  I don't know.
20    Q  So I'm correct?
21      MS. REHMAN:  Objection to form.  You can
22  answer.
23    A  Somewhat.
24    Q  Tell me what the somewhat is about?
25    A  I mentioned that the way that I went out

Page 135

1  with Eckerd I wouldn't want to know what it would be
2  like to run a full core Rite Aid, because of the way
3  they treated me before I even got a chance to realize
4  it, they just want -- they use us like robots and
5  cleanup men, that was all that it was, robots and
6  cleanup men.
7      We got all the Eckerd merchandise out of
8  there and once that was accomplished I never even
9  stayed around to see the Rite Aid stuff --
10    Q  Exactly.
11    A  -- coming in.
12    Q  So that is what I'm asking you, I'm asking
13  you if you know what it would be like today, and the
14  answer is you don't.  I understand that --
15    A  No, I don't know.  I don't know.
16    Q  Okay.
17      MS. REHMAN:  Objection to form, misstating
18  his testimony.
19  BY MS. PUCKETT:
20    Q  Well, did you -- do you know what it would
21  be like to run a Rite Aid store today?
22    A  No.
23    Q  Thank you.  We were talking about the sales
24  volume of your store and you said that during that
25  period of time your sales volume dropped.  Do you

Page 136

1  remember what it dropped to?
2    A  Oh, it was on 30, 40, 50 percent off of
3  last year's sales.
4    Q  Did you look at the sales numbers
5  regularly?
6    A  I had to, it was a -- it was a daily thing
7  that you had to go in and see how much -- how much
8  money you had to do for the day.  And if you didn't
9  make that day then you had to do even double the next
10  day so it would be up to where you were going to beat
11  the weekly figures.
12    Q  So looking at the numbers was an essential
13  job of yours; right?
14    A  Oh, yes, ma'am.
15    Q  What about Peru, did he look at them, too?
16    A  Yeah.
17      MS. REHMAN:  Objection to form.  You can
18  answer.
19    A  He was my first assistant, he was privy to
20  the same information, because when I wasn't there he
21  had to make sure that the -- the merchandise was
22  continued to flow when we did have Eckerd merchandise
23  in the back room to fill the counters, and the
24  warehouse truck put up and everything else, yes,
25  ma'am.

Page 137

1    Q  What about the young lady, the 25-year-old,
2  was she privy to that information?
3    A  No.  Overnight they don't need to know that
4  information.
5    Q  Because they're doing sort of a different
6  job?
7    A  Yes, ma'am, mm-hmm.
8    Q  Even when Peru was overnight was he still
9  privy to it?
10    A  Mm-hmm.
11    Q  Yes?
12    A  Yes, ma'am.
13    Q  Because he was your first assistant?
14    A  Yes, ma'am.
15    Q  So, and then that goes also for -- strike
16  that -- you said the 25-year-old was an overnight
17  assistant and she didn't have any need for that
18  information?
19    A  No.
20    Q  Does that also go for Tobias?
21    A  Yes.  Even though Tobias, I guess he was a
22  store manager somewhere.  I don't -- I never got into
23  that with him but he knew how the system -- he knew
24  how Rite Aid's system worked so he could just go in
25  and look at figures anytime he wanted to.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.          08 CV 9361 (PGG)
Vincent Brown                                          October 17, 2011

41 (Pages 158 to 161)

## Page 158

1  employees was questioning why she still here.  She's
2  late all the time but she don't call in.
3       Q   Was she -- did she usually work the same
4  shift as you or did she work an overnight?
5       A   She just worked mornings.
6       Q   So this was not on the overnight shift,
7  this was in the morning?
8       A   Right.
9       Q   Did you -- did you let her go?
10      A   Mm-hmm.
11      Q   You did?
12      A   I had to.
13      Q   Because she kept not showing up for work;
14  right?
15      A   Yeah.
16      Q   Do you remember about what year that was?
17      A   No, ma'am.
18      Q   If that happened on the nightshift what
19  would the assistant manager in charge do?
20      MS. REHMAN:  Objection to form.  You can
21  answer.
22      A   What do you -- what do you mean?  If
23  somebody failed to show up?
24      Q   Yes.
25      A   He would -- he would let me know.

## Page 159

1       Q   Would he wake you up?
2       A   No, not call me.  He would let me know the
3  next day, when I came in, in the morning, because I
4  got there at 7:00 and he left at 7:00, 7:30.  He would
5  let me know that Susan didn't come to work last night.
6  And I would say, that's it, we got to get rid of
7  Susan, that's what Eckerd.
8       With Rite Aid we couldn't fire nobody.  If
9  we had to fire somebody it had to go through the DM.
10  He had to make that decision.
11      Q   Did you ever ask the DM to make that
12  decision?
13      A   About firing somebody?
14      Q   Yes.
15      A   I gave him the situations and he determined
16  if that person was fired.  I never asked him, it was
17  up to him to determine if the person should be fired
18  or not.
19      Q   But it was up to you to bring that
20  situation to his attention; right?
21      A   Yes, exactly.
22      Q   And did he -- did he trust your judgment?
23      MS. REHMAN:  Objection to form.  You can
24  answer.
25      THE WITNESS:  I'm sorry.

