# Exhibit X

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

YATRAM INDERGIT, on behalf      )
of himself and others          )
similarly situated,            )
                               )
            Plaintiff,         )   CIVIL ACTION NO.
                               )   1:08-cv-09361-PGG-
      VS.                      )   HBP
                               )
RITE AID CORPORATION, RITE     )
AID OF NEW YORK, INC., and     )
FRANCIS OFFOR as Aider &       )
Abettor,                       )
                               )
            Defendants.        )
_____)

DEPOSITION OF MARK DANIEL DAYTON
Los Angeles, California
Wednesday, August 10, 2011

Reported by:  NIKKI ROY
              CSR No. 3052

Page 130

1    right?

2        A.   Right.

3        Q.   And you have an opportunity to say, you know,

4    okay, we need to have these things --

5        A.   Yes.

6        Q.   -- because they're in the ad, right?

7        A.   Uh-huh.

8        Q.   But I need to decide, you know, whether our store

9    is actually going to sell a ton of beach balls or

10   whether what we're going to -- we -- we're going to sell

11   more of is sun tan lotion, right?

12       A.   Right.

13            MS. SCOTT:  Objection; form.

14   BY MS. FALCONE:

15       Q.   Okay.  So -- and you had the ability to decide

16   which of the ad items you wanted how much of within

17   certain parameters?

18       A.   Yes.

19            MS. SCOTT:  Objection; form.

20   BY MS. FALCONE:

21       Q.   Okay.  You couldn't order a million bottles of

22   sun tan lotion, right?

23       A.   I could.

24       Q.   You -- you could do that?

25       A.   Well, I mean, they -- they've called and said,

Page 131

1    you know, did you really want 10,000 bottles of

2    something?  No, it's a key strike error, so --

3       Q.  Okay.  Okay.  All right.  So did you as the store

4    manager have to analyze the demographics of your store

5    and what was being offered in the ad to try and figure

6    out which items you would need?

7               MS. SCOTT:  Objection; form.

8               THE WITNESS:  Actually, Ibrahim used to send

9    us out like the items -- every week he would send us out

10   a list of the items that we needed to order on, and if

11   we didn't order them, he would add them to our order.

12   Like if we didn't order enough, he would say, well, I'm

13   going to go into your order and I'm going to add, you

14   know, so many to your order.  I -- or he'll -- he would

15   say, you know, I going to -- none of you ordered enough

16   of this, I'm going to order more of it, you know, for

17   you guys.  So that would happen.  He would step in and

18   he had the ability to -- to add to our orders, which he

19   would do.

20   BY MS. FALCONE:

21      Q.  Right, but -- but that doesn't really answer my

22   question.  In the first instance, would you as the store

23   manager sit down and conduct your own analysis of what

24   you thought your store needed based on the demographics?

25               MS. SCOTT:  Objection; form.

Page 132

1              THE WITNESS:  Not so much based on

2    demographics, more based on their suggestions and what

3    the item was and the fact that I knew Ibrahim wanted me

4    to order a bunch of a certain type of thing, you know, I

5    would -- I would order heavier on that.

6              They had preprograms like end caps, and if

7    the item was going to be on a preprogram -- well, all

8    the -- all the end caps are preprogrammed, but the ad

9    ones, they have specific ones that they want us to do.

10   So I had to make sure I ordered enough to fill a certain

11   end cap regardless of whether I thought I could sell it

12   or not.

13   BY MS. FALCONE:

14     Q.  But did you ever make decisions like, okay.  I

15   know it's about to be spring break at SCSU, so maybe I

16   should order more sun block because kids are going to

17   come in and want to buy it for their spring break.

18              Did you make decisions such as that?

19              MS. SCOTT:  Objection; form.

20              THE WITNESS:  Not that one because sun block

21   came in automatically, big displays of it in the summer.

22   BY MS. FALCONE:

23     Q.  What about alcohol, did you ever make any

24   analysis, gee, you know, we're near a college, we've got

25   a lot of college kids who probably want to buy things

Page 332

 1   Q.  What kinds of complaints were you responsible for
 2   handling?
 3   A.  Usually conflicts with like two different
 4   employees.
 5   Q.  Okay.
 6   A.  Maybe it'd be a customer problem like a customer
 7   was being inappropriate with an employee and...
 8   Q.  And would you make the decision as to how to
 9   handle those types of issues on your own?
10   A.  Those sometimes, and sometimes we'd check with
11   human resources just to be sure.
12   Q.  Okay.  Did you think that because you had to
13   check with human resources that that made you less of a
14   manager?
15   A.  Well, it's not giving me the final say.  There
16   was a lot of times when I thought she should have said I
17   could go ahead and write somebody up and then she, you
18   know, said, no, I couldn't or -- you know, it was time
19   to terminate or no, it wasn't.
20          MS. FALCONE:  Okay.  Let's go off the record
21   for a break.
22          THE WITNESS:  Okay.
23          (Recess from 4:23 p.m. to 4:38 p.m.)
24          MS. FALCONE:  Okay.  Let's go back on the
25   record.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Mark Daniel Dayton**                                                        **August 10, 2011**

Page 333

1      Q.   Mr. Dayton, I am going to ask you to estimate for

2   me your average number of hours worked per week over the

3   time that you were a store manager, and I'd like to

4   start with the time period that you were in El Cajon.

5          When you were in El Cajon, how many hours per

6   week on average do you think you worked?

7              MS. SCOTT:   Objection; form.

8   BY MS. FALCONE:

9      Q.   And you can give me a range.

10     A.   Yeah, I'm trying to remember exactly or as close

11  as possible.  I would say a minimum of 60 and maximum of

12  -- I had some really big weeks there when I first

13  started there, but I was paid as assistant and I'd just

14  been moved to that store and it was right before an

15  inventory.

16          I'm going to discount those because those were

17  crazy weeks of like 100-plus hours -- or two-week

18  periods of 100-plus.  So I'm going to say probably

19  generally between 60 and 70.

20     Q.   Okay.  After you moved to 5651, between

21  February 4, 2007 and the end of December 2007, how many

22  total hours over 40 did you work on average?

23              MS. SCOTT:   Objection; form.

24              THE WITNESS:   On average?

25  ///

Page 334

1    BY MS. FALCONE:

2        Q.   Uh-huh.

3        A.   An average week.

4        Q.   And again, a range is fine.

5        A.   Let me think here.  I'm going to say on the

6    average probably 80 hours a week.

7        Q.   That's 80 total, correct?

8        A.   Total, yeah.

9        Q.   That's not over 40, it was 80 total?

10       A.   Total.  Yeah, I'm sorry.

11       Q.   All right.  What about for -- from January 1st,

12   2008 until December 31st, 2008?

13       A.   Oh, I'm sorry.  The first time period was what?

14       Q.   October --

15       A.   The -- the one that I just answered, the 80.

16       Q.   The first -- the first time period was from

17   February 4th, 2007, and I guess I should have said 2008.

18   Let me look.  No, I got it right.  From February 4th,

19   2007 when you left El Cajon --

20       A.   Right.

21       Q.   -- till the end of 2007.  I'm asking about

22   2007 --

23       A.   Oh, okay.  Yeah, not as many.

24       Q.   -- at 5651.

25       A.   Yeah.  Then I probably averaged about 60 hours a

Page 335

1    week.

2        Q.   Okay.   Total, correct?

3        A.   Total, 20 over 40.

4        Q.   Okay.   Now, what about in 2008?   In 2008 how many

5    hours were you working on average per week?

6               MS. SCOTT:   Objection; form.

7               THE WITNESS:   Probably -- 2008.   Probably

8    about 60 to 65.

9    BY MS. FALCONE:

10       Q.   Okay.   What about 2009?   During that year, how

11   much -- well, how many hours did you work per week on

12   average?

13       A.   That was the --

14              MS. SCOTT:   Objection; form.

15              THE WITNESS:   -- well, I probably worked 80

16   hours a week then average.

17   BY MS. FALCONE:

18       Q.   Okay.   And what about during the period

19   January 1st, 2010 until March 22nd, 2010, how many hours

20   on average were you working per week during that time?

21              MS. SCOTT:   Objection; form.

22              THE WITNESS:   Still in the 80 range.

23   BY MS. FALCONE:

24       Q.   Okay.   Did you ever take a lunch?

25              MS. SCOTT:   Objection; form.

Page 336

1           THE WITNESS:  Never left the store.  I

2    usually would go -- I would -- I would eat something

3    every day, but usually I'd go to the computer and do

4    something like pay bills or do credits or something like

5    that while I was eating.

6    BY MS. FALCONE:

7        Q.  Okay.

8        A.  Yeah, that was...

9           MS. FALCONE:  What exhibit are we on?  9?

10   Please mark as Exhibit 9 a self-appraisal dated

11   September -- no -- February 20th, 2009.

12               (The document referred to was marked by

13               the CSR as Deposition Exhibit 9 for

14               identification and attached to the

15               deposition transcript hereto.)

16   BY MS. FALCONE:

17       Q.  Mr. Dayton take a look at Exhibit 9 and let me

18   know when you're done.

