# Exhibit A A

Page 1

```
        IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF NEW YORK


YATRAM INDERGIT, on behalf    )
of himself and all others     )
similarly situated,           )
                              )
          Plaintiff,          )  CIVIL ACTION NO.
                              )  1:08-cv-09361-
                              )  PGG-HBP
v.                            )
                              )
RITE AID CORPORATION, RITE    )
AID OF NEW YORK, INC.,        )
and FRANCIS OFFOR as          )
Aider & Abettor,              )
                              )
          Defendants.         )
                        - - -
```

The deposition of PETER E. DURAN, taken on
behalf of the Defendants, pursuant to the
stipulations agreed to herein, before JoRita B.
Meyer, Registered Merit Reporter, Certified
Realtime Reporter, Certified Court Reporter, at
Ogletree, Deakins, One Ninety One Peachtree Tower,
191 Peachtree Street, N.E., Suite 4800, Atlanta,
Georgia, commencing at 9:50 a.m., August 1, 2011.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
Peter E. Duran                                                  **August 1, 2011**

```
 1              If we got the thumbs up from Doug,
 2    saying, yeah, go ahead, sounds good, then second
 3    interview, we would just kind of review everything
 4    that we talked about the first time.  You know,
 5    here's the hours, this is what the job is going to
 6    entail; as we're opening the store, it's going to
 7    be a lot of work; you know, just kind of giving
 8    the general details of the job duties.
 9              And then if the employee, potential
10    employee, still seemed to be agreeable and you
11    still got a good vibe from that person, then you'd
12    say, you know, here's the dollar amount that we're
13    going to pay you per hour; what do you think?  And
14    then, yeah, sounds good.  Then you would tell them
15    when to be there.
16         Q.   And during the second interview of a
17    particular candidate, was it you interviewing them
18    or Doug interviewing them, or both?
19         A.   I know I did some.  I don't know if Doug
20    did any with the cashiers.  If he had an assistant
21    manager or somebody in management that he liked,
22    he would take them and I wouldn't be involved in
23    that.
24         Q.   So you weren't involved in the
25    management hiring at that time; is that right?
```

**Page 57**

```
 1        A.    No.
 2        Q.    So I said "is that right."  Did you mean
 3   "correct"?
 4        A.    Correct.
 5        Q.    That's okay.  I just wanted to get it
 6   clear for the record.
 7        A.    We weren't -- anybody that went into
 8   management needed to talk to HR; and at that time
 9   I believe they had to talk to the district
10   manager.
11        Q.    When you say "at that time," did that
12   change?
13        A.    Yeah, because later on it was talk to
14   the HR, loss prevention, and the district manager.
15        Q.    Do you know why that change was made?
16        MS. REHMAN:  Objection to form.
17        You can answer.
18        THE WITNESS:  I have no real clarity as
19   to maybe why, other than they -- maybe loss
20   prevention had some other ways of looking
21   into body language.
22        Some people, they've got all these
23   little ways that loss prevention can, you
24   know, detect somebody that is lying or
25   uncomfortable.  They call it -- I believe
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
Peter E. Duran                                                    August 1, 2011

Page 58

```
1        it's called the reinterview.  And somebody
2        that looks up to the right or down to the
3        left indicates that, you know, a question.
4        And so I think with the management potential,
5        you know, have you ever used drugs, if, you
6        know, that potential person did something,
7        they could get a -- some sort of a read on
8        it.
9   BY MS. PUCKETT:
10       Q.   So there's a special expertise in loss
11  prevention in terms of detecting lies?
12            MS. REHMAN:  Objection to form.
13            You can answer.
14            THE WITNESS:  I don't know if it really
15       works.  They just have this program that the
16       loss prevention people are privy to.
17  BY MS. PUCKETT:
18       Q.   You said you hired approximately 20 to
19  25 employees during that time.  Do you remember
20  how many you interviewed for those 20 to 25
21  employees you ultimately hired?
22       A.   Well, it probably was -- probably 60, 70
23  people that came.
24       Q.   What would distinguish a good applicant
25  from a not-so-good applicant?
```

Page 80

1    management versus cashiers.

2          A.    Well, you'd open up, you'd probably have

3    the manager, the opening manager, and a cashier.

4    The afternoon, you might wind up with the

5    assistant or a shift supervisor and maybe another

6    cashier.   And in the evening, it would drop back

7    down to maybe just the management on duty and a

8    cashier.

9          Q.    So in the afternoon, there was a manager

10   and two cashiers or --

11         A.    There could be.   I'm just kind of

12   shooting from the hip on that.   You know, you

13   might have a cashier that goes home at 1 o'clock

14   when the other cashier showed up.   Again, it just

15   depended on the store.   And being brand-new, you

16   don't know.   You just -- every -- every day is a

17   whole new experience as to how the business is

18   going to be, ads break, things like that.

19         Q.    So because these were new stores, there

20   wasn't a tone already set in terms of how many

21   people would be needed; is that fair?

22         A.    Correct.

23               MS. REHMAN:  Objection to form.

24               You can answer.

25               THE WITNESS:  Correct.

Page 81

```
 1    BY MS. PUCKETT:

 2         Q.   So as the manager, you had to constantly

 3    be assessing how business was going; is that

 4    right?

 5              MS. REHMAN:  Objection to form.

 6              You can answer.

 7              THE WITNESS:  Well, yeah.  You'd have to

 8         look at it and say, I wrote the schedule for

 9         X amount of hours because I was anticipating

10         doing $20,000 this week and we did 15, so the

11         next week we've got to -- okay.  And the

12         district manager is going to have a great

13         deal of input on that, because he or she

14         tells you, you got to have this amount of

15         hours or this percent or this amount of

16         dollars.

17    BY MS. PUCKETT:

18         Q.   Are you referring to labor budgets?

19         A.   I'm sorry?

20         Q.   Are you referring to labor budgets when

21    you say "number of hours"?

22         A.   Yes, uh-huh.

23         Q.   But there wasn't a previous year to

24    refer to when citing the labor budgets for these

25    new stores, right?
```

Page 82

```
 1        A.    Correct.

 2        Q.    So it just was sort of week-by-week?

 3        A.    Pretty much.  Because once -- once you

 4  got going, then, you know, you could say, you

 5  know, like my 24-hour store, we did 25,000, you

 6  know, whereas the other store down the street that

 7  isn't, you know, did 12.

 8             Well, the district manager then is going

 9  to, you know, orchestrate what you can use.  And

10  with a brand-new store, because it's a gray zone,

11  the only thing they can go on is, well, this store

12  in -- over here does 12 and they used X amount of

13  hours, so here's this with your budget.  So that

14  would be up to the district manager.  You'd have

15  to ask one of them how they got that information.

16        Q.    But would it be fair to say that it was

17  maybe not as accurate because there was no

18  framework to go on from the previous year?

19             MS. REHMAN:  Objection to form.

20             You can answer.

21             THE WITNESS:  Actually, yeah.  I don't

22        know how else they would come up with the

23        number other than -- because there's nothing

24        to go on.

25  BY MS. PUCKETT:
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
Peter E. Duran                                                    **August 1, 2011**

**Page 83**

```
 1        Q.    Did that make it more challenging to
 2   write the schedule week by week?
 3        A.    No, not more challenging, other than
 4   if -- if the sales were a lot less than what they
 5   had anticipated, you were going to have to tell
 6   some people, well, you're only going to get 10
 7   hours this week.  If they understood or, you know,
 8   whatever, got mad, there wasn't much you could do.
 9   Just --
10        Q.    So was -- okay.  I think we'll come back
11   to that.
12              So we were talking about your move to
13   Oregon.
14        A.    Can I interject something real quick?
15        Q.    Oh, sure.
16        A.    Back on the hiring, it hit me when we
17   were talking about --
18        Q.    Absolutely.
19        A.    -- interviewing --
20        Q.    Yeah.
21        A.    -- and decision-making and stuff.
22        Q.    Sure.
23        A.    There was a program out, I remember,
24   that before we could hire anybody, Rite Aid had a
25   program -- I can't remember the name of it.
```

Page 86

 1    stealing throughout your career at Rite Aid?

 2             MS. REHMAN:  Objection to form.

 3             You can answer.

 4             THE WITNESS:  Yes.

 5    BY MS. PUCKETT:

 6        Q.   Was that somebody that you hired or

 7    somebody somebody else hired?

 8        A.   Both, really.

 9        Q.   Okay.  Well, what's an example of

10    somebody that you hired that you eventually had to

11    fire for stealing?  Do you remember a person's

12    name?

13             MS. REHMAN:  Objection to form.

14             You can answer.

15             THE WITNESS:  I don't remember the name.

16        I know it was a guy, and he worked with me

17        out in the Portland area.  And loss

18        prevention came in and did these little

19        checks that they do, and he apparently came

20        up on their radar and then they interviewed

21        him and he admitted to taking products and

22        money, things like that.

23    BY MS. PUCKETT:

24        Q.   Had you suspected that?

25        A.   On him, um -- I want to say yes.  And I

Page 87

```
 1    was the one that notified loss prevention.
 2         Q.    Did anyone ever, throughout your course
 3    of employment with Rite Aid, get fired for
 4    stealing that you didn't suspect was stealing?
 5         A.    Not stealing.  I've had people fired
 6    from loss prevention point -- or not loss
 7    prevention, but from a point of view that I had no
 8    control.  Let's say they sold -- in one instance,
 9    one of the cashiers sold cigarettes to a minor
10    without double-checking their ID, and of course
11    that's a big no-no, so they -- the police
12    department was the one that actually came back in,
13    told us what was going on, and then at that point,
14    it was out of my control.  It was just, call loss
15    prevention, call the district manager, and we had
16    to -- there was a policy that just said, you know,
17    anybody that gets caught selling liquor or
18    cigarettes...
19         Q.    Because that breaks the law, right?
20         A.    Yeah.
21               MS. REHMAN:  Objection to form.
22               You can answer.
23               THE WITNESS:  You know, I don't know if
24    it's how the law is really written, because
25    nobody gets arrested.  They get -- you know,
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
Peter E. Duran                                                    **August 1, 2011**

Page 88

```
 1        they come in and they say, you know, you're
 2        going to get a fine.  It's kind of like a
 3        traffic ticket.
 4            So I honestly don't know about if, from
 5        a legal standpoint other than -- I mean, I
 6        know everybody gets in a lot of trouble.  The
 7        store can get fined.  If there's enough abuse
 8        found in a particular location, they can lose
 9        their license to sell tobacco and alcohol.
10        It's not pretty.
11   BY MS. PUCKETT:
12        Q.   So Rite Aid has, actually, a lot of risk
13   if people violate this law; is that fair?
14        A.   Oh, yes.
15             MS. REHMAN:  Objection to form.
16             You can answer.
17             THE WITNESS:  Yes.
18   BY MS. PUCKETT:
19        Q.   And is that why there's a policy that
20   people doing it have to be fired?
21             MS. REHMAN:  Objection to form.
22             You can answer.
23             THE WITNESS:  I'm trying to think if it
24        is strictly a district-by-district as to
25        their tolerance, or if that is a company
```

Page 102

```
 1       pretty cut and dry or --
 2  BY MS. PUCKETT:
 3       Q.   So you didn't find yourself disagreeing
 4  with your district manager that often; is that
 5  fair?
 6            MS. REHMAN:  Objection to form.
 7            You can answer.
 8            THE WITNESS:  Not when it came down to
 9       something that was just more or less
10       black-and-white.  If there was something kind
11       of in the gray and fuzzy zone, it depends on
12       that particular individual that I'm dealing
13       with.
14  BY MS. PUCKETT:
15       Q.   And by "that particular individual," you
16  mean the district manager?
17       A.   The district manager, uh-huh.
18       Q.   So some -- some district managers you
19  disagreed with more than others; is that fair?
20       A.   Uh-huh.
21       Q.   Yes?
22       A.   Yes.
23       Q.   So for the DMs that you disagreed with
24  more than others, do you remember an example of a
25  time that you disagreed with a district manager
```

Page 103

