# Exhibit DD

Case 1:08-cv-09361-JPO-HBP   Document 213-11   Filed 01/22/13   Page 2 of 25

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**   **1:08-CV-09361-PGG-HBP**
**Nicholas Gauger**                                            **August 8, 2011**

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
YATRAM INDERGIT, ON BEHALF OF        )
HIMSELF AND OTHERS SIMILARLY         )
SITUATED,                            )
                                     )
                     PLAINTIFF,  )CASE NO.
                                 )1:08-CV-09361
          vs.                    )-PGG-HBP
                                     )
RITE AID CORPORATION, RITE AID OF    )
NEW YORK, INC., AND FRANCIS OFFOR AS )
AIDER & ABETTOR,                     )
                                     )
                     DEFENDANTS. )
_____)
```

DEPOSITION OF NICHOLAS GAUGER
TAKEN MONDAY, AUGUST 8, 2011
LOS ANGELES, CALIFORNIA

Reported by Audra E. Cramer, CSR No. 9901

**Page 54**

```
 1                     clubs?

 2                     "Answer:  No.  You asked me that

 3                     question already.")

 4          MS. FALCONE:  Why don't we take a break.  We've

 5     been going about an hour.

 6                          (Recess taken.)

 7          MS. FALCONE:  I have that it's 11:16 a.m.

 8     Q.   Mr. Gauger, I just want to make sure you

 9     understand.  Audra swore you in at the beginning of the

10     day this morning.  We're going to take breaks.  She's

11     not going to swear you in every time we come back, but

12     whenever we're on the record at this deposition, you're

13     under oath.

14          Do you understand?

15     A.   Yes.

16     Q.   Did you review any documents during the break?

17     A.   No.

18     Q.   Do you agree with me that the store manager is

19     the highest-level manager in the store at Rite Aid?

20     A.   Define "highest."

21     Q.   There's no one who outranks the store manager

22     in the store.  Do you agree with that?

23     A.   No.

24          MR. PRICE:  Objection.  Form.

25
```

**Page 55**

```
 1    BY MS. FALCONE:

 2        Q.    Who works in the store that outranks the store

 3    manager?

 4        A.    Pharmacy manager.

 5        Q.    The pharmacy manager outranks the store

 6    manager, or is that the same level?

 7        A.    Well, it's not just the highest though.

 8        Q.    Okay.  So if I'm understanding you correctly,

 9    the store manager and the pharmacy manager are at the

10    same level; correct?

11        A.    Correct.  It's a partnership.

12        Q.    Is there a job position in the store that

13    outranks the store manager?

14        A.    No.

15        Q.    Do you agree with me that the store manager is

16    in charge of the store?

17              MR. PRICE:  Objection.  Form.

18              THE WITNESS:  Partially.

19    BY MS. FALCONE:

20        Q.    Why do you say "partially"?

21        A.    Because the store manager's somewhat in charge

22    of the store; however, there is a district manager

23    inside the store on a routine basis micromanaging the

24    tasks that are at hand that he or she will direct.

25        Q.    Do you think that every single DM at Rite Aid
```

Page 56

```
 1   is a micromanager?

 2           MR. PRICE:  Objection.  Form.

 3           THE WITNESS:  I have no idea.

 4   BY MS. FALCONE:

 5      Q.   So you're speaking based on your experience.

 6      A.   My experience with a couple district managers

 7   that I've had, yes.

 8      Q.   Who are those district managers?

 9      A.   Jason.

10      Q.   Jalili?

11      A.   Correct.

12           And Dan.

13      Q.   Dan?

14      A.   Dan Salcedo.

15      Q.   So Mr. Jalili and Mr. Salcedo were

16   micromanagers?

