# Exhibit EE

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------

YATRAM INDERGIT, on behalf
of himself and others                   Action No.
similarly situated,                  #1:08-cv-09361-PGG-HBP

        Plaintiffs,

    vs.

RITE AID CORPORATION, RITE
AID OF NEW YORK, INC., and
FRANCIS OFFOR as Aider &
Abettor,

        Defendants.

-----------------------------------------------------

OGLETREE DEAKINS

191 PEACHTREE STREET

SUITE 4800

ATLANTA, GEORGIA

AUGUST 4, 2011 - 9:30 A.M.


    DEPOSITION of BRAD M. GERBER, before Steven S.

Huseby, Registered Professional Reporter, Certified Shorthand

Reporter and Notary Public.

REPORTED BY: Steven S. Huseby, RPR, CSR www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022 (404) 875-0400
9d654179-bf58-4c1e-a369-6f628be7b1a5

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP

## Brad M. Gerber          August 4, 2011

Page 46

1  help you convert the store, let's put it that
2  way.
3      Q.  Did you work well with Jessie?
4      A.  Not really.
5      Q.  Why not?
6      A.  He -- I don't like bad-mouthing
7  people.  He wasn't a nice guy.  He was a
8  micromanager.  I guess that's enough said.
9      Q.  Was Josephine a micromanager?
10      A.  Not like Jessie.
11      Q.  What about Frank?
12      A.  Not like Jessie.
13      Q.  Joe?
14      A.  Not at all.
15      Q.  Did you have more managerial
16  discretion under Joe than you did under
17  Jessie?
18          MS. RUBIN:  Objection to form.
19  You can answer.
20          THE WITNESS:  No, not really.  I
21  mean, mostly everything we had to do was sent
22  down by the corporate level, we just had to
23  execute more than anything else.
24  BY MR. SCOTT:
25      Q.  So why did the micromanagement of

Page 47

1  Jessie cause you problems?
2      A.  I can't -- I can't assume, again, but
3  I mean, the man seemed to have a bit of a
4  problem that I got in his opinion I would
5  guess, and I guess, I can't read his mind,
6  that I was dumped on him.  I was -- I was a
7  very highly paid manager in his district as
8  compared to New York City, and I think that he
9  didn't like the idea that I was knowing more
10  about Rite-Aid than he did.
11      And that's a guess, that's just my opinion
12  on what I took from reading him, I guess.
13  Again, I'm under oath, I don't want to assume.
14  I can only tell you truthfully what my
15  feelings were.  That's fair.
16      Q.  Did Jessie come over from Eckerd?
17      A.  Jessie worked for Eckerd, yes.
18      Q.  So he was trying to learn the Rite-Aid
19  policies and procedures at the same time your
20  employees were?
21      A.  Unless he had training beforehand or
22  differently, I guess so, I don't know.
23      Q.  Did he ever ask you questions about
24  how Rite-Aid did a certain thing as opposed to
25  Eckerd?

Page 48

1      A.  No, not to me directly that I
2  remember.
3      Q.  Store 3883 in Brooklyn was in an urban
4  environment, correct, within the city?
5      A.  It's within the five boroughs of New
6  York City, yes.
7      Q.  What sort of neighborhood was 11475
8  in?
9      A.  I guess what someone from New York
10  would call a suburban area, but maybe here a
11  little bit more urban than we are used to up
12  north.
13      Q.  Did 3883 have a photo lab?
14      A.  It did.
15      Q.  Did 11475 have a photo lab?
16      A.  It did when I was there, which is all
17  I can speak to.
18      Q.  That's all I want.
19      A.  That's fine.
20      Q.  How many truck deliveries a week did
21  3883 get?
22      A.  General merchandise deliveries?
23      Q.  From the warehouse?
24      A.  From the warehouse.
25      Q.  Yeah.

Page 49

1      A.  Most of the time one, occasionally
2  two.
3      Q.  Depending on volume?
4      A.  And time of season.
5      Q.  When you left 3883 had 10 to 12
6  employees front end?
7      A.  Uh-huh, that's a guess.
8      Q.  Does that include you?
9      A.  No.
10      Q.  Did you have a salaried ASM at 3883?
11      A.  I did.
12      Q.  How many?
13      A.  Well, no, no.  I take that back.  I
14  had a salaried co-manager, I did not have an
15  ASM.
16      Q.  How many salaried co-managers did you
17  have at any one time?
18      A.  Never -- during my time with Rite-Aid,
19  never more than one.
20      Q.  Did you have shift supervisors?
21      A.  I did.
22      Q.  How many, please?
23      A.  When I left?
24      Q.  Yes.
25      A.  One.

13 (Pages 46 to 49)

REPORTED BY: Steven S. Huseby, RPR, CSR www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022 (404) 875-0400
9d654179-bf58-4c1e-a369-6f628be7b1a5

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP
Brad M. Gerber                                August 4, 2011

Page 50

1    Q.  Do you remember the name of the
2  salaried co-manager that you had?
3    A.  When I left?
4    Q.  Yes.
5    A.  Evan Kirschenbaum.
6    Q.  What was the name of your shift, do
7  you remember?
8    A.  Golda, G-O-L-D-A, last name
9  M-A-R-K-O-V-I-C-S.
10    Q.  I'm just going to call her Golda if
11  that's all right with you.
12    A.  Certainly, Golda Markovics is her
13  name.
14    Q.  The remainder of the front end
15  employees were clerk cashiers?
16    A.  Sales associates, yeah.
17    Q.  Did you have any photo lab techs?
18    A.  Not designated as such in 3883.
19    Q.  Correct.
20    A.  Not designated as such.
21    Q.  What was the sales volume at 3883 when
22  you left?
23    A.  Front end sales volume was
24  approximately 65 to $70,000 a week, depending
25  on season and situation.

Page 51

1    Q.  You say situation, what do you mean?
2    A.  The store was in a unique area, it was
3  in a Hasidic Jewish community, and there are
4  times of the year when the Hasidic community
5  is required by the Jewish law to not purchase
6  at all because they are not allowed to spend
7  money, and there are times when they have to
8  purchase in excess because of a holiday.
9  And -- that's it.
10    Q.  So your sales would then fluctuate
11  with the demands of the surrounding community?
12    A.  Just like every other store, yes.
13    Q.  But in your particular community those
14  demands were uniform across the populace,
15  right?
16    A.  Yeah, but at different times, that's
17  the difference.
18    Q.  Right, okay.  What was the overall
19  store sales at 3883 -- strike that.
20       Did you have a busy pharmacy at 3883?
21    A.  At times while I was there.
22    Q.  How many pharmacists did you have?
23    A.  It varied during the times I was
24  there, but two -- two full-time most of the
25  time I was there.

Page 52

1    Q.  And how many pharm techs and cashiers?
2    A.  That also varied during the times I
3  was there.  On any given day, probably -- and
4  again, they each did each other's -- I mean
5  not each other's jobs, the techs also worked
6  on the registers.  The cashiers didn't work as
7  a tech.  But two or three.
8    Q.  You say the techs worked on the
9  registers up front?
10    A.  In the pharmacy.
11    Q.  Did any techs ever work on the
12  registers at the front end?
13    A.  Rare occasions.
14    Q.  Does any front end employees ever work
15  the registers in the pharmacy?
16    A.  Rare occasions.
17    Q.  All right.  You scheduled all front
18  end employees at 3883, correct?
19    A.  With the co-manager together, yeah,
20  mostly me, yes.
21    Q.  Evan helped you?
22    A.  He had input and he did it when I was
23  on vacation.
24    Q.  Did you schedule the pharmacy
25  employees as well?

Page 53

1    A.  I did not.
2    Q.  Did the pharmacy manager do that?
3    A.  I believe so.
4    Q.  Did you monitor the labor budget for
5  the pharmacy?
6    A.  I did not.
7    Q.  When you scheduled, you had to stay
8  within your labor budget, correct?
9    A.  Yes, sir.
10    Q.  And your store was allocated a certain
11  number of hours per week?
12    A.  At certain times.
13    Q.  And within those labor hours you could
14  schedule your front end employees as you saw
15  fit, correct?
16       MS. RUBIN:  Objection to form.
17  You can answer.
18       THE WITNESS:  Can you repeat that,
19  please?
20  BY MR. SCOTT:
21    Q.  Within the labor budget, allocated to
22  the store, labor hours allocated to your
23  store, you could schedule your employees as
24  you saw fit, correct?
25    A.  I could schedule them up to the amount

14  (Pages 50 to 53)

REPORTED BY:  Steven S. Huseby, RPR, CSR  www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400
9d654179-bf58-4c1e-a369-6f628be7b1a5

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP
Brad M. Gerber          August 4, 2011

Page 86

BY MR. SCOTT:
1  Q.  What do you think your bonus was based
2
3  on?
4  A.  I believe the bonus was based on
5  sales, profit and loss, and CSI from what I
6  can remember.
7  Q.  Did you receive stock options as well?
8  A.  I did, yeah.
9  Q.  And what were those stock options
10  based on?
11  A.  I believe they were a gift, I don't
12  think they were based on anything.  They gave
13  out stock options at one time as a gift.
14  Q.  As a store manager, your overall goal
15  was to make the store as profitable as
16  possible, correct?
17  MS. RUBIN:  Objection to form.
18  You can answer.
19  THE WITNESS:  Sure, like any other
20  store manager, yeah, you want to be as
21  profitable as possible, yes.  I'm sorry.
22  BY MR. SCOTT:
23  Q.  And as a store manager, your objective
24  is to increase sales and reduce losses,
25  correct?

Page 87

1  A.  Correct.
2  Q.  And as a store manager, you're always
3  ultimately responsibility for the overall
4  store's success, right?
5  A.  As the store manager, yeah, I would
6  agree with that.
7  Q.  Were you ever disciplined as a store
8  manager?
9  A.  To the best of my recollection, I do
10  not ever think I received any written
11  discipline.  I did have conversation on
12  occasion, verbal conversation with my
13  supervisors as per certain things.  But I do
14  not remember being written disciplined.  And
15  if my memory is wrong then I apologize, but I
16  do not remember ever being written
17  disciplined.
18  Q.  As a store manager, you're the highest
19  ranking person at the front end of the store,
20  correct?
21  A.  That's correct.
22  Q.  And when you had a co-manager, the
23  co-manager was the second highest ranking
24  person in the front end?
25  A.  Correct.

Page 88

1  Q.  And when you had an assistant manager,
2  the assistant manager was the second highest
3  ranking person on the front end?
4  A.  Correct.
5  Q.  And when the assistant manager is in
6  the store and you're not in the store that
7  person is the highest ranking employee in the
8  store, correct?
9  A.  In the front end of the store,
10  correct.
11  Q.  When you were at 11475, how many hours
12  a week was Saundra scheduled to be in the
13  store when you were not in the store?
14  A.  I can't give you a number like that.
15  Sandra was scheduled 40 hours a week.  How
16  many hours she was there when I wasn't there,
17  I don't remember.
18  Q.  When you drafted the schedule, did you
19  try to draft the schedule so there was always
20  a manager in the store?
21  A.  Of course.
22  Q.  And so you would try to minimize the
23  overlap between you and Saundra, right?
24  A.  I don't know about minimize, I mean, I
25  would make sure that if there was a day I was

Page 89

1  scheduled to be off that I would have a
2  manager in the store to run the store from
3  open to close.
4  Q.  And that would be Saundra?
5  A.  Or Helen.
6  Q.  Or Helen, the other ASM?
7  A.  Correct.
8  Q.  And when you worked with Evan as the
9  co-manager, when he was the co-manager in
10  3883, you did the same thing with him, right?
11  A.  Or Golda, correct.
12  Q.  And when you were on vacation, they
13  were in charge of running the store, right?
14  A.  In theory, correct.  Yeah.
15  Q.  In practice too?
16  A.  Sure.
17  Q.  As a store manager, you have to figure
18  out what tasks need to be done in the store,
19  correct?
20  A.  I have to execute -- I have to
21  prioritize what tasks need to be done in the
22  store.  I mean, I have to execute what the
23  company tells us they want done.
24  Q.  Sure, the company issues directives
25  that have to be carried out, right?

