# Exhibit FF

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


YATRAM INDERGIT, on Behalf

of Himself and Others

Similarly Situated

          Plaintiff          Civil Action No.:

vs.                              1:2008cv09361

RITE AID CORPORATION, RITE

AID OF NEW YORK, INC. and

FRANCIS OFFOR as Aider &

Abettor

          Defendants

_____/



          The deposition of KAY GOODLOE was held on

Friday, July 22, 2011, commencing at 9:30 a.m., at the

Offices of Gore Brothers Reporting & Videoconferencing,

20 South Charles Street, Suite 901, Baltimore, Maryland

21201, before Susan M. Wootton, Notary Public.



REPORTED BY: Susan Wootton, RPR, CLR

**Page 56**

1      Q      So I take it this downtown store involved

2    very little hiring on your part?

3              MR. ELLWANGER:  Objection to form.

4              MS. BARBAREE:  Is that correct?

5              THE WITNESS:  Correct, the only people who

6    changed were assistant managers, and I had no control

7    over hiring assistant managers.

8      Q      And are you sure that they were called

9    assistant managers, once it became Rite Aid?

10     A      Or service assistants.  To me, the names

11    are the same.

12     Q      And it's your testimony that, even though

13    they were hourly, you were not involved in hiring them?

14     A      Absolutely not.

15     Q      Did you interview them before they came to

16    your store?

17     A      No, most of them had worked at previous

18    stores and didn't work out there and were assigned to

19    me to deal with.

20     Q      So, even though you had met the cashier,

21    Tavia, and interviewed her before she came to your

22    store from another store, it's your testimony that the

23    service assistants, you were not allowed to interview

24    before they started working at your store?

25     A      Not allowed?  I, you know, I mean I don't

**Page 57**

```
 1   know that not allowed is the correct word.  I just,
 2   they were assigned to my store.
 3              You know, I probably could have gone over
 4   to the store and interviewed them, yes, but, that
 5   wouldn't have changed who came to my store.
 6        Q    While you were a store manager at the
 7   downtown store, did you ever terminate any employee?
 8        A    No, all of our terminations had to go
 9   through human resources or loss prevention for
10   termination.
11              I could not hire or fire anyone.
12        Q    Was that true at Eckerd?
13        A    I just, I didn't do a lot of firing.  I
14   can't think of a time that I, you know, had to fire
15   someone.
16        Q    And at Brooks, did you ever fire someone?
17        A    Did I ever?  Yes, I think I did.  I had a
18   young man who was an assistant manager who was
19   falsifying -- no, that was probably under Brooks, was
20   the one that I did.
21        Q    That's what I was asking about.
22        A    And I contacted HR on that.
23        Q    So you recommended termination to HR in
24   that instance?
25        A    And they sent out loss prevention, because
```

**Page 58**

1    it was a loss prevention issue.

2         Q     And then did you sit down to terminate the

3    employee with someone from loss prevention?

4         A     Yes.

5         Q     And then, once it became a Rite Aid store,

6    the downtown store, did you ever recommend termination

7    of anyone?

8         A     No.

9         Q     And was anyone, in fact, terminated from

10   that store while you were the store manager there and

11   it was a Rite Aid store?

12        A     Not that I recall.

13        Q     Did you have a good working relationship

14   with Paul Johnson?

15        A     Yes.

16        Q     What did you think his strengths were as a

17   district manager?

18        A     I think he was good at listening to our

19   needs and trying to resolve things that we needed for

20   the store.

21              Sometimes I didn't feel like he was fair.

22        Q     Any other strengths that Paul had as a

23   district manager?

24        A     No, I just, I co-existed with him.

25        Q     What do you mean by that?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**          **1:2008cv09361**
Kay Goodloe                                                            July 22, 2011

Page 78

1       Q       So you said one of your strengths as a
2   store manager was providing excellent customer service.
3               Why did you make sure, as a store manager,
4   that your store was providing excellent customer
5   service?
6       A       Making sure that the product was in stock
7   and that the store was clean and just in good shopping
8   condition for the, for the customers.
9       Q       Why were you concerned about making sure
10  that you provided your customers with the best customer
11  service experience?
12      A       That was my job, as it was for everybody in
13  the store.
14      Q       Well, do you think that good customer
15  service had an impact on the store's profitability?
16      A       Sure.
17      Q       Did you think that keeping the store in
18  stock improved the store's profitability?
19      A       Sure.
20      Q       Do you think that keeping the store clean
21  improved the store's profitability?
22      A       Sure.
23      Q       And obviously it was important to keep it
24  in good shopping condition to drive sales?
25      A       Correct.

**Page 79**

```
 1        Q      You also said one of your strengths as a
 2   store manager was keeping up with the daily records?
 3        A      Right.
 4        Q      What paperwork did you have to do daily as
 5   a store manager?
 6        A      I had to check out, making sure that all
 7   the logs in the store, that were requirements by Rite
 8   Aid, were completed, and that I went to our portal and
 9   got all the messages off of it as what to do per
10   corporate.  That's about it.
11        Q      That's the only daily paperwork you recall
12   being involved in as a store manager?
13        A      The check out, but that wasn't something
14   that I had to do solely, myself.
15        Q      What do you mean by the check out?
16        A      Checking out the money and you know
17   reporting sales and everything, but that could be done
18   by my assistant as well.
19        Q      Did you prepare the schedule as the store
20   manager?
21        A      Not entirely, no.  It was done through
22   Kronos which generated a schedule for my associates
23   based on the hours that they, that were entered for
24   them to work, what hours they were available to work.
25        Q      When did you use, when did you use Kronos
```

**Page 80**

1    to assist you with scheduling?

