# Exhibit HH

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

YATRAM INDERGIT, on behalf      )
of himself and all others       )
similarly situated,             )
                                )
          Plaintiff,            )  CIVIL ACTION NO.
                                )  1:08-cv-09361-
                                )  PGG-HBP
v.                              )
                                )
RITE AID CORPORATION, RITE      )
AID OF NEW YORK, INC.,          )
and FRANCIS OFFOR as            )
Aider & Abettor,                )
                                )
          Defendants.           )
                            - - -

     The deposition of LUCILLE C. HULSEY, taken on
behalf of the Defendants, pursuant to the
stipulations agreed to herein, before JoRita B.
Meyer, Registered Merit Reporter, Certified
Realtime Reporter, Certified Court Reporter, at
Ogletree, Deakins, One Ninety One Peachtree Tower,
191 Peachtree Street, N.E., Suite 4800, Atlanta,
Georgia, commencing at 10:00 a.m., August 2, 2011.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Lucille C. Hulsey**                                      **August 2, 2011**

**Page 33**

```
 1    Aid actually made that acquisition.

 2         Q.    And that was up until 2009?

 3         A.    Yes, sir.

 4         Q.    And why did you leave Rite Aid?

 5         A.    I left because they -- they said I

 6    falsified a time report.

 7         Q.    What do you mean?

 8         A.    Changed the time on a time report.

 9         Q.    A time report for another employee?

10         A.    Yes, sir.

11         Q.    An employee that you were managing?

12         A.    Yes, sir.

13         Q.    And who was that employee?

14         A.    Jennifer Deese.

15         Q.    You had actually -- you had hired

16    Ms. Deese, correct?

17         A.    Yes, sir.

18              MS. RUBIN:   Objection.

19    BY MR. TURNER:

20         Q.    You interviewed Ms. Deese, correct?

21         A.    Yes, sir.

22         Q.    And then you made the decision to hire

23    her?

24              MS. RUBIN:   Objection to form.

25    BY MR. TURNER:
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Lucille C. Hulsey**                                            **August 2, 2011**

**Page 34**

 1      Q.    Correct?

 2      A.    It wasn't my final decision to hire.

 3      Q.    We'll talk about -- let's talk about

 4  Ms. Deese.  Ms. Deese -- did you know Ms. Deese

 5  before she began working at Rite Aid?

 6      A.    I did.

 7      Q.    And how did you know her?

 8      A.    She was married to my second cousin.

 9      Q.    And did you suggest to her that she seek

10  employment at Rite Aid?

11      A.    No, sir.

12      Q.    She asked you about seeking employment

13  at Rite Aid?

14      A.    Yes, sir.

15      Q.    And did you tell her how to fill out an

16  application and seek employment?

17      A.    I gave her an application to fill out.

18      Q.    And she filled it out?

19      A.    Yes, sir.

20      Q.    And she returned it?

21      A.    Yes, sir.

22      Q.    And then you interviewed her, correct?

23      A.    Yes, sir.

24      Q.    And did you make the decision to

25  interview her?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Lucille C. Hulsey**                                            **August 2, 2011**

Page 35

```
 1        A.    Yes, sir.
 2        Q.    And did anyone else participate in that
 3   interview?
 4        A.    No, sir.
 5        Q.    You then made a recommendation that
 6   Ms. Deese be hired, correct?
 7        A.    Well, she did what she had to do on the
 8   computer and all, and then after all that came
 9   back okay, then, you know, you can hire them.
10        Q.    Well, on the computer, you're talking
11   about Quickscreen, correct?
12        A.    Quickscreen, and you had to punch their
13   social security number into the system, make sure
14   that came back okay.  There was three steps you
15   had to do before you could actually hire them.
16        Q.    And those --
17        A.    Background check.
18        Q.    And those were all things to determine
19   if they were eligible to be hired, correct?
20        A.    Yes, sir.
21        Q.    And once the computer -- once you had
22   done the Quickscreen, background check, and the
23   bringing the social security number in, if it came
24   back and they were eligible to be hired, you could
25   then make a recommendation -- or strike that.
```

Page 57

 1              MS. RUBIN:  Objection.

 2              THE WITNESS:  Yes, sir.

 3              MR. TURNER:  What is your objection?

 4              MS. RUBIN:  Compound question.

 5     BY MR. TURNER:

 6         Q.   And in fact, you did discipline

 7     employees for failing to do the job that you

 8     assigned to them, correct?

 9         A.   Yes, sir.

10         Q.   You also gave Mr. Luker authority to

11     discipline employees for failing to do the jobs he

12     assigned to them when you were not present,

13     correct?

14         A.   Yes, sir.

15         Q.   And he was your assistant manager,

16     correct?

17         A.   Yes, sir.

18         Q.   You commended Mr. Luker on -- well,

19     strike that.

20              You said also you could discipline

21     employees for not completing the job, correct?

22         A.   Yes, sir.

23         Q.   And you did that, correct?

24         A.   Yes, sir.

25         Q.   And then you said that you couldn't call

Page 58

1    the DM for every little thing in the store?

2         A.   That's right.

3         Q.   Your district manager was not running

4    your store, was he?

5         A.   To some extent, yes.

6         Q.   To what extent?

7         A.   On some --

8         Q.   Go ahead.

9         A.   Well, all right.  Say just for what we

10   were just talking about.  If an employee, say, you

11   told them to hang the signs up, they didn't get

12   the signs hung up, then you didn't run and call

13   your district manager and say, hey, look, Susie

14   didn't hang the ad signs; what do you want me to

15   do?

16              But if you had something that you

17   thought an employee was stealing or you had an

18   employee that kept calling in a lot, then you

19   would have to call the district manager and say,

20   look, this is the problem; what do I do?

21        Q.   How often did your -- strike that.

22              How many district managers did you have

23   who were responsible for your -- for you and your

24   district?

25        A.   Three.

Page 59

1       Q.    In 2007, 2008, and 2009 you had three?

2       A.    Yes, sir.

3       Q.    Who were they?

4       A.    Bobby Little, Frank Krake, Keith

5   Draughton.

6       Q.    And how would you describe Bobby

7   Little's management style?

8       A.    He -- whatever he told you to do, he

9   meant for you to do it.  He was highly respected,

10  and I never had a problem doing anything he asked

11  me to do because of the way -- the type person he

12  was.  He wasn't like a dictator.

13      Q.    Were any of the other district managers

14  like a dictator?

15      A.    Keith was my worst district manager.

16            Frank Krake really wasn't my district

17  manager for that long of a period of time.  Frank

18  Krake had been market manager when we first went

19  into the acquisition from Harco to Rite Aid.  Then

20  he was made district manager at one point.

21      Q.    What made Keith your worst DM?

22      A.    I just don't think that he really -- we

23  really connected.

24      Q.    In what way?

25      A.    I really don't know.  I just sensed that

Page 85

 1    whole store, and the pharmacists just came in.
 2        Q.   And then at Rite Aid, what you're saying
 3    is that the pharmacist did the scheduling?
 4        A.   Yes, sir.  They did -- they did their
 5    own hiring and they did their own scheduling.
 6        Q.   In your store?
 7        A.   Yes, sir.
 8        Q.   You don't know whether that was the case
 9    in all other stores, do you?
10        A.   No, sir.
11        Q.   You don't even know if that was the case
12    in other stores in your district, do you?
13            MS. RUBIN:  Objection to form.
14            THE WITNESS:  The pharmacists in the
15        stores, if they had a regular pharmacy
16        manager, it's my understanding that they did
17        their own hiring.
18    BY MR. TURNER:
19        Q.   If they had a regular pharmacy manager?
20        A.   Yes, sir.
21        Q.   And when they didn't have a regular
22    pharmacy manager, you don't know, do you, what
23    happened?
24        A.   Well, I can't really tell you what went
25    on in the other stores.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Lucille C. Hulsey**                                                **August 2, 2011**

1          Q.    Why is that?

2          A.    Because I wasn't there, for one reason.

3     And I had a full-time job taking care of my own.

4          Q.    Your own what?

5          A.    My own store.

6          Q.    All right.  So going back to the

7     schedule for the front end, you'd have another

8     cashier come in around 4:15?

9          A.    Yes, sir.

10         Q.    And you would have one come in around

11    12:15?

12         A.    Yes, sir.

13         Q.    And what would happen with the one that

14    had come in around 12:15?

15         A.    If I had hours, they would stay till

16    9:15.

17         Q.    So you would have the cashier that came

18    in at 12:15 and the cashier that came in at 4:15?

19         A.    Yes, sir.

20         Q.    How many hours a day, on a normal day,

21    not a truck day, a normal day, how many hours did

22    you typically work when you came in at 7 or

23    7:15 a.m. and opened the store?

24         A.    I cannot tell you the days that I worked

25    in that store from about 7 to 7:15 in the morning

Page 87

1    till closing at night.

2        Q.   How many days a week did you schedule

3    yourself to work?

4        A.   Whatever I scheduled myself to work was

5    what I worked.  I worked at least a half a day on

6    Saturday, and I worked five days during the week.

7        Q.   And who would work the other half day on

8    Saturday if you weren't there, from a management

9    standpoint?

10       A.   Whichever shift supervisor I scheduled

11   to work.

12       Q.   And then on Sunday, would you have a

13   manager there?

14       A.   Yes, sir.

15       Q.   And who would that typically be?  Shift

16   supervisor or assistant manager?

17       A.   Shift supervisor.  Sometimes it would be

18   assistant manager.  Sometimes it was me.

19       Q.   But typically, you tried to take Sundays

20   off?

21       A.   Yes, sir.

22       Q.   That was true during the last three

23   years of your employment?

24       A.   That's really been true my whole

25   employment time.  And I would always talk with my

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Lucille C. Hulsey**                                                      **August 2, 2011**

**Page 88**

1    district managers and try to work out to where I

2    could at least go to church on Sunday mornings and

3    then come in, because I'm pianist at church.

4              And then if it was a Sunday that I had

5    to work, I would always, you know, go to church

6    and then come in to work.

7         Q.   All right.  Then I think you said you

8    and Mr. Luker typically worked days.

9         A.   Yes, sir.

10        Q.   So was it usually Mr. Luker that was the

11   one coming in around 7:45 a.m.?

12        A.   Yes, sir.

13        Q.   Why did you choose not to have a

14   rotating schedule with Mr. Luker where Mr. Luker

15   would be there when you're not?

16        A.   When Mr. Luker was hired, he was

17   hired -- he -- he said that he wouldn't be able to

18   work most nights nor weekends.  And I so sort of

19   more or less worked with him for his scheduling.

20   All right.

21              At that particular time, he was just a

22   shift supervisor, and then Mr. Little came in and

23   he observed Mr. Luker, and he said that he needed

24   to be made a store manager -- I mean assistant

25   store manager.

Page 149

