# Exhibit KK

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


YATRAM INDERGIT, on Behalf

of Himself and Others

Similarly Situated

　　　　　Plaintiff　　　　　Civil Action No.

vs.　　　　　　　　　　　08-CV-9361

RITE AID CORPORATION, RITE

AID OF NEW YORK, INC., and

FRANCIS OFFOR as Aider &

Abettor

　　　　　Defendants

_____/


　　　The deposition of BRENDA KITCHEN was held on

Friday, July 22, 2011, commencing at 9:43 a.m., at the

Offices of Gore Brothers Reporting & Videoconferencing,

20 South Charles Street, Suite 901, Baltimore, Maryland

21201, before Dawn L. Venker, Notary Public.



REPORTED BY:  Dawn L. Venker

Page 112

1        Q      I'm just going to take them one at a time.

2    Angelo -- Angela?

3        A      Angela.

4        Q      Excuse me.  What was the reason for her

5    termination?

6        A      Taking product off the shelf and eating it

7    on her breaks.

8        Q      Okay.  Was she not paying for it either?

9        A      Not paying for it.

10       Q      It was like employee theft?

11       A      Yes.

12       Q      And who caught her?

13       A      It was -- there was -- it was at inventory

14   time, and there was an open container of peanuts

15   sitting in the photo area.  I asked who it belonged to.

16   And they said Angela.  Angela's.

17       Q      Okay.

18       A      So then I immediately reported it to

19   district manager, loss prevention manager, and then

20   they took it from there.

21       Q      Okay.  Did you have to prepare a written

22   statement?

23              MS. SCOTT:  Objection to form.

24       A      Once they -- yeah.  Well, the fact that I

25   found the open can of peanuts, yes.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**                    08-CV-9361
**Brenda Kitchen**                                                    July 22, 2011

Page 113

```
 1        Q      So you prepared a written report of this?

 2        A      Yes.

 3        Q      Okay.  And who did you give that to?

 4        A      Was either Brian or the loss prevention

 5   manager.

 6        Q      Okay.  Just for the record, Brian is Brian

 7   Peelman, the district manager?

 8        A      Yes.

 9        Q      Okay.  When you say after you reported to

10   them they took care of it, did you have any input as to

11   what her punishment should be?

12               MS. SCOTT:  Objection to form.

13        A      No.

14        Q      Did you make any recommendation?

15               MS. SCOTT:  Objection to form.

16        A      No.

17        Q      Did you have the authority to terminate on

18   your own as store manager?

19               MS. SCOTT:  Objection to form.

20        A      No.

21        Q      Did you ever terminate anyone on your own?

22               MS. SCOTT:  Objection to form.

23        A      No.

24        Q      Did you ever make a recommendation to the

25   district manager or loss prevention that someone should
```

Page 114

1    be terminated?

2         A     Yes.

3         Q     And about whom did you make that

4    recommendation?

5         A     To a cashier/clerk we had that had very

6    poor customer service skills.

7         Q     Is that one of the three people you

8    identified?

9         A     No.

10        Q     And at what store was this?

11        A     3969.

12        Q     Do you remember her name?

13        A     It was -- I can see her.

14        Q     Okay.

15        A     I don't know.

16        Q     What was it she had done that caused you to

17   recommend termination?

18        A     She had very poor customer service skills,

19   and she was constantly calling the union on -- on

20   different things that was -- she claimed was happening

21   in the store.

22        Q     Did -- did store managers in nonunion

23   stores have more freedom than you did in terms of

24   termination of employees?

25              MS. SCOTT:  Objection to form.

Page 121

```
 1        A     About that time frame.  I mean some weeks,

 2   some months he may -- he may not have needed to go to

 3   different stores.  So he may have hung out there a

 4   little bit longer.

 5        Q     Did you ever complain to anyone that he

 6   only would come to your store once a month for half an

 7   hour?

 8        A     To him.

 9        Q     So that's what I'm trying to understand.

10        A     During one of my first -- during my first

11   year, yeah, there was time frames where he was in and

12   out quickly, and I told him that I needed him -- I

13   needed a little bit more support from him.

14        Q     So when he visited the store during -- on

15   these monthly visits, how long was he actually coming

16   to the store?

17        A     It varied.

18        Q     Okay.

19        A     I mean it varied from -- I mean it could --

20   it could be a half hour, it could be half a day.  I

21   mean it varied.  All depended upon what was on his

22   schedule.

23        Q     Okay.  Do you know what would cause him to

24   stay at the store longer, as opposed to a thirty-minute

25   visit?
```

Page 122

```
1        A       Phone calls.

2        Q       Phone calls of --

3        A       Different -- from other managers.

4        Q       Okay.

5        A       Phone calls from other managers.  Phone

6   calls from the district.  He would be working in the

7   office on the computer.  On occasion he would -- if it

8   was truck day, he would help sort the truck.

9        Q       Okay.

10       A       If we were in middle of doing a seasonal

11  changeover, he would maybe do one or two feet (sic) of

12  it.

13       Q       Okay.  On those occasions where he came for

14  a half hour, what is it he did?

15       A       He came in.  He briefly walked the store

16  and made his notes.  Gave me a list.  We reviewed it.

17  He may have went over that, the quick visit form, on --

18  that was provided to him as a store checkoff.  I would

19  sign off on it saying okay, this is what we'll work on

20  prior to next visit.

21       Q       Okay.

22       A       And then he would be out.

23       Q       Okay.  Did you ever hear of the Paint and

24  Powder Program?

25       A       I've heard of it.
```

Page 123

1       Q      Do you know what it is?

2       A      No.

3       Q      Okay.  I take it then you were never

4    involved in it?

5       A      Unless that was what they considered the

6    resets.

7       Q      Okay.

8       A      I mean that could be the term that they

9    called the whole store resets.

10       Q      Okay.  And those were what we discussed

11    earlier?

12       A      Yeah.

13       Q      Other than those three store resets you

14    were sent on, were there any other projects during the

15    time you were at 3969 that you were taken away from the

16    store for any extended period of time?

17       A      I mean -- yeah, we traveled to different

18    locations to help out.  Like new store openings.  I

19    couldn't count.

20       Q      As you sit here today, do you have any

21    recollection of any assignment you were given that took

22    you away from your store for an extended period of

23    time?

24       A      I did the Brooks/Eckerd transit --

25    transitions.

Page 129

```
 1    that you were responsible for the overall profitability
 2    of your store?
 3              MS. SCOTT:  Objection to form.
 4         A    Overall, yes.
 5         Q    And do you agree that the assistant store
 6    manager in the stores you worked was the second highest
 7    ranking employee in the store?
 8         A    Yes.
 9         Q    You never worked in a store where you had a
10    co-manager?
11         A    No.
12         Q    Okay.  Have you heard of that position?
13         A    Yes.
14         Q    Okay.  Do you have any knowledge then as to
15    whether the duties of a store manager in a store with a
16    co-manager would be any different than the duties you
17    had as a store manager in a store without?
18         A    No, I do not.
19              MS. SCOTT:  Objection to form.
20         A    No, I do not.
21         Q    Okay.  As store manager, were you
22    responsible for identifying the tasks that needed to be
23    completed in your store?
24              MS. SCOTT:  Objection to form.
25         A    To a degree, yes.
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.                    08-CV-9361
Brenda Kitchen                                                            July 22, 2011

Page 130

1          Q      And what do you mean by that?

2          A      We had SYSMs from our district manager that

3    we -- that laid out what needed to be done.  I would

4    say within a year, year and a half before I left, was

5    terminated, we had a new system go in -- and, I'm

6    sorry, I don't know the name of the new system, but it

7    gives you in detail day to day this is what needs to be

8    done in your store.

9          Q      Well, for the majority of the time that you

10   were the store manager in Store 3969, your district

11   manager only visited you once a month, correct?

12         A      But he -- but he SYSM me, which SYSM is the

13   e-mail system on this is what I -- what we need to make

14   sure -- directions from corporate this is what we need

15   to make sure is happening in our store.

16         Q      But to answer my question, he visited you

17   once a month for the majority of time that you were the

18   store manager, correct?

19         A      Correct.

20                MS. SCOTT:  Objection to form.

21         Q      So he didn't have a day-to-day vision of

22   your store, correct?

23                MS. SCOTT:  Objection to form.

24         Q      He didn't walk your store every day?

25         A      No.

Page 131

1      Q      And as store manager, you walked your store

2      every day, correct?

3             MS. SCOTT:  Objection to form.

4      A      Yes.

5      Q      And when you walked your store, did you

6      identify tasks that you believed needed to be completed

7      in your store?

8             MS. SCOTT:  Objection to form.

9      A      Yes.

10     Q      Okay.  And you did that every day, right?

11     A      No.

12     Q      You didn't walk the -- well, when you were

13     on duty?

14     A      Well, I mean I did -- I walked my store --

15     every ounce of it, every inch of it, every day, no.

16     Q      Do you know if you were supposed to?

17     A      Yes.

18     Q      Okay.  And why wouldn't you?

19     A      Because (a) a cashier called off.  So you

20     were -- you were the cashier till your fill-in could

21     get there that you woke up.  (b) deliveries came at

22     eight o'clock in the morning.  So you went right from

23     opening the store to deliveries.

24     Q      Could you also delegate the store walk to

25     your assistant store manager?

Page 246

```
 1        A      Uh-huh.

 2        Q      Who in the sore had authority to place the

 3   order for cigarettes?

 4        A      Myself, the assistant, and the two shifts.

 5        Q      Okay.

 6        A      But in my store I had -- my lead cashier

 7   did it.

 8        Q      Okay.  So that -- earlier when you --

 9   that's the one order that a sales/clerk -- a

10   cashier/clerk was able to do --

11        A      Correct.

12        Q      -- in your store?  And what was involved in

13   placing the cigarette order?

14        A      You just went through and you scanned the

15   different types of cigarettes that you wanted to have

16   come in, and to order them to get them to come in.

17        Q      Okay.  And would you actually do that

18   order?

19        A      When she was off.

20        Q      You personally?

21        A      I -- I gave it to her because she is behind

22   the counter -- was behind that counter the most because

23   she was the lead.

