# Exhibit OO

**Page 1**

IN  THE  UNITED  STATES  DISTRICT  COURT

FOR  THE  SOUTHERN  DISTRICT  OF  NEW  YORK


YATRAM INDERGIT, on Behalf

of Himself and Others

Similarly Situated

      Plaintiff                    Civil Action No.:

vs.                                     1:2008cv09361

RITE AID CORPORATION, RITE

AID OF NEW YORK, INC. and

FRANCIS OFFOR as Aider &

Abettor

      Defendants

_____/



      The deposition of KIMBERLYN MALONE was held

on Monday, July 25, 2011, commencing at 9:45 a.m., at the

Offices of Gore Brothers Reporting & Videoconferencing,

20 South Charles Street, Suite 901, Baltimore, Maryland

21201, before Dawn L. Venker, Notary Public.



REPORTED BY:  Dawn L. Venker

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**                   **1:2008cv09361**
**Kimberlyn Malone**                                                **July 25, 2011**

1      Q      That affects, among other things, your CSI

2    score, right?

3          A      That is true.

4          Q      And for the record, the CSI score is a

5    customer satisfaction index, right?

6          A      True.

7          Q      And that's one of the things that you are

8    evaluated on as a store manager, correct?

9          A      We weren't at the -- not at the initial

10   beginning with the company.

11         Q      I see.  The customer -- the CSI index is

12   something that came along later?

13         A      It did.

14         Q      Okay.  Were you evaluated on customer

15   complaints at the beginning of your tenure of store

16   manager?

17         A      No.

18         Q      Okay.  Was there any performance metric

19   relating to customer service satisfaction that you had

20   when you first started as a store manager?

21         A      No.

22         Q      Customer service affects sales, correct?

23         A      Yes.

24         Q      If you are nice to people they'll come

25   back, right?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.                    1:2008cv09361
Kimberlyn Malone                                                July 25, 2011

Page 29

```
 1      A      That's -- that's what they say.

 2      Q      Okay.  Is that what you found as well?

 3      A      From experience, yes.

 4      Q      As a store manager, when the store had

 5   vacancies in the front end, it was your job to

 6   interview and hire for those vacancies, correct?

 7      A      Interview, but not hire.

 8      Q      Did you do any hiring at 4510?

 9      A      You don't -- it's not your personal -- you

10   don't do the hiring for the company.  The company has a

11   system that individuals have to go through.  There is a

12   process that they have to go through in order for you

13   to hire them.  So you don't personally just hire

14   people.

15      Q      There is certain controls that the company

16   has on the hiring process?

17      A      I say they have the majority of the

18   control.

19      Q      The applicant has to go through the quick

20   screen process, right?

21      A      That is true.

22      Q      And they have to do a background check?

23      A      That is true.

24      Q      And they have to do a drug test?

25      A      That is true.
```

**Page 30**

```
 1          Q      And then you make the recommendation if
 2    they pass those things if that person should be hired,
 3    if you want to hire that person, right?
 4          A      Yes.
 5          Q      And if they pass all those tests, then that
 6    person can be hired, right?
 7          A      Yes.
 8          Q      And who communicates to the person whether
 9    or not they are going to be offered a job?
10          A      Myself or the DM, or HR.
11          Q      Okay.  Did you let Lori do any of the
12    interviewing at 4510?
13          A      I can't recall.
14          Q      Did Sandra do any of the interviewing?
15          A      I can't recall.
16          Q      Can you recall any instance in which a job
17    applicant passed the quick screen process and you made
18    a recommendation that they be hired and they were not
19    hired?
20          A      Yes.
21          Q      What was that instance?
22          A      Due to my budget, my store budget.
23          Q      Do you remember the person's name?
24          A      No.
25          Q      And this was at 4510?
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**     **1:2008cv09361**
**Kimberlyn Malone**                                            **July 25, 2011**

**Page 34**

```
 1        A        When you go -- when you are transferred
 2   over to a new store, you get new employees.
 3        Q        Did your store ever have a new hire,
 4   clerk/cashier that was placed into your store who you
 5   did not first interview?
 6        A        No.
 7        Q        Did the DM ever come to you and say, Kim, I
 8   don't care what you say, you are taking this person.  I
 9   don't even want you to interview them, they are going
10   in your store?
11        A        Not like that, but there were employees who
12   was transferred over to your store.  That I had
13   transferred over to my store.
14        Q        But not new hires, right?
15        A        But not no new hires.
16        Q        At 4510 you did the scheduling, correct?
17        A        Yes, I put the schedule in.
18        Q        And you put the schedule in for both the
19   front end and pharmacy?
20        A        Yes.
21        Q        How many employees did you schedule to work
22   on an opening shift.
23        A        On an opening shift -- at the opening of
24   the store -- the store, you have maybe a manager and
25   one other individual.  So just two.
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.          1:2008cv09361
Kimberlyn Malone                                                 July 25, 2011

Page 35

1        Q      And that does not include the pharmacy,

2   correct?

3        A      Correct.

4        Q      And how many employees came in during the

5   high volume parts of the day at 4510?

6        A      Probably about five people.

7        Q      When you are in the store as a store

8   manager, you are the boss, right?

9               MR. SABA:   Objection to form.

10       A      I'm not the boss.

11       Q      Who is the boss?

12       A      My district manager is.

13       Q      Do you know how many stores your district

14  manager had in his district?

15       A      I can only give you approximately.

16  Probably twenty to twenty-six.

17       Q      Okay.  So your district manager was a boss

18  of twenty-six stores at once?

19       A      Yes.

20       Q      Could any other employee in the store -- in

21  your store tell you what to do?

22       A      Sure.  We are a team.

23       Q      Who among your associates delegated tasks

24  to you?

25       A      Who among my associates?

**Page 36**

1    Q    Yeah.  Who among your subordinate employees

2  delegated tasks to you?

3    A    I delegate the tasks.

4    Q    Okay.  Was your -- was Lori Boggs the boss

5  of you?

6    A    No, but Lori and I worked together as a

7  team.

8    Q    A team mentality is something that you try

9  to foster at your store, correct?

10   A    Yes.

11   Q    Did Sandra ever delegate tasks to you?

12   A    No, we are a team.

13   Q    Okay.  Was Sandra the boss of you?

14   A    No.

15   Q    You were responsible for supervising all

16  the employees in the store, correct?

17   A    Yes.

18   Q    Okay.  And you are responsible for

19  directing their work, right?

20   A    Yes.

21   Q    And you are responsible for telling them

22  what to do, right?

23   A    Yes.

24   Q    As a store manager, when you are in the

25  store, you are the highest ranking employee, right?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.          1:2008cv09361
Kimberlyn Malone                                                 July 25, 2011

Page 95

1       Q     You were using daily tour sheets to

2  delegate tasks to associates, right, based on their

3  abilities?

4       A     That varies.

5       Q     At the time you were doing that, right?

6       A     Had to be.

7       Q     If you can take a look at the next page

8  under leadership.  He wrote, "There is no doubt who is

9  leader in this store.  Kim is in total control of all

10  issues concerning her store."  Do you see that?

11      A     Uh-huh.

12      Q     That's accurate, right?

13            MR. SABA:  Objection to form.

14      A     That's Bill's opinion.

15      Q     And that's Bill's opinion that you said was

16  very fair, right?

17            MR. SABA:  Objection to form.

18      Q     Right?

19            MR. SABA:  Objection to form.

20      Q     You can answer.

21      A     Uh-huh.

22            MR. SABA:  Same objection.

23      Q     That was a yes?

24      A     No.  It wasn't a yes.

25      Q     What's your answer to that question?

Page 96

1        A      Bill states that it's her store, meaning
2   that it's my personal store, but it's not my store.
3   It's Rite Aid's store.   The leadership, I think there
4   is no doubt of who the leader is.   The leader is the
5   district manager.
6        Q      Okay.  So you -- you say now that you are
7   not the leader in your store?
8        A      No, I'm saying that I am the person who's
9   overseeing the store, yes.
10       Q      Okay.
11       A      This is Bill's opinion about the leadership
12   that was ran at the store.   These are Bill's opinions.
13       Q      Right.
14       A      Not my own.   They are his.
15       Q      Right.  When -- when Bill gave you this
16   review, did you say to him, Bill, I'm not the leader in
17   the store, you are the leader in the store?
18       A      I can't recall.
19       Q      Okay.  So Bill was the leader in
20   twenty-five different stores at once?
21       A      Bill was always the leader.  He is the
22   district manager.
23       Q      Okay.  Is the RVP the leader in 250
24   different stores at once?
25       A      Absolutely.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**  1:2008cv09361
**Kimberlyn Malone**  July 25, 2011

Page 97

```
 1        Q     Okay.  And is the CEO the leader in all
 2   stores?
 3        A     Absolutely.
 4        Q     Okay.  But as to this unit, this store, you
 5   are the leader, right?
 6        A     I am the one in charge.
 7        Q     Okay.  All right.  Can you turn to the next
 8   page for me?  Can you look at associate managed
 9   development -- management development -- excuse me.  He
10   wrote, "Kim has brought along her associates very well
11   to be all that they can be, right?
12        A     Yes, that's what he wrote.
13        Q     And that was accurate, right?
14              MR. SABA:  Objection to form.
15        A     That was Bill's opinion.
16        Q     Was Bill's opinion accurate?
17        A     Yes, at the time.
18        Q     Take a look at 15 for me.  It says, "Kim
19   seems to have well trained and maintained staff even in
20   a college town."  That's what he wrote, right?
21        A     Yes, that's what he wrote.
22        Q     And the college town is what we were
23   talking about where you have the college students
24   coming there and they don't necessarily have to work,
25   right?
```

Page 111

1    shift supervisors, but not the ASM, right?

