# Exhibit SS

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

YATRAM INDERGIT, on behalf    )
of himself and others         )
similarly situated,           )
                              )
              Plaintiff,       )   CIVIL ACTION NO.
                              )   1:08-cv-09361-PGG-
       VS.                    )   HBP
                              )
RITE AID CORPORATION, RITE    )
AID OF NEW YORK, INC., and    )
FRANCIS OFFOR as Aider &      )
Abettor,                      )
                              )
              Defendants.      )
_____)

DEPOSITION OF SANDRA L. MCCARTHY
Los Angeles, California
Friday, August 12, 2011

Reported by:  NIKKI ROY
              CSR No. 3052

Page 18

1        A.   Uh-huh.

2        Q.   And you've been a store manager since on or

3   around October 9th, 2005.  Does that sound correct?

4        A.   Correct.

5        Q.   And are you still the store manager at

6   Springfield?

7        A.   Yes.

8        Q.   Are you still exempt, or are you hourly now?

9        A.   Exempt.

10       Q.   During the time that you were a, that you have

11   been a store manager for Rite Aid, did you receive any

12   training on the Fair Labor Standards Act, sometimes

13   called the FLSA?

14       A.   Not that I recall.

15       Q.   Other than something that you learned from your

16   lawyers -- I don't want to -- I don't want information

17   that you've learned from your lawyers -- prior to this

18   lawsuit, did you have an understanding of the difference

19   between an exempt employee and a nonexempt employee?

20       A.   No, not that I -- I don't know.

21       Q.   At any time during your employment as an exempt

22   manager -- so that would be from -- I'm going to

23   consider your assistant store manager time from 2000 --

24   roughly June of 2000 froward -- did you ever tell anyone

25   at Rite Aid that you thought you should be classified as

Page 19

```
 1    nonexempt?

 2              MR. SABA:  Objection; form.

 3              THE WITNESS:  Not that I recall.

 4    BY MS. LIVELY:

 5         Q.  Did you ever ask anyone to be changed from

 6    exempt to being hourly paid, from June of 2000 forward?

 7         A.  No.

 8              MR. SABA:  And just for purposes of the

 9    deposition, I'm assuming you're using "exempt" as a

10    designation.  Obviously, that's what the claims of the

11    lawsuit are about.

12              MS. LIVELY:  Correct.

13              MR. SABA:  Yeah.

14    BY MS. LIVELY:

15         Q.  Did you participate in any -- during the period

16    that you were a store manager, from 2005 forward, have

17    you participated in any way of [sic] the hiring of

18    assistant store managers?

19         A.  No.

20         Q.  Do you interview assistant store managers?

21         A.  No.

22         Q.  Who, as far as you know, hires assistant store

23    managers?

24         A.  Human resources and district manager.

25         Q.  And has that been the same throughout your time
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Sandra L. McCarthy**                                          **August 12, 2011**

Page 20

1   as a store manager at Rite Aid from 2005 forward?

2        A.  Yes.

3        Q.  When you were promoted to the exempt ASM

4   position in June of 2000, did you understand that you

5   would be being paid a salary at that point in time?

6        A.  Yes.

7        Q.  And did you understand that the salary you were

8   being paid was designed to compensate you for all hours

9   worked?

10       A.  Yes.

11       Q.  In other words, you could work 30 hours one

12  week and 80 hours one week, and you would get the same

13  salary; is that correct?

14       A.  Correct.  But it was scheduled on a 45-hour

15  week.

16       Q.  But whether you worked more than 45 hours or

17  less than 45 hours, you would get the same salary,

18  correct?

19       A.  Yes.

20       Q.  And you knew when you were promoted to a

21  salaried ASM that you would not be entitled to overtime;

22  is that correct?

23       A.  Yes.

24       Q.  And when you were promoted to the store manager

25  position in October of 2005, you also knew that you

Page 21

1  would not be entitled to overtime, correct?

2        A.  Yes.

3        Q.  And you always accepted your paychecks when you

4  received them; is that correct -- without protest?

5        A.  I don't --

6        Q.  When you received a paycheck when you were a

7  store manager, did you ever protest the paycheck and

8  say, "I should be being paid overtime," or something to

9  that effect?

10       A.  No.

11       Q.  During Two Thousand- -- start with 2007, as

12  a -- you're a store manager in Florence, I believe, at

13  the time.  What was the maximum number of hours that you

14  worked in any given week as a store manager?

15            I'm not asking for an average.  I'm saying, if

16  you had to take the worst week you had in 2007 as a

17  store manager, how many hours would you say you worked?

18       A.  Eighty-five.

19       Q.  Okay.  And was there anything particular going

20  on that made that week that busy?

21            Such as, was it the holiday season, Valentine's

22  Day, people called in sick; any factors like that that

23  made that week so busy?

24       A.  Just cleaning up the store.

25       Q.  Anything else?

Page 22

 1      A.  Just, I took over the store and I was cleaning

 2  it up and, and I -- yeah.

 3      Q.  When you --

 4      A.  No, wait.  2007?

 5      Q.  2007.

 6      A.  I'm sorry.

 7      Q.  That's all right.  Slow down.  It's -- you can

 8  take your time to think about something before you give

 9  an answer, if you need to.

10      A.  In 2007, that's correct on the hours.

11      Q.  Uh-huh.

12      A.  We were building a new store --

13      Q.  Okay.

14      A.  -- and we were moving product.

15      Q.  What new store?

16      A.  We were moving -- no.  They built a new

17  store -- they relocated a store in Florence.

18      Q.  And were you participating in that relocation?

19      A.  Correct.

20      Q.  And how about in 2008; if you could take the

21  worst week in 2008, how many hours did you work during

22  that week?

23      A.  That one, one of those weeks was probably 90.

24      Q.  Okay.

25      A.  And that was when we actually opened the new

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Sandra L. McCarthy**                                        **August 12, 2011**

Page 23

1    store in Florence.

2         Q.  And what was it -- I've never been through a

3    store opening.  So what was it about the store opening

4    that made so many hours that you needed to work?

5         A.  We had to make sure all the sets were complete,

6    that the store was -- product was on the shelf, shelves

7    were full, all the signage was up.

8         Q.  Did you have to hire additional employees when

9    the new store was opened?

10        A.  I did not hire them.  People came from other

11   stores to help with that.

12        Q.  And I'm going to ask you the same thing about

13   2009.  Taking your worst week, how many hours did you

14   work in 2009?

15        A.  Around 80.

16        Q.  And was there anything particular going on that

17   led to that?

18        A.  Shortage of management; management out on --

19   actually on medical leave.

20        Q.  And is this ASMs that are out on medical leave?

21        A.  Supervisors.

22        Q.  Okay.  And what about 2010; worst week ever

23   2010, how many hours did you work?

24        A.  That was last year.  Ninety.  Didn't have any

25   management people -- enough management people to cover

Page 24

1    the shifts in the store.

2         Q.   And was there supposed to be a manager on duty

3    at all time?

4         A.   Yes.  Management.

5         Q.   More than one manager at all time?

6         A.   No.

7         Q.   And in 2010, you moved -- you were in

8    Springfield, correct?

9         A.   Yes.

10        Q.   Okay.  And 2011, worst week ever so far,

11   hours-wise?

12        A.   Probably 80; and the same thing --

13        Q.   Not enough --

14        A.   -- not enough management people to cover the

15   opening and closings.

16        Q.   Is the Florence, Eugene or Springfield

17   stores -- are any of those union stores?

18        A.   No.

19        Q.   Are any of them 24-hour stores?

20        A.   No.

21        Q.   Do you remember generally what the hours of

22   operation at Florence were when you were the store

23   manager there?

24        A.   8:00 a.m. to 9:00 p.m.

25        Q.   How about Eugene?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Sandra L. McCarthy**                            **August 12, 2011**

Page 25

1        A.   Same.

2        Q.   And how about Springfield?

3        A.   Same.   The only difference on Florence is

4    Sundays was 9:00 to 7:00.

5        Q.   During the time that you were a store manager

6    for Rite Aid, was your primary job duty to manage the

7    store on a day-to-day basis?

8        A.   Yes, with what I've been given.

9        Q.   Did you think -- and do you think you were a

10   good store manager?

11       A.   Yes.

12       Q.   And what do you think your three best qualities

13   as a store manager are?

14       A.   Honesty, hard-working.  I don't know.  Fair.

15       Q.   Do you tend to get along well with the

16   employees who work below you?

17       A.   Excuse me?

18       Q.   Do you tend to get along well with the

19   employees who work below you?

20       A.   I do, yes.

21       Q.   And I'm going to go through store by store with

22   you and ask you some different questions about each

23   store -- we'll do Florence and then Eugene and then

24   Springfield -- regarding shifts, number of employees,

25   size of the store, so that I can have a better

Page 29

1       Q.  More often than not, were there more than two

2   people working at the store?

3       A.  No.  It just depends on the hours that was

4   given to me.

5       Q.  Do you know the square footage of the Florence

6   store?

7       A.  I don't recall.

8       Q.  Would you consider it a small store or a big

9   store or a medium store?

10      A.  Medium.

11      Q.  When you were at -- the store manager at the

12  Florence store, were you the highest-ranking individual

13  at the store?

14      A.  At the store level, yes.

15      Q.  And did you have the authority to direct the

16  work of the ASM, the shift supervisors and the cashiers?

17      A.  I wrote a work list of what was given to us in

18  the profit planner, yes.

19      Q.  Other than writing the work list, if you had

20  seen a cashier completing a task and you thought another

21  task was more important, would you have had the

22  authority to say to that cashier, "Hey, instead of

23  facing merchandise, I need you to go and clean up a

24  spill," or something like that?

25      A.  Yes.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Sandra L. McCarthy**                                    **August 12, 2011**

Page 30

1        Q.   Did you have authority over any of the

2   individuals in the pharmacy department?

3        A.   I -- I wrote their schedules.

4        Q.   Including the pharmacist?

5        A.   No.

6             And I wrote their schedules based on the hours

7   in the system.

8        Q.   Did you use StaffWorks for your scheduling?

9        A.   Back then, yes.

10       Q.   Would a cashier have the authority at the

11   Florence store to direct your work, to tell you what to

12   do?

13       A.   No.

14       Q.   Would a shift supervisor have had the authority

15   to tell you what to do?

16       A.   No.

17       Q.   Would an ASM have had the authority to tell you

18   what to do?

19       A.   No.

20       Q.   Would, excluding the pharmacist, a pharmacy

21   employee have had the authority to tell you what to do?

22       A.   No.

23       Q.   Now what about the pharmacist; was the

24   pharmacist a peer manager of yours, or did you have

25   authority, ultimately, over the pharmacist?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Sandra L. McCarthy                                  August 12, 2011

Page 31

```
 1        A.   I don't have authority over the pharmacist, no.

 2        Q.   Was it a he or a she?

 3        A.   It was a he at the time.

 4        Q.   Did he have any sort of authority over you?

 5        A.   No.

 6        Q.   You talked about writing a work list.  What do

 7   you mean by a work list?

 8        A.   It has everybody's name on it, lunch breaks,

 9   when they take their breaks and lunches; and then just a

10   list of the daily tasks that are to be done, whether

11   it's facing the store, taking out the trash, doing the

12   profit -- you know, what's in the profit planner, the

13   tasks that come down from corporate to -- to do.

14        Q.   And so you would -- you would take those tasks

15   that have come down from corporate, put them on a piece

16   of paper.  And would they have individuals' names

17   assigned to them or --

18        A.   Yes.  Everybody in the store that's working

19   that day.

20        Q.   And did you do a task list on a daily basis

21   when you were there?

22        A.   Yes.

23        Q.   And if you weren't there, did somebody else do

24   a task list?

