# Exhibit VV

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

YATRAM INDERGIT, on behalf of
himself and all others similarly
situated,

      Plaintiff,

                             Case No.
      – vs –                08 CV 9361 (PGG)

RITE AID CORPORATION, RITE AID OF
NEW YORK, INC., and FRANCIS OFFOR
as Aider & Abettor,

      Defendants.

----------------------------------------x

                  August 10, 2011
                  10:02 a.m.

      Deposition of MICHAEL ORLANDO, taken by
Defendants, pursuant to Notice, at the offices
Of Epstein Becker & Green, P.C., 250 Park
Avenue, New York, New York, before Linda D.
Danelczyk, a Registered Professional Reporter,
Certified Court Reporter, and Notary Public of
the States of New York and New Jersey.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.        08 CV 9361 (PGG)
Michael Orlando                                                August 10, 2011

Page 10

  1        A.    Yes.

  2        Q.    Did you receive them on your home

  3   computer?

  4                    Michael Orlando

  5        A.    Yes.

  6        Q.    Do you still own the home computer

  7   that you received those e-mails on?

  8        A.    Yes.

  9        Q.    Okay, I will ask you to produce

 10   those e-mails.

 11             MR. SINHA:  Well, to the extent

 12        that they are subject to the

 13        attorney/client privilege, we will -- we

 14        reserve not to do that.  But we'll take

 15        it under advisement.

 16        Q.    You were a store manager for Rite

 17   Aid, I believe; is that true?

 18        A.    That's correct.

 19        Q.    And you were paid a salary?

 20        A.    Yes.

 21        Q.    Were you paid a salary for all the

 22   hours that you worked?

 23        A.    No.

 24        Q.    How many hours were you not paid

 25   for?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.          08 CV 9361 (PGG)
                    Michael Orlando                              August 10, 2011

Page 11

```
 1            A.    Every hour over 50 to 55.
 2            Q.    You were paid a salary for how
 3  many hours?
 4                    Michael Orlando
 5            A.    Fifty to 55.
 6            Q.    And what's the basis of your
 7  opinion that you were paid a salary for 50 to 55
 8  hours?
 9            A.    Well, it's not an opinion, it's a
10  fact.  I would work 60 hours and I would be paid
11  for 50.
12            Q.    And what's the basis of that fact?
13            A.    That I worked it.  I would be
14  working over 50 hours.
15            Q.    Well, how do you know that your
16  salary was only limited to 50 hours?
17            A.    Because it was the same pay every
18  week.
19            Q.    Same pay every week?
20            A.    Yes, unless there was a raise or a
21  holiday or something of that nature.
22            Q.    So you received the same amount no
23  matter how many hours you worked?
24            A.    That's correct.
25            Q.    So if you worked 45 hours, you
```

Page 12

```
 1    received the same salary?

 2              A.    That's incorrect.

 3              Q.    Oh, you were docked?

 4                    Michael Orlando

 5              A.    I was asked -- told to make up for

 6    the hours that I lost.

 7              Q.    Who told you that?

 8              A.    My district manager -- well,

 9    actually, I heard that from both district

10    managers that I had, was Scott B.  I don't

11    recall his last name in full.  And Nick P.

12              Q.    If you worked 45 hours, were you

13    paid the same salary as if you worked 55 hours?

14              A.    Yes.

15              Q.    Did the weekly compensation you

16    were paid vary according to the number of hours

17    you worked?

18              A.    No.

19              Q.    You were paid a fixed salary for

20    all hours you worked; weren't you?

21              A.    Yes.

22              Q.    And is it your claim in this

23    lawsuit that you are due hours in excess of 55?

24    That you are due overtime for hours that you

25    worked in excess of 55?
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**     08 CV 9361 (PGG)
**Michael Orlando**     **August 10, 2011**

Page 272

1  cash register?

2       A.    It happened often typically in the

3  morning.  The store manager would open alone to

4                Michael Orlando

5  save some labor dollars.

6       Q.    What time did you open the store?

7       A.    Mostly 7 a.m.

8       Q.    What time did the store open to

9  the general public?

10       A.    7 a.m.

11       Q.    What time did you arrive at the

12  store to open it?

13       A.    It depends, usually 6.

14       Q.    And what time did you schedule

15  hourly associates to join you?

16       A.    It would depend on the budget that

17  week.  Typically the first one would roll in at

18  8, and perhaps the next one at 9.

19       Q.    So by 9 a.m. you generally had at

20  least two other people in the store working with

21  you?

22       A.    It depends.

23       Q.    If you opened the store?

24       A.    Not always.  That scenario was

25  common, not all the time.

Page 273

1                There were times where I would be

2    alone and with one other cashier until noon.

3            Q.    And the reason for that is?

4                    Michael Orlando

5            A.    There was not enough labor dollars

6    to put, you know, someone in earlier.

7            Q.    Approximately how many hours a

8    week of hourly associates' time did you actually

9    supervise?

10                MR. SINHA:   Object to the form.

11           A.    Sir, if you would you mind

12   rephrasing that question, I don't understand it.

13           Q.    Okay.  I can have it repeated.

14           A.    Oh, that's right, you want to try

15   that?

16           Q.    Let's try that first and then

17   I'll...

18           A.    Okay.  Okay.

19                (Whereupon, the record was read.)

20           Q.    Do you understand the question?

21           A.    No, I don't understand the

22   question.

23           Q.    Okay.

24                There may be no one in the store

25   but you from 7 a.m. to noon, but then there may

Page 274

```
 1   be five associates from noon to 7.
 2              So that from noon to 7, you were
 3   in the store at that time, you'd be supervising
 4                     Michael Orlando
 5   35 hours.
 6              Do you understand what I mean now?
 7        A.    I understand this, yes.
 8        Q.    So approximately how many hours of
 9   hourly associates' time did you supervise each
10   week?
11              MR. SINHA:  Objection to form.
12        A.    What's your definition of
13   "supervise"?
14        Q.    In the store at the same time.
15        A.    In the store at the same time?
16              100 percent of the time.
17        Q.    And approximately how many hours
18   is that?
19        A.    Well, my hours varied.  So I --
20   I -- you know, I don't know.
21              It varied so much and I didn't
22   bother calculating it because it had no meaning
23   because I wasn't being paid for it.  There was
24   no reason for me to document, so I can't give
25   you an answer.
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.        08 CV 9361 (PGG)
Michael Orlando                                                  August 10, 2011

Page 283

```
 1           A.    Yes.
 2           Q.    And "around that time" refers to
 3    about a week -- about a year ago?
 4                      Michael Orlando
 5           A.    Yes.
 6           Q.    Did you retain the letter that you
 7    received about three weeks ago?
 8           A.    No.
 9           Q.    Did you discard that letter?
10           A.    Yes.
11           Q.    And why is that?
12           A.    I didn't feel a need to have it.
13           Q.    Are there any other documents that
14    you've received pertaining to this case?
15           A.    No.
16                 MR. WEINER:  Off the record.
17                 (Whereupon, a discussion was had
18           off the record.)
19                 MR. WEINER:  I'm going to stop now
20           and ask for you to proceed.
21                 MR. SINHA:  Okay.
22                 And if you want to take a minute,
23           that will be great.
24                 THE WITNESS:  Yeah, that will be
25           good.
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08 CV 9361 (PGG)
Michael Orlando   August 10, 2011

Page 284

1              (Whereupon, a recess was taken.)

2     EXAMINATION

3     BY MR. SINHA:

4                    Michael Orlando

5          Q.    Mr. Orlando, can you tell us what

6     your day-to-day duties were as a store manager?

7          A.    Yes, it would be opening the

8     store.  Ah, making sure the cash was in the

9     registers.  Taking care of customers.  Taking

10    care of merchandise.  Planograms.  Recalls.

11    Transfers.  Price changes.  Ordering

12    merchandise.  Working through overstock.

13    Customer complaints.  Employee appraisals.

14                 That's all I can think of right

15    now.

16         Q.    You also testified that you

17    stocked shelves; is that right?

18         A.    Yes.

19         Q.    The duties such as cleaning,

20    stocking shelves, working the register, is it

21    fair to say that those were nonmanagerial

22    duties?

23         A.    Yes.

24         Q.    Can you approximate what portion

25    of your day you spent doing those nonmanagerial

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**     **08 CV 9361 (PGG)**
**Michael Orlando**     **August 10, 2011**

Page 285

```
 1    duties?
 2            A.    Seventy-five percent.
 3            Q.    And did you do these duties every
 4                  Michael Orlando
 5    day that you worked?
 6            A.    No.
 7            Q.    How frequently did you do these
 8    duties?
 9            A.    Approximately 75 percent of my
10    work week.
11            Q.    And did you consider doing these
12    nonmanagerial duties to be part of your regular
13    duties?
14            A.    No.
15            Q.    You were shown a job description
16    of a store manager, which is Exhibit 7.
17                  Did you see any of those
18    nonmanagerial duties listed in that job
19    description?
20            A.    No.
21            Q.    When you were doing these
22    nonmanagerial duties -- strike that.
23                  Did your performing these
24    nonmanagerial duties affect how you were able to
25    run the store?
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**        08 CV 9361 (PGG)
**Michael Orlando**                                August 10, 2011

Page 286

```
 1            A.    Yes.

 2            Q.    How so?

 3            A.    Well, for an example, if I was

 4                  Michael Orlando

 5    doing a seven-hour planogram, I could do very

 6    little else, but do the seven-hour planogram.

 7            Q.    Any other way?

 8            A.    If I was doing six or seven hours

 9    of price changes, I could do very little else

10    but the price changes.

11            Q.    Did your performing these

12    nonmanagerial duties affect your ability to

13    supervise staff?

14            A.    Yes.

15            Q.    How so?

16            A.    Well, again, if I was in an aisle

17    for several hours doing whatever, I -- I

18    couldn't really see what the employees were

19    doing to properly evaluate them, or supervise

20    them.

21            Q.    Before you were asked about profit

22    and loss statements, and I believe you testified

23    that you didn't have a lot of time to review

24    them; is that right?

25            A.    Yes.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**          **08 CV 9361 (PGG)**
**Michael Orlando**                                                  **August 10, 2011**

 1          Q.    And would that also be because you
 2   spent a lot of your time doing the nonmanagerial
 3   duties?
 4                    Michael Orlando
 5          A.    Yes.
 6          Q.    Did the assistant store managers
 7   also perform these nonmanagerial duties?
 8          A.    Yes.
 9          Q.    Can you approximate what portion
10   of their day they spent doing these duties?
11          A.    Almost all of it.
12          Q.    At Rite Aid, who made the final
13   decision regarding hiring employees?
14          A.    I don't know.
15          Q.    Did you make the final decision?
16          A.    No.
17          Q.    Who made the final decision
18   regarding terminating employees?
19          A.    I don't know.
20          Q.    Did you make the final decision?
21          A.    No.
22          Q.    You made recommendations for
23   hiring and firing?
24          A.    Yes.
25          Q.    And who did you make that

Yatram Indergit, et al. v. Rite Aid Corporation, et al.          08 CV 9361 (PGG)
                    Michael Orlando                              August 10, 2011

                                                                     Page 288

 1    recommendation to?

 2              A.    The district office.

 3              Q.    Who made the final decision

 4                    Michael Orlando

 5    regarding disciplining employees?

 6              A.    I don't know.

 7              Q.    Did you have the final decision in

 8    disciplining employees?

 9              A.    No.

10              Q.    Who made the final decision

11    regarding promoting employees?

12              A.    I don't know.

13              Q.    Did you have -- did you make the

14    final decision regarding promotions?

15              A.    No.

16              Q.    Who made the final decision

17    regarding evaluation of employees?

18              A.    I did the evaluation.

19              Q.    And did you -- strike that.

20                    And did you need any sign off from

21    corporate or the DM on those evaluations?

22              A.    Yes.

23              Q.    Who made the final decision in

24    setting your store's payroll?

25              A.    I have no idea.

Page 289

```
 1              Q.    Was it you?

