# Exhibit AAA

**Page 1**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

YATRAM INDERGIT, on behalf of himself

and others similarly situated,

        Plaintiff,               CIVIL ACTION NO. 1:08-cv-09361-

  - vs -                      PGG-HBP

RITE AID CORPORATION, RITE AID OF

NEW YORK, INC., and FRANCIS OFFOR as

Aider & Abettor,

        Defendants.

------------------------------------x

July 11, 2011

9:56 a.m.

DEPOSITION of OMAR RIAZ, taken by

Defendants, pursuant to Fed.R.Civ.P. 30 and

agreement of counsel, held at the offices of EMG

New York, 250 Park Avenue, New York, New York

10177, before Janet Hamilton, a Registered

Professional Reporter and Notary Public of the

State of New York.





Yatram Indergit, et al. v. Rite Aid Corporation, et al.   1:08-cv-09361-PGG-HBP
Omar Riaz                                July 11, 2011

[Page 105]

1                    O. Riaz, 7/11/11

2    with my hours.  Looking forward to assign those

3    tasks to somebody else that would result in

4    going above my assignment hours.

5         Q.    I take it there were times that you

6    assigned tasks to hourly employees that they did

7    not complete within the time that you had given

8    them?

9         A.    Yes.  Because -- yes.  That

10   happened.  Because they ran out of time.  Their

11   assigned scheduled hours.

12        Q.    And were there times that the

13   assistant store manager would assign work to

14   hourly employees and they would not finish the

15   work that had been assigned to them?

16        A.    Would you please repeat that?

17        Q.    Sure.  Were there times that your

18   assistant manager assigned work to employees and

19   they did not finish work that had been assigned

20   to them?

21        A.    Yes.

22        Q.    So as a store manager, how did you

23   try to ensure that employees would finish the

24   assignments you had given them within the time

25   that you gave them?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.    1:08-cv-09361-PGG-HBP
Omar Riaz                                                  July 11, 2011

[Page 106]

1                    O. Riaz, 7/11/11

2          A.      It was very, very challenging.

3     Almost impossible for them to finish those

4     assigned tasks and take care of the customers at

5     the same time.  So there was always an ongoing

6     struggle with that; for them to complete those

7     tasks in a timely manner assigned to them and

8     also do customer service while they're on the

9     floor.  Unless they're working in the back of

10    the store.  Which, you know, it's not

11    accessible.  It was not accessible by employees.

12    But being on the floor and trying to do those

13    tasks it humanly was not possible.  They needed

14    more hours to get that work done.

15          Q.      But my question was:  What steps

16    did you take as the manager assigning the work

17    to try to make sure that they finished their

18    assigned work?

19          A.      I jumped in myself into their task

20    and assignment and helped them.

21          Q.      You would work alongside them?

22          A.      Correct.

23          Q.      And when you were working alongside

24    the hourly associates performing tasks that they

25    were also performing, were you still in charge

Case 1:08-cv-09361-JPO-HBP   Document 213-19   Filed 01/22/13   Page 5 of 207
Yatram Indergit, et al. v. Rite Aid Corporation, et al.      1:08-cv-09361-PGG-HBP
Omar Riaz                                          July 11, 2011

[Page 107]

1                          O. Riaz, 7/11/11

2      of the store?

3             A.    Yes.

4             Q.    And you were still keeping an eye

5      out for customer service?

6             A.    As humanly possible.  Yes.

7             Q.    And you were still keeping an eye

8      out for loss prevention issues?

9             A.    Yes.  And a lot of other things at

10     the same time.  Part of my job description.

11            Q.    Do you know what I mean by

12     "multitasking"?

13            A.    Yes.  I know what you mean by

14     "multitasking."

15            Q.    As a store manager at Rite Aid, did

16     you have to multitask all the time?

17            A.    Yes.  All the time.

18                  MS. BARBAREE:  I think it's a good

19         time for a break.

20                  (Recess, 11:57 a.m. to 12:04 p.m.)

21                  CONTINUED EXAMINATION

22     BY MS. BARBAREE:

23            Q.    Did you talk with anyone about your

24     testimony during the break?

25            A.    No, I did not.

[Page 115]

1                    O. Riaz, 7/11/11

2          A.    I asked my senior store managers in

3    my district the easiest way to keep an eye.  And

4    the answer was there is no easy way to keep an

5    eye.  The answer was this is something you just

6    look at it and just look at it.  You don't

7    really do anything about it.  Because it is what

8    it is.  And if you have more questions, go to

9    your district manager.  And the district

10   manager's answer was it's not your part.  You

11   just make sure your parking lot is clean.  Make

12   sure your restrooms are clean.  He used to tell

13   me those kind of things.

14          Q.    But you figured out your own way to

15   look at your store's trend?

16          A.    Yes.  I have a bachelor's in

17   accounting.  I always loved to look at numbers.

18   And I always wanted to -- I was very curious

19   about the numbers.  Something that was not

20   totally or properly revealed to me in my

21   training.

22          Q.    But you were able to figure it out

23   because of your accounting background?

24          A.    Yes.  And I kept playing with the

25   computers.  And I got to those reports that

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   1:08-cv-09361-PGG-HBP
Omar Riaz                                                July 11, 2011

[Page 116]

1                    O. Riaz, 7/11/11

2     would actually show you your monthly revenue,

3     your store operating expenses and damages and

4     employee wages.  And somehow I was able to look

5     at the dollar, bottom dollar amount of what was

6     really being, the company was really being made

7     as far as the profits were concerned for the

8     company.  And the store was not in profit.  It

9     was not.

10          Q.     And so, when you were able to look

11    at these types of reports, were you able to make

12    decisions about things you could do differently

13    to adjust some of the profitability issues?

14          A.     Yes.

15          Q.     What are the things that you did to

16    try to make adjustments to profitability as a

17    store manager?

18          A.     To make sure I have more employees

19    on the floor when they're supposed to be there

20    for our customers.  But mainly my district

21    manager had a lot of interaction with such

22    items.  And he would just delegate stuff to me.

23    He would just tell me how to handle things.

24    Basically, he was just running the show.  I was

25    just -- you know.  I was just a -- like I always

1                    O. Riaz, 7/11/11

2    called myself there a glorified stocker.

3         Q.    Well, for example, earlier you told

4    me that your assistant store manager would call

5    you about reordering merchandise.  Did you try

6    to keep a close eye on merchandise ordering so

7    that you could make the store more profitable?

8         A.    Yes.  There are ways to get that

9    done.  The ways to get there, the road is not

10   very easy, was not very easy to do that; to make

11   sure we don't ordering of -- ordering stuff that

12   we don't really need.  And that was happening.

13   Every other delivery we had issues where parts

14   were being ordered and we already had them in

15   stock excessively.  So had no way to return

16   them.  They were there.

17        Q.    Did you figure out why that was

18   happening?

19        A.    Yes.  That was happening because of

20   the lack of labor.  Lack of hours.  Not getting

21   those counts done on a weekly basis.  And the

22   system didn't know that.  The system thought we

23   were out of something.  But physically we would

24   have 10 or 20 or more of that item in the store

25   available.  The system would think we didn't

[Page 118]

1                    O. Riaz, 7/11/11

2    have any.  And the system would order it for us.

3         Q.    Did you figure out a way to address

4    overstocking, even when you couldn't get your

5    counts done?

6         A.    Please repeat that.

7         Q.    Do you know what I mean by that?

8    So you said that sometimes you were not getting

9    the counts done of merchandise in the store?

10        A.    Yes.

11        Q.    And the system was automatically

12   reordering things because you didn't input the

13   counts?

14        A.    Yes.

15        Q.    And did you figure out a way of

16   adjusting the ordering without actually doing

17   the counts while you were store manager?

18        A.    Yes.  There was a very easy way to

19   have somebody assigned to that particular task

20   and have somebody go through the whole store in

21   a day or so to have the proper counts manually

22   done and manually entered into the system to

23   make sure the system knows from that point on to

24   not reorder the merchandise and the products

25   that we already had in the store.  But to get

[Page 137]

1                        O. Riaz, 7/11/11

2     were late or something.  Missed their day.  And

3     my district manager would make me clean the

4     parking lot.  Instead of me spending more time

5     in the profit and loss trends and trying to

6     figure out how to get the store back into a

7     profit making store, I was also engaged in a lot

8     of activities that came down to me from my

9     immediate supervisor, my district manager.  And

10    he said, "I want to get things done.  No matter

11    how you do it, I want to get certain things

12    done.

13                        He also offered me to work six days

14    a week.  He told me to work six days a week, not

15    offer me -- which I declined, because of my

16    family commitments.  And he said, "Okay."  He

17    said, "Here's another option.  Why don't you

18    work 12 hours a day instead of 10?"  And I was

19    already doing so.

20                        So, literally, I mean, it came to a

21    point where he told me to just come in the store

22    in the morning and leave at night.  You know.

23    "Just stay in the store.  Think it's your home.

24    And just stay there and, you know, you pay your

25    bills from here.  You're doing everything from

1                    O. Riaz, 7/11/11

2     here.  Remember?"

3                 I said, "Yeah.  I remember."

4                 "Why don't you stay here?  Think

5     it's your home.  It's a big family here.  All

6     the employees."

7                 I said, "Yeah.  I already think

8     that way.  The employees are part of my family,

9     because I spend a lot of time with them.  But I

10    also have another life away from the store.  And

11    I would like to continue that life."

12                He would say, "Well, what if we

13    terminate you for some reason?  You won't have

14    the life as comfortable as you have now.  You

15    make all your money from here."

16                Well, that's common sense.  People

17    go out to work and make money and feed their

18    kids and pay their bills.  Phone bills or

19    whatever.  So they can have a continuous life

20    cycle.  But he would -- he had a totally

21    different vision about how to run the store.

22                I never met anyone in my life who

23    had so many things to say of that nature.  And

24    those things didn't care about my position or my

25    designation.  And he would bypass me and he

[Page 139]

1                    O. Riaz, 7/11/11

2     would talk to employees directly about some of

3     these things.  Even employees had his cell

4     number.  So there goes the chain of command

5     concept.

6               So employees could actually call

7     him directly and talk to him.  Which I

8     understand was some kind of open door policy.

9     But where am I at the end the day?  What was I?

10    Just a glorified stocker.

11         Q.    Are you finished with your answer?

12         A.    Yes.  Yes.

13         Q.    On the occasion where you said that

14    he came to the store and he said that the

15    parking lot was dirty and hadn't been cleaned by

16    the vendor, did you get in touch with the

17    vendor?

18         A.    Of course.  Yes.  The vendor had

19    missed their day.  Two times a day.  They were

20    already busy.  They were third-party vendors,

21    not selected by me.  I mean, I had no control

22    over them.  All I could do was just leave a

23    voicemail with them or talk to somebody and tell

24    them, hey, please, come back to my store and

25    take care of this location.  And they said okay.

[Page 140]

1                    O. Riaz, 7/11/11

2    And they would always do it as they become

3    available.  And that's the only thing I could

4    do, was a phone call.

5            Q.    Did you ever change any of the

6    store's vendors while you were the store

7    manager?

8            A.    No, I did not.

9            Q.    And were there other types of

10   vendors that serviced the store, other than the

11   parking lot company?

12           A.    Yes.  The floor cleaning vendor was

13   also a company that would come into the store

14   one particular day of the week.  And they would

15   stay in the store for a couple of hours and

16   clean all the store.  They would buff the floor

17   and do a lot of serious cleaning on the floor.

18           Q.    And as the store manager you were

19   responsible for making sure that these vendors

20   actually came and did the work that they were

21   being paid to do?

22           A.    Yes.  I was told to contact them if

23   you don't see them.  If they don't come do their

24   work, contact them.  And if you have anymore

25   problems, you contact your district manager and

```
 1                    O. Riaz, 7/11/11

 2          A.    Customer service issues?  I think

 3    in one particular incident where -- in one

 4    particular incident where a customer walked up

 5    to me and complained to me that she was not

 6    being -- she was not -- that she did not get

 7    help right away when she asked for it, from

 8    another employee on the floor.  And I think one

 9    time I wrote somebody up for that.

10          Q.    Do you remember who that was?

11          A.    That, I do not remember.  I think

12    it was a female.  I do not remember that, her

13    name.

14          Q.    You told us -- sorry.  Were you

15    finished?

16          A.    I do not remember her name.  No.

17          Q.    You told us this morning that there

18    was the one incident where you terminated the

19    employee when HR called you about his background

20    check issue?

21          A.    Yes.

22          Q.    Other than in that instance, was

23    there ever a time that you wanted to terminate

24    one of the employees at 4822?

25          A.    If I -- if I wanted to?
```

[Page 200]

1                         O. Riaz, 7/11/11

2              Q.    Yes.

3              A.    Terminate an employee?  I mean, I

4     would only need to do that if there was -- if

5     there was a huge issue with that employee or

6     there was some kind of --

7              Q.    Did that ever happen?

8              A.    Sorry?

9              Q.    Did that ever happen?

10             A.    I need to recall.  Yes.  I think

11    there was a cashier named Kashmere that you

12    mentioned earlier today.  I also terminated her

13    for her not coming to work on time.  And she had

14    more than one issue behind her termination.  One

15    of them was the punctuality.  The other one was

16    that her register was short more than one time.

17             Q.    Did you actually sit down with

18    Kashmere and tell her that she was terminated?

19             A.    Yes, I did.

20             Q.    And it was your decision?

21             A.    It was my decision to -- not my

22    decision.  But it was my, I would say, more like

23    it was a recommendation to my district manager.

24    Because I was not able to fire somebody without

25    his consent.  And I told him the situation and

1                     O. Riaz, 7/11/11

2      everything.   And he said, okay, and there you

3      go.  So...

4              Q.     You understood that to terminate

5      and employee you had to partner with either your

6      district manager or human resources?

7              A.     Just the district manager.

8              Q.     Just the district manager.  And

9      there was never a time that you told your

10     district manager you wanted to terminate someone

11     and he said no?

12             A.     There was -- no.  There was a time.

13     There was a time.  Because I wanted to replace

14     somebody.  And he said no to me.  He said, "No.

15     He's good to go.  Give him more time or keep an

16     eye on him or I will talk to him."  He suggested

17     things of that nature to me.  And I had to keep

18     the guy.

19             Q.     Who was that?

20             A.     His name is Nicholson.  Last name,

21     I do not remember.

22             Q.     What was his position?

23             A.     Shift supervisor.  He used to go by

24     the name Nick.

25             Q.     Did your district manager ask you

[Page 202]

1                    O. Riaz, 7/11/11

2    to provide him with more training?

3         A.    No.

4         Q.    And why did you want to replace

5    Nick?

6         A.    Because Nick was very rude to

7    customers in my absence.  I was made aware of

8    that by other employees; that this guy was very,

9    very rude to other people in a way that that

10   could bring other problems to the store.  Like,

11   legal actions by the customers.  Because that

12   guy would make statements and say things.  And I

13   was very cautious about that.  I was very

14   worried that this guy was going to do something

15   to the store that was going to cost us even --

16   you know.  Something more.  And I told my

17   district manager about that; that the way this

18   guy was behaving was very erratically.  And the

19   district manager -- and then I actually sat down

20   with him.  And I went over the whole thing with

21   him.  And he got mad at me.  And he left the

22   office with cell phone in his hand, dialing the

23   district manager's phone number.  It was a very

24   dramatic situation in the store.  He called the

25   district manager right in front of me.  Went

[Page 208]

1                         O. Riaz, 7/11/11

2     district manager said no?

3              A.      There was no other time.

4              Q.      You never made any other

5     recommendation, other than Melinda?

6              A.      I did not, no.

7              Q.      Did you understand that you were

8     responsible for developing your shift

9     supervisors?

10             A.      Yes.

11             Q.      And did you understand that you

12    were responsible for developing your assistant

13    store manager?

14             A.      Yes.

15             Q.      Did you think that your district

16    manager had responsibility for developing you?

17             A.      Yes.

18             Q.      Did he?

19             A.      Yes.

20             Q.      While you were the store manager at

21    4822, you were the highest ranking employee in

22    the store?

23             A.      In the store.   Yes.

24             Q.      And you understood that you were in

25    charge of the store as the store manager?

[Page 209]

1                    O. Riaz, 7/11/11

2          A.    Yes.

3          Q.    Did you try to treat your managers

4     like a team?

5          A.    Yes.  I always treated them as a

6     team.

7          Q.    Were you aware of store managers in

8     your district who worked more than you?

9          A.    I'm sorry.  Please repeat that

10    again.

11         Q.    Were you aware of store managers in

12    your district who worked more hours than you?

13         A.    So your question is were my store

14    managers in my district?

15         Q.    Were you aware that other store

16    managers in your district were working more

17    hours than you?

18         A.    Yes.  I was aware of a couple of

19    people.

20         Q.    Were you aware of other store

21    managers in your district who were working less

22    hours than you?

23         A.    No, I was not aware of that.

24         Q.    How were you aware of other store

25    managers who were working more hours than you?

Case 1:08-cv-09361-JPO-HBP   Document 213-19   Filed 01/22/13   Page 20 of 207
Yatram Indergit, et al. v. Rite Aid Corporation, et al.   1:08-cv-09361-PGG-HBP
Omar Riaz                                                  July 11, 2011

[Page 210]

1                      O. Riaz, 7/11/11

2           **A.**   I have, you know, people -- you

3    know.  Every time we got together, our district

4    office, for our monthly store manager meetings,

5    we, you know, we talked to each other.  And we

6    vented the air out to each other by, you know,

7    by talking things, like, you know, financial.

8    That, hey, I'm working six days.  Somebody said

9    I'm working five days, 70 hours.  I'm working

10   this, this, this.  You know.  So we all knew

11   that we were all being overworked, working over,

12   way over our assigned hours.

13          **Q.**   As you sit here today, would you be

14   able to tell us how many hours you worked in any

15   particular week while you were store manager?

16          **A.**   Yes.  I worked somewhere around 60

17   to some -- some particular instance and

18   particular days of the week I also worked longer

19   hours than 60 a week, 65.  Sometimes I would

20   open the store and close the store.  That itself

21   is, 8:00 a.m. to 10:00 p.m., is a 14-hour long

22   shift.  And I would also come into the store on

23   my days off for a couple of hours or so.

24                 So, counting all these hours

25   together, you know, I go well above 60 hours a

[Page 211]

1                O. Riaz, 7/11/11

2      week.

3            Q.     And so you said in particular

4      instances you might work more than 60 hours in a

5      week.   What kinds of things might cause you to

6      work more than 60 hours a week as a store

7      manager?

8            A.     Okay.   Resetting the seasonal

9      aisles, which were in the very front of the

10     store.   They used to be there.   I don't know if

11     they are still there.   Three or four aisles

12     right in front of the store, when you enter the

13     store.   Those are called seasonal aisles.   Those

14     aisles always need replanning, redesigning,

15     remerchandising.   Everything.   Because that

16     stuff is always seasonal.   If it's Halloween

17     time, the Halloween stuff is there.   Or if it's

18     Mother's Day, Mother's Day stuff goes there.

19     Everything else has to be moved.   Things have to

20     go on the shelves.   So there's always a major

21     change going on in those aisles, five aisles

22     there.   So working on those five aisles with

23     just one man, doing a one-man show in those

24     aisles, it's not -- I mean, it requires lots of

25     hours for you to work there.

[Page 212]

1                    O. Riaz, 7/11/11

2          Q.    Can you think of any other

3    particular circumstances that might cause you to

4    work more than 60 hours in a week?

5          A.    Yes.   The long list of assignments.

6    Long list of tasks that would be given to me by

7    the district manager would require me to stay

8    there for very, very long hours.   I would

9    finally have to pull myself out of there and go

10   home.

11         Q.    Any other particular instances that

12   you can think of that cause you to work more

13   than 60 hours?

14         A.    I won't call the situation as an

15   incident.   I think it was an ongoing story.   It

16   was an ongoing struggle that was going on

17   there --

18         Q.    Were there particular --

19         A.    -- on a weekly basis.

20         Q.    I'm sorry.   Were you finished?

21         A.    Yes.

22         Q.    Were there particular circumstances

23   that caused you to sometimes have to open and

24   close the store?

25         A.    Yes.   If somebody had called in

1                    O. Riaz, 7/11/11

2      that day and my district -- if my ASM was also

3      off that day, and if somebody had called in and

4      somebody had to go to the doctor's office or

5      something, I would -- I would just go home for

6      an hour or so and come right back and close the

7      store.

8            Q.     Did you use the daily tour sheet?

9            A.     Daily tour sheet?

10           Q.     Yes.

11           A.     I did use the daily tour sheet in

12     the beginning, right after I finished my

13     training.  But then it became my habit just to

14     use my regular notepad, to just jot down stuff

15     that needed to be taken care of that day.  Stuff

16     that I could see when entering the store,

17     opening the store that day.

18           Q.     Instead of using the daily tour

19     sheet?

20           A.     Yes.  It works the same.

21           Q.     But you always, when you opened,

22     part of your responsibility was to walk the

23     store and figure out things that needed to

24     happen that day?

25           A.     Exactly.  Yes.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.     1:08-cv-09361-PGG-HBP
Omar Riaz                                                   July 11, 2011

[Page 214]

1                    O. Riaz, 7/11/11

2          Q.    You would agree that you were

3   responsible for safety in the store as well?

4          A.    I was responsible for safety along

5   with everybody else that was working the store.

6          Q.    If you saw an unsafe situation in

7   the store, you needed to address that?

8          A.    Yes.  Yes.  Or if my cashier saw

9   it, he or she would also be able to address the

10  issue.

11         Q.    Do you know what a "sysm" is?

12  S-y-s-m.

13         A.    Yes.  Sysm is an e-mailing.  It's a

14  way of communication.  It's a way of

15  communication, internal communication between

16  employees and corporate and store managers and

17  stuff like that.  Sysm is like an e-mail.

18         Q.    Do you know if it was e-mail based?

19         A.    It was e-mail based.  Intranet

20  based, I think.  Intranet.  More secure than

21  Internet.

22         Q.    Do you remember that it looked like

23  the old DOS screen?

24         A.    Yes.  Old DOS screen.  Exactly.

25         Q.    Greenish green?

[Page 284]

1                    O. Riaz, 7/11/11

2          Q.    Okay.  So in setting the schedule

3    every week, did you feel that you were

4    controlling store expenses?

5          A.    No.  I was not in control of my

6    expenses.

7          Q.    You did not think that the way you

8    scheduled employees was one way that you could

9    control expenses in the store?

10         A.    Like I said earlier, those expenses

11   were being controlled already by my supervisor.

12         Q.    Okay.  Let's look at the next

13   category, Page 2 of Exhibit 4.  Customer

14   Focused.  Do you see anything there that you

15   felt you were not responsible for as the store

16   manager?

