# Exhibit HHH

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x
YATRAM INDERGIT, on behalf of        :
himself and others similarly         :
situated,                            :
                                     :
              Plaintiff,             :
                                     :CIVIL ACTION
         vs.                         :NO. 1:08-cv-
                                     :09361-PGG-HBP
RITE AID CORPORATION, RITE AID OF    :
NEW YORK, INC., and FRANCIS OFFOR    :
as Aider & Abettor,                  :
                                     :
              Defendants.            :
- - - - - - - - - - - - - - - - - - x

July 12, 2011


          Deposition of ROSITA SOLIS, taken
pursuant to notice, held at the offices of Epstein
Becker & Green, P.C., 250 Park Avenue, New York,
New York, commencing at 10:05 a.m. before Jamie I.
Moskowitz, a Registered Professional Reporter and
Notary Public.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                                    **July 12, 2011**

**Page 16**

```
 1       Q          Were you a member of that union?
 2       A          Yes.
 3       Q          When you were promoted from shift
 4  supervisor to assistant manager, did you remain a
 5  member of the union?
 6       A          No.
 7       Q          How did that work?
 8       A          That's what I found.  We were also --
 9  once you became an assistant or a manager, your
10  benefits and everything that you had dropped.  You
11  would actually be paying more out of my pay, and the
12  benefits were not the same.  You didn't really have
13  good benefits like you did when you were a cashier,
14  key and supervisor.
15       Q          As a member of the union, you had
16  better benefits --
17       A          Yes.
18       Q          -- than you did as a member of
19  management?
20       A          Yes.
21       Q          Are you referring to health benefits?
22       A          Yes.
23       Q          Any other benefits?
24       A          No.
25       Q          Did you ask to be promoted to
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Rosita Solis                                              July 12, 2011

Page 17

 1  management?
 2      A        No.
 3      Q        This was something that the store
 4  manager decided for you?
 5               MR. VALLI:  Objection to form.
 6               THE WITNESS:  Well, he asked me if I
 7          think I could handle it.  He thought I did good
 8          in the store and everything, and he saw
 9          potential in me, and I said, "Okay, I'll give
10          it a try."
11  BY MR. WEINER:
12      Q        Was there an increase in pay?
13      A        Yes.
14      Q        Was the shift supervisor position an
15  hourly position?
16      A        Yes.
17      Q        And how about the assistant manager
18  position that you held, was that hourly or salaried?
19      A        Salaried.
20      Q        Do you recall what the salary was?
21      A        When you first started, I can tell you
22  what I -- like every two weeks I would make.  When I
23  first started, it would be about maybe a thousand
24  every two weeks, a little over.
25      Q        Is that net or gross?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                                            **July 12, 2011**

```
 1       A         That's -- that's net.
 2       Q         That's what you basically took to the
 3   bank?
 4       A         Yes.
 5       Q         And did that amount change over the
 6   course of time that you were an assistant manager?
 7       A         Every six months you would get a raise
 8   of maybe 30 cents.
 9       Q         Thirty cents an hour or 30 cents -- 30
10   cents a week?
11       A         Thirty cents an hour.
12       Q         An hour.
13                 So the salary also had an hourly
14   component that was calculated into it?  Thirty cents
15   an hour is a little unusual to discuss a means of
16   calculating an increase to a salary, isn't it?
17                 MR. VALLI:  Objection.
18   BY MR. WEINER:
19       Q         If you know.
20                 MR. VALLI:  I don't know what you're
21       asking her, and if I don't know what you're
22       asking her --
23                 MR. WEINER:  I'll withdraw that
24       question.
25
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                                    **July 12, 2011**

```
 1        Q        One at a time, and two different ones
 2   over the course of that time?
 3        A        Yes.
 4        Q        So, all together, there were about
 5   seven or eight employees who were your subordinates?
 6        A        Yes.
 7        Q        And you scheduled their hours of work?
 8        A        Yes.  But we were given -- all
 9   managers were given, through SYSM, which is a
10   message through the computer, what was the budget.
11        Q        That's the labor budget?
12        A        Yes, how many hours we had to deal
13   with.
14        Q        Was the labor budget expressed in
15   terms of dollars or in terms of hours?
16        A        Both.
17        Q        During the time that you were a store
18   manager, can you recall what your labor budget was?
19        A        It would change every week.  Every
20   week you would get a different budget.
21        Q        What were the factors that went into
22   the labor budget changing every week?
23                 MR. VALLI:  Objection.
24                 THE WITNESS:  I guess it depends maybe
25       what the store brought in that week.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP**
**Rosita Solis**          **July 12, 2011**

```
 1    BY MR. WEINER:

 2         Q        In terms of sales?

 3         A        In terms of sales.  That's basically

 4    it.  How many people you had, you had to, you

 5    know...

 6         Q        Were you told how many people you

 7    should have or was that something you could

 8    schedule?

 9         A        Does this have to do with, like, the

10    hiring, like how many -- I don't understand.

11         Q        Okay.  Well, let me go back.  I'll

12    withdraw that question and ask you about the labor

13    budget.

14         A        Okay.

15         Q        Even though it changed every week --

16         A        Right.

17         Q        -- would you be able to give me a

18    range that it changed from and to, high, low, this

19    kind of thing?

20         A        The majority of the time it would be

21    low.  It would get cut a lot.

22         Q        Can you recall a dollar amount?

23         A        Not really.  I mean, one week it would

24    be -- say you have, in terms of hours, you would

25    have, say, 200 hours to split between all the
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                                      **July 12, 2011**

1   employees.  Then next week it will be 170.  It would

2   drop most of the time.  For the dollars, I'm not

3   sure.

4        Q        Were the cashiers all paid the same

5   hourly rate?

6        A        In the beginning, yes.  After that, we

7   got a SYSM, stating that if we were to hire a

8   cashier, they would have to be started at a certain

9   amount, which was different from when it first

10  started.

11       Q        What was the difference?

12       A        Fifteen cents.  I think it started at

13  seven, then you would have to hire them at 7.15.

14       Q        Do you recall how many cashiers you

15  hired?

16                MR. VALLI:  Objection.

17                THE WITNESS:  About -- as a manager

18       about maybe three; three or four.

19  BY MR. WEINER:

20       Q        What did you look for in a cashier?

21       A        If they had experience in the past.

22  They would have also had to take the drug test.  I

23  would give them a test right then and there, a

24  little bit of math.  You know, if I was to give this

25  person, how much change would I get back, see how

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Rosita Solis                                                July 12, 2011

Page 34

1    they did with that.  Their school experience.

2    That's basically it.

3         Q        Do you recall approximately how many

4    applicants applied for work when you were the store

5    manager?

6         A        Many.

7         Q        Were there many that you rejected as

8    applicants?

9         A        Well, me, personally, I would have to

10   go through him, through my district manager, to hire

11   and fire.  So, I would never really make the

12   decision myself.  I would come across an application

13   and I would run it through him:  "Do you think this

14   is good?  Because I really think this person has a

15   good resume."  And he would come see us some of the

16   time.  A rejection, a couple.

17        Q        Were there applicants that you decided

18   you would not even recommend to your district

19   manager?

20        A        No.  I told him everybody that would

21   come in and try to apply.

22        Q        And did you give the district manager

23   your view as to whether you thought they were good

24   or not?

25        A        Yes.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                                July 12, 2011

```
 1        Q         Did the district manager ever say to

 2   you that you had to hire someone that you had

 3   recommended not be hired?

 4        A         No.  Just when I promoted one girl

 5   from a cashier to a supervisor, and he told me if I

 6   was sure, because she seemed kind of slow and, you

 7   know, not on the ball.  But she ended up being a

 8   supervisor anyway.

 9        Q         Who was the district manager you had

10   the conversation about the cashier with?

11        A         Wade LaRue.

12        Q         Wade LaRue?

13        A         Yes, sir.

14        Q         What was it about that cashier that

15   you decided that you wanted to promote her?

16        A         She did a great job.  You would tell

17   her to do something and she would do it, no

18   questions asked.  She wanted to learn more, wanted

19   to -- on the job, she would ask; she wouldn't

20   hesitate.  She always wanted to learn more.  She was

21   always willing to go further.

22        Q         And what was it that Wade saw that

23   made him hesitate?

24                  MR. VALLI:  Objection.

25                  THE WITNESS:  I guess, to him, she
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                                    **July 12, 2011**

Page 53

```
 1      A         No.
 2                MR. VALLI:  Objection.
 3   BY MR. WEINER:
 4      Q         Other than those two individuals, do
 5   you recall who else you wrote up while you were the
 6   store manager?
 7                MR. VALLI:  Objection.
 8                THE WITNESS:  No.
 9   BY MR. WEINER:
10      Q         Were there any others?
11      A         Yes.
12      Q         Do you recall what position they may
13   have held?
14      A         Cashier.
15      Q         Do you recall the reason that you
16   wrote them up?
17      A         Majority of the write-ups were late
18   or -- that's it, late.
19      Q         When you were the assistant store
20   manager, did you recommend anyone be written up?
21      A         No.
22      Q         When you were the assistant store
23   manager, did you recommend that anyone be promoted?
24      A         No.
25      Q         Did you recommend anybody be hired?
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                                    **July 12, 2011**

Page 54

```
 1        A         No.
 2        Q         Did you have a chance to recall the
 3   amount of the labor budget?
 4        A         It would change every week.
 5        Q         It varied week to week?
 6        A         Yes.
 7        Q         And when the labor budget varied, your
 8   scheduling of employees also varied; is that right?
 9        A         Yes.
10        Q         Could you schedule people as
11   part-timers rather than full-timers, if you wanted
12   to?
13        A         I couldn't personally myself.
14        Q         As a store manager?
15        A         Yes.
16        Q         What do you mean by that?
17        A         It would have to go through Wade
18   whether they be part-time, full-time, how many hours
19   were given to the people.
20        Q         So, tell me what the process was that
21   you used to schedule the people who worked under you
22   at the store.
23        A         Well, while doing the schedule --
24   actually, a schedule that they wanted would come out
25   through the computer on its own.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                                    **July 12, 2011**

**Page 55**

1        Q          What did that schedule look like?

2        A          It was different.  Every week the

3    schedule would come out different.

4        Q          The store hours of operation didn't

5    change -- well, actually, they did.  You mentioned

6    that Saturday hours got cut back?

7        A          That was for pharmacy.

8        Q          For pharmacy.

9                   How about the hours of the operation

10   of the rest of the store, did they remain constant

11   throughout your course of employment?

12       A          Yes.

13       Q          And I think you said that they started

14   at 8:00 in the morning?

15       A          Yes.

16       Q          Eight-thirty.  Was it 8:30?

17       A          No.  8:00.

18       Q          And how many people did you schedule

19   to work at 8:00 in the morning?

20                  MR. VALLI:  Objection.

21   BY MR. WEINER:

22       Q          Can you recall a typical schedule that

23   you prepared?

24       A          Well, like I said, it would come out

25   on the computer.  You would have to adjust it, but

**Page 56**

1    fax it to them before you put it out there on the

2    bulletin.   They had to approve it.

3                 You would get maybe one cashier in the

4    morning, 8:00, main cashier.

5        Q        And how long would you schedule that

6    cashier to work?

7        A        It depends.  It would depend on what

8    our budget was and what our hours were that week.

9        Q        How long did it take you to prepare

10   the schedule each week?

11       A        Two to three hours.

12       Q        Did you receive more hours or more

13   dollars in the labor budget around holiday times?

14       A        No.  Maybe more hours, if that.

15       Q        What was the busiest season for the

16   store?

17       A        Christmas.

18       Q        And how many weeks before Christmas

19   did you notice the business increase?

20       A        Before Christmas?

21       Q        Yes.  How many weeks before Christmas?

22       A        Three weeks.

23       Q        And was summer a busier time than

24   winter, other than the Christmas time?

25       A        Not really.

Page 57

```
 1        Q         Was spring any different than the
 2   fall?
 3        A         No.
 4        Q         How about during the day -- well,
 5   before we get to during the day, let me ask you,
 6   during the week, what was the busiest day of the
 7   week?
 8        A         Mondays.
 9        Q         What was the next busiest day of the
10   week?
11        A         Wednesdays.
12        Q         Third busiest?
13        A         Sundays.
14        Q         Fourth?
15        A         Tuesday.  Friday and Saturday.
16        Q         Friday and Saturday, in that order.
17                  Saturday was the least busiest day of
18   the week?
19        A         Yeah.
20        Q         Would you schedule more hours on
21   Mondays than you did on Saturday?
22        A         Yes.  Depends what was given to me.
23        Q         Describe what was given to you.  Were
24   you given a number of weekly hours that you
25   allocated?
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                                           **July 12, 2011**

Page 58

```
 1      A         Every week I was given a number of
 2  hours.
 3      Q         And did you allocate those hours to
 4  the people who worked in the store?
 5      A         Well, say it was 200 hours.  We had to
 6  split between all the workers that were there, 200
 7  hours.
 8      Q         And that was a decision that you made
 9  when you were the store manager?
10      A         No.
11      Q         Who made that decision?
12      A         Wade.
13      Q         Did he tell you, "I want Betty to work
14  30 hours, I want Jorge to work 20 hours," that kind
15  of thing?
16      A         Yes.
17      Q         He told you exactly how many hours he
18  wanted each person to work?
19      A         Well, whatever was given to me he said
20  I can split up, but he would look at the schedule
21  and say, "No.  Give this person more," because
22  probably their work ethic was better or they can get
23  there on time more.
24      Q         Were there times that you and he would
25  argue who should receive the hours?
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                                      **July 12, 2011**

**Page 59**

```
 1      A          No.

 2      Q          Did you make recommendations for the

 3   schedule that he approved?

 4      A          No recommendations, no.  I would tell

 5   him that the hours that were given to us, which all

 6   the managers did, weren't enough.  But we had to

 7   take it.

 8      Q          Did you write the schedules out for

 9   the workers and send them to Wade for him to take a

10   look at?

11      A          Yes.  Every schedule, yes.

12      Q          When did you do that?

13      A          Monday mornings.

14      Q          And was that for the very week that

15   you were in or was that for the following week?

16      A          Following week.

17      Q          And if you had 200 hours, you'd

18   allocate those 200 hours and send that to Wade

19   Monday morning?

20      A          Yes.

21      Q          And when would you hear from Wade

22   about his views of the allocation of the hours to

23   the scheduled workers?

24                 MR. VALLI:  Objection.

25                 THE WITNESS:  That same day.
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Rosita Solis                                               July 12, 2011

Page 60

```
 1   BY MR. WEINER:
 2        Q          How often was your schedule modified
 3   by Wade?
 4        A          Almost all the time.
 5        Q          And why was that?
 6                   MR. VALLI:  Objection.
 7                   THE WITNESS:  I guess it will probably
 8        go over sometimes, what was given.
 9   BY MR. WEINER:
10        Q          So, would you be given 200 hours, and
11   you would schedule people to work 225, for example?
12        A          No.  It would be -- no, a little bit,
13   202.  We would get in trouble for that.
14        Q          Wade would say, "I didn't give you
15   202"?
16        A          Yup.
17        Q          "I didn't give you 201.  I gave you
18   200"?
19        A          Yes.
20        Q          And what would you say?
21        A          "Okay."
22        Q          Did you have to work with anyone in
23   the union about scheduling any of the hours?
24        A          No.
25        Q          Was there any kind of a seniority
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Rosita Solis                                                    July 12, 2011

Page 61

1  system, where one employee would be entitled to more

2  hours than anyone else?

3       A       I was told, yes.

4       Q       And who told you?

5       A       Wade.

6       Q       And what did Wade say?

7       A       "The longer a person is there, the

8  more hours they get."

9       Q       Did he say that was because of the

10  collective bargaining agreement?

11      A       No.

12      Q       Did you ask him why he told you that

13  the people who were there longer should get more

14  hours?

15      A       No.

16      Q       Did he tell you why?

17      A       Just because they were there longer.

18      Q       He thought that was fair?

19              MR. VALLI:  Objection.

20  BY MR. WEINER:

21      Q       Do you believe that he thought that

22  was fair, or do you know why he told you that people

23  who were there longer should get more hours?

24              MR. VALLI:  Objection.

25              THE WITNESS:  I didn't know why he

**Page 78**

```
 1   if you passed the test, you would receive a

 2   Certificate of Achievement?

 3        A        On some of them there were tests and

 4   you would receive the certificate, yes.

 5        Q        Was that for all employees or was that

 6   for management employees?

 7        A        All employees.

 8        Q        Was that something that Mark also did

 9   or was this something that Wade initiated?

10        A        Mark also did.

11        Q        Did you take the CBTs when Mark was

12   your district manager?

13        A        Yes.

14        Q        You don't recall going to any of these

15   monthly meetings where Mark was the district

16   manager; is that correct?

17        A        Correct.

18        Q        Do you recall the first meeting you

19   went to when Wade was the district manager?

20        A        No.

21        Q        Do you recall the last meeting you

22   went to when Wade was the district manager?

23        A        A specific date, no.

24        Q        Not a specific date, just the meeting

25   itself?
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                                          **July 12, 2011**

**Page 79**

1        A          No.  They all had to do with the same

2    thing.

3        Q          What did he say about payroll at the

4    meeting?

5        A          You have to follow it.  Couldn't go

6    over budget, over hours.  You have to stick to that.

7    You can get written up if you did.

8        Q          And what did he say about scheduling?

9        A          Basically you had to schedule what was

10    given.

11        Q          So, what he had to say about payroll

12    was that you had to stay within the budget?

13        A          Yes.

14        Q          What he said about scheduling was that

15    you had to stay within the budget; is that correct?

16                   MR. VALLI:  Objection.

17                   THE WITNESS:  Yes.

18    BY MR. WEINER:

19        Q          And you said that hours were a subject

20    of the meetings as well?

21        A          Yes.

22        Q          What did he say about the hours?

23        A          Couldn't go over.

24        Q          Was there conversation and discussion

25    among the store managers at the meetings about these

**Page 80**

1    subjects?

2         A          Yes.

3         Q          Did store managers ask Wade questions

4    or make comments?

5         A          Yes.

6         Q          Do you recall any of those comments or

7    questions?

8         A          Why couldn't we get more.  What would

9    happen if we went over.

10        Q          And do you recall the answers?

11        A          Written up if you went over.  There

12   was no more to be given out.

13        Q          Were you ever written up for going

14   over your payroll?

15        A          Not that I remember.

16        Q          Were you ever written up for anything?

17        A          Yes.

18        Q          What were you written up for?

19        A          Not finishing a lane on time,

20   planogram.  That's it, that I remember.

21        Q          Did Wade write you up?

22        A          Yes.

23        Q          How did he know how long it took you

24   to complete a planogram?

25        A          He would be in the store a lot.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                                                    **July 12, 2011**

**Page 84**

```
 1       things had to be done a certain way also.
 2    BY MR. WEINER:
 3       Q        Do you recall what they were?
 4       A        Same thing: facing the store,
 5    outdates.
 6       Q        Did you say anything to him?
 7       A        Just okay, thank you.  That's it.
 8       Q        And what did the district manager say
 9    when he was with the regional vice president and
10    they were walking the store with you?
11       A        Nothing much.
12       Q        Did the regional vice president ever
13    come to any of the monthly meetings that the
14    district manager had?
15       A        No.
16       Q        Did you ever ask the regional vice
17    president for more hours to schedule associates or
18    cashiers?
19       A        No.
20       Q        Why not?
21       A        Managers just thought what was given
22    to us was given to us by Wade, and we didn't know we
23    could go higher to ask anybody else.
24       Q        So, you didn't know that you could go
25    to anybody that was higher than Wade or a district
```

**Page 85**

1    manager for additional budget authority; is that

2    right?

3         A         Right.  That came from them.

4         Q         They told you what budget you had to

5    use to run the store, right?

6         A         Yes.  Not me, personally, on a

7    personal basis like we are now.  The SYSM.

8         Q         They would communicate with you

9    electronically, through the computer?

10        A         Yes.

11        Q         Through the system that you call SYSM?

12        A         Yes.

13        Q         Were any of the assistant store

14   managers at your store paid by the hour or were they

15   all salaried?

16        A         Salaried.

17        Q         Do you know if there were assistant

18   store managers in your district that were paid by

19   the hour?

20        A         Not that I know of.

21        Q         Do you know if there were any

22   assistant store managers at stores outside your

23   district?

24        A         Not that I know of.

25                  MR. WEINER:  I'm going to ask to take

Page 86

```
 1        another two-minute break.

 2                (Whereupon, a short break was taken.)

 3   BY MR. WEINER:

 4        Q       Regarding the meetings that were

 5   conducted by the district manager, the monthly

 6   meetings where payroll, scheduling and hours were

 7   discussed, is there anything else about those

 8   meetings that you can recall, that you haven't

 9   described yet?

10        A       No.  Maybe if a new product was going

11   to come up, we would get a heads-up about it, talk

12   about the product.  Other than that...

13        Q       I want to go back to Exhibit 3 that's

14   in front of you.  And you described the RAPTAR page

15   and the commendation you received from the customer.

16                Was this commendation from the

17   customer signed by a fellow named Mike Caden,

18   director of customer support?  Do you know who that

19   is?

20        A       No.

21        Q       The next page, do you recognize what

22   that is?  It says "SYSM" at the top, "SYSM INBASKET

23   PRINT."

24        A       Yes.

25        Q       Could you identify what this is?
```

Page 189

1   strength; is that right?

2        A        Yes.

3        Q        I heard you describe assigning work as

4   a strength that you had; is that correct?

5        A        Yes.

6        Q        And that unloading a truck correctly

7   was a strength you had as a manager --

8        A        Yes.

9        Q        -- is that correct?

10       A        Yes.

11       Q        Tell me about unloading a truck

12   correctly.  What did that involve?

13       A        Truck would come in, in the morning.

14   Correctly spotting everything where it goes, instead

15   of putting everything in one aisle and then

16   separating it.  It's double work.

17       Q        When you say "spotting," is that the

18   term that is used for --

19       A        Putting things correctly where they

20   go.

21       Q        How long did that process take, of

22   unloading the truck?

23       A        Depending how many pallets we got that

24   week.

25       Q        And did that vary week to week?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                                    **July 12, 2011**

**Page 190**

```
 1        A          Yes.

 2        Q          What was the highest number of pallets

 3   you got in a week?

 4        A          Fifteen.

 5        Q          What was the lowest number of pallets

 6   you got in a week?

 7        A          Five.

 8        Q          And what was on the pallets?

 9        A          Merchandise.

10        Q          Everything?  Or were certain pallets

11   designated to certain types of merchandise?

12        A          No.  Everything.

13        Q          Why, in some weeks, would you receive

14   15 pallets, and in other weeks, you would only

15   receive five?

16        A          Holidays.  It could be a holiday.

17        Q          Holiday you would receive much more;

18   is that correct?

19        A          Yes.  Or Wade would go into the system

20   and change the numbers of what I ordered.

21        Q          Tell me about the ordering process.

22   Did you make the initial order for merchandise, as a

23   store manager?

24        A          No.  He would tell me what to order

25   more of and what to order less of.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                                    **July 12, 2011**

                                                                    **Page 191**

1        Q        Was it your job to prepare the order

2    for merchandise that you wanted to see in the store?

3                    MR. VALLI:  Objection to form.

4                    THE WITNESS:  Can you repeat that?

5        I'm sorry.

6    BY MR. WEINER:

7        Q        Was it your job to make the order for

8    the merchandise that you wanted to see sold in the

9    store?

10                   MR. VALLI:  Objection to the form.

11                   THE WITNESS:  I was able to go into

12       the system and put orders in, but he would

13       change it.

14   BY MR. WEINER:

15       Q        On what basis would you order

16   merchandise?

17       A        If a certain product was going to be

18   on sale that week, you order more of it.

19       Q        Did you have customers that came to

20   you and said, "I really like this product.  I wish

21   you'd get it in for me"?

22       A        Yes.

23       Q        Did you put those on your order?

24       A        Yes, I would put those on my order, if

25   we had a spot for it in the store.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Rosita Solis                                                July 12, 2011

Page 192

1      Q        Were there times that you requested
2  items in your order and Wade said, "That's a good
3  order.  I'm not going to change it"?
4      A        Maybe two or three times, on certain
5  sections of the store.  But the majority, he would
6  go in and change the order.
7      Q        Do you know why he changed your order?
8      A        No.
9      Q        Did he ever discuss the changes in
10 orders that he made with you?
11     A        No.
12     Q        Did you ever ask him why he changed
13 your order?
14     A        Couple of times, yes.
15     Q        What did he tell you?
16     A        I remember once -- once he said
17 because an item was on sale the following week, a
18 really, really good price.  He ordered way more of
19 it.
20     Q        That makes sense, doesn't it?
21     A        Depends how many people get in the
22 store that day.  It's not always the same.
23     Q        It varied from week to week?
24     A        Yes.
25     Q        It varied from day to day?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Rosita Solis                                                July 12, 2011

**Page 193**

```
 1      A        Yes.
 2      Q        If an item was in your store after a
 3   certain period, was it marked down?
 4      A        After a long period of time, we would
 5   get a SYSM saying what had to be marked down.
 6      Q        Did markdowns affect the profitability
 7   of the store?
 8      A        Yes.
 9      Q        Now, I'm going to show you what I have
10   marked as Exhibit Number 1.  I believe you have a
11   copy of this.  I know your lawyer does.  I'll give
12   you the marked copy, and I'm just going to ask you
13   not to make any marks on it at this time.
14               Showing you what's been marked as
15   Exhibit Number 1, that's the Rite Aid job
16   description for a store manager.
17               Have you ever seen this before?
18      A        I don't remember.
19      Q        Was the Rite Aid job description given
20   to you before you became a store manager?
21      A        Yeah, just told me verbally.  I don't
22   remember getting that.
23      Q        The summary of the store manager
24   states that "the primary purpose of this position is
25   to manage the operation of an individual store in an
```

**Page 201**

```
 1   Rite Aid?
 2       A        Yes.
 3       Q        Were you able to converse with your
 4   customers in Spanish?
 5       A        Yes.
 6                (Whereupon, a short break was taken.)
 7   BY MR. WEINER:
 8       Q        During the time that you worked as a
 9   store manager, did the number of hours that you
10   worked change during the course of your employment
11   as a store manager?
12       A        No.
13       Q        Approximately how many hours a week
14   did you work?
15       A        You had to do 50.
16       Q        What was your schedule as a store
17   manager, your weekly schedule?  Like start with
18   Monday, if you don't mind?
19       A        It changed.
20       Q        Oh, did you set your own schedule?
21       A        No.  We were told that the
22   managers/assistant supervisors had to do at least
23   every other weekend.
24       Q        Why was that?
25                MR. VALLI:  Objection to form.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                                July 12, 2011

Page 202

```
 1                   THE WITNESS:  I don't know.
 2   BY MR. WEINER:
 3        Q       Did you have a typical schedule or did
 4   it vary so much that it was just different every
 5   single week?
 6        A       It would be different.  Sometimes I
 7   would open, sometimes I would close.
 8        Q       If you opened, what were the things
 9   that you did when you opened the store?
10        A       As soon as you opened, you would punch
11   the safe.
12        Q       Punch the safe?
13        A       Punch the numbers on the safe.
14        Q       To do what?
15        A       To take the deposit out.
16        Q       To take the deposit out?
17        A       It would take 10 to 15 minutes to
18   open.
19        Q       Open the safe, you mean?
20        A       Yes.
21        Q       Let me ask you this:  Did the same
22   manager who closed the store open the store?
23        A       Sometimes, yes.
24        Q       Well, if you were opening the store,
25   then what?
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Rosita Solis                                                July 12, 2011

Page 203

1       A       Yes, drop deposits off to the bank,
2   check SYSMs right away.
3       Q       SYSMs would have messages from the
4   district office?
5       A       Yes.
6       Q       Which did you do first, drop deposits
7   or check SYSMs?
8       A       As I was waiting for the safe to pop
9   open, because you had to wait 10 to 15 minutes, I
10  would check the SYSMs.
11      Q       Was that some kind of safety device,
12  to make the safe open after 10, 15 minutes?
13      A       I'm guessing, yes.
14      Q       And then after you opened the safe,
15  checked SYSMs, you dropped the deposits in the bank
16  across the street?  Is that what you mean by
17  "dropping deposits"?
18      A       Yes.
19      Q       Is there something more than that?
20      A       No, no.  Yeah, you would go drop them
21  off in the slot that they had.
22      Q       It didn't even matter whether the bank
23  was open?
24      A       No.
25      Q       And then what did you do?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                                  **July 12, 2011**

Page 204

1        A         Checked SYSMs; see what had to be

2   done, whether it be planograms, recalls, price

3   changes.

4        Q         And then?

5        A         See what I had to do and get to work.

6        Q         And if you opened the store on Monday,

7   what time would you leave the store at the end of

8   your shift?

9        A         Well, if I open, I would have to be

10  there at least a half an hour before.

11       Q         Yes.

12       A         So, it would be a 10-hour day, so that

13  would be 8 to 6, or 7:30 to 5:30.

14       Q         During the day could you leave the

15  store, if you needed to?

16       A         If there was someone there that was

17  able to cover.

18       Q         Someone like the assistant store

19  manager?

20       A         Yes, or the shift supervisor.

21       Q         Or the shift supervisor.

22                 As long as one of the three of you

23  were there?

24       A         Yes.

25       Q         Then the store was covered from a

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                                    **July 12, 2011**

Page 205

1    management perspective; is that right?

2        A        Yes.

3        Q        And did you leave during the day to do

4    different things outside the store?

5        A        Just to get change -- drop off

6    deposits, get change.  For lunchtime, I would

7    probably go and get something, come right back, eat

8    it at the office.

9        Q        Did you take a regular meal period?

10       A        Most of the time, no.

11       Q        What did you do, go out and grab a

12   sandwich from a deli and bring it back and eat it in

13   the office?

14       A        Or bring something from home.

15       Q        How many days a week did you generally

16   open?

17       A        We had to do at least -- you had to

18   open at least three times a week.

19       Q        And how many times a week did you

20   close?

21       A        At least three, four times a week.

22       Q        Which days did you open, or did that

23   vary?

24       A        It varied.

25       Q        And same with the days that closed?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                                    **July 12, 2011**

Page 206

1        A         It varied.

2        Q         And same with the number of weekends

3    that you worked?  That varied, too?

4        A         Well, that varied, but we had to do

5    every other weekend, if not both.  Sometimes we had

6    to do both together.  If we did every other weekend,

7    it would have to be back to back.

8        Q         You mean Saturday and Sunday?

9        A         Yes.

10       Q         So, every other week you'd work both

11   Saturday and Sunday, and the following week you'd

12   have Saturday and Sunday off; is that right?

13       A         Yes.

14       Q         And did you schedule the assistant

15   store manager to do the same thing?  If you were

16   working the one weekend, was the assistant store

17   manager working the other weekend?

18       A         Yes.

19       Q         How about the shift supervisor; did

20   they have to work the weekends, too?

21       A         Yes.

22       Q         So that the shift supervisor covered

23   those hours on the weekend where either you weren't

24   there or the assistant store manager wasn't there?

25       A         We could have been there at the same

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                                    **July 12, 2011**

Page 207

1    time.

2         Q        Do you generally schedule the three of

3    you to be covering the store, rather than to be

4    there at the same time?

5         A        Sometimes.

6         Q        Did you prepare the schedules for the

7    assistant store manager and for the shift

8    supervisor?

9         A        Yes, but I had to get it approved.

10        Q        When you were in the store, were you

11   in charge of the store?

12        A        I didn't feel that way.

13        Q        Well, when you were in the store, the

14   assistant store manager wasn't in charge of the

15   store, were they?

16        A        No.

17        Q        And when you were in the store, the

18   shift supervisor wasn't in charge of the store, were

19   they?

20        A        When I wasn't in the store?

21        Q        When you were in the store.

22        A        When I was, no.

23        Q        And when you were in the store, you

24   were the highest official in the store, weren't you?

25        A        Yes.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                          July 12, 2011

Page 208

```
 1              MR. VALLI:  Can we go off the record.

 2              (Whereupon, a discussion was held off

 3         the record.)

 4    BY MR. WEINER:

 5         Q         Did Rite Aid have any program that

 6    certified managers as trainers?

 7         A         Not that I recall.

 8         Q         How often did you evaluate the

 9    performance of the hourly associates?

10         A         On a monthly basis.

11         Q         A written evaluation?

12         A         Sometimes.

13         Q         Was there an annual performance

14    evaluation that you had to perform, as a store

15    manager?

16         A         There were these cards that would be

17    given out, similar to the RAPTAR, if the associate

18    was doing a good job.  We would write their name on

19    it, give them one, and Wade was given a poster, that

20    we had to put them there, so he can see.

21         Q         Who you had given the good job cards

22    to?

23         A         Yes.  And he would want to know why.

24         Q         How many good job cards did you give

25    out?
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Rosita Solis                                                              July 12, 2011

Page 221

1           MR. WEINER:  Then I'm going to reserve

2      any additional time I have to see if I have any

3      redirect.  So, please.

4           MR. VALLI:  The first thing is we

5      would like an opportunity to read and review

6      this transcript, so please place that on the

7      record.

8  EXAMINATION BY

9  MR. VALLI:

10      Q        Who is Bruce Kaplan?

11      A        Bruce Kaplan was a manager there.

12      Q        You indicated he had made certain

13  promotions.  Do you know if there was input from his

14  district manager in those promotions?

15      A        There had to be.

16      Q        You used the word "deposits."  Are

17  those both deposits into the safe and deposits into

18  the bank?

19      A        Yes.

20      Q        Did you have to open the safe to make

21  a deposit or was it a slot?

22      A        There was a slot you would put money

23  in.  Push it, it would go down to the bottom.  You

24  would open the bottom and make a deposit.

