UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------
YATRAM INDERGIT, on behalf of himself
and all others similarly situated,

                         Plaintiff,

        v.                                             08 CV 9361 (JPO) (PGG)

RITE AID CORPORATION, RITE AID OF
NEW YORK, INC. and  FRANCIS
OFFOR as Aider & Abettor,

                         Defendants.
----------------------------------------------------------------


# MEMORANDUM OF LAW IN SUPPORT OF
# PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Robert J. Valli, Jr. (RV-9995)
James Vagnini (JV-2163)
Aneeba Rehman (AR-6404)
**Valli Kane & Vagnini LLP**
600 Old Country Road, Suite 519
Garden City, NY 11530
*Attorneys for Plaintiffs*

Jay D. Ellwanger
**DiNovo Price Ellwanger & Hardy LLP**
7000 North MoPac Expressway
Suite 350
Austin, Texas 78731
*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

Table of Contents............................................................................................*i*

Table of Authorities.......................................................................................*iii*

PRELIMINARY STATEMENT ......................................................................1

STATEMENT OF FACTS...............................................................................3

I.      All RA Stores Operate Under the Same Centrally Controlled, Corporate Driven

         Comprehensive Procedures and Policies....................................................3

         a.      RA's Hierarchy and Reporting Structure...........................................4

         b.  RA's Uniform Corporate Policies.....................................................5

                 i.  Portal..............................................................................5

                         1.  SYSMs/Emails.........................................................5

                 ii.  Corporate Directives and Control..........................................6

         c.  Corporate Supervision of All Stores....................................................8

         d.  Personnel Decisions and Staffing......................................................9

II.     RA Classified All SMs as Exempt Prior to 2009.........................................12

         a.  RA's 2009 Restructuring..............................................................13

                 i.  Store Operations and Frontend Workload Efficiency...................13

                 ii.  Classification Change of Some SMs.....................................14

III.    Uniform SM Job Descriptions.............................................................16

         a.  2009 Restructuring and Job Description...........................................17

IV.     Uniform Training For All SMs.............................................................18

V.      All SMs are Required to Perform Similar Duties in a Similar Manner ...............19

VI.     Payroll and Budget..........................................................................22

i

LEGAL ARGUMENT..................................................................................................23

I. Background Legal Framework..............................................................................23

    a. New York Labor Law.......................................................................................23

    b. Rule 23 Standards.............................................................................................24

II. Plaintiffs Satisfy the Rule 23 Requirements......................................................24

    a. Numerosity is Met Under Rule 23(a)(1).........................................................24

    b. Commonality is Met Under Rule 23(a)(2).......................................................25

    c. Plaintiffs' Claims are Typical of the Class Claims.........................................27

    d. Plaintiffs Will Adequately Represent the Class..............................................29

        1.  Plaintiff's interests are consistent with the interest of other members of the

            class....................................................................................................29

        2.  Plaintiffs' attorneys are qualified, experienced and able to conduct the

            litigation.............................................................................................30

III. Common Questions Predominate.......................................................................30

IV. Class Treatment Is Superior to Other Alternatives..........................................33

    CONCLUSION...................................................................................................34

## TABLE OF AUTHORITIES

**Cases**

Ale v. TVA, 269 F.3d 680 (6th Cir. 2001) .................................................................................... 20

Amchem Products, Inc., v. Windsor, 521 U.S. 591 (1997) ........................................................... 32

Augustin v. Jablonsky (In re Nassau Country Strip Search Cases), 461 F.3d 219 (2d Cir. N.Y.

2006)...................................................................................................................................... 12, 33, 34

Baffa v. Donaldson, 222 F.3d 52 (2d Cir. 2000) ..................................................................... 29, 30

Caridad v. Metro-North Commuter R.R., 191 F.3d 283 ................................................................ 27

Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473 (2d. Circ. 1995) .................................... 24

Cuevas v. Citizens Financial Group, 2011 U.S. Dist. LEXIS 155160 (E.D.N.Y. May 21, 2011) 1,

3, 21 24, 26, 27, 30, 34

Damassia v. Duane Reade, Inc., 250 F.R.D. 152 (S.D.N.Y. 2008) 3, 17, 23, 24, 26, 29, 30, 32, 33

Espinoza v. 953 Assocs. LLC, 2011 U.S. Dist. LEXIS 132098 (S.D.N.Y. 2011) ....................... 27

Han v. Sterling Nat'l. Mortg. Co. Inc., 2011 U.S. Dist. LEXIS 103453 (E.D.N.Y. Sept. 14, 2011)

....................................................................................................................................................... 24, 27, 29

Hanlon v. Chrysler Corp., 150 F.3d 1011 (9th Cir. 1998)...................................................... 25, 30

Hearn v. Rite Aid Corp., 2012 N.J. Super. Unpub. LEXIS 643 (N.J. App. Div. Mar. 27,

2012)...3, 32

Iglesias-Mendez v. LaBelle Farm, Inc., 239 F.R.D. at *363, 371 (S.D.N.Y. Jan. 26, 2007) ....... 26

Indergit v. Rite Aid Corp., 2010 U.S. Dist. LEXIS 32322 (S.D.N.Y. Mar. 31, 2010)................. 20

Indergit v. Rite Aid Corp., No. 08 Civ. 9361 (PGG), 2010 U.S. Dist. LEXIS 60202 (S.D.N.Y.

June 15, 2010) ....................................................................................................................................... 6, 8

In re Initial Public Offerings Securities Litig., 471 F.3d 29 (2d Cir.

2006)……………………………………………………………………………………………..24

Jermyn v. Best Buy Stores, L.P., 276 F.R.D. 167 (S.D.N.Y. 2011) .............................................. 33

Johnson v. Big Lots Stores, Inc., 604 F.Supp.2d 903 (E.D. La 2009) .................................... 21, 23

Labbate-D'Alauro v. GC Servs. Ltd. P'ship., 168 F.R.D. 451 (E.D.N.Y. 1996) .......................... 34

Marisol A. v. Giuliani, 126 F.3d 372 (2d Cir. 1997) .................................................................... 28

McLaughlin v. Liberty Mut. Ins. Co., 224 F.R.D. 304 (D. Mass. 2004) ...................................... 32

Morgan v. Family Dollar Stores, 551 F.3d 1233 (11th Cir. Ala. 2008)) ............................ 3, 29, 32

Morris v. Affinity Health Plan, Inc., 2012 U.S. Dist. LEXIS 64650 (S.D.N.Y. 2012) ............... 27

Myers v. Hertz Corp, 624 F.3d 537 (2d Cir. 2010) ............................................................... 3, 5, 27

Nerland v. Caribou Coffee Co., 564 F. Supp.2d 1010 (D. Minn. 2007)....................................... 29

Niemiec v. Ann Bendick Realty, 2007 U.S. Dist. LEXIS 98840 (E.D.N.Y. Mar. 30, 2007) ....... 32

Pendlebury v. Starbucks, 518 F.Supp.2d 1345 (S.D. Fla. 2008) .................................................. 29

Perkins v. So. New England Tel. Co., 669 F. Supp. 2d 211 (D. Conn. 2009).............................. 32

Pippins v. KPMG, 2012 U.S. Dist. LEXIS 949 (S.D.N.Y. Jan. 3, 2012) ..................................... 27

Presby. Church of Sudan v. Talisman Energy, Inc., 226 F.R.D. 456 ........................................... 25

Ross v. RBS Citizens, N.A., 2010 U.S. Dist. LEXIS 107779 ....................................................... 26

Scott v. Aetna Servs., Inc., 210 F.R.D. 261 (D. Conn. 2002)....................................................... 32

Stinson v. City of New York, 2012 U.S. Dist. LEXIS 56748 (S.D.N.Y. Apr. 23, 2012) ............. 33

Tierno v. Rite Aid Corp., 2006 U.S. Dist. LEXIS 71794 (N.D. Cal., June 16, 2006)25, 26, 27, 28,

30, 31, 32

Torres v. Gristedes Oper. Co., 2006 U.S. Dist. LEXIS 74039 (S.D.N.Y. Sept. 26, 2009)........... 32

Toure v. Cent. Parking Sys., 2007 U.S. Dist. LEXIS 74056 (S.D.N.Y. Sept. 28, 2007) ............. 29

Wal-Mart v. Dukes, 131 S.Ct. 2541 (2011)............................................................................. 32, 33

Wang v. Chinese Daily News, Inc., 231 F.R.D. 602 (C.D. Cal. 2005) ........................................ 34

Willix v. Healthfirst, Inc., 2009 U.S. Dist. LEXIS 114818 (E.D.N.Y. Dec. 4, 2009)............ 25, 32

Youngblood v. Family Dollar Stores, Inc., 2011 U.S. Dist. LEXIS 115389 (S.D.N.Y. Oct. 4,

   2011)................................................................................. 2, 4, 16, 19, 21, 24, 25, 29, 30, 31, 32,

**Statutes**

29 U.S.C. § 207 (a)(1) (2012) ..................................................................................................... 23

Fed. R. Civ. P. 23(a) and 23(b) ........................................................................................ 2, 24, 26

N.Y. COMP. CODES R. & REGS. tit. 12, § 142-2.2 (2012)............................................................. 23

N.Y. LAB. LAW § 650 (Consol. 2012) et seq............................................................................... 23

**Treatises**

1 Newberg on Class Actions § 3.05 (2d ed.1985) ........................................................................ 24

## PRELIMINARY STATEMENT

Plaintiff, on behalf of himself and current or former New York State ("NYS") Rite Aid store managers ("SMs"), submit this Memorandum of Law in Support of Plaintiff's Motion for Class Certification under the New York Labor Law ("NYLL"). Plaintiff challenges Rite Aid's ("RA") corporate policy of classifying SMs as exempt from the overtime requirements of the NYLL. SMs' claim that they were systematically required to perform menial, non-exempt tasks without properly being paid overtime. The proposed class is:[1]

> All persons who have worked for Defendants as salaried Store Managers in New York State at any time between October 31, 2002 to the entry of final judgment in this case (the "Class Period"),and who have not been paid all wages owed to them, including overtime premiums, in violation of the New York Labor Law (the "Class").[1]

RA exercises strong centralized control over its stores with respect to virtually *every* aspect of store operations – from store appearance, lay out, merchandising, inventory control, pricing, staffing, budgeting, and personnel policies to the music played and the temperature of each store. RA's highly standardized chain store operation is purposefully designed to ensure that *all* SMs perform the same or substantially similar tasks in a similar manner. As evidenced in deposition testimony and Defendants' corporate documents, RA fosters homogeneity in the SMs job duties and the manner in which they are performed. The common question of law for all potential class members, is whether RA's policy of classifying all SMs as exempt prevented these SMs from collecting lawfully earned overtime compensation. In 2009, RA decided to pay some SMs overtime while claiming SMs are still exempt from overtime.

