D799inda

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   YATRAM INDERGIT ON BEHALF OF
    HIMSELF AND ALL OTHERS
4   SIMILARLY SITUATED, JOSE
    FERMIN, CONSOLIDATED
5   PLAINTIFF, ET AL.,

6                 Plaintiffs,

7         v.                            08 CV 9361 (JPO)

8   RITE AID CORPORATION, ET AL.,

9                 Defendants.

10  ------------------------------x
                                      New York, N.Y.
11                                    July 9, 2013
                                      11:44 a.m.
12
    Before:
13
                   HON. J. PAUL OETKEN
14
                                          District Judge
15
                      APPEARANCES
16
    VALLI KANE & VAGNINI LLP
17       Attorneys for Plaintiffs
    BY:  ROBERT J. VALLI, JR.
18          ANEEBA REHMAN

19  DINOVO PRICE ELLWANGER AND HARDY LLP
         Attorneys for Plaintiffs
20  BY:  JAY D. ELLWANGER

21
    OGLETREE, DEAKINS, NASH, SMOAK & HILL, LLP
22       Attorneys for Defendants
    BY:  DANIEL E. TURNER
23          BETH A. MOELLER

24  EPSTEIN BECKER & GREEN, P.C.
         Attorneys for Defendants
25  BY:  PATRICK G. BRADY

2
D799inda

1          (In open court; case called)

2          THE COURT:  Good morning.  Here we have crossmotions,

3  I believe.  There's a motion -- well this case involves store

4  managers of Rite Aid.  And we have a motion for class

5  certification and a motion to decertify with respect to the

6  FLSA collective action, I believe.

7          So on this one I guess we have crossmotions so why

8  don't we start with plaintiffs, if that's okay.

9          MR. VALLI:  That's fine, your Honor.

10          THE COURT:  And I'm going to ask you if you could

11  start with a little factual background if you could tell me a

12  little bit -- I've read through the briefs, but if you could

13  just give me a little bit of high level discussion of the store

14  manager position insofar as it's revealed by discovery at this

15  point.

16          Is there one store manager in each store?

17          MR. VALLI:  Most of the time, yes, your Honor.

18          THE COURT:  Okay.

19          MR. VALLI:  There were three positions when we started

20  the case.  There were store managers.  There was assistant

21  store managers.  There were comanagers.  The assistant manager

22  and comanager position were dependent upon which store was a

23  union store or nonunion store.  I think in the interim there

24  was the Ibea case that I think -- I think Judge Gardephe had or

25  maybe in Pennsylvania where Rite Aid has eliminated the exempt

D799inda

1    assistant manager position.  In 2009, they looked at the store

2    manager position and decided, based upon store volume, they

3    would create an exempt store manager position and a nonexempt

4    store manager position.  So but factually what you have is you

5    have a situation where Rite Aid created a single national job

6    description.  In 2009, they created two job descriptions on a

7    national level once again.  The differences in the job

8    description between exempt and nonexempt are virtually

9    immaterial.  So it's our position that they're viewing store

10   managers as one homogeneous group.  They did it in the

11   beginning and then in the middle of litigation they did it

12   again.

13           And if you look at the cases that the defendants

14   cited -- each case seems to have a bit of evidence that leads

15   to a decision by the district court to look at individual

16   factors.  For one instance, maybe you have a single job

17   description but no real national evidence.  Or maybe you don't

18   have national evidence but you have deposition testimony.

19           In our case we have all of the evidence that warrants

20   a granting of certification and a denial of their motion.

21           THE COURT:  So what are the state law claims?

22           MR. VALLI:  It's the New York labor law claims, your

23   Honor.  It's the overtime claims.  It's a misclassification.

24           THE COURT:  Do the New York labor law claims apply to

25   out-of-state store managers?

D799inda

1            MR. VALLI:  No.

2            THE COURT:  So, it's only the in-state.

3            MR. VALLI:  It's just the New York state store

4    managers.

