UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                       :

YATRAM INDERGIT, *on behalf of himself and*  :
*all others similarly situated*,             :
                          Plaintiff,  :        08 Civ. 9361 (JPO)
                                    :

                 -v-               :        <u>OPINION AND ORDER</u>
                                    :

RITE AID CORPORATION, RITE AID OF NEW :
YORK, INC., and FRANK OFFOR,         :
                      Defendants.  :
                                    X
-----------------------------------------------------------

J. PAUL OETKEN, District Judge:

        Plaintiff Yatram Indergit, on behalf of himself and others similarly situated, asserts

claims against Rite Aid corporation, Rite Aid of New York, Inc., and Frank Offor (together,

"RA"), alleging that RA failed to compensate its store managers ("SMs") for overtime hours, in

violation of both the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), and the New

York Labor Law §§ 650 *et seq.* ("NYLL").  Prior to discovery, in June 2010, Judge Paul G.

Gardephe conditionally certified the FLSA class of RA store managers, granting Indergit's

motion for court-authorized notice.  *Indergit v. Rite Aid Corp.*, Nos. 08 Civ. 9361 (PGG), 08 Civ.

11364 (PGG), 2010 WL 2465488 (S.D.N.Y. June 16, 2010).  Before the Court are RA's motion

to decertify the FLSA class on the ground that discovery has revealed that the plaintiffs

constituting the class are not "similarly situated," as required by FLSA, for purposes of the

misclassification inquiry, as well as Plaintiff's motion to certify a class of New York plaintiffs

pursuant to Federal Rule of Civil Procedure 23.  For the reasons that follow, Plaintiff's motion is

granted as to liability and Defendants' motion is denied.

I.    **Background**

A.    **Factual Background**[1]

RA, a large drugstore chain, operates nearly 5,000 stores nationwide and approximately 328 stores in New York. RA's stores are divided into districts, which in turn are broken into regions and group levels that report to each district. There are currently 14 regions and 8 groups of RA stores. The stores within each district are managed by district managers ("DMs"), who report to regional vice presidents.

SMs are tasked with managing their individual RA store, and the SM position is described by RA as a salaried, full-time, FLSA-exempt role with a self-determined work pace and a moderate level of supervision. (Ex. D.)[2] Among the SMs' "essential duties" are "maintaining proper accountability for cash handling and company banking," ensuring that the store meets "retail budgeted sales, margin, labor, expenses, and overall P&L [referring to profit and loss] monthly results," hiring and training new employees, and maintaining "merchandise

---

[1] The facts are taken from Judge Gardephe's prior opinions in this case and the parties' submissions in connection with the instant motions. Familiarity with the facts is presumed, and accordingly, only those relevant to the issues before the Court are briefly addressed.

[2] Unless otherwise noted, Plaintiff's exhibits for the instant motions are referred to as follows "Ex. __" with the accompanying letter of the alphabet. These exhibits are attached to the Declaration of Robert J. Valli, Jr. in Opposition to Defendant's Motion for Decertification, Dkt. No. 227 (Exs. A-UUU) or the Declarations of Robert J. Valli, Jr. at docket entry numbers 222 (Exs. A-PP) and 224 (Exs. QQ-HHH). The citations to alphabetically designated exhibits in the FLSA decertification section are attached to the declaration at docket entry number 227 and those in the class certification section are attached to docket entry numbers 222 and 224. Although Plaintiff designates his exhibits accompanying docket entry numbers 222 and 224 with numbers, rather than letters, the Court has redesignated them with corresponding letters, for ease of reference. Exhibit A corresponds to Exhibit 1, and so forth, through Exhibit 60, which is designated as Exhibit HHH. Defendants' exhibits are referred to as follows "Dkt. No. __, Ex. __" with the accompanying number. These exhibits are attached to the Declarations of Daniel E. Turner at docket entry numbers 212, 226, and 229. As Defendant restarts the numbering with each docket entry number, that number is included as well for ease of reference.

standards" in accordance to company policy and best practices.  (*Id.*)  According to the RA job description, SMs, who themselves report to the DMs, are also responsible for "directly supervising" store associates and carrying out "supervisory responsibilities in accordance with Rite Aid policies and applicable laws."  (*Id.*)

Prior to 2009, RA classified all of its SMs as exempt employees under FLSA.  That year, however, RA engaged in a restructuring, reclassifying 1,847 SMs as non-exempt, while 2,944 remained exempt.  According to RA, the reclassification of its SMs had "nothing to do with this lawsuit," but instead was a response to the fact that the company was "bleeding money" and was, for a time, "on the verge of bankruptcy."  (Oral Argument Transcript, Dkt. No. 237 ("Tr."), at 23:4-10.)  According to Plaintiff, this restructuring only emphasizes the misclassification of the current, exempt SMs, as RA engaged in this reorganization based on store volume ranges and applied its results nationwide, without regard to the attributes of a particular region, store, or SM.

According to Plaintiff, the SMs are repeatedly mandated by company fiat to perform menial, non-exempt tasks without payment of overtime wages, in violation of both NYLL and FLSA.  Plaintiffs characterize their role as that of Potemkin leaders; while their job description suggests a managerial position imbued with discretion and responsibility, Plaintiffs claim they are mere automatons, whose choices are carefully circumscribed by corporate policies and micromanaging DMs, "[r]egardless of store location, size, volume, staffing, or any other variable . . . ."  (*Id.* at 5:21-22.)  Whereas Plaintiffs portray an indistinguishable army of SMs who are only delusionally in charge of the stores in which they work, RA suggests that not only do its SMs possess significant and meaningful discretion, but also that this discretion is exercised so differently and is so contingent on myriad, divergent factors—such as a DM's management style or the store's location—that it renders the SMs' claims unsuitable for classwide resolution.

3

**B.     Procedural Background**

Indergit filed his Complaint in this action on October 31, 2008.  (Dkt. No. 1.)   RA

answered in January 2009 (Dkt. No. 8), and Indergit later filed an Amended Complaint in March

2009 (Dkt. No. 17).  Indergit's original claim was asserted on behalf of both SMs and Assistant

Store Managers ("ASMs"), though he had not himself served as an ASM.  On March 27, 2009,

RA filed a motion for partial judgment on the pleadings, seeking dismissal of Indergit's

allegations relating to ASMs.  (Dkt. Nos. 24, 25.)  Judge Gardephe granted RA's motion as to

Indergit's FLSA claim for conduct prior to October 31, 2005, but otherwise denied the motion.

(Dkt. No. 36.)  In July 2009, Indergit filed a motion to conditionally certify the FLSA class in

this case.  (Dkt. No. 56.)  RA also moved, in August 2009, for summary judgment on the merits

of Plaintiff's FLSA, NYLL, and injunctive relief claims.  (Dkt. No. 71.)  On March 31, 2010,

Judge Gardephe granted in part and denied in part Defendants' motion for summary judgment,

dismissing Plaintiff's retaliation claims and his personal claims for injunctive relief, while

otherwise denying the motion.  (Dkt. No. 92.)  In June 2010, Judge Gardephe outlined his

reasoning for granting Indergit's motion for court-authorized notice to potential FLSA opt-in

plaintiffs, determining that RA's managers were sufficiently similarly situated to permit

conditional certification.  (Dkt. No. 103.)

The instant motion for decertification was filed on January 23, 2013.  (Dkt. No. 218.)

Plaintiffs filed their motion for class certification that same day.  (Dkt. No. 220.)  The Court held

oral argument on the fully briefed motions on July 9, 2013.

## II.    Legal Standard

### A.    FLSA Exemptions[3]

The FLSA is a remedial statute, designed to combat, and eliminate, "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers . . . ."  29 U.S.C. § 202(a).  Intrinsic to this mission is the concept of "guarantee[d] compensation for all work or employment engaged in by employees covered by the Act."  *Reich v. New York City Transit Authority*, 45 F.3d 646, 649 (2d Cir. 1995) (quotations and citation omitted).  As a general rule, the FLSA requires all employers to pay employees overtime wages for all hours worked in excess of 40 hours per week so long as the employees are not "exempt" under one of the statutory categories.  29 U.S.C. § 207; *see also Jacob v. Duane Reade, Inc. ("Jacob I")*, No. 11 Civ. 160 (JPO), 2012 WL 260230, at *2 (S.D.N.Y. Jan. 27, 2012).  Exempt employees include those who are "employed in a bona fide executive, administrative, or professional capacity . . . ."  29 U.S.C. § 213(a).

The so-called "executive exemption" alleviates employers from the overtime requirements of the labor laws for employees (1) who are compensated on a salaried basis at a rate no less than $455 per week; (2) "whose primary duty is management of the enterprise in which the employee[s] [are] employed or of a customarily recognized department or subdivision thereof;" (3) "[w]ho customarily and regularly direct[] the work of two or more other employees;

---

[3] The parties agree that the merits of Plaintiffs' claims under the NYLL are governed by the same standards as FLSA, as the NYLL exemptions track FLSA's definitions.  *See Xuedan Wang v. Hearst Corp.*, No. 12 Civ. 793 (HB), 2013 WL 1903787, at *3 n.3 (S.D.N.Y. May 8, 2013), *motion to certify appeal granted*, No. 12 Civ. 793 (HB), 2013 WL 3326650 (S.D.N.Y. June 27, 2013) ("The courts in this circuit have held that the NYLL 'embodies the same standard for employment as the FLSA.'" (quoting *Cano v. DPNY, Inc.*, 287 F.R.D. 251, 260 (S.D.N.Y. 2012)).

and" (4) who possess[] the authority to "hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."  29 C.F.R. § 541.100(a)(1)-(4).

The applicable regulations also provide for an "administrative exemption," removing from coverage those employees who (1) are compensated on a salary or fee basis at a rate no less than $455 per week; (2) "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) [w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance," from FLSA's overtime requirements.  29 C.F.R. § 541.200(a)(1)-(3).

These regulations also provide for a "combination exemption," which applies to those employees who "perform a combination of exempt duties as set forth in the regulations . . . ."  29 C.F.R. § 541.708.  Accordingly, employees "whose primary duty involves a combination of exempt administrative and exempt executive work may qualify" as exempt workers, despite the fact that their duties fit neatly within neither the executive nor the administrative exemption.

In order to determine whether an employee is properly exempt, courts must determine whether his "primary duty" is exempt work.  The regulations supply an non-exhaustive list of factors that can aid in this primary duty analysis, including "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee," as instructive, though not dispositive, factors.  29 C.F.R. § 541.700(a).  Even employees who fail to devote "more than 50 percent of their time

6

performing exempt duties," may nevertheless be properly classified as exempt, so long as other factors support that conclusion.  *Id.* at § 541.700(b).

These exemptions, in light of the remedial purpose of FLSA, are to be "narrowly construed."  *Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 614 (2d Cir. 1991).  With respect to the questions relating to an employee's primary duties and exempt status, "[s]ignificantly, the regulations make clear that these questions should be resolved by examining the employees' *actual* job characteristics and duties."  *Myers v. Hertz Corp.*, 624 F.3d 537, 548 (2d Cir. 2010) (emphasis added).  Accordingly, even where an employee's job description appears to exempt him from eligibility for FLSA overtime pay, if that employee's actual duties vary from the seemingly exempt description, such that they are engaged primarily in rote, manual, and non-discretionary tasks, he would be misclassified, despite the exempt nature of his job description.

## B.      Decertification of FLSA Claims

"Section 216(b) of FLSA provides for a private right of action to recover unpaid overtime compensation and liquidated damages from employers who violate FLSA's overtime provisions[,]" *Jacob I*, 2012 WL 260230, at *3, providing in pertinent part as follows:

> An action . . . may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought. . . .