## Page 160

1       MS. REHMAN:  That's okay.
2       A   I hope he did.
3       Q   Did you ever present him with a situation
4  and he decided not to fire the person?
5       A   No.
6       Q   So he always trusted your judgment about
7  the particular situation; right?
8       MS. REHMAN:  Objection to form.  You can
9  answer.
10      A   Not every -- not every one, like he never
11  got me a -- another assistant after they fired Peru.
12      Q   Right, but specifically regarding
13  terminations?
14      A   I never had a problem with that, yes,
15  ma'am.  He -- he did do a good job there.
16      Q   Do you remember how many times that
17  happened where you --
18      A   Probably once or twice.
19      Q   You had a pretty good crew?
20      A   Oh, yeah, that's the only way you're going
21  to function.
22      Q   And so you --
23      A   Until I had to cut hours.  When I cut hours
24  then it just started getting real rough.
25      Q   What do you mean?

## Page 161

1       A   Like I said, when I had to cut hours it
2  wasn't the same.
3       Q   And what do you mean by getting real rough,
4  like people --
5       A   I mean people not -- they figured they had
6  the attitude if you going to pay me 32 hours a week
7  that's all you going to get out of me.
8       Q   People felt less invested in the store?
9       A   Yes.
10      Q   So the morale dropped?
11      A   Yes, exactly.
12      Q   Did you try to improve the morale?
13      A   I tried it, we always had meetings
14  discussing that, I would just say it's going to get
15  better, because that's what we were told to keep the
16  morale up with the employees, just tell them it's
17  going to get better.  Things are going to change, just
18  have to hang in there.
19      Q   But your morale was pretty low, too; right?
20      MS. REHMAN:  Objection to form.  You can
21  answer.
22      A   My morale was pretty low?  No, because I
23  was a robot.  A robot doesn't have morales.  You just
24  do what you were told to do.
25      Q   Your testimony was that you had no emotion

42 (Pages 162 to 165)

**Page 162**

1   about the change?
2         MS. REHMAN:  Objection to form.
3      A  I had no emotion about the change.
4      Q  I asked you if your morale was low, and you
5   said, no, no, it wasn't, because you were a robot?
6      A  Mm-hmm.
7      Q  I don't understand that.
8      A  Well, like, again, I'm going to explain it
9   to you.  A robot just functions.  They don't have
10  feelings, they don't have morale, they just function.
11        Have you ever seen Lost in Space?  That
12  robot didn't have any feelings.  He just did what Will
13  Smith told him to do.
14     Q  At the end of the movie I don't believe
15  that was the case, was it?
16        MS. REHMAN:  Objection to form.
17  BY MS. PUCKETT:
18     Q  Maybe I'm thinking of i, Robot, that was
19  Will Smith?
20     A  I'm sorry, Will Robinson was the Lost in
21  Space.
22     Q  Okay.  At the end of i, Robot the robot
23  ended up taking over and having emotions, doesn't it?
24     A  Yeah, they were employing that into them.
25  They was getting ready to have them take over the

**Page 163**

1   whole human race.
2      Q  If someone asked you to be a robot don't
3   you think that would decrease your morale?
4      A  Well, it wasn't asking you, it's on paper,
5   it tells you.
6      Q  It says, "be a robot"?
7      A  Well basically what they want you to do,
8   how they want you to do it, it wasn't like being a
9   manager.
10     Q  You just testified that you -- that
11  whenever you told your DM about a situation your DM
12  listened to you; right?
13     A  Yeah, but that --
14        MS. REHMAN:  Objection to form.
15        THE WITNESS:  Yeah, thank you.
16     A  We were talking about something entirely
17  different.  You're kind of twisting things right about
18  now.
19     Q  I'm not twisting anything.  I'm asking you
20  to clarify.
21     A  Yes, ma'am, but you're putting words in my
22  mouth.  I never said some of the things you're
23  repeating back to me.
24     Q  That's what I'm asking, if I ask you a
25  question and you don't agree with the way I said it,

**Page 164**

1   that's why I'm asking.  I'm asking if you agree with
2   the question.
3      A  The last question you're applying it into a
4   totally different situation.
5      Q  So when you say robot you're talking about
6   the merchandising aspect?
7      A  I'm talking about working for Rite Aid,
8   period.
9      Q  Okay, but the time period --
10     A  On everything.
11     Q  But that includes the time you took
12  situations to your DM, does it not?
13     A  Of course, miss, I'm not going to stop
14  doing that.
15     Q  So that wasn't very robotic?
16        MS. REHMAN:  Objection to form.  Is that a
17  question or a statement?
18        THE WITNESS:  Yeah, really?  You want me to
19  answer that, because I don't understand if it's a
20  question or a statement.
21        MS. PUCKETT:  I'll ask you to refrain from
22  speaking objections.
23        MS. REHMAN:  Okay.  And I'll ask you to ask
24  him questions.
25        THE WITNESS:  Yeah, really.