19           (Document reviewed by witness.)

20           THE WITNESS:  Okay.

21   BY MS. FALCONE:

22       Q.  Have you ever seen Exhibit 9 before?

23       A.  Yes.

24       Q.  Is this your handwriting on Exhibit 9?

25       A.  Yes.

Page 350

1    store manager at Rite Aid completing those nonmanagerial

2    tasks?

3                MS. FALCONE:  Objection -- objection; vague,

4    overbroad.

5                MS. SCOTT:  Counsel, we agreed to just limit

6    our objections to form.  I would appreciate it --

7                MS. FALCONE:  Those are form objections.

8                MS. SCOTT:  Yes, but I would appreciate it

9    if you would just object to form as I did throughout the

10   entire deposition.

11               MS. FALCONE:  We didn't stipulate that the

12   only thing that could be said is object as form, and you

13   did not restrict your comments to only saying object as

14   to form on several occasions.  You made additional

15   comments.  I don't think there's anything wrong with me

16   stating the grounds.

17               MS. SCOTT:  We agreed at the very beginning

18   of this deposition that we would object only to form.

19               MS. FALCONE:  Those are form objections.

20               MS. SCOTT:  I agree that they're form

21   objections, but I would appreciate it if you would not

22   interrupt the deposition and would just object to form.

23               MS. FALCONE:  I am making form objections.

24   I disagree as to what our agreement was.

25   ///

Page 351

```
 1              MS. SCOTT:  Nikki, do you mind -- do you
 2    mind reading over the question that was just posed?
 3                   (The record was read as follows:
 4              Q    What percentage of your time did
 5                   you spend as a store manager at Rite Aid
 6                   completing those nonmanagerial tasks?)
 7              MS. FALCONE:  Same objections.
 8              THE WITNESS:  Can I answer?
 9    BY MS. SCOTT:
10       Q.  Yes, go ahead.
11       A.  It was pretty much entwined into my whole day.
12    Like it's hard to kind of separate out the -- because
13    you were constantly going to the check stand to ring
14    somebody up, going to ice cream and do this, you're
15    doing something in the back, stocking shelves, doing
16    this and that.
17           If I had to pick a percentage, I would say maybe
18    80, 85 percent.
19       Q.  And as a store manager at Rite Aid, why did you
20    complete those nonmanagerial tasks rather than having
21    the hourly employees complete those tasks?
22              MS. FALCONE:  Objection; overbroad, vague.
23              THE WITNESS:  Go ahead?
24    BY MS. SCOTT:
25       Q.  You can go ahead.
```

Page 352

1    A.  There were no hourly employees to do the tasks if

2    I was -- most of the time it was me and maybe two other

3    employees, so we would be forced into checking and

4    scooping ice cream.  And if we had more than, you know,

5    a few people in line, obviously myself and my assistant

6    manager would have to jump in and do that, the check

7    stand duties.

8         As far as stocking shelves and things, that's --

9    always store managers have done that, have always worked

10   on load and always unloaded trucks and put up the stock

11   in the shelves.

12        We've -- most of the managers that I've worked

13   with have always straightened and done stocking type

14   duties.  And some of them have done cleaning type duties

15   and things like that.

16   Q.  Now, you said that store managers have always

17   worked fine unloading the truck, doing stocking duties.

18   Were you referring only to store managers at Rite Aid or

19   were you referring --

20   A.  I only know Rite Aid.  I only worked at Rite Aid.

21   Q.  You testified earlier -- or there was testimony

22   earlier regarding the fact that your district

23   managers -- at least one of your district managers

24   complained that you should delegate tasks to store

25   hourly employees rather than completing them yourself.

Page 353

1          Was this possible?

2      A.   If there was another --

3           MS. FALCONE:   Objection; vague, calls for

4   speculation, overbroad.

5   BY MS. SCOTT:

6      Q.   You can answer.

7      A.   Sometimes it was possible if there was another

8   employee available, but most of the time it just fell on

9   me.  I mean, there wasn't another person I could say,

10  hey, go do this because they're already checking or

11  they're already working at a check stand.

12          I mean, if there's three people in the store, you

13  know, we're -- we're all checking and scooping ice cream

14  and doing, you know, all the stock.  There wasn't

15  another person I could delegate it to.

16     Q.   Do you know if other store managers had the same

17  issue with not being able to delegate to store

18  employees -- to hourly employees because -- because

19  there were not enough hours in the budget?

20          MS. FALCONE:   Objection; calls for

21  speculation.

22          THE WITNESS:   I know of at least one other

23  store manager that had to work long hours and had to do

24  a lot of basic like checking and -- and that type stuff

25  for a fact.  I mean, I've talked to him about it.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Mark Daniel Dayton**                                      **August 10, 2011**

Page 354

```
 1   BY MS. SCOTT:

 2      Q.  And do you know if it was for the same reason,

 3   the reason being that he didn't have enough employees?

 4      A.  It's the lack of people, yes.

 5             MS. FALCONE:  Objection; calls for

 6   speculation.

 7   BY MS. SCOTT:

 8      Q.  Did doing these nonmanagerial duties affect how

 9   you were able to run your store as a store manager at

10   Rite Aid?

11             MS. FALCONE:  Objection; vague.

12             THE WITNESS:  Could you repeat it?

13   BY MS. SCOTT:

14      Q.  Sure.  Did doing these nonmanagerial tasks as a

15   supervise -- or as a store manager at Rite Aid affect

16   how you were able to run the store?

17      A.  Yes.

18             MS. FALCONE:  Objection; vague.

19   BY MS. SCOTT:

20      Q.  Did doing these nonmanagerial duties affect how

21   you were able to supervise your staff?

22             MS. FALCONE:  Objection --

23             THE WITNESS:  Yes.

24             MS. FALCONE:  -- vague.

25   ///
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Mark Daniel Dayton                                        August 10, 2011

Page 355

1    BY MS. SCOTT:

2        Q.   Were you able to fully supervise your employees

3    while you were doing nonmanagerial tasks?

4              MS. FALCONE:   Objection; vague --

5              THE WITNESS:   No.

6              MS. FALCONE:   -- leading.

7    BY MS. SCOTT:

8        Q.   Did the assistant store managers also perform

9    nonmanagerial tasks?

10       A.   Yes.

11             MS. FALCONE:   Objection; calls for

12   speculation, leading.

13   BY MS. SCOTT:

14       Q.   Is that a "yes"?

15       A.   Yes.

16       Q.   You talked earlier during your testimony about

17   how assistant store managers were paid hourly rather

18   than salary?

19       A.   Yes.

20       Q.   When did that happen or was it from the very

21   beginning when you started with Rite Aid where assistant

22   store managers were paid hourly?

23             MS. FALCONE:   Objection; calls for

24   speculation, overbroad.

25             THE WITNESS:   There was a point when they

Page 356

1  changed from having assistant salary to hourly.  The

2  exact year, I don't remember, but there was a lawsuit

3  involved with that too where Rite Aid was sued and they

4  determined that they had to pay the assistant managers

5  on an hourly basis and not on a salary basis.

6  BY MS. SCOTT:

7     Q.  Do you know, at least in the stores that you were

8  working in at Rite Aid, if this occurred while you were

9  a store manager at Rite Aid or did it occur when you

10 were an assistant store manager at Rite Aid?

11    A.  That occurred when I was an assistant store

12 manager.

13    Q.  Okay.  And when the assistant store managers were

14 paid on an hourly basis, were they paid overtime for

15 hours that they worked over the 45-hour limit?

16    A.  Yes, they were paid overtime everything over 40.

17 They were guaranteed five overtime hours and then

18 whatever, you know, they could get over that.

19    Q.  So they would always be paid overtime no matter

20 how many hours they worked over that 45; is that right?

21          MS. FALCONE:  Objection; misstates the

22 witness's testimony, vague.

23          THE WITNESS:  The 45 hours a week included

24 five hours overtime and it was I think calculated into

25 their pay.  I mean, so they were all expected to work 45

Page 357

 1   hours a week.  They worked nine-hour days.

 2   BY MS. SCOTT:

 3       Q.  Did they ever work more than 45 hours a week?

 4               MS. FALCONE:  Objection; calls for

 5   speculation, overbroad.

 6               THE WITNESS:  Yes.

 7   BY MS. SCOTT:

 8       Q.  And would they be paid for that overtime that

 9   they worked over 45?

10       A.  Yes.

11       Q.  Okay.  Were you ever paid overtime as a store

12   manager at any Rite Aid --

13       A.  No.

14       Q.  -- for the hours that you worked over 45 hours?

15       A.  No.

16       Q.  Who made the final decision regarding hiring

17   staff?

18               MS. FALCONE:  Objection; vague, vague as to

19   time, calls for speculation.

20               THE WITNESS:  The final decision would be to

21   the district manager because I would have to approve it

22   through him.

23   BY MS. SCOTT:

24       Q.  And who made the final decision regarding firing

25   staff?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Mark Daniel Dayton                                          August 10, 2011

Page 358

 1            MS. FALCONE:  Objection; vague, vague as to
 2    time, overbroad.
 3            THE WITNESS:  That would be a human resource
 4    and/or the DM also.  I would have to have approval from
 5    one or both of them.
 6    BY MS. SCOTT:
 7       Q.  Who made the final decision regarding setting
 8    payroll?
 9            MS. FALCONE:  Objection; vague, vague as to
10    time, overbroad.
11            THE WITNESS:  Final decision on?
12    BY MS. SCOTT:
13       Q.  Payroll.
14            MS. FALCONE:  Same objection.
15            THE WITNESS:  I don't understand the
16    question.
17    BY MS. SCOTT:
18       Q.  The number of or your budget.
19       A.  Oh, budget.  Okay.  The district manager.
20       Q.  And were you able to change the budget at all?
21            MS. FALCONE:  Objection; vague, vague as to
22    time, overbroad.
23            THE WITNESS:  Usually no.  Occasionally,
24    yes.  Very rare occasions he would let me add hours to
25    it, but was not like when he sent in the people to help

Page 359