```
 1    and told him so, or her?
 2         A.   Nothing really comes -- nothing really
 3    comes to light that would be, you know,
 4    earth-shattering.  A lot of the disagreements
 5    would be, you know, like item placements.
 6    Rite Aid dictated everything to the store
 7    managers.  You had to put this on this particular
 8    end cap and you had to do these particular, you
 9    know, plan-o-grams within this time frame and
10    such.  And it would be -- it would be things like
11    that.  It's just like, that is just not right, you
12    know, we can't sell that particular item, put it
13    on the end cap.  It would be like, well, you don't
14    have any choice because corporate wants it there.
15    Or we're getting a visit from -- from, you know,
16    the regional vice president, and he's looking to,
17    you know, have signs put, you know, everywhere on
18    the store.  It's like, you know, it looks
19    terrible, to -- you know, to do something like
20    that.  You had no choice.  It was dictated to you
21    and that was going to be it.
22         Q.   We're talking about things like that had
23    to do with the appearance of merchandise in the
24    store and sign placement; is that right?
25         A.   That would probably be the biggest area
```

Page 104

1    of disagreements.

2        Q.   So having owned your own store, was it

3    difficult for you to -- strike that.

4            Having owned your own store, you had

5    experience placing things in certain places and

6    deciding where to put them, right?

7        A.   Uh-huh.

8        Q.   Yes?

9        A.   Yes.

10       Q.   So sometimes things that Rite Aid

11   suggested in a plan-o-gram, you didn't agree with,

12   right?

13           MS. REHMAN:  Objection to form.

14           You can answer.

15           THE WITNESS:  Well, plan-o-gram is -- is

16       different than a profit plan.

17   BY MS. PUCKETT:

18       Q.   Okay.

19       A.   I'm not sure if -- a plan-o-gram would

20   be like setting toothpaste and deodorants and all

21   that.  That is not a place of contention there.

22   It's their profit planner that they had for the

23   seasonal, that would be where it was mostly

24   disagreement.

25       Q.   So why wasn't the plan-o-gram a place of

Page 107

1    maybe discontinued fishing supplies so now there's

2    a 24-foot department.  Well, what are we going to

3    do?  How are we going to expand this?  What are we

4    going to put in that hole?  Well, we can expand

5    shampoos from eight foot to 12 foot and fill in

6    the holes.  Then he or she would have to notify

7    corporate to say, you know, instead of an

8    eight-foot plan-o-gram, the store is going to have

9    a 12-foot plan-o-gram.  So everything was dictated

10   from that point of view.

11          The store manager himself or herself

12   just couldn't arbitrarily go out and do it,

13   because if they did, the district manager may not

14   know that he or she expanded the department from

15   eight to 12.  But the products aren't going to

16   come in because corporate is looking at that

17   store, saying, you've got an eight-foot shampoo --

18   why did I say "shampoo"? -- hairspray department,

19   and in our 12-foot department, we've got Pantene

20   Extra-Extra Hold, but in the eight-foot

21   department, we've only got Pantene Extra Hold.

22   See what I mean?  So --

23          Q.   So if I'm understanding you correctly,

24   the reason the store manager couldn't just change

25   the department size him or herself was because if

Page 108

1    Rite Aid thought that you had a different size

2    department, the merchandise wouldn't come in

3    correctly; is that right?

4           A.    Correct.

5                 MS. REHMAN:  Objection to form.

6                 You can answer.

7                 THE WITNESS:  Correct, because there was

8           what's called an auto-replenishment and the

9           auto-replenishment was based off the scanned

10          sales.  Well, it also had a little thing in

11          there that even if you had it in your store,

12          if it wasn't part of that particular

13          plan-o-gram size, it wouldn't be reordered.

14          Now, they could reorder it manually, but it

15          wouldn't come in automatically.  And

16          therefore, if that store manager leaves, he's

17          expanded this eight foot to 12 foot, the new

18          manager comes in, doesn't realize that, well,

19          all of a sudden, he starts getting all these

20          outs in this 12-foot department.  What's

21          going on?  What's going on?  And he doesn't

22          understand.

23   BY MS. PUCKETT:

24          Q.    So that made sense to you, that they had

25   this check on the store manager's discretion; is

Page 109

1    that fair?

2              MS. REHMAN:  Objection to form.

3              You can answer.

4              THE WITNESS:  A check?

5    BY MS. PUCKETT:

6         Q.   Oh, well -- sorry.  If -- so you're

7    saying that the store manager can't arbitrarily go

8    change the department size, and then you described

9    some of the consequences if that were to happen.

10   So I was just asking if that policy made sense to

11   you?

12        A.   Yes, that makes sense.  The only thing

13   that doesn't make sense is that if they've got

14   this system in place for auto-replenishment, just

15   because the department wasn't turned on for a

16   12-foot, and yet the product is, you know, there

17   and it gets scanned, why it wouldn't be reordered

18   for that store, even though they weren't set up

19   for the proper.  Again, it's out of that store

20   manager's control.

21        Q.   So did that ever happen to you, where

22   the product wasn't reordered in that circumstance?

23        A.   Oh, all the time.

24        Q.   So what did you do to fix it?

25        A.   I had to contact the district -- well,

Page 110

 1    first I had to figure out what in the world was

 2    the problem.  A lot of what I would do is if I'd

 3    go into these stores and I'd have to fix them up,

 4    clean them up, because the store manager prior

 5    screwed it up, I would have to first figure out,

 6    what's the problem?  Did they -- is it a

 7    discontinued item, and they just didn't pull the

 8    tag and spread out the way they were supposed to?

 9            And spread out, I mean the item next to

10    it is still there, so they make two facings of it

11    instead of just one.

12            Is the department the wrong size?  Just

13    try to investigate first to find out what's going

14    on here.

15            If it was the department size, and it

16    was an eight-foot set put in 12 foot, then I had

17    to contact the district manager, tell him or her

18    what it was, that we need to expand it from eight

19    to 12, get his or her approval.  They would in

20    turn contact corporate.  Corporate would in turn

21    say, okay, turn it on, and so it was a multi-step

22    process.

23        Q.   So there were a couple of layers you had

24    to go through to get the problem corrected, right?

25        A.   Correct.

Page 191

```
 1          Q.   And you actually mentioned Maalox
 2   earlier when you were talking about your sister
 3   being one of the people who came in and checked
 4   for that; is that right?  Would that be on an end
 5   cap?
 6              MS. REHMAN:  Objection to form.
 7              You can answer.
 8              THE WITNESS:  I was just using that as
 9         an example, that we didn't -- I mean, the
10         buyer would buy a particular product and then
11         place it on the profit planner for, say, that
12         given month, and then stores would receive
13         those items and were told where to put it.
14   BY MS. PUCKETT:
15          Q.   Right.  So do you know what I mean when
16   I say ad order?
17          A.   Uh-huh.
18          Q.   Yes?
19          A.   Yes.  Sorry.
20          Q.   And when you say corporate sent in
21   merchandise, you mean that that -- that's based on
22   the ad order, right?
23              MS. REHMAN:  Objection to form.
24              You can answer.
25              THE WITNESS:  Not completely.  There
```

Page 192

```
 1          was -- there was mass distribution that the
 2          buyer would buy and ship in, and the stores
 3          had no choice in the matter.
 4     BY MS. PUCKETT:
 5          Q.   What's the buyer?  What do you mean by
 6     buyer?
 7          A.   Whoever the corporate buyer is.  They've
 8     got several of them up there.
 9          Q.   So --
10          A.   They call them a category buyer.
11          Q.   Okay.  So they enter agreements with
12     suppliers, right?
13          A.   I don't know how they do it, but...
14          Q.   Okay.  So it comes in from the ad order
15     and from certain categories; is that right?
16               MS. REHMAN:  I'm going to object to
17          form.
18               THE WITNESS:  Well, yes and no.  Take
19          seasonal, Christmas, Easter, things like
20          that.  We have no choice in, let's say, how
21          many Christmas trees are going to be shipped
22          to the store, because the buyer does that
23          maybe six, seven, eight, nine months back,
24          because they're dealing with China, whatever,
25          so they have to go off of how many sales, how
```

Page 193

```
 1         many 6-foot Christmas trees they sold.
 2              So then for the next season they'll say,
 3         all right, the company sold X amount of
 4         6-foot Christmas trees, we see a positive
 5         trend, so we're going to buy more 6-foot
 6         Christmas trees.  And then they're going to
 7         take each one of those tier stores and say
 8         the really good stores are going to get 20
 9         trees, and the B stores are going to get 18
10         trees, and so on, so on.
11              So we had no control on those kind of
12         items.
13    BY MS. PUCKETT:
14         Q.   Did you want control?
15         A.   Absolutely.
16         Q.   Why?
17         A.   Because I knew what my store could sell.
18         Q.   You knew what your store could sell?
19         A.   Uh-huh.
20         Q.   So you sometimes got merchandise that
21    you knew wouldn't sell?
22         A.   Yes.
23         Q.   And what did you do about that?
24         A.   Nothing.  You had to place it on an end
25    cap where they told you to put it and put the rest
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
Peter E. Duran                                             **August 1, 2011**

**Page 194**

1    in the back, place it as a little overstock symbol

2    or note on the shelf, and then just let it,

3    through attrition, work its way out.

4         Q.   So things would work their way out

5    through attrition?

6         A.   Uh-huh.

7         Q.   Yes?

8         A.   Yes, on sales.

9         Q.   When you ran your own store, you got to

10   make all the decisions about what to order, right?

11        A.   Yes.

12        Q.   And your store went under, right?

13        A.   Yes.

14        Q.   With all the things that need to get

15   done in the Rite Aid store, do you think it would

16   make your job easier or harder if you had to make

17   all of the decisions?

18             MS. REHMAN:  Objection to form.

19             You can answer.

20             THE WITNESS:  That's a tough one.  I

21        would say probably, with my experience, I

22        would say my job would have been easier.

23   BY MS. PUCKETT:

24        Q.   If you got to make all the decisions?

25        A.   If I could make the decisions.

Page 195

1        Q.   And that's -- and why is that?

2        A.   Well, you become sensitive to each one

3    of the stores, the store that you're in.  And,

4    like, ad ordering, I could -- I would know from

5    past sales how many tree lights I could order or

6    how many I could use.

7        Q.   So that's how you were able to do the ad

8    order, based on your own sensitivity to each

9    store?

10       A.   Initially.

11            MS. REHMAN:  Objection to form.

12            You can answer.

13            THE WITNESS:  Well, the ad ordering was

14       a computer-based system.

15   BY MS. PUCKETT:

16       Q.   Right.  It suggested numbers, and then

17   you could change them, right?

18            MS. REHMAN:  Objection to form.

19            You can answer.

20            THE WITNESS:  You could change them, but

21       the district manager could override.