17      A.   Correct.

18      Q.   Was Mr. Petit a micromanager?

19      A.   No.

20      Q.   Is it correct that you customarily refer to the

21   store that you were assigned to as your store, or --

22      A.   Meaning --

23      Q.   -- "my store"?

24      A.   I'm sorry.

25      Q.   Did you refer to the stores that you were
```

**Page 92**

```
 1      Q.    You write under item No. 6 -- there's a
 2   sentence that begins, "Another good attribute of being
 3   aggressive ..."
 4            Do you see that?
 5      A.    Uh-huh.
 6      Q.    You write, "Another good attribute of being
 7   aggressive is how to maximize sales, as in stock and
 8   being aggressive with vendors for their support has
 9   helped me succeed in this past year."
10      A.    Correct.
11      Q.    How were you aggressive with vendors for their
12   support?
13      A.    By allowing them to merchandise different
14   things.  Because vendors -- for instance -- for an
15   example, vendors are somewhat free labor.  So if you
16   receive something from Frito-Lay and it's a display,
17   they'll put it out; versus being more aggressive with
18   warehouse delivery due to the fact that Rite Aid does
19   not give you more hours based on more delivery.  So I
20   would be more aggressive with vendor-related
21   merchandise.
22      Q.    So you made a decision to be more aggressive in
23   getting vendors to put up displays; correct?
24      A.    Correct.  But there was no displays that we
25   could really do at store level either.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**     1:08-CV-09361-PGG-HBP
**Nicholas Gauger**                                             **August 8, 2011**

**Page 93**

1      Q.   I'm not really asking you about that.  What I'm

2    asking you about is:  How were you aggressive with

3    vendors?

4              So did you go out and pursue vendors or suggest

5    to them, you know, "Would you like to increase your

6    display in the store?"

7              MR. PRICE:   Objection.  Form.

8              THE WITNESS:   We had no control over the,

9    per se, vendors, the vendors that are directed to go to

10   our store.  The company makes the decision on who the

11   vendors are, so we had no control over that.  However,

12   from the standpoint of the vendors that were allowed to

13   come in, we could bridge by different items or display

14   different items.

15   BY MS. FALCONE:

16     Q.   Right.  And if I'm understanding you correctly,

17   you aggressively sought out vendors who were willing to

18   do that; correct?

19     A.   Correct.

20     Q.   And part of the reason you did that is because

21   you knew that would put displays and product in your

22   store without you needing to use labor to do it?

23     A.   We didn't have the labor; that was my point.

24     Q.   Go ahead.

25     A.   That was my point that I was trying to discuss,

**Page 94**

```
 1   that I had to be aggressive with them, because that was

 2   where I was getting the labor from.  They're free labor.

 3   We only had -- we had strict budgets.

 4        Q.   Right.  And you made a decision that one way

 5   you could work around the labor budget was to pursue

 6   vendors to put in displays; is that true?

 7        A.   Correct.

 8        Q.   Did someone tell you to make that decision, or

 9   did you make it on your own?

10        A.   Partly.

11        Q.   Partly someone told you?

12        A.   Yes.

13        Q.   Who told you?

14        A.   Sometimes a district manager would force

15   different displays on to us as well and different

16   company programs that were directed out on the DSD

17   planner and our profit planner.

18        Q.   Which vendors were you aggressive with for

19   their support?

20        A.   Beer and chips.

21        Q.   And what companies?  What beer companies?  What

22   chip companies?

23        A.   Ace Beverage Company, Classic Distributing and

24   Frito-Lay.

25        Q.   And did you select those vendors as the ones
```

Page 229

```
 1      Q.   And how long were you working in that store?
 2      A.   Nine days.
 3      Q.   Other than that nine days, do you have any
 4  experience working in New York?
 5      A.   No.
 6           And I was in the suburban part of New York.
 7  They only use co-managers in Manhattan.
 8      Q.   Have you ever worked at a store that had
 9  co-managers?
10      A.   No, not to my knowledge.
11      Q.   Over the last three years, you worked with how
12  many different shift supervisors in your capacity as a
13  store manager?
14      A.   20 to 30.
15      Q.   And were any of them promoted?
16      A.   One.  But that was, like, right after I left
17  Monterey Park.
18      Q.   Okay.  Did you have any role in promoting that
19  person?
20      A.   Did I have any role?
21      Q.   Yes.
22      A.   No.
23      Q.   Did anyone ask you whether you thought the
24  person should be promoted?
25      A.   Jason had a question or two, but that's about
```

Page 230

1    it.