23 (Pages 86 to 89)

REPORTED BY: Steven S. Huseby, RPR, CSR  www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022 (404) 875-0400
9d654179-bf58-4c1e-a369-6f628be7b1a5

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP
Brad M. Gerber                    August 4, 2011

Page 90

1   A.  Correct.
2   Q.  And you can either perform those
3  directives yourself or delegate them to a
4  subordinate employee?
5   A.  Yes.
6   Q.  And because the corporation is not in
7  the store with you, you also have to do
8  walk-throughs to determine what other tasks
9  need to be completed, right?
10   A.  The corporation is not physically in
11  the store with me unless there's a supervisor
12  above me in the store.  And at that time if I
13  see something with my eye that has to be done,
14  yeah, I would have to decide to do it, yeah,
15  of course.
16   Q.  Did you write work lists as a store
17  manager?
18   A.  Sometimes.
19   Q.  And when you wrote those work lists,
20  you would take both the corporate directives
21  and what you saw personally in the tore and
22  you would prioritize the duties that had to be
23  assigned, right?
24   A.  Sure.
25   Q.  And then you would take those duties

Page 91

1  and you would do some of them yourself?
2   A.  Sure.
3   Q.  And then you would assign some of
4  those duties to employees?
5   A.  Absolutely.
6   Q.  Some employees are better at following
7  directions than others, do you agree?
8   A.  Everywhere in the world.
9   Q.  And some employees you had to follow
10  up on more than others?
11   A.  Okay, yes, that's true.
12   Q.  And when you were a store manager, you
13  tried to evaluate the strengths and weaknesses
14  of your employees?
15       MS. RUBIN:  Objection to form.
16  You can answer.
17       THE WITNESS:  Always as a store
18  manager, you try to do that.
19  BY MR. SCOTT:
20   Q.  And would you try to assign tasks
21  based on what you observed as each employee's
22  strengths and weaknesses?
23   A.  Sometimes yes and sometimes no.
24  Sometimes I would evaluate an employee -- I
25  tend to say associate now because that's the

Page 92

1  Wal-Mart thing.  I would tend to evaluate an
2  employee and give them tasks that were to
3  their strengths to complete the tasks more
4  quickly.  And sometimes I would give them a
5  task that may have been new to them to help
6  develop them.  So it depends on the situation.
7   Q.  As a store manager, you attempt to
8  develop your employees so that they can
9  perform all duties in the store, right?
10   A.  Within the scope of their job, yes.
11   Q.  And one of your job duties is to train
12  them in how to become better employees for the
13  company, right?
14   A.  That's an objective, yes.
15   Q.  And within that objective is assigning
16  people new tasks so that they learn how to do
17  them?
18   A.  Correct.
19   Q.  Such as if a cashier came in, that
20  cashier was new to the company, you assign him
21  or her a planogram and would assign someone to
22  help train him or her how to do that
23  planogram, correct?
24   A.  Or do it myself, yeah.
25   Q.  Or do it yourself?

Page 93

1   A.  I mean train them?
2   Q.  Right.
3   A.  Right, yeah.
4   Q.  And the hope is in that training
5  process that at some point they can
6  independently do that planogram without
7  someone sitting there training them?
8   A.  That would be your objective.
9   Q.  How would you describe your managerial
10  style as the store manager at Rite-Aid?
11   A.  My managerial style.  I mean, you can
12  go in different directions.  I feel that I'm a
13  good teacher, I'm a people person, I'm a very
14  good communicator and very creative,
15  innovative.  I lead by example.  That's me in
16  a nutshell, I guess.
17   Q.  And do you try to foster a team
18  environment in your store?
19   A.  Absolutely.
20   Q.  And by leading by example, the
21  employees know that you're willing to perform
22  the tasks you're asking them to perform,
23  right?
24       MS. RUBIN:  Objection to form.
25  You can answer.

24 (Pages 90 to 93)

REPORTED BY: Steven S. Huseby, RPR, CSR www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022 (404) 875-0400

9d654179-bf58-4c1e-a369-6f628be7b1a5

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP

## Brad M. Gerber      August 4, 2011

Page 94

1      THE WITNESS:  Say it again.
2  BY MR. SCOTT:
3      Q.  When you lead by example, you show the
4  employees that you're willing to perform the
5  tasks that you asked them to perform, right?
6      A.  When I say lead by example, I don't
7  necessarily always mean to the actual tasks.
8      Q.  Okay.
9      A.  It's a matter of attitude,
10  personality, style, and tasks, I guess task is
11  part of it, yes, to do a task in a certain way
12  or to show them that I'm willing to do the job
13  that I'm asking them to do, yeah, if -- if
14  that's the case, I guess you could say that.
15      Q.  And you want to set the proper
16  attitude for all store employees, right?
17      A.  Well, you can't set the proper
18  attitude but you want to display the proper attitude so
19  that they will follow it.
20      Q.  Right.  Regardless of the tasks that
21  you're performing in the store as a store
22  manager you're always in charge, right?
23      MS. RUBIN:  Objection to form.
24  You can answer.
25      THE WITNESS:  No, not in -- not in

Page 95

1  essence.  In essence, you're really in the
2  middle between what needs to be done and what
3  you're instructed to do by the corporate level
4  or your corporate supervisors.  So, you know,
5  it's just a title for the most part.  I mean,
6  you're the person of responsibility but you're
7  not really in charge.
8  BY MR. SCOTT:
9      Q.  Regardless of the tasks you perform,
10  you're still the boss of all front end
11  employees, right?
12      A.  The boss?  I'm the immediate
13  supervisor within the -- I'm the highest
14  ranking supervisor based on title at the store
15  level.
16      Q.  And all employees --
17      A.  To say boss is different.
18      Q.  All employees in the front end of the
19  store have to do what you say, right?
20      A.  They are supposed to, they don't have
21  to.  They are supposed to do what I ask them
22  to do as their supervisor, yeah.
23      Q.  And if they don't do what you tell
24  them to do you can discipline them, right?
25      A.  Well, I could, yeah.

Page 96

1      Q.  And you did, right?
2      A.  I could have, yeah, I did, I did
3  discipline people for not performing to the
4  level that they were supposed to.
5      Q.  When you schedule an employee to come
6  in on time, you'd have to make sure that
7  employee did come on time, right?
8      A.  That's correct.
9      Q.  And if they didn't come on time you
10  would discipline them, right?
11      A.  Not necessarily the first time.
12      Q.  What factors would you use to
13  determine whether or not you were going to
14  discipline an employee?
15      A.  Again, I had to follow whatever the
16  corporate level set down.  There was
17  progressive discipline -- progressive
18  discipline procedure that the corporate level
19  set down and we had to follow it, and we did.
20      Q.  Was the same progressive discipline
21  procedure in place the entire time you worked
22  at Rite-Aid or did it change?
23      A.  I think it pretty much was the same
24  the whole time.
25      Q.  If an employee did not show up for

Page 97

1  work, you would write that employee up,
2  correct?
3      A.  Not necessarily.
4      Q.  Why do you say not necessarily?
5      A.  Because it would depend on the reason
6  they didn't show up for work, it would depend
7  on whether they called in that they weren't
8  going to show up for work, it would depend on
9  where we were in the progressive discipline.
10  A write-up wasn't necessarily the first step
11  in progressive discipline.  It wasn't -- I
12  shouldn't say necessarily; it was not the
13  first step in progressive discipline.
14      Q.  So depending on the other
15  circumstances relating to their failure to
16  report to work, it may or may not result in a
17  write-up?
18      A.  Depending on circumstance and level of
19  discipline in the procedure, yeah.
20      Q.  And it would also depend on the
21  explanation they gave to you as the store
22  manager, right?
23      A.  Correct.
24      Q.  And when you assign an employee a task
25  and the employee continued not to perform the

25 (Pages 94 to 97)

9d654179-bf58-4c1e-a369-6f628be7b1a5

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP
Brad M. Gerber      August 4, 2011

## Page 118

1  did discuss most employees. Was he allowed to
2  hire somebody without my approval? I had
3  different co-managers but I don't remember. I
4  don't remember.
5      Q.  Is that an authority that you would
6  have given him?
7      A.  I don't know or remember if I had that
8  authority. It would be based on the company
9  policy. I don't remember if the company
10  policy was that the store manager had to
11  actually hire or any salaried member of
12  management could hire. I don't remember.
13      Q.  The co-managers did interview
14  employees though, correct?
15      A.  To the best of my memory, yes.
16      Q.  And they could make recommendations to
17  you based on those interviews as to who should
18  be hired?
19      A.  We would discusses the interviews to
20  see if the person was qualified for the
21  position based on the standards, yeah.
22      Q.  And when you're interviewing a person
23  for a position at Rite-Aid, what qualities are
24  you looking for in that person?
25      A.  We're looking for -- we're looking for

## Page 119

1  previous experience in a retail environment.
2  We're looking for a person with a good
3  outgoing personality, and when -- and we're
4  looking for a person that doesn't have issues
5  with their previous employers in separation.
6  That would be the main three things. And then
7  there was questions that were set down by the
8  company to ask, and that's what we would ask.
9  That would be -- what I told you the three
10  things, that's the scope. But we had to go
11  through questions that the company gave us to
12  go through to the best of my memory.
13      Q.  And you could also ask your own
14  questions, right?
15      A.  I don't remember if we could. I mean,
16  I would ask every person why they wanted to
17  work for Rite-Aid. That was a general
18  question, and whether that was my own question
19  or it was on the paperwork, I do remember
20  asking that question to almost every person,
21  so I don't remember if it was their question
22  or mine. I may have read it off the sheet and
23  then kept doing it. But I don't remember.
24      Q.  And based on their answers to the
25  question, you yourself would determine whether

## Page 120

1  or not you wanted to hire that person, right?
2      A.  I myself would determine?
3      Q.  Right.
4      A.  I didn't have the final determination.
5      Q.  I --
6      A.  Based on the answers to the questions,
7  I guess would determine whether I wanted to go
8  forward with that person.
9      Q.  And based on the answers to those
10  questions, you would make the determination as
11  to whether or not to recommend that that
12  person be hired, right?
13      A.  To put them through into the next
14  process, part of the process, yeah.
15      Q.  And if you didn't recommend that
16  person be put into the next process, they
17  would not be offered employment at Rite-Aid,
18  right?
19      A.  I would assume that's correct, yes.
20      Q.  And when you're doing these
21  interviews, your district manager is not
22  standing behind you making sure that you
23  adhere to the questions on the sheet, right?
24      A.  When I was interviewing was the
25  district manager standing behind me, no.