2         A    Every week.

3         Q    When did you start using Kronos?

4         A    To do the scheduling, when Rite Aid took

5    over.

6         Q    You think that the software was called

7    Kronos?

8         A    Well, no, not the software for Kronos, but

9    the scheduling part of it was something that I had

10   never used for Brooks or Eckerd.

11        Q    Okay.  So let's talk about at Brooks and

12   Eckerd, how did you prepare your schedule as a store

13   manager?

14        A    I did it based on, you know, the hours that

15   I was given and then basically manually did it myself.

16        Q    So at Brooks and Eckerd while you were a

17   store manager you were given a certain number of hours

18   a week that you could schedule employees?

19        A    Right.

20        Q    And that, that amount for payroll was given

21   to you in hours and not dollars?

22        A    Correct.

23        Q    Did you ever ask for an increase in the

24   number of hours you were given, while you were a store

25   manager at Brooks or Eckerd?

**Page 81**

```
 1      A      I really didn't need it.  As you could see
 2   I had more employees.
 3      Q      And my question was did you ever ask for an
 4   increase in the hours, while you were a store manager
 5   at Brooks or Eckerd?
 6      A      Probably from time to time I did.  There
 7   were different activities that were, that happened
 8   downtown and I would ask for additional hours and
 9   usually I got it.
10      Q      And then there were times that you didn't?
11      A      Right.
12      Q      When you say there were activities
13   downtown, there might be something seasonal going on --
14      A      Exactly.
15      Q      Could I finish my question?
16      A      Uh-huh.
17      Q      There might be something seasonal going on
18   that would cause you to want to plan differently at
19   your store?
20      A      Correct.
21      Q      And that might be additional staffing or
22   additional merchandise?
23      A      Correct.
24      Q      What types of activities might be happening
25   downtown?
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**          **1:2008cv09361**
                          **Kay Goodloe**                                **July 22, 2011**

1          A       He was plugging those in at his, at his

2     level.

3                  I didn't do any scheduling or anything of

4     her in, in my system.

5                  It was just when I got my print-out of

6     payroll Beth was on there.

7          Q       When Paul Johnson came in your store as the

8     district manager, let's say in 2009, I know you told me

9     that his pay was changed towards the end of your

10    employment?

11         A       Right.

12         Q       So let's focus on 2009, when he came in

13    once every two to three weeks, how long was he there?

14         A       Oh, he would be there from anywhere from 45

15    minutes to two hours.

16         Q       What did he do while he was there?

17         A       Basically checked all the reports, told me

18    what I needed to do for the next, basically, three

19    weeks until I saw him again, things to do in my store.

20                 He would leave me a list of maybe, you

21    know, it could be two to three pages of things to do.

22         Q       So he would walk the store with you --

23         A       Uh-huh.

24         Q       -- and you all would talk about things that

25    needed to be done in the store?

Page 106

1        A      He would talk about things that needed to

2    be done and I would write them down, and it would be

3    two to three pages of things I needed to do, you know,

4    that he felt needed to be done.

5        Q      Did Paul ever come in your store and

6    actually work in the store?

7        A      Never.

8        Q      You never saw him do a planogram for you,

9    for example?

10       A      Oh, no.

11       Q      Or work along side your hourly employees?

12       A      No.

13       Q      Did you, as the store manager, create a

14   work list every morning?

15       A      Yes.

16       Q      Why did you do that?

17       A      Because I was the one who read the E-Mails

18   that were sent out by corporate.

19              We could have as many as 30 E-Mails a day

20   telling us of things to do.

21              So I would compile all of those and that

22   would be our work list, along with the daily things we

23   needed to get done.

24       Q      When you were store manager for Brooks or

25   Eckerd, at that same downtown store, did you create a

Page 107

1    daily work list?

2          A    Yes.

3          Q    How was it different, at all, from the one

4    that you created for Rite Aid?

5          A    You know, I found when we had Rite Aid that

6    the tasks that they wanted us to do on a daily basis,

7    or the SYSMs that we got and were generated were just

8    unbelievable.

9               You know, we want you to do this today.

10   Oh, we made a mistake.  Oh, we need you to do it this

11   way.

12              You know, it was just constant changing

13   things that --

14         Q    Did you get SYSMs about things that needed

15   to be done in your store, that had no application to

16   your store?

17         A    Sometimes.

18         Q    And those were ones that you could just

19   disregard?

20         A    Right.

21         Q    Did you have a liquor department in your

22   store?

23         A    No.  No.

24         Q    Did you have a GNC?

25         A    No.

Page 112

```
 1       A      Uh-huh.
 2       Q      -- you might get called to the front for a
 3   zero sale or a void that you needed to approve?
 4       A      Yes, to do management work, yes.
 5       Q      And if you were standing at the front
 6   running the register you might be also watching for
 7   shoplifting or security issues in the store?
 8       A      As everybody was in the store, yes.
 9       Q      And even if you were standing in the front
10   of your store -- well, let me ask you this.
11              In this particular downtown store that you
12   managed as a store manager could you see the entire
13   store from the front?
14       A      No.
15       Q      What areas could you not see?
16       A      I couldn't see a lot of areas because the
17   shelves were high.
18       Q      Were the shelves higher than other Rite Aid
19   stores, to your knowledge?
20       A      No.
21       Q      No?
22       A      No.
23       Q      So when you were standing in the front
24   running a register, for example --
25       A      Right.
```

Page 113