```
 1   what needs to be done and deciding who is going to
 2   do it, correct?
 3        A.   Yes, sir.
 4        Q.   Maintaining store conditions is making
 5   sure your employees are keeping the store clean,
 6   correct?
 7        A.   Making sure the store is kept clean.
 8        Q.   Regardless of who is doing it, correct?
 9        A.   Right.
10        Q.   And then organizing, what do you mean by
11   that?
12        A.   Organizing what's got to be done.  You
13   get a mailbag oncest a week, and whatever was in
14   that mailbag, you would organize your time and
15   your -- plan how to get it done.
16        Q.   And that's something you did, correct?
17        A.   Yes, sir.
18        Q.   All right.  Number 7, "What areas do you
19   need to develop?  What assistance do you need?"
20   And you said, "Staffworks is still a weakness for
21   me.  Assistance has already been provided to me
22   and has helped me."
23             Did I read that correctly?
24        A.   Yes, sir.
25        Q.   How were you scheduling in your store if
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Lucille C. Hulsey                                    August 2, 2011

Page 150

1    you were having problems using Staffworks?

2         A.    You had to use Staffworks, and you just

3    had to figure it out.  I mean, it wasn't an option

4    as to whether or not you wanted to do it.

5              And when I did this evaluation, probably

6    Staffworks was just a brand new tool to work with,

7    and I didn't fully understand how to do the

8    Staffworks, and so I would, you know, call another

9    store manager and work through it, make my

10   schedule using Staffworks.  You didn't have an

11   option as to whether or not you wanted to use it.

12        Q.    At least that was your understanding,

13   correct?

14        A.    Correct.

15        Q.    If other store managers were doing

16   handwritten schedules, they were doing it

17   different than you, correct?

18        A.    You know what?  Some people were

19   actually doing that.  But then when you got caught

20   doing it, you got in trouble, you know.

21        Q.    Were you doing handwritten schedules?

22        A.    Not after we started doing this

23   Staffworks thing.

24        Q.    But you knew other store managers were,

25   correct?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Lucille C. Hulsey**                                           **August 2, 2011**

Page 151

```
 1        A.   Yes, sir.
 2        Q.   So they were doing scheduling in a
 3   different way than you, correct?
 4        A.   I guess.
 5        Q.   And Staffworks, did you ever come to
 6   master Staffworks?
 7             MS. RUBIN:  Objection to form.
 8   BY MR. TURNER:
 9        Q.   Strike that.  Did you ever become more
10   proficient with Staffworks?
11        A.   I did.  And about the time I did, they
12   changed the thing.
13        Q.   Okay.  How did they change it?
14        A.   Kronos.
15        Q.   And how did that -- how did Kronos
16   change Staffworks?
17        A.   It was a different -- it was a different
18   way you did it on the computer.  It was totally
19   different.
20        Q.   All right.  Now, Staffworks, you would
21   put in information about employees' availability,
22   correct?
23        A.   Right.
24        Q.   And then it would give you a proposed
25   schedule, correct?
```

Page 153

1    the schedule to accommodate employee call-outs,

2    correct?

3        A.   Yes, sir.

4        Q.   Or no-shows, correct?

5        A.   Yes, sir.

6        Q.   And you said in -- Number 8, "How can

7    your supervisor help you perform your job more

8    effectively?"  And at the time your supervisor was

9    Keith Draughton, correct?

10       A.   Yes, sir.

11       Q.   And you said, "Listen to my concerns and

12   questions and respond with how he wants things

13   done."

14            Was he not doing that?

15       A.   I just didn't really feel comfortable

16   with Keith a lot of times.  I'll just be perfectly

17   honest with you.  I hated to even have to call

18   him.

19       Q.   So you tried not to?

20       A.   I tried my best not to.

21       Q.   How often do you think you called

22   Mr. Draughton when he was your DM?

23       A.   Oh, I called him a bunch of times.  Not

24   necessarily saying I wanted to, but there was lots

25   of times I had to call him.  He called me, you

Page 154

```
 1    know.

 2         Q.    Did you call him on a daily basis?

 3         A.    No.

 4         Q.    Did you call him every other day?

 5         A.    No.

 6         Q.    Did you call him every third day?

 7         A.    No.

 8         Q.    Did you call him every week?

 9         A.    I probably called him at least oncest a

10    week.

11         Q.    And he was calling you probably about

12    the same?

13         A.    Sometimes it would be maybe just oncest

14    a week, depending on what the situation was.

15         Q.    And then I think you told me he only

16    came to your store once every three months, on

17    average?

18         A.    On an average basis, yeah.

19         Q.    So on average, you would have a personal

20    visit with Mr. Draughton, your district manager,

21    once every three months and phone communication

22    once or twice a week; is that a fair statement?

23         A.    Yes, sir.

24         Q.    And were you otherwise communicating

25    with Mr. Draughton in any other form of
```

Page 155

1    communication?

2         A.    On SYSMs.

3         Q.    And how often were you communicating

4    with him on SYSMs?

5         A.    We would probably do that every day.

6    And we would have a managers meeting -- he tried

7    to have one at least every month.

8         Q.    And the SYSMs, what kind of things would

9    you get in SYSMs?

10        A.    Lists of things that he wanted to know

11   had been done in the store.  You had a weekly list

12   that come out with plan-o-grams, you're up to date

13   on plan-o-grams.

14             Let's see.  Price changes, where you

15   stood on price changes.  And just different things

16   like that that he would send lists out for,

17   wanting to know.

18        Q.    But those were things that were -- that

19   needed to be -- he was essentially confirming that

20   they had been completed, correct?

21             MS. RUBIN:  Objection to form.

22             THE WITNESS:  Yes, sir.

23   BY MR. TURNER:

24        Q.    He wasn't telling you how to do them,

25   correct?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Lucille C. Hulsey**                                                    **August 2, 2011**

Page 156

 1        A.    He was if they weren't done.

 2        Q.    I understand.  But if you completed your

 3   job, if you made sure that the things had been

 4   done in the store, what he was doing was following

 5   up to make sure that things had been accomplished,

 6   correct?

 7        A.    Correct.

 8        Q.    Just like you were following up with

 9   your subordinate employees to make sure that they

10   had completed their tasks that you had assigned to

11   them, correct?

12        A.    Yes, sir.

13        Q.    Did you ever think Mr. Draughton wasn't

14   your manager?

15        A.    No, sir.

16        Q.    Did you believe that your subordinate

17   employees didn't view you as their manager?

18        A.    No, sir.

19              (Deposition Exhibit Number 3 was marked

20              for identification)

21   BY MR. TURNER:

22        Q.    Ms. Hulsey, you have in front of you

23   what is marked as Exhibit 3.  Have you seen that

24   document before today?

25        A.    Yes, sir.

Page 175

```
 1   they could do their job better, correct?
 2           MS. RUBIN:  Objection.
 3           THE WITNESS:  Yes, sir.
 4   BY MR. TURNER:
 5       Q.   And that was true regardless of what
 6   task you were performing, correct?
 7       A.   Yes, sir.
 8       Q.   Is it fair to say that training for you
 9   as a store manager was a constant ongoing process
10   with your employees?
11       A.   Yes, sir.
12       Q.   And the amount of time that you would
13   have to spend training varied employee by
14   employee, correct?
15       A.   Yes, sir.
16       Q.   Some people have strengths --
17       A.   Yes, sir.
18       Q.   -- that others don't, correct?
19       A.   Correct.
20       Q.   And some people have weaknesses that
21   others don't, correct?
22       A.   Correct.
23       Q.   And did you -- when you were training
24   some of your shift supervisors, did you ever talk
25   to your district manager, Bobby Little, who you
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
Lucille C. Hulsey                                                    August 2, 2011

**Page 176**

1   had a better relationship with, about which shift

2   supervisors you thought had what it took to go to

3   the next level?

4              MS. RUBIN:   Objection to form.

5              THE WITNESS:   Sometimes.

6   BY MR. TURNER:

7       Q.   Just so we're clear, did you talk to

8   Bobby Little about shift supervisors working in

9   your store that you believed had the potential to

10  become assistant store managers?

11      A.   No.   Just shift supervisors.

12      Q.   So hourly employees that you thought had

13  the potential to go to shift supervisor positions?

14      A.   Correct.

15      Q.   You would talk to Bobby Little about

16  that?

17      A.   Yes, sir.

18      Q.   What about Mr. Draughton?

19      A.   Anytime that you was going to get

20  somebody promoted to a shift supervisor, you --

21  they were actually the ones that had to promote

22  them.   You could recommend them, and they would

23  come and interview them.   And if they didn't think

24  so, it was no.

25      Q.   Do you agree that store managers are

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
Lucille C. Hulsey                                     August 2, 2011

Page 177

 1    responsible for making sure that the -- their

 2    subordinate employees receive appropriate and

 3    necessary training?

 4               MS. RUBIN:  Objection to form.

 5               THE WITNESS:  You mean training for what

 6         they got to do for their job?

 7    BY MR. TURNER:

 8         Q.   Yes, ma'am.

 9         A.   Yes, sir.

10         Q.   Did you believe it was your

11    responsibility to provide necessary training to

12    your subordinate employees?

13         A.   Yes, sir.

14         Q.   And that was true to your assistant

15    manager, correct?

16         A.   Yes, sir.

17         Q.   And it was true to your shift

18    supervisors, correct?

19         A.   Yes, sir.

20         Q.   And it was true to all of the other

21    employees that worked in your store, correct?

22         A.   Yes, sir.

23         Q.   Did you expect that your assistant store

24    manager would provide similar training to the

25    subordinate employees?

Page 180

1    then they sent him when they opened the new store

2    in Talladega, and he was the manager down there.

3    And he didn't stay in his store enough to know

4    what was going on and he had such really bad

5    shrinks, that he was given the ultimatum of leave

6    or get fired.  And he left.  They rehired him at

7    the store I was at, when I left.

8              Shortly after that, they took and put --

9    Lance Lockhart that was at the Oxford store, he is

10   over the Saks store, which is 7087, the store I

11   was at, which is 7084, and the store that he was

12   at was 7086.  They have one manager for those

13   three stores now.

14        Q.   Managing three stores at once would be

15   very different from what you did; do you agree

16   with that?

17        A.   Yes, sir.

18        Q.   In almost every aspect of the job,

19   correct?

20        A.   Yes, sir.

21        Q.   So how many hours a week -- when

22   Mr. Luker was promoted to assistant store manager,

23   how many hours a week was he working?

24        A.   When they promoted him to assistant

25   store manager, he was on salary.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Lucille C. Hulsey**                                                    **August 2, 2011**

Page 181