24        Q      Okay.

25        A      So she knew what sold and she didn't know
```

Page 247

1    what sold.

2         Q    Okay.  So if I asked you how much time you

3    spent a week on the cigarette orders, is it possible

4    you went a week without doing the cigarette order?

5         A    Oh, yes.  Yes.

6         Q    Okay.  Did you as a store manager have

7    authority to decide what merchandise was sold in your

8    store?

9              MS. SCOTT:  Objection to form.

10        A    When you say what merchandise, what do

11   you -- I mean --

12        Q    Well, you told me earlier there were

13   suggestions you made.  For instance, the Goya I

14   remember.

15        A    Right.

16        Q    Did you have authority to identify what was

17   sold in your store?

18             MS. SCOTT:  Objection to form.

19        A    No.

20        Q    If you felt something should be sold in

21   your store that was not being sold, do I understand

22   from your testimony earlier that you could make

23   recommendation to your district manager?

24        A    Yes.

25        Q    And from your testimony earlier, there were

Page 248

 1   occasions where he approved your suggestions?

 2        A    Yes.

 3        Q    Okay.  Did you as store manager review any

 4   reports which identified, you know, strong selling

 5   products versus weak selling products in your store?

 6        A    Yes.

 7        Q    How often would you review those reports?

 8        A    Monthly.

 9        Q    And what -- what -- what's the name of that

10   report?  You don't know?

11        A    I don't remember.

12        Q    And what was the purpose of you reviewing

13   those reports?

14        A    You -- you reviewed it when the district

15   manager came for his walk.  It was one of his questions

16   on his form that we had to review it.

17        Q    Okay.

18        A    But I can't tell you what the name of the

19   report was.

20        Q    And did the review of that report assist

21   you in terms of your understanding of what you needed

22   to order in terms of the ad order, the hard order?

23        A    To a degree, yes.  To a degree.

24        Q    Okay.  With respect to product placement in

25   the store, you told me earlier that in the stores you

Page 346

```
 1              MS. SCOTT:  Objection to form.
 2       A      Huh?  No, I cannot identify anybody.
 3       Q      And it states here, "using an associate
 4  discount on clearance priced merchandise is a violation
 5  of company policy, one that you stated you knew."  Do
 6  you see that?
 7       A      Yes.
 8       Q      Do you agree that is a violation of company
 9  policy?
10       A      It is a violation of company policy.
11       Q      And were you aware of that at the time that
12  you did it?
13       A      Yes, but I was not thinking at the time
14  when I was doing it.
15       Q      Okay.
16              MR. O'CONNOR:  Take a minute to look at my
17  outline, please.
18              (A recess was taken.)
19              MR. O'CONNOR:  I think that's all I have.
20  Thank you.
21  EXAMINATION BY MS. SCOTT:
22       Q      Ms. Kitchen, I'm going to ask you a few
23  follow-up questions now.  What duties did you perform
24  as a store manager at Rite Aid that you would consider
25  nonmanagerial?
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**                    **08-CV-9361**
**Brenda Kitchen**                                              **July 22, 2011**

Page 347

```
 1              MR. O'CONNOR:  Object to form.

 2       A      Unloading truck.  Stocking.  Sweeping the

 3  store.  Mopping the floor.  Restrooms.  Cleaning of

 4  restrooms.  Running the cash register.  Photo area when

 5  we had it.

 6       Q      Would you consider pricing items a

 7  nonmanagerial task?

 8              MR. O'CONNOR:  Object to form.

 9       A      Yes.

10       Q      What portion of your day would you spend

11  doing these nonmanagerial tasks?

12              MR. O'CONNOR:  Object to form.

13       A      In the beginning in a ten hour shift, six

14  to seven hours.  In the end it was five or six in my

15  forty-five hour workweek.

16       Q      That would be five or six hours a day?

17       A      A day.

18       Q      What percentage of your workweek would you

19  spend doing nonmanagerial tasks, would you approximate?

20              MR. O'CONNOR:  Object to form.

21       A      80, 85 percent.

22       Q      To your knowledge, were these tasks, the

23  ones that you've listed as nonmanagerial, were they

24  part of the job description of a store manager?

25       A      Not on paper.
```

Page 348

```
 1              MR. O'CONNOR:  Note my objection to form.
 2      Q      We looked at Exhibit -- I believe it was 1.
 3   The store manager --
 4              MR. O'CONNOR:  9.
 5      A      9.
 6      Q      Oh, I'm sorry.  Okay.  Exhibit 9.  In
 7   looking over Exhibit 9, which is the job description of
 8   the store manager, do you see those duties listed on
 9   there anywhere?
10      A      No, I do not.
11      Q      Doing your nonmanagerial duties affect how
12   you were able to run the store?
13              MR. O'CONNOR:  Object to form.
14      A      Yes.
15      Q      In what ways?
16      A      The fact that if you were task oriented on
17   a project, on a planogram, you weren't -- you were
18   engrossed in your work, you were not really supervising
19   anybody else.  You were -- you're trying to meet that
20   deadline and get that planogram done, getting the truck
21   up.  Whatever task that was that day, you could kind of
22   lose yourself in it knowing that they needed to get
23   done.
24      Q      And did Rite Aid expect you to still
25   perform your managerial duties while you were having to
```

Page 350

```
 1        Q      So what percentage of the time that you
 2   spent working as a -- excuse me.  Strike that.
 3               On a weekly basis, how many hours would you
 4   do nonmanagerial tasks at Sears?
 5               MR. O'CONNOR:  Object to form.
 6        A      Forty hour workweek, less than ten I would
 7   perform nonmanagerial duties.
 8        Q      You said one of the duties of a manager, a
 9   store manager at Rite Aid, is to make the store
10   profitable.  Would you agree that the budget affects
11   the profitability of the store?
12               MR. O'CONNOR:  Object to form.
13        A      Yes.
14        Q      And who created the budget?
15        A      Corporate.
16        Q      And did you have any say in the budget?
17        A      Only if -- if we submitted the weekly
18   budget -- this is the reason why I think we need to --
19   to up the budget and they approve it.
20        Q      And how often would they approve upping the
21   budget?
22               MR. O'CONNOR:  Object to form.
23        A      At the times that I put it in, I submitted
24   one -- submitted them ten times maybe.  And I would say
25   they did listen to me, yes.  They upped my budget.  But
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.                08-CV-9361
Brenda Kitchen                                                                    July 22, 2011

Page 351

1    that was when the grocery store across the street

2    closed and our sales volume and our budget went up.   I

3    mean went up high instantly.   Overnight.

4         Q    Did you ever request more hours or an

5    increased budget in any instance other than the one

6    that you just mentioned?

7         A    No.

8         Q    Did you work -- did you work overtime at

9    every store that you worked at?

10             MR. O'CONNOR:   Object to form.

11        A    As?

12        Q    At some point -- strike that.

13             I believe you said earlier that you worked

14   at least fifty-five hours a week, correct?

15        A    Fifty-five plus.

16             MR. O'CONNOR:   Object to form.

17        A    Yes.

18        Q    And you were salaried at fifty hours a

19   week; is that right?

20        A    Correct.

21        Q    So you were working at least five hours a

22   week overtime at all times while you were working for

23   Rite Aid as a store manager, right?

24             MR. O'CONNOR:   Object to form.

25        A    Right.

Page 352

1       Q      Were you doing nonmanagerial tasks at the
2   store that you claim to have been country stores?
3              MR. O'CONNOR:  Object to form.
4       A      Yes.
5       Q      Were you doing nonmanagerial tasks at
6   stores you said were inner city stores?
7       A      Yes.
8              MR. O'CONNOR:  Object to form.
9       Q      Did you have budgeting issues at stores
10  that you said were country stores, or stores located in
11  the countryside?
12      A      Yes.
13      Q      Did you have budgeting issues in stores
14  that you said were inner city stores?
15      A      Yes.
16      Q      I know you said you were responsible for
17  the profitability as a store manager at Rite Aid, but
18  could you control the -- actually control the
19  profitability of a store?
20             MR. O'CONNOR:  Object to form.
21      A      No.
22      Q      Did you always have enough employees or
23  hours to allocate to employees to get all the tasks
24  done in the store that you needed to be completed?
25             MR. O'CONNOR:  Object to form.

Page 367

1                    CERTIFICATE OF DEPONENT

2

3

4        I hereby certify that I have read and examined

5    the foregoing transcript, and the same is a true and

6    accurate record of the testimony give by me.

7        Any additions or corrections that I feel are

8    necessary, I will attach on a separate sheet of paper

9    to the original transcript.

10

11                        _____

12                              BRENDA KITCHEN

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit LL

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


YATRAM INDERGIT, on behalf of     * CIVIL ACTION No.
himself and others similary       * 1:08-cv-09361
situated,                         * PGG-HBP
                                  *
          Plaintiff,              *
                                  *
vs.                               *
                                  *
RITE AID CORPORATION, RITE        *
AID OF NEW YORK, INC., and        *
FRANCIS OFFOR as Aider            *
& Abettor,                        *
                                  *
          Defendants.             *
                                  *
*   *   *   *   *   *   *   *   *



DEPOSITION OF JAMES MICHAEL LEMBEZEDER
taken on Monday, October 3, 2011,
before Diana C. Nadas,
Registered Professional Reporter
and Certified Court Reporter
in and for the State of Louisiana,
at Law Offices of
Ogletree, Deakins, Nash,
Smoak & Stewart, P.C.,
639 Loyola Avenue, Suite 2550,
New Orleans, Louisiana 70113,
commencing at 10:07 o'clock a.m.

REPORTED BY:
     Diana Nadas Roloff, CCR, RPR
     License No. 90012

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361 PGG-HBP**
**James Michael Lembezeder                    October 3, 2011**

Page 37

```
 1              Objection form.
 2         THE WITNESS:
 3              I don't recall.
 4    BY MR. SCOTT:
 5         Q.   More than a regular day?
 6         MS. SCOTT:
 7              Objection form.
 8         THE WITNESS:
 9              Yes.
10    BY MR. SCOTT:
11         Q.   How many employees were in the front-end
12    of your store, per shift, at the El Centro store?
13         A.   I don't recall.
14         Q.   Do you have any recollection,
15    whatsoever?
16         MS. SCOTT:
17              Objection form.
18         THE WITNESS:
19              No, I don't.
20    BY MR. SCOTT:
21         Q.   Do you remember seeing other employees
22    in the store?
23         A.   Yes.
24         Q.   Okay.  There were people there?
25         A.   Yes, there were.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361 PGG-HBP**
**James Michael Lembezeder                        October 3, 2011**

Page 38

1        Q.    Okay.   And you scheduled those

2    employees?

3        A.    No.   I -- I didn't.

4        Q.    Who scheduled them?

5        A.    Staffworks, the computer.

6        Q.    Who operated Staffworks?

7    MS. SCOTT:

8              Objection form.

9    THE WITNESS:

10              Oh, I supposed I did.

11    BY MR. SCOTT:

12        Q.    Who printed out the schedule?

13        A.    (Indicating.)  That varied between me

14    and my assistant.  I didn't always do the

15    scheduling.  Sometimes, I'd have -- I -- not the

16    scheduling, but the inputting, you know, pushing

17    the button to print the schedule, sometimes, my

18    assistant.

19        Q.    Who adjusted the schedule?

20    MS. SCOTT:

21              Objection form.

22    THE WITNESS:

23              Just whoever was going to do it that

24    week.

25    BY MR. SCOTT:

Page 39

```
 1        Q.    It could have been you, or it could have
 2   been the assistant manager?
 3        A.    Yeah.
 4        Q.    When an employee wanted to take a
 5   vacation, who did the employee come to?
 6        A.    Either me or my assistant.
 7        Q.    And when an employee wanted to take a
 8   vacation, who told the Staffworks program not to
 9   schedule that employee?
10        A.    Either me or my assistant.
11        Q.    And when a new employee was hired, who
12   added that person to the scheduling system?
13        A.    I can't remember if we inputted it, or
14   it actually was downloaded, the name.  I'm not
15   sure.
16        Q.    Somebody had to tell the computer that
17   an employee had been hired, though?
18        MS. SCOTT:
19             Objection form.
20        THE WITNESS:
21             Yes.
22   BY MR. SCOTT:
23        Q.    And when the schedule was printed, where
24   did you put it in the store?
25        A.    Oh, in the camera department.
```

Page 43

 1   another employee had assigned it, that that

 2   employee would be, ultimately, responsible for

 3   making sure it was completed?