2         A    Yes.  This was -- this location here is the

3    location that once I was promoted, I was sent to 4510.

4    When I was sent to 4510, there was not -- I mean 4519.

5    Excuse me.  There was not an assistant manager.  There

6    were shift managers.  As a matter of fact, when I first

7    arrived, there was just one shift manager and myself.

8         Q    Okay.  And did you develop somebody else to

9    take over the shift supervisor position?

10        A    Yes.  Justine Arnold.

11        Q    Okay.  And how did you go about developing

12   shift supervisors?  In what way do you develop a shift

13   supervisor to take over the managerial, or to assist in

14   the managerial operations of the store?

15        A    Actually, there is -- someone that shows an

16   interest of responsibility.  But I am not the one to --

17   I make a recommendation, but the DM is actually the

18   person to promote a shift supervisor.  And then they

19   have a criteria that an individual have to complete

20   before -- excuse me.  Before they are interviewed for

21   that position.  So someone just showing an interest,

22   and, you know, willing to -- to work and be

23   responsible.  Let me turn off my telephone.

24             MR. SABA:  You need to take a break?

25             THE WITNESS:  I just want to turn my phone

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**           1:2008cv09361
**Kimberlyn Malone**                                                  July 25, 2011

Page 112

```
1    off.  It sounds like I am taking pictures instead of

2    turning off.  That's what it sounds like I'm doing

3    here.  Excuse me.  We can continue.

4         Q    So you recommend that a person be promoted

5    to shift supervisor, but the actual promotion occurs

6    when the DM makes the decision?

7         A    Yes.

8         Q    Okay.  How do you -- I understand that part

9    of it, but how do you develop -- how do you as a store

10   manager develop the shift supervisors?

11        A    There is a plan of action that an

12   individual has to go through.  And once they complete

13   those action plans through the development process,

14   that's how they are developed to become a shift

15   supervisor.

16        Q    Okay.

17        A    You -- I'm -- I'm sorry.

18        Q    No.  Please.

19        A    I per se don't develop them.  There is a

20   plan.

21        Q    Okay.  And you make sure they follow that

22   plan?

23        A    Yes, I follow the plan.

24        Q    Did you ever work in a store that was also

25   a district office?
```

Page 113

```
 1        A      No.

 2        Q      Take a look at the next page.

 3               MR. SABA:  39.  Is that it?

 4               MR. SCOTT:  Yes.

 5        Q      Two, he writes, "Kim continues to be

 6   dedicated to the improvement of her associates."  Is

 7   that accurate?

 8               MR. SABA:  Objection to form.

 9        A      That's Bill's opinion.

10        Q      I understand it's Bill's opinion, but it

11   is -- is it accurate that you were dedicated to the

12   improvement of your associates?

13        A      Yes.

14        Q      Okay.  He writes that you had many

15   corporate visits this year.  Do you recall having all

16   those corporate visits?

17        A      Where is that at?

18        Q      Commitment to excellence.  Third section.

19        A      Okay.  Not at this time I don't recall.

20        Q      Okay.  Four, planning skills.  He says,

21   "Kim needs to use her daily and weekly tour sheets to

22   accomplish all tasks with a short staff management

23   team."  That's what he wrote, right?

24        A      Yeah, that's what he wrote.

25        Q      And, again, that's his opinion, right?
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.          1:2008cv09361
Kimberlyn Malone                                                  July 25, 2011

Page 146

```
 1        Q      And you ensured that the front-end people
 2   were trained?
 3        A      Me and my management team, yes.
 4        Q      Right.  And -- but you did have to make
 5   sure that the pharmacy employees completed their CBTs,
 6   otherwise you get a bad performance review, right?
 7        A      Yes.
 8        Q      And you scheduled all twenty plus
 9   employees, right?
10        A      Scheduled -- yes.
11        Q      And if any front-end employees violated
12   company policy, you would be responsible for
13   disciplining that associate as appropriate, right?
14               MR. SABA:  Objection to form.
15        A      No.
16        Q      What is incorrect about that?
17        A      District manager and HR do the discipline.
18        Q      In your store the district manager and the
19   HR issued write-ups?
20        A      You can do the write-up, but you -- the
21   discipline goes through the DM and the HR.
22        Q      Okay.  So when you noticed -- say you are
23   in a store and you noticed that your associate is
24   violating company policy --
25        A      Yes.
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.          1:2008cv09361
                    Kimberlyn Malone                              July 25, 2011

                                                                    Page 147

 1        Q      -- you can verbally counsel that person,

 2    right?

 3        A      Yes.

 4        Q      Or you can decide if that person needs a

 5    write-up, right?

 6        A      Yes.

 7        Q      And you go and you write-up that person and

 8    then you send the write-up to the district manager or

 9    HR, right?

10        A      That is correct.

11        Q      You don't have final authority to terminate

12    a person?

13        A      That is correct.

14        Q      You can recommend a person be terminated?

15        A      That is correct.

16        Q      But you have to interact with the DM and HR

17    in order to effectuate that termination, right?

18        A      That is correct.

19        Q      Okay.  Did you have any employees that were

20    terminated in 4510?

21        A      Yes.

22        Q      And how many employees were terminated in

23    4510?

24        A      I can't recall.

25        Q      What sort of infractions were they

Page 148

```
 1   terminated for?
 2              MR. SABA:  Objection to form.
 3       A    I can't recall.
 4       Q    Okay.  But you worked with the HR and DM
 5   when terminating those employees, right?
 6       A    Yes.
 7       Q    And that was in part to make sure that
 8   everyone was treated fairly so that it went through HR,
 9   right?
10       A    Yes.
11       Q    And that was to make sure that you complied
12   with all laws including Title 7, ADA, FMLA and all the
13   other laws, right?
14              MR. SABA:  Objection to form.
15       A    Some of those things that you just
16   mentioned, I don't even know what those laws are.  So I
17   can't say.
18       Q    Okay.  Fair enough.  But the HR is involved
19   to make sure that everyone is treated fairly, right?
20       A    Yes.
21       Q    Okay.  Whenever any front-end employees
22   were in the store and you were in the store, you were
23   responsible for directing their work, right?
24       A    Yes.
25       Q    Okay.  Can you take a look at Number 2 on
```

Page 196

1        Q        I believe it, based on what you told me

2    about Kayla.  And why were they your favorite ASMs to

3    work with?

4        A        Bryant had people skills.  Bryant had

5    people skills.  And he -- we worked it very well

6    together.  By him being the opposite sex, a lot of

7    times you work better with the opposite sex.  It's more

8    challenging when you are working with women because

9    you -- you know, kind of clashes.

10        Q        Did you trust Lori to run the store in your

11    absence?

12        A        Sure I did.

13        Q        When you were -- when you took a vacation,

14    or you were on a leave of absence, did Lori do the

15    schedule?

16        A        I don't know.

17        Q        Okay.  Lori and Bryant assigned work to

18    employees, right?

19        A        Yes.

20        Q        Did they ever do the daily tour sheets?

21        A        I believe so, yes.

22        Q        And, of course, that's under your

23    supervision, but that's something that they are doing,

24    right?

25        A        Yes, when they were done.

Page 197

1      Q      Did you ever have an ASM who managed an

2   independent liquor store within your store?

3      A      No.

4      Q      All these ASMs you supervised, right?

5      A      Yes.

6      Q      And all these ASMs you directed their work?

7      A      Yes.

8      Q      And you directed the work of all shift

9   supervisors that worked under you?

10     A      Along with the assistant managers.

11     Q      And you supervised all the shift

12  supervisors that were under you?

13     A      Yes.

14     Q      And you supervised all the hourly employees

15  that were under you?

16     A      Along with the help with the other

17  managers, yes.

18     Q      And you directed the work of all the hourly

19  employees that were under you?

20     A      Not all -- not all.  I didn't direct all of

21  the work, but I had some -- majority of input, yes.

22     Q      And when you say you didn't direct all the

23  work, that was because other members and management

24  team were also directing work?

25     A      Absolutely.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**          1:2008cv09361
**Kimberlyn Malone**                                                  July 25, 2011

Page 198

1        Q        Including the ASMs?

2        A        Yes.

3        Q        Did certain people require more time to be

4    trained than others?  Let me rephrase that.  Certain

5    people are slow learners and certain people are faster,

6    right?

7        A        Yes.

8        Q        And the people who are less quick to pick

9    up on things, the manager, or whoever is training them,

10   has to spend more time with them, right?

11       A        Not necessarily.

12       Q        Why is that wrong?

13       A        Because it depends on the job function.

14   Maybe some people can comprehend a job function and

15   they do well at that.  And -- you know.  And they might

16   not be able to do another type of job function, you

17   know.

18       Q        And did you spend time trying to work on

19   those job functions that they were not able to do?

20       A        Yes, because that's how you develop people.

21       Q        Okay.  And you gave work to employees on a

22   daily basis, right?