25        A.   Yes.
```

Page 34

1        A.   He never worked for me.

2        Q.   Do you know who that is?

3        A.   Yes.

4        Q.   How is it that you know who that is?

5        A.   I met him once up at Corvallis, and his wife

6    took over the store that I left at Coburg.

7        Q.   Did you ever have the opportunity to observe

8    him work?

9        A.   No.

10       Q.   The Eugene store, 5373, when you were there,

11   how many employees were there, roughly, working at any

12   given time?

13            Let me rephrase that.  Strike that question.

14            At the Eugene store, when you were the store

15   manager, how many employees were employed at the Eugene

16   store, including pharmacy?

17       A.   Approximately 15.

18       Q.   And how many of those were pharmacy employees?

19       A.   Six.

20       Q.   And would that include one pharmacist, or more?

21       A.   Two pharmacists.

22       Q.   And did you have regularly scheduled shifts,

23   such as an opening and a closing shift, at the Eugene

24   store when you were the store manager?

25       A.   Yes.

Page 35

 1        Q.  And what was the opening shift, generally?

 2        A.  8:00 to 3:00 or 4:00, and 4:00 to 9:00 or 1:00

 3   to 9:00.

 4        Q.  And did you have any midday shifts?

 5        A.  If it was available with the hours given.

 6        Q.  And how many employees were generally scheduled

 7   to work the opening shift?

 8        A.  A cashier and a supervisor/management person.

 9        Q.  And what about a pharmacy individual; would

10   there be a pharmacy individual there too?

11        A.  Not till 9:00 o'clock, when the pharmacy

12   opened.

13        Q.  And I should have asked that with --

14        A.  Florence.

15        Q.  -- Florence.

16        A.  Same.

17        Q.  Would a -- say a pharmacy tech or a pharmacist

18   would come on at 9:00 a.m.?

19        A.  9:00 a.m., yeah.

20        Q.  And was it -- would you say it was more often

21   the case -- actually, strike that.

22            Did you, with any regularity, have midday

23   shifts?

24            Were people coming in midday?

25        A.  Occasional; only if I had the hours.

Page 36

1      Q.   And did you have ASMs at the Eugene store?

2      A.   Yes.

3      Q.   How many ASMs?

4      A.   One.

5      Q.   And who was that?

6      A.   Kimberly Weils, W-e-i-l-s.

7      Q.   And did you have shift supervisors at the

8  Eugene store?

9      A.   Two.

10     Q.   And did the Eugene store have a photo

11 department?

12     A.   Yes.

13     Q.   And did the Florence store have a photo

14 department?

15     A.   Yes.  Well, not a separate photo in Florence.

16     Q.   And did you complete a daily task list or a

17 work list, I think you called it --

18     A.   Yes.

19     Q.   -- at the Eugene store as well?

20     A.   Yes.

21     Q.   How is it that you would decide who should be

22 assigned what task?

23     A.   Whoever was working, scheduled at the time.

24     Q.   Did you have some --

25     A.   For --

Page 37

1       Q.  I'm sorry.  Go ahead.

2       A.  For certain tasks that have to be done in the

3   morning, whoever was working got to do those tasks.

4       Q.  Did you have a situation where some employees

5   were better than others at certain things, so you would

6   schedule them for those things, or did you try to rotate

7   tasks?

8       A.  Whoever was on the schedule.

9       Q.  And did you create the work list at Eugene on a

10  daily basis, for days you were there?

11      A.  Yes.

12      Q.  And did you have a regularly scheduled shift

13  that you worked when you were at Eugene, hours that you

14  typically came in?

15      A.  Whatever the needs of the store were and

16  whatever I had scheduled or available.  I never had a

17  set schedule, no.

18      Q.  Did you have a set schedule at Florence?

19      A.  No.

20      Q.  And what sorts of tasks would be on the work

21  list for Eugene?

22          What sort of things would you write down on the

23  work list?

24      A.  For everybody?

25      Q.  Yes.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Sandra L. McCarthy**                                          **August 12, 2011**

Page 38

1        A.   Facing, price changes, building ends, the

2    profit planner, whatever comes from corporate of tasks

3    that have to be done for the day.

4        Q.   And you had the authority to direct your ASM,

5    shift supervisors and cashiers to do these tasks; is

6    that correct?

7        A.   Yes.

8        Q.   And did the cashiers, shift supervisor or ASM

9    have the authority to direct you in what task you should

10   be doing on a daily basis?

11       A.   No.

12       Q.   Who had the authority to direct you, what you

13   should be doing on a daily basis when you were a

14   shift super- -- excuse me -- a store manager in Eugene?

15       A.   My district manager, corporate communications.

16       Q.   And has Ms. Horton been your district manager

17   throughout the time you've been a store manager?

18       A.   Yes.

19       Q.   Did you have the authority to direct tasks of

20   the nonpharmacist pharmacy employees when you were at

21   Eugene?

22       A.   No.

23            The authority?

24       Q.   Well, if there was a pharmacy employee, not the

25   pharmacist --

Page 39

1       A.   Okay.

2       Q.   -- we'll leave pharmacist out.  But if there

3  was a pharmacy employee doing something, and you thought

4  he or she should be doing a separate task, maybe things

5  that had spilled in front of the pharmacy counter --

6       A.   Oh.

7       Q.   -- did you have the authority to say to that

8  employee, "Can you" --

9       A.   Yes.

10       Q.   -- "go clean up the spill?"

11       A.   Yes.

12       Q.   Do you know -- do you recall what the volume of

13  the Eugene store was?

14       A.   Approximately 32-, 33,000 a week.  That's just

15  front end.

16       Q.   Front end --

17       A.   I don't know --

18       Q.   -- sales volume?

19       A.   -- pharmacy.

20       Q.   And was the Eugene store a higher-volume or

21  lower-volume store, compared to the Florence store?

22       A.   Eugene was lower, I believe.

23       Q.   Were they close?

24       A.   I think in the end they were, yes, after we

25  relocated.

Page 46

 1          MR. SABA:  Objection; form.

 2          THE WITNESS:  Yes.

 3   BY MS. LIVELY:

 4       Q.  Do you believe you have more responsibilities

 5   at the Springfield store compared to the cashiers?

 6       A.  Yes, more responsibilities.

 7       Q.  Are there documents, maybe reports from

 8   corporate, SYSMs, that you have access to that a cashier

 9   would not have access to?

10       A.  Yes.  Cashiers don't have SYSM.

11       Q.  Do cashiers get things like the P&L report?

12       A.  No.

13       Q.  Are there any other reports that you can think

14   of, that you get that a cashier would not get?

15       A.  Time sheets.

16       Q.  Anything else?

17       A.  Umm, the -- like the CBT training, like the

18   list of who hasn't done them.

19       Q.  Who gets that list?

20       A.  Management, supervisors, ASMs, store managers.

21       Q.  What about loss prevention reports; are there

22   any loss prevention reports that you get that a cashier

23   would not get?

24       A.  No.

25       Q.  What about shrink reports?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Sandra L. McCarthy**                                              **August 12, 2011**

                                                                    Page 47

1        A.   No.

2        Q.   In what ways would you say your position as the

3    store manager is different from that of a cashier?

4        A.   I have the ability -- or I do the schedule, and

5    I can approve payroll, and I have SYSM, and I have keys

6    to open and close the store.  But other than that, the

7    cashiers have access to the other stuff.

8        Q.   The cashiers don't have the ability to direct

9    work of you or other management members --

10       A.   Correct.

11       Q.   -- though, do they?

12       A.   Correct.

13       Q.   And what about the difference between your job

14   as a store manager and shift supervisors; you think

15   there are different duties that you have that a shift --

16   compared to a shift -- a shift supervisor?

17       A.   Shift supervisors actually can do everything

18   that I do.  They have the ability to create schedules

19   and approve payroll.

20       Q.   Can they direct the work of ASMs or store

21   managers?

22       A.   They can write a work list and put the names on

23   them.

24       Q.   If a shift supervisor wrote a list and gave you

25   a task and you didn't want to do it, would you be

Page 48

1    required to do it anyhow?

2           MR. SABA:  Objection; form.

3           THE WITNESS:  No.

4    BY MS. LIVELY:

5       Q.  Do shift supervisors receive performance

6    evaluations?

7       A.  Yes.

8       Q.  Who writes those performance evaluations?

9       A.  They do a self-appraisal and then I do the

10   appraisal.

11      Q.  Can shift supervisors do appraisals of you?

12      A.  No.

13      Q.  Are there any reports that you receive that a

14   shift supervisor would not receive?

15      A.  Not that I'm aware of.

16      Q.  And how about your job as a store manager

17   compared to that of an ASM; are there any differences

18   that you can think of?

19      A.  Not that I'm aware of.

20      Q.  Do ASMs review store managers?

21      A.  No.

22      Q.  Do you review ASMs?

23      A.  Yes.

24      Q.  So that would be a difference, correct?

25      A.  That would be a difference.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Sandra L. McCarthy                                  August 12, 2011

Page 60

```
 1   BY MS. LIVELY:

 2        Q.  So my question --

 3        A.  Sorry.

 4        Q.  I'm sorry.  Go ahead.

 5        A.  Your question?

 6        Q.  No.

 7            So my question is -- what I've asked you to

 8   look at to help refresh your recollection is a field

 9   performance, management hourly appraisal form, that

10   appears to be for someone named Steven Bletscher --

11        A.  Uh-huh.

12        Q.  -- who is a cashier.  And there's -- there's

13   different boxes that get checked for rating.

14        A.  Uh-huh.

15        Q.  My question to you is, how do you know whether

16   to rate someone "needs development" or "competent" or

17   "above expectations"?

18            What -- what do you rely on to decide which box

19   to check?

20        A.  Observation and working with them and...

21        Q.  And did you try to be accurate in filling out

22   performance appraisal forms for your cashiers?

23        A.  Yes.

24        Q.  And for shift supervisors, would you have the

25   same answer, that you relied on your observations and
```

REPORTED BY: Nikki Roy, CSR                    www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Sandra L. McCarthy**                                    **August 12, 2011**

Page 61

1  working with those individuals in order to fill out a

2  performance evaluation for them?

3         A.  Yes.

4         Q.  And how about for the assistant store managers;

5  what would you rely upon to know how to rate an

6  assistant store manager?

7         A.  The same, working with them and observing them.

8              And those went up to district managers for

9  final approval.

10        Q.  The ASM ones?

11        A.  Uh-huh.  Before you -- before they were given

12  to -- so I did the initial, the district manager made

13  changes, and then I could review it with the store

14  manager, or assistant at the time.  So it was above my

15  head.

16        Q.  For -- what about for the shift supervisor; did

17  those go to a district manager?

18        A.  No.

19        Q.  And for a --

20        A.  Cashier?

21        Q.  -- cashier, did those go to a district manager?

22        A.  No.

23        Q.  During the time that you've been a store

24  manager, did you ever recommend any employees for

25  promotion, whether from cashier to shift or from shift

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Sandra L. McCarthy                                          August 12, 2011

Page 62

1     to ASM or ASM to store manager?

2           A.  Just last year I recommended a supervisor be

3     promoted, and I had to go through my district manager.

4           Q.  Was that individual promoted?

5           A.  Eventually.

6           Q.  And who is that individual?

7           A.  Lindsay Ogg.

8                THE DEPOSITION OFFICER:  Spell that.

9                THE WITNESS:  O-g-g.

10    BY MS. LIVELY:

11          Q.  Other than Ms. Ogg, have there been any other

12    individuals who you've recommended for promotion?

13          A.  Not for promotion, no.

14          Q.  Have you ever recommended an individual for

15    demotion?

16          A.  No.

17          Q.  Do you know whether your district manager,

18    Ms. Horton, considered your recommendation in the

19    promotion of Ms. Ogg?

20          A.  She considered it, but it took a couple months

21    for it to happen.

22          Q.  Do you know why it took a couple months?

23          A.  To my understanding, she was -- she didn't want

24    to because of her age.

25          Q.  And where did you get that understanding?

Page 63

1        A.   From her.

2        Q.   Who, her?

3        A.   Denny.

4        Q.   What did Ms. Horton say?

5        A.   She was concerned about interview age.

6        Q.   What did she say to you?

7        A.   She was concerned because she was 21 years old.

8        Q.   Was she concerned that she wasn't mature

9   enough?

10       A.   Yes.

11       Q.   But she eventually signed off on Ms. Ogg's

12   promotion; is that correct?

13       A.   Yes.

14       Q.   Are you responsible for handling employee --

15   strike that.

16            Since you've been a store manager at Rite Aid,

17   do you receive complaints from employees if they are

18   unhappy with something?

19       A.   Yes.

20       Q.   And are employees encouraged to bring

21   complaints forward to you?

22       A.   Yes, they are.

23       Q.   And are they encouraged to bring complaints

24   forward to assistant store managers as well?

25       A.   Yes; to any management.

Page 65

1      Q.  And are you able to do a written warning and a

2   final written warning?

3      A.  With the approval of HR, human resources.  I

4   know for the final; but I'm not sure on the written --

5      Q.  So --

6      A.  -- the first written.

7      Q.  Okay.  So let me -- I'm going to try to get

8   this in pieces.

9      A.  Okay.

10     Q.  You would have the authority to do verbal

11  coaching on your own; is --

12     A.  Correct.

13     Q.  -- that correct?

14         And for first written, would you have the

15  authority to do that on your own?

16     A.  I'm not sure on --

17     Q.  Okay.

18     A.  -- that one.

19     Q.  For a final written warning, would you have

20  authority to do that on your own?

21     A.  No.  That has to go through human resources.

22     Q.  And what about for termination?

23     A.  Human resources.

24     Q.  On a final written warning, would you give a

25  recommendation to human resources?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Sandra L. McCarthy**                                    **August 12, 2011**

Page 66