 2              A.    No.

 3              Q.    Who made the final decision in

 4                    Michael Orlando

 5    setting your store's budget?

 6              A.    I don't know.

 7              Q.    Was it you?

 8              A.    No.

 9              Q.    Were you able to change the

10    budget?

11              A.    No.

12              Q.    Who made the -- strike that.

13                    Previously you testified that you

14    could schedule overtime for employees; is that

15    right?

16              A.    For some period of time, that's

17    correct.

18              Q.    Did you need to get approval from

19    the district manager or corporate for that?

20              A.    During some periods of time, yes.

21              Q.    You also talked about Staffworks.

22                    Can you briefly tell me how

23    Staffworks operated?

24              A.    They would have your amount of

25    hours that you were allowed versus on the
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**   08 CV 9361 (PGG)
**Michael Orlando**   August 10, 2011

Page 290

1   computer's theory of what your sales were going

2   to be.  And then you would type in the schedule

3   that fit within those guidelines.

4                    Michael Orlando

5            Q.    So is it fair to say that the

6   operation of Staffworks affected your ability to

7   schedule employees?

8            MR. WEINER:  Objection as to form.

9   A.    Yes.

10            Q.    Who do you believe was ultimately

11   responsible for profitability at your store?

12            A.    Ultimately responsible?  Mary

13   Sammons.

14            Q.    Who is Mary Sammons?

15            A.    The president of the company.

16            Q.    And why do you think that?

17            A.    Because she's the president of the

18   company and I would have to assume that

19   budgeting starts somewhere in that area.

20            Q.    And you weren't able to change the

21   budget, right?

22            A.    Correct.

23            MR. WEINER:  Objection as to form.

24            Q.    And doesn't budgeting affect

25   profitability?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.          08 CV 9361 (PGG)
Michael Orlando                                      August 10, 2011

Page 291

1          A.    Can you please rephrase that?

2          Q.    Doesn't the budget for a

3     particular store affect how profitable it will

4                    Michael Orlando

5     be?

6                    MR. WEINER:  Objection as to form.

7          A.    Yes.

8          Q.    You mentioned that you trained

9     several stores, correct?

10         A.    Yes.

11         Q.    And that included -- correct me if

12    I'm wrong -- Rhode Island, Connecticut, New

13    Jersey, New York, New Hampshire; is that right?

14         A.    Yes.  Yes, I'm not positive about

15    New York, I think I was in one, but I don't

16    recall.

17         Q.    Was there any differences in how

18    you trained a manager in any of those different

19    stores?

20         A.    No.

21         Q.    Did you apply the same system of

22    policies or procedures for training Rite Aid

23    managers at those stores?

24         A.    Yes.  It was a book.

25         Q.    And you trained those managers

**Page 297**

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3                  Michael Orlando

 4          I, MICHAEL ORLANDO, do hereby

 5      acknowledge that the same is a true,

 6      correct and complete transcription of the

 7      testimony given by me, and any corrections

 8      appear on the attached errata sheet signed

 9      by me.

10

11

12      _____      _____

13      (Date)                        (Signature)

14

15

16

17

18

19

20

21

22

23

24

25
```

# Exhibit WW

Case 1:08-cv-09361-JPO-HBP   Document 213-18   Filed 01/22/13   Page 20 of 102

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**            **1:2008cv09361**
**Philip David Palumbo**                                               **July 26, 2011**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


YATRAM INDERGIT, on Behalf

of Himself and Others

Similarly Situated

          Plaintiff              Civil Action No.:

vs.                              1:2008cv09361

RITE AID CORPORATION, RITE

AID OF NEW YORK, INC. and

FRANCIS OFFOR as Aider &

Abettor

          Defendants

_____/



        The deposition of PHILIP DAVID PALUMBO was

held on Tuesday, July 26, 2011, commencing at 10:00

a.m., at the Offices of Gore Brothers Reporting &

Videoconferencing, 20 South Charles Street, Suite 901,

Baltimore, Maryland 21201, before R. Dwayne Harrison,

Notary Public.


REPORTED BY: R. Dwayne Harrison

Page 68

```
 1        A      I don't believe you could.  I believe it
 2   was just a generic "this number is unavailable."
 3        Q      So we don't really know if this person
 4   knows that she's been terminated?
 5               MS. SCOTT:  Objection to form.
 6        A      I'm sorry?
 7        Q      Do you know whether Nemwen knows if she's
 8   been terminated?
 9        A      We don't know.  We hope the best for her.
10   Nobody has seen her or heard from her.
11        Q      Well, how about a termination that did
12   involve some interaction?  What's the most recent that
13   you can think of where the person knew they were being
14   terminated?
15        A      That would be Nicole Sheehan.
16        Q      And what happened there?
17        A      She sold cigarettes to a minor in front of
18   an undercover cop.
19        Q      Were you there at the time?
20        A      Yes.
21        Q      Tell me what happens just from top to
22   bottom.
23        A      Okay.  A young lady comes in.  I didn't see
24   the young lady.  She presents ID and, unfortunately,
25   Nicole is blind in one eye, so she didn't really -- she
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**   **1:2008cv09361**
**Philip David Palumbo**   **July 26, 2011**

Page 69

```
 1   typed in, I believe it was, '82 and it should have been

 2   '92.  She typed in the right month and day but not the

 3   right decade which prompts on the register.  She sold

 4   the cigarettes to the young lady.  The young lady

 5   leaves.  The undercover officer immediately says I need

 6   the $20 that's highlighted because they know what

 7   currency she used.

 8            We watch.  They notified me.  I came up

 9   front.  We went to the office and he basically said

10   you're getting a ticket for -- you have a court

11   appearance, you know, this is the information and so

12   forth, and gave her a ticket.  And from there I

13   suspended her and then talked to human resources and

14   human resources made a decision that she's no longer

15   going to be employed with us.  And I had to call her

16   back and inform her of that.  This was February, maybe,

17   March, maybe, of this year.

18       Q    Did she appeal that?

19       A    No.

20       Q    Did you think she should have been

21   terminated?

22            MS. SCOTT:  Objection, form.

23       A    Do I think she should have been terminated?

24   Yes.

25       Q    Why?
```

Page 70

1        A       Do I feel bad -- why?  Because she broke

2    the law.

3        Q       Even though she was blind in one eye?

4        A       She broke the law.  I think it was an

5    honest mistake but, unfortunately, the honest mistake

6    broke the law.

7        Q       And you think that warrants termination?

8        A       Yeah, and after all the amounts of training

9    that we go through yearly on how to handle tobacco

10   transactions.  It's reviewed over and over again.

11       Q       Because of incidents like this, right?

12       A       Of course.

13       Q       Is that the only time you've ever had an

14   undercover cop come in?

15       A       No.  They do it quite frequently, actually.

16       Q       If everything goes well, do you know

17   whether they come in?

18       A       Yes.

19       Q       How?

20       A       They actually give you a certificate.

21       Q       Like a trophy?

22       A       Not exactly a trophy.  It's just a printout

23   and then it puts the date in and the cashier's name and

24   it says, you know, congratulations.  And a few years

25   ago, before that, they used to give, like, a ten-dollar

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**  1:2008cv09361
**Philip David Palumbo**  July 26, 2011

Page 71

1   gift card to Domino's Pizza.  I swear.

2          Q     The cops gave you a ten-dollar --

3          A     Not to me, to the cashier who handled the

4   transaction.

5          Q     Okay.  I was not aware of that affiliation

6   between the cops and Domino's Pizza.

7          A     And Domino's Pizza, yeah.  They don't do

8   that anymore, though.

9          Q     Okay.  So was that the only time in any of

10  your stores that you failed?

11         A     No.

12         Q     What other time?

13         A     I would say probably five to seven years

14  ago -- what was her name?  Mary Oliver also sold

15  cigarettes to a minor.

16         Q     Was she fired?

17         A     No.

18         Q     Why?

19         A     That was reviewed by human resources again.

20  She was a minor, so they wanted her retrained and did

21  not -- and disciplined but not fired.

22         Q     Did you think she should have been fired?

23         A     Yes.

24         Q     Because she broke the law?

25         A     Yes.

Page 72

1        Q       So you didn't agree with HR?

2        A       I understood where they were coming from

3   because she was a minor.

4        Q       Was she pretty inexperienced at the company

5   at that time?

6        A       I'd say so.  Although I'm sure she received

7   the proper training as far as tobacco sales.

8        Q       Did you have to make sure that all the

9   associates in your stores received that draining?

10       A       Yes.

11               MS. SCOTT:  Objection, form.

12       Q       How did you do that?

13       A       It's tracked through a computer system.

14   They call it CBT, it's computer-based training.

15       Q       How do you make sure that the associates

16   actually go through with it?

17               MS. SCOTT:  Objection, form.

18       A       Go through with it as far as not sell

19   cigarettes to minors or do the training?

20       Q       Do the training.

21       A       That will show up in an exception report

22   that you can print off of the Rite Aid portal which is

23   kind of the Windows-based information screens.

24               MS. SCOTT:  Counsel, we've been going for

25   almost an hour half.  Do you mind if we take a break?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**          **1:2008cv09361**
**Philip David Palumbo**                                              **July 26, 2011**

Page 99

```
 1         Q     In terms of experience level, are they
 2    comparable?
 3               MS. SCOTT:  Object to form.
 4         A     Aradnha has a little more experience, I
 5    think, overall.  Larry just returned to the company
 6    about six months ago, but he has a lot of previous
 7    experience with Rite Aid.
 8         Q     Are either of them interested in getting
 9    promoted?
10         A     Yes.
11         Q     Both of them?
12         A     No.
13         Q     Which one?
14         A     Larry.
15         Q     Why isn't Aradnha interested?
16         A     She's actually been offered that
17    possibility to take the next step and she feels she's
18    not ready for it.
19         Q     Do you agree with her?
20         A     I disagree in the fact that I think if she
21    had her own store she would be quite capable.
22         Q     Have you encouraged her to try to take
23    that?
24         A     Yes.
25         Q     And what does she say to you?
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**     **1:2008cv09361**
**Philip David Palumbo**     **July 26, 2011**

Page 100

```
 1        A      No.