17         A.    Yes.  I was responsible for all

18   those bullet points there.

19         Q.    Okay.  Turn to Page 3 of Exhibit 4.

20   Accountability.  Let me know if any of those

21   were things that you were not responsible for.

22         A.    A few things.  Adjust work plans to

23   meet changing company needs.

24         Q.    Anything else?

25         A.    Yes.  Personally manages

Yatram Indergit, et al. v. Rite Aid Corporation, et al.     1:08-cv-09361-PGG-HBP
Omar Riaz                                               July 11, 2011

[Page 285]

1                    O. Riaz, 7/11/11

2      productivity by prioritizing tasks appropriately

3      based on needs and supervisor instructions.

4           Q.    So I'm a little confused by your

5      disagreement with those.  We did talk earlier

6      about the fact that you would decide what work

7      needed to be done on a particular day.  Correct?

8           A.    Yes.

9           Q.    And you would also prioritize the

10     work that needed to be done on a particular day.

11     Correct?

12          A.    I would have a guideline from my

13     district manager how to prioritize work.

14          Q.    But as you were assigning work to

15     associates who were working for you, weren't

16     there times that you said "I want you to do this

17     first.  And if you finish that, then do this"?

18          A.    Of course.  I did say those things.

19     But those things came down to me from another

20     individual.

21          Q.    And -- well, no one was telling you

22     make sure Melinda does this first today and this

23     second, were they?

24          A.    Yes.  Actually, yes.

25          Q.    Who was telling you that?

[Page 286]

1                    O. Riaz, 7/11/11

2           A.     Mr. Kal.

3           Q.     He actually called you every day

4    and told you who should do what?

5                  MR. VALLI:   Objection to form.

6           A.     He actually told me every day.

7           Q.     (By Ms. Barbaree)   And told you

8    which employee should do what?

9           A.     He would talk to me about the tasks

10   for the day and who those tasks were assigned to

11   and how they were being done and the work

12   progress.

13          Q.     So he would ask you who you had

14   assigned the tasks to?

15          A.     Yes.  Yes.

16          Q.     Did you sometimes make changes in

17   your work plans based on whatever happened that

18   particular day?

19          A.     Yes.

20          Q.     Check out the next category, on

21   Page 3.  Teamwork.  Any of those areas things

22   that you felt you were not responsible for?

23          A.     Teamwork.  Where do you see

24   Teamwork?  Page 3?

25          Q.     Page 3.  In the middle of the page.

[Page 287]

1                         O. Riaz, 7/11/11

2     Competency 3.  Teamwork.

3                    MR. VALLI:  Do you want me to point

4          it out?  I will.

5                    MS. BARBAREE:  Sure.

6                    Sorry.  We weren't finished with

7          that page yet.

8          A.    Demonstrates flexibility, adapts

9     well to change.

10         Q.    (By Ms. Barbaree)  You did not have

11    to be flexible as a store manager?

12         A.    I would have loved to do so, but I

13    was not very flexible.  There are so many things

14    that I could and could not do.  So -- a few

15    things that limited my ability to do so.

16         Q.    So you were not as flexible as you

17    would have liked to have been?

18         A.    Of course.  Yes.

19         Q.    There were things that you could be

20    flexible about, but things that you could not?

21         A.    Yes.

22         Q.    Look at the next competency

23    initiative.  Are those things that you did as a

24    store manager?

25         A.    Anticipates needs and acts

[Page 309]

 1                    O. Riaz, 7/11/11

 2          revisited.)

 3          Q.    (By Mr. Valli) I'm going to ask you

 4    just about Page 1 and 2 right now.  Page 1 and 2

 5    go together.  Correct?  They're for one week.

 6          A.    That is correct.

 7          Q.    Okay.  And going to the second

 8    page, the last entry, it has Nirmal Saha.  But

 9    all the time has been whited out.  Did you do

10    that, do you know?

11          A.    I did that.  Yes.

12          Q.    Do you know if Nirmal was on

13    vacation this week?

14          A.    Exactly.

15          Q.    Okay.  And now, if you look at one

16    column up, Omar Riaz?

17          A.    Yes.

18          Q.    Are you scheduled every single day

19    that week?

20          A.    Yes.

21          Q.    And did you work every single day

22    that week?

23          A.    Yes.

24          Q.    Approximately 70 hours?

25          A.    Yes.

[Page 310]

1                    O. Riaz, 7/11/11

2          Q.    And if you look at those entries,

3    they're all either 7:45 or 7:30.  Is that

4    correct?

5          A.    That's correct.

6          Q.    What does that mean?  Did you open

7    every day?

8          A.    I opened every day.

9          Q.    And who closed?

10         A.    My shift supervisor.

11         Q.    Who?

12         A.    Nicholas Dickson.

13         Q.    Okay.  So when you described the

14   closing procedures before --

15         A.    Yes?

16         Q.    -- did Nicholas Dickson perform all

17   those closing procedures?

18         A.    Yes.

19               MS. BARBAREE:  Objection to the

20        form.

21         A.    Yes, he did.

22         Q.    (By Mr. Valli)  Okay.  Well, you

23   assume that he did.  Correct?

24         A.    Correct.

25         Q.    Each morning when you came in on

[Page 311]

1                    O. Riaz, 7/11/11

2      this week, did you notice if anything wasn't

3      done the night before in terms of closing

4      procedures?

5           A.    Many things I noticed.

6           Q.    Did you ask Mr. Dickson why?

7           A.    Mr. Dickson's excuse was the lack

8      of manpower.

9           Q.    Okay.  Does Mr. Dickson deal with

10     the cash when he closes?

11          A.    He did.  He made the deposits.

12     Yes.  And counted the register before closing

13     the registers.

14          Q.    He has access to the safe?

15          A.    Yes.

16          Q.    He has access to the alarm codes?

17          A.    Yes, he had.

18          Q.    Okay.  Before you talked about

19     customer service and repeat customers.

20          A.    Yes.

21          Q.    What, if anything -- withdrawn.

22                Did you attempt to provide

23     excellent customer service?

24          A.    I always intended to provide

25     excellent customer service.

[Page 312]

1                    O. Riaz, 7/11/11

2          Q.    Did anything impair that ability?

3          A.    Please repeat that.

4          Q.    Did anything impair your ability to

5    provide excellent customer service?

6          A.    A number of factors actually

7    impaired my ability to do so.  And I could go

8    on, but the number one issue, like I've been

9    saying that all day, was the understaffing, not

10   getting enough hours, and having lots of work

11   being put on me that hindered, slowed down my

12   progress, and made me, almost disabled me from

13   carrying out my actual duties with the

14   distraction that I was involved in.  Such as

15   cleaning the restrooms.  Preparing the shelves.

16   Looking for dead rats under the shelves.

17   Cleaning parking lots.  Things of that nature.

18         Q.    In terms of Exhibit 4 -- I think

19   it's this.  No.  I'm wrong.

20               The first page is Superior

21   Experience.  I just want to call your attention

22   to Page 1, down at the bottom, where it says Be

23   Profitable.

24         A.    Yes.

25         Q.    And it says "LY shrink of 74,353 at

Page 332

1          A C K N O W L E D G M E N T

2

3    STATE OF ~~NEW YORK~~ *NEW JERSEY*       )

4                              :ss

5    COUNTY OF *Hudson*   )

6

7          I, OMAR RIAZ, hereby certify that I

8    have read the transcript of my testimony taken

9    under oath in my deposition of July 11, 2011;

10   that the foregoing transcript is a true,

11   complete, and correct record of my testimony;

12   and that the answers on the record as given by

13   me are true and correct.

14

15                    _____

16                    OMAR RIAZ

17

18   Signed and subscribed to before me

19   this ___*9th*___ day of ___*August*___ , 2011.

20

21   _____

22   NOTARY PUBLIC

23   GENEVA BROOKS
     NOTARY PUBLIC
     STATE OF NEW JERSEY
24   MY COMMISSION EXPIRES JULY 15, 2014
     I.D.# 2058687

25

# Exhibit BBB

Page 1

STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


YATRAM INDERGIT, ON BEHALF OF          )
HIMSELF AND OTHERS SIMILARLY           )
SITUATED,                              )
                                       )
                      PLAINTIFF,   )CASE NO.
                                   )1:08-CV-09361
          vs.                      )-PGG-HBP
                                       )
RITE AID CORPORATION, RITE AID OF      )
NEW YORK, INC., AND FRANCIS OFFOR AS   )
AIDER & ABETTOR,                       )
                                       )
                      DEFENDANTS.  )
_____)


DEPOSITION OF CINDA RILEY

TAKEN FRIDAY, AUGUST 12, 2011

LOS ANGELES, CALIFORNIA


Reported by Audra E. Cramer, CSR No. 9901

Page 85

```
 1      A.    No.

 2      Q.    How did you inform the person that he or she

 3   was banned from the store?

 4      A.    We have a trespass form, and we handed them

 5   that and told them they weren't allowed on Rite Aid

 6   property.

 7      Q.    How many customers do you think you banned from

 8   the store?

 9            MS. SCOTT:  Objection.  Form.

10            THE WITNESS:  I have no idea.

11   BY MR. SCOTT:

12      Q.    More than one?

13      A.    Yes.

14            MR. SCOTT:  Hand you what's been marked as

15   Exhibit 5.

16                    (Whereupon, Exhibit 5 was marked

17                 for identification.)

18   BY MR. SCOTT:

19      Q.    Exhibit 5 is a somewhat rough copy of your

20   performance appraisal as a store manager at 6341

21   administered in February of '02; right?

22      A.    Yes.

23      Q.    And Terry would have been your district manager

24   at this time?

25      A.    Yes.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**     1:08-CV-09361-PGG-HBP
**Cinda Riley**                                                 **August 12, 2011**

Page 86

1      Q.   And this is a performance review that you

2  received as a store manager; right?

3      A.   Yes.

4      Q.   And that's your signature on the last page of

5  the exhibit?

6      A.   Yes.

7      Q.   When asked the primary duties and

8  responsibilities of the store manager position, Terry

9  wrote, "Store manager is in charge of total store

10  operation"; right?

11     A.   Yes.

12     Q.   And that was accurate; correct?

13     A.   No.

14     Q.   Why was that not accurate?

15     A.   Because when he would come into my store, he

16  would -- we would do store walks, and I'd have to create

17  a list, and he would tell me to change this, to change

18  that; this wasn't what he thought it would be.  He'd

19  also tell me -- like scheduling, he told me I couldn't

20  have a sweetheart schedule, which is, like, a

21  Monday-through-Friday schedule for employees.  He said

22  Rite Aids frowned upon schedules like that.

23          And I said, "Well, I'm not allowed to give them

24  more money, but I can give them a better schedule."

25     Q.   By "them," you mean your employees?

Page 87

```
 1        A.    Yes.
 2        Q.    So you don't believe you were in charge of
 3   total store operations because Terry also had a hand in
 4   the store operations?
 5        A.    Yes.
 6        Q.    And Terry would come in about once a month?
 7        A.    Yes.
 8        Q.    And would issue you directives when he came in?
 9        A.    Yes.
10        Q.    And outside of that direction from Terry, you
11   were in charge of total store operations; right?
12        A.    Well, unless it was an HR problem.  Then I
13   had -- every step had to be documented with HR.  I had
14   to talk to them about different issues with employees,
15   and I didn't have the authority to fire anybody unless
16   it was approved by HR.
17        Q.    When you say "HR issue," you mean personnel
18   issue?
19        A.    Yes.
20        Q.    And personnel issues you had to run through HR?
21        A.    Yes.
22        Q.    There was required documentation you had to
23   complete with respect to personnel issues?
24        A.    Yes.
25        Q.    You were in charge of completing the
```

Page 88

1   documentation?

2        A.   Or the other members of management.

3        Q.   The other members of management were under your

4   supervision?

5        A.   Yes.

6        Q.   So when you wanted to fire someone, you had to

7   complete the required documentation as to that person?

8        A.   Well, I never wanted to fire somebody.  But if,

9   say, there were cash control problems, it all had to be

10  documented.  And we would try to work with them, you

11  know, different forms of -- maybe having somebody else

12  work side by side with them during cashiering to see

13  what the issues were.

14       Q.   Did you ever recommend when you were a

15  store manager that somebody be terminated and that

16  person was not terminated?

17       A.   No.

18       Q.   Did you ever fire any employees?

19            MS. SCOTT:  Objection.  Form.

20            THE WITNESS:  I don't remember.

21  BY MR. SCOTT:

22       Q.   When Terry gave you this evaluation and wrote,

23  "Store manager is in charge of total store operations,"

24  did you say, "Terry, I am not in charge of total store

25  operation"?

Page 89

1          MS. SCOTT:  Objection.  Form.

2          THE WITNESS:  I don't remember.

3     BY MR. SCOTT:

4     Q.    In the "Comments" section at the end of the

5     page, when it asks you, "What are your comments, if any,

6     regarding this appraisal?" you didn't write, "This

7     appraisal is inaccurate"; correct?

8     A.    No.

9     Q.    That means that you didn't write it; right?

10    A.    No.

11    Q.    Did you write in the "Comments" section, "This

12    appraisal is inaccurate"?

13    A.    No.

14    Q.    Can you take a look at the "Primary Duties and

15    Responsibilities" section on the first page.

16          Terry wrote, "One of the primary duties and

17    responsibilities of this position is overseeing store

18    conditions, including facing, ordering, et cetera."

19          Do you agree with that?

20    A.    Where am I looking?

21    Q.    No. 1 in "Primary Duties and Responsibilities."

22    A.    Yes.

23    Q.    Do you agree you had to oversee store

24    conditions, including facing and ordering, as a

25    store manager?

Page 90

```
 1      A.   For facing and ordering, yes.

 2      Q.   2, he wrote, "In charge of labor, front end and

 3   pharmacy.  Must hit corporate budgeting goals."

 4           Do you agree you were in charge of labor,

 5   front end and pharmacy and that -- strike that.

 6           Do you agree that you were in charge of labor

 7   and that front end and pharmacy must hit corporate

 8   budgeting and goals?

 9           MS. SCOTT:  Objection.  Form.

10           THE WITNESS:  I don't believe that I was

11   ultimately in charge of those, because like I said, they

12   would call and ask me to cut hours or...

13   BY MR. SCOTT:

14      Q.   You could not set the labor budget for your

15   store?

16      A.   No.

17      Q.   Within the labor budget for your store, you

18   were responsible for making sure that that labor did not

19   exceed your budget though; right?

20      A.   Yes.

21      Q.   That was true for both the front end and the

22   pharmacy?

23      A.   Yes.

24      Q.   3 under "Primary Duties and Responsibilities,"

25   he wrote, "Must hit goals for sales shrink and
```

Page 91

1    profitability."

2        A.    Yes.

3        Q.    And as a store manager, you did have to hit

4    your sales shrink and profitability goals; right?

5            MS. SCOTT:  Objection.  Form.

6            THE WITNESS:  Yes.

7    BY MR. SCOTT:

8        Q.    4, he wrote, "In charge of hiring and

9    discipline, et cetera, for front end and pharmacy."

10       A.    Yes, he wrote that.

11       Q.    Do you agree with that?

12       A.    No.  Like I said before, discipline had to be

13   run through HR.  And what was the first thing?  In

14   charge of...

15       Q.    Hiring.

16       A.    I would say I was in charge of hiring.

17       Q.    And for discipline, you could verbally

18   discipline an employee whenever you wanted to; right?

19           MS. SCOTT:  Objection.  Form.

20           THE WITNESS:  It still had to be documented.

21   BY MR. SCOTT:

22       Q.    Every time you verbally disciplined an

23   employee, it had to be documented?

24       A.    Yes.  It didn't have to be a written -- like, a

25   warning or anything, but I had to write down, "On

Yatram Indergit, et al. v. Rite Aid Corporation, et al.     1:08-CV-09361-PGG-HBP
Cinda Riley                                                         August 12, 2011

Page 92

1    such-and-such day I talked to John Doe about" --

2    whatever the issue was.

3        Q.    Did you have to get HR approval prior to

4    verbally disciplining an employee?

5        A.    No.

6        Q.    Did you have to get HR approval prior to

7    writing up an employee if that write-up was the first

8    write-up?

9        A.    I didn't have to get their approval, but I was

10   supposed to let them know when I did a write-up.

11       Q.    After the fact?

12       A.    Yes.

13       Q.    And if it was a final warning, then you had to

14   get HR approval.

15       A.    Yes.

16       Q.    And to terminate someone, you had to get HR

17   approval?

18       A.    Yes.

19       Q.    You had to partner with them to make sure that

20   everyone was being treated fairly?

21             MS. SCOTT:  Objection.  Form.

22             THE WITNESS:  I don't know if it was for being

23   treated fairly, but everyone was treated the same.

24   BY MR. SCOTT:

25       Q.    Everybody was treated equally?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**      **1:08-CV-09361-PGG-HBP**
**Cinda Riley**                                                 **August 12, 2011**

Page 93

```
 1       A.   Yes.

 2       Q.   As a store manager, you're evaluated on whether

 3   you hit payroll; right?

 4       A.   Yes.

 5       Q.   And whether you hit sales?

 6       A.   Yes.

 7       Q.   And whether you hit your planned

 8   Abida [phonetic]?

 9       A.   EBITDA?

10       Q.   EBITDA.

11       A.   Yes.

12       Q.   And what is EBITDA?

13       A.   Something about before something and

14   amortization.  It's...

15       Q.   It's a way of looking at the store's bottom

16   line; right?

17       A.   Yes.

18       Q.   And it compares profits against losses; right?

19       A.   Yes.

20       Q.   And that's something that you're evaluated on

21   as a store manager?

22       A.   Yes.

23       Q.   As a store manager, your most important duty is

24   to make the store as profitable as possible; right?

25            MS. SCOTT:  Objection.  Form.
```

Page 131

1    a detailed work list for you and your employees?

2        A.   Yes.

3        Q.   We've got one more of these, and then we'll

4    break.

5             As a store manager, you're evaluated on the

6    overall profitability of the store; correct?

7             MS. SCOTT:  Objection.  Form.

8             THE WITNESS:  Yes.

9             MR. SCOTT:  I'm going to hand you what's been

10   marked as Exhibit 10.

11                        (Whereupon, Exhibit 10 was marked

12                    for identification.)

13   BY MR. SCOTT:

14       Q.   Exhibit 10 is your self-appraisal from March

15   of 2006 when you were a store manager at Store 5256;

16   right?

17       A.   Yes.

18       Q.   Under the first section "Objectives of Your

19   Job" and whether you have met or exceeded them during

20   the past year, you wrote, "Running a profitable store.

21   Beat my EBITDA plan controlling payroll"; right?

22       A.   Yes.

23       Q.   Running a profitable store was an objective of

24   yours?

25       A.   Yes.

Page 132

1      Q.   Beating your EBITDA plan was an objective of

2   yours?

3           MS. SCOTT:  Objection.  Form.

4           THE WITNESS:  Yes.

5   BY MR. SCOTT:

6      Q.   And controlling payroll was an objective of

7   yours?

8           MS. SCOTT:  Objection.  Form.

9           THE WITNESS:  Like I said, dictated by the

10   district manager on conference calls and anytime he

11   needed to make his budget.

12   BY MR. SCOTT:

13      Q.   Payroll is a controllable store expense;

14   correct?

15           MS. SCOTT:  Objection.  Form.

16           THE WITNESS:  Yes.

17   BY MR. SCOTT:

18      Q.   And an example of an uncontrollable store

19   expense is rent; right?

20      A.   Yes.

21      Q.   And when you control payroll as a controllable

22   store expense, you improve the profitability of the

23   store; right?

24           MS. SCOTT:  Objection.  Form.

25           THE WITNESS:  But when you hire someone, they

Page 133

1    expect a certain amount of hours.  And as a RAPTAR

2    thing, I didn't feel like I could ask them -- they had

3    their bills to pay, and I didn't like having to tell

4    someone they couldn't come in.

5              MR. SCOTT:  I'm going to object to that

6    response as nonresponsive.

7         Q.   When you control payroll and lower payroll,

8    that improves the profitability of the store; correct?

9              MS. SCOTT:  Objection.  Form.

10             THE WITNESS:  On paper.

11   BY MR. SCOTT:

12        Q.   And I understand that you wanted to give your

13   employees as many hours as they wanted --

14        A.   As many hours as my budget said I could.

15        Q.   -- but bottom-line figures, if you're spending

16   less money on payroll, you're making more money in the

17   store; right?

18             MS. SCOTT:  Objection.  Form.

19             THE WITNESS:  But it usually wasn't my store

20   that wasn't making their plan.  It was other stores and

21   so that my boss could make his budget, because he was

22   given a budget too.  You know, these are your sales

23   plans for the month, you know, for all combined stores.

24   So then he would call me because he knew I would come in

25   and work the extra.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**    **1:08-CV-09361-PGG-HBP**
**Cinda Riley**                                **August 12, 2011**

Page 274

```
 1      Q.    Did Lee do that?
 2      A.    He never got to that point.
 3      Q.    Did George ensure all merchandise is set up
 4  according to planograms received from the corporate
 5  office?
 6      A.    Yes.
 7      Q.    Did Lee do that?
 8      A.    He wasn't around long enough to get those
 9  responsibilities.
10      Q.    He was around at least six months; right?
11      A.    But he couldn't even log on a till.  So we
12  worked with him, so he was never actually responsible
13  for making sure those things got done.
14      Q.    I understand.  I'm just saying he was there for
15  at least six months.
16      A.    Yes.
17      Q.    Okay.
18            Did George execute weekly sales ads and price
19  changes?
20            MS. SCOTT:  Objection.  Form.
21            THE WITNESS:  Yes.
22  BY MR. SCOTT:
23      Q.    Did Lee?
24            MS. SCOTT:  Objection.  Form.
25            THE WITNESS:  No.
```

Page 275

```
 1    BY MR. SCOTT:
 2        Q.    Did George process recalled, damaged, outdated
 3    and transferred merchandise?
 4        A.    Yes.
 5        Q.    Did Lee?
 6        A.    No.
 7        Q.    Did George receive merchandise deliveries from
 8    vendors and Rite Aid distribution centers?
 9              MS. SCOTT:   Objection.   Form.
10              THE WITNESS:   Yes.
11    BY MR. SCOTT:
12        Q.    Did Lee?
13              MR. SCOTT:  Objection.  Form.
14              THE WITNESS:   I think he did do some DSD
15    receiving.
16    BY MR. SCOTT:
17        Q.    Did he perform that duty in its entirety?
18        A.    Yes.
19        Q.    Did George verify vendor invoice information is
20    accurate and enter them into the accounts payable
21    system?
22        A.    I don't think he paid invoices online.
23        Q.    Did Lee do that?
24        A.    No.
25        Q.    Did any assistant store manager that you worked
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.      1:08-CV-09361-PGG-HBP
Cinda Riley                                                 August 12, 2011

Page 276

 1    with do that?