25      Q        Was the bottom locked?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                                     **July 12, 2011**

Page 222

```
 1        A          It was two safes.  Bottom was locked,
 2   top was not.
 3        Q          Okay.
 4        A          Bottom had the safe timer, 10 to 15
 5   minutes.
 6        Q          You talked about Jill and Meir and
 7   Bruce and Peggy as store managers?
 8        A          Yes.
 9        Q          And they had various styles.
10                   Did they all have the same duties and
11   responsibilities?
12        A          Yes.
13        Q          With respect to the labor budget, do
14   you know how it is calculated?
15        A          Totally depending on what your store
16   makes.  Some of the time, not all of the time.  So
17   I'm not sure.
18        Q          Were you involved in the creation of
19   the labor budget for your store?
20        A          No.
21        Q          Were you involved in the creation of
22   the labor budget for the district?
23        A          No.
24        Q          In terms of paying cashiers, you said
25   at some point it went from $7 to $7.15?
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Rosita Solis                                           July 12, 2011

Page 223

 1         A         Yes.

 2         Q         Do you know if that's minimum wage?

 3         A         I'm not sure.

 4         Q         Were associates hired at more than

 5    minimum wage?

 6         A         No.

 7         Q         In terms of hiring, if Wade said you

 8    could not hire someone, could you hire them anyway?

 9         A         No.

10         Q         You indicated at some point in your

11    termination you were told that it was taking too

12    long to set up planograms and too long to set up

13    seasonal?

14         A         Yes.

15         Q         What were you doing during the day

16    that you couldn't get planograms done?

17         A         Taking out garbage; running back and

18    forth to the registers for pickups, approvals;

19    dealing with the customers on a one-on-one; going to

20    the bank, making deposits.

21         Q         Was there anything that you needed to

22    finish planograms in the time that Wade gave you?

23         A         I'm sorry, say that again, please.

24         Q         Was there anything that you needed at

25    the store to finish planograms at the time that Wade

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Rosita Solis                                                    July 12, 2011

Page 224

1    gave you?

2          A          As for fixtures and stuff?  What do

3    you mean "needed"?

4          Q          In terms of labor.

5          A          Yes.

6          Q          Okay.  What did you need?

7          A          More hours, more people.

8          Q          The 200 hours that we have discussed,

9    in terms of labor budget, did that include the

10   hundred hours for you and the ASM?

11         A          Yes.

12         Q          Give me a typical week, then, in terms

13   of opening.  If you were opening the store, what

14   time would the next employee come in?

15         A          Eight o'clock.

16         Q          And other than yourself and this one

17   employee, who else would be in the store at opening?

18         A          The majority of time, no one, because

19   we wouldn't have enough payroll.

20         Q          And where would that employee be

21   assigned?

22         A          The 8:00 employee?  Register.

23         Q          All the other duties that had to be

24   done in the morning, if there was no other employee

25   there, who would do them?

Page 225

```
 1        A          Myself.

 2        Q          Was there a register that you called

 3   the manager's or supervisor's register?

 4        A          Yes.  We were told we had to have one

 5   register that was just for us, that included the

 6   money order.

 7        Q          Who told you that?

 8        A          Wade and Hany.

 9        Q          Was that a register that you, as the

10   store manager, used?

11        A          Yes.

12        Q          Who else used that register?

13        A          Assistant manager.

14        Q          And what about the shift supervisor?

15        A          Yes.

16        Q          The shift supervisor, when they

17   worked, did they ever open the store?

18        A          Yes.

19        Q          And the duties that you described,

20   were those also the duties of the shift supervisor

21   at opening?

22        A          Yes.

23        Q          With respect to any of the individuals

24   that were hired into your store when you were the

25   store manager, were any of those hires conducted
```

Page 226

1    without Wade's approval?

2          A          No.

3          Q          You indicated at some point that you

4    could not do overtime.  What does that mean?

5          A          We could not do overtime.  Assistant

6    managers and managers had to do a total of 50, but

7    we did way more, but we wouldn't get paid for that;

8    it would just be a total of 50.

9          Q          So even though you were scheduled for

10   50, you worked more than 50?

11         A          Yes, sir.

12         Q          What was the most hours you ever

13   worked in a week?

14         A          In a week?

15         Q          Approximately.

16         A          Seventy, 72.  Sometimes I would get

17   stuck doing double shifts because there would be no

18   one else to do it.

19         Q          And there was no one else to do it

20   why?  Why couldn't you get someone else in the

21   store?

22         A          Not enough payroll.

23         Q          Did you ever work less than 50 hours

24   in a week?

25         A          No.

Page 227

1        Q        Could you assign an employee to work

2     more than 40 hours in a week without Wade's

3     approval?

4        A        No.

5        Q        At some point we went through a lot of

6     CBT Certificates of Achievement?

7        A        Yes.

8        Q        Were there certain CBTs that you had

9     to do every month?

10       A        Yes.

11       Q        And were there CBTs that also had to

12    be completed by employees every month?

13       A        Yes.

14       Q        Were there any CBTs that you did, as

15    the store manager, that employees did not have to

16    do?  I'll give you an example to make it easier.

17    Rite Aid WorkForce Management Modules?

18       A        If I'm not mistaken, that was just for

19    assistants and managers, just that one.

20       Q        Okay.  Other than the WorkForce

21    modules, were the other CBTs to be completed by all

22    employees?

23       A        Yes.

24       Q        You have indicated that Wade said that

25    he wanted CBTs done when they came in?

Page 228

```
 1      A         Yes.
 2      Q         If you were not in the store, what
 3   would happen?
 4      A         Whoever was there would have to get
 5   theirs done.
 6      Q         So, would the ASM decide who would
 7   take a CBT?
 8      A         Yes.
 9      Q         Would the shift supervisor decide who
10   should take a CBT?
11      A         Yes.
12      Q         Did you ever make an adjustment to an
13   associate's hours that did not coincide with the
14   schedule?
15      A         No.  The only time I would make a
16   change is if someone would call out.  You had to.
17      Q         In terms of punching in and punching
18   out, there was some testimony about correcting, I
19   guess, the payroll to match into the schedule.
20                Did you ever give an employee less
21   hours than they worked?
22      A         No.
23      Q         Did you ever give an employee more
24   hours than they worked?
25      A         No.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                                July 12, 2011

Page 229

 1        Q        Your store was located in New Jersey?

 2        A        Yes.

 3        Q        Did you have any issues with snow when

 4   you worked there?

 5        A        Oh, yes.

 6        Q        Could you close the store early

 7   without DM approval?

 8        A        No.

 9        Q        Could you open the store late without

10   DM approval?

11        A        No.

12        Q        Did you set the hours for your store?

13        A        No.

14        Q        Ms. Solis, I'm showing you what we

15   marked as Exhibit 2.  I'm not sure if you've seen

16   this actual exhibit, but you've seen the pages.

17                 Going to the last page, there's a

18   space for appraiser signature and appraiser

19   supervisor.  That's not filled in.  Do you know why?

20        A        This just had to get faxed.

21        Q        To whom?

22        A        To Wade or Hany.

23        Q        At any point while were you an ASM,

24   did your store manager have you prepare your annual

25   appraisal?

Page 230

```
 1        A         Yes.

 2        Q         In terms of SYSMs, were there certain

 3   SYSMs that went to every store in the district?

 4        A         Yes.

 5        Q         Were there certain SYSMs that just

 6   went to your store?

 7        A         Yes.

 8        Q         Do you know if the products in the

 9   stores in your district were the same in each store?

10        A         Yes.

11        Q         Could you take a look at Exhibit 1,

12   please?  Doug had shown you this before, and I want

13   to go to the middle paragraph, which is Summary, and

14   it reads, "The primary purpose of this position is

15   to manage the operation of an individual store in an

16   efficient manner while maximizing sales."

17                  Can you tell me how, as a store

18   manager, you would maximize sales?

19        A         Depending on what we would order, how

20   much we ordered, that would bring in more sales.

21        Q         Could you control the prices of your

22   products as a store manager?

23        A         No.

24        Q         Could you control the types of

25   products that you sold?
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Rosita Solis**                                                    **July 12, 2011**

Page 231

1          A          No.   What we got was what we got.

2          Q          What is margin in that paragraph?

3          A          Margin in that paragraph, meaning you

4     had to -- you had to follow a certain number that

5     they would give.

6          Q          And profitability, that would be how

7     many -- what your revenue was in the store versus

8     your expenses?

9          A          Yes.

10          Q          And the expenses in the store would

11     be, I guess, the structure itself, the electric, the

12     heat?

13          A          Yes.

14          Q          Did you have control over that, as a

15     store manager?

16          A          No.

17          Q          Labor budget, that would be the

18     payroll expenses?

19          A          Yes.

20          Q          Did you have control over that?

21          A          No.

22          Q          Did you have a loss prevention

23     associate or employee in the store, like a security

24     guard?

25          A          For the last couple months I was

Page 232

1    there.

2        Q        Do you know if the payroll or the cost

3    of the loss prevention employee was charged to the

4    profitability of your store?

5        A        I believe so.

6        Q        Did you set the hourly rate or payroll

7    of that employee?

8        A        No.

9        Q        Did you supervise that employee?

10       A        No.

11       Q        Going to paragraph 2 of the central

12   duties and responsibilities, do you know what EBITDA

13   stands for?

14       A        I don't remember at this time.

15       Q        It's earnings before interest, taxes,

16   depreciation and amortization.

17       A        It had to do with profit and loss.

18       Q        Did you have a RAD pharmacy tech

19   certification?

20       A        You mean like a --

21       Q        Unfortunately, you have to actually

22   talk as if you're still talking to Doug, instead of

23   turning your head, because we have to get it all on

24   the record.

25       A        Can you state it again?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Rosita Solis                                                    July 12, 2011

Page 233

```
 1      Q          It's on page 2, down at the bottom,
 2 under Certificates, Licenses and/or Registrations.
 3      A          Okay.
 4      Q          It says, "This position requires an
 5 RAD pharmacy technician certification."
 6      A          The only thing I remember doing was a
 7 CBT on how the pharmacy runs.
 8      Q          And was that before or after you were
 9 a store manager?
10      A          Before.
11      Q          Now, other than having associates take
12 a CBT, how often did you talk to your associates
13 about sale -- the sale of tobacco to teens?
14      A          At least once a week, just to refresh
15 their memory.
16      Q          Other than a CBT, how often did you
17 talk to them about flexible spending and health
18 reimbursement?
19      A          Maybe every couple of weeks.
20      Q          What is flexible spending and health
21 reimbursement?
22      A          Flexible spending, okay, that, to my
23 recollection, meant -- it had to do a little bit
24 with the 1199 and how they got paid.
25      Q          How often would employees block
```

Page 234

1   electrical panels?

2        A          Not often, no.

3        Q          Did your photo lab have chemicals, or

4   was it a stand-alone kiosk?

5        A          It was a kiosk.

6        Q          Did it have any chemicals at all that

7   you had to replenish?

8        A          No.  Just the ink.

9        Q          I believe on direct, at the end, you

10  stated that you did not feel like you were in charge

11  of the store; is that correct?

12       A          Yes.

13       Q          Why did you feel that way?

14       A          I was told -- I was given a list of

15  stuff to do, told how to run the store.  The

16  district manager would be there three times a week,

17  just looking around, always saying something was

18  wrong, telling me how to do things.

19       Q          So, who do you think actually ran the

20  store?

21       A          Oh, Wade.

22       Q          The district manager?

23       A          Yes, sir.

24                  MR. VALLI:  I have nothing further.

25

Page 235

```
 1    EXAMINATION BY
 2    MR. WEINER:
 3         Q        Who supervised the security guard?
 4         A        Hany.
 5         Q        The security guard didn't report to
 6    you?
 7         A        He would come in, punch in.  Basically
 8    that's it.  Just walk around the store.
 9         Q        How many minutes did Wade spend in the
10    store?
11         A        Hours.
12         Q        Each time --
13         A        Yes.
14         Q        -- he visited?
15         A        Yes.
16         Q        How many visits did he make a day?
17         A        A day?  Once.
18         Q        How many visits did he make a week?
19         A        Two or three.
20         Q        How many hours was the store in
21    operation during the week?
22         A        From 8 to 10, except for Sundays, 9 to
23    8.
24         Q        So, that's 14 hours times 6, plus 11?
25         A        On Sunday, yes.
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-cv-09361-PGG-HBP
Rosita Solis                                        July 12, 2011

Page 241

1              C E R T I F I C A T E

2

3    STATE OF  Garden City          :

4    COUNTY/CITY OF  New York        :

5

6    Before me, this day, personally appeared

7    ROSITA SOLIS, who, being duly sworn, states that the

8    foregoing transcript of his/her Deposition, taken in

9    the matter, on the date, and at the time and place

10   set out on the title page hereof, constitutes a true

11   and accurate transcript of said deposition.

12

13

                    Rosita Solis

14

                  ROSITA SOLIS

15

16

17   SUBSCRIBED and SWORN to before me this  12th 29th

18   day of  July/August, 2011, in the

19   jurisdiction aforesaid.

20

21        Syed I. Hussein
          Notary Public-State of New Jersey
          Qualified in Bergen County
          No. 2274315
22   My  Commission Expires 02/11/2012          Notary Public

23

24

25

# Exhibit III

Page 1

                    UNITED STATES DISTRICT COURT

                  SOUTHERN DISTRICT OF NEW YORK

            ------------------------------------x

            YATRAM INDERGIT, on behalf of himself

            and others similarly situated,

                       Plaintiff,

                  - vs -

            RITE AID CORPORATION, RITE AID OF

            NEW YORK, INC., and FRANCIS OFFOR as

            Aider & Abettor,

                       Defendants.

            ------------------------------------x


                            Tuesday, July 12, 2011

                            9:48 a.m.


                DEPOSITION of STEPHEN F. SPENCER, taken by

            Defendants, pursuant to Fed.R.Civ.P. 30, and

            agreement of counsel, held at the offices of

            Epstein Becker & Green, P.C., 250 Park Avenue,

            New York, New York 10177, before Janet Hamilton,

            a Registered Professional Reporter and Notary

            Public of the State of New York.


            DiNOVO PRICE ELLWANTER & HARDY, LLP

            7000 North MoPac Expressway, Suite 350

            Austin, Texas 78731

                    Attorneys for Plaintiff

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
Stephen F. Spencer                                July 12, 2011

Page 7

```
 1          A.    No.
 2                S. Spencer, 7/12/11
 3          Q.    And if it was a telephone
 4   deposition, you were sitting with the court
 5   reporter somewhere and the other people were on
 6   the phone?
 7          A.    No.
 8          Q.    No?
 9          A.    No.
10          Q.    Did anyone make you raise your
11   right hand?
12          A.    No, they did not.
13          Q.    No.  Okay.  Is it possible that
14   that was maybe an interview instead of a
15   deposition?
16          A.    I was told I was going to be
17   deposed over the phone.  I gave information.  I
18   gave information that was asked of me.
19          Q.    Okay.
20          A.    To my knowledge, that's what it
21   was.
22          Q.    But, at least as of 2005, you had a
23   very good understanding of what it meant to be
24   paid on a salary basis, it sounds like?
25          A.    Yes.
```

Page 8

```
 1            Q.    Yes.  So you understood at
 2                  S. Spencer, 7/12/11
 3   Duane Reade that you were being paid a salary
 4   for all the hours you worked, regardless of how
 5   many hours you worked?
 6            A.    Yes.
 7            Q.    Was that how you were paid at
 8   Rite Aid as well?
 9            A.    I was being paid on a salary at
10   Rite Aid.  Yes.
11            Q.    And you understood at Rite Aid that
12   the salary you received was for all hours that
13   you worked?
14            A.    Yes.
15            Q.    Regardless of how many hours you
16   worked?
17            A.    Yes -- no.  That's not true.
18            Q.    No?
19            A.    I was told when I was hired that I
20   had to work an average of 50 hours a week as a
21   store manager.  Upon my interview.
22            Q.    And while you were working for
23   Rite Aid as a store manager, did you ever work
24   less than 50 hours in one week?
25            A.    No.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
Stephen F. Spencer                                              July 12, 2011

Page 9

 1          Q.    Never took any vacation?

 2               S. Spencer, 7/12/11

 3     A.    No.

 4          Q.    Never took any personal time?

 5     A.    No.  I was not given any.

 6          Q.    And there was not a single week

 7   where you worked 49 instead of 50 hours?

 8     A.    None.

 9          Q.    And you understood, though, at

10   Rite Aid that, if you worked 65 hours, you

11   weren't going to receive additional pay?

12     A.    Yes.

13          Q.    I'm correct?

14     A.    Yes.  You're correct.  Yes.  I

15   agree.

16          Q.    And the Clearview Cinemas lawsuit,

17   what was that about?

18     A.    Well, I was deposed -- that wasn't

19   a lawsuit.  It was a customer who was suing the

20   company.  I was the theater general manager.

21   And the customer was claiming that they had an

22   accident in the theater.  Like, they slipped and

23   fell due to unsafe conditions.  And I was

24   definitely at an office where I gave a

25   deposition.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
Stephen F. Spencer                                              **July 12, 2011**

                                                                            **Page 45**

```
 1              MR. SABA:  Objection.  Form.
 2               S. Spencer, 7/12/11
 3         A.   No, I did not.
 4         Q.   (By Ms. Barbaree)  And you didn't
 5    say to Josephine, "I'm concerned about being
 6    paid on a salary basis for any reason"?
 7              MR. SABA:  Objection.  Form.
 8              MS. BARBAREE:  What's your
 9         objection?
10              MR. SABA:  It calls for assuming
11         facts in evidence -- not in evidence.
12         Excuse me.  It's misleading.  And I think
13         it misstates or mischaracterizes -- a
14         mischaracterization.
15         Q.   (By Ms. Barbaree)  You can answer
16    the question.  Do you need her to read it back?
17         A.   Yes, please.
18              THE REPORTER:  "And you didn't say
19         to Josephine, 'I'm concerned about being
20         paid on a salary basis for any reason'?"
21              MR. SABA:  And I think misleading
22         as well.
23         A.   No, I did not.
24         Q.   (By Ms. Barbaree)  And you didn't
25    talk to Mr. Calisi about your pay at all?
```

Page 46

```
 1          A.    No, I did not.

 2                S. Spencer, 7/12/11

 3          Q.    Do you know how many pharmacy

 4     employees worked at 3883?

 5          A.    Anywhere from eight to ten, I

 6     believe.

 7          Q.    What were the things that Evan

 8     trained you on while you were store manager in

 9     training?

10          A.    Merchandising.  Making the

11     employees schedules.  Sending and receiving

12     sysms.  The cash register.  Making deposits.

13     Scanning in vendors.  Scanning damages.  Things

14     of that nature.

15          Q.    Did he talk with you at all about

16     hiring?

17          A.    Yes, he did.

18          Q.    He gave you some training on that

19     as well?

20          A.    He gave me the procedure to

21     recommend that an employee be hired.

22          Q.    Did he talk with you about how to

23     discipline employees at Rite Aid?

24          A.    Yes.

25          Q.    Did he talk with you at all about
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Stephen F. Spencer                                    July 12, 2011

Page 47

```
 1      how employees would be terminated at Rite Aid?
 2                    S. Spencer, 7/12/11
 3           A.    Yes.
 4           Q.    What did he tell you about that?
 5           A.    He explained to me that we had no
 6      authority to terminate employees.  That we were
 7      allowed to document what their violations were
 8      of company policy.  And that human resources
 9      would then go ahead with the final outcome.
10           Q.    Do you remember if Evan used the
11      words "partnering with human resources"?
12           A.    No.
13           Q.    But it was your understanding that,
14      as a result of your training at Evan's store,
15      that, as a store manager, if you wanted to
16      terminate an employee, you would need to make a
17      recommendation to human resources and then they
18      would give final approval?
19           A.    Yes.
20           Q.    Did you ever do that while you were
21      store manager?
22           A.    Yes.
23           Q.    Do you remember how many times?
24           A.    Quite a few times with specifically
25      one or two employees.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
Stephen F. Spencer                                                    **July 12, 2011**

**Page 48**

1        Q.     Were your recommendations for

2               S. Spencer, 7/12/11

3    termination of those one or two employees

4    accepted?

5        A.     No.  Not while I was within their

6    employment.

7        Q.     What do you mean by that?

8        A.     Meaning the person that I tried to

9    have terminated basically the whole year that I

10   was there, she was terminated right after I was

11   terminated.

12       Q.     Do you know why she was terminated?

13       A.     Yes.  Based on my documentations

14   and previous managers' documentations over a

15   12-year period of insubordination.

16       Q.     And a few minutes ago you said you

17   did have some training after you became a store

18   manager about special unionized issues?

19       A.     Yes.

20       Q.     What was that training?

21       A.     Training was on how to handle

22   situations with unionized employees about what

23   was in their union contract which you were

24   allowed to do and not allowed to do as a store

25   manager.  About how many write-ups you had to

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
Stephen F. Spencer                                    July 12, 2011

Page 49

```
 1   have on an employee.
 2                  S. Spencer, 7/12/11
 3          Q.    Do you remember who gave you that
 4   training?
 5          A.    No.  I don't remember his name.
 6          Q.    As a result of that training, did
 7   you understand as a store manager that the
 8   manner in which you could discipline and
 9   terminate employees at a union store was
10   different from -- Evan's store, for example?
11          A.    Evan's store was unionized.
12          Q.    It was unionized?
13          A.    Most stores are unionized.
14          Q.    So did you have an understanding of
15   a non-union store, how it worked in terms of
16   discipline or termination at Rite Aid?
17          A.    No.  I didn't have any knowledge of
18   how a nonunion store went about terminating an
19   employee.
20          Q.    And Evan didn't -- even though he
21   had a union store, he didn't explain to you
22   about collective bargaining agreement rules with
23   respect to discipline or termination?
24          A.    No.  He explained basics about
25   documenting.  About documenting it and keeping
```

Page 70

1    preparation.

2                    S. Spencer, 7/12/11

3          Q.    What did Evan tell you about his

4    relationship with Josephine; his working

5    relationship?

6          A.    That they had a great relationship.

7          Q.    Do you know how often Evan spoke

8    with Josephine by telephone?

9          A.    Pretty much on a daily basis.

10         Q.    Did you speak with Josephine on the

11   telephone while you were a store manager in

12   training at that store?

13         A.    Maybe once.

14         Q.    Do you have any idea what she would

15   call to talk about?

16         A.    With Evan?

17         Q.    Yes.

18         A.    Payroll.  Mostly payroll.  How my

19   training was going.  Sales.  Merchandising.

20         Q.    Do you think that Evan devoted

21   enough time to your training?

22         A.    No, I don't.

23         Q.    You wish that he had spent more

24   time on your training?

25         A.    Yes.  But there were circumstances

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Stephen F. Spencer**                                                                 **July 12, 2011**

Page 71

1   why he was not able to.  Because he was

2                S. Spencer, 7/12/11

3   preparing for the yearly inventory, and that

4   took a lot of my training time away.  And he

5   admitted as such.

6        Q.   Did he train you about how to

7   prepare for inventory?

8        A.   Yes.  He trained me on that.

9        Q.   As part of your training at

10  Rite Aid, did you review any policies and

11  procedures?

12       A.   Yes.

13       Q.   Where were they?

14            MR. SABA:  Objection.  Form.

15       A.   Could you repeat that, please?

16       Q.   (By Ms. Barbaree)  Where were they,

17  the policies and procedures that you reviewed?

18       A.   CBT training tapes.  Management

19  seminars.  Management meetings.  Discussions

20  with Nancy Virga.  Sysms.  Daily.

21       Q.   When you say daily sysms, what were

22  the -- what were the topics of daily sysms that

23  you recall?

24            MR. SABA:  I'm going to object to

25       form.  Just clarification.  Did he say

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Stephen F. Spencer                                                July 12, 2011

Page 72

1          "daily"?  Yes?  Excuse me.

2                    S. Spencer, 7/12/11

3          A.     I'm sorry.  Could you repeat that?

4          Q.     (By Ms. Barbaree)  What were the

5    topic of daily sysms that you can recall?

6          A.     Payroll.  Payroll reduction.  CBT

7    completions.  Merchandising.  Your sales figures

8    for the week.  Year-to-date.  Meetings.

9    Conference calls.  It was just numerous sysms.

10         Q.     As a store manager in training at

11   Evan's store, did you review the sysms?

12         A.     Yes.

13         Q.     Why?

14         A.     Why?  Because I was told that this

15   is a responsibility of a store manager; to check

16   your sysms on a daily basis.

17         Q.     And so Evan gave you some training

18   on checking the sysm and then addressing any

19   issues that you were asked to address in the

20   sysm?

21         A.     Yes.

22         Q.     Sometimes you would get sysms about

23   things like product recalls and things like

24   that.  Do you remember that?

25         A.     Yes.

Page 73

```
 1          Q.    And that was something you would
 2                S. Spencer, 7/12/11
 3   need to take immediate action about in your
 4   store?
 5          A.    Yes.
 6          Q.    Did you ever attend any of the
 7   district manager conference calls that Evan had
 8   while you were in training?
 9          A.    Yes.
10          Q.    Did he have weekly district manager
11   conference calls?
12          A.    From what I remember, he -- he had
13   weekly.  Yes.  Once a week.
14          Q.    And you said that there were also
15   some management meetings that you attended?
16          A.    Yes.
17          Q.    Did you attend those while you were
18   in training and as a store manager?
19          A.    No.
20          Q.    Just while you were in training?
21          A.    I didn't attend any managers'
22   meetings while I was in training.  I was always
23   at the store.
24          Q.    Just as a store manager?
25          A.    Yes.
```

Page 74

```
 1        Q.    And what about -- you referenced
 2              S. Spencer, 7/12/11
 3   management seminars.  When did you attend those?
 4        A.    That could be once every couple of
 5   months or so.
 6        Q.    Do you remember the topics of any
 7   of the seminars?
 8        A.    Customer service.  The 1199 union.
 9   Daily operations.
10        Q.    Once you became a store manager and
11   you attended management meetings, do you
12   remember how frequently?
13        A.    Managers' meetings, about once a
14   month.
15        Q.    How long were they?
16        A.    Anywhere -- it could be anywhere
17   from seven to eight hours.
18        Q.    Did your district manager, once you
19   became a store manager, have weekly conference
20   calls?
21        A.    More than weekly.
22        Q.    How frequently?
23        A.    Sometimes two to three times a
24   week.
25        Q.    Do you recall how long Nancy's
```

**Page 75**

1    conference calls typically were?

2                   S. Spencer, 7/12/11

3         A.     At least an hour.

4         Q.     Sometimes longer?

5         A.     Yes.

6         Q.     How frequently was Nancy in your

7    store while you were store manager?

8         A.     Once or twice a week.

9         Q.     And how long did she usually stay?

10        A.     She'd stay for hours.

11        Q.     And what would she do during the

12   hours that she was there?

13        A.     Give instruction on what she wants

14   done.  Monitor customer service.  Monitoring the

15   facing of the store or non-facing of the store.

16   Inventory.  She would focus on pharmacy issues.

17        Q.     Did you have -- I'm sorry.  Were

18   you finished?

19        A.     Merchandising, more than anything.

20        Q.     And explain to the jury what you

21   mean by "merchandising."

22        A.     She would explain exactly where she

23   wants this product sold, or what should be on

24   that end cap.  Moving displays around the store.

25        Q.     I take it your store had

Page 76

```
 1   planograms?
 2              S. Spencer, 7/12/11
 3       A.    Yes.
 4       Q.    Did Nancy ever make changes to the
 5   planograms?
 6       A.    Very rarely.
 7       Q.    But there were times that she
 8   changed things around in the store?
 9       A.    Yes.  Depending on the size of your
10   store.  If a planogram was for a 12-foot shelf
11   and you had an 8-foot shelf there, you would
12   have to adjust it.  She would want you to adjust
13   it.
14       Q.    And you said that she would move
15   displays around.  What do you mean by that?
16       A.    Well, if she didn't like the way I
17   put a display in the store, she would come and
18   move it somewhere else.  If she didn't like the
19   product I had on the front end cap of the store,
20   because I think that that product would sell in
21   that neighborhood, she would instruct me to move
22   it.
23       Q.    But as a store manager at Rite Aid,
24   you tried to make decisions about where to place
25   merchandise that you thought would sell best in
```

Page 77

```
 1   your store?

 2                   S. Spencer, 7/12/11

 3        A.    Yes.  I tried.

 4        Q.    And there were times that she

 5   overruled your merchandising plans?

 6        A.    Yes.

 7        Q.    Did you ever, as a store manager at

 8   Rite Aid, ask for product that had not

 9   previously been in your store?

10        A.    Yes.

11        Q.    And what happened?

12        A.    And I was denied.

13        Q.    What did you ask for?

14        A.    For a certain type of drinks to be

15   sold in the store.  Because it was a West Indian

16   type of neighborhood.  And I thought that it

17   would sell at that store.  But she told me

18   that's not in the -- it's not in the profit

19   planner.  It's not in the planogram.  So you

20   cannot sell it.

21        Q.    Do you know if the drinks that you

22   were looking for were available from the store's

23   current vendors?

24        A.    Yes.

25        Q.    They were?
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
Stephen F. Spencer                                                      July 12, 2011

Page 78

```
 1          A.    Yes.
 2                S. Spencer, 7/12/11
 3          Q.    Who were the vendors that serviced
 4    your store while you were store manager?
 5          A.    Pepsi.  Coke.  Frito-Lay.
 6    Entenmann's.  That's the ones that I recall
 7    right now.
 8          Q.    Did you have dairy products in your
 9    store?
10          A.    Yes.
11          Q.    And who provided those?
12          A.    Beyer Farms.  B-e-y-e-r.  Beyer
13    Farms.
14          Q.    Was there a magazine vendor?
15          A.    Yes.  Hudson News.
16          Q.    Hudson News?
17          A.    Yes.
18          Q.    When you had a vendor come to your
19    store, was it required that a member of
20    management work with the vendor?
21          A.    Yes.  In theory.
22          Q.    What do you mean by "in theory"?
23          A.    What I mean by "in theory" is the
24    manager is supposed to work with that vendor and
25    scan in their merchandise.  But at times we were
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
Stephen F. Spencer                                                July 12, 2011

Page 95

1          MR. SABA:  Objection.  Form.

2           S. Spencer, 7/12/11

3      A.    I feel it was my responsibility,

4  yes.  Customer safety was my responsibility.

5  Yes.

6      Q.    (By Ms. Barbaree)  Did you think

7  that the leaks were a safety issue?

8      A.    Yes.

9      Q.    Were they actually in the store?

10 Or in the back room of the store?

11     A.    They were in the area of customers.

12 From the air-conditioning above, from the roof.

13     Q.    Did that happen more than once?

14     A.    Yes.

15     Q.    You would have to put buckets out

16 and mark off areas?

17     A.    Yes.

18     Q.    Did it actually get repaired more

19 than once as well?

20     A.    To my knowledge, it happened a

21 couple of times while I was there.  But I was

22 told by my assistant manager that it was an

23 ongoing problem for years.

24     Q.    Do you know if that store was an

25 Eckerd store before?

Page 96

1          A.     No, it wasn't.

2                 S. Spencer, 7/12/11

3          Q.     It wasn't?  It was built as a

4     Rite Aid store?

5          A.     Yes.

6          Q.     What competitors were close to that

7     location?

8          A.     Family Dollar.  Duane Reade was

9     across the street.

10         Q.     I think I asked you about the hours

11    at the training store that you were in.  What

12    were the store hours at your store?

13         A.     8:00 a.m. -- Monday to Friday.

14    8:00 a.m. to 9:00 p.m.

15                Saturday, 8:00 a.m. -- sorry.

16    Saturday, also 8:00 a.m. to 9:00 p.m.

17                Sunday, 9:00 a.m. until 8:00 p.m.

18         Q.     Who prepared employee schedules at

19    3855?

20         A.     I, as the store manager, input the

21    information on the employees.  And the computer

22    generated the schedule.

23         Q.     And once the computer generated the

24    schedule for you, did you ever make changes to

25    that schedule?

Page 97

```
 1          A.    I was doing that for a period of
 2               S. Spencer, 7/12/11
 3     time.
 4          Q.    And then, I would assume, that
 5     there were some times where you had to make a
 6     change to a schedule because something
 7     unforeseen happened; where an employee called
 8     out, or something like that?
 9          A.    Yes.
10          Q.    And when you say "I was doing that
11     for a period," what do you mean?
12          A.    I was instructed not to make the
13     schedule with edits anymore; to go with the
14     schedule that the computer would generate based
15     on the employee's availability and the peak
16     hours of the store.
17          Q.    And who gave you that instruction?
18          A.    Nancy Virga, district manager.
19          Q.    While you were the store manager at
20     3855, did the scheduling software change?
21          A.    Not that I recall.
22          Q.    And so did Nancy say to you that
23     the store scheduling software was actually
24     making sure that you had the right coverage
25     during peak hours?
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Stephen F. Spencer                                          July 12, 2011

Page 98

1           A.    Yes.  That's what she told me.

2                 S. Spencer, 7/12/11

3           Q.    What were the changes that you had

4      been making to the schedule?

5           A.    The changes I was making to the

6      schedule were based on -- the busiest time of

7      the store was in the evening.  And the computer

8      was generating a schedule that was putting more

9      people in the daytime.

10          Q.    When you made changes to the

11     schedule during the week because of an employee

12     calling out, for example, would you just

13     handwrite on the schedule that was posted?

14          A.    I did both.  I changed it in the

15     computer, and I changed it handwritten also.

16          Q.    Were there times that you didn't

17     change the schedule but you knew that employees'

18     schedules had changed?

19          A.    Yes.

20          Q.    So sometimes it wouldn't be

21     reflected on either the computer based or a

22     handwritten schedule?

23          A.    Yes.

24          Q.    Did your co-manager ever work on

25     employee scheduling?

Page 104

1    them to handle, then they referred it back to

2                    S. Spencer, 7/12/11

3    me.

4          Q.    How did you deal with customer

5    complaints that came to your attention?

6          A.    Rite Aid requires that you call the

7    customer.  Their name and phone number is in the

8    computer.  You're required to call up that

9    customer.  You first identify what the complaint

10   was about.  Call up that customer.  Try to

11   resolve the complaint which ever way you can.

12         Q.    What if the customer is in the

13   store?

14         A.    Oh.  Well, I would listen to what

15   their complaint was, apologize, and try to

16   resolve it.

17         Q.    Now, you said with respect to the

18   manager's schedule that you were working at some

19   periods five days a week, at some times six days

20   a week.  Did you always work opening?  Or did

21   you both open and close?

22         A.    I was mostly closing the store,

23   which was my preference; because the store was

24   busier at night.  But I was then forced to open

25   the store five days a week by Nancy Virga.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Stephen F. Spencer                                         July 12, 2011

Page 105

1          Q.     When did Nancy force you to start

2                 S. Spencer, 7/12/11

3    opening five days a week?

4          A.     I'd say the last three, last three

5    to four months that I was there.

6          Q.     So was this conversation after the

7    February conversation you told me about?

8          A.     Yes.

9          Q.     And what did she say in the

10   conversation about opening?

11         A.     She explained to me that I was not

12   getting my managerial duties completed by

13   working later in the day when the store is busy,

14   because I'm on the cash register.  So she felt

15   that I would have more time in the morning when

16   it's less busy, say between the hours of

17   8:00 and 10:00, to get managerial duties done.

18   That's why she was forcing me to work in the

19   morning.

20         Q.     What were the managerial duties

21   that Nancy told you she thought you were not

22   completing?