In May 2011, Judge Block ruled in favor of class certification in Cuevas v. Citizens Financial Group, 2011 U.S. Dist. LEXIS 155160 (E.D.N.Y. May 21, 2011). In Cuevas,

---

[1] In 2009, RA reclassified a number of their SMs. The now non-exempt hourly SMs only have a claim for the period they were salaried. Ex. 1, September 14, 2012 Stipulation.

1

Assistant Branch Managers ("ABMs") alleged defendants violated the NYLL by classifying all ABMs as exempt from the overtime requirements. Id. Plaintiffs moved for class certification contending that the class of ABMs met all the requirements for class certification and defendants opposed. Id. at 2. Judge Block granted Plaintiff's motion for class certification under FRCP 23(a) and (b)(3) holding that ABMs were allowed to proceed on as a class because, as in the case at bar, "the common issues predominate and the proposed class is 'sufficiently cohesive' to warrant class certification. Id. at 11, 18-19. Judge Block held that "a class action is the superior method of resolving the putative class members' claims." Id. at 14.

Likewise, in October 2011, Judge Berman held that class certification was appropriate where SMs suffered a similar blanket classification as exempt from overtime. Youngblood v. Family Dollar Stores, Inc., 2011 U.S. Dist. LEXIS 115389 (S.D.N.Y. Oct. 4, 2011). The store managers in Family Dollar, just as in the case at bar, alleged that while they were classified as managers exempt from overtime, their primary duties consisted of non-exempt, non-managerial duties. Id. at 6. They alleged that consistent with uniform corporate directives, all SMs spent their time performing tasks including stocking, unloading/loading trucks, operating the registers, facing products, shoveling, and cleaning and that these duties were largely consistent across the class. Id. at 10.

In granting class certification in Judge Berman held that Plaintiffs satisfied their burden and were able to show that despite some immaterial differences, the SMs presented common questions of law and fact which predominate over any individual questions. Id. at 16-17. The Court held that there was "nothing unfair about litigating a single corporate decision in a single collective action, especially where there is robust evidence that the store managers perform uniform, cookie-cutter tasks mandated by a one-size-fits-all corporate manual." Id. at 20 (citing

2

Morgan v. Family Dollar Stores, 551 F.3d 1233, 1264 (11th Cir. Ala. 2008)).

In Damassia v. Duane Reade, Inc., 250 F.R.D. 152, 154 (S.D.N.Y. 2008), class certification was granted on behalf of assistant managers challenging their exempt classification. Id. Duane Reade admitted that assistant managers were not paid overtime but claimed they were exempt. Id. at 155. Judge Lynch held that because all class members' claims were based on the *same* course of events and legal theory, class certification was appropriate. Id. at 158. In Myers v. Hertz Corp, 624 F.3d 537, 547-50 (2d Cir. 2010), the Court while denying certification, endorsed the holding in Damassia. The Hertz Court found that in Damassia because "plaintiffs were able to demonstrate that the plaintiffs' jobs were similar in ways material to the establishment of the exemption criteria," certification was appropriate. Id. at 549.[2]

Similar to Cuevas, Family Dollar and Damassia, in the case at bar, there are common questions of law and fact which predominate over any immaterial individual issues. *Infra,* Legal Arg., Sec. III. Plaintiff demonstrates below that their jobs were materially similar such to warrant class certification. As such, a Rule 23 class will best address the propriety of RA's classification of SMs as exempt in a judicially efficient and cost-effective manner.

## STATEMENT OF FACTS

I.      **All RA Stores Operate Under the Same Centrally Controlled, Corporate Driven Comprehensive Procedures and Policies**

RA is the third largest drugstore chain in the country operating approximately 4,667 stores nationwide. Ex. 2, RA 2012 Annual Report, p. 4.[3]   RA runs its stores subject to

---

[2] On March 27, 2012, the New Jersey Appellate Division reversed a denial of class certification for a class of RA assistant managers. Hearn v. Rite Aid Corp., 2012 N.J. Super. Unpub. LEXIS 643 (N.J. App. Div. Mar. 27, 2012). In Hearn, the Court held that individual issues did not predominate and that the focus of the decision is not the immaterial differences in experiences but the facts common to the class which predominate. Id. at 35-36.
[3] All exhibits are attached to the Declaration of Robert J. Valli Jr. ("Valli Dec.").

comprehensive, centrally derived, cookie-cutter policies.[4] RA directs all functions for all its stores including store operations, store systems, store processes, and company programs/initiative. Id.; DM Carpenter, p. 83.[5] RA also decides the classification of employees. Crandall 30(b)(6), p. 70; DM Carpenter, pp. 35-36. Regardless of store location, size, volume, staffing or any other variable, RA requires uniformity of all store operations. DM Virga, pp. 226 – 27. Consequently, RAs across the country and across NYS do not materially differ from store to store. RA accomplishes uniformity through constant and consistent contact with the stores using RA's Portal System, SYSMs[6]/emails, via DMs and even sending "Weekly Front-End Directives" from corporate directing the duties of SMs. Sadler 30(b)(6), p. 19; Ex. 16, Emails/SYSMs to Managers; Ex. 11, Weekly FE Directives.

    a.  RA's Hierarchy and Reporting Structure

    RA is broken down into divisions and each division is then broken down into regions and group levels which report into the division. Ex. 25, Exhibit 7 to Crandall 30(b)(6). Each region or group is broken down into districts. Currently, there are 14 regions and 8 groups. Id. Each district has a number of stores which report up to the District Mangers ("DM"). Id. The DM reports up to the Regional Vice President (RVP). Id.; DM Dilallo, p. 26. In New York City, there are 4 regions and 16 districts. Sadler 30(b)(6), p. 29. There are 328 stores in NYS alone.[7]

---

[4] Ex 3, RA''s Associate Atlas ("Atlas"); Ex. 4, RA's Store Management Guide ("SM Mgmnt Guide"); Ex. 5, RA's District Manager Store Visit Guide ("DM Store Visit"); Ex. 6, RA Tour Sheet; Ex. 7, RA's Principals of Merchandise Presentation ("POMP Manual"); Ex 8, Store Manager Office Standards and Set-Up ("SM Office Standards"); Ex. 9, RA's Management Development Program ("MDP"); Ex. 10, RA''s Front End Workload Efficiency ("FE Efficiency"); Ex. 11, RA's Weekly Front-End Directives ("Weekly FE Directives"); Ex. 12, RA DM Job Description; Ex. 13, RA Counseling/Development Form; Ex. 14, RA Discipline Guidelines, and Ex. 15, RA Hourly Associate Interview Guide.

[5] All deposition transcripts are attached as exhibits to the Valli Dec. Citations to transcripts will indicate job title ("SM" for store manager testimony and "DM" for district manager testimony) followed by the witness' last name and page number (e.g. Deposition of Plaintiff Yatram Indergit will read "SM Indergit, p. _"). All citations to 30(b)(6) depositions will include the corporate witness' last name followed by "30(b)(6)" and page number (e.g. Kristin Crandall 30(b)(6) Deposition will read "Crandall 30(b)(6)").

[6] "SYSMs" is RA's email messaging system. ("…a green screen e-mail system.") Markely 30(b)(6), p. 71.

[7] Rite Aid website, http://www.riteaid.com/careers/state_city.jsf?state=NY&storeCount=382.

4

b. RA's Uniform Corporate Policies

RA corporate disseminates uniform policies through a centrally-managed store "Portal" (*infra* I(b)(i)), and through communications from RVPs, DMs, and corporate executives. RA's protocols are not differentiated between regions, districts or stores. Rather, RA disseminates the same company-wide policies which command conformity with every imaginable matter down to requiring associates to "shave daily" and maintain a "normal hair color." Ex.3, Atlas at 4082. For example, the Associate Atlas governs the behavior of store level employees. It states that "[v]iolations of our standards [contained in the code of ethics and policy and procedure manuals] will result in corrective action, up to and including discharge." Id. at 4055.

*i. Portal*

The primary form of communication that RA uses to correspond with stores is the Store Portal ("Portal"). Portal is software that runs on a computer at each store and maintains communications and important documents. These documents include "guideline documents on various subjects." Sadler 30(b)(6), p. 53. "It contains reference materials such as policies and procedures, training documents, forms that stores may need to print and complete." Id. at 21. Portal contains communications including those that are sent "out on a *regular* basis that inform the stores of upcoming promotional activities that are happening, maybe different advertising events that are happening. It could be new systems or programs that we're rolling out. It could be reminders of *routine* processes that stores *need* to complete." Id. at 21-22 (emphasis added).