5            THE COURT:  How many are in the class?

6            MR. VALLI:  I think 123 -- it's about 300 stores, but

7    123 I believe.

8            THE COURT:  In New York state?

9            MR. VALLI:  In New York state alone.

10            THE COURT:  Does collective action apply out of state?

11            MR. VALLI:  The collective action applies nationwide

12    except for California, because that was the Tierno case which

13    has already been resolved.

14            THE COURT:  Do you know how many are in the collective

15    action?

16            MR. VALLI:  1,554.

17            THE COURT:  That's opt-ins?

18            MR. VALLI:  That's opt-ins.

19            THE COURT:  You have actually gotten those opt-ins?

20            MR. VALLI:  About eight thousand people total, and

21    about fifteen hundred opted in.

22            THE COURT:  Okay.

23            MR. VALLI:  In thinking about this, your Honor,

24    obviously we're talking about store managers.  And at various

25    times during the depositions the defendants would ask a store

D799inda

1    manager:  Are you in charge?  I'm in charge.

2          Well in thinking about it this weekend, I was watching

3    my four-year-old nephew.  He was driving one of those Playskool

4    kind of cars.  And it's got a steering wheel and it's got a

5    shifter.  And it's got mirrors.  It's got a horn that actually

6    works.  It's got pedals.  And if you ask my nephew:  Are you

7    driving the car?  Oh, yeah, I'm driving the car.  But my

8    brother is behind him with a big aluminum pole controlling

9    everything.  And that's the situation you have at Rite Aid.

10   And not to disparage the store managers, because I'm sure there

11   are some of them, in a different context, who could actually

12   manage the store.

13         THE COURT:  You're saying they delusionally thought

14   that they were in charge of the store?

15         MR. VALLI:  Absolutely, Judge.  They're not in charge

16   of the store.

17         When you look at the type of command and control that

18   Rite Aid has from the top down, they delineate virtually every

19   aspect of a store -- of the store manager position from the

20   portal system.

21         This is now testimony.  Regardless of store location,

22   size, volume, staffing, or any other variable, Rite Aid

23   requires uniformity in all store operations.  That's one of

24   their district managers.  That's exactly what we're saying.

25         Defendants have treated this group as a homogeneous

D799inda

1    group.  Their policies are nationwide.  They disseminate them

2    to all of the stores electronically.  Their executives

3    recognize that Rite Aid wants this to be one homogeneous group

4    with no changes.

5         One of their other executives, in describing the

6    portal system, which is how Rite Aid communicates with the

7    stores and gives them all their information and all their

8    instructions and all the rules they have to follow, portal

9    guides district managers and store managers on virtually every

10   aspect of the store functions and operations.

11        THE COURT:  When you say portal guides, what does that

12   mean?

13        MR. VALLI:  Portal is what they call their -- their

14   software.  We could call it outlook.  So they call it portal.

15   Portal -- I can give you a specific definition, your Honor.

16   Portal contains all the communication software, how the stores

17   communicate with corporate, how corporate communicates with the

18   stores, all the advertising that the stores are supposed to do.

19   This is instructing them how to do it, all the store systems

20   that are in place, all the routine processes that the stores

21   have to engage in.

22        There's virtually no aspect of what a store manager

23   does that involves independent control and discretion.  It is

24   all dictated.

25        So if you would ask a store manager:  Do you hire and

D799inda

1    fire?  Well they may say yes.  But in actuality:  Oh, wait,

2    I've got to send that applicant to HR.  HR has to approve that

3    applicant.  And if you asked every store manager:  Can you hire

4    someone without HR approval?  Absolutely not.  Can you fire

5    without approval?  Absolutely not.  Can you change your budget?

6    Absolutely not.  Can you do overtime?  Absolutely not.  Can you

7    order -- you know, if you order something that's not on the

8    list?  No.  Can you set prices?  No.