29 U.S.C. § 216(b).  District courts may, within their discretion, facilitate notice to putative plaintiffs in these actions, informing the prospective class of "their opportunity to opt-in as represented plaintiffs."  *Myers*, 624 F.3d at 554 (citing *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989)).  In determining whether to facilitate such notice, courts follow a two-step

7

process whereby they first make an "initial determination to send notice to potential opt-in plaintiffs who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred." *Id.* at 555 (citations omitted).  The notice may be sent after the plaintiffs have satisfied their burden of making a "modest factual showing that they and potential opt-in plaintiffs together were victims of a common policy or plan that violated the law." *Id.* (quotations and citation omitted).  "In a FLSA exemption case, plaintiffs accomplish this by making some showing that 'there are other employees . . . who are similarly situated with respect to their job requirements and with regard to their pay provisions,' on which the criteria for many FLSA exemptions are based, who are classified as exempt pursuant to a common policy or scheme." *Id.* (quoting *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1259 (11th Cir. 2008)).

     In June 2010, in *Indergit*, Judge Gardephe found that Plaintiff had met his initial, preliminary burden "demonstrating that . . . Rite Aid store managers are similarly situated, that they perform similar duties, and that they have been subjected to an allegedly unlawful nationwide corporate policy of shifting the work of non-exempt workers to store managers, and then denying these managers overtime compensation . . . ."  2010 WL 2465488, at *5.  Now, after several years of discovery, the Court is faced with the second tier of the two-step process described in *Myers*; accordingly, the Court now must "conduct a more stringent 'second tier' analysis upon a full record to decide whether the additional plaintiffs are similarly situated to the original plaintiffs." *Id.* at *4; *accord Cohen v. Gerson Lehrman Grp., Inc.*, 686 F. Supp. 2d 317, 327 (S.D.N.Y. 2010) ("After discovery, typically on the defendant's motion for decertification, courts engage in the second phase of analysis.  At that point, the court determines on a full record, and under a more stringent standard, whether the additional plaintiffs are, in fact,

similarly situated.  If the court concludes that all plaintiffs are similarly situated, the collective

action proceeds to trial; otherwise, the collective action is decertified and the claims of the opt-in

plaintiffs are dismissed without prejudice." (citations omitted)).  This so-called "decertification

stage" is the point at which the Court "revisits" the question of whether the plaintiffs are indeed

similarly situated, so as to render FLSA collective action appropriate.  *See Francis v. A & E

Stores, Inc.*, No. 06 Civ. 1638 (CS), 2008 WL 4619858, at *2 (S.D.N.Y. Oct. 16, 2008).  In

determining whether to decertify, courts look to the following factors: "'(1) disparate factual and

employment settings of the individual plaintiffs; (2) defenses available to defendants which

appear to be individual to each plaintiff; and (3) fairness and procedural considerations

counseling for or against [collective action treatment].'"  *Zivali v. AT&T Mobility, LLC*, 784 F.

Supp. 2d 456, 460 (S.D.N.Y. 2011) (quoting *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d

346, 352 (E.D.N.Y. 2008) (alteration in original)).  It is the named plaintiff who bears the burden

of proving that the "other employees are similarly situated."[4]  *Id.* (citing *Ayers v. SGS Control

Servs.*, No. 03 Civ. 9078 (RMB), 2007 WL 646326, at *4 (S.D.N.Y. Feb. 26, 2007)).  Where

discovery has shown that plaintiffs are similarly situated, the collective action will properly

advance to trial; "but if they are not, 'the class is decertified, the claims of the opt-in plaintiffs

---

[4] While the Second Circuit has not yet addressed the specific level of proof for this second-stage inquiry, the Third Circuit has held that a preponderance of the evidence standard is appropriate when employing the decertification analysis. *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 534 (3d Cir. 2012) ("We decide today that to certify an FLSA collective action for trial, the District Court—after considering the claims and defenses of the parties and all the relevant evidence—must make a finding of fact that the members of the collective action are "similarly situated." The burden of demonstrating that members of the collective action are similarly situated is to be borne by the plaintiffs, who must show by a preponderance of the evidence that they are similarly situated.").

are dismissed without prejudice, and the class representative may proceed on his or her own claims.'" *Id.* (quoting *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 197 (S.D.N.Y. 2006)).

### C.    Rule 23 Class Certification

Class certification pursuant to Federal Rule of Civil Procedure 23 embodies a different standard from that applicable in FLSA collective actions.  A putative class must first satisfy the four prerequisites of Rule 23(a), namely that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. Pr. 23(a)(1)-(4).  "These Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy are a baseline inquiry for any court considering the class certification question." *Rapcinsky v. Skinnygirl Cocktails, L.L.C. (Skinnygirl)*, No. 11 Civ. 6546 (JPO), 2013 WL 93636, at *3 (S.D.N.Y. Jan. 9, 2013) (citation omitted).  In addition to these four prerequisites, a plaintiff seeking class certification must also satisfy one of the three 23(b) classifications.  Fed. R. Civ. Pr. 23(b).  Here, Plaintiffs move for certification under Rule 23(b)(3), which permits classification where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.*  In examining this predominance requirement, courts look to the following, four factors delineated in the Rule:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation
of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

Fed. R. Civ. Pr. 23(b)(3)(A)-(D).

In sum, a court "may certify a class only after making determinations that each of the Rule 23 requirements has been met[.]"   *In re Initial Public Offerings Sec. Litig. ("In re IPO")*, 471 F.3d 24, 41 (2d Cir. 2006).  These determinations are appropriately made "only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met." *Id.*  Moreover, "the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement[.]" *Id.*  It is the plaintiff who bears the burden of satisfying the class certification requirements. *See Torres v. Gristede's Operating Corp.*, No. 04 Civ. 3316 (PAC), 2006 WL 2819730, at *8 (S.D.N.Y. Sept. 29, 2006) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997)); *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 58 (2d Cir. 2000)).  A plaintiff's burden of proof for the Rule 23 requirements is a preponderance of the evidence standard. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008) ("Today, we dispel any remaining confusion and hold that the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements.").  Importantly, "Rule 23 does not set forth a mere pleading standard," meaning "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties,

common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

### III.    Discussion

#### A.    Decertification

As a result of Judge Gardephe's conditional certification of this action, notice was sent to approximately 7,220 current and former SMs nationwide, and 1,545 Plaintiffs have opted into this action.  (Plaintiff's Opposition to Defendants' Motion for Decertification, Dkt. No. 225 ("Pl.'s Opp."), at 1.)

#### 1.    Disparate Factual and Employment Settings

Defendants contend that the issue of whether its SMs are entitled to overtime, or, by contrast, are properly classified as exempt workers under the executive, administrative, or combination exemptions is highly fact-specific and individualized, rendering class treatment inappropriate.  Defendants specify the factors listed in the applicable regulations for each exemption, together with divergent accounts within the record, contending that discovery has revealed just how *dissimilarly* situated the RA SMs are from each other.  (Memorandum in Support of Defendants' Motion for Decertification, Dkt. No. 219 ("Def.'s Mem."), at 10.)  In response, Plaintiff argues that the record reflects both a lack of discretion and the real similarities inherent in the SM position as actually performed.

#### a.    Executive Exemption

First, with respect to the executive exemption, Defendants highlight that when determining liability, the Court must examine (1) whether the SMs' "primary duty" is managing their given store; (2) whether the SMs customarily and regularly direct the work of two or more fulltime employees; and (3) whether the SMs have the authority to hire or fire other employees

or make recommendations thereof.  Accordingly, where there are significant differences among SMs' testimony that go to the heart of the factors relevant to a particular exemption, decertification is appropriate.  *See, e.g.*, *Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1104-05 (D. Kan. 2012) ("[G]iven the fact intensive nature of the executive exemption analysis, Plaintiffs have not satisfied the Court that they are similarly situated to the extent necessary to make collective treatment of their claims proper and efficient under § 216(b) of the FLSA.  Such diversity in individual employment situations inhibits Harbor Freight from proving its statutory exemption defenses relating to each individual Plaintiff's claim based on representative proof.  Based on the foregoing, the Court concludes that decertifying the class is required.").

With respect to the SMs' primary duties, the vast majority of deposed SMs expressed that they worked between 50 and 70 hours per week, and spent most of their time on a mix of non-exempt work, but nevertheless felt an ultimate responsibility for their store and its profitability. For example, a survey of some thirty SMs reveals that, with two exceptions, they all work between 50 and 70 hours per week.  (*See* Ex. A, at 17 (Astelford: 50 hours generally, more in the summer months; Bolduc: 50-52 hours usually, 55-60 hours when he first took over as SM; Brown: R., between 55-70 hours; Bourgeois: 60 hours; Duran: over 60 hours; Gerber: 50-55 hours some weeks, 70-75 hours other weeks; Hulsey: 65-70 hours; Lembezeder: 55-70 hours; Lemmings: 60-70 hours; Lenart: more than 50 hours some weeks; Malone: 65 hours; Martin: 65-70 hours; Martson: 50-60 hours; McCarthy: describing her "worst weeks" of 2007-2011 as weeks in which she worked between 80-90 hours; McGillivray: weeks over the course of seven years ranged between 50-70 hours; O'Brien: no less than 50 hours; Orlando: 60 hours; Paul: 65 hours; Perez: 70 hours; Pletka: 50-70 hours; Riaz: 60 hours generally, sometimes 65 hours;

Riley: 50-70 hours, with 80 hours being the highest; Ruzat: around 60 hours; Santos: "always ended up doing more" than 50 hours; Simons: 60 hours; Smith: 60 hours; Solis: 50-72 hours; Spencer: never less than 50 hours; Tardo: 60-80 hours; Whindom: 60-65 hours; Wilson: 55-60 hours over the course of four years).)   The time these SMs claim they spent on non-managerial, non-exempt tasks is also generally consistent and includes a similar mix of running the register, stocking shelves, unloading trucks, engaging in plan-o-grams, and general maintenance.  *See id.* at 24 (Bogash: 90-95%; Dayton: 80-85%; Dixon: 85%; Echeverria: 80%; Gauger: 50-70%; Handshoe: 70%; King: 5-7 hours of a 12-hour day; Kitchen: 80-85%; Lembezeder: 90%; Lenart: 60-70%; Malone: 50-60%; Martin: 70%; McCarthy: 70%; McGillivray: 60%; Orlando: 75%; Palumbo: 80-85%; Perez: "pretty much all day" was spent performing non-managerial duties; Pletka: 50-60%; Riley: "more than half" the day on non-managerial tasks; Saab: "most of the time" spent performing non-managerial work; Spencer: 50-75%; Tardo: 75%; Tremblay: 8 hours out of a 10-hour day spent performing non-managerial tasks; Whindom: 65-70%; Wilson: "more than half" his day spent on non-managerial tasks).)   Again, these percentages are consistent across-the-board.

Despite the fact that many SMs described their day as primarily spent performing non-managerial tasks, as noted *infra*, the time spent performing a given task does not necessarily render that work an employee's primary duty as defined by the applicable FLSA exemptions. *See Gardner v. Western Beef Properties*, No. 08 Civ. 2345, 2013 WL 1629299, at *8 (E.D.N.Y. Mar. 25, 2013), *report and recommendation adopted sub nom. White v. W. Beef Properties, Inc.*, No. 07 Civ. 2345, 2013 WL 1632657 (E.D.N.Y. Apr. 16, 2013) ("Provided that an employee's primary duty is management, '[c]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption.'  For example, '[a]n exempt employee

can . . . simultaneously direct the work of other employees and stock shelves [provided that his primary duty is management].' (quoting 29 C.F.R. § 541.106 (internal citation omitted)). Accordingly, so long as an employee's most important duty is management, the fact that that employee concurrently performs nonexempt work will not render the executive exemption inapplicable.