**Page 165**

1   BY MS. PUCKETT:
2      Q  Okay, that wasn't very robotic, was it?
3      A  What?
4      Q  Taking your situations to your district
5   manager?
6      A  No, that wasn't very robotic, at all.  But
7   that's not the way the -- you know, it wasn't -- just
8   to answer your question, no, it wasn't very robotic.
9      Q  So you did things other than being a robot;
10  correct?
11     A  Okay, 90 percent of the time I was a robot,
12  how is that?  The other ten percent I was taking stuff
13  that I needed to take to my district manager, so how
14  is that?
15     Q  So ten percent of your time you spent
16  taking situations to your DM?
17     A  Yep, not being a robot.  Yes, ma'am,
18  exactly.
19     Q  Okay.  Let's talk about --
20     A  Mm-hmm.
21     Q  -- earlier you testified that you needed a
22  manager to be on the overnight shift because otherwise
23  there would be chaos; right?
24     A  Yes.
25     Q  So if I -- if I ask a robot to be in the

Yatram Indergit, et al. v. Rite Aid Corporation, et al.
Vincent Brown

08 CV 9361 (PGG)
October 17, 2011

43 (Pages 166 to 169)

| Page 166 |
| --- |

1   store overnight would that suffice to keep people from
2   stealing?
3          MS. REHMAN: Objection to form.
4      A   No, ma'am.
5      Q   So really, you were being a robot, but you
6   were also watching the store; right?
7          MS. REHMAN: Objection to form.
8      A   That was part of our robotic job, yes,
9   ma'am.
10     Q   But if I put a literal robot in the store
11  he couldn't have prevented -- it couldn't have
12  prevented people from stealing?
13     A   Because it's not a person.
14     Q   Correct.  So really, when you say you were
15  a robot part of your job involved robotic duties, but
16  you were simultaneously having to be a person;
17  correct?
18         MS. REHMAN: Objection to form.
19     A   That sound like somebody Star Trek, right
20  there.  I'm not laughing at you.  I'm laughing with
21  you.
22     Q   I understand.  I'm laughing.
23     A   But that was a good one.  I like that one.
24  Yes.
25     Q   You talked about the time when you did not

| Page 167 |
| --- |

1   have an assistant store manager to work the overnight
2   shift.  How many hours a week would you average during
3   that period of time?
4      A   A bunch.  I'm saying like 60, 70, I mean,
5   like I said earlier, it -- it -- every day seemed like
6   it was just the same day, because you doing the same
7   thing constantly, constantly.  I didn't -- I wasn't
8   getting paid for the hours so why should I keep track
9   of them?  But it was a bunch of hours, miss.
10         Going in at 10:00, 10:00 p.m., get off at
11  12:00 noon, come back at 10:00 p.m., and do the same
12  thing, constantly, for four, four and a half months,
13  constantly.
14     Q   And this was, again, for the record, to the
15  time period where you had to box up all the Eckerd
16  freight; correct?
17     A   It was during the time period when that
18  occurred and when they fired Peru, yes, ma'am.
19     Q   Would you agree with me that you worked
20  more after they fired Peru?
21     A   Oh, yeah, oh, yeah, I would agree with you
22  a hundred percent, there.
23     Q   And how many hours, before they fired Peru,
24  did you work per week?
25     A   Probably 55.

| Page 168 |
| --- |

1      Q   And then what about before Rite Aid took
2   over?
3      A   Forty-five, I could go fishing, I could go
4   hunting, I could go see my grand kids play.  I can't
5   do that -- I couldn't do any of that with Rite Aid.
6      Q   So after Rite Aid took over your hours
7   increased to about 55, on average, per week; correct?
8      A   That's with -- yes.
9      Q   And then after Peru got fired that
10  increased to a bunch?
11     A   Yes.
12     Q   What else would change the amount of hours
13  you would work, maybe seasonal, did -- did --
14     A   Oh, yes, seasonal always played any -- you
15  know, you expect to do -- you expect to do more hours
16  during the seasonal, like Halloween, Thanksgiving,
17  Christmas, and then it gets back down to normal right
18  after New Year's.
19     Q   How often -- let's go back to when you
20  worked for Eckerd.  How often did your DM visit?
21     A   Probably once every three months.
22     Q   When Rite Aid took over you had two
23  different DMs, tell me about the first one, how often
24  did he visit?
25     A   Well, he was my -- he was my second DM from

| Page 169 |
| --- |

1   Eckerd.
2      Q   I see.
3      A   That he was a Eckerd DM.
4      Q   And he was there during the transition; is
5   that right?
6      A   They transferred him to Maryland then we
7   got this other guy.  I wish I could think of the other
8   guy's name but I can't.
9      Q   Okay.  So this, the second DM you had --
10     A   Mm-hmm.
11     Q   -- was also an Eckerd DM?
12     A   No.
13     Q   Okay.  Let's clarify.  I'm -- the first DM
14  you ever had with Eckerd he visited about once every
15  three months; right?
16     A   Yes, ma'am.
17     Q   And then your second DM, you don't remember
18  his name, how often did he visit?
19     A   About the same, just like a DM, if you've
20  got everything in order they don't need to come by
21  that often.
22     Q   So the frequency of district manager visits
23  would depend on how well your store was doing?
24     A   Yes, ma'am.
25         MS. REHMAN: Objection to form.  You can

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**          08 CV 9361 (PGG)
**Vincent Brown**                                                     October 17, 2011