```
 1   with the planogram, but it was very infrequent.
 2   BY MS. SCOTT:
 3      Q.  And if you wanted to change the budget, would you
 4   have to seek approval from the district manager?
 5      A.  Oh, definitely, yes.
 6      Q.  And who made the final decision regarding
 7   ordering merchandise?
 8              MS. FALCONE:  Objection; vague, vague as to
 9   time, overbroad.
10              THE WITNESS:  For the most part, although
11   like I said before, he would go in and alter numbers
12   that we had punched in for our ad orders and he would
13   order bulk orders for beer and soda and things like
14   that.  So I didn't have the final say on those items.
15   It was, you're going to get this.
16   BY MS. SCOTT:
17      Q.  Would you say that creating the budget or the
18   budget in general affected the profitability of the
19   store?
20      A.  Yes.
21      Q.  Could you completely -- because you didn't set
22   payroll, could you completely control the profitability
23   of the store --
24              MS. FALCONE:  Objection --
25   BY MS. SCOTT:
```

Page 360

1       Q.  -- as a store manager at Rite Aid?

2                   MS. FALCONE:  Objection; leading, vague.

3                   THE WITNESS:  I would say no just because I

4       didn't have the staff to be as profitable as I could be.

5       I saw customers walk out when we had long lines in the

6       check stands and only two people checking, you know, and

7       one in ice cream.  I saw it.

8       BY MS. SCOTT:

9       Q.  You testified earlier regarding the fact that

10      your stores were union stores and regarding union

11      contract that applied to the employees working in your

12      stores.

13          Did the fact that your stores were union stores

14      change the budget in any -- or affect the budget in any

15      way?

16                  MS. FALCONE:  Objection; calls for

17      speculation.

18                  THE WITNESS:  No, I don't have any

19      experience with a nonunion store, so I don't...

20      BY MS. SCOTT:

21      Q.  Did the union itself have any role in setting the

22      budget or creating the budget?

23                  MS. FALCONE:  Objection; calls for

24      speculation, vague, vague as to time.

25                  THE WITNESS:  Only in --

Page 385

1            DECLARATION UNDER PENALTY OF PERJURY

2

3        I, MARK DANIEL DAYTON, do hereby certify under

4    penalty of perjury that I have read the foregoing

5    transcript of my deposition taken August 10, 2011; that

6    I have made such corrections as appear noted herein, in

7    ink, initialed by me; that my testimony as contained

8    herein, as corrected, is true and correct.

9

10         DATED this _____ day of _____, 2011,

11    at _____, California.

12

13

14

15

16

17

18

19

20            _____

21                   MARK DANIEL DAYTON

22

23

24

25

# Exhibit Y

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

YATRAM INDERGIT, on behalf      )
of himself and others          )
similarly situated,            )
                               )
            Plaintiff,         )  CIVIL ACTION NO.
                               )  1:08-cv-09361-PGG-
    VS.                        )  HBP
                               )
RITE AID CORPORATION, RITE     )
AID OF NEW YORK, INC., and     )
FRANCIS OFFOR as Aider &       )
Abettor,                       )
                               )
            Defendants.        )
_____)

DEPOSITION OF MARTHA DEL ANGEL
Los Angeles, California
Monday, October 10, 2011

Reported by:  NIKKI ROY
              CSR No. 3052

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Martha Del Angel**                                      **October 10, 2011**

 1    A.  Yes.

 2    Q.  Do you agree that you show concern for employee

 3  issues and work to resolve them in an equitable way?

 4    A.  Yes.

 5    Q.  Do you agree with Mr. Champion's statement at

 6  No. 3 where it says "Commitment to Excellence" that you

 7  set high standards for yourself and your store?

 8    A.  Yes.

 9    Q.  Do you agree that you take pride in your store

10  conditions and financial results?

11    A.  Yes.

12    Q.  Do you agree that you embrace company programs

13  and take responsibility to ensure that they are

14  followed?

15    A.  Yes.

16    Q.  Do you agree with Mr. Champion's statements at

17  No. 4 where it says "Planning Skills," that you

18  consistently take steps to make sure you have a plan for

19  future programs, changes or projects?

20    A.  Yes.

21    Q.  Do you agree that you are always prepared to

22  address upcoming events and communicate your plans to

23  your team?

24    A.  Yes.

25    Q.  Do you agree that a good example of you being

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Martha Del Angel                                         October 10, 2011

Page 62

1    prepared in that way was your -- was handling the

2    remodel at store 5600?

3       A.  Yes.

4       Q.  And do you agree that you maintained store

5    standards and positive sales during that remodel

6    project?

7       A.  Yes.

8       Q.  When was the remodel at 5600, sometime in

9    2002-2003 time?

10              MS. SCOTT:  Objection; form.

11              THE WITNESS:  Yes.  I don't recall the exact

12   time.

13   BY MS. BOLLIGER:

14      Q.  What challenges did that remodel present?

15      A.  Mainly to have our customers just be able to shop

16   without any problems while the remodel was going on.

17      Q.  What did you do to overcome those challenges?

18      A.  Tried to keep the store clean and organized as

19   much as possible.

20      Q.  Okay.  And moving to No. 5 where it says

21   "Organizing Skills," do you agree with Mr. Champion's

22   statements that you developed routines and systems to

23   meet new challenges?

24      A.  Yes.

25      Q.  Do you agree with Mr. Champion's statement at

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Martha Del Angel                              October 10, 2011

Page 63

1    No. 6 where it says "Controlling Skills," that you

2    control inventory and expenses to meet established

3    objectives?

4        A.  Yes.

5        Q.  Do you agree with Mr. Champion's statement at No.

6    7 regarding communication, that you keep your immediate

7    supervisor informed on store issues and personnel

8    concerns?

9        A.  Yes.

10       Q.  And do you agree that you are willing to listen

11   with an open mind and use good judgment based on

12   information you receive?

13       A.  Yes.

14       Q.  Do you agree with Mr. Champion's statement at No.

15   8, which is "Leadership," that you are a leader who is

16   willing to take charge of any situation?

17       A.  Yes.

18       Q.  Do you agree that you have been helpful as a team

19   leader for the district?

20       A.  Yes.

21       Q.  Do you agree that you have accepted

22   responsibilities beyond the scope of your immediate

23   area?

24               MS. SCOTT:  Objection; form.

25               THE WITNESS:  Yes.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Martha Del Angel                                    October 10, 2011

```
 1     Q.  Okay.  So you recall receiving one?
 2     A.  Yes.
 3     Q.  And do you recall what he said in his
 4  self-appraisal regarding his own performance?
 5     A.  No.
 6     Q.  Okay.  Let me see if this helps you remember.
 7         We'll introduce Exhibit No. 25 only for purposes
 8  of refreshing Ms. Del Angel's recollection.
 9                 (The document referred to was marked by
10                 the CSR as Deposition Exhibit 25 for
11                 identification and attached to the
12                 deposition transcript hereto.)
13                 (Document reviewed by witness.)
14  BY MS. BOLLIGER:
15     Q.  Do you recall that Mr. Sandoval indicated he had
16  amazing and experienced trainers?
17     A.  No, I did not know.
18     Q.  Did Mr. Sandoval seem appreciative of the
19  mentoring that you provided to him?
20     A.  I don't remember.
21     Q.  Okay.  Did you ever recommend Mr. Sandoval for
22  promotion?
23     A.  No.  He was too new.
24     Q.  Okay.  Did he end up leaving at some point?
25     A.  He was terminated.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Martha Del Angel**                                   **October 10, 2011**

Page 217

```
 1      Q.   Why was he terminated?

 2      A.   Loss prevention terminated him.

 3      Q.   Do you know what the circumstances were of

 4   Mr. Sandoval's termination for loss prevention issues?

 5      A.   Yes.

 6      Q.   What were they?

 7      A.   He used a coupon for an item that was not for the

 8   coupon, so he committed coupon fraud.

 9      Q.   Is that a serious offense in your view?

10      A.   Yes.

11      Q.   How did this issue come to loss prevention's

12   attention?

13      A.   Mr. Garcia saw the receipt and notified me at

14   home.   And in the morning when I came in the next day, I

15   had to call loss prevention and they had to do an

16   investigation.

17      Q.   So you reported the information that you received

18   from Mr. Garcia to loss prevention regarding

19   Mr. Sandoval's coupon fraud?

20      A.   Yes.

21      Q.   And did -- did the loss prevention investigator

22   keep you informed regarding the investigation?

23      A.   Yes.

24      Q.   Did you agree with the decision to terminate

25   Mr. Sandoval?
```

Page 218

1        A.  It wasn't my decision.

2        Q.  Did you agree that it was the right decision,

3   though?