22   BY MS. PUCKETT:

23       Q.   How often did he do that for you?

24       A.   For me, it was seldom.

25       Q.   Because you were good at it, right?

Page 196

```
 1              MS. REHMAN:  Objection to form.
 2              You can answer.
 3              THE WITNESS:  Well, I was experienced at
 4         it, and he trusted me.
 5    BY MS. PUCKETT:
 6         Q.   And you were sensitive to each one of
 7    your individual stores, right?
 8              MS. REHMAN:  Objection to form.
 9              You can answer.
10              THE WITNESS:  After I was there for a
11         little bit.
12    BY MS. PUCKETT:
13         Q.   You had to spend some time there to get
14    to know the individual store before you would be
15    sensitive to its specific needs, right?
16              MS. REHMAN:  Objection to form.
17              You can answer.
18              THE WITNESS:  Well, like anything, yes,
19         you would have to be.
20    BY MS. PUCKETT:
21         Q.   So for other store managers, the
22    district manager might change the ad order more
23    frequently than for you?
24              MS. REHMAN:  Objection to form.
25              You can answer.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
Peter E. Duran                                                    August 1, 2011

**Page 197**

 1              THE WITNESS:  I don't know for sure if
 2       it was the district manager that would be
 3       doing that.
 4   BY MS. PUCKETT:
 5       Q.   But you said that the district manager
 6   trusted you, right?
 7              MS. REHMAN:  Objection to form.
 8              You can answer.
 9              THE WITNESS:  Well, he trusted a lot of
10       people.
11   BY MS. PUCKETT:
12       Q.   Some people he didn't trust, though,
13   right?
14              MS. REHMAN:  Objection to form.
15              You can answer.
16              THE WITNESS:  That, I couldn't tell you
17       for sure.
18   BY MS. PUCKETT:
19       Q.   Because you were one of the people he
20   did trust?
21       A.   Yes.
22       Q.   So does it make sense to you that the
23   district manager would be able to tweak the ad
24   orders?
25              MS. REHMAN:  Objection to form.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Peter E. Duran**                                                **August 1, 2011**

Page 198

1          You can answer.

2          THE WITNESS:  Well, initially they

3     could, and then they recently had changed the

4     ad ordering so that you just got what was

5     there.

6          You could -- the way it was, my

7     understanding, you could make a change to the

8     ad order, but it was pretty much locked in as

9     to what you were going to be getting, even

10    though you made the changes.

11 BY MS. PUCKETT:

12    Q.   So the system would disregard the change

13 you made?

14    A.   My understanding of it, yes.

15    Q.   What do you mean, your understanding?

16    A.   Well, it was brand new.  It was just

17 coming out prior to me leaving, and they had

18 changed it so that it would say that you are

19 going -- you're going to sell six, you have three,

20 so you should order six more.

21          And if it was something that I thought

22 might be a real good seller, because of the price

23 or my neighborhood, I may want to bump it up to

24 nine or twelve.  And the way I understood it is

25 that the -- the order may or may not come in --

Page 199

```
 1          Q.    What do you mean --
 2          A.    -- at my suggested quantities.
 3          Q.    What do you mean, "may or may not"?
 4          A.    Just that the buyer, whoever, I don't
 5     know who the power would be, but they -- it may
 6     not come in.  They may only send in the suggested
 7     order.
 8          Q.    Did that ever happen to you while you
 9     were there?
10          A.    The new system, again, was brand-new to
11     me so --
12          Q.    So you're just speculating, right?
13                MS. REHMAN:  Objection to form.
14                You can answer.
15                THE WITNESS:  Not on that.  I'm not
16          speculating on how that worked completely.
17          But the older system, before they upgraded,
18          the district manager could change if he so
19          chose, you know, thought you ordered too much
20          or too little.  And then the buyer could
21          change that if they decided that they wanted
22          to send more in.
23     BY MS. PUCKETT:
24          Q.    And how often did that happen for you?
25          A.    I couldn't say, because the ad ordering
```

Page 200

```
 1    was, you know, a weekly thing.
 2         Q.   So did you find yourself frustrated that
 3    the buyer added more frequently, or was that also
 4    seldom?
 5         A.   The seasons were about the only time
 6    that it was more frustrating.  But then I had no
 7    control over the -- the quantities at that time.
 8         Q.   Because those weren't part of the ad
 9    order, right?
10              MS. REHMAN:  Objection to form.
11              You can answer.
12              THE WITNESS:  Right.  The seasonal items
13         weren't -- weren't even listed on the
14         computer screen to order.
15    BY MS. PUCKETT:
16         Q.   So back to this new system.  It's my
17    understanding, based on your testimony, that you
18    never actually experienced the new system.  Is
19    that right?
20         A.   It had only been around for a few months
21    prior to me leaving.
22         Q.   And did you ever have the experience
23    that you suggested, where you ordered a certain
24    quantity and a different quantity came?
25         A.   Not with the new system.
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Peter E. Duran                                          August 1, 2011

Page 201

1        Q.    You had that experience with the old

2   system?

3        A.    Infrequently.  There was times that

4   something more would come in and it was like, you

5   know, I don't remember ordering, you know, three

6   cases of this.

7              And again, when you go back into the

8   computer system and look under the PIPI screen I

9   was talking about earlier, it could tell you what

10  the reason was.  It would say that you ordered

11  six, as a -- I think it was PC, which meant you

12  ordered it, but then right below it may be another

13  line, and it may say another 24.  And it would

14  say, like, MA, for mass distribution -- MD for

15  mass distribution.

16       Q.    So when a mass distribution came in, you

17  weren't expecting it, but it was one of those

18  situations that you had to deal with as the store

19  manager, right?

20            MS. REHMAN:  Objection to form.

21            You can answer.

22            THE WITNESS:  Yeah, it would -- it might

23       tell you that it was, you know, for some

24       seasonal or for an end cap.  The shipping

25       label on the outside would tell you that this

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Peter E. Duran                                         August 1, 2011

Page 267

1        Q.    Observing for shoplifters?

2        A.    Yeah.  Shoplifting became kind of a

3   third wheel, though.  Again, I don't know this for

4   a fact, but probably just because of liability,

5   they were afraid of somebody grabbing somebody

6   that really wasn't stealing.

7             You hear about it every once in a while,

8   you know, somebody got hurt in trying to catch a

9   shoplifter.

10       Q.    So this is another balancing act between

11  trying to minimize shrink and also protecting

12  employees, right?

13            MS. REHMAN:  Objection to form.

14            You can answer.

15            THE WITNESS:  Yeah.  It was always the

16       philosophy, you know, with Rite Aid, you

17       know, when in doubt, let it out.

18  BY MS. PUCKETT:

19       Q.    So don't risk your personal safety or

20  the safety of the employees in your store?

21       A.    That was -- that was the focus.

22       Q.    Did you agree with that policy?

23       A.    Yeah.  Only because today's environment,

24  it can be, you know, pretty hostile out there.

25       Q.    And did you have to inform HR before you

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
Peter E. Duran                                                    August 1, 2011

Page 268

1     terminated someone?

2          A.    Yes.    And if there was, like -- like I

3     said previously, when I'm on my third written

4     notice or going to do my third written notice and

5     suspend and term, I would call them.

6          Q.    And did they ever tell you not to

7     terminate someone?

8          A.    Not with the documentation that I would

9     have had in hand.

10         Q.    How many employees over the course of

11    your career at Rite Aid have you promoted?

12              MS. REHMAN:  Objection to form.

13              You can answer.

14              THE WITNESS:  Well, who I suggested to

15         probably be promoted would be more accurate,

16         and probably five or six.

17    BY MS. PUCKETT:

18         Q.    And what positions were they promoted

19    from and to?

20         A.    Store management also.  I can't think of

21    anybody else, any other department I would have.

22         Q.    What about a cashier to a shift

23    supervisor?

24         A.    Yes, I've done that.  And again, it's

25    the same procedure.  I can recommend, but that's

Page 269

1    it.

2         Q.    Have you ever made a recommendation and

3    the person wasn't promoted?

4         A.    It seems to me that it has.

5         Q.    Is that pretty seldom or frequently?

6         A.    Yeah, it was pretty -- yeah, it was

7    infrequent.

8         Q.    You said infrequent, right?

9         A.    Yeah.

10        Q.    Can you remember a specific example of

11   when that happened?

12        A.    Not a specific, but it seems like it was

13   something that I was going to promote somebody up,

14   and I think it had to deal with we just didn't

15   have enough payroll, that they thought better to

16   wait.

17        Q.    Was that person eventually promoted?

18        A.    I don't remember.

19        Q.    So it was more of a timing issue than

20   the person shouldn't be promoted, right?

21        A.    As far as my memory serves, yes.

22        Q.    What about demotions?  How many

23   employees did you demote --

24             MS. REHMAN:  Objection.

25   BY MS. PUCKETT:

Page 278

1          schedule people all over them, you know, when

2          they would have two, three, cashiers.  You

3          know, then when the shift supervisor at night

4          would come on duty, it would be them and one

5          person.

6                And Staffworks was to help eliminate

7          that.  Staffworks was supposed to eliminate

8          any outside influences.  So when you'd put it

9          in it, so and so is available to work 9 to 5,

10         this person works 4 to 9; I mean, whatever

11         the available shifts were.

12  BY MS. PUCKETT:

13     Q.   Right, but the store manager was able to

14  change what Staffworks generated, right?

15     A.   Correct.

16     Q.   So when you say it took away that

17  ability, that's not totally accurate.  It just

18  generated a schedule that would eliminate that,

19  right?

20              MS. REHMAN:  Objection to form.

21              You can answer.

22              THE WITNESS:  Yes, it did.  But where I

23         was going with that schedule -- or that thing

24         was after Staffworks was implemented and we

25         realized that the payroll had gone up, they

Page 279

```
 1        had taken it away from saying Staffworks,
 2        just hit the button and enter and let
 3        Staffworks write the schedule.
 4             Rite Aid came back and said, no, you're
 5        going to have to write your schedule based on
 6        this many hours or this percent, it would
 7        change.
 8             Well, that messed up what Staffworks'
 9        true intent was, was to take the manager out
10        of the loop, so to speak, to plug in who your
11        associates are, when they can work, and then
12        it would marry with the sales volume of your
13        store when you needed the most help in your
14        building.
15   BY MS. PUCKETT:
16        Q.   So you still had to basically do it
17   manually?
18        A.   Only because when -- when Rite Aid came
19   in and said you're going to get 175 hours this
20   week, when you hit the schedule generated from
21   Staffworks, it may tell you you should have 200
22   hours.  So the store manager had to go in and
23   would have to edit out 20, 25 hours in order to
24   reach the hours that the district manager gave the
25   store to use.
```

Page 280

```
 1       Q.    And the hours that they gave you to use,
 2   that's, again, labor budgets, right?
 3       A.    I'm assuming they got it somewhere.  All
 4   we did was get our budget, for lack of a better
 5   word.  The district manager would say, this is
 6   what you can use.
 7       Q.    And sorry, I just want to make sure that
 8   we're talking about the same thing.  We're talking
 9   about labor budgets, right?
10       A.    Hours that could be used, uh-huh.
11       Q.    And do you know what the reason is for
12   labor budgets?
13       A.    Well, it's to control costs.  Payroll is
14   one of the largest expenditures that a store or a
15   company has.
16       Q.    So it's bottom-line profitability,
17   right?
18       A.    Yeah.  It's a factor in it.
19       Q.    Did you try to meet your labor budget?
20       A.    Had to.
21       Q.    Were some store managers not as good at
22   it as others?
23             MS. REHMAN:  Objection to form.
24             You can answer.
25             THE WITNESS:  Couldn't say how -- how
```

Page 281

1          the other stores handled themselves, other

2          than on the conference calls that we would

3          have, the district manager would be, you

4          know, you used too many hours and so on.

5   BY MS. PUCKETT:

6          Q.   So were you ever on the receiving end of

7   that, you used too many hours?

8          A.   There might have been an occasion here

9   or there.