2        Q.    So the district manager called and asked you

3    some questions about the person's potential promotion?

4        A.    Correct.

5        Q.    Do you know to what extent he relied on the

6    information you provided?

7        A.    Very little, because he had asked me a year

8    prior to her promotion.

9        Q.    Why does that make you think that your feedback

10   had very little impact?

11       A.    Because there was other openings during that

12   course of the year that she was never promoted.

13       Q.    Do you know whether there were other people who

14   received a more, you know, ringing endorsement from

15   their store manager?

16       A.    No, because he hired externally.

17       Q.    Were any of the 20 to 30 shift supervisors that

18   you worked with in the last three years demoted?

19       A.    Not to my knowledge.

20       Q.    Were any of the 20 to 30 shift supervisors that

21   you worked with in the last three years terminated?

22       A.    One of them, which I had already mentioned, for

23   attendance.  And one of them did after my tenure at a

24   location due to fraud.  Anything other than that, no.

25       Q.    Where was the person terminated due to fraud?

Page 231

1      A.    Monterey Park, 5597.

2      Q.    Did you have any role in bringing the fraud to

3   light?

4      A.    No.  I was unaware of all of it actually.

5   Surprised.

6      Q.    How did it come to light that the person was

7   engaged in fraud?

8      A.    Loss prevention manager.

9      Q.    Your stores' labor budgets, were they given to

10  you in dollars?

11     A.    At the time, yes.

12     Q.    How was the labor budget provided to you?

13     A.    Meaning?

14     Q.    Was it e-mailed to you?  Did someone tell you

15  what the budget was?  Was it in a report you could look

16  at?

17           How was it provided?

18     A.    It was on the scheduling matrix.

19     Q.    And you could use overtime if necessary; right?

20     A.    No.

21     Q.    Never?

22     A.    Preferably not.  You had to get district

23  manager approval.  Overtime was defined as unproductive

24  labor because it was paying one person for an hour and

25  them getting paid one hour and a half.

**Page 266**

1       Q.    Right.  But part of your job was also watching

2  them to make sure they did it and addressing it with

3  them if they weren't doing it; right?

4       A.    Right.  But you -- what was the question?

5            MS. FALCONE:  Audra, can you read it back.

6                        (Record read as follows:

7                        "Question:  As a store manager, how

8                much time do you think you spent

9                managing other store employees or

10               directing their performance of the

11               work?")

12           THE WITNESS:  That's just directing their work.

13  I was just, like, delegating the task.  That's how I

14  took it as.

15  BY MS. FALCONE:

16       Q.    Okay.  But I'm including any time where you

17  made a decision to say to somebody, "Hey, I want you to

18  stop doing what you're doing and go up to the

19  checkstand" or "I want you to go, you know, help with

20  the truck unload," or something like that.

21       A.    Well, other associates would call other

22  associates up to the checkstand using the intercom

23  system.  And associates assisting help unload, it would

24  already be delegated on their workboard as to their

25  assigned functions and if they needed to multitask and

Page 267

1    work checkstand occasionally at the same time.

2        Q.    Did you interview prospective employees?

3        A.    Yes.

4        Q.    Would you conduct the initial interview?

5        A.    Yes.

6        Q.    Would anyone else assist you in conducting it?

7        A.    Sometimes my human resource manager, the talent

8    manager or the district manager or other assistant

9    managers.

10       Q.    Okay.   What employees did you have the

11   authority to hire?   For what positions, I mean.

12             MR. PRICE:   Objection.   Form.

13             THE WITNESS:   None.

14   BY MS. FALCONE:

15       Q.    As to what positions did you have input as to

16   who should be hired to fill a vacancy?

17       A.    All positions.   All store operational

18   positions.

19       Q.    You didn't appoint the CEO, but if it was a job

20   within your store, you got to have input into who should

21   be placed in that job; true?

22       A.    Correct.

23       Q.    How would you decide when a new associate was

24   needed in your store?