## Page 121

1      Q.  So you could ask whatever you wanted,
2  right?
3          MS. RUBIN:  Objection to form.
4  You can answer.
5          THE WITNESS:  In theory, I guess I
6  could ask whatever I wanted. Did I ask
7  whatever I wanted in each particular case? I
8  don't remember. And I don't know.
9  BY MR. SCOTT:
10      Q.  In order for an employee to be hired
11  in your store in the front end, you had to
12  approve that hire, right?
13      A.  I had to recommend it, but I don't --
14  I didn't have to approve it, the company had
15  to approve it.
16      Q.  HR is not going to hire someone that
17  you don't recommend to be hired, right?
18      A.  They are not going to hire somebody if
19  I don't push them forward into the process and
20  put them up for the screening and everything
21  else they have to do, if that's what you're
22  asking me.
23      Q.  Right. And that was your decision to
24  push them through the process, right?
25      A.  Yeah.

REPORTED BY: Steven S. Huseby, RPR, CSR www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022 (404) 875-0400
9d654179-bf58-4c1e-a369-6f628be7b1a5

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP
Brad M. Gerber                August 4, 2011

Page 122

1    Q.  As a store manager, you have to make
2  sure that all employees in your store are
3  fully trained, right?
4    A.  That's a policy, yeah.
5    Q.  And it's the policy that you had to
6  carry out, right?
7    A.  I would think so, yeah, sure.
8    Q.  The policy makes sense, I mean you
9  want your employees to be fully trained,
10  right?
11    A.  Of course.
12    Q.  And you have to make sure they go
13  through the orientation at the company, right?
14    A.  Okay.
15    Q.  And that's something that your
16  co-manager did as well?
17    A.  And I think the shift supervisor as
18  well, if I remember correctly.
19    Q.  Do you remember Evelyn Encalada?
20    A.  No, I actually don't remember.  Maybe
21  I remember a girl named Evelyn.  I don't
22  remember the name Encalada.  Maybe.  Maybe.
23    Q.  You had to make sure that all of your
24  employees received the Rite-Aid associate
25  atlas, correct?

Page 123

1    A.  Associate atlas, yes, yes, they did
2  get a copy of that book.
3    Q.  And you had to make sure they signed
4  an acknowledgment?
5    A.  They would have to sign off I believe
6  on the last page of the atlas, yes.
7    Q.  And you had to make sure that they
8  understood it and could come to you with any
9  questions, correct?
10    A.  That is correct.
11    Q.  We touched on this a little bit
12  before, but one of your job responsibilities
13  was to evaluate the employees in your store,
14  right?
15    A.  Uh-huh.
16    Q.  That's a yes, right?
17    A.  Yes, sir, I'm sorry.
18    Q.  That's no problem.  And --
19    A.  I leaned back, I got too comfortable,
20  sorry.
21    Q.  And you could give informal
22  evaluations, just tell them they're doing a
23  good job or areas they need to improve on,
24  right?
25    A.  Verbally, of course.

Page 124

1    Q.  And you could offer them constructive
2  criticism as to how they could do their job
3  better?
4    A.  Yes.
5    Q.  If you saw them doing something that
6  you didn't approve of like setting up a
7  planogram wrong, you could stop them and tell
8  them how to better do the planogram, right?
9    A.  I could give input, yes.
10    Q.  And that was input that they would be
11  expected to follow, right?
12    A.  Yes.
13    Q.  And you also gave formal written
14  evaluations to your employees, right?
15    A.  I believe so, yeah.
16    Q.  And those written evaluations occurred
17  on an annual basis?
18    A.  To the best of my memory, yeah.
19    Q.  And so you would write up the
20  evaluation and then you would sit down with
21  the employee and go over the evaluation with
22  that employee, right?
23    A.  To the best of my memory, yeah.
24    Q.  You also were able to give out awards
25  or accommodations to your employees, right?

Page 125

1    A.  For -- yeah, I think so, yeah.
2    Q.  And you were able to give out things
3  like associate of the quarter awards, right?
4    A.  Yeah, we had awards that the
5  company -- the company created some programs
6  that were based on customer service and I
7  think respect if I remember correctly, yeah.
8    Q.  And it was up to you to determine to
9  whom to give those awards out to, right?
10    A.  It wasn't just up to me, it was a
11  discussion that was had between the management
12  of the store.
13    Q.  And obviously you were part of the
14  decision as to who would get the award, right?
15    A.  I was in the discussion, yeah.
16    Q.  And you would give associate of the
17  quarter awards out to employees for good
18  customer service?
19    A.  Correct.
20    Q.  And for carrying out tasks assigned?
21    A.  I don't remember if carrying out tasks
22  assigned was part of it.  I think a lot of it
23  was customer service and courtesy.  I don't
24  remember how much of it was tasks assigned.
25  It might have been, there might have been

32  (Pages 122 to 125)

REPORTED BY: Steven S. Huseby, RPR, CSR www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022 (404) 875-0400
9d654179-bf58-4c1e-a369-6f628be7b1a5

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP
### Brad M. Gerber                    August 4, 2011

Page 158

1    Q.  And sour facial expression that you
2  were observing, right?
3    A.  Correct. And so were the customers
4  and other employees in the building.
5    Q.  Right, and that was a problem for you
6  for customer service reasons if your employee
7  had a sour facial expression?
8    A.  Correct. You want to have a good work
9  atmosphere and a happy work atmosphere because
10 it transfers from the employees to the
11 customers.
12   Q.  And it was your responsibility for
13 making sure that the employees were friendly
14 to the customers, right?
15   A.  Correct.
16   Q.  That's a part of customer service?
17   A.  But in this particular instance I just
18 want to put on the record it was her choice.
19 It does say on here it was her choice. She
20 was told to adjust or she could to home as she
21 was not needed under those circumstances.
22   Q.  I guess that's a form of a choice,
23 right?
24   A.  Well, it was her choice, either try to
25 be friendly and outgoing or if you're not

Page 159

1  going to do that, you're causing a negative
2  aspect to the store and the business. So at
3  that point I don't need an associate here on a
4  day like that. Okay. That's enough said.
5    Q.  Do you remember Christine?
6    A.  I do. I don't remember this
7  particular instance until I look at it now, I
8  don't know what the reasons were behind
9  everything. I mean, she may have had issues
10 or something, I don't know. But I do remember
11 Christine, yes.
12   Q.  And you gave her the choice either
13 shape up or leave?
14   A.  I gave her the choice either, yeah,
15 either -- either come under the umbrella of
16 friendliness or the store is not benefiting
17 you from you being here under this
18 circumstance so you can go home.
19   Q.  And she did go home?
20   A.  Right.
21   Q.  Did you remember if she came back
22 after that day?
23   A.  To work, ever?
24   Q.  Yes.
25   A.  Yeah, she was still in the store after

Page 160

1  I left that store.
2    Q.  And did she adjust her sour facial
3  expression?
4    A.  She did have a better attitude, I
5  believe, after that, and she was happier. She
6  actually was still this the store when I left.
7  She did get promoted after I left. So I guess
8  she -- I guess she did. I wasn't there. But
9  I would guess she did if she got promoted.
10   Q.  So you talked about this just a minute
11 ago, but this was a form of discipline that
12 you were administering outside of the company
13 form. You were just writing this down to
14 document the issues that you were having with
15 this employee, correct?
16   A.  It really wasn't a form of discipline,
17 It was just a note that I made to have for
18 myself that a conversation was had and I
19 specifically wrote it, I would imagine. I
20 guess, I don't remember exactly, so that I
21 would have an indication in front of me that
22 it was her choice to stay or leave. I did not
23 tell her based on what I wrote here you're
24 walking around the store sad, go home. I
25 didn't do that. I gave her an opportunity to

Page 161

1  either stay or go.
2    Q.  How many employees did you terminate
3  in 3883?
4    A.  To the best of my memory, once
5  associates got past their 90 days, I do not
6  remember actually myself terminating anyone.
7  I think every person who got terminated from
8  my store after that 90 days was either
9  terminated by human resources or the loss
10 prevention department.
11   Q.  Let's take --
12   A.  And that's to the best of my memory.
13 I could be wrong.
14   Q.  How many employees did you terminate
15 who were in that first 90-day --
16   A.  I don't --
17   Q.  -- probationary period?
18   A.  I don't remember. Maybe eight.
19 That's a good guess. Ten. I don't remember.
20   Q.  One thing that we're starting to do is
21 talk over each other.
22   A.  I'm sorry.
23   Q.  And it's both of us.
24   A.  I'm sorry.
25   Q.  I just want to make our court

41 (Pages 158 to 161)

REPORTED BY: Steven S. Huseby, RPR, CSR www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022 (404) 875-0400
9d654179-bf58-4c1e-a369-6f628be7b1a5

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP

Brad M. Gerber          August 4, 2011

Page 162

1  reporter --
2      A.  That's because it's close to
3  lunchtime.
4      Q.  We're almost ready for that.
5      A.  I'm sorry, I'll try to slow down.
6      Q.  Out of the eight to ten employees that
7  you terminated in a 90-day period, what types
8  of infractions were they terminated for?
9      A.  Okay, the eight to ten is a guess and
10  I would imagine different things like
11  attendance, register differences, overages and
12  shortages, work performance.
13      Q.  And you made the decision to terminate
14  those employees based on those performance
15  issues, correct?
16          MS. RUBIN:  Objection to form.
17  You can answer.
18          THE WITNESS:  I was the person
19  that told them they would no longer have a
20  position there based on situation, the over
21  and shortages part was company policy.  The
22  performance level that they didn't meet was
23  based on also what company standards were.  To
24  my -- what company standards are are based on
25  how I read into it, what the company standards

Page 163

1  were, I mean interpreted, okay.  That was the
2  word I was looking for.  And what was the
3  third thing I said?  Attendance was company
4  policy.
5  BY MR. SCOTT:
6      Q.  And this company policy like you said
7  you would have to interpret and enforce that
8  company policy on the employees in your store,
9  right?
10      A.  Well, some things you can interpret,
11  some things you couldn't.  Overages and
12  shortages was light.  Attendance I believe
13  also was light.  Three days missed without
14  calling or something like that, if that's what
15  it was, I don't remember, just giving an
16  example, there's no gray area.  Performance is
17  more interpretation.
18      Q.  When you say performance, you also
19  have to discern for yourself whether or not
20  that employee is willfully not performing or
21  it's just that they don't understand how to
22  perform, right?
23      A.  Correct, you have to make a
24  determination as a manager whether they need
25  more training and development or whether they

Page 164

1  are just not capable or not willing in your
2  words.
3      Q.  And you're not going to terminate
4  someone who's just not fully trained, right?
5      A.  Not -- not offhand.  We'd try -- you
6  would try to work with them or have someone
7  work with them and try to improve them before
8  you would do that, correct.  And we did have a
9  company policy in place that there was a
10  person who was -- a buddy system that they did
11  work with them.
12      Q.  Willful disobedience is another
13  matter, if an employee is not --
14      A.  Correct.
15      Q.  -- obeying your assigned tasks, then
16  it's time during that 90-day period for him or
17  her to go, correct?
18      A.  You would -- I guess that's correct,
19  yes.
20      Q.  Let's talk about the non-90-day
21  employees and then we'll break.
22      A.  Okay.
23      Q.  So once they get through this 90-day
24  probationary period, how many employees did
25  you recommend to HR or through your DM be

Page 165

1  terminated?
2      A.  I didn't actually quote, unquote
3  recommend.  If a person was caught stealing in
4  the store, for example, whether it was by me
5  or by a loss prevention person -- if it was by
6  me, I had the authority to suspend them
7  without pay and then notify the loss
8  prevention department and human resources of
9  it and they would make all the decisions from
10  that point and the person would not come back
11  to my store if they were terminated.  And they
12  were not terminated then they came back.  That
13  wasn't my decision.
14      If a person -- that's really the only
15  instances I can think of where somebody would
16  have gotten fired.  I don't remember anybody
17  being suspended and being terminated by loss
18  prevention department for other instances or
19  by human resources for that matter.
20      Q.  Did you ever have an employee who was
21  past the 90-day probationary period that you
22  wanted to terminate but who was not
23  terminated?
24      A.  You mean terminated on the spot?
25      Q.  Terminated in general.