```
 1        Q        -- were you also supervising employees in
 2   the store?
 3        A        No.  I mean, no, there was a lot of times
 4   that, that I couldn't supervise employees.  I would be
 5   out unloading a truck in the middle of the street
 6   outside.
 7                 There wasn't a manager inside the store to
 8   watch employees.
 9        Q        But they would call you if they needed you,
10   right?
11        A        If they could find me, yes, absolutely.
12        Q        Why do you say if they could find you?
13        A        Well, a lot of times I would be unloading a
14   truck which was, you know, in a certain parking area
15   for a loading zone.
16        Q        And it was required that you, as a manager,
17   be in the presence of the truck because of security
18   issues, correct?
19        A        A lot of times the pharmacist would have to
20   jump in and do managerial things for me, because I was
21   just spread so thin that I was doing, unloading a truck
22   while they needed things from the front or approvals or
23   whatever.
24        Q        Could you try answering the question I
25   asked?
```

**Page 114**

1      A      Sure.

2      Q      Would you read it back?

3             (The reporter read back as requested.)

4      Q      When the back door is open a manager has to

5   be there, right --

6      A      I went through the front door that was open

7   all the time.

8      Q      -- unloading the truck?

9      A      Uh-huh.

10      Q      Yes?

11      A      Yes.

12      Q      I just need verbal responses.

13      A      Yes.

14      Q      I'm not questioning your answers.  I just

15   need verbal responses.

16      A      Okay.

17      Q      But even if you came in the front door a

18   manager still had to be involved with merchandise

19   coming off the truck, correct?

20      A      It didn't have to be a manager to unload a

21   truck.

22      Q      In your opinion, it didn't have to be a

23   manager involved in the unloading of a truck?

24      A      No, Not until it came to RX crates.

25      Q      So at least a manager had to be there for

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**     1:2008cv09361
Kay Goodloe                                                                July 22, 2011

Page 136

1   you would sometimes use a daily tour sheet and

2   sometimes just write on your own piece of paper?

3         A      Sure because a lot of things didn't apply

4   to that store, and then there were other tasks that did

5   or didn't apply to other stores.

6         Q      So the daily tour sheet was really not that

7   useful to you?

8         A      No, but I still had to do it.

9         Q      But didn't do it every day?

10        A      Pretty much I had to, because it was a

11  requirement of my job to do it.

12               I mean even though it didn't -- I did a lot

13  of things in that store just to be compliant.

14        Q      So you would fill out the daily tour sheet

15  but not use it?

16        A      Uh-huh.

17        Q      You would use your own work list that you

18  had created?

19        A      Yes, and when things would come in like,

20  you know, A check list for things from corporate some

21  things didn't apply to me because I didn't have it.

22        Q      And you would just check those things off?

23        A      I would put NA on it, you know, to those

24  things that didn't apply to me, but I still had to do

25  them.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**            **1:2008cv09361**
Kay Goodloe                                                            **July 22, 2011**

Page 137

1          Q      But with respect to the daily tour sheet,

2     you're saying you actually filled it out and created

3     your own work list?

4          A      Uh-huh.

5          Q      Yes?

6          A      Yes.

7          Q      Were you the type of store manager that did

8     not only daily planning of work, but weekly and monthly

9     planning of work?

10         A      Yes, sure.

11         Q      What type of long-term planning did you do

12    as a store manager?

13         A      Just like seasonal merchandise.  I knew

14    that was coming up and I would have to plan accordingly

15    for that.

16                I would have to call stores and find out

17    what they had overstock of that I could come and get.

18    I mean all that took planning.

19         Q      Did you make decisions about the way your

20    associates were paid while you were a store manager?

21         A      No.

22         Q      Did you ever recommend a pay increase for

23    an employee?

24         A      Yes, but they didn't get it.

25         Q      I assume that you you're saying you did not

Page 138

1     make pay decisions when you were a store manager at

2     Brooks, Eckerd or Rite Aid?

3          A     It was a lot easier to get pay increases at

4     Eckerd.

5          Q     At Eckerd?

6          A     Uh-huh.

7          Q     How did you get pay increases at Eckerd?

8          A     I would ask my district manager for it and,

9     you know, it seemed like it was pretty much etched in

10    stone that everybody got twenty cents at Rite Aid.

11         Q     So your associates at Rite Aid did get

12    increases --

13         A     Yes.

14         Q     -- but you felt like you had no input in

15    the increases?

16         A     Absolutely none.

17         Q     Could you have, for example, prevented them

18    from getting the standard annual increase?

19               MR. ELLWANGER:  Objection to form.

20               THE WITNESS:  No.

21               MR. ELLWANGER:  You can answer.

22               THE WITNESS:  No.

23               MS. BARBAREE:  Did you ever try?

24               THE WITNESS:  I didn't try because I didn't

25    have any employees that weren't deserving of it.

**Page 139**