```
 1        Q.    I understand.  But how many hours a week
 2   was he working?
 3        A.    Fifty, until they put us on the 45-hour.
 4        Q.    And he was set at 50, and that's what he
 5   worked every week?
 6        A.    Yes, sir.
 7        Q.    And during that same time frame -- you
 8   told me earlier when you opened the store in 1999,
 9   there were a lot of times you were there from open
10   until close.
11             2007 and 2008, how many hours a week
12   were you typically working?
13        A.    Until they put us on the 45-hour thing,
14   I was -- lots of times I'd be there 65, 70 hours a
15   week.
16        Q.    Sometimes less?
17        A.    Not less -- not a whole lot less than my
18   50 hours that I was required to be there.
19        Q.    Sometimes less than 50, but not very
20   often?
21        A.    Sometimes, after my husband got really
22   bad sick, I might need to leave to go to the
23   hospital or something, and I would call whichever
24   one was my district manager, tell them, and they'd
25   tell me to go ahead and do what I had to do and
```

Page 182

 1    not worry about it.  But it was a very rare

 2    occasion.

 3         Q.   There was some times that you worked

 4    less than the 50?

 5         A.   Yes, sir, there were some.

 6         Q.   And then there were times when you

 7    worked the 50?

 8         A.   Yes, sir.

 9         Q.   And then there were times when you

10    worked as many as 65 to 70?

11         A.   Yes, sir.

12         Q.   Do you have records of your work hours?

13         A.   No, because all we had to do was clock

14    in in the mornings when we got there.

15         Q.   You didn't clock in, you logged in in

16    the cash register, right?

17         A.   Yes, sir.

18         Q.   And so how would we know how many hours

19    you worked in any specific week?

20         A.   For me to keep up with, or for you?

21         Q.   I'm just asking, how would you know?

22         A.   Well, if I went in in the mornings

23    between 7 and 7:15 and stayed till 9 o'clock at

24    night and stayed down there five days a week and

25    then went back in on Saturday and worked at least

Page 249

```
 1   BY MS. RUBIN:
 2        Q.   When was --
 3        A.   Mainly, you know, if I've got to go in
 4   and run the register, that's priority.  You know,
 5   you got to run the register.  So then whenever I'd
 6   get off the register, I'd run in and do some of my
 7   manager's responsibilities.  And you just played
 8   it by ear, you know.
 9        Q.   Why did you work from 7 a.m. to closing
10   on some days?
11             MR. TURNER:  Object to form.
12             THE WITNESS:  That was what I'd have to
13        do to make sure that what needed to be done
14        was done.  Wasn't what I wanted to do.
15   BY MS. RUBIN:
16        Q.   In an emergency situation where you
17   decided to give an employee overtime, did you have
18   to then tell your district manager afterwards?
19        A.   You would have to let him know why you
20   did it, yes.
21        Q.   What would happen if you did not let him
22   know?
23             MR. TURNER:  Object to form.
24             THE WITNESS:  You'd get your phone call.
25   BY MS. RUBIN:
```

Page 250

1      Q.   Were you able to watch your employees

2  all the time when you were at the store?

3           MR. TURNER:  Object to form.

4           THE WITNESS:  Not all the time.

5  BY MS. RUBIN:

6      Q.   Why?

7      A.   Well, sometimes you'd be, like, in the

8  back doing plan-o-grams or doing things that

9  required you to be in the back part of the store.

10  You had your Red Dot program, per se.  Okay?  Your

11  Red Dot program was where whatever was in the

12  stockroom was overstock from what you had on your

13  shelf.  All right.

14           You had to go back there, and you had to

15  check and make sure the Red Dot program was done.

16  You'd have to have certain sections that they

17  called it Friday Freshness that you'd have to do

18  for out-of-dates.  And you weren't always, you

19  know, right where you could watch everything.

20      Q.   Did you have any discussion over

21  determining your labor budget?

22      A.   No, ma'am.

23           MR. TURNER:  Object to form.

24  BY MS. RUBIN:

25      Q.    If you were allowed to have more

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Lucille C. Hulsey**                                                  **August 2, 2011**

Page 251

1    employees, would you have been able to better

2    manage and carry out your management duties?

3          A.    Yes, ma'am.

4          Q.    Did you decide what vendors to use?

5                MR. TURNER:  Object to form.

6                THE WITNESS:  No, ma'am.

7    BY MS. RUBIN:

8          Q.    Why not?

9          A.    You had a list of vendors that they sent

10   out, and if you wanted to use -- if you wanted to,

11   like, get bread or something else other than what

12   they had listed, you could contact them and see if

13   you could get, like, bread in your store.

14   Sometimes you'd get an okay to do it.  But the

15   vendors were all designated vendors.

16         Q.    Designated by whom?

17         A.    Corporate, I guess.

18         Q.    When you were providing new paperwork

19   for a new hire, did you determine what paperwork

20   to use?

21               MR. TURNER:  Object to form.

22               THE WITNESS:  They sent you -- sent a

23         package, a new-hire employee package, and you

24         used what was in that package.

25   BY MS. RUBIN:

Page 252

1      Q.    Who is "they"?

2      A.    Corporate.

3      Q.    Did your district manager tell you what

4   to do ever?

5            MR. TURNER:  Object to form.

6            THE WITNESS:  Yes, ma'am.

7   BY MS. RUBIN:

8      Q.    How often?

9      A.    Well, you had --

10           MR. TURNER:  Object to form.

11           THE WITNESS:  -- all them things that

12      you had to do.  And then sometimes he would

13      call and want you to do specific things,

14      per se, go measure the departments in your

15      store or just, I mean, he would tell you

16      things to do, different things.

17  BY MS. RUBIN:

18      Q.    Why did you perform performance

19  appraisals?

20           MR. TURNER:  Object to form.

21           THE WITNESS:  I didn't understand you.

22  BY MS. RUBIN:

23      Q.    Why did you perform performance

24  appraisals or performance evaluations of other

25  employees?

**Page 253**

 1        A.    That was what I -- part of my job that I

 2    had to do.  I had to do their appraisals and then

 3    send them in to be approved by the DM.

 4        Q.    Do you know what would have happened if

 5    you complained to your district manager about

 6    wanting to be compensated for more hours?

 7             MR. TURNER:  Object to form.  Calls for

 8        raw speculation.

 9    BY MS. RUBIN:

10        Q.    You can answer.

11        A.    I don't know.  I wouldn't -- I wouldn't

12    have confronted him, because I would have been

13    afraid to.

14        Q.    Were there employees in your store who

15    could not work certain schedules?

16        A.    Yes, ma'am.

17        Q.    Did that affect how you were able to

18    schedule people into the system?

19        A.    Yes, ma'am.

20             MR. TURNER:  Object to form.

21    BY MS. RUBIN:

22        Q.    Do you think that situations where you

23    were unable to use the full budget plan for hours

24    in the store were due to the fact that employees

25    were unable to work certain schedules?

Page 255

```
 1              THE WITNESS:  Well, not very often.  You
 2         would -- like I said, when you first hired
 3         one in, you would be with them till they felt
 4         comfortable, and then you would go on trying
 5         to do what you had to get done.
 6              You were supposed to be allotted so many
 7         hours per new hire for training, but that was
 8         not so.
 9    BY MS. RUBIN:
10         Q.   Did you develop the training plans
11    yourself?
12              MR. TURNER:  Object to form.
13              THE WITNESS:  No, ma'am.
14    BY MS. RUBIN:
15         Q.   Where did those training plans come
16    from?
17         A.   Corporate.
18         Q.   Would you say you spent more time doing
19    nonmanagerial duties than managerial duties?
20              MR. TURNER:  Object to form.
21              THE WITNESS:  Yes, ma'am.
22    BY MS. RUBIN:
23         Q.   Why is that?
24              MR. TURNER:  Object to form.
25              THE WITNESS:  Because of the hours that
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Lucille C. Hulsey**                                            **August 2, 2011**

Page 256

```
 1        you had to work with, especially the last --
 2        after we went on the 45-hour workweek.
 3   BY MS. RUBIN:
 4        Q.   What was involved in facing shelves?
 5        A.   Pulling everything to the front.
 6        Q.   And where were your other employees when
 7   you were facing the store?
 8        A.   I'd have one on the cash register most
 9   of the time.  That was it.
10        Q.   Could you see that employee when you
11   were facing the store?
12        A.   No, ma'am.
13             MR. TURNER:  Object to form.
14   BY MS. RUBIN:
15        Q.   How did you discipline employees?
16             MR. TURNER:  Object to form.
17             THE WITNESS:  It just varied as to what
18        the situation was.  If it was a severe
19        situation, then you had to get in touch with
20        your district manager or security manager,
21        one, to get advice on what to do with it or
22        how to handle it.
23             If it was just a minor thing you just
24        handled it yourself.
25   BY MS. RUBIN:
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Lucille C. Hulsey**                                    **August 2, 2011**

Page 257

```
 1        Q.    And does that --
 2        A.    A minor thing would be like being late
 3   for work or calling in excessively.
 4              Theft or failure to report to work a
 5   bunch of times would involve getting the district
 6   manager's opinion before you actually did
 7   anything.
 8        Q.    So if it were a minor incident, what
 9   would the discipline involve?
10              MR. TURNER:  Object to form.
11              THE WITNESS:  Most of the time, just
12         talking with them.
13   BY MS. RUBIN:
14        Q.    Did you have to document that you talked
15   with them?
16              MR. TURNER:  Object to form.
17              THE WITNESS:  You would.
18   BY MS. RUBIN:
19        Q.    You testified earlier that some of your
20   recommendations for giving a raise were not
21   accepted.  Why was that?
22        A.    Some of the amounts that I would turn in
23   would not be approved.  If it was over their
24   amount that they said could be given and you felt
25   like that person deserved maybe a little bit more,
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Lucille C. Hulsey**                                      **August 2, 2011**

Page 258

1   most of the time they would say no.