 4        MS. SCOTT:

 5             Objection form.

 6        THE WITNESS:

 7             No.

 8   BY MR. SCOTT:

 9        Q.   Okay.  Well, when you say, "if I

10   assigned it, yes" --

11        A.   Yes.

12        Q.   -- that leads me to believe, perhaps,

13   you're saying, if somebody else assigned it, then

14   no.  Do you understand what I'm saying?

15        A.   Yeah.  If somebody else assigned it,

16   then I wasn't responsible.

17        Q.   As a store manager, though, you're

18   responsible for the overall success of the store;

19   correct?

20        MS. SCOTT:

21             Objection form.

22        THE WITNESS:

23             No.

24   BY MR. SCOTT:

25        Q.   How is that not correct?

Page 44

```
 1        A.   I just wasn't -- I -- I'm not
 2    understanding the question.
 3        Q.   Who, but you, is responsible for the
 4    overall success of the store?
 5        A.   District manager.
 6    MS. SCOTT:
 7             Objection form.
 8    BY MR. SCOTT:
 9        Q.   How many stores are there in the
10    district?
11    MS. SCOTT:
12             Objection form.
13    THE WITNESS:
14             Don't recall.
15    BY MR. SCOTT:
16        Q.   More than 20, though; right?
17        A.   Maybe not.
18        Q.   Certainly, more than one?
19        A.   Yes.
20        Q.   And so the district manager has to
21    ensure the entire success of the district; right?
22        A.   Yes.
23        Q.   Which is composed of many stores?
24        A.   Yes.
25        Q.   And you're in charge of your store;
```

Page 45

1    right?

2         A.    Sometimes, I was.

3         Q.    When weren't you?

4         A.    Corporate directives would come down.  I

5    really wasn't in charge of what they were telling

6    us to do.

7         Q.    Who enforced --

8         A.    I was following what they told us to do.

9         Q.    And who enforced the corporate

10   directives?

11        MS. SCOTT:

12              Objection form.

13        THE WITNESS:

14              The district manager.

15   BY MR. SCOTT:

16        Q.    Did you ever enforce a corporate

17   directive?

18        MS. SCOTT:

19              Objection form.

20        THE WITNESS:

21              Occasionally, maybe.

22   BY MR. SCOTT:

23        Q.    Did you have to make sure your employees

24   were following company policy?

25        A.    Yes.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361 PGG-HBP**
**James Michael Lembezeder                                      October 3, 2011**

Page 46

```
 1      Q.   Did you have to make sure that when the
 2  district manager told you to do something, that
 3  your employees complied with that directive?
 4      A.   I passed it on, yes.
 5      Q.   And if they didn't comply, you would
 6  counsel them; correct?
 7      A.   No.  I -- I hardly counseled anybody.
 8      Q.   Whose decision was it to counsel them or
 9  not?
10      MS. SCOTT:
11           Objection form.
12      THE WITNESS:
13           Me.
14  BY MR. SCOTT:
15      Q.   And if you saw someone doing something
16  that was improper, you might not verbally
17  discipline them, but you might tell them, "This is
18  the way it's supposed to be done"; right?
19      A.   Yes.
20      Q.   And so instead of writing them up, you
21  would help them learn how to do it better?
22      A.   Yes.
23      Q.   And that was the effective way that you
24  found to manage your people; right?
25      A.   Yes.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361 PGG-HBP**
**James Michael Lembezeder**                                    **October 3, 2011**

Page 49

```
 1        Q.    Give me a range.

 2        A.    Four to eight hours.

 3        Q.    How frequently would you talk to Gary on

 4   the phone?

 5   MS. SCOTT:

 6             Objection form.

 7   THE WITNESS:

 8             Once or twice a week.

 9   BY MR. SCOTT:

10        Q.    How long did those phone calls take?

11   MS. SCOTT:

12             Objection form.

13   THE WITNESS:

14             Varied.

15   BY MR. SCOTT:

16        Q.    Give me a range.

17        A.    Five minutes to an hour and a half.

18        Q.    All right.  Where was your store, in

19   relation to the district office?

20        A.    Ninety minutes.  To get there, 90

21   minutes.

22        Q.    And Gary, who was visiting your store

23   every other month, was not running your store, was

24   he?

25   MS. SCOTT:
```

Page 50

1          Objection form.

2       THE WITNESS:

3          He was telling me how to run it.

4    BY MR. SCOTT:

5       Q.   Who was, actually, running the store?

6       MS. SCOTT:

7          Objection form.

8       THE WITNESS:

9          I would say that he was.  He was

10       telling me, and the corporate policy was

11       telling me -- corporate directives were

12       telling me how to do everything, and so I

13       really wasn't running it.

14    BY MR. SCOTT:

15       Q.   So Gary was simultaneously running

16    multiple stores at the same time?

17       MS. SCOTT:

18          Objection form.

19       THE WITNESS:

20          In a way.

21    BY MR. SCOTT:

22       Q.   And Gary was running a store that he

23    would only visit once every two months, give or

24    take?

25       MS. SCOTT:

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361 PGG-HBP
James Michael Lembezeder                           October 3, 2011

Page 51

 1              Objection form.

 2         THE WITNESS:

 3              Give or take, yeah.

 4    BY MR. SCOTT:

 5         Q.   That's your testimony?

 6         A.   Yeah.

 7         Q.   Okay.  So --

 8         A.   That's how I see it.

 9         Q.   So when you were a store manager and you

10    were in charge of a 12 million dollar a year

11    store, you're telling me that a person who only

12    visited the store once every two months was

13    actually running the store?

14         MS. SCOTT:

15              Objection form.

16         THE WITNESS:

17              Yeah.

18    BY MR. SCOTT:

19         Q.   All right.  Did you --

20         A.   Because before, when it wasn't Rite Aid,

21    you know, I was running the store.  I was able to

22    put things on end-caps, that I wanted to.  I was

23    able to do a lot more at the -- management than I

24    was with Rite Aid.

25         Q.   Okay.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361 PGG-HBP**
**James Michael Lembezeder**                                    **October 3, 2011**

Page 100

1    I didn't.

2        Q.   All right.  Your testimony, sitting here

3    today, is that you can't remember ever instructing

4    any employee on how to better perform their job

5    from 2006 to 2009?

6        MS. SCOTT:

7             Objection form.

8        THE WITNESS:

9             I can't remember if I did or not.

10   BY MR. SCOTT:

11       Q.   Do you think that you did?

12       MS. SCOTT:

13            Objection form.

14       THE WITNESS:

15            I -- I don't know.

16   BY MR. SCOTT:

17       Q.   Was it your job to?

18       A.   I don't know.

19       Q.   Did Rite Aid ever issue any new

20   corporate policies between 2006 and 2009 --

21       MS. SCOTT:

22            Objection.

23   BY MR. SCOTT:

24       Q.   -- that were implemented in your store?

25       THE WITNESS:

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361 PGG-HBP**
**James Michael Lembezeder**                                    **October 3, 2011**

Page 101

```
 1              Objection form.
 2         THE WITNESS:
 3              They might have.
 4    BY MR. SCOTT:
 5         Q.   Do you have any recollection of them
 6    doing that?
 7         A.   Of what?
 8         Q.   Of them doing that?
 9         MS. SCOTT:
10              Objection form.
11         THE WITNESS:
12              No.  I -- I don't remember.
13    BY MR. SCOTT:
14         Q.   All right.  From 2006 to 2009, did you
15    have to make sure that your store was clean and
16    faced?
17         A.   Yes.
18         Q.   What is, "faced," for the record?
19         A.   Merchandise pulled to the lip of the
20    counter, spread out.
21         Q.   And turned the right way?
22         A.   Labels front.
23         Q.   Did you hire any employees between 2006
24    and 2009?
25         A.   No.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361 PGG-HBP**
**James Michael Lembezeder**                                      **October 3, 2011**

Page 102

1      Q.    Did the store have any vacancies between

2    2006 and 2009?

3      A.    Yes.

4      Q.    Did the store have any front-end

5    vacancies between --

6      A.    Yes.

7      Q.    Okay.   And who hired those employees?

8      A.    Human Resources.

9      Q.    What open positions did you have between

10   2006 and 2009?

11     A.    It had to have been just part-time

12   cashiers.

13     Q.    Who interviewed the employees?

14     A.    My assistant.

15     Q.    Did you do a single interview between

16   2006 and 2009?

17     A.    Probably not.

18     Q.    So your assistant store manager did?

19     A.    Yes.

20     Q.    Was your assistant store manager working

21   for Human Resources?

22     A.    No.

23     Q.    Who made the offers of employment to the

24   people who were hired?

25     A.    Probably my assistant manager would

Page 103

1    have.

2         Q.    Okay.  Who made the decision as to which

3    employees to hire?

4         A.    My assistant manager would have.

5         Q.    Okay.  Did you trust your assistant

6    manager to hire the right people?

7         MS. SCOTT:

8              Objection form.

9         THE WITNESS:

10              Yes.

11   BY MR. SCOTT:

12        Q.    Do you have any recollection,

13   whatsoever, of someone from Human Resources coming

14   to your store to interview a potential candidate

15   for a part-time clerk-cashier position?

16        A.    No.

17        Q.    Those interviews were done by in-store

18   management personnel; correct?

19        MS. SCOTT:

20              Objection form.

21        THE WITNESS:

22              That wasn't the whole employment

23        process.

24   BY MR. SCOTT:

25        Q.    That's not the question.  The interviews

Page 105

 1      MS. SCOTT:

 2           Objection form.

 3   BY MR. SCOTT:

 4      Q.   And then, once that green light was

 5   given, the in-store management could make the

 6   decision as to whether or not to hire that person;

 7   right?

 8      MS. SCOTT:

 9           Objection form.

10      THE WITNESS:

11           Yes.

12   BY MR. SCOTT:

13      Q.   Okay.  Did Human Resources ever take

14   someone off the street and say you were going to

15   hire this person?

16      MS. SCOTT:

17           Objection form.

18      THE WITNESS:

19           No.

20   BY MR. SCOTT:

21      Q.   When someone applied for a job at your

22   store, the job applications were kept in the

23   office?

24      A.   Yes.

25      Q.   And then, when a position opened up, the

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361 PGG-HBP**
**James Michael Lembezeder**                          **October 3, 2011**

Page 106

1   in-store management could take a look at the job

2   applications and decide whom to interview?

3          A.   Yes, it could.

4          Q.   And they did; right?

5          A.   I don't know.

6          Q.   Did you have any involvement in the

7   interviewing and hiring process at your store?

8          A.   No.

9          Q.   The assistant store manager took care of

10  that?

11         A.   Yes.

12         Q.   Did you say, "hi" to the new hires when

13  they came in?

14         A.   I was introduced, yes.

15         Q.   And who made sure that those new hires

16  received all the on-the-job training that they

17  needed?

18         A.   The assistant.

19         Q.   Okay.  Which assistant was this that was

20  doing all of this?

21         A.   I had gone through three or four in

22  those three years; so whatever assistant.  I'm not

23  sure who it was.

24         Q.   And how did you know that the assistant

25  store manager was competent to handle the

**Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361 PGG-HBP**
**James Michael Lembezeder                October 3, 2011**

Page 107

1    interviewing and hiring and training?

2         MS. SCOTT:

3              Objection form.

4         THE WITNESS:

5              Just by knowing him or her.

6    BY MR. SCOTT:

7         Q.   Did you go over any of this stuff with

8    them, or you know knew them and so you knew they

9    could do it?