23                MR. SABA:  Objection to form.

24       A        As much as I could.

25       Q        Within the constraints of your labor

Yatram Indergit, et al. v. Rite Aid Corporation, et al.                    1:2008cv09361
Kimberlyn Malone                                                           July 25, 2011

Page 199

```
 1    budget, right?
 2         A    No.  It all depends on the scenario at your
 3    store.  What's going on at your store.  You are not
 4    looking at the budget.  I mean you are looking at the
 5    budget, but you are really going on your situation
 6    there.
 7         Q    Right.  You -- you delegated tasks to
 8    employees based on the available help that you had in
 9    any given day, right?
10         A    Yes.
11         Q    Okay.  And that's something that the ASMs
12    did as well, correct?
13         A    Yes.
14         Q    Whenever you were in the store, you were
15    responsible for supervising all employees in the store,
16    right?
17         A    Yes.
18         Q    Whenever -- you always accepted job
19    applications regardless of whether or not you had an
20    opening at the time, right?
21         A    True.
22         Q    And then you kept them on file in case you
23    had an opening?
24         A    True.
25         Q    And who made the decision whether or not to
```

Page 225

1        Q     Okay.  And you performed bag checks on all
2   store employees, right?
3        A     Yes.
4        Q     And that's another mechanism to prevent
5   shrink, right?
6        A     Yes.
7        Q     You also checked SYSMS, correct?
8        A     Oh, yes.
9        Q     What is a SYSM?
10       A     SYSM is an e-mail that's coming through
11   corporate, and it's communications -- it's a
12   communication line e-mail.
13       Q     And that's a communication that you receive
14   on your store computer in your office, right?
15       A     Yes.
16       Q     And the office you said in your store was
17   located at the front of the store next to registers?
18       A     That was over at 45 -- it's in the photo
19   lab area at some places.  Back by the photo lab.  And
20   some places up by the registers area.
21       Q     Different stores have different layouts
22   where the office is?
23       A     Right.
24       Q     Did you ever have an office that was in the
25   back room?

Page 226

```
 1        A      No, never in the back room.
 2        Q      Every week -- or every payroll, you
 3   completed payroll for your store, right?
 4             MR. SABA:  Objection.  Form.
 5        A      No, because the other managers also -- they
 6   also did payroll too.  The assistants.
 7        Q      The ASMs did payroll in your store as well?
 8        A      Pardon me?
 9        Q      The ASMs did payroll in your store as well?
10        A      Yeah.  And the shift -- and the shift
11   supervisor.
12        Q      Okay.  Payroll is a function that you did
13   perform as a store manager, though, correct?
14        A      Yes, it is.
15        Q      And describe the payroll process at Rite
16   Aid, please?
17        A      Rephrase that question.  I don't --
18        Q      What did you have to do to complete
19   payroll?
20        A      Approve the hours that were -- that the
21   associates work to complete payroll.
22        Q      So the hourly employees come in and they
23   punch in, right?
24        A      The hourly employees, yes, they do.  They
25   punch in and out.
```

**Page 227**

1          Q       And then when they go to lunch, they punch

2     out, they come back, they punch in, right?

3          A       Yes.

4          Q       And at the end of the day, they punch out?

5          A       Yes.

6          Q       And so in the payroll process, you have to

7     approve those punches, right?

8          A       Yes.

9          Q       And sometimes employees forget to clock

10    out, right?

11         A       Yes.

12         Q       And so you have to talk to that employee

13    and figure out what hours that employee worked, right?

14         A       And you look at the -- the schedule to see,

15    you know what I mean?

16         Q       And you correct those punches, right?

17         A       Yes.  You edit it.

18         Q       As the store manager, you had to review

19    reports related to inventory as well, right?

20         A       Yes.

21         Q       And those reports let you know what product

22    needed to be ordered, right?

23         A       Yes.

24         Q       And those reports told you about your

25    shrink, right?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**  **1:2008cv09361**
**Kimberlyn Malone**  **July 25, 2011**

 1    But a store with twenty employees has more employees
 2    than a store with ten -- ten employees, correct?
 3         A    Yes.  Logic.  Yes.
 4         Q    Okay.  And so a store with twenty employees
 5    can delegate more than you can at a store with ten
 6    employees, right?
 7         A    Yeah, but show me a store with twenty
 8    employees.  Front end.
 9         Q    Okay.  Regardless -- regardless of the task
10    that you are doing, you are still in charge of the
11    store, right?
12         A    Yes.
13         Q    And regardless of the task that you are
14    doing, you are still responsible for supervising all
15    store operations, right?
16              MR. SABA:  Objection.  Asked and answered.
17         Q    You can answer.  You can answer and then
18    we'll move on.
19         A    You said "all."
20         Q    Regardless of the tasks you are performing,
21    you are responsible for supervising all front-end
22    employees, right?
23              MR. SABA:  Objection.  Form.
24         Q    Go ahead.
25         A    Along with my other managers.

Page 248

```
 1        Q     Okay.  And the other managers include the
 2    ASM and shifts, right?
 3        A     Yes.
 4        Q     How many hours a week did you work in two
 5    thousand -- strike that.
 6              You didn't work for Rite Aid in the store
 7    in 2009, correct?
 8        A     That is correct.
 9        Q     How many hours a week did you work in 2008?
10        A     I did a grand opening for 2008.  So I put
11    in -- it varies.
12        Q     Throughout the year it changed?
13        A     No, we were required -- you know --
14    rephrase that.
15        Q     Sure.  What was the average -- strike that.
16              During 2008, during the grand opening, how
17    many hours were you actually working per week?
18        A     Per week?
19        Q     Yes.
20        A     During the grand opening?
21        Q     Yes.
22        A     Anywhere from 80 to 100.
23        Q     Were you working seven days a week?
24        A     Yes.
25        Q     And some weeks you were working seven --
```

Page 249

1        A        Fifteen hour days.

2        Q        Okay.  When you were not doing the grand

3   opening, what was your average hours worked per week in

4   2008?

5        A        Sixty-five.

6        Q        Do you have any record of the hours that

7   you worked?

8                 MR. SABA:  Objection.  Form.

9                 MR. SCOTT:  What's the --

10                 MR. SABA:  You've asked and answered.

11                 MR. SCOTT:  I don't think I've asked that

12   particular question.

13        Q        Do you have any record of the hours that

14   you worked in 2008?

15                 MR. SABA:  Objection.  Form.

16        A        The form should be in company policy.

17        Q        No.  No.  Do you have -- do you have any

18   record of the number of hours that you worked per week?

19   Do you personally have any record of the number of

20   hours that you worked per week in 2008?

21                 MR. SABA:  Objection.  Form.

22        A        Do I personally have any records, no.

23        Q        Okay.  Is that also true for 2007?

24        A        Yes.

25        Q        How many hours did you work per week, on

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**      **1:2008cv09361**
**Kimberlyn Malone**                                              **July 25, 2011**

Page 250

1    average, in 2007?

2         A    Sixty, sixty-five.

3         Q    How many hours were you scheduled each

4    week?

5         A    Fifty.

6         Q    And that was true in 2007 and 2008?

7         A    Yes.

8         Q    And the amount of hours fluctuated as the

9    amount of work fluctuated, right?

10        A    Yes.

11        Q    And with the grand opening, there was a lot

12   more work to be done, right?

13        A    Yes.  And during your seasonal time, there

14   is a lot more work to be done too.

15        Q    So seasonal time you mean like

16   Christmastime?

17        A    Christmas.  Summer.  Back to school.

18   Easter.  Valentine's.  You know, spring and summer.  It

19   varies.

20        Q    During those times of year the hours worked

21   might go up?

22        A    Yeah.  You are putting in more -- not your

23   hours to schedule, but the hours that you put in you

24   might put in about seventy-five hours a week.

25        Q    The amount of time that you were spending

                                                        **Page 251**

1    doing certain things varied throughout the year as

2    well, right?

3        A    Yes.

4        Q    So the amount of time you are doing

5    planograms you might do -- you might spend a lot of

6    time on planograms one month and then the next month

7    not get as many planograms, correct?

8        A    No, you are doing -- planograms come down

9    monthly.

10       Q    Okay.  Do you have the same amount of

11   planograms every month?

12       A    No, it varies.

13       Q    Okay.  So the amount of time you might

14   spend on planograms will also vary, right?

15       A    Yes.

16       Q    Okay.  And the amount of time that you are

17   dealing with truck would also vary?

18       A    Yes.

19            MR. SCOTT:  Mark that for me, please.

20            (Malone Exhibit No. 16 was marked for

21   purposes of identification.)

22       Q    Ms. Malone, you have been handed what's

23   been marked as Malone 16.  Do you recognize it?

24       A    I do.

25       Q    And what is it?

Page 258

```
 1   district manager.  Input.  Developing an action plan,
 2   they state it's here, but that's district manager.  To
 3   achieve expected results.
 4        Q    Okay.  Were you responsible for preparing
 5   your store for inventory.
 6        A    Was I responsible?
 7        Q    Yes.
 8        A    Yeah, I had input.  Yes, I had input.
 9        Q    The district manager had to do inventory
10   for every store in his district, right?
11        A    Yes, but it's a team effort.
12        Q    What do you mean it's a team effort?
13        A    The district manager -- when inventory is
14   done, the district manager comes in and really
15   regulates how he wants things done in your store for
16   you to -- you might do the work in preparing, and then
17   he might also call in other employees to come and help
18   you out to prepare.
19        Q    Other employees from other stores?
20        A    Yeah.  Or other manager.  Mainly managers.
21   So the input is really on the district manager, not the
22   store manager.
23        Q    Number 9, "Responsible for hiring and
24   training."  Do you agree with that?
25        A    I totally disagree with that.
```

Page 259

1        Q      Go ahead and cross it out.  You totally

2    disagree that you are responsible for training?