```
 1        A.   If I had the opportunity.

 2        Q.   Have there been any situations where you've

 3   provided human resources with a final written warning or

 4   asked that a final written warning be completed for an

 5   employee?

 6        A.   I have not completed a final written warning.

 7   I did have a situation where I had a technician that --

 8   a pharmacy technician that we had problems with.  She

 9   actually ended up calling HR and starting an

10   investigation.

11        Q.   Okay.

12        A.   And she was not terminated, even though I

13   recommended it.

14        Q.   And who was that employee?

15        A.   Jane Saul, S-a-u-l.

16        Q.   Have there ever been situations where you have

17   recommended an employee for termination and they were

18   terminated?

19        A.   I had an employee let -- or terminated.  It was

20   violation of company policy.  But I still had to go

21   through HR to get it approved.

22        Q.   Did you draft the recommendation for -- strike

23   that.

24             Was there a recommendation for termination

25   drafted?
```

Page 67

1        A.   Just phone calls.

2        Q.   Okay.

3        A.   There might have been a SYSM.

4        Q.   Do you remember that employee's name?

5        A.   Colby Hale.

6        Q.   Did HR call you for any follow-up on the

7   recommendation for termination?

8        A.   I don't understand.

9        Q.   If there was either a SYSM sent or something

10  written, where you said, "I recommend terminating this

11  person," was there some sort of follow-up, or did HR

12  just say, "Okay.  Go ahead and terminate"?

13            How did that work?

14       A.   I sent them a SYSM --

15       Q.   Okay.

16       A.   -- with the information of what happened.  And

17  I believe they -- I think she called me the next day --

18  I can't be certain on the thing -- and told me that he

19  had to be terminated.

20       Q.   And then did you actually terminate the

21  individual?

22       A.   Yes.  I sent in the pay request.

23       Q.   Do you have any information to show that human

24  resources failed to consider your recommendation in

25  terminating Mr. Hale?

Page 68

1      A.   No.

2      Q.   As the store manager for Rite Aid, have you had

3   any authority to decide what sort of product should be

4   bought for the store?

5      A.   As far as what we sell?

6      Q.   Yes.

7      A.   I don't -- no, I don't have authority to do

8   that.

9      Q.   As a store manager for Rite Aid, have you had

10  any authority to determine the quantity of items to

11  order?

12     A.   Yes, through corporate ad buy.

13     Q.   Tell me what that is.

14     A.   It's, on our computer system it shows a picture

15  of what we're going to sell in the ad --

16     Q.   Uh-huh.

17     A.   -- and then it shows you the different

18  products.  And you put in how many you think you're

19  going to sell.  It doesn't show you everything that's on

20  sale.  They pick what they think we need to buy.

21          I don't have the authority to order my store.

22  If I want to order something other than what's on that

23  ad buy, I have to go through my district manager and she

24  has to approve it.

25     Q.   Have you had that happen, where you felt

Page 69

1   something needed to be ordered and you asked your DM for

2   it and she approved it?

3       A.   I have to order things weekly for things we run

4   out of for customers.  And it has to be sent to her

5   assistant, her DMA, and they have to order it for me.

6       Q.   Do you have any information that your district

7   manager does not consider your recommendation for what

8   should be bought pursuant to that process?

9            MR. SABA:  Objection; form.

10           THE WITNESS:  I -- I don't.

11  BY MS. LIVELY:

12      Q.   Have you ever -- oh, I'm sorry.

13           Going back to the ad buy, how do you

14  determine -- my understanding is you can determine the

15  amount of whatever those certain list of products are.

16  How do you determine what amount should be bought?

17      A.   It's based -- let's see.  How do I say this?

18           It's how many you want to have in your store at

19  the time of the sale.  And it has in there how much you

20  sold the last time it was on sale, what your average

21  movement is.  So corporate's loaded all that into the

22  system, and you just do it.

23      Q.   Do you have some discretion, though, to decide

24  whether you want 25 or 45 of something?

25      A.   I put that -- yes, I put that in there.

Page 84

1    one of your daily task sheets?

2        A.  Yes.

3        Q.  And that would be assigned by either you, an

4    ASM or a shift supervisor?

5        A.  Correct.

6        Q.  Do you do any store-level advertising or

7    marketing that's not from corporate?

8        A.  No.

9        Q.  When a new employee is hired, is there certain

10   paperwork that has to be completed by the new hire that

11   management assists with?

12       A.  A new hire is signed on to the computer.  They

13   fill out all their paperwork, the I-9, the W-4s, the new

14   hire forms.  And then it goes into a queue for

15   management to look at and approve, and then it's, I

16   believe, faxed in.  It's all changed again.

17       Q.  When you say it's queued in for management to

18   look at and approve, which management, what level

19   management?

20       A.  I believe it's assistant manager and store

21   manager.  Shift supervisors, no.

22       Q.  Do you need to seek permission from your

23   district manager before you interview individuals for

24   those first pass interviews?

25       A.  No.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Sandra L. McCarthy                                                    August 12, 2011**

Page 85

1        Q.   Do you submit your schedule that you've come up

2    with to your district manager before it's posted or

3    presented to employees at the store level?

4        A.   No, but it has to be in the system before

5    Monday at 5:00, so that they can look at it and

6    recommend changes to it.

7        Q.   The district manager or the employee?

8        A.   District manager.

9        Q.   Has it been your experience that Ms. Horton has

10   commonly changed the schedule?

11       A.   Asked us to change it.

12       Q.   Is that something that happens regularly?

13       A.   If it's over budget, over schedule.

14       Q.   How often, on a -- there's 52 weeks in a year.

15   What percentage, would you say, of the time you have had

16   an over-scheduled budget that Ms. Horton has asked be

17   changed?

18       A.   It's a guess.  Three or four.

19       Q.   Three or four schedules or three or four

20   percent?

21       A.   Oh.  What were you asking?

22       Q.   I was --

23       A.   Schedules?

24       Q.   -- asking what percent?

25       A.   Percent.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Sandra L. McCarthy                                      August 12, 2011

Page 86

1       Q.   Of 52, weeks, are you saying --

2       A.   Probably maybe 10 percent.

3       Q.   After the schedule is posted for the employees,

4   do you have -- have you had situations happen where some

5   employee comes back later on and says, "Oh, I see I'm

6   scheduled to go on Saturday 8:00 to 5:00, but I've got a

7   wedding to go to."

8       A.   Uh-huh.

9       Q.   "Can I change that?"

10      A.   Uh-huh.

11      Q.   Does that happen?

12      A.   It has.

13      Q.   And do you have the authority to change the

14  schedule, so long as you stay within budget?

15      A.   Yes, as long as I stay within the budget.

16      Q.   Would an ASM have the authority to change the

17  schedule, so long as they stay within budget?

18      A.   Yes.

19      Q.   Would they need to go to you for approval?

20      A.   They would let me know about it.

21      Q.   And would a shift supervisor have the authority

22  to change a schedule, assuming it stayed within budget?

23      A.   Yes.

24      Q.   And would they need approval from you before

25  making that change?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Sandra L. McCarthy                                   August 12, 2011

Page 89

1       A.  He was Payless.

2       Q.  Okay.

3       A.  Sorry.

4       Q.  That's all right.

5       A.  That's all I can remember.

6       Q.  And were their management styles different?

7           Were there any -- was one more hands on, hands

8   off, micromanager, not micromanager?

9           Any differences in management style that you

10  observed between the three of them?

11      A.  No.  They were all -- I don't recall.  I'm --

12      Q.  Do you get along with Ms. Horton?

13      A.  I do.

14      Q.  How often did Ms. Horton visit your store when

15  you were at Florence?

16      A.  I don't recall how often.

17      Q.  More than once a month?

18      A.  Oh, no.  Less than once a month.

19      Q.  Less than once every two months or somewhere in

20  between?

21      A.  I would say once every three months.

22      Q.  Okay.  And where is Ms. Horton based?  Do you

23  know?

24      A.  Albany.

25      Q.  And how about your store in Eugene; how often

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Sandra L. McCarthy**                                    **August 12, 2011**

Page 90

1    did Ms. Horton visit when you were at the store in

2    Eugene?

3         A.  The same, about once every three months.

4         Q.  And how about now, at Springfield?

5         A.  About the same.

6         Q.  And how would you describe Horton's management

7    style?

8         A.  I don't know how to explain it.  I don't know.

9         Q.  Would you consider her to be a hands-on or

10   hands-off manager?

11        A.  She's a hands-on, through corporate

12   communication.

13        Q.  Is that SYSMs generally?

14        A.  SYSM, controlling of the budget.

15        Q.  What does that mean, "controlling of the

16   budget"?

17        A.  Insists that you make the budgeted plan hours.

18        Q.  Have you ever not made the budgeted plan hours?

19        A.  Yes.  But I've not scheduled to miss it.  Like

20   I've scheduled to make the plan.  But there are

21   circumstances at times that required to go over.

22        Q.  And how --

23        A.  Or the sales weren't there to make it, so you

24   didn't make your plan.

25        Q.  And how did Ms. Horton respond?

Page 91

1     A.   She responds in SYSM; just, it's a blanket

2   SYSM.

3     Q.   What do you mean, "a blanket SYSM"?

4     A.   She sends a SYSM out to the whole district for

5   sales and budget.

6     Q.   And is she telling people, "You need to improve

7   your sales" or --

8     A.   Improve your budget and make your plan and cut

9   your overtime.

10    Q.   Does she offer suggestions on how to do that?

11    A.   Not to my knowledge.

12    Q.   The Florence store, is that in a rural, urban

13   or suburban area?

14    A.   I guess it would be considered rural.  I can't

15   say that word.

16    Q.   There are not a lot of houses around or other

17   businesses around or -- I can't picture it.

18    A.   I don't know what's considered suburban, rural.

19   I don't -- I don't know what the differences are.

20    Q.   Rural would be where there's not a lot of -- in

21   my opinion, rural would be where there's not a lot of

22   houses or other buildings around; it's kind of just a

23   store, kind of on its own, country sort of atmosphere.

24         Suburban would be, you know, houses, maybe some

25   schools around.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Sandra L. McCarthy                                                  August 12, 2011

Page 125

1              Need to work on ad goods prior to
2          the ad start and while ordering the
3          weekly ad.
4          Do you know what that means?
5     A.   The weekly ad buy that we were talking about
6   earlier, and work on ad goods prior to the ad start
7   date.
8     Q.   Does that mean you were supposed to do
9   something with ad goods?
10         I'm sorry, I just --
11    A.   Order.
12    Q.   -- don't know what that means.
13    A.   Order, if we don't have it in hand -- on hand.
14    Q.   And in the next box down, which is "Drive
15   Sales," it states:
16              Front end sales were 6.8 percent
17          below plan and 6 percent below last year;
18          script growth down 1.2 percent to plan.
19          What is script growth?
20    A.   How many scripts we do.
21    Q.   Prescriptions?
22    A.   Prescriptions.
23    Q.   And do you know why prescriptions were on
24   your -- something dealing with prescriptions were on
25   your performance evaluation as opposed to a pharmacist's

Page 126

 1    performance evaluation?

 2         A.  They combined the front end and the pharmacy.

 3         Q.  For sales?

 4         A.  For sales and plan.

 5         Q.  And so then are you ultimately responsible for

 6    making sure the sales target gets met for the front end?

 7         A.  For the front end?

 8         Q.  Yes.

 9         A.  Repeat that.

10         Q.  Sure.  And maybe it's not a good question.

11              I'm just trying to understand why -- why a

12    script growth would be on your performance evaluation.

13    Is it because the script growth -- that you were

14    ultimately responsible somehow for prescription sales in

15    the store or -- or meeting plan?

16              I'm just not understanding why it's on your

17    performance evaluation.

18         A.  As store managers, we're supposed -- we're to

19    help the pharmacy increase their script count.

20         Q.  And so did you -- did you have some

21    understanding that as the store manager you had some

22    responsibility to assist the pharmacy in doing that?

23              MR. SABA:  Objection; form.

24              THE WITNESS:  No.  When I became a store

25    manager, I did not realize that I had to help with the

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Sandra L. McCarthy                                        August 12, 2011

Page 127

1    pharmacy growth.

2    BY MS. LIVELY:

3        Q.  At -- excuse me.  As of May 12th, 2009, did you

4    understand that you needed to help the pharmacy with

5    growth?

6        A.  I don't know how to answer that.  I don't.

7        Q.  Do you know whether, as a store manager in

8    2009, you understood that you had some responsibility

9    with regard to script growth?

10       A.  Yes, I -- I understand that I am to help the

11   pharmacy in what they need to do to increase their

12   script growth.

13       Q.  And what, if anything, did you do to help the

14   pharmacy to increase its script growth after receiving

15   Exhibit 5?

16       A.  I don't recall doing anything specific.

17       Q.  Then the next item down, under "Be Profitable,"

18   it states:

19              NBT well below last year and below

20          plan.

21          What is NBT?

22       A.  I believe it's net before taxes.

23       Q.  And then it states:

24              Sandy has done a good job

25          controlling front end payroll to her

Page 147

1      Q.  Did you have your ASMs participate in any way
2   in the performance review process for shift supervisors?
3      A.  No.
4      Q.  How much time per week did you spend observing
5   your employees to make sure that they were working
6   properly and doing their jobs?
7          MR. SABA:  Objection; form.
8          THE WITNESS:  I can't give you a time on what
9   was spent.  You see something and you deal with it.
10  There's no time.
11  BY MS. LIVELY:
12     Q.  So is it just on an ongoing, as-needed basis?
13     A.  As you're -- yeah -- doing tasks and you see
14  something, somebody not doing something, then you talk
15  to them.
16     Q.  During the time that you have been a store
17  manager, have you ever identified any sales associates
18  that you thought had management potential?
19     A.  Yes.  I recommended one for promotion.
20     Q.  And was that Ms. Ogg?
21     A.  Ogg, uh-huh.
22     Q.  Did you create any sort of procedure or rule in
23  your store, where employees needed to get vacation or
24  time off requests to you within a certain period of
25  time, like you need to ask for time off two weeks ahead

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Sandra L. McCarthy                                    August 12, 2011

Page 148

1    of time, or three days or two days, anything like that?

2        A.  Not that I'm aware, no.

3        Q.  If an employee were to need time off or want to

4    take time off for a vacation, would they go to you for

5    that, or do they fill out some sort of slip, or what?

6        A.  Just they would come to me.

7        Q.  And then how -- how does this get input into

8    the computer?

9            Do they just get marked out on certain days?

10       A.  It's done doing the daily schedule and what was

11   StaffWorks or Work Force Management.

12       Q.  And who would have the authority to schedule an

13   employee out on vacation, in the store?

14       A.  Whoever is doing the schedule, which -- me or

15   assistants.  Shift supervisors are -- they can do

16   schedules, also.

17       Q.  Do you currently have your shift supervisors

18   doing scheduling?

19       A.  I do not, no.

20       Q.  Have you ever had your shift supervisors do

21   scheduling for you, when you've been store manager?

22       A.  No.

23       Q.  Is there a process that you have used to

24   forecast scheduling needs in your store?

25       A.  No.  That's done above, corporate or

Page 149

 1    district -- I don't know who does it.

 2        Q.  As far as you know, you don't have any -- any

 3    input into that?

 4        A.  I don't have input into it.

 5        Q.  And what sort of -- strike that.

 6            I think we talked earlier that sometimes you

 7    may need to adjust an employee's schedule after the

 8    schedule has been printed or come out.

 9            In what sort of circumstances have you needed

10    to adjust the schedule?

11        A.  Somebody calls in sick or there's a family

12    emergency.  Most -- mostly it's just sick.

13        Q.  And in that situation, do you have the

14    authority to call another employee to see if you can get

15    coverage?

16        A.  Yes, I do.

17        Q.  And does anyone else in the store have that

18    authority?

19        A.  Assistants and supervisors.

20        Q.  If for some reason your store was experiencing

21    more business than expected, would you have the

22    authority to call another employee in?

23        A.  If it was within the budgeted hours.

24        Q.  Yes.

25        A.  Only at that time.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Sandra L. McCarthy**                                    **August 12, 2011**

Page 150

 1          I'm sorry.

 2     Q.  I'm sorry.

 3     A.  That was my answer.

 4     Q.  I thought it was a question.

 5     A.  Yes.

 6     Q.  So let's try this again.

 7          If your store was experiencing more business

 8     than expected, would you have the authority to call

 9     another employee in?

10     A.  Yes, as long as it's kept within the budgeted

11     hours.

12     Q.  And if you knew you were going to go over the

13     budgeted hours and you thought you still needed more

14     coverage, what would you do?

15     A.  I would have to call and ask for approval from

16     the district manager.

17     Q.  Have you ever had to do that?

18     A.  Not that I recall.

19     Q.  As a store manager, would you agree that you

20     were responsible for enforcing company policy?

21     A.  Yes; making sure people are following them,

22     yes.

23     Q.  Have you ever had to discipline an employee for

24     failure to follow company policy?

25     A.  Yes.

Page 221

1                DECLARATION UNDER PENALTY OF PERJURY

2

3          I, SANDRA LYNNE MCCARTHY, do hereby certify

4    under penalty of perjury that I have read the foregoing

5    transcript of my deposition taken August 12, 2011; that

6    I have made such corrections as appear noted herein, in

7    ink, initialed by me; that my testimony as contained

8    herein, as corrected, is true and correct.

9

10         DATED this _____ day of _____,

11   2011, at _____, California.

12

13

14

15

16

17

18

19

20         _____

21                          SANDRA LYNNE MCCARTHY

22

23

24

25

# Exhibit TT

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


YATRAM INDERGIT, ON BEHALF OF          )
HIMSELF AND OTHERS SIMILARLY           )
SITUATED,                              )
                                       )
                       PLAINTIFF, )CASE NO.
                                 )1:08-CV-09361
           vs.                   )  -PGG-HBP
                                 )
RITE AID CORPORATION, RITE AID OF      )
NEW YORK, INC., AND FRANCIS OFFOR AS   )
AIDER & ABETTOR,                       )
                                       )
                       DEFENDANTS. )
_____)


DEPOSITION OF ANTHONY MC GILLIVRAY

TAKEN THURSDAY, AUGUST 11, 2011

LOS ANGELES, CALIFORNIA


Reported by Audra E. Cramer, CSR No. 9901

Page 46