 2        Q      She just doesn't feel like she's ready?

 3        A      She doesn't feel she's ready, no.

 4        Q      What shifts do they typically work?

 5               MS. SCOTT:  Objection to form.

 6        A      They usually work either, like, say -- I

 7   guess they're on nine-hour days which kind of

 8   fluctuates.  They usually work between 8:00 to 5:00

 9   sometimes and then they also close which would be,

10   like, a 3:00 to midnight.  Sometimes it's, you know,

11   10:00 to 8:00 or something along those lines.  It's not

12   an exact science with the way that the scheduling tool

13   is put together.

14        Q      Do you write the schedule?

15               MS. SCOTT:  Objection to form.

16        A      I use a scheduling tool to create the

17   schedule.

18        Q      Staffworks?

19        A      No.  That's the old one.

20        Q      Okay.  What's the new one called?

21        A      The new one is called Workforce Management.

22        Q      When did that change happen?

23        A      Quite some time ago.  Let me think.  Let me

24   think.  Again, I'm taking an educated guess.  I'm going

25   to say two years ago.
```

Page 101

```
 1        Q     Do you think that was an improvement on
 2   Staffworks?
 3              MS. SCOTT:  Objection to form.
 4        A     It definitely was the same type program in
 5   a Windows format which I do think it's an improvement.
 6        Q     Just visually or did it also help
 7   efficiency-wise?
 8        A     I'd say it would be pretty comparable.
 9   Visually, it was a much better program and as far as
10   the hands-on use, it's a little more user friendly, I
11   guess you could say.
12        Q     Anybody else other than you do the schedule
13   in your store right now?
14        A     Not usually.  Larry and Aradnha both have
15   been trained on how to.
16        Q     But have they ever done it for you?
17        A     Larry has in his training because I trained
18   him.  Aradnha, I believe, has in the past as well.
19        Q     Under what circumstances would they do the
20   schedule?
21        A     If I were to take a vacation week and not
22   prepare two weeks of schedule, they could do it.
23        Q     Do you ever do that?
24        A     No.  I usually make it myself.  I usually
25   do it two weeks in advance.
```

Page 182

1    comfortable interviewing anybody and, again, it would

2    be -- if they did interview them, I would probably more

3    than likely want to interview them again before they

4    were hired which, to be honest with you, is like double

5    work.

6            On the other hand, if an assistant manager

7    came to me and said I want to learn how to do this, let

8    me do this, I would be more than welcome to coach them

9    and mentor them and let them actually physically go

10   through the applications.  It's not a very fun job.  It

11   really isn't.  I'll be honest.

12       Q    And so you don't often have assistant

13   managers ask to do it because it's not very fun?

14       A    No.

15       Q    Is there a similar process with regard to

16   promoting people like an interview or a screening?

17            MS. SCOTT:  Objection, form.

18       A    Could you repeat?  Is that like an internal

19   promotion?

20       Q    Yes.

21       A    There is a -- yes, there is.  There is

22   another background check and urinalysis.

23       Q    And what?

24       A    A drug test, urinalysis.

25       Q    I wasn't sure if you said your analysis.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.                    1:2008cv09361
Philip David Palumbo                                                       July 26, 2011

Page 183

1       A       No.  I'm sorry.  I'll just call it a drug
2   test.  Sorry.
3       Q       Okay.  So another background check and drug
4   test but not necessarily an interview?
5       A       Yes.  There's a structured interview for
6   associates that would like to become a shift
7   supervisor.
8       Q       And you conduct that interview as well?
9               MS. SCOTT:  Objection, form.
10      A       Yes.  Excuse me.  I'd like to clarify that.
11      Q       Sure.
12      A       There's a structured interview that I do
13  and there's a structured interview that the district
14  manager does.
15      Q       For shift supervisors?
16      A       Yes.
17      Q       So you do the first interview and the DM
18  does the second?
19      A       Yes.
20      Q       Do you know if it works that way in all
21  districts?
22              MS. SCOTT:  Objection, form.
23      A       To my knowledge, that's the way the company
24  policy should be.
25      Q       But you're not sure?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**     **1:2008cv09361**
**Philip David Palumbo**                              **July 26, 2011**

Page 184

1     A     I couldn't answer for any other district.

2     Q     Does the district manager interview the

3   candidate regardless of whether you like the candidate

4   or not or does it depend on the result of your

5   interview?

6             MS. SCOTT:  Objection, form.

7     A     I think mine would be the preliminary

8   interview.  So if they're not material to be promoted,

9   at least at that point in time or not a consideration,

10  that the district manager probably would not interview

11  them in most cases.

12    Q     You mentioned earlier that the district

13  manager needed to interview some assistant manager

14  candidates and, if you like the assistant manager

15  candidate, they generally trust you.

16            Is that also true of the shift supervisor

17  candidates?

18            MS. SCOTT:  Objection, form.

19    A     My district manager would trust my

20  judgment?

21    Q     Yes.

22    A     Yes, I think he'd trust my judgment.

23    Q     Has he ever gone the other way on somebody?

24            MS. SCOTT:  Objection, form.

25    A     Not that I can recall.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**      **1:2008cv09361**
**Philip David Palumbo**      **July 26, 2011**

Page 303

1          MS. PUCKETT:  Okay.

2   BY MS. PUCKETT:

3      Q     Mr. Palumbo, are there any other facts that

4   we have not discussed today that relate to the lawsuit?

5          MS. SCOTT:  Objection.  Asked and answered.

6      Q     You can answer.

7      A     I really don't -- I'm sure there's -- you

8   can ask me -- I mean, you're really, honestly, asking

9   me what I feel are bizarre off-the-wall questions about

10   my daily activities and things that I've experienced

11   and I really don't see how this has anything to do with

12   any type of lawsuit, but apparently it does.

13      Q     Okay.  Was your pay ever docked at

14   Rite-Aid?

15          MS. SCOTT:  Objection, form.

16      A     I cannot remember any situations where I

17   had my pay docked.

18      Q     Has your testimony been complete and

19   accurate today?

20      A     Yes.

21          MS. PUCKETT:  have no further questions.

22          MS. SCOTT:  If I could just have five

23   minutes...

24          (There was a brief recess taken at 5:04 and

25   the deposition resumed at 5:13 p.m.)

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**          **1:2008cv09361**
**Philip David Palumbo**                                              **July 26, 2011**

Page 304

```
 1              EXAMINATION BY MS. SCOTT:
 2      Q      All right.  Mr. Palumbo, I'm going to ask a
 3  series of questions now just to follow up on what
 4  opposing counsel has asked you.
 5              What duties that you complete as a store
 6  manager would you consider to be non-managerial?
 7      A      Non-managerial?  Processing film; printing
 8  film; ringing register; stocking shelves; moving
 9  freight; cleaning toilets; cleaning parking lots;
10  mopping floors; probably taking out trash; putting
11  returns back on the shelf; organizing stock rooms;
12  organizing ad goods; building end caps; filling aisles
13  in with overstock.  That's a lot of manager --
14  non-managerial duties that are done.
15      Q      And what percentage of your time would you
16  consider -- strike that.
17              What percentage of your time as a store
18  manager is spent doing non-managerial tasks?
19      A      A percentage?  If I were to guess, on an
20  average week, I would say about 80 percent, possibly
21  85.
22      Q      Do assistant store managers also complete
23  these non-managerial tasks?
24      A      Yes.
25      Q      What is the difference in job duties and
```

Page 305

```
 1    tasks between an assistant store manager and a store

 2    manager at Rite-Aid?

 3                MS. SCOTT:  Objection to form.

 4         A    They're the same.  They're the same duties.

 5    The biggest difference would be, I guess, the overall

 6    accountabilities of the store manager.

 7         Q    But you would say that an assistant store

 8    manager and store manager basically complete the same

 9    tasks?

10         A    Yes.  When I'm on vacation, I expect my

11    assistant managers to complete the tasks.  The business

12    goes on.  I mean, it has to get done.

13         Q    Are assistant store managers paid hourly or

14    are they salaried?

15         A    They are hourly now.

16         Q    Were they ever salaried?

17         A    Yes.

18         Q    When did that change?

19         A    I don't know the exact date.  If I were to

20    guess, I would say about 18 months ago, possibly two

21    years ago.

22         Q    And are they still -- are assistant store

23    managers still completing the same tasks and duties as

24    store managers at Rite-Aid?

25         A    Yes, but they don't have a 50-hour work
```

Page 306

1    week.   They're based on a 45-hour work week that

2    involves 40 hours of regular time and five hours of

3    overtime.

4         Q     So assistant store managers are paid five

5    hours of overtime every single week; is that correct?

6         A     I wouldn't say that's correct.  Their work

7    is based on that.  For example, if they work less than

8    that, they won't make the same amount.  If they work

9    more that, they'll more than that.

10        Q     So if assistant store managers work over 45

11   hours they get paid overtime for that time?

12        A     Yes.  Anything over the 40 hours they work

13   they will get overtime for.

14              MS. SCOTT:  That's all I have.

15              EXAMINATION BY MS. PUCKETT:

16        Q     Just to followup, while -- during the

17   80 percent of your time that you say that you're

18   performing non-managerial duties you described, you are

19   still in charge of the store, right?

20              MS. SCOTT:  Objection, form.

21        A     As far as ultimate responsibility?

22        Q     Yes.

23        A     Ultimately, yes, I would say I'm the person

24   in charge of the store.

25        Q     And that's no less true because you're

Page 307

 1   stocking a shelf, right?

 2              MS. SCOTT:  Objection, form.

 3       A     I say that's -- I would say that, yes, I'm

 4   still the one that's in charge.

 5       Q     Do you understand the term "lead by

 6   example?"

 7       A     Yes, I do.

 8       Q     Do you believe in it?

 9       A     Whole-heartedly.

10       Q     Tell me about lead by example.

11       A     Lead by example is what I feel I portray to

12   the most of my employees.  I would never ask anybody to

13   do something that I'm not willing to do.

14       Q     And why do you think that is an effective

15   managerial technique?

16              MS. SCOTT:  Objection, form.

17       A     It sets a good example.

18       Q     Would you say that your employees are more

19   motivated to clean a bathroom if they know that you

20   would clean a bathroom?

21              MS. SCOTT:  Objection, form.

22       A     I wouldn't say necessarily motivated.  I

23   would say probably willing to if they know that I

24   cleaned it last time, maybe somebody else can do it

25   this time.

Page 311

1                    CERTIFICATE OF DEPONENT

2

3          I hereby certify that I have read and

4    examined the foregoing transcript, and the same is a

5    true and accurate record of the testimony given by me.

6

7          Any additions or corrections that I feel

8    are necessary, I will attach on a separate sheet of

9    paper to the original transcript.

10

11

12                    _____

13                    PHILIP DAVID PALUMBO

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit XX

Page 1

IN  THE  UNITED  STATES  DISTRICT  COURT

FOR  THE  SOUTHERN  DISTRICT  OF  NEW  YORK


YATRAM INDERGIT, on Behalf

of Himself and Others

Similarly Situated

        Plaintiff         Civil Action No.:

vs.                      1:2008cv09361

RITE AID CORPORATION, RITE

AID OF NEW YORK, INC. and

FRANCIS OFFOR as Aider &

Abettor

        Defendants

_____/


        The deposition of CHRISTOPHER B. PAUL was

held on Thursday, July 21, 2011, commencing at 9:30

a.m., at the Offices of Gore Brothers Reporting &

Videoconferencing, 20 South Charles Street, Suite 901,

Baltimore, Maryland 21201, before Susan M. Wootton,

Notary Public.


REPORTED BY: Susan Wootton, RPR, CLR

Page 137

1    store, moved to quite a bit higher volume, I proposed a

2    raise to him.

3              Then he kind of went away.  Then I went

4    through the remodel.  Eventually the regional vice

5    president gave me a raise, so --

6         Q    Was that while Garrett was your district

7    manager?

8         A    It was while, I guess Larry technically was

9    my district manager at the time.

10        Q    Okay.  So backing up for a minute, you had

11   also asked Rick for a raise?

12        A    Yes.

13        Q    And what did he say?

14        A    He said, it will take three to six months

15   of a trial basis at the store to see if you can make

16   it.

17        Q    At 934?

18        A    Correct.

19        Q    Okay.  And then, what was the raise that

20   you were given by an RVP at 934?

21        A    How much?

22        Q    Yes.

23        A    $10,000.

24        Q    Was that before or after the remodel?

25        A    After.

Page 138