 2         A.    I don't think so.

 3         Q.    Do you currently do that?

 4         A.    I have probably three or four times since I've

 5    been there.

 6         Q.    As an ASM?

 7         A.    Yes.

 8         Q.    Did George prepare the retail store for

 9    physical inventory by ensuring merchandise on the sales

10    floor and in the stockroom is in order and easy to

11    access?

12         A.    Yes.

13         Q.    Did Lee do that?

14         A.    No.

15         Q.    Did George analyze operating reports and make

16    recommendations for improvement?

17              MS. SCOTT:  Objection.  Form.

18              THE WITNESS:  I believe -- we always went over

19    the P&L to see what we could improve, but I don't

20    remember him making recommendations.

21    BY MR. SCOTT:

22         Q.    Did Lee go over the P&L with you?

23         A.    I showed it to him a couple of times, but he

24    never made any recommendations.

25         Q.    In your absence, did George utilize Staffworks

Page 302

```
 1      Q.   Did you ever do a performance review for a

 2  pharmacy technician?

 3      A.   I don't believe so.

 4      Q.   If I asked you a question today and you didn't

 5  understand it, you asked me to clarify it; right?

 6      A.   Yes.

 7      Q.   And if you answered the question without asking

 8  me to clarify, I can assume that you understood it; is

 9  that fair?

10          MS. SCOTT:  Objection.  Form.

11          THE WITNESS:  Yes.

12          MR. SCOTT:  I pass the witness pending recross.

13          MS. SCOTT:  Can we just go off the record for a

14  little while?

15          MR. SCOTT:  Sure.

16          MS. SCOTT:  I just need, like, five minutes.

17          MR. SCOTT:  Take whatever you need.

18                  (Recess taken.)

19

20                  EXAMINATION

21  BY MS. SCOTT:

22      Q.   Ms. Riley, I'll be asking you some questions

23  now.

24          As a store manager at Rite Aid, did you

25  complete nonmanagerial tasks?
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**   **1:08-CV-09361-PGG-HBP**
**Cinda Riley**                                              **August 12, 2011**

Page 303

1          MR. SCOTT:  Object to the form.

2          THE WITNESS:  Yes.  I would clean the

3   restrooms, sweep the floor, stock the shelves, usually

4   for more than half my day.

5   BY MS. SCOTT:

6      Q.   Do you know what I mean when I say

7   "nonmanagerial tasks"?

8      A.   Items or tasks that aren't -- that I'm only not

9   able to do, like make the schedule and things like that.

10     Q.   When you say that you're not only able to do,

11  do you mean that other employees in the store would be

12  able to do those tasks, such as cashiers?

13     A.   Yes.  They're not able to write schedules or

14  pay invoices.  They can now.  With the Telxon, they can

15  pay invoices, but if they had to go through the console,

16  they couldn't do it.  So, yeah, I'd spend more than half

17  my day doing the nonmanagerial tasks that used to be

18  done mostly with cashiers.

19     Q.   Would you consider stocking shelves a

20  nonmanagerial task?

21         MR. SCOTT:  Object to form.

22         THE WITNESS:  Yes.

23  BY MS. SCOTT:

24     Q.   Did you stock shelves as a store manager at

25  Rite Aid?

Page 304

```
 1      A.   Yes.
 2      Q.   Would you consider pricing items a
 3   nonmanagerial task?
 4           MR. SCOTT:  Object to form.
 5           THE WITNESS:  Yes.
 6   BY MS. SCOTT:
 7      Q.   Did you price items when you were a
 8   store manager at Rite Aid?
 9      A.   Yes.
10      Q.   Would you consider working the cash register a
11   nonmanagerial task?
12           MR. SCOTT:  Same objection.
13           THE WITNESS:  Yes.
14   BY MS. SCOTT:
15      Q.   Did you work the cash register as a
16   store manager at Rite Aid?
17      A.   Yes.
18      Q.   Would you consider watering plants a
19   nonmanagerial task?
20           MR. SCOTT:  Object to form.
21           THE WITNESS:  Yes.
22   BY MS. SCOTT:
23      Q.   Did you water plants as a store manager at
24   Rite Aid?
25      A.   Yes.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.    1:08-CV-09361-PGG-HBP**
**Cinda Riley                                      August 12, 2011**

Page 305

```
 1        Q.   Are there any other nonmanagerial tasks you
 2   completed as a store manager at Rite Aid that you can
 3   think of?
 4        A.   I would come in at 5:00 a.m. and offload the
 5   truck by myself.
 6        Q.   Why wouldn't there be someone helping you
 7   unload the truck?
 8        A.   I didn't have the budget for it.  And when I
 9   talked to Marv about it, he just said, "Sorry."
10        Q.   Who set the budget at Rite Aid?
11             MR. SCOTT:  Object to form.
12             THE WITNESS:  I'm not really sure how they come
13   up with their budgets.  I'm assuming that the DM has
14   some input, but I'm not really sure how it's done.
15   BY MS. SCOTT:
16        Q.   As a store manager at Rite Aid, were you able
17   to alter the budget?
18        A.   You mean raise the amount of hours I used or...
19        Q.   Raise or lessen.  However you felt needed.
20        A.   If I raised it, I got a SYSM -- if I used more
21   hours than I was budgeted, then I had to answer to the
22   DM as to why.  And I lowered it when I was instructed to
23   do so by the DM.
24        Q.   Did you ever request from the DM additional
25   hours when you were a store manager at Rite Aid?
```

Page 306

 1      A.   Yes.

 2      Q.   And what resulted?

 3      A.   Nothing.  He said, "Everybody wants more

 4   hours."

 5      Q.   So you didn't end up getting those additional

 6   hours that you requested.

 7      A.   No.

 8      Q.   Going back to nonmanagerial tasks, why did you

 9   have to complete nonmanagerial tasks as a store manager

10   at Rite Aid.

11           MR. SCOTT:  Object to form.

12           THE WITNESS:  With the budgets being cut on a

13   regular basis, the expectations were that all the store

14   operations still had to be completed, and as the

15   salaried employee, I had to -- because it didn't put any

16   extra hours onto our budget.

17   BY MS. SCOTT:

18      Q.   And what would happen if the store operations

19   weren't completed as required by the district manager?

20      A.   He would either call me, or when he came in the

21   store and saw that this end wasn't done or whatever --

22   well, good example.  He came into my store one day, and

23   there were some items missing on the -- up front by the

24   cash register.  You know, they put those little

25   compulsive thing for people to buy, and there were some

Page 323

```
 1    STATE OF CALIFORNIA          )

 2    COUNTY OF LOS ANGELES        )  SS.

 3

 4

 5                    I, CINDA RILEY, hereby certify under

 6    penalty of perjury under the laws of the State of

 7    California that the foregoing is true and correct.

 8                    Executed this _____ day of

 9    _____, 2011, at

10    _____, California.

11

12

13                    _____

14                    CINDA RILEY

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit CCC

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


-------------------------------------x

YATRAM INDERGIT, on behalf of himself

and others similarly situated,

        Plaintiff,                    CIVIL ACTION NO. 1:08-cv-09361-

    - vs -                                 PGG-HBP

RITE AID CORPORATION, RITE AID OF

NEW YORK, INC., and FRANCIS OFFOR as

Aider & Abettor,

        Defendants.

-------------------------------------x


        July 14, 2011

        9:43 a.m.


    DEPOSITION of KENNETH RUZAT, taken by

Defendants, pursuant to Fed.R.Civ.P. 30 and

agreement of counsel, held at the offices of EMG

New York, 250 Park Avenue, New York, New York

10177, before Janet Hamilton, a Registered

Professional Reporter and Notary Public of the

State of New York.

Page 120

1   involves computers, anything that involves

2   electronic transactions.

3          A.    But there isn't one if you're going

4   to handwrite it, is what you're saying.

5          Q.    So the handwritten rain check form,

6   there's no --

7          A.    It's not trackable.  No.

8          Q.    There's no, like, carbon.  You

9   know.  You can write out Rain Check, and

10  underneath there's a --

11         A.    Oh, there's a yellow copy.  But we

12  don't hold it.  We know we needed it.  So we

13  just ordered it and we'd throw it out.

14               Same with the one from the

15  register.  We don't keep that extra copy.  We

16  look at it and make sure you order more of it.

17         Q.    The rain check form is in a book

18  with a yellow copy?

19         A.    The rain check form has two copies;

20  a yellow and a white copy.

21         Q.    And is the white the original, so

22  to speak?

23         A.    Yes.  That you give to the

24  customer.

25               K. Ruzat, 7/14/11

Page 121

1          Q.      And the yellow stays in your book?

2          A.      Well, like I said, we didn't keep a

3     record of any book or anything.

4          Q.      Was it Rite Aid's policy to keep a

5     record?

6          A.      No.

7          Q.      What was the purpose of the yellow

8     form?

9          A.      The yellow form was to let you know

10    that next order you order it.

11         Q.      How did you know that if you didn't

12    retain it?

13         A.      I retained it in my brain to know

14    that item, that one particular item.

15         Q.      And the store manager made the

16    orders for merchandise?

17         A.      Not all the time.

18         Q.      Sometimes?

19         A.      Sometimes.  Or the assistant

20    manager.

21         Q.      Did anyone else have the authority

22    to order merchandise, other than the store

23    manager or the assistant store manager?

24         A.      As far as ordering?  You mean for

25                     K. Ruzat, 7/14/11

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Kenneth Ruzat                                          July 14, 2011

Page 122

1    the cycle count gun?  That was the proper way to

2    do it.

3          Q.    Tell me the proper way to do it.

4          A.    That was supposed to be how you

5    would do it.  You went back to the shelf and you

6    ordered it.  You couldn't order more or less.

7    You had to get approval from the district

8    manager.  You had to do cycle counts only.

9    That's how you came up with shortages, as far as

10   not having enough for the sale.

11         Q.    Now, I thought you mentioned that

12   the yellow copy, if it was -- if the rain check

13   was written out on the paper book, was to remind

14   the store manager or the assistant store manager

15   to order more of that item.  Is that correct?

16         A.    Correct.

17         Q.    So ordering took place in more than

18   one way.  One, through the cycle gun.  Is that

19   correct?

20         A.    Correct.

21         Q.    And was there a way to supplement

22   the order through the cycle gun?

23         A.    Yes.

24         Q.    And how did you do that?

25                    K. Ruzat, 7/14/11

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Kenneth Ruzat**                                                    **July 14, 2011**

Page 123

1          A.     You could order it.   There was a

2     screen on the cycle count gun or in the computer

3     where you would order supplies.   Where you could

4     order supplies plus add in anything more.   But

5     at one point DMs were telling you that you were

6     not allowed to do that anymore.   You had to go

7     with whatever the count was on the shelf or get

8     his approval if you wanted to order extra of

9     anything; to keep inventories under control.

10          Q.     When you say "order supplies," is

11     that different than the items that you ordered

12     to sell?

13          A.     Correct.

14          Q.     Supplies like what?

15          A.     Paper bags.

16          Q.     Oh.  Paper bags.

17          A.     Plastic bags, I mean.   Bathroom

18     supplies.  Cleaning supplies.   Office supplies.

19          Q.     Supplies that you needed to run the

20     business?

21          A.     Yes.

22          Q.     Rather than items that you needed

23     to sell?

24          A.     Yes.

25               K. Ruzat, 7/14/11

Page 124

```
 1          Q.    And when you ordered supplies,
 2   there was a place where you could order
 3   additional items to sell.  Is that correct?
 4          A.    Yes.
 5          Q.    Who had the authority to order
 6   supplies?  The store manager, the assistant
 7   store manager?  Well, let me ask you.  Did the
 8   assistant store manager have the authority to
 9   order supplies?
10          A.    He did, if I asked him to order
11   them for that week.
12          Q.    It was a duty that the store
13   manager had.  But the store manager could
14   delegate that duty to the assistant store
15   manager.  Is that correct?
16          A.    Yes.  Correct.
17          Q.    Could the store manager delegate
18   that duty to the shift supervisor?
19          A.    Yes.
20          Q.    Could the store manager delegate
21   that duty to anyone else in the store?
22          A.    No.
23          Q.    Could the assistant manager
24   delegate that duty to the shift supervisor?
25                     K. Ruzat, 7/14/11
```

Page 143

 1   associates?

 2          A.     I'm sorry.  Can you repeat the

 3   question?

 4          Q.     Certainly.  I'll even withdraw that

 5   question and I'll ask you this question.

 6                 And we're going to take lunch in --

 7   would you like to take lunch now?

 8          A.     No.  I'm good.

 9          Q.     Okay.  As the store manager, when

10   you received the payroll budget, was the payroll

11   budget expressed in the number of hours that you

12   could allocate to the hourly associates?

13          A.     What I can remember is you could

14   look on the computer and it would tell you in

15   dollars.

16          Q.     Dollars.  Thank you.  Okay.  Go

17   ahead.

18          A.     Then we would have discussions with

19   the district manager.  And he would say, well,

20   this is the total hours.  Make sure you don't go

21   over this.

22                 And we'd say, well, that doesn't

23   quite go with what's listed on the computer.

24                 And he'd say that's what it is.  I

25                 K. Ruzat, 7/14/11

Page 144

1    can't change it.

2         Q.    Why wouldn't the expression of the

3    payroll budget in hours be consistent with the

4    amount shown in the computer for the payroll

5    budget in dollars?

6              MR. SINHA:  Objection to form.

7         A.    I don't know.

8         Q.    (By Mr. Weiner)  Well, what was the

9    difference between the hours and the dollars?

10        A.    You would end up with more hours,

11   because the dollars were higher.

12        Q.    If you used the dollars, you'd have

13   more hours?

14        A.    Yes.

15        Q.    So the district manager didn't

16   allow you to allocate all of the payroll budget?

17        A.    No.

18        Q.    Is that correct?

19        A.    Correct.

20        Q.    What would the reason for that be?

21   If you know.

22              MR. SINHA:  Objection to form.

23        A.    I don't know.  I have no idea.

24        Q.    (By Mr. Weiner)  Can you recall

25              K. Ruzat, 7/14/11

Page 145

1    what the dollars were of the payroll budget at

2    2548?

3            A.    No.

4            Q.    Can you recall the dollars of a

5    payroll budget at any store?

6            A.    2264.  When we converted it, it was

7    under 290 hours to run, for the store.

8            Q.    Who did the conversion from dollars

9    to hours?

10           A.    It was on the chart.  It would tell

11   you dollars, and then this is the hours.

12           Q.    The computer did that?

13           A.    Yes.

14           Q.    Because doesn't the number of hours

15   depend upon the hourly rate?

16           A.    Jim would also send out how many

17   hours you had used.

18           Q.    So he calculated the hours?

19           A.    He would tell you you had this many

20   hours.  I would go back and keep telling him

21   it's getting less.  It's getting less.

22           Q.    I understand that.  But it's just

23   that --

24           A.    But it was on the computer.  It did

25                 K. Ruzat, 7/14/11

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Kenneth Ruzat**                                                        **July 14, 2011**

Page 206

```
 1          A.    Yes.
 2          Q.    How long was a new hire teamed up
 3   with a buddy?
 4          A.    Approximately three, four weeks.
 5          Q.    And what else did you do in the
 6   hiring process?
 7          A.    I personally walked the store with
 8   them.  Showed them how things were.  What the
 9   signs meant.  The labels.  How the truck order
10   came in.  Like I said, I reviewed the schedule
11   with them.  How the pay period worked.
12   Introduced them to everyone on the staff,
13   including the pharmacy staff.
14          Q.    How many times do you think you did
15   what you just described during the course of
16   your employment at Rite Aid?
17          A.    I don't recall how many times.
18          Q.    Was it more than ten?
19          A.    Yes.
20          Q.    Was it more than 20?
21          A.    Yes.
22          Q.    Oh.  Was it more than 40?
23          A.    Yes.
24          Q.    Was it more than 60?
25                K. Ruzat, 7/14/11
```

Page 207

```
 1          A.    Over 20-some years, I would think
 2    so.  I mean, not 20; 18.  From 1987.
 3          Q.    And with regard to the other side
 4    of that equation, what did you do to discipline
 5    employees?
 6                MR. SINHA:  Objection to form.
 7          A.    Rite Aid had a form which you
 8    filled out.  The first one was oral.  Second was
 9    a write-up.  I don't know exactly at this point,
10    it's been a while, how the actual write-ups went
11    before they were reviewed and fired.  You had to
12    have the district manager's approval and human
13    resource manager's approval before you could
14    fire them.  But there were several steps.
15    Because it was a union store.  The union rep had
16    to -- the union steward had to be involved also.
17          Q.    (By Mr. Weiner)  Did the union
18    steward have to be involved for the oral
19    warning?
20          A.    No.
21          Q.    You could do that at any time?
22          A.    Correct.
23          Q.    What did you do as a store manager
24    if you saw somebody violating the policy?  Did
25                K. Ruzat, 7/14/11
```

Page 208

1    you initially -- you know.  I'll just leave it
2    at that.  What did you do if you saw somebody
3    violating the policy?
4            A.    Well, if it was a theft or
5    something outright, I would be calling the
6    security manager.
7            Q.    And then what?
8            A.    Then he would come in and interview
9    the person.
10           Q.    And then what?
11           A.    Then we would discuss what the
12   interview was and go from there as far as the
13   write-up or the termination at that time.
14           Q.    Theft is pretty serious, isn't it?
15           A.    Yes.
16           Q.    Did you have the authority to
17   orally warn employees on your own?
18           A.    Yes.
19           Q.    Did a union steward have to be
20   involved in a write-up?
21           A.    No.
22           Q.    You had the authority to do that on
23   your own?
24           A.    Yes.
25                 K. Ruzat, 7/14/11

Page 235

 1          A.    No.

 2          Q.    Do you have any reconstructions of

 3    the hours that you worked at this time?

 4          A.    Repeat the question.

 5          Q.    Have you prepared a written summary

 6    of the hours that you worked?

 7          A.    No.  No.

 8          Q.    Have you prepared a written

 9    statement of your work at Rite Aid?

10          A.    No.

11          Q.    Did you bring any documents with

12    you to this deposition?

13          A.    No.

14          Q.    Did you review any documents in

15    preparation for this deposition?

16          A.    No.

17                MR. SINHA:  For the record, except

18         for the attorney-client work product.

19          Q.    (By Mr. Weiner)  Do you know

20    what --

21          A.    Yes.  I know what you mean there.

22          Q.    Okay.  Good.

23          A.    I brought my itinerary.  That's it.

24    How to get here.

25                K. Ruzat, 7/14/11

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Kenneth Ruzat**                                                                                                     **July 14, 2011**

Page 236

1          Q.     Where did you come from, actually?

2          A.     Philadelphia.  Outside Philly.

3     Delaware County.

4          Q.     When you were a store manager at

5     2548, how many hours did you work per week?

6          A.     That would be an average of 61, 62

7     hours.

8          Q.     Did that fluctuate?

9          A.     Yes.

10         Q.     What's the most number of hours you

11    ever worked at 2548?

12         A.     Seventy-two hours.

13         Q.     What's the least?

14         A.     Forty-eight.  Forty-seven,

15    forty-eight hours.

16         Q.     And my question, as I think you

17    understood it, only pertains to those work weeks

18    when you were working the full week.  I'm not

19    asking you about vacation weeks or weeks in

20    which you took certain days off because you were

21    sick or on another kind of leave or anything

22    like that.

23         A.     Uh-hum.  Yes.

24         Q.     What were some of the factors that

25               K. Ruzat, 7/14/11

Page 237

```
 1    determined how many hours you worked as a

 2    salaried store manager at 2264?

 3          A.      Staffing.  Workload.

 4          Q.      Could you describe the effect

 5    staffing had on the number of hours you worked?

 6          A.      Budget cuts.  Call outs.

 7          Q.      Call outs are where an employee who

 8    is scheduled to work calls out sick?

 9          A.      Yes.

10          Q.      What did you do in those cases?

11    Did you try to get somebody else to come in and

12    cover that shift?

13          A.      Yes, I did.  But I could not get

14    anyone to come in.

15          Q.      Did you go through the list of

16    people who worked at that store and ask them if

17    they could come in and cover the shift?

18          A.      Yes.

19          Q.      Did you have the authority to cover

20    that shift?

21          A.      I had the authority to cover the

22    shift.  Yes.

23          Q.      I mean, you had the authority to

24    call someone in to cover the shift?

25                    K. Ruzat, 7/14/11
```

Page 249

```
 1          A.    Per week.  Before the store opened,
 2    while I was there?
 3          Q.    Okay.  Yes.  Please.  That's a
 4    clarification.  I appreciate that.
 5          A.    Well over 80 hours.
 6          Q.    Eighty hours a week?
 7          A.    For the three weeks.  First couple
 8    weeks.  Close to 80 hours.
 9          Q.    Each week?
10          A.    For that three weeks.
11          Q.    And how many hours a week did you
12    work after the store actually opened to the
13    general public?
14          A.    I always averaged in the busier
15    stores 58 to 64, 62 hours.
16          Q.    And was 1782 one of the busier
17    stores after it opened?
18          A.    Yes.  It picked up.
19          Q.    Busier in terms of sales volume?
20          A.    Sales volume, yes.
21          Q.    Do you remember how many dollars a
22    week you were doing at the new store after it
23    opened?
24          A.    When I left, it was doing close to
25                K. Ruzat, 7/14/11
```

Page 250

1    $30,000.

2           Q.    Was that a profitable store?

3                 MR. SINHA:  Objection to form.

4           A.    I couldn't tell you exactly.

5           Q.    (By Mr. Weiner)  As an assistant

6    manager, how many hours did you work at 731?

7           A.    Fifty-six, fifty-seven hours.

8           Q.    And did that vary from week to

9    week?

10          A.    Yes.

11          Q.    Based on staffing and workload?

12          A.    Yes.

13          Q.    And holiday?

14          A.    Yes.

15          Q.    And summer?

16          A.    Yes.  Summer vacations.  That work

17    had to be covered.

18          Q.    And weather effected the number of

19    hours that you worked in a week at well.

20          A.    Weather?

21          Q.    Weather.

22          A.    No.

23          Q.    No.  That was not a factor?

24          A.    No.

25                K. Ruzat, 7/14/11

Page 251

```
 1          Q.    I am going to show you what has
 2    been marked as Exhibit Number 1.
 3                (Exhibit 1 marked for
 4         identification.)
 5          Q.    (By Mr. Weiner) It's entitled Field
 6    Performance Management Salary Appraisal Form.
 7    It's a three-page document that, on the last
 8    page, is dated July 22nd, 2008.  Is that your
 9    signature on the last page?
10          A.    Yes, it is.
11          Q.    And is that Lee Ennis' signature?
12    E-n-n-i-s?
13          A.    Yes.
14          Q.    He was your district manager at the
15    time?
16                MR. SINHA:  If you know.
17          A.    I don't recall him being district
18    manager for this store, for me.
19          Q.    (By Mr. Weiner)  Do you recall this
20    performance evaluation?
21          A.    Yes.  But I recall it for 2548.
22          Q.    Was Lee Ennis your district manager
23    at 2548?
24          A.    Yes.
25                K. Ruzat, 7/14/11
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   1:08-cv-09361-PGG-HBP
Kenneth Ruzat                                                July 14, 2011

Page 288

 1    to 10:30, 11:00.