23         A.     Read all sysms.  Complete

24   Work Force employee scheduling on time.

25   Checklists that had to be done.  CBTs.  Pulling

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Stephen F. Spencer                                    July 12, 2011

Page 106

 1    expired merchandise.  Scanning damaged
 2                   S. Spencer, 7/12/11
 3    merchandise.
 4          Q.    And when you changed to opening
 5    five days a week, were you able to get these
 6    managerial duties done?
 7          A.    No.  Not consistently.  No.
 8          Q.    Did you think that you were able to
 9    get more of them done than you had been able to
10    get done when you were closing?
11          A.    Yes.
12          Q.    And did you work that five-day
13    opening schedule until you left Rite Aid?
14          A.    Yes.
15          Q.    So you never changed back to
16    working more closing shifts?
17          A.    No.  She wouldn't allow it.
18          Q.    So let's talk about the closing
19    shift for a minute and tell me what you recall
20    the closing manager's responsibilities were.
21          A.    Closing manager's responsibilities
22    are to count out all of the cash, make deposits,
23    make sure that the store is completely,
24    100 percent, faced, cleaned, restocked.  That
25    was basically it.

Page 107

```
 1          Q.    When you were working as a closing

 2                S. Spencer, 7/12/11

 3    manager, would you leave notes to your assistant

 4    manager as to what you would want done in the

 5    morning?

 6          A.    Yes.

 7          Q.    When you came in as the closing

 8    manager, would you typically meet with the

 9    employees who were working?

10          A.    Would you repeat that?

11          Q.    When you came in as a closing

12    manager -- first of all, let me ask you this.

13    What time did you come in when you were closing?

14          A.    12:00.

15          Q.    Noon?

16          A.    11:00 to 9:00 -- no.  11:30 to 9:30

17    or 11:00 to 10:00.  It took me about an hour.

18          Q.    So when you came in at 11:00 or

19    11:30, did you get the employees together to

20    talk with them about what you wanted to

21    accomplish on the shift?

22          A.    Sometimes yes.  Sometimes no.

23          Q.    And you just decided whether you

24    needed to talk with them or not.  Right?

25          A.    Yes.  Sometimes it's only one
```

Page 108

1    employee there.  She's on the register.  And

2                   S. Spencer, 7/12/11

3    there's no time to talk to her.

4         Q.    And would you talk with the other

5    manager who had opened the store --

6         A.    Yes.

7         Q.    -- when you got there?  And you

8    would talk with him about whether he had made

9    certain work assignments?

10         A.    Yes.

11         Q.    So when you were the opening

12    manager, what were your responsibilities for

13    opening the store?

14         A.    If -- to restock, if it wasn't

15    completed the night before.  Count the

16    registers.  Count the safe.  Pull expired

17    merchandise.  You handle a lot of vendors in the

18    morning.  Bringing in product.  Help out pack

19    out, the delivery.  And help out on the cash

20    register.

21         Q.    Well, let's start with the minute

22    you get there as the opening manager.  You

23    unlock the doors.  Right?

24         A.    Yes.

25         Q.    Enter the safe -- I mean enter the

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Stephen F. Spencer**                                                    **July 12, 2011**

Page 109

1    code information?

2                    S. Spencer, 7/12/11

3           A.    Yes.

4           Q.    Did you walk around the store?

5           A.    Yes.

6           Q.    For what purpose?

7           A.    To -- you do a walk-through of the

8    store to see the condition of the store left

9    from the night before.  What needs to be

10   addressed right away.  What needs to be stocked

11   up.  You're really checking the condition of the

12   store from the night before.

13          Q.    Did you make any notes while you

14   were doing that?

15          A.    Yes.

16          Q.    And then would you use those notes

17   to make assignments to the employees who were

18   working that day?

19          A.    Yes.

20          Q.    Did you typically give the

21   assignments to the employees in writing, or just

22   tell them when they got there?

23          A.    I would document what I wanted

24   done.  And then I would tell it to the

25   employees.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
Stephen F. Spencer                                                July 12, 2011

Page 110

```
 1          Q.    So you would make your own
 2               S. Spencer, 7/12/11
 3   document, but then you would verbally tell the
 4   employees?
 5          A.    Yes.
 6          Q.    And would you say to the employees,
 7   "I want you to get this done first.  And then,
 8   if you have time, then also do this and this"?
 9          A.    Yes.
10          Q.    I'm guessing there were times you
11   worked alongside the employees.  When they were
12   stocking, for example?
13          A.    You mean in the daytime?
14          Q.    Sure.  Any time.
15          A.    Yes.
16          Q.    There were times when you stocked
17   on the floor, along with other employees.
18   Right?
19          A.    Yes.
20          Q.    And you understood that, even when
21   you were stocking on the floor, you were still
22   responsible for the overall operations of the
23   store.  Correct?
24          A.    Yes.  I was still being held
25   responsible.  Yes.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Stephen F. Spencer**                                              **July 12, 2011**

                                                                    **Page 111**

 1          Q.      And you were still supervising the

 2                  S. Spencer, 7/12/11

 3    employees?

 4          A.      I couldn't properly supervise the

 5    employees.

 6          Q.      What do you mean, you couldn't

 7    properly?

 8          A.      If I'm on a register, I cannot --

 9    in a huge store, like which is 3855, I cannot

10    monitor what employees are doing if I'm stuck on

11    a register or if I constantly have to stock

12    shelves, if I have to constantly clean up the

13    back room or scan damages.  Because there's no

14    employees there to do it.

15          Q.      When you say a "huge" store, you

16    couldn't see the entire store from the front

17    registers?

18          A.      No.

19          Q.      How big is it?

20          A.      It was -- it had 12 aisles.  I

21    can't remember the exact square footage of the

22    store.  But it was a large store.  It had

23    12 aisles.

24          Q.      Were there mirrors that let you see

25    all the aisles from the front?

Page 112

```
 1          A.    No.

 2                S. Spencer, 7/12/11

 3          Q.    No?

 4          A.    No.

 5          Q.    Where was your office?

 6          A.    My office, which is in every

 7   Rite Aid, is located within the photo lab.

 8          Q.    Did I ask you if you had a photo

 9   supervisor at your store?

10          A.    No, you did not.

11          Q.    Did you have one?

12          A.    No.

13          Q.    Did you have employees who only

14   worked in photo?

15          A.    No.

16          Q.    Was your photo machine working

17   while you were the store manager?

18          A.    Yes.

19          Q.    The whole time?

20          A.    The majority of the time.

21          Q.    There were times when you had to

22   call a vendor to repair the photo machine as

23   well?

24          A.    Yes.

25          Q.    Did you have certain hours that the
```

Page 116

```
 1          Q.    A key holder?
 2                S. Spencer, 7/12/11
 3          A.    Yes.
 4          Q.    And what was the purpose of
 5     register audits?
 6          A.    To check overage, shortages at any
 7     given time, to see if there was improper cash
 8     handling by the cashiers.  If there was possible
 9     theft.  If it was just bad cash handling.  It
10     may not necessarily be theft.  It could be just
11     bad cash handling by a cashier.
12          Q.    So were there times that you would
13     be doing one thing and you would stop and go do
14     the register audit and then come back to
15     whatever you had been doing before?
16          A.    Yes.
17          Q.    Did you carry a cell phone in the
18     store?
19          A.    Yes.
20          Q.    Did employees call your cell phone?
21          A.    No.
22          Q.    They would just page you over the
23     intercom?
24          A.    Yes.
25          Q.    Would you say that, to be an
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Stephen F. Spencer                                                    July 12, 2011

Page 117

1    effective store manager at a Rite Aid store, you

2                    S. Spencer, 7/12/11

3    have to be able to multitask?

4           A.    Yes.

5           Q.    You're often doing many things at

6    the same time?

7           A.    Yes.

8           Q.    And one of the things that you're

9    supposed to be doing is supervising the

10   employees at all times that you're in the store.

11   Correct?

12          A.    Yes.

13          Q.    Is a store manager the highest

14   ranking employee in the store?

15          A.    Yes.

16          Q.    As a store manager, did you feel

17   that you were in charge of your store?

18          A.    No.

19          Q.    Why not?

20          A.    Because the majority of the

21   decisions that were made were made by the

22   district manager.  Also, everything was dictated

23   that you had to do through CBTs, through

24   planograms.  You were not allowed to make these

25   decisions on your own.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
Stephen F. Spencer                                        July 12, 2011

Page 118

1          Q.     While you were working for

2                 S. Spencer, 7/12/11

3    Duane Reade were there CBTs?

4          A.     No.

5          Q.     What are CBTs?

6          A.     It's a training -- I can't remember

7    the exact wording for CBT.  But it's a training

8    tool.  A tape you watch on a computer for

9    whatever specific task that they want you to do.

10         Q.     How often did you watch CBTs while

11   you were a store manager?

12         A.     Almost on a daily basis.

13         Q.     Were other employees in the store

14   required to watch the same CBTs?

15         A.     Not always the same.  There were

16   some for management.  And there were some for

17   staff.  And then there were some that we all

18   watched.

19         Q.     About how long were the CBTs that

20   you were watching almost daily?

21         A.     The times varied.  It could be ten

22   minutes for one.  An hour and a half for another

23   one.

24         Q.     And if it was an hour-and-a-half

25   CBT, would you set aside a special time to watch

Page 119

```
 1   that?
 2                 S. Spencer, 7/12/11
 3        A.    I tried to.
 4        Q.    Were there times that you just
 5   didn't finish watching them?
 6        A.    Yes.
 7        Q.    Were there times you didn't watch
 8   them at all?
 9        A.    Yes.
10        Q.    Did Duane Reade have planograms?
11        A.    Yes.
12        Q.    What is your understanding of why
13   retailers have planograms?
14        A.    To maximize sales on a particular
15   item.
16        Q.    Was the way you handled planograms
17   at Duane Reade any different from the way you
18   handled planograms at Rite Aid?
19        A.    I really was not required to do
20   planograms at Duane Reade.
21        Q.    When you say "do planograms," what
22   do you mean?
23        A.    To execute the planograms at
24   Duane Reade.  As a store manager, I didn't
25   really have that responsibility.  I delegated
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Stephen F. Spencer**                                      **July 12, 2011**

Page 130

```
 1          A.      They would be working opening

 2                  S. Spencer, 7/12/11

 3    shift, midday, closing.

 4          Q.      All three?

 5          A.      Yes.

 6          Q.      Would your shift typically overlap

 7    with your co-managers?

 8          A.      Yes.

 9          Q.      So you said in February of 2010, I

10    think you said that you were typically working

11    the closing shift.  Correct?

12          A.      Yes.

13          Q.      And you would come in around what

14    time?

15          A.      11:00.

16          Q.      Until?

17          A.      10:00.

18          Q.      And when did your co-manager work

19    when he was working the opening shift?

20          A.      He would work from 8:00 a.m. until

21    5:00 or 6:00 at that time.

22          Q.      What about pharmacy techs?  When

23    did they come in?

24          A.      8:00 a.m.

25          Q.      And they stayed until 9:00 p.m.?
```

Page 131

```
 1          A.    No.  They did eight-hour shifts.

 2                S. Spencer, 7/12/11

 3          Q.    Well, I meant there was a pharmacy

 4   tech there between 8:00 a.m. and 9:00 p.m.?

 5          A.    Yes.  Yes.

 6          Q.    At least one?

 7          A.    Yes.

 8          Q.    Were there sometimes two?

 9          A.    Yes.  Sometimes three.

10          Q.    So if that's the typical schedule

11   that you recall from 2010, at what point did the

12   number of employees change?

13          A.    It started gradually -- I'd say

14   around that summer, that summer of 2010,

15   gradually the payroll dollar amount was reduced.

16          Q.    Do you recall how you would change

17   your schedule?

18          A.    I just omitted employees from

19   shifts.

20          Q.    Do you remember which shifts?

21          A.    Yes.  The evening.  It had to be

22   the evening shift.  Because you only had one

23   person in the morning at all times.

24          Q.    And so when you had that opening

25   person -- I assume that was a cashier at
```

Page 132

```
 1    8:00 a.m.?
 2                  S. Spencer, 7/12/11
 3         A.    Yes.
 4         Q.    Would you also have a shift
 5    supervisor there at 8:00 a.m.?
 6         A.    No.
 7         Q.    No?
 8         A.    No.
 9         Q.    I thought you said you had an
10    opening midday and closing?
11         A.    If I opened or my co-manager
12    opened, that shift is not going to be there.
13    That shift would probably be closing.
14         Q.    Well, either you -- strike that,
15    because I may be making an assumption.
16               Was either you or your co-manager
17    there at all times?
18         A.    No.
19         Q.    So your shift sometimes opened and
20    closed as well?
21         A.    Yes.
22         Q.    And how did you figure out how
23    often the shift would overlap with either you or
24    the co-manager?
25         A.    It depends on if it was a delivery
```

Page 161

```
 1          A.     Yes.
 2                 S. Spencer, 7/12/11
 3          Q.     What types of things?
 4          A.     To do the employee schedule.   To
 5   close the store.  Get out of the store more
 6   efficiently.  To leave the store in better
 7   condition the night before.  I found it was
 8   easier to do these things as I was developing.
 9   Because at that time I was fully staffed.
10          Q.     Were there any things that you
11   realized with more experience as a Rite Aid
12   store manager that you needed to spend more time
13   on then you had been earlier?
14          A.     Yes.  Yes.
15          Q.     What were the things you realized
16   you needed to spend more time on, as you got
17   more experienced?
18          A.     Working on the seasonal aisle.  The
19   seasonal aisle.
20          Q.     Did you realize that the seasonal
21   aisle had a greater impact on the store's
22   profitability?
23          A.     Yes.
24          Q.     What would you say the strengths of
25   your district manager, Nancy, were, if any?
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Stephen F. Spencer                                                July 12, 2011

Page 162

1          A.     She's very -- she's very dedicated.

2                 S. Spencer, 7/12/11

3     She's -- she's a hard driving -- you know.  She

4     pushes.  She pushes managers to get -- you know.

5     To try to get the best out of them.

6          Q.     Would you say that she was a

7     micromanager?

8          A.     Yes.

9          Q.     Did you have enough experience

10    working with Josephine to say what her strengths

11    were as a district manager?

12         A.     I didn't work with Josephine.

13         Q.     Except when you were in the

14    training store?

15         A.     Yes.  And I only saw her two days

16    in three months.

17         Q.     Did anyone ever say to you that

18    Josephine was a micromanager?

19         A.     No.  I was told she was the

20    opposite.  I witnessed that she was the

21    opposite.

22         Q.     What would you say Nancy's

23    weaknesses were as a district manager?

24         A.     Basically, it's her way -- she's

25    not flexible about listening -- she's not

Page 163

1    flexible about listening to managers.

2               S. Spencer, 7/12/11

3        Q.    Any other weaknesses she had?

4        A.    She's not understanding about if

5    you might have a personal problem.

6        Q.    Did you have personal problems

7    while you were a store manager at Rite Aid?

8        A.    Yes.

9        Q.    What types of personal problems?

10       A.    My sister -- my sister got in a car

11   accident.  She lost her leg.  So at times -- you

12   know.  She lives in my building.  At times I was

13   helping her out early in the morning, you know,

14   to get dressed or to get her to rehabilitation.

15   And that's one reason why I preferred --

16              (Interruption by phone.)

17       A.    That's one reason why I preferred

18   to close the store, so I could help my sister

19   out in the mornings.

20              When I tried to explain this to

21   Nancy, that opening the store every day was not

22   feasible for me for that reason, she didn't want

23   to hear about it.  She told me I'm the store

24   manager.  She wants me there in the morning.

25       Q.    Was your sister actually injured

Page 173

 1   had a problem anywhere before I've worked with

 2                  S. Spencer, 7/12/11

 3   how I handle employees.  I'm firm but fair with

 4   employees.

 5                  Evan had at least ten years of

 6   Rite Aid management experience.  So it's really

 7   hard for me to compare myself with him, as far

 8   as knowledge.  You know.  But as far as his

 9   overall management style, we're very different.

10        Q.    While you were a store manager at

11   3855, did you assign certain areas of the store

12   to certain employees?

13        A.    I didn't assign it, because it was

14   already predetermined before I was there.

15        Q.    So that was already in place when

16   you got there?

17        A.    Yes.  But I was asked by -- I was

18   asked by Nancy to cease that policy and stop

19   having one employee work Aisle 8 and this

20   employee work Aisle 9, which I did.

21        Q.    Was that effective, that change?

22        A.    I don't think so.  No.

23        Q.    You thought it was better for them

24   to have an assigned aisle or area?

25        A.    Yes.  Yes.

Page 174

```
 1            Q.     While you were a store manager at

 2                   S. Spencer, 7/12/11

 3      3855, do you know what your highest weekly sales

 4      volume was?

 5            A.     I think it was in the area of

 6      $66,000, $67,000.  The front end.

 7            Q.     And do you know what the average

 8      front-end annual sales were for 3855 while you

 9      worked there?

10            A.     The annual?

11            Q.     Yes.

12            A.     I don't recall that.

13            Q.     Was it profitable?

14            A.     It was profitable.

15            Q.     And as a store manager, was it your

16      goal to make it as profitable as possible?

17            A.     Yes, it was.

18            Q.     Is it fair to say that you were

19      always in charge when you were in the store,

20      regardless of what duties you were performing?

21                   MR. SABA:  Objection.  Form.

22            A.     No.  I would not agree with that.

23            Q.     (By Ms. Barbaree)  Why wouldn't you

24      agree with that?

25            A.     Because it was being dictated to me
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
Stephen F. Spencer                                            **July 12, 2011**

**Page 175**

1   what I would do as a store manager, what I would

2                    S. Spencer, 7/12/11

3   sell, what pricing it would be, where to

4   merchandise certain items, what to do with

5   employees, how they wanted -- how customer

6   complaints were to be handled.  So I do not feel

7   I was in charge.

8        Q.    Are you saying that Nancy gave you

9   instruction on how to handle customer

10  complaints?

11                MR. SABA:  Objection.  Form.

12       A.    Yes, she did.

13       Q.    (By Ms. Barbaree)  What kind of

14  instruction did she give you about that?

15       A.    To go into the computer, look up

16  the customer's name and phone number, and call

17  the customer, and basically apologize whether or

18  not it was something -- I could have been off

19  that day.  But, basically, apologize and fix the

20  problem.

21       Q.    Was that something you had learned

22  during your training as well; about how to

23  handle customer complaints?

24       A.    That's something I've known

25  wherever I've worked.  It just was never handled

Page 176

```
 1   in that manner.
 2                S. Spencer, 7/12/11
 3        Q.    So if you were in the store, are
 4   you saying that there was someone else in the
 5   store who was in charge instead of you?
 6                MR. SABA:  Objection.  Form.
 7        A.    Could you repeat that, please?
 8        Q.    (By Ms. Barbaree)  Sure.  If you
 9   were in the store at 3855 as the store manager,
10   are you saying that there was someone else in
11   the store who was in charge instead of you?
12                MR. SABA:  Objection.  Form.
13        A.    I was the highest ranking person in
14   the store at the time.  But I was not the one in
15   charge of the store.
16        Q.    (By Ms. Barbaree)  And if you
17   weren't in the store, would you say that your
18   co-manager was the highest ranking employee in
19   the store?
20        A.    Yes.
21        Q.    Assuming he was there?
22        A.    Yes.
23        Q.    Would you say that, when you
24   weren't in the store, your co-manager was in
25   charge?
```

Page 195

1    anyone in upper management.

2                  S. Spencer, 7/12/11

3         Q.    (By Mr. Saba)  Okay.  Now, how did

4    the duties and responsibilities at Thriftway

5    compare to your duties and responsibilities at

6    Rite Aid?

7         A.    I was allowed to run the store at

8    Thriftway as if it was my own business.  I was

9    fully responsible for the profitability of the

10   store.  I made all decisions as far as what I

11   wanted to sell, how I wanted to merchandise what

12   was sold in the store.  I was fully responsible

13   for everything.  And I had no one -- I had no

14   one dictating to me how to run the store.

15        Q.    Okay.  Ms. Barbaree asked you a lot

16   about the duties that you were responsible for

17   at Rite Aid as a store manager.

18        A.    Yes.

19        Q.    What non-managerial duties did you

20   also have to perform at Rite Aid?

21              MS. BARBAREE:  Objection to form.

22        A.    Cleaning of the store.

23              MR. SABA:  Go ahead.

24        A.    Cleaning the store.  Working the

25   cash register the majority of my shifts.

Page 196

```
 1    Packing the shelves.  Those were the main
 2                    S. Spencer, 7/12/11
 3    responsibilities, non-managerial, that I had to
 4    perform at Rite Aid.
 5         Q.    (By Mr. Saba)  And on average, what
 6    percentage of your work per week did you spend
 7    doing these non-managerial duties?
 8               MS. BARBAREE:  Objection to form.
 9         A.    I spent half to three quarters of
10    my time doing non-managerial tasks.
11         Q.    (By Mr. Saba)  Do you feel that
12    performing these non-managerial tasks made you
13    any less responsible as a-- let me ask it this
14    way:  Do you feel that, in engaging in these
15    non-managerial tasks, you were any less
16    responsible for your managerial duties?
17               MS. BARBAREE:  Objection to form.
18         A.    No.  I was still responsible for
19    all of my managerial duties.
20         Q.    (By Mr. Saba)  Do you feel that you
21    were properly compensated for doing those
22    duties?
23               MS. BARBAREE:  Objection to form.
24         A.    No, I don't.
25         Q.    (By Mr. Saba)  Okay.  When did you
```

Page 197

```
 1   decide to become a plaintiff in this lawsuit?
 2                 S. Spencer, 7/12/11
 3         A.    After I was contacted through the
 4   mail.
 5         Q.    Do you know what date that was?
 6         A.    I don't remember.  I don't remember
 7   the date.
 8         Q.    And do you have an approximate date
 9   on when you elected to opt in?
10         A.    Whatever the last day was, the
11   cut-off date, that's the date that I came into
12   the class action suit.
13         Q.    And were you still an employee at
14   Rite Aid?
15         A.    Yes, I was.
16         Q.    How soon after you made the
17   decision to opt in were you terminated from
18   Rite Aid?
19         A.    I'd say within a four- to
20   five-month period.
21         Q.    And do you believe your termination
22   was fair?
23         A.    No.
24         Q.    Why?
25         A.    I was terminated for job
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Stephen F. Spencer                                July 12, 2011

Page 201

```
 1   STATE OF NEW YORK      )

 2                          :ss

 3   COUNTY OF              )

 4

 5          I, STEPHEN F. SPENCER, hereby certify

 6          A C K N O W L E D G M E N T

 7   that I have read the transcript of my testimony

 8   taken under oath in my deposition of July 12,

 9   2011; that the foregoing transcript is a true,

10   complete, and correct record of my testimony;

11   and that the answers on the record as given by

12   me are true and correct.

13

14                    _____

15                    STEPHEN F. SPENCER

16

17   Signed and subscribed to before me

18   this _____ day of _____, 2011.

19

20   _____

     NOTARY PUBLIC

21

22

23

24

25
```

# Exhibit JJJ

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


YATRAM INDERGIT, on behalf of    * CIVIL ACTION No.
himself and others similary      * 1:08-cv-09361
situated,                        * PGG-HBP
                                 *
          Plaintiff,             *
                                 *
vs.                              *
                                 *
RITE AID CORPORATION, RITE       *
AID OF NEW YORK, INC., and       *
FRANCIS OFFOR as Aider           *
& Abettor,                       *
                                 *
          Defendants.            *
                                 *
   *    *    *    *    *    *    *    *    *



DEPOSITION OF RON ANTHONY TARDO
taken on Tuesday, September 13, 2011,
before Diana C. Nadas,
Registered Professional Reporter
and Certified Court Reporter
in and for the State of Louisiana,
at Law Offices of
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.,
639 Loyola Avenue, Suite 2550,
New Orleans, Louisiana 70113,
commencing at 10:15 o'clock a.m.



REPORTED BY:

     Diana Nadas Roloff, CCR, RPR
     License No. 90012

Page 73

1   speed.  What do you mean?  What was wrong with the

2   ordering at Store 7290 when you became the store

3   manager?

4        A.   Well, they had a lot of holes in the

5   shelves and no -- no product.

6        Q.   So somebody had not been ordering

7   product that was needed?

8        A.   Exactly.

9        Q.   And does that also affect the store's

10  profitability?

11       A.   Yes, ma'am.

12       Q.   Were there any other challenges that you

13  had to deal with when you became the store manager

14  at 7290?

15       A.   That's it, that I know of.

16       Q.   So what types of things did you do to

17  get that store into better shape upon becoming the

18  store manager there?

19       MS. SCOTT:

20            Objection form.

21       THE WITNESS:

22            I had to -- to work excessive hours to

23       get it straight and the ordering.

24  BY MS. MOELLER:

25       Q.   That took you more time?

**Page 74**

```
 1        A.    Exactly.
 2        Q.    Okay.  So when you became the store
 3   manager at 7290, were you working longer hours
 4   than you had been as the store manager at the
 5   Bogalusa store location?
 6        A.    Yes, ma'am.
 7        Q.    At the Bogalusa store, how many hours
 8   did you work, on average, in a week?
 9        A.    Oh, when I was on salary?
10        Q.    Yes.  As a store manager, yes.
11        A.    Oh, it's about the same, to be honest,
12   because I was working 60 to 80 hours a week.
13        Q.    That's a Bogalusa?
14        A.    Yes, ma'am.
15        Q.    And when you became the store manager at
16   7290 in Slidell, how many hours a week did you
17   work?
18        A.    I probably worked about 80.
19        Q.    And that's because of the shape that the
20   store was in when you took over?
21        A.    Yes, ma'am.
22        Q.    And did that change at any point during
23   your employment as the store manager at that
24   store?
25        A.    Well, I was the only salaried person.
```

**Page 75**

1   And then, when the budget cuts came, that's when I

2   had to start working a lot more.

3        Q.   I'm sorry.  Let me make sure I

4   understand.  When the budget cuts came, you had to

5   work more?

6        A.   Uh-huh.

7        Q.   Because you were still salaried, at that

8   time?

9        A.   Yes, ma'am.

10       Q.   When did the budget cuts happen?

11       A.   Oh, I don't know.  I can't remember.

12       Q.   That's when you were the store manager

13   at 7290?

14       A.   Yes, ma'am.

15       Q.   And what -- what was the nature of the

16   budget cuts?

17       A.   Well, it was being cut all -- even when

18   I was at 7287, it was being cut.  But when it got

19   to 7290, it got cut even more.

20       Q.   And that's the labor budget,

21   specifically?

22       A.   Well, no.  I think it was because of the

23   profitability.

24       Q.   So if the store's profitability went

25   down, then the labor budget went down?

Page 79

```
 1        MS. SCOTT:

 2            Objection.

 3        THE WITNESS:

 4            Yeah.

 5   BY MS. MOELLER:

 6        Q.   How many people would you estimate you

 7   hired at the Bogalusa store?

 8        A.   About the same.

 9        Q.   Five to ten?

10        A.   Five to ten.

11        Q.   And so when you arrived as the store

12   manager at 7290 and the assistant manager had

13   already hired the eight people, roughly; is that

14   correct?

15        A.   Yes, ma'am.

16        Q.   Were you responsible for training those

17   eight people?

18        A.   Yes, ma'am.

19        Q.   So she didn't train those people because

20   she left; correct?

21        A.   Exactly.

22        Q.   So you had to take them through all of

23   the new-hire orientation and things of that

24   nature?

25        A.   Yes, ma'am.
```

Page 80

```
 1        Q.    What other types of things did you train

 2   those persons on?

 3        A.    Planograms and the register, stocking,

 4   photo lab.

 5        Q.    Anything else?

 6        A.    That's about it.

 7        Q.    Were you responsible for training those

 8   persons on, like, all of Rite Aid's policies?

 9        A.    Yes, ma'am.  Make sure they did their

10   CBTs, understood them.

11        Q.    That's the computer-based

12   training that --

13        A.    Yes, ma'am.

14        Q.    -- we talked about?

15        A.    Yes, ma'am.

16        Q.    During the time that you worked as the

17   store manager at 7290, was there a particular

18   schedule that you worked in a given week?

19        A.    Well, two -- I worked two nights and the

20   rest, days.

21        Q.    Does that mean you closed two nights,

22   per week?

23        A.    Yes, ma'am.

24        Q.    How many days a week did you generally

25   work as a store manager at 7290?
```

Page 81

1          A.     Five.

2          Q.     And so you --

3          A.     Was that -- you're talking about salary

4     or hourly?

5          Q.     Yes.   Let's talk about it just during

6     the time you were salaried.

7          A.     Oh, I worked, sometimes, seven -- seven

8     days a week.

9          Q.     And during the time that you were an

10    hourly manager, store manager, at 7290, how many

11    days a week did you work?

12         A.     As hourly, five.

13         Q.     So during the time you were salaried at

14    7290, you worked -- did you close two nights, per

15    week?

16         A.     Yeah, supposed to be.   But I wound up

17    closing a lot more than that.

18         Q.     What was the reason for that?

19         A.     Oh, I guess, budget cuts.

20         Q.     And how many days did you open during

21    the time that you were a salaried store manager at

22    7290?

23         A.     Oh, I want to say five -- it was five or

24    six or -- sometimes, I closed -- opened and

25    closed.

Page 82

1       Q.   At Store 7290, were there certain times

2    during the day where there were more people on

3    duty than others, like, the times that the store

4    got busier?

5       MS. SCOTT:

6            Objection form.

7       THE WITNESS:

8            Well, all day long, it was, kind of,

9       busy at 7290.

10   BY MS. MOELLER:

11      Q.   How many hourly employees would there be

12   with you --

13      A.   Oh, just --

14      Q.   Let's say you opened the store as a

15   salaried store manager at 7290 --

16      A.   Uh-huh.

17      Q.   -- how many hourly employees would be in

18   the front-end of the store?

19      A.   One.

20      Q.   And, then, did an additional person come

21   in?

22      A.   They would work from 8:00 to 3:00, and

23   an additional person would come in from 3:00 to

24   10:00.

25      Q.   And then there were additional people

Page 194

```
 1        A.    Yes.
 2        Q.    And that store managers have the
 3   discretion to subordinate hourly employees when
 4   it's necessary?
 5        A.    What do you mean?
 6        Q.    If you saw a situation where an hourly
 7   employee at your store had violated some type of
 8   policy, you had the discretion to discipline that
 9   employee?
10        A.    Yes.
11        Q.    Okay.  And you could verbally discipline
12   them, or you could discipline them in writing;
13   correct?
14        A.    Yes.
15        Q.    As a store manager, did you have the
16   discretion to suspend an employee if circumstances
17   warranted it?
18        A.    Suspend?
19        Q.    Yes.
20        A.    I would have to go through -- I'd have
21   to go over it with John Perkins, my DM.
22        Q.    Did you ever have a situation that you
23   felt warranted the suspension of an employee?
24        A.    Well, yeah.  That was my assistant, at
25   the time, that was stealing.
```

**Page 195**

```
 1        Q.   And you believed that -- was that a male
 2   or a female?
 3        A.   Male.
 4        Q.   And you believed that he should be
 5   suspended?
 6        A.   Well, they terminated him.
 7        Q.   Okay.  Was he suspended pending his
 8   termination?
 9        A.   Yes.
10        Q.   And did you recommend that he be
11   suspended during that period of time?
12        A.   I had no control over that.
13        Q.   You weren't involved in that?
14        A.   Unh-unh.
15        Q.   Was there any other situation where you
16   believed an employee should have been suspended?
17        A.   No.
18        Q.   As a store manager, if an employee
19   committed, like, a major violation, for example,
20   fighting at work or bringing drugs to work, did
21   you have the authority to terminate that employee,
22   on the spot?
23        A.   Well, within cause, yes.
24        Q.   I'm sorry?
25        A.   Within cause, yes.  But I would have to
```

Page 196

1    go over it with my boss, John Perkins.

2        Q.    So, for example, let's just take a

3    hypothetical.  Let's say you caught an employee at

4    work with drugs.

5        A.    Right.

6        Q.    You could go ahead and send that

7    employee home or terminate --

8        A.    I'd send him home, talk to my boss, and

9    then get Loss-Prevention, and they'd review

10   everything.

11       Q.    And that's to ensure that all employees

12   are treated the same?

13       A.    Yeah.

14       Q.    And you understood that you had that

15   authority?

16       A.    Yes.

17       Q.    Did you ever have to do that?  Did you

18   have a situation that warranted that?

19       A.    I'm not -- what do you mean, "a

20   situation --"

21       Q.    Where an employee needed to be

22   terminated, on the spot?

23       A.    Yes.  That was an assistant.

24       Q.    He was stealing?

25       A.    Yes.

Page 197

1        Q.    Any other time?

2        A.    That was it.

3        Q.    Did you ever have to discipline an

4   employee for attendance issues?

5        A.    Oh, I'm trying to remember.  No, not

6   that I know.  I can't remember, though.

7        Q.    During the time you were a store

8   manager, did you ever have to discipline an

9   employee for dress-code violations?

10       A.    I'm to trying think who that is.  I

11  know that -- I think it was one time I did have

12  to, yes.

13       Q.    And do you recall what type of

14  discipline?  Was it verbal or written?

15       A.    It was written.

16       Q.    Did you ever have to discipline an

17  employee for insubordination?

18       A.    What do you mean?

19       Q.    Let's say they talked back to you or had

20  an attitude?

21       A.    No.

22       Q.    You never had such a situation?

23       A.    Unh-unh.

24       Q.    But you knew that you had the authority

25  to do so?

Page 267

```
 1       A.    That's it.
 2       Q.    Mr. Tardo, have you understood all of my
 3   questions today, or if you've not understood,
 4   you've let me know?
 5       A.    Yes, ma'am.
 6       Q.    And has your testimony been accurate and
 7   complete?
 8       A.    Yes, ma'am.
 9   MS. MOELLER:
10          All right.  I don't have any further
11       questions, at this time.
12   MS. SCOTT:
13          If I could just have ten minutes off the
14       record?
15   MS. MOELLER:
16          Sure.  Off the record.
17          (A brief off-the-record recess is held
18       at this time.)
19   MS. SCOTT:
20          Good afternoon, Mr. Tardo.  I will be
21       asking you some questions now.
22   THE WITNESS:
23          Yes, ma'am.
24   MS. SCOTT:
25          As we discussed earlier, just like I was
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-CV-09361PGG-HBP**
**Ron Anthony Tardo**                                   **September 13, 2011**

Page 268

```
 1        objecting to Beth's questions, she also will
 2        be, I expect, objecting to mine or, at least,
 3        she's allowed to object to mine.  And just
 4        like you were allowed to answer questions
 5        when I objected, you are also allowed to
 6        answer questions even when she objects.
 7        THE WITNESS:
 8             Okay.
 9        MS. SCOTT:
10             But just for the court reporter's sake,
11        if you could just give a brief pause before
12        answering my questions, I'm sure that will be
13        appreciated; okay?
14        THE WITNESS:
15             Okay.
16   EXAMINATION BY MS. SCOTT:
17        Q.   Do you know what I mean when I say,
18   "non-managerial duties"?
19        A.   Yeah.  That would be, like, cleaning the
20   bathrooms, sweeping the floors, running the
21   register, working the photo lab.
22        Q.   And what non-managerial duties did you
23   complete when you were a store manager at Rite
24   Aid?
25        A.   All of them.  I did it all.
```

Page 269

```
 1        Q.    And can you elaborate on that and
 2   explain specific examples of non-managerial tasks
 3   that you completed while as a store manager at
 4   Rite Aid?
 5        A.    Well, I swept the floors.  I got the
 6   buggies.
 7        Q.    And what do you mean by that?
 8        A.    I mean, I retrieved them, brought them
 9   inside.
10        Q.    By, "buggies," do you mean the carts
11   that were used --
12        A.    Shopping carts, yes.  The shopping
13   carts.  Cleaned the bathrooms, swept and mopped
14   the floors, ran the cash register, worked in the
15   photo lab, put up stock, did planograms.  That's
16   about it.
17        Q.    Did you unload the truck, as a store
18   manager at --
19        A.    Yes.
20        Q.    -- Rite Aid?
21        A.    Yes.
22        Q.    Would you consider unloading the truck a
23   non-managerial duty that you completed?
24        MS. MOELLER:
25             Objection to form.
```

Page 270

```
 1        THE WITNESS:

 2             Yes.

 3   BY MS. SCOTT:

 4        Q.   What was your answer?

 5        A.   "Yes."

 6        Q.   Did you price items while you were a

 7   store manager at Rite Aid?