1. SYSMs/Emails

RA accomplishes control and uniformity by sending SYSMs- RA email messages, and e-mails. Ex. 16. These SYSMs/emails direct the actions of managers on virtually a daily basis. Ex. 16; SM Indergit, p. 67; SM Gerber, p. 247; SM Spencer, pp. 71-72; DM Spink, p. 153. For example, DMs send SYSMs to the stores reiterating corporate assignments like "Please make

sure you have the endcap up of Miracle grow and Roundup." Ex. 16(f). These SYSMs/emails are often followed up with additional communications and even store visits. Id. ("I will be out to many stores this week and look forward to seeing your hard work and diligence first hand.") RA also sent the same Weekly front-end directives to all stores. Ex. 11, FE Directives.  In granting conditional certification in an FLSA misclassification case, Judge Seibel of this district found that a series of emails produced by Plaintiffs from their supervisors and managers "directing the implementation of several of the …policies and practices regarding day-today operation of Panda Express restaurants" demonstrated the degree of control Panda Express maintained over individual restaurants. Ex. 41, Kudo v. Panda Express Order on Conditional Certification p.14-15 (citing Ex. 42, Indergit v. Rite Aid Corp., No. 08 Civ. 9361 (PGG), 2010 U.S. Dist. LEXIS 60202, at *11(S.D.N.Y. June 15, 2010)). Further, it evidenced Panda Express' corporate philosophy of treating the stores as one homogenous unit which is akin to RA's practice. Id.

### ii.  Corporate Directives and Control

While Defendants will undoubtedly argue that each store is different, their own corporate documents beg to differ.[8] All stores receive the same documents through Portal which are not differentiated based on store specific attributes or even geographic locations. SM Indergit p. 67. RA's Portal contains resources which guide DMs and SMs on virtually *every* aspect of the store functions and operations, stripping SMs of any discretionary power. Sadler 30(b)(6), p. 73 ("So if a store manager or district manager needed some clarity on parking lot lights and landscaping, whatever, then there is a reference document that talks about what those are."). For example, each SM must comply with a checklist prepared by the Company which sets forth a list of items

---

[8] In granting conditional certification in this case, Judge Gardephe held "Internal Rite Aid documents indicate that store managers are officially assigned a similar set of duties by Rite Aid's corporate headquarters. Most telling is Rite Aid's "Store Management Guide" … which delineates in great detail how store managers should complete a variety of weekly tasks and includes corporate "planograms" that dictate how certain sale items must be displayed in the store." Ex. 42, Indergit v. Rite Aid Corp., No. 08 Civ. 9361 (PGG), 2010 U.S. Dist. LEXIS 60202, at *11(S.D.N.Y. June 15, 2010).

that must be completed each day. Ex. 6, Tour Sheet; SM Indergit, pp. 67-68.  Examples of RA's corporate policies and reference documents include, but are not limited to the following documents with pertinent excerpts:

- Principles of Merchandise Presentation
    o  "The purpose of Merchandising Standards is to ensure the highest level of *consistent* execution . . . ." Ex.7, POMP Manual, at 151079.
    o  Indeed, SMs are not even allowed to interpret definitions of vocabulary on their own: ""When the meaning of a word used in the Principles of Merchandise Presentation (POMP) manual is subject to interpretation, the word is placed in the glossary." Id.
    o  The POMP Manual dictates merchandise presentation in all RA stores including: the appearance and set up of rest rooms, break rooms, managers offices, back rooms, product placement and display, store layout, plan-o-gram specifics, designated location and display periods, seasonal product layouts, and signage standards. [9]
- Associate Atlas (i.e.: Employee Manual)
    o  RA expects these protocols to be followed: "As a Rite Aid associate, remaining focused on these business beliefs and incorporating them into your daily routine will undoubtedly bring about success with our customers, enrich our work environment, and help us achieve our mission." Ex. 3, Atlas, at 4055.
    o  RA even provides detailing grooming and uniform guidelines. Id. at 4081-82.[10]
- Store Manager Office Standards and Set-Up
    o  "…there are standards that *must* be in place in order to ensure our stores operate as efficiently as possible." Ex. 4, Store Mngmt Guide, at 151053.
    o  These standards are in fact detailed guidelines of exactly how the offices are expected to look including "the required equipment, documents, posters, files, binders, and storage compartments needed to set up each office." Id.
    o  This document also provides blueprints of how the office should look, including the set up of the bulletin board and binders in each office. Id. at 151057-59.
- Management Development Program ("MDP")
    o  The MDP is an eight week period designed "to expose the management trainee to all aspects of the position" including store administrative and operations, human resources, inventory management, store financial, loss prevention, merchandising & marketing, and pharmacy operations. Ex. 9, MDP, at 149207-08.[11]

---

[9] Pertinent Quotes include: "A planogram diagrams and *dictates* the placement of product" and the purpose of a planogram includes "[t]o achieve *consistent* product presentation." Ex. 7, POMP Manual, at 151129; "A Profit Plan is a comprehensive communication tool used to *direct* store associates in the *proper* implementation of all seasonal and promotional merchandising for a specified period of time."  "The purpose of a Profit Plan is to guide store associates in the proper placement of seasonal and promotional merchandise in order to achieve *consistency* and maximize profitable sales throughout all *stores*." Id. at 151147; "Signing standards are guidelines for *consistent* in-store visual communication of product or service offering to the customer." Id. at 151175SMs cannot even decide how their offices should be set up: "no post-it-notes around the office;" "memos need to be filed in binders;" and "clipboards need to be set up and maintained for regional and/or Corporate directives." Id. at 151083.

[10] "Male store associates should shave daily and wear a clean shirt, tie and dress slack.  Those with mustaches and beards should keep them neatly trimmed." Ex. 3, Atlas at 4082.

[11] Manager training is open to management associates including hourly shift supervisors, ASMs and SMs. The

7

- Front End Workload Efficiency
  - o In or around 2009, a corporate program entitled Front End Workload Efficiency was rolled out and sought to distribute companywide best practices to ensure that all RA stores operate "effectively" by improving and standardizing select operations including tasks within cashiering, signing shelves, receiving and stocking. Ex. 10, FE Efficiency.
  - o These best practices which RA expects associates to follow, dictate details of how to perform basic functions.[12]
  - o The best practices also provide blueprints of different types of RA store layouts and diagram where and how totes/products should be placed. Id. at 265013-017

RA promotes, expects and directs consistency and uniformity in all its stores through these policies. SM Indergit, p. 65 ("Well, all stores have the same duty."); SM Santos, p. 210; SM Simons, pp. 81-82; DM Dilallo, p. 159; Ex. 16c, Planogram SYSMs/E-mails.  Detailed policies, procedures and guidelines dictate virtually every aspect of a SMs' duties and functions, including *how* to perform those duties and functions thereby stripping any authority and independent discretion from the SMs. SM Simons, pp. 155-57; SM Spencer, p. 167; DM Smykla, pp. 232-33.

    c.  Corporate Supervision of All Stores

RA fosters homogeneity in the SM's job duties, and in the manner in which they are performed, by utilizing a system of close control by their DMs.  SM Indergit, p.363; SM Gerber, p. 46 ("I mean, mostly everything we had to do was sent down by the corporate level, we just had to execute more than anything else."); SM Saab, p. 43; SM Santos, p. 214; SM Simons, pp. 91-92; SM Spencer, p. 117 ("[T]he majority of the decisions that were made, were made by the

---

training is uniform and not differentiated based on store attributes or location. DM Smykla, p. 139.

[12] Cashiering Checklist includes: "If there are bag racks, associates should use both hands.  After the hand closest to the scanner scans an item, it is transferred to the other hand and put in the bag while the next item is picked up." Id. at 264983. Under Sorting Signs: "Signs are already sorted by plan-o-gram on each sheet. Sorting with the left hand allows items to stay in the correct order." It also lists the order in which different signs should be hung. Id. at 264985 ("Tear signs from sheet ONE sheet at a time using the left hand.") Id. at 264988.  Under Receiving Truck: "Time is for one associate to unload the truck and the other associate to sort and spot the totes." Id. at 264993. Under Stocking Steps:"Each stocker should get a shopping cart and basket. Place the shopping basket in the shopping cart. Tie a trash bag to the handle of the cart."  Id. at 264999. See also Associate Certification Checklist for best practices. Id. at 265031-33

district manager…. You were not allowed to make these decisions on your own."); DM Spink, p. 153. RA's own corporate documents clearly and unequivocally state that DMs are responsible for the "overall operation" of their stores. Ex. 12, DM Job Des. They are expected to "assist in operating efficient stores, develop consistent practices throughout the chain, and obtain superior results…." Ex. 5, DM Store Visit. DMs are expected to "conduct frequent store visits" and are expected to complete Store Visit Guides which is a corporate-created checklist of items DMs are tasked with ensuring are completed in each store to RA's satisfaction. DM Carpenter, p. 75; DM Smykla, p. 128. DMs are tasked with creating action plans from their store visits which the SM is expected to follow. Ex. 12, DM Job Des.; Ex. 5, DM Store Visit; DM Carpenter , p. 75. The DM Store Visit Guide dictates how to use this checklist:

- "Walk the floor with Store Manager and develop action plans on areas that do not meet our store standards.
- Leave the Checklist with the Store Manager and have it filed in the Store Management Guide for **daily** follow up.
- The Store Manager should assign projects from *your* visit on the Store Manager Daily Tour Sheet to ensure the action plan is completed."

In actuality, RA runs the stores via DMs while SMs served as pawns carrying out specific and detailed instructions, possessing no authority. DM Carpenter, p.185 ("[I] manage the district performance through the store managers."); SM Gerber, pp. 46, 89; SM Saab, p. 307 ("With Rite Aid, I feel like I am a robot. Somebody controlled me with a remote control."); SM Santos, pp. 212-13 ("[I]t's about following – I'm not really managing. You know, I'm there of course, I'm the store manager but I'm not really managing, I'm doing what district managers or – or you know, loss prevention and/or corporate tells us to do, you know."); SM Spencer Dep., p. 117. This control was accomplished via consistent emails and SYSMs to the stores directing managers (including assistant and co-managers) what to do. Ex. 16a-e, Emails/SYSMs.