9         One of my favorite examples dealt with what's called

10   an end cap.  And this is when you walk into Rite Aid and you

11   look in aisle one has cosmetics in every Rite Aid.  And at the

12   end of the aisle is an end cap.  And it has a particular

13   product.  And that's going to be the product in virtually every

14   store.  Now it may be -- it may change.  Maybe you'll have

15   suntan lotion in Miami and you'll have gloves and hats in

16   Michigan.  But it's the same for every store.

17        And now the store manager will say:  Well, yeah, I

18   designed that.  In actuality, it came from corporate.

19   Corporate has a map, a diagram of every store.  And it's

20   telling that store:  You will put this product here starting on

21   this day, ending on this day.  You will have ten units on the

22   first shelf, eight units on the second shelf.  And they have no

23   control.  And that's the point that we're making.  So when you

24   look at --

25        THE COURT:  Well, I understand.  To some extent this

D799inda

1     is getting into the merits of the exempt issue.  But I

2     understand your point about -- your emphasize, for purposes of

3     these motions, is the uniformity, commonality, etc.

4              MR. VALLI:  As your Honor stated in the prior Jacob

5     decision, there is no requirement that the store managers be

6     identical, that the duties be identical.  This is not a jigsaw

7     puzzle that I have to put the pieces in, in the exact same

8     framework that Rite Aid requires.

9              Classification at this level, as Myers said, and as

10    the Court just reiterated in Cuevas, is inherently not an

11    individual issue.  It is a common class issue that should be

12    decided on common class grounds.  There is no other way to look

13    at it.

14             THE COURT:  Let me hear from defense counsel.

15             Mr. Turner, is that right?

16             MR. TURNER:  Yes, your Honor.

17             THE COURT:  Mr. Turner, I wonder if -- you can start

18    with any sort of general job background sort of stuff.  But I

19    wonder if you'd talk a little bit about, given what I wrote in

20    the Duane Reade classification issue and putting aside whether

21    I'm going to reconsider that, which I'm going -- I don't want

22    you to assume anything about yet.

23             MR. TURNER:  Yes, your Honor.

24             THE COURT:  How is this different?

25             MR. TURNER:  Your Honor, this record is vastly

D799inda

1    different in almost every possible way.

2          The evidence in this case is that contrary to the

3    smoke and mirrors that you're hearing about all these

4    policies -- and I will give you specific names -- there are

5    store managers who testified:  I don't need policies and I

6    don't look at policies.

7          The portal that he's telling you about has only been

8    in place since 2009 or 2008, in that timeframe.  And all it

9    does and what Rite Aid makes clear in its -- in the corporate

10   testimony is that they offer guidelines and best practices.

11   There is no requirement that they -- that the store managers

12   follow those.  And there's a reason for that.  Rite Aid, unlike

13   Duane Reade, and Rite Aid, unlike CVS, has grown over the years

14   through many acquisitions.  And there are different -- for

15   example, in the middle of this class, the Eckerd stores were

16   acquired.  They operated under the Eckerd banner for a year.

17          THE COURT:  What's the word, Eckerd?

18          MR. TURNER:  Eckerd, E-C-K-E-R-D.

19          They operated under the Eckerd banner for year and

20   operated under Eckerd policies and then over time were changed

21   over.  But the testimony in this case is not even close to what

22   plaintiffs wish it were.  In reality, your Honor, I think

23   that -- here's where we are.  We assert the executive, the

24   administrative, and the combination exhibit.  And we've

25   provided evidence of all three of those in our briefing to your

D799inda

1    Honor.  They haven't addressed the administrative exemption or

2    their combination exemption at all.  I'll focus on the

3    executive exemption which is where their focus has been.  We

4    know there is no dispute at all in this case that the salary

5    basis test is satisfied.  It's not an issue.  We know that

6    there is no dispute in this case that the store managers

7    regularly directed the work of two or more employees; some

8    testifying that -- specifically, your Honor, store manager

9    Rali supervised 70 employees.  You have vastly different stores

10   at Rite Aid, unlike the other chains.  Grand Central Station.