Here, while the extent to which given DMs supervise the stores in their districts varies somewhat, the vast majority of SMs nonetheless agree that their role is to be "in charge" of their store, even when the demands of the store requires multitasking, while concurrently performing nonexempt duties.[5]  Similarly, while Plaintiff contends that RA SMs are unable to properly

---

[5] (*See* Dkt. No. 229, Ex. 3 (Astleford: felt responsible for managing his store; Bolduc: primary duty was running a profitable store; Dayton: believed he was responsible for the store; Anderson (Defendants repeatedly cite to the deposition of one "Ensor," however, this deposition is actually that of SM Cheryl Ann Anderson (*see* Dkt. Nos. 226, Ex. 2; 229, Ex. 33)): agreed that she, as SM, is the leader of the store and is "in charge" when she is in the store; Gerber: expressed that the SM role is really to execute what corporate wanted done, but admitting that he, as SM, ultimately felt responsible for the store's success and profitability; Indergit: as SM, was responsible for profitability of the store, was in charge of the store, and was "running" the store; Kitchen: as SM was "always responsible" for the entire store, was responsible for the store's overall profitability, and was the highest ranking employee in the store; Mangino: SM is there to "supervise, make sure things are getting done, paperwork, payroll, everything"; Marston: agreed that, as SM, he was the highest-ranking person in the store and was always in charge of the "overall operations"; Palumbo: felt that "ultimately," as SM, he was in charge of the store, a fact that was "no less true because he was stocking shelves"; Paul: as SM was always in charge, regardless of what specific task he was performing at the time; Riaz: despite noting that his DM simply delegated tasks to him as SM, nevertheless felt responsibility for the whole store and agreed it was "part of [his] job description" to remain in charge even when working alongside hourly associates; Riley: despite suggesting that her DM dictated her role, agreed that she was "in charge" of her individual store as SM; Ruzat: despite remarking that he had no autonomy due to the control of the DM, he offered conflicting testimony, at one point stating that he, as SM, was ultimately responsible for the profitability of his store; Simons: agreed that regardless of the task he was performing, whether it be managerial or non-managerial, as SM he was in charge of the store and its success and profitability; Smith: felt ultimately responsible for his store as an SM; Tardo: agreed that as SM he was "in charge," regardless of the duties he was performing and was supervising his employees even when cashiering; Wesley: was "in-charge" other than when the DM or regional vice president was in the store; Wickline: stated that as SM she was

supervise while engaged in the myriad non-managerial duties they perform during a given workday, it appears that the vast majority of surveyed opt-ins recognized the physical limitations of supervision when engaged in, for example, unloading a truck, but nevertheless did their best to multi-task.  Moreover, the fundamental role of being responsible for the day-to-day operations of the store does not appear to have been diminished by the functional necessity of non-managerial duties.[6]

---

"running" the store on a day-to-day basis and agreed that she was "still in charge no matter what [she] was doing"; Wilson: noted that as SM he was "was in charge of running the day-to-day operations" of his store).)

[6] (*See* Dkt. No. 229, Ex. 5 (Astleford: as SM he would supervise to the extent that he could, but could not be "everywhere at once"; Brown, R.: always remained in charge as SM and even when performing non-managerial tasks could see or hear supervisees; Brown, V: was unable to see over the counters while stocking shelves, which limited his ability to supervise his employees, but admitted that while stocking, he remained the SM and was "still following up with [his] employees"; Dayton: despite expressing the difficulty of supervising hourly associates while performing nonmanagerial tasks, agreed that supervision was more important, in terms of his overall job duty as an SM, than the nonmanagerial work; Del Angel: claimed she could not supervise hourly employees while stocking or cleaning, but admitted that even while cashiering, she was "supposed to try and make sure that [hourly employees were] doing their work"; Echeverria: agreed that regardless of the task she was performing, she was responsible for supervising her employees; Gauger: explained that the responsibility of supervision and accountability of hourly associates rested with the SM, regardless of the task the SM was performing; Gerber: noted that although he could not supervise employees while offloading a truck outside, he was nevertheless "still in the supervisory role," agreeing that he was "responsible" and noting that he can stop what he is doing when engaged in nonmanagerial tasks and  observe his employees; Hulsey: while recognizing that an SM cannot be in all places at once, admitting that SMs "try to know what was going on in [their] store[s] all the time that [they] [are] there"; Indergit: agreed that he would supervise and manually work at the same time, and as an SM, was always responsible for his stores and employees; King: stating that it was impossible to perform managerial duties while on the cashier, but agreeing that she was "in charge" when in the store; Kitchen: regardless of what she was doing, was responsible for supervision of the store; Lembezeder: SM is responsible for supervising front-end, non-pharmacy personnel; Malone: claimed that she was not able to supervise hourly employees properly but agreed that she "constantly had to multitask" and was "responsible" for front-end employees; Marston: multitasked to supervise and ensure store ran smoothly; Martin: was responsible for supervision and direction whenever in store; McGillivray: SM responsible for directing and supervising the work of hourly employees and often had to multitask; O'Brien:

Defendants also point to disparate accounts of the way in which the SM's role is affected by (1) store turnover, (2) management styles, and (3) the store's type or location, contending that these differences reveal the individualized nature of the exemption inquiry in this particular case. (Def.'s Mem. at 13.)  Nevertheless, a closer look at these divergent statements reveal that the differences among SMs are marginal and expected, rather than hyper-individualized and unpredictable.  For example, with regard to store turnover, the cited testimony reflects agreement among SMs that new employees require more training on the part of the SM than experienced employees, and, similarly, higher employee turnover leads, expectedly, to a greater degree of hiring and training on the part of the SM.  (*See, e.g.*, Dkt. No. 226, Ex. 3, at 65:17-20 (responded in the affirmative to the question: "The amount of time you spent training employees varied on whether you had new employees or more seasoned employees, correct?"); Ex. 7, at 148:8-20 ("Q: Yeah, if you've got a store where you've got employees who are very efficient and hand [sic] working and you don't have to stay on top of them, then you've got a very different environment than a store that's got constant turnover and a bunch of new people, correct? A: Well, right.  *That would be the case for anyone, any atmosphere*." (emphasis added)); Ex. 8, at 298:20-299:3 (worked fewer hours as an SM at one store as opposed to another, because his shift supervisors were better at one store than at another); Ex. 9, at 203:20-23 ("Q: And with the

_____

agreed he would "plan[] other work while . . . working on plano-grams or whatever it might be"; Palumbo: felt that the unloading of the truck was more efficient when he was there to direct and supervise; Pletka: noted despite the limitations of supervision while stocking shelves, agreed that when the SM is in the store he is responsible, adding "I feel comfortable that I am supervising ok"; Riley: wrote the schedule, supervised, assigned or directed additional work, engaged in multitasking and agreed that he was always supervising the store as SM, no matter what; Simons: despite being unable to adequately view all employees while stocking shelves or cashiering, agreed that he was always supervising the entire store as SM; Wesley: emphasized the importance of multitasking to the SMs' role, stating that he was "accountable" for the store).)

17

higher degree of turnover comes more interviewing and more hiring and more training, right? A: Sure."); Ex. 13, at 185:6-17 (high volume store results in "constantly training new people throughout the year"); Ex. 15, at 356:20-357:5 ("Q: Do you agree with me that the amount of time actually spent on training . . . would depend on whether or not you had new or experienced employees? A: Yes, experienced. Q: So it would vary week to week? A: Yes. Q: And store to store? A: Store to store.").)

Importantly, there is no indication that the fact that hourly employees with little or no experience require more training than veteran associates causes the SMs in stores with no such turnover to spend all their time engaged in non-managerial tasks.  Put another way, the fact that some associates require more training than others does not alter the fundamental mix of similar duties in which SMs engage.  In sum, the differences among stores as related to their turnover are only relevant insofar as they affect the relevant classification of SMs as exempt workers. While the time spent training seasoned, versus new, hourly associates is likely inversely proportionate to those associates' experience, the fact that some SMs spend less time than others training new associates, in a manner entirely correlative to their respective store's turnover, does not render the class dissimilar.

Moreover, the testimony involving SMs' various management and work styles does not reflect a difference in primary duties, the authority, or discretion an SM is able to exercise on a given workday, or the supervisory duties of an SM.  For example, one opt-in plaintiff agreed that the "manner in which" he performed his job changed with experience.  (Dkt. No. 226, Ex. 7, at 132:23-133:4), and another acknowledged that one would have to "look at each store manager individually to know how they ran their store," after citing an anecdotal example in which she had heard that one SM spent only a small number of hours on the floor and "expected his

18

employees to do everything." (*Id.*, Ex. 3, at 22:8-23:11; 31:14-32:4.)  But as this Court has previously held in a similar case, "[a] management style is just that—a style . . . ."  *Jacob v. Duane Reade, Inc. ("Jacob II")*, 289 F.R.D. 408, 421 (2013).  And while certain SMs may choose to seek guidance from their DMs on a more regularized basis (*see, e.g.*, Dkt. No. 226, Ex. 16, at 163:3-23 (DM explaining that if there are "newer managers with less confidence in their ability," he will "partner" with them if they wish, acting "as a mentor and a coach," adding that "if they want to do that, that's fine, but they can do it themselves")), so long as the seeking of that advice from their DMs does not alter their responsibilities as SMs or curb the exercise of their discretion in significant ways, it will not defeat the similarity required for FLSA certification.  Of course, in any group there will always be outliers.  (*See, e.g.*, *id.*, Ex. 3, at 184:15-24 (describing a SM who apparently worked 20-25 hours per week and never spent time on the store floor with his employees).)  But here, the differences highlighted by defendants seem to reflect outliers, predictable variation, and at times, long deposition questions designed to elicit a particular general response coupled with equivocal answers on the part of the deposed SM, rather than dissimilarities mandating decertification.  (*See, e.g.*, *id.*, Ex. 3, at 31:4-13 ("Q: Do you agree with me that Mr. Lockhart did not do some job duties that you did, such as working on the floor in the manner you did?  A: I don't know, I guess, I mean.  Q: Well, if he didn't work on the floor, he did different things than you, correct?  A: Yes, sir.").)

Defendants also point to testimony suggesting that the duties of SM vary based on season, location, store volume, and store type.  These differences, however, do not go to the heart of the SMs' duties.  For example, when probed on the how his duties as SM changed when he

was "given the opportunity to manage a Customer World location,"[7] SM Handshoe stated:

"Yeah. It was a lot larger location. I mean, the square footage was a little bit bigger, yeah." (*Id.*,

Ex. 7, at 178:18-179:4.)  And while operating a store close to a fast food establishment appears

to, for example, pose unique challenges for clean-up and maintenance, again, nothing about

those variances suggests that the opt-in SMs are disparately situated for the purposes of the

applicable exemption analysis.  (*See, e.g.*, *id.*, Ex. 6, at 88:5-17 (discussing the challenges of

running a RA store located within a mall).)[8]  Moreover, the fact that offloading a truck might

take a different amount of time depending on the size of the load or the season does not render a

SM's primary duty nonmanagerial at times and managerial at others, so long as that SM was

nevertheless supervising and serving as the leader of the store at that time.  Accordingly,

seasonal variances in the time dedicated towards non-managerial duties fails to render class

treatment untenable.  (*Cf. id.*, Ex. 9, at 270:5-15 (the "man-hours" spent offloading a truck

"varied based on truck size, it varied based on stores. The company wanted the whole truck put

up within 24 hours, the best of my memory.  And that wasn't always the policy that I can

---

[7] The actual question posed was as follows: "And that [change] created some different opportunities for you in terms of your ability to manage, correct?"

[8] Describing his work as SM in a mall store, Brian Bogash recounted, when pressed on the challenges faced:

> Q: Would you say that there are any special challenges that come with managing a mall store as opposed to a freestanding store?
> A: Let's see. My last, last week there, there was a shooting in front of me, about 10 feet in front of me, where I got splattered with blood. I eyewitnessed six murders while I was there. Special challenges? Yeah, I would say there are special challenges, because, if your, if your neighbor is Popeyes, for an example and they flood their floor and it runs into my basement, I then have a basement full of merchandise that's been contaminated with chicken blood. And we had that on a regular basis there.

remember, but I remember it at times and I can't tell you how many man-hours.  The truck was done different ways at different times, you know, from rolling the merchandise down the wheels to taking a whole pallet in the store is completely different, so I can't give you a number").)