53 (Pages 206 to 209)

| Page 206 |
|---|

1      MS. REHMAN: Objection to form.
2      A  Because I could fire people with Eckerd. I
3  couldn't fire people with Rite Aid. That's how the
4  results would have been different.
5      Q  But you could tell your district manager?
6      A  No.
7      Q  And you testified earlier that your
8  district manager trusted your judgment; correct?
9      MS. REHMAN: Objection to form.
10     A  Mm-hmm, yes.
11     Q  So since you never presented your new
12 district manager with the situation of someone to fire
13 you don't know whether the result would be different;
14 correct?
15     A  Well, when they tell you that -- that you
16 send all your problems to me before you do anything,
17 what I mean, what else is there? How clear could that
18 be?
19     Q  I'm asking you if the result was different
20 and you're telling me that it never happened so you
21 don't know; is that fair?
22     A  Yes.
23     Q  And so we talked about ordering, is it your
24 testimony that you never ordered after -- Rite Aid --
25 Rite Aid took over?

| Page 207 |
|---|

1      A  Their system wasn't an ordering system, it
2  was a replenishing system.
3      Q  Auto replenishment; correct?
4      A  Replenishment system, correct.
5      Q  And Eckerd didn't have that; correct?
6      A  No.
7      Q  But the first year that you worked under
8  Rite Aid you said it was business as usual. So the
9  auto replenishment didn't take over until the second
10 transition; is that right?
11     A  Yeah, they cut off the Eckerd one, yes.
12     Q  So how would I know when the actual
13 transition happened, from Eckerd to Rite Aid, in any
14 given store; how would I know that?
15     A  I don't know.
16     Q  I would have to ask every individual store
17 manager; right?
18     A  I don't know.
19     Q  I would have to ask every district manager;
20 right?
21     A  I don't know.
22     Q  Because you're saying that the actual
23 transition, the first and second transition, the first
24 one was when Rite Aid actually bought Eckerd; right?
25     A  Yes.

| Page 208 |
|---|

1      Q  And then the second one was a year or so
2  later; right?
3      A  Mm-hmm.
4      Q  Yes?
5      A  Yes.
6      Q  But that didn't happen at the same time in
7  every single store, did it?
8      MS. REHMAN: Objection to form.
9      A  The transition, yeah, the transition, both
10 of those transition, happened as a company, miss.
11     Q  How do you know regarding the second
12 transition?
13     A  Sending the merchandise back?
14     Q  Yes.
15     A  Because all the stores that were Eckerd had
16 to send the merchandise back.
17     Q  How do you know at what period in time that
18 that occurred?
19     A  I don't know that.
20     Q  Okay.
21     A  I don't know that.
22     Q  That's what I was asking.
23     A  I don't know that.
24     Q  So you don't know exactly when that
25 happened for any other stores than yours; correct?

| Page 209 |
|---|

1      A  No, ma'am.
2      Q  What about any other stores in your
3  district did it happen around the same time for those
4  stores?
5      A  I don't know.
6      MS. REHMAN: Objection to form.
7      A  I don't know.
8      Q  Earlier you talked about a job in jeopardy
9  form; right?
10     A  Mm-hmm.
11     Q  Yes?
12     A  Yes.
13     MS. PUCKETT: I'm going to mark Brown 2.
14     (Brown Exhibit No. 2 was marked for
15 identification.)
16 BY MS. PUCKETT:
17     Q  I want you -- I want you to look at that
18 form and tell me if this is the form you were talking
19 about, the first two pages?
20     A  This is the supervisor's signature. Do you
21 know who that is?
22     Q  Well, I was hoping you can tell me.
23     A  I don't know who that is, I can't even make
24 that out.
25     Q  That's your signature on the left-hand

Yatram Indergit, et al. v. Rite Aid Corporation, et al.
Vincent Brown

08 CV 9361 (PGG)
October 17, 2011

65 (Pages 254 to 257)

Page 254

1  just supposed to go and take somebody's register down,
2  and put a new till in it, and then go back and count
3  it into the system, which indicates an audit.  And
4  they would know if you were doing that or not.
5     Q  Did Peru do cash register audits?
6     A  Mm-hmm.
7     Q  Yes?
8     A  Yes.
9     Q  Did Tobias?
10    A  I think he did.
11    Q  Overnight -- did -- did anyone do cash
12  register audits?
13    A  Well, you had to count the tills at the end
14  of the shifts.
15    Q  When I say cash register audits do you
16  understand me to be saying random audits?
17    A  Not that -- well, there was only either one
18  or two registers open at night.  I mean, you could
19  have done them, but I don't think we did them at night
20  because, like I said, at the end of their shifts the
21  tills had to be counted.
22    Q  Did your shift supervisors, like Sheiffel,
23  do cash register audits?
24    A  Yes.
25    Q  You said after Rite Aid took over you

Page 255

1  didn't order merchandise anymore?
2     A  No, we didn't.
3     Q  Have you heard the term hard order; do you
4  understand what I mean by that?
5     A  That's in case you want something that you
6  can't get through the regular replenishment system you
7  can go to your DM and they can put in an order for
8  you.
9     Q  And you can make requests; right?
10    A  Yes.
11    Q  And did you ever do that?
12    A  Oh, yeah, we -- we never got it.
13    Q  You --
14    A  We never --
15    Q  You never got it?
16    A  We never -- no, we never -- well, remember,
17  I wasn't around to see what a real Rite Aid was
18  supposed to work like, remember?
19    Q  It was only during --
20    A  So I didn't see that, all I saw was getting
21  the merchandise out of there, all the Eckerd stuff,
22  and then four, four and a half months later the Rite
23  Aid stuff starts trickling in, and we set the
24  plan-o-grams and the merchandise started trickling in.
25    Q  So -- so you -- you never did hard order,