4        A.  Yes.

5        Q.  Can you recall the names of the associates that

6   you hired?

7                MS. SCOTT:  Objection; form.

8                THE WITNESS:  Not all of them.

9   BY MS. BOLLIGER:

10       Q.  Are they too many to recall the names of?

11       A.  Yes.  Too many and it's been very long.

12       Q.  Do you recall hiring Eva Mary Dominguez?

13       A.  Yes.

14       Q.  Do you recall hiring William Powers?

15       A.  Yes.

16       Q.  Did you hire Ivan Nicholas Alexander?

17       A.  Yes.

18       Q.  Did you hire Marlene Ruby Armstrong?

19       A.  Yes.

20       Q.  And you hired Ms. Dominguez in January 2006,

21   correct?

22       A.  Who?

23       Q.  That's Eva Mary Dominguez.  You hired her in

24   January 2006, correct?

25       A.  If it says the date.  I don't recall the date.

Page 219

```
 1    I'm recalling the names as you say them.
 2        Q.  Okay.  What position did you hire Ms. Dominguez
 3    into?
 4        A.  Clerk.
 5        Q.  Okay.  What position did you hire Mr. Powers
 6    into?
 7        A.  I believe he was a hand-dipper.
 8        Q.  And was that date of hire on or around June 2006?
 9        A.  I don't know.
10        Q.  Does that sound right?
11            MS. SCOTT:  Objection; form.
12            THE WITNESS:  It could be.
13    BY MS. BOLLIGER:
14        Q.  Did you have any input from anyone else into the
15    decision to hire Ms. Dominguez?
16        A.  I believe it was the human resource.
17        Q.  Okay.  What input did human resources provide?
18        A.  We did a hiring session for -- to open the new
19    store.
20        Q.  Okay.
21        A.  In January we started doing applications and
22    interviews, so all my signatures are probably on those
23    packets.  And I had the human resource and I believe the
24    train -- the trainer helping with the process.
25        Q.  So walk me through how the process worked for
```

Page 220

1  this hiring session as opposed to the normal procedure

2  for hiring an associate into the store.

3      A.  Since it's a brand-new store, they put an ad in

4  the paper to apply at a certain time and date.  And so

5  when they came in, all the applicants, they just waited

6  and they would see either the human resource manager,

7  the trainer -- the training -- the training manager or

8  myself.

9      Q.  For an interview?

10     A.  Yes.

11     Q.  Did you have an assistant manager hired yet at

12 this point for this store?

13     A.  They were going to transfer one from another

14 store.

15     Q.  Okay.  But the person had not started working

16 yet?

17     A.  No.

18     Q.  And this was for store 6468, correct?

19     A.  Yes.

20     Q.  So what happened next after the person was

21 interviewed by either HR, a trainer or yourself?

22     A.  We gave them some paperwork to fill out, filled

23 some forms, call some of them back, went through the

24 process of hiring.

25     Q.  How did you choose who to have come in for an

Page 221

1   interview?

2       A.  Depending on their interview and their

3   application.

4       Q.  Did you review all the applications that came in?

5       A.  Not all of them myself.  Like I said, the HR and

6   trainer were there and they did too.

7       Q.  Okay.  Did you have the opportunity to meet each

8   associate who was being considered to be hired before

9   they actually were hired to work in your store?

10              MS. SCOTT:  Objection; form.

11              THE WITNESS:  I don't remember.

12  BY MS. BOLLIGER:

13      Q.  Okay.  And so this hiring session process

14  occurred when you started at store 6468, correct?

15      A.  Yes.

16      Q.  And that was on or around January 2006?

17      A.  Yes, about the end of January.

18      Q.  Okay.  Did you make the decision to hire

19  Ms. Dominguez?

20      A.  I don't remember.

21      Q.  Okay.  Did you make the decision to hire

22  Mr. Powers?

23      A.  Yes.

24      Q.  Did anyone have input into the decision to hire

25  Mr. Powers?

Page 222

 1              MS. SCOTT:  Objection; form.

 2              THE WITNESS:  Not that I recall.

 3    BY MS. BOLLIGER:

 4      Q.  Do you recall hiring Ivan Nicholas Alexander?

 5      A.  Yes.

 6      Q.  And that was also for store 6468, correct?

 7      A.  Yes.

 8      Q.  And do you recall that was about April 2007?

 9      A.  It could be.

10      Q.  Did anyone else have input into the decision to

11    hire Mr. Alexander?

12              MS. SCOTT:  Objection; form.

13              THE WITNESS:  He was recommended by Laura

14    Arias.

15    BY MS. BOLLIGER:

16      Q.  Laura Arias was?

17      A.  A key.

18      Q.  Did you interview Mr. Alexander after Laura Arias

19    recommended him?

20      A.  Yes.

21      Q.  Have you ever hired an associate without

22    interviewing them?

23      A.  Not that I recall.

24      Q.  Okay.  And what position did you hire

25    Mr. Alexander to fill?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Martha Del Angel                                      October 10, 2011**

Page 223

1      A.   Cashier.

2      Q.   Did you hire Marlene Ruby Armstrong?

3      A.   Yes.

4      Q.   That was also to come work in store 6468,

5    correct?

6      A.   Yes.

7      Q.   Was that in or around August 2007?

8      A.   It could be.

9      Q.   Did anyone have input into your decision to hire

10   Ms. Armstrong?

11     A.   No.

12     Q.   What position did you hire Ms. Armstrong into?

13     A.   I believe it was hand-dipper.

14     Q.   What's a hand-dipper?

15     A.   Hand-dipper is a person that is not 18 years

16   old -- old and that they can serve ice cream, clean ice

17   cream, fill and do that but cannot be at the register.

18     Q.   Okay.  Did you hire Nichole Danielle Brandon?

19     A.   I don't remember that.

20          MS. BOLLIGER:  We'll look at -- will be

21   Exhibit 26.

22               (The document referred to was marked by

23               the CSR as Deposition Exhibit 26 for

24               identification and attached to the

25               deposition transcript hereto.)

Page 224

1            MS. BOLLIGER:  And this is only for purposes

2    of refreshing Ms. Del Angel's recollection.

3            (Document reviewed by witness.)

4    BY MS. BOLLIGER:

5      Q.  Ms. Del Angel, having reviewed Exhibit 26, does

6    that refresh your recollection that you hired Nichole

7    Brandon in or around July 2008?

8      A.  Name seems familiar.  I don't recall her.

9      Q.  Okay.  Do you recall what position -- do you

10   recall whether Ms. Brandon worked with you in store 6468

11   at some time?

12     A.  She probably did.

13     Q.  Okay.

14     A.  But I don't remember.

15     Q.  Okay.  Did you hire Briana Marie Roman?

16     A.  Yes.

17     Q.  And you hired Ms. Roman into 6468 as well?

18     A.  Yes.

19     Q.  And was that in or around August 2009?

20     A.  Sounds about right.

21     Q.  Did you get input from your district manager into

22   that hiring decision?

23     A.  No.

24     Q.  Have you ever sought input from your district

25   manager before hiring an associate to work in one of

Page 225

1    your stores?

2        A.   Yes.

3        Q.   What were the circumstances of getting input from

4    the district manager?

5             MS. SCOTT:  Objection; form.

6             THE WITNESS:  I -- I needed -- I believe I

7    needed to put another key in my store and they have to

8    approve that with loss prevention or human resources.

9    BY MS. BOLLIGER:

10       Q.   So if I understand you correctly, the district

11   manager had to approve your ability to hire some person

12   to fill that additional key role, correct?

13       A.   Yes.

14       Q.   Did you get input on who to hire to fill that

15   additional key role from the district manager?

16            MS. SCOTT:  Objection; form.

17            THE WITNESS:  I don't recall.

18   BY MS. BOLLIGER:

19       Q.   What sort of information did you provide to the

20   district manager to persuade him to allow you to hire

21   another key?

22            MS. SCOTT:  Objection; form.

23            THE WITNESS:  I don't think I was able to

24   hire anybody.  I believe they -- I think they

25   transferred someone.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Martha Del Angel                                             October 10, 2011

Page 226

 1   BY MS. BOLLIGER:

 2      Q.  Did you have the opportunity to obtain

 3   information about the individual who was being

 4   transferred before he or she came to your store?

 5      A.  He would let me know who it was, and that's about

 6   it.

 7      Q.  Other than seeking possible approval for another

 8   key, were there any other times you can recall getting

 9   input from your district manager about a hiring

10   decision?