10          Q.   But you weren't one of the regulars?

11          A.   I wasn't, no.

12               MS. REHMAN:  Objection to form.

13               You can answer.

14   BY MS. PUCKETT:

15          Q.   So would you agree with me that some

16   store managers went over more than others?

17               MS. REHMAN:  Objection to form.

18               You can answer.

19               THE WITNESS:  That -- I mean, on a

20          regular ongoing basis, I couldn't say.  I

21          mean, I just --

22   BY MS. PUCKETT:

23          Q.   You can only say what you did, right?

24          A.   What I did.

25          Q.   And you didn't go over on a regular

Page 320

```
 1    going to go hourly.  And if I'm not mistaken --

 2         Q.   So you --

 3         A.   -- I mean, because I -- they did that

 4    shortly before I left.  So -- but if I'm not

 5    mistaken, it's hitting all the way across the West

 6    Coast, because I believe an assistant manager that

 7    I used to have out West went down to hourly, and

 8    she --

 9         Q.   You said -- sorry.  Go on.

10         A.   And she was a salaried assistant.

11         Q.   So are you talking about assistant

12    managers going from salary to hourly, or store

13    managers?

14         A.   Both.  They segmented -- like I said,

15    they segmented, and I'm not familiar with where

16    they came up with what they were doing or how they

17    were going to do it or whatever, but it was just

18    when we went to the meeting, it was you guys that

19    are here are going to be hourly, you guys that are

20    here are going to stay salaried, and all of the

21    assistant managers were going to go hourly.

22              And then he was just saying that

23    eventually other -- there's going to be more tiers

24    where they're going to be going to hourly rate.

25         Q.   Okay.  So you went to hourly, right?
```

Page 321

```
 1        A.    I went to hourly.

 2        Q.    Were you happy about that?

 3        A.    Well, initially I was, because they

 4   said, well, you know, you're going to be 45 hours

 5   a week, and blah, blah, blah, blah.  I thought,

 6   cool, you know, it's 45 hours, and I normally work

 7   50, 55 hours, somewhere in there.  I'll get, you

 8   know, a little extra pay.

 9              And then it turned out that, no, you

10   don't go over 45 hours, period.  If you do, you've

11   got to call me, which is the district manager,

12   first, before you can.  So -- and the average

13   hourly rate that they -- they gave me, I really

14   couldn't quite understand how they came up with

15   that particular number, because what I was making

16   on the West Coast hourly, and salaried over on the

17   East Coast, and when they did their math, it came

18   out to like a dollar less than what I thought it

19   was.  But I could never figure out exactly how to

20   get the math to gel.

21        Q.    It turned out that it was a salary cut?

22        A.    I felt that I lost a little.  It was

23   pretty doggone close, but I felt like I lost a

24   little.

25              But what -- where the issue was, is that
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Peter E. Duran                                      August 1, 2011

Page 322

```
 1    I normally was, you know, taking my 50 hours, or
 2    even a little more, and depending on what was
 3    happening.  Summertime you might be able to keep
 4    it there.  Christmastime, you were way up there in
 5    the hours, so...
 6         Q.   So did being hourly and having to get
 7    approval for overtime make it more difficult for
 8    you to run your store?
 9              MS. REHMAN:  Objection to form.
10              You can answer.
11              THE WITNESS:  That's two questions,
12         isn't it?
13              MS. PUCKETT:  Maybe.
14              Can you read back the question, because
15         I don't even remember what I asked.
16
17              (Record read as follows:
18              "So did being hourly and having to get
19         approval for overtime make it more difficult
20         for you to run your store?")
21
22              THE WITNESS:  I guess it was one
23         question, just a long one.
24              Overtime was -- you could call the
25         district manager and tell him, but the thing
```

Page 323

```
 1       was, is you may not know you're going to have

 2       overtime, if it was going to happen, until

 3       Saturday.  Because if you were working your

 4       store and then your shift supervisor or

 5       somebody calls in sick Saturday and you had

 6       to be the one to run down there, you're

 7       hard-pressed to call the DMs and, hey, this

 8       is what's going to happen.

 9            But he always wanted to have -- to know

10       about anything above 45 hours a week.

11            As for running my -- my store, it became

12       more difficult, because while the hours

13       became restricted, the workload stayed

14       identical.  So you had to cap ends a little

15       bit faster.

16            MS. PUCKETT:  Okay.  With that

17       understanding, I'm going to ask you to mark

18       up this job description, and I'm going to

19       procure a pen for you.

20            MS. REHMAN:  You want him to write on

21       the exhibit?

22            MS. PUCKETT:  Yes.

23            MS. REHMAN:  Okay.

24            MS. PUCKETT:  And then what we'll do is

25       we'll introduce a clean copy as Exhibit 6 and
```

**Page 359**

```
 1   profitability.
 2        Q.   So, in fact, keeping the store clean
 3   improved loss prevention?
 4             MS. REHMAN:  Objection to form.
 5             You can answer.
 6             THE WITNESS:  Well, you'd have to ask a
 7        loss prevention guy on that one.  But a
 8        clean, organized, you know, store face, it's
 9        just much easier to maintain and to run.
10             MS. REHMAN:  Can I just ask how much
11        time is left?
12             THE REPORTER:  I'd have to end the
13        program and calculate it.
14             MS. PUCKETT:  I really only have a
15        couple more things.
16             MS. REHMAN:  Okay.  That's fine, then.
17   BY MS. PUCKETT::
18        Q.   Number 9, "Responsible for hiring and
19   training."  You wrote "Upon approval."  You mean
20   that when you -- before you hired someone, you had
21   to obtain HR approval; is that right?
22        A.   You had to get Quickscreen approval.
23        Q.   Okay.  So the person had to pass the
24   screening?
25        A.   They'd have to pass the screening.  And
```

Page 360

1    then again, it depended on who you were hiring.

2    If you were hiring a cashier, they get approved,

3    you can proceed, whatever.  But if you were

4    looking for a shift supervisor, that all had to go

5    through loss prevention and district management.

6         Q.   So for management positions, there were

7    additional steps, right?

8         A.   Correct.

9         Q.   And I think you mentioned earlier

10   that -- strike that.

11             I'll just ask.  Was there anyone that

12   you recommended to be a shift supervisor or a

13   manager that the -- that wasn't ultimately put in

14   that position?

15        A.   I think we went through that on another

16   one.  It wasn't that -- because they disagreed

17   with me wanting the person.

18        Q.   Timing?

19        A.   It was timing, payroll, budget cuts,

20   things like that.

21        Q.   And that's the only time you remember

22   that?

23        A.   As far as I can remember.

24        Q.   Anybody else in your store other than

25   you responsible for hiring and training?

Page 361

```
 1        A.   Only if I had an assistant manager that

 2   was getting primed and ready for his own store.

 3             Now, I wouldn't let them do the ultimate

 4   end of it.  I would let them go through the whole

 5   procedure, talk to them, interview them, do the

 6   whole procedure so that they would get a feel for

 7   what's going on.  And then if it all looked good,

 8   and then they would just ask me, this is what I

 9   found out, they would inform me, and I would just

10   kind of guide them, say, okay, well, if you feel

11   comfortable with it, go ahead and hire them.

12             I would let -- we would talk about

13   whatever the hourly rate would be, and then I

14   would send them back or let them go ahead and do

15   the procedure of actually hiring the person.

16             And then when they brought them in, I

17   would let them go through the whole training

18   aspect of it, making sure the paperwork is filled

19   out, all the CBTs were accomplished, done; and

20   that way, they were prepped for being a store

21   manager.

22             But that was the only time that I would

23   allow that.

24        Q.   So, for example, Jim?

25        A.   Uh-huh.
```

Page 362

1        Q.   Yes?

2        A.   Jim, yes.

3        Q.   So not -- so some of your assistant

4   managers did that and not others, right?

5        A.   Well, again, like I said, it would be

6   those that were, you know, ready for store

7   management or that the district manager was

8   interested in, so we would -- I just really wanted

9   to make sure that that person was comfortable.

10       Q.   So did you usually take their

11  recommendations?

12       A.   At that point in time, I would.  And

13  unless I just saw that person, you know, walking

14  around with their finger in their ear or

15  something, it was like, hmm.

16       Q.   Did that ever happen that you recall?

17       A.   No, no.  It went pretty smooth.

18       Q.   You didn't change the bottom paragraph,

19  "Supervisor Responsibilities."  "This position

20  directly supervises store associates and carries

21  out supervisory responsibilities in accordance

22  with Rite Aid policies and applicable laws.

23  Responsibilities include interviewing, hiring,

24  training, directing, rewarding, and disciplining

25  associates, appraising associate performance, and

1   resolving complaints."

2           Is that accurate?

3           MS. REHMAN:  Objection to form.  You can

4       answer.

5           THE WITNESS:  As best that I can say in

6       that short little sentence, by following

7       policies and procedures, I mean, that's what

8       I like to do.

9   BY MS. PUCKETT:

10      Q.   Mr. Duran, why did you join this

11  lawsuit?

12      A.   It's kind of complicated in that when

13  they took me down from salaried to hourly, it --

14  personally, it just seemed kind of insulting.

15  That was a lot of what separated the management

16  from -- from the employee base.

17          It -- when I was -- when I was salaried,

18  of course out West it was 50 hours for salary; out

19  East, it was 45 hours.  And they took the -- it

20  was a great deal of pride in what I would do.  And

21  I would work 50, 55, depending on the week.  If

22  there was -- if there was an inventory, if it was

23  Christmastime, I could be working 60.

24          When they dropped me down and then said,

25  you're going to work 45 hours a week and you're

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Peter E. Duran                                    August 1, 2011

Page 364

 1   still going to do the same amount of work and

 2   you're going to get it done in 45 hours, you know,

 3   it was just like, you guys, you don't understand,

 4   you know, that --

 5        Q.   So it was insulting?

 6        A.   It was.  It was an insulting thing.  And

 7   then to be told that, you know, you can't go over

 8   45 hours, and you must call me before you can get

 9   any extra hours, you know, retail is not -- is not

10   a --

11        Q.   Forty-hour-a-week job?

12        A.   Forty-hour-a-week job.  You know,

13   they -- there's just weeks when you need to have

14   more.

15        Q.   Is that also why you left Rite Aid?

16        A.   No.  I left Rite Aid amidst a coupon

17   issue that they had at my store that just got

18   totally out of hand.  And during the

19   investigation, it just -- the investigation went

20   south for me, and I was -- I was just not pleased

21   with the way they were -- they were handling it.

22        Q.   But you voluntarily left, right?

23        A.   Correct.

24        Q.   You weren't fired?

25        A.   No.

Page 373