25       A.    How did I decide?

Page 268

1      Q.   Yes.

2      A.   When somebody got fired.

3      Q.   Okay.  Would you always fill a position if

4   someone got fired?

5      A.   No.

6      Q.   How did you decide whether or not that job

7   should be filled?

8      A.   If I had available dollars on the table.

9      Q.   Was your labor budget ever increased?

10     A.   No.

11     Q.   For none of your stores?

12          The labor budget was always exactly the same

13   from the first day you got there to the last day you

14   left?

15     A.   There was -- there was a time at Monterey Park

16   it went up because of sales; however, historically, the

17   budgets have drastically been cut.

18     Q.   When your budget went up at Monterey Park, did

19   you have an opportunity to consider whether you should

20   be hiring for another body?

21     A.   I did contact my human resource manager.  Based

22   on union, we always have to go through human resource

23   manager to ensure that there's no current layoffs.  So

24   it's not my ultimate decision.

25     Q.   Because someone might have recall rights;

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

YATRAM INDERGIT, ON BEHALF OF        )
HIMSELF AND OTHERS SIMILARLY         )
SITUATED,                            )
                                     )
                    PLAINTIFF, )CASE NO.
                                     )1:08-CV-09361
          vs.                        )-PGG-HBP
                                     )
RITE AID CORPORATION, RITE AID OF    )
NEW YORK, INC., AND FRANCIS OFFOR AS )
AIDER & ABETTOR,                     )
                                     )
                    DEFENDANTS. )
_____)

DEPOSITION OF NICHOLAS GAUGER
TAKEN MONDAY, AUGUST 8, 2011
LOS ANGELES, CALIFORNIA

Reported by Audra E. Cramer, CSR No. 9901

Page 349

 1          MS. FALCONE:  Asked and answered.

 2          THE WITNESS:  Well, just like the sales floor,

 3   it's very similar.  There's general merchandise in the

 4   front and behind the checkstand that you would stock to

 5   create efficiency for your employees and efficiencies

 6   within the store.  Like, talking about lead by example,

 7   if I'm behind the cash register, I'm going to complete

 8   tasks.  I'm not just going to stand behind the

 9   cash register with no associates to manage behind the

10   cash register.  So I would, you know, complete stocking

11   the merchandise and completing planograms, if any,

12   behind the counter.

13   BY MR. PRICE:

14      Q.   So you worked the cash register?

15          MS. FALCONE:  Objection.  Leading.

16          THE WITNESS:  Very much so.

17   BY MR. PRICE:

18      Q.   Do you consider working the cash register a

19   nonmanagerial task or a managerial task?

20          MS. FALCONE:  Objection.  Calls for a legal

21   conclusion.  Vague.

22          THE WITNESS:  I consider it a nonmanagerial

23   task.

24   BY MR. PRICE:

25      Q.   How do you define a nonmanagerial task?

Page 350

1        A.   Nonmanagerial task would be you not having the

2    time -- let me rephrase that.  Strike that.

3             Having -- when there's no associates present

4    and you're doing a function that store associates or

5    hourly store associates can complete.

6        Q.   So why did you perform these nonmanagerial

7    tasks as a store manager?

8             MS. FALCONE:  Objection.  Calls for

9    speculation.  Vague.

10            THE WITNESS:  I would have to perform cashier

11   register duties due to the budgeting within the store.

12   In some locations the hours are very cut, so even if you

13   map out all the hours and try to calculate all the

14   associates to be triple-staffed, it would be impossible

15   at all hours of the day.  So it's very difficult for a

16   store manager to just manage people, so you would have

17   to indulge [sic] yourself in other tasks.

18   BY MR. PRICE:

19       Q.   As a store manager, what percentage of your

20   time on average did you spend doing nonmanagerial tasks?

21            MS. FALCONE:  Objection.  Vague.  Vague as to

22   time.