42  (Pages 162 to 165)

9d654179-bf58-4c1e-a369-6f628be7b1a5

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP

Brad M. Gerber                    August 4, 2011

Page 166

1    A.  Not that I remember specifically.
2    Q.  Did you ever recommend that an
3  employee be terminated to HR or to LPM or
4  to -- strike that.
5    Did you ever recommend that an employee be
6  terminated to anyone and that employee was not
7  terminated?
8    A.  Not to my -- not to my recollection,
9  no.
10       MR. SCOTT:  Let's break.
11       (Lunch recess).
12  BY MR. SCOTT:
13    Q.  When you worked at the Eckerds store
14  prior to it being transitioned to a Rite-Aid
15  store was the Eckerd store a different layout
16  than the Rite-Aid store?
17    A.  You mean from when I got there until
18  they changed it to the Rite-Aid store?
19    Q.  Yes.
20    A.  I think to the best of my memory that
21  originally it had full aisles and they might
22  have changed it to cut, like break in the
23  aisles, but for the most part it was pretty
24  much the same.  The office was in the same
25  place, the pharmacy was in the same place, the

Page 167

1  folding counter was in the same place.
2    Q.  And you said overall the store was a
3  smaller store?
4    A.  A little bit smaller, I mean --
5    Q.  We got to --
6    A.  -- square footage.
7    Q.  We got to make sure not to interrupt
8  each other.
9    A.  I'm sorry.
10    Q.  No problem.  So a little bit smaller
11  in terms of square footage?
12    A.  Yes.
13    Q.  And it carried less products?
14    A.  I don't know if it carried less
15  products.  It might have had just less facings
16  of the products.  It had -- it had products in
17  that store that they didn't have in the New
18  York store like the wine, for example.
19    Q.  What other products did it have in the
20  North Carolina store that it didn't have in
21  the Brooklyn store?
22    A.  I mean, there might have been regional
23  type products that you wouldn't find up there,
24  like pork rinds, stuff like that.  But the
25  Eckerd store had their own brand before

Page 168

1  Rite-Aid took over.  It was the Eckerd brand.
2  I think basically the same type products, you
3  know, health and beauty aids, first aid,
4  dietary, all that stuff.
5    Q.  When the store transitioned from
6  Eckerd to Rite-Aid, how long did that process
7  take?
8    A.  To the best of my memory it was about
9  three weeks, I think.
10    Q.  Was the store open during that period?
11    A.  Yes.
12    Q.  And so you had to handle the
13  transition and all the new aisles and all the
14  new products while still servicing customers?
15    A.  Yes.
16    Q.  Was that a challenge?
17    A.  Sure.
18    Q.  And did that require you to work more
19  hours than you regularly would?
20    A.  I think so.  I don't remember exactly
21  but it's possible.
22    Q.  When the Eckerd brand products were
23  shipped out and the Rite-Aid brand products
24  were shipped in did you have to explain to the
25  customers that these products were equivalent

Page 169

1  to each other?
2    A.  I don't know about equivalent but we
3  told them that this was a generic brand of
4  medication or item that they were used to, I
5  guess.
6    Q.  When the store was transitioned from
7  an Eckerd to a Rite-Aid, did customers come in
8  and have questions about where is this product
9  that formerly was in aisle three, now where is
10  it?
11    A.  Yes.
12    Q.  And did you have to field a lot of
13  those questions?
14    A.  I fielded some, yes.
15    Q.  And your employees had to handle those
16  questions as well, correct?
17    A.  Yes.
18    Q.  And during this time period you were
19  training the Eckerd employees to become
20  Rite-Aid employees?
21    A.  After the transition?
22    Q.  Correct.
23    A.  The follow-up on the training they
24  received during the transition, yeah.
25    Q.  How long did it take to train the

43 (Pages 166 to 169)

9d654179-bf58-4c1e-a369-6f628be7b1a5

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP
Brad M. Gerber                August 4, 2011

---

Page 226

1 problem, you had more cameras and you could
2 view different parts of the store when you
3 were in the office?
4     A.  I believe that's correct.
5     Q.  And then at the end you said there was
6 no monitor in there besides the CBTs?
7     A.  I could be wrong. I don't remember. I
8 don't remember if there was a monitor. I
9 think there may have been. I'm pretty sure
10 there may have been but I don't remember. I
11 remember the only monitor was up at the door
12 that had the DVR in it. Whether we had a
13 monitor in the office or not, maybe only on
14 the cashiers. Again, I don't remember, I'll
15 be honest with you.
16     Q.  When you had issues with internal
17 theft when an employee was stealing, did you
18 ever go back and review the tapes to see if
19 you could see the employee stealing from the
20 store?
21     A.  The loss prevention department I think
22 would come in and do that or when I had a
23 security guard up in the front if he had a
24 concern, he would call me up to the DVR and we
25 would look at it together and watch for

---

Page 227

1 employees and for customers.
2     Q.  When you were at 11475, did you have
3 cameras throughout the store that would allow
4 you to view different parts of the store when
5 you were in the office?
6     A.  Yes, there was cameras in different
7 parts of the store, and there was a monitor in
8 the office.
9     Q.  And so when you were in the office you
10 could switch the monitor to the different
11 cameras to see what was going on throughout
12 the store?
13     A.  I believe that's correct.
14     Q.  Do you know what multitasking is?
15     A.  Yes, sir, I do.
16     Q.  Would you agree with me that as a
17 store manager you had to multitask pretty much
18 whenever you were in the store?
19     A.  Yes, I do.
20     Q.  And so while you were doing things
21 like teaching employees, you were also putting
22 up stock?
23     A.  Sometimes.
24     Q.  And while you were doing -- while you
25 were supervising employees sometimes you would

---

Page 228

1 also be running a cash register?
2     A.  Sometimes.
3     Q.  And while you were supervising
4 employees, sometimes you would also be
5 offloading truck?
6     A.  Couldn't supervise employees when I
7 was offloading truck because I'm outside the
8 store.
9     Q.  When you were -- wait a minute. When
10 the truck made its deliveries to 3883, did the
11 truck driver get in the back of the truck and
12 bring the merchandise off the truck onto the
13 street?
14     A.  (Witness shakes head negatively).
15     Q.  What did he do, he just stayed in the
16 driver seat?
17     A.  When we used to get truck at 3883 it
18 would come on a trailer, and we had two
19 different types of deliveries. At one time
20 there was a system of rollers and the truck
21 driver would put the boxes on the rollers and
22 roll them down to the bottom of the base of
23 the truck, and the store manager or the
24 manager on duty would stand there and take
25 them off, handle every single piece, put it on

---

Page 229

1 carts and the associates would come in and out
2 of the store and bring the carts inside.
3     And one time in 3883, they had trucks that
4 had lift gates and they would bring off entire
5 pallets of merchandise at one time. And the
6 pallets would get on the floor outside and if
7 the weather was permitting they would be
8 separated outside and you would open up inside
9 and see what was there, what departments,
10 separate them off and they would be wheeled
11 into the store.
12     And then at one time in 3883, the pallets
13 were brought directly into the store and were
14 done inside the store, but the manager was
15 always with the truck. That was -- at one
16 time, that was company policy. Whether it
17 continued to be that, you have to look that
18 up, I don't know, but it was at one time. The
19 manager must be at the back of the truck.
20     Q.  When the pallets were brought off the
21 truck in whole and brought into the store,
22 were you as a store manager just sitting
23 outside by the truck?
24     A.  Sitting outside? No.
25     Q.  What were you doing?

---

REPORTED BY: Steven S. Huseby, RPR, CSR www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022 (404) 875-0400

9d654179-bf58-4c1e-a369-6f628be7b1a5

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP
Brad M. Gerber                      August 4, 2011

Page 234

1  you?
2       A.  Correct.
3       Q.  Okay.  Now, when we talk about
4  multitasking in the store, I understand as
5  you're managing the store, managing the
6  overall operations of the store, you also have
7  to do things like assembling plan-o-grams,
8  right?
9       A.  Part of the -- part of the things that
10  I did, yes, I was there.
11      Q.  And as you're putting up stock and
12  implementing plan-o-grams and doing BDRs and
13  cycle counts, you're also making sure that the
14  overall store operations are running smoothly,
15  correct?
16      A.  As much as I can when I'm involved in
17  doing particular tasks, yeah.
18      Q.  And say you're doing a plan-o-gram and
19  a customer asks to speak to a manager, the
20  customer is going to be brought to you or to
21  another management employee?
22      A.  If I'm the only manager in the store,
23  I won't bring the customer to me, I'll go to
24  the customer.  And if there's somebody else
25  there and one of us is engaged in a task then

Page 236

1  amount of weekend days, if I'm not mistaken,
2  and that's the best of my memory.  The two
3  nights a week I definitely remember, I opened
4  and I closed.  There was days that I opened
5  and I closed.  So on some days I opened, some
6  days I closed, some days I was there all the
7  time, some days I was there way before opening
8  and stayed way past closing.  There was one
9  occasion when I worked 36 hours in a row
10  without going home.
11      Q.  What occasion was that?
12      A.  It was an inventory preparation.
13      Q.  Inventory involves a lot more hours
14  work by the management than other times of the
15  year?
16      A.  It -- according to the company it
17  shouldn't but sometimes it does.
18      Q.  In practice it does?
19      A.  Sometimes, depends.
20      Q.  What was your routine in the mornings
21  when you opened the store?
22      A.  Opened the door, take off the alarm,
23  obviously, sorry, that was obvious.  Turn on
24  the lights if they weren't automatic,
25  sometimes they were.  At one point they were,

Page 235

1  the other one will take care of it or that
2  person will take care of it, depending on,
3  again, the situation at the moment.
4       Q.  As the store manager, you have the
5  safe codes?
6       A.  Sure.
7       Q.  And you had the alarm codes for the
8  store?
9       A.  Sure.
10      Q.  And when you got there in the morning
11  you unlocked the door?
12      A.  Absolutely.
13      Q.  And when you closed the store in the
14  evening, you locked the door?
15      A.  Absolutely.
16      Q.  And obviously given the discipline
17  that we saw that a co-manager experienced,
18  those alarm codes and safe codes were not to
19  be disseminated amongst the employees, right?
20      A.  Correct.
21      Q.  When you were at 3883, would you
22  normally open or close?
23      A.  It was a company policy, we had to
24  close two nights a week.  There was a company
25  policy that said that we had to work a certain

Page 237

1  at one point they weren't.  Go into the
2  office, get a sheet of paper or a pad or a
3  tour sheet, walk the store, see what
4  opportunities may have been available for the
5  day that may not have been taken care of the
6  night before or if I had been there the night
7  before I knew already some things that may
8  have needed to be done.
9       Review my communications from the company
10  to see what they needed done and what new
11  things were coming up, check the schedule to
12  see who was there and when and where.  Set up
13  the registers with money, starting tills.
14      A lot of days I had to go and prep the
15  photo lab and change and set the chemicals and
16  run test strips and start the machine and get
17  it going so we could run photos, when there
18  was film, photos there.
19      Sometimes there were vendors waiting when I
20  opened the door and I took in the vendors and
21  checked them in.  Every day brought a little
22  bit different, aside from the norm but you
23  know, you try staying on a routine.  I guess
24  that pretty much says it.
25      Q.  When you say take in vendors, what