```
 1        Q      Did you ever talk to Paul Johnson about
 2   giving an employee an increase that you thought they
 3   were deserving of?
 4        A      Sure.
 5        Q      How often did you talk to Paul about that?
 6        A      Once out of two employees.
 7        Q      Who was that?
 8        A      What?
 9        Q      Who was the employee?
10        A      Aretha.
11        Q      What was Mr. Johnson's response?
12        A      She was maxed out.  I mean the bottom line
13   is she wasn't going to get any more.
14        Q      Did your employees at the downtown store
15   ever have conflicts?
16        A      No.  It was a very close knit --
17        Q      Do you know whether the employees at the
18   downtown store ever complained about you?
19        A      Not that I know of.
20        Q      Do you recall ever being involved in an HR
21   investigation in your store?
22        A      HR, no.
23        Q      Do you recall being disciplined for
24   retaliating against an employee who had complained
25   about you?
```

**Page 147**

1    handle customer complaints.

2        Q     What about the ones that you learned about

3    from a customer's contact with the corporate office?

4        A     We had very few, but if I, if that was the

5    case -- I mean very few, maybe three or four in the

6    time that, you know, I was there.

7              Of course, I would handle those or my

8    assistant.

9        Q     So you must have had very good CSI scores?

10       A     Yes.

11       Q     How was your shrink as a store manager at

12   that downtown store?

13       A     Actually, on the CSI scores we really

14   didn't, because there were a lot of things that people

15   complained about that were not under my control.

16       Q     What were those things?

17       A     Store hours on the weekends, the mix of

18   merchandise.  I had no control over that.  That was

19   done during the remodel by Paul Johnson.

20             You know, things like that I had no control

21   over, so, yes, that brought it down.  The wait times

22   for checking out.

23             MS. BARBAREE:  I think it's a good time for

24   a short break.

25             (A short break was taken.)

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**   **1:2008cv09361**
Kay Goodloe                                July 22, 2011

Page 148

```
 1        Q      Ms. Goodloe, you understand that you're
 2   still under oath?
 3        A      Yes.
 4        Q      Did you talk about the deposition during
 5   the break?
 6        A      No.
 7        Q      So I want to talk a little bit more about
 8   the downtown store where you were a store manager and
 9   make sure that I understand what you were actually
10   doing day to day in that store as the store manager.
11               If I understood you correctly, you said
12   that you unloaded the truck by yourself at that store?
13        A      Most of the time, yes.
14        Q      And when you say most of the time, how
15   often?
16        A      Probably 90 percent of the time.
17        Q      And the other 10 percent of the time what
18   happened?
19        A      My assistant would help.
20        Q      Your assistant, Don?
21        A      Mostly Linda.
22        Q      And who was Linda?
23        A      She was the older lady that I had.
24        Q      Okay.  You've remembered her name now?
25        A      Uh-huh, yes.
```

Page 149

```
 1        Q      Do you know what her title was, her job
 2   title?
 3        A      I think she was a service assistant until
 4   that, that job no longer, that title no longer existed.
 5        Q      And do you know whether she was an hourly
 6   employee?
 7        A      Hourly.
 8        Q      Did Don help you unload the truck?
 9        A      A little bit.
10        Q      What would be the occasions when Don would
11   be helping you unload the truck?
12        A      Well, you know, he would try to.  It was
13   difficult for him to.
14               He had some kind of medical problems that
15   he couldn't, you know, help efficiently.
16        Q      Do you know what his medical problems were?
17        A      They caused him to go to the bathroom a
18   lot.  I don't know.
19        Q      And when you say you unloaded the truck by
20   yourself, that means that you carried the totes in --
21        A      Uh-huh.
22        Q      -- and placed them in the aisles?
23        A      Right.
24        Q      You didn't have anywhere else to place the
25   totes?
```

Page 151

1   downtown store while you were store manager you ran the

2   register yourself?

3        A     Yes, I did.  I ran it one hour in the

4   morning before, from 8:00 to 9:00 every morning.

5        Q     And then did you also run it at other parts

6   of the day?

7        A     At the lunchtime hour, I would run it then,

8   and I would also go in the back and relieve the

9   pharmacy so they could go to lunch, which would be

10  another hour, because both of them had to go to lunch

11  and it was too busy at that time of day to, to just

12  leave one person back there.

13       Q     When you say both, you mean the pharmacist

14  and the pharmacy tech?

15       A     Tech, exactly.

16       Q     And were there other times during the day

17  that you also ran registers?

18       A     Yes.  Whenever there was a backup, I would

19  go right onto the third register up front.

20             It was either my assistant or myself would,

21  would go up there and would run that.

22       Q     Who kept the downtown store clean while you

23  were the store manager?

24       A     I did because there was nobody else to do

25  it.  You know, I could assign that to somebody, had I

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**         **1:2008cv09361**
                          Kay Goodloe                                   **July 22, 2011**

Page 152

1    had the opportunity, but I didn't.

2        Q    So what type of cleaning did you do on a

3    daily basis in the downtown store?

4        A    Floor cleaning on a daily basis.  I would

5    front and face, if it wasn't done the night before, my

6    associates if they didn't have time to.

7            I would do all the planograms, the updates

8    on planograms.  Basically I did all of that, which

9    could be done by an associate, had I had somebody to do

10   it.

11       Q    Are you testifying that you did all of

12   planograms in the downtown store by yourself while you

13   were the store manager?

14       A    90 percent, yes.

15       Q    And who did the other 10 percent?

16       A    My assistant.

17       Q    Were the hourly employees in that store not

18   trained on how to do planograms?

19       A    Oh, they could do it if they had had time

20   to do it, certainly.

21       Q    But they didn't?

22       A    But they didn't have time to do it.

23       Q    Would you say that at that downtown store

24   you had such experienced employees that you didn't

25   actually have to direct their work day to day?

Page 153

 1                  MR. ELLWANGER:  Objection to form.

 2                  THE WITNESS:  It was directed, but they

 3      knew what to do.

 4                  MS. BARBAREE:  So, how was it directed.

 5                  THE WITNESS:  I would make a list, and they

 6      certainly knew how to go after it and get it done, what

 7      they could, you know, and they knew that, you know, if

 8      they weren't busy with, with customers, that they would

 9      jump right in on a tote and put it up or clean up their

10      areas, sweep, whatever needed to be done.

11                  I mean they absolutely knew that, if they

12      weren't busy, that they would jump right on those tasks

13      and do them.

14          Q     Based on your direction, or they just knew

15      without you telling them?

16          A     They knew without telling.  I mean they

17      were --

18          Q     Because they were very experienced, right?

19          A     Yes, exactly.

20          Q     When you told me about walking the store in

21      the mornings and determining the work that needed to be

22      done, were you primarily making a list for yourself?

23          A     Yes, basically.

24          Q     So, the work that you needed to get

25      accomplished that day?

**Page 156**

1    out at that store previously.

2         Q     When you say the budget that was laid out,

3    what did he tell you about that?

4         A     He gave me the hours for that store, you

5    know.  He didn't change it.

6         Q     So, he again told you a number of hours?

7         A     Uh-huh.

8         Q     Yes?

9         A     Yes.

10        Q     Rather than a dollar figure?

11        A     Yes.

12        Q     Did you discipline any employees at the

13   University store?

14        A     No.

15        Q     Did you hire anyone at the University

16   store?

17        A     No.

18        Q     Did you fire anyone at the University

19   store?

20        A     No.

21        Q     Did you also prepare the manager's schedule

22   at the University store?

23        A     Yes.

24        Q     Did you have a loss prevention agent at the

25   University store?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**    **1:2008cv09361**
Kay Goodloe    July 22, 2011

Page 157