2        Q.   Do you know why?

3        A.   They just didn't want to pay more money,

4   I guess.

5             MR. TURNER:  Object to form.  Calls for

6        speculation.

7   BY MS. RUBIN:

8        Q.   How many employees did you approve

9   vacations for?

10       A.   I didn't have but just, let's see, about

11  three or four full-time employees in my store,

12  counting myself.  The rest were part-time.

13       Q.   Did you actually approve vacations for

14  all three or four, including yourself?

15       A.   Yes, ma'am.

16       Q.   You approved your own vacation?

17       A.   I could take it most of the time

18  whenever I wanted to.  We were supposed to turn

19  them in as to when we were going to take them.

20  But I more or less took it, you know -- I would,

21  like, send my district manager a SYSM and tell him

22  that I was wanting to take vacation such and such

23  a date, and most of the time he'd always send back

24  and say okay.

25       Q.   Did you ever send anyone home, an

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Lucille C. Hulsey**                                      **August 2, 2011**

Page 259

1  employee home, for violating some policy?

2       A.   I sent one home -- I sent a couple home

3  for coming in with bluejeans on.  And I sent one

4  home when they come in with, like, a halter top

5  on.

6            Usually just the dress code was about

7  the only thing.  If they'd come in dressed out of

8  dress code, then I'd tell them go home and change.

9       Q.   You testified that you were supposed to

10 handle complaints or grievances at the store

11 level.  Could you explain what you meant by that.

12      A.   We were supposed to handle anything at

13 store level within a 24-hour period of time.  And

14 they didn't want it to go any higher.

15      Q.   Who is "they"?

16      A.   Like, district managers --

17           MR. TURNER:  Object to form.

18           THE WITNESS:  -- and people above them.

19      They didn't -- the district managers did not

20      want it to go above them.

21 BY MS. RUBIN:

22      Q.   Who told you to check SYSMs three times

23 a day?

24      A.   District managers.

25      Q.   Did you ever eat your lunch and not do

**Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP**
**Lucille C. Hulsey**                                       **August 2, 2011**

Page 260

 1   work at the same time?

 2       A.   Yes, ma'am.

 3       Q.   How often was that?

 4       A.   It just varied.  On truck day most of

 5   the time I'd just grab a sandwich and go on back

 6   out on the truck.

 7            Like I said a while ago, when my husband

 8   was really bad, I would try to go home basically

 9   about the same time every day.  Most of the time

10   I'd be gone for an hour.

11       Q.   Do you know who made the decision to

12   start using clear bags for trash?

13            MR. TURNER:  Object to form.

14            THE WITNESS:  Corporate, I guess.

15   BY MS. RUBIN:

16       Q.   I'd like to go back to Exhibit 7, the

17   store manager job description.  Did this

18   description tell you to stock shelves?

19            MR. TURNER:  Object to form.  The

20       document speaks for itself.

21   BY MS. RUBIN:

22       Q.   Did you stock shelves?

23            MR. TURNER:  Object to form.  Compound.

24            THE WITNESS:  Yes, ma'am.

25            MS. RUBIN:  My last question was not

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Lucille C. Hulsey**                                          **August 2, 2011**

**Page 261**

 1        compound.

 2             MR. TURNER:  You asked two questions

 3        before she answered -- definitively asked two

 4        questions before she answered.  That would be

 5        the definition of compound.  You can strike

 6        it and start again.

 7   BY MS. RUBIN::

 8        Q.   So new question:  Did you stock the

 9   shelves?

10             MR. TURNER:  Object to form.

11             THE WITNESS:  I did.  And if you'll read

12        Number 7, it was "Maintain merchandise

13        standards according to the POMP manual,

14        profit planner, corporate plan-o-grams, and

15        ongoing merchandise information."

16             It speaks for itself.

17   BY MS. RUBIN:

18        Q.   Did doing nonmanagerial tasks prevent

19   you from being able to manage the way this Rite

20   Aid job description lays out the manager's

21   responsibilities?

22             MR. TURNER:  Object to form.

23             THE WITNESS:  Yes, ma'am.

24   BY MS. RUBIN:

25        Q.   Were you able to effectively provide

**Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP**
**Lucille C. Hulsey**                                          August 2, 2011

Page 262

1    good customer service when working on a

2    plan-o-gram?

3              MR. TURNER:  Object to form.

4              THE WITNESS:  Not effectively, because

5         you were concentrating on what you were

6         doing.

7    BY MS. RUBIN:

8         Q.   Did you have the ability to terminate

9    employees?

10        A.   No, ma'am, not without prior approval.

11        Q.   Who would you get prior approval from?

12        A.   From the district manager or the

13   security manager.

14        Q.   Who set your store budget?

15        A.   I guess corporate.

16             MR. TURNER:  Object to form.

17   BY MS. RUBIN:

18        Q.   Did you have any authority to change

19   your store budget?

20             MR. TURNER:  Object to form.

21             THE WITNESS:  No, ma'am.

22   BY MS. RUBIN:

23        Q.   Do you believe that Rite Aid created a

24   budget policy that left most, if not all, stores

25   that you were aware of inadequately staffed?

Page 263

 1              MR. TURNER:  Object to form.

 2              THE WITNESS:  Yes, ma'am.

 3              MS. RUBIN:  Those are all my questions.

 4              F U R T H E R   E X A M I N A T I O N

 5       BY MR. TURNER:

 6          Q.   Ms. Hulsey, I have to ask you a few more

 7       questions.  Sorry about that.

 8              Did you ever give prior approval to

 9       terminate an employee?

10          A.   Yes, sir.

11          Q.   You made a recommendation that somebody

12       be terminated, correct?

13          A.   Yes, sir.

14          Q.   And your recommendation was followed,

15       correct?

16          A.   Yes, sir, most of the time, because

17       whatever the reason was was a reason to be

18       terminated.

19          Q.   And then you actually terminated the

20       employee, correct?

21          A.   No.  The security manager would come and

22       do it.

23          Q.   On any occasion there was an employee

24       terminated in your store, the security manager

25       came?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Lucille C. Hulsey**                                      **August 2, 2011**

Page 264

```
 1           MS. RUBIN:  Object to form.

 2           THE WITNESS:  Or the district manager,

 3     whichever district manager that I had.  I

 4     never terminated anybody on my own.

 5  BY MR. TURNER:

 6      Q.   But you would make recommendations, and

 7  those recommendations were followed, correct?

 8      A.   Yes, sir.  In the situations that I had

 9  to call them for, they were.

10      Q.   And you were asked whether you could

11  change the store level budget.  Do you recall

12  that, just a few minutes ago?

13      A.   Yes, sir.

14      Q.   You actually exceeded your store level

15  budget on occasion, didn't you?

16      A.   I did.

17      Q.   So while you couldn't actually change

18  the budgeted amount, you could go over or under

19  the budgeted amount based on your discretion,

20  correct?

21           MS. RUBIN:  Object to form.

22           THE WITNESS:  Yes, sir.

23  BY MR. TURNER:

24      Q.   You were asked about approving vacation

25  time, and you said that you did approve vacation
```

**Page 265**

1    time for the employees in your store who had

2    vacation?

3         A.   Yes, sir.

4         Q.   You also approved unpaid time off for

5    the employees who did not have vacation, didn't

6    you?

7         A.   Yes, sir.

8         Q.   And you were asked whether or not -- I

9    believe the question was whether most of the

10   stores were understaffed as a result of Rite Aid's

11   budgeting, or words to that effect.  Do you recall

12   that?

13        A.   Yes, sir.

14        Q.   You've told me that you don't really

15   know what was happening in stores outside of the

16   four stores sitting in Anniston, correct?

17             MS. RUBIN:  Object to form.

18             THE WITNESS:  I don't.  I didn't know

19        what was going on in the other stores.

20   BY MR. TURNER:

21        Q.   And one of those four stores was

22   supervised by store manager Lockhart, correct?

23        A.   Yes, sir.

24        Q.   Who apparently had enough people working

25   for him that he only had to work 20 to 25 hours,

Page 273

```
 1        A.   Yes, sir.

 2        Q.   First, do you agree with me that your

 3   answer to it was yes?  Correct?

 4        A.   Yes, sir.

 5        Q.   And do you agree with me that by

 6   answering that, you were agreeing that you were,

 7   in fact, doing management duties?  The question

 8   was whether you could do them better, correct?

 9        A.   I don't recall the question.

10        Q.   Okay.  Well, whether you were -- whether

11   you could have done a better job of being a

12   manager if you had more employees or not doesn't

13   detract from your testimony today that you were,

14   in fact, managing your store, correct?

15             MS. RUBIN:  Objection.

16             THE WITNESS:  Yes, sir.

17   BY MR. TURNER:

18        Q.   You were asked whether your district

19   manager would tell you what to do.  Do you recall

20   your counsel asking you that?

21        A.   Yes, sir.

22        Q.   Do you recall testifying to me that you

23   talked to Mr. Draughton on the phone approximately

24   one time a week and saw him in your store three --

25   every three months?  Do you recall that?
```