10        A.   I hoped they could do it.

11        Q.   Okay.  How did you know that they could

12   do it?  Did you discuss it with them, or you just

13   liked them, generally?

14        MS. SCOTT:

15             Objection.

16        THE WITNESS:

17             Just liked them.

18   BY MR. SCOTT:

19        Q.   You just liked them?

20        A.   You could tell.  You could tell if

21   somebody was smart in retail.

22        Q.   Okay.  And so you didn't go over with

23   them any of the policies and procedures, with

24   respect to interviewing and hiring?

25        MS. SCOTT:

Page 118

```
 1        MR. SCOTT:
 2             Back on the record.
 3   BY MR. SCOTT:
 4        Q.   Do you remember if your ASMs were
 5   salaried or hourly?
 6        A.   What are, "ASMs"?
 7        Q.   Assistant store managers.  Do you
 8   remember if your --
 9        A.   Hourly.
10        Q.   Your assistant store managers, to the
11   best of your recollection, were hourly?
12        A.   When I left, yes.
13        Q.   Were they hourly the entire time?
14        MS. SCOTT:
15             Objection form.
16        THE WITNESS:
17             I -- I'm not sure if they were.  After
18             they won the lawsuit against Rite Aid in
19             California, I don't know whether they were
20             salaried or hourly before then.
21   BY MR. SCOTT:
22        Q.   How many hours a week were the assistant
23   store managers in the store when you were not
24   there?
25        MS. SCOTT:
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361 PGG-HBP**
**James Michael Lembezeder**                                    **October 3, 2011**

Page 119

```
 1              Objection form.

 2        THE WITNESS:

 3              I'm not sure.

 4    BY MR. SCOTT:

 5        Q.   Was it 20?

 6        MS. SCOTT:

 7              Objection form.

 8        THE WITNESS:

 9              I couldn't tell you.

10    BY MR. SCOTT:

11        Q.   They were there when you were not there,

12    though; correct?

13        A.   Yes.

14        Q.   And during that time, they were in

15    charge of the store; right?

16        A.   Yes.

17        Q.   Is there some reason why you chose not

18    to be involved in the interviewing and hiring

19    process at the El Centro store?

20        A.   Language.

21        Q.   Did your assistant store manager speak

22    Spanish?

23        A.   Yes.

24        Q.   Do you speak Spanish?

25        A.   No.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361 PGG-HBP**
**James Michael Lembezeder**                                    **October 3, 2011**

Page 120

```
 1        Q.    Did the candidates they were hiring
 2   speak Spanish?
 3        A.    Mostly, yes.
 4        Q.    Is that why you left it up to them to do
 5   that?
 6        A.    Yes.
 7        Q.    Would the customers speak Spanish?
 8        A.    Yes.
 9        Q.    Did that create challenges for you in
10   dealing with the customers?
11        A.    Yes, it did.
12        Q.    Did that create challenges for you in
13   dealing with your employees, sometimes?
14        A.    Yes, sometimes.
15        Q.    Did you prefer to hire bilingual
16   employees who could converse in Spanish with the
17   customers?
18        A.    No.
19        Q.    Why not?
20        A.    I could always communicate.
21        Q.    Do you speak any Spanish?
22        A.    A little.
23        Q.    And did you communicate with that little
24   Spanish?
25        A.    A little bit.
```

Page 134

    1       Q.    Are you aware of any other Rite Aid

    2   stores in the country that didn't have a manager's

    3   office in it?

    4       A.    Oh, I don't know.  I have no idea.

    5       Q.    We'd have to go and look in each one of

    6   them?

    7       A.    Yeah.

    8       Q.    What percentage of your time, per week,

    9   did you spend in the computer room?

   10   MS. SCOTT:

   11           Objection form.

   12   THE WITNESS:

   13           I couldn't tell you.

   14   BY MR. SCOTT:

   15       Q.    One hundred percent?

   16       A.    No.

   17       Q.    Zero percent?

   18   MS. SCOTT:

   19           Objection form.

   20   THE WITNESS:

   21           More than zero.

   22   BY MR. SCOTT:

   23       Q.    Was it more than 20?

   24   MS. SCOTT:

   25           Objection form.

Page 135

```
 1        THE WITNESS:

 2            Less.

 3   BY MR. SCOTT:

 4        Q.  How many hours a day?

 5        A.  I have no idea.  I -- I couldn't give

 6   you an hour figure.

 7        Q.  Can you give me an hour figure as to how

 8   much time, per week, you did anything?

 9        MS. SCOTT:

10            Objection form.

11        THE WITNESS:

12            I worked my butt off 55 to 70 hours a

13   week.

14   BY MR. SCOTT:

15        Q.  Can you give me an hour figure as to how

16   much time, per week, you performed any task in the

17   store?

18        A.  An hour figure?

19        Q.  Right.

20        A.  No, I don't -- not an hour figure.

21        Q.  Can you give me any figure of time --

22        A.  It -- it varied, from week to week.

23        Q.  Okay.  Based on what?

24        A.  The season.

25        Q.  What else?
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361 PGG-HBP
James Michael Lembezeder                    October 3, 2011

Page 136

```
 1        A.    Basically, the season.
 2        Q.    Can you put a set percentage of time on
 3   any tasks that you performed at Rite Aid?
 4        A.    If I wrote it down, yeah.  I could
 5   probably give you a list.
 6        Q.    Have you ever written it down and come
 7   up with a list, percentage-wise?
 8        MS. SCOTT:
 9              Objection form.
10        THE WITNESS:
11              Probably.
12   BY MR. SCOTT:
13        Q.    Do you have that list?
14        A.    No, I don't.
15        Q.    Do you know where it is?
16        MS. SCOTT:
17              Objection form.
18        THE WITNESS:
19              No.
20   BY MR. SCOTT:
21        Q.    Do you have any document in your
22   custody, possession, or control that would
23   indicate to me or to anybody else the percentage
24   of time that you spent performing duties at Rite
25   Aid?
```

Page 289

1   ordering, cycle counts, recalls, unloading trucks,

2   receiving freight, filing invoices, making

3   deposits.  Rite Aid used to have a bookkeeper; so

4   all the bookkeeping responsibilities, I -- I would

5   assume to be non-managerial, and they did all of

6   those things.

7        Q.   You said Rite Aid used to have a

8   bookkeeper.  Was that person considered a manager

9   of Rite Aid, or was that person --

10       A.   No.

11       Q.   -- considered a non-management --

12       A.   That person was hourly.  Rite Aid used

13  to have a photo clerk that did all the photo

14  processing and all that.  Rite Aid -- oh, what

15  else did Rite Aid have -- it used to have a

16  bookkeeper; a receiver, a receiving manager.  They

17  eliminated that position and did not recreate a

18  new position for the receiving manager and -- the

19  receiving manager was also an hourly employee; so

20  that's about it.

21       Q.   When did Rite Aid do away with those

22  positions of bookkeeper and receiver?

23       MR. SCOTT:

24            Object to form.

25       THE WITNESS:

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361 PGG-HBP**
**James Michael Lembezeder**                    **October 3, 2011**

Page 290

```
 1            Shortly after they took over from --
 2       took over Thrifty Payless Drugs.
 3  BY MS. SCOTT:
 4       Q.   So were these positions, the positions
 5  that Thrifty Payless Drugstore had -- strike that.
 6  Were the positions of bookkeeper and the receiver
 7  positions that were at Thrifty Payless Drugstore,
 8  were they at Rite Aid for only a limited period of
 9  time?
10       A.   Yes.
11       Q.   And all of the non-managerial tasks that
12  you just listed, did you complete all of those
13  tasks?
14       A.   Yes.
15       Q.   Okay.  And I don't know if you listed
16  this -- but, perhaps, I missed it -- do you
17  consider working the cash register a
18  non-managerial task?
19       A.   That's non-managerial, yes.
20       MR. SCOTT:
21            Object to form.
22  BY MS. SCOTT:
23       Q.   What portion of the day would you say
24  you spent completing non-managerial tasks?
25       MR. SCOTT:
```

Page 291

```
 1              Object to form.
 2         THE WITNESS:
 3              It would be hard to say, daily.  But,
 4         weekly, non-managerial tasks provided 90
 5         percent of my duties, and 10 percent of my
 6         duties were managerial.  I must say that Rite
 7         Aid had all their computer programing and
 8         everything down pat, where I wouldn't have to
 9         spend time on managerial duties.  My time was
10         spent on non-managerial duties.
11    BY MS. SCOTT:
12         Q.   If you would look at Exhibit No. 4,
13    which is the Rite Aid Job Description for the
14    Store Manager --
15         A.   (Reviewing Documents.)  Yes.
16         Q.   -- do you see any of the non-managerial
17    duties that you just listed, listed on Exhibit No.
18    4?
19         A.   (Reviewing Documents.)  It shows, "cash
20    handling," but to me, cash handling is verifying
21    deposits, not actually doing deposits, not
22    actually, you know, counting, physically counting
23    the money.  That's what a bookkeeper used to do,
24    and that's on there; so I don't know if -- but
25    verifying the money, yes, the manager is
```

Page 292

```
 1   responsible for.

 2        Q.   Are there any other non-managerial tasks

 3   that you listed a moment ago, listed on there, on

 4   the front page of Exhibit 4?

 5        A.   (Reviewing Documents.)  This is,

 6   basically, what a manager does, but "he" only

 7   involves 10 percent of their time.

 8        Q.   Would you consider, since you said, or

 9   testified, that -- strike that.  Since you

10   testified that you spent 90 percent of your time,

11   on a weekly basis, completing non-managerial

12   tasks, would you consider these non-managerial

13   tasks to have been duties that you had to

14   complete, as a store manager at Rite Aid?

15        MR. SCOTT:

16             Object to form.

17        THE WITNESS:

18             Yes it is.

19   BY MS. SCOTT:

20        Q.   Would you be disciplined by either your

21   district manager or HR if you did not complete

22   these -- or if these non-managerial tasks were not

23   completed at your store?