3        A      I have some input on the training, but the

4    training is based on how Rite Aid -- you know, how Rite

5    Aid has the training procedures that they go by.  You

6    have your CBTs.  I don't have anything to do with those

7    CBTs.  That's Rite Aid's training.  Implement -- how

8    they implement their training.  I might do the -- I

9    assist with the training.

10       Q      You are responsible for making sure that

11   the employees are trained according to how Rite Aid

12   wants them trained, correct?  Right?

13       A      Yes.  Me with the other managers.

14       Q      All right.  And you are responsible for --

15   strike that.

16              Why -- why do you say that you are not at

17   all responsible for hiring?

18       A      Because I think -- not that I think.  There

19   is procedure.  I only make recommendations.  I don't do

20   the hiring process.  Rite Aid does the hiring.  If I

21   was to hire, I will be the one -- it would be

22   through -- the way I -- my procedures are.  Not through

23   someone else's procedures.  Rite Aid has their programs

24   in place to hire people.

25       Q      You are the one that does the interviews,

Page 260

1    though, right?

2         A    Not by myself, no.  There is other managers

3    that does interviews.

4         Q    You did do interviews, though, correct?

5         A    But that's only for a recommendation.

6         Q    Okay.

7         A    Not for the hiring.

8         Q    So you don't consider interviewing to be in

9    the hiring process?

10         A    I think as a recommendation for the hiring

11    process.

12         Q    Okay.  Take a look at the supervisory

13    responsibility section.

14         A    Supervisor.  Where is that?

15         Q    First page.  Last entry.  Go ahead and read

16    that to yourself and tell me if you disagree with any

17    of that section.

18         A    Hiring, rewarding, disciplining associates,

19    and resolving complaints.

20         Q    Okay.  You did reward your associates,

21    though, didn't you?

22         A    Yes, I did, but I'm not the only one

23    rewarding associates.  Rite Aid rewards associates as

24    well.

25         Q    All right.  You did discipline your

Page 283

```
 1        A      Yes.

 2        Q      And Payless?

 3        A      Yes.

 4        Q      Do you believe you had the discretion to

 5   perform your managerial responsibilities at Payless?

 6        A      Yes.

 7        Q      And at Wendy's?

 8        A      Yes.

 9        Q      Do you feel that you had the Independence

10   to make those -- to perform your responsibilities at

11   Wendy's?

12        A      Yes.

13        Q      And Payless?

14        A      Yes.

15        Q      How did your responsibilities at Payless

16   compare with that of Rite Aid?

17        A      I'm not -- I wasn't able to do

18   independently my job performance, as opposed to like I

19   was independently -- independently able to do with

20   Payless or Rite Aid (sic).  There was always, you know,

21   someone else who I had to see to or had to go through

22   to make a decision.

23        Q      And Mr. Scott asked you about your

24   managerial responsibilities at Rite Aid, right?

25        A      Yes, he did.
```

**Page 284**

```
 1          Q      Let's talk about your nonmanagerial
 2   responsibilities.  Do you understand what I mean when I
 3   say nonmanagerial responsibilities?
 4          A      Absolutely.
 5          Q      And what were those nonmanagerial duties?
 6                 MR. SCOTT:  Object to form.
 7          Q      Yeah, let me rephrase that.  Do you
 8   understand what I mean when I say nonmanagerial duties?
 9          A      Yes.
10          Q      And what are those?
11          A      Those are things like performing -- like
12   doing the stocking.  Doing the cleaning.  Doing the
13   cash proceduring.  Doing the photo lab.  Doing a truck.
14   Receiving.  Not receiving, that's part of it.  But
15   things like that.
16          Q      Working the register?
17          A      Working the register.
18          Q      Okay.  And, on average, how much would you
19   spend performing your nonmanagerial duties on any given
20   average workweek?
21          A      My nonmanagerial duties.
22                 MR. SCOTT:  I'm going object to the form of
23   this question.
24          A      At least 50 to 60 percent the time.
25          Q      More than 60 percent?
```

**Page 285**

1          MR. SCOTT:  Object to the form.

2      A     It depends on the workweek.

3      Q     Okay.  Mr. Scott showed you Exhibit 17,

4  which was the description of your store manager

5  responsibilities.

6      A     Yes.

7      Q     Do you feel that this fairly represents the

8  nonmanagerial duties that were part of your

9  responsibilities at Rite Aid?

10         MR. SCOTT:  Object to form.

11     Q     You can answer.

12     A     Rephrase that.

13     Q     In other words, are all the nonmanagerial

14  duties that you just described, are they anywhere on

15  that job description?

16     A     No.

17     Q     So do you feel that that's a fair

18  representation of what you actually did as a store

19  manager?

20         MR. SCOTT:  Object to form.

21     A     No.

22     Q     All right.  You testified earlier today

23  that -- that you would share your own bonuses with your

24  employees.  In other words, you would personally share

25  your bonuses with your employees, whoever were at your

Yatram Indergit, et al. v. Rite Aid Corporation, et al.          1:2008cv09361
                    Kimberlyn Malone                              July 25, 2011

Page 288

```
 1       A       No, I was -- I was terminated from the

 2  company.

 3       Q       And why were you terminated?

 4       A       Because I was not aware of the extended

 5  request that I could have asked for on my leave of

 6  absence.

 7       Q       So you were entitled to more leave of

 8  absence?

 9       A       Yes.  It states in writing that I could

10  have -- I had the option to ask for an extension on the

11  leave of absence form.

12       Q       And Rite Aid didn't afford you the

13  extension?

14       A       No, because it was automatically -- HR was

15  adamant about I only received it six months.  And when

16  I brought it to their attention, I didn't even get a

17  response back.

18       Q       What was the reason they gave you for your

19  termination?

20       A       There wasn't a reason.  I was just

21  terminated due to not reporting back on the LOA.

22       Q       Did it have anything to do with your --

23  your written up notices?  I think it was this last

24  exhibit we were talking about.  Right.  This last and

25  final -- this last and final warning right here.  Let
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**          **1:2008cv09361**
**Kimberlyn Malone**                                                   **July 25, 2011**

1   me show it -- direct your attention to Exhibit 21.  Is

2   that the reason they gave you for your termination?

3         A    No, it had nothing to do with this.

4         Q    Okay.  I see.  I understand now.  You had

5   testified earlier that -- that you were responsible for

6   supervising your store employees, correct?

7         A    Yes.

8         Q    Were you able to properly supervise your

9   store employees when you were engaged in nonmanagerial

10  duties?

11            MR. SCOTT:  Object to form.

12        A    No.

13        Q    And why not?

14        A    Because when you are taking care of -- when

15  you are at a register taking care of customers, you are

16  not doing your -- your manager duties.  You're

17  concentrating on your customer service for your store.

18  If you are at the photo department and you -- some

19  photo departments -- some departments -- like some of

20  the stores have very high percentage in the photo lab.

21  So if you are doing that, no, you can't concentrate on

22  your manager duties.  If you are doing stocking.  I

23  mean if you are cleaning up a restroom, if you are

24  cleaning up your stock room.  You know, there is

25  numerous of things, though, that take place that people

Page 290

 1    really don't even see.  You don't see it.  You don't.

 2    But it happens.  You know, a lot of the managers and --

 3    like myself, we working.  We are working.  And you're

 4    doing a lot of unnecessary things instead of

 5    concentrating on doing these things to make the company

 6    profitable.  Because I believe that I was one of those

 7    individuals who believed in the company.

 8              MR. SABA:  Thanks, Ms. Malone.  Pass the

 9    witness.

10    EXAMINATION BY MR. SCOTT:

11        Q    Ms. Malone, when you were -- Justin Scott.

12    When you were doing things like stocking --

13              Do you need a second, Ms. Malone?

14        A    I'm good.  I'm good.

15        Q    When you were doing things like stocking or

16    running the cash register, you remained the highest

17    ranking employee in the store, correct?

18        A    It's not about being ranking the highest

19    employee in the company.  We are all employees.

20        Q    I understand that, Ms. Malone, but you --

21    regardless, you remained the highest ranking employee

22    in the company, right?

23        A    No.  Actually, the pharmacist is.

24        Q    The pharmacist is higher ranking than you

25    in the front end of the store?

**Page 294**

1                      CERTIFICATE OF DEPONENT

2

3

4          I hereby certify that I have read and examined

5    the foregoing transcript, and the same is a true and

6    accurate record of the testimony give by me.

7          Any additions or corrections that I feel are

8    necessary, I will attach on a separate sheet of paper

9    to the original transcript.

10

11                              _____

12                                        KIMBERLYN MALONE

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit PP

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


YATRAM INDERGIT, on behalf of    * CIVIL ACTION No.
himself and others similary      * 1:08-cv-09361
situated,                        * PGG-HBP
                                 *
          Plaintiff,             *
                                 *
vs.                              *
                                 *
RITE AID CORPORATION, RITE       *
AID OF NEW YORK, INC., and       *
FRANCIS OFFOR as Aider           *
& Abettor,                       *
                                 *
          Defendants.            *
                                 *
   *    *    *    *    *    *    *    *    *


DEPOSITION OF JOSEPH MICHAEL MANGINO
taken on Wednesday, September 14, 2011,
before Diana C. Nadas,
Registered Professional Reporter
and Certified Court Reporter
in and for the State of Louisiana,
at Law Offices of
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.,
639 Loyola Avenue, Suite 2550,
New Orleans, Louisiana 70113,
commencing at 10:05 o'clock a.m.


REPORTED BY:

      Diana Nadas Roloff, CCR, RPR
      License No. 90012

Page 313

```
 1       Corporate, your sales, no, he didn't.  As

 2       long as your store looked good, he didn't

 3       tell you how to do it, when to do it, and

 4       what to...