```
 1   he took over.
 2        Q.   Did Dave ask you whether Mike was ready to take
 3   his own store?
 4        A.   I'm not sure.  Probably.
 5        Q.   If he had asked you, would you have said that
 6   he was ready?
 7        A.   Yes.
 8        Q.   And is that because you had trained him on all
 9   aspects of being a store manager?
10        A.   Yes.
11        Q.   Did you train him on the schedule?
12        A.   Yes.
13        Q.   Profit and loss?
14        A.   Yes.
15        Q.   Business daily reports?
16        A.   Yes.
17        Q.   Managing inventory?
18        A.   Yes.
19        Q.   Disciplining associates?
20        A.   Yes.
21        Q.   Interviewing and hiring processes?
22        A.   When it was approved.
23        Q.   You trained him on the process by which a store
24   manager can hire someone though; right?
25        A.   Yes.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**   **1:08-CV-09361-PGG-HBP**
**Anthony McGillivray**                                       **August 11, 2011**

Page 47

```
 1        Q.    Did you train him on ordering?

 2        A.    Yes.

 3        Q.    And ad ordering?

 4        A.    I don't believe we had the system at that time.

 5        Q.    So ad ordering was something that had not yet

 6    come in?

 7        A.    Correct.

 8        Q.    At that point at 6263, were you writing the

 9    schedule by hand, or were you using Staffworks?

10        A.    Staffworks.

11        Q.    Did you train Mike on how to check in vendors?

12        A.    Yes.

13        Q.    Did you train Mike in the profit planner?

14        A.    Yes.

15        Q.    Did you train him in the category sales report?

16        A.    Yes.

17        Q.    And did you train him in register audits?

18        A.    I don't recall.  I don't recall if we did those

19    at that time.

20        Q.    Any other training that you provided Mike that

21    I've missed?

22        A.    Not that I recall.

23        Q.    When Mike came in to be trained, would he

24    shadow you throughout the day, or would you meet with

25    him at specific times to talk about the various
```

Page 48

1    managerial processes that he had to learn?

2         A.    Combination.

3         Q.    By the end of his training, could you trust him

4    to run a shift?

5         A.    Yes.

6         Q.    At the beginning of his training, could you

7    trust him to run a shift?

8         A.    Shortly into it.

9         Q.    Not right away, but soon thereafter?

10        A.    Yes.

11        Q.    Was Mike an outside hire, or was he promoted

12   from within Rite Aid?

13        A.    Outside hire.

14        Q.    So he had to learn Rite Aid processes in their

15   entirety; right?