```
 1        Q      Okay.  So then, any conversations that you
 2   had with Garrett about the hours you worked or your
 3   compensation?
 4               MS. SCOTT:  Objection to form.
 5               THE WITNESS:  He wasn't very responsive to
 6   it, almost shrugged it off.
 7        Q      What did he say?
 8        A      You know, one time I remember specifically
 9   he said, you know how many hours I work in a week?
10        Q      Do you remember anything else he said?
11        A      No.  I mean eventually I quit saying stuff
12   to him about it.  It was always almost a shrug off.
13        Q      How did the hours you worked at 944 compare
14   to the hours you worked at 934 as a store manager?
15        A      Probably 55 to 60 at 944, and probably 60
16   to 65, maybe more, 65 to 70 at 934.
17        Q      When you became an assistant store manager,
18   you were paid on a salary basis, is that correct?
19        A      After I completed my 12-week training, I
20   went to salary yes, I did.
21        Q      Once you became a salaried assistant store
22   manager, did you have an understanding that you would
23   receive the same pay regardless of the number of hours
24   you worked?
25        A      Yes, that my salary would be the same each
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**   **1:2008cv09361**
**Christopher B. Paul**   **July 21, 2011**

Page 139

1    week, yes.

2         Q    And it was the same each week, wasn't it?

3         A    It was.

4         Q    Do you remember how much it was when you

5    were an assistant store manager?

6         A    I started at twenty-seven five, which

7    ironically was $10.20 an hour, where I was making

8    $11.75 when I was hourly.

9         Q    And did it change while you were an

10   assistant store manager?

11        A    Did my pay rate change?

12        Q    Your salary.

13        A    I think it might have been one yearly raise

14   in there, which was $1,000 maybe.

15        Q    And then, when you became a store manager,

16   did your salary change?

17        A    Yes.

18        Q    To what?

19        A    39, 9.

20        Q    Then you said you got the first increase

21   from an RVP at 934?

22        A    I got one raise while I was at 944 to get

23   to like 41, 40, 41.

24        Q    Okay.  And then you got a raise at 934 to

25   51?

Page 146

1    store manager?

2        A     For a good amount of time, yes, yes, ma'am.

3        Q     Okay.  So look back at page 1, and I want

4    you to read through the essential duties and

5    responsibilities.

6              And it starts with, the associate is

7    responsible for the functions below, and so I want you

8    to let us know, after you read through 1 through 9, if

9    there are any functions listed there that you were not

10   responsible for as a store manager at Rite Aid?

11       A     Okay.  Nothing with one.

12       Q     When you say nothing with one, you were

13   responsible for number 1?

14       A     Correct.  That's accurate.

15       Q     Okay.

16       A     Two, we were responsible for that.  Three,

17   we were responsible for that.  It changed to Workforce

18   Management.

19             The program changed from Staffworks to

20   Workforce Management, a different program called

21   Workforce Management.

22             Number 4, that's correct.  Number 5 is

23   correct.  Number 6 is correct.

24             Number 7 is correct with additional

25   district manager direction, I would say.  Number 8 is

Yatram Indergit, et al. v. Rite Aid Corporation, et al.                    1:2008cv09361
                          Christopher B. Paul                              July 21, 2011

Page 147

1    correct.

2              Number 9 is correct, except for the hiring

3    portion.  We were able to hire cashiers but not as

4    supervisor or management.

5         Q    You did not hire any shift supervisors as a

6    store manager at Rite Aid?

7         A    I did not hire.

8         Q    And you did not hire any assistant store

9    managers while you were a store manager at Rite Aid?

10        A    I did not hire.  I did do paperwork, but it

11   went through the DM.  The DM did final say on all

12   management.

13        Q    Did you ever interview a shift supervisor

14   candidate?

15        A    Yes.

16        Q    And which store did that happen in?

17        A    934.

18        Q    Was that a candidate that you favored?

19        A    I didn't favor -- at the end of the

20   interview, there were several.

21             I was actually, we would have people come

22   in at certain times, and I would be one of the

23   interviewers.  The pre-interviewers were the DM.

24        Q    Would you give your recommendation as to

25   whether or not the person should be hired?

Page 148

```
 1        A      Yes.
 2        Q      Do you recall whether any of those people
 3   were hired that you recommended be hired?
 4        A      Some were.
 5        Q      Were there some that you recommended be
 6   hired who were not hired?
 7        A      Yes.
 8        Q      Were there any that you recommended not be
 9   hired who were hired?
10               MS. SCOTT:  Objection to form.
11               THE WITNESS:  Nope.
12        Q      If we go back to number 7 for a second, on
13   Exhibit 1, you said, with additional DM direction.
14               By that, do you mean your DM's also had
15   certain merchandise standards?
16        A      The DM would come to your store and have
17   you frequently change or adjust or different things.
18        Q      Adjust what had been communicated by the
19   corporate planograms?
20        A      Yes, for instance, in the seasonal
21   department, how to flex and add something to what
22   corporate wanted.
23        Q      Were there times, as a store manager, that
24   you talked with your DM about making adjustments to
25   corporate planograms that you thought would be helpful?
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**               **1:2008cv09361**
**Christopher B. Paul**                                                    **July 21, 2011**

Page 215

1       Q     And this is a performance appraisal dated

2    March 23rd, 2007, that you received from Rick Chapman?

3       A     Yes.

4       Q     And then the last page includes your

5    self-appraisal, is that right?

6       A     Yes.

7       Q     I just want you to look at the first page.

8    Again, at which store were you at in March of 2007?

9       A     This should be South Hills.

10       Q     944?

11       A     Yes.  Yes.  I had been there about three or

12    four months.

13       Q     And it shows that that store also came in

14    for payroll under the budgeted payroll for the year,

15    correct?

16       A     Correct.

17             MS. BARBAREE:  Thank you for your time,

18    Mr. Paul.

19             THE WITNESS:  Thank you.

20             EXAMINATION BY MS. SCOTT:

21       Q     Mr. Paul, I'm going to be asking you some

22    questions now.

23       A     Okay.

24       Q     Which of your duties that you performed, as

25    a store manager at Rite Aid, would you consider

Page 216

1    nonmanagerial?

2                    MS. BARBAREE:  Objection to form.

3                    THE WITNESS:  Nonmanagerial would be

4    unloading trucks, unloading liquor trucks, putting up

5    stock, recalls, price changes.

6                    MS. SCOTT:  Would you consider cleaning a

7    nonmanagerial task?

8                    MS. BARBAREE:  Objection to form.

9                    THE WITNESS:  Nonmanagerial, absolutely.

10                   MS. SCOTT:  Would you consider working the

11   register, cash register a nonmanagerial task?

12                   MS. BARBAREE:  Objection to form.

13                   THE WITNESS:  Nonmanagerial, yes, I agree.

14                   MS. SCOTT:  Are there any other duties that

15   you would consider nonmanagerial?

16                   MS. BARBAREE:  Objection to form.

17                   THE WITNESS:  Running the registers,

18   cleaning, putting up stock, doing planograms, setting

19   seasonal, putting up stock, I think that I already said

20   that, liquor truck, unloading trucks.  That's probably

21   it.

22                   MS. SCOTT:  On an average week, how many

23   hours would you work in the store as a store manager?

24                   MS. BARBAREE:  Objection to form.

25                   THE WITNESS:  Average about 65.

Page 217

1          MS. SCOTT:  What percentage of those 65

2   hours would you spend doing nonmanagerial tasks?

3          MS. BARBAREE:  Objection to form.

4          THE WITNESS:  50 to 60.

5          MS. SCOTT:  How frequently would you do

6   nonmanagerial tasks?

7          MS. BARBAREE:  Objection to form.

8          MS. SCOTT:  Would you do them every day?

9          MS. BARBAREE:  Objection to form.

10          THE WITNESS:  Daily.

11          MS. SCOTT:  To your knowledge, are these

12   tasks a part of your job description?

13          MS. BARBAREE:  Objection to form.

14          THE WITNESS:  Yes.  They were not written

15   in the job description but expected.

16          MS. SCOTT:  Okay.  If you look at Exhibit 1

17   or what's been previously marked as Exhibit 1, the

18   store manager job description --

19          THE WITNESS:  Bear with me.

20          MS. SCOTT:  -- do you see any of those

21   nonmanagerial tasks that you just described written on

22   there anywhere?

23          MS. BARBAREE:  Objection to form.

24          THE WITNESS:  Nope.

25          MS. SCOTT:  Why would you say that they're

Page 218

1    considered part of your job description?

2              MS. BARBAREE:  Objection to form.

3              THE WITNESS:  Because of the way that it

4    was created there was nobody else to do it.

5              MS. SCOTT:  How did doing these

6    nonmanagerial duties affect the way that you were able

7    to manage your store?

8              MS. BARBAREE:  Objection to form.

9              THE WITNESS:  It left you less time to

10   examine things such as your P&L to get your operating

11   expenses under, to manage your sales, to do additional

12   things, incremental items, creativity.

13             I think you lose a lot of that by doing

14   those.

15             MS. SCOTT:  Would it be fair to say that

16   doing these, or being required to do these

17   nonmanagerial tasks took away from the time that you

18   had to do your managerial tasks?

19             MS. BARBAREE:  Objection to form.

20             THE WITNESS:  Yes.

21             MS. SCOTT:  Did Rite Aid expect that you

22   still supervise your store while you were engaged in

23   nonmanagerial tasks?

24             MS. BARBAREE:  Objection to form.

25             THE WITNESS:  Yes.

Page 219

1              MS. SCOTT:  Were you able to fully
2    supervise your staff when you were having to do these
3    nonmanagerial tasks?
4              MS. BARBAREE:  Objection to form.  To the
5    best of my ability, yes, but not, I wouldn't say fully,
6    no.
7              MS. SCOTT:  For instance, if you were in
8    the back unloading a truck, would you be able to
9    supervise your cashiers at the register?
10             MS. BARBAREE:  Objection to form.
11             THE WITNESS:  No.
12             MS. SCOTT:  Did the assistant store
13   managers also perform nonmanagerial tasks?
14             MS. BARBAREE:  Objection to form.
15             THE WITNESS:  Yes, they did.
16        Q    When Tracey was asking you some questions
17   earlier, you talked about negative hours when punching
18   in and out of the time clock.
19             Can you explain what you meant by negative
20   hours?
21        A    The way the salary structure is built you
22   only punch once, so essentially at the end of the week
23   it will say 50 hours as your salary base.
24             If you were to punch in and out every day
25   and work to an extent that is above that 50 hours,

**Page 220**

 1   because it does track your time, it shows up as a

 2   negative number.

 3                For instance, if I were to work 65 hours

 4   even, it would come up as negative 15.

 5        Q     You mentioned earlier that, instead of,

 6   occasionally instead of putting in a maintenance

 7   request, you would just do the maintenance yourself?

 8        A     Yes.

 9        Q     Why would that be?  Why would you do the

10   maintenance?

11        A     One, it would save money, two, it would

12   save time, and that's usually the reason why, or it was

13   something silly that you would pay to call out a

14   hundred bucks for, that you could do by going to the

15   hardware store for five.

16        Q     It would help profitability of your store?

17        A     Absolutely.

18        Q     Would you consider these maintenance tasks

19   nonmanagerial tasks?

20                MS. BARBAREE:  Objection to form.

21                THE WITNESS:  Yes.

22        Q     You mentioned that keeping the store clean

23   was one of the top three priorities for you at all

24   times.

25                What tasks would you do or what tasks would

Page 230

1   long as they passed through the drug test, the

2   background check, I had the final say, and we had to

3   check also our payroll system to make sure they were

4   either hirable or rehirable.

5            If they got through those, then I did, I

6   was able to hire cashiers.  Any managerial function job

7   or promotion went through the district manager and

8   human resources manager.

9            MS. SCOTT:  For the cashier positions, did

10  HR run the background check?

11           MS. BARBAREE:  Objection to form.

12           THE WITNESS:  We would fill out a

13  background check form and fax it in, I think to a third

14  party company.

15           MS. SCOTT:  If that background check came

16  back as having some sort of criminal background, would

17  it automatically not allow you to hire the potential

18  employee?

19           MS. BARBAREE:  Objection to form.

20           THE WITNESS:  Correct.  Also there was a

21  system quick screen that you had to run them through.

22  If they failed that, they did not qualify.

23           MS. SCOTT:  And what other responsibilities

24  on that list did you not have the final say in?

25           MS. BARBAREE:  Objection to form.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.          1:2008cv09361
                    Christopher B. Paul                              July 21, 2011

Page 231

 1            THE WITNESS:  Rewarding, I'm not really
 2     sure where that even falls into place.
 3            You can reward them with praise.  There
 4     wasn't a whole lot of rewarding going on, reward them
 5     with promotions.  That was the final say by the DM or
 6     human resources, or both.
 7            Disciplining associates, you did have some
 8     freedom to do that.  As for terminations, they had to
 9     go through the human resources department.
10            I think that's about it.
11            MS. SCOTT:  Okay.  If you'll look at
12     Exhibit Number 2, the associate store manager's
13     responsibilities --
14            THE WITNESS:  All right.
15            MS. SCOTT:  -- under the essential duties
16     and responsibilities, the nonmanagerial tasks that we
17     spoke of earlier are not included on that list, is that
18     right?
19            MS. BARBAREE:  Objection to form.
20            THE WITNESS:  That's right.
21            MS. SCOTT:  But they would have to complete
22     those nonmanagerial duties?
23            MS. BARBAREE:  Objection to form.
24            THE WITNESS:  Yes, every day.
25            MS. SCOTT:  You mentioned earlier that you

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**      **1:2008cv09361**
**Christopher B. Paul**                                           **July 21, 2011**

Page 232

1    would often have an office day and that day would

2    usually fall on Mondays.

3              Would you still do nonmanagerial work on

4    that office day?

5              MS. BARBAREE:  Objection to form.

6              THE WITNESS:  Yes, typically you're ending

7    up having to work in the photo department and do

8    people's photos and run the register, handle, I guess,

9    vendors that might be, because they're managerial

10   tasks, I would say, customer complaints, all that kind

11   of stuff.

12             But you try to focus on the office day, and

13   there is, you know, you try to schedule a backup

14   management person, but it doesn't always work out.

15             So you end up a lot of, honestly with a lot

16   of register time and photo time.

17             MS. SCOTT:  So, is it safe to say that you

18   would still have to make sure that all the work was

19   completed no matter --

20             MS. BARBAREE:  Objection to form.

21             THE WITNESS:  Yes.  Sorry.

22             MS. SCOTT:  You still had to make sure that

23   all the work was completed?

24             MS. BARBAREE:  Objection to form.

25             THE WITNESS:  Correct.

Page 254

1                    CERTIFICATE OF DEPONENT

2

3            I hereby certify that I have read and

4    examined the foregoing transcript, and the same is a

5    true and accurate record of the testimony given by me.

6

7            Any additions or corrections that I feel

8    are necessary, I will attach on a separate sheet of

9    paper to the original transcript.

10

11

12                          _____

13                          Christopher B. Paul

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit YY

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – x
YATRAM INDERGIT, on behalf of          :
himself and others similarly           :
situated,                              :
                                       :
            Plaintiff,                 :
                                       :CIVIL ACTION
            vs.                        :NO. 1:08-cv-
                                       :09361–PGG–HBP
RITE AID CORPORATION, RITE AID OF      :
NEW YORK, INC., and FRANCIS OFFOR      :
as Aider & Abettor,                    :
                                       :
            Defendants.                :
– – – – – – – – – – – – – – – – – – x

July 13, 2011


        Deposition of ARTHUR PEREZ, taken
pursuant to notice, held at the offices of Epstein
Becker & Green, P.C., 250 Park Avenue, New York, New
York, commencing at 9:57 a.m. before Jamie I.
Moskowitz, a Registered Professional Reporter and
Notary Public.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Arthur Perez**                                      **July 13, 2011**

**Page 17**