 2         Q.    And what percentage of the day was

 3    that, can you say?

 4         A.    A quarter of the day, each day.

 5         Q.    How frequently -- did you do these

 6    tasks every day?

 7         A.    Yes.

 8         Q.    And did you consider doing these

 9    duties part of your regular duties?

10         A.    Yes.

11         Q.    And, to your knowledge, were these

12    duties part of what a manager at Rite Aid was

13    expected to do?

14         A.    Yes.

15         Q.    Did you feel that your performing

16    these duties effected how you were able to

17    manage the store?

18         A.    Yes.  With doing the duties, like

19    how to do -- like, I was unable to keep up with

20    planograms.

21         Q.    Anything else?

22         A.    Seasonal.  Changing over the

23    seasonal aisle and the end caps for the monthly

24    changeover.  Falling behind on CBTs.

25                   K. Ruzat, 7/14/11

Page 289

```
 1          Q.     Anything else?

 2          A.     Not right now.

 3          Q.     Did it effect your ability to

 4    supervise your staff?

 5          A.     Yes.  Because I was either in the

 6    back room, cleaning the bathroom or the break

 7    room, and leaving them alone up front by

 8    themselves our outside doing the parking lot.

 9          Q.     And this would be for at least a

10    quarter of the day, you said?

11          A.     Yes.

12          Q.     And you worked as a store manager

13    at other companies besides Rite Aid?

14          A.     Store manager?  No.

15          Q.     Okay.  I'm going to ask you a

16    series of questions.  Who made the final

17    decision regarding hiring staff at Rite Aid?

18          A.     We were able to hire.  We made the

19    final decision, unless their background check or

20    survey did not come out to what it should be.

21    And the human resource manager and the district

22    manager was involved.

23          Q.     And was that true for all hires?

24    All positions?

25                    K. Ruzat, 7/14/11
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP
Kenneth Ruzat                                                    July 14, 2011

Page 290

1           A.      We only were able to hire cashiers

2     and shift supervisors.

3           Q.      And "we," meaning as the store

4     manager?

5           A.      Yes.

6           Q.      And what about assistant store

7     managers?  Who had the final decision regarding

8     those hires?

9           A.      District manager.

10          Q.      And -- okay.  Who made the final

11    decision regarding firing staff?

12          A.      That would be the human resource

13    manager and district manager.

14          Q.      Who made the final decisions

15    regarding disciplining staff?

16          A.      That would be the store manager.

17          Q.      Was that true for all levels of

18    discipline?

19          A.      What was the question again?

20          Q.      Did the store manager have the

21    final decision in disciplining staff regarding

22    all types of discipline?

23                  MR. WEINER:  Objection as to form.

24          A.      No.

25                  K. Ruzat, 7/14/11

Page 291

 1        Q.    (By Mr. Sinha)  Can you describe --
 2   can you describe what levels of discipline the
 3   store manager was able to -- had a final
 4   decision?
 5        A.    We had forms to fill out.  And if
 6   it detailed insubordination, lateness, there
 7   were certain periods of time, steps, how many
 8   times they did the act.  And then they were, had
 9   a final warning.  Then it was turned over to the
10   district manager and human resource manager.
11        Q.    Okay.
12        A.    And discussed with their union rep.
13        Q.    Were there any other types of
14   discipline that the district manager had a final
15   decision on?
16        A.    If it was due to theft, he was
17   involved in that.
18        Q.    Who made the final decision
19   regarding promotion of staff?
20        A.    The district manager did the review
21   for shift supervisors.
22        Q.    And who made the final decision
23   regarding evaluation of staff?
24        A.    With the new review policy, we were
25                    K. Ruzat, 7/14/11

Page 292

```
 1    doing the reviews; the store managers.

 2          Q.    And before the new review policy?

 3          A.    It was the district managers.

 4          Q.    And approximately when did the new

 5    review policy go into effect?

 6          A.    Within the last two years, that I

 7    can recall.

 8          Q.    Who made the final decision

 9    regarding setting the overall payroll?

10          A.    Rite Aid Corporation.

11          Q.    Who made the final decision

12    regarding setting the budget for your store?

13          A.    Rite Aid Corporation.

14          Q.    Did you have any voice in changing

15    the budget?

16          A.    We could put in a request for a

17    review of the payroll, as to why we feel we

18    needed more.

19          Q.    And who made the final decision on

20    that?

21          A.    Rite Aid Corporation.

22          Q.    And who did you consider to be

23    ultimately responsible for profitability at your

24    store?

25                      K. Ruzat, 7/14/11
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP**
**Kenneth Ruzat**                                    **July 14, 2011**

Page 293

```
 1          A.    Me.

 2          Q.    And did the district manager have

 3   any role in setting -- in -- I'm sorry.  Did

 4   the -- strike that.

 5                Did the district manager have any

 6   role in being responsible for profitability at

 7   your store?

 8          A.    Yes.

 9          Q.    And what role did he have or she

10   have?

11          A.    Controlling what I could get fixed

12   in the store as far as whether it was a plumbing

13   problem.  I'd have to go through him.  Or having

14   the windows cleaned.  How many times they picked

15   up the parking lot.

16          Q.    Were you able to control the

17   profits at your store if you couldn't control

18   the payroll and the budget?

19          A.    No.

20          Q.    So isn't it true that you weren't

21   ultimately responsible for profitability at your

22   store?

23          A.    No.

24                MR. WEINER:  Objection as to form.

25                     K. Ruzat, 7/14/11
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Kenneth Ruzat                                                    July 14, 2011

Page 294

 1                    You may answer.

 2          Q.    (By Mr. Sinha)  I guess I'm trying

 3    to clarify what your answer is.

 4          A.    Can you repeat the question?

 5          Q.    Sure.  Did you consider yourself

 6    ultimately responsible for profitability at your

 7    store?

 8          A.    No.

 9          Q.    Did you feel you had autonomy at

10    your store?  Autonomy to run your store?

11          A.    No.

12          Q.    And why not?

13          A.    Most things had to be approved

14    through the district manager.  When we had

15    conference calls, it was discussed to make sure

16    we send him an e-mail when things that we needed

17    done were ordered.  If we needed -- not your

18    basic supplies, like bags and things like that.

19    But ordering hooks, things like that.  Even

20    though we had a book for it, we had to have him

21    approve that.

22          Q.    You said you trained managers at

23    various Rite Aid stores across the country.  Is

24    that right?

25                    K. Ruzat, 7/14/11

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Kenneth Ruzat                                                          July 14, 2011

Page 295

 1          A.    Yes.

 2          Q.    I think you mentioned California,

 3   Louisiana, Maine, Pennsylvania.  Is that right?

 4          A.    Yes.

 5          Q.    And did you also train in

 6   Massachusetts and Mississippi?

 7          A.    Yes.

 8          Q.    Was there any difference in how you

 9   trained a manager in any of those stores?

10          A.    No.

11          Q.    Did the same systems, policies,

12   procedures for training Rite Aid managers apply

13   to all the stores?

14          A.    Yes.

15          Q.    And the training manual that you

16   testified to earlier, was it the same training

17   manual used in training at all those stores?

18          A.    At the Eckerd stores.

19          Q.    And what about the other stores

20   that you trained for Rite Aid?

21          A.    No.  We did it just knowing how we

22   ran our store.

23          Q.    Okay.

24          A.    And we were told to follow how we

25                K. Ruzat, 7/14/11

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Kenneth Ruzat                                                    July 14, 2011

Page 310

```
 1              A C K N O W L E D G M E N T

 2                    Pennsylvania
 3    STATE OF ~~NEW YORK~~    )

 4                            :ss

 5    COUNTY OF  Delaware  )

 6

 7         I, KENNETH RUZAT, hereby certify that

 8    I have read the transcript of my testimony taken

 9    under oath in my deposition of July 14, 2011;

10    that the foregoing transcript is a true,

11    complete, and correct record of my testimony;

12    and that the answers on the record as given by

13    me are true and correct.

14

15                    _____

16                         KENNETH RUZAT

17

18    Signed and subscribed to before me

19    this  25  day of  August  , 2011.

20

21    _____
      NOTARY PUBLIC

22
             COMMONWEALTH OF PENNSYLVANIA
23                  Notarial Seal
              Leticia Matos, Notary Public
24         City of Chester, Delaware County
           My Commission Expires June 2, 2015
         MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES
25
```

# Exhibit DDD

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - x
YATRAM INDERGIT, on behalf of          :
himself and others similarly           :
situated,                              :
                                       :
            Plaintiff,                 :
                                       :CIVIL ACTION
            vs.                        :NO. 1:08-cv-
                                       :09361-PGG-HBP
RITE AID CORPORATION, RITE AID OF      :
NEW YORK, INC., and FRANCIS OFFOR      :
as Aider & Abettor,                    :
                                       :
            Defendants.                :
- - - - - - - - - - - - - - - - - - - x

July 11, 2011


            Deposition of MOHAMED SAAB, taken
pursuant to notice, held at the offices of Epstein
Becker & Green, P.C., 250 Park Avenue, New York, New
York, commencing at 10:00 a.m. before Jamie I.
Moskowitz, a Registered Professional Reporter and
Notary Public.

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv- 09361-PGG-HBP
Mohamed Saab                                        July 11, 2011

Page 27

```
 1      A        Yes.
 2      Q        Did you work for any other stores
 3  other than New Hyde Park, Auburndale, Valley Stream
 4  or Jackson Heights for Eckerd or Rite Aid?
 5               MS. REHMAN:  Objection to form.
 6               THE WITNESS:  I worked for Eckerd.
 7  BY MR. WEINER:
 8      Q        And then you worked for Rite Aid?
 9      A        Yes.
10      Q        Are the stores at New Hyde Park and
11  Auburndale the only stores you worked at for Eckerd?
12      A        No.
13      Q        What other stores did you work at for
14  Eckerd?
15      A        Winston Park.
16      Q        Okay.  What else?
17      A        Elmont.
18      Q        Elmont?
19      A        Yes.  Valley Stream.
20      Q        Go ahead.
21      A        That's all three stores for Eckerd.
22      Q        Okay.  Three stores for Eckerd and two
23  stores for Rite Aid, correct?
24      A        Yes.
25      Q        Valley Stream and Jackson Heights?
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv- 09361-PGG-HBP**
Mohamed Saab                                                    July 11, 2011

Page 28

```
 1        A          Yes.
 2        Q          Was there a change in the way the
 3   store was operated when Rite Aid bought it from
 4   Eckerd?
 5        A          Not much.
 6        Q          Was there a change in the way the
 7   store was operated when Eckerd bought it from
 8   Genovese?
 9        A          Yes.
10        Q          Is that the change from the full
11   autonomy that you had described earlier to the
12   limited autonomy that you described when working for
13   Eckerd?
14                   MS. REHMAN:  Objection to form.
15                   THE WITNESS:  Yes.
16   BY MR. WEINER:
17        Q          When you said there was not much
18   change in the way you operated the store when
19   Rite Aid acquired the store from Eckerd, what did
20   you mean?
21        A          I think I told you before when Eckerd
22   bought Genovese, but I'm going to tell you again.
23   When Rite Aid bought Eckerd, it's almost identical
24   policy.  It's always corporate policy.  They made
25   the decision for me.
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv- 09361-PGG-HBP
Mohamed Saab                                          July 11, 2011

Page 29

1        Q        With regard to merchandising?

2        A        Yes.

3        Q        With regard to ordering?

4        A        Some ordering.

5        Q        When you say "some ordering," what do

6    you mean?

7        A        I order for the shelves.  And

8    corporate, they decide what to put on sale and how

9    much to send to the store.

10       Q        Now, at Eckerd, did you have a

11   co-store manager in your store, co-manager?

12       A        Yes.

13       Q        Did you have an assistant manager?

14       A        No.

15       Q        How many hourly employees did you

16   have?

17       A        Which store?

18       Q        At Williston Park, how many hourly

19   employees did you have?

20       A        Maybe 15.  Around 15.

21       Q        And at Williston Park, did you have a

22   co-manager?

23       A        We don't call them co-manager.  It's a

24   salaried assistant manager.

25       Q        How many salaried assistant managers

Page 30

```
 1    did you have at Williston Park?

 2       A       One.

 3       Q       And were you a salaried store manager?

 4       A       Yes.

 5       Q       The 15 hourly employees that you

 6    described, do you call those associates?

 7       A       Yes.

 8       Q       Does that include workers in the

 9    pharmacy?

10       A       The cashier in the pharmacy, pharmacy

11    tech.

12       Q       And was the Williston Park store a

13    unionized store?

14       A       No.

15       Q       At Elmont, you were the salaried store

16    manager; is that right?

17       A       Yes.

18       Q       Did you have a salaried assistant

19    manager there?

20       A       Yes.

21       Q       Did you have more than one salaried

22    assistant manager?

23       A       No.

24       Q       How many associates did you have?

25    Those are the hourly employees.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv- 09361-PGG-HBP**
Mohamed Saab                                                    July 11, 2011

Page 42

 1       A          Northern Boulevard and 145th Street,

 2    150.

 3       Q          That's where all of Rite Aid's

 4    district managers worked?

 5                  MS. REHMAN:  Objection to form.

 6                  THE WITNESS:  I don't know.

 7    BY MR. WEINER:

 8       Q          Do you know how many district managers

 9    worked at Rite Aid?

10       A          No.

11       Q          When you worked for Eckerd, how many

12    district managers did you work for?

13       A          Two.

14       Q          Tony and Roy?

15       A          Yes.

16       Q          Now, why did you leave Rite Aid?

17       A          I had a disagreement with the district

18    manager.

19       Q          Disagreement with Mr.?

20       A          Abu Baker.

21       Q          Abu Baker.

22                  What was the disagreement about?

23       A          About payroll, about store layout, you

24    know.

25       Q          This was a disagreement that you had

**Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv- 09361-PGG-HBP**
**Mohamed Saab**                                    **July 11, 2011**

                                                                        Page 43

 1    with Mr. Abu Baker that you did not have with Bob

 2    Tancs?

 3        A       No.

 4        Q       Did you get along pretty well with Bob

 5    Tancs?

 6        A       I think so.

 7        Q       What was different about Abu Baker

 8    from Bob Tancs?

 9        A       Well, Abu Baker have -- he wants to

10    run the store, he wants to be on the top of

11    everything.

12        Q       Could you give me four examples?

13        A       Four examples?

14        Q       I'll take three, but if you can give

15    me four, that will be even better.

16        A       If I want to make changes for end

17    caps, for displays, I can't do it.  I cannot add any

18    money for payroll.  Restrict all the ordering.

19        Q       One more, that's all I ask.  One more

20    example of how Abu Baker --

21        A       Just everyday operation.  He ran the

22    store like everyday operation.

23        Q       But Mr. Bob Tancs wasn't like that; is

24    that correct?

25        A       He had a different style.  They all

Page 44

 1   did their job, the same job, maybe different style.

 2        Q        Each of the district managers had a

 3   different management style?

 4        A        Different individuals, but they have

 5   the same policy and the same direction from

 6   corporate.

 7        Q        Did you see the directions the

 8   district managers received from corporate?

 9        A        I used to get the book every month.

10        Q        Which book is that?

11        A        Rite Aid called it a store map.

12        Q        What was the store map?

13        A        It contains four weeks for the month,

14   how you merchandise your store, where to allocate

15   the merchandise, where to put the signs, how you

16   hang the signs.

17        Q        Bob Tancs didn't tell you what your

18   end-cap displays should be, did he?

19                 MS. REHMAN:  Objection to form.

20                 THE WITNESS:  I think I explained to

21        you, it comes with a map, a store map.

22   BY MR. WEINER:

23        Q        Well, you were explaining to me the

24   reason that you had a disagreement with Mr. Abu

25   Baker, that you did not have with Mr. Bob Tancs.

Page 51

1        Q          And did you go to that meeting the

2   next day?

3        A          Yes.

4        Q          How long did that meeting last?

5        A          About six hours.

6        Q          Six hours.

7                   And who did most of the talking?

8        A          He did.

9        Q          What did he say?

10       A          He talked about Rite Aid.

11       Q          Did he discuss differences that would

12   take place in the operation of the store once it had

13   been purchased by Rite Aid?

14       A          Yes.

15       Q          Do you recall what differences he

16   discussed?

17       A          Some of it.  I don't recall the whole

18   thing.  I mean, I don't recall six hours of talking.

19       Q          And I'm not going to ask you to relate

20   six hours of talking.

21       A          Right.  Some things stick in my mind,

22   yes.

23       Q          Those are the only ones that I'm going

24   to ask you to describe at this time, whatever sticks

25   in your mind.

Page 52

1       A       Well, basically, he said:  I'm your

2   new district manager.  I run the show.  I make the

3   decision for you guys.  I want to know everything

4   that goes on in the store.

5       Q       How many people were at the meeting?

6               MS. REHMAN:  Objection to form.

7               THE WITNESS:  Maybe 12, 15.

8   BY MR. WEINER:

9       Q       Was everyone in the meeting a store

10  manager except Ravi?

11      A       Yes.

12      Q       Did you know the other store managers

13  who were there?

14      A       Not all of them.

15      Q       Did you say anything at the meeting?

16      A       No.

17      Q       Did Ravi tell you what to expect in

18  the next four to six weeks, when the transition was

19  taking place -- I'm sorry, four to ten weeks, I

20  believe you said?

21              MS. REHMAN:  Objection to form.

22  BY MR. WEINER:

23      Q       Did you say four to ten weeks?

24      A       No.  You asked me how many people they

25  sent to the store.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv- 09361-PGG-HBP**
**Mohamed Saab**                                                    **July 11, 2011**

Page 53

 1        Q          You said four to ten?

 2        A          Four to ten.

 3        Q          And it was about a four-week period?

 4        A          Some stores.  Depends on the size of

 5   the store.

 6        Q          You just said that the transition may

 7   take different lengths of time depending on the size

 8   of the store; is that correct?

 9        A          Well, are you asking me about Valley

10   Stream store?

11        Q          I don't know.

12        A          The stores.  If you ask me about my

13   store, I know my store.

14        Q          I asked you how long the transition

15   took, and you answered it depended on the size of

16   the store and different things.  Now I'm asking what

17   you meant by that.

18        A          Well, you don't ask me if my store.

19   Am I talking about my store or another store?

20        Q          I'm talking about your --

21        A          No, you don't specify.  My store, I

22   told you, took about four weeks.  I already answered

23   that question.

24        Q          Mr. Saab, I'm going to ask you to

25   listen to this testimony you just gave me, and if

Page 61

```
 1      A        When I saw Bob Tancs, he used to come
 2   to the store.  He said:  Please, let's change this,
 3   let's do this.  Always very nice.  And the other
 4   two, they come and they just change it now.  It's a
 5   different treatment.
 6                  MS. REHMAN:  You may continue.  I just
 7       have to make a call.  But you can continue
 8       without me.
 9   BY MR. WEINER:
10      Q        When you worked at Eckerd, were you
11   given a labor budget?
12      A        Yes.
13      Q        And did you have a labor budget at
14   Rite Aid?
15      A        Yes.
16      Q        Who gave you the labor budget at
17   Rite Aid?
18      A        The district manager.
19      Q        So Ravi gave you a labor budget?
20      A        Yes.
21      Q        And Bob Tancs gave you a labor budget?
22      A        Yes.
23      Q        And Abu Baker gave you a labor budget?
24      A        Yes.
25      Q        What was the labor budget at Valley
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv- 09361-PGG-HBP**
**Mohamed Saab**          **July 11, 2011**

Page 62

```
 1    Stream?
 2         A          I would say about 7,500.
 3         Q          Did that change?
 4         A          Yes.
 5         Q          Could you describe the changes in your
 6    labor budget at Valley Stream, from what to what?
 7         A          It went down to 6,500.
 8         Q          Started out at 7,500 and was reduced
 9    to 6,500?
10         A          Yes.
11         Q          Did it ever go back up again?
12         A          No.
13         Q          Do you recall the amount of the labor
14    budget at Valley Stream that Eckerd had set?
15         A          Between 8,000, 8500.  8,000 to 8500.
16         Q          When Ravi took over as Rite Aid's
17    district manager, did he reduce the amount of your
18    labor budget?
19         A          Yes.
20         Q          How long after he took over did he
21    reduce the amount of your labor budget?
22         A          I don't remember exactly.
23         Q          Was it a couple of days, a couple of
24    weeks, a couple of months, couple of years?
25         A          No.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv- 09361-PGG-HBP**
**Mohamed Saab**                                              **July 11, 2011**

Page 63

 1        Q          Tell me.

 2        A          I would say maybe a couple of months.

 3        Q          You told me business also declined?

 4        A          Yes.

 5                   MS. REHMAN:  Objection to the form.

 6   BY MR. WEINER:

 7        Q          By about a million and a half dollars

 8   a year in the transition of Eckerd to Rite Aid; is

 9   that correct?

10        A          Let me explain this.  The store itself

11   did not go down.  All the money we lost in business,

12   in the pharmacy.

13        Q          Did the front-end portion of the

14   Valley Stream store revenue remain the same?

15        A          Almost.

16        Q          From Eckerd to Rite Aid, almost

17   remained the same?

18        A          Yes.

19        Q          A little bit down or a little bit up

20   or just about the same?

21        A          Fluctuates.

22        Q          Fluctuated?

23        A          From week to week.

24        Q          Why did the pharmacy sales drop off so

25   dramatically?

Page 77

 1                    MS. REHMAN:  Objection to form.

 2    BY MR. WEINER:

 3         Q        And within that labor budget, were you

 4    able to solve that problem any way you decided to,

 5    as long as you did not exceed the amount of revenue

 6    they allocated to you?

 7                    MS. REHMAN:  Objection to form.

 8                    THE WITNESS:  I tried my best.

 9    BY MR. WEINER:

10         Q        What were some of your strategies for

11    solving that problem?

12         A        Cut the employees' hours.

13         Q        What else?

14         A        That's the only thing.  I can't cut

15    the rent.

16         Q        Well, rent was a different budget,

17    wasn't it?