 8        A.   Well, no.  That all came in from

 9   Corporate.

10        Q.   So you had no control over the pricing

11   of items?

12        A.   No.

13        Q.   What percentage of time would you say

14   that you -- strike that.  What percentage of time,

15   as a store manager at Rite Aid, did you complete

16   non-managerial tasks?

17        MS. MOELLER:

18             Object to the form.

19        THE WITNESS:

20             About 75 percent of the time.

21   BY MS. SCOTT:

22        Q.   (Indicating.)  And if you'll look at

23   what's been marked as Exhibit 4 in front of you,

24   do you see any of the non-managerial tasks that

25   you just listed a moment ago written on that,
```

Page 271

```
 1    Exhibit 4, which is labeled as the, "Rite Aid Job
 2    Description of the Store Manager"?
 3         A.   (Reviewing Documents.)  No.
 4         Q.   Did you consider those tasks to be your
 5    responsibility to perform?
 6         A.   No.
 7         Q.   If those tasks were not completed by
 8    you -- strike that.  If the non-managerial tasks
 9    that you had to complete were not completed, what
10    would happen to you?
11         MS. MOELLER:
12              Objection to form.
13         THE WITNESS:
14              I would have got behind or would have
15         got wrote up.
16    BY MS. SCOTT:
17         Q.   Why did you have to complete
18    non-managerial tasks, as a store "supervisor" at
19    Rite Aid?
20         A.   Because of the labor rate.
21         Q.   And can you explain that?
22         A.   If I was -- if they gave me 200 hours, I
23    had to manage my employees in that 200 hours, even
24    including my -- including time, 45.  But in a
25    salary, they would have been just employees, the
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al. 1:08-CV-09361PGG-HBP**
**Ron Anthony Tardo**                              **September 13, 2011**

Page 272

 1  front end.

 2      Q.   So were your 45 hours included in the

 3  200 hours that you would have allotted?

 4      A.   If it was hourly, yes.  The salary would

 5  just be the -- just employees on the -- the

 6  hourly, the labor rate.

 7      Q.   I'm sorry.  Can you explain that, how

 8  the -- would your salaried number of hours be

 9  included in your labor budget?

10      A.   No.

11      Q.   Did completing non-managerial tasks

12  affect how you were able to run the store?

13      A.   Yes.

14      Q.   In what ways?

15      A.   It was taken away from my job duties of,

16  you know, watching employees, you know, doing

17  all -- doing the evaluating.

18      Q.   And did doing these non-managerial tasks

19  affect how you were able to supervise staff?

20      A.   Yes.

21      Q.   Did doing these non-managerial tasks

22  affect how you were able to monitor the safety

23  conditions in the store?

24      A.   Yes.

25      Q.   Did doing these non-managerial tasks and

Page 273

```
 1   duties affect how you were able to supervise the

 2   store at all times?

 3        MS. MOELLER:

 4             Object to the form.

 5        THE WITNESS:

 6             Yes.

 7   BY MS. SCOTT:

 8        Q.   Were you able to fully supervise your

 9   employees while doing non-managerial tasks?

10        A.   Yes.

11        Q.   You were able to fully supervise --

12        A.   Yes.

13        Q.   If, for instance, you were unloading the

14   truck, were you able to supervise a cashier who

15   was ringing up the register?

16        MS. MOELLER:

17             Objection.

18        THE WITNESS:

19             No.

20   BY MS. SCOTT:

21        Q.   Were there any other times when you

22   would be completing a non-managerial task where

23   you would not be able to supervise employees

24   because, as a for-instance, you weren't able to

25   see them?
```

Page 289

```
 1                     WITNESS' CERTIFICATE

 2

 3

 4        I, RON ANTHONY TARDO, do hereby certify that

 5   I have read or have had read to me the foregoing

 6   transcript of my testimony, given on Tuesday,

 7   9/13/11, and hereby certify that it is a true and

 8   correct transcription of my testimony, with the

 9   exception of any corrections or changes attached

10   hereto.

11

12   (CHECK ONE)

13

14   (  )  WITHOUT CORRECTIONS.

15

16   (  )  WITH CORRECTIONS, AND/OR

17     ADDITIONS ATTACHED HERETO.

18

19

20

21   SIGNATURE: _____

22

23

24

25
```

Exhibit KKK

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


-------------------------------------x

YATRAM INDERGIT, on behalf of himself

and others similarly situated,

      Plaintiff,            CIVIL ACTION NO. 1:08-cv-09361-

    - vs -              PGG-HBP

RITE AID CORPORATION, RITE AID OF

NEW YORK, INC., and FRANCIS OFFOR as

Aider & Abettor,

      Defendants.

-------------------------------------x


        July 15, 2011

        9:53 a.m.


    DEPOSITION of LAURENT TREMBLAY, taken by

Defendants, pursuant to Fed.R.Civ.P. 30 and

agreement of counsel, held at the offices of EMG

New York, 250 Park Avenue, New York, New York

10177, before Janet Hamilton, a Registered

Professional Reporter and Notary Public of the

State of New York.

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Laurent Tremblay**                                                    **July 15, 2011**

Page 30

```
 1                  L. Tremblay, 7/15/11
 2          A.     Yes.
 3          Q.     And then it was in 2008 that they
 4     had the grand reopening as a Rite Aid store?
 5          A.     Yes.
 6          Q.     Do you recall when in 2008 the
 7     grand reopening took place?
 8          A.     I believe it was in June.
 9          Q.     Did that effect your work in any
10     way?
11          A.     Yes.
12          Q.     How did it effect your work, the
13     grand reopening in June 2008?
14          A.     I ended up working a lot more.
15          Q.     Tell me -- tell me all about it.
16          A.     I was told by the district manager
17     that during this period I should work six or
18     seven days a week and be there as much as
19     possible.
20          Q.     How long did that period last?
21          A.     From the remodel start?  I believe
22     they started remodeling in March, I want to say.
23          Q.     March of 2008?
24          A.     Yes.
25          Q.     How long did the remodeling last?
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Laurent Tremblay**                                                    **July 15, 2011**

                                                                            **Page 31**

     1                    L. Tremblay, 7/15/11

     2          A.    I believe it was, like, six to ten

     3     weeks.  In that range.

     4          Q.    Were you still open for business

     5     during that time?

     6          A.    Oh, yes.  Yes.

     7          Q.    Are you familiar with the term

     8     "paint and powder"?

     9          A.    Yes.

    10          Q.    What does that refer to?

    11          A.    Just refurbish the inside of the

    12     store with paint and rearrange.

    13          Q.    Is that what took place in the

    14     Fall River store?  Or was it more extensive than

    15     that?

    16          A.    They changed aisles.  They painted.

    17     They redid the floor.  Put carpeting.

    18          Q.    Did the store's hours of operation

    19     change during the remodeling?

    20          A.    Yes.

    21          Q.    What was -- what were the hours of

    22     operation for the Fall River store in 2006?

    23          A.    When I first got there, I believe

    24     it was 9:00 to 9:00.

    25          Q.    Was that seven days a week?

**REPORTED BY: Janet Hamilton, RPR**                    **www.huseby.com**
**HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400**

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Laurent Tremblay**                                                    **July 15, 2011**

Page 32

1                    L. Tremblay, 7/15/11

2          A.     Sunday was 9:00 to 6:00.

3          Q.     Was that the hours of operation in

4    2007?

5          A.     They did change the hours to

6    8:00 to 10:00.

7          Q.     In 2007?

8          A.     I believe it was then.

9          Q.     Monday through Saturday?

10         A.     Yes.

11         Q.     And then what did they do on

12   Sunday?

13         A.     I believe it was 8:00 to 6:00.

14         Q.     So they increased the hours of the

15   store's operation?

16         A.     Yes.

17         Q.     And during the remodeling, how did

18   the hours of operation change?

19         A.     Not too much.  You mean being open?

20         Q.     Yes, sir.

21         A.     They stayed the same.

22         Q.     Being open to the general public?

23         A.     Right.  They stayed the same.

24         Q.     Did the remodeling crews work

25   overnight?

Page 33

1                    L. Tremblay, 7/15/11

2          A.    No.  I don't think they did.  I

3     don't remember them staying overnight.

4          Q.    Were they working alongside you

5     while you were doing business in the store and

6     they were remodeling the store?

7          A.    They were doing their thing.  I was

8     doing mine.  Yes.

9          Q.    Did that effect business in any

10    way?

11         A.    Yes.  Business dropped a little bit

12    during the paint and powder.

13         Q.    So "paint and powder" was the term

14    they used for your remodel?

15         A.    You could say that.

16         Q.    Now, during 2006 and 2007, before

17    the remodeling, what was your regular schedule

18    of work?

19         A.    My regular schedule in Fall River?

20         Q.    Yes, sir.

21         A.    Was 50 hours a week, minimum.  It

22    was five days.

23         Q.    And did you open the store?

24         A.    Yes.

25         Q.    How many days did you open?

Page 34

```
 1                 L. Tremblay, 7/15/11
 2          A.     Four.
 3          Q.     Let me take a wild guess.  Did you
 4   close one day?
 5          A.     One or two.
 6          Q.     So you opened three to four and you
 7   closed one to two?
 8          A.     Yes.
 9          Q.     Did you decide which days you would
10   open?
11          A.     Yes.
12          Q.     And did you decide which days you
13   would close?
14          A.     Yes.
15          Q.     Did you assign the assistant store
16   manager to open the store on the days that you
17   did not?
18          A.     Yes.
19          Q.     And did you assign the assistant
20   store manager to close the store on the days
21   that you did not?
22          A.     Yes.
23          Q.     Did you assign the shift supervisor
24   to either open or close the store?
25          A.     Yes.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Laurent Tremblay**                                      **July 15, 2011**

Page 35

```
 1                    L. Tremblay, 7/15/11
 2          Q.    How many days did the shift
 3     supervisor -- who I think you referred to as a
 4     key person.  Right?
 5          A.    Right.
 6          Q.    If I refer to that person as a
 7     shift supervisor, will you understand who I
 8     mean?
 9          A.    Yes.
10          Q.    Did you assign the shift supervisor
11     to open the store?
12          A.    Yes.
13          Q.    How many days a week?
14          A.    As needed, when the assistant or
15     myself weren't opening or closing.  Most of the
16     time it was to close the store at night.
17          Q.    So you assigned the shift
18     supervisor to open or close as needed when
19     neither yourself nor the assistant store manager
20     were available to do that.  Is that correct?
21          A.    Yes.
22          Q.    Now, tell me about the opening
23     procedure.  When you opened the store, what did
24     you do?
25          A.    Came in.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Laurent Tremblay                                            July 15, 2011**

Page 36

```
 1                    L. Tremblay, 7/15/11
 2         Q.    This is Fall River?
 3         A.    Fall River.
 4               Come in at 7:00, 7:15 in the
 5    morning.
 6         Q.    This is when the store opened at
 7    8:00?
 8         A.    Yes.
 9         Q.    Or when the store opened at 9:00?
10         A.    At 8:00.
11         Q.    You arrived at the store between
12    7:00, 7:15?
13         A.    Yes.
14         Q.    And what did you do?
15         A.    I did the daily deposit.
16         Q.    What did that involve?
17         A.    Counting the money from the night
18    before, matching it up with the receipt, the
19    register totals.
20         Q.    This is money that was in the safe?
21         A.    Correct.
22         Q.    And the safe was in the manager's
23    office?
24         A.    Yes.
25         Q.    And just before we get to the safe,
```

Page 37

```
 1                 L. Tremblay, 7/15/11
 2   was there an alarm that you turned off?
 3          A.    Yes.  Deactivated the alarm.
 4          Q.    You had a code to do that?
 5          A.    Yes.
 6          Q.    Did the assistant store manager
 7   also have a code to deactivate the alarm?
 8          A.    Yes.
 9          Q.    And did the shift supervisor also
10   have a code to deactivate the alarm?
11          A.    Yes.
12          Q.    Then you went to the office and
13   counted the money in the safe?
14          A.    Correct.
15          Q.    And compared it to the receipts
16   that were on the cash register's record from the
17   sales of the day before?
18          A.    Correct.
19          Q.    Is that the same procedure that the
20   assistant manager used when the assistant
21   superman --
22          A.    There were no supermen in that
23   store.
24          Q.    The assistant store manager --
25                MS. RUBIN:  Objection to form.
```

Page 42

```
 1                    L. Tremblay, 7/15/11
 2         now, if you don't mind.
 3                 (Recess, 10:42 a.m. to 10:46 a.m.)
 4                 CONTINUED EXAMINATION
 5    BY MR. WEINER:
 6         Q.    (By Mr. Weiner)  Did you schedule
 7    the assistant manager to cover the hours the
 8    store was open when you were not there?
 9         A.    No.
10         Q.    How did you --
11         A.    We overlapped sometimes.
12         Q.    Tell me how you would arrange the
13    schedule of the people that you had.
14         A.    I tried to schedule more hours when
15    it was busier.  Usually, that was, like I said,
16    between, you know, 4:00 and 6:00.  Sometimes a
17    little later.  Schedule more people when the
18    truck arrived.  You know.  To put it up, help
19    put it up.  After -- usually, I unloaded it with
20    the assistant manager.  And we used the hours
21    after to have them -- after it was unloaded and
22    spread out in the store, they would come in and
23    help put it up.
24         Q.    And how did you use your shift
25    supervisors?
```

Page 43

```
 1                L. Tremblay, 7/15/11
 2        A.    Usually at night, from 4:00 to
 3   10:00, 5:00 to 10:00.  You know.  Usually to
 4   close the store.  It was usually either one or
 5   two cashiers.
 6        Q.    What time did you generally leave
 7   the store, if you opened the store?
 8        A.    That varied.  Depending on what had
 9   to be done.  Usually it was 5:30.  Anywhere from
10   5:30 to 6:00.  Not every day, but sometimes
11   longer.
12        Q.    Sometimes shorter?
13        A.    Not usually.
14        Q.    What kinds of things would keep you
15   past 5:30?
16        A.    Late truck.  If you happen to catch
17   a shoplifter at 5:00.  The amount of work that
18   was -- that needed to be done.
19        Q.    Did the truck come on a specific
20   day?
21        A.    Yes.
22        Q.    Which day?
23        A.    They rotated the trucks every -- I
24   want to say three months.
25        Q.    The delivery day was --
```

Page 44

1                   L. Tremblay, 7/15/11

2          A.    The delivery day would change one

3     day.  You would go from a Monday to a Tuesday to

4     a Wednesday to a Thursday, Friday.  And then

5     start over again.  But it stayed consistent for

6     that -- you know.  Unless there was a holiday,

7     it would stay consistent for that period of

8     time.

9          Q.    You received one delivery each week

10    from the truck?

11         A.    Yes.

12         Q.    The truck was a Rite Aid truck?

13         A.    Yes.

14         Q.    What time of day did the truck

15    arrive?

16         A.    In Fall River?

17         Q.    Yes, sir.

18         A.    Around 1:00 or 2:00.

19         Q.    Did that vary?

20         A.    Sometimes.

21         Q.    How long did it take to unload the

22    truck?

23         A.    That varied on the size of the

24    order.  You usually -- I was pretty lucky in a

25    way, because the truck would back up.  I had a

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Laurent Tremblay**                                                    **July 15, 2011**

Page 48

```
 1                  L. Tremblay, 7/15/11
 2          Q.    On the truck day?
 3          A.    Yes.  Sometimes it would lap over
 4    into the next day.
 5          Q.    And while you were doing that
 6    stocking, were you concurrently doing other
 7    duties?
 8          A.    Yes.
 9          Q.    For example, keeping an eye out for
10    shoplifters?
11          A.    Yes.
12          Q.    Answering customer complaints, if
13    there were any?
14          A.    Yes.
15          Q.    Answers customer questions?
16          A.    Yes.
17          Q.    So that, while you were stocking,
18    you could be interrupted by other activities
19    that needed your attention.  Is that fair to
20    say?
21          A.    Yes.
22          Q.    During the time you were there, did
23    you hire any of the cashiers?
24          A.    We would interview them.  And the
25    district manager gave you the okay to either
```

Page 49

```
 1                  L. Tremblay, 7/15/11
 2   hire them or not.
 3          Q.    Did you recommend certain cashiers
 4   be hired, recommend others not be?
 5          A.    When I want to hire somebody, I
 6   want to hire them.  You know.  Naturally, you're
 7   going to recommend them to the district manager.
 8   I wouldn't hire somebody that I didn't think was
 9   going to do a good job.  So I would give him the
10   application.  And he'd go over it, interview
11   them, and he would give me the okay to hire or
12   not to hire.
13          Q.    So you would interview applicants?
14          A.    Yes.
15          Q.    And this is Fall River?
16          A.    Yes.
17          Q.    In 2006, do you recall
18   approximately how many applicants for a
19   cashier's job you interviewed?
20          A.    Couldn't tell you, really.
21          Q.    And then, if I asked you each year,
22   would you say you couldn't tell me per year?
23          A.    I'm sure it varied.
24          Q.    Let me just ask you.  Over the
25   course of the time you were the store manager at
```

Page 50

```
 1                    L. Tremblay, 7/15/11
 2      Fall River, from 2006 through the end of 2008,
 3      or through September of 2008, in total,
 4      approximately how many applicants did you
 5      interview?
 6              A.     Probably somewhere between 20 and
 7      30.
 8              Q.     And of those, how many did you
 9      recommend be hired?
10              A.     Probably half.  Around 15.
11              Q.     And of the 15 you recommended be
12      hired, how many did the district manager
13      approve?
14              A.     Not sure.  There were a few that
15      were not -- you know.  I was told not to hire
16      them.  I can't remember their names.  But I know
17      there were a few.
18              Q.     And is that because their
19      background check didn't come out right?
20              A.     I'm not sure.  They would just tell
21      me they're not hireable.
22              Q.     Did applicants, after you
23      interviewed them, have to submit to a drug test?
24                     MS. RUBIN:  Objection to form.
25              A.     I don't think so.
```

Page 51

```
 1                    L. Tremblay, 7/15/11
 2          Q.    (By Mr. Weiner)  Was there a
 3   background screening that had to be conducted?
 4          A.    With Rite Aid, there was a test.
 5   Like, it was an honesty test, I forget the name
 6   of the test, that they would give the
 7   applicants.  And if they didn't pass that
 8   test -- well, this was -- I should clarify that.
 9   That was when I first started with them in '92.
10          Q.    I'm going to try to confine our
11   inquiry to the later period, if that's okay with
12   you.
13          A.    I don't believe there was a drug
14   test.  There might have been for the pharmacy.
15   I'm not sure.  I can't remember.
16          Q.    All right.  Did you interview
17   applicants for positions in the pharmacy?
18          A.    No.
19          Q.    The 20 to 30 that you indicated
20   that you interviewed were all for front end?
21          A.    Yes.
22          Q.    Did you -- well, did you interview
23   anyone for any position other than cashier?
24          A.    Key people.
25          Q.    You did.  How many key people did
```

Page 54

```
 1                 L. Tremblay, 7/15/11
 2        Q.    And were there any other district
 3   managers at that store?
 4        A.    No.
 5        Q.    Do you recall when Guy Suffelleto
 6   left the position of district manager?
 7        A.    I think it was probably about seven
 8   or eight months after I got to the Fall River
 9   store.  I'm not quite positive.  In that range.
10        Q.    Do you know where Guy went?
11        A.    He went to the New Bedford area.
12   They took that store away from him and gave it
13   to another district manager.  And he inherited
14   some stores down on the Cape.
15        Q.    And had Jean Duval been a district
16   manager somewhere else?
17        A.    Yes.
18        Q.    Do you know where?
19        A.    He was in Fall River.  Newport.  In
20   that area.
21        Q.    Newport, Rhode Island?
22        A.    Yes.  We had stores all over.  I
23   mean, his territory covered a lot.  You know.
24        Q.    About how many stores were in Guy
25   Suffelleto's district?
```

Page 55

1              L. Tremblay, 7/15/11

2         A.    I believe it was between, like, 15

3    and 18.

4         Q.    And how many stores were in Jean

5    Duval's district?

6         A.    They all had about the same amount

7    within one or two stores.

8         Q.    Now, we'll get back to transfers.

9    But let's finish with the promotions that you

10   were describing earlier.

11        A.    What promotion?

12        Q.    The promotions from cashier to key

13   people.

14        A.    Oh.  Okay.

15        Q.    There were five or six applicants

16   that you interviewed for the key position.  Is

17   that correct?

18        A.    I believe so.  Yes.

19        Q.    And of those five or six, you were

20   able to promote two.  Is that correct?

21        A.    Yes.

22        Q.    Were there any applicants for the

23   assistant manager position?

24        A.    We had people that came in and

25   applied for store manager, assistant manager.

Page 56

```
 1                    L. Tremblay, 7/15/11
 2    Whatever.  We would take their application and
 3    turn it in.  Never interviewed anybody for
 4    assistant.
 5            Q.    Because there were no positions
 6    available.  Is that correct?
 7            A.    No.  Because we couldn't hire.
 8            Q.    Because you didn't have the --
 9            A.    Authority.
10            Q.    The payroll authority?  Or just the
11    authority to hire a management position?
12            A.    Assistant managers were hired by
13    district managers.
14            Q.    Who hired you at Fall River?
15            A.    I was already -- at that time I had
16    been working for Rite Aid already.  I mean,
17    Brooks.  And I just continued on.  I mean, it
18    wasn't -- you know.
19            Q.    You weren't a new hire?
20            A.    Yes.  I wasn't a new hire.
21            Q.    You were a keeper?
22            A.    No.  I was a store manager.
23            Q.    Right.
24                  MS. RUBIN:  Objection to form.
25            Q.    (By Mr. Weiner)  You were kept as a
```

Page 57

```
 1                  L. Tremblay, 7/15/11
 2   store manager by Rite Aid after Rite Aid
 3   acquired Brooks?
 4          A.    Right.
 5          Q.    Was there a training period that
 6   took place after Rite Aid acquired Brooks?
 7          A.    Yes.
 8          Q.    Do you recall who came to your
 9   store to train you?
10          A.    Some person from -- I can't
11   remember where.  I think it was the Pennsylvania
12   area.  Came down for a number of weeks.  Showed
13   us the system.  Because we had new registers and
14   all that stuff.  And the procedures to follow.
15   I think it was a two-week period that they came.
16          Q.    How many of them were there?
17          A.    One.
18          Q.    One fellow?
19          A.    Woman or -- I believe it was a guy
20   that came down.  I can't remember his name.
21          Q.    I'm going to try.  Was it Ken
22   Ruzat?
23          A.    There was a -- I can't be sure.
24          Q.    Was it Ken?
25          A.    It sounds -- the name rings a bell.
```

Page 73

```
 1                  L. Tremblay, 7/15/11
 2     you ordered ten items and they picked eight and
 3     eight were delivered and you were charged for
 4     ten, that would be shrink, too.  Is that
 5     correct?
 6          A.    Right.  Yes.
 7          Q.    The pickers you're referring to are
 8     at the warehouse?
 9          A.    Warehouse.  Yes.
10          Q.    Could you determine whether you got
11     the right number of totes?
12          A.    Yes.  Usually.
13          Q.    Did you verify that the number of
14     totes that you ordered were --
15          A.    Yes.
16          Q.    -- were properly delivered?
17                MS. RUBIN:  Please let him finish
18          the question.
19                THE WITNESS:  Sorry.
20                MR. WEINER:  That's all right.
21          We're all trying to do the same thing.
22          Some people get upset when they're
23          interrupted.  I'm not one of them.  But --
24          I need to take another break.
25                (Recess, 11:32 a.m. to 11:36 a.m.)
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Laurent Tremblay**                                                    **July 15, 2011**

Page 74

```
 1                   L. Tremblay, 7/15/11
 2                  CONTINUED EXAMINATION
 3   BY MR. WEINER:
 4          Q.    I had asked you earlier about
 5   applicants that you interviewed for cashier
 6   positions.  And I asked you about promotions
 7   from cashier positions to shift supervisor.  Let
 8   me ask you:  Were there any employees that you
 9   demoted?
10          A.    No.
11          Q.    Were there any employees that you
12   terminated?
13          A.    There were a couple of cashiers
14   that were terminated while I was there.
15          Q.    Tell me about them.
16          A.    I called the district manager, told
17   them what was happening.  I thought the girl was
18   taking, stealing out of the registers.  And they
19   did catch her and determined that she was
20   stealing.  And he fired her.
21          Q.    And what was it that aroused your
22   suspicion?
23          A.    Well, she had shortages a lot.
24   Nothing really big, big.  But, you know,
25   shortages.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Laurent Tremblay**                                                    **July 15, 2011**

Page 75

 1                    L. Tremblay, 7/15/11

 2          Q.     Like, how much?

 3          A.     You know.  Five dollars.  Ten

 4   dollars.  Four bucks.  Three bucks.

 5          Q.     Uh-hum.  Did you conduct cash

 6   register audits?

 7          A.     Yes.

 8          Q.     How frequently did you conduct

 9   them?

10          A.     I tried to get everybody at least

11   once a month.

12          Q.     Were these surprise audits?

13          A.     Yes.

14          Q.     And how did you determine who to

15   audit?

16          A.     You just -- if we suspected

17   anything, then we would probably audit her a

18   little more often.  But we did try to audit

19   everybody.

20          Q.     When you say "we" --

21          A.     Me.  The assistant manager.

22          Q.     Did the assistant manager also have

23   the authority to conduct a cash register audit?

24          A.     Yes.

25          Q.     Did the shift supervisors also have

Page 89

```
 1                   L. Tremblay, 7/15/11
 2           Q.     How frequently?
 3           A.     It varied.  You know.  It wasn't on
 4    a set time schedule.  We had more conference
 5    calls than anything.
 6           Q.     How frequent were the conference
 7    calls?
 8           A.     Usually once a week.
 9           Q.     Who were on these conference calls?
10           A.     The store managers and the district
11    manager.  If the store manager wasn't there for
12    some reason -- I mean, they basically wanted you
13    to be there when the conference call was going
14    to be held, unless you had some extenuating
15    circumstances.
16           Q.     They basically wanted a store
17    manager to be on the conference call?
18           A.     Conference call.  Yes.
19           Q.     But if there was an extenuating
20    circumstance, they'd exempt --
21           A.     If you had a doctor's appointment
22    or an emergency or whatever.
23           Q.     Or if you were on vacation?
24           A.     Or vacation.  Yes.
25           Q.     And then they would accept the
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Laurent Tremblay**                                               **July 15, 2011**

Page 90

```
 1                    L. Tremblay, 7/15/11
 2    assistant store manager in your place.  Is that
 3    correct?
 4           A.    Correct.
 5           Q.    So the store managers from each of
 6    the stores in the district were on the call.  Is
 7    that correct?
 8           A.    Yes.
 9           Q.    And the district manager was on the
10    call?
11           A.    Yes.
12           Q.    Anybody else at the district level?
13           A.    No, not usually.
14           Q.    And anyone else at the store level?
15           A.    No.
16           Q.    And what were the subjects that
17    were discussed in the conference calls?
18           A.    Labor.  Stay on budgets.
19           Q.    Labor, meaning the labor budget?
20           A.    Yes.  If you were over, they would
21    want to know why, usually.  I mean, you couldn't
22    go over budget unless you called him and asked
23    him for hours.
24           Q.    What happens if you did?  What
25    happens if you just -- you know.  You were given
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Laurent Tremblay**                                        **July 15, 2011**

                                                                    **Page 91**

          1                    L. Tremblay, 7/15/11

          2     200 hours to schedule, and you recognize that

          3     you needed more -- like 210 -- and you scheduled

          4     210?

          5                    MS. RUBIN:  Objection.

          6          Q.    (By Mr. Weiner)  What happened

          7     then?

          8          A.    You would get a call.

          9          Q.    Did you ever do that?

         10          A.    Yes.

         11          Q.    You would schedule more people than

         12     you were budgeted.  Right?

         13          A.    Without permission?  I did it once

         14     and, you know, I got reprimanded for it.

         15          Q.    By the district manager?

         16          A.    Yes.

         17          Q.    Which one was that?

         18          A.    Guy Suffelleto.

         19          Q.    How much over the budget did you

         20     schedule?

         21          A.    Like, seven, eight hours.

         22          Q.    And what did Guy Suffelleto say?

         23          A.    You can't go over budget, unless

         24     you call me and I approve it.

         25          Q.    Did you thereafter call for

Page 92

```
 1                 L. Tremblay, 7/15/11
 2   approval for more hours on certain occasions?
 3        A.    Not really.  Unless it was
 4   something really dire.  You know.
 5        Q.    Like not having an assistant
 6   manager?
 7        A.    Yes.
 8        Q.    Did you call the district manager
 9   when you didn't have an assistant manager and
10   said --
11        A.    Oh, he --
12              MS. RUBIN:  Objection.  Form.
13        A.    I mean, I didn't have to call.  He
14   came down and told me, you know, we don't have
15   anybody right now.  Just hang in there.  You
16   know.  Do whatever you got to do.
17        Q.    (By Mr. Weiner)  So staying within
18   the labor budget was a subject that was
19   discussed during the conference calls?
20        A.    Frequently.
21        Q.    What else?
22        A.    If we were, had a lot of planograms
23   to do, he wanted to make sure everybody was up
24   to date on them.  You weren't falling behind on
25   your price changes.  Store conditions.
```

Page 174

```
 1                    L. Tremblay, 7/15/11
 2    me, they owed me four weeks vacation, which I
 3    was going to lose in two weeks because I
 4    couldn't take my vacation because I didn't have
 5    the help.
 6            Q.    Did you get paid for the vacation?
 7            A.    Yes.  But, still, that doesn't --
 8    you know.  You need time away.  You need time
 9    away.  It's a benefit that I couldn't take that
10    I was entitled to.
11            Q.    Do you recall how much your salary
12    was at the time you left?
13            A.    I want to say 847 a week.  Like
14    43,000.  You know.  Around there.
15            Q.    Is there anything else that we
16    haven't yet discussed about your employment at
17    Rite Aid?
18                MS. RUBIN:  Objection to form.
19            A.    You know.  I just didn't like the
20    way I was treated.  Because of the, you know,
21    the hours and always this and that.  You know.
22            Q.    (By Mr. Weiner)  And is that
23    primarily as a result of the district managers?
24            A.    Well, yes.  They would come down.
25    You know.  They would beat on you -- not beat on
```

**Page 175**

```
 1                    L. Tremblay, 7/15/11
 2   you, but pounded into you you've got to stay on
 3   budget.  The vice president is coming.  This guy
 4   a coming.  That guy is coming.
 5           Q.    So at this time do you believe that
 6   your testimony is complete and accurate?
 7           A.    Yes.  As far as I'm concerned.
 8   Yes.
 9                    MR. WEINER:  Do you have any
10           questions?
11                    MS. RUBIN:  I do.  Can I have a few
12           minutes?
13                    MR. WEINER:  Of course.  Certainly.
14           You're not going to speak to Mr. Tremblay
15           before you begin your examination, are
16           you?
17                    MS. RUBIN:  No.
18                    (Recess, 3:00 p.m. to 3:07 p.m.)
19                    CROSS EXAMINATION
20   BY MS. RUBIN:
21           Q.    So, Mr. Tremblay, how much time was
22   spent doing non-managerial duties?
23           A.    Well...
24           Q.    At the Fall River store.
25           A.    I'd say, out of a day, a ten-hour
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Laurent Tremblay                                          July 15, 2011

Page 176

1                    L. Tremblay, 7/15/11

2      day, I probably spent two hours managing.  And

3      the rest was either stocking, cleaning, putting

4      up -- doing stuff in the back room.  Like

5      bringing out -- we used to have a list that

6      would print out of the computer.  And that was

7      in the back room.  We'd have to go get it, bring

8      it out, put it up on the shelf.  Wash floors

9      sometimes.  Because we had nobody else to do it.

10     I mean, I could tell people to do it, if I had

11     them.  But most of the time it was me and the

12     cashier.  So all that stuff fell on me.  So I'd

13     say about two hours.

14                You did the deposit.  You set up

15     the drawers.  Went to the bank.  Probably took

16     two hours, total.  And then the rest -- you

17     know.  The rest of the time you were doing

18     non-managerial.

19          Q.    And how did that effect your

20     ability to manage the store?

21          A.    I mean, you couldn't manage the way

22     you really wanted to.  I mean, you couldn't

23     delegate a lot of things.  You had to do it

24     yourself.  It just put too many constraints on

25     you.  You just didn't have the hours to deal

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Laurent Tremblay**                                      July 15, 2011

Page 177

1                    L. Tremblay, 7/15/11

2      with what they wanted done.  You just couldn't

3      do it in the time they allotted.

4              Q.    How did District Manager Suffelleto

5      treat you?

6              A.    Not very well.

7              Q.    How is that?

8              A.    He was very condescending.

9      Threatened a lot.  You know.  Not "I'm going to

10     kill you," or anything like that.  But, "You've

11     got to work six days.  You've got to work seven

12     days.  I want this done now.  You've got to get

13     this done for us."  You know.  Very -- very

14     condescending sometimes.

15             Q.    How did that compare to District

16     Manager Jean?

17             A.    Jean Duval?  They were both -- Jean

18     might have been a little bit nicer in front of

19     you.  But, you know, when it came down to if it

20     was going to effect him, he just would rip you a

21     new -- whatever.  You know.

22             Q.    You mentioned that you would work

23     the register sometimes?