     *d. Personnel Decisions and Staffing*

9

Even personnel decisions are largely controlled by RA, including involvement by Human Resources and/or DM. SM Simons, p. 121. The authority to perform these functions is set by protocols applied to all RA stores and contrary to a true manager's role, is not in the hands of RA SMs. SM Gerber, p. 96 ("Again, I had to follow whatever the corporate level set down. There was progressive discipline – progressive discipline procedure that the corporate level set down and we had to follow it, and we did.") Hiring, promoting, demoting, or terminating employees are not everyday duties for SMs. SM Santos, p. 134. To the extent SMs play any limited role in these processes, or make occasional recommendations, the DM and HR must ultimately approve nearly everything.[13] In all instances, SMs are guided by detailed protocols established and disseminated by RA corporate to all stores. Ex. 14, Discipline Guidelines.; SM Gerber, p. 119 (there was "paperwork" dictating what questions to ask interviewees).   These protocols are not differentiated based on geographic location, size of store, sales, or any other criteria. For example, RA corporate developed and disseminated a "Counseling/Development Form" for SMs to use complete with detailed instructions:

> "Instructions to Management…
> - Give COPY of counseling form to Associate and place ORIGINAL in personnel file.
> - **All Final Warnings and Terminations must have the prior approval of an Associate Relations Manager, Sr. HRM, HR Director or HR Vice-President**
> - Two Final Warnings (for any combination of violations) within a 12 month rolling period may lead to termination
> - One Final Warning within the new hire probationary period may lead to termination
> - Management may suspend an Associate with pay pending a timely HR investigation. Suspension without pay **must have prior HR approval**."

SMs are tasked with hiring hourly associates in accordance with very detailed instructions on the complete hiring process. SM Gerber Dep., p. 119. SMs have testified that

---

[13] SM Gerber, p. 121; SM Saab, p. 308 ("Q. Were you allowed to or could you promote an employee without approval from the district manager? A. No." "Q. Could you fire an hourly associate without approval from your DM? A. No."); SM Santos, p. 135; SM Simons, pp.191-92 ("Q. Did you have full authority to hire without approval of the district manager or HR? A. Not full authority." "Q. Did you have full authority to fire without the approval of the district manager or HR? A. No."); SM Spencer, p. 48 ("Q. Were your recommendations for termination of those one or two employees accepted? A. No.)

often even hourly associates cannot be hired without HR or DM approval. SM Gerber, p. 120 ("I didn't have the final determination" (referring to hiring)); SM Saab, p. 79; SM Santos, p. 134; SM Spencer, p. 85. Nonetheless, all candidates are required to pass a screening process by HR. SM Gerber, pp. 110-11, 121; SM Saab, p. 308. If a potential candidate does not pass the HR screening, they cannot be hired. SM Simons, p. 193; SM Spencer, p. 85.  RA has created a uniform "Hourly Associate Interview Guide" which managers (including SMs, ASMs and DMs) are expected to use when interviewing potential candidates. Ex. 15, Interview Guide. SMs are stripped of the independent authority to hire hourly associates; the guise of 'authority' they are tasked with is controlled by detailed corporate guidelines. Additionally, the limited authority of SMs to hire is contingent upon whether the store has the budget to hire an employee.  SM Saab, p. 184; SM Simons, p. 197.  The budget of a store is defined by corporate – the SM plays no role in determining their store budget.  DM Carpenter, p. 118; SM Gerber, p. 62; SM Santos, pp.121, 255. Consequently, an SM has no authority to increase a stores budget to even allow the additional manpower to operate the store. SM Santos, pp. 122, 255.  Even if SM has the budget to hire an hourly associate, these opportunities come rarely and definitely do not qualify as a SM's primary task. SM Saab, p. 184 ("I don't remember hiring anybody for Rite Aid. Q. Because you didn't have any openings? A. I don't have any money to pay them in my budget.") While SMs can sometimes 'suggest' who to promote to a managerial position, the DM makes the ultimate decision and possesses the sole authority to determine which employee can be promoted to a Shift Supervisor ("SS") and ASM position. SM Indergit, p. 62. Unequivocally, SMs do not have the authority to terminate an employee without DM or HR approval. SM Saab, pp. 306, 308; SM Santos, p. 256; SM Simons, p. 191-92; SM Spencer, pp. 46-47; Ex. 13, Counseling/Development Form.

All RA stores now use Work Force Management System (WFMS) scheduling software in their stores.[14] Sadler 30(b)(6), p. 63. WFMS is a program which projects sales for each store, daily staffing needs, and SM's tasks on a daily basis. DM Virga, pp. 100-02. SMs were stripped of significant authority to schedule employees in the stores. A work schedule is created once a week by inputting employee availability into StaffWorks/WFMS. Id. The computer then generates a weekly schedule which SMs spend minimal time editing. SM Spencer, p. 97 ("I was instructed not to make the schedule with edits anymore; to go with the schedule that the computer would generate based on the employee's availability and the peak hours of the store. Q. And who gave you that instruction? A. Nancy Virga, district manager."). SMs do not have actual independent discretion to schedule employees.[15]

## II.    RA Classified All SMs as Exempt Prior to 2009

The Class is aggrieved by RA's blanket policy of classifying all SMs as exempt, and as such, this case is precisely the type of situation where a class action is appropriate. See Augustin v. Jablonsky (In re Nassau Country Strip Search Cases), 461 F.3d 219, 228 (2d Cir. N.Y. 2006). Prior to 2009, RA categorically classified all SMs as exempt employees without exception and without regard to store size, location, sales levels, staffing levels or customer base, and without making any individualized assessments to account for potential variation between individual SM. Crandall 30(b)(6), p. 90. Based on data provided by RA, at the time of the 2009 reclassification, of the 4,791 SMs, 1,847 were reclassified as non-exempt while 2,944

---

[14] Prior to WFMS, RA used the StaffWorks Scheduling System. Sadler 30(b)(6), p. 63.

[15] SMs (and often ASM and SSs) create a work schedule by inputting employees' availability in to the scheduling software, a computer program provided by Defendants; the computer program then creates the weekly schedule. SM Gerber, p. 103; SM Saab, p. 110; SM Simons, p. 93; SM Spencer, p. 96 ("I, as the store manager, input the information on the employees. And the computer generated the schedule.") Even if Plaintiffs made adjustments to the schedules, this task is undertaken once a week and takes minimal amount of time. SM Spencer, p. 97. As such, it is not a primary duty nor does it require much independent judgment. SMs do not control the scheduling of employees – they merely inputted information into a Company-provided computer program that generates the weekly schedule. SM Spencer, p. 96.

remained exempt. Today, there are 1,660 exempt SMs but 2,253 non-exempt SMs. Ex. 1, Stipulation.

     a.  RA's 2009 Restructuring

After this lawsuit was filed, RA reclassified some of their SMs but the classifications were not based on individual store or SM attributes; rather, the exemption status of SMs were now based on store volume ranges and applied chain-wide. DM Carpenter, pp. 35-36. DM Augustine, p. 110-12. At the same time, front end store operations and efficiencies were revised.

         *i.  Store Operations and Frontend Workload Efficiency*

RA maintains best practices applicable to all stores, regardless of size, volume, or geographic location, which are to "improve the associate experience, to improve the customer experience, to improve the work environment in the store, to achieve the task that the process is oriented to make it quicker, faster, and more efficient" and to drive profits. Sadler 30(b)(6), pp. 34-35. "We look for best practices and we provide best practices to our stores on different activities." Id. at 33.

In or around 2009, RA contracted with Accenture, a consultant group, to work on recommendations for front-end[16] store operation processes. Crandall 30(b)(6), p. 96. Accenture developed new best practices and new labor standards for all RA stores. Markley 30(b)(6), p. 52. "There was a discussion between Accenture and Rite Aid about store operations, procedures, efficiencies, things of that nature. So if the store operations group that works at Rite Aid made recommendations as to changes to our business, they may have had some involvement in making recommendations to that store operation team." Crandall 30(b)(6), pp. 96-97. The Accenture project provided new labor standards which were then inputted into RA's formulas

---

[16] When referring to "front-end" sales and operations, we are referring to front end of the RA stores not including the pharmacies.

for the labor budgets of the stores.  Markley 30(b)(6), pp. 35-36.  Consequently, stores were expected to – and in fact, had no choice but to follow best practices as their store budgets were now based on these new standards. Ex. 10, FE Efficiency.

RA created a "best practices library" for their store and field teams. Sadler 30(b)(6), p. 33.These documents were sent to the stores, posters were developed to hang in the stores, and there was also a "computer based training module that was created at the time as well." Id., at 34. As Mr. Sadler testified during his 30(b)(6) deposition, "it's certainly our hope that our store teams would follow best practices to maximize the sales in their stores, and that's what this is designed to do." Id., at 90. David Markley clarified that best practices were also referred to as labor standards. Markely 30(b)(6), p, 52.

RA sought to make changes to store operations, simplify processes, "change payroll allocations, things of that nature. And there was a big push at the time. **That's when we first clarified in a written way that was disseminated to our district teams on the expectations of what type of staff should be working in the store**." Crandall 30(b)(6), pp. 71, 73. By RA's own admission, expectations of what the staff should be doing in the stores was not even communicated on a store level, but a district level – further evidencing the fact that SMs had absolutely no discretion, no input, not a clue of what RA corporate was deciding for them and "their" stores. Until the corporate directives were disseminated to SM via DMs, SMs had no information. In terms of individual store attributes, the corporate charts – though expected to be followed - were not based on individual store specific attributes nor were they based on individual attributes of SMs. DMs who supervised numerous stores through the nation, and more specifically, New York conceded that they were never asked by corporate what the SMs in their respective districts did on a daily basis. DM Smykla, p. 73.

14

### ii. Classification Change of Some SMs

This 2009 restructuring also included changing the classification of some SMs. Ex. 1, Stipulation. Crandall 30(b)(6), p. 90. RA made a decision to reclassify some of its SMs from exempt to non-exempt, thereby creating two identically titled groups of employees who were paid dramatically differently. Id. at 72. RA claims that the classification change was based on front-end store sales volumes. Ex. 17, Charts. RA created charts delineating front-end store structure and which identified front-end store volume ranges and designated the managerial composition of the store. Id. These charts outlined managerial positions including shift supervisors, assistant managers, co-managers, and store managers. Id. It also indicated which SM positions would be exempt versus non-exempt. Id.; Crandall 30(b)(6), p. 75. The duties, responsibilities and job descriptions of these SMs did not change - just the manner in which they were paid.