11   That store has 50, 60, 70, employees.  Someone is running that

12   store.  And it is not a district manager.

13            THE COURT:  Is there one person who is the store

14   manager there?

15            MR. TURNER:  That's correct, your Honor.  That's my

16   understanding.  It's a 24-hour store so it's possible that

17   there could be more than one.  And contrary to what plaintiffs'

18   counsel has said, there are now store managers who actually run

19   multiple stores at once, especially lower volume stores.  And

20   they move around from store to store.

21            THE COURT:  What's their salary?

22            MR. TURNER:  The range, your Honor, the top range is

23   around $84,000 I believe.  I don't know what the low range is

24   because we haven't looked at this in some time and I -- please

25   don't hold me to the 84.  That's what I recall from some time

D799inda

 1    back.

 2              THE COURT:  Could you explain, while I'm thinking

 3    about it, I don't want to forget.  What's the status of

 4    discovery?  I think Judge Gardephe had this case before and I

 5    know there was a denial of summary judgment as to liability,

 6    saying there needed to be more facts.  But has there since been

 7    discovery on liability issues?

 8              MR. TURNER:  Not -- it's been focused on class issues,

 9    your Honor.

10              THE COURT:  Okay.

11              MR. TURNER:  To date, we've been limited to 50

12    depositions, which plaintiffs concede there was nothing about

13    the methodology of picking them.  They created a statistically

14    sound model.

15              We were told 50.  We were allowed to take 50

16    depositions.

17              We were even limited in New York.  The only testimony

18    you have on their Rule 23 New York claim is from six opt-ins.

19    We noticed the depositions of six in Atlanta.

20              Keep in mind.  Those individuals have affirmatively

21    already asserted a claim against Rite Aid.  Twenty percent of

22    the people in New York who received the notice in the FLSA case

23    opted in.  There is testimony from four of the 80 percent who

24    didn't opt-in, we submitted declarations, and they in turn

25    deposed them.  They obviously don't cite their testimony in any

D799inda

1   of their charts or anything else.  Those individuals testified

2   at length about their managerial duties.  My point being,

3   there's nothing in this record that provides enough

4   representative proof that would allow the Court to certify a

5   Rule 23 action.

6        But what is in this record already, we know the

7   following, your Honor, that -- so, what I was going to say, as

8   to the exemption, there really are only two issues.  And these

9   really are the questions that the Court should ask, is there a

10  common answer:  Whether the store managers' primary duty was

11  the management of the store?  That's one of the prongs.  And

12  then the second one is:  Did they have the authority to hire,

13  fire, or make recommendations as to hiring, firing,

14  advancement, or promotion that were given particular weight.

15       As to hiring and firing.  Here's what the testimony

16  is.  Store managers Blake, Hazara, Palumbo, Pletka and Rand

17  always handled all aspects of the hiring process with no

18  district manager or human resources oversight.  That's the

19  testimony that is in this record.  And we've provided the

20  citations for each of those to your Honor in the charts.  They

21  selected who to interview.  They decided, once they -- and then

22  they conducted the interview.  They decided who to hire.  And

23  then they completed the hiring process after making an offer,

24  with no one else involved.

25       Store manager Indergit testified that from up until

D799inda

2006 he had the exact same authority at all times.  No

oversight by anyone.  After 2006 he had to -- he went through

the entire process, and then he would recommend to his district

manager, Mr. Offor whether or not -- or seek -- he would

recommend this one be hired.  He never once had Mr. Offor say

no.  Every recommendation he made was accepted.

We also know, your Honor, that store managers Gerber

and Santos always had to seek district manager and human

resources approval.

We also know that store managers Goodloe and Smith

never hired anyone.  They weren't involved in the process at

all.

We know that store manager Lembezeder, he didn't hire

anybody either.  Why?  He delegated it to his assistant manager

and let his assistant manager do all of the hiring.  And then

he wasn't involved at all.  Doesn't mean he didn't have the

authority.  He gave the authority away.