As for the supervision requirement, the record reflects the fact that all SMs regularly supervise the hourly employees in their stores.  While this supervision may be subject to some physical limitations depending on the daily demands of the SM position, as discussed *supra*, this supervisory element is clearly ever-present.  RA is indeed correct in its observation that the surveyed SMs supervise a range of hourly employees, depending on the size and location of their stores.  (*See, e.g.*, *id.*, Ex. 18, at 34:18-21; 66:23-25 (supervised 25 employees in one store and 12 employees in another).)  Be that as it may, the differences associated with an SM's number of supervisees are not those that change the ultimate responsibility of that very supervisory role.  Put another way, while an SM managing 25 employees will face certain challenges unknown to an SM managing a smaller store, both of those SMs have the same baseline responsibilities.  Of course, an SM managing a larger store may have to spend more time delegating tasks to his more substantial staff (*id.*, Ex. 3, at 103:17-104:15 (noting that "the more employees you've got, the more people you've got to assign tasks to be done in the store," but also agreeing that an increased number of employees meant that there were more hourly associates to oversee and who were "potentially goofing off"), but the SM managing 12 employees would also share those same responsibilities, albeit on a smaller scale.[9]

Next, with respect to hiring and firing, despite RA's contention to the contrary, the testimony is remarkably consistent insofar as it relates to the basic responsibilities of the SMs in

---

[9] Even here, the testimony cited by RA to highlight the differences among SMs' supervisory duties reflects a similar story—with the cited SMs generally supervising from 10-20 employees, with some outliers on either end.

this area.  In general, it seems that all SMs had the authority to hire hourly associates, so long as those hourly associates passed a drug test and the corporate "QuickScreen" test.  For shift supervisors or managers, however, SMs did not have full authority to hire, but rather had to go through the DM or corporate.[10]

_____

[10]  (_See_ Dkt. No. 229, Ex. 1 (Bogash: as SM, went through applications to determine who to interview, interviewed applicants, interviewees would then take a screening test and were subject to a background check, however, DM and loss prevention manager ("LPM") had the "final say" in hiring; Bolduc: as SM can hire general employees, such as cashiers, without DM or HR approval; Brown, R.: as SM would look through applications to determine who to interview, based on what characteristics he thought would be best for store; Del Angel: could hire hourly employees, such as cashiers, without DM approval, but for a "key" personnel position, would need DM approval, and described the hiring process, which included an initial interview, then a background check and screening process; Gauger: as SM, would conduct the initial interview for applicants, once recommended that an applicant who had failed the QuickScreen test be considered competitive, and successfully was able to hire that applicant; Hulsey: could make recommendations for shift supervisor candidates or promotions, and recalled instance where she gave applicant an application, interviewed her, and hired her once she had passed the QuickScreen background check; Indergit: as SM, had the authority to put a "help wanted" sign in the store window, would go through applications himself, determining who to interview, but promotions had to be approved by the DM; King: would decide who to have fill out QuickScreen based on the applicant's presentation and would then interview them if they came back as "competitive" or "hirable" after the background check; Kitchen: would conduct a quick, first interview with an applicant, then would send them to get a background check, would do a full interview if they passed the background check, and had full authority to hire those individuals providing they passed those tests; Lembezeder: HR hired to fill his store's vacancies from 2006-2009, but noted his assistant manager conducted the interviews for part-time cashiers and likely extended the offers of employment; Lenart: promotions had to go through the DM or HR, but hourly associates were hired by SM, "following some screening processes"; Mangino: shift managers and assistant managers were hired by the DM, but SM hired for all hourly-level, cashier, stock-clerk type positions; McCarthy: recommended promotions through DM, but otherwise, for hourly employees, would review applications, and would direct those he selected to the automated phone screening test; McGillivray: if an applicant passed the QuickScreen and drug test, it was within the SM's authority to hire that applicant for a clerk or cashier position, would give recommendations to DM with regards to promotions; Palumbo: as SM would go through applications and determine who to interview for hourly associates, making the final decision; Paul: "We were able to hire cashiers but not as supervisor or management," but would give recommendations as to shift supervisor or management positions to DM; Pletka: majority of his recommendations regarding management promotions were followed and it was the SM's "general" responsibility to fill most vacancies; Riley: stated that she was in charge of hiring and promoted someone to shift supervisor; Ruzat: SMs were able to hire cashiers and shift

RA notes that some SMs testified that they hired "hundreds" of hourly employees, whereas others stated that they had no involvement in hiring and that such discrepancies render class treatment inappropriate.  (Def.'s Mem. at 16-17.)  While the number of employees hired by each SM varies somewhat, only one opt-in plaintiff testified that he never hired anyone, instead delegating that process to his ASM.  (Dkt. No. 229, Ex. 40, at 102:1-103:4.)  Nearly all of the surveyed opt-ins (1) sifted through the initial applications for associates; (2) conducted an initial interview; (3) sent those desired applicants to the QuickScreen or background check process on the phone; and (4) chose who to hire from those candidates who came back as "competitive" after the screening.  As for shift supervisors or management positions, SMs would make recommendations to their DMs, who would, in turn, make the final hiring determination.  The fact that some SMs hired ten hourly employees and some hired two during their tenure does not vitiate the similarities in the given testimony.  Moreover, the fact that one SM testified that he worked with the pharmacy staff to fill pharmacy gaps (Dkt. No. 229, Ex. 48, at 182:14-19), and another stated that he never sits in with pharmacy staff to help hire new pharmacy employees (*id.*, Ex. 40, at 60:1-7), fails to counteract the overwhelming consistency of the SMs' hiring experiences and testimony.

---

supervisors, but DM had final say with respect to ASMs, and as SM, promoted a few individuals to shift supervisor, and was the only person hiring new staff; Simons: explained the process of hiring as follows—"I would interview.  Explain what their responsibilities would be as an employee if they were hired.  Submit a drug test form.  Submit a background check to human resources.  Human resources would then review all of the documentation.  And then they would notify you if this person was eligible to hire," at which point he, as SM, would get back in touch with the applicant; Tardo: when there was a vacancy would (1) put a help wanted sign in front of the store; (2) go through the applications and select someone to interview; (3) submit the interviewee to a background check; and (4) would make a determination about who to hire, unless the applicant was a shift supervisor or ASM).)

The testimony regarding the SMs' roles in terminating employees reflects similar consistency.  It appears that, as a general rule, the SMs need DM approval before terminating an employee, but, at the same time, DMs tend to listen to most of the SMs' recommendations with regard to termination.[11]  Additionally, the differences among stores highlighted by RA relating

---

[11] (Dkt. No. 229, Ex. 2 (Astleford: needed DM or LPM approval for final termination; Bourgeois: could not suspend or terminate someone without DM or LPM approval; Brown, V: DM always listened to his recommendations about termination; Del Angel: reported coupon fraud to LPM, all her recommendations regarding termination were followed; Anderson: made recommendations with respect to terminations to the DM, although some terminations—those which involved theft—were handled directly by LPM; Gerber: terminated several employees during the 90-day probationary period, although it appears from the testimony that even these terminations went through DM, but the tiered warning system that generally applies during terminations did not apply during the 90-day period, and stated as follows regarding the probationary period: "I didn't actually quote, unquote recommend.  If a person was caught stealing in the store, for example, whether it was by me or by a loss prevention person -- if it was by me, I had the authority to suspend them without pay and then notify the loss prevention department and human resources of it and they would make all the decisions from that point and the person would not come back to my store if they were terminated.  And if they were not terminated then they came back.  That wasn't my decision"; Hulsey: could not terminate an employee without prior approval by DM, but made recommendations that were followed; Indergit: when he first started at RA could terminate without approval, but, in the later stages of his job as SM had to partner with HR and recommend to DM; King: when asked how many times he terminated an employee, stated he had done so "four or five" times, was not asked whether he needed approval from the DM to do so; Kitchen: had power to recommend termination and exercised that authority as SM; Lembezeder: described an incident when he terminated an employee on the spot after witnessing them stealing and called the police; Malone: had the power to recommend terminations and worked with HR/DM to effectuate those terminations; Marston: made recommendations to DM and HR with respect to terminations, and those recommendations were generally followed; McGillivray: "Generally, terminations had to be approved through HR"; Paul: made recommendations to HR or DM with respect to terminations but agreed that as an SM at RA he terminated several employees; Pletka: recommended terminations, and described an incident where he witnessed stealing, called the police, recommended the employee be terminated, and that employee was terminated shortly after that, "[r]ight after the security people talked to her"; Riley: could discipline employees without HR approval, but had to receive HR approval before termination; Simons: made recommendations with respect to termination to HR; Tardo: stated that if he caught an employee breaking the law during the workday, he would send him home, then speak to DM and loss prevention before termination; Wesley: stated that generally corporate had to approve terminations, but that she fired two individuals without corporate approval, because one was drinking at work and the other stopped showing up, however, when pressed, she added that she

to, for instance, whether a particular store was a union branch or not, are minor in comparison to the aforementioned consistency. For example, of the opt-ins surveyed, SM Martin testified as follows in response to questioning about the termination process in a union store:

> Q. When she [a previously terminated employee] came back, did you verbally counsel her for her attendance problems?
> A. Yes.
> Q. That termination William and Mike agreed with, right?
> A. Yes.
> Q. But their hands were tied because of the union?
> A. As far as I know.
> Q. Okay.
> A. I don't know the logistics. Like I said, I wasn't there.
> Q. Obviously in a store that doesn't have a union, if you fire someone and the district manager and the HR approve, that person is just fired, right?
> MR. SABA: Objection. Form.
> A. I don't know. I have never dealt with it. So I don't know.

(Dkt. No. 229, Ex. 46, at 116:6-23.) Accordingly, even if the Court were to take this testimony as an example of the "differences" between termination in union versus non-union stores, it is apparent that overall, the recommendation process whereby the SMs would approach their DMs or LPMs with termination suggestions is not markedly different, even if HR or corporate had additional limitations based on the union status of a given store. Continuing in this vein, even the testimony highlighted by RA to highlight the variation among SMs' approaches to termination tends to underscore the fact that such discrepancies exist only at the margins.[12]

---

had to "notify [corporate] and put everything in writing" (quoting Dkt. No. 229, Ex. 63, at 233:23-25); Whindom: would have to go through DM and HR to terminate an employee, but stated he had terminated an employee and made recommendations with respect to termination).)

[12] (*See* Dkt. No. 226, Ex. 6, at 70:21-24 (would "coach and counsel" his ASMs if they did not supervise the cashiers and clerks properly); 167:5-168:4 (75% of the time he recommended termination of an employee, his recommendation was accepted, there was one DM that would not accept his recommendations, but instead would transfer the employee); *id.*, Ex. 10, at 58:5-12 (happened never to recommend anyone for termination while she was an SM); 179:4-5 ("I could

In sum, in all relevant respects, the opt-in testimony is largely consistent in connection to those factors pertinent to the court's executive exemption analysis.

### b.   Administrative Exemption

With respect to the administrative exemption, which exempts those employees whose work is "directly related to the management or general business operations" of their employer, and "whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance," 29 C.F.R. § 541.200(a)(2)-(3), RA contends that some SMs disclaim performing any such duties, while others felt that they were highly responsible for the store's profitability.  RA adds that some employees used their discretion in the ad-ordering process, while others simply conformed to the corporate recommendation, noting that "[d]ifferences are apparent in each Store Manager's exercise of discretion related to almost every aspect of running a store."  (Def.'s Mem. at 18.)  The Court disagrees with RA's characterization of the record, again finding meaningful similarities in the opt-ins' testimony.