Page 256

1  then; is that your testimony?
2     A  I couldn't.  The only one that could hard
3  order was the DM.
4     Q  Okay?
5     A  That can replace, they're the only one that
6  can say, well, he needs this, let's go ahead and get
7  that through there.
8     Q  Okay.  When I say hard order I mean request
9  your DM for something?
10    A  Mm-hmm.
11    Q  Did you ever hard order?
12    A  Well, I requested that we needed certain
13  items, yes, ma'am.
14    Q  And you didn't get them.  But you also
15  qualified that by saying you didn't stick around?
16    A  It wasn't that --
17       MS. REHMAN:  Objection to form.  You can
18  answer.
19       THE WITNESS:  Thank you.
20    A  It wasn't that I didn't stick around, I got
21  terminated.
22    Q  Right.  But you weren't around for the
23  post-transition Rite Aid world?
24    A  I can't -- can't comment on that world.  I
25  was never there.

Page 257

1     Q  Did you ever do the ad order?
2     A  All of -- well, with the Rite Aid,
3  remember, we weren't getting the merchandise, that's
4  where I said earlier this morning we had to go to Rite
5  Aid stores to get ad merchandise because they weren't
6  sending it to into the Eckerd stores at all.
7     Q  So you went yourself --
8     A  Yep.
9     Q  -- to the stores?
10    A  Yep.
11    Q  Like with your own car?
12    A  Yep, my own gas and everything, that's
13  right.
14    Q  You loaded up your car?
15    A  Yes, I did.
16    Q  And that's what ad ordering was, was you
17  driving in your car to another store?
18    A  Yeah.  Yeah.
19    Q  And that was for a period of about -- of
20  about four to five months?
21    A  Mm-hmm, until the merchandise started.  I
22  think they said that they had to open -- they hadn't
23  opened the system to the store yet or something to
24  that effect.
25    Q  So you don't know whether it was like that

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**
08 CV 9361 (PGG)

**Vincent Brown**
October 17, 2011

**86 (Pages 338 to 341)**

**Page 338**

1   Q  I don't know. I'm just asking you to make
2  sure.
3   A  No, ma'am. No, ma'am, not that -- I can't
4  fluff nothing up with Rite Aid, I'm sorry.
5   Q  So if I read a copy of your resumé it would
6  be accurate; correct?
7   A  Yes, it would.
8   Q  Have we talked about all of your jobs since
9  school, have we mentioned all of them?
10   A  I only had two jobs, miss.
11   Q  Right?
12   A  K-Mart and Rite Aid, I mean, K-Mart and
13  Eckerd.
14   Q  K-Mart, Eckerd, Rite Aid and then your
15  current job?
16   A  Yes. And this is a part-time job, if you
17  want to call that a job.
18   Q  And the senior center did you apply to
19  volunteer there?
20   A  Yes, I did.
21   Q  And did you give them a resumé?
22   A  They didn't need one, for a volunteer they
23  didn't need a resumé.
24   Q  What is the name of your current employer?
25   A  Fairfax County.

**Page 339**

1   Q  So it's the government?
2   A  Yep, the government, yes.
3   Q  Fairfax County, that's the county
4  government; right?
5   A  Yes.
6   Q  And you're paid by the hour; right?
7   A  Yes.
8   Q  Were there any other facts that we haven't
9  discussed that relate to this lawsuit?
10   A  No, ma'am, I think we done discussed facts
11  that I didn't even know about, so yes.
12   Q  So you're saying I'm very thorough is what
13  you're saying?
14   A  Yes, you're very thorough.
15   Q  Was your pay ever docked at Rite Aid?
16   A  No.
17   Q  Or Eckerd?
18   A  No.
19   Q  And your testimony today has been complete
20  and accurate?
21   A  Yes, ma'am.
22   MS. PUCKETT: Okay.
23   MS. REHMAN: All right. Just going to ask
24  you a couple of questions.
25   THE WITNESS: Yes, ma'am.

**Page 340**

1   MS. REHMAN: I know you want to be out of
2  here.
3   EXAMINATION BY COUNSEL FOR PLAINTIFF YATRAM INDERGIT
4  BY MS. REHMAN:
5   Q  During your time with Rite Aid, that's the
6  time period during in which we're discussing now, can
7  you identify your job duties as a store manager?
8   MS. PUCKETT: Objection to form.
9  BY MS. REHMAN:
10   Q  You can answer.
11   A  Oh, okay.
12   MS. PUCKETT: Same rules apply. Same rules
13  apply.
14  BY MS. REHMAN:
15   Q  Same rules apply?
16   A  It was basically the — it was to make sure
17  that the store is making profit, make sure that all
18  our plan-o-grams are up to date, make sure you take
19  care of all your associates, what do you call it,
20  their annual reviews, because, you know, everybody
21  wants to get more money, and keep on the order
22  schedule. Without being on the order schedule you
23  can't get merchandise in the store.
24   Q  Did you stock shelves as a store manager
25  working for Rite Aid?