11      A.  Yes.  My applicants were not of age, a lot of

12   them or --

13      Q.  They were under 18?

14      A.  Yes.  I really didn't have very good applicants,

15   so then they set up something online to get applicants

16   through online.

17      Q.  Okay.  From that point forward did you then

18   decide who to interview and continue the normal process

19   with respect to hiring?

20      A.  Yes.

21      Q.  And when was the time that you tried to get

22   approval to hire another key?

23      A.  I don't remember the dates.

24      Q.  Was that -- was it Mr. Champion that you were

25   speaking with about that?

Page 251

1      Q.   Who was the district manager?

2      A.   I don't remember.

3      Q.   And then you went to store No. 5608, correct?

4      A.   No.  I went to 5585 for a month.

5      Q.   Okay.  Okay.  And then to 5608?

6      A.   Correct.

7      Q.   Okay.  So during that transition in 2003, you got

8  a raise, correct?

9      A.   Somewhere in there I did.

10     Q.   Somewhere in there.  Okay.  Have you ever made a

11 complaint to anyone in Rite Aid about not receiving

12 overtime pay?

13     A.   Yes.

14     Q.   Who did you complain to about that?

15     A.   Paul Champion.

16     Q.   When did you complain to Paul Champion about not

17 receiving overtime pay?

18     A.   I don't remember the dates.

19     Q.   Was it in the last few years?  Can you

20 remember --

21     A.   Yes.

22     Q.   -- approximate time?

23     A.   It's been a few years.  The -- the last few

24 years.

25     Q.   How many times did you talk with Paul Champion

Page 252

1   about not receiving overtime pay?

2       A.  I don't know exactly how many times.

3       Q.  Was it more than once?

4       A.  Yes.

5       Q.  Was it more than twice?

6       A.  Yes.

7       Q.  Was it more than five times?

8       A.  I don't think so.

9       Q.  Okay.  And what did you tell Mr. Champion when

10  you talked with him about not receiving overtime pay?

11      A.  I just would tell him, you know, that I had been

12  working 12 hours, how about some overtime for me.

13      Q.  What did Mr. Champion say?

14      A.  He laughed.

15      Q.  Did he say anything else?

16      A.  No.

17      Q.  Setting aside the times when you were on leave of

18  absence in 2010, how many hours did you typically work

19  in a week?

20              MS. SCOTT:  Objection; form.

21              THE WITNESS:  I would say between 45 to 60.

22  BY MS. BOLLIGER:

23      Q.  What factors influenced the number of hours that

24  you worked in your observation?

25      A.  The payroll of dollars.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Martha Del Angel                                        October 10, 2011

Page 253

 1      Q.  The -- I'm sorry?

 2      A.  Payroll labor budget.

 3      Q.  Okay.  Did the number of managers in the store

 4   impact the number of hours you worked?

 5      A.  No.  I didn't understand the question I guess.

 6      Q.  Well, if you had two managers -- if you had three

 7   managers work during a day, did you typically work a

 8   shorter day?

 9      A.  No.

10              MS. SCOTT:  Objection; form.

11   BY MS. BOLLIGER:

12      Q.  Why did you want to have another key associate?

13      A.  Because Mr. Garcia was asking for a transfer.

14      Q.  Okay.  So it didn't seem to impact the number of

15   hours you worked at all, whether you had only you as a

16   manager or an assistant manager and two keys?

17              MS. SCOTT:  Objection; form.

18              THE WITNESS:  I really don't understand your

19   question.

20   BY MS. BOLLIGER:

21      Q.  Okay.  So I think you testified that your hours

22   in 2010 ranged from 45 hours to 60, correct?

23      A.  Correct.

24      Q.  What sorts of factors caused it to be closer to

25   45 versus closer to the 60?

Page 263

1      A.  Yes.

2      Q.  What percentage of your day would you say as a

3   store manager at Rite Aid that you spent doing

4   nonmanagerial tasks?

5           MS. BOLLIGER:  Objection; calls for

6   speculation and vague and ambiguous.

7   BY MS. SCOTT:

8      Q.  You can answer.

9      A.  Depends on what days.  And if one day I would

10  say, you know, I have to get my reports done and my

11  paperwork, so a lot of times I would just be the second

12  checker, give change because I'm close by and I can come

13  back and forth so I can get my reports done or schedule

14  done or my ordering done.

15          Other days I would just do the minimum that I had

16  to do, orders in, go to the bank, get change, write a

17  work board and then just start working on either the

18  planograms because they only give you seven days to --

19  to complete them, or load.  On load day you don't do

20  anything else but the load.

21     Q.  What would you say the minimum amount of time

22  would be that you would spend doing on nonmanagerial

23  tasks as a store manager at Rite Aid?

24          MS. BOLLIGER:  Objection; calls for a legal

25  conclusion, vague and ambiguous.

Page 264

```
 1               THE WITNESS:  Minimum?

 2   BY MS. SCOTT:

 3       Q.  The minimum, yes.

 4       A.  I would say two to three hours.

 5       Q.  Out of how long of a day?

 6       A.  Ten-hour day.

 7       Q.  And what would be the maximum number of hours

 8   that you would work as a store manager doing

 9   nonmanagerial tasks?

10               MS. BOLLIGER:  Same objections.

11               THE WITNESS:  Non?

12   BY MS. SCOTT:

13       Q.  Let me rephrase that.

14       A.  Okay.

15       Q.  Same question, just to the maximum number of

16   hours.  So how many hours maximum would you do

17   nonmanagerial tasks as a store manager at Rite Aid?

18               MS. BOLLIGER:  Same objections.

19               THE WITNESS:  About eight to ten hours.

20   BY MS. SCOTT:

21       Q.  And would that also be out of a ten-hour day?

22       A.  Yes.

23       Q.  Or longer?

24       A.  Or longer.

25       Q.  You said it would depend on a day-by-day basis.
```

Page 265

1    Would you be able to give me the percentage or an

2    average percentage of the amount of time that you did

3    nonmanagerial tasks on a weekly basis?

4              MS. BOLLIGER:  Same objections.

5              THE WITNESS:  No, I wouldn't.

6    BY MS. SCOTT:

7       Q.  No?  Would you be able to on a monthly basis?

8       A.  No.  I'm more of a daily person type of thing.

9       Q.  If you'll look at Exhibit 31 which was the store

10   manager Rite Aid job description.  Do you see any of

11   those nonmanagerial tasks that you've just listed

12   earlier list on there?

13      A.  It says "planograms" right here.

14      Q.  Do you see any of the other nonmanagerial tasks

15   listed?

16              MS. BOLLIGER:  Same objections.

17              THE WITNESS:  No.

18   BY MS. SCOTT:

19      Q.  Would you consider these nonmanagerial tasks,

20   tasks that you had to complete as the store manager at

21   Rite Aid?

22              MS. BOLLIGER:  Objection; calls for

23   speculation.

24              THE WITNESS:  Yes.

25   ///

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Martha Del Angel                                      October 10, 2011

Page 266

1      BY MS. SCOTT:

2          Q.   Why did you have to complete nonmanagerial tasks

3      as a store manager at Rite Aid?

4                     MS. BOLLIGER:   Objection; calls for

5      speculation and calls for a legal conclusion.

6                     THE WITNESS:   Because there's a standard

7      that we have to maintain our stores, and I always tried

8      to do the best and make sure that my store looks good

9      and I really need my job.

10     BY MS. SCOTT:

11         Q.   And did the labor budget affect how many

12     nonmanagerial -- strike that.

13         Did the labor budget affect how many

14     nonmanagerial tasks that you had to complete?

15                    MS. BOLLIGER:   Same objections.

16                    THE WITNESS:   Yes.

17     BY MS. SCOTT:

18         Q.   In what way?

19         A.   Like it could be a holiday week and they cut a

20     lot of hours because all the full-time employees have an

21     extra day off, so they figure, okay, they're not going

22     to pay that.  So now they cut it.  But you still have

23     the same amount of time opening the store because we

24     don't close on the holidays plus we have the same amount

25     of work.