```
 1       week, we might only get one on Sunday.
 2   BY MS. REHMAN:
 3       Q.   Would you have any discretion as to what
 4   the price change would actually be?
 5       A.   No.
 6       Q.   Did you work on the cash registers at
 7   all?
 8       A.   Yes.
 9       Q.   About how many hours a day would you
10   spend on the cash register?
11       A.   Well, again, it would be kind of
12   depending on what happened in the day.  Somebody
13   goes on break or lunch, if I didn't have anybody
14   to watch the register, then it would be my
15   responsibility.  If a cashier called in sick, then
16   I would be watching the cash register in the
17   mornings until I could find somebody.
18            So it's kind of tricky to answer that
19   one only because the situations dictated how much
20   time I would be on the cash register.
21       Q.   Did you have a photo lab in all your
22   stores?
23       A.   Yes.
24       Q.   And did you have to work at the photo
25   lab?
```

Page 374

1        A.   Yes.   The morning opening manager would

2    prep the photo register -- not register -- photo

3    machine, make sure the chemicals were full, run up

4    the water, and get it fired up so that it would be

5    ready for customers to have prints made.

6        Q.   Did you have a photo lab tech or an

7    hourly associate you could assign to the photo

8    lab?

9        A.   No, there wasn't enough hours in the

10   budget to really assign on a regular basis.  Most

11   of the time it was the management team would jump

12   back there and help.  If -- if it got really,

13   really busy and we needed somebody back there for

14   a great deal of time, we might do it our -- you

15   know, I might get back there so that the employees

16   could be able to get -- you know, take care of the

17   customers at the registers.

18       Q.   While you were stocking or pricing or

19   unloading the truck or working at the cash

20   register or the photo lab, did Rite Aid still

21   expect you to supervise the store?

22       A.   Of course.

23       Q.   And if you were all the way in the front

24   of the store at the cash register, would you be

25   able to see your employees in the back end of the

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Peter E. Duran                                                    August 1, 2011

Page 375

1   store?

2        A.   No.

3        Q.   If you were stocking a shelf at the

4   bottom of the shelf, would you be able to see

5   employees in other aisles?

6        A.   No.

7        Q.   If you were in the back of the store

8   unloading the truck, would you be able to see what

9   was going on inside of your store?

10       A.   No.

11       Q.   Were you able to supervise all your

12   employees effectively?

13            MS. PUCKETT:   Objection to form.

14            THE WITNESS:   When unloading, like, the

15       truck or there was a big project that was

16       required, there would be no way that I could

17       do it effectively as it should be.  You're so

18       busy doing your own thing, you don't know

19       exactly what that cashier is doing up front.

20   BY MS. REHMAN:

21       Q.   You had testified that you had worked at

22   different stores in the management level.  How did

23   your duties differ from what you experienced in

24   terms of managing a store at Walgreens versus

25   managing at Rite Aid?

Page 376

1        A.   It was a little different in that when I

2    was with Walgreens, they didn't have a lot of the

3    Staffworks and the computer programs, so we had a

4    lot more autonomy in what we were ordering.  Rite

5    Aid -- I mean Walgreens used a program for your

6    sales for generating the amount of hours that were

7    going to be necessary.

8             Well, it didn't have Staffworks.  You

9    would do a certain math procedure and say, I'm

10   going to do $20,000 a week times this average

11   hourly rate.  Then that would generate your hours

12   for you.

13        Q.   Would you say that you had a lot more

14   control in terms of generating your hours at

15   Walgreens than Rite Aid?

16             MS. PUCKETT:  Objection.  You can't lead

17        your own witness.

18             MS. REHMAN:  I'm crossing my witness.  I

19        can ask him that.

20             MS. PUCKETT:  Objection.

21             You can answer.

22             THE WITNESS:  Well, again, times were a

23        little bit different, but yes, there was more

24        control that I had at the operation, only

25        because there was less computers out there

Page 414

 1                  E R R A T A   S H E E T

 2

 3        Pursuant to Rule 30(7)(e) of the Federal

 4   Rules of Civil Procedure and/or Georgia Code

 5   Annotated 81A-130(B)(6)(e), any changes in form or

 6   substance which you desire to make to your

 7   deposition testimony shall be entered upon the

 8   deposition with a statement of the reasons given

 9   for making them.

10

11        To assist you in making any such corrections,

12   please use the form below.  If supplemental or

13   additional pages are necessary, please furnish

14   same and attach them to this errata sheet.

15                        - - -

16        I, the undersigned, PETER E. DURAN, do hereby

17   certify that I have read the foregoing deposition

18   and that, to the best of my knowledge, said

19   deposition is true and accurate (with the

20   exception of the following corrections listed

21   below).

22

23

24

25

Exhibit BB

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

YATRAM INDERGIT, ON BEHALF OF          )
HIMSELF AND OTHERS SIMILARLY           )
SITUATED,                              )
                                       )
                    PLAINTIFF, )CASE NO.
                               )1:08-CV-09361
          vs.                  )-PGG-HBP
                                       )
RITE AID CORPORATION, RITE AID OF      )
NEW YORK, INC., AND FRANCIS OFFOR AS   )
AIDER & ABETTOR,                       )
                                       )
                    DEFENDANTS. )
_____)

DEPOSITION OF ELMA E. ECHEVERRIA
TAKEN WEDNESDAY, AUGUST 10, 2011
LOS ANGELES, CALIFORNIA

Reported by Audra E. Cramer, CSR No. 9901

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   1:08-CV-09361-PGG-HBP
Elma E. Echeverria                                        August 10, 2011

Page 142

```
 1      A.   Correct.

 2      Q.   And if they passed all of that, then you could

 3   offer them a job; right?

 4      A.   Correct.

 5      Q.   How many interviews did you conduct per

 6   vacancy?

 7           Does that make sense?

 8      A.   Yes.

 9      Q.   How many interviews did you conduct per

10   vacancy?

11      A.   I didn't have too many vacancies in the four

12   years.  So maybe I did it at the beginning of when I

13   started the store, because the company allowed you extra

14   payroll in the holidays for Christmastime.  So I kind of

15   did -- the first year there, I kind of hired and had

16   more interviews at the beginning of the year.  So I

17   think that I had, like, three to four people for that

18   Christmas season only, and at the end of the year

19   they're terminated.  So it's just seasonal.

20           But as we went on through the years, the

21   company took that away, and you really didn't have

22   payroll to do that anymore.  So during the year, I kind

23   of did very little, maybe one or two, and that's because

24   maybe one of the girls was on leave of absence and I had

25   to fill it just for that part of the time, so I would
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.        1:08-CV-09361-PGG-HBP
Elma E. Echeverria                                             August 10, 2011

Page 143

1    have to bring someone.

2            Or what Mohammad liked to do was not to hire,

3    and bring someone from another store and put them in my

4    store.  So we wouldn't have to deal with an associate --

5    a new associate, because after 90 days you have to

6    promise them their job.

7        Q.   With the union there's a 90-day probationary

8    period; right?

9        A.   Correct.

10       Q.   And during that probationary period they can be

11   terminated?

12       A.   Correct.

13       Q.   And after that 90-day probationary period, you

14   have to go through the union if you want to terminate

15   them?

16       A.   Not the union really.  You have to go through

17   HR again.

18       Q.   Okay.  And during the 90-day period, if they do

19   something -- if they violate company policy or they are

20   insubordinate, you could fire that person; right?

21       A.   We go back to the same thing:  HR specifically

22   told us even on a 90-day probation we need to call him.

23       Q.   If you called HR and you said, "I want to fire

24   this person that's in the 90-day period," and they said

25   okay, then you can fire that person?

Page 144

1     A.    Correct.

2     Q.    And did you have any employees during the

3  90-day period that you wanted to fire and you

4  recommended that they be fired and they were fired?

5     A.    I don't remember exactly how it happened, but I

6  did have one.  I don't know if it went into the 90-day

7  or past the 90-day, but I did have one.

8     Q.    And who was that?

9     A.    I don't remember his name, but it was just an

10  older guy.

11     Q.    We'll get to him.  I know who you're talking

12  about.  We'll get to him.

13          Did you fire any other employees in your store

14  at any other time?

15     A.    I let go of some of associates, because we

16  offered them a job but didn't come in.  So we have to

17  call HR, and his procedure would be call them; after

18  they don't show one day, call them the second time;

19  leave them a message.  You had to leave a message either

20  on their phone or someone that they could reach it.

21          Once you did that, you called HR, and he will

22  say, "Okay.  Have you done this procedure?  Make a note

23  on the file that you have done this procedure, the date

24  and the times that you have called, file it, and then

25  call back and terminate them.  And make sure you have

Yatram Indergit, et al. v. Rite Aid Corporation, et al.      1:08-CV-09361-PGG-HBP
Elma E. Echeverria                                                      August 10, 2011

Page 299

1  that task.  So it was a constant thing that I was

2  looking outside because I knew he was going to come in

3  sooner or later to make sure that was clean.  Because as

4  soon as he walked in, if that was okay, then it went

5  smoother than coming already upset that he's looking at

6  the presentation of the store.

7  BY MR. PRICE:

8      Q.   Did he know that you were doing these types of

9  tasks?

10     A.   Oh, yeah, he knew.  Because when I was working,

11 I was setting seasonals or stocking, he will walk into

12 my store and say, "Hi.  How are you?"

13          MR. SCOTT:  Object to the form of that last

14 question.

15          THE WITNESS:  So...

16 BY MR. PRICE:

17     Q.   Did he ever ask you why you didn't delegate

18 that work?

19     A.   He knew why.  He knew how many people were in

20 the store.  His thing was, "Do whatever it takes to get

21 that store running."

22     Q.   Did he tell that to you?

23     A.   Yes.

24     Q.   Did he ever try to stop you when he would walk

25 in and you would be doing something like stocking

Page 300

 1   shelves or things of that nature?

 2       A.    He would stop me if he needed to go into my

 3   office.  So he goes, "Can you go please open the office

 4   for me."  And I will open my office, and he will go in,

 5   and I will continue doing my work.

 6       Q.    But he wouldn't say, "Hey, stop.  You need to

 7   get an associate to do this.  You need to manage the

 8   store"?

 9       A.    No.  No.

10       Q.    Okay.  So I took us down another path.  Back to

11   the outside part of the store.

12            Were there any other non-supervisory-type tests

13   that you did as a store manager outside the store?

14       A.    I never had anyone to pick up my baskets, so I

15   will collect all the baskets in the shopping center

16   because there was insufficient associates.  Run out, get

17   the baskets, come back in.

18            MR. SCOTT:  Sorry.  I'm going to object to that

19   question.  Object to form.

20   BY MR. PRICE:

21       Q.    So what percentage of your overall work on

22   average were you doing that you considered to be

23   non-supervisory?

24            MR. SCOTT:  Object to form.

25            THE WITNESS:  I would say non-performing

Page 301

1    manager duties was -- like, 80 percent of my job I was

2    not doing manager duties.

3    BY MR. PRICE:

4         Q.   I'm sorry.  You said "non-performing"?

5         A.   I wasn't going over Staffworks consistently.  I

6    wasn't checking profit planner.  I wasn't in my ad.  It

7    wasn't one day's task or one hour task.  It was couple

8    days' task.  Because if you're selling that

9    merchandise -- right? -- the system doesn't pick it up

10   right away.  It takes 48 hours to do it.  So today I'd

11   say I'd go order -- the system says, "You have three

12   in stock," and then by when it's due -- on Wednesday in

13   the middle of the week it was due -- the system will

14   shut you down, and you can't order any more.  You'd be

15   empty; right?  But if I didn't have enough time to go

16   back into the system and sit down and go over that

17   paper, that wouldn't properly be ordered.

18        Q.   But the answer to my question about the

19   percentage of time that as a store manager you did

20   non-supervisory type of work, what is that number?

21             MR. SCOTT:  Object to form.

22             THE WITNESS:  I would say 20 was management and

23   80 was non-management?

24   BY MR. PRICE:

25        Q.   Now, you testified that you received lists from

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**   1:08-CV-09361-PGG-HBP
**Elma E. Echeverria**                                    **August 10, 2011**

**Page 302**

1   Mohammad on a daily basis; is that right?

2        A.   Correct.

3        Q.   How were those communicated to you?

4        A.   He would walk in, or there would be a

5   phone call early in the morning.  I would have a

6   notepad, and I would write down what he specifically

7   told me.

8        Q.   So you would write the list?

9        A.   Yes.

10       Q.   He would call and tell you what to write down

11  or what to do?