23            THE WITNESS:  I would say anywhere between

24   50 to 70 percent of my time was nonmanagerial.  I kind

25   of believe that a lot of it's nonmanagerial due to the

Page 351

1    fact that -- you know, kind of there has to be
2    associates there to manage actually.  You know, I'm not
3    an executive of a company making corporate decisions,
4    making corporate buys, making, you know, corporate
5    pricing, corporate budgeting or planning.  I'm not
6    planning out the hours for the store, you know, the
7    opening and closing hours.  I can make suggestions, but
8    that's about it.
9    BY MR. PRICE:
10       Q.   There was some testimony earlier today
11   regarding managers delegating tasks, and you testified
12   that you need to have the associates to delegate to.
13            Do you recall that testimony?
14       A.   Yes.
15            MS. FALCONE:  Objection.  The record speaks for
16   itself.
17   BY MR. PRICE:
18       Q.   What do you mean by that?
19            MS. FALCONE:  Objection.  Calls for a
20   narrative.
21            THE WITNESS:  Sorry.  That you have to have --
22   can she bring up the narrative, or no?
23   BY MR. PRICE:
24       Q.   You can just answer my question --
25       A.   Okay.  Sorry.

Page 352

1      Q.     -- and I can repeat it if you need me to.

2      A.     Go ahead.  Repeat it.

3      Q.     There was some testimony earlier today

4    regarding managers delegating tasks, and you testified

5    something to the effect that you need to have associates

6    to delegate to.

7      A.     Correct.

8      Q.     What did you mean by that statement?  If you'd

9    expand on that, please.

10          MS. FALCONE:  Objection.  Calls for a

11    narrative.

12          THE WITNESS:  Just as mentioned, different

13    stores have different situations.  In some of my

14    locations I was the only manager or the manager on duty,

15    and then there was another associate, such as the

16    pricing coordinator, which her job description is to do,

17    roughly speaking, 40 hours of already a boom-boom-boom

18    task assignment.  So if you're just opening with them,

19    you have no other associate that you can delegate tasks

20    to.  So you would have to do those tasks yourself, be it

21    that it's cleaning the checkstand, doing a planogram at

22    the checkstand, running back and forth cleaning the

23    cosmetic area, doing photos in the photo department,

24    scooping ice cream, assisting customers alike.  It was

25    an everyday occurrence.