60 (Pages 234 to 237)

REPORTED BY: Steven S. Huseby, RPR, CSR www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022 (404) 875-0400
9d654179-bf58-4c1e-a369-6f628be7b1a5

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP
Brad M. Gerber          August 4, 2011

Page 246

1  aisle 3883 would mean they need a pickup from
2  their register. I have a 99 up front would
3  mean they need change. The idea of saying two
4  rolls of nickels, two rolls of dimes, that was
5  my idea.
6      Q. And so if you need two rolls of
7  something, the person's in --
8      A. In aisle 2.
9      Q. -- aisle 2 and he's --
10     A. Yeah. It's kind of hard -- and the
11 cash registers were only along the first five
12 aisles so you really couldn't say I need ten
13 rolls of quarters, that's kind over stupid.
14 So highest they could go would be like I need
15 five rolls of pennies, or however they wanted
16 to say it. I need five-dollar bills would be
17 my guess what we would say.
18     Q. And aggressive hospitality, that term
19 means you're going up and you're making eye
20 contact and you're asking the person can I
21 help you and --
22     A. Smiling, can I help you, what can I
23 help you find today, is there anything else
24 you need. And sometimes they say get away
25 from me and sometimes they just walk out of

Page 247

1  the store if they are doing something dubious.
2      Q. How many -- strike that.
3  How frequently did the profit and loss
4  report come out?
5      A. I believe it was monthly.
6      Q. And would you review it every month?
7      A. I would.
8      Q. And would you go over the profit and
9  loss report with the co-managers?
10     A. Sometimes, yeah. Most of the time I
11 would say. Parts of it if not all of it.
12     Q. Had the company implemented the Rite
13 Report during your tenure?
14     A. I don't know what the Rite Report is.
15     Q. That answered that?
16     A. You're saying the Rite Report, you
17 mean R-I-T-E?
18     Q. Yes.
19     A. No, I don't remember that.
20     Q. You also checked SYSMs everyday.
21     A. Of course. S-Y-S-M-S, it's interstore
22 e-mails, communications, kind of, right? What
23 does it stand for, go ahead, tell me?
24     Q. I don't know what it stands for.
25     A. I don't know what it stands for

Page 248

1  either.
2      Q. But for the record, a SYSM is an
3  electronic communication between stores,
4  right?
5      A. Right, because we didn't have
6  internet, we had intranet, so it was only
7  within the company itself.
8      Q. And you could send and receive SYSMs,
9  right?
10     A. I could send and receive -- I could
11 receive SYSMs from anybody in the company that
12 had the authority level to send them to me,
13 but I could only send SYSMs within my own
14 district.
15 So if I wanted to send one to a regional
16 vice president it wouldn't go through. If I
17 wanted to send one to Mary Sammons, who was
18 the CEO at the time, it wouldn't go through.
19     Q. Did you try to send one to her?
20     A. No, but I was told that I wasn't
21 allowed to communicate through SYSM like that.
22     Q. What types of SYSMs would you be
23 sending to HR?
24     A. I don't know, I'm sure different
25 things, like if we caught somebody doing

Page 249

1  something that was wrong and had -- whenever
2  we had to suspend somebody, we would send
3  information that they were suspended. I'm
4  sure we sent SYSMs based on hiring situations.
5  Specifically, I don't remember.
6      Q. Did -- access to a SYSM is through a
7  computer located in the manager's office,
8  correct?
9      A. That was the only place I think that
10 you could do or receive a SYSM.
11     Q. So when you had to check a SYSM you
12 had to go into the office?
13     A. Correct.
14     Q. Was the office located up front next
15 to the cash registers?
16     A. No, the office was located next to,
17 next to the photo machine in my store, in
18 3883.
19     Q. And where was it in 11475?
20     A. Next to the front door, about 20 feet
21 away from the registers.
22     Q. Okay. So the office location
23 obviously was different in the stores you
24 worked in?
25     A. Yes, sir.

63 (Pages 246 to 249)

REPORTED BY: Steven S. Huseby, RPR, CSR www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022 (404) 875-0400
9d654179-bf58-4c1e-a369-6f628be7b1a5

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP
Brad M. Gerber                    August 4, 2011

Page 254

1    thought the product would sell?
2       A.  We could adjust it up or down.  The
3    adjustments that we made were not always
4    suggested -- accepted, excuse me, and
5    sometimes if we wanted to do something that
6    was out of the ordinary, we had to get
7    permission from the corporate level, direct
8    supervisor, district manager or the actual
9    corporate level.  And again, because of the
10   uniqueness of my store, that happened more
11   often than not.
12      Q.  And are you referring to the kosher
13   products and the kosher section that you had
14   to order?
15      A.  Not necessarily the kosher products in
16   the kosher section.  The kosher products in
17   the kosher section had nothing to do with the
18   company ad ordering.  It came in from a
19   separate entity and they weren't even in the
20   actual replenishment system or inventory
21   system.  I'm referring as an example, if I can
22   give an example, during the holiday of
23   Passover, every Jewish person has to change
24   their toothbrush because you're not allowed to
25   eat bread during the holiday.  So if you

Page 255

1    brushed your teeth after eating a bread
2    product, that toothbrush is no longer useable
3    during the Passover holiday.  You're supposed
4    to change your toothbrush every six months
5    anyhow.
6       So if there was going to be an ad right
7    before the Passover holiday, for example, and
8    toothbrushes were going to be on sale, and the
9    last time they were on sale was three months
10   before and it wasn't Passover, suggestion for
11   a particular toothbrush might be to order two
12   dozen.  But I might need 2,000.  So I could
13   not put that in the system without the company
14   giving me permission to do so.
15      And even when I did it sometimes they
16   thought I was out of my mind.  They actually
17   made me go to other stores and go get
18   toothbrushes and get them from the other
19   stores back to fill up my own staff.  They
20   would not send them to me.
21      Q.  And that's something that you did, you
22   went to other stores and got the surplus of
23   toothbrushes?
24      A.  Yeah, excuse me one second.
25      Q.  Let take a quick break.

Page 256

1       (Off-the-record discussion).
2    BY MR. SCOTT:
3       Q.  You said the ordering for the kosher
4    section was distinct and apart from the
5    replenishment system and the ad ordering
6    system.  Can you tell me about the special
7    ordering system for the kosher section,
8    please?
9       A.  The kosher section was a vendor
10   section.  It was no different than any other
11   vendor section.  None of the vendor sections
12   were replenishable, whether it be Coca-Cola,
13   Lay's potato chips or anybody else.
14      The kosher section was originated through
15   approval of the company and it was replenished
16   through the salesperson coming in from that
17   particular distributor, seeing how much
18   merchandise we had, making an order based on
19   it, and then sending the merchandise.
20      Q.  And would you discuss the order with
21   the person that came in?
22      A.  I would -- I would go over it with
23   them but I really didn't have a say of whether
24   or not I could take the merchandise or not.
25   They had to submit the order to the corporate

Page 257

1    level and then they would approve it.  And
2    whether they changed the items and amounts, I
3    don't know.
4       Q.  Who approved it at the corporate
5    level?
6       A.  I don't know.
7       Q.  Did you ever discuss with anyone the
8    products that you suggested should be sold in
9    certain times of the year to celebrate the
10   Jewish holidays?
11      A.  I did.
12      Q.  And who did you discuss that with?
13      A.  Most of the time with my district
14   manager at the time.
15      Q.  And there were some suggestions that
16   you made that the products should be ordered
17   that were followed, correct?
18      A.  There were some that were agreed to
19   and they did bring them in, yes.
20      Q.  We discussed earlier the business data
21   reports, the BDRs?
22      A.  Yes, sir.
23      Q.  How often would you review BDRs?
24      A.  Every day.
25      Q.  And what sort of information would a

65 (Pages 254 to 257)

REPORTED BY: Steven S. Huseby, RPR, CSR www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022 (404) 875-0400
9d654179-bf58-4c1e-a369-6f628be7b1a5

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP
Brad M. Gerber                    August 4, 2011

Page 270

1  You can answer.
2  BY MR. SCOTT:
3     Q.  Do you understand what I mean by that?
4     A.  Yeah, I understand.  How many
5  man-hours, it varied based on truck size, it
6  varied based on stores.  The company wanted
7  the whole truck put up within 24 hours, the
8  best of my memory.  And that wasn't always the
9  policy I can remember, but I remember it
10  at times and I can't tell you how many
11  man-hours.  The truck was done different ways
12  at different times, you know, from rolling the
13  merchandise down the wheels to taking a whole
14  pallet in the store is completely different,
15  so I can't give you a number.
16     Q.  So it varied based on the store, the
17  store volume, the truck, the manner of
18  importing the truck, the employees in the
19  store and the location of the store?
20     A.  Correct.  That's just a few things,
21  right?
22     Q.  Any other variations you can think of?
23     A.  No -- yeah, it also varied based on
24  whether the truck was in the middle of the
25  night or whether the truck was during working

Page 271

1  hours of the store being open.
2     Q.  The truck took a significant amount of
3  time regardless of the actual number of hours.
4  It took a significant amount of time to unload
5  and put up the stock, right?
6     A.  Elaborate on what you consider to be
7  significant.
8     Q.  More than ten employee hours?
9     A.  More than ten employee hours to do the
10  whole thing?
11     Q.  Right.
12     A.  Absolutely.
13     Q.  And so if you have more truck
14  deliveries per week, more employee time, more
15  of your time is going to be spent off-loading
16  the truck and supervising the implementation
17  of the stock in the store, right?
18     A.  The more merchandise that comes in,
19  the more hours have to be used to deal with
20  the merchandise and the process that it takes
21  to do it, yes.
22     Q.  And so you and your employees spent
23  more time off-loading the truck at 3883 than
24  you did at 11475 overall, right?
25     A.  In general, yes, but not all the time,

Page 272

1  Depending, again, on the factors that we
2  discussed, size of the truck and manner of the
3  way the truck was done.
4     Q.  At 11475, did you try to schedule all
5  front end employees for truck day?
6     A.  I did.
7     Q.  And when truck came during business
8  hours at 3883, did you try to schedule all
9  front end employees?
10     A.  I could not always because
11  sometimes -- on the business day or when the
12  truck came?
13     Q.  When the truck came during business
14  hours.
15     A.  I could not schedule them all to be
16  there at that time, but I tried to have them
17  all scheduled on that day, just to clarify.
18     Q.  How many hours did you work per week
19  in 2008?
20     A.  It varied.  That was strictly in North
21  Carolina.  Could have been anywhere from 45 to
22  75, depending on the situation.
23     Q.  And what factors made you work more or
24  less?
25     A.  A lack of employees to handle the work

Page 273

1  flow, the remodel, the training that was
2  necessary that went with the remodel because
3  when the trainers were there I was supposed to
4  be there as well.
5     I also had to be there earlier every single
6  day for the workers who would come in like the
7  construction guys who were doing
8  flooring and stuff.  I had to be there to open
9  the door for them.  Sometimes I had to be
10  there until later at night to close the door
11  for them when they were going beyond hours of
12  the normal store operation.  So it varied.
13     Q.  When the construction guys are coming
14  in you're talking about the time period in
15  which the remodel was taking place?
16     A.  Correct, the company set up a schedule
17  where the manager had to be at the project
18  manager meeting first thing in the morning,
19  6:00, and so that was extra time I had to put
20  in.
21     Q.  Any other factors that accounted for
22  the variation in your hours in 2008?
23     A.  I don't think so.
24     Q.  How many hours a week did you work per
25  week in 2007?