```
 1       A     No.  I mean there was one assigned, but I
 2   didn't see them in those two weeks.
 3       Q     So there was a loss prevention manager
 4   assigned?
 5       A     Yes.
 6       Q     But there wasn't a loss prevention agent
 7   who worked in the store?
 8       A     Oh, no, not in the store, no.
 9       Q     In the few weeks that you were assigned to
10   the University store as the store manager, would you
11   say that you were running that store?
12             MR. ELLWANGER:  Objection to form.
13             THE WITNESS:  No.
14             MS. BARBAREE:  Would you say that you were
15   running the downtown store as the store manager?
16             MR. ELLWANGER:  Objection to form.
17             THE WITNESS:  No.
18       Q     And why would you say you were not running
19   the downtown store while you were a store manager
20   there?
21       A     Because I didn't have the leeway from
22   corporate to run that store.
23       Q     From corporate or from Paul Johnson?
24       A     You know, I include him in the corporate
25   realm of things.  You know, everything was just laid
```

Page 158

1  out for me to do, and that's what I was supposed to do.

2       Q      And Paul Johnson had you doing things that

3  didn't even apply to your store?

4       A      Did not even apply to that store, yes.

5       Q      Did you ever do any ordering at the

6  University store?

7       A      No.

8       Q      Do you know when the truck came at the

9  University store?

10       A      No.

11       Q      Do you know if the University store had a

12  back room?

13       A      Yes.

14       Q      Did you do any work on the back room --

15       A      Yes.

16       Q      -- at the University store?

17       A      A little.

18       Q      What did you do?

19       A      I put out merchandise.

20       Q      And you said earlier, I think, that the

21  University store was open on the weekends as well?

22       A      Yes.

23       Q      And then it was also open later at night on

24  the weekdays?

25       A      Yes.

Page 172