Page 274

```
 1          A.   Yes, sir.

 2          Q.   And he would send SYSMs, correct?

 3          A.   That's correct.

 4          Q.   And his SYSMs were about whether tasks

 5     had been completed, correct?

 6          A.   Not all of them.  Some of them were

 7     things that he wanted us to do.

 8          Q.   Right.  And then you would decide how

 9     they were going to be accomplished in your store,

10     is your testimony earlier, correct?

11          A.   Unless he said stop what you're doing

12     right now and go do this, it needs to be back into

13     the office before 3 o'clock today.

14          Q.   What kind of things would he say needs

15     to be back into the office before 3 o'clock today?

16          A.   Most of the time it was some CBT, maybe,

17     that needed to be done by an employee in the

18     store.  It might be measuring departments in the

19     store.  It might be getting -- calling around to

20     CVS and a grocery store and the service station

21     across the street, getting cigarette prices.  It

22     could have been measuring your beer cooler for

23     footage.  It could have been measuring your

24     magazine rack for footage.  It could have been

25     measuring your American Greeting department for
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
Lucille C. Hulsey                                                          August 2, 2011

Page 275

 1    footage.

 2           But whatever he said do and said he

 3    needed it back by 3 o'clock, you had to stop what

 4    you were doing and go do it.

 5        Q.   Or have somebody else go measure,

 6    correct?

 7        A.   I guess you could get somebody else to

 8    do it, but you wanted to make sure that it was the

 9    right -- the right thing.

10        Q.   You would take it upon yourself to do it

11    because you didn't trust your employees to do it,

12    correctly, fair?

13           MS. RUBIN:  Objection.

14           THE WITNESS:  Not necessarily.

15    BY MR. TURNER:

16        Q.   Sometimes you did, sometimes you didn't,

17    correct?

18           MS. RUBIN:  Objection.

19           THE WITNESS:  Most of the time, if you

20        just had a cashier on the front register and

21        you got a part-time cashier up there that

22        don't know nothing about what you're talking

23        about to start with, you go do it yourself.

24    BY MR. TURNER:

25        Q.   To make sure it gets done right?

**Page 278**

 1   Page_____Line_____should read:_____

 2   Reason for change:_____

 3

 4   Page_____Line_____should read:_____

 5   Reason for change:_____

 6

 7   Page_____Line_____should read:_____

 8   Reason for change:_____

 9

10   Page_____Line_____should read:_____

11   Reason for change:_____

12

13   Page_____Line_____should read:_____

14   Reason for change:_____

15

16   Page_____Line_____should read:_____

17   Reason for change:_____

18

19

20   _____

21   LUCILLE C. HULSEY

22   Sworn to and Subscribed before me

23   _____, Notary Public.

24   This_____day of_____2011.

25   My commission Expires:_____              JBM

# Exhibit II

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

08 Civ. 9361 (PGG)
----------------------------------------x
YATRAM INDERGIT, on behalf of himself
and others similarly situated,

             Plaintiff,


                vs.


RITE AID CORPORATION, RITE AID OF
NEW YORK, INC. and FRANK
OFFOR as Aider & Abettor,

             Defendants.
----------------------------------------x

             April 23, 2009
             10:09 a.m.


    VIDEO DEPOSITION of Plaintiff,

YATRAM INDERGIT, taken by Defendants Rite

Aid Corporation and Rite Aid of New York,

Inc., pursuant to Notice and agreement,

held at the offices of Gibbons P.C., One

Pennsylvania Plaza New York, New York,

before Reva Weiss, a Notary Public of the

State of New York.

Page 64