24        MR. SCOTT:

25             Object to form.
```

Page 333

1                       WITNESS' CERTIFICATE

2

3

4        I, JAMES MICHAEL LEMBEZEDER, do hereby

5    certify that I have read or have had read to me

6    the foregoing transcript of my testimony, given on

7    Monday, October 3, 2011, and hereby certify that

8    it is a true and correct transcription of my

9    testimony, with the exception of any corrections

10   or changes attached hereto.

11

12

13   (CHECK ONE)

14

15   (  )   WITHOUT CORRECTIONS.

16

17   (  )   WITH CORRECTIONS, AND/OR

18      ADDITIONS ATTACHED HERETO.

19

20

21

22   SIGNATURE: _____

23

24

25

# Exhibit MM

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

YATRAM INDERGIT, on behalf of

himself and others similarly          Action Number

situated,                             1:08-cv-09361-PGG-HBP


    Plaintiffs,

v.

RITE AID CORPORATION, RITE AID

OF NEW YORK, INC., and

FRANCIS OFFOR as Aider & Abettor,

    Defendants.

------------------------------------------------------------


Deposition of RITA LEMMING

October 5, 2011

10:09 a.m.

*   *   *   *   *   *   *

Held at the Americourt Hotel

1515 U.S. 19E

Veterans Memorial Parkway

Elizabethton, Tennessee



Reporter: Candy Thomas, CSR, RPR

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rita Lemming                                                October 5, 2011**

Page 36

1        A.    The latter part of 2004, I think.

2        Q.    Would you agree that a store manager who is

3    transitioning from an Eckerd to a Rite Aid would have

4    different challenges as a manager than you would in a

5    store that has always been a Rite Aid?

6              MS. RUBIN:  Objection to form.

7              You can answer.

8              THE WITNESS:  If so, I don't know

9         what it would be.  I mean, I am sure they

10        had to answer to their district manager,

11        just like we did.

12       Q     (By Ms. Offitt) But you never went

13    through a transition process, you were always

14    at Rite Aid?

15       A.    Right.

16       Q.    So you never had the challenges of

17    retraining on Rite Aid policies or procedures or cash

18    registers or telling employees their new rates of pay

19    if that was applicable?

20       A.    No.

21       Q.    You wouldn't have had those challenges?

22       A.    No.

23       Q.    Only they would have had those challenges.

24             But you never talked with them directly

25    about what those challenges were?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rita Lemming                                           October 5, 2011**

Page 37

```
 1      A.   No.
 2      Q.   Do you know how we would find out what those
 3  challenges were that they faced?
 4      A.   No.  I am sure some of them are still
 5  around.
 6      Q.   So we would have to talk to them?
 7      A.   I don't know their names, actually.  I know
 8  Bobby is one, but that's all I know.
 9      Q.   Okay.  So the best way to find out would be
10  to talk to those managers?
11      A.   Yes.
12      Q.   So from 2004 on, you were at 1818?
13      A.   Correct.
14      Q.   How would you describe Chuck Russell's
15  management style?
16      A.   Firm.
17      Q.   How so?
18      A.   Because he told you what to do and you were
19  expected to carry out what he said.
20      Q.   Can you give me examples?
21      A.   Well, you had seasonal items, of course,
22  that came in all the time through every season.  You
23  may set it one way -- say it was Christmas and you set
24  ornaments, then you sent tinsel and went down the
25  line.  He would come in and you may have to bring it
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rita Lemming**                                                  **October 5, 2011**

Page 38

1     from down here back up to here because he wanted

2     lights first instead of tinsel.

3               So you were expected to -- it didn't matter

4     how you set it, it had to be how he wanted it set,

5     even if you were going by the planogram.

6          Q.   Okay.

7          A.   Does that make sense to you?

8          Q.   I think so.  Let me just check.

9          A.   Okay.

10         Q.   So even if you followed what corporate, the

11    planograms that corporate sent out for Christmas

12    displays, if he came in with a different personal

13    preference, he expected you to follow through his

14    preference?

15         A.   Correct.

16         Q.   Not corporate's?

17         A.   Correct.

18         Q.   Did you ever disagree with him on that?

19         A.   I sure did.

20         Q.   And what happened?

21         A.   He won.  We set it the way he wanted it.

22         Q.   How frequently did these disagreements

23    happen?

24         A.   Probably every new season.

25         Q.   So not just Christmas holidays, but even

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rita Lemming**                                    **October 5, 2011**

Page 39

1    Halloween or Valentine's Day, he had a certain way

2    that he wanted things set and you were to set them

3    that way?

4        A.   Correct.

5        Q.   Do you know how many stores Mr. Russell had

6    in his district?

7        A.   I believe it was 28.

8        Q.   Was his district just Tennessee or did it

9    encompass --

10       A.   It encompassed Kentucky at one time, but I

11   think -- it was like they would change.  So at one

12   time Kentucky was there, but they were not later.

13       Q.   How often did he visit your store?

14       A.   Our store was not so much as other stores

15   got.  So I would say once every, I will say once every

16   two months.

17       Q.   You, did you just say that you believed he

18   visited other stores more?

19       A.   Yes.

20       Q.   What stores did he visit more?

21       A.   I know Elizabethton was one.  The

22   Chattanooga stores, once we acquired those in our

23   district, he was down there all the time.

24       Q.   I'm sorry, Elizabethton and what?

25       A.   Chattanooga.  We got both stores.

Page 54

1    ten to 12.

2           Q.    And I am sorry, this was the 2004 to 2010

3    period when you were store manager, ten to 12?

4           A.    Probably.  There wasn't a lot.

5           Q.    Did you ever have an assistant store manager

6    at 1818?

7           A.    No.

8           Q.    So what was the hiring process like?

9           A.    We had to bring them in for an interview and

10   then we would send them for a drug test, do a

11   background check.  And there was a 800 number they had

12   to call for a survey, which I am not sure what they

13   were asked on that.  I never did one.  And we had to

14   receive all three of those back before we could hire

15   them.

16          Q.    Did Mr. Russell have to interview the

17   cashiers?

18          A.    There was about a six-month period that he

19   would not let us hire anyone without his approval.

20          Q.    This is six months out of the six years that

21   you were store manager?

22          A.    Correct.

23          Q.    Other than those six months, you were

24   allowed to hire people without his approval?

25          A.    Cashiers, yes.

Page 55

1        Q.     How did the process differ for shift

2   managers?

3        A.     We could not hire.

4        Q.     Who hired them?

5        A.     He did.

6        Q.     Did you identify and interview them?

7        A.     If we got an application in that we thought

8   would be good for a shift supervisor, if we needed

9   one, of course.  Like I said, we didn't have a lot of

10  turnover in our store, so there was only a couple of

11  times.  And then we would call him and set up an

12  interview.

13       Q.     Can you think of any shift supervisors that

14  you identified and recommended to him?

15       A.     There was one, Sandy.  I don't remember her

16  name.  He did hire her.

17       Q.     Did you recommend that he hire her?

18       A.     I told him I thought she would be good.

19       Q.     Were there any others?

20       A.     No.  The only other one I had was Vickie

21  Williams, but she transferred from another store, so.

22       Q.     So you only recommended one shift supervisor

23  and she was hired?

24       A.     Right.

25       Q.     There was no one that you recommended that

Page 56

1    was not hired?

2         A.   No.  I never recommended anyone other than

3    her.  We didn't have -- I know I keep saying it, but

4    we didn't have a lot of turnover in our store, so.

5         Q.   Did you ever have internal candidates that

6    you wanted to promote to shift supervisor?

7         A.   One.

8         Q.   Who was that?

9         A.   Her name was Shalina Eum, E.U.M.

10        Q.   She was a cashier?

11        A.   Yes.

12        Q.   And you recommended that she be promoted to

13   shift supervisor?

14        A.   Yes.

15        Q.   Was she promoted?

16        A.   No.

17        Q.   Why not?

18        A.   Well, because she had tattoos from here

19   (indicating) all the way up her arm and on the side of

20   her neck.  And Mr. Russell didn't seem to think that

21   that would be a good candidate for a shift supervisor.

22        Q.   Was she the only person that you ever

23   recommended for promotion at 1818?

24        A.   I think so.

25        Q.   I believe you said at some point 1818

Page 67

1    with her?

2          A.    I didn't.

3          Q.    Do you think you were just fortunate with

4    your good crew?

5          A.    Well, my shift supervisor had been with Rite

6    Aid 28 years, so.  And the people that I feel that I

7    hired, I thought were good.  So, yes, I do think I had

8    a good crew.

9          Q.    Do you think a store with more turnover

10   would just have more personnel issues and disciplinary

11   issues than you did?

12         A.    Probably.

13         Q.    Your store's payroll budget is based on the

14   volume of sales, correct?

15         A.    Yes.

16         Q.    So if your sales were to go up, your payroll

17   budget should go up as well?

18         A.    Yes, it should go up.

19         Q.    Did that ever happen?

20         A.    No.

21         Q.    Did your sales go up?

22         A.    Yes.

23         Q.    By how much?

24         A.    I don't know.  We fluctuated.  It was like

25   one week we may be like bottom man on the totem pole

Page 68

```
 1   in the district.  But there were times we actually did
 2   get up.
 3        Q.   Okay.  Was your payroll budget always the
 4   same or did it change?
 5        A.   It changed from a hundred and, I want to say
 6   185, and I don't remember that for positive.  But when
 7   I left, it was a 175.
 8        Q.   I am sorry, 185 to 175?
 9        A.   I think.
10        Q.   Do you know who creates the stores' budget?
11        A.   I know our district manager is the one that
12   called us to tell us what ours was.
13        Q.   But you don't know if he is the one that
14   made it?
15        A.   No, I don't.
16        Q.   Is it something that was set weekly?
17        A.   No.
18        Q.   How often was it set?
19        A.   It was a 175 hours.
20        Q.   Period?
21        A.   Unless you heard during the week to cut.
22        Q.   Okay.  I believe I asked you about sales at
23   one of your stores.  But you don't know how profitable
24   1818 was, or do you?
25        A.   I don't.  I am sorry, I don't remember.
```

Page 69

```
 1        Q.    That's okay.  Not even an approximate
 2   number?
 3        A.    I am trying to think if I can see the sales
 4   book.  I don't remember.
 5        Q.    Okay.
 6        A.    I am sorry.
 7        Q.    No, that's okay.
 8              Were either of the stores that you worked in
 9   considered training stores?
10        A.    No.
11        Q.    And you never had a comanager at 1818?
12        A.    No.  Assistant manager?
13        Q.    Or comanager?
14        A.    We had shift supervisors, which was a key,
15   but.
16        Q.    So after the shift supervisor, you were the
17   person in charge?
18        A.    Correct.
19        Q.    So you had the most authority at the store?
20        A.    Yes.
21        Q.    But there were times that you were not there
22   and the shift supervisor was there?
23        A.    Yes.
24        Q.    Did she have to call you if she needed
25   something important?
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rita Lemming**                                                     **October 5, 2011**

Page 70

 1      A.   If it was something important, yes, she
 2  would call me.
 3      Q.   What would examples of those be?
 4      A.   I know we went through a period of, we were
 5  not allowed to make a decision on whether to give a
 6  customer a gift card if they were angry over
 7  something.  So if that decision needed to be made, of
 8  course they would call me, we would talk about it.  If
 9  it was something that I thought was needed one, then
10  they would turn around and have to call the district
11  manager and get his approval.
12      Q.   Anything else besides gift cards that she
13  would need to call you about?
14      A.   If they had to mark something down.  If it
15  was within, I believe, and I am not positive on this,
16  but I believe it was ten dollars.  Within a ten
17  dollar, like if you needed to mark something down a
18  dollar, we could do that.  If not.  I would have to
19  tell her to call the district management, get his
20  approval, and mark it down.
21      Q.   So she wouldn't have to call you to mark
22  something down, unless you needed DM approval?
23      A.   Right.  If it was like a dollar, she would
24  not need to call me.
25      Q.   Would she ever call you about customer

Page 71

1   complaints or a particular customer issue that she

2   felt she couldn't handle?

3          A.   I don't think -- if they did, I don't

4   remember it.  I mean, they used to call me sometimes

5   just to talk, so it is hard for me to distinguish, you

6   know, if it was a problem.  But if it was a major

7   problem I would be made aware, I think.

8          Q.   How many hours a week did you work?

9          A.   When I was salary or when I was hourly?

10         Q.   Let's start with salary.

11         A.   Salary, it could be anywhere from 60, 65,

12   70.

13         Q.   And when you were hourly?

14         A.   Forty-five.

15         Q.   You never went over 45?

16         A.   No.

17         Q.   When you were salaried, how was your week

18   spread out?  Did you work weekends?

19         A.   We had to work every other weekend and two,

20   I believe two, I can't remember, two nights a week.

21         Q.   Did you ever need to schedule people for

22   overtime?

23         A.   I am sorry, did I need to, is that the

24   question?

25         Q.   Yes.

Page 72

```
 1        A.   I did need to, yes.