 5  BY MS. SCOTT:

 6       Q.   And did you say that that was at

 7  Eckerd --

 8       A.   At Eckerd's.

 9       Q.   Okay.

10       A.   And the same thing in the grocery

11  business; I mean, I had the autonomy to put

12  displays, get with vendors, set things up and put

13  things in to increase the sales; I mean, write the

14  schedules and -- as long as I made my numbers,

15  which I was pretty good at, I was, pretty much,

16  left alone.

17       Q.   And at the other companies that you just

18  described, were you completing non-managerial

19  duties and tasks?

20       MS. MOELLER:

21            Objection.

22       THE WITNESS:

23            No.

24  BY MS. SCOTT:

25       Q.   While you were a store manager at Rite
```

**Page 314**

```
 1   Aid, who made the final decision regarding hiring
 2   staff?
 3        A.   Either John or HR.
 4        Q.   And by, "John," you mean your --
 5        A.   My district --
 6        Q.   -- district manager?
 7        A.   My district manager.
 8        Q.   And who made the final decision, while
 9   you were a store manager at Rite Aid, in firing
10   staff?
11        A.   It was John and, I'm assuming -- I'm
12   pretty sure that HR had to -- that he had to get
13   with HR.  It was -- John gave me the final word,
14   but I -- he had to run it by HR.
15        Q.   And who made the final decision, while
16   you were a store manager at Rite Aid, in
17   disciplining staff?
18        MS. MOELLER:
19            Objection.
20        THE WITNESS:
21            To a certain extent, I could discipline.
22        But if it came to suspending or firing or
23        anything, it was made by the district
24        manager.
25   BY MS. SCOTT:
```

Page 315

```
 1        Q.    In what instances could you discipline
 2   the staff?
 3        A.    Insubordination or -- or not showing
 4   up -- work, on time, minor things.  If it came to
 5   theft, or anything, you immediately had to call
 6   Loss-Prevention.
 7        Q.    If it was not a minor incident, did you
 8   have to either talk to your district manager or HR
 9   about disciplining staff?
10        A.    Yes.
11        Q.    And who set the payroll for your store
12   while you were a store manager at Rite Aid?
13        A.    It came from Corporate to John, as far
14   as the district payroll budget, and then he -- it
15   was supposed to be based on sales, but then he
16   would allot the payroll to each store.
17        Q.    And did you have any ability to alter
18   the store budget while you were a store manager at
19   Rite Aid?
20        MS. MOELLER:
21            Objection.
22        THE WITNESS:
23            No.
24   BY MS. SCOTT:
25        Q.    Based on your experience as a store
```

Page 325

1                  WITNESS' CERTIFICATE

2

3

4       I, JOSEPH MICHAEL MANGINO, do hereby certify

5    that I have read or have had read to me the

6    foregoing transcript of my testimony, given on

7    Wednesday, September 14, 2011, and hereby certify

8    that it is a true and correct transcription of my

9    testimony, with the exception of any corrections

10   or changes attached hereto.

11

12

13   (CHECK ONE)

14

15   (  )  WITHOUT CORRECTIONS.

16

17   (  )  WITH CORRECTIONS, AND/OR

18     ADDITIONS ATTACHED HERETO.

19

20

21

22   SIGNATURE: _____

23

24

25

Exhibit QQ

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


YATRAM INDERGIT, on Behalf

of Himself and Others

Similarly Situated

        Plaintiff        Civil Action No.:

vs.                   1:2008cv09361

RITE AID CORPORATION, RITE

AID OF NEW YORK, INC. and

FRANCIS OFFOR as Aider &

Abettor

        Defendants

_____/


        The deposition of SHIANN M. MARTIN was held

on Tuesday, July 26, 2011, commencing at 9:50 a.m., at

the Offices of Gore Brothers Reporting &

Videoconferencing, 20 South Charles Street, Suite 901,

Baltimore, Maryland 21201, before Dawn L. Venker,

Notary Public.


REPORTED BY: Dawn L. Venker

Page 31

```
 1        A      No.

 2        Q      When you were the store manager at 1615,

 3   you were responsible for the overall operations of the

 4   store, correct?

 5        A      I was within reason.  I had -- usually had

 6   direction from my district manager.

 7        Q      Who was your district manager at that time?

 8        A      William Jeffrey.

 9        Q      And how many stores did he have in his

10   district?

11        A      I don't know the exact number.

12        Q      Was it more than twenty?

13        A      Yes.

14        Q      Mr. Jeffrey was in charge of the district

15   at large?

16        A      Yes.

17        Q      And you were in charge of your store?

18        A      To an extent, yes.

19        Q      Within Rite Aid's policies and procedures,

20   right?

21        A      No, not -- I would say no because I wasn't

22   able to do everything that my -- the policy said.

23        Q      What weren't you able to do that the policy

24   said?

25        A      You know, I wasn't given the option -- I --
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**   1:2008cv09361
**Shiann M. Martin**   July 26, 2011

Page 32

1    I was -- I don't know how I want to word it.  But

2    hiring and firing I wasn't able to do without the

3    approval of my district manager, human resources.

4    Scheduling.  I had to follow a budget.

5         Q     What policy are you referring to that --

6    that said that you could do those things without

7    approval and you weren't able to follow that policy?

8         A     Well, just basically the job description as

9    a store manager.

10        Q     Okay.  When is the last time that you

11   reviewed the job description?

12        A     I briefly looked at it today.

13        Q     Okay.  So that's one document that you did

14   review prior to the deposition?

15        A     Yes.

16        Q     Did you review any other documents?

17        A     I didn't get to read the whole thing.

18        Q     Okay.  Did you review any other documents

19   prior to the deposition?

20        A     No.

21        Q     Can you point me to a Rite Aid policy that

22   says that store managers can hire and fire without HR

23   approval?

24        A     No.

25        Q     Can you point me to a Rite Aid policy that

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**          **1:2008cv09361**
**Shiann M. Martin**                                                   **July 26, 2011**

**Page 33**

```
 1    says that store managers can hire and fire without DM
 2    approval?
 3         A    No.
 4         Q    How many new hires did Store 1615 have --
 5    strike that.  Hold on to that.
 6              You were on a leave of absence in late
 7    January 2009, correct?
 8         A    Yes.
 9         Q    And you returned in April 2009?
10         A    Yes.
11         Q    And when you returned -- strike that.
12              You stepped down and became a shift
13    supervisor?
14         A    In order to save my job, yes.
15         Q    Tell me what you mean by that?
16         A    Because I was not able to work the amount
17    of hours under doctor's orders.
18         Q    What were the limitations on your hours
19    pursuant to the doctor's orders?
20         A    Twenty hours a week.
21         Q    And you took a shift supervisor position at
22    4011?
23         A    Yes.
24         Q    And that's where you previously worked as a
25    shift supervisor?
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**     **1:2008cv09361**
**Shiann M. Martin**                                             **July 26, 2011**

Page 105

```
 1        A      Yes.

 2        Q      Was the HR in that store?

 3        A      Yes.

 4        Q      Any other corporate level people?

 5        A      No.  They used it for training.  I mean

 6    there was a lot of coming and going, but their offices

 7    were the ones that were just listed.  But they -- a lot

 8    of other people used that store.

 9        Q      Okay.  Did that put added pressure on you

10    to perform well in that store given that all those

11    district personnel were there?

12        A      Of course.

13        Q      And I mean William Jeffrey's coming in on a

14    frequent basis.  So everything has to be perfect,

15    right?

16        A      Yes.  On whatever he wanted done.

17        Q      Did he ever pitch in in the store?

18        A      The only time would be at inventory.

19        Q      Okay.  Inventory occurs annually?

20        A      Yes.

21        Q      And so would he pitch in in preparing for

22    the inventory?

23        A      Actually, he didn't at 1483.  He did at

24    other stores I was in, but he didn't at 1483.

25        Q      Okay.  So at other stores you had district
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**          **1:2008cv09361**
**Shiann M. Martin**                                                 **July 26, 2011**

1  manager help and 1483 did not?

2          A     Right.

3          Q     Did you have a good working relationship

4  with Mr. Jeffrey?

5          A     Yes.

6          Q     Were you able to make suggestions to him as

7  to how your store could improve?

8          A     I could suggest it, but he was pretty

9  adamant about the things that he wanted, the way that

10 he wanted.

11         Q     Is he a micromanager?

12         A     I guess define "micromanager" in your

13 terms.

14         Q     Was he somebody that had to control every

15 aspect of your store?

16         A     Yes.

17         Q     Do you know if other district managers are

18 like that?

19         A     From what I have heard, hearsay, yes.

20         Q     How have you heard that?

21         A     Cause you are in contact with other stores

22 for different -- for training purposes.  And I mean you

23 talk to other store managers.

24         Q     Stores outside your district?

25         A     Yes.

**Page 107**

1     Q     In which districts were those stores

2   located?

3     A     4424.  I don't know their district number.

4   Because they changed.  They realigned and whatnot.  So

5   4424 was no longer in Bill's district.

6     Q     And whose district was it in?

7     A     I don't recall.

8     Q     Okay.  Do you have the names of any

9   district managers that you believe were the same in

10  terms of their control over the stores?

11    A     I -- I've heard, but I don't know the

12  names.  And it's been too long to speculate.