16        A.    Yes.

17        Q.    Did 6263 sell alcohol?

18        A.    Yes.

19        Q.    Did it sell beer and wine?

20        A.    Yes.

21        Q.    Did it sell hard liquor?

22        A.    Yes.

23        Q.    So obviously it had a liquor license.

24        A.    Yes.

25        Q.    And associates had to go through training

Yatram Indergit, et al. v. Rite Aid Corporation, et al.          1:08-CV-09361-PGG-HBP
Anthony McGillivray                                                                    August 11, 2011

Page 284

```
 1     A.    Yes.

 2     Q.    That was part of the SMILE-RAPTAR program?

 3     A.    Yes.

 4     Q.    Which was aimed at improving employee morale?

 5     A.    Yes.

 6     Q.    And based on your assessment of how the

 7  employees were doing, would you hand out SMILE or RAPTAR

 8  cards?

 9     A.    Yes.

10     Q.    At 6263 did truck come during business hours or

11  overnight?

12     A.    The truck -- it would be during business hours.

13     Q.    At 5846 did truck come during business hours or

14  overnight?

15     A.    Business hours.

16     Q.    4063?

17     A.    Business hours most of the time.  Sometimes

18  early in the morning before opening.

19     Q.    And 5297?

20     A.    Most of the time, actually came before store

21  opening.

22     Q.    And all of these stores received the truck

23  deliveries in the doors that were in the back of the

24  store?

25     A.    Yes.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**     **1:08-CV-09361-PGG-HBP**
**Anthony McGillivray**                                          **August 11, 2011**

Page 285

1     Q.   At no store that you ran did you have to bring
2     in the merchandise through the front end where the
3     customers were coming in?
4     A.   No.
5     Q.   And you'd try to schedule all your store
6     employees on truck day; right?
7     A.   Yes.
8     Q.   And when the store receives a truck outside of
9     regular business hours, would you schedule yourself to
10    meet it?
11    A.   Yes.
12    Q.   And you would schedule as many employees as
13    possible to bring the product into the store and stock
14    it; right?
15    A.   Yes.
16    Q.   And so would you run a crew of employees to
17    complete that task as quickly as possible?
18    A.   Yes.
19    Q.   You tried to have the product off the truck, in
20    the store and on the shelves within 24 hours?
21    A.   Yes.
22    Q.   How many hours a week did you work as a
23    store manager in 2005?
24         MS. SCOTT:   Objection.   Form.
25         THE WITNESS:   I don't recall.

Page 286

```
 1   BY MR. SCOTT:
 2       Q.    What was the average week for you in terms of
 3   hours worked in 2005?
 4           MS. SCOTT:  Objection.  Form.
 5           THE WITNESS:  It varied.  Minimum of 50.  I
 6   don't recall.
 7   BY MR. SCOTT:
 8       Q.    What would the maximum be?
 9       A.    70.
10       Q.    What did it vary based on?
11       A.    Help in the store.  What was going on.
12   Inventory.  Just busy.  Things like that.
13       Q.    2006.  What's the range of hours worked per
14   week?
15           MS. SCOTT:  Objection.  Form.
16           THE WITNESS:  Same.
17   BY MR. SCOTT:
18       Q.    2007?
19           MS. SCOTT:  Objection.  Form.
20           THE WITNESS:  Same.
21   BY MR. SCOTT:
22       Q.    2008?
23           MS. SCOTT:  Objection.  Form.
24           THE WITNESS:  Started getting more into
25   the 55-60 range plus.
```

Page 287

1    BY MR. SCOTT:

2         Q.    2009?

3              MS. SCOTT:   Objection.   Form.

4              THE WITNESS:   Same.   Around 55, 60 average.

5    BY MR. SCOTT:

6         Q.    2010?

7              MS. SCOTT:   Objection.   Form.

8              THE WITNESS:   Started averaging about 60 to 70.

9    BY MR. SCOTT:

10        Q.    Why was that?

11        A.    No help in the store.

12        Q.    As we discussed earlier, your labor budget was

13   decreased.

14        A.    Yes.

15        Q.    And you resigned in 2011?

16        A.    Yes.

17        Q.    What month?

18        A.    March.

19        Q.    And in the two months that you worked as a

20   store manager in 2011, how many hours a week did you

21   work?

22             MS. SCOTT:   Objection.   Form.

23             THE WITNESS:   60 to 70.

24   BY MR. SCOTT:

25        Q.    As a store manager did you clock in but not

Page 288

1    clock out.

2        A.   In Washington, yes.  In California, no, we

3    didn't.  We weren't required to punch.

4        Q.   Do you have any record in your possession -- I

5    don't mean here, but in your possession generally --

6    that would show the hours that you worked at Rite Aid?

7        A.   I don't know.

8        Q.   The hours a week that you worked, would those

9    increase in 5297 at the holiday season?

10       A.   Yes.

11       Q.   And during lower-volume seasons, if it wasn't

12   inventory, you might work less?

13           MS. SCOTT:  Objection.  Form.

14           THE WITNESS:  If there was staffing, yes.

15           MR. SCOTT:  I'm going to hand you what's been

16   marked as Exhibit 21.

17                        (Whereupon, Exhibit 21 was marked

18                     for identification.)

19   BY MR. SCOTT:

20       Q.   Exhibit 21 is a job description for the

21   position of store manager at Rite Aid; right?

22       A.   Yes.

23       Q.   Have you seen this document before?

24       A.   Yes.

25       Q.   And have you seen this document after having

Page 314

1       Q.    What percentage of your time did you spend as a

2    manager at Rite Aid completing nonmanagerial tasks?

3              MR. SCOTT:   Object to form.

4              THE WITNESS:   Towards the end it was close to

5    60 percent, maybe more.

6    BY MS. SCOTT:

7       Q.    By "towards the end," do you mean 2009?  2010?

8       A.    Late 2009, most of 2010, yes.

9       Q.    Actually, let's just go year by year, and you

10   can give me on average the percentage of time that you

11   spent doing nonmanagerial tasks.

12              In 2005, on average, how much time did you

13   spend doing nonmanagerial tasks?

14              MR. SCOTT:  Object to form.

15              THE WITNESS:  It was probably about 50/50.

16   BY MS. SCOTT:

17      Q.    In 2006 how much time did you spend

18   percentage-wise doing nonmanagerial tasks?

19              THE WITNESS:  Probably about 50/50.

20              MR. SCOTT:  I'm going to withdraw my objection

21   to the first one of these questions.

22   BY MS. SCOTT:

23      Q.    In 2007 what percentage of time did you spend

24   doing nonmanagerial tasks as a store supervisor?

25              MR. SCOTT:  Object to form.

Page 315

1            You mean store manager?

2            MS. SCOTT:  Oh, sorry.  Store manager, yes.

3            THE WITNESS:  2007 we probably went up to about

4    55 percent nonmanagerial.

5    BY MS. SCOTT:

6       Q.   In 2008 what percentage of time did you spend

7    doing nonmanagerial tasks as a store manager?

8       A.   Probably still around 55.

9       Q.   In 2009?

10      A.   It started getting up into the 60-plus range.

11      Q.   And the portion of 2010 that you worked as a

12   store manager at Rite Aid, what percentage of your time

13   did you spend doing nonmanagerial tasks?

14      A.   60-plus.

15      Q.   Why did you have to do nonmanagerial tasks as a

16   store manager at Rite Aid?

17           MR. SCOTT:  Object to form.

18           THE WITNESS:  The labor constraints made it so

19   that the manager had to pick up the slack for not having

20   personnel there to do those tasks.

21   BY MS. SCOTT:

22      Q.   Did the labor constraints make it difficult to

23   delegate nonmanagerial tasks to store employees?

24           MR. SCOTT:  Object to form.

25           THE WITNESS:  Yes.  Hard to delegate when

Page 316

1   there's nobody to delegate to.

2   BY MS. SCOTT:

3       Q.   If you'll look at the exhibit that's been

4   marked as 21, which is the store manager job description

5   for Rite Aid, on that exhibit do you see any

6   nonmanagerial tasks listed?

7       A.   No.

8       Q.   Did performing these nonmanagerial tasks affect

9   how you were able to run the store at Rite Aid as a

10  store manager?

11          MR. SCOTT:  Object to form.

12          THE WITNESS:  Yes.  It was hard to focus on the

13  managerial tasks when I was out on the floor doing

14  freight or cashiering, straightening the store,

15  whichever.  Couldn't review the P&L and things like

16  that.

17  BY MS. SCOTT:

18      Q.   Was it more difficult to supervise your staff

19  when you were doing nonmanagerial tasks as a

20  store manager?

21          MR. SCOTT:  Object to form.

22          THE WITNESS:  Yes.

23  BY MS. SCOTT:

24      Q.   Did Rite Aid expect you to still supervise your

25  staff while you were having to complete nonmanagerial

Page 317

1    tasks?

2         A.   Yes.

3         Q.   Did the assistant store managers at Rite Aid

4    also complete nonmanagerial tasks?

5         A.   Yes.

6         Q.   Did they complete nonmanagerial tasks at every

7    store that you were either an assistant store manager or

8    store manager at at Rite Aid?

9         A.   Yes.

10        Q.   Would you look at the exhibit that has been

11   marked 22, the Rite Aid job description of assistant

12   store manager.

13        A.   Yes.

14        Q.   Can you tell me if anywhere on there you see

15   nonmanagerial tasks listed on that job description.

16        A.   I don't believe so, no.

17        Q.   And you might have testified to this earlier,

18   so I apologize if it's already on the record and if

19   you've already been asked this:  Were you ever

20   compensated on an hourly basis as an assistant store

21   manager at Rite Aid?

22        A.   Yes.

23        Q.   Were you compensated on a salaried basis as an

24   assistant store manager?

25        A.   Yes.

Page 318

1        Q.   Can you tell me the time periods where you were

2   hourly and the time frame in which you were salaried as

3   an assistant store manager?

4        A.   I don't remember the years.  I would estimate

5   that 2000 to 2001 or '2 as salary, and then from that

6   point on until I was promoted, as an hourly.

7        Q.   Did your job duties change as an assistant

8   store manager when you went from salaried to hourly?

9        A.   No.

10       Q.   Are you aware of why your salary changed from

11  salaried to hourly as an assistant store manager?

12            MR. SCOTT:  Object to form.

13            THE WITNESS:  Rite Aid lost a class action

14  lawsuit in the state of California.

15  BY MS. SCOTT:

16       Q.   And it was after that class action that your

17  compensation structure changed?

18       A.   Yes.

19       Q.   You testified about an assistant store manager

20  named Goldie earlier.  You said she also went from

21  salaried as an assistant store manager to an hourly

22  assistant store manager; right?

23       A.   Yes.

24       Q.   Did her job duties change at all when she went

25  from a salaried assistant store manager to an hourly

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**      **1:08-CV-09361-PGG-HBP**
**Anthony McGillivray**                                   **August 11, 2011**

Page 319

 1   assistant store manager?

 2        A.   No.

 3        Q.   Was she completing nonmanagerial tasks as an

 4   assistant store manager?

 5             MR. SCOTT:  Object to form.

 6             THE WITNESS:  Yes.

 7   BY MS. SCOTT:

 8        Q.   I want to discuss with you assistant store

 9   managers -- actually, strike that.

10             I want to discuss with you the hourly

11   compensation of the assistant store managers compared to

12   salaried compensation of assistant store managers while

13   you were at Rite Aid.

14             When the compensation went to hourly, were

15   assistant store managers paid overtime?

16        A.   Yes.  The way -- yes and no.  The way they did

17   it to work out the amount, when I was an hourly

18   assistant, I was paid 40 hours of regular time, 5 hours

19   of overtime.

20        Q.   Were you ever allowed to work more than

21   those 45 total hours?

22        A.   It was frowned upon, but yes.

23        Q.   If you did work over those 45 hours, would you

24   be paid that additional overtime?

25        A.   Yes.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.    1:08-CV-09361-PGG-HBP**
**Anthony McGillivray    August 11, 2011**

Page 320

1      Q.    Were you ever paid overtime for the hours that
2   you worked over the 45 hours as a store manager?
3      A.    No.
4      Q.    Were you ever paid overtime for the hours that
5   you worked over 45 hours as a salaried assistant store
6   manager?
7      A.    No.
8      Q.    Who made the final decision regarding firing
9   staff?
10        MR. SCOTT:   Object to form.
11        THE WITNESS:   Generally, terminations had to be
12   approved through HR.
13   BY MS. SCOTT:
14      Q.    And who set the store budget for Rite Aid?
15      A.    Corporate.
16      Q.    Were you able to change that budget at all if
17   you thought, as a store manager, the budget needed to be
18   changed?
19      A.    No.
20      Q.    Did you ever try to request more hours for your
21   budget as a store manager at Rite Aid?
22      A.    Yes.
23      Q.    What happened when you requested those
24   additional hours?
25      A.    I was told the budget is the budget.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.      1:08-CV-09361-PGG-HBP**
**Anthony McGillivray                                          August 11, 2011**

Page 321

 1      Q.   You testified earlier that you now are
 2   currently an assistant manager at Bi-Mart.  Can you
 3   compare your duties as an assistant manager at Bi-Mart
 4   with your duties as a store manager at Rite Aid?
 5           MR. SCOTT:  Object to form.
 6           THE WITNESS:  As an assistant for Bi-Mart, my
 7   responsibilities are maintaining store in-stocks and
 8   driving sales through that and ensuring that the
 9   department leads and the department personnel are
10   completing their tasks and getting their freight done on
11   time and completing their counts.
12   BY MS. SCOTT:
13      Q.   Do you have more autonomy as an assistant
14   manager at Bi-Mart than you did as a store manager at
15   Rite Aid?
16      A.   Yes.  We can merchandise end caps however we
17   feel is necessary for sales.  More of my job is
18   delegating to the department personnel.  And we are able
19   to order specific things for -- we can order specific
20   things for a customer, excess quantities or an item for
21   the area that we're in.
22      Q.   You mentioned delegating as part of your duties
23   as an assistant manager at Bi-Mart.  Do you now have
24   enough staff to delegate nonmanagerial tasks to?
25      A.   Yes.

Page 322

 1          MR. SCOTT:  Object to form.

 2     BY MS. SCOTT:

 3        Q.   Do you, as a result, complete fewer

 4     nonmanagerial tasks than you did as a store manager at

 5     Rite Aid?

 6          MR. SCOTT:  Object to form.

 7          THE WITNESS:  Yes.

 8     BY MS. SCOTT:

 9        Q.   Do you complete more managerial tasks than you

10     did as a store manager at Rite Aid?

11          MR. SCOTT:  Same objection.

12          THE WITNESS:  Yes.

13     BY MS. SCOTT:

14        Q.   Do you feel you're more able to control

15     profitability as an assistant manager at Bi-Mart than

16     you did as a store manager at Rite Aid?

17          MR. SCOTT:  Object to form.

18          THE WITNESS:  Yes.  We have specific abilities

19     to bring in product to fill the store.  We can bring in

20     specials and order higher quantities to build displays

21     if we have a product that is selling really well.

22     BY MS. SCOTT:

23        Q.   Could you not do that as a store manager at

24     Rite Aid?

25          MR. SCOTT:  Object to form.

Page 323

1              THE WITNESS:   No.

2    BY MS. SCOTT:

3         Q.    If you'll look at Exhibit 20 for me.

4         A.    Okay.

5         Q.    It is a Rite Aid weekly schedule for May 2,

6    2009.  Do you see that?

7         A.    Yes.

8         Q.    And for your weekly total that week, it says

9    that you were working 50 hours.  Do you see that?

10        A.    Yes.

11        Q.    I know that you probably don't remember exactly

12   the number of hours that you worked on this week, but in

13   general, if you scheduled yourself for 50 hours, did it

14   mean that you actually worked 50 hours?

15        A.    No.  The system was designed to automatically

16   schedule us 50 hours a week.  If you scheduled yourself

17   more, it decreased the payroll for other staff.  So if

18   you were going to work Friday or Saturday, as I'm

19   scheduled off on these days, then I would just come in

20   and work those days.

21        Q.    And did Rite Aid keep track of those hours?

22              MR. SCOTT:  Object to form.

23              THE WITNESS:  No.

24   BY MS. SCOTT:

25        Q.    Just as an example, if you'll look at Sunday,

Page 324

1    April 26, 2009, it looks like you're scheduled for

2    7:00 o'clock a.m. until 5:00 o'clock p.m. --

3         A.   Yes.

4         Q.   -- and Linda James is scheduled to open with

5    you at 7:00 o'clock a.m.

6              Do you see that?

7         A.   Yes.

8         Q.   What would happen if Linda didn't come in at

9    7:00 o'clock?

10        A.   I would be alone until 9:00 a.m. unless I could

11   find somebody to replace her.

12        Q.   And if you couldn't find someone to replace

13   her, would you be alone in the store?

14             MR. SCOTT:  Object to form.

15             THE WITNESS:  Yes.

16   BY MS. SCOTT:

17        Q.   You testified about your vacation earlier, and

18   you mentioned during that testimony that you didn't take

19   all of your vacation except for, I believe, one year; is

20   that correct?

21        A.   I believe so.

22        Q.   Why didn't you take all of your vacation in the

23   years that you didn't take all of your vacation?

24        A.   My assistant was not performing to standards,

25   and I was not able to leave the store without coming

Page 329

1   STATE OF CALIFORNIA          )

2   COUNTY OF LOS ANGELES        )   SS.

3

4

5                I, ANTHONY MC GILLIVRAY, hereby certify

6   under penalty of perjury under the laws of the State of

7   California that the foregoing is true and correct.

8                Executed this _____ day of

9   _____, 2011, at

10  _____, California.

11

12

13                        _____

14                        ANTHONY MC GILLIVRAY

15

16

17

18

19

20

21

22

23

24

25

# Exhibit UU

Page 1