```
 1      A          Maybe two years, three years.
 2      Q          And before Clarence Hill, who was your
 3  district manager?
 4      A          Gus Fogliano.
 5      Q          And about how long was he your
 6  district manager?
 7      A          Couple of years, maybe two years or
 8  maybe three.  I'm really trying to go backwards.
 9      Q          Yeah, now we're getting back there, I
10  agree.
11                 Do you remember who was the district
12  manager before Gus?
13                 MR. SINHA:  If you know.
14                 THE WITNESS:  I'm trying to go back.
15  BY MR. WEINER:
16      Q          Do you remember who the district
17  manager was when you worked in Stamford?
18      A          In Stamford, the district manager was
19  Roger Perez.
20      Q          So, Clarence Hill and Gus Fogliano
21  were the district manager when you worked in Norwalk
22  on East Avenue?
23      A          Yes.
24      Q          Do you remember who the district
25  manager was when you worked at the Westport Avenue
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Arthur Perez                                                        July 13, 2011

Page 18

```
 1    store?

 2          A        When I was on Westport Avenue, it was

 3    Gus Fogliano and Clarence Hill.  I remember them.

 4          Q        You were the store manager throughout

 5    this entire time period; isn't that right?

 6                   MR. SINHA:  Objection to form.

 7    BY MR. WEINER:

 8          Q        You just have to say yes.  I saw you

 9    nod, but...

10          A        Yeah, to an extent, yes.

11          Q        Well, what do you mean by "to an

12    extent, yes"?

13          A        Because in my previous work, being the

14    manager is to run the store.  In this particular

15    store, it was really the DM who really run the

16    store.  He come in, tell us what to do, and that's

17    what we did.

18          Q        The position that you held was store

19    manager; is that correct?

20          A        That's what they told me, yes.

21          Q        Were you working for Rite Aid as an

22    assistant store manager?

23          A        When I start working with the company,

24    they hired me as a manager.  Then one of the DMs got

25    demoted and they told me that I was going to be
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Arthur Perez**                                                    **July 13, 2011**

**Page 19**

1    co-manager or manager of the store.  I was the same

2    label.  They never told me that I was an assistant

3    or anything.  If they did on paper, I don't know.

4    But they never told me I was an assistant.  I was

5    never told that I was an assistant.

6         Q         So you were told that you were a store

7    manager; is that correct?

8         A         That's correct.

9         Q         Were you ever told you were a

10   co-manager?

11        A         Yeah.  They say it was going to be one

12   or the other, either manager or co-manager.  But we

13   was both in the same label, position.  That's what I

14   was told.

15        Q         And who was it that told you that?

16        A         I was told by RVP, Joseph Garvey.

17        Q         RVP is regional vice president?

18        A         Yes.

19        Q         Garvey?

20        A         Yes.

21        Q         G-a-r-v-e-y?

22        A         Yes.

23        Q         And about when did this conversation

24   take place?

25        A         It was the same -- I think I was with

Page 82

```
 1                  MR. SINHA:  Objection to form.
 2   BY MR. WEINER:
 3        Q       Is that correct?
 4        A       What was that?
 5        Q       Is that correct?
 6        A       Can you say that again, please?
 7        Q       Yes.  Did he tell you that you had to
 8   work within the budget he gave you and that you
 9   could not get anymore?
10                  MR. SINHA:  Objection to form.
11                  THE WITNESS:  No, he didn't say he
12        gave me.
13   BY MR. WEINER:
14        Q       What did he say?
15        A       He say, "That's the budget that
16   corporate gave you.  Corporate base it on whatever
17   they base, and that's what you guys got to use."
18        Q       So, Mike Barrett said that it wasn't
19   his decision to give you fewer hours in the labor
20   and budget; he said that it was a decision that came
21   from higher up?
22                  MR. SINHA:  Objection to form.
23   BY MR. WEINER:
24        Q       Is that correct?
25        A       That's correct.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Arthur Perez**                                                    **July 13, 2011**

**Page 83**

```
 1        Q           And that he couldn't get you anymore
 2    hours; is that correct?
 3                    MR. SINHA:  Objection to form.
 4                    THE WITNESS:  I don't know if he use
 5            that kind of term you're saying.  He said -- I
 6            remember him saying, "That's the budget that
 7            corporate give you.  That's what you guys have
 8            to work with."
 9    BY MR. WEINER:
10        Q           And how did you work with that budget?
11        A           It was very hard to work with the
12    hours that we have.  And I will have to work, me and
13    my assistant, to -- you know, 70 hours a week to
14    cover what we didn't have covered.
15        Q           Well, let's discuss that.  What was
16    your schedule of work?  Did you open the store or
17    did you close the store?
18        A           We did both.
19        Q           What did you do?
20        A           I open couple of days, and I close at
21    least two to three nights.
22        Q           Can you recall which days you opened,
23    or did that vary?
24        A           That varied.
25        Q           What were the factors that went into
```