18         A        Yes.

19         Q        Did the rent come out of any budgets

20    you were given?

21         A        I never saw a budget.

22         Q        You never saw a rent budget?

23         A        Not with Rite Aid.

24         Q        You saw the labor budget?

25         A        I saw the number.

Page 78

```
 1        Q          And that was a weekly number?

 2        A          Yes.

 3        Q          Did that number change from week to

 4   week?

 5        A          Maybe every two weeks, three weeks.

 6        Q          Do you know why that number changed

 7   every two, three weeks?

 8        A          I don't know.

 9        Q          Were there seasonal factors that would

10   influence the change of the labor budget?

11        A          I don't know.

12        Q          Did you notice that in periods of high

13   sales volume, that there would be additional labor

14   revenue for you to use, like holidays?

15        A          Yes, around Christmas.

16        Q          Were the sales at the Valley Stream

17   store seasonal in nature?

18        A          No.

19        Q          It was the same in the winter as it

20   was in the summer?

21        A          Almost.

22        Q          Did merchandise change from the winter

23   to the summer?

24        A          Yes.

25        Q          And did the merchandise change from
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv- 09361-PGG-HBP
Mohamed Saab                                                July 11, 2011

Page 79

 1    the spring to the fall?

 2        A        Yes.

 3        Q        Did your weekly sales volume change

 4    from winter to summer?

 5        A        Not too much.

 6        Q        Or from spring to fall, did the sales

 7    volume stay about the same?

 8        A        Almost.

 9        Q        If you wanted to hire associates

10    part-time and have employees in the store just

11    during the times when you had the highest sales

12    volume, could you do that?

13        A        Not on my own.

14        Q        Say that again?

15        A        Not on my own.  I have to call the

16    district manager.

17        Q        And what did you say to the district

18    manager and what did the district manager say to

19    you?

20        A        I need to hire a part-timer or two

21    part-timer, and most of the time he said:  No, don't

22    hire.  Give somebody more hours for the two weeks

23    holiday and then you go back to normal.  Or some

24    other stores, if they had extra, he'll send one.

25        Q        If you could allocate the labor budget

Page 80

1    in a way that covered your store with part-timers
2    rather than full-timers, or rather than overtime, is
3    that something that the district manager approved?
4                    MS. REHMAN:  Objection to form.
5                    THE WITNESS:  I don't know.
6    BY MR. WEINER:
7         Q        Did you make those recommendations?
8         A        No.
9         Q        What recommendations did you make to
10   use your labor budget and run the store?
11        A        The only method I did, I cut payroll.
12   If somebody is working 30 hours, I cut them down to
13   20.  Somebody working 25, cut them down to 20, to
14   18, so I could meet my budget.
15        Q        You didn't use much overtime, did you?
16        A        No.
17        Q        And why is that?
18        A        It was not allowed.
19        Q        Well, it wouldn't be a good use of
20   your labor budget, would it?
21                    MS. REHMAN:  Objection.
22   BY MR. WEINER:
23        Q        Overtime?
24        A        I can't give enough hours -- I can't
25   give overtime.  There's not enough hours.

Page 81

```
 1       Q         If you needed 120 hours of hourly
 2   work, it would make more sense for you to have three
 3   hourly associates working 40 hours each rather than
 4   two hourly associates working 60 hours each,
 5   wouldn't it?
 6                  MS. REHMAN:  Objection to form.
 7                  THE WITNESS:  That's not my decision.
 8   BY MR. WEINER:
 9       Q         You were given the labor budget,
10   weren't you?
11       A         Yes.
12       Q         And you were told to run the store
13   with that labor budget, weren't you?
14       A         Yes.
15       Q         So you could run the store with
16   part-timers or full-timers?  That was your decision,
17   wasn't it?
18       A         No.  I inherit the store.  They gave
19   me a store already staffed full-timers and
20   part-timers.
21       Q         Wait.  We're talking Valley Stream
22   here?
23       A         No.  Jackson Heights.
24       Q         Well, let's do one store at a time.
25   The Valley Stream store, you were the store manager
```

Page 82

 1    when Rite Aid purchased it from Eckerd?

 2         A       Yes.

 3         Q       So you had that store staffed and you

 4    were operating that store for Eckerd; isn't that

 5    correct?

 6         A       Yes.

 7         Q       And you described a four-week period

 8    in which Rite Aid sent in troops and made a

 9    transition; is that correct?

10                 MS. REHMAN:  Objection to form.

11                 THE WITNESS:  Yes.

12    BY MR. WEINER:

13         Q       Let's talk about that four-week

14    period.  Describe what happened during that period.

15         A       I did not pay anybody that came to

16    Rite Aid.  I did not pay their salaries.

17         Q       The transition team that Rite Aid sent

18    to the Valley Stream store after Rite Aid purchased

19    it from Eckerd did not come out of your labor

20    budget; is that correct?

21         A       Yes.

22         Q       Your labor budget continued to pay for

23    the staff of associates that you had before Rite Aid

24    bought the store; isn't that correct?

25         A       Yes.

Page 144

1   sweep.

2        Q        If you had seven employees, hourly

3   associates, and three or four were cashiers, what

4   would the other three or four be doing?

5        A        One part-timer, he would be on the

6   floor like I explained to you.  When we had the

7   photo, we used to have one in photo.  And we used to

8   have one called cosmetician, in charge of beauty

9   section.

10        Q        Was the photo employee full-time

11   designated to the photo lab?

12        A        Yes.

13        Q        And if that person wasn't busy in the

14   photo lab, would they also be helping out on the

15   floor?

16        A        They would be cashier if I need them.

17        Q        And cosmetician, is that a full-time

18   hourly associate?

19        A        It was a full-time, yes.

20        Q        And did you tell the full-time hourly

21   cosmetician that there were no longer any hours for

22   her?

23        A        Yes.

24             MS. KANE:  Object to the form.

25

Page 145

 1    BY MR. WEINER:

 2         Q         And what did the cosmetician say to

 3    you?

 4         A         She left.

 5         Q         Do you know where she went?

 6         A         I don't know.

 7         Q         On Wednesday, who was in charge of the

 8    store?

 9         A         Assistant manager, salaried.

10         Q         That's at Valley Stream or is it at

11    Jackson Heights?

12         A         Both.

13         Q         When you weren't in the store, the

14    assistant store manager was in charge; is that

15    correct?  The salaried assistant store manager was

16    in charge; is that correct?

17         A         Yes.

18         Q         On Friday -- on Thursday, what time

19    did you leave the store?

20         A         About 7:00, 6:00.

21         Q         On Friday, what time did you leave the

22    store?

23         A         Ten p.m.

24         Q         From 7:00 a.m. until 10:00 p.m.?

25         A         No.  Twelve o'clock, 12 noon.

Page 146

```
 1        Q         On Friday.  Okay.

 2                  And the store stayed open after

 3   10:00 p.m., didn't it?

 4        A         Yes.

 5        Q         Because it was a 24-hour store, right?

 6        A         Yes.

 7        Q         And Saturday, what time did you leave?

 8        A         About 5:30, 6:00.

 9        Q         On Sunday, what time did you leave?

10        A         I would stay about three or four

11   hours.

12        Q         Some Sundays you didn't have to go in

13   at all; isn't that correct?

14        A         Sometimes I don't have to.

15        Q         If you went in on a Sunday, what

16   reason did you go in?

17        A         I have to close payroll.

18        Q         What does that involve?

19        A         Check the payroll for the last two

20   weeks.  We call the pay period.

21        Q         And what did you say, close the pay

22   period?

23        A         Yeah, close payroll for the period.

24        Q         What does that involve?

25        A         I have to check the payroll for the
```

Page 147

1   two weeks, make sure everything is punched in and
2   punched out, all the employees are in, all the sick
3   days are in, all the vacation days are in, and I
4   submit it to human resource, to corporate.
5        Q        How long did that process take?
6        A        If you have a lot of employees, it can
7   take awhile.
8        Q        At Valley Stream, did you have a lot
9   of employees?
10       A        With the pharmacy, about 22.
11       Q        Were you responsible for the payroll
12  for the pharmacy employees as well?
13       A        Just to check, make sure all the ins
14  and outs.  If there is something missing, I will
15  call the pharmacy manager.
16       Q        And did you do that?
17       A        Yes.
18       Q        Did the pharmacy manager work on
19  Sunday?
20       A        Yes.
21       Q        Did it take about three or four hours
22  on Sunday to close the payroll?
23       A        No.
24       Q        How long did it take to close the
25  payroll?

Page 196

```
 1        Q          If she's short, what do you do?
 2        A          We write her up.
 3        Q          What kinds of things do you write in
 4   the write-up?
 5        A          Cashier, Mrs. Smith, on June or
 6   July 11, for $4.55.  She sign it.
 7        Q          And do you sign it, too?
 8        A          Yes.
 9        Q          And does it go anywhere else from
10   there?
11        A          It goes to her file.
12        Q          You don't have to send that on to the
13   district manager, do you?
14        A          After three write-up, yes, we have to
15   send it to the district manager.
16        Q          Three write-ups for the same thing?
17        A          Three write-ups.
18        Q          Three write-ups in a year or three
19   write-ups in your career?
20        A          In a calendar year.
21        Q          In one calendar year.
22                   So on January 1st, all the write-ups
23   that might have been in the file before get --
24        A          That's with Genovese.  I don't know
25   about Eckerd or Rite Aid.
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv- 09361-PGG-HBP
Mohamed Saab                                                July 11, 2011

Page 197

1       Q       Let me see here.  Who did you sue in

2   this lawsuit?  It was Rite Aid, wasn't it?  That's

3   what I was told.

4               So, let's do this:  When I'm asking

5   you about Valley Stream, I'm going to ask you about

6   your experience there as a store manager during the

7   time you worked for Rite Aid, okay?

8       A       Okay.

9       Q       Thank you.

10      A       You're welcome.

11      Q       I should have made that clear before

12  now, I'm quite sure.

13              You were explaining to me write-ups at

14  Valley Stream.  Is what you told me about write-ups

15  true for the time you worked as a store manager for

16  Rite Aid at Valley Stream?

17      A       Yes.

18      Q       Thank you.

19              Now, let's just get to the annual

20  basis of there being three write-ups before having

21  to notify the district manager.  Was that true at

22  Rite Aid?

23      A       Shortage over $50.

24      Q       Over 50?

25      A       Over 50, okay?  You have to call the

Page 198

1    district manager right away.  He has to make a

2    decision if that cashier stay or she gets fired.

3         Q         Did that ever happen while you were

4    the store manager at Valley Stream?

5         A         No.

6         Q         Did that ever happen while you were a

7    store manager at Jackson Heights?

8         A         I don't remember.

9         Q         You don't remember whether someone was

10   short $50 or more as a cashier at Jackson Heights?

11        A         No, I don't remember.

12        Q         Is it possible somebody was short more

13   than $50 and you just don't recall?

14        A         Maybe.

15        Q         Otherwise, if a cashier is short $1.25

16   on January 5th, on July 11th, and that's all in the

17   calendar year, do those write-ups get thrown out and

18   the cashier gets to start over in the next calendar

19   year?

20                  MS. REHMAN:  Objection to form.

21                  THE WITNESS:  I don't know.

22   BY MR. WEINER:

23        Q         At Rite Aid, you're not sure?

24        A         I don't know.

25        Q         Did you ever have a cashier that had

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv- 09361-PGG-HBP
Mohamed Saab                                                    July 11, 2011

Page 199

```
 1    more than three write-ups in one calendar year while
 2    were you employed by Rite Aid?
 3         A        No.
 4         Q        Did you ever have an employee that you
 5    wrote up for being late?
 6         A        Yes.
 7         Q        How many employees did you write up
 8    for being late?
 9         A        Maybe one, one or two.
10         Q        One or two, did you say?
11         A        One or two, yes.
12         Q        Okay.  And do you recall whether that
13    was at Valley Stream or at Jackson Heights?
14         A        Both stores.
15         Q        One each, or one or two each?
16         A        I don't remember the numbers.  Maybe
17    one in Jackson Heights and maybe two in Valley
18    Stream.
19         Q        Thank you.
20                  Can you give me any of the details
21    that you remember about the employee at Jackson
22    Heights that came in late?
23         A        Can you rephrase the question, please?
24         Q        Yes.  Do you recall how late the
25    employee was at Jackson Heights that you wrote up?
```

Page 200

```
 1        A         Yes.

 2        Q         How late?

 3        A         Sometimes 20 minutes, sometimes half

 4   an hour.

 5        Q         So, it wasn't just one event; that was

 6   someone that was late frequently?

 7        A         A couple of times.

 8        Q         And did you give the person an oral

 9   warning before you wrote them up?

10                  MS. REHMAN:  Objection to form.

11                  THE WITNESS:  I talked to them.

12   BY MR. WEINER:

13        Q         What did you say to them?

14        A         "Don't be late.  Try to be on time."

15        Q         And what did they say to you?

16        A         "I'll try."

17        Q         Did they explain any reason why they

18   were coming to work late?

19        A         Transportation, the bus, the train, I

20   don't find a baby-sitter for my son.

21        Q         And how many times were they late

22   before you wrote them up?

23        A         Two.  Twice.

24        Q         About 30 minutes each?

25        A         No.
```

Page 201

```
 1        Q          Twenty minutes each?

 2        A          Maybe 20; 15 minutes, 20.

 3        Q          And after you wrote them up, did they

 4   have any latenesses after that?

 5        A          Not really, no.

 6        Q          So, that discipline was handled

 7   entirely at the store-level basis; you didn't have

 8   to get involvement from anyone at the district

 9   level; is that correct?

10                   MS. REHMAN:  Objection to form.

11                   THE WITNESS:  For that incident,

12        because it stopped.  But if it's continued, I

13        have to call the district manager.

14   BY MR. WEINER:

15        Q          But for that incident, you were able

16   to handle that within your own authority at the

17   store; is that correct?

18                   MS. REHMAN:  Objection to form.

19                   THE WITNESS:  Yes.

20   BY MR. WEINER:

21        Q          How about the two at Valley Stream,

22   can you recall how many times the one person -- were

23   there two individuals that you can think of?

24        A          I think two, but I don't recall the

25   time or...
```

Page 202

1       Q         Do you recall any of the details?

2       A         No.

3       Q         Do you recall whether you counseled

4    them and told them not to be late before you wrote

5    them up?

6       A         Yes.

7       Q         And do you recall how many times they

8    were late before you wrote them up?

9       A         Maybe once or twice.

10      Q         Do you recall how many minutes they

11   were late?

12      A         No.

13      Q         Do you recall whether, after you wrote

14   them up, they stopped being late?

15      A         One of them left, I think.

16      Q         And the other?

17      A         Was fine.

18      Q         Do you remember either of their names?

19      A         No.

20      Q         Do you remember what positions they

21   held?

22      A         Cashier, floor guys.

23      Q         And, at Jackson Heights, do you recall

24   the position the individual held that you wrote up?

25      A         Stock boy.

Page 305

```
 1      A          Not the human resource manager.

 2      Q          How often did you see the human

 3 resources manager?

 4      A          When I was in Jackson Heights, one

 5 time.

 6      Q          One time.  Only one time?

 7      A          Yes.

 8      Q          Did you retain any material that you

 9 were given as a store manager by Rite Aid, any

10 training material?

11      A          No.

12      Q          Did you ever receive a performance

13 evaluation in writing yourself?  Were you ever the

14 subject of a performance evaluation?

15      A          Yes.

16      Q          And was that in writing?

17      A          Yes.

18      Q          And did you retain that performance

19 evaluation?

20      A          No.

21      Q          Do you recall what the performance

22 evaluation was, whether it was positive or negative?

23      A          It was positive.

24      Q          How many performance evaluations from

25 Rite Aid did you receive?
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv- 09361-PGG-HBP**
**Mohamed Saab**                                         **July 11, 2011**

Page 306

```
 1      A        One.

 2      Q        And who performed that?

 3      A        Ravi.

 4               (Whereupon, a discussion was held off

 5      the record.)

 6  EXAMINATION BY

 7  MS. REHMAN:

 8      Q        Can you describe what your managerial

 9  duties for Genovese were when you were a store

10  manager for Genovese?

11      A        When I was with Genovese, my duty was

12  make sure store runs right, make sure meet my

13  budget, and do whatever I can to increase sales,

14  increase margin.

15      Q        Is that all?

16      A        Most of it, yes.

17      Q        And what were your managerial duties

18  when you were store manager for Rite Aid?

19      A        Most of my time with Rite Aid I spent

20  on the floor doing work which was supposed to be

21  done by hourly workers, like stocking shelves,

22  bringing boxes from the basement, run the photo lab.

23      Q        Are there any other daily

24  nonmanagerial duties that you were required to do as

25  a store manager for Rite Aid on a daily basis, aside
```

Page 307

1    from those that you just mentioned?

2         A         Whatever the store need, I have to do,

3    I did it.

4         Q         Why did you not assign those tasks or

5    duties to hourly associates?

6         A         Because I don't have them.

7         Q         Why don't you have them?

8         A         I don't have enough money from my

9    budget.

10        Q         And can you just describe the

11   difference between being a manager for Genovese and

12   being a manager for Rite Aid, a store manager.  What

13   was the difference, in your opinion?

14        A         My opinion, manager for Genovese, you

15   are really a store manager, truly a store manager.

16   They left you alone, you did your job, you perform,

17   and most of their stores were making money.

18                   With Rite Aid, I feel like I am a

19   robot.  Somebody control me with a remote control.

20   I have no say in any decision in the store regarding

21   payroll, regarding where the merchandise go.

22   Everything was done for me.

23        Q         And you said that you worked at Valley

24   Stream and Jackson Heights; is that correct?

25        A         Yes.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv- 09361-PGG-HBP**
**Mohamed Saab**            **July 11, 2011**

Page 308

1    Q       Valley Stream was a non-union store?

2    A       When I was there, it was non-union.

3    Q       And when you were a store manager at

4  Jackson Heights, it was a union store; is that

5  correct?

6    A       Yes.

7    Q       And was there any difference in the

8  duties that you were required to do in the Jackson

9  Heights store and in the Valley Stream store?

10    A       No.

11    Q       Were you allowed to or could you

12  promote an employee without approval from the

13  district manager?

14    A       No.

15    Q       Could you hire an employee without

16  approval from your district manager?

17    A       I can hire, but they have to pass a

18  corporate test.  So, really, it's not my decision.

19    Q       And could you fire an hourly associate

20  without approval from your DM?

21    A       No.

22    Q       You had said earlier in your -- in the

23  deposition, you had said that you would come in on

24  Sunday sometimes to do payroll; is that correct?

25    A       Yes.

Page 309

```
 1      Q        Why would you not come in any other
 2  day to do payroll?
 3      A        Because I'm there every day, and
 4  Sunday I have to submit the payroll.
 5               MS. REHMAN:  I think that's all.
 6  EXAMINATION BY
 7  MR. WEINER:
 8      Q        You did say that you had the
 9  discretion at Valley Stream to recommend a raise in
10  the range of 2 to 4 percent, didn't you?
11      A        Yes.
12      Q        And that was different from the duties
13  that you had at Jackson Heights, wasn't it?
14               MS. REHMAN:  Objection to form.
15               THE WITNESS:  That was not a union
16      store.  We explained this already.
17  BY MR. WEINER:
18      Q        I know.
19               So there was a difference between a
20  union store and a non-union store, wasn't there?
21      A        Yes.
22               MS. REHMAN:  Objection to form.
23  BY MR. WEINER:
24      Q        Now, when your lawyer just asked you
25  that same question, you said there was no
```

Page 312

1               C E R T I F I C A T E

2

3    STATE OF ___*New York*_____ :

4    COUNTY/CITY OF ___*Queens*_____ :

5

6    Before me, this day, personally appeared

7    MOHAMED SAAB, who, being duly sworn, states that the

8    foregoing transcript of his/her Deposition, taken in

9    the matter, on the date, and at the time and place

10   set out on the title page hereof, constitutes a true

11   and accurate transcript of said deposition.

12

13

                        *Mohamed Saab*

14

                    MOHAMED SAAB

15

16

17   SUBSCRIBED and SWORN to before me this __*04th*__

18   day of __*August*__, 2011, in the

19   jurisdiction aforesaid.

20

21   __*02/20/15*_____        _____

22   My Commission Expires         Notary Public

23

24

25

BENADITO FITANZO III
Notary Public - State of New York
NO. 01FI6161197
Qualified in Nassau County
My Commission Expires 02/20/15

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv- 09361-PGG-HBP
Mohamed Saab                                                          July 11, 2011

Page 313

```
 1                      DEPOSITION ERRATA SHEET
 2         RE
           FILE NO.
 3         CASE CAPTION:  Yatram Indergit vs. Rite Aid
           DEPONENT:  MOHAMED SAAB
 4         DEPOSITION DATE: July 11,
 5         To the Reporter:
           I have read the entire transcript of my Deposition
 6         taken in the captioned matter or the same has been
           read to me.  I request for the following changes be
 7         entered upon the record for the reasons indicated.
           I have signed my name to the Errata Sheet and the
 8         appropriate Certificate and authorize you to
           attach both to the original transcript.
 9         _____
10         _____
           _____
11         _____
           _____
12         _____
           _____
13         _____
           _____
14         _____
           _____
15         _____
           _____
16         _____
           _____
17         _____
           _____
18         _____
           _____
19         _____
           _____
20         _____
           _____
21         _____
22         SIGNATURE: _Mohamed Saab_____  DATE: 8/4/11___
23              MOHAMED SAAB
24
25
```

# Exhibit EEE

```
 1              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF NEW YORK
 2  ----------------------------------------x
    YATRAM INDERGIT, on behalf of
 3  himself and others similarly
    situated,
 4
         Plaintiff,
 5                            Civil Action No.
         - vs -              1:08-CV-09361-PGG-HBP
 6
    RITE AID CORPORATION, RITE AID OF
 7  NEW YORK, INC., and FRANCIS OFFOR
    as Aider & Abettor,
 8
         Defendants.
 9
    ----------------------------------------x
10

11                  October 19, 2011

12                  10:12 a.m.

13

14       Deposition of JOSE R. SANTOS, taken by

15  Defendants, pursuant to Notice, at the offices

16  of Epstein Becker & Green, P.C., 250 Park

17  Avenue, New York, New York, before Linda D.

18  Danelczyk, a Registered Professional Reporter,

19  Certified Court Reporter, and Notary Public of

20  the States of New York and New Jersey.

21

22

23

24

25
```

```
 1          A.     Did I ask my store manager?

 2          Q.     Yes.

 3          A.     Can you repeat that, please?

 4          Q.     Yes.

 5                 Did you ask your store manager to

 6     do the same things you did with the guns, the

 7     scanning guns regarding ordering merchandise?