24             A.    Yes.

25             Q.    How often were you on the register

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Laurent Tremblay                                           July 15, 2011

Page 178

 1                    L. Tremblay, 7/15/11

 2    on, like, a daily basis?

 3        A.    Anywhere from -- I'd say an hour to

 4    two hours.  Sometimes.  Depends on if -- if

 5    somebody was late and there was nobody there,

 6    you had to ring.  You know.  If the girl was a

 7    half hour late and you rang for the lunch and

 8    her breaks, it might amount to an hour and a

 9    half, two hours.  You know.

10            While you're doing that, you can't

11    do anything else.  You've got no way to be there

12    for the customer.  I mean, you could walk up to

13    the office.  By the time you get there, you've

14    got somebody waiting.  You walk back down.  You

15    go back and forth.  It's hard to get things

16    done.

17        Q.    Were you able to see every part of

18    the store while you were on the register?

19        A.    No.  No.  You could see -- I mean,

20    you had a little walkway in the back of the

21    register, which was probably, I'd say, ten feet.

22    So you were kind of constricted to, like, maybe

23    three aisles.  So...

24        Q.    How did your position as a store

25    manager at Rite Aid compare to when you were a

Page 179

 1                    L. Tremblay, 7/15/11

 2      store manager at Brooks?

 3             A.    When we were at Brooks, we had more

 4      hours.  Rite Aid came in and cut our hours.  The

 5      only time we got extra hours is when it wouldn't

 6      benefit -- most of the time it was going to

 7      benefit the district manager.  His boss was

 8      going to come in.  He'd give you a few hours to

 9      get the store to look good so he would look

10      good.  Otherwise, they were "Stick to your

11      budget."  I had better bonuses with Brooks.

12                    It was just a much better

13      atmosphere working for Brooks than it was at

14      Rite Aid.

15             Q.    Did you have more control as a

16      store manager at Brooks than you had at

17      Rite Aid?

18             A.    Yes.

19             Q.    Why is that?

20             A.    The district manager would kind of

21      tell you, you know, if you've got to use a few

22      more hours, use them.  You know.  Use them for

23      what you need.  Not -- you know.  Just don't add

24      ten hours onto your schedule; but, if you fall

25      behind a little bit and you need a few extra

Page 180

```
 1                    L. Tremblay, 7/15/11
 2    hours, go ahead and use them.
 3            Q.    At Rite Aid as a store manager did
 4    you have any ability to schedule overtime?
 5            A.    No.
 6            Q.    Why is that?
 7            A.    They didn't want to -- you know.
 8    They didn't want to pay anybody any overtime.
 9    So it was kind of frowned upon to schedule
10    anybody overtime.
11            Q.    You mentioned during your testimony
12    that there was a code for deactivating the alarm
13    in the office.  Correct?
14            A.    Yes.
15            Q.    And that code was available to the
16    store manager, the assistant store manager, and
17    the shift supervisors?
18            A.    Yes.
19            Q.    Why was that code given to all
20    three?
21            A.    Because we either had to open the
22    store or close the store.  So -- the key people
23    could open or close.  So they could set the
24    alarm if they came in in the morning or left at
25    night.  Same thing with the assistant.  You
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Laurent Tremblay**                                                    **July 15, 2011**

Page 181

```
 1                    L. Tremblay, 7/15/11
 2    know.  She had to close the store.  The pharmacy
 3    had their own alarm system and gates.  Some of
 4    the stores had gates.  Some didn't.  Some just
 5    had an alarm system.  If you went near it, it
 6    would go off.  But everybody that had a code
 7    could close or open the store.
 8           Q.    And would you say that those three
 9    positions all were responsible for the same
10    types of duties?
11           A.    Oh, yes.  Cash control.  Doing --
12    you know.  Putting up the stock.  Whatever.  We
13    all did what we could while we were there.  So,
14    everybody that -- if I wasn't there and the
15    assistant was there, she was responsible for the
16    store.  And if it were a key person, we held
17    them responsible for the store, if we weren't
18    there and the assistant wasn't there.  So they
19    were responsible for the condition of the store
20    when they left at the end of the night.
21           Q.    Some of the exhibits that we looked
22    at, we went over some training forms that were
23    signed.  I think it was Exhibit 7 and 8, 9, 11.
24    Did you have any control in deciding what
25    training to give to employees?
```

Page 182

```
 1                   L. Tremblay, 7/15/11
 2         A.    No.  It was -- it came in a packet.
 3   And we had them each sign papers, whatever was
 4   in the packet, according to their position.  Key
 5   people had to sign maybe one more page that was
 6   different than a cashier.  It was training that
 7   came down, all came down from headquarters.  And
 8   it was all on the computer.  So we didn't really
 9   train.  We just set them up.  There you go.  And
10   everybody signed each one of these.  You know.
11   They had an I9.  They had all these documents to
12   get hired.  So we were all responsible for that
13   stuff.
14              MS. RUBIN:  I think that's all I
15         have.
16                   REDIRECT EXAMINATION
17   BY MR. WEINER:
18         Q.    Mr. Tremblay, you mentioned that
19   the closing manager was responsible for the
20   condition of the store at the end of the day.
21   Is that right?
22         A.    Yes.
23         Q.    And if you were the opening manager
24   and you came in the following day, is that one
25   of the things you would take a look at; to see
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Laurent Tremblay                                                    July 15, 2011

Page 190

```
 1              A C K N O W L E D G M E N T

 2

 3    STATE OF NEW YORK        )

 4                             :ss

 5    COUNTY OF                )

 6

 7            I, LAURENT TREMBLAY, hereby certify

 8    that I have read the transcript of my testimony

 9    taken under oath in my deposition of July 15,

10    2011; that the foregoing transcript is a true,

11    complete, and correct record of my testimony;

12    and that the answers on the record as given by

13    me are true and correct.

14

15                      _____

16                      LAURENT TREMBLAY

17

18    Signed and subscribed to before me

19    this  9   day of  August       , 2011.

20

21    _____

22    NOTARY PUBLIC

23              RAYMOND E. GRAMLICH JR.
                    Notary Public
24         Commonwealth of Massachusetts
              My Commission Expires
25              November 9, 2012
```

REPORTED BY: Janet Hamilton, RPR                    www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400

Exhibit LLL

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YATRAM INDERGIT, on behalf<br>of himself and others<br>similarly situated,<br><br>                    Plaintiff,<br><br>    VS.<br><br>RITE AID CORPORATION, RITE<br>AID OF NEW YORK, INC., and<br>FRANCIS OFFOR as Aider &<br>Abettor,<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)  CIVIL ACTION NO.<br>)  1:08-cv-09361-PGG-<br>)  HBP<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

DEPOSITION OF RUSSELL H. WHINDOM
Los Angeles, California
Thursday, August 11, 2011

Reported by:  NIKKI ROY
              CSR No. 3052

Page 69

```
 1      A.  Yes.
 2      Q.  So would one of your job duties then be making
 3  sure the store was profitable?
 4          MR. SABA:  Objection; form.
 5          THE WITNESS:  Carrying out the mandates of
 6  corporate as far as merchandising is concerned.  That
 7  would be a manager duty, which I did, yes.  As far as
 8  where that merchandise went and ordering that
 9  merchandise to be profitable, no, that was done by corp.
10  BY MS. LIVELY:
11      Q.  But you would agree, though, that part of your
12  job duties included the profitability of the store,
13  correct?
14          MR. SABA:  Objection; form.
15          THE WITNESS:  Yes, I was responsible for.
16  BY MS. LIVELY:
17      Q.  Did you ever work at a store that was known as
18  a training store for Rite Aid?
19      A.  No.
20      Q.  Do you know if there were any in your district?
21      A.  Define "training."
22      Q.  A store where they send new hires to learn to
23  be trained on a regular basis.
24      A.  No.
25      Q.  With the exception of the Burien store, was the
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Russell H. Whindom                                        August 11, 2011

Page 70

```
 1    store manager -- you -- were you as the store manager
 2    the highest ranking employee at the store level?
 3         A.  At the store level?
 4         Q.  Yes.
 5         A.  Just concerning the store itself?
 6         Q.  Yes.
 7         A.  Yes.
 8         Q.  Were your -- the ASMs that you had at the
 9    different stores, were they all salaried or were some of
10    them hourly?
11         A.  5201, the last time, hourly.
12         Q.  And do you know why that was?
13         A.  Not exactly, no.
14         Q.  Did you hire that ASMs who's hourly --
15         A.  No.
16         Q.  -- or was they -- was he or she changed?
17         A.  Changed.
18         Q.  Did you ever promote any individuals into the
19    ASM position?
20         A.  I made recommendations and some were promoted
21    into assistant manager positions.
22         Q.  Who did you make recommendations to?
23         A.  District manager.
24         Q.  And how did you get the information in order to
25    make a recommendation?
```

**Page 71**

1      A.  Worth -- work ethics, how they handled people.

2      Q.  Anything else?

3      A.  No.

4      Q.  And was that based on your own observations?

5      A.  Yes.

6      Q.  Approximately how many individuals did you

7   recommend for an ASM position?

8      A.  Over the years, 10, 15.

9      Q.  And were all of them promoted?

10     A.  I don't recall.  I'm going to say probably.

11     Q.  When you made recommendations for an individual

12   to be promoted into the ASM position, did you make any

13   recommendations on their rate of pay?

14     A.  No.

15     Q.  At 5220, did you participate in any way in the

16   hiring of employees?

17     A.  Yes.

18     Q.  And what was your level of participation in

19   hiring employees?  Excuse me.

20     A.  I would take applications, review the

21   applications, decided on which one to interview or how

22   many to interview.  I would interview them.  I could not

23   offer them a position until forms were filled out,

24   background checks were done by corporate and human

25   resources signed off after the background checks were

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Russell H. Whindom                                            August 11, 2011

Page 72

1    completed, and if warranted, a drug check.  Then I could
2    call them back in and offer them a position.
3        Q.  And was that consistent -- that process
4    consistent during the entire ten years you were at 5220?
5        A.  No, that was the last part of the -- prior to
6    that --
7        Q.  Okay.  Go ahead, please.
8        A.  Okay.  You want me --
9        Q.  I was going to say when did that change?
10       A.  I don't recall what year it changed, but prior
11   to that, I could interview somebody, offer them a
12   position, hire them, background check done after --
13   basically after they were hired.  If it came back bad,
14   then I fired them.  Prior to that, no background checks
15   were completed.  I did all the hiring and basically
16   firing.  On a yearly basis I don't know what, where the
17   breakdown was.  I...
18       Q.  Okay.  Do you remember generally -- and -- and
19   I know one of the questions you answered before you kind
20   of went back to how long before your retirement was.  Do
21   you recall generally how many years before your
22   retirement that this last -- where you had to have the
23   background check and HR sign off on it that was in place
24   before your retirement?
25       A.  I don't.

**Page 73**

```
 1      Q.  And did that vary -- taking the years out of

 2   it, did that vary by store at all?  In other words,

 3   was -- did the process -- I guess it would have all been

 4   at 5220, 5212 and 5201.  Did they all have --

 5      A.  Same process.

 6      Q.  -- the same process?  Okay.

 7          Did you ever have your assistant store managers

 8   participate in this interview process that you've

 9   described?

10      A.  They would sit in on occasion just as a

11   training.

12      Q.  Between 5220, 5212 and 5201, did -- were there

13   any of the stores that had different departments

14   compared to the other?

15          I think we've already established they all had

16   pharmacy and photo lab.  Were there certain stores that

17   had other departments that -- was there one -- perhaps

18   5220 that had departments that 5201 didn't?

19          MR. SABA:  Object to form.

20          THE WITNESS:  Between 5220 and 5201, all the

21   basic departments were basically the same.  5212 had the

22   core departments as far as cosmetics, toiletries, paper,

23   chemicals all downsized to fit the configuration of the

24   store.  And they did not have all the departments that

25   the larger stores did.
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Russell H. Whindom                                     August 11, 2011

**Page 84**

```
 1        A.   Right.

 2        Q.   -- add?

 3             And would that be one employee typically?

 4        A.   One -- one employee.

 5        Q.   And at Renton, did you have to add more

 6   employees during the Christmas holiday as well?

 7        A.   I did not add employees.  I gave -- I added

 8   hours.

 9        Q.   I'm sorry.  For clarification, at the Renton

10   store, did you add the number of employees scheduled to

11   work those shifts during the Christmas period?

12        A.   Yes.

13        Q.   And during your last four years at 5220, was

14   there a regular time that you were there or did that

15   vary?

16        A.   A lot of the time I was there scheduled 7:00 to

17   5:00.  I would also work a 12:00 to 10:00.

18        Q.   And is that five days a week, six days a week,

19   seven days a week?

20        A.   Five days a week.

21        Q.   So typically 7:00 to 5:00 --

22        A.   Scheduled.

23        Q.   Right.  So -- sorry.  You were typically

24   scheduled five days a week from 7:00 to 10:00, but

25   sometimes you would do a -- or I'm -- strike that.
```

**Page 85**

1            My understanding is that typically you would

2    five days a week work a schedule of -- be scheduled for

3    7:00 to 5:00, and sometimes you would be scheduled for

4    12:00 to 10:00; is that correct?

5        A.   Correct.

6        Q.   And did you usually work in addition to your

7    scheduled hours?

8        A.   Yes.

9        Q.   And if you could say during those last four

10   years at 5220 what your typical work schedule was, what

11   would it have been, as far as hours you actually worked?

12       A.   You want total hours?

13       Q.   Let's say, per day or per week.

14       A.   60 to 65 hours.

15       Q.   Per week?

16       A.   Per week.

17       Q.   And was that consistent during that your -- the

18   entire last four years at 5220?

19       A.   Yeah.  Now, seasons were a different story,

20   especially the Christmas season, and inventory.

21       Q.   How often did inventory occur?

22       A.   Once a year.

23       Q.   And how many hours you -- would you say you

24   worked during inventory a week?

25       A.   We usually started getting ready for inventory

Page 86

1    two weeks prior, so I'm going to say 75 to 80 hours a

2    week for two weeks.

3              Q.   And what about Christmas?

4              A.   Christmas was 70 hours a week.

5              Q.   And for how many weeks would that go on?

6              A.   That would go from Thanksgiving to basically

7    January 1st.

8              Q.   So roughly four weeks?

9              A.   Yeah.

10             Q.   Did you take vacations where you were gone for

11   more than a few days at a time during the time you were

12   store manager at 5220 in those last four years?

13             A.   Week at a time.

14             Q.   And how many weeks of vacation?

15             A.   Five weeks.

16             Q.   Did you take your vacation every year that you

17   were allotted?

18             A.   Missed a few days here and there.

19             Q.   And were there ever weeks, not including

20   vacation weeks during those last four years at 5220

21   where you were working less than 60 hours a week?

22             A.   No.

23             Q.   And what about during -- at Renton, during the

24   last period you were there, how many -- strike that.

25                  At Renton during the end of your career with

Page 87

1   Rite Aid, what -- did you have a typical schedule as far
2   as scheduled hours?
3          A.   Scheduled hours?
4          Q.   Uh-huh.
5          A.   Same amount of hours scheduled.
6          Q.   And how about hours actually worked?
7          A.   7:00 to 5:00 with a few 12:00 to 10:15.
8          Q.   So at Renton the second time, were you
9   typically working about 40 -- 40 to 45 hours a week?
10         A.   No.
11         Q.   I'm trying to find out how many hours you
12  actually worked at Renton the second time you were
13  there.
14         A.   Second time?
15         Q.   Yes.
16         A.   Per week?
17         Q.   Yes.
18         A.   I'm going to say 55 to 60 with the exception of
19  holidays, et cetera.
20         Q.   Did you --
21         A.   Inventory.
22         Q.   Did you go through --
23         A.   I didn't go through an inventory at Renton.
24         Q.   That's what I was just going to ask you.
25              Did you take any vacation when you were at

Page 102

1    directives of the store manager and to run the store in

2    the absence of the store manager.  I didn't assign

3    anybody anything different than I would another store

4    manager -- or assistant manager.

5         Q.  So there weren't -- there wasn't one store

6    manager who you thought this person is fabulous, I'm

7    going to give them additional duties that I think

8    somebody who's marginal as an ASM might be?

9         A.  No, you work with the marginal ones and bring

10   them up to speed.

11        Q.  Did you do performance evaluations for ASMs?

12        A.  Yes.

13        Q.  And I should phrase that better.  Did you --

14   did you prepare performance evaluations -- evaluations

15   for ASMs, did you write them?

16        A.  Define "prepare."

17        Q.  Did you write them?

18        A.  They wrote their preliminary evaluations and I

19   evaluated them on their performance on the previous year

20   in the categories that were given out in the forms.

21        Q.  And was part of what you were evaluating them

22   on what you had observed by walking around?

23        A.  What I observed of their work ethics, how they

24   performed their job and aspects of the assistant

25   manager's job description and whether they were

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Russell H. Whindom                                        August 11, 2011

Page 103

1    performing those duties.

2         Q.   Who were would you say were your -- strike

3    that.

4              Do you remember the names of the ASMs that you

5    thought were your strongest ASMs?

6         A.   No.

7         Q.   None of them?

8         A.   Well, the last one who was still -- she was

9    fairly new.  She got thrown into the situation that she

10   really didn't want to be into.  The one previous to

11   that, he moved to San Diego as an assistant manager.  I

12   mean, he was accepted as -- as an assistant manager down

13   there at one point.

14        Q.   What was the name of this last one, the woman

15   who was thrown in a situation where she --

16        A.   Stacy -- I can't remember her last -- her last

17   name.  5201.

18        Q.   Did you ever manage somebody named Renee Hoff?

19        A.   Renee Hoff.

20        Q.   Yeah.

21        A.   No.

22        Q.   Of Mr. Sand, Mr. --

23        A.   Smolinski.

24        Q.   -- Smolinski -- thank you -- and Mr. Mahoney,

25   which of them gave you the most discretion in running

Page 104

1     your store?

2              MR. SABA:   Objection; form.

3     BY MS. LIVELY:

4         Q.   Excuse me.

5         A.   There really wasn't any discretion in -- given

6     out as far as how to run the store.   We all have

7     corporate policies to follow.   They initiate and follow

8     up on whether those corporate policies are being done as

9     well as directives on merchandising, whether they're

10    being followed.

11        Q.   And of --

12        A.   They're doing their job to see that we're doing

13    our job.

14        Q.   And of those three, was there one of them who

15    was more persistent in his follow-up compared to the

16    others?

17        A.   I would say Marv Sand.

18        Q.   And in what ways was he more persistent, what

19    did he do?

20        A.   If there was a directive that needed to be done

21    tomorrow, he would follow up tomorrow to see if it was

22    done.   Mr. Mahoney might take a couple of days.

23        Q.   Were any of them ever rude to you in their

24    follow-up?

25        A.   No.

Page 105

```
 1       Q.  Was the assistant store manager the second

 2  highest ranking individual in the store when you were

 3  there?

 4       A.  You talking total store?

 5       Q.  Yeah, in the store, yes.

 6       A.  Including pharmacy?

 7       Q.  Yes.

 8       A.  See, that's a -- they're -- they're two

 9  separate entities.

10       Q.  Okay.

11       A.  Okay?  There's a pharmacy manager, store

12  manager.

13       Q.  Okay.

14       A.  Now, as far as the store is concerned, yes,

15  they were the ultimate store second in charge.

16       Q.  Would the pharmacy manager have been your peer

17  or would you have ultimately been higher than him or her

18  on a hierarchy?

19       A.  I'm responsible for the whole store.

20       Q.  Including the pharmacy?

21       A.  Including the pharmacy, although I had very

22  little or no say over the pharmacy.

23       Q.  Okay.  But if something went wrong with the

24  pharmacy, ultimately it would come back to you?

25       A.  It would bite me.
```

Page 106

1      Q.   Okay.  What job duties do you believe are most

2   important in your role as a store manager?

3      A.   Following the directives of corporate,

4   profitability.

5      Q.   Anything else?

6      A.   Making sure the store is run on an efficient...

7      Q.   And do you believe you were good at all of

8   these tasks?

9      A.   I believe I was.

10     Q.   Do you believe that you had any specific

11  weaknesses as a store manager?

12     A.   Maybe not micromanaging the store as much as I

13  probably should have as far as -- and that -- that's

14  also a time issue on being able to do things 110

15  percent.

16     Q.   So explain to me what that means to not

17  micromanage as much as you should have.

18     A.   Well, if I gave somebody a task to do or two or

19  three people tasks to do, a lot of times I didn't have

20  time to follow up and make sure that they were done

21  correctly or done.

22     Q.   What took up the most amount of your time?

23  Let's -- you can go through the last four years as you

24  were working as a store manager.  If you had to say on a

25  daily or weekly basis what tasks took up most of your

Page 107

1   time, what would they be?

2        A.  Making sure the store was full, making sure the

3   monthly planner is initiated and merchandise put out

4   that was sent in for the monthly planner, planograms,

5   which we'd get two, three a week, making sure that they

6   were done or doing them yourself.

7        Q.  Did employee issues, if you will, problems with

8   employees take up any significant amount of your time?

9        A.  Not a lot.  They -- it'd depend on the issue.

10  If it was a small issue as far as discipline is

11  concerned, you know, 15, 20 minutes, you know, sitting

12  down with them.

13       Q.  Did you participate in -- with new hires in any

14  of the actual training that they received as far as

15  either computer-based training or going through new hire

16  paperwork training, anything like that?

17       A.  New hire paperwork was all done on the

18  computer.  Training as far as the cashier is concerned,

19  and that's where they first went, I generally had a

20  couple of good cashiers that they would work with.  As

21  far as them doing any merchandising, they would work

22  with a seasoned employee.

23       Q.  Okay.  Did you try to divide a certain amount

24  of your time on any sort of consistent basis between how

25  much time you would be in your office versus how much

Page 108

1    time you would be walking the floor?

2          A.   I would generally be in my office for two hours

3    or less daily.  The rest of the time would be on the

4    floor either facing, putting out merchandise, doing

5    planograms.

6          Q.   Blue dots?

7          A.   Putting out merchandise, blue dots, pulling

8    back room stock.

9          Q.   When you were doing these items such as pulling

10   back room stock or putting out merchandise, were you

11   ever working with another employee?

12         A.   No.

13              MR. SABA:  Objection; form.

14   BY MS. LIVELY:

15         Q.   When you were doing tasks such as merchandising

16   or pulling stock, were you still in charge of the store?

17         A.   Yes.

18         Q.   When you were engaging in those duties, did you

19   still attempt to observe what was going on around you as

20   far as was the store clean or safe or what have it?

21         A.   Cleaning, make sure the floor is clean, make

22   sure the aisles are faced, yes.

23         Q.   Did your job duties as a store manager change

24   over time in the last ten years of employment with Rite

25   Aid?

Page 109

 1        A.  I don't think I understand your question, what
 2   you're getting at.
 3        Q.  I'm trying to find out, when you -- you've been
 4   a manager for a long time.
 5        A.  Uh-huh.
 6        Q.  Not everyone who we question has been a manager
 7   for a long time.  And so some people when they start off
 8   as a manager, they're spending more time learning how to
 9   read reports.  And obviously as you became more
10   seasoned, maybe you need to spend less time doing that
11   and more time observing and walking around.
12            You came in -- my understanding is you came to
13   Rite Aid already an experienced manager.
14        A.  Yes.
15        Q.  So did your focus, as far as what you were
16   working on, change in the last ten years that, when I
17   started off I was really focused heavily on these tasks,
18   and that changed, so by the end I was more focused on
19   these tasks or directives?
20            MR. SABA:  Wait.  I'm sorry.  When you're done,
21   wait one second.
22            Objection; form.
23            And you can answer if you can.
24            THE WITNESS:  Okay.  Ten years ago we had more
25   autonomy.  As the years progressed down, corporate took

Page 110

1   over many of the directives that the store manager had

2   to do.

3   BY MS. LIVELY:

4        Q.   Can you give me some examples of what those

5   directives that were taken over were?

6        A.   Mandating where merchandise was to be placed,

7   tightening the budgets, what merchandise could -- we

8   couldn't order merchandise that we thought would sell in

9   the store from a vendor.  It was all done -- this is all

10  done by corporate.  We were basically told what we

11  could -- what was to come in the store and where it was

12  put.

13            The monthly planner, ten years ago we didn't

14  have.  It's got more -- I don't know how to say it.

15  The -- it's more of an issue in the last two to four

16  years that it had to be followed to the T.  Even if you

17  didn't have the merchandise for the end, you were to set

18  that end.  If you had two items or three items on an end

19  and you only had two items, the other shelf stayed

20  empty, if you even got that merchandise at all.

21            It's really tough to sell empty space and make

22  a profit.  So yeah, it's changed.

23        Q.   In the last two to four years of your

24  employment as a store manager with Rite Aid, did you

25  have any discretion in where merchandise was placed?

Page 111

```
 1        A.  As far as the basic tables were concerned, no.
 2   As far as the planogram or the monthly planner, no.
 3   Seasonal, there was a little wiggle room there.  Not all
 4   stores got the same amount of merchandise and/or type of
 5   merchandise, especially in the Christmas and the summer
 6   seasonal merchandise.  So we were able to put at our
 7   discretion in different areas.
 8        Q.  And what about ordering merchandise, in the
 9   last two to four years of your employment as a store
10   manager with Rite Aid, did you have any discretion in
11   what type of merchandise should be ordered?
12        A.  Ad goods.
13        Q.  Pardon me?
14        A.  Ad goods.  That was done on a weekly basis.  We
15   had the ad that we went through.  We were able to order
16   what we thought would sell.  Not always getting what we
17   wanted.  We -- like I say, we did that on a weekly
18   basis.  That had to be done by Sundays every week.
19        Q.  When you were performing tasks such as
20   merchandising or pulling freight, you made the decision
21   that you would do those tasks, correct?
22        MR. SABA:  Objection; form.
23        THE WITNESS:  Made the decision based on the
24   help I had at that time and what needed to go out at
25   that time.  If I had no hourly employees to do that, I
```

Page 143

1        Is that correct?

2        A.  Okay.  The retail -- or the budgeted sales is

3   set by corporate.  The retails are set by corporate.  I

4   have no control over this.

5        Q.  But were you responsible for meeting those

6   budgets?

7        A.  I was responsible for meeting them, but

8   without -- without my control, it's awful tough to do.

9   I mean, as a store manager, if somebody else is

10  budgeting it and somebody else is setting the prices,

11  which ultimately gives you the margin, I don't feel that

12  I was responsible for that portion of it.

13       Q.  Well, I'm not asking you whether you were

14  responsible or whether this document says you were

15  responsible for setting the budget or the margin.  It

16  asked whether you were responsible for meeting the store

17  retail budgeted sales.

18            Would you agree that you were responsible for

19  meeting store retail budgeted sales?

20            MR. SABA:  Objection; form.

21            THE WITNESS:  I was -- basically under the

22  store budget, yes, I was responsible for meeting, but I

23  had no control meeting.

24  BY MS. LIVELY:

25       Q.  Right, but part of your goal of your job was to

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Russell H. Whindom                                      August 11, 2011

Page 144

```
 1   meet whatever your budgeted sales goal was; is that
 2   correct?
 3            MR. SABA:  Objection; form.
 4            THE WITNESS:  Yes.
 5   BY MS. LIVELY:
 6       Q.  And then the other thing that it looks like you
 7   have crossed out is on No. 3 which is, "Utilize and
 8   follow StaffWorks to ensure that labor is scheduled,"
 9   and I show that you have crossed out "to meet customer
10   service"; is that correct?
11       A.  Yes.
12       Q.  And why did you cross that out, sir?
13       A.  It's basically not meant for customer service.
14   StaffWorks -- the labor scheduling was to meet the
15   budget that was handed down by corporate.  Customer
16   service had nothing to do with -- with the budget as far
17   as StaffWorks is concerned.  It was set -- in other
18   words, the labor is set to the budget and it does not
19   necessarily mean customer service needs.
20       Q.  Would you --
21       A.  We had to live with the budget that was given
22   us, whether it satisfied the customers' needs or not.
23       Q.  Would you agree that providing good customer
24   service was part of your job responsibilities?
25       A.  Yes.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP**
**Russell H. Whindom**                                              **August 11, 2011**

**Page 145**

1      Q.  And would you agree that making sure your

2   associates provided good customer service was one of

3   your job responsibilities?

4      A.  Yes.

5      Q.  And then the last thing as far as I can see

6   that you have crossed out is on No. 9.

7      A.  Uh-huh.

8      Q.  You crossed out "For hiring"; is that correct?

9      A.  Yes.

10      Q.  Why did you cross that out?

11      A.  Because I -- I did not have the ultimate say in

12   who was hired and who was not hired.

13      Q.  But you did have the say in who was

14   interviewed, correct?

15      A.  Correct.

16      Q.  And you did have the say in recommending a

17   hire; is that correct?

18      A.  I did, but it held no weight.

19      Q.  How do you know that?

20      A.  Because if they didn't pass background tests

21   for whichever reason why, I was unable to hire that

22   person whether I liked to or not.  If I liked to hire

23   that person, I did not have an override on background

24   checks.

25      Q.  Other than background check, did your

Page 146

1   recommendation -- strike that.

2           Other than the background check, was it your

3   understanding that your recommendation was important to

4   the hiring decision?

5       A.  Yes.

6       Q.  Other than the background check -- actually,

7   strike that.

8           Did you ever have a hire that you recommended

9   not be hired because they failed a background check?  I

10  think I phrased that in a double negative.  Let me try

11  again.

12      A.  I think we need to rephrase that.

13      Q.  Yeah.  Did you ever recommend someone for hire

14  who was not hired because they failed the background

15  check?

16      A.  Yes.

17      Q.  Did you ever recommend somebody for hire who

18  was not hired for reasons other than the failing the

19  background check?

20      A.  No.

21      Q.  Aside from the items that you have lined out on

22  Exhibit 2, were all of the other items listed as duties

23  and responsibilities duties and responsibilities that

24  you in fact at one time or another as a store manager

25  were responsible for?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Russell H. Whindom                                    August 11, 2011

Page 212

1       A.  Yes.

2       Q.  Do you know what factors went into whether you

3   received a bonus?

4       A.  EBITDA, sales.  I think those are the two

5   factors in -- plus customer service, three factors.

6       Q.  Were hourly employees at your store, aside from

7   pharmacists, eligible for bonuses?

8       A.  No.

9       Q.  Did you receive stock options from Rite Aid?

10      A.  Yes.

11      Q.  Do you know whether hourly associates were

12  entitled to stock options?

13      A.  No.

14      Q.  No, you don't know, or no, they were not?

15      A.  They were not.

16      Q.  Did you ever lodge any sort of complaint

17  against Rite Aid to their associate hotline or to human

18  resources --

19      A.  No.

20      Q.  -- you personally?

21      A.  No.

22      Q.  Did you know you could have?

23      A.  Yes.

24      Q.  During the time you were employed as a store

25  manager, did you ever complain to anyone about not

Page 213

1    receiving overtime?

2         A.   No.

3         Q.   And you understood that as a salaried exempt

4    employee, you were not -- you would not be receiving

5    overtime; is that correct?

6         A.   Correct.

7              MS. LIVELY:   That's all I have.  Thank you.

8              MR. SABA:   Thank you.

9              We take a quick break.

10             (Recess from 5:03 p.m. to 5:39 p.m.)

11

12                       EXAMINATION

13   BY MR. SABA:

14        Q.   Okay.  Mr. Whindom, thank you for bearing with

15   us.  We know it's been a long day.  I have a couple

16   questions that I want to ask you.

17        A.   Okay.

18        Q.   As a store manager at Rite Aid, did you feel

19   that you had the discretion to properly manage your

20   store?

21             MS. LIVELY:   Objection; vague.

22             THE WITNESS:   No.

23   BY MR. SABA:

24        Q.   Why not?

25        A.   All policies were dictated from corporate.  We

Page 214

1   were told where to put the merchandise, we were told how
2   to price the merchandise.  We were told basically how to
3   run the store by corporate standards and it was dictated
4   by corporate.
5        Q.  Prior to joining Rite Aid, you were a store
6   manager at Skaggs Drug; is that correct?
7        A.  Correct.
8        Q.  Generally speaking, how did your managerial
9   responsibilities and duties in that role compare to
10  being a store manager at Rite Aid?
11       A.  Basically it was a 180 degree turn.  Skaggs, I
12  was able to buy my own merchandise, price my own
13  merchandise, display my own merchandise where I deemed
14  fit.  Rite Aid, I could not do this.
15       Q.  Were you responsible for the profitability at
16  your stores as a store manager at Skaggs Drug?
17       A.  Yes.
18       Q.  And did you feel as though you had the autonomy
19  in that previous position to control profitability?
20       A.  Yes.
21       Q.  How did that compare to being a store manager
22  at Rite Aid?
23       A.  I could price my own merchandise.  Rite Aid, I
24  could not.  I could display my own merchandise where I
25  wanted it.  Rite Aid tells me where to put the

Page 215

1   merchandise.  I could order promotions.  Rite Aid orders

2   the promotions for me, tells me where to put it.  We did

3   very well in pricing our own merchandise at Skaggs Drug.

4   Our profitability was there.  Rite Aid, although the

5   profit is there to a certain extent, the sell-through on

6   merchandise, which we have to mark down if it isn't a

7   sell-through, takes away from the profitability of the

8   store.

9        Q.  Okay.  I want to talk to you a little bit about

10  the hours that you worked --

11       A.  Okay.

12       Q.  -- at Rite Aid.  Okay?

13          For clarification -- and I guess we can talk

14  just generally about the last four years -- on average,

15  how many hours per week percentage-wise did you work as

16  a store manager at Rite Aid?

17          MS. LIVELY:  Objection; vague.

18  BY MR. SABA:

19       Q.  Do you understand what I'm --

20       A.  No.

21       Q.  -- what I'm asking you?  Let me ask it again.

22  In 2007, how many hours per week did you work an

23  average?

24          MS. LIVELY:  Asked and answered.

25          THE WITNESS:  About 65.

Page 218

1   overtime involved.

2        Q.  So was that your -- did you believe that to be

3   your overtime pay?

4        A.  I have no idea.  There was no explanation.

5        Q.  All right.  You were paid biweekly; is that

6   correct?

7        A.  Correct.

8        Q.  Did your compensation change on a weekly basis

9   when you went hourly?

10       A.  Well, you got paid for every 15 minutes over

11   45.  Did I make more as an hourly employee?  Yes.

12       Q.  Okay.

13       A.  Versus an exempt employee on a

14   biweek-by-biweek.

15       Q.  All right.  Ms. Lively asked you a lot about

16   your responsibilities as a store manager.  I want to

17   talk to you a little bit about what your duties were as

18   a store manager.

19           Do you understand what I mean when I say

20   "nonmanagerial duties"?

21       A.  Yes.

22       Q.  What --

23           MS. LIVELY:  Calls for a legal conclusion.

24   BY MR. SABA:

25       Q.  Do you understand what -- what is

**Page 219**

```
 1   "nonmanagerial duties"?