The charts defined RA's general "expectation of whether there would be an exempt or a non-exempt job code available in a store." Crandall 30(b)(6), p. 91. While Crandall testified that "we didn't force them to come exactly to what's on these charts" she also confirmed that it was how it "should be" and "this is how they were budgeted and this is how we ideally wanted them to be staffed." Id. at 112. The budget of the stores depended on this structure and consequently, if the stores tried to deviate from it, they would be unable to do so because the budgets were based on the delineated corporate staffing of individual stores.

Although these front-end store structural charts specifically delineated the front-end staffing of individual stores, these charts were not disseminated to the SMs. Crandall 30(b)(6), p. 88; DM Carpenter, p. 36 ("They (SMs) didn't see any charts with specific information on them. They may have seen a memo that said what the volume ranges were."). Consistent with RA's

corporate control and lack of any actual SM autonomy or authority, the charts were disseminated to DMs, RVPS, and group directors. Id. It was "not a document that we sent or handed out directly to the store managers" but the district level and above saw it. Id. Indeed, as Crandall admitted, RA corporate did not believe the individual stores' staffing and front-end structure (for which SMs were purportedly responsible for) was "information they [SMs] needed to have." Id. According to RA, SMs did not need to have information relating to the number of Co-managers, ASMs, and SSs in their stores. This is just another example, and admission, of the fact that individual issues/attributes do not matter to the level Defendants will argue and evidences the strict corporate limitations placed on SM's ability to exercise real control and autonomy over their stores. RA's "business" decision of re-classifying SMs was applied consistently companywide without regard to any store or SM specific attributes.

RA's corporate control is even present in the communications DMs have with their SMs. In or around June 2009, RA sent the districts a "script" which they were to follow to inform SMs of changes to the store structure – including any change in the SMs exemption statuses.[17] DM Carpenter, p. 133; DM Virga, p. 62; Ex. 18, Script: Talking Points for DMs.

## III.   Uniform SM Job Descriptions

RA corporate created and relied on a single job description for all SMs until this litigation was filed. Ex. 19, '05 SM Job Des. A single document lays out the duties of the SM position. Thus, interpreting whether the duties described therein are consistent with the overtime requirements under law is a relevant question common to all class members. See Family Dollar, 2011 U.S. Dist. LEXIS 115389, at *12-13 (where this district held that these policies are

---

[17] "Stores under 1.25M will be classified as a Low Volume store and will have *prescribed management structures*. As you will see these changes are going to enable Rite Aid to better structure our leadership, have more efficient stores, enhance the associate and customer experience while increasing the overall profitability of our Lower Volume stores." Ex. 18, Script (emphasis added).

16

"unquestionably probative of [store managers'] actual duties,' such that 'interpreting whether the duties described in th[em]....are consistent with either the 'executive' or 'administrative' exceptions is a relevant question common to all class members." (citing Damassia, 250 F.R.D. at 156-57)). RA engages in comprehensive and detailed corporate control of all RA stores, without any consideration for geographic location, size of store, staffing of store, or sales – even when creating and executing this SM job description (and classification decision). It is clear that RA purposefully intended uniformity in all their stores and amongst all their SMs. The job description, much like all other RA policies and guidelines, sets forth uniform expectations for all members of this proposed class.

   a.  2009 Restructuring and Job Description

   As a part of RA's 2009 Restructuring, RA created two new SM job descriptions: one for exempt SMs and one for newly non-exempt SMs. Ex. 20, '09 Exempt SM Des.; Ex. 21, '09 Nonexempt SM Des. Despite the different classification, the job descriptions are virtually identical and only differentiated by a few words. Id.; Crandall 30(b)(6), p. 53-54 ("So the job descriptions themselves are very similar other than, again, just a couple of wording things.")

   Clearly, the corporate expectations do not considerably differ for salaried SMs versus hourly. Indeed, SMs and their DMs testified that after this 2009 classification change, the job duties of the SMs who were re-classified did not change. DM Carpenter, p. 59 (Q. Aside from the change in the schedule for the lunch breaks, was there any change in the job duties they were performing? A. No.") As such, if the now hourly SMs were performing the same duties before and after the classification, there is no dispute that they were entitled to overtime prior to the 2009 change. Nevertheless, despite classification status, the job descriptions still require that the SM "Enforce company policies and procedures while ensuring directives and all daily activities

17

deliver against the expected operating standards, merchandising programming and budgeted financial targets." Ex. 20, '09 Exempt SM Des.; Ex. 21, '09 Nonexempt SM Des. **All** SMs are still required to simply carry out corporate dictations and procedures on every aspect of their jobs.

> RA concedes that it does not look at individual attributes when drafting job descriptions.
>
> We have thousands of store managers that have different levels of work experience, that have different knowledge about the business, that have different supervisors. So these job descriptions reflect the general expectations of store managers. There's no way that we could capture every responsibility. Or depending, again, like we said, on the person's experience or background that their experiences are going to be different.
>
> …
> **So we don't have an individual job description for every – for each of the thousands of store managers we have. These are general documents where we have attempted to lay out general responsibilities and duties.**

Crandall 30(b)(6), p. 55-56 (emphasis added).

Job descriptions are not based on any specific or individual store attributes. They consist of uniform expectations applicable to the entire chain.

## IV.  Uniform Training for all SMs

RA has uniform corporate created training materials for all SMs and expects consistent training throughout the chain. Portal contains a computer based training ("CBT") tab and Portal maintains a list of all CBTs supposed to be or expected to be completed by employees. Sadler 30(b)(6), p. 56-57; DM Carpenter, p. 110; DM Virga., p. 118. A Management Development Plan (MDP) is used to train SMs and ASMs. DM Augustine, p. 29-31; SM Smykla, p. 139. Training materials do not differ based on volume of the stores. In other words, all SMs (and ASMs) go through the same training program across the country. SM Gerber, 81-82 ("There were managers from other parts of the country that came in and helped train people, yes.") The same set of training materials exist for all stores through Portal irrespective of *any* store specific attribute. SM Simons, pp. 199-200. SMs are trained to follow corporate policies and directives

on any and every possible aspect of the position so as to strip SMs (or managers in training) of

any ability to make independent judgments and decisions. SM Saab, p. 253.

## V.     All SMs are Required to Perform Similar Duties in a Similar Manner

Regardless of the size of the store or geographic location, all RA SMs have the *same*

primary job duties. SM Indergit, p. 65. While there may be slight variations due to store size or

location, deposition testimony of SMs do not reveal material differences in their responsibilities:

SMs spend the majority of their day engaging in non-managerial tasks including:

- o  stocking merchandise on store shelves
- o  loading and unloading delivery trucks
- o  operating the cash register
- o  cleaning the store and bathroom
- o  moving and facing products forward on the shelves
- o  helping customers
- o  recovery, cleaning, and organizing the store in compliance with plan-o-grams (i.e., layouts mandating where products are set up in the stores)
- o  putting up price tags sent from RA corporate
- o  unpacking boxes and totes[18]

SMs have no input, let alone power to make independent decisions, for many "managerial" duties including:

- o  what products to sell in the stores;
- o  how to arrange the merchandise in the store;
- o  how much to charge for the products;
- o  sale items or hot buys;
- o  what signs to place in the store or where to place them;
- o  a store's payroll/labor budget;
- o  when to increase overtime hours;
- o  music played in the stores;
- o  design or layout of the stores;
- o  the dress code;
- o  how the SM office should look;

---

[18] SM Indergit, pp. 363, 365, 390 ("We do the same job. I mean, putting up stuff on the shelf."); SM Gerber, pp. 267, 314-16 ("I had to operate the – prepare and operate the photo machine. I had to run a register. I had to stock shelves. I had to perform maintenance inside and outside the building. I had to complete cycle counts, price changes, plan-o-grams. I had to – what else? I had to unload trucks. I had to reload trucks with empty and damaged merchandise.); SM Saab, pp. 122-25, 141, 212, 216, 306 ("Most of the times with Rite Aid I spent on the floor doing work which was supposed to be done by hourly workers, like stocking shelves, brining boxes from the basement, run the photo lab."); SM Santos, pp. 152, 244-47 (SM forced to shovel snow); SM Simons, pp. 162-63 (SM was required to stock shelves), 190 (SM was required to clean, sweep, mob, work on the register and unload trucks), 193-96; SM Spencer, pp. 105-06, 111, 123, 142-43, 195-96 ("Q. And on average, what percentage of your work per week did you spend doing these non-managerial duties? A. I spent half to three quarters of my time doing non-managerial tasks.").

     o   the hours of a store;

     o   when a store can be closed for emergency situations; and

     o   independently terminate an employee.[19]

"At Rite Aid, there is no such thing as 'it's not my job.'" Ex. 3, Atlas, at 4071. Any purported "managerial duties" are nothing more than non-exempt tasks performed within the closely prescribed limits of Defendants' extensively detailed procedures and automated software programs.