We also know that store manager McGillivray assisted

with the pharmacy hiring; whereas, store manager Lembezeder and

Smith -- or managers Lembezeder and Smith did not do so.

We know store manager Hazara set the pay rate for

people she hired.  That's her testimony.

We also know that store managers Spencer and Simons

did not because they had collective bargaining agreements that

did it for them.

D799inda

1          The record is all over the board.

2          So if we just look at the two common questions that

3    really you should be looking can you answer those questions:

4    Could they hire?  It depends.  And it depends dramatically from

5    yes, no, to everything in between.  That's what this record

6    demonstrates.

7          The allegations of corporate control are the same

8    thing.  The job description, the testimony is all over the

9    board.

10          Plaintiff Indergit -- may we approach?  We've got some

11    job descriptions we asked them to markup during their

12    depositions to show if they -- may we?

13          THE COURT:  Sure.

14          MR. TURNER:  I'll let Ms. Moeller so I can keep

15    talking, if that's okay with your Honor.

16          THE COURT:  Sure.

17          MR. TURNER:  Plaintiff Indergit testified during his

18    deposition that his primary duty was to -- was managing the

19    total store operations and that the job description defined his

20    position.

21          We know that store managers -- let me get my notes,

22    your Honor, I'm sorry -- we know that store managers Martin and

23    Echeverria dispute that the job description defined their

24    positions.

25          And importantly, your Honor, you asked me why this

D799inda

1    case is different from Duane Reade.  Well it's different

2    because of its first line managers and there's nobody in the

3    store overseeing them on a daily basis like the assistant

4    managers.  It's different because Rite Aid's testimony in this

5    case, the 30(b)(6) testimony in this case is we don't require

6    the store managers to follow guidelines and we don't take the

7    position that the job description defines the position.

8           In Jacob, the Court stated DR asserts that the

9    assistant manager job description accurately denotes the

10   assistant managers's duties, responsibilities, and

11   expectations.

12          In Demassia v. Duane Reade, Duane Reade affirmatively

13   conceded that it had uniform business practices and the job

14   duties and responsibilities of all assistant store managers

15   were centrally derived

16          In this case, Rite Aid's position is we don't

17   standardize things in our stores.  We look for best practices

18   and we provide best practices to our stores on different

19   activities.  But we don't dictate how they do any particular

20   activity.  And that's Tony Sadler, who is the executive

21   vice-president of operations and was the witness for the

22   company in this case.

23          Are there district managers out there who micromanage?

24   Absolutely.  If you look at the testimony we provided to your

25   Honor -- and again I can go through and give you names of

D799inda

1    people.

2           District manager Indergit testified that his district

3    manager did not run his store.  He ran his store.  Definitively

4    he testified to that.

5           District Managers Enser and Keane say it depended on

6    the district manager.

7           Some were completely off -- completely hands-off and

8    not involved.  Some micromanaged them

9           District Manager Lembezeder, he claimed that a

10   district manager who visited his store bimonthly ran his

11   $12-million-a-year store.

12          It's all over the board as to any factor that's

13   identified as being part of the primary duty.

14          Here's the kicker.  On the issue of primary duty.

15   Even if we assume that the job description accurately defines

16   the primary duty of the store managers, as the Court indicated,

17   along with policies and procedures in the Duane Reade case, in

18   this case we know that doesn't end the question.

19          The summary judgment order in this case, despite

20   Mr. Indergit's testimony, my primary duty was total

21   operations -- managing the total operations of the store.

22   Despite that admission, the summary judgment order in the case

23   says that's not enough.  You have to look behind that.  You

24   have to look at the percentage of time that he spent performing

25   nonmanagerial duties.  You have to look at concurrent duties.