For example, while one SM did testify that had "nothing to do" with the profitability of his store, he admitted that his store's sales mattered to him.  (*See* Dkt. No. 226, Ex. 19, at 95:1-23.)  Moreover, as discussed *supra*, most SMs did feel responsible for their respective stores and

---

not discipline an associate before it went through human resources."); *id.*, Ex. 11, at 55:9-14 (terminated close to ten employees); 55:20-24 (had previously disciplined each employee that he terminated); *id.*, Ex. 13, at 100:2-13 (when disciplining employees sometimes would discipline them verbally, other times in writing, it would "depend[] on the situation"); 114:18-117:19 (agreed that he could (1) verbally counsel; (2) do a write up; (3) do a final warning once he gets permission from HR); 119:3-17 (personally recommended that between six and ten individuals be terminated); *id.*, Ex. 24, at 158:11-21 ("I don't believe I recommended [termination] because I hate seeing people lose their jobs over something that happened like that.  I had cashiers that were scammed.  So it actually wasn't their—it was their fault; but, again, I had cashiers that were scammed a hundred dollars or 50 dollars.  They were scammed by a customer. . . . And at that point, I had no choice but to write them up.").)

seek to contribute to their profitability. (*See, e.g.*, *id.*, Ex. 7, at 277:1-8 (agreeing that "most important part of the job at the end of the day is making sure that the store is running in a profitable manner . . . ."); 285:18-286:4 (taking credit for a 15% increase in profitability); *id.*, Ex. 9, at 275:15-24 ("Built sales up" by "fostering better feelings in the community, making sure that our instock was in good shape, doing good ad ordering and recognizing what merchandise we were going to sell, creating a good environment in the store to make it a better shopping experience for the customers.").) Moreover, with respect to ad-ordering, for example—the process by which new merchandise is acquired for the store—almost all opt-ins provided similar testimony, outlining a process by which the computer system would generate a suggested product amount that they could then change or override based on the needs of their particular store. Furthermore, most SMs, when discussing ad-ordering, noted that they had discretion to either override the projections of the system, or make the projections themselves, but added that their DM would have the "final say" depending on the severity of the deviation, from either the projection or the products placed in the ad-buy catalogue. Additionally, while a minority of SMs delegated their ad-ordering to their ASMs or shift supervisors, even those SMs who did so nonetheless reviewed the work and quantities before submission.[13]

---

[13] (*See* Dkt. No. 226, Ex. 4, at 241:8-21 (agreeing that ad-ordering requires some familiarity with the store's history in terms of determining how much of each product was needed); *id.*, Ex. 13, at 90:3-24 (agreeing that in the ad-ordering process, he tried to base his decisions on what was going to sell); 226:9-15 (agreeing that ad-ordering is a product "forecast" and that such ordering is part of the function of the SM); *id.*, Ex. 25, at 102:24-103:16 (could override the auto replenishment computer suggestion during ad-ordering to "beef up things such as bleach, certain soap products and beverage," along with "vast quantities of beer"); 194:25-195:12 (would review the ad-order page-by-page and make judgments concerning whether he felt they were sufficient); *see also* Dkt. No. 229, Ex. 6 (Bolduc: the ad-ordering system will suggest the number of each product to order, but the SM does not have to take those recommendations; Bourgeois: ad-ordering procedure was altered after Hurricane Katrina, as they had no power, but in general, as SM, would do the ad-order and DM would have final say; Brown, R.: SM would do ad-

In sum, it appears from the record that the variations in the opt-ins' testimony does not require decertification on the ground that their disparate factual and employment settings render FLSA-class treatment untenable.  The Court turns now to the second two factors of the decertification analysis, examining fairness, procedural concerns, and the available defenses to RA.

### 2.   Available Defenses and Procedural Fairness

As noted, in examining decertification, a court must look to "whether the potential defenses pertain to the opt-in class as a whole or whether many different defenses will be raised

---

ordering and would base that ordering on what he thought was going to sell; Dayton: was responsible for the ad-ordering, would pick what he thought would sell within certain parameters, DM had the final say; Anderson: SM makes determinations about what products are needed in the store and would adjust the product numbers up or down from the default as needed; Gerber: stating, of the ad-ordering process—"We could adjust it up or down. The adjustments that we made were not always suggested -- accepted, excuse me, and sometimes if we wanted to do something that was out of the ordinary, we had to get permission from the corporate level, direct supervisor, district manager or the actual corporate level. And again, because of the uniqueness of my store, that happened more often than not"; "It allowed me to make suggested increases or decreases in the merchandise that was already listed there. I didn't get to choose the merchandise.  But yes, that's correct"; "I attempted to utilize the system to order more than they had designated for my store and sometimes large quantities because of the uniqueness of the store, yes"; Hulsey: would allow her ASM to do the ad-ordering, but would review it after and make changes, no one had to approve the ad-ordering; Kitchen: ASM and SM did the ad-ordering; Marston: would adjust the ad-ordering as necessary; McCarthy: has discretion to adjust the ad-ordering, would have to go through DM if she wanted to order something other than what was on the ad-buy system; McGillivray: in the beginning of his tenure he could adjust up or down from the projected number on the ad-buy system, at the end of his tenure, he could just put in the number he believed necessary without any projection; Riaz: used discretion to determine how much to order; Simons: SMs forecast how much they think their store will use or need of a given product when ad-ordering; Tardo: SMs are responsible for ad-ordering, he delegated his ad-ordering at times to his shift supervisors; Tremblay: could adjust the ad-order up or down; Wesley: used discretion to determine how many liquor packets to order; Wilson: could adjust ad-order up or down based on what he thought the store would sell).)

with respect to each individual plaintiff." *Reyes v. Texas Ezpawn, L.P.*, No. V-03-128, 2007 WL 101808, at *5 (S.D. Tx. Jan. 8, 2007) (citation omitted). Available defenses and procedural fairness go hand-in-hand, as "[t]he efficiency gained by holding one trial as opposed to many cannot be obtained at the expense of [a defendant's] due process rights." *Knott v. Dollar Tree Stores, Inc.*, 897 F. Supp. 2d 1230, 1241 (N.D. Al. 2012).

RA first notes that more than 96 opt-ins' claims must be dismissed because they failed to disclose the FLSA claim in bankruptcy proceedings and 260 opt-ins' claims are either "compromised or limited by their release of such claims in other contexts." (Def.'s Mem. at 32; *see also id.* at 3, n.4.) These defenses, however, would not require individualized analysis or mini-trials. Instead, at the conclusion of trial, if liability were found, a list of the opt-ins could be simply compared to a list of the *Tierno*[14] plaintiffs and a list of those who failed to discharge their claim in bankruptcy and the Court would reduce or bar the settlements accordingly. Presumably, deciding damages in this fashion would be even more efficient than relitigating the same issue with respect to the bankruptcy disclosure or the *Tierno* discharge in courtrooms across the country. A California court, in *Hernandez v. United Auto Credit Corp.*, No. C-08-03404, 2010 WL 1337702 (N.D. Ca. Apr. 2, 2010), while eventually decertifying the FLSA class on fairness grounds given the disparate nature of the cited employment settings, came to a similar conclusion with respect to a statute of limitations defense raised by the defendants. The *Hernandez* court noted: "Although there might be disputes as to when a particular employee

---

[14] (*Id.* ("In 2009, a Rule 23 case regarding the classification of Store Managers in California, *Tierno v. Rite Aid*, Case. No. C 05 02520 (TEH) (N.D. Cal.), was settled. More than 260 current *Indergit* opt-ins participated in the *Tierno* settlement, receiving payment for their state law claims and releasing any claims related to their compensation as Store Managers, including claims under the FLSA. Thus, 260 current opt-ins have released their claims in this case in full or in part. Such will be the subject of motion practice creating additional individualized analyses.).)

worked for [the defendant] or whether any FSLA violation was willful as to a particular plaintiff

(thus resulting in a three year limitation as opposed to two), such disputes would not be a major

impediment to a collective action." *Id.* at *5. The *Hernandez* court observed that "[t]he periods

of employment in most cases would likely be subject to agreement or easily verifiable proof,"

and "[t]he willfulness question would probably, in most cases, be capable of resolution on a

class-wide basis." *Id.* Similarly here, whether an opt-in's claims were discharged due to the

bankruptcy disclosures or by the *Tierno* settlement would be subject to generalized proof, and

the question of judicial estoppel itself is one of law, that could be determined by the Court in one

instance after examining the relevant law and its applicability to the two instances cited by RA.

Additionally, the record testimony has revealed the consistency of the SMs' duties,

responsibilities, and discretionary exercise. Accordingly, the Court is persuaded that if one SM

is properly classified as exempt, whether under the executive, administrative, or combination

exemptions, so too must be all SMs. *But see Morano v. Int'l Cap. Grp., Inc.*, No. 10 Civ. 2192

(KBF), 2012 WL 2952893, at *8 (S.D.N.Y. July 17, 2012) (decertifying FLSA class where some

of the opt-ins signed employment agreements stipulating that they had to receive prior approval

before working overtime, other opt-ins did not sign such an agreement, and it was not recorded

whether 34 plaintiffs signed the agreements).

As for the third factor—procedural concerns and fairness—the Court's determination is

guided by its resolution of the first two decertification elements. For example, where "there

appears to be substantially different employment experiences among the various [opt-ins] the

procedural advantages of a collective action cannot be realized." *Hernandez*, 2010 WL 1337702,

at *5. Section 216, however, is meant to be remedial; accordingly, where there is "reliable

evidence show[ing] that employees performed substantially similar work," collective action is

appropriate.  It is true that RA points to citations in the record where opt-ins agree that the

amount of time spent on a given task varied depending on the day or week.[15]  However, as

discussed, the mix of duties the opt-ins perform, the discretion they have in performing those

duties, and their general approach to supervision is largely similar.  Moreover, it is clear that the

majority of opt-ins claim they perform non-exempt tasks for the largest percentage of their

workdays, however, those same opt-ins generally feel that they are consistently in a supervisory

role and multi-tasking while performing those tasks.  Accordingly, RA can clearly put forth a

robust counter-narrative, with generalized proof, that suggests that all SMs' primary duty was

supervision, or some other exempt responsibility, even while cashiering or stocking.  Here, it is

not as if "the deposition testimony of members of the Manager Class shows that for every

manager who says one thing about his or her job duties and responsibilities, another says the

opposite."  *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1133 (N.D. Cal.

2011).  Instead, the differences highlighted by RA either are singular instances that appear to be

the exception rather than the rule, or discrepancies at the lowest level of generality[16] that are non-

---

[15] (*See, e.g.*, Dkt. No. 226, Ex. 8, at 328:12-20 ("Q: "And he amount of time you spent doing any particular thing in your stores as a Rite Aid store manager varied depending on the day of the week?  A: Yes.  Q: Correct?  A: Correct.  Q: The time of year?  A: Correct.  Q: The number of employees who were working with you that particular time?  A: Correct.).)

[16] (*Compare* Dkt. No. 226, Ex. 6, at 238:19-24 ("I was allowed to put Coke on an endcap where the Jack Daniel's was for an example.  I was allowed to put nuts in clip strings hanging where the beer was.  I was allowed to do all these things to do tie-in sales that were not in our profit planner in that store, so I had a bit of a freehand."), *with id.*, Ex. 8, at 88:18-23 (never worked in a RA store that had a hard liquor department); *see also id.*, Ex. 12, at 65-66 (in RA stores where there were plants, employees, including SM had to set up plants and water them); *id.*, Ex. 14, at 62:14-24 ("Q: How do the responsibilities for the store managers within your district differ?  A: A: Gosh, that's a really wide one.  They differ, wow, based on geography, size of store. What I'm telling you is a chunk of what could be many other things.  They differ on – am I – do I have a store in a resort area?  Do I have it in the middle of Boise, Idaho?  Do I have it in a college town

dispositive with respect to the SMs' exemption status. *Accord Scott v. Aetna Servs., Inc.*, 210

F.R.D. 261, 265 (D. Conn. 2002) ("[S]everal courts have held that it is appropriate to bring an

FLSA exemption claim as a class action with regard to employees who perform similar, but not

identical, duties, notwithstanding the highly fact-specific nature of the exemption inquiry. . . .