**Page 341**

1   MS. PUCKETT: Objection, asked and
2  answered.
3  BY MS. REHMAN:
4   Q  Okay, you can answer it.
5   A  Yes, I did.
6   Q  Did you work on the cash register as a
7  store manager for Rite Aid?
8   MS. PUCKETT: Same objection.
9   A  Yes, I did.
10   Q  Did you clean as part of your job duties as
11  a store manager for Rite Aid?
12   MS. PUCKETT: Same objection.
13   A  Yes, I did.
14   Q  Did you unload trucks as a store manager
15  working for Rite Aid?
16   A  Yes, I did.
17   MS. PUCKETT: Same objection.
18  BY MS. REHMAN:
19   Q  Did you price items working as a store
20  manager for Rite Aid?
21   A  We didn't price the items but we made
22  labels for the counters and the shelves.
23   Q  Did you consider the tasks that I just
24  listed as part of your regular duties as a store
25  manager for Rite Aid?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.       08 CV 9361 (PGG)
Vincent Brown                                                 October 17, 2011

87 (Pages 342 to 345)

**Page 342**

```
 1        MS. PUCKETT:  Same objection.
 2     A  Yes.
 3     Q  To your knowledge were these tasks part of
 4  your job description working as a store manager for
 5  Rite Aid?
 6     A  For Rite Aid?  Well, we never got any type
 7  of job.  I was just going off of what we had as
 8  Eckerd.
 9     Q  Did your job description at Eckerd include
10  cleaning as a store manager for Eckerd?
11     A  It didn't include cleaning, because we had
12  someone to clean, it was to make sure that it was
13  done.  But you didn't have to do it yourself because
14  we had people to make sure that it was done.
15     Q  Were you able to supervise your store
16  effectively while you were stocking shelves?
17        MS. PUCKETT:  Objection to form.
18     A  It was impossible.
19     Q  Why was it impossible?
20     A  Because of the shelves.  The counters was
21  72 inches high.  You can't see over them.  All you can
22  see was what was down at that end of the counter and
23  what was down at that end.
24     Q  And just to be clear we're still talking
25  about your time period as a store manager working for
```

**Page 343**

```
 1  Rite Aid?
 2     A  Yes.
 3     Q  And where were the cash registers in Rite
 4  Aid located in your store?
 5     A  At the front of the store.
 6     Q  And if you were at the cash register in
 7  front of the store could you see what one of your
 8  employees in the back of the store was doing?
 9     A  There was one that I could walk down, I
10  think it was register three, and I could see
11  basically, yes, straight down and see what was going
12  on.
13     Q  You could see straight down the store?
14     A  On that side, where register three was.
15     Q  Could you see on the other side, where the
16  register wasn't?
17     A  No, ma'am, unless I walked all the way over
18  to the one-hour photo, which I did, quite a few times,
19  too, because I wanted to see where everybody was, so
20  that's how I could do my normal patrol.
21     Q  And what about when you were unloading the
22  truck, were you able to supervise your employees
23  effectively?
24     A  No.
25        MS. PUCKETT:  Object to form.
```

**Page 344**

```
 1        THE WITNESS:  Oh.
 2        MS. PUCKETT:  Same thing.
 3     A  We were outside.  We couldn't see nothing
 4  inside.
 5     Q  Did you ever work at the one-hour photo
 6  section?
 7     A  Mm-hmm.
 8     Q  Doing what?
 9     A  Process, starting up the machines, shutting
10  down the machines, getting customers' pictures,
11  unjamming the picture machine.
12     Q  Could you have assigned an hourly associate
13  to do those tasks?
14     A  No.
15     Q  Why not?
16     A  Because the -- it was overnight.  All I had
17  was the cashier, and the cashier basically was just
18  there to do the running of the cashier.  People would
19  come up and stick their little cards in there, because
20  we're a 24-hour store they think that the one-hour
21  photo was still open.  And the thing would just drop
22  inside.  So basically you have to take the front off
23  to get that little SIM card out of there.
24     Q  You had testified earlier that there was a
25  budget cut and there was a cut in payroll and
```