Page 267

1      So it depends a lot of times.  If your
2   reconciliations were not downloaded or there were
3   problems with the computers and it doesn't show any
4   sells for two or three days in a week, that, for the
5   next year labor budget, they don't take in consideration
6   that your sales were there.  They just didn't come up
7   for that week.  So they'll cut.
8          A lot of times even though it looked like you had
9   a good budget for the week or -- or -- what I mean by a
10  good budget is, we're going to have so many hours and at
11  least there's coverage that I wouldn't have to spend at
12  the -- as cashiers or my assistant manager doesn't have
13  to be a cashier or my key associates don't have to be a
14  cashier.  They can do the tasks.
15         Then we would get a message that we need to cut
16  120 hours from that budget.
17     Q.  And what would happen when you've had to cut 120
18  hours from the budget?
19     A.  We would have to cut them.
20     Q.  And would that mean that you would have to work
21  longer hours?
22     A.  I would have to work longer hours or I would have
23  to cut an employee and I would pick up the -- the
24  workload on it.  For instance, I wouldn't -- I would
25  cover the -- the lunch for the cashier and cover their

**Page 268**

```
 1   breaks or I would have to do the -- the pack duties
 2   because you would ask them, you know, would you like to
 3   take an extra day off because I don't have enough hours.
 4          Because you have to ask them, they're union,
 5   they're full-time.  So if they did, that was fine, you
 6   made your budget, but you have to still do the -- the
 7   things that they are supposed to do on a daily basis.
 8       Q.  So if your budget was cut, your labor budget was
 9   cut, would that mean that you would complete more
10   nonmanagerial tasks?
11       A.  Yes.
12       Q.  And you mentioned a "pack" earlier.  What is a
13   "pack"?
14       A.  A pack is a person responsible for all the
15   pricing, and they're -- they have to do all the blue
16   dots.  They have to put the new advertising flags.  They
17   have to put up the rebates and the Rite buys and all the
18   pricing in the store, signs and all that, and audits.
19   We have to do six audits a week.
20       Q.  And did you ever open the store with a pack while
21   you were at Rite Aid -- while you were a store manager
22   at Rite Aid?
23       A.  Yes.
24       Q.  And what did that entail?
25       A.  She would be on the floor and I would cover the
```

Page 269

1    front of the store.

2       Q.  Were you able to supervise this pack while she

3    was doing her duties as a pack and you were the only

4    other person in the store?

5       A.  No.  Depending if she was up front doing

6    something, but most of the time she had to do the

7    receiving in the back.

8       Q.  Would you be working the cash register while she

9    was doing her duties as a pack?

10      A.  Yes.

11      Q.  Would you be doing other nonmanagerial tasks

12   while she was doing her duties as a pack?

13            MS. BOLLIGER:  Objection; calls for a legal

14   conclusion.

15            THE WITNESS:  I -- I usually try to

16   incorporate if I was going to be at the checkstand, I

17   would do some of my reports up -- that I needed to do up

18   front, do my report list, do some straightening or work

19   on some seasonal areas there.

20   BY MS. SCOTT:

21      Q.  Did doing these nonmanagerial duties as a store

22   manager affect how you were -- how you were able to run

23   the store?

24            MS. BOLLIGER:  Calls for a legal conclusion.

25            THE WITNESS:  At times.

Page 270

1    BY MS. SCOTT:

2       Q.  In what ways?

3       A.  At times I -- you know, I could see my store

4    not -- not being the way it usually was, you know,

5    clean, organized and in stock.

6       Q.  And was that because you didn't have enough labor

7    hours to have employees do those tasks that you just

8    mentioned?

9       A.  Yes.

10      Q.  And did doing nonmanagerial tasks affect how you

11   were able to supervise your employees?

12            MS. BOLLIGER:  Objection; vague and

13   ambiguous, calls for a legal conclusion.

14            THE WITNESS:  Yes.

15   BY MS. SCOTT:

16      Q.  In what way, can you give me an example?

17      A.  Like I said, everything had deadlines and you had

18   to order certain things that -- and it stops.  You can't

19   order after a certain time or you can't do certain

20   things.  The -- the computer stops at certain times.

21            So if you were trying to order, for instance, in

22   the store or do the -- the blue dots and you had to

23   cover the checkstand or customer service or anything

24   like that, it would -- you know, you wouldn't finish.

25   You did the job, but it was not complete.  It was

Page 271

```
 1   halfway.
 2       Q.   You did your nonmanagerial task and your non --
 3   strike that.
 4            You did the nonmanagerial and managerial tasks
 5   that they didn't always get completed, is that what
 6   you're saying?
 7       A.   Yes.
 8       Q.   Were you able to, for instance, supervise a
 9   cashier if you were at the back of your store cleaning
10   up a spill?
11       A.   No.
12       Q.   Would you be able to supervise and see someone at
13   the back of your store who was doing stock -- you know,
14   stocking shelves if you were at the front of the store
15   as a cashier?
16            MS. BOLLIGER:   Object as to form.
17            THE WITNESS:   No.
18   BY MS. SCOTT:
19       Q.   Did Rite Aid expect you to supervise employees
20   even though you were having to do these nonmanagerial
21   tasks?
22            MS. BOLLIGER:   Object as to form and calls
23   for speculation.
24            THE WITNESS:   Yes.
25   ///
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Martha Del Angel                                    October 10, 2011

Page 272

 1    BY MS. BOLLIGER:
 2       Q.  Who made the final decision regarding setting the
 3    payroll?
 4                MS. BOLLIGER:  Objection; calls for
 5    speculation.
 6                THE WITNESS:  The final call would be the
 7    district manager.
 8    BY MS. BOLLIGER:
 9       Q.  And who made the final decision regarding setting
10    the budget?
11                MS. BOLLIGER:  Objection --
12                THE WITNESS:  Corporate.
13                MS. BOLLIGER:  -- calls for speculation.
14    BY MS. BOLLIGER:
15       Q.  Were you able to change the budget as the store
16    manager at Rite Aid?
17                MS. BOLLIGER:  Objection; calls for
18    speculation, vague.
19                THE WITNESS:  No, unless you're going to
20    lower it.
21    BY MS. BOLLIGER:
22       Q.  So you could lower the budget as a store manager
23    at Rite Aid but you couldn't get additional hours for
24    your budget?
25       A.  Yes.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Martha Del Angel**                                           **October 10, 2011**

Page 273

```
 1      Q.  Did Rite Aid's budget policy where you didn't

 2   have enough hours leave your store understaffed?

 3                MS. BOLLIGER:  Object as to form.

 4                THE WITNESS:  Yes.

 5   BY MS. BOLLIGER:

 6      Q.  And did Rite Aid's budget policy cause you as a

 7   store manager to have to complete nonmanagerial tasks?

 8                MS. BOLLIGER:  Objection as to form.

 9                THE WITNESS:  Yes.

10   BY MS. BOLLIGER:

11      Q.  Can you delegate tasks to employees if you don't

12   have enough employees to -- or hours to delegate those

13   tasks to?

14                MS. BOLLIGER:  Object as to form.

15                THE WITNESS:  No.

16   BY MS. BOLLIGER:

17      Q.  Did you often not the have enough employees to

18   delegate tasks to?

19                MS. BOLLIGER:  Same objection.

20                THE WITNESS:  Yes.

21   BY MS. BOLLIGER:

22      Q.  What would happen to you as the store manager at

23   Rite Aid if you didn't get all the tasks completed that

24   your district manager expected you to complete?

25                MS. BOLLIGER:  Object as to form and calls
```

Page 274

```
 1   for speculation.

 2            THE WITNESS:  You would start getting verbal

 3   warnings and written warnings and could go from there to

 4   demotion, termination.

 5   BY MS. BOLLIGER:

 6      Q.  So if you didn't have enough employees to

 7   complete the tasks, would it have been an option for you

 8   to not complete the nonmanagerial tasks?

 9            MS. BOLLIGER:  Object as to form.

10            THE WITNESS:  No.

11   BY MS. BOLLIGER:

12      Q.  Would you say the budget affects the

13   profitability of your store?

14            MS. BOLLIGER:  Object as to form.

15            THE WITNESS:  I believe so.  If there is

16   enough cashiers and people to help the customers when

17   they come in and they want to know where this is, that,

18   and they can't find it, you know, if there's enough

19   employees to show you where the things are, then you are

20   going to buy something else or what you were looking

21   for.

22   BY MS. BOLLIGER:

23      Q.  And you testified earlier about lists that your

24   district manager would send out which would list

25   different tasks that you had to complete.
```

Page 279

```
 1   STATE OF CALIFORNIA        )
                                ) ss.
 2   COUNTY OF LOS ANGELES          )

 3

 4        I, NIKKI ROY, Certified Shorthand Reporter,

 5   certificate number 3052, for the State of California,

 6   hereby certify:

 7        The foregoing proceedings were taken before me at

 8   the time and place therein set forth, at which time the

 9   deponent was placed under oath by me;

10        The testimony of the deponent and all objections

11   at the time of the examination were recorded

12   stenographically by me and were thereafter transcribed;

13        The foregoing transcript is a true and correct

14   transcript of my shorthand notes so taken;

15        I further certify that I am neither counsel for

16   nor related to any party to said action nor in any way

17   interested in the outcome thereof.

18        In witness whereof I have hereunto subscribed my

19   name 14th day of October, 2011.