12       A.   Correct.

13       Q.   Did your doing these non-supervisory-type

14  duties affect your ability to manage the store?

15            MR. SCOTT:  Object to form.

16            THE WITNESS:  Yes.

17  BY MR. PRICE:

18       Q.   Why?

19       A.   If you're stocking and breaking and cleaning,

20  what percentage do you really have to supervise people

21  and tell them exactly what to do.  Or even have

22  associates inside the store, you can't really delegate

23  what your title is.  So it's just -- you're just not

24  doing the job you were hired for.  You're just another

25  high-paid clerk.

**Page 316**

```
 1   STATE OF CALIFORNIA          )

 2   COUNTY OF LOS ANGELES        )   SS.

 3

 4

 5              I, ELMA E. ECHEVERRIA, hereby certify

 6   under penalty of perjury under the laws of the State of

 7   California that the foregoing is true and correct.

 8              Executed this _____ day of

 9   _____, 2011, at

10   _____, California.

11

12

13                    _____

14                    ELMA E. ECHEVERRIA

15

16

17

18

19

20

21

22

23

24

25
```

# Exhibit CC

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


YATRAM INDERGIT, on Behalf

of Himself and Others

Similarly Situated

       Plaintiff          Civil Action No.

vs.                     08-CV-9361

RITE AID CORPORATION, RITE

AID OF NEW YORK, INC., and

FRANCIS OFFOR as Aider &

Abettor

       Defendants

_____/


       The deposition of CHERYL ANN ANDERSON was

held on Wednesday, July 20, 2011, commencing at 9:38

a.m., at the Offices of Gore Brothers Reporting &

Videoconferencing, 20 South Charles Street, Suite 901,

Baltimore, Maryland 21201, before Ronald E. Bennett,

Notary Public.


REPORTED BY:  Ronald E. Bennett

Page 23

```
 1        Q.   The Randallstown store, did you ask to be
 2   transferred there?
 3        A.   Did I ask?  No.
 4        Q.   How did that come about?
 5        A.   It was a 24-hour store.  They didn't have
 6   any manager to take it.  And they just transferred
 7   me there temporarily until they found a manager to
 8   do it.
 9        Q.   Finksburg was not a 24-hour store?
10        A.   No.
11        Q.   Do you know why they couldn't find a
12   manager to fill the Randallstown store?
13        A.   I have no idea.
14        Q.   Was the Randallstown store a stand-alone
15   store or in a shopping mall?
16        A.   Shopping mall.
17        Q.   Bigger or smaller in terms of size?
18        A.   Bigger.
19        Q.   Much bigger or somewhat bigger?
20        A.   It was much bigger.
21        Q.   How many employees front end worked at the
22   Randallstown store during the time you were there?
23        A.   I would say roughly 12.
24        Q.   Including you or not including you?
25        A.   Including me.
```

**Page 24**

1          Q.    How many pharmacy employees were there?

2          A.    Pharmacy employees.  Probably about eight.

3          Q.    How many pharmacy employees were in the

4     employ of or employed by the store in Finksburg

5     during the time you were the store manager?

6          A.    Five.

7          Q.    What was the sales volume in the

8     Randallstown store?

9          A.    Front end volume.

10         Q.    Yes.

11         A.    Roughly $35,000.

12         Q.    So the volume there was roughly

13    $1.8 million a year, front end volume?

14         A.    Roughly, yes.

15         Q.    Do you agree with me that a store that has

16    roughly $1.8 million in sales volume just in the

17    front end doesn't run itself?

18              MR. ELLWANGER:  Object to form.

19         A.    I didn't understand the question.

20    BY MR. TURNER:

21         Q.    Somebody has to run the store, a store

22    that has $1.8 million in sales volume.  Do you agree

23    with that?

24              MR. ELLWANGER:  Object to form.

25         A.    Yes.

**Page 25**

1    BY MR. TURNER:

2        Q.    As a store manager, that's what you did,

3    correct?

4              MR. ELLWANGER:   Object to form.

5        A.    That was a little impossible to do.

6    BY MR. TURNER:

7        Q.    Why is that?

8        A.    There wasn't enough hours in the store to

9    do it properly.

10       Q.    Properly or not that is what you were

11   trying to do, correct?

12       A.    That's what Rite Aid was asking me to do.

13       Q.    But you aren't cable of doing it?

14             MR. ELLWANGER:   Object to form.

15             THE WITNESS:   It was impossible to do it

16   the way they outlined it to do.

17   BY MR. TURNER:

18       Q.    How were they outlining it to do?

19       A.    They wanted me to manager and supervise --

20   we had to do a lot of the work myself.

21       Q.    There were periods of time where you were

22   able to come in under your payroll budget, correct?

23       A.    Yes.

24       Q.    And in coming in under your payroll budget

25   you were making decisions about the workforce that

Page 26

1    you were going to have in your store, correct?

2         A.   Usually when that happened it's usually

3    when somebody had called off from work.

4         Q.   For an entire year your performance

5    evaluations you had periods of time where you were

6    under your payroll budget for the year, right?

7         A.   Yes.

8         Q.   As the store manager, you were making

9    decisions about how you were going to utilize the

10   front-end employees in your store, correct?

11              MR. ELLWANGER:  Object to form.

12              THE WITNESS:  Not entirely, no.

13   BY MR. TURNER:

14        Q.   What is not entirely correct about that?

15        A.   Well, when somebody was on vacation or the

16   DM pulled somebody else out.

17        Q.   Absent those exceptions, you would be

18   making the decisions about who was going to work

19   when, correct?

20              MR. ELLWANGER:  Object to form.

21              THE WITNESS:  Usually the Staffworks

22   scheduled them.

23   BY MR. TURNER:

24        Q.   Ms. Anderson, the Staffwork schedule came

25   out with a proposed schedule, correct?

**Page 36**

1   manager, absent something out of the ordinary, would

2   have been in the store when it was opened?

3       A.   There would have been one of us at all

4   times, yes.

5       Q.   And if you weren't there, there would be

6   an assistant store manager who would be the highest

7   ranking employee in the store?

8       A.   Yes.

9       Q.   Would that assistant store manager have

10  all the same authority that you had as the store

11  manager when they were the highest ranking employee

12  in the store?

13          MR. ELLWANGER:   Object to form.

14      A.   I didn't understand the question.  Do you

15  mean -- did they run the store when I was not there?

16  BY MR. TURNER:

17      Q.   Yes.

18      A.   Yes.

19      Q.   And would they call you at home, if

20  something happened?

21      A.   Yes.

22      Q.   How often did that happen?

23      A.   Maybe once, twice a week.

24      Q.   For the assistant store managers when you

25  were there, would you leave lists of things for them

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**           08-CV-9361
**Cheryl Ann Anderson**                                              July 20, 2011

                                                                    **Page 37**

 1   to complete?

 2        A.   Yes.

 3        Q.   Would you expect them to also leave lists

 4   of things that needed to be completed when their

 5   shift stopped?

 6        A.   They just -- the next person just picked

 7   up on the same list.

 8        Q.   But in terms of deciding who was going to

 9   do what on the list, would you do that or would you

10   expect your assistant store managers to do that?

11        A.   I would expect my assistant manager to do

12   that.

13        Q.   You wouldn't have a list that essentially

14   turned them into a robot.  You expected them to use

15   their discretion and make decisions?

16        A.   Yes.

17             MR. ELLWANGER:  Object to form.

18   BY MR. TURNER:

19        Q.   Did you have any turnover during the time

20   you were in the Randallstown store?

21        A.   Yes.

22        Q.   Did you terminate anyone?

23        A.   There were terminations done, but I

24   physically did not do them.

25        Q.   How many employees were terminated in the

**Page 38**

1    Randallstown store while you were there as store

2    manager?

3        A.    Just in the first month was ten.  And I

4    would say through the course 25 maybe.

5        Q.    Did you make recommendations that any of

6    those employees be terminated?

7        A.    Yes.

8        Q.    How many employees did you recommend be

9    terminated during the time you were the store

10   manager at the Randallstown store?

11       A.    About five.

12       Q.    You said approximately you understood

13   potentially as many as 35 employees were terminated?

14       A.    Yes.  That was through loss prevention.

15       Q.    During the 10 month period you were there

16   approximately 35 employees were terminated?

17       A.    Approximately, yes.

18       Q.    So five of them you made recommendations

19   they be terminated?

20       A.    Yes.

21       Q.    Who did you make those recommendations to?

22       A.    My DM.

23       Q.    Who was the DM that you made the

24   recommendations to?

25       A.    John Libers.

**Page 39**

1        Q.   Do you recall the names of the employees

2   you recommended being terminated?

3        A.   No.

4        Q.   Do you recall the reasons you recommended

5   any of them be terminated?

6        A.   The ones that I recommended would have

7   been no shows and lateness.

8        Q.   And did Mr. Libers follow your

9   recommendations?

10        A.   Yes.

11        Q.   So those five employees were in fact

12   terminated based on your recommendation?

13        A.   Yes.

14        Q.   Now the other employees, the other 30,

15   roughly 30 employees were terminated for loss

16   prevention issues?

17        A.   Yes.

18        Q.   What kind of loss prevention issues?

19        A.   Some thefts.  Some of them I really have

20   no clue.

21        Q.   Did you ever witness any of those

22   employees actually stealing?

23        A.   No.

24        Q.   And did the loss prevention manager ever

25   seek your input before terminating any of those

Page 40

1      employees?

2              A.     No.

3              Q.     So that meant that -- if 35 employees were

4      terminated during that 10 month period, how many

5      employees were hired during that same period?

6              A.     I would say probably 40.

7              Q.     Describe the hiring process to me.

8              A.     Are you talking about generally what it

9      was supposed to be or what actually happened?

10             Q.     Let's talk about what it's supposed to be.

11             A.     It's supposed to be the applicants filled

12     out the applicants.  We look over them.  Call them

13     in.  We do an interview.  Then they have to do a

14     phone interview, a background check before they can

15     be hired.

16             Q.     You say we look through the resume.  We

17     look through the applications.  Who is we?

18             A.     The store manager and the assistants.  We

19     look over the applications.

20             Q.     That's something you and your assistant

21     managers did?

22             A.     Yes.

23             Q.     You said there's a difference in what

24     actually happened?

25             A.     Yes.

**Page 41**

1        Q.    What actually happened?

2        A.    At the Randallstown store we actually

3   looked over the applicants, but we never did the

4   interviews themselves.  The DM did all the

5   interviews and the hiring.

6        Q.    You participated in some interviews,

7   correct?

8              MR. ELLWANGER:  Object to form.

9        A.    Not while at the Randallstown store.

10  BY MR. TURNER:

11       Q.    In Finksburg you did interviews, correct?

12       A.    Some of them, yes.

13       Q.    And in Finksburg you followed what you

14  said it was supposed to be.  You get an application,

15  look over it, call a person in, interview.  And then

16  they would do the phone interview and background

17  check; is that right?

18             MR. ELLWANGER:  Object to form.

19             THE WITNESS:  Yes, but I never made that

20  final decision.

21  BY MR. TURNER:

22       Q.    But you would make recommendations?

23       A.    Yes.

24       Q.    And your recommendations were followed at

25  times, correct?