**Page 353**

```
 1   BY MR. PRICE:

 2       Q.   If you as the store manager controlled the

 3   schedule, why didn't you just schedule more people to

 4   help you out so you didn't have to do these

 5   nonmanagerial tasks?

 6       A.   Because there was not associates or hours

 7   available to schedule them for.

 8       Q.   Why weren't there?

 9            MS. FALCONE:  Objection.  Calls for

10   speculation.

11            THE WITNESS:  Because the company gives out

12   plans, and we're dictated that we have to be under those

13   dollar budgets, and now hour budgets.

14   BY MR. PRICE:

15       Q.   Where do the plans come from within the

16   company?

17            MS. FALCONE:  Objection.  Calls for

18   speculation.

19            THE WITNESS:  Where do they come from?

20            MS. FALCONE:  Vague as to time.

21            THE WITNESS:  Corporate.  I'm not quite too

22   sure the specific individual that handles labor analysis

23   within a store location.

24   BY MR. PRICE:

25       Q.   Who gave you the allotted time that you had?
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**   **1:08-CV-09361-PGG-HBP**
**Nicholas Gauger**   **August 8, 2011**

Page 354

 1            MS. FALCONE:  Objection.  Asked and answered.

 2            THE WITNESS:  Workforce Management.  It's a

 3    tool that we create the schedule for, and it's just

 4    always in there.  So if it says 330 hours, we have to be

 5    under 330 hours.  Or $3,000, we have to be under $3,000.

 6    BY MR. PRICE:

 7      Q.   Is it your understanding that all store

 8    managers use the same tool?

 9            MS. FALCONE:  Objection.  Calls for

10    speculation.

11            THE WITNESS:  Correct.  All store managers to

12    my knowledge use the same Workforce Management tool,

13    99.9 percent of the time.

14    BY MR. PRICE:

15      Q.   And do you know if all the store managers had

16    the same restraints on them imposed through the tool?

17            MS. FALCONE:  Objection.  Calls for

18    speculation.  Vague.

19            THE WITNESS:  Yes.

20    BY MR. PRICE:

21      Q.   And did they have the same restraints as you?

22            MS. FALCONE:  Objection.  Calls for

23    speculation.  Vague.

24            THE WITNESS:  Yes, they had the same

25    restrictions.  Some had worse restrictions.  Some had

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**   1:08-CV-09361-PGG-HBP
**Nicholas Gauger**   **August 8, 2011**

Page 355

1   more based on the operating hours or their hourly

2   budgets within their location.

3   BY MR. PRICE:

4        Q.   Because you had to dedicate time to

5   nonmanagerial tasks, did that affect your ability to

6   manage the store?

7             MS. FALCONE:  Objection.  Vague.  Leading.

8             THE WITNESS:  Did it affect my ability to

9   manage the associate -- well, the ability to manage the

10  few associates that I had at some of the locations, it

11  didn't affect the ability.  I would have to get more

12  hands-on involved to meet the expectations of the

13  company.

14  BY MR. PRICE:

15       Q.   How did you do that?

16       A.   By completing nonmanagerial duties myself.

17       Q.   As a store manager, can you describe the

18  process that you would go through for getting an

19  employee terminated.

20            MS. FALCONE:  Objection.  Calls for a

21  narrative.

22            THE WITNESS:  The process to go through a sales

23  associate termination would be that I'd have to partner

24  with my human resource manager on each corrective

25  directive -- or each corrective action or disciplinary

Yatram Indergit, et al. v. Rite Aid Corporation, et al.        1:08-CV-09361-PGG-HBP
Nicholas Gauger                                                August 8, 2011

Page 356

1   action and get a final say from the human resource

2   manager and/or my district manager to complete a

3   termination in our payroll system.

4   BY MR. PRICE:

5       Q.   Could you terminate an employee without the

6   district manager approving it?

7           MS. FALCONE:  Objection.  Vague.  Asked and

8   answered.

9           THE WITNESS:  No.

10  BY MR. PRICE:

11      Q.   When we looked at Exhibit 16, you testified

12  that HR did not restrict you from writing up employees

13  that did not -- or this particular employee that did not

14  clean the freezer in this situation.

15      A.   Uh-huh.

16      Q.   Have there been times when you were not

17  permitted by HR to discipline or write up an employee?

18      A.   Yes.

19      Q.   Can you describe that situation or those

20  situations, please.

21          MS. FALCONE:  Objection.  Compound.

22          THE WITNESS:  There were several situations

23  that I wanted to address with written notices or

24  corrective actions to my associates; however, the human

25  resource department refused based on fairity [sic]

Page 357

1    across the district and/or the company.  So they were

2    disallowing me to correct the situation at locations

3    based on the situation that occurred.

4    BY MR. PRICE:

5        Q.   There's been some testimony about

6    store-budgeted hours, and I want to get an understanding

7    of what, if any, changes there were in store-budgeted

8    hours.

9            So what store were you working in in January

10   of 2008 as a store manager?

11           MS. FALCONE:  Objection.  Asked and answered.

12           THE WITNESS:  January 2008, I was at that time

13   located at 5597.

14   BY MR. PRICE:

15       Q.   Were you at the same store in January 2009?

16       A.   Yes.

17       Q.   What were the store-budgeted hours for that

18   store in January of 2008?

19           MS. FALCONE:  Objection.  Calls for

20   speculation.

21           THE WITNESS:  Roughly about -- I think it

22   was 750 to about 850 hours, depending on the dollars or

23   if one of my high-paid cashiers were on vacation.

24   BY MR. PRICE:

25       Q.   And what was the store-budgeted hours for that

**Page 361**

```
 1   STATE OF CALIFORNIA          )

 2   COUNTY OF LOS ANGELES        )  SS.

 3

 4

 5                I, NICHOLAS GAUGER, hereby certify under

 6   penalty of perjury under the laws of the State of

 7   California that the foregoing is true and correct.

 8                Executed this _____ day of

 9   _____, 2011, at

10   _____, California.

11

12

13                    _____

14                    NICHOLAS GAUGER

15

16

17

18

19

20

21

22

23

24

25
```