REPORTED BY: Steven S. Huseby, RPR, CSR www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022 (404) 875-0400

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP
Brad M. Gerber                August 4, 2011

Page 274

1   A.  The same answer as the other one, I
2  mean, based on different factors but the same
3  answer.  It varied some weeks it's from -- the
4  rules were a little bit different in New York
5  at the end than they were in North Carolina.
6  When we first went to North Carolina Eckerd
7  had the managers set at a 45 hour work week
8  which we rarely saw but we did once or twice
9  maybe.
10  But Rite-Aid when I first went in they
11  stated a different number.  I believe it was
12  indicated as a 50 hour work week and I rarely
13  worked less than 50 hours.  And the last year,
14  because they changed the policy and gave us a
15  set number on hours instead of a percentage of
16  our sales and our sales were growing so fast I
17  had to put a lot of extra hours in to cover a
18  lot of extra work that needed to be done in
19  the store.  So it would vary again between
20  maybe 50 and 70 to 75.
21  Q.  How many hours a week did you work in
22  2006?
23  A.  The same.  The same.  It doesn't vary.
24  Mostly every year I was there, it didn't vary,
25  it's the same thing.  It was anywhere from 50

Page 275

1  to 70 to 75.
2  Q.  Will I get the same answer from 2001
3  through 2005 as 2006?
4  A.  Actually, 2001 when I first went back
5  to 3883 I actually worked more hours a week
6  consistently because of the lack of employees
7  I had in the store and the way we built the
8  sales up so quickly.  So I worked -- again, I
9  worked -- some weeks I worked 50, 55, and then
10  some weeks I worked 70 to 75.  But in 2007,
11  the last year I was in New York, there might
12  have been less weeks that I worked 70, 75 than
13  there was in 2001, but still a great number of
14  weeks.
15  Q.  When you say you built the sales up,
16  how did you build the sales up?
17  A.  By doing a lot of things that we
18  already discussed, fostering better feelings
19  in the community, making sure that our instock
20  was in good shape, doing good ad ordering and
21  recognizing what merchandise we were going to
22  sell, creating a good environment in the store
23  to make it a better shopping experience for
24  the customers.
25  Q.  I'm going to hand you what's been

Page 276

1  marked as Exhibit 8.
2  (Exhibit Number 8
3  marked for identification).
4  BY MR. SCOTT:
5  Q.  Have you ever seen Exhibit 8 before?
6  A.  A job description for store manager?
7  Yeah, I would imagine I saw it in the very
8  beginning when I first started.  Have I seen
9  it lately?  No.
10  Q.  Can you take a look at -- strike that.
11  Exhibit 8 is the job description for a
12  store manager at Rite-Aid, correct?
13  A.  Okay.
14  Q.  That's right, right?
15  A.  Yes, sir.
16  Q.  Can you take a look at the summary
17  paragraph in the middle of the first page,
18  which is INDERGIT RA 1896 and tell me -- read
19  it to yourself and then tell me if you agree
20  or disagree with the -- strike that.  Strike
21  that entire thing.
22  Take a look at the summary paragraph and
23  please tell me if there's anything in there
24  that you disagree with.
25  A.  The paragraph that's headed

Page 277

1  supervisory responsibilities or the one that's
2  headed essential duties and responsibilities?
3  Q.  The one above that headed summary.
4  A.  The summary itself?
5  Q.  Yes.
6  A.  Okay.  (Witness reviews document).  I
7  agree with all of it except for one sentence.
8  Q.  Which sentence?
9  A.  Frequent independent judgments are
10  essential.  It wasn't as frequent as it would
11  sound just by reading it as a blank statement.
12  Q.  Did you make some independent
13  judgments?
14  A.  Did I make some independent judgments?
15  Q.  Yes.
16  A.  Absolutely.
17  Q.  But you disagree with the frequent?
18  A.  I don't think -- not written as a
19  blank statement, all right.  Some categories,
20  yes, deciding who to call in when somebody
21  called out, that was a frequent independent
22  judgment.  So it was my decision who to call
23  if I had to hours to pay them.
24  But deciding what merchandise to bring in
25  to my store and deciding how much to order and

REPORTED BY: Steven S. Huseby, RPR, CSR www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022 (404) 875-0400
9d654179-bf58-4c1e-a369-6f628be7b1a5

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP

Brad M. Gerber                         August 4, 2011

Page 278

1   a litany of other things. I did not make
2   frequent independent judgments. So that's a
3   blank statement and it leaves a lot to be
4   open. There's a lot of gray area there.
5       Q.  So if that independent judgment
6   sentence were modified as we just discussed
7   you would agree with the summary paragraph?
8       A.  If it was modified, yes.
9       Q.  Can you take a look at the essential
10  duties and responsibilities section and tell
11  me if there are any essential duties and
12  responsibilities listed that you disagree with
13  based on your experience as a store manager?
14      A.  Okay.  (Witness reviews document).
15  Okay. I have issue with some of the things
16  that are on here because I don't agree with
17  them as blanket statements. There are items
18  on here that were not on the job description
19  that I originally received when I became a
20  Rite-Aid manager. I did not get a job
21  description -- I don't want to say that for
22  sure. I did not get this particular job
23  description each time I came back to the
24  company, because there are things on here that
25  didn't exist then, like SMILE and RAPTAR

Page 279

1   didn't exist in 2001 or 2004. Maybe 2004 but
2   not in 2001. Clutter Free did not exist then.
3   The blanket statement that says responsible
4   for hiring and training, that was not fully my
5   responsibility. It was -- there had to be
6   input from the corporate level whether I was
7   allowed to hire, and the training that was
8   given was all not like from my imagination, it
9   was from another source.
10      There was no StaffWorks when I first
11  started. I don't even think there was a
12  StaffWorks the last time that I came back in
13  2004 and that was the last description that I
14  saw. And I did not have the line that says
15  standard of operation enforced in the pharmacy
16  department because I did not control their
17  scheduling at that time. The pharmacy manager
18  did. At that time, there was a pharmacy
19  manager and from what I can remember as best I
20  can when I left the company there was no such
21  thing anymore as a pharmacy manager. I think
22  there was just a supervising pharmacist. It
23  was a different title and I don't know if
24  their job description changed.
25      But otherwise, I would imagine that most of

Page 280

1   it I tend to agree is the responsibilities of
2   a manager.
3       Q.  There is a lot there, so let's take it
4   one item at a time by itself.
5       A.  Go ahead.
6       Q.  Number one, responsible for opening
7   and closing the store and maintaining proper
8   accountability for cash handling and company
9   banking. Do you agree with that?
10      A.  I do.
11      Q.  Number two, responsible for meeting
12  store retail budgeted sales, margin, labor,
13  expenses and overall P&L monthly results to
14  ensure operating EBITDA and income are
15  achieved. Do you agree with that?
16      A.  Not as a blanket statement because I
17  didn't have control over all expenses.
18      Q.  We discussed earlier some expenses
19  were controllable and some were not, right?
20      A.  As per controllable expenses I do
21  agree with the statement.
22      Q.  And uncontrollable expenses is
23  something like rent, right?
24      A.  Correct, rent is, that's correct.
25      Q.  Number three, this will change

Page 281

1   depending on which year we're discussing,
2   right?
3       A.  It does, yes.
4       Q.  Utilize and follow StaffWorks to
5   ensure that labor is scheduled to meet
6   customer service needs and completing
7   operating activities to ensure the same
8   standards of operation are in force in the
9   pharmacy department.
10      Now, when you first started StaffWorks
11  didn't exist and you did the schedule by hand,
12  right?
13      A.  That's correct.
14      Q.  And then they implemented StaffWorks
15  and you generally wrote the schedule by
16  handled and then implemented it into
17  StaffWorks, correct?
18      A.  I would make a rough copy by hand and
19  then implement it into the StaffWorks system,
20  most of the time, yes. There were times I
21  went directly into the StaffWorks system
22  because I had a general idea of where my
23  people were going to be.
24      Q.  And you said you didn't disagree for
25  the statement -- you didn't disagree with the

71 (Pages 278 to 281)

9d654179-bf58-4c1e-a369-6f628be7b1a5

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP
Brad M. Gerber                    August 4, 2011

Page 298

1  with human resources prior to administering
2  the review?
3      A. I think there was a set amount but I'm
4  pretty sure that -- I think there was a set --
5  I think it was a set policy, how much they
6  could get based on the union. I don't think
7  it had anything to do with human resources,
8  that I can remember.
9      Q. The union contract would dictate the
10 increases in the people's salary as they
11 leveled up?
12     A. In New York.
13     Q. Right. And in 11475 in North
14 Carolina, that was not the case?
15     A. I don't think there was a union there.
16     Q. Right.
17     A. And I do not remember -- I was only
18 there for six months and it was only a
19 Rite-Aid for three months I believe out of the
20 six, and I don't think anybody came to that --
21 I don't remember doing any evaluation while I
22 was there.
23     Q. Who did the performance reviews for
24 the salaried co-managers in your store?
25     A. Salaried co-managers had to do their

Page 299

1  own self-appraisal much like I did. And then
2  I would do an appraisal of them.
3      Q. And would you recommend to -- strike
4  that.
5      Were the co-managers governed by the union
6  agreement as well?
7      A. They were salaried, no.
8      Q. And would you recommend a percentage
9  raise to HR for those people based on the
10 evaluations?
11     A. I don't think I had the authority to
12 recommend a percentage raise. I think the
13 percentage raise was dictated by the company
14 for them and myself.
15     Q. And did you discuss what raise your
16 co-managers would be getting with HR prior to
17 the reviews?
18     A. Not that I remember.
19     Q. And the co-managers were evaluated on
20 the same criteria that you were in large part,
21 correct?
22     A. I don't know if it was exact from top
23 to bottom page but I think it was based on the
24 same criteria for the most part, let's say
25 that.

Page 300

1      Q. You would evaluate them on qualities
2  such as ability to delegate tasks and follow
3  up, right?
4      A. I believe so.
5      Q. And leadership within the store?
6      A. I believe so.
7      Q. And dependability?
8      A. Yes.
9      Q. And the overall store's profit and
10 loss, you discussed that with them as a goal
11 to be achieved, right?
12     A. Right, I don't think that -- I don't
13 know exactly how it was written but you're in
14 the right direction, yeah.
15     Q. And you discussed with them team work
16 and how well they were leading their team and
17 directing their associates?
18     A. Yeah, I believe so.
19     Q. And that's a process that would occur
20 annually?
21     A. I think yes, I think it was annual. I
22 was hoping you had one of my evaluations
23 there. I haven't seen one in a long time.
24 I'm sure I got them somewhere in the garage,
25 but I don't know where they are.