```
 1        Q     And now, if we go back to Exhibit 1, we
 2  have your markings, and I want to go over those.
 3              In the summary section, I take it you felt
 4  you were not at all responsible for merchandising,
 5  programming and budgeted financial targets as a store
 6  manager?
 7        A     Correct.
 8        Q     And specifically as an exempt store
 9  manager?
10              MR. ELLWANGER:  Objection to form.
11              THE WITNESS:  I don't know what the
12  question was.
13        Q     While you were a salaried store manager at
14  Rite Aid, you felt that you were not responsible for
15  merchandising, programming?
16        A     Not, not making up planograms, no, they
17  were all set by corporate.
18        Q     And you felt that you were not responsible
19  for budgeted financial targets?
20        A     Not really.
21        Q     What does not really mean?
22        A     No.
23        Q     Okay.  And then you also have marked,
24  frequent independent judgments are essential.
25              They were not essential to you as a
```

Page 173

 1   salaried store manager at Rite Aid?

 2        A     I didn't really, I wasn't able to really do

 3   what I wanted to do.

 4        Q     You did not make frequent independent

 5   judgments in that position?

 6        A     Yes, I guess I did, but it was according to

 7   the guidelines of what Rite Aid set forth.

 8        Q     Well, you either did or you didn't, and I

 9   can't tell from your answers which it is.

10              Are you saying that you did make frequent

11   independent judgments as a, as a salaried store

12   manager?

13        A     No.

14        Q     What were the things that you did make

15   independent judgments about as a salaried store manager

16   at Rite Aid?

17        A     I mean, are you talking about should I,

18   should I stock the shelves or should I wait on

19   customers, are you talking about things like that?

20        Q     Is that what you're talking about, you

21   could make judgments about what you personally were

22   going to do?

23        A     No.  I mean those were basically set forth

24   from corporate.

25              You know, I didn't have any say-so what

Page 174

1    went on end caps or at the front register or how many
2    hours I used, anything like that.
3            I really didn't have the judgment, I didn't
4    have the power to make those decisions.
5        Q    Can you think of anything that you could
6    make independent decisions about as a store manager at
7    Rite Aid?
8        A    Not really.
9        Q    And then, if we look down on Exhibit 1, you
10   have underlined number 2?
11       A    Uh-huh.
12       Q    Yes?
13       A    Yes.
14       Q    Are you saying that you were not
15   responsible for meeting store retail budgeted sales
16   margin, labor, expenses and overall P&L monthly
17   results?
18       A    I felt like that was taken away from me.
19   Budgets were set by Paul Johnson.
20            If, if I had the budgets to make, I
21   wouldn't have taken 40 hours a week out of my payroll
22   for someone who didn't work in my store, and that was
23   out of my control.
24       Q    And then the last one, number 9, you have
25   marked through, responsible for hiring and training?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**          **1:2008cv09361**
Kay Goodloe                                                            July 22, 2011

Page 175

1          A        Absolutely not.   I was not responsible for
2    hiring people.   All the assistants that I had came from
3    being appointed to my store.
4                    If I had somebody come in that I felt
5    really good about hiring and they didn't pass say the
6    personality test, that wasn't my judgment to make
7    whether they worked for the company or not.   That was
8    my DM's decision.
9                    As far as training, all training of
10   management came from video sources from corporate.
11                   We had so many training videos monthly for
12   safety.   For anything that came new to the store, you
13   would always have a training video that you would sit
14   them down at.
15                   I even had, at one time, we had to Velcro
16   the scanning gun here (indicating), and it could not be
17   touched.   Everything you did had to come through the
18   scanning gun with it Velcro-ed to the cabinet.
19                   Now, I know myself, I'm left-handed, so it
20   was kind of a hard thing for me to do, being
21   left-handed and it being structurally settled on the,
22   on the Velcro.
23                   The only time that you could take it off of
24   the Velcro was to do like a big thing of water or
25   something like that.

Page 176

1                You had to only touch merchandise with one

2      hand, and there again being left-handed and for all

3      associates that are left-handed, that necessarily

4      didn't, didn't fit my way of doing things.

5                You know, I felt, I felt powerless when

6      that, when that lock came into effect.  I felt like you

7      were restricting me as, you know, it was a disability

8      for many employees, and I really resented that.

9                And they sent around an associate or a

10     manager that he had deemed to make sure that this was

11     in place, and I truly resented that, because it was a

12     disability to me, being a left-handed person, to have

13     to do it right-handed.

14          Q    Was that after you became an hourly store

15     manager?

16          A    Yes, it was, I believe.  I mean, this is,

17     the time frame is really hard for me without actual

18     dates.

19          Q    Do you know if that was one of the workload

20     efficiency changes that came into play?

21          A    I think it was, yes.

22          Q    And you mentioned the personality test.

23     Are you saying now that you did speak with candidates

24     for employment, but you were unable to hire them

25     because they failed a test?

**Page 194**

 1                    CERTIFICATE OF DEPONENT

 2

 3              I hereby certify that I have read and

 4      examined the foregoing transcript, and the same is a

 5      true and accurate record of the testimony given by me.

 6

 7              Any additions or corrections that I feel

 8      are necessary, I will attach on a separate sheet of

 9      paper to the original transcript.

10

11

12                        _____

13                              KAY GOODLOE

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit GG

YATRAM INDERGIT, ET AL. v. RITE AID CORPORATION, ET AL. July 7, 2012

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


YATRAM INDERGIT, on behalf of        )