```
1                    INDERGIT
2    profitability, correct?
3         A      Yes.
4         Q      Some stores in your district
5    were less profitable than yours, correct?
6         A      Yes.
7         Q      Why?
8         A      Performance, I guess.
9         Q      Performance of the managers?
10        A      I guess, yes.
11               MS. KANE:  Don't guess.
12        A      Yes.
13               MS. KANE:  If you don't
14    understand, ask him to clarify it.
15        A      Yes.
16        Q      The answer is "yes"?
17        A      Yes.
18        Q      What was it about those
19    managers that caused their store
20    performance to be different or less
21    effective than yours?
22        A      I don't know.
23        Q      Because you don't know what
24    they did, right?
25        A      Maybe they --
```

Page 65

1           INDERGIT

2           MS. KANE:  Objection to form.

3    A      I don't know what they did,

4    right.

5    Q      You don't know what job duties

6    they performed on a daily basis, correct?

7    A      Well, all stores have the same

8    duty.  It just depends how they do it.  I

9    don't know.

10   Q      All stores have the same thing

11   that have to be accomplished?

12   A      Accomplished, yes.

13   Q      But each manager has the

14   discretion to determine how they should

15   be accomplished within their store,

16   correct?

17   A      Yes.

18   Q      And that's true for store

19   managers and assistant managers, correct?

20   A      Yes.

21   Q      So each store manager and

22   assistant store manager may run a store

23   in a completely different way, correct?

24   A      Yes.

25   Q      The ultimate goal just to make

INDERGIT

1                    INDERGIT

2     sure that all of the things that are

3     required to be done are done?

4          A     Yes.

5          Q     And as an example, there is a

6     daily tour sheet that is available as a

7     tour?

8                MR. TURNER:  Strike that.

9          Q     There is a daily tour sheet

10    that is available as a tool for managers

11    to use to determine what tasks need to be

12    accomplished, correct?

13         A     On a daily basis, yes.

14         Q     You used that sometimes but not

15    all the times, right?

16               MS. KANE:  Objection to form.

17    Can you rephrase.

18         Q     You used that sometimes but not

19    all times, correct?

20         A     I used it.

21         Q     Every day?

22         A     All the time.

23         Q     Are you aware that some store

24    managers do not?

25         A     I don't know.

Page 67

1              INDERGIT

2       Q       Tell me how you would use that

3  daily tour sheet?

4       A       Tour the store.  Take the

5  sheets, go down each aisle and see what

6  got to be done.

7              The first is thing you have to

8  find out what come down from the

9  Corporate, what got to be done, which is

10  top priority.  You go to the computer,

11  you make copies.

12       Q       When you say "you," you mean

13  the managers?

14       A       The managers.

15       Q       Only the managers have access

16  to that, correct?

17       A       Exactly.  That's a code.

18       Q       So you would each -- starting

19  out a day --

20       A       That's right.  You go to read

21  the SYSM, the messages.

22       Q       So when you are determining a

23  work plan for the day, how to get things

24  done in the store, the first part of that

25  process would be seeing if there's any

Page 68

1                    INDERGIT

2    directive from Corporate that something

3    has to be done today?

4         A     Yes.  Such as a recall or

5    whatever.

6         Q     And recalls, correct me if I am

7    recall, if something is recalled and you

8    don't get it out of your store, your

9    store can be charged for it, correct?

10        A     Yes.

11        Q     Yes?

12        A     Yes.

13        Q     And that would affect your

14   overall profitability, correct.

15        A     Bottom line.

16        Q     So you made sure that when you

17   got a recall, you got them turned around,

18   correct?

19        A     Yes.

20        Q     Would that come in an an e-mail

21   or the SYSM system?

22        A     SYSM.

23        Q     You would check that?

24        A     That's a must.

25        Q     If you were opening the store,

1              INDERGIT

2    about what task you were going to do as

3    well?

4        A     Yes.

5        Q     You had the ability to make

6    determinations as to what task you would

7    perform, correct?

8        A     Well, we saying this -- yes.

9    If the help provide -- if I had the

10   sufficient help.  The manager usually do

11   it himself.

12       Q     Tasks that had to be done, for

13   example --

14       A     Yes.

15       Q     -- would be making sure that

16   the product is properly faced?

17       A     Yes.

18       Q     Customer service?

19       A     Yes.

20       Q     You did customer service,

21   right?

22       A     Yes.

23       Q     Making sure that the product is

24   out on the floor?

25             MS. KANE:  Just note my

1             INDERGIT

2      objection.

3      A      Yes.

4           MS. KANE:  You are testifying as

5      to what was being done as opposed to

6      asking him what --

7           MR. TURNER:  I'm asking him.

8      And it's not appropriate.  If you want

9      to say something, three words, "object

10     to form."

11          MS. KANE:  I object to form.

12          MR. TURNER:  Thank you.

13     Q      These are the tasks -- types of

14     things that would be happening, correct?

15     A      Yes.

16     Q      So you would have a list of

17     things that needed to be done.

18     A      Right.

19     Q      You could decide who did what,

20     correct?

21     A      Like I said, if I have the

22     manpower, because I end up -- the manager

23     end up doing it himself.

24     Q      How many employees were on your

25     list, on your payroll on a weekly basis?

1              INDERGIT
2       A     On a weekly basis, a weekly or
3   daily basis?
4       Q     Weekly.
5       A     Weekly, I would say about 10 or
6   11.  Including managers?
7       Q     I'm just talking about non
8   managers.
9       A     Okay.
10       Q     Ten is your guess?
11       A     No.  Well, that's include the
12   managers.  I would say eight, nine.
13       Q     That was true for the last six
14   years, is that your testimony?
15       A     Yes.
16       Q     Did that include pharmacy?
17       A     No.
18       Q     So you would have employees
19   scheduled to be in your store to --
20       A     Yes.
21       Q     -- work.
22             And if -- what I'm -- I
23   understand you're saying that you had to
24   do some tasks because you didn't have
25   enough people, and we're going to talk

1                     INDERGIT

2     would need to make it complete or

3     accurate?

4          A     No.

5          Q     You performed all of the duties

6     that are identified on that document,

7     correct?

8          A     Yes.

9          Q     And it accurately states what

10    your essential duties and

11    responsibilities were as a store manager,

12    correct?

13         A     Yes.

14         Q     And it accurately states your

15    supervisory responsibilities, correct?

16         A     Yes.

17         Q     Mr. Indergit, as I understand

18    your allegations in this lawsuit, you

19    claim that the total amount of

20    subordinate hours or time for subordinate

21    employees to work in your store decreased

22    and that you were not permitted to use

23    overtime.

24         A     Yes.

25         Q     Is that correct?

1            INDERGIT

2        A      Yes.

3        Q      Are you alleging that you could

4    never use overtime after January of 2002?

5        A      Well, we used -- in other

6    words, we usually use overtime until the

7    cooperation come down with it there is no

8    overtime.

9        Q      You say "the corporation."  Who

10   told you that?

11       A      Well, that comes from the -- if

12   it was in my computer SYSM.

13       Q      And you saw a SYSM --

14       A      Yes.

15       Q      -- that said that you can

16   not --

17       A      Sent by -- yes.

18       Q      Go ahead.

19       A      Sent by my supervisor.

20       Q      Who was?

21       A      Frank.

22       Q      Mr. Offor sent a SYSM --

23       A      Yes.

24       Q      -- to you.  Anybody else on it?

25       A      No.

INDERGIT

1

2     Q     Just to you?

3     A     Yes.

4     Q     That says you can't use

5  overtime?

6     A     Yes.

7     Q     That actually was in 2007,

8  correct?

9     A     Well, 2000 -- this -- 2002,

10  2003 we get every problems we have from

11  that time on.

12     Q     You say "we."  I'm saying --

13     A     Me.

14     Q     You.

15     A     Yes.

16     Q     It was you.

17     A     Yes.

18     Q     Nobody else was on those SYSMs,

19  it was only you?

20     A     I don't know who was on.  When

21  you send a SYSM, you send it to me.

22  That's only management, that's me.

23     Q     You did not see other managers'

24  names on that SYSM, correct?

25     A     I guess you can do that.  I

Page 419

1

2              MR. TURNER:  Subject to the many

3       stipulations that we have on this

4       deposition from the start, and subject

5       to his review of the documents in an

6       effort to speed things along, I will

7       suspend.

8              MS. KANE:  Sounds good.

9              THE VIDEOGRAPHER:  This

10      concludes today's deposition.  The

11      time is 5:55.  We are off the record.

12             (Time noted: 5:55 p.m.)

13

14

15      _____

16              YATRAM INDERGIT

17

18      Subscribed and sworn to before me

19      this _____ day of _____ , 2009

20

21

22      _____        _____

23      NOTARY PUBLIC           MY COMMISSION EXPIRES

24

25

# Exhibit JJ

Page 1

        IN THE UNITED STATES DISTRICT COURT
        OF THE SOUTHERN DISTRICT OF NEW YORK


YATRAM INDERGIT, on      )
behalf of himself        )
and others similarly     )
situated,                )
                         )
      Plaintiff,         ) Civil Action File
                         ) No.  08Civ.9361
vs.                      ) (PGG) (HBP)
                         )
RITE AID                 )
CORPORATION, RITE        )
AID OF NEW YORK,         )
INCORPORATED, and        )
FRANK OFFOR as Aider     )
& Abettor,               )
                         )
      Defendants.        )


                    - - -


            Deposition of GARY KING
             (Taken by Defendants)
               Atlanta, Georgia
               August 1, 2011


     Reported by: Lynne C. Fulwood
               Certified Court Reporter

Page 34

1    availability to be a strength?

2        A    Well, with all the things happening

3    at the time of Rite Aid -- or not -- yeah, Rite

4    Aid acquisition and, you know, all the

5    districts realigning and everything, there was

6    a lot going on.  And there would be a lot of

7    times that, you know, we'd have to talk about

8    things that had to be done, needed to be done,

9    what we needed to get them done.  So

10   availability was very important at that time.

11       Q    How often was Mr. Redmon in your

12   store while he was your district manager?

13       A    I'd -- I'd say not more than once a

14   month.

15       Q    And how often do you think you spoke

16   with him on the phone while he was your

17   district manager?

18       A    At least once a week.

19       Q    Did you think that Mr. Redmon trusted

20   your judgment as a store manager?

21           MS. RUBIN:  Objection to form.

22       A    Well, I'm sure he did to some extent,

23   but I mean, with the way all the plans are laid

24   out, you know, pretty much didn't rely on our

25   judgment, just our ability to accomplish the

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)**
**Gary King**                                                          **August 1, 2011**

 1    tasks that needed to be accomplished.

 2        Q    But it would be fair to say that he

 3    did rely on your judgment in terms of planning

 4    how the tasks would be accomplished, right?

 5        A    I --

 6             MS. RUBIN:  Objection to form.

 7        A    I can only assume that he would.  I

 8    can't -- you never know what's on somebody's

 9    mind, so --

10        Q    Well, did he ask you what your plans

11    were?

12        A    More times than asking it would be

13    more like telling me what my plans were.

14        Q    Well, we'll start with my question,

15    which is did he ask you what your plans were,

16    and then we'll get to what you just said.

17        A    Yeah, I'm sure at times he would ask

18    me what my plans were.

19        Q    And at times he would tell you what

20    he needed you to get accomplished?

21        A    More often than not, yeah, it was,

22    you know, you need to do this, this, this and

23    this, in this order, you know.

24        Q    What was going on with your store

25    during that three months that Mr. Redmon was

---

**REPORTED BY: Lynne C. Fulwood, CCR**          **www.huseby.com**
**HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400**

Page 36

1    supervising you?

2         A     It was during -- that was during the

3    acquisition period, I believe.

4         Q     And so your store was being

5    converted?

6         A     Yes.

7         Q     From what to Rite Aid?

8         A     Eckerd.

9         Q     And what was involved in the

10   conversion that you recall?

11        A     Re- -- realigning the gondolas, the

12   painting and resigning, making it -- I mean,

13   making it look like Rite Aid -- like the

14   existing Rite Aid stores looked like,

15   remodeling.

16        Q     And I take it these things would

17   involve different crews, work crews showing up

18   at your stores for different things to happen

19   on a given day?

20        A     That's correct.

21        Q     And so Mr. Redmon would let you know,

22   The next thing that's going to happen at your

23   stores, we're going to be painting, or whatever

24   it might be?

25        A     Yes.

Page 123

1    run.  And then the rest of it was pretty much

2    computer based training.

3         Q    And you've referred to computer based

4    training a few times today.  By that you mean a

5    video that you watched on the computer screen?

6         A    Correct.

7         Q    Was it interactive training at all?

8         A    There was some -- some interactive

9    training.  One -- I mean, we did have one

10   register set up to where when you were at that

11   particular station doing register training, it

12   would have you do different functions that you

13   would do on the register.

14         But as far as office paperwork and

15   things like that, it was pretty much, you know,

16   just them telling you how it's done and then

17   giving you a quiz at the end of it.

18        Q    Would you say that Rite Aid had a

19   sophisticated computer based process in its

20   stores while you were a store manager?

21        A    Sophisticated.  The training system

22   was -- I mean, it could be a very good tool,

23   but time allotted for it was what hindered it

24   from being what it could be.

25        Q    I really intended my question to be

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)**
**Gary King**                                                     **August 1, 2011**

Page 124

1    broader than training, so it probably wasn't a

2    good question.

3           Would you say that as a store manager

4    at Rite Aid you used sophisticated computer

5    equipment in your responsibilities?

6        A    Oh, yes.

7        Q    Do you remember how you communicated?

8    Other than by telephone or in person, on the

9    computer, how did you communicate?

10       A    SYSMs.

11       Q    And would you say that SYSMs were a

12   sophisticated communication system?

13          MS. RUBIN:   Object to the form.

14       A    Yeah, basically it's -- you know,

15   it's the equivalent of e-mail.

16       Q    You viewed SYSMs as the equivalent of

17   e-mail?

18       A    Yes.

19       Q    Do you use a home computer?

20       A    Yes.

21       Q    What kind of system do you have at

22   home?

23       A    I have one of those XP Professional.

24       Q    Do you remember that SYSMs were

25   basically a green screen with a cursor

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)**
**Gary King**                                              **August 1, 2011**

Page 125

1   blinking?

2        A    Well, yeah.

3        Q    It didn't seem out of date to you?

4        A    Well, if you put it that way, maybe,

5   but I mean, it was effective.

6        Q    And when you were given the training

7   on you said computers and paperwork during the

8   transition from Eckerd to Rite Aid, who

9   provided computer based training?

10       A    You have computer based training in

11  every store.  It's a part of the overall

12  system.

13       Q    I think I'm still not asking the

14  question well, because you're talking about the

15  video training that you can watch on the

16  computer, right?

17       A    Well, that to me is computer based

18  training.

19       Q    It is, you're right.  That's why I'm

20  saying I'm not asking it very well.

21            Who provided you with training about

22  how to use the computers?

23       A    How to use all of that stuff?

24       Q    Yes.

25       A    Okay.  Well, that was that one day

Page 140

```
 1      A    No.  I think the biggest change from

 2  going from Eckerd to Brooks Eckerd was the

 3  color of the shelf labels.

 4      Q    So district managers while you were

 5  store manager in order are Mike Jones,

 6  Mr. Redmon, and then Mr. Kozemko?

 7      A    Yeah.

 8      Q    Any others while you were store

 9  manager?

10      A    Not while I was store manager, no.

11      Q    What kind of working relationship did

12  you have with Micky Kozemko?

13      A    We had a good relationship.  We

14  didn't always see eye to eye, but --

15      Q    What did you not see eye to eye with

16  Mr. Kozemko about?

17      A    The fact that, you know, we couldn't

18  make any changes to the profit planner to make

19  more money in the store.  The fact that he

20  liked to visit stores a lot, and he would spend

21  a lot of time in the stores, and that's time

22  taken away from you, store manager, to be

23  accomplishing things that needed to be done

24  that he's telling you during his visit that

25  need to be done, that you already know need to
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)**
**Gary King**                                          **August 1, 2011**

Page 141

1    be done but --

2          Q     What did he do while he was in your

3    store?

4          A     He would check all the paperwork,

5    make sure it was where it's supposed to be.

6    And then he would walk the store with you and

7    go -- I mean, he'd have the profit planner with

8    him, you know, making sure all the --

9    everything that's in the profit planner was set

10   the way it's supposed to be set, and then --

11   you know, nit-pick if you ask me.

12         Q     You never had a district manager like

13   Mr. Kozemko before?

14         A     No.

15         Q     Were you ever disciplined by

16   Mr. Kozemko?

17         A     Yes.

18         Q     For what?

19         A     Well, the alcohol incident, and then

20   he wrote me up for not being properly prepared

21   for an inventory.

22         Q     The alcohol incident is the situation

23   where the employee sold --

24         A     Underage sale, yes.

25         Q     Why weren't you properly prepared for

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)**
**Gary King                                           August 1, 2011**

Page 142

1    inventory, or do you think you were?

2         A    Well, I was prepared as I could be,

3    but I had to go to three other stores prior to

4    my inventory to assist them in their

5    inventories.  And I -- you know, I told my

6    district manager, I got a lot to do, and, you

7    know, I'm spending all these days in these

8    stores unable to do what I need to do, you

9    know.  And then the last day before he finally

10   sent his office assistant and her daughter to

11   my store to help me, and they did very little.

12   And, I mean, the inventory went fine, but he

13   still wrote me up for preparation.