 2        Q.   Did you ever schedule anyone for overtime?

 3        A.   No.

 4        Q.   Never ever?

 5        A.   No.

 6        Q.   When did you need to schedule people for

 7   overtime?

 8        A.   When it was only me there.  If I needed

 9   someone else to come in because somebody had called

10   in.  If that cashier would have went into overtime,

11   then I could not have called her in.

12        Q.   Did you ever attempt to?  Did you ever talk

13   with Mr. Russell about needing overtime?

14        A.   I did.

15        Q.   How many occasions?

16        A.   I don't know a number.  A lot.

17        Q.   Do you know if he permitted any other stores

18   within the district to have overtime?

19        A.   I don't.  I don't know.

20        Q.   Do you have any idea whether the decision on

21   whether a store could have overtime is based on

22   volume?

23        A.   I don't know.  I would imagine that that had

24   something to do with it.  Because I knew he always

25   wanted to come in in his payroll for the district.
```

Page 87

1    ever been in that building is a Rite Aid.

2        Q.   Okay.  That's not a very good efficient

3    space then.

4             Do you know when it was built?

5        A.   I don't.  Seems like it was like 25 years

6    ago.  But I don't know that for positive.

7        Q.   Were there ever any major renovations that

8    you're aware of?

9        A.   No, not while I been there.

10       Q.   Any other areas in which you needed to

11   improve according to Mr. Russell?

12       A.   No.  I can't think of any.  I'm sure there

13   was at any given time.  But I don't remember.

14       Q.   Part of your job as store manager was to

15   make the store as profitable as possible, correct?

16       A.   Yes.  I would assume.

17       Q.   And you're the store manager, so that's your

18   responsibility?

19       A.   The district manager always told us it was,

20   yes.

21       Q.   Do you not believe that?

22       A.   No, I don't.

23       Q.   Whose responsibility was it?

24       A.   Well, I think it should have been the store

25   manager's responsibility.  But when you tried to do

Page 88

1   something like we wanted to go out to the community

2   and give baskets, remind people that we do have a

3   pharmacy, bring them into the store.  And we were not

4   allowed to do that per our DM, we couldn't go out and

5   visit in our community.  So if you want to make me

6   responsible for them, let me be responsible for it.

7        Q.   Okay.  So you don't think that you had

8   discretion to do the things outside of normal policies

9   and procedures that you wanted to do that you felt

10   would make the store more profitable?

11        A.   Absolutely not.

12        Q.   Okay.  But within the policies and

13   procedures at the end of the day it's the store

14   manager that's responsible for keeping the store

15   maintained the way it should be, customers happy and

16   the store profitable?

17        A.   I agree with you it is my responsibility to

18   make sure that a customer is happy before they leave

19   the store.  It is the store manager's responsibility

20   to make sure it's clean and nice when the customer

21   comes in.  As far as being profitable, I won't agree

22   with you on because I didn't have the choice of what

23   to do to make it profitable.  I was told what to do to

24   make it profitable.

25        Q.   Okay.  So you weren't given discretion.  But

Page 89

```
 1    you were told what to do --
 2         A.    As far as planograms.
 3         Q.    -- according to policies --
 4         A.    Yes.
 5         Q.    -- and procedures?
 6         A.    I don't know how to answer that.  We have a
 7    book of policy and procedures.
 8         Q.    Uh-huh (affirmative).
 9         A.    It never one time told me in there in policy
10    that I could go into the community.  But if you want
11    me to make that store profitable, let's go out to
12    doctor's offices.  Get in good with your doctors that
13    are in our community so that maybe they mention us
14    when a patient comes in.  You know Rite Aid is right
15    up here at the store.  Do you want me to call your
16    prescription in there?  Or, you know, I think a close
17    knit community needs to stay in your community.
18         Q.    I hear you and I see what you're saying.
19    And I could also see where a person with poor judgment
20    could take that too far.  Do you know what I mean?
21    There are people that you would trust to go to
22    doctor's offices and things.  And there are people
23    that would just maybe abuse the discretion.  So let's
24    just say that Rite Aid wanted to keep it within a
25    universe of things that they've outlined for you to
```

Page 207

1   vary.  You would, they needed to be done as soon as

2   they came in, so.  I'm going to say an hour and a half

3   every morning.  So maybe three days a week.

4        Q.   What did that entail?

5        A.   Pulling the merchandise that they gave you

6   the recall for, boxing it up and putting paperwork on

7   it.

8        Q.   Did you usually handle the recalls?

9        A.   Yes.

10        Q.   What about rotating inventory, did you do

11   that?

12        A.   We did that as we stocked.

13        Q.   So did -- was the entire staff helping with

14   rotating inventory?

15        A.   Yes.  Like truck day.

16        Q.   Okay.

17        A.   We did that on truck day.

18        Q.   What about supervising the condition of the

19   store.  Like looking for broken appliances and

20   fixtures and things.  How often did you do that?

21        A.   Never that I can think of.  We had a leak in

22   our ceiling that I had to call maintenance over.  But

23   actually we called corporate, corporate called

24   maintenance.

25        Q.   Okay.  But was that also, would you call

Page 208

```
 1    that part of your morning walk as well, looking for

 2    anything that might have been broken?

 3         A.   If it was merchandise.  We didn't have like

 4    fixtures, we had shelves and things like that.

 5         Q.   Okay.

 6         A.   We didn't have lamps or anything to look for

 7    broken.

 8         Q.   Okay.  But like a shelf?

 9         A.   If a shelf was broken it would be in the

10    floor, so.

11         Q.   You would know that immediately?

12         A.   Right.

13         Q.   Okay.  Can you describe all of your

14    responsibilities with respect to merchandising?

15         A.   Well, like I've told you we had to change

16    season to season.  So any time the old stuff came down

17    you moved everything towards the back of the old

18    season, set the new season in front of it, so.  Is

19    that what you're talking about merchandising?

20         Q.   Yeah.  Anything else that you had to do?

21         A.   Planograms.  To me that's merchandising --

22         Q.   Right.

23         A.   -- because you put up new ones, take out

24    old.

25         Q.   Did you have the discretion to decide what
```

Page 209

1   merchandise needed to be purchased or did you
2   recommend anything for purchase for your area?
3        A.    I tried.  We wanted shirts to go with -- we
4   have a high school.
5        Q.    Uh-huh (affirmative).
6        A.    Right down from us.  But we could not get
7   them.
8        Q.    Why not?
9        A.    I don't know.
10       Q.    Who did you ask?
11       A.    The DM.
12       Q.    Who could make the pricing decisions or
13   recommendations in your store?
14       A.    The district manager.
15       Q.    Were there any, ever any circumstances under
16   which you could make pricing decisions or
17   recommendations?
18       A.    Only if a customer was angry.  We can mark
19   it down if it was a dollar or less.  Like if something
20   was five, we could take it to four.
21       Q.    Can you explain signage?
22       A.    We would get signs from our corporate office
23   in the mail.  If it was new items, we had to take down
24   the old signage put up the new.  We had signs that
25   hang from our ceiling that different seasons mostly.

Page 210

1    Is that what you're talking about?

2        Q.   Uh-huh (affirmative).  Did you ever make

3    decisions with respect to signage?

4        A.   No.

5        Q.   How often did you have to change the

6    signage?

7        A.   Any new season there was new seasonal signs

8    that came out.  We did have pharmacy signs that

9    changed from time to time.  But I would say twice a

10   year the pharmacy signs changed.

11       Q.   Okay.

12       A.   That hung from the ceiling.

13       Q.   Did you direct other people to change the

14   signage or did you do it yourself?

15       A.   Did it myself.

16       Q.   Why?

17       A.   That's hard to explain to you.  If you're a

18   store manager you're ultimately responsible.  So if

19   it's done wrong, it comes back to you.  So if I'm

20   doing it, I know it's right.

21       Q.   Okay.  So to ensure that it's done

22   correctly, it was just best that you did it yourself?

23       A.   Correct.

24       Q.   Can you explain product placement?

25       A.   Product placement, as far as a new item

Page 227

```
 1        Q.    Just the price changes, but not stocking?

 2        A.    No.

 3        Q.    Okay.  So you didn't care who stocked, but

 4   as long as people were stocking?

 5        A.    Usually the person stocking make-up was the

 6   cashier.

 7        Q.    Okay.

 8        A.    That was supposed to be up front because it

 9   was that wall right beside the cash registers.

10        Q.    Okay.

11        A.    So.

12        Q.    You were stocking on truck day?

13        A.    Yes.

14        Q.    Was there a place in the store that you

15   preferred to stock so that you can keep an eye on the

16   store?

17        A.    No.

18        Q.    You would stock anywhere?

19        A.    Yes.

20        Q.    But you were still obviously supervising

21   while you were stocking?

22              MS. RUBIN:  Objection.

23              THE WITNESS:  I was still a store

24        manager.

25        Q     (By Ms. Offitt) Okay.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rita Lemming**                                                           **October 5, 2011**

Page 228

1      A.   There's no way to supervise when you're

2   stocking a truck.   There's just no way.

3      Q.   What do you mean?

4      A.   Because you have, I don't know if you've

5   ever seen a truck that comes in.  You get merchandise

6   in totes.

7      Q.   Uh-huh (affirmative).

8      A.   So you have all of these totes in a line

9   stacked up past your head.  So you're just going to

10  get a tote.  Then you're going through the store

11  stocking.

12     Q.   Uh-huh (affirmative).

13     A.   So if I'm, say aisle one, and there's

14  everybody else is on aisle eight, there's no possible

15  way I'm supervising them.

16     Q.   Okay.  You're not watching because you can't

17  see them directly?

18     A.   Right.

19     Q.   Okay.

20     A.   If they call for a member of management I'm

21  still store manager, so I'm going to go if there's a

22  problem.

23     Q.   Okay.  You're still the supervisor on duty.

24  You just can't see what they're doing?

25     A.   Yes.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Rita Lemming                                          October 5, 2011

Page 229

1       Q.    Is the distinction that you're making?

2       A.    Yes.

3       Q.    Is that correct?

4       A.    Yes.

5       Q.    Okay.  Would you imagine that some stores

6   took longer to stock than other stores?

7       A.    Probably.  Ours took longer for, you know,

8   we had less employees than say a higher-volume store.

9       Q.    Okay.  And at some point I think you said

10  your truck slowed down to once every two weeks?

11      A.    Correct.

12      Q.    Was it a bigger load once every two weeks?

13      A.    Just a little.

14      Q.    But a really, really busy store might

15  actually get bigger loads twice a week?

16      A.    I never heard of one getting twice a week.

17      Q.    Okay.

18      A.    So I don't know.

19      Q.    Okay.  Can you estimate how much time you

20  spent each week physically unloading freight from the

21  truck?