13    Q     Okay.  Take a look at Martin 12.  Martin 12

14  is the performance appraisal you received in 2007,

15  correct?

16    A     Yes.

17    Q     And you received this performance appraisal

18  from Celesta, the store manager, correct?

19    A     Yes.

20    Q     And this was at 4424?

21    A     Yes.

22    Q     And this is when you were shift supervisor?

23    A     Yes.

24    Q     Celesta was evaluating you on numerous

25  criteria including customer service.  Associate

**Page 158**

```
 1   sure that they received all the CBTs?
 2        A     Yeah.  It was my responsibility that they
 3   completed what corporate sent down.
 4        Q     And that they had the practical training
 5   required for them to perform their positions, right?
 6        A     Yes.
 7        Q     Were you -- were you particularly proud of
 8   any employees development within your store?
 9        A     I had -- it was mainly -- it was a very
10   small store.  My employee base.  And the employees that
11   was there had some issues obviously.  So it was hard.
12   My assistant manager and I did -- it was left up to us.
13        Q     You didn't get along with the Debras very
14   well?
15        A     No.
16        Q     And did Marie have the same problem with
17   the Debras?
18        A     Yes.
19        Q     When you were on vacation or when you had
20   jury duty, did Marie ever write the work list to your
21   knowledge?
22        A     No, I wrote it up every day while I was
23   gone.
24        Q     Even when you were on vacation?
25        A     Yep.  Because I knew what had to be done
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**                    **1:2008cv09361**
**Shiann M. Martin**                                                           **July 26, 2011**

Page 159

1  those days especially.  You know, Bill had expectations

2  for each day.  So I just made sure it was passed on and

3  known.

4         Q    And when she closed -- so if you opened and

5  you had the work list and she closed, would she then

6  continue to work on that work list?

7         A    Well, the work list was not always -- it

8  was not a fun task because we were by ourselves.  She

9  was by herself also too as the ASM.  If I opened, I

10 would get there at eight.  Depending on what day of the

11 week.  Now, you know, you can ask me which day you want

12 to go on, but through the week it would be from eight

13 to ten I would be by myself.  I wouldn't have a cashier

14 until ten o'clock in the morning.  And then if -- at

15 close, it depended, seven or eight o'clock after -- at

16 night, we didn't have a cashier up front.  So depending

17 on who opened and who closed, we were left alone.

18        Q    Okay.

19        A    So the work list that you are talking about

20 wasn't able to become completed because we were

21 spending our time at the register.

22        Q    Somebody had to do the work list though,

23 right?

24        A    Well, yeah.  I mean of course eventually

25 had got done, but --

Page 160

1        Q      Right.  And at some points of the day you
2   were not there by yourself?
3        A      Yeah, of course.
4        Q      And during those points of the day you
5   worked the work list or you delegated to other people?
6        A      Yeah, I would -- that was a time spent
7   stocking shelves or doing whatever I had to do.  Or the
8   manager -- try to fit in the managerial duties that
9   were assigned to just me or Marie.
10       Q      As a store manager you often had to
11  multi-task and do different things at once, right?
12       A      If I was given the opportunity, yes.
13       Q      And as you were trying to do your
14  managerial tasks, you also had to do such things as
15  stocking, right?
16       A      Yes.
17       Q      And as you were in the office, you also had
18  to make sure that all of the customers are being taken
19  care of in your store?
20       A      Yeah, it was my overall --
21       Q      And I understand much of the time in this
22  particular store, you were there by yourself?
23       A      It wasn't just my store in my district that
24  had that happened.
25       Q      What do you mean in your district?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.                    1:2008cv09361
                     Shiann M. Martin                                      July 26, 2011

Page 161

```
 1        A      There was other stores that the managers

 2   had to run the stores by themselves.

 3        Q      Which stores?

 4        A      The one I know for sure is in Coldwater,

 5   Michigan.

 6        Q      What's its store number?

 7        A      I don't recall.

 8        Q      Who is store manager there?

 9        A      I don't know now.

10        Q      What is their labor budget?

11        A      I don't know.

12        Q      Who was the store manager at the time?

13        A      Celesta.

14        Q      Was that 4424?

15        A      No.

16        Q      So Celesta moved to another store?

17        A      Yes.

18        Q      All right.  Any other stores that you were

19   aware of like that?

20        A      44 -- the first store that I worked in, it

21   was like that too, but I don't know the store manager's

22   name.  And I -- it was only hearsay.

23        Q      When you were a clerk/cashier at 4424, were

24   you ever there by yourself?

25        A      There was a couple times, yes, as a shift
```

Page 243

1           MR. SCOTT:  All right.  Bear with me one --

2    I need one -- one minute to collect myself here.  You

3    can take a break if you want to.  I'll be -- I'm not

4    getting up, but give me a minute.

5           MR. SABA:  Do you need to take a break?

6           (A recess was taken.)

7      Q    How many hours a week did you work as an

8    ASM?

9      A    It varied.

10      Q    Give me the low and high?

11      A    The low would probably be fifty-five.

12    Sixty-five is the high.

13      Q    And what did it vary based on?

14      A    Coverage in the store.  What needed to be

15    done.

16      Q    Would it vary based on the time of year?

17      A    It all stayed the same.  Our district

18    manager at Christmastime -- actually November 1st

19    through January 1st he were required to work six days a

20    week.  So it didn't matter.  We knew from the -- that

21    period of time that our schedule was going to be

22    severely increased.

23      Q    So that around the holidays you got to work

24    more?

25      A    Yeah.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**     1:2008cv09361
**Shiann M. Martin**                                             July 26, 2011

Page 244

```
 1        Q    And your hours go up?

 2        A    Yep.

 3        Q    How many hours a week did you work as a

 4   store manager at 1615?

 5        A    I can't recall exact number.

 6        Q    Give me a range.

 7        A    At least -- at least sixty.

 8             MR. SCOTT:  Go off for one second.

 9             (A recess was taken.)

10        Q    How many hours a week did you work as a

11   store manager at 1483?

12        A    Sixty-five to seventy.

13        Q    Did that vary?

14        A    Not too much.

15        Q    Were there any weeks that you worked fifty?

16        A    I'm sure there was.

17        Q    Do you have any record in your possession,

18   not here, but in your possession generally that would

19   record the amount of hours that you worked as a store

20   manager?

21        A    I have schedules that were printed off.

22   And it tells -- it would say how many hours per week I

23   was scheduled.

24        Q    And it would also show when your hourly

25   employees were scheduled?
```

Page 245

1     A     Some of them because I can print my
2 individual.  It just depended on the schedule.
3     Q     So you have some individual schedules and
4 some store schedules?
5     A     Yeah, I believe so.  I don't know how many
6 of each, but I do.
7     Q     And what period of time?
8     A     I don't recall without looking at them.
9     Q     When is the last time that you looked at
10 those schedules?
11     A     Not since I was terminated.  Since last
12 year.
13     Q     Did you just keep them in your house?
14     A     I just have a file.  I keep a file for
15 work.  Keep a file for everything.  And I just --
16 honestly, I haven't gone through it to --
17     Q     Do you have -- besides schedules, which I
18 understand record your time, do you have any other
19 documents that would be a reflection of the hours that
20 you worked as a store manager?
21     A     I don't, no.
22     Q     Do you have any schedules from when you
23 were an ASM?
24     A     No.
25     Q     Do you have any documents which would

Yatram Indergit, et al. v. Rite Aid Corporation, et al.                    1:2008cv09361
                    Shiann M. Martin                                        July 26, 2011

1          Q      Did anything at all happen today to make --
2     to prevent you from testifying truthfully and
3     accurately?
4          A      No.
5                 MR. SCOTT:  All right.  I tender for
6     redirect, and I may have some small recross.
7                 MR. SABA:  You're what?
8                 MR. SCOTT:  She is your witness for
9     redirect.  Tend --
10                MR. SABA:  You're passing her?
11                MR. SCOTT:  Yeah, I'm passing her.
12                MR. SABA:  Okay.  Give us a second.
13                (A recess was taken.)
14                EXAMINATION BY MR. SABA:
15         Q      Ms. Martin, thank you for being here today.
16    We appreciate you bearing with us.  I want to ask you a
17    couple quick follow-up questions.
18         A      Okay.
19         Q      I'm going to show you Martin Exhibit 17.
20    We were talking about this earlier today.  Real -- real
21    quick, I'm directing your attention to the summary
22    paragraph here.
23         A      Okay.
24         Q      And you crossed out -- let me ask you that.
25    Why did you cross that paragraph out?

Page 262

1          MR. SCOTT:  Strike -- object to form.  She

2    didn't cross the whole paragraph out.

3          Q     Okay.  What -- why did you cross out the

4    portions of that paragraph?  Explain to me that?

5          A     Because I feel like I wasn't given the full

6    opportunity to perform those tasks.  I had constant

7    direction from my district manager.

8          Q     Did you feel that you had the independence

9    necessary to serve Rite Aid as a store manager?

10          MR. SCOTT:  Object to form.

11          A     No.

12          Q     What about the discretion?

13          MR. SCOTT:  Objection to form.

14          A     No.

15          Q     And let me ask you about this real quick.

16    This is Exhibit 20.  And you crossed out a paragraph on

17    the second page under "supervisory responsibilities."

18    See that?

19          A     Yes.

20          Q     For the -- for the areas that you crossed

21    out, tell me why you crossed those out?

22          A     The part that the Rite Aid policies and

23    procedures, that I wasn't able to enforce because there

24    was so many times that I would try to enforce the

25    policies that were in the handbook and it just clearly

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**      **1:2008cv09361**
**Shiann M. Martin**                                              **July 26, 2011**

**Page 263**

1   was shot down every time I would take it to my district

2   manager or my human resource manager.

3        Q     Okay.  And so you testified earlier that

4   you served as an assistant store manager and a store

5   manager at Rite Aid, right?

6        A     Yes.

7        Q     And what is the difference between an

8   assistant store manager and a store manager in your

9   view?

10              MR. SCOTT:  Object to form.

11       A     I believe that the position -- or the

12  procedures and everything you do is the same.  The

13  responsibilities are the same.  Just as a store

14  manager, you take the brunt of the fall if anything

15  goes wrong.

16       Q     So you would be ultimately responsible?

17       A     Yes.

18       Q     Okay.  What nonmanagerial responsibilities

19  did you perform on a daily basis?

20       A     Ringing the register.  Cleaning.  Stocking

21  the shelves.  Running the photo kiosk.  Fixing the

22  photo kiosk.  That type -- stocking the shelves.  I

23  said that.

24       Q     And I think you said unloading the trucks

25  earlier?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.                    1:2008cv09361
                          Shiann M. Martin                                       July 26, 2011

                                                                            **Page 264**

```
 1        A      Yeah, that's done weekly.