```
         IN  THE  UNITED  STATES  DISTRICT  COURT
      OF  THE  SOUTHERN  DISTRICT  OF  NEW  YORK


   YATRAM  INDERGIT,  on      )
   behalf  of  himself        )
   and  others  similarly     )
   situated,                  )
                              )
        Plaintiff,            )  Civil  Action  File
                              )  No.   08Civ.9361
   vs.                        )  (PGG)  (HBP)
                              )
   RITE  AID                  )
   CORPORATION,  RITE         )
   AID  OF  NEW  YORK,        )
   INCORPORATED,  and         )
   FRANK  OFFOR  as  Aider    )
   &  Abettor,                )
                              )
        Defendants.           )



                    -   -   -


      Deposition  of  CHRISTOPHER  O'BRIEN
           (Taken  by  Defendants)
            Atlanta,  Georgia
            August  2,  2011


   Reported  by:  Lynne  C.  Fulwood
            Certified  Court  Reporter
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Christopher O'Brien                                        August 2, 2011

Page 60

```
 1       A      No, I have not.
 2       Q      Were you supervising more employees
 3   as a store manager at Wild Oats than you have
 4   as a store manager at Rite Aid?
 5       A      Yes.
 6       Q      When you were store manager at Fresh
 7   Market, how was your store staffed?  How many
 8   -- were there assistant managers?
 9       A      Yes, three assistants.
10       Q      Were there department managers?
11       A      Yes.
12       Q      If I'm getting the titles wrong, just
13   let me know.
14       A      That's fine.  There was also --
15       Q      How many supervisors below the
16   department manager level?
17       A      Yes.
18       Q      What were they called?
19       A      Assistant department managers.
20       Q      Then as a district manager at Fresh
21   Market, how many stores were you responsible
22   for?
23       A      Three and then one building at the
24   time.
25       Q      As a store manager at Fresh Market,
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Christopher O'Brien                                              August 2, 2011

Page 61

```
 1    did you believe that you had overall
 2    responsibility for your store?
 3              MS. REHMAN:  Objection to form;
 4         you can answer.
 5         A    At Fresh Market?
 6         Q    Yes.
 7         A    Yes.
 8         Q    At Rite Aid as a store manager, do
 9    you believe that you had overall responsibility
10    for your store?
11              MS. REHMAN:  Objection to form;
12         you can answer.
13         A    No.
14         Q    Why not?
15         A    Because you don't really have a say
16    in what goes on in your store.
17         Q    Any other reason?
18         A    I mean, you have to ask permission
19    for pretty much anything you want to do outside
20    of, you know, how it's laid out.
21         Q    So what it is that you felt at Rite
22    Aid as a store manager you didn't have a say in
23    with respect to the store that you were
24    managing?
25         A    A lot of things.
```

Page 62

```
 1        Q      Tell me what things.
 2        A      If I wanted to hire somebody, I had
 3   to go above me.   If I didn't -- if what was on
 4   an end cap, if I wanted to impact sales, I
 5   couldn't make decisions that would help me
 6   impact sales because if this item is on the end
 7   cap and that's where it is, I can't move it.
 8   If I want to get something fixed, I have to go
 9   through corporate and then let them make a
10   decision as to whether or not it should be
11   fixed or not.
12        Q      Anything else?
13        A      No.   That's all I have.
14        Q      And then you said at Rite Aid as a
15   store manager you have to ask permission, what
16   did you mean by that?
17        A      Depending on what it is, you make a
18   phone call, whether to your boss or to, you
19   know, corporate maintenance themselves.
20        Q      And that's about getting something
21   fixed in the store?
22        A      Getting something fixed; if I wanted
23   to hire somebody, I really couldn't just hire
24   them.   I would have to just recommend.
25        Q      When you were working with Vicky at
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Christopher O'Brien                                    August 2, 2011

Page 63

1    the University Boulevard store, did she hire

2    anyone during that time period?

3              MS. REHMAN:   Objection.

4        A    I don't remember.

5        Q    You don't recall whether she gave you

6    any specific training on hiring?

7        A    Well, she didn't hire anybody but as

8    far as training, she says you have to -- all

9    you can do is take the application and then you

10   have them call a 1-800 number where they get

11   screened and you submit their information and

12   then you wait to hear back from corporate

13   whether or not you can hire them or not.

14       Q    How do you know that Vicky didn't

15   hire anybody?

16       A    I don't know that she didn't.

17       Q    You said she didn't hire anybody.

18       A    While I was there that I know of.

19   You asked me if she hired anybody.

20       Q    During the short time you were there,

21   she didn't hire anyone?

22       A    I don't know.

23       Q    She explained the process to you?

24       A    Yes.

25       Q    And so once you became a store

Page 64

1    manager outside of Vicky's store, when was the

2    first time you were involved in hiring anyone?

3                MS. REHMAN:   Objection to form;

4         you can answer.

5         A    I've accepted applications many

6    times.  I don't recall exactly when I submitted

7    them or the first time.

8         Q    Tell me the steps in the hiring

9    process.  If someone comes into your store at

10   Rite Aid and you're the store manager and asks

11   about employment, what happens next?

12        A    You have them fill out an

13   application.  Then they call a 1-800 number to

14   get screened and then you wait.  You've got to

15   wait for corporate to contact you back and say

16   it's okay to proceed with the hiring process

17   and at that point, you can send them for a drug

18   test and then you would wait for corporate

19   again to get back to you on whether or not they

20   can proceed.

21        Q    So when the person comes in your

22   store and asks about employment, are there any

23   candidates that you have said, we're not

24   hiring?

25        A    No.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  08Civ.9361(PGG) (HBP)
Christopher O'Brien                                    August 2, 2011

Page 65

1      Q    You've never told a candidate that at
2  Rite Aid?
3      A    That we're not hiring?
4      Q    Yes.
5      A    No.  I always take an application.
6      Q    So you always give the candidate an
7  application?
8      A    Always.
9      Q    Do you interview them?
10     A    I always talk to somebody.  I ask
11  them what they're looking for and things like
12  that but --
13     Q    Do you give every single candidate
14  the 800 number to call?
15     A    Yes.
16     Q    Even if you talked with them and they
17  don't meet your hiring needs?
18     A    Yes.
19     Q    You still have them call the 800
20  number?
21     A    Yes.
22     Q    Are you aware of the cost involved in
23  them calling the 800 number?
24     A    No.
25          MS. REHMAN:  Objection to form;

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Christopher O'Brien                                        August 2, 2011

Page 126

1        A     It -- I believe the term -- I believe
2    it would be called a second notice, I think.
3        Q     And it was your practice as a store
4    manager to draft a second notice regarding any
5    discipline issue and send that to HR for
6    approval?
7        A     You wouldn't send it.  You would
8    actually get on the phone with HR and explain.
9        Q     So your practice as a store manager
10   was if you were going to issue a second notice,
11   you would call HR to discuss it with them
12   first?
13       A     Yes.
14             MS. REHMAN:  Objection to form;
15       you can answer.
16       Q     And what was the next step after a
17   second notice?
18       A     Then it would be termination.
19       Q     How did you handle terminations as a
20   store manager at Rite Aid?
21       A     You would ask permission.
22       Q     Who did you ask for permission?
23       A     HR or your district manager.
24   Actually he would ask permission, too.  I don't
25   think they would do it unless HR approved it.