Page 84

```
 1   the variation of the days of the week that you

 2   opened the store?

 3        A        If I have my -- between my assistant

 4   and my shift, so if they only open -- if they open

 5   four days, so the other three days I will open.  If

 6   they only close two days, so then the other days,

 7   whatever.  We just rotate, work it out.  So, I will

 8   close.

 9        Q        How did you decide which days would

10   you open and which days they would open?

11        A        Well, we -- based on the need of the

12   store.

13        Q        Did the need of the store determine

14   whether you opened the store or your assistant

15   manager opened the store?

16        A        Yes.  Like if it was truck day, if

17   it's truck day and the truck is coming at 4 in the

18   afternoon, so I schedule myself to close, because I

19   have to unload the truck.

20        Q        Because you have to?

21        A        Unload it.  Unload the truck.

22        Q        Right, unload the truck.

23        A        If the truck is coming in the morning,

24   so then I would change it, because the truck change

25   every holiday, move a day.  And that goes out, we
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Arthur Perez                                              July 13, 2011

Page 86

1    schedule myself or my assistant to come in around

2    7:00 p.m., take care of everything from the floor,

3    so this guy would come in at night, when we close

4    the store, and start doing it.  They finish at 1, 2

5    in the morning, and then we would have to put

6    everything back, so we could open the store the

7    following morning.

8        Q        And did that take you and your

9    assistant manager or either one of you?

10       A        Either one.

11       Q        The fellow who did the floor, did his

12   pay come from your labor budget?

13       A        No, not from the labor.  It came from

14   the store, but not from the budget, no.

15               MR. WEINER:  I'm going to ask to take

16        two more minutes.

17               (Whereupon, a short break was taken.)

18   BY MR. WEINER:

19       Q        The fellow that buffed the floor, you

20   said he was not paid from your labor budget but that

21   the store paid him; is that correct?

22       A        Yeah.  They take it out of the -- the

23   money comes somehow.  That's what I was told.  We,

24   the store, pay those guys whatever the guys charge.

25   But the guy that stayed there, like when we go there

Page 87

1    and stay at the store, that's out of our budget.
2    Like if I work 10 hours, 12 hours, that comes out of
3    my budget.  My assistant, that comes out of my
4    budget.
5         Q         The number of hours you worked were
6    also part of the labor budget?
7         A         Yes.
8         Q         On truck day, was that something that
9    only you could unload the truck or was that
10   something that the assistant store manager could do
11   as well?
12        A         Yes.  Any -- anybody could do it.  A
13   cashier could do it or somebody that works on the
14   floor or something.  But, normally, because of the
15   budget, we schedule ourself, me and the assistant,
16   12 hours that day.  We have to be there 12 hours a
17   day.  And then we have two cashiers running the
18   front, so him and I will do it.
19        Q         Both of you would be there 12 hours a
20   day?
21        A         Yes, sir.
22        Q         And two cashiers would be working the
23   cash registers?
24        A         Yes.
25        Q         And the shift supervisor?

**Page 88**

```
 1        A          Sometimes two cashier and the -- yeah.

 2        Q          Two cashiers and the shift supervisor?

 3        A          Depends on the schedule.  There was

 4   times that we keep either one cashier, if it's not

 5   busy, and then we have another one helping us pull

 6   the truck.  When I'm working, pulling the truck with

 7   my assistant, when we get busy, she call that one of

 8   us goes and ring up the register.  Whoever is closer

 9   to the register go and jump on that and start doing

10   that.  Same thing we follow.

11        Q          When you were in the store, were you

12   the highest ranking official in the store?

13                   MR. SINHA:  Objection to form.

14   BY MR. WEINER:

15        Q          You're the store manager.  When you

16   were in the store and the assistant store manager

17   was also in the store and the shift supervisor was

18   also in the store and cashiers were also in the

19   store, someone may have been in the photo lab, there

20   were other people in the pharmacy, you were the top

21   person in authority in the store, weren't you?

22                   MR. SINHA:  Objection to form.

23                   THE WITNESS:  Not really, because the

24       decision that I make, the assistant could make

25       it or the shift, because we -- not much
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Arthur Perez                                                    July 13, 2011

Page 134

1    for our customers."  What did you mean by that?

2         A       Well, I want to do more things for the

3    customer, but there was no time to do it.  I really

4    want to do more for them.  If a customer need a

5    favor or something, I want to be able to go and help

6    them.

7         Q       What kind of favor?

8         A       Like if a customer, an old lady, will

9    come and tell me, "Listen, I am looking for

10   Tylenol," we don't have a choice.  The only choice

11   that we have is give the customer the finger,

12   "Aisle 7."

13        Q       Is that giving the customer the

14   finger, just pointing to the aisle?

15        A       Yeah, all the time the finger.

16   Because, to me, that's not customer service.  An old

17   lady, you should walk the lady to the aisle or go

18   get it for her.  But we couldn't do it because I

19   have three people waiting in line here and I'm

20   ringing on the register.

21               So, I have to go like -- hey, I

22   address this in several meetings.  I mean, you have

23   to give the customer, "Aisle 7, go down, all the way

24   down."  If you find it, good.  If you don't -- I

25   mean, that's not a way to run a business.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Arthur Perez**                                                     **July 13, 2011**

Page 135

1                MR. SINHA:  For the record, when the

2          witness was gesturing, he was gesturing with

3          his index finger.

4                THE WITNESS:  Yeah, that's what I

5          mean.

6    BY MR. WEINER:

7          Q       Pointing?

8          A       Pointing.

9          Q       Pointing to the aisle?

10         A       Yeah.  Just, to me --

11         Q       With the index finger?

12         A       It's just like -- that's like --

13   giving them the finger, I don't think that's the way

14   anybody should run a business.

15         Q       And another strength that you wrote

16   was, "My ability to make decisions to benefit my

17   store."  What did you mean by that?

18         A       Well, there's no ability to make

19   decisions, because you don't make the decision.  The

20   DM makes the decision for you, the loss prevention,

21   the HR.  And I thought that I supposed to be the one

22   making the decisions, you know, in the store.

23         Q       Well, let me ask you this.  Number 6

24   says, "What do you feel are your greatest strengths

25   in your current position?"

Page 136

```
 1                    And you wrote, "My ability to make
 2   decisions to benefit my store."  Now, was that true
 3   when you wrote that?
 4        A         Yeah.  I mean, I want to have more
 5   ability to make decisions.  That's what I meant by
 6   writing that.
 7        Q         You said that one of your greatest
 8   strengths was your ability to make decisions to
 9   benefit my store, correct?
10        A         Maybe I misunderstood the question.
11   Let me see.
12        Q         Number 6.
13        A         Number 6.  I put it there.  I have
14   ability to make the decision to benefit my store.
15        Q         That was one of your strengths as a
16   store manager, wasn't it?
17        A         Yes, sir.  I mean, I put it there.
18        Q         Number 7, "What areas do you need to
19   develop?  What assistance do you need?"
20                  And you wrote, "Controlling and
21   organizing my office paperwork."  Is that correct?
22        A         That's correct.
23        Q         And what does that mean?
24        A         Well, there's very limited time, as a
25   manager, to spend in the office.  I used to go in
```

Page 137

```
 1   the office.  So, every time I get paperwork from
 2   vendors and everything, so you don't have time,
 3   like, to put them on file and everything.  So, you
 4   just put them in a pile.  And I think that I was
 5   supposed to make more time just to organize that
 6   paperwork.  And that's what I mean by that.
 7        Q       Number 8, "How can your supervisor
 8   help you perform your job more effectively?"
 9               You wrote, "Communicate more with
10   conference calls in between our manager meeting, to
11   keep people employed and" -- I'm sorry, the rest
12   looks like it was cut off.  Do you remember what
13   else you wrote?  My copy is cut off.
14        A       Mine, too.
15        Q       Yours, too.  Okay.  I don't have
16   anything more than that.
17               First of all, let me ask you, when you
18   read "your supervisor," who was it that you had in
19   mind?
20        A       The DM.
21        Q       The district manager?
22        A       District manager, yeah.
23        Q       So you're saying that the district
24   manager could help you perform your job more
25   effectively if he communicated more with conference
```

```
 1      A          Sunday.

 2      Q          Did you schedule more hours to cover

 3   the store on Sunday than you did on other days of

 4   the week?

 5      A          No, sir.

 6      Q          What was the next busiest day?

 7      A          Monday.

 8      Q          What was the next busiest?

 9      A          Friday.

10      Q          How about the next busiest?

11      A          Tuesday.

12      Q          And next?

13      A          Thursday.

14      Q          The next?

15      A          Wednesday.  And Saturday.

16      Q          Saturday was the last, or where does

17   Saturday fall into this?  Where would you like to

18   put Saturday?

19      A          Saturday, I want to put Saturday like

20   the fifth day.

21      Q          So, it would be Sunday, Monday,

22   Friday, Tuesday, Saturday?

23      A          Uh-huh.

24      Q          Thursday and Wednesday?

25      A          Yes, sir.
```

Page 198

```
 1      Q         Did you adjust the staffing of the
 2  employees working at the store to cover the busiest
 3  day the most, and the least busy the least?
 4      A         We have StaffWorks.  StaffWorks have
 5  all the sales and everything.  They will tell you
 6  where to put what.  We don't really do it.
 7      Q         Would StaffWorks schedule more
 8  employees to work on Sunday than to work on
 9  Wednesday?
10      A         Yes, sir.
11      Q         And that's based on the sales of the
12  store?
13      A         Yes, sir.
14      Q         Did you ever receive a labor budget
15  stated in dollars rather than hours?
16      A         The answer for that, my DM will take
17  whatever money they give for the store; he will
18  divide it and tell me, "You can use that many
19  hours."  Giving me a number, the answer would be no.
20      Q         Giving you a dollar number?
21      A         A dollar number, no.
22      Q         He gave it to you in hours?
23      A         He gave it to me in hours.
24      Q         And it didn't matter to him whether
25  the hours were at a higher hourly rate or a lower
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Arthur Perez                                                July 13, 2011

Page 199

1    hourly rate; he just gave you the number of hours to

2    work with; is that correct?

3        A       Yes, that's correct.

4        Q       It would have increased the

5    profitability of the store if you had used more

6    employees paid at a lower rate and fewer employees

7    paid at a higher rate, wouldn't it?

8                    MR. SINHA:  Objection to form.

9                    THE WITNESS:  I don't know.

10   BY MR. WEINER:

11       Q       And if the district manager had taken

12   your assistant to work at Bridgeport and your shift

13   supervisor got sick, called in and said, "Got a

14   fever of 103, can't get out of bed," could you

15   schedule one of the other cashiers for overtime?

16       A       It could happen, but it would have to

17   be approved by the DM or by the RVP, which, not a

18   chance.

19       Q       The regional vice president wouldn't

20   have you close the store, would he?

21       A       No.  I would have to stay and cover.

22   And if there's nobody else, they would have called

23   another store, somebody that want extra hours, not

24   to go overtime.  They would do that in an emergency.

25       Q       What was the biggest store you ever

**Page 211**

1   recalls?

2        A        Yes, sir.

3        Q        Were you responsible for implementing

4   the planograms?

5        A        Yeah.

6        Q        Were you responsible for checking for

7   outdated inventory?

8        A        Yes, sir.

9        Q        And were you responsible for

10  determining what merchandise needed to be purchased?

11       A        No.

12       Q        Were you ever responsible, under Jim

13  Zasso, for merchandise to be purchased?

14       A        No, sir.

15       Q        Same answer for Mike Barrett?

16       A        No, sir.

17                MR. SINHA:  "No, sir," meaning you

18          were not responsible?

19                THE WITNESS:  No, we never bought

20          anything from anybody.  Corporate does all the

21          buying of everything.

22                MR. WEINER:  Mr. Sinha, do you have

23          any questions?

24                MR. SINHA:  I do.

25                MR. WEINER:  Would you, please?  I'm

Page 212

```
 1        going to reserve any further time that I have

 2        to a re-examination after you conclude yours.