 8                 MS. REHMAN:  Objection to form.

 9          A.     I'm not understanding because you

10     referring to which store managers?

11          Q.     Well, when -- when I asked you

12     about the use of the scanning guns, my

13     understanding is you explained to me that you

14     used the guns to order merchandise.

15          A.     Yes.

16          Q.     And that was when you were the

17     store manager; is that correct?

18          A.     Yeah.

19          Q.     And when you were the store

20     manager, did you ever delegate that task to your

21     assistant manager?

22          A.     Oh, to the assistant -- okay, you

23     were saying store manager.

24          Q.     No, when you were the store

25     manager --
```

1         A.     Okay.

2         Q.     -- did you tell the assistant

3    store manager to do the job of ordering

4    merchandise using the scanning gun?

5         A.     Um, not really.

6                Because, um, I -- I used to do

7    order most of the time.  I used to do the order.

8                However, if I was not there, the

9    assistant manager will grab the gun and do the

10   order because I don't -- I don't order.

11               There's certain days to do the

12   order before the order comes.  So in between

13   those days, if the order is not done, the person

14   that -- we had two days, I mean this is -- this

15   procedure come from corporate that we need to

16   order by certain day.  If we order after that,

17   the merchandise will not come.

18               So if I was -- if I was off on the

19   day of the order, and then the other person

20   that's there will do the order.  Either the

21   shift supervisor or the assistant manager.

22        Q.     Were there certain days of the

23   week that the ordering was done?  Or did it

24   depend on when the merchandise was needed?

25        A.     No.  No.

```
 1                    Yeah, there is a specific day that

 2      the truck comes, which -- which I don't have no

 3      power over that.  It's corporate.

 4                    And the days that we need to make

 5      the order is also corporate that makes the

 6      decision is specific days to order.

 7                    If you miss that time, then the

 8      computer will generate an order and bring it to

 9      you based on what the computer thinks you have.

10      We don't have control over that.

11           Q.    So when you place an order for

12      merchandise, that overrides the automatic order

13      that the computer sends you?

14                    MS. REHMAN:  Objection to form.

15           Q.    Is that correct?

16           A.    Can you repeat that again, please?

17           Q.    Yes.

18                    If you do not place an order,

19      merchandise will be sent to you automatically;

20      is that correct?

21           A.    Some merchandise.

22                    It may not be exactly what you

23      need.

24           Q.    And that's why you place an order.

25           A.    Not really.
```

1            Because to my knowledge in retail,

2    placing an order is not a good -- a good way

3    because it's better to keep a good -- a good --

4    a good count of the merchandise that you have,

5    unless the computer, you know, kind of do -- do

6    their job and things like that.

7            But our -- our district mangers,

8    they also say No, no, no, no, no, order, order,

9    order.

10           And, you know, we have to do

11   what -- what the -- you know, higher levels tell

12   us to do.

13       Q.   Do you know why the district

14   managers told you to order?

15       A.   I don't know.

16           They have different understanding

17   of things.  I don't know what is on their head.

18       Q.   Well, sometimes the computer's

19   list of inventory that you have in the store

20   isn't accurate; isn't that true?

21       A.   Yes.

22       Q.   And that's why you perform the

23   cycle count?

24           MS. REHMAN:  Objection to form.

25       A.   What you mean?

```
 1           Q.    Is that why you perform the cycle
 2    count?
 3           A.    Why?
 4           Q.    To determine whether the inventory
 5    in the store matches the list in the computer?
 6           A.    Yes.
 7           Q.    And if the physical count of the
 8    merchandise in the store is different than what
 9    the computer has, you'll have to make up that
10    difference in your order; won't you?
11           A.    No.
12           Q.    For what reason do you place an
13    order for merchandise?
14           A.    To fill up the -- the merchandise
15    that's needed.
16           Q.    The computer wouldn't do that
17    automatically?
18           A.    No, not always.
19           Q.    How do you know what's needed?
20           A.    Well, the district manager, if he
21    comes and sees a section light, by light I mean
22    there's only one or two items or there's holes,
23    you know, they always tell us, the district
24    manager, order, order, order.  Manually order
25    everything, you know, never let a section go
```

```
 1              A.     Can you -- I don't understand the
 2    question.
 3              Q.     Did the labor budget you received
 4    as a store manager stay the same or did it vary?
 5              A.     It varied.
 6              Q.     Did it go up at Christmas?
 7              A.     I don't remember.
 8              Q.     Do you remember any reasons why it
 9    went up or down?
10              A.     I remember as time passed by, and
11    the budget kept shrinking.
12              Q.     You had to make due with less
13    labor dollars to spend; is that correct?
14              A.     Yes.
15              Q.     When you received labor dollars --
16    let me ask you this:
17                     Do you remember what your labor
18    budget was at 4261?
19              A.     I don't remember.
20              Q.     Do you remember what your labor
21    budget was at 4887 in 2009?
22              A.     No.
23                     The only one I -- I remember is
24    4889.
25              Q.     In 2009?
```

YATRAM INDERGIT, et al. v. RITE AID CORPORATION, et al.   1:08-CV-09361-PGG-HBP
Jose Santos on 10/19/2011                                         Page 123

```
 1          A.    Yeah.

 2          Q.    And what was it then?

 3          A.    It was about -- between 6,000 to

 4    6,500.

 5                And I remember --

 6          Q.    For the week?

 7          A.    Yes.

 8                And I remember that when I came

 9    back now in 2011, I -- the store manager pull up

10    the screen, and they were giving her 4,000 --

11    about 4,000 and four or 500.  4,500.  Something

12    like that.  A little less, a little more.  I

13    can't remember, but it was under 4,000.

14                So, you know, it -- every time

15    they kept shrinking.

16          Q.    When you were the store manager

17    and you were given the labor budget of $6,500,

18    were you able to allocate that the way you

19    thought would best serve the business of the

20    store?

21                MS. REHMAN:  Objection to the

22          form.

23          A.    No.

24          Q.    Were you able to -- well, tell me

25    why you said, "No"?
```

```
 1            A.    Because that budget, that is a

 2      difficult store that opens at 7 a.m. closes at

 3      midnight, and the staff -- it wasn't the budget

 4      that I had at that time, it wasn't enough to --

 5      to cover every -- everything that corporate

 6      wants us to do.  It wasn't enough.

 7                  So I ended up always working very

 8      often.  You know, I was there always, but very

 9      often I ended up working a lot of extra to

10      finish the job that was not done.

11            Q.    Now, from the labor budget that

12      paid for cashiers and stock clerks and shift

13      supervisors and assistant store managers; is

14      that correct?

15            A.    And store manager.

16            Q.    And store manager, okay.

17            A.    Correct.

18            Q.    Okay.

19                  So that 6,500 was to pay for

20      hourly cashiers, whether they were part time or

21      full time, right?

22            A.    Yes.

23            Q.    And hourly stock clerks full time

24      or part time, right?

25            A.    Yes.
```

```
 1   in, you know, at night, they have to be packed
 2   out overnight.
 3              So if I had somebody working
 4   after, they -- they packed out, they worked the
 5   overnight packing out the truck.
 6              Even if -- even if I wanted to
 7   close, I mean even if I -- yeah, if I wanted to
 8   close, I cannot make those people that working
 9   the overnight, you know, do an extra shift or --
10   you know, it's a little bit complicated.
11              Sometimes I -- I could not choose,
12   you know, I got to go also by what other
13   managers have, you know.
14        Q.    And did you decide which days the
15   other managers opened the store and which days
16   other managers closed the store?
17        A.    Yeah, sometimes.  Most of the
18   time.
19        Q.    And did you decide what shifts the
20   shift supervisor worked?
21        A.    Yes.
22        Q.    And did you decide which shifts
23   the stock clerks worked?
24        A.    Yes.
25        Q.    Did you decide --
```

```
 1              A.    Well, I'm sorry.  That's not a
 2    hundred percent accurately.
 3                    Sometimes I could not decide on
 4    what time an employee works, because it is based
 5    on seniority.
 6                    So even if I needed certain people
 7    in the afternoon rather than during the day,
 8    there's nothing I can do.  They have to keep the
 9    schedule because they have the most seniority
10    and they get to kind of keep their schedule that
11    they have.
12              Q.    Was that a union store?
13              A.    Every store that I worked is union
14    store.
15              Q.    And is the seniority because of
16    working with a union?
17                    MS. REHMAN:  Objection to the
18              form.
19              A.    I don't know why was that.  I
20    don't know if it's New York law or union law.  I
21    don't know.
22              Q.    And apart from the seniority, did
23    you decide the shifts the stock clerks were
24    assigned to work?
25              A.    Yes.
```

```
 1            Q.     And the same with the cashiers?

 2            A.     Yes.

 3            Q.     Were some cashiers better workers

 4     than others?

 5            A.     I don't believe anybody is better

 6     than another.

 7            Q.     You don't believe any worker is

 8     better than another worker?

 9            A.     No.

10            Q.     You don't believe some workers

11     have more energy or some workers are more

12     careful in what they do or that some workers are

13     more productive than others?

14                   MS. REHMAN:   Objection to the

15                   form.

16            A.     Not -- not really because -- not

17     really, I don't believe that.

18            Q.     Why not?

19            A.     Because an employee who might be

20     good only the register and fast on the register

21     may not be as good packing out boxes and totes.

22                   Another one really good packing

23     out boxes and totes may not be the -- as

24     efficient on the cash register and vice versa.

25                   So I can't, I never judge on
```

```
 1          Q.    To the best of your ability?

 2          A.    Like I told you not, you know, I

 3   would love to -- to do it that way.  But because

 4   of the seniority and -- and factors like that, I

 5   really couldn't too much.  Although I tried to,

 6   you know.

 7          Q.    And that -- you allocated the

 8   labor budget to the employees at 4889 and 4887

 9   and 4261; is that right?

10                MS. REHMAN:  Objection to form.

11          A.    The question was too long.

12          Q.    Sorry.

13          A.    Yeah.

14          Q.    Three stores; 4261, 4887, 4889.

15                You just described how you

16   scheduled employees and allocated the labor

17   budget at 4889.

18                Did you do the same kind of thing

19   in allocating the labor budget to the employees

20   who worked in the store at 4887?

21                MS. REHMAN:  Objection to the

22          form.

23          A.    If you mean creating the schedule,

24   yeah, I did the schedule.

25          Q.    And did you do the same at 4261?
```

YATRAM INDERGIT, et al. v. RITE AID CORPORATION, et al 1:08-CV-09361-PGG-HBP
Jose Santos on 10/19/2011                                      Page 134

```
 1              A.      Correct.

 2              Q.      4261, approximately how many shift

 3      supervisors did you have?

 4              A.      It varies from time.

 5                      I had one and then I had two.

 6              Q.      Did you most often have one or

 7      two?

 8              A.      I don't remember how often I was

 9      with just one.  But, yeah, I don't remember.

10              Q.      Okay.

11              A.      I don't know if it was about half.

12      Half and half was the beginning.  Half the

13      beginning one, and the other half with two.

14                      But I'm not really sure.

15              Q.      Did you interview applicants for

16      the shift supervisor position when you hired the

17      second one?

18                      MS. REHMAN:  Objection to the

19              form.

20              A.      I don't hire.

21              Q.      I understand.

22                      When the second one was hired, did

23      you interview any applicants.?

24              A.      No.  The decision was all my -- my

25      district manager.
```

```
 1                    He was -- the second shift
 2   supervisor, he was an employee within my own
 3   store.  And he asked me like who you think is a
 4   good, you know, for -- for, you know, for the
 5   position.  And then I said, well, my team is
 6   pretty good.  And he said, well, tell me about
 7   somebody that never calls out and things like
 8   that.
 9                    I said, well, I have -- I have a
10   guy that almost, almost never called out, and I
11   pointed out to him and then, you know, sometimes
12   he'll pass by the store and see how he was
13   doing, and then he offered him the position
14   and -- to be a shift supervisor.
15            Q.    The district manager asked you who
16   you recommended to be promoted from an hourly
17   associate to a shift supervisor; is that right?
18                    MS. REHMAN:  Objection to form.
19            A.    The district manager.
20            Q.    Did the district manager ask you
21   who you recommended to be promoted?
22            A.    Not really.
23                    He asked me -- he asked me who did
24   I think was good.  That never called out and
25   who -- who probably will be good for the
```

```
 1            A.    You didn't ask me.

 2            Q.    I didn't ask you, that's true.

 3                  Well, let me ask you this:

 4                  Can you identify all of the

 5     positions that were paid by the labor budget?

 6            A.    It was the stock, cashier, shift

 7     supervisor, assistant store manager.

 8                  But I'm not sure on the security.

 9     Like my mind blank.  I don't remember.

10            Q.    Okay.

11                  Was there a security guard at 4887

12     in 2009?

13            A.    4887?  Yes.

14            Q.    Was that security guard full time?

15            A.    I don't remember.

16            Q.    Was there a security guard at

17     4261?

18                  You just told me yes.

19                  Was there -- you told me that's

20     where the -- that's where you broke your thumb,

21     right?

22            A.    Yes.

23            Q.    At 4889, was there a security

24     guard?

25            A.    I don't remember if that store had
```

```
 1        a -- a security guard.

 2                        Yes.  Yes.

 3               Q.     Now, I'm going to ask you about

 4        the number of hours that you worked in a week,

 5        not during the time that you were paid hourly,

 6        the hourly basis of pay is not the focus of my

 7        question.

 8                        When you were a salaried store

 9        manager at 4261 in 2008 and 2009, what were the

10        average number of hours you worked a week?

11               A.     It varied.  I don't -- I don't

12        remember.

13               Q.     Do you remember what the highest

14        number of hours per week was?

15               A.     The highest that I once worked, it

16        will be hard to tell, because there was a day

17        that I remember the district manager had

18        complained, I don't remember if it was Lenny or

19        Mike, probably Mike, they had complained

20        about -- about us having too much Halloween

21        merchandise in the basement and -- and there was

22        a -- there was a CEO coming.

23               Q.     CEO?

24               A.     Yeah, Mary Sammons.

25               Q.     M-A-R-Y?
```

```
 1          A.     Mary Sammons.

 2          Q.     Mary?

 3          A.     Yes.

 4                 And he had complained about having

 5    all that stuff and, you know, he says, you know,

 6    get rid of that and make sure you -- you set up

 7    everything up to the seasonal aisle.

 8          Q.     Up to the seasonal aisle?

 9          A.     Yeah, to bring up and make sure --

10    I mean, it was so much work and so little bit of

11    time, and we didn't have the manpower to do it.

12                 And I remember me and my assistant

13    manager, we worked -- I remember I came in at

14    7 a.m., and next day at 7 a.m. I was still on

15    the store as well as my assistant manager, and

16    we ended up leaving in the afternoon.

17                 We worked way over 30 hours.

18          Q.     Straight?

19          A.     Straight without going home.

20    Without, you know, not even brushing our teeth.

21                 I remember that.

22          Q.     Who was the assistant manager you

23    worked with?

24          A.     His name was Leon Kendall.

25          Q.     Do you remember when this took
```

```
 1   place?

 2              A.    I don't remember exactly.

 3                    But I know the season was

 4   Halloween.

 5              Q.    Was that at 4261?

 6              A.    Yes, sir.

 7              Q.    So it could have been October of

 8   2008?

 9              A.    Probably, but I don't remember

10   exactly.

11                    We get the merchandise before,

12   long before we get the season.  But I don't

13   remember the day.

14              Q.    Do you remember Mary Sammons

15   coming to visit the store?

16              A.    I remember the person that came

17   was the president of the -- of the company.

18              Q.    Do you remember what that person's

19   name was?

20              A.    He's the current CEO.  His name is

21   John Stanley.

22              Q.    J-O-H-N is John?

23              A.    Yeah.

24              Q.    Stanley, S-T-A-N-L-E-Y?

25              A.    Yeah.  I believe, yeah.  Stanley.
```

```
 1   John Stanley.

 2            Q.      Hmm.

 3                    Did you meet John Stanley?

 4            A.      Yes.

 5            Q.      Did you speak to him?

 6            A.      Yes, different occasions.

 7            Q.      Not just this once?

 8            A.      No, not just this once.

 9            Q.      What did John Stanley say about

10   the store when he visited in approximately

11   October of 2008?

12            A.      He will walk the store and

13   basement and say, "Good job."

14            Q.      He did; didn't he?

15            A.      Yeah.

16            Q.      What did the district manager say?

17            A.      The district manager very often

18   they -- they didn't say much.

19            Q.      But on this occasion when the

20   president of Rite Aid came to your store, walked

21   the store, went to the basement and said, "Good

22   job," what did the district manager say?

23            A.      I don't remember.  Probably he say

24   the same thing, but I don't remember.

25            Q.      Other than that, which was a
```

 1   pretty unique instance; wasn't it?

 2                 MS. REHMAN:   Objection to form.

 3        Q.    You didn't work 30 hours straight

 4   on any other occasion; did you?

 5        A.    There were other occasions we -- I

 6   cannot remember specifically.

 7                 I remember this incident

 8   specifically because of his visit.

 9        Q.    Uh-huh.

10        A.    But that's why I'm able to give

11   you details.

12                 But I don't remember other

13   specifics, but there were times that I -- that I

14   work long hours.

15        Q.    And what was the least amount of

16   hours you ever worked in a week as a salaried

17   store manager?

18        A.    The least?

19                 The least I'll say -- I don't

20   remember exactly.  But we -- I don't know.

21                 I don't think I did less than 60

22   something hours.

23        Q.    That was your least?  As the

24   salaried store manager?

25        A.    But I don't -- I don't remember

 1   certainly.

 2              They said the -- it's 50 hours we

 3   are supposed to, you know, that they said, but

 4   what I heard, but not that I also seen

 5   everything in any place.  They supposed to be

 6   about 50 minimum.  But I always ended up doing

 7   more, more than that.

 8              Q.   The salary that you received was

 9   for all the hours that you worked, whether it

10   was 50, 60, 70, or more; isn't that right?

11              MS. REHMAN:  Objection to form.

12         A.   What?

13         Q.   Did the salary you receive change

14   if you worked more hours?

15         A.   I wish.

16         Q.   Well, I'm going to ask you to say

17   yes or no to this question.

18         A.   No.

19         Q.   Okay.

20              So the salary that you received is

21   the salary you were paid for all the hours that

22   you worked?

23         A.   Correct.

24              MS. REHMAN:  Objection to form.

25         Q.   Whether few or many; is that

```
 1   right?

 2           A.    It was the same salary.

 3           Q.    Do you remember working with a

 4   assistant store manager by the name of Zakiya

 5   Millar?

 6           A.    Yes.

 7           Q.    You do?

 8           A.    Yes.

 9           Q.    Did you ever write her up?

10           A.    I don't remember.

11           Q.    Well, let me ask you:

12                 As a store manager, did you assign

13   tasks to the workers in the store?

14           A.    Yes.

15           Q.    And did you give workers lists of

16   tasks to accomplish?

17           A.    No list.  I will tell them.

18           Q.    Directly?

19           A.    Yeah.

20           Q.    Orally?

21           A.    Orally.

22           Q.    Not in writing?

23           A.    Not that I remember.

24                 Actually, sometimes I left notes

25   to the managers to do things.  But not very
```

```
 1    said I can't work as many hours as you scheduled

 2    me the following week, would you cut their hours

 3    and give those hours to someone else?

 4          A.    Probably.  I don't remember people

 5    not wanting hours.

 6          Q.    You remember people wanting hours?

 7          A.    No, I said I don't remember --

 8    yeah, I don't remember people not wanting hours.

 9                But I don't remember specifics,

10    you know.

11          Q.    But I think you used the example

12    of someone who said, Can I have that day off?

13    And you'd say, Yes.

14          A.    I used it as an example, yeah.

15                But I don't remember specific.

16    You know, I cannot -- it's not that -- that it

17    happened.  You know, I just use an example.

18          Q.    Of something that might have

19    happened?

20          A.    Probably.

21          Q.    Did you ever receive questions

22    from customers?

23          A.    Yes.

24          Q.    What kind of questions?

25          A.    What time do you close?
```

```
 1                    Are you going to receive -- I
 2   purchased the last item that was remaining, are
 3   you going to receive more?
 4                    Can you -- do you carry this
 5   product?  Can you order it for me?
 6                    Things like that.
 7          Q.    And what did you say to a customer
 8   who said, Can you order this for me?
 9          A.    I will -- I will ask the customer
10   if I could take a look at the product and then I
11   will check to see if we carry the product first.
12                    And if we -- if we carry it, the
13   first thing I'll do is I'll tell them to wait
14   for me for -- for a minute so while I go
15   downstairs to the basement to look for the
16   product and maybe if we are stocked.
17                    If we don't have the product, then
18   I cannot order it, and I will explain to the
19   customer that it's not up to me to bring
20   merchandise that the company doesn't carry, it's
21   corporate the ones that's in charge of putting
22   in the merchandise that we sell.  It's not -- I
23   don't have the power.  I can only order what the
24   merchandise that the company, corporate already
25   put on the planogram.
```

```
 1              Q.    And were there times that you were

 2     out of an item that an employee -- I'm sorry,

 3     that a customer wanted to buy and the customer

 4     asked you to order it for the next delivery from

 5     the truck?

 6              A.    Yes, there were times.

 7              Q.    And did you do that?

 8              A.    Yes.

 9                    It depends.  Sometimes I will try

10     to get the item.  If the customer was in need of

11     the item, I will try to -- to call other stores

12     to see -- to try to locate it and tell the

13     customer, you know, they have it in this place.

14              Q.    You'd call other stores to see if

15     the item the customer wanted to buy was

16     available in other stores?

17              A.    Correct.

18              Q.    Did you ever receive complaints

19     from customers?

20              A.    Yes.

21              Q.    What kinds of things did customers

22     complain about?

23              A.    Well, sometimes they will

24     complain, for example, if they cannot find an

25     item and they will complain.
```

```
 1          A.    Yes.

 2          Q.    "The primary purpose of this

 3  position is to manage the operation of an

 4  individual store in an efficient manner while

 5  maximizing sales margin and profitability."

 6                Do you agree that's a primary

 7  purpose of the position of store manager?

 8          A.    Can you repeat the question,

 9  please?

10          Q.    Is the first sentence an accurate

11  description of the primary purpose of a store

12  manager?

13          A.    I don't -- I guess.  But

14  partially.

15          Q.    Well, from your experience, is it

16  an accurate description of the position of store

17  manager as you performed that job?

18          A.    Well, I perform, you know, a

19  profitability -- in a profitability store.

20          Q.    You performed in a profitable

21  store?

22          A.    Yes.

23          Q.    And did you think it was one of

24  your primary purposes to manage the operation of

25  that store to keep it profitable?
```

```
 1          A.    Well, that is always -- that is

 2    most of the time a concern to keep it

 3    profitable.