 2        A.   Any duties other than supervising the running

 3   of the store.

 4        Q.   Okay.  And what nonmanagerial duties did you do

 5   as a store manager at Rite Aid?

 6        A.   Unloading the truck, putting merchandise on the

 7   sales floor, doing the blue dot system, pulling back

 8   room merchandise, doing planograms, sometimes sweeping

 9   the floor, facing the floor.

10        Q.   Cleaning the store?

11        A.   Yes.

12        Q.   What is "back room pull sheets"?

13        A.   Back room pull sheets is merchandise that was

14   sold the previous day that's basic merchandise and

15   nonbasic merchandise.  Could be end cap merchandise,

16   side end merchandise which is not basic.  Those change

17   out on a monthly basis.

18             Now, this merchandise was sold the previous

19   day.  Might have ten in the back room, you sold one, you

20   take one out of the back room.  You have to scan it with

21   a scanner to reduce the number in the back room, put it

22   on the floor, merchandising on the floor.

23        Q.   Over the last three years, what percentage of

24   your time do you believe you spent on nonmanagerial

25   tasks in any given week?
```

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Russell H. Whindom                                    August 11, 2011

Page 220

1           MS. LIVELY:  Calls for speculation.

2           THE WITNESS:  65, 70 percent.

3    BY MR. SABA:

4       Q.  And you testified earlier that you would work

5    the register at times; is that correct?

6       A.  That's correct.

7       Q.  How can you properly supervise your employees

8    when you're working a register?

9           MS. LIVELY:  Objection; assumes facts not in

10   evidence.

11          THE WITNESS:  Outside of the register area, you

12   cannot.  You cannot leave.  If you're cashiering, you

13   cannot leave your register.

14   BY MR. SABA:

15      Q.  I want to talk to you a little bit about the

16   differences between an associate store manager and a

17   store manager.  All right?

18      A.  Associate store manager?

19      Q.  Uh-huh.  An ASM.

20          MS. LIVELY:  An assistant store manager?

21   BY MR. SABA:

22      Q.  Excuse me.  An assistant -- yes, it's a long

23   day.  Assistant store manager or we've been using ASM.

24   All right?

25      A.  Right.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Russell H. Whindom                                              August 11, 2011

Page 221

 1      Q.  Generally speaking, what do you believe the

 2  differences are between a store manager and an

 3  assistant -- or assistant store manager?

 4      A.  None.

 5      Q.  Is the assistant store manager ultimately

 6  responsible for the profitability of the store?

 7      A.  Yes.

 8      Q.  Why?

 9      A.  Because they are also there to implement the

10  plans set down from corporate as pricing --

11      Q.  Okay.

12      A.  -- merchandise, locations.

13      Q.  All right.  Let's talk about a few other

14  questions -- or let me ask you a few other questions and

15  we can get you out of here.

16          Did you have the discretion to schedule

17  overtime for your employees?

18          MS. LIVELY:  Asked and answered.

19          THE WITNESS:  No.

20  BY MR. SABA:

21      Q.  Why not?

22      A.  Not in the budget.

23      Q.  Did you have the discretion to change the

24  budget?

25      A.  To change the budget?

Yatram Indergit, et al. v. Rite Aid Corporation, et al.  1:08-cv-09361-PGG-HBP
Russell H. Whindom                                                August 11, 2011

Page 222

1         Q.   Uh-huh.

2         A.   No.

3         Q.   Why not?

4         A.   Sent down from corporate.  We had no say in

5    what -- we had no say in changing the budget that was

6    sent down from corporate.

7         Q.   How was it sent down to you?

8         A.   It was sent down through SYSM.  It is also --

9    as far as the salaries, on a weekly basis -- it's in

10   StaffWorks of how many hours that we can -- we are

11   allowed for any given week.

12             Generally the StaffWorks is out three weeks.

13   Corporate has the ability to change the hours up and

14   down, generally down, and adjust those.  We don't -- we

15   do not as store managers.

16        Q.   Did you have the final authority to terminate

17   employees at your store?

18        A.   No.

19        Q.   Did you have the final authority to discipline

20   your employees?

21        A.   Yes.  And --

22        Q.   And -- sorry.

23        A.   Depending upon the severity of the infraction.

24   Okay?  A lot of it as far as discipline is concerned was

25   dealt through write-ups.  More severe would be district

Page 223

1    manager, HRM, and they would be involved immediately

2    depending upon the severity of the infraction of the

3    employee.

4         Q.  When you disciplined an employee through a

5    write-up, was the district manager involved?

6         A.  No.

7         Q.  At what the point in time did the district

8    manager get involved?

9         A.  Final warning, final written warning.

10        Q.  When you wrote up an employee for discipline,

11   where did that write-up go?

12        A.  In their employee file.

13        Q.  And what steps did you do to get it to the

14   employee file?

15        A.  Open a drawer and put it in.

16        Q.  Oh, so you the kept the employee files?

17        A.  Yes.

18        Q.  At your store?

19        A.  The only employee files that were not kept at

20   store level were managers, assistant managers and

21   pharmacists.

22        Q.  Did the -- did HR have any of your associate

23   employee files or copies of them?

24        A.  Hourly --

25        Q.  Yeah.

Page 235

1              DECLARATION UNDER PENALTY OF PERJURY

2

3          I, RUSSELL H. WHINDOM, do hereby certify under

4    penalty of perjury that I have read the foregoing

5    transcript of my deposition taken August 11, 2011; that

6    I have made such corrections as appear noted herein, in

7    ink, initialed by me; that my testimony as contained

8    herein, as corrected, is true and correct.

9

10          DATED this _____ day of _____,

11    2011, at _____, California.

12

13

14

15

16

17

18

19

20                        _____

21                                RUSSELL H. WHINDOM

22

23

24

25

Exhibit MMM

Case 1:08-cv-09361-JPO-HBP   Document 213-20   Filed 01/22/13   Page 201 of 281

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**   **1:08-CV-09361-PGG-HBP**
**Kyle Wilson**   **October 1, 2011**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

YATRAM INDERGIT, on behalf   )
of himself and others        )
similarly situated,          )
                             )
            Plaintiff,       )    CIVIL ACTION NO.
                             )
        vs.                  )  1:08-CV-09361-PGG-HBP
                             )
RITE AID CORPORATION, RITE   )
AID OF NEW YORK, INC.,       )
FRANCIS OFFOR as Aider and   )
Abettor,                     )
                             )
            Defendants.      )


DEPOSITION OF

KYLE WILSON


October 1, 2011
9:49 a.m.

Gilbert & Jones
1607 Norwich Street
Brunswick, Georgia

Debbie Gilbert, Certified Court Reporter, B-515

Page 38

```
 1        A.     That was my title, yes.
 2        Q.     And again that was in July of '06?
 3        A.     That's correct.
 4        Q.     And then you were promoted to store
 5   manager in November of '06?
 6        A.     That's correct.
 7        Q.     And did you go back to 6452?
 8        A.     Yes.
 9        Q.     So that's when Monica left and you took
10   over the store?
11        A.     That's correct.
12        Q.     And when you went back to 6452 as the
13   store manager, you were in charge of the store;
14   correct?
15        A.     I was in charge of running the day-to-day
16   operations, yes.
17        Q.     And you were in charge of all the store
18   employees?
19               MS. SCOTT:  Objection, form.
20               THE WITNESS:  Yes, they reported to me.
21        Q.     (By Mr. Scott)  And you supervised all the
22   employees in the store; right?
23        A.     Assured, yeah, the daily tasks were
24   completed.
25        Q.     And you directed all your work; right?
```

Page 39

1              MS. SCOTT:  Objection, form.

2              THE WITNESS:  On days I was there, yes.

3         Q.   (By Mr. Scott)  And on days that you

4    weren't there, the other managers of the store

5    directed their work?

6         A.   That would be correct.

7         Q.   And everyone in the store was ultimately

8    responsible to you?

9         A.   Yes.

10             MS. SCOTT:  Objection to form.

11        Q.   (By Mr. Scott)  And you scheduled the time

12   of all the employees in store?

13        A.   I did most of the scheduling, yes.

14        Q.   You ran payroll for the store?

15        A.   No.  Payroll was determined by corporate.

16        Q.   When you say "determined by corporate,"

17   what do you mean?

18        A.   They gave us a set number of hours or

19   dollars to use.

20        Q.   Your store had a labor budget; right?

21        A.   Yes.

22        Q.   And within that labor budget, you could

23   allocate the budget hours to the store employees?

24             MS. SCOTT:  Objection, form.

25             THE WITNESS:  Yes.  They had a computer

Page 40

1        program that determined the schedule that we

2        would have to generate using the program.

3        Q.    (By Mr. Scott)   Was that Staff Works at

4    the time?

5        A.    Yes, it was.

6        Q.    Staff Works generates a schedule based on

7    available labor hours and anticipated need; correct?

8        A.    Yes.

9        Q.    And then you can alter the Staff Works

10   schedule if you think that it doesn't accurately

11   forecast the needs of the store?

12             MS. SCOTT:  Objection, form.

13             THE WITNESS:  Yes, you could make edits to

14        it.

15        Q.    (By Mr. Scott)  If someone was, for

16   example, on vacation, you could take that person off

17   the schedule and put somebody else in; right?

18        A.    You generally tell the program prior to it

19   generating the schedule, and it would generate a

20   schedule without that person on the schedule.

21        Q.    So if someone came to you and said, "Mr.

22   Wilson, I would like to take a week off," you would

23   take them out of the Staff Works schedule for that

24   particular week if you allowed it?

25        A.    Yes, prior to generating the schedule.

Page 41

1     Q.     Okay.  When you took over 6452, how many

2   employees did you supervise?

3     A.     I don't remember exactly, but it was

4   probably the same, six or seven, and then it would

5   have been I guess it was just two other members of

6   management at the time.

7     Q.     So between eight and nine people total?

8     A.     That's correct.

9     Q.     And did you have a salaried ASM in 6452?

10    A.     That's correct.

11    Q.     And who was that person?

12    A.     Initially it was Brandon --

13    Q.     The same Brandon as before?

14    A.     -- Pappos.  That's correct.

15    Q.     And then was he promoted out of that

16   store?

17    A.     He was transferred.  He was not promoted

18   at that time.

19    Q.     And how long did Brandon work as an ASM

20   under you?

21    A.     Just a couple months.

22    Q.     Do you remember which store he was

23   transferred to?

24    A.     I believe it was 5239.

25    Q.     When Brandon was transferred to 5239, who

Page 264

1          Q.     Did you have a loading bay?

2          A.     Yes.

3          Q.     And did the truck driver actually

4     physically move the product off the truck?

5          A.     Usually but not always.

6          Q.     And he would bring it into the loading bay

7     and then you and the other store employees would

8     bring the merchandise into the warehouse?

9                 MS. SCOTT:  Objection, form.

10         Q.     (By Mr. Scott)  Is that right?  Tell me

11    what happened.

12         A.     Depending -- depending on the week, but

13    typically the truck driver would dock the truck and

14    then unload it with you and then leave it in the

15    middle of the warehouse and then leave.

16                On occasion they would what they call the

17    spot the truck, and so they would drop the trailer

18    there and they always ran doubles, so they had two

19    separate trailers and take the first trailer to

20    another store and unload them and come back to your

21    store, and then typically if they were spotted, we

22    were responsible for physically pulling it off the

23    truck ourselves.

24         Q.     And how often did that spotting occur?

25         A.     At Sehome, probably every other week or

Page 265

1    about half the time, if not more.  At the other

2    stores, it did not happen with any real frequency.

3        Q.    And when you had the guy leave the store,

4    when you had the truck driver leave the store, did

5    that increase the amount of time it took to offload

6    the truck if he wasn't helping in offloading the

7    truck himself?

8        A.    Yeah, it would add another 30 or 40

9    minutes, maybe, not a significant amount of time but

10   a little bit.

11       Q.    How many hours a week did you work as a

12   store manager in 2007?

13       A.    Probably around 55 hours a week.

14       Q.    Did it vary by week?

15       A.    Yes.

16       Q.    Based on what?

17       A.    A number of different factors.  Whether it

18   was -- holidays, like the Christmas season, it was

19   dictated that we would work six days a week.  Or any

20   other seasonal conversions, there is usually the

21   increased work load.

22       Q.    Did you ever tell your district manager

23   "I'm only working 40 hours a week"?

24       A.    No.

25       Q.    How many hours a week did you work in

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**      1:08-CV-09361-PGG-HBP
Kyle Wilson                                                      October 1, 2011

Page 266

1    2008?

2          A.      Approximately the same 55 to 60, I would

3    say as well.

4          Q.      And again it would change by week?

5          A.      A little, I mean, but -- we were expected

6    to work a minimum of 50.

7          Q.      Did you take two weeks' vacation every

8    year?

9          A.      Yes.

10         Q.      In 2009, how many hours a week did you

11   work as a store manager?

12         A.      Approximately the same.

13         Q.      2010?

14         A.      Towards the end of 2010, I would say it

15   started increasing.

16         Q.      To what?

17         A.      Closer to 60 hours a week.

18         Q.      2011?

19         A.      About the same, closer to 60, but not

20   every week it was 60.

21         Q.      It varied based on what was going on?

22         A.      Yes.

23         Q.      And based on the managers that you had on

24   staff?

25         A.      Yes.

Yatram Indergit, et al. v. Rite Aid Corporation, et al.     1:08-CV-09361-PGG-HBP
Kyle Wilson                                      October 1, 2011

Page 267

```
 1        Q.    And based on whether employees called in

 2   sick or not?

 3        A.    On occasion, but that was one of the

 4   smaller factors.

 5              (Wilson Exhibit 12 was marked for

 6   identification.)

 7        Q.    (By Mr. Scott)  I hand you what's been

 8   marked as Exhibit 12.

 9              All right, Exhibit 12 is a job description

10   for the position of store manager at Rite Aid;

11   correct?

12        A.    That's correct.

13        Q.    Have you seen this document before?

14        A.    Yeah, I believe I have.

15        Q.    When?

16        A.    It was available on the portal.

17        Q.    What I want to do is walk you through it.

18              Take a look, please, at the summary

19   paragraph and tell me, read it to yourself and tell

20   me if you disagree with any of the statements made in

21   the summary paragraph in relation to the job duties

22   and responsibilities that you had as a store manager

23   at Rite Aid?

24        A.    It's generally -- it's generally, I guess,

25   the -- it leaves out a lot of the actual tasks that
```

Page 278

```
 1              MR. SCOTT:  I'm going reserve the

 2        remainder of my time for redirect.

 3              MS. SCOTT:  Can we just go off the record

 4        for a few minutes?

 5              (Recess from 3:24 p.m. to 3:28 p.m.)

 6                        EXAMINATION

 7   BY MS. SCOTT:

 8        Q.    Good afternoon, Mr. Wilson.  It's now my

 9   time to ask you some questions.

10        A.    All right.

11        Q.    And just as I was objecting to some of

12   Justin's questions, he is allowed to object to my

13   questions, but just as you were allowed to answer his

14   questions, if he objects, you can also go ahead and

15   answer my questions.  Do you understand?

16        A.    All right, yes.

17        Q.    Do you know what I mean when I say

18   non-managerial tasks?

19        A.    Typically anything beyond the supervision,

20   training, disciplinary functions of the store.

21        Q.    And what would you consider to be

22   non-managerial tasks?

23        A.    Cashiering, stocking shelves, the zeros or

24   Blue Dot Program, running photo, those types of

25   functions.
```

Page 279

```
 1       Q.    Would you consider cleaning to be a
 2  non-managerial task?
 3       A.    Yes.
 4       Q.    Would you consider pricing items to be a
 5  non-managerial task?
 6             MR. SCOTT:  Object to form.
 7             THE WITNESS:  Yes.
 8       Q.    (By Ms. Scott)  Are there any other types
 9  of non-managerial tasks you can think of?
10       A.    Not off the top of my head.
11       Q.    And did you complete all of those
12  non-managerial tasks that you just listed while you
13  were a store manager at Rite Aid?
14             MR. SCOTT:  Object to form.
15             THE WITNESS:  Yes.
16       Q.    (By Ms. Scott)  What percentage of your
17  time as a store manager at Rite Aid did you spend
18  completing non-managerial tasks?
19             MR. SCOTT:  Object to form.
20             THE WITNESS:  More than half.
21       Q.    (By Ms. Scott)  And if you will look at
22  Exhibit Number 12 for me, do you see any of those
23  non-managerial tasks that you just listed listed on
24  Exhibit 12, which is the store manager Rite Aid job
25  description?
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**   1:08-CV-09361-PGG-HBP
Kyle Wilson                                    October 1, 2011

Page 280

```
 1       A.    No.
 2       Q.    Would you consider the non-managerial
 3  tasks that you just listed to be duties that you were
 4  required to do as a store manager at Rite Aid?
 5            MR. SCOTT:  Object to form.
 6            THE WITNESS:  Yes, on a daily basis.
 7       Q.    (By Ms. Scott) And did assistant store
 8  managers also have to complete those non-managerial
 9  tasks?
10       A.    Yes.
11       Q.    So, for instance, the assistant store
12  manager Pamela would have had to complete those
13  non-managerial tasks as an assistant store manager at
14  Rite Aid?
15            MR. SCOTT:  Object to form.
16            THE WITNESS:  Yes.
17       Q.    (By Ms. Scott)  And if you will now look
18  at Exhibit 13 for me, which is the assistant store
19  manager Rite Aid job description, do you see any of
20  those non-managerial tasks listed on Exhibit 13?
21       A.    No.
22       Q.    Would you consider those non-managerial
23  tasks to have been duties and responsibilities that
24  Rite Aid expected its assistant store managers such
25  as Pamela to do?
```

Page 281

```
 1                    MR. SCOTT:  Object to form.
 2                    THE WITNESS:  Yes.
 3          Q.     (By Ms. Scott)  Did doing these
 4    non-managerial duties or tasks affect how you were
 5    able to run the store while you were a store manager
 6    at Rite Aid?
 7                    MR. SCOTT:  Object to form.
 8                    THE WITNESS:  Yes.
 9          Q.     (By Ms. Scott)  In what way?
10          A.     They took up the majority of my time so I
11    was unable to adequately spend time doing performance
12    reviews and training and developing associates.
13          Q.     Did the non-managerial tasks take away
14    from your managerial duties?
15          A.     Yes.
16          Q.     Did doing the non-managerial tasks affect
17    the way that you were able to supervise your staff --
18                    MR. SCOTT:  Object to form.
19          Q.     (By Ms. Scott) -- while you were a store
20    manager at Rite Aid?
21          A.     Yes.
22          Q.     Did Rite Aid still expect you to supervise
23    all of your employees while you were engaged in
24    non-managerial duties?
25          A.     Yes.
```

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**   **1:08-CV-09361-PGG-HBP**
Kyle Wilson                                               October 1, 2011

Page 282

1        Q.      And was it difficult to do so?

2        A.      Yes.

3        Q.      In what way?

4        A.      Well, the example of doing Blue Dots, I

5    felt like I spent a lot of time doing that every day,

6    so I'm unable to -- anything else I viewed as a

7    priority, I was unable to focus on, or sit down with

8    an associate.  Training was always -- always an issue

9    because there was never a sufficient amount of time

10   for training to develop associates.

11       Q.      And if you were, for instance, completing

12   Blue Dots and you had an employee at the cash

13   register ringing up customers, were you able to

14   supervise or watch that employee while you were doing

15   the Blue Dots?

16              MR. SCOTT:  Object to form.

17              THE WITNESS:  No.

18       Q.      (By Ms. Scott)  Would you say that these

19   duties prevented you from truly being able to manage

20   your store as a store manager at Rite Aid?

21              MR. SCOTT:  Object to form.

22              THE WITNESS:  Yes.

23       Q.     (By Ms. Scott)  Who made the final

24   decision regarding setting payroll while you were a

25   store manager at Rite Aid?

**Yatram Indergit, et al. v. Rite Aid Corporation, et al.**      1:08-CV-09361-PGG-HBP
**Kyle Wilson**                                                    **October 1, 2011**

Page 283

```
 1        A.      The corporate -- I don't know how much say
 2   my district manager had in it.  I would assume some.
 3        Q.      And who had the final decision regarding
 4   setting the budget while you were a store manager at
 5   Rite Aid?
 6        A.      Corporate did.
 7        Q.      Do you believe that Rite Aid created a
 8   budget policy that left most if not all stores
 9   inadequately staffed?
10              MR. SCOTT:  Object to form.
11              THE WITNESS:  Yes, most definitely.
12        Q.      (By Ms. Scott)  Do you believe that this
13   inadequate staffing led store managers and assistant
14   store managers to have to complete non-managerial
15   tasks?
16              MR. SCOTT:   Object to the form.
17              THE WITNESS:   Yes.
18        Q.      (By Ms. Scott)  You testified earlier that
19   you worked more hours per week during your last years
20   at Rite Aid; is that correct?
21        A.      Yes.
22        Q.      Do you know why this is?
23        A.      Because the work load had continued to
24   increase due to initiatives, such as the Blue Dot
25   Initiative took up more and more of my time, but I
```

Page 284

1  was still expected to try and complete the other --

2  other weekly and daily tasks as well.

3       Q.    Did the labor budget change during your

4  latter years at Rite Aid?

5       A.    Yes.  It continued to go in a downward

6  direction.  My first year at Sehome our budget was

7  approximately a thousand dollars less per week than

8  the previous year.

9       Q.    Did the fact that you had less hours in

10 your labor budget contribute to the fact that you had

11 to do non-managerial tasks?

12      A.    Yes.

13            MR. SCOTT:  Object to the form.

14      Q.    (By Ms. Scott)  And did the labor hours --

15 strike that.

16            Did the fact that the labor budget

17 decreased during your later years at Rite Aid as a

18 store manager make you have to work more hours per

19 week than you were working when you started as the

20 store manager at Rite Aid?

21            MR. SCOTT:  Object to form.

22            THE WITNESS:  Yes.

23            MS. SCOTT:  Okay.  That's all I have.

24       Pass the witness.

25

Page 303

1
2              DEPOSITION OF KYLE WILSON /DDG
3       I do hereby certify that I have read all
4  questions propounded to me and all answers given by
   me on October 1, 2011, taken before Debbie Gilbert,
5  and that:
6           1)  There are no changes noted.
            2)  The following changes are noted:
7
         Pursuant to Rule 30(e) of the Federal Rules of
8  Civil Procedure and/or the Official Code of Georgia
   Annotated 9-11-30(e), both of which read in part:
9  Any changes in form or substance which you desire to
   make shall be entered upon the deposition...with a
10 statement of the reasons given...for making them.
   Accordingly, to assist you in effecting corrections,
11 please use the form below:
12
   Page No.        Line No.        should read:
13
14 Page No.        Line No.        should read:
15
   Page No.        Line No.        should read:
16
17 Page No.        Line No.        should read:
18
   Page No.        Line No.        should read:
19
20 Page No.        Line No.        should read:
21
   Page No.        Line No.        should read:
22
   Page No.        Line No.        should read:
23
   Page No.        Line No.        should read:
24
25 Page No.        Line No.        should read:

Page 304

```
 1                DEPOSITION OF KYLE WILSON/DDG
 2    Page No.        Line No.        should read:
 3
 4    Page No.        Line No.        should read:
 5
 6    Page No.        Line No.        should read:
 7
 8    Page No.        Line No.        should read:
 9
10    Page No.        Line No.        should read:
11
      Page No.        Line No.        should read:
12
13    Page No.        Line No.        should read:
14
      Page No.        Line No.        should read:
15
16
      If supplemental or additional pages are necessary,
17    please furnish same in typewriting annexed to this
      deposition.
18
19
                      KYLE WILSON
20
      Sworn to and subscribed before me,
21    This the      day of            , 20   .
22
      Notary Public
23    My commission expires:
24
25
```

# Exhibit NNN

Page 1

```
1
2    UNITED STATES DISTRICT COURT
3    SOUTHERN DISTRICT OF NEW YORK
4    ---------------------------------x
5    YATRAM INDERGIT, on behalf of
     himself and all others similarly
6    situated,
7            Plaintiff,    08 CV 9361 (PGG)
8       -against-
9    RITE AID CORPORATION, RITE AID
     OF NEW YORK, INC. and FRANCIS
10   OFFOR as Aider and Abettor,
11           Defendants.
     ---------------------------------x
12
              250 Park Avenue
13            New York, New York
14            January 26, 2012
              9:10 a.m.
15
              CONFIDENTIAL
16
17       Videotaped Deposition of ROB
18   AUGUSTINE, taken by Plaintiff, pursuant to
19   Notice, held at the above-mentioned time and
20   place, before Robin LaFemina, a Certified
21   LiveNote Reporter and Notary Public within
22   and for the State of New York.
23
24
25
```

Page 2

```
1
2    A P P E A R A N C E S :
3
4    VALLI KANE & VAGNINI LLP
     Attorneys for Plaintiff
5        600 Old Country Road
         Garden City, New York 11530
6
     BY:  ANEEBA REHMAN, ESQ.
7         ANDREW KIMBLE, ESQ.
8
     EPSTEIN BECKER & GREEN, P.C.
9    Attorneys for Defendants
         One Gateway Center
10       Newark, New Jersey 07102-5311
11   BY:  PATRICK G. BRADY, ESQ.
12
13   ALSO PRESENT:
14       TOM ASTA, Videographer
15
16           --oo0oo--
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2        IT IS HEREBY STIPULATED AND AGREED,
3    by and between the attorneys for the
4    respective parties herein, that filing and
5    sealing be and the same are hereby waived.
6        IT IS FURTHER STIPULATED AND AGREED
7    that all objections, except as to the form
8    of the question, shall be reserved to the
9    time of the trial.
10       IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be signed and
12   sworn to before any officer authorized to
13   administer an oath, with the same force and
14   effect as if signed and sworn to before the
15   officer before whom the within deposition
16   was taken.
17
18
19
20           CONFIDENTIAL
21
22
23
24
25
```

Page 4

```
1            Augustine - Confidential
2        THE VIDEOGRAPHER:  This is the
3    deposition of Rob Augustine taken
4    pursuant to Notice beginning at 9:10
5    a.m.  Valli Kane & Vagnini LLP,
6    attorneys for Plaintiff, 600 Old
7    Country Road, Garden City, New York,
8    11530, phone number 516-203-7180,
9    United States District Court, Southern
10   District of New York, Yatram Indergit
11   on behalf of himself and all other
12   similarly situated as Plaintiff versus
13   Rite Aid Corporation, Rite Aid of New
14   York, Inc. and Francis Offor as Aider
15   and Abettor as Defendants, Amended
16   Complaint 08 CV 9631 (PGG).
17   R O B        A U G U S T I N E,
18       after having been first duly sworn by
19       Robin LaFemina, a Notary Public within
20       and for the State of New York, was
21       examined and testified as follows:
22   EXAMINATION BY
23   MS. REHMAN:
24       Q.    Hi, Mr. Augustine, we met
25   briefly off the record.  My name is Aneeba
```

1 (Pages 1 to 4)

Augustine - Confidential

1  name, I apologize.
3     A.  Hourly.
4     Q.  Kristi Glosser?
5     A.  Hourly.
6     Q.  John Appleford?
7     A.  Salary.
8     Q.  Ted Mieatta?
9     A.  Hourly.
10    Q.  Dan Scime?
11    A.  Salaried.
12    Q.  Gary Ostrowski?
13    A.  Hourly.
14    Q.  Jeff Calabrese?
15    A.  I believe he is salaried.
16    Q.  Lisa Kaufman?
17    A.  Hourly.
18    Q.  John Schwab?
19    A.  Salaried.
20    Q.  The store managers in your
21 district which you've named as hourly
22 employees, do you know whether or not they
23 were always hourly store managers under your
24 district?
25    A.  They were not always -- well --

Augustine - Confidential

2     Q.  As far as you know, since you
3 started as a district manager.
4     A.  Ted Mieatta was recently
5 promoted, so his entire time as a store
6 manager has been hourly.
7     Q.  Was there a change, a recent --
8 strike that.
9        Was there recently a change in
10 some of the store managers going from salary
11 to hourly in your district?
12       MR. BRADY:  Object to the form.
13    A.  In what time frame?
14    Q.  You mentioned recently, so --
15    A.  Well, he was recently promoted.
16 He was an assistant manager.  So he's never
17 been a salaried manager.
18    Q.  Okay.
19    A.  I believe the same would be true
20 for store 1511.
21    Q.  Since your employment as a
22 district manager in 1999, was there a point
23 where your store managers were switched from
24 salary employees to hourly employees?
25    A.  Some of my store managers were.

Augustine - Confidential

2     Q.  Do you recall when?
3     A.  Specifically, no.
4     Q.  Do you recall if it was a year
5 ago, two years ago, three years ago?
6     A.  Within the last two to three
7 years.
8     Q.  Were you at all involved in the
9 decision as to whether or not some of your
10 store managers would be switched from salary
11 to hourly?
12    A.  I was not.
13    Q.  Who informed you about the switch?
14    A.  I believe our human resource
15 person.
16    Q.  Who was your human resource
17 person?
18    A.  Deb Breed.
19    Q.  Do you recall what she told you?
20    A.  I don't.
21    Q.  Do you recall if she told you
22 why they were being switched?
23    A.  I do not.
24    Q.  Do you recall asking why they
25 were being switched?

Augustine - Confidential

2     A.  No, I do not.  And if you're
3 asking -- are you asking for specific
4 reasons why?  I mean, that was a business
5 decision based off of store volume, so I
6 understood why they were being switched, but
7 did I ask specifically why an individual
8 was, no.
9     Q.  You said there was a business
10 decision based on volume.
11    A.  Store volume.
12    Q.  Store volume.
13       What is your understanding of
14 that decision?
15    A.  That the stores were placed into
16 different levels and that based off of front
17 end volume, managers would be classified as
18 either salaried or hourly.
19    Q.  And do you recall what level of
20 volume a store needed to be at for a store
21 manager to be hourly?
22    A.  I don't.  I know a ballpark
23 figure, but I don't know what level.
24    Q.  What is the ballpark figure that
25 you do know?