Defendants will argue that SMs are "in charge" or the "highest-ranked" employee at their stores. However, "[t]he words 'in charge [or "highest ranked"] are not, [however,] a magical incantation that render an employee a bona fide executive regardless of his actual duties." Indergit v. Rite Aid Corp., 2010 U.S. Dist. LEXIS 32322, at *18 (S.D.N.Y. Mar. 31, 2010) (citing Ale v. TVA, 269 F.3d 680, 691 (6th Cir. 2001)).[20]

Simply because there are employees lower than them in the company's hierarchy, SMs are not automatically "executives" and exempt under the law. In fact, SSs and ASMs who are lower in the chain of command and are entitled to overtime compensation often have a similar level of

---

[19] SM Indergit, p. 244 ("Q. If a – if your store ran out of a product, you could contact vendors directly, correct? A. No. Q. Never? A. Not allowed to."); SM Gerber, pp. 94, 312 ("I didn't have independent judgment over the placement of merchandise."); SM Saab, pp. 28-29, 43, 73 ("When I ask to match the price [of local competitors], I was told no. Q. And who did you ask? A. District manager."); SM Santos, pp. 212-15; SM Simons., pp. 155-56 ("Q. Did you decide where the end caps go in the store? A. No."); SM Spencer, p. 75-76 ("She (DM Nancy Virga) would explain exactly where she wants this product sold, or what should be on that end cap. Moving displays around the store." "[I]f she didn't like the way I put a display in the store, she would come and move it somewhere else. If she didn't like the product I had on the front end cap of the store, because I think that that product would sell in that neighborhood, she would instruct me to move it."); DM Carpenter, pp. 77, 83, 167 ("Q. Does the store manager play any role in setting the price of an item? A. No. They don't. Q. What about dealing with outside vendors? Do store managers? A. No. They don't. "); DM Dilallo, pp. 159, 241 ("Q. Who decides what the promotional item of the week is? A. Corporate…"), 307 ("A. Hot buy end caps, sale end caps. Something that we feature. Q. Who decides what's on the sale caps? A. The profit planner."); DM Smykla, pp. 210, 232-33; DM Spink, pp. 169, 170, 176-77, 192 ("Company music that came through the – however they funneled it into the stores. Q. You didn't have a say in what music played? A. No."); DM Virga, pp. 135-136, 227, 279-80 ("There is an outline that tells you what you should have in the manager's office, what type of binders should be set up, you know, that you have that for reference.")

[20] Steven Spencer, former NY RA SM testified: Q. Is it fair to say that you were always in charge when you were in the store, regardless of what duties you were performing? A. No. I would not agree with that. Q. Why wouldn't you agree with that? A. Because it was being dictated to me what I would do as a store manager, what I would sell, what pricing it would be, where to merchandise certain items, what to do with employees, how they wanted --how customer complaints were to be handled. So I do not feel I was in charge. SM Spencer, 174: 18-25, 175: 1-7.

responsibility as the SMs. See generally Johnson v. Big Lots Stores, Inc., 604 F.Supp.2d 903, 910-44 (E.D. La 2009) (denying executive exemption defense where plaintiffs sometimes served as sole managers in-charge of their store). For example, 'supervising' employees is an essential factor to the exemption requirement. SMs have testified that there are often times where they are the only employees in the store and have no one to supervise. SM Saab, p. 243 ("There is a period of time that I am by myself in the store. Q. How often is that? A. Four hours a day."); SM Santos, p. 18 ("[T]hey left me by myself in the store with no help working seven days a week.") Nonetheless, while SMs are sometimes the *only* employee in the store with no one to 'supervise,' RA does not consider them to be the only 'managers' of the store. In fact, RA refers to "managers on duty" ("MOD") as the highest ranking associate in the store but SMs are not the only MODs.[21] Assistant Store Managers (ASM), and even hourly shift supervisors (SS) are considered members of the **management** team and are often tasked with 'supervising' all associates. SM Gerber, p. 310; SM Simons, p. 62. All members of this team are paid overtime except exempt SMs. Like SMs, ASMs and SSs are at various points of the day, 'in charge' of the store and the highest ranking employee in the store. SM Saab, p. 230; SM Simons, p. 158.

While SMs' experiences are not identical, even with some variations among the daily duties of class members, "class certification is appropriate where 'the crux of [the] case is whether...company-wide policies, as implemented, violated Plaintiffs' statutory rights...." Cuevas, 2011 U.S. Dist. LEXIS 155160, at *6-7 (citing Family Dollar, 2011 U.S. Dist. LEXIS 115389). There is nothing in the deposition testimony to support extreme discontinuity in the roles of the SMs so as to deny class certification. Rather, deposition testimony shows the daily tasks of the SMs to be largely consistent across the board. Plaintiff does not dispute that there

---

[21] "And when I say managers in that sentence I mean shift supervisors and store managers." Crandall 30(b)(6), p. 111 (describing the breakdown of the front-end store structure charts). Shift supervisors are non-exempt hourly employees.

may be minor differences amongst the SMs, but that the job duties of the putative class members are largely consistent across the class; that individual differences in job tasks, while they may exists, are not of the magnitude to cause individual issues to predominate.

## VI.    Payroll and Budget

RA dictates the labor budget of each store each week. Markley 30(b)(6), p. 46 ("The plan is based on them performing all hourly types of functions. To that we then add a layer of store manager and assistant manager on top of what is required to run the store.") A SM does not have the ability or authority to change the budget. DM Carpenter, p. 118; DM Dilallo, pp. 245-46; DM Spink, pp. 74-75; SM Gerber, pp. 137-38. RA, not individual SMs, decides what is needed to "run" a store. SM Saab, pp. 74-76 ("Q. You don't know what factors went into the labor budget? A. No. They never discuss it with me. Q. You were just given a number? A. Yes. Q. And what were you told to do with that number? A. 'Come within the number'"); SM Simons, p. 197 ("Q. Could you effectively schedule employees with the 180 hours? A. No." "Q. Did you have any authority in deciding what your labor budget would be? A. No."); SM Spencer, p. 151.

When the labor budget decreased, fewer labor hours were allocated to the stores causing SMs to spend more time performing non-managerial tasks and more manual labor. SM Indergit, p. 71 ("[T]he manager end up doing it himself."); SM Saab, pp. 124-25, 285 ("I asked for more payroll so I don't have to do an hourly worker's job."); SM Santos, pp. 152, 244-45; SM Simons, pp. 75, 196 ("Q. Why didn't you assign those tasks to hourly associates? A. I didn't have that many hourly associates who could come in because of the payroll situation."); SM Spencer, pp. 105-06, 123-24. SMs play no role in deciding how much payroll the stores receive and cannot go above their budgets without approval from their DM. SM Gerber, pp. 137-38; SM Saab, pp. 74-75, 285; SM Santos, p. 179 (" I couldn't give more hours than what corporate told me to use."); SM Simons, p.197. In fact, whether an SM went over their payroll is a component

22

in their yearly appraisals. SM Spencer, p. 151 ("I sent this sysm because the payroll number that I was being given was pretty much impossible for me to make. And if I didn't make that number, I was going to be reprimanded.")

SMs are not permitted to exceed their labor budgets and are not permitted to allow employees to work overtime hours. SM Indergit, p. 149, 155. DMs constantly remind their SMs that they are not allowed to use overtime without DM approval. DM Carpenter, p. 66; Ex. 16d-e. Indeed, SMs are not the only "managers" chastised for using overtime or exceeding the budget. Ex. 16d and e, Payroll and Overtime Emails/SYSMs.

## LEGAL ARGUMENT

### I.   Background Legal Framework

#### a.  New York Labor Law

The NYLL requires employers to pay employees one and one-half times their regular rate of rate for all hours worked in excess of 40 hours per work week. N.Y. LAB. LAW § 650 (Consol. 2012) et seq.; N.Y. COMP. CODES R. & REGS. tit. 12, § 142-2.2 (2012); accord 29 U.S.C. § 207 (a)(1) (2012).   Employees are exempt from the overtime requirements if, among other exceptions, they are working in a bona fide executive or administrative capacity. 29 U.S.C. § 213 (a)(1) (2012).   The executive exemption applies to employees whose primary duty is the management of the enterprise, customarily and regularly direct the work of two or more employees, and have authority to hire and fire other employees, or make suggestions relating to hiring and firing that have weight. Big Lots, 604 F.Supp.2d at 907. The administrative exemption only applies to employees whose primary duty is office or non-manual work and requires the exercise of independent judgment and discretion. Id. Exemptions to NYLL overtime requirements are interpreted using the same standards as the FLSA. Damassia, 250 F.R.D. at 1561 n. 1. Here, RA classified all SMs as exempt and after 2009, reclassified some SMs pursuant

to a single corporate decision citing business reasons as the basis for the change. It is RA's

burden to show that the classification of SMs was correct. Family Dollar, 551 F. 3d. at 1269.

> b. Rule 23 Standards

In order to certify the proposed class, Plaintiff must demonstrate that the class, and its

proposed representatives meet all of the requirements of Fed. R. Civ. P. 23(a) and 23(b). A

district court evaluating a motion for class certification must conduct a "rigorous analysis,"

assessing "all of the relevant evidence admitted at the class certification stage" to "determine

whether each Rule 23 requirement has been met." In re Initial Public Offerings Securities Litig.,

471 F.3d 24, 29, 42 (2d Cir. 2006). Under Rule 23(a), the requirements are: (1) the class is so

numerous that joinder of all members is impracticable; (2) there are questions of law or fact

common to the class; (3) the claims or defenses of the representative parties are typical of the

claims or defenses of the class; and (4) the representative parties will fairly and adequately

protect the interests of the class. Under 23(b), Plaintiff must show that (1) there are questions of

law or fact common to the members of the class that predominate over any question affecting

only individual members and (2) a class action is superior to other available methods for the fair

and efficient adjudication of controversy. Damassia, 250 F.R.D. at 9; Cuevas, 2011 U.S. Dist.

LEXIS 155160, at *3-4; FED. R. CIV. P. 23.

## II.   Plaintiff Satisfies the Rule 23 Requirements

> a. Numerosity is Met under Rule 23(a)(1)

The first requirement of Rule 23(a) is that "the class is so numerous that joinder of all

members is impracticable." Rule 23(a)(1) "Numerosity is presumed at a level of 40 members."