D799inda

```
 1              How do you do that?  You have to get testimony from

 2     other people who worked with him, from the supervisor.  You

 3     have to get testimony from his coworkers.  You have to get

 4     testimony from his subordinates.

 5              That's the only way you're going to know, according to

 6     the law of this case.

 7              That analysis applies to every one of the store

 8     managers and particularly in light of the evidence that we have

 9     demonstrating vast, vastly conflicting testimony as to what

10     they did or did not do.

11              THE COURT:  Okay.  Thank you.

12              Did you want to reply to anything?

13              MR. VALLI:  Absolutely.

14              THE COURT:  You don't need to.  I think that answers

15     the questions I have but if there's anything you would like to

16     add you may.

17              MR. VALLI:  I would draw your attention to Exhibit A

18     your Honor which is in our opposition to their motion for

19     decertification which is oddly enough our version of a rigorous

20     analysis by going through all the testimony and providing it

21     for your Honor.

22              And at the primary -- with respect to the primary

23     duties, as you stated in Jacobs, the vast majority of these

24     individuals all testified to having the very same duties.  And

25     the level of control exhibited by Rite Aid over these
```

D799inda

1    individuals, despite what counsel has said, is there.

2           Everyone testified these are national policies

3    distributed on a national level.  I don't recall anyone saying

4    that store managers can violate policy and not be held

5    accountable.  I don't believe that's the actual case.

6           With respect to best practices, your Honor, we didn't

7    even discuss that.  But what Rite Aid has done is now they've

8    created a system whereby how you take a product out of a bin

9    and place it on the shelf was analyzed.  They timed it.  They

10   figured out how many times that takes place in each store.  And

11   they calculated a labor budget based upon that.  They then held

12   each store to that labor budget.  Store managers had no input

13   in that.  The district managers had virtually no input in that.

14   So, to say the store managers have this level of control is

15   just not accurate.

16           THE COURT:  Okay.

17           MR. TURNER:  May I?  Very briefly.

18           THE COURT:  Sure.

19           MR. TURNER:  There -- I believe that the correct

20   number.  There are somewhere -- we estimate around fifteen

21   hundred class members as opposed to a hundred and something.

22   But I believe Mr. Valli, that's what I understood him to say.

23           MR. VALLI:  In New York.  Just in New York.

24           MR. TURNER:  What he was talking about was the number

25   of opt-ins in his case here in New York.  We're talking about a

D799inda

1    vastly different number of store managers, almost none of which

2    do we have testimony from those who haven't actually

3    affirmatively asserted a claim.

4             THE COURT:  So the number of class members.

5             MR. TURNER:  Just in New York.

6             THE COURT:  In New York is what?

7             MR. TURNER:  We think it's somewhere around fifteen

8    hundred.  We'd have to -- there could be some -- we had them

9    pull the numbers, and there could be some overlap.  It goes by

10   job code.  People could come in and out.

11            The number they actually polled was closer to

12   seventeen.  But it's probably better to say it's around fifteen

13   is our best guess.

14            THE COURT:  That's assuming you go back six years

15   under the New York statute of limitations?

16            MR. TURNER:  From this point it's actually level

17   years.

18            THE COURT:  Right.

19            MR. TURNER:  Correct, your Honor.

20            THE COURT:  Okay.

21            MR. TURNER:  And your Honor I would -- if I may, at

22   the end of the day despite -- regardless whether there could

23   possibly be any common answers, the individual issues --

24   setting aside just damages -- but the individual issues -- and

25   I'm happy to talk to your Honor about terminations, but there

D799inda

```
 1    are store managers who testified they terminated people on the
 2    spot with nobody involved, and they did it throughout their
 3    career.  Some had the ability to do it within 90 days of hiring
 4    somebody without anyone involved.  Mr. Indergit, it depended on
 5    the timeframe.  Up until 2006 he could do it whenever he wanted
 6    to.
 7            Just as to the single issue of whether or not they had
 8    the ability to hire and fire, there is no common answer.  But
 9    even if you could conclude that there somehow is, the
10    individual issues will swamp any common answer as to whether
11    they could or couldn't because they say they can.
12            But I'll also point out -- do you want to hear from us
13    on Comcast at all?
14            THE COURT:  If you'd like to add anything you may but
15    I've received your letters.
16            MR. TURNER:  There's two things that I don't think are
17    very clear in our letter that I think we would like to point
18    out to your Honor.
19            The number of hours we're talking about here -- and
20    I've looked at the Duane Reade briefing -- vastly different.
21    The range of hours according to their clients who are actually
22    opt-ins in the FSLA case is 45 to 90 hours.  That's more than a
23    work week.  There is no way -- what I think the Supreme Court
24    is saying is you have to come up with something other than
25    speculation, a just and reasonable inference.
```