Here, the plaintiffs have established that their claims may be supported by generalized proof.

The record evidence suggests that the actual job duties of the plaintiffs are quite similar."

(citations omitted)).

Accordingly, in light of (1) the factual settings of the individual plaintiffs; (2) defenses

available to Defendants; and (3) the relevant fairness and procedural concerns, the Court holds

that decertification of the SMs' FLSA claim is not required by law.

### B.      Class Certification

In order to litigate the NYLL claims associated with his misclassification claim, Plaintiff

also seeks to certify the following class:

> All persons who have worked for [RA] as salaried Store managers
> in New York State at any time between October 31, 2002 to the
> entry of final judgment in this case (the "Class Period"), and who
> have not been paid all wages owed to them, including overtime
> premiums, in violation of the New York Labor Law . . . .

(Memorandum of Law in Support of Plaintiff's Motion for Class Certification, Dkt. No. 221

("Pl.'s Mem."), at 1.) RA opposes Plaintiff's motion on the ground that "[t]he striking conflict

between Plaintiff's allegations and the deposition testimony in the record can only be resolved

through SM-by-SM determinations," as determining whether the SMs are properly exempt

---

of Pullman or Moscow where 19,000 people go to school; right? So, you know, their
responsibilities differ on just a variety of different things.").

mandates "'fact-intensive inquiry into each potential plaintiff's employment.'"  (Defendants'

Opposition to Plaintiff's Motion for Class Certification, Dkt. No. 209 ("Def.'s Opp."), at 1

(quoting *Myers*, 624 F.3d at 545).)

As discussed *supra*, conditional certification, decertification, and Rule 23 class

certification are subject to disparate legal standards.  Nevertheless, courts have recognized that

the "similarly situated" analysis for the purposes of FLSA certification "can be viewed, in some

respects, as a sliding scale."  *Gardner*, 2013 WL 1629299, at *6.  In other words, "[t]he more

opt-ins there are in the class, the more the analysis under § 216(b) will mirror the analysis under

Rule 23."  *Id.*  (citations omitted).  The Court will address Rule 23's requirements in turn.

### 1.      Numerosity

Numerosity is presumed whenever the putative class number is above 40 members.  *See

Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995) (citing 1 *Newberg On

Class Actions 2d* (1985 Ed.) § 3.05).  Here, there are approximately 328 RA stores in New York

state, and around 190 New York SMs have opted into the FLSA collective.  (Pl.'s Mem. at 25.)

Accordingly, numerosity is satisfied.

### 2.      Commonality and Typicality

Commonality refers to Rule 23(a)(2)'s requirement that a plaintiff shows that "there are

questions of law or fact common to the class."  This mandate demands not so much that the

putative class share common questions, as "[a]ny competently crafted class complaint literally

raises common questions," *Dukes*, 131 S. Ct. at 2551 (quotations and citation omitted) (alteration

in original), but rather, demands that the "plaintiff demonstrate that the class members 'have

suffered the same injury,'" *id.* (quoting *Gen. Tele. Co. of SW v. Falcon*, 457 U.S. 147, 157

(1982)).  Accordingly, what truly matters for class certification purposes "is not the raising of

common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L. Rev. 97, 131-132 (2009)).  Importantly, "[c]ommonality 'does not mean that all issues must be identical as to each member, but it does require that plaintiffs identify some unifying thread among the members' claims that warrant[s] class treatment.'"  *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 156 (S.D.N.Y. 2008) (quoting *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 153 (S.D.N.Y. 2002) (alteration in original)).  Rule 23(a)(3)'s requirement of typicality, on the other hand, demands "that the claims of the class representatives be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'"  *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir.1997) (quoting *In re Drexel Burnham Lambert*, 960 F.2d 285, 291 (2d Cir. 1992)).  "When the same unlawful conduct was directed at or affected both the named plaintiff and the prospective class, typicality is usually met."  *Aponte v. Comprehensive Health Mgmt., Inc.*, No. 10 Civ. 4825 (PKC), 2011 WL 2207586, at *10 (S.D.N.Y. June 2, 2011) (citing *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993)).  Additionally, "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims."  *Robidoux*, 987 F.2d at 936-37 (citations omitted).

These two requirements, of commonality and typicality, "tend to merge into one another, so that similar considerations animate analysis of [both]."  *Marisol*, 126 F.3d at 376 (citations omitted).  Importantly, neither commonality nor typicality requires "factual identity between the

named plaintiffs and the class members," *Aponte*, 2011 WL 2207586, at *10; *see also*, *Jacob II*, 289 F.R.D. at 414, but rather, demand, with respect to commonality, "some unifying thread among the members' claims [warranting] class treatment," *Jacob II*, 289 F.R.D. at 414 (quotations and citation omitted), and insofar as typicality, an inquiry into "the fairness of allowing an entire class's claim to rise or fall with the fate of the named representative's claims," *Skinnygirl*, 2013 WL 93636, at *5.

RA contends that the "record here confirms that Plaintiff's alleged common questions cannot generate common answers for liability purposes, and that Plaintiff's claims are not typical," citing "significant dissimilarities in the actual job duties performed by SMs who worked in New York stores . . . ." (Def.'s Opp. at 14.) According to RA, the uniform classification of its SMs as exempt employees, while a fact common to all members of the putative class, is dwarfed by the disparate testimony regarding the SMs' actual duties. Thus, RA argues that "under similar circumstances courts have found such individualized defenses make class treatment unmanageable." (*Id.* at 15-16.) With respect to commonality, Plaintiff focuses on the fact that, prior to 2009, RA treated all its SMs as exempt employees, subjecting them to the "same policy of being classified as exempt from overtime." (Pl.'s Mem. at 26.) Even if RA's SMs were still uniformly classified, which they are not, such a "generalized, central policy is not alone determinative of class certification or commonality." *Jacob II*, 289 F.R.D. at 415 (citation omitted). Nevertheless, whether the putative class of SMs is properly exempt is certainly a common question. Moreover, as discussed, there is no indication from the record that an uncommon answer will be generated as to any of the NY SMs. Put another way, the variances among SMs' testimony do not suggest that some are *properly* exempt, while others are misclassified.

35

Plaintiff has submitted evidence that all the SMs in the putative class perform similar duties, including, *inter alia*, the description of the SM position, the testimony of SMs, and corporate policy documents.  In response, Defendants have pointed to dissimilar testimony among SMs and testimony of RA management suggesting that no two stores are alike (*e.g.*, some RA stores contain fresh plants and flowers, or liquor departments, while others contain neither). Whereas Plaintiff contends that SMs are mere cogs in RA vast, highly specific corporate machine, without meaningful choice within their day-to-day decisionmaking, RA argues instead that (1) not only do its SMs exercise discretion within their management role, but (2) the varied and dissimilar exercise of this discretion defeats commonality.  As the Court has been "presented with conflicting evidence concerning the primary duties of the [SMs]," it must "analyze rigorously the conflicting evidence before it and resolve the material disputed facts."  *Cuevas v. Citizens Fin. Grp., Inc.*, No. 12 Civ. 2832, 2013 WL 2321426, at *2 (2d Cir. May 29, 2013). After careful examination of the record, some of which is discussed in the decertification analysis *supra* and some of which is discussed *infra*, the Court determines that (1) Plaintiff's portrayal of SMs as automatons, who perform rote tasks as explicitly directed by RA is inaccurate; and (2) despite their obvious discretion,[17] however, most SMs perform a similar mix of duties, and at the relevant level of generality, exercise their discretion in similar ways, supporting a commonality finding.

It appears from the record that SMs have meaningful discretion in hiring, firing, disciplining, allocation of labor budgets, scheduling, and merchandise ordering—some of the

---

[17] RA devotes much of its briefing to the argument that SMs are properly exempt, as they are imbued with significant discretion.  After review of the record (admittedly for a different purpose), it appears that RA may well have the better of this argument, and invites RA to address it again in a later motion for summary judgment.

main duties listed on their job description. (*See generally* Dkt. No. 212, Ex. 5.) Accordingly, the answers to the *common* questions relevant to the misclassification inquiry appear to be largely similar. For example, almost without exception, the NY SMs testified to concurrently performing managerial and non-managerial duties at the same time. (*See e.g.*, *id.*, Ex. 18, at 257:22-258:6; 367:2-373:18 (supervising and manually working at the same time; remained in charge of store while stocking or cashiering); *id.*, Ex. 20, at 324:2-5 (engaged in non-managerial and managerial tasks at the same time); *id.*, Ex. 27, at 178:15-21 (constantly engaged in multitasking); *id.*, Ex. 28, at 117:4-16 (must be able to multitask and perform numerous duties at the same time).) All SMs are, to some extent, involved in hiring (*id.*, Ex. 18, at 342:7-346:21; *id.*, Ex. 19, at 49:5-11; *id.*, Ex. 20, at 108:20-110:18; *id.*, Ex. 21, at 61:19-20; *id.*, Ex. 22, at 38:2-40:13; *id.*, Ex. 23, at 59:20-63:14; *id.*, Ex. 26, at 172:1-25; *id.*, Ex. 28 (85:16-87:11), and termination (*id.*, Ex. 18, at 130:10-138:2; *id.*, Ex. 20, at 144:23-145:4; *id.*, Ex. 21, at 62:7-15; *id.*, Ex. 27, at 161:2-166:9.) Moreover, it appears that the NY SMs largely exercise discretion in some way while developing the schedule for their respective stores, despite their use of the RA computer system, StaffWorks or WorkForce Management. (*See id.*, Ex. 18, at 186:8-12; 200:24-201:24; *id.*, Ex. 19, at 39:4-11; *id.*, Ex. 20, at 56:2-17; 281:18-23; *id.*, Ex. 21, at 35:16-36:2; *id.*, Ex. 22, at 47:18-48:12; *id.*, Ex. 24, at 114:13-24; 129:6-15; *id.*, Ex. 26, at 79:4-6; 220:5-221:5.) Additionally, the NY SMs consistently testified to the supervisory aspects of their roles. (*See id.*, Ex. 18, at 71:24-72:17; 182:12-19 (always was supervising at least 2 employees, generally supervised 8-9 supervisees on payroll per week); *id.*, Ex. 20, at 26:16-27:7 (supervised 5-6 employees as an SM, which grew to 12); *id.*, Ex. 22, at 79:11-17 (SM in a 50-employee store; supervised approximately 10-12 employees on a given shift); *id.*, Ex. 26, at 224:19-225:1 (agreed with the following statement from RA's SM job description "Supervisory responsibilities. This

position directly supervises store associates and carries out supervisory responsibilities in accordance with RA policies and applicable laws."); *id.*, Ex. 27, at 71:23-72:6 ("Q: So during regular business hours you get at least two people that are subordinate to you, right?  A: Right. Q: And when they're there and you're in the store, you're supervising their work, right?  A: Correct.").)   They also largely agreed that, as SMs, they must assign tasks to their hourly associates or cited instances where they had done so.  (*See id.*, Ex. 18, at 69:21-70:4; 125:10-15; *id.*, Ex. 20, at 76:19-25; 90:19-91:5; 91:20-22; *id.*, Ex. 22, at 47:4; *id.*, Ex. 23, at 76:16; *id.*, Ex. 24, at 206:25-207:6; *id.*, Ex. 27, at 91:2-5; *id.*, Ex. 28, at 109:20-110:9.)  And finally, the SMs consistently had some role in both merchandising the store (*see id.*, Ex. 18, at 245:16-246:9; *id.*, Ex. 19, at 39:12-25; *id.*, Ex. 20, at 275:15-24; 316:23-317:12; *id.*, Ex. 21, at 75:25-76:9; *id.*, Ex. 24, at 79:2-13), and interacting with vendors to some extent (*see id.*, Ex. 18, at 245:3-9; *id.*, Ex. 20, at 70:15-24; *id.*, Ex. 22, at 87:2-6; *id.*, Ex. 24, at 242:5-22; *id.*, Ex. 27, at 149:6-151:16; *id.*, Ex. 28, at 46:14-18.)