**Page 345**

```
 1  therefore you had to cut hours; is that correct?
 2     A  Yes.
 3     Q  Did this payroll cut and cut in hours
 4  affect your ability to staff the store?
 5     A  Oh, big time.
 6     Q  How so?
 7     A  Well, we went from being able to have
 8  people to clean the bathrooms to you had to do them
 9  yourself.  Either that or get someone to go back and
10  help you, it depends on how bad the job was, if it was
11  something that I figured I could just do myself, just
12  hold my breath long enough, I would go in there and do
13  it.  But I'll never do that again.  I don't even think
14  I want to change my granddaughter's diaper, now.
15     Q  Did the cut in hours affect the job duties
16  that you took on as a store manager or that you were
17  required to do as a store manager?
18        MS. PUCKETT:  Objection, compound.
19     A  Yes.
20     Q  Let me -- let me restate it so that it's
21  clear.
22     A  Okay.
23     Q  The cut in payroll and the cut in hours --
24     A  Mm-hmm.
25     Q  -- did that affect the job duties that you
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.    08 CV 9361 (PGG)
Vincent Brown                                                October 17, 2011

88 (Pages 346 to 349)

---

**Page 346**

1  were required to perform in the store as a store
2  manager for Rite Aid?
3       A  Yes, ma'am.  Yes, ma'am, it did.
4       Q  How so?
5       A  Well it couldn't all be done without help.
6  You need more than the packing up of all that freight
7  and shipping it off, and getting it from upstairs to
8  downstairs and on the truck, you know, if you had an
9  extra hand you could have gotten it done a lot
10  quicker.
11       Q  You mentioned packing up the freight at
12  various times throughout your testimony.  Who told you
13  or who directed you to pack up the freight?
14       A  Rite Aid.
15       Q  Do you know who from Rite Aid?
16       A  It was from the regional office.  They gave
17  us a -- a thick binder, ten times as thick as this,
18  and we had to go through it all, find all -- they
19  weren't taking all the merchandise back.  And you had
20  to find it and put the counts on it.
21       Q  Did you ever meet anyone from the regional
22  office?
23       A  When we had to go there, yeah.
24       Q  When did you have to go there?
25       A  When we -- when we weren't selling enough

---

**Page 347**

1  of those balloons, those Miracle balloons.
2       Q  Do you remember the name of the person you
3  met with?
4       A  No.  I can't even remember my DAs name.  I
5  sure enough wasn't going to remember his name.
6       Q  Do you remember when you went?
7       A  It had to be like this time of the year
8  because it was kind of cold when we got up there.
9       Q  But you don't remember which year?
10       A  It could have been 2000 -- the fall of
11  2008.
12       Q  You mentioned that you worked as a store
13  manager for K-Mart?
14       A  Mm-hmm.
15       Q  For how many -- I'm sorry -- how many
16  years?
17       A  Twenty-eight.
18       Q  Twenty-eight years?
19       A  Mm-hmm.
20       Q  How did your job responsibilities as a
21  store manager working at K-Mart differ from your job
22  duties working as a store manager in Rite Aid?
23       A  It was -- it was the difference of night
24  and day.  I had people.  I had -- I had a much larger
25  building to manage.  I had a much -- many more

---

**Page 348**

1  employees to keep up with, but I also had a lot of
2  help.  I had a lot of assistants.  I had my own
3  personnel.  I had the department managers.  So you
4  know, the bigger the unit the more -- the more people
5  you need to help you run the unit.
6       Q  Do you feel like you needed more people to
7  help you effectively run the Rite Aid when you were
8  working as a store manager for Rite Aid?
9       A  Yes.
10       Q  Did you tell the regional, when you went to
11  the regional office, did you explain to them that you
12  needed more people to work in the store?
13       A  We weren't there to -- to express any other
14  grievances.  We were there to get talked to about not
15  selling balloons, that was the main cause for all of
16  us going up there, or the main reason, not a cause.
17       Q  You said "all of us."  Who is all of us?
18       A  All the managers in my district.  There had
19  to be like ten or -- ten or twelve of us, plus the DM
20  and the loss prevention manager went, also.
21       Q  Did you have any say in setting payroll --
22       A  No.
23       MS. PUCKETT:  Objection.
24  BY MS. REHMAN:
25       Q  -- while working as a store manager for

---

**Page 349**

1  Rite Aid?
2       A  No, not at all.
3       Q  What about setting the budget, did you have
4  any say --
5       A  No.
6       Q  -- or input in setting the store budget
7  while working as a store manager for Rite Aid?
8       A  No, ma'am.
9       Q  Were you able to change the budget?
10       A  If you wanted to get in trouble.  You
11  couldn't change it, you just didn't abide by it, if
12  they told you that you had 35 hours to work, and you
13  worked 45 hours, you was going to hear it.
14       Q  From whom?
15       A  From the DM.
16       Q  Whose ultimate responsibility was it --
17  strike that -- who was ultimately responsible for the
18  profit -- bit of profitability of your store?
19       A  When?
20       Q  While you were working as a store manager
21  for Rite Aid?
22       A  It was the -- it was the company.  They
23  sent the merchandise in, we never ordered any
24  merchandise, it was up to them to send the merchandise
25  in.

---

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**
**Vincent Brown**

08 CV 9361 (PGG)
October 17, 2011

89 (Pages 350 to 353)

**Page 350**

1    Q   Was there any merchandise that you knew
2  sold in your store, while you were working for Eckerd,
3  that you couldn't have in your store -- store -- while
4  working for Rite Aid?
5    A   Oh, yeah.
6      MS. PUCKETT:  Objection, asked and
7  answered.
8    A   There was a number of items that customers
9  requested for us to try to get back.  And we just
10  never could get them back.
11    Q   Why not?
12    A   Because it wasn't in the assortment.
13    Q   And who provided you with the assortment?
14    A   Rite Aid.
15    Q   Do you think that if you had that
16  merchandise the store would have been more profitable?
17    A   It wouldn't have been a loss --
18      MS. PUCKETT:  Objection, calls for
19  speculation.
20    A   Yes.
21    Q   How much authority did you have to run your
22  own store while working as a store manager for Rite
23  Aid?
24      MS. PUCKETT:  Objection to form.
25    A   You -- you want it in percent?

**Page 351**

1    Q   No, just --
2    A   Not much.
3    Q   What do you mean by not much?
4    A   Well, like I kept emphasizing to Bonnie,
5  right?
6      MS. PUCKETT:  Yes.
7    A   We were robots, you know, you just do what
8  you're told, that's all you would do, you just do what
9  you're told.
10    Q   Who made the final decision regarding
11  hiring staff while working as a store manager for Rite
12  Aid?
13      MS. PUCKETT:  Objection, asked and
14  answered.
15    A   The DM.
16    Q   What about firing staff?
17    A   The DM.
18    Q   Promoting staff, who had the final say,
19  while you were working as a store manager for Rite
20  Aid?
21      MS. PUCKETT:  Same objection.
22    A   Well, I never promoted anybody, so I guess
23  it would still have to go through him.
24    Q   Did the DM review any of the evaluations
25  that you completed regarding the hourly employees?

**Page 352**

1    A   We never got around to --
2    Q   You never got around to it?
3    A   -- do that.
4    Q   Do you recall the computer program that you
5  used while working for Eckerd, do you recall the name
6  of it?
7    A   Not -- no.
8    Q   No?
9    A   All I know it worked for us better than
10  Rite Aid.  What was it called, Prism?  Was it Prism?
11  I think it was called Prism.
12    Q   Okay.
13      MS. REHMAN:  I think I am done.
14      MS. PUCKETT:  Okay.  I just have a few
15  follow-up questions.
16      THE WITNESS:  Okay.
17    EXAMINATION BY COUNSEL FOR DEFENDANT RITE AID
18  BY MS. PUCKETT:
19    Q   The time period we were just discussing,
20  your attorney said while you worked for Rite Aid, you
21  understood that to mean after the second transition;
22  correct?
23      MS. REHMAN:  Objection to form.
24    A   Well, what I understood is when I worked
25  for Rite Aid.

**Page 353**

1    Q   And you testified earlier that things were
2  business as usual until the second transition; right?
3    A   Well, look, Bonnie, Rite Aid stayed out of
4  the picture for a whole year, so I cannot consider
5  that as being Rite Aid when we were still doing
6  business as Eckerd.  We were still getting Eckerd
7  merchandise in and everything.
8    Q   Okay.
9    A   So I can't consider that first one.  Yes,
10  we were purchased by Rite Aid, at that point in time,
11  but they -- no individual came around for a whole
12  year.
13    Q   Okay.  I just wanted to make the record
14  clear --
15    A   Yes, ma'am, I understand.
16    Q   -- as to the discussion that we just had,
17  that was all regarding after the second transition;
18  correct?
19    A   After the second transition?
20    Q   The packing of the freight?
21    A   Well, I can't say yes to that, Bonnie,
22  because it -- Rite Aid didn't come and they didn't do
23  anything for a year.  They didn't even -- we didn't
24  even sell Rite Aid merchandise.  We just was acquired
25  by Rite Aid, on paper.  There was nothing about the

Yatram Indergit, et al. v. Rite Aid Corporation, et al.          08 CV 9361 (PGG)
Vincent Brown                                                    October 17, 2011

94 (Pages 370 to 373)

**Page 370**