20

21        _____

22

23

24

25
```

Exhibit Z

Page 1

IN  THE  UNITED  STATES  DISTRICT  COURT

FOR  THE  SOUTHERN  DISTRICT  OF  NEW  YORK


YATRAM INDERGIT, on Behalf

of Himself and Others

Similarly Situated

        Plaintiff

vs.                                        Civil Action No.

RITE AID CORPORATION, RITE          1:2008cv09361

AID OF NEW YORK, INC., and

FRANCIS OFFOR, as Aider &

Abettor

        Defendants

_____/


        The deposition of VICKY DIXON was held

on Monday, July 25, 2011, commencing at 9:50 a.m.,

at the offices of Gore Brothers Reporting &

Videoconferencing, 20 South Charles Street, Suite

901, Baltimore, Maryland 21201, before Susan M.

Wootton, Notary Public.


REPORTED BY:  Susan Wootton, RPR, CLR

Page 135

```
 1    for example, I would have made an advanced schedule.
 2         Q     So Yvonne wouldn't have made the schedule?
 3         A     Not to my recollections, no.
 4         Q     Did you ever have any turnover in the
 5    Lawrenceville store?
 6               MS. SCOTT:  Objection to form.
 7               THE WITNESS:  Explain.
 8               MS. PUCKETT:  Do you know what turnover
 9    means?
10               THE WITNESS:  Explain it, which way are you
11    asking for it?  I need a more brief detail.
12               MS. PUCKETT:  What do you think of when I
13    say turnover?  Like, what does that mean to you?
14               THE WITNESS:  It just -- you need to give
15    me an explanation, because I don't understand what
16    you're asking for --
17         Q     You don't understand the word turnover?
18         A     -- Becasue turnover could mean anything in
19    a number of situations.
20         Q     Okay.  Well, I'm sort of asking you what
21    you think of when I say turnover, like what different
22    kinds of things could it mean?
23         A     Employee turnover.  Basically that is it,
24    to me.
25         Q     Okay.
```

Page 136

```
 1        A      I mean, it depends on what situation you're

 2   implying on.

 3        Q      So was there ever any employee turnover at

 4   Lawrenceville?

 5        A      Not while I was there.  I don't --

 6        Q      What about Emporia?

 7        A      No, not while I was there.

 8        Q      So no hiring occurred while you were in

 9   either of those stores?

10        A      Okay, if you're asking if hiring occurred,

11   yes.

12        Q      Okay.  So, at which store, Lawrenceville or

13   Emporia or both?

14        A      Both.

15        Q      Okay.  So what hiring occurred at

16   Lawrenceville?

17        A      Okay, meaning in what detail?

18        Q      Well, you just said hiring occurred so --

19        A      Well, they needed an extra -- we needed an

20   extra part-timer, but I didn't have complete control

21   over hiring.

22               I did the interview process, and HR and the

23   district manager had the overall say.

24               Then there had to be information put

25   through the SYSM, as far as background checks,
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**               **1:2008cv09361**
**Vicky Dixon**                                                            **July 25, 2011**

Page 137

1    et cetera.

2              So speaking, Rite Aid had total control

3    over the hiring process.

4        Q    But they had to go on your recommendation,

5    right?

6        A    Not necessarily so.

7        Q    Did you ever recommend an employee be hired

8    who wasn't?

9        A    No, not that I can recall.

10       Q    You were the only person who interviewed

11   them, right?

12             MS. SCOTT:  Objection to form.

13             THE WITNESS:  Yes.  Yes, at that point I

14   did the interview.  I took them through the process

15   because we had a booklet which was presented by

16   Rite Aid and by HR that we had to follow.

17             So the standard procedure was to take them

18   through that booklet, do the paperwork process and then

19   mail it to HR and to the DM, and then they would do the

20   final.

21       Q    But to your knowledge, they always took

22   your recommendation to hire, right?

23             MS. SCOTT:  Objection to form.

24             THE WITNESS:  No, because if -- no, because

25   they had to pass some kind of standard test, and if

Page 262

1    hadn't been shown the basics, because I believe Charlie

2    was doing everything himself, basically, because

3    they -- he had a problem teaching them.

4         Q     What was the problem?

5         A     It was, I guess it was because of their

6    learning skills, you know.  He didn't, I think Charlie

7    didn't have the patience.

8         Q     Did you have the patience?

9         A     Yes, I always had the patience.

10        Q     But Nancy and Debra were already shift

11   supervisors, they weren't brand new, right?

12        A     No, they weren't.

13        Q     Okay.

14        A     And I didn't promote them, yes.

15        Q     So was there anyone who was a brand new

16   shift supervisor when you were the store manager?

17              MS. SCOTT:  Objection to form.

18              THE WITNESS:  I can't remember.  I'm

19   wondering -- I don't know.

20              Sterling, I know he got promoted and I'm

21   trying to remember.  I don't remember.

22        Q     Okay.

23        A     I do recall recommending him because he was

24   so diligent, and Charlie used to say that he could

25   become an assistant manager one day.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**          1:2008cv09361
**Vicky Dixon**                                                      July 25, 2011

Page 263

1    Q    Okay.  So back to this document, at the

2    very bottom it says:

3              What are your comments, if any, regarding

4    this appraisal, and you said: I've been at this store a

5    long time.  I've hired and dismissed those who have not

6    followed policies and procedures.

7              What did you mean by dismissed?

8         A    They, they were suspended, per the HR rules

9    by Rite Aid's procedures, going through HR and

10   Debra Pence, yes.

11        Q    So you meant suspended, not fired --

12        A    Yes.

13        Q    -- because you never fired anyone, right?

14        A    No.

15        Q    Did you ever --

16        A    You couldn't fire anyone anyway because you

17   had to go through HR and the DM.

18        Q    But you never went through that process to

19   go through HR and the DM to fire anyone, right?

20        A    I never went through -- you have to, yes.

21        Q    But you --

22        A    No, I didn't fire anyone.

23        Q    Okay.

24        A    No, no.

25        Q    And no one got fired, that's what you said

Page 264

1  earlier?

2      A     I said I wasn't sure.

3      Q     Okay.  Does this help you remember?

4      A     If anything, I was told to send them home.

5            MS. SCOTT:  Counsel, I'm sorry, can you

6  point me to where it says fired?

7            THE WITNESS:  Because I don't see it,

8  either.

9            MS. PUCKETT:  I asked her.  I asked her

10  when it was dismissed, or what she meant by dismissed.

11  That's what we're talking about.

12            So you don't know what you meant by

13  dismissed, whether it meant fired or dismissed?

14            THE WITNESS:  I do, when I told you that we

15  had to send people, when you mentioned about sending

16  people home for not having the correct dress attire.

17      Q     When you say dismissed, you weren't talking

18  necessarily about terminating?

19      A     No, because I didn't have that power.

20      Q     Well, you had the power to recommend

21  termination, though?

22      A     No, I had the power to write them up and to

23  call and turn it into HR and the DM, and they made the

24  final decisions.

25      Q     Right.  Did you ever do that?

Page 298

1   up in the store, it was like highly impossible to keep

2   them all up to date and at one time.

3            You had to cut back on something just to do

4   a planogram.

5        Q    Okay.  So that's the reason that you, you

6   crossed it out --

7        A    Yes.

8        Q    -- and wrote --

9        A    Yes, for the planogram part.

10       Q    -- and wrote the word, outside vendors?

11       A    Yes.

12       Q    And then on number 9, it says:  Responsible

13  for hiring and training, and then it says, DM and HR

14  responsibility in your handwriting next to it.

15           Why did you write that there?

16       A    Because that is their main task and their

17  responsibilities is for hiring.

18           We just do the interviewing.

19       Q    So you're responsible for the interviewing,

20  and the DM and HR is responsible for the actual hiring?

21       A    Yes.

22       Q    But you, you're responsible for making

23  recommendations, right?

24       A    Actually, the recommendation is done

25  through the system.  Now, like I said, they have those

Page 299

```
 1    tests to pass and everything before they --
 2              Like you saw on the one that you gave me,
 3    they have to be okayed, okayed to hire.
 4              I don't think that I have that.
 5         Q    Yes, we discussed --
 6         A    Yes.
 7         Q    We discussed the fact that they need to
 8    pass some screening checks, right?
 9         A    Yes, prescreening.
10         Q    One of which is a thorough interview with
11    you, right?
12         A    Yes.
13         Q    So you're the only one at the store level
14    who is responsible for hiring, is that right?
15         A    I'm responsible for doing the interview and
16    initiating the process, but the hiring has to come
17    finalized and recommended from the corporate sector,
18    which is Rite Aid, and the DM and the HR.
19         Q    Right.  But at the store level, you're the
20    one who initiates the hiring process, is that fair?
21         A    Yes, that's fair.
22         Q    And you said number 9 says:  Responsible
23    for hiring and training.  And then you wrote DM and HR
24    responsibility next to that.
25              Was that mainly referring to hiring because
```

Page 300

1    you had testified earlier that you were responsible for

2    training, right?

3         A    Yes, but they do do some training with us

4    and so forth.

5              What was I going to say --

6         Q    But you're also responsible for training,

7    right?

8         A    Yes.

9         Q    And those are the only two changes you made

10   to this job description?

11        A    Yes.

12             MS. SCOTT:  I believe, actually it looks

13   like she -- did you make changes on the last page?

14             THE WITNESS:  Yes.

15             MS. PUCKETT:  Oh, okay.  I didn't see that.

16   Thank you, counsel.

17             MS. SCOTT:  Sure.

18             MS. PUCKETT:  The third page, you put,

19   under the physical requirements:  Regularly required to

20   do the following activities:  Stand dynamically for

21   long periods without a break, and you wrote, if need to

22   ensure breaks.  What did you mean by that?

23             THE WITNESS:  Because sometimes when you

24   work 12 hours, you're not able to take a break and it

25   depends on the circumstances.