Page 42

```
 1        A.    Not all the time, no.

 2        Q.    They were followed at times, correct?

 3        A.    Yes.

 4        Q.    Were your assistant store managers in

 5   Finksburg also involved in the interview process?

 6        A.    Yes.

 7        Q.    Would they do interviews without you?

 8        A.    No.

 9        Q.    Were you training them?

10        A.    Yes.

11        Q.    You were training them in the hiring

12   process?

13        A.    Yes.

14        Q.    Would they make recommendations based on

15   the interview process to you?

16        A.    Yes.

17        Q.    Did you follow those recommendations?

18        A.    Not always.

19        Q.    Sometimes you did?

20        A.    Yes.

21        Q.    You did seek input from your store

22   managers who sat in interviews with you as to

23   whether potential employees should be hired?

24        A.    Yes.

25        Q.    Did you seek input from your assistant
```

Page 79

```
 1        A.    There were more training.

 2        Q.    A lot more training going on in that

 3   store?

 4        A.    Yes.

 5        Q.    You don't have somebody come in and say go

 6   run that cash register?

 7        A.    No.

 8        Q.    How would you train new employees when

 9   they were hired in as a cashier?

10        A.    First of all, you bring them in.  They

11   have what they call CBT, computer training.  They

12   have to sit through all those.  You pair them up

13   with a cashier as a buddy to let them, teach them

14   how to run that register.

15        Q.    I assume you would try to pick a cashier

16   for the buddy that you thought was a good cashier?

17        A.    Correct.

18        Q.    And there were varying levels of ability

19   in terms of cashiers, correct?

20        A.    Correct.

21        Q.    Some people, do you agree with me, are

22   self-starters?

23        A.    Some of them.

24        Q.    Some people need more watching over?

25        A.    Correct.
```

**Page 80**

```
 1        Q.   And part of your job, when you were in the
 2   stores either Finksburg or Randallstown, was to make
 3   sure your employees were completing the tasks
 4   assigned to them?
 5        A.   Correct.
 6        Q.   When you were doing tasks, regardless of
 7   what they were, you were responsible for making sure
 8   that the store that the other tasks were being
 9   completed inside your store?
10        A.   Correct.
11        Q.   And you would watch your -- you could
12   simultaneously do some work and also watch your
13   employees to make sure they were doing what they
14   were supposed to do?
15        A.   At times.  Sometimes if I'm in the back of
16   the store you can't see from the front-end cashier
17   is doing.
18        Q.   Depending on where you were in the store
19   and what you were doing you would be able to
20   simultaneously monitor your employees and do other
21   work?
22        A.   Like I said, if I was at the front of the
23   store, yes.  If I was doing something in the middle
24   or back of the store, which most of the work is
25   being done, no.
```

Page 81

1        Q.    Unless you had the employees there with

2   you or in that same area, correct?

3        A.    If you had an extra -- most of the time,

4   like I said, there was just me and one cashier.

5   Very rarely there was a second one in the cashier.

6        Q.    And the cashier in the pharmacy?

7        A.    The cashier in the pharmacy was being

8   supervised by the pharmacy manager.  We were

9   supposed to oversee, but if I'm out on the floor

10  doing tasks, it is impossible for me to watch the

11  pharmacy cashier.

12       Q.    You had supervisory authority over the

13  pharmacy cashier, correct?

14              MR. ELLWANGER:  Object to form.

15              THE WITNESS:  I had but it was impossible

16  to do.

17  BY MR. TURNER:

18       Q.    So at Randallstown you had new cashiers

19  being hired?

20       A.    Yes.

21       Q.    You had new shift supervisors being hired?

22       A.    I only had one shift supervisor the whole

23  time.

24       Q.    There was no turnover in the shift

25  supervisor position?

Page 104

1    help them or fix any problems?

2         A.   Correct.

3         Q.   And you would do that for all of the

4    hourly employees you were supervising in your store,

5    come March of a particular year, correct?

6         A.   Well, the associates were done when they

7    reached that one year.  Theirs weren't done at all

8    the same time.  Just the assistant managers.

9         Q.   So did you do evaluations of the employees

10   at Randallstown store?

11        A.   There wasn't any to --

12        Q.   Nobody made it a year without getting

13   fired, right?

14        A.   Right.

15        Q.   Did you do six-month evaluations with

16   them?

17        A.   No.

18        Q.   But you would give them input of your

19   thoughts that they were doing well or not doing well

20   on a regular basis?

21        A.   Yes.

22        Q.   And you expected your assistant managers

23   to do the same, correct?

24        A.   Yes.

25        Q.   Do you agree that the goal in each Rite

Page 105

1    Aid store that you worked, really Finksburg and

2    Randallstown during this time period that we are

3    talking about, was to make the store as profitable

4    as possible?

5         A.   That was Rite Aid's goal, yes.

6         Q.   What was your goal?

7         A.   Oh, absolutely.  I was working for the

8    company.  I wanted them to do well, yes.

9         Q.   Were you ever formally disciplined while

10   you worked as a store manager other than your

11   termination?

12        A.   No.

13        Q.   Were you ever verbally disciplined?

14        A.   Yes.

15        Q.   For what?

16        A.   For going over payroll.

17        Q.   You could go over payroll but somebody

18   would call and talk to you about it.

19        A.   We were told absolutely no overtime.

20        Q.   But we already talked about you still did

21   it?

22        A.   Occasionally, yes, I did go over.

23        Q.   During the time that you worked at the

24   Finksburg store from up until you left there to go

25   to Randallstown from January '07 until then, how

Page 106

1   many hours a week were you working?

2          A.   I'm saying an average of 60 a week.

3          Q.   How many days a week were you working?

4          A.   An average of six.

5          Q.   And how many hours a week was Joy working?

6          A.   50.

7          Q.   Was she on a set schedule of 50?

8          A.   Yes.  Well, not really.  Flexible schedule

9   of 50.

10          Q.   Did you try to make sure that either you

11   or Joy were in the store at all times?

12          A.   Yes.

13          Q.   Did you discipline any employees at the

14   Finksburg store during that time period?

15          A.   You're talking about Rite Aid?

16          Q.   Yes.

17          A.   Yes.

18          Q.   You would exercise your discretion to

19   write them up for violation of company policy?

20          A.   Basically what those were, they were no

21   shows.

22          Q.   You could exercise your discretion what

23   you were going to do?

24          A.   Yes.

25          Q.   And you did that?

Page 107

1       A.    Yes.

2       Q.    Do you know if Joy ever disciplined any

3   employees during that time?

4       A.    Not that I know of.

5       Q.    Not formal written discipline?

6       A.    Not formal written.

7       Q.    But she did do verbal discipline?

8       A.    Yes.

9       Q.    At Randallstown how many hours a week do

10  you believe that you worked?

11      A.    On an average 65-70.

12      Q.    Was that a store that you were sent there

13  to try to turn it around?

14      A.    Yes.

15      Q.    And it was a store that was in trouble, I

16  guess would be one way of putting it?

17      A.    Yes.

18      Q.    What was wrong in the store when you

19  arrived?

20      A.    The store was not faced.  It was not --

21  the inventory level was way down.  Shelves were

22  empty.  Store was dirty.  There was a huge turnover

23  of employees.  They had basically taken out the

24  entire staff.

25      Q.    When you have a lot of turnover, that's

**Page 108**

```
 1    going to create different managerial duties for a
 2    store manager, true?
 3         A.   True.
 4         Q.   Have to deal with training?
 5         A.   Yes.
 6         Q.   Have to deal with hiring?
 7         A.   Yes.
 8         Q.   Part of the hiring process is preparing
 9    the new hire paperwork?
10         A.   Correct.
11         Q.   And you did that?
12         A.   When I was at Randallstown, I sat up the
13    interviews, chose the applicants.  The DM officially
14    did all the hiring.
15         Q.   We talked about you made recommendations?
16         A.   Right.
17         Q.   And the district manager followed your
18    recommendations sometimes and others not?
19         A.   Correct.
20         Q.   But when somebody actually appeared for
21    work, you would do the new hire paperwork?
22         A.   Yes.
23         Q.   And you did that for potentially 40
24    employees just at Randallstown alone?
25         A.   Correct.
```

Page 135

1    an Eckerd store was different than the operation of

2    a Rite Aid store?

3        A.   I didn't see the operation of an Eckerd

4    store.

5        Q.   So you don't know?

6        A.   No.  We went in the morning of the

7    computer transfer over.

8        Q.   And had the stores already been rebranded

9    as well as Rite Aid?

10       A.   Not all of them, no.

11       Q.   Did they still have Eckerd product in

12   them?

13       A.   Some of them did, yes.  They were in the

14   transition of pulling the product off the shelf.

15       Q.   And did you ever review the Eckerd Policy

16   and Procedures Manual?

17       A.   No.

18       Q.   Did you ever review the Eckerd store

19   operations manual?

20       A.   No.

21       Q.   From the time that you spent with

22   employees did you get the sense that there were

23   differences in the way the Eckerd stores had been

24   operated versus what you were trying to get them to

25   do in Rite Aid?

Page 136

 1       A.   I never discussed Eckerd.  We were there
 2   to train them on Rite Aid policies and the way Rite
 3   Aid does the computers.
 4       Q.   Not just computers.  There's other
 5   policies and procedures?
 6       A.   Correct.
 7       Q.   You didn't form an opinion as to whether
 8   this was useful time by you?
 9            MR. ELLWANGER:  Object to form.
10   BY MR. TURNER:
11       Q.   If there weren't any differences, why
12   would you need to be there?
13       A.   I would assume it was a different computer
14   system.  I have no idea what an Eckerd store was ran
15   like.  So I just assumed everything that I was
16   teaching them was all new to them.
17       Q.   During these weeks where you would do this
18   how many hours a week did you work?
19       A.   Those weeks?  I would say 50 to 60.
20       Q.   It varied?
21       A.   It varied.
22       Q.   Do you have any records you could go back
23   to to see what the actual time was?
24       A.   No.
25       Q.   Other than the stores you visited in the

Yatram Indergit, et al. v. Rite Aid Corporation, et al.          08-CV-9361
                    Cheryl Ann Anderson                       July 20, 2011

Page 137

1   transition, the Eckerd transition, you have never

2   worked in any Rite Aid brand stores outside of a

3   single district during the relevant period, correct?

4        A.   Correct.

5        Q.   Do you recall what district that is?

6        A.   The district number?

7        Q.   Yes.

8        A.   Don't recall.

9        Q.   It was always within that one district?

10       A.   Yes.

11       Q.   And so you don't know what happened in

12  other stores in other districts which we have

13  already talked about?

14       A.   No.

15       Q.   You don't know whether it was different

16  running a urban store in Downtown New York, New York

17  versus a rural store in Finksburg, Maryland,

18  correct?

19       A.   No.

20       Q.   Is there any way you could know?

21       A.   Not unless you would go ask somebody, no.

22       Q.   Or go see for yourself?

23       A.   Correct.

24       Q.   But you do know there can be variations in

25  how stores are run based on just the two that you

**Page 143**

```
 1    purposes of identification.)

 2    BY MR. TURNER:

 3         Q.    Have you ever seen that document before

 4    today?

 5         A.    Yes.

 6         Q.    What is it?

 7         A.    This looks like a self-appraisal that I

 8    have done.

 9         Q.    I think you told me this would have been

10    at the Finksburg store, correct?

11         A.    Yes.

12         Q.    And there's a fax line at the top dated

13    March 15, 2006?

14         A.    Yes.

15         Q.    Do you have any reason to believe this was

16    not your 2006 self-appraisal?

17         A.    No, I would say it would be.

18         Q.    Now in the section that says, indicate the

19    objectives of your job where you have met or

20    exceeded them during this past year.  Do you see

21    that?

22         A.    You're talking about number 1?

23         Q.    Yes, ma'am.

24         A.    Yes.

25         Q.    This is your handwriting, correct?
```

Page 144

1        A.    Yes.

2        Q.    If we turn to the second page.  That's

3    your signature?