Page 301

1      Q. I'm handing you what's been marked as
2  Exhibit 10.
3      (Exhibit Number 10
4      marked for identification).
5  BY MR. SCOTT:
6      Q. Exhibit 10 is a job description for
7  the position of assistant store manager,
8  correct?
9      A. Okay. Yes, I think so.
10     Q. And if you would, please take a look
11 at the job description and tell me if the
12 summary paragraph accurately describes the
13 position that your assistant store managers in
14 your North Carolina store occupied?
15     A. (Witness reviews document). Again,
16 except for the sentence that says frequent
17 independent judgments are essential, I don't
18 want to accept that as a blanket statement,
19 because it depends on what the criteria and
20 situation are, but otherwise I agree with it
21 100 percent.
22     Q. Can you take a look at the essential
23 duties and responsibilities section and tell
24 me if you agree with those essential duties
25 and responsibilities as they pertain to the

76 (Pages 298 to 301)

REPORTED BY: Steven S. Huseby, RPR, CSR www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022 (404) 875-0400
9d654179-bf58-4c1e-a369-6f628be7b1a5

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP
## Brad M. Gerber                August 4, 2011

### Page 302

1   job duties of the assistant store managers in
2   your store in North Carolina?
3       A.  (Witness reviews document).  The only
4   part that I would not agree with as a blanket
5   statement is "interacts with vendors to order
6   ad, seasonal, and basic merchandise and ice
7   cream where applicable for the store" because
8   there were many items that came in from the
9   vendors that were corporate-ordered and I
10  don't want to say forced upon us but we had to
11  take them without a choice.
12      Q.  Which items were those?
13      A.  Chip displays and other displays maybe
14  for special events like Super Bowl, things
15  they called weekenders, which is like for
16  example, in Charlotte if there's a big race
17  event they bring in a weekender of beer or
18  what they expect you to sell through on the
19  weekend because it's going to be a high volume
20  time.  Where my store was it was right across
21  from the Quail Hollow Golf Course where they
22  have that annual golf tournament so we would
23  get special promotion.
24      And we did not have any authority when it
25  came to those things.  We didn't order them,

### Page 303

1   we didn't suggest them, they just came.
2       Q.  They just showed up?
3       A.  Yeah, sometimes -- I mean, they didn't
4   just show up.  We were told we're going to get
5   them.  Sometimes you would get a newsletter or
6   SYSM or whatever it may have been, but you
7   couldn't say like no, I don't want this.  On
8   occasion they would ask do you need more but
9   you still got what you got.
10      Q.  What was the golf tournament that was
11  across the street from your store?
12      A.  The Quail Hollow Golf is there.  It
13  used to be called the Wachovia Open.  Now it's
14  called the Wells Fargo Open.  Tiger Woods came
15  walking into the store one day, but I wasn't
16  working there then.  That's what I heard.
17      Q.  I'm sorry to hear that.
18      A.  In his golf cleats and bought a soda.
19  That's what -- the year before I got them.
20      Q.  So during the time when you had this
21  big golf tournament, the customer volume in
22  the store increased?
23      A.  During the tournament, yeah, I believe
24  so.
25      Q.  And it occasionally included

### Page 304

1   celebrities?
2       A.  That's from what I was told.
3       Q.  With that modification to the
4   essential duties and responsibilities section,
5   do you agree with the remainder of the
6   essential duties and responsibilities listed
7   for the --
8       A.  I do agree that these are amongst
9   their responsibilities, yes.
10      Q.  The next page on Exhibit 10, if you
11  could take a look at the supervisor
12  responsibilities for me and tell me if you
13  agree with that paragraph as it pertains to
14  the assistant store managers that you worked
15  with in North Carolina.
16      A.  (Witness reviews document).  Again,
17  except for the part where it says hiring and
18  training.  You know, some of it came through
19  company policy so, yeah, I agree with it
20  otherwise.
21      Q.  They were involved in hiring and
22  training in accordance with company policy,
23  correct?
24      A.  I agree.
25      Q.  Have you had any discussions about

### Page 305

1   this lawsuit with anyone besides your
2   attorneys?
3       A.  Yes, my wife.
4       Q.  Anybody else?
5       A.  My immediate supervisor where I work
6   now only to the fact that I told him I had to
7   go out of town for a few days and why.  I told
8   him that I had to go give a deposition against
9   the former company that I worked for.
10      Q.  Anybody else?
11      A.  Not that I can remember, no.
12      Q.  Since leaving Rite-Aid in 2008 you
13  worked for that hotel, Big Lots, and Wal-Mart;
14  is that right?
15      A.  I also worked for KB Toys until they
16  went out of business.  I went into a training
17  program with Buy Buy Baby.
18      Q.  What's that?
19      A.  It's an offshoot of Bed, Bath and
20  Beyond, for babies.  It's a retail business, I
21  was in the training program for a few weeks
22  and then went out of the training program.  It
23  didn't work out.  I was on unemployment
24  insurance, if you want to write that down.  I
25  mean, that's part of income, I guess, right?

REPORTED BY: Steven S. Huseby, RPR, CSR www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022 (404) 875-0400

9d654179-bf58-4c1e-a369-6f628be7b1a5

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP
Brad M. Gerber                    August 4, 2011

Page 306

1  Did I work for anybody else? I think that's
2  enough. No. That's more than enough. No,
3  no, that's it.
4      Q.  That's it?
5      A.  Since I left Rite-Aid.
6      Q.  Right. What was your --
7      A.  Yeah, yeah.
8      Q.  What was your position at Big Lots?
9      A.  I was hired as an assistant manager.
10     Q.  Were you salaried or hourly?
11     A.  Salaried.
12     Q.  Did you work more than 40 hours a
13 week?
14     A.  I was only there for three weeks. I
15 believe I did at least one of those weeks.
16     Q.  Did you get overtime?
17     A.  No, sir.
18     Q.  What was your position at KB Toys?
19     A.  I was a store manager.
20     Q.  How long were you a store manager
21 there?
22     A.  September -- 5 months.
23     Q.  Salaried or hourly?
24     A.  Salaried.
25     Q.  Did you get overtime?

Page 307

1      A.  No, sir.
2      Q.  How many employees did you supervise
3  at KB Toys?
4      A.  Including management personnel,
5  anywhere from seven to 20 based on the season.
6  Christmas was a lot more. Toy store.
7      Q.  Did you work more than 40 hours a
8  week?
9      A.  I did.
10     Q.  Did you complain at KB Toys that you
11 should get overtime?
12     A.  Did I complain?
13     Q.  Yes.
14     A.  No, sir.
15     Q.  Did you complain at Big Lots you
16 should get overtime?
17     A.  No, sir.
18     Q.  Was the Big Lots store that you worked
19 for in Charlotte, North Carolina?
20     A.  Uh-huh, yes, it was.
21     Q.  What about Wal-Mart, KB Toys?
22     A.  Wal-Mart, I worked for Wal-Mart
23 actually twice. Once was in York, South
24 Carolina and now currently in West Columbia,
25 South Carolina.

Page 308

1      Q.  Do you live in South Carolina?
2      A.  No, sir. I live in Charlotte.
3      Q.  And where was the KB Toys?
4      A.  KB Toys was in Charlotte.
5      Q.  Throughout the day, if I asked you a
6  question that you didn't understand, you asked
7  me to rephrase it, right?
8      A.  I did.
9      Q.  And if you didn't ask me to rephrase
10 it, I can assume that you understood it,
11 correct?
12     A.  I agree.
13         MR. SCOTT: I'm done. I imagine
14 you guys will have some redirect.
15         MS. RUBIN: I need a few minutes
16 to see.
17         MR. SCOTT: Sure. And then I'll
18 reserve my remaining time for recross.
19         (Brief recess.)
20         EXAMINATION
21 BY MS. RUBIN:
22     Q.  Mr. Gerber, did you have any control
23 over the truck delivery time?
24         MR. SCOTT: Object to form.
25 BY MS. RUBIN:

Page 309

1      Q.  You can answer.
2      A.  I did not have control over the truck
3  delivery time. It was set by the company.
4  BY MS. RUBIN:
5      Q.  And was that case for the truck
6  deliveries at all the Rite-Aid stores you
7  worked?
8      A.  Yes, we made requests but they
9  didn't -- they had their own schedule setup.
10     Q.  Were your shift supervisors hourly or
11 salaried employees?
12     A.  Shift supervisors were hourly. I only
13 had one. She was hourly.
14     Q.  And were the assistant store managers
15 hourly or salaried?
16     A.  I had two assistant store managers in
17 North Carolina. I know for sure that the lady
18 named Helen was definitely hourly. The other
19 lady named Sandra, I don't remember. She
20 might have been hourly, she might have been
21 salaried. I don't remember.
22     Q.  Did you consider hourly assistant
23 store managers and hourly shift supervisors
24 part of the management team?
25     A.  I did consider them part of the

78 (Pages 306 to 309)

REPORTED BY: Steven S. Huseby, RPR, CSR www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022 (404) 875-0400
9d654179-bf58-4c1e-a369-6f628be7b1a5

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP
Brad M. Gerber                   August 4, 2011

Page 310

1  management team, but they did not have every
2  single -- I don't think they had every single
3  responsibility that the salaried members had.
4      Q.  You do not recall?
5      A.  I don't remember in essence, but they
6  were part of the management team, yes, I
7  considered them such.
8      Q.  Which employees held keys to the
9  stores that you worked at for Rite-Aid?
10     A.  All management personnel had keys to
11 the store, including the hourly supervisors, I
12 believe.
13     Q.  How did your inability to choose
14 merchandise affect sales?
15         MR. SCOTT:  Object to form.
16         THE WITNESS:  It didn't help my
17 sales.  I mean, if I was able to choose the
18 merchandise that I wanted and the quantities
19 that I wanted at given times I would have been
20 able to increase my sales accordingly. I
21 believe.
22 BY MS. RUBIN:
23     Q.  Did you have any say over where
24 security cameras were placed in your stores
25 when there were security cameras?

Page 311

1      A.  No, I did not.
2      Q.  How much time did you spend in your
3  office viewing footage from the security
4  cameras?
5      A.  Very little.
6         MR. SCOTT:  Object to the form of
7  that last question.
8         THE WITNESS:  Sorry, I answered
9  too fast?
10        MR. SCOTT:  No, that's all right.
11 BY MS. RUBIN:
12     Q.  How much time did you spend in your
13 office?
14        MR. SCOTT:  Object to the form.
15        THE WITNESS:  Average day, average
16 week, can you elaborate, please?
17 BY MS. RUBIN:
18     Q.  Sure, how much time did you spend in
19 your office on an average day?
20     A.  I would say about -- every day -- it
21 varied but maybe 15 percent.
22     Q.  When you interviewed for the store
23 manager position, were you told you would be
24 prepping the photo lab with test strips?
25     A.  No.