himself and others similarly         )
situated,                            )
                                     )
              Plaintiff,             )
                                     )
         vs.                         ) CIVIL ACTION FILE NO.:
                                     ) 1:08-cv-09361-PGG-HBP
                                     )
RITE AID CORPORATION, RITE AID OF    )
NEW YORK, INC., and FRANCIS OFFOR,   )
as Aider & Abettor,                  )
                                     )
              Defendants.            )

                    - - -


                  DEPOSITION OF
              JARED NATHAN HANDSHOE
                  JULY 7, 2012
                   9:00 A.M.



     OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
           191 PEACHTREE STREET, N.E.
                  SUITE 4800
                ATLANTA, GEORGIA




REPORTED BY:
        STEVEN S. HUSEBY, RPR
           CCR-B-1372

Reported By: Steven S. Huseby, RPR, CCR www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208   (800) 333-2082
eace624b-0139-49ef-a516-5a2e978a486f

YATRAM INDERGIT, ET AL. v. RITE AID CORPORATION, ET AL.  July 7, 2012

Page 26

1    estimate four years.

2         Q.   How long did you work with Kenneth

3    Daniels?

4         A.   Until November of 2011.  I would say two

5    years.

6         Q.   And then who was the third?  Who's the

7    new one?

8         A.   Thomas Ferneaux, and that was from

9    December to present.

10        Q.   How is Mr. Ferneaux as a district

11   manager?

12        A.   He's -- he came from another company.

13   He came from -- I want to say it was Walgreens,

14   it could have been CVS, as a district manager.

15   We don't see eye to eye on some things.

16        Q.   What does that mean?

17        A.   He -- we have very different management

18   styles.

19        Q.   What do you mean by management style?

20        A.   As far as whenever he came into the

21   district, the previous district manager, Ken

22   Daniels was let go, and Tom was the one that was

23   coming in to repair the broken district.  And in

24   his process, he stepped on a lot of toes.

25        Q.   But what do you mean by management

Reported By: Steven S. Huseby, RPR, CCR www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208   (800) 333-2082

eace624b-0139-49ef-a516-5a2e978a486f

Page 27

1   style?  Not just as it relates to him.  You said

2   you have different management styles.  What do

3   you mean by that term?

4       A.   He's very much a micro manager, and

5   he -- like he takes -- like he does the majority

6   of like everything, just -- it's just one of the

7   people that you just don't mesh with.  I don't

8   really know how to explain myself.

9       Like he's taken everything that I do and

10  tried to change it and tried to make it -- he is

11  like, we're going to make it better.  We're going

12  to make you successful.  You're going to succeed.

13  You're going to do this and that.

14      I mean, he's to the point -- like he makes us

15  turn in our own schedules, like we don't get to

16  write our own schedules anymore.  Like he is very

17  much a micro manager.

18      Q.   What do you mean, your own schedule?

19      A.   I think like the schedule for the store.

20      Q.   There was a period of time where you had

21  complete control over drafting the store's

22  schedule?

23      A.   No, no.  I mean, within -- I mean, the

24  company expectation, I mean, you have -- I mean,

25  obviously you have to make a schedule to meet the

Reported By: Steven S. Huseby, RPR, CCR www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208   (800) 333-2082
eace624b-0139-49ef-a516-5a2e978a486f

YATRAM INDERGIT, ET AL. v. RITE AID CORPORATION, ET AL. July 7, 2012

Page 28

1  needs of the business.  The schedule -- I mean,

2  the manager is expected to close two nights a

3  week, rotating with the assistant manager, and

4  you obviously rotate weekend, and outside of that

5  boundary, I mean, you can generally make a

6  schedule the way you want to.

7      Q.   Other than making sure that there are --

8  there are some rules in place as to specific

9  times that you need to have an assistant manager

10  or a store manager present in the store, correct?

11      A.   Right.

12      Q.   Other than that, up until this new

13  Mr. Ferneaux, you've had the ability to make your

14  own schedule, correct?

15      A.   Yes.

16      Q.   And that has always been true up until

17  the time Mr. Ferneaux came, correct?

18      A.   There's been several -- I mean, if you

19  don't -- they will get on it hot and heavy for

20  awhile and then it will be, you know, you're not

21  doing every other weekend or you're not closing

22  two nights a week and it will -- I mean, you'll

23  get an e-mail out, the DM will come in, you know

24  you need to fix this, we need to change the

25  schedule, or you've got something going on this

Reported By: Steven S. Huseby, RPR, CCR www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208   (800) 333-2082
eace624b-0139-49ef-a516-5a2e978a486f

YATRAM INDERGIT, ET AL. v. RITE AID CORPORATION, ET AL.  July 7, 2012

Page 313

1    from this mathematical analysis you just did?

2                MR. TURNER:  Let me object.  You're

3    asking him to provide expert testimony,

4    hypotheticals, and I'll object to the form as

5    well.

6    BY MR. PRICE:

7        Q.    Go ahead.

8                MR. TURNER:  Go ahead and answer it,

9    if you know.

10               THE WITNESS:  Well, I mean, it was

11   just the amount of people in the store at any

12   given time.

13   BY MR. PRICE:

14       Q.    No, my question is not that.  My

15   question is, what can we learn from the analysis

16   you just did?

17               MR. TURNER:  Same objections.

18   BY MR. PRICE:

19       Q.    What have you concluded from the

20   analysis you just did?

21               MR. TURNER:  Same objections.

22               THE WITNESS:  There's not enough

23   payroll to effectively do the work without you

24   doing it yourself.

25   BY MR. PRICE:

Reported By: Steven S. Huseby, RPR, CCR www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208    (800) 333-2082
eace624b-0139-49ef-a516-5a2e978a486f

YATRAM INDERGIT, ET AL. v. RITE AID CORPORATION, ET AL. July 7, 2012

Page 314

1      Q.   So to effectively do the work, who does

2    the work?

3      A.   I mean, I do a large portion of the

4    physical work in the store.

5      Q.   When you say a large portion of the

6    physical work in the store, what percentage of

7    the work in the store that is physical do you

8    think you do?

9              MR. TURNER:   Object to the form.

10             THE WITNESS:   I would say 70 percent