14        Q    Do you know whether her daughter was

15   a Rite Aid employee?

16        A    Yes.

17        Q    She was?

18        A    Still is as far as I know.

19        Q    Was she a manager?

20        A    That's the Redmon clan.

21        Q    The daughter was also a Redmon?

22        A    Uh-huh.

23        Q    Yes?

24        A    Well --

25        Q    You need to give the verbal response.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)**
**Gary King**                                              **August 1, 2011**

Page 146

1    then.  And this was around Christmastime when

2    it was high ticket electronics items that they

3    had specifically for Christmas sales.

4              And it was pretty evident he was

5    doing it, but, you know, he wasn't on film

6    doing it or anything like that.  But finally

7    after they transferred him to the store they

8    transferred him to, they set up cameras and

9    caught him.

10        Q    Do you remember an assistant store

11   manager named Lisa?

12        A    Lisa.  You have a last name?

13        Q    No.

14        A    Lisa.

15        Q    No recollection?  Griffin?

16        A    Lisa Griffin.  Oh, I think she was at

17   Polo Road maybe.

18        Q    She -- actually it looks like she

19   went by Marika or something like that.

20        A    I think I know who you're talking

21   about.  She was a shift supervisor?

22        Q    Well, let me ask it this way.  Do you

23   remember disciplining an assistant manager

24   named Lisa for not completing work that you had

25   assigned to her?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Gary King                                                                    August 1, 2011

Page 147

 1        A     Yeah, that was her.  Yeah.

 2        Q     And for taking too many smoke breaks?

 3   We need a verbal response.

 4        A     Yes.

 5        Q     Thank you.

 6              What else do you remember about Lisa?

 7        A     She was not -- I mean, when I hired

 8   her, she sounded like -- I mean, she did a good

 9   interview, but after she was hired, she was too

10   involved with her outside life and not involved

11   enough with the store.  Like I said, she'd take

12   too many smoke breaks, and she'd take them

13   because she'd be out there talking on the

14   phone.  And, I mean, the work load -- it's bad

15   enough when everybody's doing their job, and

16   when somebody's not doing their job, the work

17   load is worse.  So she just -- I mean, she

18   wasn't the right candidate for the job.  She --

19   I think she quit, pretty sure.

20        Q     But you hired her?

21        A     Her mother worked at another store

22   and asked me if I needed -- well, her mother

23   knew that I did need a shift supervisor at the

24   time and recommended her, so I gave her name to

25   the district office, and actually the district

Page 148

1    manager is the one that hired her.

2         Q     I thought you said a second ago, when

3    I interviewed her, she --

4         A     Yes, I interviewed her prior to

5    sending her to the district manager.

6         Q     And then you think that she quit on

7    her own?

8         A     Yeah.  You know, after I wrote her

9    up, she I guess came to the realization that I

10   wasn't just going to sit back and let her slack

11   and then everybody else have to take up her

12   slack.

13        Q     How many times were you injured while

14   you were working as a store manager for Eckerd,

15   Brooks Eckerd or Rite Aid?

16             MS. RUBIN:  Objection to form.

17        A     I slammed my thumb in the door on one

18   occasion.  That was a really good one.  I had

19   to go and have them drill a hole in my thumb to

20   relieve the pressure on that one.

21             Then on that inventory that I got

22   written up for, a couple of days before the

23   inventory I had dropped a shelf on my foot, had

24   to go see a doctor for that.  And they told me

25   to stay off my foot, but they wouldn't give me

Page 149

1    an excuse for work, so I had to work on a bad

2    foot during the inventory.

3              But the most prominent is when I was

4    rear ended going to the bank.  That was the

5    straw that broke the camel's back there.

6         Q    The thumb-in-the-door injury, did you

7    miss any work related to that?

8         A    No.  I didn't miss any work for that

9    or for dropping the shelf on my foot.

10        Q    And when were you rear ended going to

11   the bank?

12        A    That was April of '09.

13        Q    Did you miss work as a result of that

14   accident?

15        A    I sure did.  That's why I am like I

16   am now.

17        Q    How long were you out of work?

18        A    That was the workers' comp case.

19   From that day and -- from that day on.

20        Q    So you didn't return to work after

21   April 2009?

22        A    No.  I had surgery on my shoulder,

23   and they did numerous things to my back, but

24   nothing helped my back.  My shoulder, it's

25   marginal.  But, you know, I haven't been back

Page 154

1   location.  Like when they set the profit plan,

2   it could be something that you moved to an end

3   cap, but it also has a location within the

4   regular planogram, so you have to determine,

5   you know, if you do have it or if it's

6   something that has been lifted.

7           Q    What do you mean "lifted"?

8           A    Stolen.

9           Q    Did Brooks Eckerd have a system that

10  told you how many items you were supposed to

11  have?

12          A    It was in its infancy when Rite Aid

13  took over.  They were working on it, but it

14  never really got into full swing.

15          Q    So do you know what I mean when I say

16  inventory replenishment?

17          A    Yes.

18          Q    What is that?

19          A    That's where anything that goes

20  through point of sale, it should automatically

21  be replenished through the -- through the

22  replenishment system.  You should receive it on

23  the truck within a week after it's been sold.

24          Q    As a store manager, did you ever

25  override the automatic replenishment?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  08Civ.9361(PGG) (HBP)**
**Gary King**                                                            **August 1, 2011**

Page 155

```
 1        A     We were allowed to do that when Rite

 2   Aid first took over, and we were trying -- you

 3   know, the system -- trying to get the system to

 4   where it was caught up to what we actually had

 5   and what we didn't have.  But once they decided

 6   we'd had long enough for that to happen, then

 7   there was no overriding the system.

 8        Q     And you didn't have that automatic

 9   replenishment system at Eckerd or Brooks

10   Eckerd?

11        A     No.

12        Q     As a store manager, could you add to

13   your ordering?

14        A     The only thing that we could do as

15   far as ordering was -- was to -- they had ad

16   orders where you could -- you know, they give

17   you a list of what's going to be on sale at a

18   certain time, and you could, you know -- you

19   could decide within so much whether you thought

20   you needed more or not.  But if you thought you

21   were going to need a lot of something and the

22   system didn't think so, it would be up to the

23   discretion of the district manager whether or

24   not you could order what you wanted to order or

25   not.
```

Page 156

```
 1      Q     Were there times that you asked your

 2  district manager to order more of a particular

 3  ad item?

 4      A     Well, the way it worked is you went

 5  in and you put in what you thought you needed,

 6  and the district manager had to review them.

 7  And I don't ever remember an occasion of him

 8  calling to say, no, you don't need this many or

 9  whatever.  He just -- if he didn't think I

10  needed what I thought I needed, he'd just

11  change it, and, you know, that's how it was.

12      Q     Did he ever increase it?

13      A     I don't think so.

14      Q     Could you tell, was there something

15  that you saw to show that he increased -- I'm

16  sorry -- decreased a number that you had

17  ordered?

18      A     Yeah, on particularly -- you know, on

19  a lot of sale items, you know, something that's

20  a really good sale, and you know you're going

21  to sell a lot, and come truck day and you get

22  two of them, well, somebody changed it because

23  you know you ordered more than two and you only

24  got two.

25      Q     My question really, though, was did
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)**
**Gary King**                                              **August 1, 2011**

Page 158

```
 1      Q    What did you mean a minute ago when
 2  you said sometimes it was required?
 3      A    If you had a lot of outs in your
 4  store, you were required to go to one of your
 5  neighboring stores to get merchandise that
 6  you're out of so that you won't be out of the
 7  merchandise.
 8      Q    Were you responsible for ensuring
 9  that price changes happened in a timely manner
10  in your store?
11      A    It was a responsibility, yes.
12      Q    Did you think it was important that
13  price changes happen in a timely manner?
14      A    It's a very important aspect of the
15  store because it affects the bottom line of the
16  store.  And not only that, it's -- it can be an
17  issue with the state if you're ever audited and
18  have a lot of shelf signs that are incorrect.
19      Q    Did you order your own seasonal
20  merchandise?
21      A    No.  I mean, we could give input on
22  what we thought we needed for some seasonal
23  merchandise, but for a lot of it, they sent you
24  whatever they were going to send you anyway.
25  It was -- I mean, they just determined by the
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Gary King                                                August 1, 2011

Page 159

1    volume of your store what to send you.

2         Q    I think you just said we could give

3    input.  Did you actually give input?

4         A    On the stuff that we were allowed to

5    say, do you think you need more of, like stuff

6    that, you know, was going to be on ad that was

7    seasonal merchandise, then we could say, yeah,

8    we -- you know, if they said we only needed

9    two, and we thought, you know, we needed more,

10   we could say we needed more.

11        Q    Did you?

12        A    Yes.

13        Q    Okay.

14        A    Yes.  Didn't always get it but did

15   ask.

16        Q    If you were in the store, did you

17   generally check in vendors yourself?

18        A    No, not -- it just depended on what

19   was going on.  If I and the assistant were both

20   in the store, then whoever was -- could

21   easily -- more easily go and check in the

22   vendor was the one that did it.  It's -- I

23   mean, it wasn't something that had to be done

24   by myself.

25        Q    It could be done by you or your

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)**
**Gary King**                                                    **August 1, 2011**

Page 160

 1   assistant manager?

 2        A    Yes.  Well, actually, the cashiers

 3   could do it too.

 4        Q    Did you ever have your cashiers check

 5   in vendors?

 6        A    There have been times when we were

 7   extremely busy, like a vendor come in on truck

 8   day, and I'm busy unloading the truck, well,

 9   there's not much choice but for the cashier to

10   check them in because they don't usually leave

11   and come back later.

12        Q    Did you process vendor invoices

13   yourself?

14        A    At times, yeah.

15        Q    What types of vendors came in your

16   store while you were a store manager?

17        A    Beer vendors, snack vendors and

18   frozen goods vendors.

19        Q    Did you sell any liquor in your

20   stores other than beer?

21        A    No.  Oh, wait, we did have wine.

22        Q    In which store?

23        A    All of the stores had wine.

24        Q    Did you have the ability to get other

25   liquor products for your store?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Gary King                                                              August 1, 2011

Page 171

1   whether you were opening or closing?

2        A    Yes.  There was more paperwork

3   involved with opening than closing.

4        Q    And what were the types of monthly

5   paperwork you did as a store manager?