22      A.    Well, like I said when it was once a week,

23  it took us from 7:00 to if I had three people we could

24  usually get it unloaded and in the store by, I'll say

25  9:00.  If there was only two of us then add like a

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rita Lemming                                        October 5, 2011**

Page 258

1               E R R A T A   S H E E T

2        Pursuant to Rule 30(7)(e) of the Federal Rules of

3    Civil Procedure, any changes in form or substance which

4    you desire to make to your deposition testimony shall

5    be entered upon the depositions with a statement of the

6    reasons given for making them.

7        To assist you in making any such corrections,

8    please use the form below.  If supplemental or

9    additional pages are necessary, please furnish same and

10   attach them to this errata sheet.

11       I, the undersigned, RITA LEMMING, do hereby

12   certify that I have read the foregoing deposition and that

13   to the  best of my knowledge said deposition is true and

14   accurate (with the exception of the following

15   corrections listed below).

16

17

18

19

20

21

22

23

24

25

# Exhibit NN

                                                                    **Page 1**

 1                  UNITED STATES DISTRICT COURT

 2                  SOUTHERN DISTRICT OF NEW YORK

 3

 4      -------------------------------------------------

 5      YATRAM INDERGIT, on behalf

 6      of himself and others                  Action No.

 7      Similarly situated,          1:08-cv-09361-PGG-HBP

 8              Plaintiffs,

 9      vs.

10      RITE AID CORPORATION, RITE

11      AID OF NEW YORK, INC., and

12      FRANCIS OFFOR as Aider &

13      Abettor,

14              Defendants.

15      -------------------------------------------------

16                     CONFIDENTIAL

17              DEPOSITION OF HENRY P. LENART

18                  September 20, 2011

19                  Ogletree Deakins Nash

20                   One Boston Place

21              Boston, Massachusetts  02108

22

23      Reporter:  Dana Welch, CSR, RPR, CRR, CBC, CCP

24              Certified LiveNote Trainer

25      Job #79466

Page 246

```
 1       A.   That's what I just said.

 2       Q.   So I'm right?

 3       A.   That's what I said, yes.

 4       Q.   Okay.  So in the leeway you're given to

 5   write someone up, you accumulate three write-ups

 6   and then you go to HR.

 7       A.   If that's the format we're following.  I

 8   don't remember exactly what the format we're

 9   following is for each specific company.  Brooks'

10   process was probably different than the Rite Aid

11   process.

12       Q.   So you remember that each company did have

13   a process; is that right?

14       A.   Every company had an HR binder and HR

15   procedures.

16       Q.   So CVS had one, too.

17       A.   Yeah.

18       Q.   Okay.  So each company has their own

19   termination process, is that what your testimony

20   is?

21       A.   My testimony is that's my understanding,

22   yes.

23       Q.   You're testifying -- you understand that

24   you're testifying right now, right?

25       A.   Yeah.
```

Confidential          Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
                              Henry P. Lenart                          September 20, 2011

Page 247

```
 1        Q.  Just so you understand.

 2           We already discussed a few promotions

 3    within your store.  Or maybe we haven't.  How many

 4    promotions happened when you were at the Clinton

 5    store?

 6        A.  Promotions where?

 7        Q.  Front end?

 8        A.  Mark would probably be the only one I

 9    promoted.

10        Q.  What about in Pepperell?

11        A.  Promotion from an existing staff?  Three

12    or four.

13        Q.  From what position to what position?

14        A.  Clerk cashier to supervisor.

15        Q.  And how did that promotion process work?

16    Was that also part of the HR binder?

17        A.  In the Brooks world or in the Rite Aid

18    world?

19        Q.  Well, is there a promotion process?

20        A.  Typically your supervisors needed to be

21    spoken to by a district manager or an HR guy.  I

22    think we did this once.  Didn't we do this one

23    already?  A store manager didn't have the ability

24    in the Rite Aid world to promote a shift

25    supervisor.  Okay?  That you may have seen an
```

Page 248

1    application, the process was directly through your

2    district manager.  You may have had some input in

3    it in the Rite Aid world.  I had more input in the

4    scenario in the Brooks world.  John ultimately

5    signed off -- John Breault ultimately signed off on

6    any promotions in the Brooks world.  In the Rite

7    Aid world, HR and my DM had ultimate say, I

8    believe, in shift supervisor promotions.

9        Q.  All of the shifts that got promoted in

10   Pepperell while you were the store manager, did you

11   recommend them?

12       A.  Yes.

13       Q.  And did the HR and DM ever not take your

14   recommendation?

15       A.  I don't believe so.

16       Q.  So all four of the shifts you recommended

17   to be promoted were promoted?

18       A.  I believe so.

19       Q.  Did Arne ever write the schedule for you?

20       A.   I think Arne did it for two weeks as part

21   of the store management development process.  I

22   think there was two weeks where he had to do it to

23   qualify on that -- I don't know what the term

24   was -- each element.

25       Q.  Did Michele ever do it?

Page 249

```
 1        A.  Michele did it a couple of times.

 2        Q.  Joy?

 3        A.  Joy was writing the schedule before I got

 4   there.  I don't think Joy ever wrote the schedule

 5   while I was there.

 6        Q.  Do you prefer to do the scheduling?

 7        A.  Yes.

 8        Q.  Is it your understanding that you are

 9   required to be the one who writes the schedule?

10        A.  I'm ultimately responsible for the

11   schedule.

12        Q.  So you could delegate it if you wanted to.

13        A.  I assume you could.

14        Q.  But you liked it, you wanted to do it

15   yourself.

16        A.  I can't say I liked it.  Writing a

17   schedule is touch, but little Johnnie and little

18   Suzie, everybody wants a different day off every

19   week.  Writing a schedule is not easy.  Because of

20   the accountability piece and those are numbers that

21   everybody is always looking at, I did write the

22   schedule to avoid any issues down the line.  If my

23   budget is 300 hours and Joy writes the schedule for

24   320, I have an issue right there.

25        Q.  So you don't know whether other store
```

Page 309

```
 1    to us corporately, so that task list is created

 2    corporately.

 3         Q.  But not all of the tasks in the store are

 4    on a list; is that fair?

 5         A.  In the Rite Aid world, a lot of the tasks

 6    are on a list.

 7         Q.  But not all of them, right?

 8         A.  I can't say that.

 9         Q.  I think you mentioned earlier that one of

10    the things that you liked about retail was the pace

11    of it and the fact that it was unpredictable.  Do

12    you remember that?

13         A.  I do.

14         Q.  So does that also include not being able

15    to put everything into a book or on a list?

16         A.  Do that one again.

17         Q.  I guess what I'm asking is not every

18    situation can be written down on a list.

19         A.  Correct.  You don't know if a little old

20    lady is going to have a heart attack in your

21    parking lot today.

22         Q.  Did that ever happen to you?

23         A.  I have had people go down in the parking

24    lot.  I could not put on the list the fact that we

25    found a dead body in the parking lot in Pepperell.
```

Page 310

1   Those scenarios could not be planned.  A good

2   portion of what we did on a daily basis was

3   planned.  It met a list, it came out in a series of

4   expectations, marketing, merchandising or store

5   operations' bulletins.  Somebody at some point said

6   this had to get done this week.  In the store, we

7   didn't randomly make up activities to keep

8   ourselves busy.  They started somewhere.

9       Q.  Merchandising with style, that's something

10  that you made up, though, right?

11      A.  The term?

12      Q.  Yeah.

13      A.  Was my term.  Did I come up with the idea

14  of opening packages at Christmas time so customers

15  can go hands-on?  No.  A lot of retailers do that.

16  I'm sure in the Brooks world and the Rite Aid world

17  there were instructions in some merchandising

18  manual at some point to snaz up your Halloween set

19  or put pumpkins out on your windowsill or candles

20  in your windows for Christmas.  At some point,

21  someone in some merchandising department came up

22  with some of these ideas.  Henry wasn't the know

23  all, do all in retail merchandising.

24      Q.  You're talking about hypothetical manuals

25  and hypothetical retailers, I'm talking about what

Page 311

1    you did.

2        A.  I'm not talking hypothetical.  I had a

3    merchandising manual from Rite Aid probably 30

4    times a week.  30 separate pieces of paper would

5    show up in the mail or through e-mail or SYSM that

6    this was something that needed to happen.  It

7    wasn't hypothetical.

8        Q.  In terms of you, you were talking about

9    merchandising with style.

10       A.  Correct.

11       Q.  Which was your term.

12       A.  Correct.

13       Q.  And you were talking about how

14   merchandising with style and that's what I was

15   talking about.  And then you were talking about how

16   merchandising with style, I think you were talking

17   about how retailers have manuals somewhere that

18   talk about it.  Is that what you were saying or no?

19       A.  What I said in the context of the

20   conversation we had in the last couple of minutes

21   is there are merchandising materials that come out

22   instructing managers what to do.  They may not tell

23   me to put the pink umbrella on top of the white

24   table at the front of my store; however, the

25   expectation in the district and corporately was you

Confidential         Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
                          Henry P. Lenart                           September 20, 2011

**Page 332**

1    Lou decided that real Rite Aid managers worked 50

2    hours a week.  Former Brooks managers were

3    compensated on a salary based on 45 hours a week.

4    Lou required us for probably eight or ten weeks to

5    submit a schedule where we worked 50 hours a week.

6         Q.  But that was Lou, right?

7         A.  Lou was my boss.

8         Q.  Right.

9             But your understanding was that it was Lou

10   who decided to change that and not --

11        A.  It's not my -- I don't have an

12   understanding of where it came from.  I know it was

13   communicated to me through my district manager.

14        Q.  I see.

15            So you don't know whether at the same time

16   Lou changed that other managers changed that across

17   Rite Aid.

18        A.  I can't speak for other managers.  I can

19   speak for what Lou told us to do.

20        Q.  And for those weeks you worked 50 hours a

21   week?

22        A.  Correct.

23        Q.  And previous to that you worked 45 hours a

24   week?

25        A.  Correct.

Page 333

1        Q.   Would you say that you worked more than

2   50 hours a week ever?

3        A.   Had I had weeks that I put in more than

4   50 hours?  Yes.  Have I had weeks where I worked a

5   four-day week opposed to a five-day week following

6   the 50- or 60-hour week, yes.

7        Q.   So some weeks you would work less than

8   45 hours.

9        A.   Some weeks that would happen, rarely is

10  the catch phrase.

11       Q.   On those weeks did you make any less

12  money?

13       A.   On a week where I worked --

14       Q.   Less than 45 hours.

15       A.   Did I make less than my base?

16       Q.   Yes.

17       A.   My base was the same.

18       Q.   Regardless of the number of hours you

19  worked, right?

20       A.   I was salaried, correct.

21       Q.   And that was consistent with your

22  understanding of how you would be paid, right?

23       A.   My understanding was I would work a

24  45-hour week.  That's what I was hired for.  My

25  salary was based on a 45-hour work week, not a

Page 334

1   50-hour work week.

2       Q.   But no one ever told you you would get

3   paid extra if you worked five extra hours, right?

4       A.   That's why I objected to the 50-hour work

5   week.

6       Q.   And when you were hired, were you under

7   the impression that your pay would be docked if you

8   worked less than 45 hours?

9       A.   Why would my pay be docked?

10      Q.   I'm just asking if that was your

11  impression.  So the answer's no.

12      A.   My answer was I made the same every week.

13  I was salaried at 45 hours a week.

14      Q.   But even if you worked less than that, you

15  still made that money, right?