 2        Q      Okay.  On average, what percentage of the

 3   time did you spend performing nonmanagerial tasks in

 4   any given workweek?

 5               MR. SCOTT:  Object to form.

 6               MR. SABA:  What's the basis?

 7               MR. SCOTT:  I think it's vague.

 8        Q      Can you answer the question?

 9        A      Yes.

10        Q      What is the answer?

11        A      I -- the majority of my time I was there I

12   was doing the basic cashier work.  And I would figure

13   it up to be at least 70 percent of my time.

14        Q      Okay.  70 percent of your time on the

15   register?

16        A      70 percent of my time doing nonmanagerial

17   work.

18        Q      Okay.  And speaking of working the

19   register, did you believe, or do you feel that you

20   could sufficiently supervise your employees while you

21   were at a register?

22               MR. SCOTT:  Object to form.

23        A      No.

24        Q      Okay.  You had testified earlier that you

25   filed for unemployment payment after you were
```

Page 265

```
 1    terminated?

 2         A     Yes.

 3         Q     Why?

 4         A     Because I feel like I was wrongfully

 5    terminated.

 6         Q     And why is that?

 7         A     Because I was just doing as I was showed

 8    how to do throughout my training at Rite Aid.

 9         Q     Okay.

10         A     And then -- I mean as far as like the CBTs

11    go, I wasn't able to put my two cashiers on the

12    schedule that needed to complete the CBTs.  And my

13    district manager came to me and asked me.  He said,

14    "Shiann, you have to get these done.  They have to be

15    off the screen per corporate."  And I said, "What do

16    you want me to do, Bill?  There is nothing I can do.

17    Employees are not working.  I can't afford to put them

18    on the schedule."  He said, "Do whatever it takes to

19    get it done."

20         Q     Okay.  And so what did you do?

21         A     I completed them.  And I -- and he knew

22    that I completed them.  He -- they were not on the

23    schedule.  And then all of a sudden they got done that

24    same day.

25         Q     And so after you were terminated, you said
```

**Page 274**

1                          CERTIFICATE OF DEPONENT

2

3              I hereby certify that I have read and

4     examined the foregoing transcript, and the same is a

5     true and accurate record of the testimony given by me.

6

7              Any additions or corrections that I feel

8     are necessary, I will attach on a separate sheet of

9     paper to the original transcript.

10

11

12                            _____

13                                  Shiann M. Martin

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit RR

Case 1:08-cv-09361-JPO-HBP   Document 213-16   Filed 01/22/13   Page 68 of 82

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.     1:08-CV-09361-PGG-HBP**
**Herbert Marston**                                                    **August 9, 2011**

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

YATRAM INDERGIT, ON BEHALF OF        )
HIMSELF AND OTHERS SIMILARLY         )
SITUATED,                            )
                                     )
                        PLAINTIFF,   )CASE NO.
                                     )1:08-CV-09361
            vs.                      )-PGG-HBP
                                     )
RITE AID CORPORATION, RITE AID OF    )
NEW YORK, INC., AND FRANCIS OFFOR AS )
AIDER & ABETTOR,                     )
                                     )
                        DEFENDANTS.  )
_____  )

DEPOSITION OF HERBERT MARSTON

TAKEN TUESDAY, AUGUST 9, 2011

LOS ANGELES, CALIFORNIA

Reported by Audra E. Cramer, CSR No. 9901

Page 113

```
 1                    (At 1:06 p.m., the deposition of

 2               HERBERT MARSTON was reconvened.)

 3

 4                    EXAMINATION (RESUMED)

 5    BY MR. SCOTT:

 6        Q.    Mr. Marston, you understand you're still under

 7    oath?

 8        A.    Yes.

 9        Q.    Did you discuss your testimony at all during

10    the break?

11        A.    No.

12        Q.    All right.  Did you feel that you were treated

13    unfairly by Mr. Piña?

14        A.    Yes.  During the circumstances of my

15    termination.

16        Q.    At any other time?

17        A.    No.

18        Q.    Was Mr. Piña more of a micromanager than was

19    Lori?

20        A.    Far more.

21        Q.    Did he want to have more of a role in the

22    overall operations of the store than did Lori?