Page 127

1        Q     And would it be the same type of

2   process where you had already issued a second

3   notice and you wanted to terminate an employee

4   so you would call HR and let them know that you

5   would like to terminate the employee?

6        A     Yes.

7        Q     And then they would either approve or

8   what?

9        A     Or disapprove.

10       Q     And did they ever disapprove a

11  termination that you recommended, HR?

12       A     Yes.

13       Q     How many times did that happen?

14       A     I believe twice.

15       Q     Tell me about the first time.  Who

16  was the employee involved and what was the

17  conduct?

18       A     I don't remember all the details of

19  that.  One of -- the only time -- most of the

20  time that I will take it that far is if it's

21  rudeness and I'm sure both cases were rudeness

22  but I have had an employee to where they

23  allowed to come back to work.

24       Q     So it's your testimony that twice you

25  attempted to terminate or you recommended

Page 128

1    termination of employees for rudeness where HR

2    told you that they would not approve the

3    termination?

4         A    Right.

5         Q    And what did you mean when you said,

6    I have had an employee come back to work?

7         A    Well, there's a -- you can send them

8    home.  HR comes back and says, you know, we

9    can't terminate them and then they would come

10   back.  You'd have to bring them back on the

11   schedule.

12        Q    How many times as the store manager

13   at Rite Aid have you sent an employee home from

14   work for disciplinary reasons?

15        A    I don't remember.  I've sent them

16   twice.

17        Q    I'm sorry?

18        A    About twice that I remember.

19        Q    And what happened with the employees

20   the two times that you recall?

21        A    The two times that I recall, I mean,

22   they'd go home.  One was -- she went home.  She

23   contacted the district manager.  I contacted

24   HR.  And I know that they decided to let her

25   come back to work so we brought her back in.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Christopher O'Brien                                          August 2, 2011

Page 129

1       Q      And what happened with the other that
2    you recall?
3       A      The other one I did not -- I don't
4    think I sent that one home.  I don't remember
5    exactly but I remember HR saying, no, we can't
6    terminate.
7       Q      Do you remember who that employee
8    was?
9       A      No, I do not.
10      Q      Do you remember why HR said you
11   couldn't terminate?
12      A      No, I do not.
13      Q      Did HR advise you to issue another
14   written discipline to that particular employee?
15      A      I don't recall that.
16      Q      How many times did you recommend
17   termination of an employee and HR approved your
18   recommendation?
19      A      Never.
20      Q      You never actually recommended a
21   termination that was approved?
22      A      Correct.
23      Q      And there were two times that you
24   recall recommending terminations that were not
25   approved?

REPORTED BY: Lynne C. Fulwood, CCR          www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400

1        A       Correct.

2        Q       But you don't recall either of those

3    employees' names?

4        A       LaQuita is one of them.  I don't

5    recall the other one.

6        Q       Was it LaQuita or Latisha?

7        A       No.  I'm sorry, LaQuita.

8        Q       What do you remember about LaQuita's

9    discipline?

10       A       I remember she was rude and I

11   remember not only to customers around the store

12   but kind of transposed to the employees in the

13   store.  I remember looking in her file, seeing

14   that she's had plenty of counseling going for

15   all different things and I remember sending her

16   home.  And I remember corporate saying, no,

17   we're not going to do that at this time and put

18   her back on the schedule so I brought her back.

19       Q       Had you issued any written counseling

20   to LaQuita before you sent her home?

21       A       Yes.

22       Q       So when you're saying you looked in

23   her file and saw that she'd been counseled for

24   a variety of things, some of those were

25   counseling that you had given her?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Christopher O'Brien                                          August 2, 2011

Page 148

1        A     Well, if I would come in and I knew

2    that that week we had to get the cough and cold

3    plano-gram done, that's -- my plan would be

4    make sure this gets done this week.

5        Q     Did you ever plan beyond the current

6    week?

7        A     No.  You're really too busy

8    throughout the week to go that far with it.

9        Q     In your experience as a store

10   manager, you were too busy to have time to plan

11   beyond the current week that you were working

12   in?

13       A     Yes.

14       Q     Did you plan day to day?

15       A     Sometimes.

16       Q     But not every day?

17       A     Not every day.

18       Q     What about every day that you were

19   working, did you plan the work that had to be

20   accomplished that day?

21       A     Sometimes.

22       Q     Not every day?

23       A     Not every day.

24       Q     If you weren't planning the work that

25   needed to be accomplished that day, who was?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Christopher O'Brien                                        August 2, 2011

Page 149

 1            MS. REHMAN:  Objection; form.
 2       A       Depending on -- your day can get
 3   interrupted so if I say -- if I planned the day
 4   before and I've got that accomplished and I
 5   didn't really look into Wednesday and I showed
 6   up Wednesday, before -- sometimes before you
 7   even get in there and look at what to do that
 8   day, you're already receiving a phone call and
 9   your day's already lined up for you.
10            You would receive a phone call from
11   your DM and it would be, this is what we want
12   done; this has to be done today.  So your whole
13   day would be spent getting that done.
14   Sometimes you wouldn't know it was coming.
15   Sometimes you would because you'd see it on the
16   calendar but you would try to plan according to
17   the calendar but let's say corporate says, you
18   get two weeks to do this plano-gram.  DM says,
19   I want it done in three days.  It's kind of
20   hard to plan.  Your whole world just gets
21   interrupted sometimes.
22       Q       And when your DM would say, I want it
23   done in three days, did you then figure out how
24   it was going to get done in three days?
25       A       Yeah.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Christopher O'Brien                                              August 2, 2011

Page 150

1        Q      And was it your experience that both

2    Mr. Little and Mr. Gentry would from time to

3    time call you and tell you something that

4    needed to be done immediately in your store?

5        A      Yes.

6        Q      Did Mr. Little ever tell you who

7    should do what in your store?

8        A      I've been told that I needed to do

9    it.

10       Q      What did Mr. Little tell you that you

11   needed to do?

12       A      Several occasions it tells me --

13   well, we're only talking my store?

14       Q      Yes.

15       A      Several times it would tell me we

16   need to get this plano-gram done; associates

17   aren't going to get it done in time.  You need

18   to work on it yourself or I need you to get

19   your back room cleaned out.

20       Q      And you understood that to mean that

21   you personally had to get the back room cleaned

22   out, not that you could get your employees to

23   get the back room cleaned out?

24       A      On occasion, yes.

25       Q      But there were times when you could

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Christopher O'Brien                                      August 2, 2011

Page 172

1       A    Oh, yeah.  I've been told, oh, we

2    don't have to do that.

3       Q    Did you go to the pharmacy manager to

4    ask why the employee was not --

5       A    Yes.

6       Q    -- helping.  And what did the

7    pharmacy manager say?

8       A    They don't have to do that.

9       Q    Who was that person?

10      A    Hank Norwood.

11      Q    Were there pharmacy employees who did

12   help when you asked?

13      A    Some of them would help without

14   asking.

15      Q    Were there some who helped when you

16   asked?

17      A    Yes.

18      Q    So back to 7139, the first time you

19   were assigned to that store as the store

20   manager, did you prepare the employee work

21   schedules?

22           MS. REHMAN:  Objection to form.

23      A    Well, there's a computer program.

24           MS. BARBAREE:  What's your

25       objection?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Christopher O'Brien                                          August 2, 2011

Page 173

1          MS. REHMAN:  You said prepared the
2     employees' work schedules.
3          MS. BARBAREE:  Yes, I did.
4          MS. REHMAN:  You need to define
5     what prepare means.
6          MS. BARBAREE:  Do you understand
7     what prepare means?
8          MS. REHMAN:  And you see that from
9     his response.
10         MS. BARBAREE:  Go ahead.
11    A    It's -- I'm going to use the word
12    idiot proof again only because it's a computer
13    program to aid you in it I guess and you would
14    pretty much start the program, hit enter so it
15    would calculate a schedule, calculate hours,
16    calculate dollars, how many hours you can do
17    and automatically schedule everybody.  So if
18    that's preparing a schedule, then, yes.
19    Q    That's how you prepared your
20    schedules at 7139?
21    A    Yes.  I would use what they would
22    call a program if -- 7139 I believe used the
23    program called Staffworx.
24    Q    In 2006?
25    A    Yes.

Page 174

```
 1        Q     So you did not create your own
 2   schedule on paper and enter it into Staffworx?
 3        A     You would put one down on paper.
 4        Q     I'm asking what you did, not what you
 5   could do or what you might do.  What did you
 6   do?
 7        A     Sometimes I would write it down first
 8   and then start Staffworx.  Could I plug it all
 9   in, no.  I would try but it's -- it's very
10   hard.  Sometimes I would win and beat the
11   system but sometimes you can't.
12        Q     So why would you write it out first?
13        A     Because I -- from my old school of me
14   being me, I would say, well, this is what I'd
15   like to see; this is what I need to have.
16        Q     And it's your testimony that as a
17   store manager at 7139, at least in 2006, you
18   couldn't enter the schedule in Staffworx as you
19   had written it?
20        A     No.  You can enter it like you've
21   written it.  Whether or not you would pass all
22   the criteria, no.  You would have to sit there
23   and edit so you can get all the little criteria
24   that they have lined up.
25        Q     Which would cause you to have to
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Christopher O'Brien                                      August 2, 2011

Page 175

1    change the schedule you'd written; is that your
2    testimony?
3         A    Yes.   Yes.
4         Q    So Staffworx would not allow you to
5    enter the schedule you wanted?
6         A    Correct.
7         Q    And what about after Staffworx
8    created its schedule for you at 7139 in 2006,
9    then did you make handwritten changes to that?
10        A    Yes.  The computer system -- when the
11   computer system scheduled it, could I go in and
12   actually manipulate it and change it?
13        Q    Could you make handwritten changes to
14   the schedule generated by Staffworx?
15        A    Yes.
16        Q    Did you?
17        A    Yes.  Somebody calls in sick, yes.
18        Q    Is that the only time you made
19   changes, when an employee called out?
20        A    Or if an employee says, well, I can't
21   really work that day; I have a doctor's
22   appointment, I would make changes where two
23   people switched but the hours would be the
24   same.
25        Q    So those are the only changes you've

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Christopher O'Brien                                      August 2, 2011

Page 176

1    ever made to a Staffworx schedule in 2006 at

2    7139?

3        A    If I would have to -- I don't know

4    exactly all the changes I've made but if I had

5    to change a schedule at 7139, it would usually

6    be a shift swap.  It could be somebody couldn't

7    come in that day or work that day, I would

8    write somebody else in.  Sometimes I would have

9    like where I had a store manager with me

10   training, I would write him in.  He would be

11   written in.  It wouldn't be in Staffworx.

12           Sometimes if somebody got hired,

13   their first day they would be written on the

14   schedule rather than in Staffworx because

15   sometimes Staffworx took a couple of days to

16   get them in the system.

17       Q    Those are the only changes you can

18   recall making?

19       A    That I can recall, yes.

20       Q    And when you said Staffworx would

21   calculate the hours and dollars for you, what

22   did you mean?

23       A    Staffworx would -- with Staffworx,

24   the design of Staffworx from what I can

25   understand is it takes your budget and it says

REPORTED BY: Lynne C. Fulwood, CCR          www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Christopher O'Brien                                        August 2, 2011

Page 187

```
 1        A      I do not know.  I do not remember.
 2   If I say a figure, I'm just guessing so I don't
 3   remember.
 4        Q      Do you remember annually?
 5        A      No.
 6        Q      What about at 7042, do you remember
 7   the weekly sales volume?
 8        A      Seven- to eight-thousand.
 9        Q      Thousand?
10        A      Uh-huh.  I do not -- I do not know
11   the figures for pharmacy because they add that
12   in.
13        Q      Do you recall whether the weekly
14   sales volume at 7042 was higher or lower than
15   7139?
16        A      Lower.
17        Q      What condition was the Fayette store
18   in when you moved there as store manager?
19        A      Very nice condition.
20        Q      What were the store hours?
21        A      I believe when I was there, I think
22   originally they were open till -- originally
23   till 9:00 I believe and then it got moved to
24   8:00 at night, 8:00 to 8:00, and then it got
25   changed.  It was 9:00, 8:00 to 9:00 and then it
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Christopher O'Brien                                        August 2, 2011

Page 188

1    got changed to 8:00.