 3              MR. SINHA:  Absolutely.

 4   EXAMINATION BY

 5   MR. SINHA:

 6        Q       Mr. Perez, can you identify your

 7   duties as a store manager at Rite Aid at the Norwalk

 8   store?

 9        A       I was in charge that the store rolls

10   well.  I put up stock; unload the truck, took price

11   changes, ordering, ringing on the register,

12   sometimes help with the photo department, clean the

13   parking lot.  Swept the floor, sometimes mop it.

14   Make sure the bathroom was clean, throw the garbage

15   out.  That's pretty much it.

16        Q       Okay.  These duties you just

17   identified, do you know if all of these duties were

18   stated in your job description?

19        A       No, sir.

20        Q       These duties that you identify, would

21   you identify them as nonmanagerial duties?

22        A       Correct.

23        Q       What portion of the day did you spend

24   doing these duties?

25        A       Pretty much all day.
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Arthur Perez                                                              July 13, 2011

Page 213

```
 1        Q         How frequently, in terms of number of
 2   days, did you do these duties?  Was it every day
 3   that you did -- that you performed these duties?
 4                  MR. WEINER:  Objection as to form.
 5        You may answer.
 6                  THE WITNESS:  No, it was done in
 7        different days.  Like truck day was one day.
 8        Then we would merchandise.  Then another day we
 9        cleaned the floors.  The store get swept every
10        day, mopped, clean the bathroom.  Different
11        days.
12   BY MR. SINHA:
13        Q         And did you consider these duties,
14   these nonmanagerial duties, as part of your regular
15   duties?
16        A         Yes, sir.
17        Q         Did your performing these
18   nonmanagerial duties affect how you were able to run
19   the store?
20                  MR. WEINER:  Objection as to form.  Go
21        ahead.
22                  THE WITNESS:  Yes, sir.
23   BY MR. SINHA:
24        Q         How so?  How did it affect your
25   ability to run the store?
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
**Arthur Perez**                                                    **July 13, 2011**

Page 231

1                        C E R T I F I C A T E
2
3      STATE OF _Connecticut_____ :
4      COUNTY/CITY OF _Fairfield_____ :
5
6      Before me, this day, personally appeared
7      ARTHUR PEREZ, who, being duly sworn, states that the
8      foregoing transcript of his/her Deposition, taken in
9      the matter, on the date, and at the time and place
10     set out on the title page hereof, constitutes a true
11     and accurate transcript of said deposition.
12
13
14     _____
                    ARTHUR PEREZ
15
16
17
18     SUBSCRIBED and SWORN to before me this___4th___
19     day of _August_____, 2011, in the
20     jurisdiction aforesaid.
21
22
       _____01.31.13_____        _____
23     My Commission Expires           Notary Public
24
25

**Page 232**

```
1                    DEPOSITION ERRATA SHEET
2    RE
     FILE NO.
3    CASE CAPTION:  Yatram Indergit vs. Rite Aid
     DEPONENT:  ARTHUR PEREZ
4    DEPOSITION DATE: July 13, 2011
5    To the Reporter:
     I have read the entire transcript of my Deposition
6    taken in the captioned matter or the same has been
     read to me.  I request for the following changes be
7    entered upon the record for the reasons indicated.
     I have signed my name to the Errata Sheet and the
8    appropriate Certificate and authorize you to
     attach both to the original transcript.
9    _____
10   _____
     _____
11   _____
     _____
12   _____
     _____
13   _____
     _____
14   _____
     _____
15   _____
     _____
16   _____
     _____
17   _____
     _____
18   _____
     _____
19   _____
     _____
20   _____
     _____
21   _____
22   SIGNATURE: _____  DATE: 8/7/11
23      ARTHUR PEREZ
24
25
```

Exhibit ZZ

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


---------------------------------------------------

YATRAM INDERGIT, on behalf

of himself and others            Action No.

similarly situated,              #1:08-cv-09361-PGG-

         Plaintiffs,      HBP

         vs.

RITE AID CORPORATION, RITE

AID OF NEW YORK, INC., and

FRANCIS OFFOR as Aider &

Abettor,

         Defendants.
---------------------------------------------------

250 PARK AVENUE

NEW YORK, NEW YORK

July 11, 2011 - 10:00 A.M.


DEPOSITION of THOMAS C. PLETKA, before S. Arielle
Santos, Registered Professional Reporter, Certified Shorthand
Reporter, Certified LiveNote Reporter and Notary Public.

Page 86

```
 1                 THOMAS C. PLETKA
 2    employees from stealing Lottery tickets?
 3            A    As well as other things,
 4    yes.
 5            Q    What did you mean when you
 6    said, "I am also trying to train and
 7    develop others to move up in the
 8    company"?
 9            A    Assist employees I believe
10    that had management potential and had the
11    desire to move in with the company and
12    try to develop them.
13            Q    Okay.  And that was
14    something that you and your DM discussed
15    is you helping create promotable
16    candidates, right?
17            A    Yes.
18            Q    Did you have any candidates
19    in your store?
20                 Did you have any employees
21    that you were particularly proud of their
22    development, any mentees?
23            A    Not right now, No.
24            Q    At Store 3702 were any shift
25    supervisors -- strike that.  Excuse me.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Thomas C. Pletka**                                                      **July 11, 2011**

Page 87

1                    THOMAS C. PLETKA

2                    At Store 3702 were any

3    shifts promoted internally?

4          A     Were they promoted to shift

5    or promoted from shift up?

6          Q     That is a good distinction.

7    Thank you.

8                    Were any -- at Store 3702,

9    were any employees brought from clerk

10   cashier to shift supervisor?

11         A     Yes.

12         Q     Okay.  And is that a

13   promotion that you executed?

14         A     No.

15         Q     Who executed that promotion?

16         A     Has to be I recommend,

17   district manager has to approve, and

18   interview, employer relations and

19   security has to do it.

20         Q     Okay.  So that person has to

21   be interviewed by the DM, HR, and LP?

22         A     Yes.

23         Q     And that's based on your

24   recommendation?

25         A     Yes.

Page 88

1                    THOMAS C. PLETKA

2            Q    And did you ever recommend

3    someone to be promoted that was not, in

4    fact, promoted?

5            A    Yes.

6            Q    Who was that?

7            A    I can't remember.  I just

8    know I have recommended people to get

9    management positions that were not.

10           Q    Okay.  Is it fair to say the

11   majority of the people that you recommend

12   be promoted in your store are promoted?

13           A    Yes.

14           Q    "Number 6:  What do you feel

15   are your greatest strengths in your

16   current position?"

17               And you wrote:  "Inventory

18   control, customer service, store

19   conditions, and loss prevention."

20               Right?

21           A    Yes.

22           Q    What do you mean by

23   "inventory control"?

24           A    Trying to maintain product

25   on the shelf, having the necessary items

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Thomas C. Pletka                                    July 11, 2011

Page 89

```
 1                  THOMAS C. PLETKA
 2      for ads.
 3           Q    You are talking about the ad
 4      ordering?
 5           A    Not just ad ordering, but
 6      the vendors -- the outside vendors, like
 7      beer, potato chips, things that are
 8      delivered to the store.
 9           Q    As a store manager you are
10      responsible for cycle counts, right?
11                MR. SINHA:  Objection
12           to form.
13                THE WITNESS:
14           Responsible to get -- yes,
15           responsible to get them
16           done.
17      BY MR. SCOTT:
18           Q    Right.
19                And zero counts?
20           A    Yes.  We have to see they
21      are done.
22           Q    And those cycle counts and
23      zero counts generate an order which then
24      comes to the store by the truck, right?
25           A    Supposed to.
```

Page 264

1                    THOMAS C. PLETKA

2        follow, your ultimate goal is to make the

3        store as profitable as possible, right?

4              A    Yes.

5              Q    As the store manager, you're

6        the highest ranking front-end person at

7        the store, right?

8              A    Yes.

9              Q    And the ASM is the second

10       highest, right?

11             A    Yes.

12             Q    You can assign tasks to

13       anybody in the front end of the store?

14             A    Yes.

15             Q    And the ASM can assign tasks

16       to anybody in the front end of the store

17       but you?

18             A    Yes.

19             Q    The ASM wouldn't assign you

20       a task, right?

21             A    Well, I have been known to

22       put the assistant manager in charge of

23       the store to develop them, and then they

24       would say, "Go do this," and I did it.

25             Q    You made them manager for

Page 265

1                    THOMAS C. PLETKA

2        the day?

3                A    It works.

4                Q    How long would they be

5        manager of the store, when you do a

6        development and exercise like that?

7                A    Maybe for the day.

8                Q    And you found that to be a

9        good developmental tool?

10               A    Yes, because I am there to

11       assist them if they develop a problem

12       they don't know how to handle.

13               Q    How many times have you done

14       that?

15               A    I can't tell you.  Many

16       times.

17               Q    How many hours a week do you

18       work?

19               A    Required to work 50.

20       Usually 50 to 60.

21               Q    Hang on one second.

22                    How many hours a week did

23       you work in 3702, approximately?

24               A    Over the four years I was

25       there, we were required to work 50.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Thomas C. Pletka                                          July 11, 2011

Page 266

1                    THOMAS C. PLETKA

2    There was many times I worked 60 or more.

3          Q    60 plus.

4               How many hours a week did

5    you work 948?

6          A    It is the same thing.  Many

7    weeks I worked 60 or 70 hours.

8          Q    How many hours a week are

9    you currently working?

10         A    Last few weeks, 50.

11         Q    What causes the fluctuation

12    of hours such that you might get up to

13    the 60 or 70?

14         A    Lack of management help.

15    You have to have a manager in the store

16    at all times.

17         Q    If you don't have an ASM or

18    the ASM is on vacation or something like

19    that, you have to work more hours, right?

20         A    If we can't locate any help

21    from anybody else, other labor

22    constraints.

23         Q    Right.

24               You don't want to leave the

25    store unmanned by a manager, right?

Page 267

```
 1                  THOMAS C. PLETKA
 2          A     You can't.  State law.
 3          Q     How many ASMs did you have
 4     in 3702 at one time?
 5          A     I believe there was two when
 6     it was a 24-hour store --
 7          Q     Right.
 8          A     -- one for midnights and one
 9     for days.
10          Q     Was one ASM assigned to work
11     the overnight shift?
12          A     Usually, yes.
13          Q     How often did you personally
14     work the overnight shift?
15          A     A few.
16          Q     So that overnight ASM would
17     be the highest-ranking manager in the
18     store the majority of the time he was
19     there, right?
20          A     Yes.
21          Q     The other ASM would
22     typically work days?
23          A     Yes.
24          Q     And that person would have
25     more overlap with you than his -- than
```

Page 319

```
 1                THOMAS C. PLETKA
 2          Q    At all times you have
 3     accepted your paycheck, right?
 4          A    Yes.
 5          Q    No deductions have ever been
 6     made from your paycheck, right?
 7          A    I don't understand
 8     deductions.  I mean, there's a lot of
 9     deductions made on paychecks, because
10     it's for healthcare, dental, stuff like
11     that.
12          Q    Sure.  Sure.
13               But let me ask this another
14     way.
15               Outside of the customary
16     healthcare, federal tax withholding,
17     state tax withholding deductions,
18     Rite-Aid Corporation has never taken a
19     part of your paycheck away, right?
20          A    Correct.
21          Q    Okay.  Have you ever made
22     any complaints during your time as a
23     store manager that you should be
24     receiving overtime?
25          A    I have made comments that I
```

Page 320

1                    THOMAS C. PLETKA

2       am saying I am working too much.