 4               However, they are more concerned

 5    in following the corporate policies and

 6    directions that come from the corporate, because

 7    like a district manager don't care much if he's

 8    making money, the store.

 9               But then if they see that a

10    planogram is not done or that the basement is

11    not looking the way they want it to, and things

12    like that, you know, so it's like -- it's about

13    everything.

14               It's not -- it's not just, you

15    know, profitability in maximizing sales.  It's

16    about -- it's about doing, implementing and, you

17    know, and doing every work that corporate sends,

18    you know.

19               Corporate sends a planogram, it

20    needs to be done.  Corporate sends a price

21    change to be done, it needs to be done.

22               Regardless if the store is making

23    huge profits, if those are not done, then, you

24    know, you get fired.

25          Q.    The second sentence, do you agree
```

```
 1   that it's:

 2                 "A primary purpose of the position

 3   of store manager to enforce company policies and

 4   procedures while ensuring directives and all

 5   daily activities, deliver against the expected

 6   operating standards, merchandising, programs and

 7   budgeted financial targets"?

 8                 MS. REHMAN:  Objection to the

 9          form.

10          A.    I don't understand what they mean

11   by delivery against.

12          Q.    I think it means, um,

13   accomplishing.

14          A.    I will read it once more.

15          Q.    I think if we used the term

16   "accomplishing" the sentence would read:

17                 Enforce company policies and

18   procedures while ensuring directives and all

19   daily activities -- maybe achieve the expected

20   operating standards.

21                 MS. REHMAN:  Same objection.

22          Q.    And my question is:

23                 Do you agree that that is a -- an

24   accurate description of a primary duty of a

25   store manager?
```

```
 1          A.    Well, I will have to say that I

 2   disagree.

 3          Q.    Okay.  How come?

 4          A.    Because I mean that is their

 5   primary -- you know, I don't know who wrote

 6   this -- this -- corporate probably.

 7                So if they -- that will be

 8   probably their understanding of what it needs to

 9   be or what a store manager is.

10                It probably defer, you know, like

11   I told you, we follow -- I don't remember ever

12   seeing this.

13          Q.    You never saw that job description

14   before today?

15          A.    No.

16          Q.    Okay.  So I'm glad I was able to

17   teach something to you.

18          A.    Yeah, so it's like that might be

19   theirs, but in the store it's a different thing,

20   you know.

21          Q.    What's different in the store from

22   this description?

23          A.    I mean it's about following -- I'm

24   not really managing.  You know, I'm there, of

25   course, I'm the store manager, but I'm not
```

```
 1    really managing, I'm doing what district

 2    managers or -- or, you know, loss prevention

 3    and/or corporate tells to us to do, you know.

 4              Okay, this could be a right

 5    description, but you see it says merchandising,

 6    programming.  I don't have control over

 7    merchandising, programming.  I don't choose what

 8    goes on the shelf.  They chose for me.

 9              Budget.  Financial targets?  I

10    don't chose the financial target and the budget.

11    They choose it for me.

12              And they not in the store a

13    hundred percent of the time.  They don't see

14    that I'm not able to -- that I live with my

15    mother and I haven't seen her in two days

16    because I haven't been home, I've been working

17    and getting things done, because I cannot pay

18    people to help me get the stuff done on a timely

19    manner, this way I could have some time and, you

20    know, work the time that I'm supposed to work

21    and then go home, but, no, I have to stay extra

22    to finish the work.

23              So this is what I'm trying to tell

24    you, you know, this is their expectation.

25         Q.   Right.
```

```
 1                  Their expectation is that the
 2   store manager enforces company policies and
 3   procedures regarding merchandising, programming
 4   and budgeted financial targets.
 5                  Do you feel that the store
 6   manager's primary duty was to enforce company
 7   policies in the store?
 8              MS. REHMAN:  Objection to form.
 9        A.    I feel it was a priority of doing
10   what they told us to do, you know.
11                  We don't -- we don't chose what
12   to...
13        Q.    Do you agree that a primary
14   purpose of the position of store manager is to
15   promote and drive customer service?
16        A.    Absolutely.
17        Q.    Is the frequent independent
18   judgment essential?
19              MS. REHMAN:  Objection to the
20          form.
21        A.    It should be.  Even though our
22   judgment is not of much good, because my
23   judgment could be, hey, this planogram I will
24   think is not a good way, but I don't have a
25   power over that.
```

 1            I could say, hey, I need -- I need
 2     more budget for this store, and I think I could
 3     make it even more productively, but I don't have
 4     a power over that.
 5            I could say this store could even
 6     open a little later, because there's nobody at
 7     this time, or it could close earlier or close
 8     later, depending on the area.  If it's not that
 9     busy on that extra hour, let's cut that hour, I
10     don't have the power over that.
11            I could say, hey, the store closes
12     at 8, but even at 8 it's still very busy, let's
13     keep it open regularly ever day until 9 or 10,
14     but I don't have a power over that.
15            So, you know, frequent independent
16     judgment are essential.  One could say, yeah,
17     but depending on what?  On what situation?  I
18     could say, yes.
19            I mean, your judgment, for
20     example, you're asking me questions, your
21     judgment is essential, your frequent judgment is
22     essential right now, you're asking me questions.
23            What about if your employee gave
24     you a list of questions to ask me.  How good is
25     your judgment essential if you're asking me what

```
 1    your colleagues told me to ask me and you're not

 2    able to ask your own questions.

 3                    So, you know, that's how we have

 4    the hands tied.

 5           Q.    Is the store manager required to

 6    perform all tasks in a safe manner consistent

 7    with corporate policies and state and federal

 8    laws?

 9           A.    Yes.

10           Q.    And then we have nine points.  I'm

11    going to ask you the same kind of question:

12                    Do you agree that these are the

13    essential duties and responsibilities of the

14    store manager?

15                    Number 1, responsible for opening

16    and closing the store and maintaining proper

17    accountability for cash handling and company

18    banking.

19                    MS. REHMAN:  Objection to form.

20           Q.    Do you agree that's an essential

21    duty and responsibility of the store manager?

22           A.    I'll have to disagree.

23           Q.    And why?

24           A.    It says opening and closing.  You

25    know, some stores is open from 7 a.m. to
```

```
 1                    Looking for outdates.

 2                    It included arranging the

 3    overstocked merchandise in the basement.

 4                    And then a couple of times a week,

 5    bringing it up and packing it out again on the

 6    things that were empty.

 7                    It included facing the store.

 8                    Sweeping the street outside in the

 9    morning so we don't get a ticket.

10                    Taking out garbage.

11                    Among other things that I cannot

12    think of right now.

13           Q.    Okay.  The tasks that you just

14    listed, did you do them every single day?

15                    And I can go by --

16           A.    Some of them.

17           Q.    Which were the ones that you did

18    every day?

19           A.    Register.  I did the register.

20                    Deposits.

21                    Approvals.

22                    Damages.  We will to try to do it

23    every day, although it was not possible

24    sometimes.

25           Q.    Why was it not possible?
```

```
 1              A.    There was not enough people and

 2    too many tasks, so it's not possible to do those

 3    things.

 4                    Facing.

 5                    Sweeping.

 6              Q.    What about taking out the garbage?

 7              A.    Oh, I didn't mention that.

 8                    Taking out the garbage also, yes,

 9    every day.

10                    I mean take -- cleaning the, you

11    know, the bins and, you know, putting the

12    garbage in the back.

13              Q.    Did you assign your hourly

14    employees to take out the garbage?

15              A.    Sometimes.  And sometimes I did it

16    myself when there was not enough people.

17              Q.    Did you stock shelves?

18              A.    Yes.

19              Q.    So when you were stocking shelves,

20    would you be able to see all the employees in

21    your store to supervise them?

22              A.    No.  No, because I'm stocking the

23    shelves.

24                    You know, when I'm stocking the

25    shelves and doing a task, I mean, you know, I
```

YATRAM INDERGIT, et al. v. RITE AID CORPORATION, et al. 1:08-CV-09361-PGG-HBP
Jose Santos on 10/19/2011                                                    Page 245

```
 1    got finish what I'm doing before I can go check
 2    on something else.
 3                So it's very difficult to -- to
 4    keep an eye on to supervise while I'm -- while
 5    I'm stocking a shelf or doing something like
 6    that.
 7           Q.    Where are the cash registers in
 8    your stores located?
 9           A.    The store is in the front.
10           Q.    So if you were working on a cash
11    register in the front of the store, could you
12    see what your employees in the back of the store
13    were doing?
14           A.    No.  No, I couldn't.  I couldn't
15    see what they were doing.
16                I mean usually, you know, I would
17    only stop what I was doing, which was necessary
18    to be done, I will only stop to do it when a
19    customer requested my help, I will stop and --
20    and help them.
21                But normally I had no control.
22    You know, I needed to do -- to do the work that
23    I was doing and it's hard to supervise
24    everybody.
25           Q.    Every Rite Aid that you worked in
```

YATRAM INDERGIT, et al. v. RITE AID CORPORATION, et al 08-CV-09361-PGG-HBP
Jose Santos on 10/19/2011                                            Page 246

```
 1   was in New York, correct?

 2              A.    Yes.

 3                    New York as the state, because I

 4   worked in the Bronx and Manhattan.

 5         Q.    Okay.  And when it snowed in New

 6   York, did you have the ability to hire someone

 7   to shovel the street?

 8              A.    I wish.

 9                    No.

10         Q.    Who did the shoveling?

11              A.    Well, the shoveling, we had to do

12   the shoveling ourselves.

13                    Sometimes I had an employee, if I

14   had the manpower, I have them do it.

15                    If it was busy or things like

16   that, I will go there myself and shovel and go

17   inside the store and then go out and shovel.

18                    We used to put salt, but it wasn't

19   that effective.

20                    And when we used to take the

21   trucks at night, that was the real problem,

22   because the snow is already kind of stuck in

23   there and we had to shovel our way in order for

24   truck to unload the merchandise.

25         Q.    And did you complain to your
```

```
 1   district manager that you needed help shoveling?
 2           A.    Yeah, but, you know, it was
 3   something -- it is something that he will even
 4   make fun of.  You know, like what?  You
 5   cannot -- you cannot shovel a little snow?  You
 6   want like...
 7                 There's a couple of DMs that were
 8   a little funny.  You know, they will be
 9   sarcastic, you know.  What you want me to hire a
10   company to shovel for your store?
11                 And, you know, I mean ...
12                 But they were convincing, you
13   know.  At one point, you know, you sit down and
14   think, Hey, I mean it's true, you know, they
15   don't have the money, but they do have the
16   money.
17           Q.    Do you believe you were able to
18   fully supervise your employees while engaging in
19   shoveling the front of the sidewalk of the
20   store, or taking out the garbage, or working the
21   cash register, or stocking the shelves?
22                 Do you feel when you were doing
23   though duties were you able to fully supervise
24   your store?
25                 MR. WEINER:  Objection as to form.
```

```
 1              A.    Not really.
 2              Q.    Why not?
 3              A.    Because if I'm shoveling outside
 4     the store, I'm not inside -- I'm not even inside
 5     the store.
 6                    If I'm packing out something in
 7     the back, I cannot see what's happening on the
 8     other side of the store.  I cannot supervise the
 9     store while I'm doing something.
10              Q.    Earlier in the day you had
11     mentioned a cut in the payroll budget, in the
12     labor budget.
13                    Do you recall that testimony?
14              A.    I said payroll cut many times.
15     Can you...
16              Q.    Do you recall -- was there a cut
17     in payroll during your time --
18              A.    Oh, yes.
19              Q.    -- when you were a store manager
20     for Rite Aid?
21                    It's okay.
22              A.    Yes.
23              Q.    And did the cut in payroll and the
24     hours affect your ability to staff your store?
25              A.    Yes.
```

1          Q.    Did the cut in payroll hours

2    affect the job duties that you were required to

3    perform?

4          A.    Definitely, yes.

5          Q.    How so?

6          A.    Because, um, I believe that if I

7    had more -- more budget to hire more people, we

8    will be able to get things done on the timely

9    manner that the company wants it done.

10               And -- and, you know, I will be

11   able to delegate responsibilities to different

12   people.

13               But if I only have a budget to --

14   to have people only on registers on busy stores,

15   guess what, either I be on register or I go on

16   the floor and do the job.

17         Q.    Who do you believe was ultimately

18   responsible for the profitability of your store

19   while you worked as a store manager for Rite

20   Aid?

21         A.    I'll say -- I'll say people from

22   corporate who makes all the decisions.

23         Q.    Do you believe you had autonomy or

24   authority to run your store?

25         A.    Well, not really because of the

```
 1    things that I just pointed out.
 2                   It is the company that's giving us
 3    budget, that giving us planograms, telling us
 4    what to do.  We cannot, you know.  Anything we
 5    say is not taken into consideration.  As far as
 6    running the business.
 7                   Like I explained before, I might
 8    need more budget.  I might need a store to close
 9    later or earlier.  You know, different changes.
10                   But a normal manager will take the
11    decision, and Rite Aid was not able to make
12    those decisions as a store manager.
13          Q.    Could you decide -- strike that.
14                   Could you order whatever you
15    thought -- whatever merchandise you believed
16    that the store needed?
17          A.    It depends if we talking about
18    quantities that the company already carried or
19    if we talking about different products.
20                   Like, for example, like I
21    explained before.  A product that the company
22    doesn't carry, even if a million customers told
23    me to bring it in the store, I wouldn't be able
24    to do it.
25                   I could order merchandise.  But
```

```
 1   from the planner that is already set.  Not --
 2   not anything that I could think of that would
 3   sell better, no, I cannot make that decision.
 4          Q.    When you worked as a store manager
 5   for Rite Aid, how often was it that you hired an
 6   assistant manager also working with you on your
 7   shift?
 8          A.    Can you repeat that?
 9          Q.    While you worked as a store
10   manager for Rite Aid, how often was it that you
11   and an assistant store manager worked the same
12   shift?
13          A.    I don't remember.  It happened,
14   but I don't remember how, how often.
15          Q.    It was often that it happened?
16          A.    It depends.  Sometimes it varies
17   by store, you know.  It depends.
18          Q.    Did you train employees?
19          A.    Yes.
20          Q.    And when you were training
21   employees, did you create your own procedures on
22   how to train them?
23          A.    No.  Everything is set.
24                I mean the -- the register has the
25   procedure how to do different things.  You know.
```

```
 1        Q.    How frequently did you work at the
 2   photo lab?
 3        A.     Well, basically, the photo lab is
 4   a machine, a kiosk machine and they come to
 5   print the photos and they ask for help, Oh, can
 6   you help me print the photos?  Whenever a
 7   customer needed help, it happened often, you
 8   know, in the store that somebody needed help.
 9              Either printing out pictures or --
10   or sending -- or sending prints to be print at
11   another location.  You know, sometimes they want
12   larger picture that the machine doesn't do it,
13   so we put them on an envelope and send it -- and
14   send it.  And so we have to help that customer
15   with the questions.
16        Q.     Do you know of any store manager
17   working for Rite Aid or who worked for Rite Aid
18   who was paid hourly?
19        A.    Store manager?
20        Q.    A store manager.
21        A.    No.
22        Q.     While you worked as a store
23   manager for Rite Aid, who had the final say on
24   hiring staff?
25        A.    Can you repeat that?  I'm sorry.
```

1        Q.    Sure.

2              When you worked as a store manager

3    for Rite Aid, who had the final say on hiring

4    staff in your store?

5        A.    That depends.

6        Q.    On what?

7        A.    It depends if -- from the people

8    that I already have, if somebody resigns, I'll

9    have the final say.  I will -- I will hire

10   somebody to fill in.

11             But the final, the real final say

12   will be the people who set the budget.  Because

13   if I have more budget, I will hire more people.

14             But, you know, it wasn't -- it was

15   not up to me.  I could not give myself more

16   budget to hire more people.

17       Q.    Were you involved in setting the

18   budget of your store?

19       A.    Oh, no.

20       Q.    Did you ever recommend a change to

21   the budget of your store?

22       A.    All the time, yes.

23       Q.    Was your recommendation ever

24   accepted?

25       A.    No.

```
 1              Q.    Who would you make the
 2     recommendation to?
 3              A.    My district manager.
 4              Q.    Did you ever have any say in
 5     setting payroll for the store?
 6              A.    In setting payroll?
 7              Q.    Payroll budget for the store.
 8              A.    That wouldn't be the same thing?
 9              Q.    Is it the same thing?
10              A.    Yeah.
11                    The payroll budget is what we get
12     to distribute on the -- on the employees.
13                    But, no, we don't have any -- any
14     say in those decisions.
15              Q.    In terms of terminating staff, who
16     had the final say regarding termination in your
17     store?
18              A.    District manager.  Loss prevention
19     manager.  And human resource manager.
20                    MS. REHMAN:  I have no further
21           questions.
22                    MR. WEINER:  I just have a couple.
23     EXAMINATION (CONTINUED)
24     BY MR. WEINER:
25              Q.    Earlier we talked about
```

```
 1   multitasking where if you're stocking a shelf
 2   and a customer comes to you and asks a question,
 3   I believe you testified that you could answer
 4   the customer's question and also continue
 5   stocking shelves; is that right?
 6              MS. REHMAN:  Objection to form.
 7        A.    No.  That wouldn't be right.
 8              You asked me if -- or probably I
 9   didn't express myself correctly.  It could be
10   but...
11              You asked me if I was stocking
12   shelves and a customer asked me a question,
13   would I help them.  And I told you, of course, I
14   will help the customer.
15              And then you told me that will be
16   multitasking.  I said well, if helping the
17   customer was multitasking, then it was.
18              But if I needed to stop what I was
19   doing because I cannot pay attention, I mean
20   that wouldn't be good customer service.
21              If I kept packing a shelf and
22   talking to a customer, I need to stop what I
23   doing and then do one thing at a time, then help
24   the customer, which was my priority, you know.
25   I will help the customer.  Definitely.
```

```
 1

 2
                    ACKNOWLEDGMENT OF DEPONENT
 3

 4

 5            I, JOSE R. SANTOS, do hereby

 6        acknowledge that the same is a true,

 7        correct and complete transcription of the

 8        testimony given by me, and any corrections

 9        appear on the attached errata sheet signed

10        by me.

11

12

13    _____      _____
      (Date)                         (Signature)
14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit FFF

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


---------------------------------------------------

YATRAM INDERGIT, on behalf

of himself and others          Action No.

similarly situated,            #1:08-cv-09361-PGG-

      Plaintiffs,      HBP

      vs.

RITE AID CORPORATION, RITE

AID OF NEW YORK, INC., and

FRANCIS OFFOR as Aider &

Abettor,

      Defendants.
---------------------------------------------------

250 PARK AVENUE

NEW YORK, NEW YORK

July 12, 2011 - 10:00 A.M.


DEPOSITION of MICHAEL SIMONS, before S. Arielle

Santos, Registered Professional Reporter, Certified Shorthand

Reporter, Certified LiveNote Reporter and Notary Public.

Page 74

```
 1    manager on staff at all times?

 2            A    Yes.

 3                 MS. REHMAN:  Objection

 4            to form.

 5    BY MR. SCOTT:

 6            Q    Who ran the overnight

 7    stocking crew?

 8            A    One of the shift

 9    supervisors.

10            Q    Did that person volunteer

11    for that job?

12            A    Yes.

13                 MS. REHMAN:  Objection

14            to form.

15    BY MR. SCOTT:

16            Q    That is a tough job to

17    assign someone?

18            A    Yes.

19            Q    Okay.  Does that person like

20    working overnight?

21                 MS. REHMAN:  Objection

22            to form.

23                 THE WITNESS:  Yes.

24

25                 MICHAEL SIMONS
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Michael Simons**                                         **July 12, 2011**

Page 75

```
 1    BY MR. SCOTT:

 2         Q    And that's something that

 3    they informed you?

 4         A    Yes.

 5         Q    And so based on that

 6    information you assigned them that duty?

 7              MS. REHMAN:  Objection

 8         to form.

 9              THE WITNESS:  Yes.

10    BY MR. SCOTT:

11         Q    How many hours a week did

12    you work?

13         A    Sixty, sometimes more.

14         Q    Ever work fifty?

15         A    When I was training.

16         Q    So your hours increased when

17    you took over the store?

18         A    Yes.

19         Q    You said sometimes more?

20         A    Sometimes more.

21         Q    What would cause you to work

22    more hours?

23         A    Lowering the store, lead

24    hours that I could give out.  I would get

25              MICHAEL SIMONS
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Michael Simons**                                                July 12, 2011

Page 76

1        my hours constantly cut.

2                Q    Labor budget?

3                A    Right.

4                Q    Do you know how the labor

5        budget is calculated?

6                A    No.  I don't know anymore.

7        I don't remember.

8                Q    The labor budget is based

9        off the volume of the store, correct?

10               A    Correct.

11               Q    And as the some volume of

12       the store fluctuates the labor budget

13       fluctuates?

14               A    Correct.

15               Q    So you have if a higher

16       volume, you are going to have more

17       employee hours?

18               MS. REHMAN:  Objection

19               to form.

20               THE WITNESS:  Correct.

21       BY MR. SCOTT:

22               Q    If you have lower volume,

23       the labor budget is going to go down,

24       right?

25                    MICHAEL SIMONS

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Michael Simons                                           July 12, 2011

Page 81

1    lab?

2            A    No.

3            Q    Did you have any employees

4    that you considered to be problematic

5    employees?

6                 MS. REHMAN:  Objection

7        to form.

8                 THE WITNESS:  No.

9    BY MR. SCOTT:

10           Q    All of your employees were

11   good employees?

12                MS. REHMAN:  Objection

13       to form.

14                THE WITNESS:  Yes.

15   BY MR. SCOTT:

16           Q    As the store manager, one of

17   your responsibilities is to make sure

18   everyone is in dress code?

19                MS. REHMAN:  Objection

20       to form.