Page 113

Augustine - Confidential

1
2      A.    I believe it was approximately
3  $24,000 a week and change.  I could be wrong
4  on that.
5      Q.    Okay.
6            Do you recall whether or not,
7  were you involved in informing the store
8  managers about this change?
9      A.    I was.
10     Q.    Was your regional vice president
11  involved?
12     A.    No, he was not.
13     Q.    Was HR involved?
14     A.    No, they were not.
15     Q.    How did you inform your store
16  managers who were being switched from salary
17  to hourly that they were being switched?
18     A.    I had individual conversations
19  with them.
20     Q.    Were these conversations over
21  the phone?
22     A.    They were not.
23     Q.    Were they in person?
24     A.    They were.
25     Q.    Did these conversations take

Page 114

Augustine - Confidential

1
2  place on a conference call?
3      A.    They did not.  They were in my
4  office.
5      Q.    Was it a group meeting or
6  individual meeting?
7      A.    Individual.
8      Q.    And when you had these individual
9  meetings with the store managers who were
10  being switched from salary to hourly, what
11  did you tell them during these meetings?
12     A.    I explained the change, I
13  explained the change in rate of pay for them
14  from a salaried rate to an hourly rate, I
15  explained the change in their benefit, and
16  that may be all.
17     Q.    Did the change from salary to
18  hourly cause changes in benefits for some of
19  these employees?
20     A.    I believe it impacted their
21  long-term disability.
22     Q.    How did it impact their long-
23  term disability?
24     A.    I don't recall.
25     Q.    Did you explain to these

Page 115

Augustine - Confidential

1
2  individual store managers what the reason
3  was for the change?
4            MR. BRADY:  Object to the form.
5      A.    I explained that it was a
6  business decision based off of volume.
7      Q.    Did any of the store managers
8  have questions during these meetings about
9  the change?
10     A.    Yes.
11     Q.    What were some of the questions?
12     A.    How their pay would be impacted.
13  That was --
14     Q.    That was the main question?
15     A.    Yes.
16     Q.    Do you recall any other question?
17     A.    Not specifically.
18     Q.    And how did you respond to a
19  question like that?
20     A.    I worked them through the rate
21  of pay that they were going through as
22  hourly and how it equated to the same rate
23  as pay that they were going to make as
24  salary and that it wasn't a pay adjustment.
25     Q.    After this change, do the store

Page 116

Augustine - Confidential

1
2  managers who were switched from salary to
3  hourly now receive overtime pay?
4      A.    They're eligible for overtime
5  pay; yes.
6      Q.    Are they eligible for overtime
7  pay for any hour worked over 40?
8      A.    Yes.
9      Q.    And do you know how many
10  overtime hours each of the store managers in
11  your district work currently?
12     A.    It varies based on the manager.
13     Q.    Are they limited to 45 hours?
14     A.    No.
15     Q.    Are they expected to work at
16  least 45 hours?
17     A.    No.
18     Q.    Is there any expectation of how
19  many hours they're supposed to work?
20     A.    The expectation is that they
21  work enough hours to maintain full-time
22  benefits.
23     Q.    If an hourly store manager now
24  wants to work over 40 hours a week to get
25  their job done, do they have to seek

**ERRATA SHEET**

CASE:  Indergit v. Rite Aid

DEPOSITION OF: Robert Augustine

| PAGE | LINE | CORRECTION | REASON FOR CHANGE |
|------|------|-----------|-------------------|
| 26 | 18 | "financial" should be "customer" | Correct stenographic error |
| 33 | 9-11 | "Formally, no, but I had spoken" should be "Formally, I applied approximately a year and a half before my promotion. Thereafter, I spoke" | Clarify the record |
| 119 | 24-25 | "I don't recall" should be "I recall we had a script but I didn't use one." | Conform with the facts |
| 149 | 11-12 | Add "to my knowledge" following the sentence "It's no longer in existence." | Clarify the record |
| 237:23-238:4 | 237:23-238:4 | Add: "We do not participate in political or religious events." | Clarify the record. |
| 304 | 21-22 | "Less than six months" should be "approximately a year" | Conform with the facts |
| | | | |
| | | | |
| | | | |

Signature of Deponent

3/5/2012

Date

# Exhibit OOO

Page 1

1
2  UNITED STATES DISTRICT COURT
3  SOUTHERN DISTRICT OF NEW YORK
4  --------------------------------x
5  YATRAM INDERGIT, on behalf of
   himself and all others similarly
6  situated,
7          Plaintiff,   08 CV 9361 (PGG)
8     -against-
9  RITE AID CORPORATION, RITE AID
   OF NEW YORK, INC. and FRANCIS
10 OFFOR as Aider and Abettor,
11         Defendants.
   --------------------------------x
12
          250 Park Avenue
13        New York, New York
14        January 27, 2012
          9:43 a.m.
15
16        CONFIDENTIAL
17
18        Videotaped Deposition of MICHAEL
19 BARRETT, taken by Plaintiff, pursuant to
20 Notice, held at the above-mentioned time and
21 place, before Robin LaFemina, a Certified
22 LiveNote Reporter and Notary Public within
23 and for the State of New York.
24
25

Page 2

1
2  A P P E A R A N C E S :
3
4  VALLI KANE & VAGNINI LLP
   Attorneys for Plaintiff
5      600 Old Country Road
       Garden City, New York 11530
6
   BY:  ANEEBA REHMAN, ESQ.
7       GAVIN McCANDLISH, ESQ.
8
9  OGLETREE, DEAKINS, NASH, SMOAK &
   STEWART, P.C.
10 Attorneys for Defendants
       One Ninety One Peachtree Tower
11     191 Peachtree Street, N.E.
       Suite 4800
12     Atlanta, Georgia 30303
13 BY:  JUSTIN SCOTT, ESQ.
14
15 ALSO PRESENT:
16     TOM RUYMEN, Videographer
17
18
          --oo0oo--
19
20
21
22
23
24
25

Page 3

1
2        IT IS HEREBY STIPULATED AND AGREED,
3  by and between the attorneys for the
4  respective parties herein, that filing and
5  sealing be and the same are hereby waived.
6        IT IS FURTHER STIPULATED AND AGREED
7  that all objections, except as to the form
8  of the question, shall be reserved to the
9  time of the trial.
10       IT IS FURTHER STIPULATED AND AGREED
11 that the within deposition may be signed and
12 sworn to before any officer authorized to
13 administer an oath, with the same force and
14 effect as if signed and sworn to before the
15 officer before whom the within deposition
16 was taken.
17
18
19
20        CONFIDENTIAL
21
22
23
24
25

Page 4

1  Barrett - Confidential
2        THE VIDEOGRAPHER:  The deposition
3  of Michael Barrett taken pursuant to
4  Notice beginning at 9:43 a.m., Yatram
5  Indergit on behalf of himself and
6  others similarly situated, Plaintiff,
7  v. Rite Aid Corporation, Rite Aid of
8  New York, Inc. and Francis Offor as
9  Aider and Abettor, 08 CV 9361.
10 M I C H A E L       B A R R E T T,
11     after having been first duly sworn by
12     Robin LaFemina, a Notary Public within
13     and for the State of New York, was
14     examined and testified as follows:
15 EXAMINATION BY
16 MS. REHMAN:
17     Q.    Hi, Mr. Barrett.  My name is
18 Aneeba Rehman.  I'm an attorney with Valli
19 Kane & Vagnini and we represent the plaintiffs
20 in this case.  We met briefly off the record.
21 This morning and this afternoon I'm going to
22 ask you a series of questions, but before we
23 begin, I just want to go over a couple of
24 the ground rules.
25        If you don't understand anything

1 (Pages 1 to 4)

Page 141

Barrett - Confidential

1   Barrett - Confidential
2   was instructed, because I was on vacation,
3   to have a meeting and explain to all the
4   managers why they were doing that, going
5   from salary to hourly.
6       Q.    Did you have a conversation with
7   Mr. McIntosh about the switch prior to you
8   going on vacation?
9       A.    I don't remember.  I possibly
10  could have, but I don't remember.
11      Q.    Do you recall if you had this
12  conversation via e-mail?  And by e-mail, I
13  mean Outlook.
14          MR. SCOTT:  Object to form.
15      A.    I don't remember.
16      Q.    Do you recall if you spoke to
17  Mr. McIntosh about the switch after your
18  vacation on the phone?
19      A.    I don't know if it was face to
20  face or on the phone.  I don't recollect.
21      Q.    And you said that Mr. McIntosh
22  told you that it came down due to the
23  business changing; correct?
24      A.    Uh-hum.
25      Q.    Do you recall what change in the

Page 142

1   Barrett - Confidential
2   business called the switch?
3       A.    The sales.  It was based strictly
4   on the store's volume.
5       Q.    What about the volume of the
6   stores affected the change in --
7       A.    The sales were down, you know,
8   based on sales, based on how -- what the
9   store's volume was at that time -- at that
10  time.
11          MR. SCOTT:  Make sure you let
12      her finish her question.
13          THE WITNESS:  I'm sorry.
14      A.    You weren't finished?
15      Q.    It's okay.
16          MR. SCOTT:  Just take a second
17      before you answer.
18      Q.    And do you know what that volume
19  was?
20      A.    No, I don't.
21      Q.    And did Mr. McIntosh tell you
22  who instructed him to have a meeting?
23      A.    He did not.
24      Q.    After the change took place, did
25  any of your store managers in your district

Page 143

1   Barrett - Confidential
2   have a conversation with you about the
3   change?
4       A.    Oh, sure.
5       Q.    Who had a conversation with you?
6       A.    I don't remember any names.  I
7   know there were some conversations, but. . .
8       Q.    And what did those conversations
9   involve?
10          MR. SCOTT:  Object to form.
11      A.    I don't remember.
12      Q.    Do you remember generally if
13  they asked you questions about the change?
14      A.    Probably, but I don't remember,
15  you know, exactly what -- I would be guessing
16  to say, you know, they asked me, you know,
17  why.  I don't, you know.
18      Q.    Did the store managers who were
19  not switched from salary to hourly approach
20  you about the switch?
21      A.    No.
22      Q.    Do you know whether or not they
23  were informed about the change?
24          MR. SCOTT:  Object to form.
25      A.    I'm not sure.

Page 144

1   Barrett - Confidential
2       Q.    Do you know whether or not
3   Mr. McIntosh held a meeting with all the
4   store managers who were being switched from
5   salary to hourly?
6       A.    Yes, he had a meeting.
7       Q.    Do you know if it was a conference
8   call or an in person meeting?
9       A.    I'm pretty sure it was an in
10  personal meeting.
11      Q.    Do you know whether or not Mr.
12  McIntosh was provided materials to use
13  during that meeting?
14          MR. SCOTT:  Object to form.
15      A.    I'd be guessing, but I'm sure he
16  was; yes.
17      Q.    When Mr. McIntosh told you about
18  the change, did you agree with it?
19          MR. SCOTT:  Object to form.
20      A.    I don't remember.
21      Q.    Do you believe the switch of
22  certain store managers in your district from
23  salary to hourly was a positive switch?
24          MR. SCOTT:  Object to form.
25      A.    I mean, this is what the company

36 (Pages 141 to 144)

Page 181

```
 1              Barrett - Confidential
 2    purpose of helping the manager do their job
 3    for the change of seasons.
 4        Q.     Do you believe profit planners
 5    help maintain consistency in the stores
 6    within your district?
 7              MR. SCOTT:  Object to form.
 8        A.     I don't understand the question,
 9    when you say consistency.
10        Q.     Do you believe the profit
11    planners when they're used in the stores
12    within your district help create a uniform
13    profit planner within each district, within
14    each store in your district?
15        A.     Every store varies, so, again,
16    it's just a guideline for -- it's a nice
17    tool to help them do their job.
18        Q.     Does Rite Aid maintain a dress
19    code for store managers, as far as you're
20    aware?
21        A.     Yes.  I mean, what is required
22    is a shirt and tie for male employees.
23        Q.     And females have a dress code as
24    well?
25        A.     Just neat, you know, just look
```

Page 182

```
 1              Barrett - Confidential
 2    professional as far as the dress code.
 3    That's the gist of it.
 4        Q.     Do you have a dress code as a
 5    district manager of Rite Aid?
 6        A.     Yes.
 7        Q.     And what is your dress code?
 8        A.     Same as the managers.  Shirt and
 9    tie.
10        Q.     Each store in your district has
11    a truck day; is that right?
12        A.     Yes, they do.
13        Q.     Do some stores have more than
14    one truck day a week?
15        A.     No.  Some biweekly, too.  They
16    get a truck every other week.  Those are the
17    low volume stores.
18        Q.     Do the stores in your district
19    have teams that unload and pack out the
20    trucks?
21        A.     Just store personnel.  There's
22    no set personnel that all they do is unload
23    trucks.  No.
24        Q.     Do you know whether or not store
25    managers within your district unload trucks?
```

Page 183

```
 1              Barrett - Confidential
 2        A.     (Witness gestures.)
 3        Q.     Do you know whether or not store
 4    managers in your district unload trucks?
 5        A.     That don't unload trucks?
 6        Q.     Do they unload trucks?
 7        A.     Yes, some do.
 8        Q.     Have you ever seen a store
 9    manager in your district unloading a truck?
10        A.     Sure.  There's not much to
11    unloading a truck because most of them come
12    on pallets, so it's just -- most of the time
13    the truck driver does it, so you're just
14    taking it off with a pallet and bringing it
15    in the back room, so there's not much to
16    unloading a truck.  That's not all stores,
17    but that's -- that's some stores, maybe half
18    that have loading docks can do it that way.
19        Q.     After the trucks are unloaded
20    and they're brought into the back room, does
21    that merchandise then have to be packed out
22    onto the shelves?
23        A.     Yes.
24        Q.     And do you know who in the
25    stores within your district pack out these
```

Page 184

```
 1              Barrett - Confidential
 2    items into the shelves?
 3        A.     Varies by store.
 4        Q.     Have you ever seen store
 5    managers in your district pack out items on
 6    the shelves?
 7        A.     Sure.  It varies -- as I said,
 8    it varies by store, but sure, I've seen
 9    store managers pack out items.
10        Q.     Do you expect store managers to
11    unload the truck?
12              MR. SCOTT:  Object to form.
13        A.     Store managers are required to
14    have their truck done in 24 hours, so if
15    they -- if it's needed, they'll do it.  If
16    it's not needed, and they've got something
17    else they're doing, then they don't need to,
18    but it's usually not an issue.
19        Q.     When you say a truck done, are
20    you including stocking the shelves with the
21    merchandise that's been packed out?
22        A.     Yeah.
23        Q.     Do any stores in your district
24    have photo labs?
25        A.     Very few.
```

46 (Pages 181 to 184)

Barrett - Confidential

1
2      Q.     The stores in your district
3  which do have photo labs, are specific
4  associates hired to run those photo labs?
5      A.     Well, there's a certain age
6  limit.  I think you have to be over 20 or
7  21 -- or over 18 to run it, so -- but
8  everybody that's over 18 we train -- we
9  train them, you know, to do it.  It's not
10  hard.
11      Q.     Have you ever seen store
12  managers in your district run photo labs?
13      A.     Sure.
14      Q.     Have you ever seen store managers
15  in your district cleaning the store while
16  you were there?
17      A.     Cleaning.
18      Q.     Mopping, sweeping?
19      A.     I've -- yes, if somebody, a
20  customer, say, dropped something that broke,
21  you know, if it's just a cashier and the
22  manager, well then yeah, I've seen somebody
23  clean, yeah.  Sure.  Not as a rule, but I
24  have seen it.  Just varies from store to
25  store, what you see.

Barrett - Confidential

1
2      Q.     Have you seen store managers in
3  your district work on cash registers?
4      A.     Again, varies from store to
5  store, but yes, I have seen store managers
6  work on cash registers.  I don't see it a
7  lot, but it happens.
8      Q.     When you were a store manager
9  Friday, did you ever run the cash register?
10      A.     I'm sure I did, but not as --
11  nothing I did a lot of, but I'm sure I did it.
12      Q.     Do you recall ever cleaning the
13  store as a store manager for Rite Aid?
14      A.     Sure.  If you're doing a
15  plan-o-gram, you're going to clean the
16  shelves before you, you know, put up new
17  merchandise up there and new labels, you
18  want to clean the shelves, so. . .
19      Q.     Do you know what inventory days
20  are?
21      A.     Sure.
22      Q.     What are inventory days?
23      A.     Inventory days are the days we
24  have a crew come in and counts your inventory,
25  counts what's in your store, in the pharmacy

Barrett - Confidential

1
2  and the front end.
3      Q.     Are you involved in inventory
4  dates with the new district?
5      A.     On inventory day I'm not involved.
6      Q.     You're not involved on the day of?
7      A.     Not on the day of.  No.  I don't
8  as a rule even go to them.
9      Q.     Are you involved in the
10  preparation that it takes for inventory days?
11      A.     I am.
12      Q.     How are you involved?
13      A.     Just make sure the store's ready
14  for inventory.
15      Q.     And what happens on inventory
16  days?
17          MR. SCOTT:  Object to form.
18  Vague.
19      A.     Just the inventory crews scans
20  the labels throughout the store and counts
21  what's on the shelf and does the same in the
22  pharmacy.
23      Q.     Do you know whether or not the
24  inventory crew are Rite Aid employees?
25      A.     They're not.

Barrett - Confidential

1
2      Q.     They are not?
3      A.     They are not.  We use a service.
4      Q.     Do you know what service you
5  used?
6      A.     We use Washington -- I'm pretty
7  sure it's Washington Inventory Service.
8      Q.     Do you know who decided to use
9  Washington Inventory Service?
10      A.     That's done in corporate.  I'm
11  not a hundred percent sure that's the name
12  of the inventory crew, but I think it is.
13      Q.     On inventory days, are store
14  managers expected to be at the store at a
15  certain time?
16      A.     Yes.
17      Q.     What time is that?
18      A.     6 a.m.
19      Q.     Do you know who decided this
20  time?
21      A.     No.
22      Q.     Do you know whether or not that
23  time came from corporate?
24      A.     Could have.  I'm not sure.
25          Let me just correct one thing.

MAR-02-2012 11:28 From:

AttachView

To:14048781732

P.3/3

Page 1 of 2

https://exchstore.riteaid.com/owa/X-AttachView/cmd/show/file/19883684040/416480934_2 4... 3/2/2012

```
                                                              306
 1                    Barrett - Confidential
 2             A C K N O W L E D G E M E N T
 3
 4              I, MICHAEL BARRETT, hereby
 5      certify that I have read the transcript
 6      of my testimony taken under oath in my
 7      deposition of January 27, 2012; that
 8      the transcript is a true, complete and
 9      correct record of what was asked,
10      answered and said during this deposition,
11      and that the answers on the record as
12      given by me are true and correct.
13
14
15      _____
16      MICHAEL BARRETT
17
18      Subscribed and sworn to
19      before me this _____ day
20      of_____, 2012.
21
22      _____
        NOTARY PUBLIC
23
24
25
```

Caruso Court Reporting, Inc.       (516) 695-3722

# Exhibit PPP

Case 1:08-cv-09361-JPO-HBP  Document 213-20  Filed 01/22/13  Page 231 of 281

**YATRAM INDERGIT, ET AL. vs. RITE AID, ET AL.**     **1:08-CV-09361-PGG-HBP**
**Walter Bradford on 02/10/2012**                    Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 SOUTHERN DISTRICT OF NEW YORK

 3

 4    YATRAM INDERGIT, ON BEHALF OF          )
      HIMSELF AND OTHERS SIMILARLY           )
 5    SITUATED,                              )
                                             )
 6                        PLAINTIFF, )CASE NO.
                                     )1:08-CV-09361-PGG-HBP
 7              vs.                           )
                                             )
 8    RITE AID CORPORATION, RITE AID OF      )
      NEW YORK, INC., AND FRANCIS OFFOR AS   )
 9    AIDER & ABETTOR,                       )
                                             )
10                        DEFENDANTS. )
      _____)

11

12

13

14

15

16         VIDEOTAPED DEPOSITION OF WALTER BRADFORD

17             TAKEN FRIDAY, FEBRUARY 10, 2012

18                 LOS ANGELES, CALIFORNIA

19

20

21

22

23

24

25         Reported by Audra E. Cramer, CSR No. 9901
                        Job No. 84918
```

1      Q.    Have there been any other times where you told

2    a store manager that they couldn't promote someone?

3             MS. PUCKETT:  Objection to form.

4             THE WITNESS:  I honestly can't recall any

5    situations other than that scenario.

6             THE VIDEOGRAPHER:  I'm sorry.  I need to change

7    tapes.

8             MS. PUCKETT:  Okay.

9             THE VIDEOGRAPHER:  All right.  Off the record

10   at 2:04 p.m.  This is the end of Tape 2.

11                     (Recess taken.)

12            THE VIDEOGRAPHER:  We are on the record

13   at 2:14 p.m.  This is the beginning of Tape 3.

14   BY MS. SCOTT:

15     Q.   Mr. Bradford, do you know what I mean when I

16   say "managerial"?

17            MS. PUCKETT:  Object to form.  Calls for a

18   legal conclusion.

19   BY MS. SCOTT:

20     Q.   Let me actually strike that.

21            Do you know what I mean when I say "managerial

22   duties"?

23            MS. PUCKETT:  Same objection.

24            THE WITNESS:  Well, I don't know what you mean,

25   because it could be in reference to something else.  You

```
 1   know, no.

 2   BY MS. SCOTT:

 3      Q.   What would your definition of "managerial

 4   duties" be?

 5           MS. PUCKETT:  Object to form.  Calls for a

 6   legal conclusion.

 7           You can answer.

 8           THE WITNESS:  Okay.

 9           In my district everything they do is a

10   managerial duty.

11   BY MS. SCOTT:

12      Q.   Everything a store manager does is a managerial

13   duty under your definition?

14      A.   Yes.

15      Q.   So you would say unloading the truck would be a

16   managerial duty?

17           MS. PUCKETT:  Same objection.  Standing

18   objection to all these questions on calls for a legal

19   conclusion.

20           Go ahead.

21           THE WITNESS:  Well, I think that's part of

22   their job.  A certain percentage of their job they're

23   going to have to do those kind of things, so that's part

24   of the managerial duty.  I think -- yes, I do.  I think

25   it's a managerial duty.
```

```
 1    BY MS. SCOTT:
 2        Q.   Would you consider stocking shelves a
 3    managerial duty?
 4             MS. PUCKETT:   Same objection.
 5             THE WITNESS:   In my district a manager might be
 6    involved in every aspect of the store, and I believe
 7    that everything that they do is a managerial duty.   So I
 8    would say yes, it would be.
 9    BY MS. SCOTT:
10        Q.   So you would believe that facing shelves would
11    be a managerial duty?
12             MS. PUCKETT:   Same objection.
13             THE WITNESS:   Again -- once again,
14    managerial -- anything that -- they're the manager, and
15    anything that they do could be encompassed in a
16    managerial duty.
17    BY MS. SCOTT:
18        Q.   So working cash registers would be a managerial
19    duty?
20             MS. PUCKETT:   Objection.   Asked and answered.
21             THE WITNESS:   Again, a managerial duty --
22    anything that they do -- and I think we've talked about
23    it previously that a manager might check on a particular
24    week anywhere from zero -- yes, that would be a part of
25    their job, would be a managerial duty.
```

```
 1   BY MS. SCOTT:

 2      Q.   So if a manager scoops ice cream, you would

 3   consider scooping ice cream a managerial duty?

 4           MS. PUCKETT:  Object to form.  Same objection.

 5           THE WITNESS:  I believe it is.  I believe in my

 6   district everything that a manager does is a managerial

 7   duty.

 8           Now, the manager has a lot of things that they

 9   do, and in my district -- in the state of California a

10   manager is tasked with spending more than 50 percent of

11   their time as being the manager:  coaching, training

12   teaching, planning, organizing.  So if that's

13   51 percent, there's 49 percent left that they have an

14   opportunity, and -- so their duties are more than

15   50 percent of the time be managerial, and say 49 percent

16   or less of the time they may be involved in those other

17   things that encompass everyday life in a retail store.

18           Most -- you know, it depends.  In a lot of

19   cases managers use those opportunities.  So they might

20   be stocking a shelf side by side with another associate.

21   They use it as a training tool.  They use it as a

22   coaching tool.  They use it as a meeting tool.  So I

23   know managers that will have little meetings with people

24   on load day, and they will go around and work with

25   everybody, so they're stocking the shelf.
```

```
 1              There's kind of a -- you know, how do you

 2     define what part of that minute that they're stocking

 3     the shelf, is that a managerial

 4     coaching/training/teaching percentage, or is that a

 5     stocking a shelf percentage?  In some cases it might be

 6     both percentage.  So I just think that it's

 7     all-encompassed.  Everything they do is their duty --

 8     managerial duty as long as, in my district in the state

 9     of California, that 51 percent -- or more than

10     50 percent of the time they spend on planning, coaching,

11     teaching, training, organizing, those things.

12              MS. SCOTT:  Objection.  Nonresponsive.

13       Q.   Mr. Bradford, do you consider scooping

14     ice cream a managerial duty?

15              MS. PUCKETT:  Objection to form, and same

16     objection as before regarding legal conclusion.

17              THE WITNESS:  Yes, in my district for my

18     managers in the state of California, I believe that they

19     can scoop an ice cream, and that is part of their duty.

20     And that would fall into the 49 percent.

21     BY MS. SCOTT:

22       Q.   Because the store manager is doing it, it's a

23     managerial duty?

24              MS. PUCKETT:  Objection to form.

25              Now you both need to listen to each other.
```

```
 1          MS. SCOTT:  Counsel, it's something that he
 2   said, and it's the question I'm asking.  It's got
 3   nothing to do with me listening or not.
 4          MS. PUCKETT:  No, I think he didn't listen to
 5   your previous question, and then I think you didn't
 6   listen to his answer.  So you might want to back up a
 7   couple questions.
 8          THE WITNESS:  Can you ask me a question.  I'm
 9   sorry.
10   BY MS. SCOTT:
11      Q.   I believe you've answered the question that I
12   asked.  Now I'm asking:  Do you believe that just
13   because the store manager does something, it's
14   managerial?
15          MS. PUCKETT:  Objection to form.  Asked and
16   answered.  Calls for a legal conclusion.
17          THE WITNESS:  I believe in my district in the
18   state of California that anything the manager does when
19   he's working is managerial.
20   BY MS. SCOTT:
21      Q.   So if a manager cleans a toilet, you consider
22   cleaning toilets managerial?
23          MS. PUCKETT:  Object to form.
24          THE WITNESS:  I would say in my district in my
25   state, that that would fall into the 49 percent, yes,
```

1    managerial.

2    BY MS. SCOTT:

3        Q.    Cleaning spills would be considered managerial?

4            MS. PUCKETT:  Objection to form.

5            THE WITNESS:  Yes.

6    BY MS. SCOTT:

7        Q.    Collecting shopping carts from the street --

8            MS. PUCKETT:  Counsel --

9    BY MS. SCOTT:

10       Q.    -- would be considered managerial?

11           MS. PUCKETT:  -- I don't think you need to run

12   down the list.  He's answered your question.

13           MS. SCOTT:  Ms. Puckett, it's my deposition.  I

14   can ask whatever questions I want to ask.

15           MS. PUCKETT:  Within reason.  But --

16           MS. SCOTT:  No, I can ask --

17           MS. PUCKETT:  -- I mean, this is just

18   ridiculous.

19           MS. SCOTT:  -- whatever questions I want to ask

20   that are not divulging privilege.

21           MS. PUCKETT:  You can burn up your time any way

22   you want.  So go ahead.  I'm just going to continue to

23   object because I think he's asked and answered your

24   question.

25           MS. SCOTT:  You have both a running objection

```
 1    and you continue objecting.

 2              MS. PUCKETT:  Okay.

 3              MS. SCOTT:  That's well within your right and

 4    well within my right of asking questions.

 5              MS. PUCKETT:  All right.  Go ahead.

 6    BY MS. SCOTT:

 7        Q.   Do you consider collecting shopping carts from

 8    the street managerial?

 9              MS. PUCKETT:  Objection to form.

10              THE WITNESS:  Yes.

11    BY MS. SCOTT:

12        Q.   Do you consider washing windows managerial?

13              MS. PUCKETT:  Objection.  Form.

14              THE WITNESS:  Yes, under the concept that

15    49 percent of the time the manager can be doing those

16    things.

17    BY MS. SCOTT:

18        Q.   Do you consider cleaning the breakroom

19    managerial?

20              MS. PUCKETT:  Objection.  Form.

21              THE WITNESS:  Yes.  Same response as before.

22    BY MS. SCOTT:

23        Q.   Do you consider sweeping floors managerial?

24              MS. PUCKETT:  Objection to form.

25              THE WITNESS:  Yes.  Same response as prior.
```

1    BY MS. SCOTT:

2        Q.   Do you consider mopping the floors managerial?

3              MS. PUCKETT:  Objection to form.

4              THE WITNESS:  Yes.  Same response as prior.

5    BY MS. SCOTT:

6        Q.   Do you consider pricing items with their price

7    managerial?

8              MS. PUCKETT:  Objection to form.

9              THE WITNESS:  Yes.

10             And I want to say that it depends.  These are

11   all very specific questions, and a lot of managers,

12   again, use that time to coach and teach and train while

13   they're doing things.  It might be you have a brand-new

14   person, and you're showing them how to sweep or you're

15   showing them how to mop.  Or in some situations there's

16   a safety issue.  If there's something on the floor,

17   we're not going to wait for somebody to come clean it

18   up.  That's -- the manager keeps his store safe, and

19   that might be something that he needs to do, and

20   that's -- to me, that's part of a managerial duty.

21   BY MS. SCOTT:

22       Q.   Do you consider manually dismantling a shelf

23   managerial?

24             MS. PUCKETT:  Objection to form.

25             THE WITNESS:  I'm not sure I understand the

1   dismantling of a shelf.

2   BY MS. SCOTT:

3       Q.   If a store manager or anyone dismantles a shelf

4   for whatever reason, would you consider that managerial?

5       A.   I think it would fall within the 49 percent,

6   yes.

7       Q.   So you consider it managerial?

8            MS. PUCKETT:  Objection to form.

9            THE WITNESS:  Again, the same thing.  In my

10  district the managers might have an opportunity that

11  they have to do that.  They might be doing it with

12  somebody else.  They might combine it.  So there could

13  be a situation.  It depends how they're doing it.  Are

14  they doing it with somebody else?  And, again, I believe

15  that, as part of their managerial job, there is some

16  things like this that are part of that job.

17  BY MS. SCOTT:

18      Q.   So if a store manager manually dismantles a

19  shelf, you would consider that managerial?

20           MS. PUCKETT:  Objection to form.

21           THE WITNESS:  Yes, I would.

22  BY MS. SCOTT:

23      Q.   Would you consider waxing floors managerial?

24           MS. PUCKETT:  Object to form.

25           THE WITNESS:  In my district a manager doesn't

YATRAM INDERGIT, ET AL. vs. RITE AID, ET AL.   1:08-CV-09361-PGG-HBP
Walter Bradford on 02/10/2012
Page 261

```
 1    STATE OF CALIFORNIA          )

 2    COUNTY OF  L̶O̶S̶ ̶A̶N̶G̶E̶L̶E̶S̶    )  SS.
              FRESNO
 3

 4

 5                I, WALTER BRADFORD, hereby certify under

 6    penalty of perjury under the laws of the State of

 7    California that the foregoing is true and correct.

 8                Executed this  ___14TH___ day of

 9    ___MARCH___, 2012, at

10    ___FRESNO___, California.

11

12

13                               _____

14                               WALTER BRADFORD

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit QQQ

[Page 1]

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

----------------------------------------X

YATRAM INDERGIT, on behalf of himself and all

others similarly situated,

                        Plaintiff,

                              08 CV 9361 (PGG)

    - against -

RITE AID CORPORATION, RITE AID OF NEW YORK, INC.

and FRANCIS OFFOR as Aider & Abettor

                        Defendants.

----------------------------------------X

                        1745 Broadway
                        New York, New York 10019
                        July 12, 2012
                        9:45 a.m.

    EXAMINATION BEFORE TRIAL OF JAMES CARPENTER,
a Witness herein, taken by the attorney for the
Plaintiff, Pursuant to Notice, and held at the
above-mentioned time and place, before Kimberly
Dean, a stenographer and Notary Public within and
For the State of New York.

[Page 34]

1                          James Carpenter

2          A.     Yes.

3          Q.     Before we went on break we were talking

4     about operation meetings, do you recall that?

5          A.     Yes.

6          Q.     Do you know whether or not during the

7     meeting operations related to the Rite Aid stores

8     are discussed?

9          A.     Could you be more specific.

10         Q.     Sure.  When you say operations meeting

11    s, is it the operations of the Rite Aid stores?

12         A.     Of all stores.  You mean Brooks Eckerd

13    and Rite Aid.  All Rite Aid.

14         Q.     When I say Rite Aid, I mean the stores

15    that are currently Rite Aid stores?

16         A.     Okay.  Yes.

17         Q.     Are there stores right now at least that

18    you are aware of that are still in the transitional

19    phase from Brook Eckerd to Rite Aid?

20         A.     Not that I am aware of.

21         Q.     Within your district the stores have

22    already transitioned from Brooks Eckerd to Rite

23    Aid?

24         A.     Yes.

25         Q.     When you mentioned earlier core stores,

[Page 35]

1                    James Carpenter

2   you meant Rite Aid core stores?

3       A.    Former Rite Aid.  I should say former

4   yes.  The difference between the 2.  Former Brooks

5   Eckerd verse core Rite Aid.

6       Q.    We were talking about when you were made

7   aware of the fact that certain stores managers

8   within your district would be changed from salary

9   to hourly?  Do you recall that?

10      A.    Yes.

11      Q.    You mentioned that you recall the method

12  for the process that resulted in the change from

13  salary to hourly, do you recall the method and

14  process?

15           MS.MOELLER:  Objection to form.

16      A.    Vaguely.  I remember that the

17  information was reviewed with us and I held a store

18  managers meeting in my district office and

19  explained it to all of the managers with the

20  assistance of the HR manager.

21      Q.    When you mentioned the process that

22  changed some managers from salary to hourly, what

23  was the process that you were referring to?

24      A.    Stores were classified and a chart 1

25  through chart 7 based on their annual current front

1                          James Carpenter

2      end sales volume.

3           Q.     Who provided you with the charts?

4           A.     I believe HR.

5           Q.     Do you recall whether or not your store

6      managers were provided with the charts?

7           A.     They were told and they were provided

8      information of what chart their store was.  They

9      were explained the overall charts.  Volume ranges.

10          Q.     They were explained what was contained

11     on the charts regarding the volume changes?

12          A.     They were explained what the charts

13     meant.  And what chart their store would fall

14     under.  In my district there were charts 3, 4 and 5

15     only.

16          Q.     When explaining the charts to the store

17     managers, do you recall if they actually received a

18     copy of the charts?

19          A.     They didn't see any charts with specific

20     information on them.  They may have seen a memo

21     that said what the volume ranges were.  So, aside

22     from what the charts 1 through 7 meant by volume

23     range.

24          Q.     You mentioned that you had held a

25     meeting with store managers in your office with the

[Page 37]

1                          James Carpenter

2   assistance of the HR department?

3        A.    Yes.  I have a conference room there.

4        Q.    Do you recall who from HR was present?

5        A.    Bill Farley.

6        Q.    What is his title?

7        A.    HR manager.

8        Q.    Aside from Bill Farley and yourself, who

9   else was present at the meeting?

10        A.    Possibly Ed Lefever. Loss prevention

11   manager.  I don't recall if he was there for that

12   part of the meeting.

13        Q.    Were all of the store managers in your

14   district at the time in attendance at the meeting?

15        A.    Yes.

16        Q.    Who spoke during the meeting?

17        A.    Myself and Mr. Farley.

18        Q.    What did you say during the meeting?

19        A.    I explained the change s that were

20   taking place and I explained the work flow

21   efficiencies that were taking place.  Then I met

22   with each individual one on one to review the

23   change in -- actually that might have been a

24   different meeting.

25        I don't believe that I met with each

[Page 195]

1                              James Carpenter

2

3

4

5        I have read the foregoing record of my

6   testimony taken at the time and place noted in the

7   heading hereof and I do hereby acknowledge it to be

8   a true and correct transcript of same.

9

10

11                              _____

12                              JAMES CARPENTER

13

14

15

16  Subscribed and sworn to

17  before me this _____ day

18  of _____, 2012.

19

20  _____

21

22      NOTARY PUBLIC

23

24

25

# Exhibit RRR

Page 1

        IN THE UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF NEW YORK

YATRAM INDERGIT,          )
On behalf of himself      )
and others similarly      )
situated                  )
                          )
     Plaintiffs,          ) Civil Action File
                          ) No.  08Civ9361
vs.                       ) (PGG) (HBP)
                          )
RITE AID                  )
CORPORATION, RITE         )
AID OF NEW YORK,          )
INC., and FRANK           )
OFFOR as Aider &          )
Abettor,                  )
                          )
     Defendants.          )


                    -  -  -


                  Deposition of
                  PAUL JOHNSON

             (Taken by Plaintiffs)

               Atlanta, Georgia
               February 21, 2012


    Reported by: Lynne C. Fulwood

             Certified Court Reporter

REPORTED BY: Lynne C. Fulwood, CCR www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400
be57bd09-d44f-422d-9df3-2a74de31709a

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ9361(PGG) (HBP)

Paul Johnson        February 21, 2012

Page 111

1   into the system that the manager oversees.

2        Q     Okay.  But that's the three-step, if

3   you will, process, correct?  Store manager

4   enters data, Workforce Management automatically

5   generates a schedule and then store manager can

6   edit that schedule?

7        A     Yes.

8             MS. CAMPBELL:  Object to the form

9        of the question.

10  BY MS. SCOTT:

11       Q     That's a yes?

12       A     Yes, that's how they work, yes.

13       Q     Do you know if Workforce Management

14  was a software product that was created by Rite

15  Aid internally or was it purchased by an

16  outside company?

17       A     That I do not know.

18       Q     What factors are utilized when

19  Workforce Management automatically creates that

20  schedule?

21            MS. CAMPBELL:  Object to the form

22       of the question.

23       A     I don't understand your question of

24  factors.  What are you looking for for factors?

25  BY MS. SCOTT:

REPORTED BY: Lynne C. Fulwood, CCR www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022  (404) 875-0400
be57bd09-d44f-422d-9df3-2a74de31709a

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ9361(PGG) (HBP)

Paul Johnson        February 21, 2012

Page 112

1      Q      What -- how does Workforce Management

2   automatically generate that schedule?  What

3   factors is it relying upon?

4           MS. CAMPBELL:  Object to the form

5      of the question.  Answer if you can.

6      A      As I stated previously, the manager

7   inputs that information.  Those are the

8   factors.

9   BY MS. SCOTT:

10     Q      So it's just based upon the

11  information that the manager inputs?

12     A      The manager inputs the information

13  into the system based on the associate's

14  availability and then they rank the associates

15  based on their qualifications that they're able

16  to do --

17     Q      It's also based upon a forecast of

18  the budget, the labor budget, correct?

19          MS. CAMPBELL:  Object to the form

20     of the question.