Han v. Sterling Nat'l. Mortg. Co. Inc., 2011 U.S. Dist. LEXIS 103453, at *8 (E.D.N.Y. Sept. 14,

2011) (citing Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d. Circ. 1995), cert.

denied, 515 U.S. 1122 (1995) (citing 1 Newberg on Class Actions § 3.05 (2d ed.1985)); see also

Presby. Church of Sudan v. Talisman Energy, Inc., 226 F.R.D. 456, 466.("Numerosity is presumed when a class consists of forty or more members.")). Here, there are approximately 328 stores in New York and approximately 190 NY SMs have already opted into the collective class and thus, numerosity is met. Family Dollar, 551 F. 3d. at 1269 (holding that numerosity was satisfied where there were approximately 333 NY stores.)

      b.  Commonality is Met under Rule 23(a)(2)

     Plaintiff must also show commonality; that there are common questions of law or fact existing among the class members. Rule 23(a). The common questions of law and fact which impact the class, include "the actual requirements of the job," "the proper classification of ... tasks as exempt of non exempt," and "policies with respect to [defendant's] classification and treatment of [class members]." Willix v. Healthfirst, Inc., 2009 U.S. Dist. LEXIS 114818, at *15 (E.D.N.Y. Dec. 4, 2009) (quoting Tierno v. Rite Aid Corp., 2006 U.S. Dist. LEXIS 71794 at *31 (N.D. Cal., June 16, 2006). "The showing needed to satisfy commonality is 'minimal.'" Hanlon v. Chrysler Corp., 150 F.3d, 1011, 1020 (9th Cir. 1998).

     In the case at bar, the common questions of law and fact include:

1. Whether Plaintiff and class members were denied overtime;
2. Whether RA's blanket classification of SMs violates class members' statutory rights such that they are entitled to overtime;
3. Whether all SMs are required to perform similar duties in a similar way; and
4. Whether such classification was done knowingly.

     In Tierno v. Rite Aid Corp., Plaintiff SMs challenged RA's classification of California SMs and moved for class certification. Defendant RA did not dispute that there were in fact questions of law and fact common to the class. Tierno, 2006 U.S. Dist. LEXIS 71794, at *5 ("Indeed, taking the allegations of the complaint as true, it is apparent that common questions of law and fact are present, including, but not limited to, whether Rite Aid improperly classified all Store Managers as exempt employees, and if so, whether such classification was done

knowingly; whether Rite Aid violated various provisions of the California Labor Code; whether all Store Managers are required to perform similar duties in a similar manner, and Rite Aid's realistic expectations regarding the position.") The Court in Tierno held that Plaintiff met this requirement as there was not one but many issues of fact and law common to the class. Id. at 37.

Here, Defendants do not dispute that prior to 2009, all SMs were subject to the same policy of being classified as exempt from overtime. Crandall 30(b)(6), p. 90. Defendants also concede that exempt store managers are subject to a uniform job description. Crandall 30(b)(6), p. 53-54 (explaining that even after the 2009 reclassification of some SMs, the job descriptions for the hourly and salary position differed by a few words).. Because RA maintained consistent policies with respect to the classification and the treatment of the class as a whole, there is a common question of whether this classification was proper and if such classification was done knowingly. Iglesias-Mendez v. LaBelle Farm, Inc., 239 F.R.D. at *363, 371 (S.D.N.Y. Jan. 26, 2007); Damassia, 250 F.R.D. at *152, 156-57 (holding that whether assistant store managers were exempt from NYLL overtime requirements was a question of law common to all class members' claims for relief); see also Ross v. RBS Citizens, N.A., 2010 U.S. Dist. LEXIS 107779, at *9 (A "policy applicable to a class of employees is enough to establish a common question of fact or law.").

In Damassia, Duane Reade argued that commonality was not met because "individualized proof" was required to determine whether the classification was lawful. However, this district found that argument unpersuasive for two reasons: (1) Defendants admitted that whether each ASM was "exempt" was common to the class regardless of "some individual questions of fact," and (2) the determination of whether the classification was proper does not rest on individualized proof. Damassia, 250 F.R.D. at *158-59. In the recent Cuevas

26

decision, the Court held that "[R]ecent cases have held that class certification is appropriate where "the crux of [the] case is whether. . . company-wide policies, as implemented, violated Plaintiffs' statutory rights," regardless of some variation among the daily duties of class members." Cuevas, 2011 U.S. Dist. LEXIS 155160, at *6-7 (citing Family Dollar, 2011 U.S. Dist. LEXIS 115389, at *4; Myers, 624 F.3d at 549; Morris v. Affinity Health Plan, Inc., 2012 U.S. Dist. LEXIS 64650, at *2 (S.D.N.Y. 2012); Espinoza v. 953 Assocs. LLC, 2011 U.S. Dist. LEXIS 132098, 2011 at *12 (S.D.N.Y. 2011); Han, 2011 U.S. Dist. LEXIS 103453, at *4.

As demonstrated above, RA implements uniform policies which dictate what tasks all SMs – regardless of any specific attributes – are required to perform and how RA wants these tasks performed. [22] The focus of this claim, is the single policy of not paying SMs overtime, and the proof of these questions do not rest on individual analysis of SMs but the analysis of a single corporate decision. Id. As such, whether the class members' rights were violated can be resolved class wide.

### c. Plaintiffs' Claims are Typical of the Class Claims

The third prerequisite under Rule 23(a) is typicality which "focuses on whether the named plaintiffs possess the 'same interest and suffer the same injury' as class members." Tierno, 2006 U.S. Dist. LEXIS 71794, at *6. While the claims need not be identical, typicality "requires that the disputed issue of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the same class." Caridad v. Metro-

---

[22] In the Family Dollar store manager case, the court held that corporate policies are "'unquestionably probative of [store managers'] actual duties, 'such that 'interpreting whether the duties described in th[em] ... are consistent with either the 'executive' or 'administrative' exemption is a relevant question common to all class members.'" 2011 U.S. Dist. LEXIS 115389, at *12-13 (concluding that whether or not the exemption applied to the class was a common issue despite defendant's assertion that an individualized inquiry would be necessary); Pippins v. KPMG, 2012 U.S. Dist. LEXIS 949, at *44 (S.D.N.Y. Jan. 3, 2012) (defendant "cannot possibly defend its admitted corporate policy of classifying all Audit Associates as exempt . . . without being able to make the argument that Audit Associates as a class fall within one of the exempt categories – regardless of individual variations in their job duties from location to location, or audit to audit, or time to time.") (emphasis in original).

North Commuter R.R., 191 F.3d, 283, 293. A class representative's claims are typical "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997).

Here, Plaintiff's claim is substantially the same, if not identical, to those of the class. Tierno. All class members' claims arise from the same classification, and same course of events: RA's decision to classify the class members as exempt from overtime.

In Damassia, Duane Reade argued that typicality was not met, attacking minor differences in the ASMs management responsibilities. The Court held that "To the extent there are such differences, they do not make named plaintiffs' claims atypical." Damassia, 250 F.R.D. at 158. As in Damassia, here trivial variations in the fact patterns underlying individual claims do **not** defeat typicality when the defendant directs the same unlawful conduct at the named plaintiffs and the class. Prior to the filing of this lawsuit, RA considered all SMs exempt, regardless of a store's hours of operation, size, sales volume, geographic location, and regardless of a SM's shift, tenure, experience, management style, or any other factor. Even if RA attempts to now argue that these attributes *might* contribute to material differences in responsibilities of the SM, these minor differences – if they exist - are not enough to defeat typicality.

As demonstrated above, deposition testimony and discovery illustrate that RA maintained detailed control over every function of the SM position, and disseminated uniform policies, procedures, best practices, and detailed instructions on what to do and how to do it – RA treated SMs as a class for all purposes including classification. *Supra* Legal Sec. II(a)(ii). It is disingenuous for RA to collectively decide all SMs are exempt and then challenge proceeding as a class. Id. Courts have refused to apply an individualized approach to evaluating exemption

decisions where the employer failed to consider any individual facts when making their classification decision. Crandall 30(b)(6), pp. 55-56; Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1263-64 (11th Cir. 2008); Pendlebury v. Starbucks, 518 F.Supp.2d 1345, 1352-53 (S.D. Fla. 2008); Nerland v. Caribou Coffee Co., 564 F. Supp.2d 1010, 1022-24 (D. Minn. 2007). The testimonies of the SMs do not reveal material differences in their responsibilities. In fact, the evidence adduced here, as set forth above, is stronger than what was before the court in Damassia– a "comprehensive corporate [set of] procedures and policies" dictating what SMs did. Damassia, 250 F.R.D. at 160.

### d. Plaintiff Will Adequately Represent the Class

To determine whether a named plaintiff will be an adequate class representative, courts inquire whether: "(1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." Baffa v. Donaldson, 222 F.3d 52, 60 (2d Cir. 2000).

#### 1. Plaintiff's interests are consistent with the interest of other members of the class.

Plaintiff must show that he has an interest in vigorously pursuing the claims of the class. Toure v. Cent. Parking Sys., 2007 U.S. Dist. LEXIS 74056, at *18-19 (S.D.N.Y. Sept. 28, 2007). When "plaintiffs' claims are typical of the class, it is strong evidence that their interests are not antagonistic to those of the class; the same strategies that will vindicate plaintiffs' claims will vindicate those of the class." Damassia, 250 F.R.D. at 158. As demonstrated above, Plaintiff's claims are typical (if not identical) to the claims of the class. *Supra*, Facts, Sec. V. Plaintiff has demonstrated his commitment to this case. In connection with the prosecution of this action, Plaintiff Indergit has worked with counsel for Plaintiffs and has, among other things, assisted with the preparation of the pleadings, responded to discovery, sat for a deposition, and produced

responsive documents. His actions demonstrate his commitment to the case and the putative class. Valli Dec., ¶38; Dec. of Indergit, ¶¶ 5-7. There is no question that Plaintiff will adequately represent the class and that his interests are harmonious with that of the class.

> ### 2. Plaintiffs' attorneys are qualified, experienced and able to conduct the litigation.

Plaintiffs are represented by Valli Kane & Vagnini and DiNovo Price Ellwanger & Hardy. Plaintiff's counsel have extensive experience in complex cases and are therefore qualified, expereinced and able to conduct the litigation. Both firms are nationally recognized law firms with experience in a wide variety of litigation including civil rights, intellectual property, wage and hour and commercial litigation. See Exs. 38 and 39; Baffa, 222 F.3d at 60.