D799inda

1          There is no just and reasonable inference that either,

2     A, for a store manager who is testifying in the record, a store

3     manager who only worked 20 to 25 hours a week or a store

4     manager testifying she knew one, then that person gets a huge

5     windfall if you try to come up with some middle line.  The

6     person who worked 90, unless you go to 90 for everybody, which

7     can't be right, they suddenly get -- their due process rights

8     are violated.  They're giving up a lot of money.  It's hundreds

9     of thousands of dollars potentially.

10         The second thing, your Honor, is in this case we have

11    correspondence from plaintiffs' counsel on the issue of damages

12    where they stated in their correspondence to us, when they were

13    asking for damages information as to all of the opt-ins, I

14    believe was the controversy at the time.  We said no, you've

15    asked for a sampling; focus on the sampling and demonstrate

16    damages based on that.  They said, the response, "Damages is

17    not a representation issue."

18         We agree.  Wholeheartedly.  You can't prove that.  You

19    can't prove damages based on representational proof in this

20    case.  And many trials or anything else isn't going to solve

21    that because of the severe range.  It's not 45 to 60, or 45 to

22    55 which seems to be the assistant manager case.  Ours is

23    vastly different.

24         THE COURT:  But is there a uniform database or

25    recordkeeping mechanism that has the hours?

D799inda

1          MR. TURNER:  No, your Honor.  There is no such thing.

2          Unlike with Duane Reade, I understood them to say

3  today -- and I don't know their record and I don't work for

4  that company -- what I understood them to say today is that

5  there are punch records.

6          There is no such thing for us.

7          Depending on the timeframe and the store they worked

8  in, what are called core Rite Aid stores, like the original

9  Rite Aid stores.  When they come in, they key in, in the

10  computer.  That just records their presence.  There is no

11  keying out.  There's nothing to indicate how much time they

12  worked.  It doesn't exist.

13          In Eckerd stores there was never anything.  Eckerd did

14  not keep it.  And when they transitioned over to Rite Aid, the

15  computer systems didn't gel at all.  So there isn't even the

16  original punch time when they come in.

17          So it's vastly different in this case than what Duane

18  Reade was describing.

19          THE COURT:  Wouldn't it be an odd incentive though if

20  the absence of records by the employer freed them from having

21  to deal with Rule 23 class actions?

22          MR. TURNER:  I don't -- no, your Honor.  I don't think

23  so.  Especially, again, you're dealing with store managers.  I

24  mean some of them are running stores that are 10, 20 million

25  dollar stores.  And there isn't any understanding by the

D799inda

1    company.  The company believes -- the company continues to

2    believe that they are properly classified.

3           The reclassification issue that they brought up had

4    nothing to do with this lawsuit.  The company was bleeding

5    money.  I don't know if you're familiar with Rite Aid, but it

6    was on the verge of bankruptcy.  And they stirred up

7    operations.  And they changed the way they ran their low volume

8    stores.  And as a good corporate citizen, they stopped and

9    looked, and said okay are they going to have enough hours to

10   supervise?  That's the question.  And it was close.

11          THE COURT:  What do you mean?  Are they going to have

12   enough hours --

13          MR. TURNER:  They have to regularly direct two or more

14   employees, which means they have to be supervising up to 80

15   hours.

16          So they dramatically changed the way those stores run

17   and said to the store managers you're going to be in the store

18   alone, which wasn't the case before.  And so we're going to

19   change the way that we pay you.