RA asserts that "the deposition testimony of SMs conclusively establishes the absence of uniformity in duties performed by each SM during the relevant period."  (Def.'s Opp. at 21.) However, "Defendants' contention that the dissimilarity of [the SMs'] duties defeats commonality is better suited to the predominance inquiry, discussed *infra*, together with an analysis of the Rule 23(b)(3) factors."  *Jacob II*, 289 F.R.D. at 415 (citing *Myers*, 624 F.3d at 549 ("With respect to the first category, Hertz's blanket exemption policy, we agree with the Ninth Circuit that while such a policy suggests 'the employer believes some degree of homogeneity exists among the employees,' and is thus in a general way relevant to the inquiry here, the existence of a blanket exemption policy, standing alone, is not itself determinative of 'the main concern in the predominance inquiry: the balance between individual and common

issues.'" (citation omitted))).  Of course, as the Court has observed in the past, "to say there are

common issues, sufficient to satisfy Rule 23(a)'s commonality requirement, is not to say that

they necessarily predominate." *Id.*  Here, the testimony reflects that in those areas crucial to both

the SM job description and the misclassification analysis, commonality is satisfied.  Whether

individual discrepancies predominate over such common questions and answers is a second

matter.

As for typicality, given the close relationship between typicality and commonality, the

aforementioned consistencies in the record show that it is fair to allow the putative "class's claim

to rise or fall with the fate of the named representative's claims." *Skinnygirl*, 2013 WL 93636, at

*5.  Here, Indergit's testimony is in line with that of the other NY SMs.  Of course there are

some differences; for example, Indergit recalls a time, prior to 2005 or 2006, during which he did

not have to seek approval from his DM before terminating someone.  (Dkt. No. 212, Ex. 18, at

130:23-132:9.)  Such differences, however, do not defeat typicality.  Perhaps if Indergit had once

had the authority to fire individuals at will, and, by the end of his tenure as an SM, had no

authority whatsoever due to a circumstance unique to him, while other SMs possessed the

authority to do so, he would prove an atypical class representative.  Here, however, the testimony

with regard to termination power among NY SMs suggests that all SMs have the power to

recommend terminations to their respective DMs, with some discussing instances where they had

suspended an individual without pay and reported the incident to their DM pending final action.

Indergit too recognized this approach to be the current RA system, and the fact that he recalled a

time where his discretion was slightly more unbridled than it was at the conclusion of his SM-

tenure does not rob his claims of typicality.  Moreover, Indergit's claims are clearly based on the

"same legal theory and arise from the same practice or course of conduct as the other class

members." *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 241 (E.D.N.Y. 1998) (citations omitted).

Accordingly, commonality and typicality are satisfied.

### 3.      Adequacy of Representation

"Under Rule 23(a)(4), adequacy of representation is measured by two standards.  First, class counsel must be 'qualified, experienced and generally able' to conduct the litigation.  And second, the class members must not have interests that are 'antagonistic' to one another." *In re Drexel,* 960 F.2d at 291 (quoting *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d Cir. 1968)).  Here, Defendants challenge neither the adequacy of the proposed class counsel, nor Indergit as lead plaintiff on adequacy grounds.  Moreover, there is no evidence in the record to suggest that any proposed class members have antagonistic interests.  Additionally, it is clear that counsel is qualified and able to conduct the litigation.  Therefore, adequacy is satisfied.

### 4.      Rule 23(b)(3)

Plaintiff seeks certification of the NY SM class pursuant to Rule 23(b)(3), which requires that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. Pr. 23(b)(3).  RA contends that (1) the SMs' varied descriptions of their job duties; (2) the use of labor budgets; (3) the lack of uniform training for SMs; and (4) the different classes of SMs, together confirm that individual issues predominate and the case would descend into mini-trials.

### a.      Predominance

As discussed *supra*, the fact that a common question exists as to a putative class does not mean that it predominates, as required by Rule 23(b)(3).  A question is said to predominate when

"resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002) (citation omitted).  The predominance inquiry examines "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Han v. Sterling Nat.'l Mortg. Co., Inc.*, No. 09 Civ. 5589, 2011 WL 4344235, at *8 (E.D.N.Y. Sept. 14, 2011) (quotations and citations omitted).  While predominance is related to commonality and typicality, courts view it as "more stringent" than the requirements of Rule 23(a).  *See* Charles Allen Wright & Arthur R. Miller, 7A Fed. Prac. & Proc. Civ. § 1763 (3d ed.).  As discussed *supra*, whether the RA SMs are entitled to overtime under the FLSA is a "complex, disputed issue, and its resolution turns on exemption, which in turn [] require[s] the [] [C]ourt to decide a number of subsidiary questions involving whether plaintiffs fall within the Labor Department's [exemption] criteria . . . ." *Myers*, 624 F.3d at 548.  In doing so, it is imperative that the Court examine the employees' *actual* duties, in order to determine whether individualized proof predominates over those dispositive elements that are provable in common. *Id.* at 550.

### i.       Disparate Descriptions of their Job Duties

In an attempt to highlight the impossibility of generalized proof in a case such as this, RA notes that (1) the day-to-day experience as an SM differs based on numerous factors such as whether the store is a 24-hour location, has a loading dock, and how experienced the SM was in his or her position; (2) some SMs do plan-o-grams, run the cash register, stock shelves, clean the store, help on truck day, and others do not; and (3) the amount of time spent on exempt versus non-exempt work varies by day.  (Def.'s Opp. at 21-24.)  However, an examination of the

testimony involving the major duties relevant to the misclassification analysis again reveals variance at the margins but overall consistency.

First, with respect to hiring, the NY SMs described the process in a similar manner as the aforementioned opt-ins, discussing the hiring experience for hourly associates generally as follows: the SM makes an initial determination as to whether to initiate the hiring process with an applicant by giving an applicant an application and directing them to the phone number where they would do the QuickScreen process, at some point the SM conducts an in-person interview with the applicant, and, providing the applicant passes the relevant screening, drug-test, and background check, the SM may hire that individual without further clearance from corporate, HR, or his or her DM.[18]

---

[18] (*See* Dkt. No. 212, Ex. 18, at 344:15-356:2 (performed initial applicant screening, then would have applicant call the number for screening, and if the applicant passed his drug test and background check, Indergit, as SM, could hire him); *id.*, Ex. 19, at 57:18-58:6; 49:5-8 (describing the hiring process as follows: "Application, interview, phone test, drug test, CBT" and noting that SMs do not need DM approval to hire but do need to receive approval before hiring through the screening process); *id.*, Ex. 20, at 120:2-25 (stated that he did not have the final determination as to hiring, but described the process in a consistent manner, noting that he would make the initial determination to decide whether to send an applicant through the screening process, and, after being told if a given applicant was competitive or hirable, was free to hire the applicant); *id.*, Ex. 21, at 58:13-21; 61:12-21 (first stated that he, as SM, performed the background check on applicants, but later mentioned the phone survey, stating with respect to applicants "They have to pass the test"); *id.*, Ex. 22, at 38:3-4; 39:3-8 (would perform the initial screening of applicants, and stated: "[w]ell, if they go through the process of calling a number, going through the drug test and background check and I don't know what's the other one, but once they go through the process and everything comes back recommended, corporate does not get involved."); *id.*, Ex. 23, at 60:4-63:14 (described the hiring process as involving a quick screen, interview, drug test, background check, at which point the SM would find out if an applicant was hirable and could then move forward from there in hiring the individual); *id.*, Ex. 24, at 98:20-99:3 ("Q: What about hiring? You made the decisions with respect to hiring, correct? A: Yes. Based upon company policies and procedures in terms of hiring. Q: And based upon your perceptions of the interviewee and whether or not you thought they should get the job, right? A: Yes. That's correct."); *id.*, Ex. 25, at 79:15-24 (had to ask his DM for permission to hire an additional, seasonal part-time worker, but did not give contradictory testimony with respect to general new hires, rather than those of a seasonal variety); *id.*, Ex. 26,

An examination of the SMs' testimony regarding their experiences terminating and disciplining employees reveals a similar consistency: SMs testified that they have the power to recommend terminations and discipline employees without DM approval, but cannot officially terminate someone from employment until HR or their DM agrees to that particular course of action. Although one NY SM stated that he never had occasion to discipline *or* terminate someone during his employment at RA (*see* Dkt. No. 212, Ex. 27, at 61:1-62:6), the other members of the putative class had similar testimony involving both discipline and termination.[19] Moreover, the NY SMs' approaches to scheduling are similar: they involve a hybrid of utilizing the StaffWorks program, but also making necessary adjustments as needed during the week as

---

at 134:20; 172:13-25 (initially stated "I don't hire," but later admitted he would interview new hires as SM and that he recommended some interviewees be selected for hiring); *id.*, Ex. 28, at 85:16-86:19 ("I would interview. Explain what their responsibilities would be as an employee if they were hired. Submit a drug test form. Submit a background check to human resources. Human resources would then review all of the documentation. And then they would notify you if this person was eligible to hire.").)

[19] (*See id.*, Ex. 18, at 130:23-132:9 (must get approval from HR before terminating an employee); *id.*, Ex. 20, at 143:23-25; 161:14-166:9 (terminated 8-10 employees during the probationary 90-day period, HR and Loss Prevention were involved, recommendations were always followed by corporate); *id.*, Ex. 21, at 62:7-15 (must consult with DM or HR before terminating an employee, but has the power to do so); *id.*, Ex. 24, at 64:21-23 (suspended an employee in connection with a theft issue, but of terminating stated: "Decisions to terminate like that would have to be approved by, of course, my district manager."); *id.*, Ex. 28, at 47:9-48:1 (SM's role was to document violations and recommend course of action to DM); *see also id.*, Ex. 18, at 103:18-22; 125:23-126:20; 134:2-135:25 (as SM, has authority to discipline employees and has disciplined and terminated employees); *id.*, Ex. 20, at 96:2-4 ("I did discipline people for not performing to the level that they were supposed to."); 96:15-24 (progressive discipline system whereby SM would write-up or warn associates was in place his entire tenure as SM); 98:3-4 ("I could discipline an employee for not completing a task, yes."); 143:10-15 (could issue both verbal and written discipline); *id.*, Ex. 24, at 64:4-23 (suspended employee in connection with a theft); 143:10-15 (had the power to discipline cashiers if there were discrepancies in the cash in the drawers); *id.*, Ex. 28, at 189:4-10 (disciplined shift supervisor for arriving at work late).)

schedules and availability change.[20]   And while one SM stated that by the conclusion of his time

as an SM he had "totally given up" on the StaffWorks system, even he admitted that his

experience was "unique," responding to a deposition question meant to highlight the differences

among SMs as follows:

> Q. So it's fair to say that different store managers would choose to
> use Staff Works in different ways, correct?
> A. Is it fair to say that?  I would have to say that my situation was
> unique and I couldn't answer that question.  You have to speak to
> those store managers.  The theory behind the program is sound.  It
> just did not work in the stores that I had any charge of.

(*Id.*, Ex. 24, at 129:6-15.)