```
 1              ACKNOWLEDGMENT OF DEPONENT
 2      I, VINCENT BROWN, do hereby acknowledge that I
 3  have read and examined the foregoing testimony, and
 4  the same is a true, correct and complete transcription
 5  of the testimony given by me and any corrections
 6  appear on the attached Errata sheet signed by me.
 7
 8  _____
 9    (DATE)              (SIGNATURE)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 372**

```
 1              E R R A T A  S H E E T
 2   IN RE: Yatram Indergit v. Rite Aid
 3   RETURN BY: _____
 4   PAGE  LINE   CORRECTION AND REASON
 5   ___  ___  _____
 6   ___  ___  _____
 7   ___  ___  _____
 8   ___  ___  _____
 9   ___  ___  _____
10   ___  ___  _____
11   ___  ___  _____
12   ___  ___  _____
13   ___  ___  _____
14   ___  ___  _____
15   ___  ___  _____
16   ___  ___  _____
17   ___  ___  _____
18   ___  ___  _____
19   ___  ___  _____
20   ___  ___  _____
21
22   (DATE)            (SIGNATURE)
23
24
25
```

**Page 371**

```
 1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
 2      I, Cassandra E. Ellis, Registered Professional
 3  Reporter, the officer before whom the foregoing
 4  proceedings were taken, do hereby certify that the
 5  foregoing transcript is a true and correct record of
 6  the proceedings; that said proceedings were taken by
 7  me stenographically and thereafter reduced to
 8  typewriting under my supervision; and that I am
 9  neither counsel for, related to, nor employed by any
10  of the parties to this case and have no interest,
11  financial or otherwise, in its outcome.
12      IN WITNESS WHEREOF, I have hereunto set my hand
13  and affixed my notarial seal this 27th day of October
14  2011.
15  My commission expires:
16  November 30, 2012
17
18
19
20  NOTARY PUBLIC IN AND FOR
21  THE DISTRICT OF COLUMBIA
22
23
24
25
```

**Page 373**

```
 1    E R R A T A  S H E E T  C O N T I N U E D
 2   IN RE: Yatram Indergit v. Rite Aid
 3   RETURN BY: _____
 4   PAGE  LINE   CORRECTION AND REASON
 5   ___  ___  _____
 6   ___  ___  _____
 7   ___  ___  _____
 8   ___  ___  _____
 9   ___  ___  _____
10   ___  ___  _____
11   ___  ___  _____
12   ___  ___  _____
13   ___  ___  _____
14   ___  ___  _____
15   ___  ___  _____
16   ___  ___  _____
17   ___  ___  _____
18   ___  ___  _____
19   ___  ___  _____
20   ___  ___  _____
21
22   (DATE)            (SIGNATURE)
23
24
25
```