Page 342

1          Is that what you're talking about when you

2    say, those duties?

3          A     Yes, basically.

4          Q     We'll go over that in a minute.

5          A     Okay.

6          Q     Would you also consider stocking shelves a

7    nonmanagerial task?

8          A     No, not exactly.

9          Q     Okay.  What about physically unloading the

10   truck?  Would you consider that a nonmanagerial task?

11               MS. PUCKETT:  Objection to form.

12               THE WITNESS:  Yes, I would, because if they

13   expect you to be in the office on the computer doing

14   the paperwork, and then you have to stop and do the

15   truck, and then if you fall behind, say that you've got

16   200 totes you've got to unload the truck, say you and

17   one other person is there.

18               Say that truck comes at 6:00 or 7 o'clock

19   in the morning, or if it comes like at 2 o'clock, and

20   maybe you've had a chance to do the office work, but,

21   if it comes at 2:00 or 3 o'clock, you don't have much

22   time to do anything else, like the price changes that

23   are supposed to be done, the recalls.

24               You're going to be stuck on that truck all

25   day and then some, so --

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**      **1:2008cv09361**
**Vicky Dixon**                                                   **July 25, 2011**

Page 343

1      Q      So would you say that having to do these

2   nonmanagerial duties took away from the time that you

3   had to do your managerial duties?

4             MS. PUCKETT:  Objection to form.

5             THE WITNESS:  Yes.

6             MS. SCOTT:  Would Rite Aid expect you as a

7   store manager to do your managerial duties, even though

8   you still had to complete the nonmanagerial tasks?

9             THE WITNESS:  Yes.

10      Q      Would Rite Aid expect you to supervise your

11   employees, even though you were still having to

12   complete these nonmanagerial tasks?

13      A      Yes.

14      Q      What percentage of your hours that you

15   would work weekly at Rite Aid would be dedicated to

16   nonmanagerial tasks?

17      A      I would say 85 percent.

18      Q      Do you consider these tasks to be part of

19   your regular duties as a store manager?

20      A      Most of them.  But some can be delegated to

21   other associates, if you have the hours to delegate

22   them to.  But basically --

23      Q      You were talking about if you had the

24   hours --

25      A      Yes.

Page 344

1       Q       -- to delegate the tasks to?

2       A       Yes.

3       Q       Who controlled how many hours you received

4    in your store budget?

5       A       The district manager.

6       Q       What if you didn't have enough cashier or

7    associate hours to complete the nonmanagerial tasks?

8    Would you have to do those tasks?

9       A       Yes.

10      Q       And what would happen if you didn't

11   complete those tasks -- or strike that.

12              What would happen if those tasks weren't

13   completed?

14      A       You would get disciplinary action, or you

15   would get called or, called into the office.

16      Q       Did doing these nonmanagerial tasks affect

17   how you were able to supervise your employees?

18      A       Yes, it did.  It did, and sometimes my

19   employees felt bad for me because then they saw that I

20   was getting sick, too, trying to keep the store up,

21   having compassion to do the work and so forth.  It was

22   confusing to them as well.

23      Q       Confusing in what way?

24      A       They felt like I was putting out more, and

25   they couldn't understand why Debra Pence or Gloria were

Page 345

1   so in my case all the time and I'm putting out

2   100 percent.

3        Q     Was it confusing to them that you were

4   doing the nonmanagerial work?

5              MS. PUCKETT:  Objection.

6              THE WITNESS:  I would say no, not too

7   confusing.

8              MS. SCOTT:  Did the assistant store

9   managers also perform these nonmanagerial tasks?

10             THE WITNESS:  Yes, they did, yes.

11       Q     Now, if you'll look at Exhibit 9, which is

12   the Rite Aid store manager duties document?

13       A     There are so many here.

14       Q     I think it's the one that you actually

15   marked with your own handwriting in red?

16       A     Do I still have that one?  I don't think

17   that I do.

18       Q     Thank you.  Now, you didn't write any

19   nonmanagerial tasks on there, did you?

20       A     No.

21       Q     And do you see any listed?

22       A     No.  I really don't see it spelled out, no.

23       Q     Okay.  So is the reason that you didn't add

24   the nonmanagerial tasks in your red handwriting, is the

25   reason because you didn't consider them to be

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


YATRAM INDERGIT, on Behalf

of Himself and Others

Similarly Situated

        Plaintiff

vs.                         Civil Action No.

RITE AID CORPORATION, RITE     1:2008cv09361

AID OF NEW YORK, INC., and

FRANCIS OFFOR, as Aider &

Abettor

        Defendants

_____/


The deposition of VICKY DIXON was held

on Monday, July 25, 2011, commencing at 9:50 a.m.,

at the offices of Gore Brothers Reporting &

Videoconferencing, 20 South Charles Street, Suite

901, Baltimore, Maryland 21201, before Susan M.

Wootton, Notary Public.


REPORTED BY:  Susan Wootton, RPR, CLR

Page 359

1    sudden it was beginning to lay a burden on me.

2              I mean, especially when I would get sick,

3    it was just too much.

4         Q     Would you say that DebraDebra didn't like

5    you?

6         A     Yes.  That's the way it seems after

7    everything that was happening, the way she would talk

8    at me, not to me.

9              She couldn't hear anything that I was

10   saying.  It seemed like, when I was trying to explain

11   the write-up and everything, I had never been written

12   up for writing anybody up, and boom, you're a

13   liability.

14        Q     Is it possible that she didn't like you

15   because of race, age or disability?

16             I'm not saying that you know that, but is

17   it a possibility?

18        A     Because I was ill, is that what you're

19   saying?

20        Q     Or because you're black or because you're

21   older than other employees?

22        A     I don't know.  I wouldn't want to say yes,

23   but I don't know.

24        Q     Okay.

25        A     I really would, years ago when with Revco,

Page 360

1    I would have said no, because she presented herself as

2    a kind person.

3                    And I don't know if it was because I was

4    getting up in age, because I was told by one Rite Aid

5    security, loss prevention person, he said something, he

6    said, they can't mess with you.  This is when I was

7    like 40-something.

8                    They can't mess with you if you're 40

9    because you're protected.  I didn't, I never understood

10    why he said that.

11                    See, I kept getting hints, but I never

12    really thought they were hinting at me or any other

13    managers that were, you know, not going to be there

14    anymore.

15                    (A discussion was held off the record.)

16            Q        Who made the final decision regarding

17    hiring?

18                    MS. PUCKETT:   Objection to form.

19                    THE WITNESS:   The DM and HR.

20                    MS. SCOTT:   Who made the final decision

21    regarding firing staff?

22                    THE WITNESS:   The DM and HR.

23            Q        Who made the final decision regarding

24    demoting staff?

25            A        HR and DM.

Page 361

1      Q      Who made the final decision regarding
2  promoting staff?
3      A      HR and DM.
4      Q      Who made the final decision regarding
5  setting payroll?
6      A      HR and DM.
7      Q      Who made the final decision regarding
8  setting budget?
9      A      Corporate, HR and DM.
10     Q      Who made the final decision regarding
11 promoting staff?
12     A      HR and DM.
13     Q      Who made the final decision regarding
14 evaluating staff?
15     A      I'm sorry?
16     Q      I'm sorry, evaluating staff?
17     A      It was a Rite Aid policy they had to be
18 evaluated, and the DM would send out -- it usually was
19 done on the anniversary date, that's according to the
20 policies and procedures -- and you would get a SYSM
21 down maybe saying this was due or so-and-so's
22 evaluation was due.
23            And then you had a printout or a list
24 saying, this is whose evaluation is done.  Yes.
25     Q      Would the district manager have to approve

Page 362

1    the evaluations?

2         A    Yes, that was in order to determine the pay

3    rate and everything.  They would tell you how much you

4    need to give them and so forth.

5         Q    When you were salaried as a store manager

6    at Rite Aid, were you paid for the time that you worked

7    overtime?

8         A    No, not when you're salaried.

9         Q    How many hours a week on average did you

10   work overtime, while you were salaried, as a store

11   manager at Rite Aid?

12        A    About 50, 60 sometimes, a week.

13        Q    So 50 or 60 total?

14        A    50 to 60.

15        Q    And how many hours were you salaried for, 45?

16        A    Yes.

17             MS. SCOTT:  All right.  That's all that I have.

18             MS. PUCKETT:  Okay.  Just brief follow-up.

19             THE WITNESS:  Okay.

20             EXAMINATION BY MS. PUCKETT:

21        Q    I don't know the exhibit numbers, either.

22   Let's see, the evaluation of Miss Moore, the assistant

23   manager, that is Exhibit Number --

24        A    7.

25        Q    -- number 7?

Page 377

1                   CERTIFICATE OF DEPONENT

2

3          I hereby certify that I have read and

4    examined the foregoing transcript, and the same is a

5    true and accurate record of the testimony given by me.

6

7          Any additions or corrections that I feel

8    are necessary, I will attach on a separate sheet of

9    paper to the original transcript.

10

11

12                    _____

13                         VICKY DIXON

14

15

16

17

18

19

20

21

22

23

24

25