4        A.    Yes.

5        Q.    It is dated March 4, 2006?

6        A.    Yes.

7        Q.    You indicated that your belief or your

8    understanding of the objectives of your job were to

9    run a clean profitable and customer service oriented

10   retail store and to supervise all store associates

11   and all tasks.  Did I read that correctly?

12       A.    Yes.

13       Q.    Is that accurate as to your understanding

14   of the objectives of your position as store manager?

15       A.    That's the understanding, but that's not

16   reality of what happened.

17       Q.    Well, we have talked about, you had in the

18   Finksburg store there were 7 to 8 front-end

19   employees?

20       A.    Correct.

21       Q.    So there would have been 6 to 7 front-end

22   employees who were subordinate to you, correct?

23       A.    The 7 or 8 would include myself and my

24   assistant.

25       Q.    Your assistant was still subordinate to

**Page 145**

```
 1   you?

 2        A.   Yes.

 3        Q.   All the employees in the store on the

 4   front end we have already talked about were

 5   subordinate to you, correct?

 6        A.   Correct.

 7        Q.   Was there a change at some point in the

 8   operations of Rite Aid that caused you, you keep

 9   saying that's what it was supposed to be.  Did

10   something happen --

11        A.   They kept reducing the payroll hours.  So

12   there wasn't enough hours to dedicate as much out as

13   they intended to suggest.

14        Q.   You were still, as we have established, in

15   charge of your store regardless of what you were

16   doing?

17        A.   Correct.

18        Q.   And you could make decisions about what

19   task you would perform versus a task someone else

20   would perform?

21        A.   Correct.

22        Q.   And so, if you decided that the best use

23   of your time was to, for example, be at the cashier

24   so you could have more interaction with customers,

25   that's a choice you could make?
```

Page 227

 1   come in.
 2        Q.    And it would depend on whether or not you
 3   had employees absent or --
 4        A.    Correct.
 5        Q.    Did you ever have anyone assigned
 6   specifically to the photolab?
 7        A.    No.  There was not enough payroll for
 8   that.
 9        Q.    How many employees at the Randallstown
10   store were trained to run the photolab?
11        A.    At the Randallstown.  One or two
12   associates.  All depends who was there.  Plus all
13   management staff.
14        Q.    What about Finksburg?
15        A.    Just the management staff.
16        Q.    Is there any way we would know how much
17   time you spent in the photolab?
18        A.    Per day?
19        Q.    Yes.
20        A.    Like I said, it would vary according to
21   the rolls of film that came in.
22        Q.    And what type of staffing you had?
23        A.    Yes.
24        Q.    Do you understand the concept of
25   partnering with human resources?

Page 228

```
 1      A.    Partnering.  No.
 2      Q.    If you wanted to terminate someone, you
 3   would need to bring human resources in, correct?
 4      A.    Yes.
 5      Q.    Did you ever do that?
 6      A.    Yes.
 7      Q.    Did you understand why?
 8      A.    Not understanding it.  I just understand
 9   what DM had told us the process of what we were
10   supposed to be doing.
11      Q.    You would share with HR what would have
12   happened and what you were planning to do?
13      A.    Yes.
14      Q.    And they would counsel you as to whether
15   you should or shouldn't; is that fair?
16      A.    Yes.
17      Q.    Ultimately did you understand the decision
18   was yours?
19      A.    Not totally, no.
20      Q.    It was a combination of the two parties,
21   you and HR?
22      A.    Or the DM.
23      Q.    When you returned to the Finksburg store
24   from Randallstown, how many hours a week were you
25   working at Finksburg?
```

Page 229

1      A.    About 60 hours a week.

2      Q.    At the Randallstown store how many hours a

3  week were your assistant managers working?

4      A.    When I had Joy, she was working 50.

5      Q.    At Randallstown?

6      A.    At Randallstown they were each working 50.

7      Q.    Scheduled for 50?

8      A.    Yes.

9      Q.    Do you have any reason to believe they

10  were working more than that?

11      A.    There were times they did, if there was a

12  call out or we still had to finish a truck.  But on

13  an average they didn't go too much over 60.

14      Q.    Were there times when they worked less

15  than 50?

16      A.    No.

17      Q.    Throughout your employment at Rite Aid as

18  a store manager did you typically work on average 60

19  hours a week?

20      A.    Yes.

21      Q.    It was true regardless of changes in labor

22  budgets, correct?

23      A.    Correct.

24      Q.    As I understand what you're saying, the

25  changes in labor budget impacted more the actual

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**          08-CV-9361
**Cheryl Ann Anderson**                                    **July 20, 2011**

**Page 230**

```
1   duties you were performing rather than the hours you

2   were working?

3        A.    Correct.

4        Q.    But your management style had always been

5   lead by example?

6        A.    Correct.

7        Q.    Even when you had a bigger labor budget,

8   at some point in time is what I'm understanding you

9   to say.  There was a point where you had more labor

10  available?

11       A.    Not a whole lot more, but, yes, some.

12       Q.    When did that change?

13       A.    I would say the last five years it

14  drastically changed.  Much lower.

15       Q.    Wait a minute.  Was it drastically or

16  somewhat?  I'm not sure I understand.  You just said

17  there was some change.

18       A.    Well, especially the last year it changed

19  drastically.  After losing my assistant they just

20  cut her 50 hours out completely.

21       Q.    Okay.  I understand what you're saying.

22  Up until that point you had always worked it out

23  with your employees?

24       A.    Not as much.

25       Q.    That's the last, that's when you went back
```

Page 261

```
 1      A.   No.
 2      Q.   Did the amount of product you sold change?
 3           MR. TURNER:  Object to form.
 4      A.   Most of the time new items came in all the
 5  time.
 6  BY MR. ELLWANGER:
 7      Q.   Did it get smaller?
 8      A.   The product?
 9      Q.   The number of items you were selling?
10      A.   No.
11      Q.   What portion of your day did you spend
12  working the register?
13           MR. TURNER:  Object to form.
14      A.   You're talking about hour wise?
15  BY MR. ELLWANGER:
16      Q.   Sure.  Percentage wise.  Whatever you are
17  more comfortable with.
18      A.   Probably percentage.  I would say probably
19  20 percent.
20      Q.   What percentage of time during your day
21  did you spend pricing items?
22           MR. TURNER:  Object to form.
23      A.   Some days we didn't price.  Some days we
24  did.  If we did, I would say 10 percent.
25  BY MR. ELLWANGER:
```

Page 262

```
 1        Q.    How many days out of an average week would
 2   you price items?
 3        A.    About two.
 4        Q.    What percentage of your day would you
 5   stock shelves?
 6              MR. TURNER:   Object to form.
 7        A.    It all depends on the day.   Truck day I
 8   would say 80 percent.   On a regular basis I would
 9   say 40 to 50.
10   BY MR. ELLWANGER:
11        Q.    And the truck came once a week?
12        A.    Once a week.
13        Q.    What percentage of your day -- how many
14   day out of the week did you clean the store?
15              MR. TURNER:   Object to form.
16        A.    We were working on cleaning the store all
17   the time.
18   BY MR. ELLWANGER:
19        Q.    But you specifically; how many days would
20   you clean the store in an average week?
21        A.    When I closed, I faced the store just like
22   the assistant would do.   She would close.   And I
23   averaged three to four nights a week.
24        Q.    What percentage of your day then would be
25   spent cleaning?
```

Page 263

1           MR. TURNER:  Object to form.

2      A.   10 to 15 percent.

3  BY MR. ELLWANGER:

4      Q.   Would you describe the tasks I just went

5  through as non-managerial duties or managerial

6  duties?

7           MR. TURNER:  Object to form.

8      A.   Non-managerial duties.

9      Q.   Why would you say that?

10          MR. TURNER:  Object to form.

11     A.   Because it's something I could designate

12  to an associate, if I had an associate available to

13  do it.

14  BY MR. ELLWANGER:

15     Q.   So why wouldn't you designate it to an

16  associate?

17          MR. TURNER:  Object to form.

18     A.   The associates ring customer service on

19  the register.

20  BY MR. ELLWANGER:

21     Q.   Why didn't you just have another associate

22  come in to do those jobs?

23          MR. TURNER:  Object to form.

24     A.   The payroll would not allow me to do that.

25  BY MR. ELLWANGER:

Page 264

```
 1          Q.    Who sat payroll?
 2          A.    It was set by the REVP and through the DM
 3     and down to us.
 4          Q.    REVP is regional vice president and DM is
 5     district manager?
 6          A.    Yes.
 7          Q.    Who made the final decisions regarding
 8     hiring staff at your store?
 9                MR. TURNER:   Object to form.
10          A.    The DM.
11     BY MR. ELLWANGER:
12          Q.    Who made the final decision regarding
13     firing staff at your store?
14                MR. TURNER:   Object to form.
15          A.    Either the LPM or DM.
16     BY MR. ELLWANGER:
17          Q.    Who made the final decision regarding
18     disciplining staff at your store?
19                MR. TURNER:   Object to form.
20          A.    It all depends what the action was.  If it
21     was a theft issue, it was the LPM.  If it was some
22     other issues, could be the DM.  There was few that I
23     did on my own.
24     BY MR. ELLWANGER:
25          Q.    Who made the final decision regarding
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**   08-CV-9361
**Cheryl Ann Anderson**   July 20, 2011

Page 265

1    promoting staff at your store?

2           MR. TURNER:   Object to form.

3       A.   The DM.

4  BY MR. ELLWANGER:

5       Q.   Who made the final decision regarding

6  setting payroll at your store?

7           MR. TURNER:   Object to form.

8       A.   The DM gave us the payroll budget.

9  BY MR. ELLWANGER:

10      Q.   How much vacation were you given at Rite

11  Aid?

12      A.   Throughout the time or as --

13      Q.   Per year.

14      A.   It was up to four weeks a year.

15      Q.   Were you encouraged to take vacation?

16      A.   Yes.

17      Q.   Did you?

18      A.   Yes.

19      Q.   Do you recall being asked questions about

20  how you accepted your paycheck whether you worked

21  more than 40 hours a week or worked less than 40

22  hours a week?

23      A.   Yes.

24      Q.   Not talking about weeks where you took

25  vacation or sick days.  But in your 21 years as a

**Page 266**

1   store manager at Rite Aid, did you ever work less

2   than 40 hours a week?

3          MR. TURNER:  Object to form.

4      A.   No.

5          MR. ELLWANGER:  Pass the witness.

6          MR. TURNER:  Does that mean you are done?

7          MR. ELLWANGER:  Unless you have a bunch of

8   other questions.

9          MR. TURNER:  I do.

10          MR. ELLWANGER:  Well, in that case I

11   reserve the right to rebut, if necessary.

12          EXAMINATION BY MR. TURNER:

13      Q.   You previously testified that with respect

14   to the discipline that you issued to Ms. Schultz,

15   you also understood you had that authority and

16   ability to do it as to other employees as well.  Do

17   you recall that?

18      A.   Yes.

19      Q.   And now your testimony is that you only

20   did it as to Ms. Schultz.  Is that true or not?

21      A.   Totally myself.  Everybody else was either

22   the DM or LPM was involved in discrimination, the

23   warnings.

24      Q.   You would bring them in, correct?

25      A.   I would call them, yes.

**Page 274**

1                      CERTIFICATE OF DEPONENT

2

3              I hereby certify that I have read and

4      examined the foregoing transcript, and the same is a

5      true and accurate record of the testimony given by me.

6

7              Any additions or corrections that I feel

8      are necessary, I will attach on a separate sheet of

9      paper to the original transcript.

10

11

12                          _____

13                             CHERYL ANN ANDERSON

14

15

16

17

18

19

20

21

22

23

24

25