Page 312

1      Q.  Did you have any control or authority
2  over when vendors came?
3      A.  No.
4      Q.  I'm going to go back to Exhibit 8 for
5  a minute, which is the store manager
6  description.  You modified the sentence that
7  stated "frequent independent judgments are
8  essential."
9      A.  Yes, ma'am.
10     Q.  What else did you not have independent
11 judgment over?
12        MR. SCOTT:  Object to the form.
13        THE WITNESS:  I didn't have
14 independent judgment over a lot of things.  I
15 didn't have independent judgment over the rate
16 of replenishment.  I didn't have independent
17 judgment over the type of merchandise we
18 received.  I didn't have independent judgment
19 over the placement of merchandise.  I didn't
20 have independent judgment over who I wanted to
21 hire and not hire.  I didn't have independent
22 judgment over which vendors I wanted to have
23 and which vendors I didn't want to have.  I
24 didn't have independent judgment over which
25 maintenance services I could use.  I didn't

Page 313

1  have independent judgment over what type of
2  security would be in my store.  I didn't have
3  independent judgment over how much payroll I
4  could use based on my sales.  I didn't have
5  independent judgment on how much merchandise I
6  could order for my advertised sales.  I didn't
7  have independent judgment over how I could
8  decorate or organize my own office.  I didn't
9  have independent judgment of how I could
10 reward or choose who to reward in my store for
11 their efforts after they put in the SMILE and
12 RAPTAR program.  I didn't have independent
13 judgment of how to set up my plan-o-grams
14 based on my customer base and the type of
15 customers I had.  That's -- I didn't have
16 independent judgment over much of anything in
17 the store.
18 BY MS. RUBIN:
19     Q.  Do you believe someone with the title
20 store manager should have independent judgment
21 over those items that you just listed?
22        MR. SCOTT:  Object to form.
23        THE WITNESS:  I believe the store
24 manager should have more independent judgment
25 over a lot of those things to better manage

79 (Pages 310 to 313)

9d654179-bf58-4c1e-a369-6f628be7b1a5

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP

Brad M. Gerber                    August 4, 2011

Page 314

1  the store because they are the one that is
2  there every day and they are the one that know
3  what's going to make the store successful and
4  reach the primary purpose of the position in
5  the summary of the job description.
6  BY MS. RUBIN:
7      Q.  Do you believe you were misinformed
8  when you were told you would work a 50 hour
9  work week and you ended up working sometimes
10 70 hours a week?
11     A.  Yeah, I believe I was misinformed when
12 I was told -- I was told it was a 50 hour work
13 week and there wasn't that many weeks that I
14 worked 50 hours.
15     Q.  What nonmanagerial duties did you have
16 to complete on a regular basis?
17     MR. SCOTT:  Object to form.
18     THE WITNESS:  I had to operate
19 the -- prepare and operate the photo machine.
20 I had to run a register.  I had to stock
21 shelves.  I had to perform maintenance inside
22 and outside the building.  I had to complete
23 cycle counts, price changes, plan-o-grams.  I
24 had to -- what else?  I had to unload trucks.
25 I had to reload trucks with empty and damaged

Page 315

1  merchandise.  That's all I can think of.
2  BY MS. RUBIN:
3      Q.  And how much time on a given day did
4  you spend performing these nonmanagerial
5  duties?
6      MR. SCOTT:  Object to form.
7      THE WITNESS:  I would say on some
8  to most days, 60 to 70 percent of the day was
9  spent on doing these tasks.
10 BY MS. RUBIN:
11     Q.  Did that affect your ability to carry
12 out your managerial duties?
13     A.  Absolutely, and it also made me work
14 more hours to be able to try to accomplish
15 some of my managerial duties that I could not
16 accomplish when the store was open.
17     Q.  And why did you not assign those
18 nonmanagerial duties that you completed to
19 someone else?
20     A.  Because I didn't have the people there
21 to do them.
22     Q.  And why didn't you have the people
23 there?
24     MR. SCOTT:  Object to form.
25     THE WITNESS:  Because the payroll

Page 316

1  was restricted to a point where we didn't
2  control how many people we had in the building
3  on any given time based on how much salary we
4  had to distribute out.
5      MS. RUBIN:  That's it.
6  BY MR. SCOTT:
7      Q.  I do have some recross.
8      A.  That's okay, it's like a tennis match.
9  I go from one side to the other.
10     Q.  You said that you couldn't choose the
11 merchandise that was brought into your store.
12 Do you recall saying that?
13     A.  Correct.
14     Q.  The ad ordering process did allow you
15 to adjust up and down the amount of product
16 that was being ordered for your store,
17 correct?
18     A.  It allowed me to make suggested
19 increases or decreases in the merchandise that
20 was already listed there.  I didn't get to
21 choose the merchandise.  But yes, that's
22 correct.
23     Q.  And in some instances, you attempted
24 to buy instead of 200 toothbrushes, two
25 thousand?

Page 317

1      A.  I attempted to utilize the system to
2  order more than they had designated for my
3  store and sometimes large quantities because
4  of the uniqueness of the store, yes.
5      Q.  And in some instances you made
6  suggestions as to unique products to order for
7  your neighborhood, right?
8      A.  I did.
9      Q.  And those products, some of those
10 products were, in fact, ordered for your
11 store, right?
12     A.  They were.
13     Q.  You talked a lot about what you didn't
14 have independent judgment to do.  You said you
15 didn't have independent judgment regarding the
16 placement of merchandise in your store.  Do
17 you remember that?
18     A.  That's correct.
19     Q.  But when we talked about merchandising
20 earlier, you did talk about how if you were
21 doing merchandising the right way, you're
22 figuring out where you could place products on
23 the shelves for people who are vertically
24 challenged, right?
25     A.  That's right.

                    80 (Pages 314 to 317)

9d654179-bf58-4c1e-a369-6f628be7b1a5

Brad M. Gerber                        August 4, 2011

Page 318

1    Q. And that's a judgment you made, right?
2    A. No, that's a recommendation that I
3  would make, and it would have to be approved
4  by my supervisor, by district manager or the
5  corporate level based on what kind of a
6  judgment it was.
7    Q. Okay. And did they approve that?
8    A. Sometimes.
9    Q. So in some instances you did have your
10 judgment to place products where you wanted in
11 the store?
12     MS. RUBIN: Objection to form.
13     THE WITNESS: Sometimes.
14 BY MR. SCOTT:
15   Q. You said you didn't have independent
16 judgment regarding the hiring process. Did
17 anybody force you to hire somebody you didn't
18 want to hire?
19   A. No.
20   Q. Everybody that you hired from the
21 store -- I understand that you had to get
22 approval, but everybody that you hired in the
23 store was your pick, right?
24     MS. RUBIN: Objection to form.
25 You can answer.

Page 319

1      THE WITNESS: At the end of the
2  day it was the person that we chose based on
3  the criteria that was set by the company that
4  as long as they passed through it all, yes.
5  BY MR. SCOTT:
6    Q. It was the person that you or the
7  salaried co-managers chose?
8    A. Yes.
9    Q. You said you didn't have independent
10 judgment regarding who to reward when they put
11 in the RAPTAR and SMILE programs. Do you
12 remember that?
13   A. Yes.
14   Q. But you could choose based on your
15 evaluations of the employee who to give the
16 RAPTAR cards to, right?
17   A. Well, we gave -- yeah, we gave them
18 out to the people who deserved them for each
19 individual instance that they exhibited those
20 behaviors.
21   Q. And that was based on your judgment of
22 whether they exhibited those behaviors, right?
23   A. Yeah, but whether they exhibited those
24 behaviors was set down by the company what the
25 behaviors were, but yes.

Page 320

1    Q. Right, but it was your observations to
2  determine whether or not they did exhibit
3  those behaviors, right?
4    A. Yeah.
5    Q. HR didn't call you and say --
6    A. No, no, no, you're right, yeah, that's
7  correct.
8    Q. And nobody ever called you and said
9  you need to give somebody a RAPTAR card right
10 now?
11   A. No, that's not true. There were
12 instances where the company did get
13 compliments on certain employees and we were
14 told to give them a SMILE card. And there
15 were times when the company actually did mail
16 us in the mail a paper that said
17 congratulations to so and so for doing a good
18 job and there was a SMILE card or a RAPTAR
19 attached to it and we gave it to them.
20   Q. And that was based on a customer
21 compliment?
22   A. That was based on a customer
23 compliment or another communication that they
24 received, yes, so they did dictate who got
25 those cards at that point.

Page 321

1    Q. What other communications would they
2  have received that dictated they got the SMILE
3  cards?
4    A. A communication may be from a visiting
5  district manager or something, seeing a person
6  doing something, and the communication went in
7  through the corporate level instead of going
8  through the store.
9    Q. Okay. Outside of these communications
10 that are coming from corporate or coming from
11 a customer compliment, which are independent,
12 you made the decision as to whom to praise
13 within your store, correct?
14   A. The store managers did, yes.
15   Q. These nonmanagerial duties that you
16 performed, when you were performing these
17 nonmanagerial duties you were still in charge
18 of the overall operations of the store,
19 correct?
20     MS. RUBIN: Objection to form.
21 You can answer.
22     THE WITNESS: I was still in the
23 supervisory role, but I did not have the time
24 to give it the proper attention that it needed
25 at that time because I was involved in

81 (Pages 318 to 321)

REPORTED BY: Steven S. Huseby, RPR, CSR www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022 (404) 875-0400

9d654179-bf58-4c1e-a369-6f628be7b1a5

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP
Brad M. Gerber                              August 4, 2011

Page 322

1   specific nonmanagerial tasks.
2   BY MR. SCOTT:
3       Q.  Regardless of the tasks you were
4   performing you were the highest ranking front
5   end employee in the store whenever you were
6   there, right?
7       A.  That's correct.
8       Q.  And regardless of the tasks that you
9   were performing you were responsible for
10  making sure that all company policies were
11  being carried out, right?
12      A.  Correct.
13      Q.  And regardless of the tasks you were
14  performing, you were responsible for directing
15  the work of all employees in the store, right?
16          MS. RUBIN:  Objection to form.  Go
17  ahead.
18          THE WITNESS:  I was responsible
19  for giving the work to the employees to
20  perform but I could not direct them to do it
21  while I was doing something else all the time.
22  That's the truth.  I mean, if I'm in the
23  bathroom cleaning the bathroom, I can't direct
24  the cashiers to -- to come up to the front and
25  make the lines get smaller if I'm the manager

Page 323

1   of the store and I'm in the bathroom cleaning
2   the bathroom.
3   BY MR. SCOTT:
4       Q.  If you're out in the store and you're
5   doing stocking or plan-o-grams, you're still
6   observing the other employees in the store
7   carrying out their functions, right?
8       A.  Not completely visually all the time,
9   but I can stop what I'm doing and go and see
10  them and stop the process of what I'm engaged
11  in, yes.
12      Q.  And as you are going through the store
13  and you're carrying out functions like cycle
14  counts, you can observe whether someone has
15  completed a plan-o-gram appropriately, right?
16      A.  As long as it's in the same area where
17  I am at that time, otherwise I can walk to
18  that area and look at it and not continue the
19  tasks that I'm doing at that time.
20      Q.  And the same is true for price changes
21  or expiration dates or anything like that?
22      A.  Of course, nobody held me hostage in
23  one spot.  I was allowed to move and the
24  store, but I still had to complete all the
25  tasks that were necessary because a lot of

Page 324

1   them were time sensitive as well.
2       Q.  So you had to complete the
3   nonmanagerial tasks and the managerial tasks
4   at the same time, right?
5       A.  Sometimes.
6           MR. SCOTT:  That's it.
7           MS. RUBIN:  All right.
8           MR. SCOTT:  You're done.
9   (Deposition concluded, 4:33 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 325

1   ERRATA SHEET
2
3       Pursuant to Rule 30(e) of the Federal Rules of
    Civil Procedure and/or the Official Code of Georgia
4   Annotated 9-11-30(e) any changes in form or
    substance  which you desire to make to your
5   deposition testimony shall be entered upon the
    deposition with  a statement of the reasons given
6   for making them.
7       To assist you in making any such corrections,
    please use the form below. If supplemental or
8   additional pages are necessary, please furnish same
    and attach them to this errata sheet.
9
            - - -
10
        I, the undersigned, BRAD M. GERBER,
11  do hereby certify that I have read the foregoing
    deposition and that to the best of my knowledge
12  said deposition is true and accurate (with the
    exception of the following corrections listed
13  below).
14
15  Page_____ Line_____should read:_____
16  Reason for change:_____
17
18  Page_____ Line_____should read:_____
19  Reason for change:_____
20
21  Page_____ Line_____should read:_____
22  Reason for change:_____
23
24  Page_____ Line_____should read:_____
25  Reason for change:_____

82 (Pages 322 to 325)

REPORTED BY: Steven S. Huseby, RPR, CSR www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022 (404) 875-0400
9d654179-bf58-4c1e-a369-6f628be7b1a5