11   is a safe number.

12   BY MR. PRICE:

13     Q.   And we've heard some testimony about

14   cleaning and -- well, let me back up.

15     You do cleaning in the store; is that

16   correct?

17     A.   Yes.

18     Q.   Stocking shelves?

19     A.   Yes.

20     Q.   You handle truck day?

21     A.   Yes.

22     Q.   Is there any -- do you consider those to

23   be all nonmanagerial tasks?

24             MR. TURNER:   Object to the form.

25             THE WITNESS:   Yes.

Reported By: Steven S. Huseby, RPR, CCR www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208   (800) 333-2082

eace624b-0139-49ef-a516-5a2e978a486f

YATRAM INDERGIT, ET AL. v. RITE AID CORPORATION, ET AL.  July 7, 2012

Page 315

1    BY MR. PRICE:

2        Q.   What other nonmanagerial tasks can you

3    provide me with that you do?

4              MR. TURNER:  Object to form.

5              THE WITNESS:  Well, the first thing

6    in the morning, the expectation for all stores is

7    you do your core report and your zero counts and

8    your freshness.  That's all nonmanagerial floor

9    tasks and, I mean, that's expected with every

10   store to be done first thing in the morning.

11       I mean, with every store first thing in the

12   morning there's only a cashier and manager, so

13   the manager is -- or the cashier, while the

14   manager -- or the cashier is doing that work.

15   BY MR. PRICE:

16       Q.   Okay.  And then after that?  Let's walk

17   through the day.  I think that's a good way to do

18   it.

19       A.   Well, I mean, you've got -- two days a

20   week you've got liquor deliveries, and you have

21   to receive the liquor.  I mean, I wouldn't

22   consider receiving the liquor too much of a

23   managerial task.  I mean, typically you're

24   hauling liquor around.

25       Q.   Okay.  So hauling liquor is one.

Reported By: Steven S. Huseby, RPR, CCR www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208    (800) 333-2082

eace624b-0139-49ef-a516-5a2e978a486f

YATRAM INDERGIT, ET AL. v. RITE AID CORPORATION, ET AL. July 7, 2012

Page 321

1    product out.

2         Q.   So it's akin to stocking --

3              MR. TURNER:  Object to the form.

4              THE WITNESS:  It's -- yeah, yeah.

5    BY MR. PRICE:

6         Q.   Any other tasks that you consider to be

7    nonmanagerial?

8         A.   Well, your first three in the morning;

9    your zero counts, your scan.  You're physically,

10   you know, working on the floor.  Your freshness

11   reports, you're pulling outdates.

12             MR. TURNER:  Hang on.  Object to the

13   last question.  I didn't want to interrupt him.

14   BY MR. PRICE:

15        Q.   Okay.  Are there any other nonmanagerial

16   tasks that you and I haven't covered?

17             MR. TURNER:  Objection.

18             THE WITNESS:  Well, I mean,

19   obviously, you take out your trash every day.

20   That's a nonmanagerial task.

21   BY MR. PRICE:

22        Q.   Do you do that?

23        A.   I mean, if you're closing.  If I'm

24   closing I would, you know, take out the trash.

25   This is part of the closing duties.

Reported By: Steven S. Huseby, RPR, CCR www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208   (800) 333-2082
eace624b-0139-49ef-a516-5a2e978a486f

YATRAM INDERGIT, ET AL. v. RITE AID CORPORATION, ET AL. July 7, 2012

Page 322

1    You set your monthly profit planner.  It's

2  seasonal and always moving around constantly.

3  That's always generally -- that's a big thing

4  that's done once a week.

5    Q.  Okay.

6    A.  Yeah, I play a large part in that, do a

7  lot of that.

8    Q.  So of all the work you do at Rite Aid,

9  let's take 55 hours, okay, what percentage of

10  that 55 hours per week would you say falls into

11  one of those categories of nonmanagerial tasks

12  that you do?

13           MR. TURNER:  Objection.

14           THE WITNESS:  Easily 70 percent.  I

15  mean, sure, I'm the manager and I do the

16  management stuff but, I mean, like I said

17  earlier, I'm multitasking.  I'm managing it and,

18  you know, I could be sweeping the floor and

19  manage it at the same time but yet I'm still

20  sweeping the floor.

21  BY MR. PRICE:

22    Q.  Yes, I want to talk about that.  So you

23  made a statement that it's taking 10 seconds out

24  of your time to manage.  Do you recall making a

25  comment like that?

Reported By: Steven S. Huseby, RPR, CCR www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208   (800) 333-2082
eace624b-0139-49ef-a516-5a2e978a486f

YATRAM INDERGIT, ET AL. v. RITE AID CORPORATION, ET AL. July 7, 2012

Page 323

1          A.    For which?  For a certain task, yeah,
2     for certain tasks.
3          I mean, as far as managing goes, I mean, like
4     if you're managing your secretary, I mean, you're
5     not going to be managing her all day long.  It's
6     not going to be a ten-hour shift or whatever.  I
7     mean, it's just -- there's not a -- you can't
8     really attach a time to management.
9          Q.    Well, I want to break down something.
10    Let's isolate something.  How about truck day,
11    okay.  How much active management are you doing
12    on a typical truck day, soup to nuts?
13                 MR. TURNER:  Object to form.
14                 THE WITNESS:  I mean, I'm physically
15    doing -- I mean, on truck day it's a physical day
16    all day long.  I mean, sure, I'm managing other
17    people, but it's a physical, like I'm out there
18    unloading.  I'm unloading the truck.  I'm staging
19    the truck.  You know, I'm stocking the shelves.
20    You know, I'm moving the totes to the back of the
21    room.  I mean, sure, I'm managing while I'm doing
22    that, but I'm -- you know, I'm doing all the
23    work, too.
24    BY MR. PRICE:
25         Q.    Okay.  Well, how about minutes or

Reported By: Steven S. Huseby, RPR, CCR www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208   (800) 333-2082
eace624b-0139-49ef-a516-5a2e978a486f

YATRAM INDERGIT, ET AL. v. RITE AID CORPORATION, ET AL.  July 7, 2012

Page 355

1    Page_____ Line_____should read:_____

2    Reason for change:_____

3

4    Page_____ Line_____should read:_____

5    Reason for change:_____

6

7    Page_____ Line_____should read:_____

8    Reason for change:_____

9

10   Page_____ Line_____should read:_____

11   Reason for change:_____

12

13   Page_____ Line_____should read:_____

14   Reason for change:_____

15

16   Page_____ Line_____should read:_____

17   Reason for change:_____

18                              _____

19   Signature

20   Sworn to and Subscribed before me

21   _____, Notary Public.

22   This_____day of _____, 2012.

23   My Commission Expires:                        STV

24

25

eace624b-0139-49ef-a516-5a2e978a486f