6        A    You had a P&L statement to do,

7   attendance report, monthly sales report, a

8   monthly known loss report.  I think that's all

9   I can think of.

10       Q    Weren't there also weekly reports or

11  paperwork that you had to complete as a store

12  manager?

13       A    Yeah, trying to -- yeah, there were

14  weeklies.  I'm having trouble recalling what

15  they were called.

16       Q    Well, we talked earlier about the

17  schedule.  I assume you did that weekly?

18       A    Yeah.  Yeah.

19       Q    Weren't there also weekly payroll

20  reports?

21       A    Yes, there was.

22       Q    And did you handle those, or did you

23  also let your assistant store manager do weekly

24  payroll?

25       A    It was a shared responsibility.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)**
**Gary King**                                                    **August 1, 2011**

Page 172

1          Q     And when you said that the P&L

2     statement was something monthly you had to do,

3     what did you do with the P&L statement?

4          A     Basically entering figures, what --

5     the P&L would give you what was projected and

6     the previous year's sales, and you had to enter

7     what your current year sales was and make sure

8     all the pluses and minuses were -- you know,

9     whether your sales were up or down and what

10    categories they were up and down.  That

11    basically -- and entering, you know, what your

12    final for the month was into the system, and it

13    computed what your percentages were compared

14    to your previous year.

15         Q     As a store manager did you study the

16    monthly P&L statement in order to make changes

17    in your store?

18         A     Making changes in the store was

19    something that was hard to do.  About the only

20    changes I could make was deciding what time

21    somebody came in.  But, I mean, making changes

22    in the store was not something you did.  If a

23    store was made -- a change was made in the

24    store other than personnel, it was made by

25    upper management.

Page 173

```
 1        Q    You felt you had no ability to make
 2   changes in your store after evaluating the
 3   profit and loss statement?
 4        A    Not really, no.
 5        Q    Well, "not really" is one of those
 6   answers that always makes us nervous as
 7   lawyers.
 8        A    I mean, you know, basically what that
 9   would tell me, which it should also tell
10   corporate that was making all the decisions, is
11   that, you know, I mean, I could see areas that,
12   you know, could have done better and see the
13   areas that did do better.  But, I mean, there
14   was really nothing I could do to effectively
15   change, you know, the areas that didn't do
16   well.  I mean, you know, we're given this
17   guideline, and this is what we have to have in
18   our store.
19            And, you know, some categories that
20   started doing really bad, you know, I knew
21   there were things that could be done, and I
22   even told my district manager -- you know, for
23   one example I was in an area where people like
24   to do cookouts, so, I mean, we could have sold
25   probably a ton of charcoal a year.  But the
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)**
**Gary King**                          **August 1, 2011**

Page 174

1   only time we had charcoal was in the summer,

2   but people cookout all year long.   And, you

3   know, I mean, I couldn't keep charcoal in my

4   store when I had it.

5        And there were other items too in the

6   same category, but there was nothing that I

7   could do.

8        Q   So you asked to be allowed to have

9   charcoal in the store at other times other than

10  summer?

11       A   Yeah, charcoal and other summer

12  products.  Sunscreen is another one.  You know,

13  there for a long time they only had sunscreen

14  in the summer.  They finally started putting

15  that back in the store on a regular basis to

16  some extent.  But that was another product that

17  in the wintertime, especially older customers,

18  you know, they sunburn easily, and they come in

19  looking for sunscreen.  And I'm like, well,

20  sorry, we only have that in the summertime, and

21  they're like, well, the sun's out all year

22  long.  And, you know, I'm like, yes, I agree

23  with you, but it wasn't a decision that I could

24  make.

25       Q   But that was something that changed

Page 175

1   while you were still a store manager?

2       A    That one did, I will say.  I mean,

3   they did -- they don't carry the full line all

4   year long, but they did start carrying certain

5   types of sunscreen all year long.

6       Q    Are you able to say, for example, how

7   much time you spent working on your profit and

8   loss statement or analyzing your profit and

9   loss statement as a store manager each month?

10      A    Each month, I'd review it several

11  times a month, so I'd say probably eight to ten

12  hours a month.

13      Q    And is that just an estimate?

14      A    That would be the minimum.

15      Q    So you may have spent more?

16      A    Yes.

17      Q    And would you agree that in order for

18  Rite Aid to know, for example, how much time

19  each store manager spent on their monthly P&L

20  statement, they'd have to talk to each store

21  manager?

22      A    I guess that would be a fair

23  assessment.

24      Q    What if I asked you a question like,

25  in the month of December of 2008 how much time

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)**
**Gary King**                                           **August 1, 2011**

Page 211

```
 1        questions.  Can I take a few minutes?
 2              MS. BARBAREE:  Sure.
 3              (Whereupon, a brief recess was
 4        taken.)
 5                    EXAMINATION
 6   BY MS. RUBIN:
 7        Q    So, Mr. King, when you opened the
 8   store, what time would you typically get there?
 9        A    I typically would get to the store at
10   least an hour and a half before opening.
11        Q    Why did you get to the store that
12   early?
13        A    That would give me more time to
14   accomplish some tasks that would be difficult
15   to accomplish after opening the store.
16        Q    Tasks like what?
17        A    Planograms, resetting end caps in
18   accordance with the profit planner.  Those were
19   the big things.
20        Q    And why did you feel you could not
21   get those done?
22              MS. BARBAREE:  Objection; form.
23        A    Once the store is open, you have
24   interruptions.  And the less interruption you
25   have when doing planograms and resetting end
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Gary King                                                                August 1, 2011

Page 212

```
 1    caps, it just makes the job go a whole lot
 2    quicker, smoother.
 3         Q    Okay.  How much time in a given day
 4    would you say you spent doing managerial
 5    duties?
 6              MS. BARBAREE:  Objection; form.
 7         A    In a given -- any given day, five
 8    hours.
 9         Q    Okay.  And what percentage of time
10    would you say you spent doing nonmanagerial
11    duties?
12              MS. BARBAREE:  Objection; form.
13         A    Typically I was in the store ten to
14    12 hours a day, so I'd say anywhere from five
15    to seven hours.
16         Q    When you opened the store and you
17    were on the cash register, were you able to see
18    the entire store?
19         A    No.
20         Q    Did that affect your ability to
21    manage?
22              MS. BARBAREE:  Objection; form.
23         A    Anytime I was on the cash register,
24    that -- I mean, that made it pretty much
25    impossible to perform managerial duties.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)**
**Gary King**                                                   **August 1, 2011**

Page 213

1         Q      How did doing nonmanagerial work
2    affect your ability to manage?
3                MS. BARBAREE:   Objection; form.
4         A      Well, the nonmanagerial stuff
5    performed -- you know, it took away -- you
6    know, just how to put it.   When you're setting
7    a planogram, you're pretty much just setting a
8    planogram.   You don't know what your cashier's
9    doing up front, and you don't know what they're
10   doing in the pharmacy because you're right
11   there.   You can't see either place.   You're
12   right there where you're working on a
13   planogram.
14                So, I mean, you can't see if there's
15   something going on that you could effect or
16   not.
17        Q      Were you able to promote customer
18   service when you were working on a planogram?
19        A      If a customer come to where I was
20   work on the planogram, yes, I could say, oh,
21   hi, how are you doing?   Is there anything I can
22   help you with?   But if they were two aisles
23   over, I wouldn't know.   So if they needed help,
24   and they didn't track me down, then, no,
25   customer service was not being done.

Page 214

1        Q    Were you able to promote customer

2   service when you were on the cash register?

3        A    Effectively, no.  I mean, you could

4   greet the customer when they come in the store,

5   but if they needed to know where something was,

6   you could try to tell them where it was at.

7   But to physically be able to take them to the

8   product, which was what we were supposed to do,

9   you're not able to do that if you're running a

10  cash register.

11       Q    Was there anything that you did as a

12  store manager that your assistant store manager

13  and shift supervisor did not do?

14            MS. BARBAREE:  Objection to form.

15       A    The only thing different for me and

16  the assistant was I had a key to the personnel

17  file.  They did not.

18       Q    Did anyone else have that key?

19       A    HR.

20       Q    Okay.  Did you have the ability to

21  choose which vendor you wanted to come to your

22  store?

23       A    No.

24       Q    Did you have the ability to decide

25  where to put security cameras?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)**
**Gary King**                                                   **August 1, 2011**

Page 215

 1          MS. BARBAREE:  Objection; leading.

 2     A     No.

 3          MS. RUBIN:  That's all I have.

 4                    EXAMINATION

 5   BY MS. BARBAREE:

 6     Q     Now, earlier when I asked you about

 7   planograms, you said that you were constantly

 8   interrupted, correct, while you were working on

 9   planograms?

10     A     Anytime, yes, if the front end or

11   back end needed change, or they had a customer

12   issue, yes.

13     Q     I assume you would also stop to see

14   what was going on in the store from time to

15   time?

16     A     From time to time.

17     Q     Make sure your employees were

18   actually working?

19     A     Yes.  But it was not something that I

20   could do constantly, you know.

21     Q     Did I understand you to say a second

22   ago that helping out on the cash register is

23   not promoting customer service?

24     A     Not helping out.  If I went up to --

25   because there were a lot of customers, that

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)**
**Gary King**                                                    **August 1, 2011**

Page 219

```
 1              E R R A T A   S H E E T
 2
        Pursuant to Rule 30(7)(e) of the Federal
 3  Rules of Civil Procedure and/or Georgia Code
    Annotated 81A-130(B)(6)(e), any changes in
 4  form or substance which you desire to make
    to your deposition testimony shall be
 5  entered upon the deposition with  a
    statement of the reasons given for making
 6  them.
 7      To assist you in making any such
    corrections, please use the form below.  If
 8  supplemental or additional pages are
    necessary, please furnish same and attach
 9  them to this errata sheet.
10                    - - -
11      I, the undersigned, GARY KING,
    do hereby certify that I have read the
12  foregoing deposition and that to the best of
    my knowledge said deposition is true and
13  accurate (with the exception of the
    following corrections listed below).
14
15
16  Page_____ Line_____should
17  read:_____
18  Reason for
19  change:_____
20
21  Page_____ Line_____should
22  read:_____
23  Reason for
24  change:_____
25
```