16      A.   And even when I worked more than that, I

17  still made that money.

18      Q.   Regardless of the number of hours,

19  correct?

20      A.   Correct.

21      Q.   Have you ever made an attempt to estimate

22  your damages in this case?

23      A.   No.

24          (Exhibit 11, INDERGIT-RA 1896 - 1898, Rite

25      Aid Job Description Store Manager, marked for

Page 346

1          MR. SINHA:  Objection to form.

2      A.  Michele was effective in her role

3  transitioning the Brooks store from what it was to

4  what it became.  Arne was effective in his role as

5  an assistant manager going into the Rite Aid age.

6  I can't say I had a favorite.

7      Q.  Between the two of them?

8      A.  I didn't have a favorite.

9      Q.  Okay.  But in terms of the three of them,

10  which was the most effective, you would say Michele

11  and Arne were each effective in their own way?

12      A.  That's fair to say.

13      Q.  And Joy was less effective would you say?

14      A.  Joy would have been my least effective

15  assistant manager.

16      Q.  Mr. Lenart, have you understood all my

17  questions today?

18      A.  So far.

19      Q.  Has your testimony been truthful?

20      A.  Yes.

21      Q.  Has it been complete and accurate?

22      A.  Yes.

23          MS. PUCKETT:  All right.  I think your

24  counsel may have some questions.

25                         EXAMINATION

Page 347

1    BY MR. SINHA:

2        Q.  Mr. Lenart, I just have a few questions.

3            You spoke about your duties or your

4    performing duties such as cleaning, stocking

5    shelves, pricing items.  Do you remember that?

6        A.  I do.

7        Q.  Is it fair to say that those are

8    nonmanagerial duties?

9            MS. PUCKETT:  Objection to form.

10       A.  I would agree with that statement.

11       Q.  What portion of your day did you spend

12   doing these nonmanagerial duties?

13           MS. PUCKETT:  Objection to form.

14       A.  Portion in a percentage?

15       Q.  Sure.

16       A.  I would say 60 to 70 percent.

17       Q.  And did you do these nonmanagerial duties

18   every day?

19       A.  I did.

20       Q.  Did you consider them, these nonmanagerial

21   duties, to be part of your regular duties that you

22   did every day?

23       A.  I did.

24       Q.  Did your performing these nonmanagerial

25   duties affect how you were able to run the store?

Page 348

```
 1       A.  Yes.

 2       Q.  How so?

 3       A.  We'll go back to neat and clean.  Had I

 4   not pulled out the vacuum when it was necessary, it

 5   would have impacted customer satisfaction.  Had my

 6   bathrooms not been clean when my district manager

 7   showed up, it would have impacted his satisfaction.

 8       Q.  And did your performing these

 9   nonmanagerial duties affect your ability to do your

10   managerial duties?

11       A.  We spent more time typically doing grunt

12   labor than we did managing the store.

13       Q.  Would you say that doing this grunt labor

14   interfered with your ability to manage the store?

15       A.  I think it negatively impacted my ability

16   to manage the store, yes.

17       Q.  Did your performing these nonmanagerial

18   duties affect your ability to supervise your staff?

19       A.  At times, yes.

20       Q.  How so?

21       A.  If I was in the back room taking out trash

22   or I was putting wax down on my back room, break

23   room or bathroom floors, I wasn't on the sales

24   floor, I wasn't supervising my customers -- my

25   staff and I had no ability to interact with my
```

Page 349

```
 1      customers.
 2         Q.   Who made the final decision while you were
 3      at Rite Aid as a store manager regarding hiring of
 4      staff?
 5             MS. PUCKETT:   Objection to form.
 6         A.   The decision process was tiered,
 7      supervisors -- as far as assistant managers and
 8      supervisors, it was made by human resources and my
 9      district manager.   My hourly sales associates
10      were -- the decision was made by me following some
11      screening processes.
12         Q.   And who made the final or ultimate
13      decision regarding terminating staff at Rite Aid?
14         A.   Human resources.
15         Q.   What about disciplining of staff, who made
16      the final decision?
17         A.   Depending on the severity of the issue,
18      final decisions were different.   I had the ability
19      to document minor policy violations.   Issues that
20      concerned loss prevention or human resource issues
21      were taken out of the store.   They were done by LP,
22      HR or my district manager.
23         Q.   You talked about what you called coaching
24      and counseling process.   Do you remember that?
25         A.   Yeah, I do.
```

Page 350

1      Q.  And did that coaching and counseling

2    process apply to any of the staff members for

3    whatever reason they might need to be coached or

4    counseled?

5           MS. PUCKETT:  Objection to form.

6      A.  It could have applied to hourly and salary

7    associates.

8      Q.  And did it also apply irrespective of the

9    reason that they needed to be coached or counseled?

10          MS. PUCKETT:  Objection to form.

11     A.  I'm a little confused with that question.

12          MR. SINHA:  Yeah, that's a bad question.

13     Q.  I guess what I'm trying to find out, was

14   there one coaching or counseling process for

15   whatever infraction --

16     A.  I think our training program detailed

17   coaching and counseling.  It didn't break it down

18   by loss prevention, human resource, cashier

19   violation or somebody who simply didn't know how to

20   vacuum.

21     Q.  Right.

22     A.  It was a simple process where the first

23   one was verbal and as problems excalated or

24   continued, it got more detailed.

25     Q.  And the same process applied to all of

Page 351

```
 1    those.

 2         A.   Correct.

 3         Q.   That's what I'm trying to find out, the

 4    same.

 5         A.   Correct.

 6         Q.   Who made the final decision regarding

 7    promoting staff?

 8         A.   As far as supervisors, my district manager

 9    and loss prevention got involved in it.   I was not

10    able to promote a supervisor in the Rite Aid

11    environment without the okay on the promotion from

12    HR and my DM.

13         Q.   Who made the final decision regarding

14    evaluation of staff?

15         A.   I completed evaluations for hourly

16    associates and assistant managers.   However, the

17    final sign-off on an increase, a salary increase or

18    an hourly increase, was made by my district

19    manager.

20         Q.   Did you have any ability to set the

21    payroll?

22         A.   My payroll budget was set annually on a

23    corporate level.

24         Q.   And did you have any ability to set the

25    budget?   I think you --
```

Page 352

```
 1        A.   I didn't have any ability to impact
 2   budgets.
 3        Q.   Okay.  Who do you consider to be
 4   ultimately responsible for determining
 5   profitability at your store?
 6             MS. PUCKETT:  Objection to form.
 7        A.   There are a lot of variables that play
 8   into profitability.  I think it's hard to nail down
 9   ultimate responsibility.  There are a lot of people
10   and a lot of departments that play into that.
11   Distribution plays a part in it.  If we can't get
12   the product on time and when our customers want it,
13   that impacts profitability.  Merchandising in a
14   store impacts profitability.  There are a lot of
15   variables that impact profitability.
16        Q.   But you agree that payroll and budget
17   impact profitability?
18        A.   Oh, definitely.
19        Q.   And they have a major impact on
20   profitability?
21        A.   Correct.
22        Q.   And those were factors/influences that
23   were outside of your control?
24        A.   Payroll and budgets were outside of my
25   control.
```

Confidential        Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Henry P. Lenart        September 20, 2011

**Page 353**

```
 1        Q.  How much autonomy did you feel you had at
 2    your store?
 3            MS. PUCKETT:  Objection.
 4        Q.  You can answer.
 5            MS. PUCKETT:  Same rules apply.
 6        A.  I had the ability to run my store, I
 7    believe; however, major decisions had to be cleared
 8    through my district manager.  A lot of our
 9    directives were corporate, be it merchandise, be it
10    timing, be it when product went out on the floor,
11    when planograms were done, I had no influence over
12    that.
13        Q.  So, for example, you spoke about the time
14    when you canceled inventory, do you recall?
15        A.  I do.
16        Q.  So is it fair to say that that was a rare
17    type of decision that you had to make?
18            MS. PUCKETT:  Objection.
19        A.  I think it was a once-in-a-lifetime
20    decision that many managers never have the ability
21    or want the ability to make.
22        Q.  So you would disagree with that reference
23    in the job description where it says that you had
24    the ability to make frequent independent business
25    judgments?
```

Confidential           Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
                              Henry P. Lenart                      September 20, 2011

Page 354

1          MS. PUCKETT:  Objection, mischaracterizes.

2      A.  I don't think I had the ability to make

3  frequent business judgments that affected my

4  overall profitability.  I didn't have the ability

5  to decide on sales budgets.  I did not have the

6  ability to decide on merchandise selection and I

7  did not have the ability to have any input in

8  payroll budgets.  So the key three items that drive

9  the store's profitability were outside of my

10  control.

11      Q.  To your knowledge, did the same system,

12  policy and procedures that apply to your store

13  apply to all other Rite Aid stores?

14      A.  I believe so.

15          MR. SINHA:  I have no other questions.

16                     EXAMINATION

17  BY MS. PUCKETT:

18      Q.  I just have a few brief follow-ups.

19          I believe you just said that you didn't

20  have any control over payroll and budget, correct?

21      A.  I didn't have any control over setting

22  payroll or sales budgets.

23      Q.  Over setting them, right?

24      A.  Correct.

25      Q.  But you mentioned earlier that the company

**Page 355**

```
 1    set payrolls and budgets, sales goals as well as
 2    budgets and you had the company's business
 3    objectives as well as your personal objectives,
 4    right?
 5         A.   Correct.
 6         Q.   So you tried to increase profitability by
 7    beating the company's objectives and meeting your
 8    own personal objectives, correct?
 9         A.   Correct.
10         Q.   And you discussed some nonmanagerial tasks
11    both with me and with your attorney and you said
12    that 60 to 70 percent of your time was spent doing
13    those nonmanagerial tasks.  Do you recall that?
14         A.   I do.
15         Q.   Was that the same at Clinton and
16    Pepperell?
17         A.   I would say it was close.  I would say in
18    Clinton I did more nonmanagerial than I did in
19    Pepperell.  Is your -- okay.  That's fair, fair to
20    say.
21         Q.   So at what percent in Pepperell?
22         A.   Over the three and a half years in
23    Pepperell, I would say it was more 50/50.  Over the
24    time in Clinton, I would say it was closer to that
25    60/70.  Realizing my time in Pepperell includes my
```

**Page 368**

```
 1                  DEPOSITION ERRATA SHEET
 2    Assignment No. 79466
 3    Case Caption: Yatram Indergit v. Rite Aid
 4             DECLARATION UNDER PENALTY OF PERJURY
 5             I declare under penalty of perjury that
 6    I have read the entire transcript of my deposition
 7    taken in the captioned matter or the same has been
 8    read to me, and the same is true and accurate, save
 9    and except for changes and/or corrections, if any,
10    as indicated by me on the DEPOSITION ERRATA SHEET
11    hereof, with the understanding that I offer these
12    changes as if still under oath.
13             Signed on the ___ day of _____,
14    2011.
15                         _____
16                         HENRY LENART
17
18                  DEPOSITION ERRATA SHEET
19    Page No._____ Line No._____ Change to:_____
20    Reason for change:_____
21    Page No._____ Line No._____ Change to:_____
22    Reason for change:_____
23    Page No._____ Line No._____ Change to:_____
24    Reason for change:_____
      Page No._____ Line No._____ Change to:_____
25    Reason for change:_____
```