23        A.    Yes.

24        Q.    Did that limit your managerial discretion as

25    compared to the discretion you had with Lori?
```

Page 114

1      A.    Yes.

2      Q.    In what ways, please?

3      A.    He would visit the store more often.   He

4   insisted on complete adherence to the profit planner.

5   And personnel issues were taken completely out of my

6   hands by him and by the human resource manager.

7      Q.    When you say "personnel issues," what do you

8   mean?

9      A.    Just personnel issues.

10      Q.    Like what?

11      A.    Who we could hire, who we couldn't hire.   We

12   had to get approval.

13      Q.    And that was not true under Lori?

14      A.    No.

15      Q.    And Lori allowed you greater flexibility with

16   respect to the profit planner?

17      A.    No.   She adhered to the profit planner as well.

18      Q.    But he was more adamant about 100 percent

19   complete compliance to it?

20      A.    He was 100 percent adamant about compliance to

21   the profit planner.

22      Q.    When you say he limited your ability to

23   determine who you could hire and not hire, did he ever

24   come in and say, "You have to hire this person"?

25      A.    No.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**   **1:08-CV-09361-PGG-HBP**
**Herbert Marston**   **August 9, 2011**

Page 115

1      Q.   Did he ever interview any store-level

2   candidates prior to them being hired?

3           MR. PRICE:  Objection.  Form.

4           THE WITNESS:  No.

5   BY MR. SCOTT:

6      Q.   The people that you hired store level, it was

7   your decision to hire them provided that they pass the

8   QuickScreen and other Rite Aid processes; right?

9      A.   No.

10     Q.   How is that wrong?

11     A.   We had to call and get his permission based

12  upon our payroll budget whether we could or could not

13  add additional hours.

14     Q.   Was it based on anything else besides the

15  payroll budget?

16          MR. PRICE:  Objection.  Form.

17          THE WITNESS:  Yes.  Whether he felt the people

18  we had were sufficient or not sufficient.

19  BY MR. SCOTT:

20     Q.   With Lori, did you have to get that

21  preapproval?

22     A.   Yes, based upon whether we had sufficient

23  hours/dollars to hire an additional individual.

24     Q.   So then how was he different from Lori with

25  respect to hiring?

Page 198

1  you did, understanding that it varied?

2      A.    Well, you would review the cashier reports.

3  You would review the time punches they would print out.

4      Q.    Anything else?

5      A.    I don't recall.

6      Q.    As part of the opening procedures, you'd do the

7  daily store tour walk; right?

8      A.    Yes.  That would generally come later.  You

9  know, if I'm in there at 6:00 in the morning, then I

10  would not do that at 6:05.  I would do that maybe

11  probably about 7:00.

12      Q.    And what was your routine in closing the store?

13      A.    My routine was making sure that all possible

14  funds that were available were deposited, or a deposit

15  was created and dropped; that the funds in the safe

16  balanced.  Then along with whoever else was working with

17  me that night, finished and accomplished our task.  We

18  were instructed and directed by corporate to be out of

19  the store within 15 minutes.

20      Q.    Then you'd lock the store, turn on the alarm?

21      A.    Yeah.  I would reverse the procedures from the

22  morning.

23      Q.    Throughout the day, whenever an employee in the

24  front end came in, you'd be responsible for telling that

25  person what to do; right?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.    1:08-CV-09361-PGG-HBP
Herbert Marston    August 9, 2011

Page 199

1      A.   I guess most of them were experienced enough

2   that they immediately went about their duties, i.e., the

3   PAC, the assistant PAC.  They had a pretty well-set

4   routine:  On Mondays they did this, Tuesdays they did

5   that.  I would only go by and check and say, "Hi.  How

6   you doing?"  Display my wit and personality and

7   compliment them on doing a good job the previous day,

8   et cetera.

9      Q.   When a new planogram came down or new tasks

10  came down, you would then disseminate those new tasks --

11     A.   Those would be set in the PAC office, and then

12  we'd prioritize them.  Small ones we would give to some

13  Person X.  Bigger ones would be held for Amy and Becky

14  to do, like cosmetics, that involved -- that were very

15  labor-intensive and minute.  And that's how we handled

16  it.

17     Q.   By "we," you mean the in-store management?

18     A.   Yes.

19     Q.   As a store manager, how many hours did you work

20  per week in 2008?

21     A.   Anywhere between 50 and 60.

22     Q.   How many hours a week did you work per week as

23  a store manager in 2009?

24     A.   Between 50 and 60.

25     Q.   How many hours a week did you work per week as

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**   **1:08-CV-09361-PGG-HBP**
**Herbert Marston**   **August 9, 2011**

Page 200

1   a store manager in 2010 prior to your leave of absence?

2        A.   50 to 60.   During the remodel period, that

3   extended greatly because I possess certain expertise in

4   remodels.

5        Q.   What expertise do you possess in remodels?

6        A.   I had completed about 50 remodels of new stores

7   and worked well with the contractors, made sure that the

8   aisles were clear, the store was safe, et cetera.

9        Q.   And you were able to draw upon that experience

10   in remodeling your own store?

11        A.   Yes.

12        Q.   What accounted for the other fluctuation in

13   hours?

14        A.   I don't understand "fluctuations."

15        Q.   Okay.   You said between 50 and 60.   What things

16   in the store would cause you to work more hours per week

17   than others?

18        A.   Tasks.   Inventory preparation.   Seasonal

19   merchandising.   Any number of issues.   People calling in

20   sick.   If the closing manager was struck by lightning, I

21   would have to stay.

22             MR. SCOTT:   Mr. Marston, I'm going to hand you

23   what's been marked as Exhibit 8.

24                  (Whereupon, Exhibit 8 was marked

25                     for identification.)

Page 201

1    BY MR. SCOTT:

2        Q.    Mr. Marston, do you recognize Exhibit 8 as the

3    store manager job description for Rite Aid?

4        A.    Yes.

5        Q.    Can you do me a favor and read to yourself the

6    paragraph marked "Summary," and tell me if you disagree

7    with any of the statements in the summary paragraphs on

8    the first page.

9        A.    And your question was, again?

10       Q.    Do you disagree with any of the statements in

11   the summary paragraph on page 1 of the job description

12   of store manager for Rite Aid, marked INDERGIT-RA 1896?

13       A.    No.

14       Q.    Please take a look at the subsequent section,

15   which is the "Essential Duties and Responsibilities"

16   section, and tell me if you disagree with any of the

17   essential duties and responsibilities listed in

18   1 through 9.

19       A.    Again the question was?

20       Q.    Do you disagree with any of the essential

21   duties and responsibilities listed in the paragraph of

22   that name on INDERGIT-RA 1896?

23       A.    No.

24       Q.    Can you take a look at the "Supervisor

25   Responsibilities" section at the bottom of the page and

Page 220

1    what a clean department actually was.  We wound up

2    getting an A rating our next visit from the health

3    department.  Oftentimes I had to restock flavors that

4    had become empty of the 3-gallon tubs.  There was no one

5    to clean the restrooms, so I had to clean the men's

6    restroom, mop, brush, make sure there were sufficient

7    paper goods and soap, basically up to the health code.

8        Q.   I thought you testified earlier that there was

9    a photo kiosk; is that right?

10       A.   Yes.  At first there was just a simple photo

11   kiosk.

12       Q.   Is that manned by a person or not?

13       A.   No, that's not manned by a person.

14       Q.   So are we done with the front of the store?

15       A.   I also made sure that the window glass was

16   clean.  It would get dirty outside.  We were busy --

17   again, because of the Hispanic demographics and their

18   shopping habits, they would shop three to four times a

19   day and buy less, so there was always an increased

20   number of transactions going on.

21       Q.   Did you actually have to clean the window

22   glass, or did you --

23       A.   Yes.

24       Q.   -- direct someone else?

25       A.   I did it.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**   **1:08-CV-09361-PGG-HBP**
**Herbert Marston**   **August 9, 2011**

Page 221

1     Q.   So let's go outside the store now.  We're in

2  the parking lot in the front of the store.

3          What nonmanagerial tasks, if any, did you

4  perform in the parking lot or out in the front of the

5  store?

6     A.   I had to go collect shopping carts.  They only

7  went one way.  So when there were no carts, I had to go

8  get them and bring them back into the store.  And this

9  was particularly true at night when I would not allow a

10  female associate to go out and perform that function.

11     Q.   Anything else outside the store?

12     A.   No.  It was part of a shopping center, and the

13  property management company took care of that.

14     Q.   So, as a store manager, what percentage of your

15  time on average did you spend doing what you consider to

16  be nonmanagerial tasks?

17          MR. SCOTT:  Object to form.

18          THE WITNESS:  At least 50 percent.

19  BY MR. PRICE:

20     Q.   To a maximum of what number?

21     A.   60, 70 percent.

22          MR. SCOTT:  Object to the form of that last

23  question.

24  BY MR. PRICE:

25     Q.   Why did you perform these nonmanagerial tasks

Page 222

1  as a store manager?

2      A.   Because I wanted to keep the store going,

3  increase sales, increase CSI scores and fulfill my

4  responsibilities as a store manager.

5      Q.   How was this tied to your CSI scores?

6      A.   Well, a clean store, shopping carts, in-stock

7  all contributed to the customers -- CSI score is a score

8  that is a perception of the customer, and so you either

9  had -- they walk in and see a mess on the floor or dirty

10  floors, then that doesn't make a positive impression.

11  So somebody has got to address it.  That included

12  cleaning in and around the pharmacy because none of

13  their personnel would come out.

14      Q.   Did you clean in and around the pharmacy?

15      A.   Yes, around outside cleaned the mats,

16  et cetera.  Made sure they had new mats.  Basic things

17  like that.

18      Q.   We didn't talk about in and around the

19  pharmacy.

20           Any other nonmanagerial tasks you performed in

21  and around the pharmacy?

22      A.   No.  The pharmacy manager -- there's really two

23  managerial structures.  There's a front end and the

24  pharmacy.  Because of the pharmacy laws in the state of

25  California, only pharmacists can supervise other

Page 224

```
 1    BY MR. PRICE:

 2         Q.    I don't understand.  Can you explain that.

 3         A.    The hours you asked about originally before was

 4    prior to the remodel.  We received no additional hours

 5    during the remodel, and the budget remained the same.

 6    Once the budget was fixed for the year, it was

 7    unchangeable.

 8         Q.    Did the remodel require extra staffing and

 9    work?

10         A.    Yes.

11         Q.    Who made up that difference, if anyone?

12         A.    We had to make it up.  I had to make it up

13    myself utilizing Randor [phonetic] efficiencies and

14    myself.

15         Q.    How did you utilize Randor efficiencies?

16         A.    I had to stay and same cover.  You know, I'd

17    have -- Becky, for example -- you know, we had to have a

18    supervisor -- because we worked 24 hours, I had to

19    allocate somebody 8 hours to be there overnight with the

20    work crew, so that took a supervisor out of position.

21         Q.    So when you were a store manager, who made the

22    final decision regarding hiring a staff member at your

23    store?

24               MR. SCOTT:  Object to form.

25               THE WITNESS:  Well, really, you could not hire
```

Page 225

```
 1    unless you got approval from the district manager that
 2    you had the hours, time and ability -- that you had the
 3    resources to actually hire and increase your staff.
 4    BY MR. PRICE:
 5        Q.    Who made the final decision regarding firing
 6    staff when you were store manager?
 7              MR. SCOTT:   Object to form.
 8              THE WITNESS:   That would have been the DM and
 9    the human resource manager.
10    BY MR. PRICE:
11        Q.    What would your role be in something like that?
12        A.    Simply reporting the facts and suspending the
13    associate.
14        Q.    When you were a store manager, who set the
15    payroll for your store?
16        A.    Corporate did.
17        Q.    How was that communicated to you?
18        A.    It showed up on your Staffworks screen.   That's
19    when you found out what your projected sales were and
20    what your projected payroll was.
21        Q.    Could you manipulate that payroll number?
22        A.    No.
23        Q.    When you were a store manager, who set the
24    budget for your store?
25        A.    Well, from my past experience as a district
```

Page 226

1   manager, it was set by the regional vice president, and
2   you received it about a month after the year started.
3       Q.   What was your role as a store manager in
4   setting the budget for your store?
5       A.   None.
6       Q.   Could you run a sale as a store manager for
7   items sold in your store on your own?
8       A.   Only under the direction of the district
9   manager who might come along and say, "Gee, this has
10  been here too long.  Put it on a markdown bulletin,"
11  which would only last a week.
12          The only other change we could make is if an
13  ad item didn't go on the ad pricing, we could put it on
14  for a week so we were not in violation of weights and
15  measures.
16      Q.   Would the district manager be involved in that
17  second scenario you just discussed?
18      A.   Not generally, no.  Unless we received a
19  communication via SYSM or phone call to make a change.
20      Q.   As a store manager, could you make a decision
21  on which products to stock in your store?
22      A.   No.  All planograms, everything, were all
23  preset by corporate planning.
24      Q.   As a store manager, could you make decisions on
25  how to display a product in your store?

Page 239

```
 1    STATE OF CALIFORNIA          )

 2    COUNTY OF LOS ANGELES        )   SS.

 3

 4

 5                   I, HERBERT MARSTON, hereby certify under

 6    penalty of perjury under the laws of the State of

 7    California that the foregoing is true and correct.

 8                   Executed this _____ day of

 9    _____, 2011, at

10    _____, California.

11

12

13                        _____

14                        HERBERT MARSTON

15

16

17

18

19

20

21

22

23

24

25
```