2         Q     Were they open seven days a week?

3         A     Yes, they were.

4         Q     If I were to ask you today on average

5    how many hours a week you worked while you were

6    at 7139 the first time as the store manager,

7    could you give me an estimate?

8         A     Uh-huh.  It's an estimate.  It would

9    be no less than 50 and probably no more than

10   maybe 65.

11        Q     And what would the reasons for the

12   variations be?

13        A     The person closing the store at

14   night, if they called out sick, you had to

15   stay.  If -- again, you would sometimes get

16   some of these phone calls that say it had to be

17   done today and stick you there all day to get

18   it done.  That's pretty much it.  Most of it

19   was scheduling, having to, you know, cover

20   shifts.

21        Q     What about did it vary seasonally?

22        A     Yes.

23        Q     Was that store ever remodeled while

24   you were the store manager there?

25        A     No.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Christopher O'Brien                                    August 2, 2011

Page 189

```
 1      Q     Were any of the stores that you
 2  managed as a store manager remodeled?
 3      A     I'm going to say no.
 4      Q     Why do you say I'm going to say no?
 5      A     Well, I don't know if Rite Aid is
 6  thinking remodel is painting, painting this and
 7  painting that or putting a new floor down in
 8  the pharmacy.  What I think of remodeling, I
 9  think of, you know, there's going to change
10  everything, the whole makeup of it so.
11      Q     Did you ever paint anything in your
12  stores as a store manager?
13      A     Personally, no.
14      Q     Did you ever perform any repair work
15  in any of your stores as a store manager?
16      A     Yes.
17      Q     What did you repair?
18      A     I had to repair -- there's a swinging
19  door between the front end customer area and
20  where you go into the pharmacy.
21      Q     Which store was that?
22      A     7141.
23      Q     Is that the only repair you can think
24  of?
25      A     Well, I wouldn't call that a repair
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Christopher O'Brien                                        August 2, 2011

Page 232

1        A      Their availability.

2        Q      But you weren't, for example,

3   required to always schedule a part-time

4   employee for at least six hours?

5        A      No.

6        Q      Or you weren't required to ensure

7   that certain part-time employees always

8   received at least 30 hours or something like

9   that?

10       A      That hadn't come up to me, no.  I've

11  heard of it but it hasn't come to me.

12       Q      How have you heard of it?

13       A      Pat Lane.  That's the -- just now the

14  name came to me.  That's the store manager that

15  I trained for 7139.  He had an employee that he

16  would I guess when he was making, you know,

17  working out Staffworx and stuff like that, one

18  employee was -- I guess complained about --

19  what he was telling me, one employee complained

20  about how many hours he got and he actually

21  said, I got a phone call from HR saying that

22  he's considered a full-time employee.  You have

23  to at least schedule him 35 hours.

24       Q      And you'd never had that experience

25  as a store manager?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Christopher O'Brien                                    August 2, 2011

Page 233

1        A      No.

2        Q      Or no one had ever communicated that

3    guideline to you?

4        A      No.

5        Q      And you had employees who were

6    considered full time in your stores who worked

7    less than 35 hours a week?

8        A      Yes.  Now the only difference between

9    full time and part time is whether or not

10   you're going to be paid eight hours for a

11   holiday or four hours for a holiday but most of

12   the full timers had insurance and for them to

13   maintain that, they have to work 35 hours a

14   week average.

15       Q      When Mr. Gentry was your district

16   manager, was he helpful to you?

17       A      Yes.

18       Q      And how frequently was he in your

19   store?

20       A      Sometimes once a month; sometimes

21   twice; sometimes three.

22       Q      Would you say Mr. Gentry was a micro

23   manager?

24       A      I'd say all of them were.

25       Q      All of who?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Christopher O'Brien                                          August 2, 2011

Page 234

1        A      All my district managers I've
2    experienced.
3        Q      All three of them?
4        A      Yes.
5        Q      When you were a district manager at
6    Fresh Market, were you a micro manager?
7        A      No.
8        Q      And how do you say that with such
9    conviction?
10        A      You can get in the way.  If not, I am
11    just -- I was there just to support them and to
12    pass down guidelines from corporate but I
13    wasn't there to run their stores.  And if
14    they're going to fall, then they fall.  I'm
15    there to help them get picked up but I'm not
16    there to run their stores.  That's what I was
17    taught.
18        Q      At Rite Aid as a store manager, did
19    you run your stores?
20        A      No.
21        Q      And why do you say no?
22        A      Because everything I do at Rite Aid
23    when I'm there is handed to me; do this, do it
24    this way, and I don't have -- there's choices
25    that I would love to be able to make that I

Page 235

1   can't make.

2        Q    When you say everything I do is

3   handed to me, is there someone telling you

4   every day what you have to do at Rite Aid?

5        A    No.  But there is somebody every day

6   telling me what has to be done in the store and

7   if I'm the only person in the store -- if it's

8   me and the cashier, I'm the one that has to do

9   it because the cashier has to stay up front or

10   I become the cashier and they do it.

11        Q    And it's your testimony that someone

12   was telling you every day what had to be done

13   in your stores while you were a store manager?

14        A    Four out of the five days at least.

15        Q    So not every day?

16        A    No.

17        Q    When you were the opening manager,

18   did you walk your store?

19        A    Yes.

20        Q    Why?

21        A    To see how straight it is so I can

22   make a determination whether or not I have to

23   face the store and bring product forward.  I'd

24   have to look for -- I would like for holes.

25   Look and see if it's been cleaned.

Page 236

```
 1       Q     Were you looking for any safety
 2   issues?
 3       A     Yes.
 4       Q     Did you make a work list as you were
 5   walking?
 6       A     Not always.
 7       Q     Sometimes?
 8       A     Sometimes.
 9       Q     Did you use the daily chore sheet?
10       A     Sometimes.
11       Q     Did you use it in the beginning and
12   then stop using it?
13       A     No.
14       Q     Were there certain things that you
15   did as a store manager at Rite Aid that took
16   less time as you became more experienced?
17       A     Yes.
18       Q     What were those things?
19       A     I got very fast at doing plano-grams.
20   I think the time that I really felt happy was
21   when I finally figured out where the analgesics
22   they call it, the cough and cold, the hardest
23   aisle in the whole store to kind of put up
24   stock and when you finally figure it out, you
25   can look at the box and know exactly where it
```

Page 262

1      Q      They have not?

2      A      They have not.

3      Q      Has your district manager contacted

4   you with questions while you've been on leave?

5      A      No.

6      Q      Do you know what I mean when I say

7   multitasking?

8      A      Yes.

9      Q      Is it important to be good at

10  multitasking as a store manager at Rite Aid?

11     A      Yes.

12     Q      Give me an example of the type of

13  multitasking you do as a store manager at Rite

14  Aid.

15     A      There's so many different things you

16  do, I'm trying to think what would be the good

17  answer to that.  A multitasking would be if

18  you're straightening up the back room, a good

19  idea would be to have the gun with you so you

20  could at the same time as straightening up, you

21  could verify the counts on hand so that at

22  least, you know, while you're straightening up,

23  you don't end up getting the same product on

24  the truck that you already have so you're

25  killing two birds with one stone by

Page 263

```
 1    straightening it and at the same time scanning
 2    it so the warehouse knows that you have that
 3    product.
 4            Another example is when you're doing
 5    a plano-gram, you're also, you know --
 6    corporate sends you a plano-gram, they send you
 7    the tags, the whole nine yards, and I've
 8    learned that most of the time the tags they
 9    send you for the plano-grams are wrong because
10    they do price changes, too.
11            And so as you're doing -- as I do a
12    plano-gram, I usually -- they want you to take
13    the tag, stick it on the shelf, then the
14    product or actually Rite Aid's way of doing it
15    is tag the entire shelf, then put the product
16    up.
17            A multitasking for me would be I do
18    the plano-gram.  I print new tags because I
19    know the price is going to be correct, rather
20    than putting those tags up and learning later
21    that this is not 9.99 anymore.  This is 10.99.
22    We need to change it so I've already taken care
23    of that.  It's current.
24        Q    You've talked a lot about plano-grams
25    today.  Did hourly employees in your store do
```

Page 264

1    plano-grams while you were a store manager?

2         A     Yes.

3         Q     So how frequently did you elect to do

4    plano-grams yourself?

5         A     You would get -- sometimes -- well,

6    again, this calendar is a good example because

7    it would tell you when plano-grams were coming

8    but you would get sometimes in a week, a bag.

9    You get a bag every week.  And in that bag, you

10   pull it out and there's -- could be a stack of

11   plano-grams like this.

12            You could not give to it your

13   employees and say, okay, you get to do these

14   all week because you'll never get them done in

15   time that they want -- that your district

16   manager would want it done by.  You would have

17   to take the back of the store, do those

18   plano-grams.  The cashier would do the front of

19   the store where they could still keep an eye on

20   the register.

21            So in a week's time I would be

22   working on a plano-gram at least four and five

23   days unless --

24        Q     Every week?

25        A     Every week, except for there's no

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ.9361(PGG) (HBP)
Christopher O'Brien                                    August 2, 2011

Page 265

1    plano-grams during the month of -- I'm not

2    going to say December because they do send one

3    in December but usually between Thanksgiving

4    and Christmas, you have no plano-gram.

5         Q    But otherwise it's your testimony

6    that four out of five days of every week you

7    worked on plano-grams as a store manager?

8         A    To keep up, yes, you're working on

9    plano-grams.

10        Q    And are you able to tell us with any

11   certainty how many hours a week you spent on

12   plano-grams as a store manager?

13        A    No.

14        Q    Why not?

15        A    Because it would be different.

16   Sometimes I may spend two hours on this one or

17   I may spend all day on another one.  Sometimes

18   I'd have to spend three days on one plano-gram

19   and sometimes I might spend two hours Monday

20   and then the next day spent eight hours on it.

21   I couldn't tell you exactly.

22        Q    You've also talked a few times today

23   about not being able to have cashiers work on

24   plano-grams.  Did you have hourly employees in

25   your store other than cashiers?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  08Civ.9361(PGG) (HBP)
Christopher O'Brien                                      August 2, 2011

                                                              Page 347

1    Page ___ Line ___ should

2    read:_____ 7141_____

3    Reason for

4    change:___Corrected Store #___

5

6    Page_____ Line_____should

7    read:_____ Reason for

8    change:_____

9

10   Page_____ Line_____should

11   read:_____ Reason for

12   change:_____

13

14   _____

15   Signature

16   Sworn to and Subscribed before me

17   _Dawn Bryant_____, Notary Public.

18   This_24th_day of_August____, 2011.

19   My Commission Expires: MY COMMISSION EXPIRES SEPTEMBER 22, 2014

20

21

22

23

24

25