3              Q     To whom did you make those

4       comments?

5              A     District managers.

6              Q     The two that we discussed?

7              A     Yes.

8              Q     Did you ever say, "I should

9       get overtime"?

10             A     No.

11             Q     Do you believe you're the

12      equivalent of an hourly employee?

13             A     Sometimes, no.  Sometimes,

14      yes.  I mean, yes, because I do so many

15      of the things they perform.

16             Q     And you do so many of the

17      things they don't perform, right?

18             A     Yes, I do.

19             Q     And you receive bonuses

20      based on the overall profitability of the

21      store, right?

22             A     Sometimes.

23             Q     Have you made any attempts

24      to calculate the damages that you believe

25      that you're owed in this action?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Thomas C. Pletka                                            July 11, 2011

Page 321

                     THOMAS C. PLETKA

1

2          A     Not at the current time.

3          Q     Do you know what damages

4     you're seeking?

5          A     I would have to -- not at

6     the moment.

7          Q     How did you find out about

8     the lawsuit?  You were sent the notice?

9          A     Yes.

10         Q     And you said you haven't

11    discussed the lawsuit with any other

12    Rite-Aid employees?

13         A     No.

14         Q     By that you mean I am right?

15         A     I have not discussed it with

16    other Rite-Aid employees.

17              MR. SCOTT:  Let's go

18              off for one second.

19                 (Whereupon, a Recess is

20              Taken.)

21              MR. SCOTT:  All right.

22              Let's go back on.

23    BY MR. SCOTT:

24         Q     You understand you are still

25    under oath?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Thomas C. Pletka**                                      **July 11, 2011**

Page 328

1                    THOMAS C. PLETKA

2       given me prior to this recross has been

3       truthful and accurate, right?

4              A    Yes.

5                    MR. SCOTT:  Okay.  I

6              just want to close out.

7                    MR. SINHA:  Very good.

8

9                    EXAMINATION

10      BY MR. SINHA:

11             Q    Mr. Pletka, can you identify

12      your day-to-day duties as store manager?

13             A    Supervise employees.  I

14      daily go in there.  I run register every

15      day.  I stock the shelves every day.

16      Several times a week I do sweep the

17      floor.  Once a week I unload the truck.

18      Day to day it's taking care of the

19      customers to help face the store.  Do

20      zero counts.

21             Q    Would you agree your duties

22      include managerial and nonmanagerial

23      duties?

24             A    Yes.

25             Q    How much time -- you

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Thomas C. Pletka**                                    **July 11, 2011**

Page 329

1                     THOMAS C. PLETKA

2       described cleaning and stocking shelves.

3                     Would you characterize those

4       as nonmanagerial duties?

5              A     Probably between 50 and

6       60 percent.

7              Q     And how frequently do you do

8       those kind of duties?  Every day?

9              A     Daily.

10             Q     Do you consider those to be

11      part of your regular duties?

12             A     Yes.

13             Q     You said previously you had

14      worked 60 to 70 hours a week as a store

15      manager; is that right?

16             A     Yes.

17                    MR. SCOTT:  Objection

18             to form.

19      BY MR. SINHA:

20             Q     Right now you work about

21      fifty, you said?

22             A     Yes.

23             Q     Why did that change?

24             A     Several months ago I was

25      working and had worked several weeks in a

Page 330

 1                    THOMAS C. PLETKA

 2      row, not a single day off.  And due to

 3      staffing issues the store had to be open;

 4      so I worked it.  And then you start

 5      getting chewed out for not having certain

 6      things done, and I just didn't feel I was

 7      appreciated; so I said I am not doing it

 8      anymore.  I basically kept myself back to

 9      50 hours because it was just too much.

10             Q    The nonmanagerial duties

11      that you described, are those duties that

12      the other nonmanagerial staff also

13      perform?

14             A    Yes.

15                  MR. SCOTT:  Objection

16             to form.

17      BY MR. SINHA:

18             Q    Do you feel your performing

19      those duties affect your ability to run

20      the store?

21                  MR. SCOTT:  Objection

22             to form.

23                  MR. SABA:  What is the

24             basis?

25                  MR. SCOTT:  Leading.

Page 331

```
 1                    THOMAS C. PLETKA
 2          And it's vague as to "those
 3          duties."
 4    BY MR. SINHA:
 5          Q    Do you understand the
 6    question?  I can rephrase it.
 7               You described certain duties
 8    that you do, like cleaning and stocking,
 9    which you said were nonmanagerial duties.
10               Do your performing those
11    duties affect your ability to run the
12    store overall?
13               MR. SCOTT:  Objection
14          to form.
15               THE WITNESS:  I really
16          don't believe so.  I mean,
17          it does affect the amount of
18          time I have for planning,
19          but I am able to still plan
20          while doing some of those
21          activities.
22    BY MR. SINHA:
23          Q    Well, let's say you're
24    cleaning or stocking shelves.
25               Are you able to see what is
```

Page 332

 1                    THOMAS C. PLETKA
 2     going on at other parts of the store?
 3              A    Very limited on what I can
 4     actually see.
 5              Q    And what percentage of the
 6     time do you spend, say per week,
 7     regarding those nonmanagerial duties?
 8                   MR. SCOTT:  Objection
 9              to form.
10                   THE WITNESS:  Again,
11              probably between 50 and
12              60 percent my time is doing
13              those activities.
14     BY MR. SINHA:
15              Q    Before you were shown the
16     job description for store manager, I
17     think it was --
18                   MR. SCOTT:  19.
19     BY MR. SINHA:
20              Q    Exhibit 19, you have it in
21     front of you?
22              A    Yes, I do.
23              Q    Are any of the nonmanagerial
24     duties that you described identified on
25     that job description?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Thomas C. Pletka                                    July 11, 2011

Page 333

1                    THOMAS C. PLETKA

2          A    No, they are not.

3          Q    Regarding the assistant

4    store managers, do they do -- what kind

5    of duties do assistant store managers do?

6          A    Basically the same duties as

7    store manager.  Oversee the store, will

8    stock the shelves, check out of dates,

9    sweep the floor if necessary, face the

10   store, take care of customers, run

11   register.

12         Q    Any of the same duties that

13   you do?

14         A    Yes, they do.

15         Q    And are the assistant store

16   managers hourly or are they salary?

17              MR. SCOTT:  Objection

18              to form.

19              THE WITNESS:  In the

20              past they were salary.  I

21              believe they have all been

22              converted to an hourly basis

23              now.

24   BY MR. SINHA:

25         Q    Do you agree there are very

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Thomas C. Pletka                                    July 11, 2011

Page 338

```
 1                THOMAS C. PLETKA
 2                MR. SCOTT:  Objection
 3           to form.
 4                THE WITNESS:  The
 5           direct supervisor of that
 6           employee makes the
 7           evaluation.  I, as store
 8           manager, would be doing the
 9           assistants and other
10           personnel.
11    BY MR. SINHA:
12           Q    Regarding the final
13    evaluation?
14           A    And then the district
15    manager would sign off on it.
16           Q    So the district manager
17    still has to sign off on your evaluation
18    of --
19           A    The assistant manager.
20           Q    -- the assistant manager?
21                MR. SCOTT:  Objection
22           to form.
23                THE WITNESS:  Yes.
24    BY MR. SINHA:
25           Q    What -- what role do you
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Thomas C. Pletka                                                July 11, 2011

Page 339

```
 1                  THOMAS C. PLETKA
 2     have in, say, payroll?
 3           A    None.
 4           Q    What role do you have in
 5     saying the budget of your store?
 6                MR. SCOTT:  Objection
 7           to form.
 8                THE WITNESS:  Budget as
 9           to the sales or payroll, I
10           have no input at all.
11     BY MR. SINHA:
12           Q    Do you have any ability to
13     change the budget?
14           A    No.
15           Q    Who has that ability to
16     change or set the budget?
17           A    The district manager has
18     some control.  I do not know how much.
19           Q    Who is ultimately
20     responsible for profitability at your
21     store?
22           A    The store manager is held
23     responsible for what I consider to be
24     corporate because those are the ones that
25     set the budget, the sales and everything,
```

Page 340

 1                    THOMAS C. PLETKA

 2    all the work that has to be done.

 3           Q    And for those matters -- the

 4    budget, payroll -- that's determined by

 5    corporate, you said; is that right?

 6                 MR. SCOTT:  Objection

 7           to form.

 8                 THE WITNESS:  Yes, that

 9           could be district manager.

10           I am not exactly sure who.

11    BY MR. SINHA:

12           Q    Do you believe you have

13    autonomy to run your store?

14           A    No.

15           Q    You testified that you were

16    a training manager; is that right?

17           A    Yes.

18           Q    And you went to different

19    stores to train?

20           A    Yes.

21           Q    That included, I believe, in

22    Massachusetts, Pennsylvania, and I

23    believe North Carolina; is that right?

24           A    Yes.

25           Q    Were -- was there any

Page 341

```
 1                  THOMAS C. PLETKA
 2    difference between how you trained the
 3    store in Massachusetts and how you
 4    trained the store in Pennsylvania and
 5    North Carolina?
 6             A    No.
 7             Q    You had to follow the same
 8    corporate guidelines?
 9             A    Yes.
10             MR. SCOTT:  Objection
11             to form.
12             THE WITNESS:  We were
13             given packet for shift
14             supervisor, assistant
15             manager, manager, and the
16             function of each had to
17             become familiar with.
18    BY MR. SINHA:
19             Q    And that package was the
20    same for each store?
21             A    Yes.
22             MR. SCOTT:  Objection
23             to form.
24    BY MR. SINHA:
25             Q    Are you aware if there are
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Thomas C. Pletka
July 11, 2011

Page 351

```
 1              A C K N O W L E D G E M E N T

 2     STATE OF  West Virginia

 3     COUNTY OF  Kanawha

 4

 5              I, the undersigned, hereby

 6     certify that I have read the transcript

 7     of my testimony taken under oath in my

 8     deposition; that the transcript is a true

 9     and complete and correct record of my

10     testimony, and that the answers on the

11     record as given by me are true and

12     correct.

13

14

15          THOMAS C. PLETKA

16

17              Signed and subscribed to

18     before me

19     This  4th  day of

20     August,

21          20 11.

22

23                    Notary Public

24

25
```

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
DEBORA L. EGGLESTON
CITY NATIONAL BANK
308 GOFF MTN. RD.
CROSS LANES, WV 25313
My commission expires May 13, 2013