21                THE WITNESS:  Correct.

22   BY MR. SCOTT:

23           Q    They have to wear the

24   Rite-Aid outfit?

25                MICHAEL SIMONS

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Michael Simons**                                                    **July 12, 2011**

Page 82

```
 1            A     Right.
 2            Q     That includes the pharmacy
 3     tech and cashiers, correct?
 4            A     Yes.
 5            Q     Did you ever have to send an
 6     employee home for being out of the dress
 7     code?
 8            A     No.
 9            Q     Would you normally open or
10     close your store?
11            A     Normally both.
12            Q     You'd normally do both?
13            A     Open and close.
14            Q     How many days a week did you
15     open and close?
16            A     Five.  Actually, sometimes
17     six.
18            Q     Five or six?
19            A     Hm-hm.
20            Q     You were there from 9:00 to
21     9:00?
22            A     Correct.
23            Q     You took a break?
24            A     Cigarette break.
25                  MICHAEL SIMONS
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Michael Simons**                                    **July 12, 2011**

Page 83

1          Q     Lunch break?

2          A     No.

3          Q     What is the opening routine

4     that you had?

5                MS. REHMAN:  Objection

6          to form.

7     BY MR. SCOTT:

8          Q     Do you know what I mean by

9     that?

10         A     Yes.

11         Q     Okay.

12         A     Open the store, make sure

13    the cash is correct, that the safe cash

14    counts right, doing a deposit from the

15    previous night, running reports, making

16    sure the registers have their tills

17    counted out, and make sure the front of

18    the store outside was clean.

19         Q     A till is a drawer with

20    money in it?

21         A     Correct.

22         Q     What reports were you

23    running in the morning?

24         A     Your stock -- your

25               MICHAEL SIMONS

Page 94

1    employees for higher-volume times of the

2    day?

3          A    Yes.

4          Q    So you were trying to

5    forecast two weeks out when those high

6    volumes would be?

7               MS. REHMAN:  Objection

8          to form.

9               THE WITNESS:  Yes.

10   BY MR. SCOTT:

11         Q    And you are basing that on

12   your past experience when customers are

13   coming into the store?

14         A    Yes.

15         Q    How many employees did you

16   schedule to stock the truck, the

17   overnight shift?

18         A    Five.

19         Q    Did that include shift?

20         A    That included shift.

21         Q    How many employees did you

22   schedule to receive the truck during

23   business hours?

24         A    One.

25               MICHAEL SIMONS

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Michael Simons                                                    July 12, 2011

Page 95

```
 1            Q    One extra?

 2            A    One extra -- no.  One

 3     person, plus myself.

 4            Q    And that one person, do you

 5     remember who that person was?

 6            A    It was either Donnie or -- I

 7     don't remember the other kids' names.

 8            Q    When that -- when Donnie

 9     came in or the other person came in for

10     the truck, were they just offloading the

11     truck?

12            A    Correct.

13            Q    Other people were running

14     the registers?

15            A    Correct.

16            Q    Would you personally offload

17     the truck yourself?

18            A    Not all the time, but most

19     of the time.

20            Q    Did the truck pull up just

21     on the street?

22            A    In the back area, yes.

23            Q    When you developed your work

24     list in the mornings, would you post it

25                 MICHAEL SIMONS
```

Page 96

```
 1      in the office?
 2               MS. REHMAN:  Objection
 3          to form.
 4               THE WITNESS:  I would
 5          basically post -- not post
 6          in the office.  I would give
 7          it to the sales supervisors
 8          too and go over with the
 9          employees that came in with
10          the schedule what they had
11          to do.
12      BY MR. SCOTT:
13          Q    Okay.  So employees would
14      come in, you had the list, and you tell
15      them what they had to do that day?
16               MS. REHMAN:  Objection
17          to form.
18               THE WITNESS:  Correct.
19      BY MR. SCOTT:
20          Q    You said you assigned two
21      employees you were comfortable assigning
22      Plan-o-grams to, right?
23               MS. REHMAN:  Objection
24          to form.
25               MICHAEL SIMONS
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Michael Simons                                                July 12, 2011

Page 190

1    of any shipments that are coming in by

2    individual vendors.

3          Q    Okay.  Were you required to

4    work on the register?

5          A    Yes.

6          Q    Were you required to clean?

7          A    Yes.

8          Q    Sweep?

9          A    Yes.

10         Q    Mop?

11         A    Yes.

12         Q    Were you required to stock

13   shelves?

14         A    Yes.

15         Q    Unload trucks?

16         A    Yes.

17         Q    Were you -- when you

18   discussed earlier about pricing items,

19   who determined what the price of an item

20   would be?

21         A    Corporate.

22         Q    Did you have any independent

23   discretion as to what the price of the

24   item would be in a store?

25              MICHAEL SIMONS

Page 191

```
 1              MR. SCOTT:  Object to
 2         form.
 3              THE WITNESS:  Only if
 4         it was problem with
 5         competitive price or if it
 6         was an item that was on sale
 7         but wasn't list -- was in
 8         the book but wasn't listed
 9         on sale on the floor.
10    BY MS. REHMAN:
11         Q    In those situations would
12    you have to discuss the price with the
13    district manager or could you make that
14    decision on your own?
15         A    That, I could make on my
16    own.
17         Q    Did you have full authority
18    to hire without the approval of the
19    district manager or HR?
20              MR. SCOTT:  Objection.
21              THE WITNESS:  Not full
22         authority.
23    BY MS. REHMAN:
24         Q    Did you have full authority
25              MICHAEL SIMONS
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Michael Simons                                                    July 12, 2011

Page 192

1      to fire without the approval of the

2      district manager or HR?

3            A    No.

4                 MR. SCOTT:  Objection

5            to form to the last

6            question.

7      BY MS. REHMAN:

8            Q    Did you have full authority

9      to discipline an employee without

10     approval from the district manager or HR?

11                MR. SCOTT:  Object to

12           form.

13                THE WITNESS:  It

14           depended on the disciplinary

15           action.

16     BY MS. REHMAN:

17           Q    For termination, you said

18     that did you not have?

19           A    No.

20                MR. SCOTT:  Object to

21           the form.

22     BY MS. REHMAN:

23           Q    Did human resources conduct

24     background checks on any new hires or

25                MICHAEL SIMONS

Page 193

```
 1     candidates for hiring?

 2           A    Yes.

 3                MR. SCOTT:  Object to

 4           the form.

 5     BY MS. REHMAN:

 6           Q    And if an HR background

 7     check came back negative where they could

 8     not -- or they didn't pass the background

 9     check, were you allowed to hire that

10     employee?

11           A    No.

12                MR. SCOTT:  Object to

13           form.

14     BY MS. REHMAN:

15           Q    How much time did you spend

16     on the register each day?

17                MR. SCOTT:  Object to

18           form.

19                THE WITNESS:

20           Three hours, maybe.

21           Sometimes more.

22     BY MS. REHMAN:

23           Q    Okay.  And where were the

24     registers located in the store?

25                MICHAEL SIMONS
```

Page 194

```
 1          A     Front end of the store.
 2          Q     And when you were on the
 3   register those three or four hours in the
 4   front of the store, could you see every
 5   employee in the store?
 6          A     No.
 7          Q     Could you effectively
 8   supervise every employee in the store
 9   while you were on the register?
10          A     No.
11                MR. SCOTT:  Object to
12          form.
13   BY MS. REHMAN:
14          Q     When were you stocking
15   shelves, could you see every employee in
16   the store?
17          A     No.
18                MR. SCOTT:  Object to
19          form.
20   BY MS. REHMAN:
21          Q     Could you see over the
22   shelves?
23          A     No.
24          Q     Could you effectively
25                MICHAEL SIMONS
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Michael Simons**                                           **July 12, 2011**

Page 195

1   supervise every employee when you were

2   stocking the shelves?

3          A    No.

4              MR. SCOTT:  Object to

5          form.

6   BY MS. REHMAN:

7          Q    When were you in the

8   backroom, could you see the front of the

9   store?

10         A    No.

11         Q    Could you effectively

12  supervise employees working in the front

13  of the store?

14         A    No.

15             MR. SCOTT:  Object to

16         form.

17  BY MS. REHMAN:

18         Q    When you were cleaning the

19  store, when mopping or sweeping, could

20  you see all employees in the store?

21         A    No.

22             MR. SCOTT:  Object to

23         form.

24  BY MS. REHMAN:

25             MICHAEL SIMONS

Page 196

 1          Q    Could you supervise all the

 2     employees in the store when you were

 3     mopping or when you were sweeping or

 4     cleaning?

 5          A    No.

 6               MR. SCOTT:   Object to

 7          form.

 8     BY MS. REHMAN:

 9          Q    Why were you cleaning?

10          A    Because I was the only one

11     in the store at the time.

12          Q    Why were you unloading the

13     trucks?

14          A    They had cut my hours; so I

15     had to go and schedule myself so I

16     wouldn't have to ruin the schedule for

17     the people that did the overnight to get

18     the merchandise out.

19          Q    You said they cut your

20     hours.

21               Who cut your hours?

22          A    The district manager.

23          Q    Why were you stocking?

24          A    Because they didn't have

25               MICHAEL SIMONS

Page 197

```
 1    enough payroll in the store to cover

 2    stocking the shelves.

 3          Q     And why were you on the

 4    register?

 5          A     Same reason, not enough

 6    payroll.

 7          Q     Why didn't you assign those

 8    tasks to hourly associates?

 9          A     I didn't have that many

10    hourly associates who could come in

11    because of the payroll situation.

12          Q     How many hours did you start

13    with in your labor budget when you first

14    started working?

15          A     237, I believe.

16          Q     Did that amount of hours

17    stay the same or did it increase or

18    decrease?

19          A     Decreased.

20          Q     Before you left the store, I

21    guess when were you leaving the store --

22    when you left the store, how many hours

23    did you have left in your labor budget?

24          A     187.

25                MICHAEL SIMONS
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Michael Simons**                                         **July 12, 2011**

Page 198

```
 1              Q    Could you effectively

 2    schedule employees with the 180 hours?

 3              A    No.

 4                   MR. SCOTT:  Object to

 5              form.

 6    BY MS. REHMAN:

 7              Q    Were your sales goals

 8    changed when your labor budget decreased?

 9              A    No.

10              Q    Did the hours of your store

11    change when your labor budget decreased?

12              A    No.

13              Q    Did you have any authority

14    in deciding what your labor budget would

15    be?

16              A    No.

17              Q    You mentioned earlier that

18    you were terminated over a bottle of

19    orange juice.

20                   Can you describe the

21    circumstances of your termination and

22    that incident.

23              A    I was supposed to be off

24    that day.  I got a call from district

25                   MICHAEL SIMONS
```

Page 199

```
 1     manager.  There was merchandise in the
 2     back outside area that the previous
 3     manager had built up.  It's bottles and
 4     cans and deposits.  And the RM saw it,
 5     said I need to go in and clean it up
 6     immediately.  I went in on my day off,
 7     got involved not only in cleaning that
 8     but also getting some merchandise out.  I
 9     was up and down, running down ladders.
10     I grabbed an orange juice from the
11     refrigerator, put it down in the
12     stockroom while I was running up and down
13     the ladder, and came back down drank the
14     orange juice, forgot to pay for it.
15           Q    And you said your district
16     manager told to you clean up the bottles
17     and cans?
18           A    Yes.
19           Q    You had also discussed
20     earlier about training new hires or
21     employees.
22           Did you use any materials to
23     train those employees?
24           A    Just what was on the
25                MICHAEL SIMONS
```

Page 217

1              A C K N O W L E D G E M E N T

2    STATE OF New York

3    COUNTY OF Allen

4

5              I, the undersigned, hereby

6    certify that I have read the transcript

7    of my testimony taken under oath in my

8    deposition; that the transcript is a true

9    and complete and correct record of my

10   testimony, and that the answers on the

11   record as given by me are true and

12   correct.

13

14   _____

15   MICHAEL SIMONS

16

17             Signed and subscribed to

18   before me

19   This ____2____ day of

20   August          ,

21   20 11 .

22                        DARLENE COOPER
                          Notary Public, State of New York
                          No. 01CO6066696
23   _____   Qualified in Suffolk County
                          Commission Expires Nov. 19, 20__

24   Notary Public

25

# Exhibit GGG

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


SHIRLEY CRAIG,                )

                                 )

        Plaintiff,          )

                                 )

        vs.                  )   CIVIL ACTION NO.

                                 )   4:08-CV-02317

RITE AID CORPORATION and        )

ECKERD CORPORATION d/b/a        )

RITE AID,                   )

                                 )

        Defendants.         )


DEPOSITION OF RICHARD D. SMITH, taken pursuant to notice dated July 22, 2011, at the Executive Office Center, 477 Congress Street, Portland, Maine, on August 3, 2011, commencing at 8:59 A.M., before Lisa S. Bishop, RPR, RMR, a Notary Public in and for the State of Maine.

Page 41

```
 1     A    Yes.

 2     Q    What about the South Paris location, was it a

 3   stand-alone store as well?

 4     A    Yes.

 5     Q    And what was the surrounding neighborhood of the

 6   South Paris store like?

 7     A    It was intown.

 8     Q    Was it in a commercial center or was it more of a

 9   residential area?

10     A    Com -- I will just say commercial.  Across the

11   street from the school, so --

12     Q    What were the store hours at the Bethel store

13   location to the best of your recollection?

14     A    8:00 to 9:00.

15     Q    Every day of the week?

16     A    Every day.

17     Q    What about the South Paris location?

18     A    Same.

19     Q    Did you ever work at a 24-hour location?

20     A    No.

21     Q    Did the store hours vary based upon the time of

22   year like around Christmastime?

23     A    No.

24     Q    I'm sorry, you never worked in a 24-hour location;

25   is that correct?
```

Page 42

```
 1      A     Not in a 24, no.

 2      Q     I'm sorry?

 3      A     I never worked in a 24-hour.

 4      Q     How often did the truck come at the Bethel store

 5   location?

 6      A     Once a week.

 7      Q     And at the South Paris store?

 8      A     Once a week.

 9      Q     What were the differences in your job duties

10   between an assistant store manager and a store manager for

11   Rite Aid?

12      A     I'm sorry, can you ask that again, please?

13      Q     Sure.  What were the differences in your job

14   duties during the time that you worked as an assistant

15   store manager as opposed to a store manager for Rite Aid?

16      A     Are you asking what the differences are?

17      Q     Yes.

18      A     I did the same thing as the hourlies did.

19   Everything they did, I did right with them.

20      Q     Did you have additional responsibilities as a

21   store manager?

22      A     Additional responsibilities would be if anything

23   goes wrong, I'm the one that is going to get burned.

24      Q     You were responsible for scheduling, is that

25   correct, as a store manager?
```

Page 43

```
 1      A    I was -- I was not responsible.  I needed to make

 2  sure -- I did it and also the hourly supervisors could do

 3  it as well.

 4      Q    The shift supervisors?

 5      A    Correct.

 6      Q    As an assistant manager, did you do any

 7  scheduling?

 8      A    No.

 9      Q    Who did the scheduling during the time you worked

10  as an assistant manager?

11      A    Dan.

12      Q    Did he delegate that responsibility to anyone

13  else?

14      A    To the best of my recollection, no.

15      Q    Were you ever shown or taught how to do the

16  scheduling?

17      A    I was shown how it looked in the system, but as

18  far as going in and physically doing it, no.

19      Q    How did you learn to do that?

20      A    On my own.

21      Q    Who showed you how it looked on the system?

22      A    A key.

23      Q    And was that when you were a store manager or an

24  assistant store manager?

25      A    As an assistant.
```

Page 58

```
 1      Q     During the closing shift?

 2      A     Correct.

 3      Q     How many hours would you estimate then that you

 4   worked on a closing shift?

 5      A     On some of the nights that you close, they would

 6   have somebody come in and do the floors.  They would come

 7   through and wash them down and buff them.  That was once a

 8   week.  So I want to say -- between the two nights, I would

 9   say probably a good two-and-a-half hours between the two

10   nights.

11      Q     An additional two-and-a-half hours?

12      A     Between the two days, so each -- I would say if I

13   did a closing shift and I had to wait until everybody is

14   out of the building, do my thing, you know, whatever I

15   needed to do obviously, and shut the store down and arm it,

16   and then the next night, they would have somebody come in

17   and do the floors, so the night that the person would come

18   in and do the floors, I was there a good hour easy after

19   the store had closed.

20      Q     And it's because you were waiting for somebody to

21   finish the floors?

22      A     Correct.

23      Q     And because you couldn't leave that person alone

24   in the store unsupervised?

25      A     Correct.
```

Page 59

```
 1      Q     So your estimate is that over the course of a

 2  week --

 3      A     Over the course of a week, from my schedule, I

 4  estimated it to be roughly 54 hours.

 5      Q     And that's during the time that you worked as an

 6  assistant store manager?

 7      A     Yes.

 8      Q     Would that be true also during the time that you

 9  worked as a store manager?

10      A     More than that.

11      Q     You worked additional hours during the time you

12  were a store manager?

13      A     Yes.

14      Q     Why was that?

15      A     I didn't have -- I only had one -- only had one

16  key, so it was just -- there was only me and her, so

17  somebody -- somebody had to be there.  And I know at least

18  almost a good week as a store manager, I worked from the

19  time we opened until the time we closed, I was the man

20  basically.  I only had one other key.  They have to have

21  their time off, you know, by law, and so I was stuck.

22      Q     So you were responsible for everything that went

23  on from opening to close?

24      A     As a store manager, during that time.

25      Q     How many hours a week would you estimate that you
```

Page 60

1    worked during the time that you were a store manager?

2        A    60.

3        Q    Now you mentioned during the time that you were an

4    assistant manager, you would do things like counting down

5    the drawers.  What other things would you have to do after

6    the store had closed as an assistant store manager?

7        A    Basically take out the trash, make sure the

8    cashiers -- well, they do anyway, but they have big

9    blinders on the windows and I would just go around and shut

10   them and then arm it.

11       Q    And it's the manager's job to take out the trash;

12   is that correct?

13           MR. MIGLIACCIO:  Objection.  Vague.  Are you

14   talking about manager or assistant store manager?

15           MS. MOELLER:  The manager on duty.

16       A    It is everybody's.

17       Q    Is it a manager's job to ensure that merchandise

18   doesn't get put within the trash can, were you ever trained

19   about anything like that?

20       A    No.

21       Q    No.  So everybody takes out the trash?

22       A    Correct.

23       Q    Did you have to review, during the time that you

24   were a store manager, employee punch records to make sure

25   employees were punching in and out?

Page 61

```
 1     A     No.

 2     Q     You never did that?

 3     A     No.

 4     Q     How many employees worked in the pharmacy at the

 5  Bethel store location?

 6     A     Estimating, five.

 7     Q     Is that including the pharmacist?

 8     A     Yes.

 9     Q     How many pharmacists worked at the Bethel store

10  location?

11     A     One.

12     Q     At the South Paris store location, how many

13  employees would you estimate worked in the pharmacy?

14     A     Six.

15     Q     And how many of those six were pharmacists?

16     A     Two.

17     Q     As the store manager at the South Paris location,

18  were you responsible for making the schedule for the

19  pharmacy?

20     A     No.

21     Q     That was left to the pharmacist?

22     A     Yes.

23     Q     At the Bethel store location, do you know who made

24  the schedule for the pharmacy?

25     A     No.
```

Page 79

```
 1      A     Correct.

 2      Q     But you didn't have the discretion to decide

 3  whether to do those tasks during the time that you were an

 4  assistant store manager?

 5      A     No.

 6      Q     Would all of these responsibilities listed under

 7  your experience as an assistant store manager for Rite Aid

 8  have been your responsibilities during the time that you

 9  worked as a store manager for Rite Aid?

10      A     No.

11      Q     Which ones would not have been one of your

12  responsibilities as a store manager for Rite Aid?

13      A     None.  It's dictated.  I'm told what to do.

14      Q     By whom?

15      A     Corporate.

16      Q     Corporate?

17      A     Corporate or a DM, as a store manager.

18      Q     As a store manager, you were not responsible for

19  the day-to-day store operations?

20      A     I don't know if you would use the word responsible

21  or not, but basically, that's what I was told to do, so

22  it's either I did it or I would probably be gone.

23      Q     Let's be clear.  I didn't use the word

24  responsible, Mr. Smith.  You used the word responsible here

25  in your resume.
```

Page 80

```
 1      A    I understand.

 2           MR. MIGLIACCIO:  Objection.  You are asking him

 3   about -- this doesn't say anything about his job as a store

 4   manager, so --

 5           MS. MOELLER:  And that's why I'm asking him.

 6      Q    You used the word -- the phrase responsible for

 7   day-to-day store operations.  Would you agree that that was

 8   true during the time that you worked as a store manager?

 9      A    It's what I was paid to do.

10      Q    Okay.  You also in the second bullet state

11   responsible for ad ordering and maintaining stock.  Is that

12   true during the time that you worked as a store manager for

13   Rite Aid?

14      A    No.

15      Q    Okay.  Who was responsible for that?

16      A    The system automatically orders itself.

17      Q    So you were not responsible for maintaining in

18   stock at the store during the time that you worked as a

19   store manager for Rite Aid?

20      A    No.

21      Q    Who was responsible for deposits and balance of

22   cash handling during the time that you were a store manager

23   for Rite Aid?

24      A    Whoever.  I did it or the shift leader did it.

25   Whoever actually did the deposit, they are the ones who
```

**Shirley Craig v. Rite Aid Corporation, et al.**      **4:08-CV-02317**
**Richard D. Smith**                                    **August 3, 2011**

Page 81

1    were responsible for it.

2        Q    So if it was the shift supervisor doing it, it was

3    the shift supervisor's responsibility?

4        A    Yes, if something went wrong, it's their fault.

5        Q    Wouldn't you agree as the store manager, you were

6    ultimately responsible for everything that went on in your

7    store?

8        A    I don't know how to give an answer to that one.

9        Q    I mean you told me earlier essentially that the

10   buck stops with you; isn't that correct?

11       A    As the top man on the totem pole, but I mean we

12   are going -- you know, if we are going -- you know, if

13   we're going into me being a store manager, you know, to me,

14   I don't understand why I'm even being questioned being a

15   store manager when I'm here for an assistant store manager

16   deposition, so it is kind of getting confusing.

17       Q    All right.  Well, I'm asking you specifically

18   about the time that you were a store manager.  Would you

19   agree that you were ultimately responsible for everything

20   that happened in your store on a day-to-day basis?

21       A    As a store manager, yes, not as an assistant store

22   manager, no.

23       Q    All right.  Thank you.  All right.  So it's your

24   testimony then, Mr. Smith, that in this resume that you

25   submitted to Rite Aid, that this had not necessarily been

Page 237

```
 1                  DEPONENT SIGNATURE PAGE

 2

 3   CAPTION:  Craig vs. Rite Aid Corporation

 4   DEPONENT:  Richard D. Smith

 5

 6   I _____, acknowledge that I have read

 7   pages _____ through _____ inclusive of the transcript of my

 8   deposition taken on August 3, 2011.

 9

10   I further acknowledge that:

11               (check appropriate language)

12   _____ the same is a true, correct, and complete

13   transcription of the answers given by me to the questions

14   recorded therein.      OR

15   _____except for the changes noted on the attached errata

16   sheet, the same is a true, correct, and complete

17   transcription of the answers given by me to the questions

18   recorded therein.

19

20   _____

21   Deponent

22   Subscribed and sworn to before me

23   this _____ day of _____, 2011.

24

25   Notary Public_____
```