21     A      The stores have a -- have a budget or

22  a fixed number of hours that they are required

23  to come within guidelines.  The Workforce

24  Management System works towards those numbers.

25     Q      Right.  In creating the schedule

REPORTED BY: Lynne C. Fulwood, CCR www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022 (404) 875-0400
be57bd09-d44f-422d-9df3-2a74de31709a

Yatram Indergit, et al. v. Rite Aid Corporation, et al.   08Civ9361(PGG) (HBP)

Paul Johnson        February 21, 2012

Page 113

1    though, are -- is data from sales for the store

2    entered by the store manager?

3         A    Into the Workforce Management?

4         Q    Yes.

5         A    It is not.

6         Q    It is not.  Is that a factor that's

7    relied upon in determining the schedule?

8         A    The Workforce Management System is

9    based automatically on their hours that have --

10   that have been set for that store.

11        Q    Okay.  So the payroll's already been

12   determined by corporate and that's a factor in

13   the schedule that's set for Workforce

14   Management?

15        A    Again, it's based on what I said

16   earlier about the tier for each store, there's

17   a set number of hours for each of those tiers.

18   That's what's in the system.

19        Q    And a store manager can't go over

20   that hourly budget, correct?

21        A    They are not to schedule over those

22   hours, correct.

23        Q    Is the store manager's salary a part

24   of the budget that's considered by Workforce

25   Management?

REPORTED BY: Lynne C. Fulwood, CCR www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022 (404) 875-0400
be57bd09-d44f-422d-9df3-2a74de31709a

Paul Johnson        February 21, 2012

Page 265

1    Page_____ Line_____should

2    read:_____

3    Reason for

4    change:_____

5

6    Page_____ Line_____should

7    read:_____ Reason for

8    change:_____

9

10   Page_____ Line_____should

11   read:_____ Reason for

12   change:_____

13

14   _____

15   Signature

16   Sworn to and Subscribed before me

17   _____, Notary Public.

18   This_____day of _____, 2012.

19   My Commission Expires:

20

21

22

23

24

25

be57bd09-d44f-422d-9df3-2a74de31709a

Exhibit SSS

```
 1                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2

 3

 4   Yatram Indergit, on behalf of      )
     himself and others similarly       )
 5   situated,                          )
                                        )
 6                    Plaintiffs,       )
                                        )
 7         vs.                          ) CIVIL ACTION FILE NO.:
                                        ) 08Civ9361 (PGG)(HBP)
 8                                      )
     Rite Aid Corporation, Rite Aid of  )
 9   New York, Inc., and Frank Offor,   )
     as Aider & Abettor,                )
10                                      )
                      Defendants.       )
11
                          -  -  -
12

13              VIDEOTAPED DEPOSITION OF
                      JOHN PERKINS
14               FEBRUARY 21, 2012
                     9:00 A.M.
15

16

        OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
17            191 PEACHTREE STREET, N.E.
                    SUITE 4800
18               ATLANTA, GEORGIA

19

20

21
     REPORTED BY:
22           STEVEN S. HUSEBY, RPR
                 CCR-B-1372
23

24

25
```

```
 1        Q.    Okay.  But Mr. Barrett didn't come in
 2   and tell you, John, this is only being applied
 3   to your district?
 4        A.    Correct.
 5        Q.    Now, for all of the assistant store
 6   managers in your district, are they all still
 7   salaried?
 8        A.    All the districts -- assistant
 9   managers in my current district, they are all
10   hourly.
11        Q.    And when did that change occur?
12        A.    90 percent of them occurred at the
13   time when the change was made for the manager
14   position going to an hourly position.  The
15   other two in the higher volume stores was
16   changed a year, year and a half ago.
17        Q.    Now, during this transition over the
18   last two to three years from 90 percent of
19   your store managers switching from salaried to
20   hourly and 100 percent of your assistant store
21   managers ultimately switching from salaried to
22   hourly, did any of their job descriptions
23   change?
24              MS. ZELDIN:  Object to the form.
25              THE WITNESS:  No.
```

1     BY MR. ELLWANGER:

2          Q.   Did any of their job duties change?

3               MS. ZELDIN:  Objection.

4               THE WITNESS:  No.

5     BY MR. ELLWANGER:

6          Q.   So the only thing that changed as a

7     part of this policy was that the vast majority

8     of them were switched from salaried to hourly?

9               MS. ZELDIN:  Object to the form.

10              THE WITNESS:  Correct.

11              MS. ZELDIN:  Sorry, go ahead.

12              THE WITNESS:  Correct.

13    BY MR. ELLWANGER:

14         Q.   Was any reasoning given to you by your

15    regional vice president as to why assistant

16    store managers were changed from salaried to

17    hourly?

18         A.   No.

19         Q.   Once the store managers who became

20    hourly were switched to hourly did they then

21    become eligible for overtime?

22         A.   Yes.

23         Q.   Prior to that switch being made and

24    they were salaried employees were they

25    eligible for overtime?

1        A.    No.

2        Q.    But to be clear, their job

3    responsibilities did not change?

4              MS. ZELDIN:   Object to the form.

5              THE WITNESS:   Correct.

6    BY MR. ELLWANGER:

7        Q.    And let's ask the same questions about

8    assistant store managers.  Prior to assistant

9    store managers being switched from salaried to

10   hourly, were they eligible for overtime?

11       A.    When they were salaried position?

12       Q.    Correct.

13       A.    No.

14       Q.    Are they eligible for overtime now?

15       A.    Yes.

16       Q.    But did their job duties change at

17   all?

18              MS. ZELDIN:   Object to the form.

19              THE WITNESS:   No.

20   BY MR. ELLWANGER:

21       Q.    Did the number of hours that a store

22   manager is expected to work change when their

23   salary changed to hourly?

24              MS. ZELDIN:   Object to the form.

25              THE WITNESS:   Yes.

1  BY MR. ELLWANGER:

2     Q.   How many hours were they expected to

3  work as a salaried employee?

4               MS. ZELDIN:  Object to the form.

5               THE WITNESS:  50.

6  BY MR. ELLWANGER:

7     Q.   How many hours were they expected to

8  work as an hourly employee?

9               MS. ZELDIN:  Object to the form.

10  Are you talking about in his district?

11              MR. ELLWANGER:  Yes.

12              MS. ZELDIN:  Okay.

13              THE WITNESS:  45.

14  BY MR. ELLWANGER:

15    Q.   And were they paid overtime for any

16  hours over 40 or just hours over 45?

17    A.   Hours over 45.

18    Q.   And are they paid time and a half?

19    A.   I'm sorry, did I say 45?

20    Q.   Yes.

21    A.   I'm sorry, hours over 40, I apologize.

22    Q.   So and the schedule, they are

23  scheduled for five hours of overtime every

24  week?

25    A.   Correct.

Yatram Indergit vs. Rite Aid Corporation, et al.
John Perkins on 02/21/2012

08Civ9361 (PGG)(HBP)
Pages 362..365

**Page 362**

E R R A T A   S H E E T

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or the Official Code of Georgia Annotated 9-11-30(e) any changes in form or substance which you desire to make to your deposition testimony shall be entered upon the deposition with a statement of the reasons given for making them.

To assist you in making any such corrections, please use the form below. If supplemental or additional pages are necessary, please furnish same and attach them to this errata sheet.

I, the undersigned, JOHN PERKINS, do hereby certify that I have read the foregoing deposition and that to the best of my knowledge said deposition is true and accurate (with the exception of the following corrections listed below).

Page_____ Line_____should read:_____
Reason for change:_____

Page_____ Line_____should read:_____
Reason for change:_____

Page_____ Line_____should read:_____
Reason for change:_____

Page_____ Line_____should read:_____
Reason for change:_____

**Page 363**

Page_____ Line_____should read:_____
Reason for change:_____

Page_____ Line_____should read:_____
Reason for change:_____

Page_____ Line_____should read:_____
Reason for change:_____

Page_____ Line_____should read:_____
Reason for change:_____

Page_____ Line_____should read:_____
Reason for change:_____

Page_____ Line_____should read:_____
Reason for change: No Changes

Signature _____

Sworn to and Subscribed before me

_____ Notary Public.

This ____ day of March, 2012.

My Commission Expires: _____   STV

Mary E. Spears, Notary Public #58914
My commission expires with my life

**Page 364**

C E R T I F I C A T E

G E O R G I A:

FULTON COUNTY:

I hereby certify that the foregoing deposition was reported, as stated in the caption, and the questions and answers thereto were reduced to written page under my direction; that the foregoing pages represent a true and correct transcript of the evidence given. I further certify that I am not in any way financially interested in the result of said case.

Pursuant to Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as an independent contractor for Huseby, Inc.

**Page 365**

I was contacted by the offices of Huseby, Inc. to provide court reporting services for this deposition. I will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-7 (a) or (b).

I have no written contract to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition. I will charge my usual and customary rates to all parties in the case.

This, the 24th day of February, 2012.

_____
STEVE S. HUSEBY, CCR-B-1372
My Commission Expires
January 20th, 2015.

Exhibit TTT

Page 1

1
2 UNITED STATED DISTRICT COURT
3 SOUTHERN DISTRICT OF NEW YORK
4 -------------------------------x
5 YATRAM INDERGIT, on behalf of himself
6 and all others similarly situated,
7            Plaintiffs,    Index No
8            - against -      08CV9361(PGG)
9 RITE AID CORPORATION, RITE AID OF
10 NEW YORK, INC. and FRANCIS OFFOR
11 as Aider & Abettor,
12            Defendants.
13 -------------------------------x
14            January 26, 2012
             250 Park Avenue
15
             New York, New York
16           9:03 a.m.
17
18
19           Videotaped Deposition of WILLIAM
20 SPINK, taken by the Attorneys for the Plaintiff,
21 pursuant to Notice, before Bonnie Kreuzburg, a
22 Shorthand Reporter and Notary Public within and
23 for the State of New York.
24
25

Page 2

1
2 A P P E A R A N C E S :
3
4    VALLI KANE & VAGNINI
5    Attorneys for Plaintiffs
6       600 Old Country Road
7       Garden City, New York  11530
8    BY:  DEBORAH L. RUBIN, ESQ.
9
10
11   OGLETREE, DEAKINS, NASH,
12   SMOAK & STEWART, P.C.
13   Attorneys for Defendants
14      191 Peachtree Tower
15      Atlanta, Georgia  30303
16   BY:  MARGARET H. CAMPBELL, ESQ.
17
18
19 ALSO PRESENT:  Gavin McCandlish, Intern with
20       Valli Kane & Vagnini
21
22       Videographer, Tim Rugman
23
24
25

Page 3

1            S T I P U L A T I O N S
2       IT IS HEREBY STIPULATED AND AGREED, by and
3 between the attorneys for the respective parties
4 hereto, that the sealing and filing of the within
5 deposition be waived; that such deposition may be
6 signed and sworn to before any officer authorized
7 to administer an oath with the same force and
8 effect as if signed and sworn to before a Justice
9 of this Court.
10
11       IT IS FURTHER STIPULATED AND AGREED
12 that all objections, except as to form, are
13 reserved to the time of trial.
14
15       IT IS FURTHER STIPULATED AND AGREED
16 that the within examination and any corrections
17 thereto may be signed before any Notary Public
18 with the same force and effect as if signed and
19 sworn to before this Court.
20
21
22
23
24
25

Page 4

1
2       THE VIDEOGRAPHER:  United States
3 District Court, Southern District of New
4 York.  Yatram Indergit, on behalf of himself
5 and all others similarly situated,
6 Plaintiff, versus Rite Aid Corporation, Rite
7 Aid of New York, Inc., and Francis Offor, as
8 Aider & Abettor, Defendants.  Index number
9 08CV9361(PGG).
10 W I L L I A M   S P I N K,
11 called as a witness, having been first duly
12 sworn by the Notary Public (Bonnie
13 Kreuzburg), was examined and testified as
14 follows:
15       COURT REPORTER:  Please state your
16 name for the record.
17       THE WITNESS:  William Spink.
18       COURT REPORTER:  Please state your
19 address for the record.
20       THE WITNESS:  1503 Genesee Street,
21 Utica, New York 13501.
22 EXAMINATION BY
23 MS. RUBIN:
24    Q.   Good morning, Mr. Spink.
25    A.   Good morning.

1 (Pages 1 to 4)

Page 73

W. Spink

1
2     A.    I understand internal to be associates
3  that are paid by Rite Aid.  I understand internal
4  -- and external could also include our vendor
5  business partners, who are our customers, and also
6  at some point act in a position of associate when
7  they're bringing their product in the store, to
8  fill the shelf space that warehouses that
9  individual products.
10    Q.    Can you read number 5 for the record?
11    A.    "Responsible for the district retail
12  budgets, including sales, script growth, margin,
13  labor, and expenses, and overall P&L results,
14  monthly, to ensure operating income and EBITDA are
15  achieved."
16    Q.    Would you agree that number 5 was part
17  of your duties and responsibilities as a district
18  manager?
19    A.    I would agree.
20    Q.    Could you tell me what your
21  involvement was in the district retail budgets,
22  including sales?
23    A.    I'd ask that to be more specific,
24  because that's broad.
25    Q.    Well, I want to understand what your

Page 74

W. Spink

1
2  responsibility was relating to district retail
3  budgets.
4     A.    I was accountable to work towards
5  achieving those budgets.
6     Q.    For each district you worked in, you
7  were given a budget, a retail budget?
8     A.    As a district manager?
9     Q.    As a district manager.
10    A.    Yes.
11    Q.    And you had to achieve those budgets?
12    A.    That was the goal.
13    Q.    Did you achieve those budgets?
14    A.    I don't recall every time, no.  Most
15  of the time, did I?  I would like to believe I
16  did.  I think that certainly I either achieved
17  them, came very close to achieving them or
18  exceeded them.
19    Q.    Could you tell me what's involved in a
20  district retail budget?
21    A.    I don't understand your question in
22  regards to what's involved.
23    Q.    Well, I personally do not know what is
24  part of a retail budget, so if you could explain
25  what is part of a retail budget in a Rite Aid

Page 75

W. Spink

1
2  district, that would be helpful.
3     A.    You would have a sales budget.  You
4  have expense budgets.  You have EBITDA budget.
5     Q.    That encompass the retail budget?
6     A.    The part that I'm accountable for.
7     Q.    There was another part?
8     A.    There's the corporate budget.
9     Q.    And you were not accountable for the
10  corporate budget?
11    A.    I'm accountable for the field EBITDA,
12  not the corporate EBITDA.
13    Q.    Now, could you tell me what EBITDA is?
14    A.    The Earnings Before Interest, Taxes,
15  Depreciation and Amortization.
16    Q.    Is there any other way of describing
17  it?
18    A.    Not that I'm aware of.
19    Q.    Is it considered your profit at the
20  end of the day?  Maybe not the day.
21    MS. RUBIN:  Strike that.
22    Q.    Is it considered your profit?
23    A.    The profit is not the EBITDA.  In any
24  textbook I've ever studied, it is the cash flow.
25    Q.    We're going to come back to this.

Page 76

W. Spink

1
2     A.    Okay.
3     Q.    How are you responsible for script
4  growth as a district manager?
5     A.    Up to 2009?
6     Q.    As a district manager.
7     A.    Between 2003 to 2009?
8     Q.    Between 2003 to 2009, yes.
9     MS. CAMPBELL:  I'm going to object to
10  the form of the question, because if you're
11  purporting to ask him a question about
12  number 5 --
13    MS. RUBIN:  Yes, I am.  I'm looking at
14  5.  Number 5 says "responsible for the
15  district retail budgets, including sales,
16  script growth, et cetera, so I'm trying to
17  break it down by each point.
18    Q.    So, how are you responsible for script
19  growth?
20    A.    In varying degrees.  The pharmacy
21  district manager is more accountable for that than
22  myself.  I am there to influence and support the
23  pharmacy district manager.
24    Q.    Do you think you are not responsible
25  for script growth then?

19 (Pages 73 to 76)

Page 149

W. Spink

1
2    Q.    What is that?
3    A.    That's where a district manager is
4    recognized in the company for outstanding
5    performance.
6    Q.    Is there a national recognition?
7    A.    Yes.
8    Q.    Did you aspire to become a district
9    manager of the year?
10    A.    It would have been nice.  Sometimes
11    those metrics that you have to achieve are not
12    always in your control.
13    Q.    Do you know how one would become the
14    district manager of the year?
15    A.    Between the years 2003 and 2009, I
16    cannot say with complete confidence I know, other
17    than it was based off the performance results of
18    the district.
19    Q.    Do you know who selects the district
20    manager of the year?
21    A.    I don't know confidently.  It would be
22    the executive leadership team.
23    Q.    When you were working as a district
24    manager, did you want to be promoted to regional
25    vice-president?

Page 150

W. Spink

1
2    A.    Yes.
3    Q.    Why?
4    A.    I have always been someone who always
5    wanted to excel.
6    Q.    Have you discussed with anyone in the
7    company what is involved in the job duties of a
8    regional vice-president?
9    A.    Yes.
10    Q.    Who have you discussed that with?
11    A.    Various vice-presidents that I have
12    worked for.
13    Q.    Is there something about their job
14    duties that made you want to be a regional
15    vice-president?
16    A.    I get personal satisfaction about
17    being able to influence other people's lives and
18    see them be able to develop and grow and get
19    promoted.  So, that is probably one -- one of the
20    variety of reasons I'd like to advance.
21    Q.    Anything else about the job duties
22    that have encouraged you at the time to get
23    promoted to regional vice-president?
24    MS. CAMPBELL:  Objection to the form
25    the question.  Answer, if you can.

Page 151

W. Spink

1
2    A.    It's just a personal goal for myself,
3    as I want to advance into the company as far as I
4    can.
5    Q.    When you were a district manager, what
6    were you trying to do to show your superiors that
7    you had promotion potential?
8    A.    Develop a good team, a team of
9    managers that really took ownership, and managers
10    that were encouraged to develop themselves to want
11    to do more themselves.
12    Q.    Do you believe that meeting company
13    goals and staying within budget would be looked at
14    as a good factor in promoting you?
15    MS. CAMPBELL:  Object to the form of
16    the question.
17    A.    I would ask you to maybe restate that,
18    because it really -- there's a lot more to that
19    than just company budgets to get promoted.
20    Q.    Do you believe that the success of
21    your stores would translate into seeing you as a
22    candidate with promotion potential?
23    MS. CAMPBELL:  Object to the form of
24    the question.  You're asking about what
25    somebody else thinks.

Page 152

W. Spink

1
2    MS. RUBIN:  I'm asking what he thinks.
3    A.    I would say not always does that
4    partake, is that a single factor.
5    Q.    Did you request that position of
6    pharmacy district manager?
7    A.    I had conversations in that -- that
8    year that I was in Connecticut with the pharmacy
9    regional vice-president about a pharmacy district
10    manager position, yes.
11    Q.    It was a position that you wanted?
12    A.    Yes.  At the time they had taken some
13    DMs and made them non-licensed pharmacy district
14    managers, and it was another part of the business
15    I could learn.
16    Q.    I want to be clear.  Was it a request
17    that you made or a decision the company made that
18    you went along with?
19    A.    A combination.
20    Q.    Are you happy in the position?
21    A.    Yes.
22    Q.    Do you still want to be promoted to
23    regional vice-president?
24    A.    Yes.
25    Q.    Do you know what a SYSM is?

Page 153

W. Spink

1
2     A.    Yes.
3     Q.    What is it?
4     A.    I like to refer to it as an outdated
5   form of e-mail.
6     Q.    Did you use SYSMs in communicating
7   with your store managers?
8     A.    Yes.
9     Q.    How often?
10    A.    It varies.  Sometimes daily, sometimes
11  every other day.
12    Q.    Did you ever receive SYSMs from your
13  store managers?
14    A.    Yes.
15    Q.    Is that also daily or every other day?
16    A.    Well, there is one of me and 28 of
17  them.  It was every day.
18    Q.    Did you ever receive SYSMs from your
19  regional vice-president?
20    A.    Yes.
21    Q.    How often?
22    A.    Sometimes daily, sometimes every other
23  day.  That varied.
24    Q.    Were there specific things that you
25  would communicate by SYSMs to your store managers?

Page 154

W. Spink

1
2     A.    Really, it would depend.  It varied
3   from the district that I was in.
4     Q.    Was there anything that you regularly
5   communicated through SYSM?
6     A.    Yes.
7     Q.    What was that?
8     A.    Customer service scores.
9   Computer-based compliance -- computer-based
10  training compliance scores.  That's probably two
11  of the ones that were consistent across all three
12  districts.
13    Q.    Did you expect your store managers to
14  review the SYSMs they received from you?
15    A.    Yes.
16    Q.    Did all of your SYSMs to store
17  managers require a response?
18    A.    No.
19    Q.    Did you have a way of knowing whether
20  or not they viewed a SYSM from you?
21    A.    I believe there is a way on the system
22  I can tell that, but I can definitely tell you I
23  didn't generally do that.  I entrusted that they
24  read and communicated properly.
25    Q.    What sorts of things would be in SYSMs

Page 155

W. Spink

1
2   from your regional vice-president?
3         MS. CAMPBELL:  Object to the form of
4   the question.  To whom?
5     Q.    To you.
6     A.    During the years of 2003 to 2009, as
7   my time as a district manager, we would get SYSMs
8   listing generally the CSI scores for the district.
9   If there was an initiative coming out or an
10  initiative that they wanted to follow up with to
11  make sure we are all promoting in the stores.  It
12  really varied from season to season, from time of
13  year to time of year.  It's very difficult for me
14  to say what kind of SYSMs I got.  A lot of times
15  they would be unique to the current event --
16  current events.
17    Q.    Would you ever get SYSMs from anyone
18  above the regional vice-president?
19    A.    It was rare, but there would be times,
20  yes.
21    Q.    From who, if you remember?
22    A.    The senior vice-president.
23    Q.    Anyone else?
24    A.    There could be others.  Sometimes the
25  SYSMs may come out from corporate.  Maybe a SYSM

Page 156

W. Spink

1
2   coming out to -- something to remind us to remind
3   our stores about.
4     Q.    And, when you say us?
5     A.    When I refer to us, to the district
6   management team.
7     Q.    How often would you get SYSMs from
8   corporate?
9     A.    It varied from time to time.  It
10  depended, again, on the season, what was -- what
11  was potentially the -- the, um, issue that they
12  wanted to communicate with the field leadership
13  team and the store teams.
14    Q.    More than once a year?
15    A.    I would say yes.
16    Q.    More than four times a year?
17    A.    I would say yes.
18    Q.    Once a month?
19    A.    I can't say that confidently here,
20  thinking for 20 seconds about 2003 to 2009, but I
21  would have to say that I'm sure there was some
22  communication that came out on a monthly basis
23  that may have impacted all the stores that they
24  wanted to communicate to the district management
25  team as well as the store teams.

39 (Pages 153 to 156)

[Page 79]

[Page 79]

```
 1            A C K N O W L E D G E M E N T

 2                 O F   D E P O N E N T

 3

 4        I, BILL SPINK, acknowledge that I have read

 5    the entire transcript of my deposition taken in

 6    the captioned matter or the same has been read

 7    to me, and the same is true and accurate, save

 8    and except for changes and/or corrections, if

 9    any, as indicated by me on the DEPOSITION

10    ERRATA SHEET hereof, with the understanding

11    that I offer these changes as if still under

12    oath.

13    _____

14                 BILL SPINK

15

16    Subscribed and sworn to on the 10th day of

17    August    , 2012 before me,

18    _____

19    Notary Public,

20    in and for the State of New York

21              JACQUELINE M. EMMA
                Notary Public, State of New York
                Qualified in Oneida County
22         Commission Expires 10/22/14

23

24

25
```

# Exhibit UUU

[Page 1]

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

YATRAM INDERGIT, on behalf of himself  :

and others similarly situated,           :

                    Plaintiffs,     :   CASE NO.

       -vs-                            :   9361 (PGG)

RITE AID CORPORATION, RITE AID OF        :

NEW YORK, INC. and FRANK OFFER as        :

Aider & Abettor,                          :

                Defendants.    :

----------------------------------------X

_____

  Videotaped Deposition Testimony of KRISTIN CRANDALL

_____

             TAKEN BY:  PLAINTIFFS

             BEFORE:    KATHRYN PLIZGA, RPR

                     NOTARY PUBLIC

             TIME:      MAY 24, 2012, 9:49 A.M.

             PLACE:     PEPPER HAMILTON, LLP

                     100 MARKET STREET, SUITE 200

                     HARRISBURG, PENNSYLVANIA

[Page 52]

1    there is a process for approving job descriptions.

2           And typically it is the leader of the work

3    center who's responsible, like that position would report

4    up into.  That would be the impetus for writing the job

5    description and creating the contents.

6           And then there's a review process of that that

7    would include the leader typically of that pyramid.  In

8    this case it would be the store operations pyramid.

9           And then there's also a review by the HR

10   department which is typically our compensation and

11   benefits team that actually puts it in this job

12   description format and looks for, you know, form and

13   types of content and the job descriptions in general.

14          So I don't recall signing off on specifically

15   the store manager one.  But typically it would be the

16   pyramid, the store operations pyramid, and then the HR

17   department; but more on the benefit and compensation

18   side to sign off on the structure of the job description.

19       Q.   Perhaps an easier question for me to ask and

20   for you to answer is whether or not you have knowledge

21   of the different store manager job descriptions that Rite

22   Aid has?

23       A.   Yes.

24       Q.   Do you know how many different job description

25   forms Rite Aid maintains for its store managers?

[Page 53]

1          MR. TURNER:  Objection, vague.

2     A.   Yeah, I am aware of there being two --

3     Q.   What are they?

4     A.   -- at the current time.

5          They're both called store manager.  There's an

6  exempt store manager position and there's a non-exempt

7  store manager position.

8     Q.   I'm not trying to make this a memory test, just

9  asking you if you know without having to go through it,

10 do you know the differences between the exempt store

11 manager job description and the non-exempt store manager

12 job description?

13         MR. TURNER:  Objection.  To the extent you need

14 to review the documents, since you are testifying on

15 behalf of the company, then you should feel free to

16 review them.

17         If you're asking her in her personal knowledge,

18 then it's outside the scope.

19         MR. ELLWANGER:  I will ask her as a corporate

20 representative, so feel free to review.

21         MR. TURNER:  Objection, the documents speak for

22 themselves also.

23    A.   The two job descriptions are very, very

24 similar.  There is a slight wording difference in one

25 portion of the job descriptions.

1          In general, with both, whether the store manager

2     is exempt or non-exempt, they are in charge of the store,

3     the enterprise, so to speak, fronting a million plus --

4     in most cases a million plus dollar business.

5          So they are responsible for the running of that

6     store, the profit and loss of the store, various parts of

7     being responsible for being the head of the enterprise or

8     running the store.

9          So the job descriptions themselves are very

10    similar other than, again, just a couple of wording

11    things.  And then, of course, the designation of salary

12    versus hourly in the description at the top of it.

13          MR. ELLWANGER:  Object to non-responsive.

14    Q.   Is the only difference between the store

15    manager job description for exempt employees and the

16    store manager job description for non-exempt employees

17    the difference between how those salaries are classified

18    on those two different job descriptions?

19    A.   No.  As I stated, there are some wording

20    differences.

21          Do you want me to point out the exact    wording

22    differences?

23    Q.   As Mr. Turner pointed out, the documents speak

24    for themselves.

25    A.   Okay.

[Page 73]

1      Q.    And you participated in these discussions that

2   occurred in the past?

3      A.    Well, the past is a long time.  I have

4   participated in some of the conversations.  I doubt I was

5   part of all of them.

6      Q.    Okay.  Is there a particular time frame you're

7   thinking about when the bulk of these discussions took

8   place?

9      A.    Yes, in the time frame of early 2009, we were

10  really looking at making lots of changes to our store

11  operations, simplifying processes, changing payroll

12  allocation, things of that nature.  And there was a big

13  push at that time.

14        That's when we first clarified in a written way

15  that was disseminated to our district teams on the

16  expectations of what type of staff should be working in

17  the store.

18     Q.    Okay.  So that's 2009, I want to leave that for

19  a minute, and we'll go back to it.

20        Present day maybe, let's go back one year from

21  today, have there been any discussions from the business

22  side about the classification of store managers?

23        MR. TURNER:  Subject to -- and don't disclose

24  any privileged conversations or communications -- so

25  subject to that you may answer.

[Page 74]

1    A.   Yeah.  Not that it wouldn't fall under a

2    privileged-type discussion.

3    BY MR. PRICE:

4    Q.   Okay.  Has Rite Aid opened any stores in the

5    last year?

6         MR. TURNER:  Objection, exceeds the scope.

7    A.   If we have opened stores it's -- I am not

8    aware of just a new store opening -- you might have a

9    store that's considered new if you account for maybe a

10   relocation.  We're not on a track for opening a lot of

11   new stores.  I can't say with certainty we didn't open

12   any, there weren't many if there were any at all though.

13   Q.   Understood.  That was more of a foundational

14   question.  What I want to get at is I want to understand

15   the process of what Rite Aid does present day when a new

16   store is opened or a store is reconfigured to where there

17   will be a volume shift or a size shift.

18        I want to understand how the determination is

19   made as to how a store manager is going to be classified

20   exempt versus non-exempt.  Can you explain that to me?

21   A.   In general, the stores will look at from a

22   front-end store volume.  So front end, I mean, it's most

23   things that aren't actual prescriptions.

24        So we'll look at that front-end store volume,

25   we'll go back to the charts that we created -- I'm pretty

[Page 75]

1    sure you've seen -- that say if the front-end store

2    volume is within this range, it gets a certain complement

3    of management or leadership positions.  And it outlines

4    our shift supervisors, assistant managers, co-managers

5    and store managers.

6         And along with that would be the exempt

7    classification for the store manager position.

8         Q.   When you say along with that it's the exempt

9    store manager, it's not always exempt though, is that

10   right?

11        A.   No.  That's going to be dependent mostly on the

12   volume and the chart that -- there are charts at

13   different store volumes that we've said, if you're at

14   this volume you have approximately "X" amount of shift

15   supervisors, you may or may not have an assistant manager

16   and the store manager may be exempt or non-exempt.  Those

17   things are all part of the discussion as we reconfigure,

18   open or move a store.

19        Q.   Okay.  Do you know of any instances where Rite

20   Aid has deviated from the recommendation of the chart

21   with respect to the classification of the store manager

22   when your store opens?

23        MR. TURNER:  Object to form and exceeds the

24   scope.

25        A.   What I do now, I don't know every -- I don't

1    have a chart of every store that has exempt versus the

2    non-exempt store manager in it today.  But I can tell you

3    what I do know.

4            There have been instances where a store might be

5    right on the cusp of being either exempt or non-exempt

6    and we'll do a pretty in-depth look at the

7    responsibilities, the staffing, the manager's style as to

8    how they run their business.  And we'll try to make sure

9    that we've put them in the right classification, whether

10   it's exempt or non-exempt.

11           So we have the stores that are right on the

12   border, a store that may have out-performed expectations

13   in one year, so it's a higher volume.  We'll go in and

14   take a look at the store's situation, the store manager,

15   and make our decision from there.

16           So if there are exceptions, that's where I think

17   the majority of the -- you know -- if there are

18   exceptions that's where they would lie.

19   Q.   Have you been involved in that process of

20   analyzing these borderline cases?

21           MR. TURNER:  Objection, exceeds the scope.

22   You're asking her personally, correct?

23           MR. PRICE:  Yeah, I'm asking her personally at

24   this point but --

25   A.   Yeah, this would be from more of a personal --

[Page 89]

1     A.    What do you mean by data?

2     Q.    Well, there are parameters in the chart, right?

3     A.    Correct.

4     Q.    Here is how I am guessing the chart looks.

5     There's a table -- it's set up like a table and you

6     look and see -- it's this size and this --

7          MR. TURNER:  We can do this.  Can we get you

8     a copy of it?

9          MR. PRICE:  If we can do it during the depo

10    that would be great.

11         MR. TURNER:  Let's take a break and we'll do

12    it right now.

13         MR. PRICE:  Look, I'll move on, I will keep

14    going.  We will come back to the chart.  When it shows up

15    we will dig on it.

16         MR. TURNER:  That way we're not guessing at

17    what it looks like.

18         MR. PRICE:  I thought I had a good guess

19    though.  I was going to nail that.

20         MR. TURNER:  I know.

21         MR. PRICE:  You guys are going to think I was a

22    wonderful  questioner because I was able to guess that.

23    BY MR. PRICE:

24    Q.    Anyway, here we go.  So let's go back to 2009

25    then since we're going to put the chart on the table for

[Page 90]

1    a while.

2              So as of '09 we have some store managers that

3    are classified as non-exempt, right?

4         A.   Mid-way through 2009, yes.

5         Q.   Before the 2009 restructuring, were all store

6    managers exempt?

7         A.   Yes.  There may have been an exception of a

8    management trainee or something of that nature.  But the

9    job descriptions for the actual store manager position

10   were all exempt.

11        Q.   And then coming out of the 2009 restructuring,

12   a decision was made to make some of those store managers

13   non-exempt, correct?

14             MR. TURNER:  Objection as to form.  You can

15   answer.

16        A.   Yes.  There was a decision made that in

17   certain stores the store manager position was going to be

18   non-exempt.

19        Q.   Was the chart used to make those decisions at

20   that time?

21             MR. TURNER:  Object to form and exceeds the

22   scope.

23        A.   I wouldn't say it the way you just said it.

24   I would say that it defined the general expectations of

25   when there would be an exempt store manager versus a non-

1    exempt.

2         So it defines in general our expectation of

3    whether there would be an exempt or a non-exempt job code

4    available in a store.

5    BY MR. PRICE:

6    Q.   Okay.  But did it exist at the time of the

7    restructuring?

8         MR. TURNER:  I'm sorry, did what exist?

9    Q.   The chart.

10         MR. TURNER:  Objection, exceeds the scope.

11    A.   Yes, as we moved forward and made the changes

12    specific to the personnel side.  So operational changes

13    were going on all along like how we unload trucks and

14    how we bag purchases at the front register.  And, you

15    know, so there were operational decisions and efficiency

16    exchanging over a long period of time.

17         In some cases the store hours changed in some

18    stores.  So after looking at all that we said, okay, this

19    volume -- this is when we'll have a store manager that's

20    exempt versus non-exempt.

21         And as we made the personnel changes that went

22    along with this, that chart was the guide to who -- which

23    stores would be exempt and none-exempt.  And then the

24    next step of that would be the managers that were there

25    would either be put in one job code or the other.

1

2

3       I have read the foregoing transcript of my

4 deposition given on May 24, 2012, and it is true, correct

5 and complete, to the best of my knowledge, recollection

6 and belief, except for the corrections noted hereon

7 and/or list of corrections, if any, attached on a

8 separate sheet herewith.

9

10

11

12

13

14         _____

15           KRISTIN CRANDALL

16

17       Subscribed and sworn to

18       before me this 27th day

19       of June _____, 2012.

20

21

22

23           Notary Public

24           Notary Public

25