## III.   Common Questions Predominate

Under this requirement, Plaintiff must show that the common issues predominate over any individual issues. If the common questions "'present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis'" Tierno, 2006 U.S. Dist. LEXIS 71794, at *13. (citing Hanlon, 150 F.3d at 1022). Like Plaintiffs in Cuevas, Family Dollar, Damassia, and Tierno, Plaintiff here can show that the Court can adjudicate the issues here in a class wide manner.

In Tierno, the Court held that Plaintiff met his burden under predominance. "The evidence indicates that Rite Aid treats its Store Managers as one homogenous group and that while some variations may exist, the Store Manager position at Rite Aid is, in fact, sufficiently similar from store to store in all important respects such that class treatment is appropriate in this case...The Court concludes that these and other common issues will "predominate" over any individual issues that may arise in this case." Tierno, 2006 U.S. Dist. LEXIS 71794, at *31. The

30

Court looked at the evidence of centralized control RA exercised over the stores, "with respect to just about every aspect of store operations – from store appearance, layout, merchandising, pricing, staffing, budgeting, and personnel policies to the music played and the temperature at each store." Id. at 14. In the case at bar, the same exact centralized control exists. *Supra*, Facts Sec. 1.

Here, like in Tierno, Defendants will undoubtedly argue that Plaintiffs job duties varied from store to store, that each store was different and therefore, a fact-intensive, individualized inquiry is necessary to determine if the SMs were in fact exempt. However, this anticipated argument is belied by RA's corporate policies that delineate the consistent, uniform, and standardized protocols for virtually every day-to-day responsibility. Indeed, in granting conditional certification in this case, Judge Gardephe noted that "These documents demonstrate that Rite Aid's corporate management exercises a great degree of control over the operation of retail branches. This makes it highly likely that Rite Aid store managers- whether located in New York City or elsewhere-perform similar duties" Order, p. 11 (citing Tierno, 2006 U.S. Dist. LEXIS 71794, at *14-16).

In Family Dollar, Defendants argued that Plaintiffs' job duties varied from store to store. However, this argument was contradicted by the fact that Family Dollar, like RA, mandated consistent, standardized and uniform corporate polices on how SMs should conduct their day-to-day operations of the stores. Family Dollar, 2011 U.S. Dist. LEXIS 115389, at *9. Indeed, Judge Berman of this District held that even assuming arguendo that there were variations amongst store managers' daily tasks, there were detailed corporate policies which these employees were expected to follow. Id. at 13. ("Where, as here, there is evidence that the duties of the job are largely defined by comprehensive corporate procedures and policies, district courts have

31

routinely certified classes of employees challenging their classification as exempt, despite arguments about 'individualized' differenced in job responsibilities." Damassia, 250 F.R.D. at 160-61).[23] Defendants were unable to show that there are striking variations among the class members' job duties that would render a class action inappropriate. Id. at 19-20.

Notably, Judge Berman held, "there is nothing unfair about litigating a single corporate decision in a single collective action, especially where there is robust evidence that store managers perform uniform, cookie-cutter tasks mandated by a one-size fits all corporate manual." Family Dollar, citing Morgan, 551 F.3d at 1264.[24]   Here, RA, by their own admission, did not engage in an individualized inquiry when creating blanket classifications for their SMs. *Supra* Sec. II(a)(ii). Rather, Plaintiff has demonstrated that RA had a single policy of denying exempt SMs overtime, and treated all exempt SMs as a class which is evidenced through the job descriptions, comprehensive protocols and procedures, uniform training materials, SM deposition testimony, SYSMs/emails, and corporate admissions that individual attributes are not used to classify SMs. Damassia, 250 F.R.D. at 159. Accordingly, the common issues predominate and the proposed class is "sufficiently cohesive" to warrant class certification. Amchem Products, Inc., v. Windsor, 521 U.S. 591, 623 (1997).

Defendants will likely rely upon Walmart v. Dukes where Plaintiffs were denied class

---

[23] Similarly, the Hearn court held in reversing a denial of class certification for RA ASMs held:
> Even though the facts varied from store to store, the common nucleus of facts strongly suggested that [Rite Aid] ASMs spent a large percentage of their time doing non-managerial tasks . . . . The trial judge mistakenly focused on the variations in experience rather than on the facts common to the class and on the common issues that predominated over individual inquiries. Hearn, 2012 N.J. Super. Unpub. LEXIS 643, at *34.

[24] Decisions across the country have certified misclassification cases when the putative class was governed by overriding corporate policies. See, e.g., Hearn, 2012 N.J. Super. Unpub. LEXIS 643, at *36 (certifying New Jersey class of RA ASMs); Tierno,2006 U.S. Dist. LEXIS 71794 (RA store manager misclassification class);Youngblood, 2011 U.S. Dist. LEXIS 115389 (store manager retail misclassification class action);McLaughlin v. Liberty Mut. Ins. Co., 224 F.R.D. 304 (D. Mass. 2004);Willix v. Healthfirst, Inc., 2009 U.S. Dist. LEXIS 114818 (E.D.N.Y. Dec. 4, 2009); Perkins v. So. New England Tel. Co., 669 F. Supp. 2d 211 (D. Conn. 2009); Niemiec v. Ann Bendick Realty, 2007 U.S. Dist. LEXIS 98840 (E.D.N.Y. Mar. 30, 2007); Scott v. Aetna Servs., Inc., 210 F.R.D. 261 (D. Conn. 2002); Torres v. Gristedes Oper. Co., 2006 U.S. Dist. LEXIS 74039(S.D.N.Y. Sept. 26, 2009).

certification. See Wal-Mart v. Dukes, 131 S.Ct. 2541 (2011). In Dukes, Plaintiffs failed identify some kind of corporate guidance that led to the managers' discretion being exercised in a uniformly discriminatory way; there was no common thread of liability that tied the class members' claims together. Id. at 2552. Since Dukes, many courts including this district have held that Dukes was inapplicable where plaintiffs, like here, identified a "specific, illegal corporate policy" which, if proven, would render defendant liable to all class members. Jermyn v. Best Buy Stores, L.P., 276 F.R.D. 167 (S.D.N.Y. 2011) (holding that "to the extent Plaintiffs here are required to identify a specific, illegal corporate policy rendering Defendant liable to all the class members, they have manifestly done so.).

In Stinson v. City of New York, 2012 U.S. Dist. LEXIS 56748, at *57 (S.D.N.Y. Apr. 23, 2012), this district held that Plaintiff satisfied their burden by establishing the class certification was appropriate where, unlike Dukes, Plaintiffs were able to identify "a common theory of liability" and the "claims brought under this theory involve sufficient common issues of law and fact subject to generalized proof…." In the case at bar, the root of the case is whether RA's company-wide policies and blanket classification, violated the class members statutory rights - this does not require an examination of the subjective intent behind thousands of individual employment decisions. Dukes, 131 S.Ct. at 2556. RA's policy not to pay overtime compensation to exempt SMs is the type of "unifying thread" that Rule 23(a)(2) requires and thus, Plaintiff meets the predominance requirement. Damassia, 250 F.R.D. at 156.

## IV. Class Treatment Is Superior to Other Alternatives

Plaintiff can demonstrate that class action would be the most fair and efficient litigation vehicle here. Augustin v. Jablonsky (In re Nassau County Strip Search Cases), 461 F.3d 219 (2d Cir. N.Y. 2006). A class action would "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural

fairness or bringing about other undesirable results." Cuevas, 2011 U.S. Dist. LEXIS 155160, at
*13 (citing Myers, 624 F.3d at 547).

Here, Plaintiff and class members are litigating common questions of fact and law which
predominate over any individual issues. Individual actions by potentially hundred of SMs are
burdensome, will inundate the courts with identical claims, and is costly.  Potential class
members may not have the financial means to bring individual claims. See Labbate-D'Alauro v.
GC Servs. Ltd. P'ship., 168 F.R.D. 451, 458 (E.D.N.Y. 1996) ("It is appropriate for the court to
consider the inability of the poor or uninformed to enforce their rights and the improbability that
large numbers of class members would possess the initiative to litigate individually.").

In Nassau County, the court found the denial of certification a reversible error holding
"when plaintiffs are 'allegedly aggrieved by a single policy of defendants,' such as the blanket
policy at issue here, the case presents 'precisely the type of situation for which the class action
device is suited' since many nearly identical litigations can be adjudicated in unison. Id. at *228.
As in Nassau County, this action has substantially progressed and "offers the benefit of a liability
phase that can be resolved quickly and conclusively." Id. at *230. The parties have engaged in
significant discovery including over 290,000 pages of documents produced by Defendants and
over 70 depositions of store managers, district managers, and corporate witnesses. Additionally,
a class action will be manageable as there will be minimal individual inquiries assessing liability.
Id.; see also Wang v. Chinese Daily News, Inc., 231 F.R.D. 602, 614 (C.D. Cal. 2005)
(certifying an overtime class and observing that "[c]ourts recognize that employer practices and
policies with regard to wages and hours often have an impact on large numbers of workers in
ways that are sufficiently similar to make class-based resolution appropriate and efficient.").

As demonstrated above, class action is the superior alternative in the adjudication of this

case. In fact, this is precisely the type of case where class certification is appropriate.

## CONCLUSION

For all the reasons set forth above, Plaintiffs respectfully request that, pursuant to Federal Rules of Civil Procedure 23(b) and (g), this Court certify the proposed class, designate an adequate Class Representative, and designate Plaintiffs' counsel as Class Counsel.

Dated:      Garden City, New York
            September 17, 2012

Respectfully submitted,

Robert J. Valli, Jr. (RV-9995)
James Vagnini (JV-2163)
Aneeba Rehman (AR-6404)
**Valli Kane & Vagnini LLP**
600 Old Country Road, Suite 519
Garden City, NY 11530
*Attorneys for Plaintiffs*

Jay D. Ellwanger
**DiNovo Price Ellwanger & Hardy LLP**
7000 North MoPac Expressway
Suite 350
Austin, Texas 78731
*Attorneys for Plaintiff*

35