20          It wasn't an issue of they just made a change.  They

21   were trying to make the company profitable again.

22          THE COURT:  Aren't some of the store managers

23   classified as nonexempt?

24          MR. TURNER:  That's correct, your Honor.  As of 2009

25   there are some store managers -- again, so the common

D799inda

1      classification issue depends on the timeframe.

2              As of 2009, the ones I was just talking about in those

3      low volume stores, there were huge operational changes.  The

4      number of times trucks come, the way that product was put out

5      on the floor.  They changed a lot.  And they said we need to

6      make these people nonexempt.

7              THE COURT:  As to them, they are keeping records, time

8      records?

9              MR. TURNER:  Of course.  And they are paid overtime.

10             THE COURT:  And they're?

11             MR. TURNER:  They're paid overtime if they work more

12     than 40 hours.

13             THE COURT:  Okay.  Thank you.

14             Did you want to reply to anything on that last point?

15             MR. VALLI:  Just your point, your Honor, which is

16     obviously when they made this change in classifications they

17     did so on store volume.  They didn't look at any individual

18     issue regarding any particular store manager.

19             I mean as you've noted, it is an odd incentive for an

20     employer to say we're not going to keep track of your records,

21     employee, and you won't be able to bring a class action.  But

22     they did punch in.  And they were instructed don't punch out.

23     So we have evidence of that.  So we think it was an affirmative

24     step by Rite Aid to prevent the employees from knowing how many

25     hours they worked.

D799inda

1         In New York state, that's not a particularly difficult

2    issue because New York state permits an employee to testify as

3    to the hours that they worked.  It is black letter law.  It has

4    been black letter law for I think -- I want to go back almost

5    45 years.  Judge Gardephe just set forth the same reasoning in

6    a bench trial that he had a few years ago.  So I'm not too

7    concerned about that.

8         And one of the other differences from Duane Reade is

9    that store managers in Rite Aid were required to work 50 hours

10   a week or more.  So we have a floor.

11        And obviously the calculation that's used by the

12   federal department of labor is probably sufficient for this

13   case, which is we take the number of hours that you worked, we

14   divide it into your weekly pay, we come up with your weekly

15   hourly rate, multiple it by -- we get 1.5, multiple it by all

16   hours over 40.  It's very straighted forward, very simple, and

17   it happens everyday in every wage-an-hour case.

18            THE COURT:  Okay.  Thank you.

19            MR. TURNER:  Any chance I can address the 50 hours?

20            THE COURT:  Sure.

21            MR. TURNER:  Not true.  There were -- at times there

22   were expectations of 50 hours.  But the store managers'

23   testimony is across the board as to whether they did it or not.

24   And the record shows that.

25            Mr. Valli referenced an Exhibit A to their brief where

D799inda

1    they showed testimony.  If you'll look, your Honor, when you

2    get a chance, which would have been attachment 8 or exhibit 8

3    to my declaration in the reply to motion, to their -- to

4    their -- to our motion for decertification, this was their

5    chart.  This is our chart that's created from their chart.

6            What it shows is there is not a single store manager

7    that they cite that is consistent across the categories they

8    claim are common.  Not one.  And, in fact, they don't even cite

9    four -- I mean seven of the store managers who were deposed.

10   Why?  Because they don't support any of the claims.  It's just

11   not even close to being the case.

12           Given the testimony in this case that's demonstrated

13   by our charts and even just hiring and termination alone where

14   it's across the board, your Honor, how are we going to try this

15   case as a class action?  How is it even possible to get there?

16           The range of nonmanagerial work as it relates to

17   primary duty alone is 20 percent to 90 percent.  Hiring is yes,

18   I did with nobody involved to no I didn't.  In every possible

19   direction.  You've got so many -- so much conflicting evidence.

20   How is it possible to try this case on a collective basis or a

21   class basis, either one?

22           THE COURT:  All right.  Thank you folks very much.

23           (Adjourned)

24

25