Finally, merchandising and relationships with vendors reflect similar consistency.  With

respect to merchandising, like the aforementioned opt-ins, the NY SMs would look at the

circular and would, at times, recommend products that they believed would fit the needs of their

---

[20] (*See, id.*, Ex. 18, at 186:8-12 ("We do -- what happened is when you make a schedule, I go in
the computer and I do it.  That's the way I write it and put them in the computer.  Apart from
that, it's a lot of adjustments you got to make during the week, people can't come in, people are
sick, so jot it down on a piece of paper.  Then I go then I make the changes."); *id.*, Ex. 19, at
39:4-11 ("Q: What does that program do?  A: It creates a schedule.  Q: After you get the
schedule that the program creates do you alter that?  A: Yes, I edit, create it and post it."); *id.*,
Ex. 20, at 281:18-23 ("I would make a rough copy by hand and then implement it into the Staff
Works system, most of the time, yes.  There were times I went directly into the Staff Works
system because I had a general idea of where my people were going to be."); *id.*, Ex. 22, at 48:4-
8 ("[W]e are given hours and then dollar amount and we put it into that software and it creates a
schedule for the store and we edit it to fit the needs of the store and then we post it."); *id.*, Ex. 26,
at 220:5-221:5 ("However, on the schedule, we could generate a schedule on the computer that
says – that schedule the people when they need and when the computer thinks it needs.
However, that is kind of hard to achieve, because the associates, they have different availabilities
and seniority and things like that we cannot touch.  And as far as completing operatives on the
times that are – that are – sometimes the computer can generate a schedule and it's just meeting –
it makes a schedule based on the amount of people that came to the store so they put more people
when it's busy.  But those people, they going to be on the registers rinning [sic] customers.  How
are we going to get the planograms done, or get the damages done, pack out things that need to
be packed out.  So it's kind of complicated.").)

particular stores.  (*See id.*, Ex. 18, at 245:16-246:9 (with supervision, could recommend particular products); *id.*, Ex. 19, at 39:12-25 (orders merchandise for store once a week, checks the computer for what sells and then completes order); *id.*, Ex. 20, at 275:15-24; 316:23-317:12 ("built up" sales by, *inter alia*, "doing good ad ordering and recognizing what merchandise we were going to sell," and sometimes made suggestions of products to sell based on the neighborhood); *id.*, Ex. 21, at 75:25-76:9 (sometimes will determine which items to place on sale form the circular); *id.*, Ex. 24, at 79:2-13 (was "aggressively involved" in the store's merchandising).)  Similarly, with respect to vendors, it appears that the NY SMs have contact with vendors when they drop off products, and are responsible for scanning in vendors during delivery, to ensure the product amount matched the order.  (*See id.*, Ex. 18, at 245:3-9 (sometimes the salesmen would come into the store and he would deal directly with them as vendors); *id.*, Ex. 22, at 87:2-6 (asked vendor to bring extra product and did not check with DM before doing so); *id.*, Ex. 24, at 242:5-22 (SM responsible for checking in vendors at the store); *id.*, Ex. 27, at 149:6-151:16 (SM responsible for checking in vendors, making sure the store received enough product); *id.*, Ex. 28, at 46:14-18 (trained on scanning in vendors when learning to be a SM).)

### ii.      Labor Budgets, Training, and Non-Exempt SMs

RA also contends that the use of labor budgets reveal the inappropriateness of class treatment for this particular group of plaintiffs; RA points out that much in the way of other retailers, RA's stores have annual labor budgets and "track performance against budget."  (Def.'s Opp. at 29.)  A given store's labor budget understandably varies based on myriad factors, including the wage rate for the hourly employees, the total number of employees, those employees' work ethics, employee turnover, and hours of operation.  (*Id.*)  Due to these, and

other, differences, RA's NY stores possess a range of labor budgets, which range from $988 to $18,954 per week, with even individual stores' budgets fluctuating at times.  (*Id.*)  RA alleges that the differences among the stores' labor budgets, and the ways in which different SMs allocate their hours, including, at times, scheduling overtime despite corporate's discouragement of such overtime allocation, reveals (1) the differences among stores and SMs and (2) the disparate time spent on managerial versus non-managerial tasks by SMs with stores possessing different labor budgets.  However, the fact that some SMs felt their labor budgets adequately covered the needs of their stores, and others did not, does not defeat the common questions crucial to the misclassification inquiry:  Are SMs "in charge" of their stores, even when performing a mix of cashiering, truck-packing, stocking, or cleaning?  Do SMs have the authority to hire, discipline, and terminate employees, or make meaningful recommendations to that effect?  Is SMs' most important duty managing their store?  Do SMs interact with vendors?  Do SMs direct the schedule, making adjustments as necessary?  Do SMs play a role in merchandise ordering for their stores?  Do SMs regularly supervise or direct the work of subordinate employees?  These questions are answerable by generalized proof, as demonstrated above.  Accordingly, the labor budgets of each store, while understandably capable of great variance depending on the needs or location of a particular store, do not vitiate the overall consistency of the record.  RA adds that Plaintiff's claim that "fewer labor hours were allocated to stores causing SMs to spend more time performing non-managerial tasks" (Pl.'s Mem. at 30) is belied by the record; the discrepancy between Plaintiff's claim and the record evidence, however, does not necessarily mean that such record evidence is incapable of classwide proof.[21]

---

[21] (*See, e.g.*, Dkt. No. 212, Ex. 18, at 151:20-22 ("Well, I follow it [RA's alleged policy of limiting overtime] but I break it too.  I break it because of – with the workload."); *id.*, Ex. 19, at

RA also argues that there can be no company policy of misclassification as (1) SMs receive starkly disparate training and (2) business decisions to reclassify some SMs as exempt and others as non-exempt employees reveal the ill-suited nature of Plaintiff's claims for class certification and treatment.  First, whether SMs' training is uniform or not, the record evidence reveals that in areas relevant to the misclassification inquiry their approaches to the job are remarkably consistent.  That some SMs did not attend the corporate Management Development Program and others did so is relevant only insofar as MDP attendance would result in the proper exemption of some members of the putative class and not others.  What is more, even the 30(b)(6) witnesses cited by RA, while insisting that different stores have varying management needs, agree that "there is that basic suite of information that a trainer starts with, and then they have to vary the training."  (Def.'s Opp. at 31.)  Moreover, as for the business decision to reclassify some SMs as exempt in 2009, this decision on the part of corporate management does not automatically convert the putative class's claims into those only resolvable at the individual level.  RA may indeed have looked into the SM position in detail, as it claims, when effectuating its restructuring.  (*Id.* at 33-34.)  This restructuring, however, cannot erase the fact that all members of the putative NY class are universally treated as exempt.  And while the 2009 restructuring reveals that RA does not treat *all* of its SMs as exempt, it does indeed treat *these* SMs as exempt, without inquiry into each store, its labor budget, or possible variance.  Of

---

42:13-43:3 (permitted to schedule employees for overtime if he asks and gives a reason); *id.*, Ex. 20, at 56:5-7 ("I had to – yes, I had to look at the labor hours that were given to me to judge what I could use."); *id.*, Ex. 21, at 42:15-43:25, 47:20-23 (employees in his store would sometimes receive overtime and would sometimes exceed his labor budget but would ask his DM for permission); *id.*, Ex. 22, at 63:4-5 (doesn't assign overtime regularly because he doesn't see a need for it); *id.*, Ex. 23, at 45:20-25 (permitted to give overtime if necessary); *id.*, Ex. 24, at 199:2-6, 228:25-229:5 (gave overtime to employees in his store from time to time).)

47

course, RA is correct that such uniformity is not *determinative*; but it is most certainly relevant to the Court's inquiry. *Jacob II*, 289 F.R.D. at 415; *see also Cuevas*, 2013 WL 2321426, at *2.

Accordingly, the Court finds that predominance is satisfied here.

### b.     Superiority

Rule 23(b)(3) also requires that the class action be the superior method for resolving the dispute at issue, before certification is appropriate.  "In determining whether 'a class action is superior to other available methods for fairly and efficiently adjudicating the controversy,' the Court must consider" the following factors:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Glatt v. Fox Searchlight Pictures Inc.*, No. 11 Civ. 6784 (WHP), 2013 WL 2495140, at *17-18 (S.D.N.Y. June 11, 2013) (quoting Fed. R. Civ. Pr. 23(b)(3)).  "Here, the relatively small recoveries available to individual plaintiffs make a class action a more efficient mechanism."  *Id.* at *18.  Moreover, Defendants point to no current litigations raising the same issues or group. The Court is an appropriate and desirable forum, because the putative class worked in New York.  And given the approximate number of plaintiffs, there is no reason to expect manageability difficulties.

For the foregoing reasons, the Court certifies Indergit's proposed class under Rule 23(b)(3) with Indergit as class representative.  Additionally, the Court designates Plaintiff's

counsel, Valli Kane & Vagnini and DiNovo Price Ellwanger & Hardy as class counsel, pursuant

to Rule 23(g).[22]

### 5.    Damages

As discussed, Plaintiff has the burden of proving Rule 23's requirements by a

preponderance of the evidence standard.  Although the Court has determined he has done so with

respect to liability, there has been no showing as to damages.  As this Court has previously

explained, *Jacob v. Duane Reade ("Jacob III")*, No. 11 Civ. 160 (JPO), 2013 WL 4028147

(S.D.N.Y. Aug. 8, 2013), the Supreme Court's decision in *Comcast v. Behrend*, 133 S. Ct. 1426

(2013), requires not only that damages match the putative class's theory of liability, which they

do here—if misclassified, SMs will receive overtime pursuant to statutory regulation for all

hours worked over forty per week—but also that those damages be capable of classwide proof.

Here, there is no showing from Plaintiffs that the relevant records for SMs even exist, let alone a

sufficient explanation of an approach for calculating damages.  This failure, however, is not fatal

---

[22] Rule 23(g) mandates that a court certifying a class appoint class counsel, specifying that a
court must consider the following:

> (i) the work counsel has done in identifying or investigating
> potential claims in the action; (ii) counsel's experience in handling
> class actions, other complex litigation, and the types of claims
> asserted in the action; (iii) counsel's knowledge of the applicable
> law; and (iv) the resources that counsel will commit to representing
> the class[.]

Fed. R. Civ. Pr. 23(g)(1)(A)(i)-(iv).  Additionally, a court *may* "consider any other matter
pertinent to counsel's ability to fairly and adequately represent the interests of the class."  *Id.* at
23(1)(B).  After considering the aforementioned factors, Court is satisfied that Plaintiff's counsel
meets the Rule's requirements.

to the class, as bifurcation of the two issues is appropriate in these instances.  *See Jacob III*, 2013 WL 4028147, at *11-12.

Accordingly, the class is certified as to liability, but not as to damages.  Plaintiffs can, of course, move to certify their class as to damages later in the litigation, if they prove successful on the merits.

## IV.   Conclusion

The Court takes this opportunity to note the complexity of these types of cases.  At the highest level of generality, many claims offer common questions for resolution.  In contrast, reduced to the specificity of the absurd, no two groups are similar.  This case lies in the shadowland between these two distinct realms.  There are examples of discrepancies among the members of both the FLSA classes and the Rule 23 class.  RA has pointed to testimony of SMs reflecting some fluctuations in their jobs—fluctuations that are largely dependent on factors that differ among stores, such as labor allocation, size, location, and experience of staff.  And yet, a close, rigorous look at the record testimony reflects that in most areas crucial to the exemption inquiry—hiring, firing, discipline, supervision, discretion, scheduling, vendor-contact, merchandising, and primary role—there are meaningful common questions and answers that predominate over the variation.  A case in the hinterland between the common and the distinct such as this necessitates a judgment call based on the most complete view of the record possible.

For the foregoing reasons, Defendants' motion to decertify the FLSA class is DENIED and Plaintiff's motion to certify the class of New York store managers, pursuant to Rule 23(b)(3) is GRANTED in part and DENIED in part.  Plaintiff's proposed class is hereby certified for purposes of liability only.  Plaintiff's counsel, Valli Kane & Vagnini and DiNovo Price Ellwanger & Hardy, are appointed class counsel.

50

The Clerk of Court is directed to close the motions at docket entry numbers 218 and 220.

SO ORDERED.

Dated: New York, New York
      September 26, 2013

_____
J. PAUL OETKEN
United States District Judge

51